ORAL ARGUMENT NOT YET SCHEDULED
No. 21-5200

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

NANCY GIMENA HUISHA-HUISHA, *et al.*, on behalf of themselves and others similarly situated,

*Plaintiffs-Appellees*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity, *et al.*,

*Defendants-Appellants*.

_____

On Appeal from the United States District Court
for the District of Columbia
No. 1:21-cv-00100-EGS
_____

**BRIEF OF *AMICUS CURIAE* THE INTERNATIONAL REFUGEE ASSISTANCE PROJECT, INC. IN SUPPORT OF PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND FOR AN ADMINISTRATIVE STAY PENDING DISPOSITION OF THE STAY MOTION**

Kathryn Austin
Geroline A. Castillo
Mariko Hirose
Deepa Alagesan
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 4th Floor
New York, N.Y. 10004

kaustin@refugeerights.org
gcastillo@refugeerights.org
mhirose@refugeerights.org
dalagesan@refugeerights.org
Tel: (516) 296-0688

*Counsel for Amicus Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A.   Parties and *Amici*

Except for any other *amici* who had not yet entered an appearance in this case as of the filing of the Defendants-Appellants' stay motion and Raul L. Ortiz, in his official capacity as Chief of U.S. Border Patrol (automatically substituted for Rodney S. Scott under Federal Rule of Appellate Procedure 43(c)(1)), all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in Defendants-Appellants' stay motion.

### B.   Rulings Under Review

Reference to the ruling at issue appears in Defendants-Appellants' stay motion.

### C.   Related Cases

*Amicus* is aware of no related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C). The case on review has never previously been before this Court or any other court, nor has any other case involving both substantially the same parties and the same or similar issues.

Dated: September 23, 2021                              */s/ Kathryn Austin*
                                                                            Kathryn Austin
                                                                            *Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rules 8(a)(4), 26.1, 27(a)(4), and 29(b) and Federal Rules of Appellate Procedure 29(a)(4)(A) and 26.1, *amicus curiae* submits the following corporate disclosure statement:

The International Refugee Assistance Project, Inc. is a private, non-profit organization dedicated to advancing and defending the rights of refugees and other displaced people through systemic litigation, direct representation, and policy and media advocacy. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## D.C. CIRCUIT RULE 29(d) STATEMENT

*Amicus curiae* the International Refugee Assistance Project, Inc. is filing a separate brief because, as an organization dedicated to advancing and defending the rights of refugees, asylum seekers, and other displaced people, and that has represented asylum seekers who have been affected by Defendants-Appellants' expulsion policy, it has a distinct perspective from other *amici*. *Amicus* seeks to provide this Court with information about the well-established rights of asylum seekers like our clients under U.S. immigration laws and to show how the expulsion policy contravenes the text and purpose of these laws.

Dated: September 23, 2021

*/s/ Kathryn Austin*

Kathryn Austin
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

D.C. CIRCUIT RULE 29(d) STATEMENT ........................................................ iii

INTEREST OF AMICUS CURIAE .........................................................................1

INTRODUCTION .....................................................................................................1

ARGUMENT .............................................................................................................2

    I.    THE EXECUTIVE MUST FOLLOW SPECIFIC PROCEDURES TO IDENTIFY AND EVALUATE HUMANITARIAN PROTECTION CLAIMS .........................................................................................................3

    II.   THE EXECUTIVE MAY NOT BLOCK ACCESS TO THE HUMANITARIAN PROTECTION SYSTEM ON HEALTH-RELATED GROUNDS ......................................................................................................7

CONCLUSION ........................................................................................................11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Grace v. Barr*,
  965 F. 3d 883 (D.C. Cir. 2020)...……………………………………….......5

**Statutes**

8 U.S.C. § 1101 ...........................................................................................................4

8 U.S.C. § 1158 .............................................................................................. 3, 4, 8, 9

8 U.S.C. § 1159 ...........................................................................................................4

8 U.S.C. § 1182 ....................................................................................................9, 10

8 U.S.C. § 1222 .........................................................................................................10

8 U.S.C. § 1225 .................................................................................................. 4, 5, 6

8 U.S.C. § 1229a ....................................................................................................3, 4

8 U.S.C. § 1231 .............................................................................................. 2, 3, 7, 8

8 U.S.C. § 1252 ......................................................................................................4, 6

8 U.S.C. § 1427 ...........................................................................................................4

Foreign Affairs Reform and Restructuring Act of 1998,
  Pub. L. No. 105-277, § 2242, 112 Stat. 2681 .......................................................7

**Regulations**

8 C.F.R. § 108.1 ..........................................................................................................5

8 C.F.R. § 208.16 ........................................................................................................3

8 C.F.R. § 208.17 .....................................................................................................3, 7

8 C.F.R. § 208.30 ........................................................................................................5

8 C.F.R. § 1208.16 ......................................................................................................4

8 C.F.R. § 1208.17 ......................................................................................................4

42 C.F.R. § 34.3 ..........................................................................................................10

42 C.F.R. § 34.5 ..........................................................................................................10

**Rules**

Federal Rule of Appellate Procedure 29 ..................................................................1

**Agency Materials**

Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists (Aug. 2, 2021) (Aug. 2, 2021) ......7

USCIS Policy Manual Vol. 7, Part M, Ch. 3 (2021), *available at* https://www.uscis.gov/policy-manual/volume-7-part-m-chapter-3 .......................9

USCIS Policy Manual Vol. 8, Part B, Ch. 3 (2021), *available at* https://www.uscis.gov/policy-manual/volume-8-part-b-chapter-3 ........................9

U.S. Dep't of Justice, Executive Office for Immigration Review, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak, PM 20-10, at 1 n.1 (Mar. 18, 2020), *available at* https://web.archive.org/web/20200320020033/https://www.justice.gov/eoir/file/1259226/download ...................................................................................................9

**Legislative History**

114 Cong. Rec. 27,758 (1968) ....................................................................................8

126 Cong. Rec. 4507 (1980) .......................................................................................6

142 Cong. Rec. 11,491 (1996) ....................................................................................5

H.R. Rep. No. 96-608 (1979) ......................................................................................6

H.R. Rep. No. 104-469 (1996).....................................................................................5

S. Rep. No. 96-256 (1979) ...........................................................................................6

*Admission of Refugees into the United States, Hearings before the Subcomm. on Immigration, Citizenship, and Int'l Law, H. Comm. on the Judiciary*, 95th Cong.

126 (1977)............................................................................................................6

## Other Authorities

The Refugee Convention, 1951: The Travaux Preparatoires Analysed with a Commentary by Dr Paul Weis 235, *available at* https://www.unhcr.org/en-us/protection/travaux/4ca34be29/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul.html..................................................8

## Glossary

| | |
|---|---|
| **CAT** | United Nations Convention Against Torture |
| **FARRA** | Foreign Affairs Reform and Restructuring Act of 1998 |
| **IRAP** | International Refugee Assistance Project, Inc. |

## INTEREST OF AMICUS CURIAE

*Amicus curiae* the International Refugee Assistance Project, Inc. ("IRAP") is a nonprofit organization dedicated to advancing and defending the rights of refugees and other displaced people through systemic litigation, direct representation, and policy and media advocacy. As counsel to hundreds of refugees and asylum seekers before administrative agencies and in the federal courts since its founding in 2008, IRAP has direct insight into the worldwide refugee crisis and a strong interest in ensuring that the Refugee Act and related laws are enforced in a manner that is consistent with Congress's humanitarian objectives. Through a dedicated project undertaken in collaboration with an organization working at the U.S.-Mexico border, IRAP has knowledge of the dangerous conditions Defendants' expulsion policy is creating, and the suffering it is causing.

No counsel for a party authored this brief in whole or in part; no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amicus curiae*, its members, or its counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E). IRAP has sought leave from the Court to participate as *amicus*.

## INTRODUCTION

Since March 2020, officers of U.S. Customs and Border Protection have been expelling people from the United States on asserted public health grounds without

regard for the system Congress created to ensure protection for those fleeing persecution and torture. Congress's system requires the executive branch to follow specific procedures to identify and evaluate humanitarian protection claims whenever it seeks to expel, turn away, or otherwise remove someone from the United States. And it bars the executive branch from discounting the rights of people at or within our borders who seek humanitarian protection (or "asylum seekers") when providing for the public health.

Defendants purport to have authority under the Public Health Service Act to expel asylum seekers like Plaintiffs and class members without these safeguards. Defendants are unlikely to succeed in their appeal of the preliminary injunction because, among other things, the U.S. humanitarian protection system that Defendants ignore is comprehensive, and its procedures are mandatory. IRAP agrees with Plaintiffs that the Court should deny Defendants' motion to stay the preliminary injunction pending appeal and submits this brief to further detail how the expulsion policy is contrary to the laws Congress enacted to protect asylum seekers. IRAP urges the Court to deny Defendants' motion to stay.

**ARGUMENT**

Under U.S. law, the federal government is prohibited from returning people to places where they will be persecuted or tortured and is required to give people who reach our borders an opportunity to seek asylum. *See* 8 U.S.C. § 1231(b)(3); 8

C.F.R. §§ 208.16, 208.17; 8 U.S.C. § 1158(a)(1). To ensure that the Executive does not run afoul of these mandates, Congress requires it to follow specific procedures to identify and adjudicate humanitarian protection claims whenever it seeks to remove a person from the United States. This system is comprehensive, and there is no legal basis for the Executive to circumvent it on public health grounds.

## I. THE EXECUTIVE MUST FOLLOW SPECIFIC PROCEDURES TO IDENTIFY AND EVALUATE HUMANITARIAN PROTECTION CLAIMS

Congress requires the Executive to follow specific procedures to protect the rights of asylum seekers at or within U.S. borders. *Contra* Defs.' Emerg. Mot. for Stay Pending Appeal at 21 (suggesting that it is within the Executive's discretion whether to follow the congressional mandates).

Ordinarily, when the government seeks to remove a person from the United States, it must provide a removal hearing with various procedural safeguards—including access to counsel and opportunities to present evidence and cross-examine government witnesses—to afford that person, among other things, a fair opportunity to present claims for humanitarian protection. *See* 8 U.S.C. § 1229a. To demonstrate that the government must protect them from persecution, a person may apply for withholding of removal under 8 U.S.C. § 1231(b)(3), which, with limited exceptions, bars the government from removing someone to a place where their "life or freedom would be threatened . . . because of [their] race, religion, nationality,

3

membership in a particular social group, or political opinion." To demonstrate that the government must protect them from torture, the person may apply for deferral or withholding of removal under the law implementing the United Nations Convention Against Torture ("CAT"), which bars the government from removing anyone to any place where it is "more likely than not" that they would be tortured. 8 C.F.R. §§ 1208.16(c), 1208.17(a). In removal proceedings, a person may also apply for asylum status, which confers additional rights beyond protection from removal. A person is generally eligible for asylum if they are a "refugee"—that is, they cannot return to their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1101(a)(42). Asylum status, unlike withholding or deferral of removal, provides a pathway to lawful permanent resident status, *see* 8 U.S.C. § 1159(b), and, ultimately, U.S. citizenship, *see* 8 U.S.C. § 1427(a). A person who does not prevail in the administrative removal hearing has the right to an appeal, *see* 8 U.S.C. § 1229a(c)(5), and ultimately has access to federal judicial review, *see* 8 U.S.C. § 1252(b).

Congress has also created an expedited removal process to permit quick removals of certain classes of recent arrivals. *See* 8 U.S.C. § 1225(b)(1)(A). Yet even as to those people who are subject to expedited removal, Congress took care to

4

ensure that any person who might be eligible for asylum or entitled to withholding or deferral of removal would not be removed unlawfully: In the expedited removal system, a person who expresses a fear of persecution or torture is referred for a "credible fear" screening, *see* 8 U.S.C. § 1225(b)(1)(A), (b)(1)(B)(ii), where they are given an opportunity to consult with a person of their choosing, *see* 8 U.S.C. § 1225(b)(1)(B)(iv); to be interviewed by an asylum officer with specialized training and under proper supervision, *see* 8 U.S.C. § 1225(b)(1)(B), (E); 8 C.F.R. § 208.30(d); and, so long as their fear is deemed credible, to be placed in full removal proceedings, *see* 8 C.F.R. § 208.30(f). This law creates "a low screening standard," 142 Cong. Rec. 11,491 (1996) (statement of Sen. Hatch), so that anyone who might possibly have a claim for humanitarian protection can present it in "the usual full asylum process" with proper procedural protections, *see id.*; *see also* H.R. Rep. No. 104-469, at 158 (1996); *Grace v. Barr*, 965 F. 3d 883, 902 (D.C. Cir. 2020) (Congress's purpose to ensure that "individuals with valid asylum claims are not returned to countries where they could face persecution" is evident in the asylum system's design and legislative history).

Congress requires these specific procedures to prevent the Executive from undercutting asylum seekers' rights. Under the previous system, adjudication of claims for asylum domestically was left to the discretion of the Executive and did not require any particular procedure. *See, e.g.*, 8 C.F.R. § 108.1 (1979). Congress

5

considered this system to be unfair and inadequate, and too susceptible to the whims of political climate and world events. *See, e.g.*, H.R. Rep. No. 96-608, at 1, 17-18 (1979) (seeking "to eliminate current discrimination on the basis of outmoded geographical and ideological considerations"); *Admission of Refugees into the United States, Hearings before the Subcomm. on Immigration, Citizenship, and Int'l Law, H. Comm. on the Judiciary*, 95th Cong. 126 (1977) (statement of Rep. Holtzman) (lamenting the absence of "specific procedures that would assure that due process is granted").

Congress enacted the 1980 Refugee Act as a "comprehensive" law to remedy this problem. *See, e.g.*, H.R. Rep. No. 96-608, at 1 (1979); S. Rep. No. 96-256, at 1 (1979). It created a new, "specific statutory basis for United States asylum policy," and directed the Attorney General to establish uniform procedures that would bind the Executive. H.R. Rep. No. 96-608, at 17-18 (1979); *see also* 126 Cong. Rec. 4507 (1980) (statement of Rep. Holtzman) (bill "mandates a procedure for the consideration of asylum claims"). When Congress created the expedited removal process in 1996, it again set limits on the Executive by, among other things, taking care to specify the training, supervision, and review to which the immigration officers conducting screenings would be required to be subjected. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III), (b)(1)(E); 8 U.S.C. § 1252(e)(3). And Congress similarly cabined the Executive's discretion in implementing the Convention Against Torture,

6

making clear that its prohibitions applied notwithstanding any other government policy. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681, 2681-822.

## II. THE EXECUTIVE MAY NOT BLOCK ACCESS TO THE HUMANITARIAN PROTECTION SYSTEM ON HEALTH-RELATED GROUNDS

Defendants suggest that guarding the public health requires them to deny the rights of asylum seekers. *See, e.g.*, Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists (Aug. 2, 2021), Add.92-94. But Congress was clear that potential health concerns are not grounds for preventing asylum seekers from accessing humanitarian protection.

First, Congress drafted the humanitarian protection laws such that a person's health would be irrelevant to whether they could be granted asylum status, withholding of removal, or CAT protection. Under CAT, the government is prohibited from returning a person to their torturers without exception. *See* FARRA, Pub. L. No. 105-277, § 2242(a)-(c), 112 Stat. 2681, 2681-822; 8 C.F.R. § 208.17(a). With respect to withholding of removal under 8 U.S.C. § 1231(b)(3), a person facing persecution is ineligible for protection only if they have persecuted others; participated in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing; have committed or been convicted of certain crimes; or pose a serious threat to the security of the United States. *See* 8 U.S.C. § 1231(b)(3)(B).

7

This is consistent with the goals of the framers of the Refugee Convention and Protocol, from which the withholding provision originated, who rejected the possibility of limiting protection on health-related grounds. *See* The Refugee Convention, 1951: The Travaux Preparatoires Analysed with a Commentary by Dr Paul Weis 222, 225, *available at* https://www.unhcr.org/en-us/protection/travaux/4ca34be29/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul.html ("[R]efugees should not be expelled . . . because they had been sick or indigent"; treaty "would not . . . permit the deportation of [refugees] on 'social grounds,' such as . . . illness"); 114 Cong. Rec. 27,758-59 (1968) (statement of Sec. of State Rusk) (Since "refugees by definition are without a homeland, deportation of a refugee is a particularly serious measure, and it would not be humanitarian to deport a refugee for reasons of health . . . ."). A person is barred from asylum only for the narrow set of reasons set out in 8 U.S.C. § 1158(a)(2), (b)(2), which overlap in part with the exceptions for withholding of removal under 8 U.S.C. § 1231(b)(3) and similarly have nothing to do with health.

Second, even though Congress created a mechanism in the immigration laws for the government to remove a person from the country on health-related grounds, it specifically declined to make such health-related grounds barriers to applying for and being granted humanitarian protection from removal. Ordinarily, a person who seeks to enter the country or to be granted certain immigration statuses must be

8

"admissible"—*i.e.*, they must not fall within any of the grounds of exclusion specified in 8 U.S.C. § 1182(a), such as lacking valid entry documents, 8 U.S.C. § 1182(a)(7)(A)(i), having crossed the border without inspection, 8 U.S.C. § 1182(a)(6)(A)(i), or having been convicted of certain crimes, 8 U.S.C. § 1182(a)(2)(A), (B).  A person may also be inadmissible on "health-related grounds," including being "determined . . . to have a communicable disease of public health significance," 8 U.S.C. § 1182(a)(1)(A)(i); according to the government, COVID-19 is one such disease.[1]  Yet Congress was clear that a person may apply for and be granted humanitarian relief regardless of whether there might be grounds, including a health-related inadmissibility ground, to remove them:  A person may apply for and be granted asylum "irrespective" of whether they are admissible.  8 U.S.C. § 1158(a)(1).  As the government itself has acknowledged:  an individual seeking asylum is simply "not subject to inadmissibility grounds at the time of [an] asylum grant."  USCIS Policy Manual Vol. 7, Part M, Ch. 3 (2021), *available at* https://www.uscis.gov/policy-manual/volume-7-part-m-chapter-3; *see also* USCIS Policy Manual Vol. 8, Part B, Ch. 3 (2021), *available at* https://www.uscis.gov/policy-manual/volume-8-part-b-chapter-3  (no specific

---

[1] U.S. Dep't of Justice, Executive Office for Immigration Review, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak, PM 20-10, at 1 n.1 (Mar. 18, 2020), *available at* https://web.archive.org/web/20200320020033/https://www.justice.gov/eoir/file/1259226/download.

9

medical examination or vaccination required for granting asylum). Withholding and deferral of "removal," for their part, by definition are available when a person could otherwise be removed.

Third, though it rejected the notion that asylum seekers might be barred from humanitarian protection on health-related grounds, Congress accounted for the public health by permitting the Executive to screen asylum seekers on arrival. Asylum seekers, like other noncitizens, may be screened for inadmissibility grounds, including "communicable disease[s] of public health significance," according to procedures specified by Congress and the Department of Health and Human Services. *See* 8 U.S.C. § 1182(a)(1)(A)(i). These procedures permit the government to conduct medical exams and to detain for medical screening certain individuals arriving at ports of entry or from places "where any [relevant] diseases are prevalent or epidemic." *See, e.g.*, 8 U.S.C. § 1222; 42 C.F.R. § 34.3. And they specify that when a medical examiner cannot make a diagnosis, the government must postpone the medical examination until a diagnosis can be made and, in the meantime, refer the noncitizen for any necessary medical care. *See* 42 C.F.R. § 34.5. The medical screening and its result may lead the government to charge an asylum seeker with a health-related inadmissibility ground in removal proceedings and, ultimately, to remove them—but only if they are not granted asylum or withholding or deferral of removal. Whatever the result of the screening, what the government may not do is

10

bypass credible fear interviews or removal proceedings, deprive asylum seekers of the opportunity to apply for humanitarian protection from removal, or prevent asylum seekers from being granted such protection on health grounds.

In adopting the challenged policy, the Executive has upended Congress's carefully delineated system. Congress accounted for the public health and at the same time took care to ensure that health considerations would not prevent a person from applying for or being granted protection.

## CONCLUSION

For all these reasons, IRAP urges the Court to deny Defendants' motion to stay the preliminary injunction pending appeal.

| | |
|---|---|
| Dated: September 23, 2021<br>New York, N.Y. | Respectfully submitted,<br><br>*/s/ Kathryn Austin*<br>Kathryn Austin<br>Geroline A. Castillo<br>Mariko Hirose<br>Deepa Alagesan<br>INTERNATIONAL REFUGEE<br>ASSISTANCE PROJECT<br>One Battery Park Plaza, 4th Floor<br>New York, N.Y. 10004<br>Tel: (516) 296-0688<br>kaustin@refugeerights.org<br>gcastillo@refugeerights.org<br>mhirose@refugeerights.org<br>dalagesan@refugeerights.org<br><br>*Counsel for Amicus Curiae* |

11

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. 32(f), it contains 2,437 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font.

Dated:  September 23, 2021

*/s/ Kathryn Austin*

Kathryn Austin
*Counsel for Amicus Curiae*