ORAL ARGUMENT NOT YET SCHEDULED

No. 21-5200

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated,

*Plaintiffs-Appellees*,

*v.*

ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia, No. 1:21-cv-00100
Before the Honorable Judge Emmet G. Sullivan

**BRIEF FOR SCHOLARS OF REFUGEE AND IMMIGRATION LAW AS
AMICI CURIAE IN OPPOSITION TO DEFENDANTS-APPELLANTS'
EMERGENCY MOTION TO STAY PENDING APPEAL**

NOAH A. LEVINE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8875

DANIEL S. VOLCHOK
SPENCER L. TODD
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

September 23, 2021

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties And Amici Curiae

Except for the amici joining this brief and any other amici who had not yet entered an appearance in this case as of the filing of the appellants' brief, all parties, intervenors, and amici appearing before the district court and this Court are listed in Defendants-Appellants' brief.

### B.     Rulings Under Review

The ruling at issue is listed in Defendants-Appellants' opening brief.

### C.     Related Cases

Amici agree with the assertion in the government's stay motion that there are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK

## CIRCUIT RULE 29(d) STATEMENT

The amici joining in this brief are filing a separate brief from other amici.

The separate brief is necessary because the amici joining this brief have a unique perspective—that of professors who teach and publish scholarship about United States refugee and immigration law.  In particular, they have a strong interest in the proper interpretation and administration of the nation's immigration laws for refugees.  Amici submitting this brief were permitted by the district court to present their views separately from other amici.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
CASES ...................................................................................................i

CIRCUIT RULE 29(d) STATEMENT....................................................ii

TABLE OF AUTHORITIES ..................................................................iv

GLOSSARY.............................................................................................v

INTEREST OF AMICI CURIAE ............................................................1

BACKGROUND .....................................................................................2

ARGUMENT ..........................................................................................5

THE CDC ORDER VIOLATES STATUTES PROVIDING FOR ASYLUM,
WITHHOLDING OF REMOVAL, AND PROTECTION AGAINST TORTURE.......................5

    A.    United States Statutes Protect From Removal
        Noncitizens Facing Persecution Or Torture In Their
        Home Countries....................................................................5

    B.    Section 265 Does Not Override The Specific Protections
        From Removal That Congress Has Enacted In The
        Intervening Decades ............................................................7

CONCLUSION ......................................................................................12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ................................................8

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .......................11

*INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999) ..........................................................6

*United States v. Fausto*, 484 U.S. 439 (1988) ..........................................................11

## STATUTES, RULES, AND REGULATIONS

8 U.S.C.
    §1101 ..........................................................................................................5
    §1158 .....................................................................................................6, 10
    §1182 ..........................................................................................................9
    §1225 .....................................................................................................4, 10
    §1229a ....................................................................................................6, 9
    §1231 ..........................................................................................................6

42 U.S.C.
    Part G .......................................................................................................11
    §265 ..............................................................................2, 7, 8, 9, 10, 11, 12

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No.
    105-277, 112 Stat. 2681 ...........................................................................7

Illegal Immigration Reform and Immigrant Responsibility Act of
    1996, Pub. L. No. 104-208, 100 Stat. 3009 ..............................................9

Refugee Act of 1980, P.L. No. 96-212, 94 Stat. 102 ..................................................5

8 C.F.R.
    §208.16 .......................................................................................................7
    §208.17 .......................................................................................................7
    §235.3 .......................................................................................................10

42 C.F.R. Part 71 .......................................................................................................11

85 Fed. Reg.

    17,061 (Mar. 26, 2020)....................................................................2, 3

    56,424 (Sept. 11, 2020) .....................................................................2

86 Fed. Reg.

    9,942 (Feb. 17, 2021).........................................................................3

    38,717 (July 22, 2021) .......................................................................3

    42,828 (Aug. 5, 2021)............................................................2, 3, 4, 7, 10

## OTHER AUTHORITIES

Convention Relating to the Status of Refugees Signed at Geneva, July
    28, 1951, 189 U.N.T.S. 150................................................................5

Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T.
    6223 ..................................................................................................5

# GLOSSARY

CAT          United Nations Convention Against Torture and Other Cruel,
             Inhuman or Degrading Treatment or Punishment

CDC          Centers for Disease Control and Prevention

IIRIRA       Illegal Immigration Reform and Immigrant Responsibility Act of
             1996

# INTEREST OF AMICI CURIAE[1]

Amici curiae are scholars with expertise in United States and international law governing refugees and United States immigration law; they have collectively spent decades researching and writing about refugee and immigration law.  Amici are as follows:

- T. Alexander Aleinikoff is University Professor at The New School and Director of the Zolberg Institute on Migration and Mobility; former United Nations Deputy High Commissioner for Refugees (2010-2015); and co-author of a leading textbook, *Immigration and Citizenship: Process and Policy*.

- Deborah Anker is Clinical Professor of Law at Harvard Law School; Founder of the Harvard Immigration and Refugee Clinic; and author of a leading treatise, *Law of Asylum in the United States*.

- James C. Hathaway is the James E. and Sarah A. Degan Professor of Law at Michigan Law, University of Michigan; founding director of Michigan Law's Program in Refugee and Asylum Law; and the author of *The Rights of Refugees under International Law*.

- Gerald L. Neuman is the J. Sinclair Armstrong Professor of International, Foreign, and Comparative Law at Harvard Law School; a Co-Director of the Human Rights Program at Harvard Law School; and the author of *Strangers to the Constitution: Immigrants, Borders and Fundamental Law*.[2]

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amici or their counsel made a monetary contribution to fund the preparation or submission of this brief.  Amici are contemporaneously filing a motion for leave to file this brief.

[2] University affiliations are provided solely for informational purposes.

This brief provides an overview of the protections that Congress has enacted for refugees, often to effectuate principles of international law and United States treaty obligations. As explained below, 42 U.S.C. §265 does not free the executive from the asylum, withholding of removal, or CAT protections mandated by Congress. Because the government is thus unlikely to succeed on the merits of its appeal, its motion to stay pending appeal should be denied.

## BACKGROUND

Last year, the Centers for Disease Control and Prevention ("CDC") issued a final rule authorizing the CDC Director to suspend "the introduction into the United States of persons from designated foreign countries" if necessary to address the danger of introducing "communicable disease into the United States." *Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes*, 85 Fed. Reg. 56,424, 56,425 (Sept. 11, 2020). Prior to that, the CDC Director—purporting to act pursuant to a previous interim version of this rule—issued an order "suspend[ing] the introduction" of persons from Mexico or Canada who otherwise would enter a "congregate setting" in a land port of entry or Border Patrol station. *Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists*, 85 Fed. Reg. 17,061, 17,067 (Mar. 26, 2020). This order did not apply to (1) United States citizens, lawful

permanent residents, and the spouses or children of U.S. citizens or lawful

permanent residents; (2) members of the U.S. military, and their spouses or

children; or (3) persons who arrive at a port of entry who have valid travel

documents or are in the visa waiver program and not otherwise subject to travel

restrictions. *Id.* at 17,061. Those persons who remained covered after these

exceptions were denominated "covered aliens," *id.*, and subject to removal by the

Department of Homeland Security immediately or as rapidly as possible, *id.* at

17,067.

In February 2021, the CDC announced a temporary exception from

expulsion for unaccompanied minors encountered in the United States. *See Notice*

*of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children*

*Pending Forthcoming Public Health Determination*, 86 Fed. Reg. 9,942 (Feb. 17,

2021). The CDC subsequently confirmed this exception. *See Public Health*

*Determination Regarding an Exception for Unaccompanied Noncitizen Children*

*From the Order Suspending the Right To Introduce Certain Persons from*

*Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg.

38,717 (July 22, 2021).

Last month, the CDC issued a new order, which replaced and superseded the

previous orders. *See Public Health Reassessment and Order Suspending the Right*

*to Introduce Certain Persons from Countries Where a Quarantinable*

- 3 -

*Communicable Disease Exists*, 86 Fed. Reg. 42,828 (Aug. 5, 2021) ("Order").

This Order continues to prohibit the introduction of "covered noncitizens," defined

to include single adults and "family units," into the United States along U.S.

borders. *Id*. at 42,837. The Order maintains the exception for unaccompanied

noncitizen children. *Id*. at 42,837-42,838.

Before the CDC Order's issuance, the Immigration and Nationality Act

("INA") already authorized expedited removal of noncitizens who (1) arrive at the

border without valid entry documents or (2) are apprehended after having entered

the country without inspection and cannot prove that they have been physically

present here for two years. *See* 8 U.S.C. §1225(b)(1)(A)(i), (iii). Immigration

officers may proceed to remove such noncitizens immediately unless the

noncitizen indicates an intention to apply for asylum, in which case asylum officers

evaluate whether the noncitizen has a credible fear of persecution. *See id.*

§1225(b)(1)(B). In light of this existing authority, the genuinely new authority

granted by the CDC Order targets a particular group: "covered noncitizens" who

would seek asylum or withholding of removal.

- 4 -

# ARGUMENT

**THE CDC ORDER VIOLATES STATUTES PROVIDING FOR ASYLUM, WITHHOLDING OF REMOVAL, AND PROTECTION AGAINST TORTURE**

### A.     United States Statutes Protect From Removal Noncitizens Facing Persecution Or Torture In Their Home Countries

From 1980 through 2008, Congress enacted a series of protections for noncitizens arriving or already present in the United States who face persecution or torture in their home countries.  These statutes effectuate principles of international law and treaty obligations of the United States, including those enshrined in the 1951 United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150, and its 1967 Protocol, Jan. 31, 1967, 19 U.S.T. 6223, the latter of which the United States ratified in 1968.

A first protection is asylum.  Congress established the asylum process in the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which largely adopted the definition of "refugee" in the 1951 Convention and 1967 Protocol.  As relevant here, United States law defines a "refugee" as

> any person who is outside any country of such person's nationality …
> and who is unable or unwilling to return to, and is unable or unwilling
> to avail himself or herself of the protection of, that country because of
> persecution or a well-founded fear of persecution on account of race,
> religion, nationality, membership in a particular social group, or
> political opinion.

8 U.S.C. §1101(a)(42); *compare* 1951 Convention art. 1(A)(2); 1967 Protocol art. 1(2).  With certain exceptions (none of which concerns public health), the INA

- 5 -

guarantees "[a]ny alien who is physically present in the United States"—like each plaintiff here—the right to apply for asylum protection as a refugee. 8 U.S.C. §1158(a)(1), (b)(1)(A). In other words, while the determination of whether to grant asylum is discretionary, the right to apply for asylum is not.

A second protection is withholding of removal for those facing persecution at home. While the INA authorizes removal of noncitizens from the United States for specified reasons, *see, e.g.*, 8 U.S.C. §1229a(a)(2), it prohibits removal (with exceptions not relevant here) to a country if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion," *id.* §1231(b)(3)(A). Unlike asylum, withholding of removal is mandatory if its requirements are satisfied. *See, e.g.*, *INS v. Aguirre-Aguirre*, 526 U.S. 415, 419-420 (1999). This prohibition on forcible return to a country where a person's life or freedom would be threatened derives from the international law principle of non-*refoulement*. That principle is set forth in, among other sources, the 1951 Convention, which provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 1951 Convention, Art. 33(1).

Yet a third protection for noncitizens is protection from torture, derived from the United States' implementation of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").  *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, §2242, 112 Stat. 2681, 2681-2822 (codified at 8 U.S.C. §1231 note). Under the regulations implementing that statute, withholding or deferral of removal is mandatory if the applicant shows that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. §§208.16(c)(2), 208.17(a).  And whereas asylum and withholding of deportation require that the threat to the noncitizen be based on his or her race, religion, nationality, membership in a particular social group, or political opinion, a threat of torture need not be so based in order to qualify for protection.

### B.    Section 265 Does Not Override The Specific Protections From Removal That Congress Has Enacted In The Intervening Decades

The CDC Order's instruction that "covered noncitizens" be promptly removed from the United States with no opportunity to invoke asylum or withholding of removal—and with no provision for the processing of CAT claims other than "affirmative, spontaneous" statements by the noncitizen—rests on the proposition that a provision of the 1944 Public Health Service Act, 42 U.S.C. §265, overrides the statutory protections described above.  That proposition lacks merit for several reasons.

- 7 -

First, it is a longstanding rule of statutory construction that "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [a] Court is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quotation marks and citation omitted). Here, it is entirely possible to "give effect" to both the public-health statute and each of the immigration provisions discussed above. Indeed, doing so would give effect to the most natural construction of the public-health statute. That law gives the U.S. surgeon general "the power to prohibit … the *introduction* of persons and property" into the United States (emphasis added). It is not about removal (or expulsion) of persons from the United States. Nor, importantly, does section 265 address the myriad protections in U.S. law (described above) against the forcible return of persons to countries where they face persecution or torture. There is simply no reason why section 265 must, or should, be read to address a subject about which it says nothing—removal or expulsion of persons from the United States—or to negate fundamental, internationally recognized, and congressionally legislated protections that section 265 never mentions.

Second, congressional action in the 75-plus years since the Public Health Service Act was enacted further confirms that Congress would not have understood it to override the statutory protections described earlier. To start, Congress has

long addressed communicable diseases in the immigration laws:  The INA states

that a noncitizen is inadmissible if he or she has "a communicable disease of public

health significance," which determination is to be made "in accordance with

regulations prescribed by the Secretary of Health and Human Services."  8 U.S.C.

§1182(a)(1)(A)(i).  In making this an inadmissibility ground, Congress also made it

a ground for removal of persons who have arrived at a port of entry or entered the

country without inspection.  *See id.* §1229a(a)(2) (authorizing charging of "alien"

in removal proceedings "with any applicable ground of inadmissibility under

section 1182(a)").  Yet having provided for removal on this communicable-disease

ground, Congress subjected that removal power to the normal defenses to removal,

*see id.* §1229a(c)(4), including the protections of asylum, withholding of removal,

and CAT.  Given that, it would be unreasonable to read section 265—a provision

from an earlier public-health law—to free the Executive Branch from the

restrictions against removal in those later-enacted laws.

Congress also has specifically addressed executive authority to conduct

expedited removal of persons who either arrive at the country's land borders or

cross them without inspection.  It did so in the Illegal Immigration Reform and

Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 100 Stat.

3009.  That law, while purporting to authorize executive officials to remove certain

individuals, nevertheless requires that noncitizens subject to expedited removal

- 9 -

have an opportunity to present any grounds they may have for asylum, withholding of deportation, or CAT protection.  *See* 8 U.S.C. §1225(b)(1) (authorizing removal without a substantial hearing "unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution"); 8 C.F.R. §235.3(b)(4) (requiring an interview "[i]f an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country").  The CDC Order denies these protections to the same persons covered by the INA's expedited removal procedures: persons denominated "covered noncitizens" by the Order. But Congress already considered the circumstances in which inadmissible noncitizens could be removed expeditiously, and it made clear that even in those circumstances, the noncitizen is entitled to a substantial hearing (at minimum, an asylum officer interview, subject to further review) on claims of persecution or torture giving rise to protection from removal.  Again, given what Congress actually did in addressing expedited removal in IIRIRA, it would be unreasonable to read section 265 to free the Executive Branch from the restrictions enacted in expedited removal provisions.

In sum, in the decades after Congress enacted section 265, it enacted a comprehensive set of immigration laws that *both* address the issues at the heart of the CDC Order—communicable diseases and expedited removal—*and* impose

specific restrictions on the authority of the Executive Branch to remove noncitizens from the United States in service of important broadly-recognized principles, including non-*refoulement*. That history is significant because "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). In other words, the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988). And put simply, section 265 cannot be read to negate the on-point statutory protections that Congress subsequently enacted.

Nor is such a reading necessary to ensure public safety, as the government has suggested. The current legal structure provides the government with ample tools to address communicable diseases while honoring the immigration protections Congress has provided. Those tools include testing and quarantine of noncitizens; indeed, Congress has provided for just that power, *see* 42 U.S.C. Part G (Quarantine and Inspection), and the CDC has issued Foreign Quarantine Regulations pursuant to that authority, *see* 42 C.F.R. Part 71 (Foreign Quarantine). That is final confirmation that section 265 should not be read to override bedrock protections against persecution and torture that Congress (consistent with our

- 11 -

treaty obligations) has expressly mandated as part of the Nation's immigration laws.

## CONCLUSION

The government's stay motion should be denied because section 265 does not free the Executive Branch from the asylum, withholding of removal, and CAT protections mandated by Congress, and hence the government is unlikely to succeed on the merits of its appeal.

Respectfully submitted.


NOAH A. LEVINE                                     /s/ Daniel S. Volchok
WILMER CUTLER PICKERING            DANIEL S. VOLCHOK
  HALE AND DORR LLP                     SPENCER L. TODD
7 World Trade Center                         WILMER CUTLER PICKERING
250 Greenwich Street                            HALE AND DORR LLP
New York, NY 10007                          1875 Pennsylvania Avenue NW
(212) 230-8875                                      Washington, DC 20006
                                                       (202) 663-6000


September 23, 2021

## CERTIFICATE OF COMPLIANCE

Amici are not aware of a rule governing the permitted length of an amicus brief in support of or in opposition to a motion.  Consistent with the general approach of the Federal Rules of Appellate Procedure regarding the length of amicus briefs, *see* Fed. R. App. P. 29(a)(5)-(6), amici have limited their brief to 2,600 words, half the permitted length of a motion or opposition.  According to the word-count function of the word-processing system used to prepare the brief, the petition contains 2,583 words, excluding the portions exempted by Rule 32(f).

/s/ Daniel S. Volchok
Daniel S. Volchok

## CERTIFICATE OF SERVICE

On this 23rd day of September, 2021, I electronically filed the foregoing using the Court's appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by that system.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK