ORAL ARGUMENT NOT YET SCHEDULED

---

**No. 21-5200**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NANCY GIMENA HUISHA-HUISHA, on behalf of
herself and others similarly situated, et al.,

*Plaintiffs-Appellees*,

v.

ALEJANDRO MAYORKAS, et al.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the District of Columbia
No. 1:21-cv-100
Hon. Emmet G. Sullivan

---

**PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-
APPELLANTS' MOTION FOR STAY PENDING APPEAL AND
ADMINISTRATIVE STAY**

---

Stephen B. Kang
Cody Wofsy
Morgan Russell
My Khanh Ngo
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

Lee Gelernt
Omar Jadwat
Daniel A. Galindo
Ming Cheung
David Chen
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

*Attorneys for Plaintiffs-Appellees*          (*Additional Counsel on Next Page*)

Andre Segura
Kathryn Huddleston
Brantley Shaw Drake
American Civil Liberties Union
Foundation of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
(713) 942-8146

Karla M. Vargas
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
(956) 787-8171

Jamie Crook
Blaine Bookey
Karen Musalo
Center for Gender &
Refugee Studies
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Robert Silverman
Irit Tamir
Oxfam America
Suite 500
Boston, MA 02115
(617) 482-1211

Scott Michelman
Arthur B. Spitzer
American Civil Liberties Union
Foundation of the District of
Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

Tamara F. Goodlette
Refugee and Immigrant Center for
Legal Education and Legal
Services (RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
(210) 960-3206

**INTRODUCTION**

Defendants claim statutory authority under 42 U.S.C. § 265 to expel noncitizens without access to the asylum and other protections Congress carefully guaranteed, and concede that their interpretation would permit them to expel U.S. citizens—even though the statute does not say a word about expulsion. The district court correctly rejected that unfounded assertion, explaining that the expulsion power rests in the immigration statutes and that the public health law authorizes a different set of enforcement mechanisms, namely civil and criminal penalties. Defendants' arguments—which address only one of three reasons their expulsion policy is unlawful—are not likely to succeed on appeal.

The balance of harms also decidedly favors denying a stay. As the extensive record evidence shows, Defendants are literally pushing families, including those with very young children, into the hands of criminal cartels in Mexico. Families are forced back over the bridges by our government while cartels stand waiting to kidnap, assault, traffic, and rape them on the other side. *See, e.g.*, Supp.Add.34–36, 43–45, 54–55. One declarant testifies that more than one in five of the migrants she works with report that they were kidnapped in Mexico, with many of the women reporting rapes during their capture or after expulsion; another testifies that 40% of her clients suffered an actual or attempted kidnapping (or both).

Supp.Add.20, 57.  The declarations in this case describe in vivid detail the brutality

that the Title 42 Process imposes on families.

Unsurprisingly, Defendants do not dispute that staying the injunction would

threaten the lives and safety of these families.  Rather, Defendants claim that the

Department of Homeland Security ("DHS") should be permitted to continue

expelling asylum-seeking families because of the potential risk of COVID-19

transmission.  Yet as the district court, public health declarants, and the Centers for

Disease Control ("CDC") itself explain, any such risk is the result of Defendants'

refusal to allocate resources to safely process families.  Add.56.

CDC's latest order clearly states that "the availability of testing, vaccines,

and other mitigation protocols can minimize risk" of transmission, including at

border facilities.  Add.74; Supp.Add.74.  Thus, as public health experts pointedly

explain, the "CDC Order is an indictment of the DHS's yearlong failure to adopt

reasonable mitigation steps in order to safely process asylum-seeking families, and

not a conclusion by CDC that migrants present an unacceptable public health risk."

Supp.Add.75.

Indeed, the CDC specifically explained that where the government has

chosen to "institute COVID-19 mitigation protocols," migrants "do not pose a

significant level of risk for COVID-19 spread into the community."  Add.88

(discussing release of unaccompanied children).  Thus, as the district court

properly recognized, the problem is DHS's refusal to allocate its substantial resources, in excess of $80 billion, to take the recommended CDC mitigation steps.

Defendants also seek to create the misleading impression that an injunction barring the use of Title 42 for families would result in a sea change. But Defendants had already reduced the percentage of families expelled at the southwest border under Title 42 to only 14% in July, demonstrating that they can process families safely.[1]  Add.53–54.  Thus, even assuming that additional mitigation steps were still necessary, the injunction would necessitate the government taking only those steps necessary to safely process the remaining small percentage of families.  Indeed, asylum-seeking families subjected to Title 42 represent only 0.1% of all the land travelers from Mexico.  These other travelers, such as commercial drivers, are permitted to enter by land without disclosing their vaccination and testing status.

## ARGUMENT

## I.    DEFENDANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

Below, Plaintiffs raised three independently sufficient statutory arguments. First, and most broadly, the power to prohibit "introduction" in § 265 does not

---

[1] U.S. Customs & Border Protection, Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (select "FMUA" for "family unit aliens" in "Demographic" drown-down menu) (last visited Sep. 19, 2021).

authorize expulsions because it regulates *only* transportation providers, and not individual travelers.  Second, even if § 265 applies to both transportation providers and individuals, it would still not authorize expulsions, because Congress nowhere granted expulsion power, and provided instead for civil and criminal penalties, as well as expulsions in the *immigration* statutes.  Third, even assuming § 265 applies to individuals and authorizes *some* expulsions, it cannot override the immigration statutes' specific mandatory protections barring the summary expulsion of those seeking asylum or other protections.  The district court rested on the second ground, Add.41 n.6, but Defendants must show likelihood of success as to all three to prevail.

Defendants initially make much of this Court's prior summary stay decision in *P.J.E.S. v. Mayorkas*, a challenge to Title 42 involving unaccompanied children.  Mot.3, 10.  That summary order was not only non-precedential, but provided *no* reasoning which could even be persuasive—particularly as the facts on the ground have since changed, including, for example, the ready availability of vaccines.  Moreover, since that decision, the Supreme Court has emphatically rejected Defendants' bottom-line argument that a statute granting CDC powers must be construed expansively to address COVID-19.  As the Court explained, "the Government's belief that its action [is] necessary" cannot "overcome a lack of congressional authorization."  *Alabama Ass'n of Realtors v. Dep't of Health &*

4

*Hum. Servs.*, No. 21A23, 2021 WL 3783142, at *4 (U.S. Aug. 26, 2021)

("*Realtors*") (internal quotation marks omitted).

## A.    Section 265 Applies Only To Transportation Providers.

As explained below, *infra* Part I.B., § 265 nowhere authorizes expulsions.

That congressional silence is unsurprising:  In 1893, when the statute was passed,

Congress was specifically concerned with cholera coming by ships from Europe,

*see* 24 Cong. Rec. 359–60, 363 (1893), and sought to remedy the problem by

prohibiting *transportation* companies from *introducing* individuals into the

country.  Defendants' Title 42 expulsion policy exceeds statutory authority,

because § 265's text regulates only transportation providers and authorizes no

direct regulation of individual travelers, much less a power to physically expel

them.[2]

Section 7 of the Act of February 15, 1893, ch. 114, 27 Stat. 449, 452

(Dkt.57-5, Ex.A), which the parties agree became 42 U.S.C. § 265 in 1944 without

material change, was drafted to regulate transportation entities bringing persons

and goods to the United States.  Then, as now, the statute granted the "power to

prohibit, in whole or in part, the *introduction* of persons and property" into the

country.  27 Stat. 452 (emphasis added).  The term "introduction" meant "'the act

---

[2] The argument that § 265 applies only to transportation providers is addressed
more fully in a historians' proposed *amicus* brief filed in this Court, and in
Plaintiffs' briefs below, Dkt.57-1 at 13–19, Dkt.118 at 6–8.

of bringing into a country.'" *Introduction*, *Universal English Dictionary* 1067 (John Craig ed. 1861); *see also Introduction*, *Webster's Collegiate Dictionary* 453 (1st ed. 1898) ("[t]o lead, bring, or usher in"). Introducing a person into a country or place is an action taken by a *third party*—here, the transportation company. *See, e.g.*, *Walsh v. Preston*, 109 U.S. 297, 298, 314–15 (1883) ("colonization" contract requiring party to "introduce" immigrant families into Texas was unsatisfied, where individuals were not "brought to Texas by [the party;]" rather, "they came and settled of their own accord"); *see also* Dkt.118 at 7 (other examples).[3]

The statutory context reinforces this point. The Act's other provisions were directed at ships, *see* Act of Feb. 15, 1893, ch. 114, §§ 1–6, and imposed penalties *only* against ships, *see id*. §§ 1–3 (fines for "vessel" violating Act). It did not impose penalties on, or otherwise purport to regulate, individuals *being introduced* into the country.

That silence is striking because immigration statutes in force in 1893 make plain that Congress knew how to provide for the deportation of individuals coming to our shores. *See, e.g.*, Act of May 6, 1882, ch. 126, §§ 2, 12, 22 Stat. 58, 59, 61 (establishing penalties for vessels, while separately providing for unauthorized

---

[3] Other meanings of the term "introduction," such as introducing oneself to a neighbor or introducing evidence in a legal case, are plainly inapposite in this statutory context.

immigrants "to be removed"); Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1086 (similar).  Congress provided for removals in the immigration statutes, not in the public health laws.  Moreover, the immigration statutes not only expressly authorized removal, but specifically authorized procedures for the prohibition and removal of noncitizens with *communicable* diseases.  26 Stat. at 1084.

That § 265 was intended solely to regulate transportation providers is further supported by its one prior similar use.  President Hoover, invoking the statute in 1929, issued an Executive Order titled: "Restricting for the time being the *transportation of passengers* from certain ports in the Orient to a United States port."  Dkt.57-5, Ex.C (emphasis added).  The Treasury Department issued associated regulations "governing the embarkation of passengers and crew" and "their transportation to United States ports."  *Id.*  As in *Realtors*, Defendants' "unprecedented" claim of expulsion power, more than a century after the statute's enactment in 1893, thus warrants considerable skepticism.  2021 WL 3783142 at *2, 4.

Defendants note that Congress sought to grant power "different from" quarantine authority in enacting the 1893 statute, suggesting this must have meant an expulsion power.  Mot.16.  But the different power Congress granted was the authority to regulate and bar *transportation*.  Indeed, just prior to its original enactment in 1893, the Executive, acting unilaterally, effectively halted all

7

transportation of immigrants in the interest of public health, triggering a significant debate about whether authority for such an extraordinary step existed. *Twenty Days Quarantine*, N.Y. Times (Sept. 2, 1892).[4] The statute was enacted to expressly authorize just such transportation prohibitions.

In short, Congress was addressing a specific problem through tailored means. The statute was designed to address a threat from Europe by ships, not land migration by foot (then relatively rare). That is not to say that the statute's terms are limited to seafaring vessels; Section 7's language was broad enough to encompass other means of introducing passengers, such as trains. But the text and context—particularly the use of "introduction"—limited the statute to the regulation of transportation providers. The same is true of today's materially identical statute, which applies to modern air travel.

**B. The District Court Correctly Held That Section 265 Does Not Authorize Expulsions, Even Assuming It Applies Beyond Transportation Providers.**

1. When Congress wants to authorize physical removal, it knows how, and does so "plainly." Add.35; *see also J.B.B.C v. Wolf*, 2020 WL 6041870, at *2 (D.D.C. June 26, 2020) (Nichols, J.) (same); 8 U.S.C. §§ 1231, 1225(b)(2)(c). And Congress does so clearly in all contexts, not just, as Defendants suggest, in

---

[4] https://www.nytimes.com/1892/09/02/archives/twenty-days-quarantine-the-government-takes-decisive-action-a.html.

"immigration law." Mot.14; *see, e.g.*, 18 U.S.C. §§ 3185, 3186, 3196 (extradition authority); Add.35.[5]  Yet § 265's text says nothing about the power to physically expel.  Thus, even if the statute directly regulates both transportation providers and individual travelers, it lacks the type of clear statement found when Congress intends to grant an expulsion power.  Add.39–40.

The statutory context reinforces the textual lack of expulsion authority.  Even as it addresses "various public health measures," "the statute as a whole does not contain a word about the power of the CDC to expel anyone."  Add.37–38 (cleaned up).  Indeed, a neighboring provision laying out "specific 'penalties'" for violations of § 265 makes no mention of expulsion, instead authorizing civil fines and imprisonment.  Add.37 (quoting 42 U.S.C. § 271).  Quarantine powers are also available.  42 U.S.C. § 264.  Nowhere does the scheme mention expulsion.

Defendants urge that a "statute prohibiting persons from entering certain protected areas is most naturally read to include . . . the power to expel."  Mot.12; *see id*. at 15.  That is wrong, as illustrated by the many statutes which prohibit entry *and* explicitly authorize physical removal.  Add.35, 40.  And Defendants do not point to a single example of silent authorization of expulsion.  They claim that the "authority to 'prevent [a dangerous] individual from boarding an aircraft,'"

---

[5] Contrary to Defendants' suggestion, Mot.14–15, courts "routinely point[] to other statutes as evidence that Congress knows how to legislate in particular ways," Add.40–41 n.5.

must also "authorize the individual's removal." Mot.13 (quoting 49 U.S.C.

§ 114(h)(3)(B)). But that statute addresses not only preventing boarding but also

"other appropriate action with respect to that individual." Defendants likewise cite

a rulemaking discussing the re-exportation of property, arguing such power is

granted by § 265. Mot.12–13. But whatever its validity, that rulemaking relied on

other authority *in addition to* § 265, including express authority for "destruction"

and "other measures" to deal with dangerous "animals or articles." 42 U.S.C.

§ 264(a); *see* 82 Fed. Reg. 6890, 6929 (Jan. 19, 2017) ("re-exportation, or

destruction").

    The implications of Defendants' position underscore that Congress did not

authorize expulsions in the public health laws. Defendants have conceded that, on

their interpretation, § 265 provides authority "to expel even U.S. citizens."

*P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 539–40 (D.D.C. 2020) (noting concessions).

As in *Realtors*, the implications of their arguments are thus "breathtaking," 2021

WL 3783142 at *3, undercutting Defendants' assertion that the statute silently

provides the extraordinary authority to expel, *cf. Valentine v. United States ex rel.

Neidecker*, 299 U.S. 5, 11–12 (1936) (rejecting implicit extradition power because

not "affirmatively granted"). It makes no difference that the current Title 42 *policy*

exempts citizens. "[T]he breadth of the [government's] asserted authority is

measured not only by the specific application at issue, but also by the implications

of the authority claimed." *Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 962 F.3d 531, 541 (D.C. Cir. 2020); *see Realtors*, 2021 WL 3783142, at *3 (similar). Those implications are magnified here because the claimed power to summarily expel citizens raises grave constitutional questions. *See P.J.E.S.*, 502 F. Supp. 3d at 540.

2. Defendants argue that Congress must have intended to grant an expulsion power notwithstanding the statute's silence because otherwise the statute would be illogical and ineffectual. Yet *Realtors* emphasized that if the Executive believes it needs greater statutory authority, it must seek such power from Congress. 2021 WL 3783142, at *4. In any event, Defendants' claim that the district court's interpretation of the statute renders it ineffectual is wrong and based on a misunderstanding of the statutory scheme and the co-existing immigration laws.

Defendants contend that the "introduction" of persons into the country is a "continuing process" that goes on even after a person passes the border, and that the district court's interpretation leaves them "without authority to halt a continuing violation" once an individual is on U.S. soil. Mot.11, 13. But assuming, as the district court did, that the statute even applies to individual travelers (rather than solely to transportation providers), the court never denied that "the process of introduction can be halted" after a person crosses the border. Add.41. The issue is one of enforcement mechanisms. Assuming it applies to

11

individual travelers, § 265 authorizes criminal and civil penalties for those who enter in violation of an order.  Add.37.  "[A]gencies are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."  *Merck*, 962 F.3d at 536 (internal quotation marks omitted).[6]

Furthermore, that Title 42 does not authorize expulsions does not mean that the Executive branch lacks the power to remove those who cross the border.  The immigration laws enacted alongside the public health laws in the late 1890s, as well as contemporary immigration laws, provide that power.  And, even before the statute here was enacted in 1893, the immigration statutes expressly included inadmissibility provisions specifically addressing "communicable diseases," with accompanying procedural safeguards to balance the competing goals of fairness and public safety.  Add.35–36; 26 Stat. at 1085; *see* 8 U.S.C. §§ 1182(a)(1), 1222.  Alongside the various other immigration tools, recent arrivals without documentation can be subjected to "expedited removal" proceedings.  *See* 8 U.S.C.

---

[6] Defendants relatedly suggest that the statute allows the government to physically block a person's introduction at the border, so it must also allow expulsion. Mot.15.  But the power to expel is far more extreme than the power to block entrance.  Thus, the statute would not be illogical even if construed to foreclose only expulsions.  In any event, § 265, by its terms, provides *no* authority to physically block entry into the country.  Rather, under the express statutory remedy provisions, § 265 orders are enforceable by arrest, imprisonment, and fine.  To the extent Defendants may block entry into the country, that power would come from other authorities, like the immigration laws.

§ 1225(b)(1).  Individuals entering from a foreign country can also be detained, examined, and quarantined under the public health laws, 42 U.S.C. § 264(c).

Moreover, § 265 provides vast additional authority by permitting such extraordinary steps as, for example, a suspension of flights from an entire country (analogous to the 1929 Order).  In conjunction with the various other public health and immigration powers, § 265 is thus a powerful tool.  These are the means Congress chose to effectuate public health, not summary expulsions.

## C. Even Assuming Section 265 Permits Expulsions of Some Persons, It Does Not Override Mandatory Statutory Humanitarian Protections.

Finally, the Title 42 policy is still unlawful even if § 265 applies beyond transportation providers and allows the expulsion of some individuals.  Congress has carefully provided procedures for noncitizens seeking asylum or other protections in the United States.  § 265 does not allow Defendants to cast those protections aside.  *See P.J.E.S.*, 502 F. Supp. 3d at 515, 540–42; *J.B.B.C.*, 2020 WL 6041870, at *2 (Nichols, J.).[7]

Because Defendants are arguing that § 265 permits them to "override[]" other legislation, they "bear[] the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Sys. v. Lewis*, 138

---

[7] This argument is addressed more fully in proposed *amicus* briefs filed in this Court by refugee and immigration law scholars, and by the International Refugee Assistance Project.

S. Ct. 1612, 1624 (2018) (cleaned up). Yet Defendants do not even mention these humanitarian statutes in their stay papers, despite advancing an expulsion system that "tramples the work done" by the immigration laws. *Id.* at 1627; *see P.J.E.S.*, 502 F. Supp. 3d at 541–42 (finding "the vague language of Section 265" insufficient).

The immigration laws "speak[] directly" to "the question before [the Court]," *Epic Sys.*, 138 S. Ct. at 1631, and entitle noncitizens to a screening for asylum and other forms of protection, Add.4–5. Critically, there is no exception for public health in the asylum laws. Even if there were a conflict with § 265, the mandatory and later-enacted immigration protections would prevail. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153–54 (1976); *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 582 n.18 (1971).

**D. Deference Is Unwarranted.**

The district court correctly concluded that Defendants' asserted expulsion power is not entitled to *Chevron* deference. *See* Add.42–43; *see also J.B.B.C.*, 2020 WL 6041870, at *2. First, CDC "hasn't just sought to interpret [§ 265] in isolation," but rather "has sought to interpret [it] in a way that limits the work of a

14

second statute." *Epic Sys.*, 138 S. Ct. at 1629. Such "reconciliation of distinct

statutory regimes is a matter for the courts, not agencies." Add.42 (cleaned up).

Second, deference is unwarranted at *Chevron*'s first step, *id*., because it is

foreclosed by "the traditional tools of statutory interpretation—including the

statute's text, history, structure, and context." *Loving v. IRS*, 742 F.3d 1013, 1021–

22 (D.C. Cir. 2014).

Third, even if the Court reached *Chevron*'s second step, Defendants' claim

that deference is warranted in light of CDC's "scientific and technical expertise"

(Mot.17) is wrong. CDC's judgment might impact what power it thinks is *needed*,

but Defendants have not "explained how [CDC's] scientific and technical expertise

would lead it to interpret 'introduction' to encompass 'expulsion'"—a purely legal

question of statutory interpretation. Add.43; *see NRDC v. Daley*, 209 F.3d 747,

755–56 (D.C. Cir. 2000) (refusing to defer to scientific expertise where agency

never explained how it informs statutory interpretation).

## II.    THE EQUITIES WEIGH STRONGLY AGAINST A STAY.

Defendants do not contest that staying the injunction would impose life-and-

death consequences on families. Nor could they, as the district court cited

overwhelming, unrebutted evidence that U.S. Customs and Border Protection's

("CBP") expulsion practices effectively deliver vulnerable families into the arms

of kidnappers waiting for them in Mexico. Add.47; *e.g.*, Supp.Add.25 ("CBP has

15

routinely expelled my clients, including newborns, into the waiting arms of kidnappers . . . ."), 35 (mother and seven-year-old daughter "kidnapped immediately after DHS expelled them to Juárez," held captive for two months, and deprived of food and water), 36 (mother "who was raped in the street in Tijuana after DHS expelled her there with her three young children"), 44 (body of 15-year-old son found mutilated after initial expulsion and second attempt to cross). These stories are too common—advocates report 20–40% of their clients are victims of actual or attempted kidnappings in Mexico. Supp.Add.20, 57. Another declarant tracked 3,250 kidnappings and other attacks during one six-month period. Supp.Add.34.

In addition to the harms inflicted when families are expelled across the border into Mexico, the district court also correctly concluded that families suffer similar irreparable harms when expelled to their home countries, which "are among the most dangerous in the world due to gang, gender, family membership, and other identity-based violence." Add.44,52; Supp.Add.3–4, 7–14, 18.[8]

Though Defendants suggest that some families can apply for a "case-by-case exception[]" from Title 42, Mot.21, there is currently no meaningful mechanism for families to do so because the formalized exception process ceased operating as

---

[8] The recent Title 42 expulsions from the Del Rio, Texas bridge are yet another example of the harm caused by the policy given the extreme unrest and danger in Haiti.

of September 1, 2021.[9]  In any event, the *ad hoc* selection of some individuals, often after they have already been kidnapped or harmed following expulsion, cannot substitute for an asylum system.  *E.g.*, Supp.Add.60.[10]

Defendants nonetheless argue that the balance of harms favors them and seek to create the misimpression that the injunction completely alters the landscape.  Mot.18–19.  Yet Defendants were *already* processing approximately 86% of migrant families into the United States—largely because the Mexican government will not accept the return of all families in certain regions.  Add.53; *see also* Mot.19; Add.86.  DHS's own declarant testified that, in response to those regional Mexican policies, the agency developed systems for "testing, isolation, and quarantine" in coordination with nongovernmental, local, and state entities, which receive migrant families upon their release from CBP.  Add.64 ¶9; Add.93. Admitting the remaining 14% of families (which would represent 0.1% of border traffic and 5% of migrant encounters) would not impose a drastic additional burden.  Add.93; Supp.Add.129–30.

---

[9] El Paso Matters, *Vulnerable migrants will no longer be exempt from rapid expulsion at the border* (Sep. 7, 2021), https://tinyurl.com/4cds79ba; AP, *Advocates end work with US to pick asylum-seekers in Mexico* (July 31, 2021), https://tinyurl.com/2756ze39.

[10] Defendants argue that fewer families will suffer harm if the appeal is expedited. Mot.3.  But that is cold comfort to the families who will be expelled while the appeal is pending.

Indeed, as dozens of public health experts emphasize, mitigation measures, such as testing and vaccinations, are now readily available and effective at preventing COVID-19 transmission, including in border facilities.  Supp.Add.75 (citing CDC Order at Add.74).  And despite Defendants' heavy reliance on the recent CDC Order, Mot.21-22, the CDC did *not* conclude that migrant families present an unacceptable health risk.  Rather, the CDC Order confirms that "the primary reason that asylum-seeking families are still being subjected to Title 42 is because of DHS's failure to expand available mitigation measures."  Supp.Add.75 (citing CDC Order at Add.93); *see also* Add.80 (CDC Order explaining that "[w]ith the additional testing capacity available through antigen tests, rapid testing can be implemented to identify infected persons so they can be isolated."), 93 (CDC Order suggesting that migrant families could be exempted from Title 42 once DHS expands "testing, consequence management, and eventually vaccination" programs); Supp.Add.76–79 (32 public health experts explaining that "[b]y combining multiple strategies, including vaccinations, testing, masking, ventilation, and sanitizing, [CBP] can safely process asylum-seeking families while minimizing transmission of COVID-19."), 68–70 (former CDC officials explaining that "immigrant families subject to Title 42 are not a significant source of COVID-19 in the United States."), 114–16 (Doctors Without Borders explaining mitigation at strategies at border).

18

The district court was thus correct that this case is ultimately about DHS's refusal to allocate resources to safely process asylum seekers. *See* Add.56 ("Indeed, the government has successfully implemented mitigation measures with regard to processing unaccompanied minors in order to minimize risk of COVID-19 transmission.").

Defendants also raise potential harm to DHS personnel and other individuals in the United States, but adults (including DHS officers) and adolescents have access to free and widely available vaccines. Supp.Add.65–66. As the public health officials explain, the unvaccinated constitute the overwhelming majority of those at risk for serious illness. *Id.*; *see also* Add.81 (CDC explaining that "breakthrough" infections rarely cause illness).

Defendants argue that "vaccines and testing do not sufficiently mitigate" infection risk because many families "originate from countries with 'markedly lower vaccination rates'" and positivity rates have recently increased. Mot.18. But Defendants ignore the evidence in this case showing that only 1.14% of migrant families who were permitted to enter the United States tested positive for COVID-19. Supp.Add.106, 131–34, 21.

Defendants also ignore the fact that these asylum-seeking families subjected to Title 42 equal a tiny fraction (1/1000) of all the travelers Defendants permit to enter from Mexico at land ports, such as business and delivery travelers, and that

19

this exponentially larger group is not required to disclose their vaccination and testing status. *See* Supp.Add.123, 129–30. To the extent that some migrants are not vaccinated, that is further reason to offer vaccines, per the CDC's and public health experts' recommendation. *See* Add.93; Supp.Add.68–69, 76–77, 115 (describing unused vaccine doses that can be re-routed to migrants).[11]

Defendants also do not address the district court's finding that DHS's expulsion practices likely *increase* transmission. Title 42 often involves "placing families on crowded planes and buses from the Rio Grande Valley, without first testing the individuals and isolating those who test positive, and transporting them to other locations in Texas, or places as far away as Arizona and San Diego, before expelling them or releasing them into the United States." Add.54 (cleaned up); Supp.Add.67–68.

The district court further noted that "under the Title 42 regime, individuals seeking an asylum hearing have attempted to cross the border multiple times," Add.55 (cleaned up), because most expulsions result in migrant families being sent back to Mexico, where many then try to cross again to escape danger. Supp.Add.123, 125. That dynamic multiplies transmission opportunities far more

---

[11] Asylum-seeking families are subject to Title 42 even where the family is vaccinated or tests negative. *Contra* CNBC, *U.S. to ease travel restrictions for foreign visitors who are vaccinated against Covid* (Sep. 20, 2021), https://tinyurl.com/42kxn55x.

than simply admitting each family once for asylum screenings, while following mitigation protocols.  Supp.Add.79.

Defendants further claim that "the injunction risks straining [DHS's] already-limited capacity," relying on statistics concerning encounters at the border. Mot.19.  The district court rightly found that those statistics were inflated: "[T]hough Defendants contend that there has been a 'historic' level of enforcement encounters at the border, the statistics Defendants cite 'overstate the number of unique individuals arriving at the border.'"  Add.55.  "[A]fter the implementation of the Title 42 Process, the recidivism rate of individuals crossing the border increased from less than 7% to 40%."  *Id.*  As explained, Title 42 has led to desperate people, who receive no asylum hearing, attempting multiple crossings, with each crossing counted as a new "encounter."  Supp.Add.125.  Correcting for this inflation, the first nine months of the current fiscal year are, in fact, comparable to FY2019—the most recent year in which travel and migration were unaffected by pandemic conditions.  Supp.Add.127.

Defendants additionally argue that DHS's "already-limited capacity has been greatly reduced due to COVID-19 protocols."  Mot.20.  But Defendants do not explain why the agency's *$81 billion budget* ($18 billion of which is just for

CBP)[12] cannot be used to build capacity to process the remaining migrant families, as the CDC itself suggested. Add.93 ("CDC encourages DHS to develop such programs as quickly as practicable."). For example, Defendants claim that migrant families "may spend hours or days" in CBP's indoor facilities, which have "very limited" "testing for noncitizens." Mot.5,19–20. "But here, again, only the government's own choice[s] appear[] to constrain its path forward." *Lockheed Martin Corp. v. United States*, 833 F.3d 225, 239 (D.C. Cir. 2016). The CDC Order itself acknowledges that rapid testing is useful, available, and "can be implemented," but Defendants fail to explain why CBP has not yet expanded testing access. Add.80,87. Similarly, Defendants have stated that processing for families for entry "is generally conducted indoors" where social distancing is less feasible. Mot.20–21. Yet Defendants do not claim that processing cannot be performed outdoors. *E.g.*, Supp.Add.30, 77–78, 103, 114.[13]

Finally, local providers testify that they have capacity to safely receive, test, quarantine, and vaccinate more families if Title 42 were lifted—especially if Defendants provided more resources. *See* Supp.Add.98 (estimating that "as of July

---

[12] Department of Homeland Security, FY 2021 Budget in Brief, https://tinyurl.com/28byu8tx.

[13] The district court rightly rejected Defendants' unfounded assertion (Mot.19) that the injunction would further increase migration. Add.54–55 (citing expert declarations).

2021, less than 10 percent of [El Paso's] capacity was currently in use"), 119 (stating existing programs "could also be scaled up" with more support), 122 (recommending that Defendants "channel[] money and resources to local agencies" that have "developed these systems without the meaningful assistance of the federal government").  Because local providers have excess capacity to transport and receive families from CBP, *e.g.*, Supp.Add.94, 98–99, 118–19, processing a small percentage of additional families is unlikely to cause overcrowding at border facilities, and any strain at CBP facilities is a result of DHS's refusal to expand capacity as the CDC has recommended, *see* Add.93.

As the district court held, Defendants' resource-allocation decisions cannot justify ongoing violations of federal law.  Add.56–57.  That is particularly so given that Defendants have had eight months since this case was filed, and six months while the parties negotiated, to increase DHS's processing capacity and implement public health safeguards.  *Cf. Realtors*, 2021 WL 3783142, at *4 (observing "the Government has had three additional months . . . to help ease the transition away from" CDC eviction moratorium).  Defendants have not carried their burden to justify the extraordinary remedy of a stay.

## CONCLUSION

Defendants' motion should be denied.

Dated:  September 23, 2021

Stephen B. Kang
Cody Wofsy
Morgan Russell
My Khanh Ngo
American Civil Liberties
Union Foundation, Immigrants'
Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770

Andre Segura
Kathryn Huddleston
Brantley Shaw Drake
American Civil Liberties
Union Foundation of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
(713) 942-8146

Karla M. Vargas
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
(956) 787-8171

Jamie Crook
Blaine Bookey
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Respectfully submitted,

*/s/ Lee Gelernt*

Lee Gelernt
Omar Jadwat
Daniel A. Galindo
Ming Cheung
David Chen
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

Robert Silverman
Irit Tamir
Oxfam America
Suite 500
Boston, MA 02115
(617) 482-1211

Scott Michelman
Arthur B. Spitzer
American Civil Liberties Union
Foundation of the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

Tamara F. Goodlette
Refugee and Immigrant Center for
Legal Education and Legal Services
(RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
(210) 960-3206

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Plaintiffs-Appellees certify as follows:

**A. Parties and Amici**

All parties, intervenors and amici appearing in this court are listed in Appellants' Motion.

**B. Rulings under Review**

Reference to the ruling under review appears in Appellants' Motion.

**C. Related Cases**

This case has not previously been before this or any other court. *P.J.E.S. v. Mayorkas*, D.C. Cir. No. 20-5357, does not involve the same parties as this case, but involves a challenge to the U.S. Centers for Disease Control and Prevention's Order under 42 U.S.C. § 265 by a provisionally-certified class consisting of all unaccompanied noncitizen children who (1) are or will be detained in U.S. government custody in the United States, and (2) are or will be subjected to the CDC Order.

*/s/Lee Gelernt*
Lee Gelernt

## CERTIFICATE OF COMPLIANCE

This motion response complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(1)(E) and (2)(A) because:

1.  It contains 5,123 words.

2.  It complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Professional Plus 2019 in 14-point Times New Roman font.

*/s/Lee Gelernt*
Lee Gelernt

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2021, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the DC Circuit by using the CM/ECF system. A true and correct copy of the foregoing has been served via the Court's CM/ECF system on all counsel of record.

*/s/Lee Gelernt*
Lee Gelernt

**Addendum**

# Table of Contents

Declaration of Javier O. Hidalgo, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Feb. 5, 2021), Dkt. 57-8.........................Supp. Add. 1

Declaration of Allison Herre, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Feb. 5, 2021), Dkt. 57-9.........................Supp. Add. 3

Declaration of Lisa Frydman, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Feb. 5, 2021), Dkt. 57-11 .......................Supp. Add. 6

Declaration of Taylor Levy, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Feb. 5, 2021), Dkt. 57-12 .....................Supp. Add. 17

Supplemental Declaration of Taylor Levy, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-3...................Supp. Add. 20

Declaration of Julia Neusner, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-4...................Supp. Add. 33

Affidavit of Jennifer K. Harbury, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-5...................Supp. Add. 42

Declaration of Erika Pinheiro, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-6...................Supp. Add. 47

Declaration of Savitri Arvey, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-7 ..................Supp. Add. 57

Supplemental Declaration of Former Centers for Disease Control and Prevention (CDC)
Officials, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-8...................Supp. Add. 62

Declaration of 32 Medical and Public Health Experts, *Huisha-Huisha et al v. Mayorkas et al,*
No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-9...................Supp. Add. 74

Declaration of Linda Rivas, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-11................. Supp. Add. 92

Declaration of Marisa Limón Garza, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-12................. Supp. Add. 96

Declaration of Astrid Dominguez, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-13............... Supp. Add. 102

Declaration of Chelsea Sachau, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-14............... Supp. Add. 105

Declaration of Susana Villén Iglesias, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-15............... Supp. Add. 110

Declaration of Teresa Cavendish, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-16............... Supp. Add. 117

Declaration of Kate Clark, Esq., *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-17............... Supp. Add. 120

Declaration of Aaron Reichlin-Melnick, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-18............... Supp. Add. 123

Declaration of Alan E. Valdez Juárez, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-19............... Supp. Add. 131

Declaration of Edgar Ramírez López, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-20................ Supp. Add 132

Declaration of Samuel Thomas Bishop, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-21................ Supp. Add 133

Declaration of Luis Alberto Lizarraga Tolentino, *Huisha-Huisha et al v. Mayorkas et al,*
    No. 1:21-cv-00100-EGS (D.D.C. Aug. 11, 2021), Dkt. 118-22............... Supp. Add 134

## DECLARATION OF JAVIER O. HIDALGO

I, Javier O. Hidalgo, swearing under penalties of perjury, that the following is true and correct to the best of my knowledge:

1. My name is Javier O. Hidalgo and I am the Supervising Attorney of the Family Detention Services Program at the Refugee and Immigrant Center for Education and Legal Services ("RAICES").  I have been the Supervising Attorney since October 2018.  I am licensed to practice law in the states of New York and Texas.

2. My colleague Andrea Meza previously provided a declaration that described RAICES's work providing free legal services at Karnes County Family Residential Center in Karnes City, Texas ("Karnes family detention center" or "Karnes") since its opening as a family detention center in August 2014. *See* ECF No. 5-2.

3. RAICES has now represented dozens of families subjected to Title 42 expulsion while detained at Karnes.  The following information is based on information learned from representing these families, as well as our communications with DHS officers.

4. The intake process for new families arriving at Karnes currently includes testing for COVID-19 and a period or quarantine. Typically, for family units that include both parents, the fathers are quarantined separately from the rest of the family. After a family who has tested negative for COVID-19 finishes their quarantine period, they are allowed to access some common spaces with other detained families.

5. Karnes currently has a total bed capacity of approximately 830 individuals.[1] We believe that it currently houses 78 individuals as of the date of this declaration, which is a relatively small percentage of its total capacity.

6. ICE detains families at Karnes in both Title 42 and Title 8 proceedings, though we believe that currently only Title 42 families are detained at Karnes. In our experience, families in Title 42 proceedings are detained at Karnes for at least two weeks on average. We have seen families in Title 42 proceedings detained at Karnes as long as forty seven

---

[1] *See* https://www.ice.gov/factsheets/karnes-county-residential-center (last accessed February 3, 2021).

(47) days. In comparison, families at the facility in Title 8 proceedings have most recently been detained at Karnes an average of twenty-seven (27) days.

7. When we learn of a detained family subject to Title 42 expulsion, and that family has a fear of return to their home country, we notify DHS that the family needs an assessment for relief under the Convention Against Torture (as DHS's guidance requires).  Thus far, we are not aware of any Title 42 families who have passed DHS's screening for torture claims.

8. The families in Title 8 proceedings receive a credible or reasonable fear interview as a threshold screening for potential asylum protection. If a family receives a negative fear determination, they can ask an immigration judge to review that finding. Upon review of our data from July 2020 through the present, the majority of families in Title 8 proceedings for whom our team provided legal services received a positive fear finding or had a negative fear finding vacated by an immigration judge. In even more cases, DHS releases the family from Karnes before we learn of the results of their fear screening, likely because family passed the screening. Generally, families in Title 8 proceedings are at Karnes for an average of 27 days, after which they are served with Notices to Appear for removal proceedings under section 240 of the INA if they receive a positive credible fear finding.  Families are then are released to a sponsor, usually a family member here in the United States, or to a shelter.

9. In the Fall of 2020, due to our advocacy DHS decided to reprocess a number of families detained at Karnes from Title 42 to Title 8. The majority of those families reprocessed into Tile 8 proceedings received positive credible fear findings and were released to their sponsors in the United States.

I declare under penalty of perjury, under the laws of the United States of America and Texas, that the foregoing is true and correct.

Date: February 4, 2021                          /s/ Javier O. Hidalgo
                                                Javier O. Hidalgo

**DECLARATION OF ALLISON HERRE**

I, Allison Herre, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney licensed to practice law in Ohio.  Since July 2019, I have been the
   Managing Attorney for Proyecto Dilley (formerly the CARA Pro Bono Project and
   Dilley Pro Bono Project).  Proyecto Dilley has provided pro bono legal services to
   asylum-seeking immigrant parents and their children who are detained by U.S.
   Immigration and Customs Enforcement ("ICE") at the South Texas Family
   Residential Center ("Dilley") in Dilley, Texas since the facility opened at the end of
   2014. Our project provides direct representation in immigration proceedings through
   project staff as well as volunteers from all over the country.

2. I have been practicing law since 2012 during which time I have focused my practice
   on immigration law at both private and non-profit organizations.  Immediately prior
   to joining Proyecto Dilley, I served as the director of Immigration Legal Services, for
   Catholic Charities of Southwestern Ohio in Cincinnati, Ohio.

3. This declaration is based on my personal experience working with noncitizen children
   and families detained at Dilley.  I am also familiar with the facility after having
   visited Dilley almost daily prior to the outbreak of the COVID-19 pandemic and by
   regularly interacting with facility staff and ICE officers both before and during the
   COVID-19 pandemic.

4. Proyecto Dilley's volunteer-based model has allowed our project to represent the
   overwhelming majority of families who have been detained at Dilley. In 2015 we
   represented 10,804 families, in 2016, we represented 12,850 families; in 2017, we
   represented 13,291 families, in 2018, we represented 16,734, and in 2019, we
   represented 10,086 families.

5. Subsequent to the government's implementation of the Title 42 expulsion process,
   ICE's use of Dilley to detain asylum-seeking families dropped dramatically. In fact,
   since the start of the COVID-19 pandemic in March 2020, our office has only
   represented fewer than 500 families.

6. In a report filed by ICE Juvenile Coordinator Deane D. Dougherty with the District
   Court for the Central District of California on January 19, 2021, 194 beds of the 2,400
   beds available at Dilley were occupied, an 8% total occupancy of the facility's total
   capacity.  This capacity reflects what we have seen for many months in Dilley.

7. Our clients typically come to the United States fleeing great danger in their home
   countries, including El Salvador, Guatemala, Honduras, Brazil, Ecuador, Haiti,
   Mexico, Cuba, Venezuela, the Democratic Republic of the Congo, Romania, Angola,
   Uzbekistan, and many others.

1

8. The families we represent seek safety in the United States after experiencing unimaginable harm. For example, Ms. K is a young mother, who was kidnapped by her child's father and held hostage for two years during which time he beat her, raped her daily, and locked her and her child in the house for days without any food. The abuser held guns to her head and threatened to kill her many times. On one occasion, he beat her so severely that she went into premature labor and her child was born with weak lungs, which have made him susceptible to severe respiratory infections. When Ms. K and her one-year-old child arrived at the border, Ms. K had a fractured collar bone from the final beating she received before escaping her abuser. Her child became very ill and required hospitalization while detained by border patrol.

9. Another client, Ms. C, is from an ethnic minority in her home country. As a member of the minority ethnic group, Ms. C was beaten by her teachers in school, had rocks thrown at her, was denied medical care, and was prohibited from entering any public buildings, such as the police station and government benefits office. Ms. C's son was murdered by a man who is a member of the majority ethnic group because Ms. C's son tried to defend himself from the man's son who punched Ms. C's child. When Ms. C tried to report her son's murder, the police refused to permit her into the building and called her "dirty" and other slurs for the ethnic minority. The man later broke into Ms. C's home with a group of men and raped Ms. C, beat her son, and raped her daughter-in-law. The man has also beaten Ms. C's son on numerous occasions.

10. We recently represented the "L" Family that openly opposed their government's anti-capitalist policies by importing goods from the United States to sell in the family's store. As punishment for the family's defiance, the government sent police to Mr. and Ms. L's store where they ransacked and looted the store on at least two occasions, arrested Mr. and Ms. L, and tortured Mr. L while he was detained. The police repeatedly beat Mr. L in the groin so many times that he required hospitalization and surgery after police finally released him.

11. As of November 2020, it is my understanding that all of the families detained at Dilley are being processed under Title 8, rather than being subjected to immediate expulsion under Title 42. Prior to November 2020, the overwhelming majority of families that we represented and worked with were also placed in proceedings under Title 8.

12. Dilley has instituted policies to house, quarantine, isolate, process, and release immigrant families from the facility.  Each family at the facility is put in the facility and quarantined for about fourteen days.  All family members are tested for COVID-19 and either remain in quarantine, or if they test positive, are put in medical isolation for at least fourteen days after the positive test.  If the family includes both a father

Supp. Add. 4

and mother, the fathers are held in a different wing of the facility apart from the mothers with their children.

13. Families who are detained in Dilley are housed in rather large solid-sided trailers, where they have access to beds, sinks, telephones, showers, bathrooms, and a sitting area. While most trailers in Dilley have capacity to hold up to six families at a time, until recently, each family was put in a trailer alone. Recently, DHS has sometimes put two or three families (mothers and children) together in a trailer, and sometimes put multiple fathers in a trailer together.

14. Many of our clients have recently reported that they were asked by facility staff if they would like to receive a COVID-19 vaccine. Clients who declined to receive a vaccine were provided with contact information for a health center close to their final destination and informed they could access the vaccine upon release from detention.

15. Typically, families who come to Dilley in Title 8 proceedings participate in interviews with the U.S. Citizenship and Immigration Services. During the interview, an asylum officer quickly determines whether the family has bona fide claim for protection from persecution or torture. If families receive a positive determination subsequent to their interview, they are processed into removal proceedings before an immigration judge and are eligible for release. They are then released, typically to the care of a sponsor in the United States who assumes responsibility for their care and housing.

16. Over the last five years, with the exception of a period of time between July 2019 and March 2020, more than 99% of the families represented by Proyecto Dilley received positive decision in their case and were released from detention.

17. Families in Title 8 proceedings can be screened, processed, and released from Dilley within 20 days, which is more than enough time for each family to complete 14 days of quarantine for COVID-19. In my experience, the vast majority of immigrant families we serve are well-suited for immediate release, because they have genuine claims for relief from persecution, pose no danger to society, and are not flight risks.

I declare under penalty of perjury under the laws of the United States of America and Texas that the foregoing is true and correct.

Executed on: February 5, 2021, in San Antonio, Texas, United States.


Signature:   _____

Allison Herre

3

**DECLARATION OF LISA FRYDMAN**

I, Lisa Frydman, pursuant to 28 U.S.C. § 1746, declare as follows:

**Information about KIND and the Declarant**

1.      I am Vice President of International Programs at Kids in Need of Defense
("KIND"), a nonprofit advocacy and legal services organization based in the United States. I am
an attorney and have been, since March 2020, Vice President of International Programs at KIND.
From 2017-2020 I was Vice President for Regional Policy and Initiatives ("Regional Team") at
KIND. From 2015-2017 I served as KIND's Director for Regional Policy and Initiatives. In my
work at KIND, I supervise KIND's International Team with programming in Central America,
Mexico, and Europe, and regularly visit the northern countries of Central America and Mexico
(referred to collectively herein as "the Region") to carry out the organization's work described
here.

2.      KIND's International Team offers direct programming with children and
adolescents in the northern countries of Central America. The International Team, through civil
society partner organizations, provides reintegration support services for children repatriating to
Guatemala and Honduras, as well as sexual and gender-based violence prevention programming
for children in certain high migration communities in Guatemala and Honduras. Through its
Reintegration Program and other Regional programming and visits, KIND's International Team
communicated with approximately 550 Central American children in 2019. From 2015-2017, the
Regional Team provided support services to children in Honduras and El Salvador with pending
cases for refugee resettlement in the United States under an in-country refugee processing and
parole effort known as the Central American Minors ("CAM") Program. In 2018 the Regional
Team, through civil society partners, conducted a project in the Region to empower adolescent

1

refugees and migrants, as well as internally displaced adolescents from El Salvador, Guatemala, and Honduras, to tell their stories related to immigration and internal displacement. In 2020, KIND launched a broader set of programming in Mexico, with staff located along the U.S.-Mexico border and in Mexico City.

3.      While KIND's focus is on unaccompanied children, our work along the border regularly intersects with families that include children. Our U.S. offices have served dozens of children who reached the borders with their families; were placed in the Trump Administration's "Migrant Protection Protocols" (MPP) program that involved returning the families to northern Mexico to await their immigration court hearings; and who subsequently entered the United States as unaccompanied children, often because their parent or guardian was kidnapped or killed while the family waited in Mexico. The experiences of families in the MPP program are relevant here because many families expelled under Title 42—particularly those who are from Guatemala, Honduras, and El Salvador—are sent to Mexico and forced to live there, instead of being returned to their countries of origin.

4.      Children and families expelled to Guatemala, Honduras, and El Salvador under Title 42 are returning to three of the most dangerous countries in the world. Guatemala, Honduras, and El Salvador all rank among the top ten most dangerous countries by homicide rates globally.[1] Accordingly, these countries send significant numbers of asylum seekers with *bona fide* claims to the United States each year. In 2018, the United States granted asylum to 7,350 individuals from these countries.[2]

---

[1] According to the United Nations Office on Drugs and Crime (UNODC), in 2017, El Salvador ranked first in the world by homicide rate, followed by Honduras (third) and Guatemala (ninth). UNODC, *Global Study on Homicide* (2019).
[2] Dep't of Homeland Security, Office of Immigration Statistics, *Annual Flow Report, Refugees and Asylees: 2018* (Oct. 2019), at 8, *available at*

2

5.      Violence, in combination with impunity and a failure of protection, causes children and families to flee their homes in the northern countries of Central America and seek safety in the United States. Migrants from these countries seek to escape violence inflicted by criminal gangs or other organized crime, for example by drug cartels; sexual and gender-based violence, including violence and extreme discrimination based on sexual orientation and/or gender identity; and domestic abuse. Women and girls, and lesbian, gay, bisexual, transgender, and intersex ("LGBTI") individuals, face very high levels of sexual and gender-based violence. Children are also frequently trafficked from rural to urban areas and across borders or to border areas, where they are often sexually exploited or subject to exploitative labor. Femicide, or the gender-motivated killing of women and girls, is also pervasive in these countries.[3]

6.      Gangs now dominate much of the urban areas of the Northern Triangle countries, and their control has increasingly spread to rural areas as well, where international drug cartels also, increasingly, operate. The most recent U.S. State Department Travel Advisory for Guatemala illustrates this point, issuing a level 3 travel advisory for the departments of Guatemala, Escuintla, Chiquimula, Quetzaltenango, Izabal, and Petén.[4] The departments of San Marcos and Huehuetenango have also experienced significant growth of organized crime in recent years. Where these criminal groups dominate, women and girls are in constant danger of

---

https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2018/refugees_asylees_2018.pdf.

[3] *See* UNODC, *Global Study on Homicide* (2019), *supra* note 4 (reporting that in 2017, El Salvador and Honduras ranked first and third in the world for female homicide rates); Mimi Yagoub, *Why Does Latin America Have the World's Highest Female Murder Rates*, InSight Crime (Feb. 11, 2016), *available at* https://www.insightcrime.org/news/analysis/why-does-latin-america-have-the-world-s-highest-female-murder-rates/ (reporting Guatemala ranked third in the world by female murder rate).

[4] U.S. Dep't of State, *Guatemala Travel Advisory*, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/guatemala-travel-advisory.html (last visited Feb. 5, 2021).

3

being targeted for sexual violence, as they use rape and the threat of rape as a tactic of control in the areas where they operate. Women and girls are also frequently targeted for forced sexual relationships with organized crime members, and those who resist these advances face violence or even death. When family members seek to protect women and girls from forced relationships they face violence repercussions.

7.      Gangs also forcibly recruit boys and girls and, once invited to join, those who resist (or are related to those who resist) face threats, torture, and ultimately death. These same consequences also face individuals who fail to comply with violent extortion demands from these groups, which have become very common in recent years. When victims attempt to escape by relocating within their countries, gangs often track them down and ruthlessly punish them.

8.      Gang-based violence is pervasive in Guatemala, Honduras, or El Salvador. Over 90% of homicide cases in the northern countries of Central America end in impunity, and in cases involving sexual and gender-based violence the impunity rate is even higher—at 95%. Law enforcement officers sometimes target LGBTI individuals precisely when they come in to report violence. Violence against women and children has increased during the pandemic, at the same time that severe restrictions on movement and reduced staff at government agencies in Guatemala, El Salvador, and Honduras, have made reporting it even more difficult.

9.      COVID-19 has exacerbated gender-based violence, gang violence, and other longstanding concerns in Northern Central America, making the situation even more dire for expelled families. The increase in violence against women and children has been evident in the spike in calls to emergency hotlines during the pandemic. The Organization of Salvadoran Women for Peace (ORMUSA) reported a 70 percent increase in complaints of violence against

Supp. Add. 9

women in El Salvador between mid-March and late May of 2020.[5]  In Honduras, since the

pandemic started, every hour a woman experiences some form of GBV[6], and the number of

reported cases of domestic and intra-family violence increased by 4.1 percent per week during

the first months of lockdown (March through May), reaching 10,000 reports made to the

National Emergency System in April alone.[7]

       10.     In El Salvador, Honduras, and Guatemala, street gangs have used COVID-related

confinement to strengthen their control over communities.[8] This includes "stepping up of

extortion, and sexual and GBV, and using forced disappearances, murders, and death threats

against those who do not comply"[9] with curfews and other restrictions. In Honduras, for

example, gangs have used such tactics against citizens who did not comply with stay-at-home

orders.[10]  In El Salvador, gangs, like the MS-13, enforced the implementation of COVID-19

lockdown restrictions in several cities, including Santa Ana and San Salvador, through threats

and violence.[11] Gangs killed 74 people during the first week of lockdown, far surpassing the

previous average of approximately three deaths per day due to gang violence.[12]

---

[5] https://ormusa.org/organizaciones-lanzan-campana-de-sensibilizacion-de-la-violencia-contra-las-mujeres-en-el-marco-de-la-emergencia-por-covid-19/ and
https://www.elsalvador.com/eldiariodehoy/violencia-domestica-coronavirus-cuarentena/702488/2020/

[6] https://honduras.unfpa.org/es/news/es-prioridad-asegurar-la-continuidad-de-los-servicios-de-atenci%C3%B3n-victimas-de-violencia-durante

[7] https://www.rescue.org/press-release/irc-data-shows-increase-reports-gender-based-violence-across-latin-america   and https://presencia.unah.edu.hn/noticias/observatorio-de-la-violencia-reporta-45-muertes-violentas-de-mujeres-en-el-periodo-de-confinamiento/

[8] UNHCR staff. 2020. "Central America's displacement crisis aggravated by COVID-19." UNHCR

[9] Ibd.

[10] UN News. 2020. "Coronavirus Lockdowns in Central America, Exploited by Criminal Gangs | COVID-19 | UN News." United Nations.

[11] Linthicum, Kate. O'Toole, M. Renderos, A. 2020."In El Salvador, gangs are enforcing the coronavirus lockdown with baseball bats." Los Angeles Times.

[12] Edgardo Ayala.2020. "Pandillas, virus más letal que el COVID-19 en El Salvador." La

11.     Expelled families are returning to grave food insecurity, a longstanding problem in Guatemala, El Salvador, and Honduras, where over 35 percent of the population experiences extreme, chronic undernourishment, but made much worse by the economic impacts of the pandemic.[13]  Increased economic and social insecurity combined with heightened control exerted by gangs during the pandemic, has left children and their families more vulnerable to violence, displacement and forced recruitment by gangs.  This has had an even greater impact on children and families who had already being displaced within their own country in previous years due to escalating violence and insecurity.[14]

12.     Closely related to impunity are the well-documented problems of corruption and repression in all three of these countries. In one notable example, the former Guatemalan president, Jimmy Morales, recently expelled the International Commission against Impunity in Guatemala ("CICIG"), an entity created by agreement with the United Nations to prosecute corruption. In its final report, CICIG described the Guatemalan government as a "mafia coalition," noting that corruption in that country could not be solved without "a profound restricting of the state."[15] In October 2019, the brother of Honduran president Juan Orlando Hernández was convicted on charges of drug trafficking, in a trial in which multiple witnesses testified that President Hernández himself was aware of the activity, but accepted bribes and

---

Jornada. And Martinez, C. Martinez, O. Lemus, E. 2020 "Pandillas amenazan a quien incumpla la cuarentena." El Faro
[13] Food and Agriculture Organization. 2020. "SDG Indicator 2.1.1 – Prevalence of Undernourishment." United Nations.
[14] https://www.unhcr.org/news/briefing/2020/5/5ebe47394/central-americas-displacement-crisis-aggravated-covid-19.html
[15] *Guatemala in grip of 'mafia coaliti*o*n', says UN body in scathing corruption report*, The Guardian (Aug. 8, 2019), *available at* https://www.theguardian.com/world/2019/aug/28/guatemala-corruption-mafia-coalition-jimmy-morales.

political support in exchange for turning a blind eye.[16] In January 2020 President Hernández shut

down the mandate for the Mission to Support the Fight Against Corruption and Impunity in

Honduras (MACCIH), the anti-graft body backed by the Organization for American States.

13.     I am aware of numerous cases involving domestic violence or sexual violence

perpetrated by a male involved in organized crime in which the perpetrator was able to "buy off"

law enforcement, as well as examples of police officers and judges being bought off. I have

spoken with numerous women, including some adolescent girls, who fled abusive domestic

partners in the northern countries of Central America whose partners had either money or family

connections that protected them from prosecution.

14.     In addition to these forms of violence, children and families expelled to

Guatemala, El Salvador, and Honduras face discrimination from those fearful that they will

introduce COVID-19 to the community. Expelled migrants have faced threats of lynching or

burning in some cases.[17] Asylum-seekers expelled to the country of origin have also continued to

face threats from their persecutors. KIND referred a number of expelled children and their

families to protective housing arrangements in order to provide some limited, short-term safety,

but asylum-seekers returned to dangerous conditions lack long-term protection. Migrants, like

the 19 shot and charred dead Guatemalans recently found in a truck in Tamaulipas, are often the

victims, with perpetrators ranging from police or other security forces to drug cartels and other

organized criminal groups.[18]  These cases include a Guatemalan family who had fled persecution

---

[16] *Honduran President's Brother is Found Guilty of Drug Trafficking*, N.Y. Times (Oct. 18, 2019), *available at* https://www.nytimes.com/2019/10/18/world/americas/honduras-president-brother-drug-trafficking.html.
[17] *U.S. returns migrant children despite risks worsened by Coronaius: UNICEF*, Reuters (May 21, 2020), *available at:* https://www.reuters.com/article/us-health-coronavirus-usa-mexico/us-returns-migrant-children-despite-risks-worsened-by-coronavirus-unicef-idUSKBN22X1RP.
[18] https://www.washingtonpost.com/world/the_americas/mexico-tamaulipas-police-migrant-

in their country of origin, after they had unsuccessfully attempted to relocate in Guatemala and

their persecutors found them.  The family—which included a parent and two children—came to

the United States and were placed in MPP and forced to live in Mexico while awaiting their

removal proceedings.  Conditions in Mexico became so unsafe that the children crossed the

border without their mother to seek safety in the United States, but were then expelled to

Guatemala.  The parent, who remained in Mexico when the children went on to the United

States,   returned to Guatemala after learning of the children's expulsion, although the parent felt

terrified to return.

15.     Mexican children and families risk return to the same dangers they fled, typically

violence at the hands of drug cartels. Central American families expelled to Mexico face the

additional risk of being targeted because of their status as migrants.[19] In one family's case, the

family was returning to one of the encampments along the U.S.-Mexico border where migrants

are living while awaiting removal proceedings in the United States.  The mother was targeted by

kidnappers and escaped, but her child was injured in the process.   Another family faced threats

by criminal gangs who were attempting to steal children in an encampment in Matamoros,

Mexico.[20] We are also aware of three families whose children suffered sexual abuse while living

---

killing/2021/02/03/32c22274-65c7-11eb-8468-21bc48f07fe5_story.html.

[19] According to Human Rights First, as of May 13, 2020 there were over 1,114 reported cases of "murder, rape, torture, kidnapping, and other violence assaults against asylum seekers and migrants" at the U.S. Mexico border, *available at:*
https://www.humanrightsfirst.org/campaign/remain-mexico; *More People Kidnapped, Abused on Migration Route in Southern Mexico*, Doctors Without Borders (Oct. 30, 2019), *available at* https://www.msf.org/increase-kidnappings-and-violence-against-migrants-southern-border-mexico.
[20] Brief of Young Center for Immigratn Children's Rights, Kids in Need of Defense, et al., *Wolf v. Innovation Law Lab*, No. 19-1212 (Jan. 22, 2021) at 19-20, 31-21,
http://www.supremecourt.gov/DocketPDF/19/19-1212/167044/20210122180800456_19-1212%20Amici%20Curiae.pdf.

in a migrant shelter in Ciudad Juarez, Mexico.

16.     Mexico ranks in the top 20 countries with the highest global homicide rates, and border towns in Mexico—where many children and families are expelled to—have some of the highest rates of homicide, kidnapping, and femicide in the country. In 2016 the average homicide rate per capita in 35 Mexican border municipalities was over four times the rate in the corresponding U.S. border counties.[21]

17.     In addition, the U.S. government currently expels many families from Guatemala, Honduras, and El Salvador to Mexico. Such families often face grave threats at the U.S.-Mexico border. In the Mexican border state of Tamaulipas, children face high rates of kidnappings and murder. From 2006 to 2014 at least 2,000 children were murdered or mutilated, and in the first five months of 2020, 265 children were reported missing.[22] Children in Mexico's border regions are particularly vulnerable to human trafficking, sexual exploitation, and forced labor, in many cases at the hands of organized criminal groups. Over the past five years, rates of femicide, or gender-motivated killing of women and girls have increased 137 percent and in many cases these murders are accompanied by torture, mutilation, and sexual violence. The border states of Sonora, Nuevo León, and Chihuahua had the highest femicide rates in the country, almost twice the rate of Mexico City. Femicide rates in the border city of Ciudad Juarez have been on the rise since 2019, and historical data show that young women are disproportionately targeted, with half

---

[21] *Here's What Violence Along the U.S.-Mexico Border Really Looks Like*, Igarape Institute (Jul 3, 2017), *available at:* https://igarape.org.br/en/heres-what-violence-along-the-u-s-mexico-border-really-looks-like/.

[22] *Relatoría sobre los Derechos de la Niñez culmina su visita a México* (Rapporteur on children's rights completes visit to Mexico), Organization of American States (Oct. 20, 2014), *available at:* http://www.oas.org/es/cidh/prensa/comunicados/2014/125.asp; https://www.hrw.org/news/2020/06/02/dhs-oig-formal-complaint-regarding-remain-mexico.

Supp. Add. 14

of victims under the age of 19.[23]

18.     Ninety-nine percent of crimes committed against migrants in Mexico end in

impunity.[24] The vast majority of gender-based crimes in Mexico also go unpunished due to

widespread underreporting, corruption, and the failure of government institutions to effectively

investigate and prosecute crimes. As many as 99 percent of femicides result in impunity.[25]

Migrant women and children who are victims of gender-based violence in Mexico face even

greater barriers to accessing protection and justice, including fear of discrimination or

deportation if they report violence.

19.     KIND has also worked with families subjected to Title 42 expulsion, including a

family that repeatedly expressed a strong fear of return to their Central American country of

origin while caring for a child recovering from a serious medical condition. After being

apprehended by CBP in July 2020, the family was held for several days in hotels near the border,

under guard and allowed only brief, non-private telephone calls with their U.S. citizen family

member; the child's medication was taken and not replaced, and a promised visit from a doctor

---

[23] Femicide in Juárez is Not a Myth, Texas Observer (Sept. 28, 2015), *available at:*
https://www.texasobserver.org/femicide-in-juarez-is-not-a-myth/. In July 2020 there were 161
homicides in Juarez, which was only the third-highest month this year; 15 of the victims were
female, including a two-year-old child. Luz del Carmen Sosa, Cobra julio 161 víctimas de
homicidio (In July, 161 victims of homicide), *El Diario* (Aug. 1, 2020), *at*
https://diario.mx/juarez/cobra-julio-161-victimas-de-homicidio-20200801-1691599.html.
[24] *Access to Justice for Migrants in Mexico: a Right that Exists Only on the Books*, Washington
Office on Latin America, Fundar, Fundacion Para la Justicia, Hermandos del Camino, Red
Migrantes Sonora, La 72, Casa del Migrante Saltillo (Jul. 2017), *available at:*
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwi2ot-
onNPuAhU9CjQIHQwBD-
MQFjABegQIBBAC&url=https%3A%2F%2Fwww.wola.org%2Fwp-
content%2Fuploads%2F2017%2F07%2FAccess-to-Justice-for-Migrants_July-
2017.pdf&usg=AOvVaw1xJPmgWElEm8dNetnhVxxY.
[25] *Despite the Coronavirus Mexican Women are Fighting Femicide*, Foreign Policy (May 20,
2020), *available at: https://foreignpolicy.com/2020/05/20/coronavirus-mexico-women-fighting-
femicide/.*

never materialized. They were then expelled on a flight to their country of origin.

I declare under penalty of perjury under the laws of the United States of America and California that the foregoing is true and correct.  Executed on: February 5, 2021, in Berkeley, California, United States.

Signature:      /s/ Lisa Frydman

                Lisa Frydman

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al. | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of | ) No. 20-cv-00100-EGS |
| Homeland Security, in his official capacity, et al., | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF TAYLOR LEVY IN SUPPORT OF PLAINTIFF'S MOTION FOR
CLASSWIDE PRELIMINARY INJUNCTION**

I, Taylor Levy, hereby declare:

1. I am an attorney admitted to practice in Texas. I became licensed in 2019. I am in good standing with the State Bar of Texas (State Bar No. 24113588). I specialize in immigration law, and run a private law firm called Taylor Levy Law through which I provide primarily pro bono legal services to individuals along the U.S.-Mexico border.

2. Since 2009, I have worked as an attorney and advocate in various capacities for noncitizens at or near the border. Among other roles, I have worked as Legal Coordinator for Annunciation House in El Paso, Texas, where I coordinated volunteers who represent and advocate for immigrants in the El Paso area. Before I became licensed as an attorney, I worked for five years as a Department of Justice Accredited Representative representing individuals in immigration court in the El Paso, Texas area.

3. Beginning in March 2020 I began going to the Mexican side of the Paso del Norte Port of Entry in Ciudad Juarez, Mexico to provide free legal advice to migrants presenting for their (cancelled) Migrant Protection Protocols ("MPP") hearings.  From March 2020 through August 2020, I went to the Paso del Norte Port of Entry almost every weekday from approximately 4 am to 10 am and provided free legal advice and free consultations. From March 2020 through November 2020, I also frequently visited migrant shelters to give free legal advice and consultations to families who had been expelled under Title 42. In addition to my work in Juarez, I serve as a free mentor to immigration attorneys from across the country. Since March 2020, I have consulted on numerous cases involving asylum-seeking families expelled across the southern border.

4. Since the Title 42 Process went into effect in March, I have worked with dozens of families subjected to expulsion under Title 42.   Many of these families include very

young children, some of whom are infants or toddlers.  Most of the families I have worked with come from El Salvador, Guatemala, Honduras, and Venezuela.

5.  Between March and August 2020, I personally observed hundreds of Title 42 expulsions, which included a number of families with parents and their children.  The children who I observed being expelled ranged from infants held in their mothers' arms who were too young to walk, to four-year-old toddlers, to teenagers.  Many of the children I saw being expelled were in wet and muddy clothes.  They told me that they were hungry and thirsty.

6.  When I observed people who I thought had been expelled, I would approach them and try to explain that I was an immigration lawyer and there to help if they needed help. They were often too scared to speak with me, as they did not know who I was or if I was going to hurt them or trick them.  However, during this period I spoke with dozens of people who were expelled, including many families with minor children, both at the bridge and in migrant shelters.

7.  The families I have worked with were frequently fleeing grave persecution and threats in their countries of origin.  I would ask families if they had asked US border agents for asylum prior to their expulsions.  Many said they had asked for asylum but that US immigration agents had told them that asylum had been cancelled and that it was impossible to ask for asylum.  Many would break down crying, sobbing, shaking, saying they had nowhere to go in Mexico, they did not know where they were, and that they could not return to their home countries.  They would often tell me that they had told immigration agents details about the violence and persecution they were fleeing in their home countries and were ignored. The most common refrain from people was, "what am I supposed to do, where am I supposed to go."

8.  People were scared of being in Juarez because they did not know how to navigate the area or where they could go to stay safe, and they were scared they would be kidnapped. They were too scared and uninformed to know who was there to help them and who was there to hurt them, so there was no way for them to learn about the (few) resources that exist in Juarez for migrants, like migrant shelters.  Some expelled migrants told me that they attempted to turn themselves in to Mexican immigration officials, but the officials told the migrants that they could not help because of the pandemic.  Some even asked Mexican officials to deport them back to their home countries because they felt safer hiding there than trying to survive on the streets of Juarez, but that Mexican officials declined because there were no deportations happening due to the pandemic.

9.  On one occasion I spoke with a family from Central America.  The family consisted of a mom and her school-aged son who were originally too scared to talk to me.  After they had been at the bridge for several hours, observing me speak with other migrants, they finally trusted me enough to talk to me.  They told me that they had been expelled after being apprehended at a Border Patrol checkpoint, trying to leave El Paso.  The mother was despondent and told me she told the agents she wanted to seek asylum.  She said they told her that no asylum was available.  She did not know what she was going to do and did not know where to go in Juarez and was scared they would be harmed in Juarez.  This

family was emblematic of many other families I observed and spoke with, who similarly were fleeing persecution and were told by U.S. officials that asylum was no longer available.

10. On another occasion I saw a mom with a little boy who was 4 or 5 years old.  I saw them at 4 am, right when I got to the bridge.  I knew she was a migrant because of the hour and because she had a small child with her.  She was an asylum seeker from Honduras who was too traumatized to tell me why she was fleeing, she just kept saying "asylum, asylum," when I asked.  The mom was very upset because when she was picked up, Border Patrol had taken her passport and her son's birth certificate.  When she was expelled, Border Patrol had not returned these documents to her.  Like other people who were expelled under Title 42, she had been taken to the middle of the bridge by Border Patrol and told to walk south.  She told me that once she understood she was being expelled, she asked the officers repeatedly to return her documents to her.  Now that she was in Juarez without these documents, she was terrified that someone would take her child from her since, without her son's birth certificate, she could not prove that her son was her son.  I immediately took her back to the middle of the bridge and asked the officers for her documents.  The officers I spoke with initially denied that Border Patrol agents had taken her documents, saying Border Patrol did not do that.  I then called Border Patrol Station 1 and begged them to listen to me.  After several phone calls and being bounced around to different officers, I was finally told that Border Patrol agents did have her documents and would return them.  Approximately one hour later, a Border Patrol officer came to the middle of the bridge where we were waiting and returned her passport and her son's birth certificate to her.  I feel confident that she would not have been able to recover her documents without my advocacy.

11. I have also consulted on numerous cases involving kidnapped Central American asylum-seeking families. In many of these cases, the families were kidnapped immediately upon being expelled from the United States. Because the families are not Mexican, and lack connections and resources in that country, they are frequently preyed upon and victimized by gang members, the cartels, or others seeking to take advantage of their vulnerable circumstances.  The families are easily-recognizable in Mexico because of the locations where they are returned, their clothing, and their accents.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed in Hallandale Beach, Florida.

Dated: February 5, 2021                           */s/ Taylor Levy*
                                                  TAYLOR LEVY

## SUPPLEMENTAL DECLARATION OF TAYLOR LEVY

I, Taylor Levy, hereby declare, pursuant to 28 U.S.C. § 1746:

## SUMMARY

1. Having worked with border communities for over ten years, including having represented over 1,200 migrants impacted by the Title 42 policy, I am deeply familiar with the humanitarian crisis fueled by the policy and the policy's disconnect from COVID-19 concerns.

2. CBP expulsions of migrants occur in predictable locations at predictable times in areas where kidnappers and organized crime are rampant. As a result, many migrants are kidnapped immediately upon CBP releasing them into Mexico from a U.S. port of entry.

3. The risks to migrants are particularly acute when CBP engages in so-called lateral expulsions, in which migrants are apprehended at one part of the border (often the Rio Grande Valley in Texas), detained for as long as seven days, transported by plane or bus to another part of the U.S. border (as far away as San Diego, California), and then expelled into a completely different part of Mexico.  Such expulsions make asylum-seekers even bigger targets for organized crime because the migrants (1) are easily identifiable outside the ports of entry, (2) are unfamiliar with their new surroundings,  (3) have no shelter or other resources in the area, and (4) they likely have no more money to pay extortion ("protection fees") to another local gang or cartel (after already being extorted at their previous location).

4. My clients in Mexico suffer abuse from every possible source.  For instance, one El Salvadoran woman had been expelled by the United States, then kidnapped, raped, and dumped in the desert, before the Mexican police told her that "migrants like to be raped" when she tried to report it; she then discovered that she was pregnant from the rape and suffered a forced abortion while seeking prenatal care at a public hospital. Overall, approximately 40% of the clients I worked with in Nuevo Laredo, Mexico report either an actual or attempted kidnapping (or both).

5. The horrific conditions that migrants endure in Mexico, combined with the federal government's decision to exempt children but not their parents from Title 42, have also forced parents to make gut-wrenching decisions to send their children across the border alone, unsure whether they will ever reunite.

6.  Many of my clients were also actively harmed by CBP during their expulsions. Mothers who recently gave birth were expelled—while still bleeding profusely—with their U.S.-citizen newborns. Others had their critical medications seized and disposed of.

7.  Through my work, I have become familiar with border processing, as well as shelter operations on both sides of the border. In my experience, Customs and Border Protection (CBP) has demonstrated that it can process families quickly, and shelter operators have taken extensive measures to prevent COVID-19 transmission among migrants, including testing and quarantine.

8.  I have helped facilitate COVID-19 testing for 858 clients, and only 22 people (2.56%) tested positive.

## QUALIFICATIONS

9.  I am an attorney admitted to practice in Texas. I became licensed in 2019. I am in good standing with the State Bar of Texas (State Bar No. 24113588). I specialize in immigration law, and run a private law firm called Taylor Levy Law through which I provide primarily pro bono legal services to individuals along the U.S.-Mexico border.

10. Since 2009, I have worked as an attorney and advocate in various capacities for noncitizens at or near the southern border. Among other roles, I have worked as Legal Coordinator for Annunciation House in El Paso, Texas. Prior to my attorney licensure, I worked for five years as an accredited representative for the U.S. Department of Justice representing individuals in immigration court in the El Paso, Texas area.

11. Beginning in March 2020 I began going to the Mexican side of the Paso del Norte Port of Entry in Ciudad Juarez, Mexico to provide free legal advice to migrants presenting for their (canceled) Migrant Protection Protocols ("MPP") hearings. From March 2020 through August 2020, I went to the Paso del Norte Port of Entry almost every weekday from approximately 4 am to 10 am and provided free legal advice and free consultations. From March 2020 through November 2020, I also frequently visited migrant shelters to give free legal advice and consultations to families who had been expelled under Title 42. In addition to my work in Juarez, I served as a free mentor to immigration attorneys from across the country. Since March 2020, I have consulted on numerous cases involving asylum-seeking families expelled across the southern border.

12. Since May 2021, I shifted my focus from my work in the Ciudad Juarez region to Nuevo Laredo (in partnership with the nonprofit organization VECINA) due to the alarming rates of expulsions under Title 42, which has subjected individuals seeking asylum to dangerous conditions in Nuevo Laredo, Mexico. I also work with some clients subjected

to Title 42 in Reynosa and Piedras Negras. I also communicate extensively with other immigration attorneys and humanitarian aid organizations providing services across the Mexican border.

13. I have also represented and helped many people seek exemptions from the CDC's Title 42 policy and be successfully processed at various ports of entry since April 2021. I have also helped arrange COVID-19 tests for hundreds of migrants prior to their entry into the United States since June 2021.

**Migrant Families Are Trapped in Horrific Conditions in Mexico As They Await the End of Title 42.**

14. Migrant families are extremely vulnerable in Mexico because, among other things, they are routinely (1) targeted for kidnapping, rape, trafficking, and extortion; (2) denied medical care even for serious illnesses; (3) displaced, homeless, and often forced to sleep on the street or in a plaza; (4) discriminated, harassed, and attacked based on race, gender, and sexual orientation; (5) assaulted by a combination of police and private actors; and (6) prevented from accessing basic services and legal protection due to language barriers.

15. Since May 2021, I have represented 398 families, and 22% of them had been kidnapped in Mexico. Twenty-one percent managed to escape from an attempted kidnapping. Overall, 41% experienced an actual or attempted kidnapping or both.

16. One of my female clients from El Salvador, who had been expelled three times under Title 42, was kidnapped by two men who put a wet rag over her mouth, causing her to lose consciousness. When she awoke, she was alone, mostly naked, dumped in the desert, and had been raped. She walked until she found a woman who gave her pants and some money for a bus ride. My client went to the municipal police to report the rape, and the police officers told her that they were not going to accept her complaint because she was a migrant and "migrants liked to be raped." She later realized that she was pregnant as a result of the rape and went to the public hospital for prenatal care. At the hospital, a doctor, without informing my client or obtaining her consent, forcibly induced an abortion. As a Christian, my client does not believe in abortion and wanted to keep her baby, who was innocent, despite being the product of rape.

17. That client's trauma was severe but not unique. I also represented a Black Honduran mother and her 7-year-old son—they were kidnapped in Reynosa, and the mother was severely beaten and raped in front of her son. When she sought help, Mexican police officers refused to help her and instead taunted her, asking her how much she would

charge to give them a turn. Since this trauma, the 7-year-old became extremely depressed and has frequently told his mother that he wants to die.

18. Another client told me that she was "lucky," because even though the kidnappers gang-raped her repeatedly, they always did it in a separate room so that her 8-year-old daughter and 6-year-old son did not have to watch.

19. Kidnappers target migrants in hopes of extracting ransom from family and friends in the U.S. Migrants, particularly Black migrants and other racial minorities, are readily identified based on their appearance and their proximity to the border.

20. Many of the families I work with have serious medical conditions and they are unable to access appropriate medical care in Mexico. They report going to the public hospitals to seek emergency treatment (as officially required under Mexican law) only to be denied care because of their status as migrants. My clients' untreated medical conditions have included cerebral palsy, seizures resulting from brain injuries suffered during beatings, brain tumor, vaginal infection, skin rashes, hernias, fainting, heart problems, diabetes, high blood pressure, asthma, anxiety, depression, suicidality, diarrhea, serious weight-loss, bed-wetting, gallstones, kidney stones, pediatric liver disease, anemia, ovarian cysts, spina bifada, hyperthyroidism, blood disease, autism, epilepsy, and scoliosis.

21. I represented a Honduran family whose one-year-old baby was denied emergency medical attention when he stopped breathing.  The baby has Down's Syndrome and a heart murmur. The family sought help at a public Mexican hospital and was told explicitly that they were denied care because they were foreigners. This family has been expelled to Mexico twice after trying to seek asylum in the United States.

22. I also represented a young Venezuelan man with spina bifada who was in a wheelchair, whose immobility made him particularly vulnerable to kidnapping. He was unable to receive necessary check-ups for his condition, and he ended up with an infection that moved to his kidneys as a result.

23. Another client had experienced vaginal bleeding for 3 months and was told by a doctor at the public hospital that she had over 20 uterine fibroids and was in severe need of surgery. However, the hospital refused to perform the operation because she was a migrant.

24. One of my clients was an 8-year-old girl with an enlarged heart that results in her turning purple and struggling to breathe. When the family sought out medical treatment for her,

doctors at public hospitals refused to serve them on numerous occasions, saying that Mexicans were more deserving of their help.

25. Families also frequently report a severe fear of leaving the shelters to seek out medical treatment because they are worried about being kidnapped, especially those families who have already survived one kidnapping and worry that their families will be unable to gather another ransom if requested.

26. My clients frequently report being harmed by Mexican law enforcement.  Many families report being robbed, bribed, kidnapped, beaten, and sexually assaulted by Mexican police.  Other migrants report Mexican immigration officials demanding $500 bribes in exchange for their release; some expelled migrants report being handed over directly to kidnappers by Mexican immigration officials immediately upon expulsion.

27. I represented a Black Honduran asylum-seeker who was six-months-pregnant and suffered a miscarriage due to extreme distress caused by frequent police raids at her apartment.

**Title 42 Has Exacerbated the Dangers that Migrant Families Face in Mexico.**

28. In addition to prolonging the time that people spend under dangerous conditions, Title 42 elevates the risks that migrants face in Mexico and inflicts additional trauma on asylum-seekers.

29. CBP expulsions of migrants occur in predictable locations at predictable times in areas where kidnappers and organized crime are rampant. As a result, many migrants are kidnapped immediately upon CBP releasing them into Mexico from a U.S. port of entry.

30. The risks to migrants are particularly acute when CBP engages in so-called lateral expulsions, in which migrants are apprehended at one part of the border (often the Rio Grande Valley in Texas), detained for as long as seven days, transported by plane or bus to another part of the U.S. border (as far away as San Diego, California), and then expelled into a completely different part of Mexico.

31. Such expulsions make asylum-seekers even bigger targets for organized crime because the migrants (1) are easily identifiable outside the ports of entry, (2) are unfamiliar with their new surroundings,  (3) have no shelter or other resources in the area, and (4) they likely have no more money to pay extortion ("protection fees") to another local gang or cartel (after already being extorted at their previous location).

32. At multiple ports of entry in Texas (Laredo, El Paso, Eagle Pass, and Hidalgo), CBP has routinely expelled my clients, including newborns, into the waiting arms of kidnappers biding their time next to the port. Migrants become immediate targets as soon as they are marched over the boundary line into Mexico. Several of my clients have reported kidnappings and attempted kidnappings by armed men in trucks and vans waiting near the spots where Title 42 expulsions occur.

33. During those incidents, children are sometimes ripped from the arms of their mothers and fathers and pulled into the kidnappers' vehicles. Oftentimes migrant families run from these kidnappers trying to escape, resulting in family separation where some members escape while others are not so lucky. In some cases, the family members who survived the attempted kidnapping never again hear from their missing family members.

34. Others have reported being kidnapped by supposed taxi drivers who park near the ports and either kidnap the migrants directly or who refuse to take them to their destination and instead hand them over to kidnappers.

35. I represented a father and his six-year-old son, who were kidnapped and almost kidnapped a second time, each time immediately after being expelled from a U.S. port of entry. The first time, they were immediately kidnapped after CBP expelled them into Reynosa; the father was trafficked for labor. After they were released, the family tried to seek asylum again—this time, CBP transported the family and expelled them into Nuevo Laredo, where they narrowly escaped another kidnapping attempt.

36. Another client family, consisting of a mother and her seven-year-old son from El Salvador, were expelled into Mexico on several occasions trying to seek asylum in the United States. On their final attempt, they were kidnapped immediately upon expulsion to Nuevo Laredo and held for eight days while their family gathered the money to pay their ransom. The mother reported that her son did not eat anything during the entire kidnapping and was deeply traumatized.

37. I also represented a Honduran mother, father, and their children, ages eight and one. The mother was kidnapped and held for a month before finally being released after her family in the United States paid a ransom. Later, the father was approached by the cartel in Nuevo Laredo who demanded that he work for them. He refused, and they beat him so badly that they broke his hip and told him that he was going to have to start working for him once he healed. The family was so terrified that they hid in the migrant shelter rather than try to seek medical care; as a result, the father can no longer walk unassisted.

38. Another client was immediately kidnapped after being expelled from El Paso and was repeatedly sexually assaulted by her captors.

39. I also worked with a young mother of three who attempted to cross at Reynosa, Mexico but the family was apprehended and expelled more than a thousand of miles away into Tijuana, Mexico. On their second attempt, they were deported to Nuevo Laredo, where the family was kidnapped for five days and threatened with dismemberment for a ransom of $20,000. The family is now traumatized from the event.

40. In another case, a mother and her two sons—including one who has severe autism and is nonverbal—were kidnapped for three weeks after being expelled into Mexico. The family had fled their home country after the children's father was murdered.

41. Another mother and her 8-year old son seeking asylum were expelled and then kidnapped for several days until her son fell ill and they were released "so her son would die elsewhere."

42. I also worked with a family of four that included a nine-month-pregnant mother, a father, and two children ages four and nine. The family originally sought asylum in the Reynosa area, only to be expelled. During their second attempt to seek safety, the family was accosted by cartel members. The young children made it across the river (thereby becoming unintentional unaccompanied minors), but the mother and father were kidnapped, separated, and brutalized. Eventually, the mother was released when she went into labor, and her baby was born with severe complications.

43. Title 42 has also resulted in more dangerous crossings. Prior to Title 42, I had rarely witnessed or learned of families attempting to climb over the border wall, but now, this has become a more common occurrence for desperate families subject Title 42 expulsions. I worked with a family who attempted to jump over the border wall and the two children fell off; one broke their leg and the other was seriously injured.

44. I have also represented clients who suffered direct harm at the hands of the Border Patrol during the expulsion process. For instance, expelled families frequently report having their medications seized by the Border Patrol. For example, I recently represented a Honduran mother with a chronic heart condition whose medication was taken away by Border Patrol upon apprehension and never returned; this resulted in her having extremely high blood pressure and swelling in her feet. I also represented a mother and her two-year-old son, whose asthma medicine was seized.

45. Since March 2021, I have represented five Central American mothers who were expelled into the streets of Piedras Negras, Mexico, within 48-72 hours after giving birth to a U.S. citizen baby in Eagle Pass, Texas. All of the mothers reported being expelled with limited baby formula, diapers, and clothing. The mothers—including one who had a cesarean section—all told me that they were in significant pain from given birth and unable to access medical care in Mexico. One mother told me that the Border Patrol took away all her belongings prior to expulsion—including her cell phone, money, clothing, and sanitary napkins—such that she had bled through her only pair of underwear and pants. All five mothers were expelled prior to obtaining birth certificates for their infants. Once in Mexico, they were unable to obtain appropriate medical attention for their babies because of their undocumented status.

**Title 42 Has Caused Innumerable Families to Become Separated From Their Children.**

46. Given the dangerous conditions in Mexico, the continued application of Title 42 to migrant families has forced parents to make heart-wrenching decisions to send their children to the United States alone, not knowing when (or if) they would ever see each other again.

47. I have witnessed the desperation that has forced parents to send their children unaccompanied to the border, because the Biden administration will accept only unaccompanied minors and not families under Title 42. Parents believe that is their only option. I have heard parents say, "no me queda de otra" ("I have no other option").

48. For example, I worked with an indigenous mother with limited Spanish fluency who tried to seek asylum with her eight-year-old daughter. Immediately upon expulsion, the family was pursued by masked men with guns. The mother told her daughter to run, and the child was able to narrowly escape while the mother was abducted. The daughter ended up in the custody of the Office of Refugee Resettlement ("ORR")—deeply traumatized— and thinking for over a month that her mother had been killed.

49. Another one of my clients was the mother of a nine-year-old boy fleeing forced gang recruitment in Honduras. After an attempted kidnapping in Mexico, the child's mother sent him alone to the U.S, where he was languishing in ORR custody with no viable sponsor and about to be placed in long-term foster care.

50. I also represented a family that crossed the border twice in April 2021 seeking asylum. After being expelled both times, the family decided to send their son across alone. The remaining adult family members narrowly escaped an attempted kidnapping in Ciudad Juarez. They were also accosted and robbed by Mexican police officers.  The father also

had uncontrolled diabetes and was unable to access proper medical care in Mexico. An attorney for the child, who was in ORR custody, contacted me for assistance applying for a humanitarian exemption from Title 42 for the adult family members, because the child—who had been identified as a victim of human trafficking—was suffering severe psychological trauma worrying about his family's safety.

51. It is my professional opinion that the unaccompanied minor increase at the border is directly linked to the Title 42 expulsions and the decision to only exempt children (but not their parents and adult relatives) from expulsion.

52. Almost all of the parents I have worked with who sent their kids ahead alone as unaccompanied minors did so only after first being expelled as a family unit.

53. I have worked with dozens of such families, including many who sent across young children. Some families decided to only send their older children across the border alone, keeping their younger children with them. After sending their kids across the border unaccompanied, the parents then continue to try and enter the country, as single adults.

54. I have worked with clients who have attempted to cross into the United States as many as nine times out of desperation, being expelled each time without an asylum hearing that could have been provided the first time they sought entry, thereby avoiding multiple contacts with CBP.

55. Instead of deterring families from coming into the United States, Title 42 forces families to enter again and again, because there is no other way to seek protection or to reunite with their children.

56. In many of these cases, unless the parent is allowed to enter the United States, the child would be stuck in government foster care indefinitely, potentially for years. I frequently field phone calls and emails from attorneys representing unaccompanied minors in ORR custody who have been designated "Category 4"—meaning that there is no parent or other sponsor able to take custody of the child in the United States.

**DHS's Selective Application of Title 42 Discriminates on the Basis of Nationality.**

57. Although the Title 42 policy on its face applies to undocumented persons regardless of country of origin, in reality, DHS engages in selective application of Title 42 that discriminates on the basis of nationality.

58. As the federal government has acknowledged, DHS generally does not expel nationalities that the Mexican government refuses to accept. *See* Centers for Disease Control and Prevention, *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* (Aug. 2, 2021) (hereinafter "CDC Order") at 15, https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf. Mexico in turn "will only accept the return of Mexican and Northern Triangle nationals," with "limited exceptions." *Id.*

59. By adopting Mexico's nationality preferences, DHS is distinguishing between migrants under Title 42 for geopolitical reasons, rather than on the basis of public health.

60. As a result of DHS's selective enforcement, Mexican, Guatemalan, Honduran, and Salvadoran migrants are much more likely to be expelled into Mexico compared to other nationalities, even though they may present the exact same COVID-19 risk. *See* CBP, *Southwest Land Border Encounters* (last visited Aug. 10, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

**CBP Can Process More Families at Ports of Entry, Including at El Paso.**

61. Rather than force families to cross dangerous terrain to seek asylum, CBP can and should make orderly presentment at ports of entry a possibility for asylum-seeking families.  I have worked with many families who approached ports of entry for an opportunity to prove their asylum claims before they were prevented from entering the port.

62. Although the government claims that every individual takes hours to process, based on my experience, CBP is capable of processing people more quickly than that.

63. I am also familiar with families and individuals being processed for humanitarian exemptions from the Title 42 policy via the so-called consortium process, which enables certain NGOs to identify and refer vulnerable individuals to the federal government to receive exemptions.  Those individuals are able to be quickly processed without being detained for hours in congregate settings.

64. Over the past several months, I have maintained a waiting list of hundreds of families who were waiting for a humanitarian exemption from Title 42.  Many of these families have been waiting in Mexico for a chance to pursue their asylum claims in the United States since before the onset of Title 42, due to various other Trump administration policies undermining access to asylum.  Some of those families have waited their turn for 1-2 years under dangerous conditions, hoping to follow the law and do everything the "correct" way. Now that NGOs responsible for referring exemption requests to DHS are

no longer accepting new cases because of a backlog, those families whose desperation has reached a tipping point after years of suffering are now left with no options.

65. In the past, families were able to be processed much more quickly than the amount of time that the government is currently contending.  Prior to 2018, I seldom witnessed noncitizens being immediately issued Notices to Appear (NTA), which formally commence removal proceedings and create a process for asserting asylum claims.  Now, DHS has opted to issue NTAs immediately and asserts that the complexities of issuing an NTA requires significant processing time (and the detention of the noncitizen while the paperwork is being prepared). However, as past practice would indicate, DHS is not required to issue NTAs immediately, particularly when doing so unnecessarily prolongs detention and strains processing capacity. DHS and CBP could easily address their capacity issue by merely returning to historical practices. In the past, noncitizens could be quickly issued release documents and informed to check in with ICE at their ultimate destination to receive their NTA.

66. Another practice that should be adopted to speed up the processing times and reduce time in congregate settings is to utilize available space around the ports of entry.  For example, due to my extensive work in the El Paso area, I am extremely familiar with the port of entry and its ability to utilize outdoor spaces for processing.  I have witnessed the use of mobile fingerprinting stations, trailers, and tents for the quick processing of migrants. The El Paso port of entry and nearby Border Patrol facilities have ample outdoor spaces and empty parking lots where mobile processing stations could be set up for faster and COVID-safe processing.  Notably, CBP has developed innovative ways to process noncitizens, but unfortunately is employing these methods to undertake Title 42 expulsions, and not for regular asylum processing.

**Testing, Quarantine, and Shelter Capacity**

67.  Through my extensive work at the border, I have personal experience with the non-governmental organizations (NGOs) that assist noncitizen families in Juarez and El Paso as well as Nuevo Laredo and Laredo.

68. My work with Annunciation House for a decade provided me with intimate knowledge in the ways that these shelters and organizations can and are more than willing to accommodate larger numbers of people entering the country.

69. The work of these organizations was happening prior to the pandemic, it continued through the pandemic, and currently they are waiting to be able to take in more people. I

have personally been responsible for setting up pop-up shelters in churches, community centers, and hotels when expansions were needed.

70. Shelters and other NGOs on both sides of the border have worked to provide COVID-19 testing and implement steps designed to reduce the risk of COVID-19 transmission in migrant shelters.  For example, from March 2020 through November 2020, I observed first-hand the various mitigation measures undertaken in the migrant shelter system in Ciudad Juarez, Mexico. There were various "filter" shelters erected to house, quarantine, and treat migrants who were COVID-19 positive and those who had not yet been tested. The rest of the shelters severely restricted in-and-out privileges to reduce the risk of contagion, and masks are generally required indoors. Hand sanitizer, bleach, and soap were plentiful. Visitation was limited to those providing essential services (such as legal aid) and occurred outdoors, masked, and with sufficient social distancing.

71. Similarly, I work closely with a network of migrant shelters in Nuevo Laredo and Monterrey, Mexico. While I have not visited them in person, I have heard about their COVID-19 protocols from both the pastor managing the shelters and the migrants themselves. Migrants are instructed not to leave the shelters except for doctor's appointments or work; regardless, most rarely leave upon arrival because of the danger faced by migrants in Nuevo Laredo. There are plentiful masks, hand sanitizer, and cleaning supplies. The shelters are cleaned twice per day by the migrants. People who test positive for COVID-19 or who have high temperatures are transferred to a special quarantine shelter and isolated from the general population. A local lab comes to the shelters to administer COVID-19 tests as needed.

72. In both Juarez and Nuevo Laredo, families who receive a humanitarian exemption from Title 42 are able to access free or affordable COVID-19 tests before their appointments at the ports of entry, to ensure that they are not carrying the virus into the United States.

73. As part of my representation of clients seeking humanitarian exemptions, I have tracked their COVID-19 test results because those who test positive for COVID-19 were rejected by CBP.

74. Overall, 2.56% of my clients (22 out of 858) tested positive for COVID-19 in Mexico when they received a test prior to their appointments at the Laredo Port of Entry.

75. On the U.S.-side, shelters like Annunciation House that receive families released by CBP have developed procedures for COVID-19 testing, quarantine, and isolation as well. They provide rapid tests on-site and move positive families to quarantine locations.

76. Vaccinations are also available in Texas on demand without an appointment.

77. Prior to, during, and after the pandemic, I have been and will be working with families to ensure safe and humane processing into the United States while they await an asylum decision. Based on years of direct experience, I know there are ways to process people quickly and in a manner that is safe for both my clients, border communities, and government personnel.

I declare under the penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. Executed in El Cerrito, California.

Dated: August 10, 2021                                      /s/ Taylor Levy
                                                           TAYLOR LEVY

## DECLARATION OF JULIA NEUSNER

I, Julia Neusner, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I am a Legal Fellow in the Refugee Protection Program at Human Rights First. I make this declaration based on my personal knowledge and my interviews with refugees and migrants who have entered or attempted to enter the United States along the U.S.-Mexico border.

2.  This declaration addresses three overarching issues.  First, under Title 42 asylum seekers are being expelled to Mexico where they are targeted by criminal organizations for kidnappings, extortion, or other attacks.  By expelling them, often at night, the U.S. government is putting vulnerable people directly in harm's way. Second, DHS is conducting expulsions in a manner that increases the likelihood that they will get sick, specifically by flying them from one part of the border to another for expulsion without testing or basic COVID protocols (so-called "lateral flights"). Third, asylum seekers blocked from seeking safety in the United States are living in encampments in unsafe conditions, where they lack access to adequate health care and become even more obvious targets for gangs and criminal elements.

**My Research and Expertise**

3.  I have worked for Human Rights First since September 2020. Human Rights First is a national non-profit, non-partisan organization that provides pro bono legal services to asylum seekers and advocates for the United States government to uphold its human rights obligations abroad and at home, including its duties to refugees and asylum seekers under U.S. law and international treaties. I received a Juris Doctor from Stanford Law School and a master's degree in international policy from Stanford University in June 2020.

4.  During the past year I have led Human Rights First's research on the effects of the Title 42 expulsion policy, interviewing hundreds of asylum seekers returned to Mexico or turned away at ports of entry. I conducted field research in migrant shelters and tent encampments in Tijuana for three weeks in March and April 2021 and in Ciudad Juárez for one week in June 2021. I also remotely interviewed hundreds of asylum seekers located in Mexican cities including Piedras Negras, Monterrey, Reynosa, Matamoros, Nuevo Laredo, and others.  I have also interviewed numerous individuals working with asylum seekers, including Mexican immigration officials, migrant shelter staff, pastors and members of religious orders assisting asylum seekers, non-profit legal and social service providers, and private immigration attorneys.  Based on these investigations, I co-authored four human rights reports.[1]

---

[1] Human Rights First, "Humanitarian Disgrace: U.S. Continues to Illegally Block, Expel Refugees to Danger," (December 2020) *available at*
https://www.humanrightsfirst.org/resource/humanitarian-disgrace-us-continues-illegally-block-

1

**Asylum Seekers Expelled to Mexico Face a Perilous Security Situation**

5.  Asylum seekers sent by DHS to Mexico under Title 42 are exposed to violent attacks and exploitation. During the time asylum seekers are forced to wait in Mexico for the opportunity to request U.S. protection, they have been and are targeted based on characteristics that mark them as foreign nationals in Mexico, including their accent and/or primary language and physical appearance, as well as on account of race, gender identity, and sexual orientation, among other characteristics.

6.  Many asylum seekers and service providers told me that criminal organizations specifically target migrants returned to Mexico by DHS for kidnappings, extortion, and other attacks—often with the participation or complicity of Mexican police and/or other Mexican security forces. DHS sometimes expels families in the middle of the night without their shoelaces, a practice which clearly marks the families as expelled migrants and makes them even more vulnerable to kidnapping by cartels.[2] More than ten asylum seekers told me they were kidnapped after DHS expelled them to unfamiliar cities far from where they'd entered the U.S. Some were kidnapped within minutes of being expelled.

7.  My colleagues at Human Rights First and I track publicly reported cases of violent attacks against asylum seekers blocked or expelled to Mexico under Title 42. This tally is based on direct interviews my colleagues and I conduct with asylum seekers and/or their attorneys, incidents reported by other human rights groups and service providers (including Al Otro Lado, Human Rights Watch, Amnesty International, and Doctors Without Borders), as well as published media accounts.

8.  As of June 17, 2021, Human Rights First has tracked 3,250 kidnappings and other attacks, including rape, human trafficking, and violent armed assaults, against asylum seekers and migrants expelled to Mexico or blocked from crossing the U.S.-Mexico

---

expel; Human Rights First, Al Otro Lado, and Haitian Bridge Alliance, "Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger," (April 2021) *available at* https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum; Human Rights First: "Update: Grave Dangers Continue for Asylum Seekers Blocked In, Expelled to Mexico by Biden Administration," (June 2021) *available at* https://www.humanrightsfirst.org/resource/update-grave-dangers-continue-asylum-seekers-blocked-expelled-mexico-biden-administration. Human Rights First and Hope Border Institute, "Disorderly and Inhumane: Biden Administration Continues to Expel Asylum Seekers to Danger While U.S. Border Communities Stand Ready to Welcome." (July 2021) *available at* https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf.
[2] "Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger," p. 28.

2

border since January 2021.[3] This tally includes incidents published in media, interviews of asylum seekers by Human Rights First, information from attorneys and humanitarian services providers at the border, as well as more than 2,700 reported incidents of violent attacks against migrants and asylum seekers stranded in Mexico that were received through an ongoing electronic survey conducted by the organization Al Otro Lado and reviewed by Human Rights First.

9. For example, a Honduran woman I interviewed in a Juárez shelter told me that she and her seven-year-old daughter were kidnapped immediately after DHS expelled them to Juárez via a lateral expulsion flight from the Rio Grande Valley in April 2021. Mexican migration officials at the State Population Council (COESPO) of Chihuahua had told the woman that shelters were full and that the family had to find housing on their own. Immediately after mother and child left the COESPO office, armed men kidnapped them and held them captive for two months in a house where they were forced to sleep on the floor with dozens of other kidnapping victims and deprived of sufficient food and clean drinking water, with nothing but potatoes and eggs to eat. They managed to escape while being transported to another location. As of June 2021, the family remained in danger in a Juárez migrant shelter, experiencing nightmares and difficulty sleeping due to the trauma they suffered.[4]

10. I interviewed at least 20 asylum seekers who had requested U.S. protection after having been kidnapped in Mexico who reported that DHS expelled them without asking if they feared returning to Mexico. DHS expelled a Salvadoran woman and her two children in June 2021 immediately after the family had escaped from kidnappers who had forcibly held them for 10 days, extorted the woman's sister for thousands of dollars, and fired shots at the family as they ran away. The woman told me that U.S. immigration officers mocked her as she begged them not to return the family to Ciudad Juárez just hours after they crossed the border to ask for protection in the United States. On their return, Mexican immigration officers took her cell phone. As of June 2021, the woman's sister was still receiving threatening messages from the kidnappers and the family was terrified to leave the Juárez shelter where we spoke.[5]

11. Another Guatemalan family with two young children reported having been kidnapped immediately after DHS expelled them to Nogales by armed men who demanded a $15,000 ransom for their release. Border Patrol agents had transferred the family 17 hours by bus from where they had entered Texas to request asylum. When their

---

[3] Human Rights First, "Human Rights First Tracker of Reported Attacks During the Biden Administration Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico" (last updated 6/17/2021) *available at* https://www.humanrightsfirst.org/sites/default/files/AttacksonAsylumSeekersStrandedinMexico DuringBidenAdministration.6.17.21.pdf
[4] Disorderly and Inhumane: Biden Administration Continues to Expel Asylum Seekers to Danger While U.S. Border Communities Stand Ready to Welcome," *supra* note 1 at 3.
[5] *Id.* at 4.

3

captors released them, they put them on a bus to Tijuana, where the traumatized family was still waiting in fear when I interviewed them in April 2021.[6]

12. I interviewed many asylum seekers who were kidnapped or attacked in Mexico while waiting for U.S. asylum processing to resume. A Honduran woman fleeing death threats by a gang that murdered her partner was kidnapped in Mexico and trafficked for sexual exploitation for three months before she managed to escape in April 2021 and reunite with her 12-year-old daughter, who had been staying with another family member in Mexico. I spoke with the woman by phone while she was hiding in a Tijuana shelter, traumatized, depressed, and terrified that her traffickers would find her again. Though she has contacted multiple legal services organizations for help, she and her daughter have been unable to access the Title 42 exemption process and remain in danger in Mexico as of August 2021.

13. Several asylum seekers told me that Mexican police refused to investigate kidnappings and attacks against them or were complicit in their perpetration. A Honduran mother with three young boys recalled being kidnapped by Mexican police in Reynosa at the end of March 2021. Police ordered her and other families onto a bus, then sold the busload of people to a cartel, who held them captive until her family paid ransom. Badly shaken, she and her children crossed the U.S. border to seek asylum. DHS expelled them back to Mexico.[7] Another Salvadoran mother told me that Mexican police kidnapped, tortured, and robbed her 16-year-old son in Piedras Negras in April 2021 while the family was waiting to request U.S. asylum.

14. Asylum seekers fleeing gender-based violence risk being discovered by their persecutors in Mexico. I interviewed several women escaping abusive ex-partners who had located them in Tijuana. In April 2021, I spoke with a Guatemalan Indigenous woman who was raped in the street in Tijuana after DHS expelled her there with her three young children in February 2021. The family had crossed the border at Mexicali to seek asylum after fleeing abuse and threats by the woman's ex-partner.  I also interviewed a Salvadoran mother and children who had entered the United States seeking protection in March 2021 after the woman's ex-partner had tried to kill her. DHS expelled them to Tijuana, where the woman received threatening WhatsApp messages from her abusive ex-partner, who knew which shelter she was staying at and told her he had eyes on her in Tijuana.[8]

---

[6] Julia Neusner, "Kidnapped, Raped, and Robbed: Dangerous Title 42 Expulsions to Mexico Continue," (May 2021) *available at* https://www.humanrightsfirst.org/blog/kidnapped-raped-and-robbed-dangerous-title-42-expulsions-mexico-continue.

[7] "Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger," *supra* note 1.

[8] "Kidnapped, Raped, and Robbed: Dangerous Title 42 Expulsions to Mexico Continue," *supra* note 6.

15. Mexican asylum seekers are particularly vulnerable, trapped in the very country they are trying to flee. Multiple Mexican asylum seekers have reported that they were fleeing the country after brutal murders of their family members. A Mexican grandmother fled to the border with her nine young grandchildren and their mothers after gang members had murdered the woman's two sons on the doorstep of the family home and threatened the rest of the family. They had also shot her two-year-old granddaughter, who had been standing outside with her father. The bullet passed through the child's body and out her arm. Another Mexican grandmother told me a cartel had killed her husband, daughter, and son. They took over her house, forcing her to flee with her two grandchildren before they had time to gather anything for the trip. When I met the families in a Tijuana shelter in April 2021, they had been waiting for more than a month for asylum processing to resume, terrified their persecutors would find them there.[9] In a shelter in Ciudad Juárez, I interviewed a grandmother from Michoacán fleeing with her surviving family members who had hid in her home helpless as masked men abducted her husband and adult son, who were found the next day shot to death. Several family members fleeing with her reported that they continue to receive death threats, but as of late June 2021, the family could not seek asylum in the United States due to Title 42.[10]

**DHS Endangers Migrants By Moving Them from One Border Location to Another for Expulsion**

16. At various points in 2021, DHS has transferred migrants via plane from one sector of the border to another, and then expelled them at the second location, in a program known as "lateral transfers."  In April 2021, I interviewed more than 50 families with young children in a shelter who had been expelled to Tijuana via lateral transfer flights after having entered the United States in the Rio Grande Valley or other parts of the border.[11] The families recalled nearly identical experiences in DHS custody. They recalled being detained with their children for days in extremely cold, crowded holding cells after border patrol agents seized all but one layer of their clothing. Many had to sleep on the floor. All reported that DHS did not separate sick detainees from the group, provided minimal or no medical care, and failed to test anyone for COVID-19. The families were transferred in packed vans to the airport, then flown 1,500 miles to San Diego, where they were again packed into vans and expelled to Tijuana. Some told me that other families they'd met in the holding cells were released into the United States.

---

[9] "Kidnapped, Raped, and Robbed: Dangerous Title 42 Expulsions to Mexico Continue."
[10] Disorderly and Inhumane: Biden Administration Continues to Expel Asylum Seekers to Danger While U.S. Border Communities Stand Ready to Welcome," *supra* note 1 at 4.
[11] *See* Kate Morrisey, "Biden expelling asylum-seeking families with young children to Tijuana after flights from Texas" San Diego Tribune (April 2021) *available at* https://www.sandiegouniontribune.com/news/immigration/story/2021-04-09/biden-expelling-families-tijuana

17. All families transferred from the Rio Grande Valley reported that DHS seized all their belongings, including clothing, medication, and food for their children, and did not return their belongings when they were expelled. Most reported receiving little or no food in DHS custody. I watched Mexican government vans deliver a group of about forty migrants to the shelter who had been transferred by flight from the Rio Grande Valley earlier that day. They exited the van with no belongings except a clear plastic bag containing their cell phones and documents. Their shoelaces had all been removed. The pastor running the shelter told me that the Mexican government had been delivering 50 to 100 asylum seekers expelled this way each day for weeks, and that many were arriving at the shelter weak and without having eaten for several days.[12]

18. A Honduran woman told me DHS expelled her while she was visibly limping due to an injured ankle along with her seven-year-old daughter to Ciudad Juárez via a lateral expulsion flight in April 2021, refusing to provide even ice to address the swelling.[13] I also spoke to a Honduran grandmother with blindness who told me that in July 2021, DHS expelled her alone to Reynosa after separating her from her daughter and grandchildren, with whom she had entered the U.S. to ask for asylum protection after the family fled death threats by gangs in Honduras and was kidnapped for 15 days in Mexico. A pastor had to find another asylum seeker to take care of the grandmother, who requires 24-hour assistance due to her blindness.

**Asylum Seekers Expelled to Mexico Are Living In Places Without Access to Adequate Health Care, and Where Criminal Elements Can Easily Prey on Them**

19. Asylum seekers blocked from the U.S. border or expelled to Mexican border cities lack access to secure housing. In August 2021 I have spoken with asylum seekers and service providers who reported that shelter capacity is lacking in the Mexican cities of Tijuana, Ciudad Juárez, Piedras Negras, and Reynosa; and that many are forced to sleep in the streets or in other precarious conditions. Large tent encampments have emerged in Tijuana and Reynosa. I spoke with many asylum seekers with medical issues who endure challenging living conditions and lack access to the medical care they need. Without money, resources, or employment opportunities, many asylum seekers who have been expelled to Mexico do not have enough to eat.

---

[12] "'They Lied to Us': Biden Administration Continues to Expel, Mistreat Families Seeking Asylum." Human Rights First (May 2021) *available at* https://www.humanrightsfirst.org/blog/they-lied-us-biden-administration-continues-expel-mistreat-families-seeking-asylum
[13] Disorderly and Inhumane: Biden Administration Continues to Expel Asylum Seekers to Danger While U.S. Border Communities Stand Ready to Welcome," *supra* note 1.

20. In Tijuana, more than 2,000[14] asylum seekers blocked from crossing the border or
returned to Mexico by DHS under Title 42, including large numbers of children, are
sheltering in a makeshift tent encampment immediately adjacent to the San Ysidro
port of entry, which renders them an obvious and easy target for rape, kidnapping,
human trafficking, robbery, assault, and extortion. The Mexican government does not
provide regular police or private security to guard the camp. When I visited the camp
in April 2021, there were no police officers in sight. A Honduran asylum seeker who
was staying in the camp told me that in April 2021, Mexican men he believed to be
gang members had approached him in the camp and asked him to transport drugs and
threatened him with death if he refused.

21. Multiple asylum seekers staying in the camp told me that people they believed to be
gang members had forcibly removed at least eight Central American men from their
tents and forced them into cars. As of May 2021, the men who were taken had not
returned to the camp.[15] Some Mexican asylum seekers refused to leave their
tents, frightened at the prospect that they might be seen by gang members patrolling
the area. One father had been beaten nearly to death by gang members that were
trying to recruit his sons in Michoacán. He told me, "the same gang that was after us
back home operates here." He and his sons were so afraid to go outside that they went
to the bathroom in buckets inside their tent. A trans woman from Chiapas, Mexico
crossed the border to seek U.S. asylum after she suffered abuse for her gender
identity. U.S. immigration officers expelled her to Tijuana, and as of April 2021 she
remained in the tent encampment, constantly afraid for her safety.[16]

22. More recently, I interviewed a Mexican woman by phone who, after being threatened
with death in Michaocán, asked for U.S. asylum with her family at the San Ysidro
port of entry in July 2021. After DHS turned the family away, they tried to sleep in
the tent encampment near the port of entry. A man in the encampment charged her
money to stay there, then a group of men assaulted the woman's teenage daughter.

23. Another family from Michoacán had a similar experience in June 2021. After gang
members tried to kill them, they asked for asylum at the San Ysidro port of entry and
were turned away. A man in the tent encampment who had offered to help the family
assaulted the mother. I also spoke to a Salvadoran man who was robbed of all his
belongings in the Tijuana tent encampment in July 2021 after he had attempted to ask
for asylum at the San Ysidro port of entry and DHS officers turned him away.
Though both families from Michoacán and the Salvadoran man have contacted
advocacy organizations for help, they have been unable to access exemption
processes and all remain in danger in Mexico as of August 2021.

---

[14] "Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel
Asylum Seekers to Danger" *supra* note 1.

[15] *Id.*

[16] "Kidnapped, Raped, and Robbed: Dangerous Title 42 Expulsions to Mexico Continue," *supra*
note 6.

24. In Reynosa, approximately 3000 migrants and asylum seekers are staying in a tent encampment in Plaza las Américas, the city's center plaza, where they endure horrendous living conditions and are vulnerable to violent crime.[17] I interviewed more than 15 asylum seekers by phone in July and August 2021 who are currently staying in the Reynosa encampment, sleeping on the ground in tents or out in the open. All reported horrible living conditions in the encampment, including dirty, fly-infested toilets, excruciating heat, and destructive storms. An Afro-Honduran woman told me she developed a fungus on her feet after walking barefoot in the toilet area. Many reported that their children became sick with nausea and flu symptoms in the encampment. Several asylum seekers told me they or their children lost significant amounts of weight because they did not have enough to eat.

25. Asylum seekers living with health conditions in the Reynosa encampment are unable to obtain the care they need. I spoke to a Honduran woman who, after fleeing death threats by gang members who killed her brother, is now staying with her 12-year-old daughter in the Reynosa tent encampment. The mother, who has kidney disease, is experiencing severe abdominal pain, headaches, and back pain from sleeping on the ground. Her daughter is so depressed that she's stopped speaking and her hair is falling out. They have been unable to obtain healthcare. Though they have contacted advocates for help, as of August 2021 they remain in danger in Reynosa.

26. Another Honduran woman and her 9-year-old daughter were robbed of all their money and valuables in Reynosa immediately after the U.S. government expelled them there in July 2021. After sleeping on the ground in a tent for weeks, cysts in the woman's breasts became inflamed and painful. Her daughter became ill with stomach pain so severe she could not sit up.

27. I interviewed another Honduran woman who was kidnapped with her 9-year-old son and held captive in horrendous conditions for 10 days before the woman's sister managed to pay ransom. Unable to ask for U.S. protection at the port of entry due to Title 42, the traumatized family went to the Reynosa tent encampment, where they slept on the ground for months. The child became weak, tired, and malnourished. The mother, who had been diagnosed with an ovarian cyst, was in severe pain, but as of July 2021, neither could access medical care in Reynosa.

28. I interviewed many asylum seekers facing threats to their personal security in the tent encampment. At least one asylum seeker has been kidnapped directly from the encampment.[18] In July 2021 a Honduran woman told me she was terrified to leave her

---

[17] Sandra Sanchez, "Mexican officials order migrant shelter in Reynosa to evacuate or face bulldozing," Border Report (July 2021) *available at* https://www.borderreport.com/hot-topics/immigration/mexican-officials-order-migrant-shelter-in-reynosa-to-evacuate-or-face-bulldozing/

8

tent because of a man in the camp who was harassing her and had repeatedly threatened to assault her. Another Honduran woman told me that in July 2021, a group of men had repeatedly recorded photos and videos of her teenage daughters, who were terrified to leave their tents for fear of being kidnapped. Another Honduran woman fleeing domestic abuse with her 8-year-old son told me she was robbed of all her belongings in Mexico before asking for U.S. protection. DHS expelled her to Reynosa where, desperate to avoid the tent encampment, she accepted an offer to work and live with a local family. Her employer repeatedly abused her in August 2021, forcing her to stay in the encampment, where she and her son remain in danger.

I declare under penalty of perjury under the laws of the United States and New York that the foregoing is true and correct.

Executed on: August 10, 2021, in Brooklyn, New York, United States.


Signature:  _____
                    Julia Neusner

9

**AFFIDAVIT OF JENNIFER K. HARBURY**

**RE: IMPACT OF TITLE 42 ON ASYLUM SEEKERS IN REYNOSA, MEXICO**

AUGUST 9, 2021

I, Jennifer K. Harbury, declare under penalty of perjury pursuant to 28 U.S.C. §1746, that the following is true and correct to the best of my knowledge:

1.  I am submitting this declaration to provide information about the severe harm that Title 42 is inflicting on the migrant families currently being expelled to Reynosa, Mexico. This is a city in Tamaulipas, the most dangerous Mexican state along our southern border, where powerful gangs and cartels target and brutalize migrants on a daily basis. These criminal networks operate with impunity because local police and officials are unable and often unwilling to protect migrants. I have met with and interviewed hundreds of migrant families who, because of Title 42, have suffered one or even multiple acts of kidnapping, extortion, rape, and/or assault. There have been many deaths as well.

2.  I graduated from the Harvard School of Law in June, 1978 and received my Texas law license shortly thereafter. I practiced law there until 2018, when I went into inactive status. Most of my practice focused on civil rights issues here in the Texas-Mexico border area of the lower Rio Grande Valley. I have also spent substantial time periods monitoring and assisting human rights in Guatemala and am very familiar with the realities on the ground in Central America.

3.  I am a founding member of the Angry Tias and Abuelas, ("Angry Tias"), an organization based here at the border, and dedicated to the preservation and promotion of human rights and human dignity for migrants on both sides of the Rio Grande. Our organization is made up of volunteers who provide humanitarian assistance to migrants, including basic necessities, transportation, shelter and other support. We assist thousands of migrants every year. In addition to meeting their physical needs, the Angry Tias collaborate with local NGOs, provide funds for legal counsel, and highlight the plight that asylum seekers face in media and policy circles.

4.  In 2017 I began to do extensive volunteer work in Reynosa, Mexico with the asylum seeker community there. In late 2018 I retired from my public interest legal career and began to do full time volunteer work there, as well as on the Texas side of the border. This work has included interviews of thousands of migrant families over the years. Although the United States government began sending migrant families back to Reynosa under Title 42 in spring 2020, this practice greatly expanded earlier this year. That is when I began to interview as many families as possible. I would estimate that I have personally interviewed several hundred families this year alone.

5.  This declaration is based on my direct experience and work with migrant families since the United States government began sending them back to Reynosa under Title 42. I have provided support to well over 300 families subject to Title 42 this year alone. This has

included assisting them in obtaining needed exemptions to lawfully cross the border on humanitarian grounds.

**Dangers for Expelled Migrant Families**

6. Reynosa, Mexico is one of the most dangerous areas anywhere in the world. Reynosa is in Tamaulipas state, which is categorized as a Category Four "Do Not Travel" security risk by the U.S. Department of State due to danger stemming from crime and kidnapping.[1] This is equal to the ranking of areas like Afghanistan and Iraq. U.S. officers are warned not to enter this region. This extraordinary danger results from the total control of the area by violent gangs and cartels. As the State Department notes: "Heavily armed members of criminal groups often patrol areas of the state and operate with impunity particularly along the border region from Reynosa to Nuevo Laredo. In these areas, local law enforcement has limited capacity to respond to incidents of crime."[2]

7. Migrant families are a favorite target for kidnapping and trafficking throughout Tamaulipas, and especially in Reynosa. This is because it is well known that there will be no consequences for such crimes. Local officials and police are unable and often unwilling to protect the migrants. It is also widely understood that, although the migrants themselves are penniless, they have relatives in the north who will do anything to save them. Even impoverished friends and family members will take on heavy debts to rescue their loved ones. Thus, gang and cartel members have great incentive to kidnap migrants, and hold them for ransoms of $5,000 or per person, or even larger amounts. This has become a booming business.

8. To make matters worse, most of the Mexican government officials in the region are fully entwined with, or have already joined, the gangs/cartels. For example, in February 2019, Telemundo aired footage showing that a number of families were being secretly held in the basement of the Mexican immigration building for $3000 ransom.[3] The monies were traced back to the Reynosa Director of the National Institute of Immigration ("INM") himself. This is but one example. I have spoken to many families who have been robbed and/or kidnapped by local officials.

9. Currently, when migrants are expelled from the United States back to Reynosa under Title 42, they must walk back across the international bridge to the Mexican INM building. There they are processed back into the country. The majority of the migrants tell me that they were taken to side rooms and thoroughly searched, sometimes strip-searched, and that the Mexican official confiscated all of their money and any valuables, including their phones. Some reported that they had to call a relative to send hundreds of dollars to pay an officer before they could be released at all. The families are given no

---

[1] U.S. State Department, Mexico Travel Advisory (July 12, 2021), https:/travel.state.gov/content/travel/en/traveladvisories/mexico-travel-advisory.html.
[2] *Id.*
[3] Noticias Telemundo, "Revelan que policías mexicanos extorsionan a migrantes" (Feb. 14, 2020), https://www.telemundo.com/noticias/edicion-noticias-telemundo/video/revelan-que-policias-mexicanos-extorsionan-migrantes-tmvo8890349.

information and have no idea where to go. Those who take taxis are often kidnapped by the drivers.

10. Most of the families initially find their way to the small park diagonally across from the international bridge. Over two thousand migrants are there now, including elderly persons, pregnant women, injured persons and numerous small children. Human rights networks have provided portable toilets and tents, and local pastors provide food and water as often as possible, but the conditions are terrible. Not surprisingly, the gangs raid this small encampment every night, kidnapping many and dragging them away to waiting vehicles. A local police car is parked there regularly, but the officers either look the other way or drive off when the kidnappers arrive.

11. Two church-run shelters exist in Reynosa. But one, Casa de Migrantes, gives only three days of lodging. The other, Senda de Vida, is suddenly under threat of demolition by local officials despite their fifteen years of close collaboration.

12. I think that the accounts of the migrants themselves best indicate the horrific effects that Title 42 has upon the migrant families. Set forth below are a few of the in-person accounts I have received.[4]

    A. A mother ("A") tried to save her young daughter when the gangs arrived to rape her. The gangs beat A and kidnapped the girl, who did not return for nearly a year. When the mother received still more threats, she fled north with her mentally disabled 15-year-old son.  The son had the functional development of a 5-year-old. The trip was terrifying. The family tried twice to cross the river, but U.S. officials sent them back both times under Title 42. In Reynosa, the mother realized she could not keep her son safe from the endless kidnappings and assaults going on around her.  If she tried to cross with her son again, they would both be sent back. If he crossed alone, he would be sent to her family in the United States because Title 42 did not apply to unaccompanied minors. Like so many other desperate parents, she finally sent him across again, this time on his own. He was found dead shortly thereafter. Initial reports suggest torture and mutilation. Based on my experience, I suspect the gangs approached the boat in which he was a passenger and asked for "claves," or passwords each traveler gets once they have paid the proper crossing "fees" to the gangs. If anyone attempts to cross without such payment, they are killed. Had the gangs asked this young man for his password, he would have been unable to answer and therefore killed.

    B. A young mother ("B"), seven months pregnant, was in her car with her husband and two small children when gang members ambushed them and opened fire with automatic weapons. B's husband was killed, and she took seven bullets. At the hospital, doctors were unable to remove the bullet lodged near her cervix. Worse yet, the killers found out that B was still alive, and that she had recognized them. She took

---

[4] For safety reasons I am not giving names or identifying information. Moreover, I am reporting only the cases of persons we have assisted to lawfully cross on humanitarian grounds.

her young children and fled north. She tried twice to cross the Rio Grande with her children, but both times U.S. officials sent the surviving members of the family back to Mexico under Title 42 despite her serious medical condition and pregnancy.

C. An older woman ("C") survived a gang massacre which left seven in her family shot to death, including her 17-year-old son. C and several others were wounded but survived. The survivors took their blind 94-year-old grandmother (C's mother), and fled north. They crossed the river, but U.S. officials sent them straight back under Title 42, despite the grandmother's frailty. The grandmother fell gravely ill back in Reynosa, but the family, like so many other migrants, had a very hard time getting her admitted to a hospital given the local anti-migrant sentiments. She died shortly thereafter. C suffered a kidnapping attempt while she was with her mother at the hospital.

D. A teenaged boy was being aggressively recruited by local gangs, but he turned them down. To keep him alive, his mother ("D") sent the boy with his father to a highly remote area where communications are nearly impossible. She then fled with her daughter, a minor who is mentally disabled. They made it to the Reynosa area, where they were kidnapped and D was raped. They tried to cross the Rio Grande but were sent back under Title 42. In Reynosa they were dumped back into the unprotected Plaza near the international bridge. As described above, the gangs arrive every night to rob and kidnap people, with the consistent acquiescence of the police officers posted nearby.

E. A young woman ("E")'s family testified against gang members responsible for the kidnapping and mutilation of a relative. The gang then came after the family. E was dragged into a car but escaped by leaping from the moving vehicle. Her shoulder was badly smashed, requiring multiple surgeries. Her uncle was later killed, as was a young man who grew up in their family home. She fled north and tried to cross to Texas but was immediately sent back under Title 42 by U.S. officials.  Mexican immigration officials stole $500 from her as she returned. She then tried to take a taxi at the foot of the bridge, but the driver kidnapped her. When she ran, he dragged her back by her hair, but she was later able to escape and make it to a shelter. Her shoulder then became badly infected, putting her life at risk.

F. A young Trans woman ("F") went through hellish persecution in her homeland. The gangs beat her so severely that she fled in early 2019. She made it to Reynosa, but U.S. officials sent her back under the MPP program. F tried to go back to the border for her immigration court appointment in Laredo, but the local gangs pulled over the bus and dragged everyone off. Eventually she got away, but she had missed her hearing. A few months ago, she tried again to cross the Rio Grande but was sent back to Mexico. This time the gangs beat her and raped her. Worse yet, she now has HIV from her assailants.

13. Please note that there are thousands of migrants in Reynosa, with similarly horrifying stories and traumatic experiences, who have not yet even been interviewed.

I, Jennifer K. Harbury, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August ___9___ 2021 at ___MANASSAS___ , ___VIRGINIA___ , United States.

Jennifer K. Harbury

## DECLARATION OF ERIKA PINHEIRO

I, Erika Pinheiro, declare under penalty of perjury, that the following is true and correct to the best of my knowledge:

**Summary**

1. In my expertise as an attorney with 18 years of experience in the immigration legal field who regularly works across the U.S.-Mexico border (principally in Southern California and corresponding areas of Mexico) and who has advised the Biden Administration on immigration policy, I have witnessed the failures and extraordinary harm of the Title 42 policy.

2. Although widespread testing and vaccination access is available in both Baja California, Mexico and San Diego to safely process migrant families seeking asylum, CBP has chosen to implement a policy that only exacerbates COVID-19 in the region. CBP is not taking basic mitigation measures to limit the spread of COVID-19 among migrants and in fact actively introduces COVID-19 into the region by flying migrants in crowded flights from other parts of the southwest border to San Diego and expelling them.

3. Title 42 expels families into extreme danger in Tijuana, where few have access to safe housing, or medical care, and face kidnapping, rape, extortion, and other violence on a regular basis. Since March 2021, three of AOL's clients have died after being denied the ability to seek medical care in the U.S.

**Experience and Expertise**

4. I am the Litigation and Policy Director at Al Otro Lado ("AOL"), a nonprofit advocacy and legal services organization based in Los Angeles, California, with offices in San Diego, California and Tijuana, Mexico. I have been the Litigation and Policy Director since April 2017. I am currently based primarily in Tijuana, Mexico, and oversee various programs and operations in all AOL locations.

5. I am an immigration attorney and have been working in the immigration legal field since 2003. I hold a JD from Georgetown University Law Center, a Masters of Public Policy from the Georgetown Public Policy Institute, and a Certificate in Refugee and Humanitarian Emergencies from Georgetown University Institute for the Study of International Migration. Throughout my legal career, I have specialized in high-volume legal representation and education for immigrants detained in immigration or criminal custody, as well as those seeking asylum at the US-Mexico border. In each position I have held, I have created, maintained, and analyzed extensive databases to identify the effects of policies governing the admission, detention, transfer, and release of immigrant adults and children at the border and in criminal and/or immigration custody. Prior to joining AOL, I administered federally funded legal access programs for immigrant adults in ICE custody and unaccompanied children in Office of Refugee Resettlement custody, serving thousands of individuals per year. Since 2010, I have personally observed and

tracked migration and detention trends, especially with respect to adults, unaccompanied children, and family units seeking asylum at the US-Mexico border.

6. AOL provides legal and humanitarian support to indigent refugees, deportees, and other migrants, including providing free direct legal services on both sides of the US-Mexico border and beyond.

7. As the Litigation and Policy Director, I supervise attorneys and other staff who work directly with migrants on both sides of the US-Mexican border. I also travel frequently across the US-Mexican border. I also engage with elected officials on immigration matters, educate policymakers about border issues, and provide technical assistance to Congressional committees and government agencies. From November 2020 through January 2021, I engaged with the Biden transition team and Secretary Mayorkas in numerous meetings concerning US border policy; since President Biden's inauguration, I meet frequently with officials at the White House, DHS, DOS, and other federal agencies to participate in immigration and border security policy discussions. I am also one of the leads of the California Welcoming Task Force, a coalition of around 100 nonprofit organizations working with the White House, federal agencies, California state government, local city and county governments, and Mexican government officials to plan and execute policies related to asylum processing at the US-Mexico border.

8. I help supervise AOL's work representing families, individuals, and children seeking a humanitarian exemption from the Title 42 expulsion process. Since April 2021, AOL has represented approximately 5,900 individuals, including 2,450 children in obtaining humanitarian exemptions.

9. This declaration is based on my personal experience working with noncitizens at the US-Mexico border as well as my experience supervising attorneys who provide legal services to them. I am also familiar with the Tijuana – San Diego border region as I work regularly on both sides of the border.

**Vaccination and testing is widely available in Baja California**

10. I have resided in Baja California since 2017, and have been on the ground providing humanitarian and legal support to refugees and other migrants residing in Tijuana and throughout Baja California since the start of the COVID pandemic. Generally, vaccines and testing are widely available in Baja California, and migrants have had relatively low COVID positivity rates as compared to the broader population due to intensive mitigation efforts, although those efforts have been frustrated by the expulsion of individuals DHS has brought to the region on lateral flights from other parts of the U.S., as explained below.

11. The Mexican government has been making a concerted effort to maximize COVID-19 vaccination in the northern border region as part of its push to more fully reopen the land border with the United States.  As of August 5, 2021, more than half of adults in the five

Mexican states along the U.S. border had received at least one dose of a COVID vaccine.[1]  The adult vaccination rate is 80% in Baja California, 60% in Sonora, 75% in Chihuahua, 56% in Coahuila, and 64% in Tamaulipas.[2]  In the Mexican municipalities (the equivalent of U.S. counties) closest to the border, rates are even higher: as of July 27, 2021 at least 75% of those in border municipalities had received at least one vaccine dose in Baja California, Sonora, Chihuahua, Coahuila, and Nuevo Leon.[3] As of August 1, 2021, more than 97% of adults between 18 and 39 had received at least one dose in Tamaulipas.[4]

12. Baja California is the first state in Mexico to have "fully" vaccinated its adult population (18+); approximately 80% of the adult population has been vaccinated with at least one shot. Vaccines continue to be regularly distributed at large-scale vaccination sites located in all of the state's municipalities and are available to anyone over the age of 18, regardless of immigration status. Municipal and state departments of health also conduct specialized outreach campaigns to vulnerable and hard-to-reach populations, such as Indigenous communities residing in remote locations. In July and August 2021, local health authorities held a vaccination drive at the migrant camp located outside the Ped West Port of Entry and at seven migrant shelters, and other shelter providers have organized transportation to bring migrants to mass vaccination sites.[5] The local departments of health continue to develop outreach strategies to vaccinate vulnerable populations, including migrants.

13. Although there has been a recent slight increase in positive COVID cases due to the spread of the Delta variant, numbers remain extremely low in Baja California. For example, on August 8, 2021, there were 69 new positive cases in Tijuana, a city of around 2 million residents. The seven-day average is 107 new positive COVID cases/day. The rate of new COVID cases in Tijuana is exponentially lower than in San Diego County, California, which saw 2,754 new positive cases on August 8, 2021, with a seven day average of 1,417 new positive cases per day for a population of around 3.3 million.[6] This discrepancy is likely due to the relatively high vaccination rate in Baja California (80% adults vaccinated in Baja California vs. 73.2% in San Diego County), as well as the consistent use of masks in most indoor spaces in Mexico. Unlike the United States, Baja California never lifted its mask mandate, even for vaccinated individuals. I have observed

---

[1] Gobierno de Mexico, Secretaria de Salud, *COVID-19 Mexico Comunicado Tecnico Diario*, at 9 (Aug. 5, 2021), https://tinyurl.com/w2enjmh3.

[2] *Id.*

[3] *Id.*

[4] Miguel Dominguez, *Afirman Vacunar Casi al 100% de Jóvenes en Tamaulipas*, Reforma (Aug. 1, 2021), https://tinyurl.com/y8d476kb.

[5] Alexandra Mendoza, *Migrants in Tijuana vaccinated at camp, shelters* (Aug. 4, 2021), https://tinyurl.com/dmf2d9m.

[6] *COVID-19 Data Repository*, Center for Systems Science and Engineering (CSSE) at Johns Hopkins University, https://github.com/CSSEGISandData/COVID-19.

almost all individuals in Baja California consistently using masks in most public indoor spaces and crowded outdoor spaces, whereas in San Diego, I rarely, if ever, see individuals using masks outside, and have observed a rising percentage of individuals who do not use masks in public indoor spaces.

14. COVID-19 testing is readily available at pharmacies and health providers across Tijuana. Pricing for tests varies among providers, but generally starts around $10-12 USD for an antigen test. Local and state Departments of Health also have free mobile testing programs, and have offered free COVID testing at the Chaparral migrant encampment and at various shelters. Several local medical nonprofits also offer free testing to migrants, and universities on both sides of the border have conducted numerous COVID-related studies through which they have administered free tests to thousands of individuals.[7]

15. Many asylum seekers have already been vaccinated before presenting at the port of entry. Dozens of our clients have sent photos of their vaccination records. Many of our clients have told our staff and volunteers that they are eager and willing to be vaccinated to protect themselves and others against COVID-19.

16. Beginning in March 2021, AOL began representing vulnerable families, children, and adults to seek humanitarian exemptions from the Title 42 expulsion process. Individuals approved for an exemption are tested for COVID-19 before presenting at a port of entry. A U.S.-based foundation has covered the cost of COVID testing for all of AOL's clients, as well as others being processed through the exemption process. CBP has required all children seven years or older to submit a negative COVID-19 test taken within 72 hours of presenting at a port of entry. Those who test positive are denied entry if they attempt to present.

17. Before the widespread availability of vaccines in Baja California, AOL worked with a network of nonprofits, international intergovernmental organizations (i.e. IOM and UNHCR), as well as with local, state, and federal government agencies to develop effective strategies that reduced the spread of COVID among migrant populations. AOL helped install hand washing stations and clean water access points at shelters and medical clinics, distributed masks and other PPE, conducted public health education, and provided funding to build capacity at local medical nonprofits serving the migrant population. IOM and the local government also established a COVID "filter" hotel, at which migrants would stay for 10-14 days before moving on to shelters. AOL also provided grocery cards, medication, PPE, quarantine housing, and other direct

---

[7] *See, e.g.*, City News Service, *COVID-19 Survey Finds Baja California Faring Better than Other Mexican States*, KPBS (June 16, 2021), https://www.kpbs.org/news/2021/jun/16/covid-19-survey-finds-baja-california-faring-bette/.

humanitarian support to help migrants residing outside of the shelter system to remain in quarantine during periods of high community spread.

**CBP's policy of lateral flights has a negative effect on COVID-19 rates in the region**

18. The mitigation efforts described above were extremely successful, and we saw very little COVID spread among migrants until March of 2021, when the US government began flying migrants who crossed in Texas on lateral flights to San Diego and expelling them there. Despite our regular engagement with the White House and DHS on border policy matters, we were given no notice, and nonprofits and government agencies working in Tijuana were ill-prepared to receive the 100 migrants being expelled each day from lateral flights, in addition to hundreds of others already being expelled or removed to Tijuana each day. Because migrants were placed in close proximity to one another on lateral flights and expelled to Tijuana, we saw a much higher COVID positivity rate among lateral flight migrants than among the local migrant population in general. Shelters receiving lateral flight expulsions began to see more COVID positive cases, but local health authorities and non-profits lacked the capacity and resources to quickly create a comprehensive public health strategy to address the problems posed by lateral flights.

19. DHS ceased the practice of lateral flight expulsions to Tijuana around June 21, 2021, which has enabled those of us working in Baja California to reassert control over the spread of COVID among the migrant population, especially in shelters, using the mitigation measures described above and by promoting vaccines. However, DHS resumed lateral flights to San Diego in the last week of July 2021, and resumed expulsions to Tijuana on Friday, August 6, 2021, when we received 135 migrants expelled from a flight that originated in Texas. Our shelter partners in San Diego, who work with San Diego County and the State of California to administer COVID tests to all migrants arriving in the region, have confirmed that the COVID positivity rate is highest among migrants who arrive via lateral flights (as compared to migrants processed at the Port of Entry or those who enter without inspection locally). Undoubtedly, the practice of lateral flight expulsions has a negative effect on COVID rates in the region and undermines the ability of government agencies and service providers on both sides of the border to control COVID spread among the migrant population.

**CBP has additional capacity to process asylum seeking families at ports of entry in the San Diego region**

20. CBP has consistently used "capacity" limitations as a pretext for reducing the number of asylum seekers processed at Ports of Entry, both before and during the pandemic. Al Otro Lado is the organizational plaintiff in *Al Otro Lado v. Mayorkas,* 3:17-cv-02366-BAS-KSC (S.D. Cal.), filed in July 2017, a class action lawsuit challenging CBP's practice of unlawfully turning away asylum seekers who seek to present at Ports of Entry, as well as "metering" policies that force asylum seekers to wait in Mexico on informal lists.

Evidence obtained through discovery in that case, including depositions of DHS officials, confirm that CBP has consistently understated its capacity to process asylum seekers at Ports of Entry in an effort to reduce access to the US asylum system. An October 2020 Office of Inspector General Report, citing in part evidence obtained from a CBP whistleblower, confirmed that CBP lied about capacity to reduce asylum seeker processing,[8] and recently, the court in *AOL v. Mayorkas* sanctioned the government for destroying evidence protected by a court order. CBP officials also admitted in a deposition that the processing of asylum seekers is given low priority among other types of processing at ports in terms of officer and resource allocation, going so far to admit that livestock would be given processing priority over asylum seekers. Nothing in the recent past indicates that these policies and priorities have changed significantly.

21. In June 2021, CBP processed approximately 412,000 pedestrians at the San Ysidro Port of Entry. Notably, CBP is processing about 500,000 *less* pedestrians per month at the San Ysidro POE than they were before Title 42 was put into place; for example, in June 2019, CBP processed over 917,000 pedestrians at the San Ysidro Port of Entry. This discrepancy should give CBP plenty of capacity to safely process asylum seekers, even allowing for the fact that processing refugee families takes longer than processing most travelers.

22. Under Title 42, US citizens, Lawful Permanent Residents, and Mexicans with certain types of visas are able to cross the border freely. Throughout the pandemic, I have personally observed large numbers of U.S. citizens crossing the border into Tijuana, Rosarito, and Ensenada for tourism and other "non-essential" purposes. I have also crossed the border, on average, about once per week since June of 2020 to the present. Based on my personal experience, CBP does not employ any COVID screening protocol for travelers not subject to Title 42 restrictions. I have personally observed numerous CBP officers working without masks, or with their masks pulled down around their chins. CBP officers have never asked me any COVID or other health-related questions when entering the United States.

**CBP is not taking adequate steps to limit the spread of COVID-19 among migrants who cross between ports of entry.**

23. When CBP encounters asylum-seeking families who cross the border between ports of entry, it does not take meaningful steps to prevent the spread of COVID-19, aside from providing masks. Migrants are flown on full planes and ride together in busses to the border to be expelled. CBP does not provide COVID-19 testing and only coordinates with third parties to test migrants when they are released from CBP custody. Those who

---

[8] *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*, Office of Inspector General (Oct. 27, 2020), https://tinyurl.com/266bbcfm.

exhibit COVID-19 symptoms are not separated from others in CBP/Border Patrol custody.

24. The state of California has provided funding for COVID testing of all migrants who come to the California border, whether through a Port of Entry, between ports of entry, or on lateral flights. California has established a testing, quarantine, treatment, and vaccination protocol for all migrants, and set up several hubs in the border region to create additional capacity. The federal government does not currently cover the costs of these regional hubs, nor do they currently cover the costs of shelter and transportation. California state and numerous counties have stepped in to create a robust migrant reception system that treats migrants with dignity while protecting public health.

25. Families that are exempt from Title 42 in Tijuana are released to a network of shelters in the San Diego area. There are two main shelter hubs in the San Diego area. Jewish Family Service provides testing, quarantine, and case management to any migrant being processed through the Port of Entry, including those who come on lateral flights. Catholic Charities serves those who cross between ports. The state, counties, and cities all work together to create local capacity for migrants as needed. For example, Long Beach, San Diego, and other cities provided convention centers and other facilities to meet the needs of unaccompanied children during a recent increase. The California Welcoming Task Force, a coalition of around 100 nonprofit organizations formed in February of 2021 working with governments on both sides of the border, coordinates to ensure that all migrants in the region receive legal, humanitarian, and other vital services upon arrival in California.

26. The biggest challenge over the past six months has not been the capacity to serve the number of migrants in the region, but rather the lack of processing at the ports of entry, and an overall lack of communication from DHS regarding its implementation of Title 42 expulsions, such as through lateral flights.

**Title 42 places asylum-seeking families in extreme danger**

27. Migrant families expelled under Title 42 to Tijuana face extreme danger and live in precarity. Few have access to safe housing, medical care, or work to support themselves. They face kidnapping, rape, extortion, and other violence on a regular basis. Clients frequently report to us that they are unable to afford food, medicine, and other basic necessities. Families travelling with minor children frequently report kidnapping attempts on their children. Families with children who identify as female frequently report sexual harassment and other sexual violence. Three of our clients have died since March 2021 because they were denied the ability to seek medical care in the U.S.

28. Thousands of migrants live in a makeshift tent encampment in El Chaparral next to the port of entry. They sleep under plastic tarps, without bathrooms, and are subject to extreme weather conditions. There is no running water or sanitation. Organized criminal

groups control the camp and AOL has received reports of kidnappings, assaults, and sexual abuse against migrants. Smugglers pressure migrants into hiring them through fraud and force. AOL has received multiple reports of migrants who were held for ransom by smugglers. Others have been kidnapped by traffickers and forced into prostitutions or other types of labor. The situation at the El Chaparral camp is so dangerous that AOL does not provide services there. Aid workers have received numerous threats from those controlling the camp. Few groups are willing to provide in-person services, so there is a lack of food and supplies for those living in the camp.

29. Families with family members who identify as LGBTQ are frequently subjected to violence and discrimination. One family that we represented in this process was forced to leave from three different housing situations after the owners of each property discovered that the mother was in a same-sex relationship. Another LGBTQ couple that we represented were both kidnapped and raped in Mexico and both subsequently contracted HIV. While in Tijuana, they were forced to leave a shelter because they were constantly receiving threats. Another client, a Haitian LGBTQ man who was unable to seek asylum due to Title 42, was living in a rented room in Tijuana when armed men broke into his dwelling, raped him, and stole all of his belongings and documents. He had to go into hiding because these same people continued to threaten him.

30. Migrants who are not from Mexico frequently struggle to access medical care. When they are able to be admitted to a hospital, they frequently report discrimination at the hands of medical staff. Multiple Haitian clients have reported to us that they refer to the hospitals in Tijuana as "where Haitians go to die."

31. AOL staff members transported a Honduran man with an epidural hematoma between hospitals because the initial hospital refused to touch him without an upfront payment in full for the emergency neurosurgery he required. At this point, he was lying on a bed with a nosebleed and struggling to breathe. When staff members tried to call for an ambulance because of the delicate nature of his condition, the hospital said that they were unable to communicate with the receiving hospital and thus it would not be possible to send an ambulance. Staff members were left with no alternative but to transport him themselves or risk his death.

32. A Haitian woman who wanted to seek asylum along with her husband and young daughter suffered third degree burns while living in Tijuana. Her injuries were so severe that an external fixator had to be applied to hold the bone in her arm together. While she was able to access emergency treatment, she was unable to access any follow-up care or cleaning for her burn wounds. The family was living in the tent camp where she had no access to running water or sanitation.

33. Because of Title 42, at least 13 mothers who gave birth while in CBP custody have been expelled to Mexico along with their U.S. citizen babies. These infants were rendered

essentially stateless in Mexico because they were expelled without any kind of legal identity documents.

34. Title 42 has separated countless vulnerable families. A 19-year-old asylum seeker was turned away under Title 42 in Tijuana even though he was permanently disabled after falling off a train. He had lost both his right arm and leg and was thus forced to live at the mercy of strangers in a shelter. He had been trying to join his mother and siblings but Title 42 kept them separated for nearly a year.

35. Four siblings, two under 18, from Nicaragua were separated from their father due to Title 42. Their father was in the U.S. and had been granted immigration relief. When the siblings' mom was disappeared in Nicaragua, they fled to seek asylum and join their father. However, Title 42 left them living in a tent camp.

36. A Honduran woman with multiple gunshot injuries and diabetes was pursuing her asylum case in the United States in 2019. She returned to Mexico when she learned that her teenage daughter had been raped and kidnapped. She left her two younger children in the care of a friend in the U.S. Once she reunited with the daughter who had been raped and kidnapped in Mexico, she was not permitted to rejoin her two minor children in the U.S. and to continue her asylum case. Around the same time, her brother was kidnapped and almost certainly killed by cartel members as he attempted to cross the border with a smuggler because Title 42 closed all legal options to request asylum.

37. AOL's clients in other cities across the southwest border face similarly dangerous situations after being expelled through Title 42. In Reynosa, one of our clients who had previously tried to seek asylum at the border but who was expelled under Title 42 was kidnapped shortly thereafter with her young son. The mother and child were held for days without food until they finally escaped.

38. Another client in Reynosa, traveling with his wife and children, was kidnapped by a criminal group. He was tortured and left for dead, covered in blood with burn and stab wounds all over his body. He survived and the family fled to Tijuana, unable to seek asylum in the U.S. due to Title 42. They were then forced to live in the tent camp at Chaparral, where the client's wounds became infected due to lack of medical treatment and sanitation.

39. In Nuevo Laredo, a client was waiting to be able to cross with her U.S. citizen daughter when they were kidnapped by armed men while walking down the street. The men took them to a house, shaved their heads, and beat them severely. The U.S. citizen daughter's face was slashed with a knife on both sides. She lost so much blood from her injuries that she had to be hospitalized.

40. CBP expelled one asylum-seeking client in Nuevo Laredo in the middle of the night and he was immediately kidnapped by gang members. His family paid the ransom and he was

released. He was then immediately kidnapped by a cartel. His family has heard nothing
from him since.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on: August 11, 2021, in Mexico City, Mexico.


Signature:

Erika Pinheiro

DECLARATION OF SAVITRI ARVEY

I, Savitri Arvey, pursuant to 28 U.S.C. § 1746, hereby declare:

**Summary**

1.  As a migration policy advisor who has worked with hundreds of migrants being subjected
    to the Title 42 policy, I am deeply familiar with the harms that the policy has inflicted on
    migrant families.  The Title 42 policy has forced asylum-seeking families, including
    pregnant mothers and individuals with U.S. citizen children, to live in squalid and
    dangerous conditions in Mexico, often sleeping under bridges or on the street. More than
    1 out of 5 of the asylum seekers I have worked with reported being kidnapped in Mexico,
    and many of the women were raped during their capture. The government's process for
    exempting certain families from Title 42 is an inadequate substitute for regular port
    processing of asylum seekers, all of whom have a right to be heard on their claims.

**Qualifications**

2.  I am currently a Policy Advisor, within the Migrant Rights and Justice program at the
    Women's Refugee Commission ("WRC"), a non-profit organization that aims to improve
    the lives and protect the rights of women, children, and youth displaced by crisis and
    conflict. In this role, I advocate on regional protection issues for women, children, and
    families in Mexico and Central America. Before assuming this role, I worked as a
    consultant for WRC from March to June 2021 where I focused on issues related to access
    to protection at the U.S.-Mexico border and asylum processing at ports of entry. I hold a
    bachelor's in International Relations from Connecticut College and a master's in public
    policy from the University of California ("UC"), San Diego.

3.  From October 2018 to July 2021, I collaborated on an initiative as the Central America &
    Mexico Policy Initiative Fellow at the Strauss Center for International Security and Law
    at the University of Texas at Austin and as a Graduate Student Researcher and Border
    and Migration Fellow at UC San Diego Center for U.S.-Mexican Studies to document
    U.S. Customs and Border Protection's ("CBP's") metering practices and the conditions
    faced by people seeking protection waiting in Mexican border cities to be inspected and
    processed by CBP officials. In these roles, I made regular visits to the U.S.-Mexico
    border and conducted phone and in-person  interviews with people seeking protection,

migrant shelter staff, representatives of international and nongovernmental organizations, and Mexican federal and local government officials in eleven Mexican border cities.[1]

4. I have also helped 251 people seek humanitarian exemptions from an order issued by the Centers for Disease Control and Prevention ("CDC's") under Title 42 of U.S. Code, obtain COVID-19 tests, and be successfully processed at four ports of entry[2] since April 1, 2021.

5. For these reasons, I am deeply familiar with conditions at the U.S.-Mexico border and CBP's ability to safely process people seeking asylum at ports of entry.

## The Devastating Toll of Title 42

6. Title 42 endangers the lives and safety of individuals seeking asylum, by leaving them waiting in squalid conditions in the Mexican border cities for many months.

7. In Piedras Negras, for example, the municipal government has prevented migrant shelters from reopening at even a limited capacity due to COVID-19. As a result, many have been forced to sleep in abandoned houses, in the bus terminal, under bridges or on the street, leaving them more vulnerable to the extreme elements and abuse from exploitative actors. In these conditions, families with young children have struggled to access the most basic necessities, such as food and water, and suffered from inadequate sanitary conditions.

8. In addition, there are hundreds of families living in tent camps in Tijuana and Reynosa, where they vulnerable to criminal elements and lack access to services.

9. The inability to request asylum at a port of entry forces migrants, including women, to wait in conditions where they are vulnerable to harm and unable to access basic medical care. Several women I interviewed have recounted being sexually assaulted or otherwise harmed while sleeping on the street in Mexican border cities.

10. I have supported thirteen pregnant women in seeking exemptions from Title 42, most of whom struggled to access basic medical or prenatal care in Mexico and the limited humanitarian assistance in Mexican border cities such as Piedras Negras and Ciudad Acuña. One woman experienced bleeding and became worried that her pregnancy was

---

[1] Those cities are: Matamoros, Tamaulipas; Reynosa, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Ciudad Juárez, Chihuahua; Agua Prieta, Sonora; Nogales, Sonora; San Luis Rio Colorado, Sonora; Mexicali, Baja California; Tijuana, Baja California. I have also conducted interviews in Monterrey, Nuevo León.
[2] Those four ports of entry are: San Ysidro, Eagle Pass, Del Rio, and Hidalgo.

high risk, while another who was able to visit a health clinic was told that she was at risk of a miscarriage. Others expressed deep concern that the insecurity and extremely unstable living conditions would negatively affect the health of their babies.

11. Title 42 expulsions have also endangered asylum seekers with medical conditions, including families with U.S. citizen children. I sought an exemption for a lesbian couple from El Salvador who were expelled to Piedras Negras days after one of the mothers gave birth to a U.S. citizen baby, while she was still recovering from a cesarean delivery. The U.S. citizen baby was severely sick for several weeks, and the couple struggled to access affordable medical care in Mexico. The couple approached the port of entry and showed the documentation for their U.S. citizen newborn, but they were prevented from entering the bridge by Mexican authorities who told them they needed a visa.

12. While waiting in Mexican border cities, numerous people seeking asylum who I have spoken to in the last few months have reported being extorted, robbed, physically assaulted, and threatened by authorities and other individuals, leaving them fearful for their lives.

13. Individuals seeking protection in Mexican border cities face a high risk of being kidnapped, and this risk is particularly heightened in the state of Tamaulipas, due to the presence of the Gulf Cartel and Cartel del Noreste. Kidnappings of migrants in Mexico that have occurred since February 2021 have been documented through public testimonies, interviews, and an electronic survey by Human Rights First.[3] Approximately one out of every five individuals I interviewed through the exemption process affirmatively reported that they had been kidnapped (32 people), suffered a kidnapping attempt (20 people), or received threats of kidnapping (2 people) in Mexico. This figure is likely a significant undercount because I did not directly solicit information about kidnapping from individuals and many people may have been afraid to report such experiences.

14. Kidnappings of migrants often occur at bus stations, outside migrant shelters, or outside an international bridge or near the port of entry.

15. Title 42 expulsions, especially expulsions to Nuevo Laredo and Reynosa, Tamaulipas, force individuals seeking protection into a situation where they can be easily targeted. After migrants and individuals seeking protection are identified on the street, they are

---

[3] Human Rights First, *Tracker of Reported Attacks During the Biden Administration Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico* (June 2021), https://www.humanrightsfirst.org/sites/default/files/AttacksonAsylumSeekersStrandedinMexicoDuringBidenAdministration.6.17.21.pdf.

3

generally forced into vans by armed men and driven to a safe house where they are asked for contacts of people will pay ransom, or their phones are searched for U.S. numbers. Those contacts, who are usually family members in the U.S., receive a call demanding thousands of dollars and threatening to harm those in captivity. While being held in the safe house, women are often raped by their captors.

16. One Honduran woman I spoke with in April 2021 was expelled with her young daughter by CBP officials at night through the Hidalgo Port of Entry. After she exited the international bridge into Reynosa, several armed men grabbed her and covered her face with a black hat and forced her in a car. While being held, she was raped multiple times and she begged her captors not to harm her daughter. Her daughter was released by herself and crossed the border unaccompanied. After a month, the woman was able to escape with other women who were being held. She did not know where her daughter was until she was finally contacted by a U.S. shelter.

**Restoring Access to Asylum at Ports of Entry**

17. Instead of forcing families to cross dangerous terrain in between ports of entry to seek protection, CBP should restore access to asylum at ports of entry.

18. Throughout the exemption process, I have worked with many families who approached ports of entry for an opportunity to present their asylum claims but they were blocked from entering the port. For example, two weeks ago, a single mother with a U.S. citizen child who has special needs approached the Eagle Pass Port of Entry but was prevented from entering.

19. Although Defendants assert that thousands of people have been processed via ports of entry for exemptions from Title 42 (over a period of several months), Shahoulian Decl. (ECF No. 113-1) ¶ 11, those exemption processes cannot meet the needs of the majority of individuals seeking protection at the border and shift burdens onto nongovernmental organizations ("NGOs") to gather information from vulnerable asylum seekers, including under dangerous conditions in Mexico.

20. Many asylum seekers do not have access to NGOs, and, due to the very limited number of exemptions granted each day, the majority of asylum seekers will not be able to obtain an exemption from Title 42, no matter how vulnerable they are.

I declare under the penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct. Executed in New York, New York.

Dated: August 10, 2021

_____
                Savitri Arvey

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

NANCY GIMENA HUISHA-HUISHA, et al.,

*Plaintiffs*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland
Security, in his official capacity, et al.,

*Defendants*.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

No. 1:21-CV-00100-EGS

</td></tr>
</table>

**SUPPLEMENTAL DECLARATION OF FORMER CENTERS FOR DISEASE
CONTROL AND PREVENTION (CDC) OFFICIALS**

The undersigned hereby declare:

1. We make this declaration based on our own personal knowledge and if called to testify
   could and would do so competently and truthfully to these matters.

2. We submit this supplemental declaration as former CDC officials to address inaccuracies
   and logic shortfalls raised in Defendants' opposition to Plaintiffs' motion for a classwide
   preliminary injunction, Opp. (ECF No. 76), and in Defendants' supplemental declaration,
   Shahoulian Decl. (ECF No. 113-1).

3. We have also carefully reviewed the CDC order issued on August 2, 2021[1] (hereinafter
   "CDC Order").

4. We reaffirm the view expressed in our original declaration from February 5, 2021, ECF
   No. 57-6, that risks of infection can be successfully mitigated by reasonable public health
   measures and that any potential risks from allowing asylum-seeking families to enter the
   United States are no greater than many of the activities sanctioned by the CDC (such as
   indoor sporting events and concerts, indoor schooling, travel, and other regular activities
   that have resumed).

5. Moreover, compared to February 2021 and earlier points in the pandemic, the United
   States is now even better equipped to safely process immigrant families, given the
   availability of high effective vaccines and other interventions.  Notwithstanding recent

---

[1]     CDC, *Order Suspending the Right to Introduce Certain Persons from Countries Where a
Quarantinable Communicable Disease Exists* (Aug. 2, 2021),
https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-
Introduce-_Final_8-2-21.pdf.

variants of the COVID-19 virus, there remains no valid public health basis for expelling immigrant families.

**Highly Effective, Widely Available Vaccines Protect Against All Known Variants of the COVID-19 Virus and Reduce the Risk of Transmission in the United States.**

6. In the United States, COVID-19 vaccines are now widely available and accessible to all individuals over the age of 12, at no cost to the recipient. Vaccines are available on demand in convenient locations, including local pharmacies.

7. As of August 10, 2021, 71% of adults in the United States have received at least one COVID-19 vaccination shot, exceeding President Biden's national goal.[2] Vaccination rates are higher among older, more vulnerable demographics, with more than 90% of adults 65 or older having received at least one dose; over 80% of adults 65 or older are fully vaccinated.[3]

8. Overall, as of August 10, 2021, more than 195,000,000 people in the United States (more than 58% of total population) have received at least one dose of the COVID-19 vaccine, and more than 166,000,000 are fully vaccinated (more than 50% of total population).[4] With respect to those individuals who are vaccine-eligible (people ages 12 and up), 68.9% of that population has received at least one dose and 58.8% is fully vaccinated.

9. Although the CDC Order claims that "vaccination uptake has plateaued," CDC Order at 10, the CDC's own data show that the daily administration of first doses has more than doubled over the last month (seven-day moving average increased from 218,696 daily doses to 438,461 daily doses between July 7 and August 7, 2021).[5]

10. The widespread availability of vaccines has no doubt changed the course of the COVID-19 pandemic. As shown below, the number of new daily cases, hospitalizations, and deaths from COVID-19 have fallen drastically in the United States as vaccination numbers have increased. Even as restrictions have been lifted, cases, hospitalizations, and deaths are now a fraction of their peak.

---

[2]     CDC, *COVID-19 Vaccinations in the United States* (last updated Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#vaccinations.
[3]     *Id.*
[4]     *Id.*
[5]     CDC, *Trends in Number of COVID-19 Vaccinations in the US* (last updated Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#vaccination-trends_vacctrends-onedose-daily.



*Figure 1* - Source: CDC, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.

## Prevalent Hospitalizations of Patients with Confirmed COVID-19, United States
### August 01, 2020 – August 08, 2021



*Figure 2* - Source: CDC, *Prevalent Hospitalizations of Patients with Confirmed COVID-19, United States, August 01, 2020 – August 08, 2021* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#hospitalizations.

**Daily Trends in Number of COVID-19 Deaths in the United States Reported to CDC and Cumulative Count of Total Doses Administered.**



*Figure 3 - Daily Number of COVID-19 Deaths vs. Total Vaccine Doses Administered. Source: CDC, Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.*

11. Since vaccines became widely available in February and March 2021, the number of individuals who die from or are hospitalized due to COVID has dropped significantly. Figure 3, above, shows the inverse relationship between COVID-19 deaths and administered vaccine doses.

12. According to the CDC, studies show that all vaccines authorized for use in the United States—Pfizer-BioNTech, Moderna, and Johnson & Johnson—are effective against all known variants, including the Delta variant. CDC, *About Variants of the Virus that Causes COVID-19* (Aug. 6, 2021), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html.

13. Individuals who are vaccinated against COVID-19 are far less likely to become infected, to require hospitalization, and to transmit the virus to others. Individuals receive significant protection even after one dose of a two-dose vaccine. Vaccination produces better protection from infection and illness than surviving a naturally occurring case of

COVID-19 illness. If fully vaccinated people become infected with COVID-19 (though still rare), they are less likely to have symptoms or to transmit the virus to others.

14. The vaccines commonly used in North America are very effective at preventing illness, hospitalization and death from all known forms of the virus, including the Delta variant that has become the dominant form.

15. While so-called "breakthrough" infections are possible in vaccinated individuals, vaccinated individuals remain unlikely to develop a symptomatic illness and only very rarely will they become seriously ill or require hospitalization even if infected.

16. According to CDC data, less than 0.001% of vaccinated individuals have died from COVID-19.[6] Unvaccinated individuals account for more than 99% of recent COVID-19 deaths.[7]

17. According to a survey of 50 hospitals around the country, unvaccinated individuals make up the overwhelming majority (nearly 95%) of COVID-19 hospitalizations and deaths.[8]

18. There is some evidence that individuals with breakthrough infections from the Delta variant can carry the virus and potentially transmit infection to others, but according to the CDC, mitigation methods such as masking, social distancing, and proper building ventilation are effective ways of preventing transmission. *See, e.g.*, CDC Order at 7, 9, 13.

19. Apart from vaccinations, an additional 10 to 15% of the U.S. population has likely recovered from a prior COVID-19 infection.[9] Although prior infection confers less protection than a vaccination, studies show that individuals who have recovered from COVID-19 are unlikely to become infected again, and such individuals tend to develop milder symptoms even if re-infected.[10]

---

[6]    CDC, *COVID-19 Vaccine Breakthrough Case Investigation and Reporting* (last updated Aug. 5, 2021), https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html.

[7]    NPR, *U.S. COVID Deaths Are Rising Again. Experts Call It A 'Pandemic Of The Unvaccinated'* (July 16, 2021), https://www.npr.org/2021/07/16/1017002907/u-s-covid-deaths-are-rising-again-experts-call-it-a-pandemic-of-the-unvaccinated.

[8]    ABC News, *Vast majority of ICU patients with COVID-19 are unvaccinated, ABC News survey finds* (July 29, 2021), https://abcnews.go.com/US/vast-majority-icu-patients-covid-19-unvaccinated-abc/story?id=79128401.

[9]    Frederick J. Angulo, *Estimation of US SARS-CoV-2 Infections, Symptomatic Infections, Hospitalizations, and Deaths Using Seroprevalence Surveys,* JAMA Network Open (Jan. 4, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7786245/.

[10]    *See, e.g.,*  Adnan Qureshi et al., *Reinfection With Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) in Patients Undergoing Serial Laboratory Testing*, Clinical Infectious Diseases (Apr. 25, 2021), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciab345/6251701

20. Even in the face of a more transmissible variant form of the virus, current cases detected in the U.S. remain far below what they were at the peak of the epidemic, even while many restrictions and regulations have been relaxed. COVID-19 vaccines have almost certainly contributed to suppressing transmission and are the best form of protection against illness, hospitalization and death.

21. Given that asylum-seeking families make up a tiny percentage of daily inbound individuals, expelling asylum seekers at the southern border would do almost nothing to reduce the number of cases or the rate of transmission in the U.S. Instead, layered protection including masking, physical distancing, and improved ventilation, along with vaccination and testing, should be expected to prevent additional cases among this group and the Customs & Border Protection (CBP) personnel they interact with.

**Defendants' Expulsion Practices Are Inconsistent with Public Health.**

22. A basic public health concept is that most public health actions produce a combination positive and negative effects, which must be weighed against one another. Notably, the CDC Order appears to be nearly devoid of any consideration of the adverse consequences of the Title 42 policy, both to the asylum seekers and to the health of the U.S. public.

23. The CDC Declaration acknowledges that, notwithstanding COVID-19 variants, numerous safety measures remain effective in preventing the transmission of COVID-19, including in congregate settings. *See, e.g.*, CDC Order at 7, 9, 13. Those measures including rapid testing, quarantining, providing vaccines, masking, distancing, improving ventilation, and others.

24. According to reports by advocates and the media,[11] Defendants are carrying out "lateral" expulsions, which involve flying or bussing untested migrants already in the United States from one part of the border to another region before expelling them into Mexico.

25. We also understand from attorneys representing immigrants subject to Title 42 that some of their clients are detained in congregate facilities for days or weeks, before they are

---

[11]     *See, e.g.*, NBC News, *Biden admin again flying migrants who cross border in one place to another place before expelling them* (June 18, 2021), https://www.nbcnews.com/politics/immigration/biden-admin-again-flying-migrants-who-cross-border-one-place-n1271211; Washington Post, *Fewer migrant families being expelled at border under Title 42, but critics still push for its end* (June 13, 2021), https://www.washingtonpost.com/immigration/fewer-migrant-families-being-expelled-at-border-under-title-42-but-critics-still-push-for-its-end/2021/06/13/422c702c-c7cc-11eb-81b1-34796c7393af_story.html; San Diego Union-Tribune, *Biden expelling asylum-seeking families with young children to Tijuana after flights from Texas* (Apr. 9, 2021), https://www.sandiegouniontribune.com/news/immigration/story/2021-04-09/biden-expelling-families-tijuana.

expelled from the United States, sometimes after testing negative for COVID-19 or after completing quarantine or isolation. *See, e.g.*, Hidalgo Decl. (ECF No. 57-8) ¶ 6; Levy Decl. ¶ 30.

26. Such practices, if undertaken by the Department of Homeland Security, increase the risk of transmission on both sides of the border, compared to actual public health strategies such as testing and quarantining or offering vaccines to migrants and releasing migrants from congregate settings.

27. Migrants in Mexico have also begun receiving COVID-19 vaccines since at least May 2021, according to multiple media reports.[12]  Like other vaccinated individuals, migrants who have received a vaccine are extremely unlikely to transmit COVID-19, compared to unvaccinated travelers who are permitted to cross the Southwest border daily.

28. There is no public health basis for expelling immigrant families, particularly those who have been vaccinated against, tested negative for, or previously recovered from COVID-19, while allowing hundreds of thousands of other travelers to enter the United States daily via the Southwest border with no restrictions.

**Immigrant Families Subject to Title 42 Are Not a Significant Source of COVID-19 in the United States.**

29. The CDC premised its Title 42 order on the need to prevent the "introduction" of COVID-19 into the United States. CDC Order at 1.

30. In public health and epidemiology, "introduction" generally refers to first contact with a disease in an area where it was previously unknown or undocumented.[13]

31. Since the first confirmed case of COVID-19 in January 2020, there have been nearly 36,000,000 confirmed cases of COVID-19 in the United States as of August 10, 2021.[14] The actual number of infections is likely much higher.

---

[12]   Reuters, *Mexico to vaccinate migrants in Baja California under new border initiative* (June 18, 2021), https://www.reuters.com/world/americas/mexico-vaccinate-migrants-baja-california-under-new-border-initiative-2021-06-19/; Reuters, *U.S. bound-migrants vaccinated for COVID-19 in Mexican border city* (May 6, 2021), https://www.reuters.com/world/americas/us-bound-migrants-vaccinated-covid-19-mexican-border-city-2021-05-06/.

[13]   KE Nelson and CM Wilson [eds] (2007), *Infectious Disease Epidemiology Theory and Practice*, 2nd Edition.  Sudbury, MA: Jones and Bartlett.

[14]   CDC, *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction* (last updated Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#cases.

32. According to the CDC, there were over 91,000 new confirmed COVID-19 cases reported on July 31, 2021, more than 80% of which were caused by the Delta variant.[15] There is no evidence that the Delta variant originated in a migrant crossing the Southwest border, and, at this point, asylum-seeking families cannot meaningfully introduce the variant into the United States, where it is already the dominant strain.

33. According to public data from CBP, the agency has expelled an average of 8,600 family unit noncitizens per month in the last two months, or approximately 285 people per day.[16]

34. Even if 100% of those approximately 285 people per day were to test positive for COVID-19 (which they will not), they would still represent only a negligible addition to the more than 70,000 new cases that have been reported each day in the United States on average over the most recent week.[17]

35. Given that noncitizen families represent a very small fraction of the hundreds of thousands of inbound people allowed to cross the Southwest border each day (without COVID-19 testing or vaccination requirements),[18] even with entry to congregate conditions, asylum seekers cannot plausibly constitute a meaningful additional COVID-19 risk to the U.S. public. That minimal risk is further diminished by a majority of Americans and a large majority of vulnerable age groups receiving COVID-19 vaccinations.

36. The minimal risk that those few asylum-seekers could infect others could be further mitigated by a testing and quarantine process or via widely available vaccinations. According to Defendants, DHS has already developed, in coordination with state, local, and NGO partners, capacity to test, quarantine, or isolate noncitizen families. Shahoulian Decl. ¶¶ 8–9. Apart from that capacity, noncitizen families can be directed to self-quarantine with the help of their family, friends, or other sponsors in the United States. A recent study found that "91.9% [of asylum seekers] have family or close friends who live in the U.S."[19]

---

[15]     CDC, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.  CDC, *Variant Proportions* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#variant-proportions.
[16]     CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.
[17]     CDC*, Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.
[18]     Department of Transportation, *Border Crossing Entry Data* (last visited Aug. 9, 2021), https://explore.dot.gov/views/BorderCrossingData/Annual?:isGuestRedirectFromVizportal=y&:embed=y.
[19]     U.S. Immigration Policy Center at UC San Diego, *Seeking Asylum: Part 2* 13(Oct. 29, 2019), https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-final.pdf?fbclid=IwAR07M_jP1Wy8KIn85d0jnw0Kobiz-MR7XeAIT77c9afuRInkd7sHL21FE1Q.

37. Additional quarantine or isolation capacity can be acquired by expanding the use of hotel or by utilizing temporary, mobile housing units that can be rapidly deployed by HHS and CDC in coordination with local partners.

**Defendants Make Misleading Claims About the Infection Risks That Agency Personnel Face.**

38. Defendants' suggestion that CBP employees are at elevated risk for COVID-19 due to contact with immigrants is unfounded.

39. If vaccinated with one of the widely available vaccines, CBP employees would be highly unlikely to contract COVID-19 and develop symptomatic or serious illness.

40. Defendants assert that the rate of infection has been increasing among CBP officers, despite significant numbers of fully vaccinated employees since January 2021. *See* ECF No.113-1, ¶ 13. However, Defendants do not indicate whether any of the recently infected CBP officers had been vaccinated, or whether any breakthrough infections had led to serious disease. Moreover, Defendants' infection figures appear to include all CBP employees, including those who are not located at the Southwest border (or even in the United States).[20]

41. Defendants also do not disclose how many CBP employees have actually been vaccinated. We understand that the federal government has only recently required all federal employees and contractors to either attest to vaccination, or otherwise comply with testing and masking requirements.[21]  As more CBP employees get vaccinated or begin to follow more rigorous testing and masking protocols, infection and hospitalization rates should correspondingly decrease.

42. Because CBP employees are far more likely and able to be tested than the average American citizen, the fact that 12.36% of CBP employees may have tested positive for COVID-19 (as of February 15, 2021) compared to 8.16% nationally is not probative. *See* ECF No. 76-2, ¶ 18. Indeed, a nationwide sero-prevalence survey conducted prior to the availability of vaccines, suggested that 14.3% of the United States population had been infected as of mid-November 2020, more than twice the number of confirmed cases.[22]

---

[20]     CBP, *Agency COVID-19 Information* (last updated Aug. 6, 2021), https://www.cbp.gov/newsroom/coronavirus.

[21]     Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Agency Model Safety Principles* (July 29, 2021), https://www.saferfederalworkforce.gov/downloads/revised%20COVID19_Safe%20Federal%20Workplace_Agency%20Model%20Safety%20Principles_20210728.pdf

[22]     Frederick J. Angulo, *Estimation of US SARS-CoV-2 Infections, Symptomatic Infections, Hospitalizations, and Deaths Using Seroprevalence Surveys,* JAMA Network Open (Jan. 4, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7786245/.

43. In fact, based on CBP's latest public data, CBP employees have likely had a lower incidence of confirmed COVID-19 cases compared to the overall adult population in the United States. Between February 15 and August 6, 2021, 1,905 CBP officers tested positive for COVID-19, out of 63,457 employees.[23] Accordingly, approximately 3.00% of CBP personnel contracted COVID-19 during that time. During that same period, 3.01% of adults in the United States tested positive for COVID-19.[24] Because CBP officers are tested more frequently than the average adult in the United States, the fact that they have almost identical rates of confirmed cases suggests that CBP officers are less likely to be infected with COVID-19 than the rest of the adult population in the country.

44. The fact that CBP officers likely have a lower rate of infection compared to the American public as a whole suggests that CBP is able to process immigrants safely, given vaccinations and other mitigation measures, despite having to work in congregate settings at times.

45. Notably, the CDC Order cites no evidence for its contention that the Title 42 policy has "helped lessen the introduction, transmission, and spread of COVID-19 among border facilities and into the United States while also decreasing the risk of exposure to COVID-19 for DHS personnel and others in the facilities." CDC Order at 15-16. Given the likely lower incidence in CBP personnel, including during the asserted period of increased facility crowding in 2021, this statement is likely incorrect.

**Defendants Make Misleading Claims About the Risk of Infection Posed by Travelers from Mexico.**

46. Defendants note that Mexico has "had the third highest total number of deaths from COVID-19 in the world," Opp. at 4, which is no longer the case. Moreover, the statement omits noting that the United States has reported the *most* COVID-19 deaths in the world cumulatively and that the COVID-19 death rate on a per capita basis is nearly identical in the US and Mexico.[25]

47. In any event, Defendants' reliance on total deaths as a measure of infection risk is misguided: National death counts vary depending on factors such as the quality of

---

[23]   *See* Miller Decl. (ECF No. 76-2) ¶ 18; CBP, *Agency COVID-19 Information* (last updated Aug. 6, 2021), https://www.cbp.gov/newsroom/coronavirus.

[24]   CDC, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.

[25]   World Health Organization, WHO Coronavirus Disease (COVID-19) Dashboard (last updated Aug. 10, 2021), https://covid19.who.int/table; Johns Hopkins University of Medicine Coronavirus Resource Center, Mortality Analysis (last updated Aug. 10, 2021), https://coronavirus.jhu.edu/data/mortality.

medical care once infected and differences in population and demographics, none of which reveals the likelihood that a traveler from Mexico is carrying the virus that causes COVID-19. Not only is quality healthcare less accessible in Mexico, the Mexican population also suffers from high rates of obesity and other chronic conditions that place them at particular risk for severe illness and death from COVID-19.[26]

48. In the latest CDC Order, the only data that the agency cited regarding COVID-19 prevalence in Mexico show that the United States is experiencing more than twice as many cases per capita compared to Mexico. CDC Order at 4. The Order also cites data indicating that the recent rate of increase of confirmed COVID-19 cases in the United States is three times higher than Mexico's. *Id.*

49. While Defendants have previously asserted that Mexico is underreporting its COVID-19 cases and deaths, sero-prevalence studies, as explained in our initial declaration, confirm that Mexico's lower counts cannot be fully explained by differences in reporting. *See* ECF No. 57-6, ¶ 24.

50. In short, the CDC has not provided any evidence or reason to believe that migrants arriving from Mexico are more likely to have COVID-19 than the average person in the United States.

---

[26]     Diego Rolando Hernández-Galdamez, et al., *Increased Risk of Hospitalization and Death in Patients with COVID-19 and Pre-existing Noncommunicable Diseases and Modifiable Risk Factors in Mexico*, Archives of Medical Research (July 22, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7375298/.

I, Sharmila Shetty, declare under penalty of perjury of the laws of the State of New York and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Massapequa Park, New York.

_____
SHARMILA SHETTY

I, Stephen Patrick Kachur, declare under penalty of perjury of the laws of the State of New York and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
STEPHEN PATRICK KACHUR

I, Leslie Roberts, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Bocaranga, Central African Republic.

_____
LESLIE ROBERTS

I, Bradley A. Woodruff, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Victoria, British Columbia, Canada.

_____
BRADLEY A. WOODRUFF

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) No. 1:21-CV-00100-EGS |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of Homeland | ) |
| Security, in his official capacity, et al., | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF 32 MEDICAL AND PUBLIC HEALTH EXPERTS**

The undersigned hereby declare:

1. We make this declaration based on our own personal knowledge and if called to testify could and would do so competently and truthfully to these matters.

2. We have carefully reviewed the latest Title 42 order issued by the Centers for Disease Control & Prevention (CDC) and conclude that it still does not provide adequate public health justifications for expelling asylum-seeking families at the border. *See* CDC, *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* (Aug. 2, 2021) (hereinafter "CDC Order"), https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.

3. Based on our professional opinion as epidemiologists, medical doctors, public health experts, and former officials from the CDC, we believe that:

   - Families seeking asylum at the southwest border can be admitted, processed, and transported in a manner that safeguards public health, notwithstanding the COVID-19 pandemic and the currently circulating variants of the COVID-19 virus;
   - Migrants are not responsible for increases in COVID-19 infections, nor did they introduce the current variants into the United States;
   - Processing of asylum seekers, with mitigation strategies, presents no greater risk than that posed by countless activities currently allowed by the CDC (such as indoor sporting events, dining, and concerts); and
   - The CDC Order does *not* conclude that the processing of asylum seekers cannot be done safely. Rather, the CDC has concluded that the Department of Homeland Security (DHS) has not taken all of the recommended mitigation steps, despite having had more than a year to do so.

4.  In short, the CDC Order is an indictment of the DHS's yearlong failure to adopt reasonable mitigation steps in order to safely process asylum-seeking families, and not a conclusion by CDC that migrants present an unacceptable public health risk.  The CDC Order also makes clear that where the federal government has wanted to allocate resources toward mitigation protocols for migrants entering the United States, it can do so, as it did when it exempted unaccompanied minors from Title 42.

5.  In its order, the CDC "recognizes [that] the availability of testing, vaccines, and other mitigation protocols can minimize risk" of COVID-19 transmission during border processing.  CDC Order at 3.  Thus, according to the CDC, the primary reason that asylum-seeking families are still being subjected to Title 42 is because of DHS's failure to expand available mitigation measures:

> CDC considers these efforts [to expand testing, consequence management, and vaccination programs] to be a critical risk reduction measure and encourages DHS to evaluate the potential expansion of such COVID-19 mitigation programs for [family units] such that they may be excepted from this Order in the future.

*Id.* at 22.  The CDC also stated that it "encourages DHS to develop such programs as quickly as practicable."  *Id.*

6.  The CDC further recognized that the federal government has successfully implemented those mitigation steps in order to process unaccompanied children without posing "a significant level of risk for COVID-19 spread into the community"—DHS simply has not done the same for families.  *See id.* at 17.

7.  To date, Title 42 has not been lifted for any subset of asylum-seeking families, even though the CDC has concluded that "[i]n light of available mitigation measures," "the gradual resumption of normal border operations under Title 8 is feasible" with "careful planning."  *Id.* at 18.

8.  Effective mitigation measures have enabled this country to re-open, return to in-person schooling, travel, religious practice, indoor sporting events and other regular activities.  The risks from allowing migrants fleeing persecution and danger into the United States are minimal considering the number of mitigation tools available, and certainly not greater than risks associated with many activities that the CDC currently sanctions.

9.  By utilizing highly effective vaccines and following the other practical mitigation recommendations (set forth below), Defendants can ensure the health of government

employees, noncitizens, and communities in the United States.  These mitigation concepts are not novel in the context of border processing.[1]

**SARS-CoV-2 and Its Variants Do Not Provide a Public Health Basis to Exclude Asylum-Seeking Families From the United States.**

10. The CDC has recognized that mitigation strategies continue to be effective against all known variants of the COVID-19 virus, including the Delta variant, the dominant strain currently circulating in the United States.  *See, e.g.*, CDC Order at 7.

11. Title 42 expulsions at the southwest border cannot prevent the introduction of the Delta variant into the country, because the variant is already widespread in the United States.[2]

12. There is no evidence that any of the four variants of concern to the CDC originated in a person crossing the southwest border.[3]

**Minimizing Transmission Risk During Border Processing.**

13. A package of risk mitigation strategies is effective even if no individual strategy completely blocks transmission on its own.  By combining multiple strategies, including vaccinations, testing, masking, ventilation, and sanitizing, Customs and Border Protection (CBP) can safely process asylum-seeking families while minimizing transmission of COVID-19.

14. On July 29, 2021, President Biden announced a requirement that millions of federal employees and contractors be vaccinated or be subjected to rigorous safety protocols.[4]

15. Ensuring that only fully-vaccinated government agents are placed in migrant-facing roles would largely eliminate the risks of serious illness, hospitalization, and death among government personnel from COVID-19; it would also significantly reduce transmission of SARS-CoV-2 between government personnel and migrants.

16. Offering COVID-19 vaccinations to migrants would further dampen cycles of transmission.  All migrants should be offered a vaccine when they come into CBP

---

[1]    Columbia Mailman School of Public Health, *Public Health Recommendations for Processing Families, Children and Adults Seeking Asylum or Other Protection at the Border* (Dec. 12, 2020), https://www.publichealth.columbia.edu/research/program-forced-migration-and-health/public-health-recommendations-processing-families-children-and-adults-seeking-asylum-or-other.

[2]    *See* CDC, *Variant Proportions* (last updated Aug. 3, 2021), https://covid.cdc.gov/covid-data-tracker/#variant-proportions.

[3]    *See* CDC, *SARS-CoV-2 Variant Classifications and Definitions* (last updated Aug. 3, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-info.html.

[4]    The White House, *Fact Sheet: President Biden to Announce New Actions to Get More Americans Vaccinated and Slow the Spread of the Delta Variant* (July 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-president-biden-to-announce-new-actions-to-get-more-americans-vaccinated-and-slow-the-spread-of-the-delta-variant/.

custody, or shortly after leaving CBP custody, regardless of whether or not they are ultimately allowed to remain in the country.

17. The U.S. government has adequate vaccine supplies to take this step.[5]  DHS should also offer vaccine information in multiple languages to increase vaccine uptake.

18. Vaccination programs for migrants arriving at the southwest border are reportedly being considered by DHS and CBP and should be implemented immediately, as recommended by the CDC.[6]  In the past, CBP has reportedly resisted the CDC's recommendation to vaccinate migrants, acting contrary to public health.[7]

19. In addition to vaccinations, transmission could be further reduced by maximizing outdoor processing, such as by repurposing parking lots and other well-ventilated spaces.  The CDC Order noted that processing for Title 42 expulsions generally takes place outdoors. CDC Order at 15.  However, if CBP were to similarly shift processing for those allowed to enter the country to outdoor settings or semi-outdoor spaces with open-sided structures, transmission risk would be substantially reduced.

20. Even if congregate processing indoors were necessary, there are numerous safeguards that minimize the risk of transmission in such settings.

21. For instance, as one layer of protection, indoor facilities can utilize air filtration or other means of improving ventilation, such as reducing recirculation of air and opening windows.

22. When families are indoors, transmission can be mitigated through masking, social distancing, and hand-sanitizing, all of which remain effective against all known variants of the COVID-19 virus.  All building occupants could be instructed to wear masks in the correct manner and to use surgical masks or respirators with better filtration instead of cloth masks.  *See* CDC, *Improve the Fit and Filtration of Your Mask to Reduce the Spread of COVID-19* (last updated Apr. 6, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/mask-fit-and-filtration.html.

23. Mobile testing units deploying rapid antigen tests could be used to test individuals for COVID-19 before they enter an indoor, congregate setting.  According to the CDC, in congregate settings, "rapid testing can be implemented to identify infected persons so

---

[5]      *See, e.g.*, The White House, *Fact Sheet: President Biden Announces Major Milestone in Administration's Global Vaccination Efforts: More Than 100 Million U.S. COVID-19 Vaccine Doses Donated and Shipped Abroad* (Aug. 3, 2021) (stating that United States government will deliver "hundreds of millions of more doses" to other countries "in the coming weeks"), https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/03/fact-sheet-president-biden-announces-major-milestone-in-administrations-global-vaccination-efforts-more-than-100-million-u-s-covid-19-vaccine-doses-donated-and-shipped-abroad.
[6]      *See* The Washington Post, *Biden administration preparing to offer vaccines to migrants along Mexico border* (Aug. 3, 2021), https://www.washingtonpost.com/national/biden-vaccines-migrants-border/2021/08/03/afaff516-f471-11eb-83e7-06a8a299c310_story.html.
[7]      CNN, *CDC urged US Customs and Border Protection to vaccinate migrants, but they rejected the idea* (Nov. 26, 2019), https://www.cnn.com/2019/11/26/health/cdc-vaccinations-migrants-border-patrol/index.html.

4

they can be isolated until they no longer pose a risk of spreading infections." CDC Order at 9. The rapid testing could be part of the COVID-19 medical screenings and temperature checks already conducted by CBP prior to taking noncitizens into custody. *Id.* at 13.

24. Any individual who tests positive for COVID-19 from the antigen test should be immediately referred for medical care and isolation while they await a PCR test to confirm the COVID-19 diagnosis. CBP can work with local health authorities, shelters, and humanitarian assistance organizations to find additional facilities, like unused dormitory and hotel facilities, to allow such individuals to isolate and undergo additional testing.

25. According to the CDC, CBP already has testing, quarantine, and isolation systems set up for most family units, who are not typically detained. *See id.* at 14.

26. According to the CDC, CBP has already been implementing several other mitigation strategies at its facilities. *Id.* at 13 ("CBP has implemented a variety of mitigation efforts to prevent the spread of COVID-19 in [CBP] facilities. CBP has invested in engineering upgrades, such as installing plexiglass dividers in facilities where physical distancing is not possible and enhancing ventilation systems. All CBP facilities adhere to CDC guidance for cleaning and disinfection. Surgical masks are provided to all persons in custody and are changed at least daily and if or when they become wet or soiled. Personal protective equipment (PPE) and guidance are regularly provided to CBP personnel. Recognizing the value of vaccination, CBP is encouraging vaccination among its workforce.").

27. We are not aware of any reason that DHS could not take additional mitigation steps beyond those it has already taken, if it were willing to allocate sufficient resources. Nor does the CDC Order explain why DHS could not take such additional mitigation steps.

28. The above precautionary measures, combined with testing (including rapid testing), quarantine, isolation, and vaccinations, provide multiple layers of protection against transmission, minimize disease transmission, and enable asylum-seeking families to be processed without posing a significant public health risk.

**Minimizing Transmission Risk During Transport.**

29. Mitigation strategies are effective in preventing transmission of COVID-19 when asylum-seeking families have to be transported by CBP prior to release.

30. Ensuring that all migrant-facing CBP personnel are vaccinated and masked, and that all noncitizens are tested prior to boarding, cohorted by COVID-19 status and known exposure, and masked will significantly reduce transmission risk. These steps for minimizing transmission during air and ground transportation are already outlined in CDC guidance. *See* CDC, *Interim Guidance for Transporting or Arranging Transportation by Air into, from, or within the United States of People with COVID-19 or*

5

*COVID-19 Exposure* (Jan. 19, 2021), https://www.cdc.gov/quarantine/interim-guidance-transporting.html.

31. Transmission risk can be further mitigated by using larger capacity vehicles, improving ventilation by opening windows, minimizing recirculation of air by the heating/cooling system, seating individuals in a socially distanced manner, and sanitizing vehicles between uses.

32. In the event that a longer trip is necessary, vehicle occupancy can be reduced to mitigate transmission risk.

**Public Health Alternatives to Expulsion.**

33. Expulsions magnify the risks of COVID-19 transmission to CBP personnel and border communities.

34. Title 42 expulsions encourage repeat interactions between noncitizens and CBP. According to CBP, "[t]he large number of expulsions during the pandemic has contributed to a larger-than-usual number of noncitizens making multiple border crossing attempts."  CBP, *CBP Announces May 2021 Operational Update* (June 9, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-announces-may-2021-operational-update.  Noncitizens subject to expulsion are generally expelled across the border into Mexico via the nearest port of entry.  *See* CDC Order at 14.

35. According to CBP statistics, approximately 35-40% of noncitizens encountered at the southwest border are repeat encounters.  *See* CBP, *CBP Announces June 2021 Operational Update* (July 16, 2019), https://www.cbp.gov/newsroom/national-media-release/cbp-announces-june-2021-operational-update. CBP, *CBP Announces May 2021 Operational Update* (June 9, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-announces-may-2021-operational-update.

36. Rather than increasing transmission opportunities by multiplying the number of direct interactions, DHS and CBP should implement proven public health strategies, such as testing and quarantine and vaccination programs for migrants.

37. According to the CDC, a protocol for testing, quarantine, and vaccination (when age-appropriate) has enabled unaccompanied children to be placed in congregate shelters or released to sponsors (who can assist with compliance with medical guidance) "without posing a significant public health risk."  CDC Order at 17.

38. The same can be done for asylum-seeking families, the overwhelming number of whom have sponsors, family, or friends in the United States who can assist with compliance

with medical and public health direction.  A recent study found that "91.9% [of asylum seekers] have family or close friends who live in the U.S."[8]

39.  According to the CDC, CBP has already developed partnerships "with state and local agencies and non-governmental organizations to facilitate COVID-19 testing of [families] upon release from CBP custody."  CDC Order at 14.  Highly effective vaccines are already available upon demand in the United States, free of charge, to all individuals 12 or older, in local pharmacies and other accessible locations.

40.  To the extent that such resources for testing and quarantine are limited, DHS and HHS should procure additional testing and quarantine capacity or provide funding to local and state groups.  The use of quarantine hotels or motels could be quickly scaled up or down as needed.

41.  Asylum-seeking families in the United States can also be directed to shelter in place at their ultimate destinations.

42.  Additionally, HHS and CDC should assist with expanding quarantine and isolation capacity through the use of temporary or mobile housing units, in coordination with local health authorities.

---

[8]     U.S. Immigration Policy Center at UC San Diego, *Seeking Asylum: Part 2* 13(Oct. 29, 2019), https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-final.pdf?fbclid=IwAR07M_jP1Wy8KIn85d0jnw0Kobiz-MR7XeAIT77c9afuRInkd7sHL21FE1Q.

I, Joseph J. Amon, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Princeton, New Jersey.

JOSEPH J. AMON, PhD, MSPH
Director of Global Health
Clinical Professor, Community Health and Prevention
Dornsife School of Public Health, Drexel University
Former Epidemiologist, Epidemic Intelligence Service, Centers for Disease Control and Prevention

I, Stefano M. Bertozzi, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 8, 2021 in Berkeley, California.

STEFANO M. BERTOZZI, MD, PhD
Dean Emeritus and Professor, Health Policy & Management
UC Berkeley School of Public Health

I, Jacqueline Bhabha, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Cambridge, Massachusetts.

JACQUELINE BHABHA
Professor of the Practice of Health and Human Rights, Harvard T.H. Chan School of Public Health
Director of Research, François-Xavier Bagnoud Center for Health and Human Rights
Harvard University

I, Ietza Bojorquez, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 8, 2021 in Tijuana, Mexico.

_____
IETZA BOJORQUEZ, MD, PhD
Department of Population Studies, El Colegio de la Frontera Norte
Tijuana, BC, Mexico

I, Joanne Csete, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
JOANNE CSETE, PhD, MPH
Associate Professor
Columbia University Mailman School of Public Health

I, Charles Nicholas Cuneo, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Baltimore, Maryland.

_____
CHARLES NICHOLAS CUNEO, MD, MPH
Assistant Professor of Medicine and Pediatrics
Johns Hopkins University School of Medicine (Division of Hospital Medicine, Pediatric Hospital Medicine Division)
Johns Hopkins Bloomberg School of Public Health (Center for Public Health and Human Rights – Migrant Health & Human Rights Program, Center for Humanitarian Health)

I, Ayman El-Mohandes, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
AYMAN EL-MOHANDES, MBBCh, MD, MPH
Dean
CUNY Graduate School of Public Health & Health Policy

I, Eric Friedman, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 8, 2021 in Washington, DC.

_____
ERIC A. FRIEDMAN
Global Health Justice Scholar
O'Neill Institute for National and Global Health Law
Georgetown University Law Center

I, Gregg Gonsalves, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New Haven, Connecticut.

_____
GREGG GONSALVES, PhD
Associate Professor of Epidemiology
Yale School of Public Health

I, Lawrence Gostin, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Washington, DC.

_____
LAWURENCE GOSTIN
Linda D. & Timothy J. O'Neill Professor of Global Health Law
Faculty Director, O'Neill Institute for National & Global Health Law
Professor of Medicine, Georgetown University
Member of the National Academy of Medicine

I, M. Claire Greene, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in New York, New York.

_____
M. CLAIRE GREENE
Postdoctoral Research Scientist
Columbia University Mailman School of Public Health

I, Michele Heisler, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Ann Arbor, Michigan.

_____
MICHELE HEISLER, MD, MPA
Professor of Internal Medicine and Public Health
Co-Director, Michigan Center for Diabetes Translational Research (MCDTR—NIDDK P30DK092926)
University of Michigan, Ann Arbor, MI

I, Monik C. Jiménez, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Brimfield, Massachusetts.


_____
MONIK C. JIMÉNEZ, ScD, SM, FAHA
Assistant Professor
Brigham and Women's Hospital/Harvard Medical School



I, Stephen Patrick Kachur, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.


_____
STEPHEN PATRICK KACHUR, MD, MPH
Professor of Population and Family Health
Columbia University Mailman School of Public Health
Former Branch Chief, Malaria Branch, Centers for Disease Control and Prevention



I, Ameeta Kalokhe, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Atlanta, Georgia.


_____
AMEETA KALOKHE, MD MSc
Associate Professor
Emory University School of Medicine, Division of Infectious Diseases
Emory Rollins School of Public Health, Department of Global Health

I, Michel Khoury, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Atlanta, Georgia.

_____
MICHEL KHOURY, MD
Assistant Professor, Department of Neurology, Emory University
Co-Director, Georgia Human Rights Clinic

I, William D. Lopez, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Ann Arbor, Michigan.

_____
WILLIAM D. LOPEZ, PhD, MPH
Clinical Assistant Professor
University of Michigan School of Public Health

I, Terry McGovern, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
TERRY MCGOVERN, JD
Professor and Chair
Heilbrunn Department of Population and Family Health, Mailman School of Public Health, Columbia University

I, Rachel T. Moresky, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.



RACHEL T. MORESKY, MD, MPH
Director, Columbia University sidHARTe - Strengthening Emergency Systems Program & Global Emergency Medicine Fellowship
Associate Professor, Population and Family Health & Emergency Medicine Departments, Columbia University Irving Medical Center

I, Katherine R. Peeler, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Boston, Massachusetts.

KATHERINE R. PEELER, MD, MA
Medical Expert, Physicians for Human Rights
Instructor of Pediatrics, Global Health and Social Medicine, and Bioethics, Harvard Medical School
Medical Director, Harvard Students Human Rights Collaborative Asylum Clinic

I, Benjamin Pinsky, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in San Francisco, California.

BENJAMIN PINSKY, MD, PhD
Associate Director of Clinical Pathology for COVID-19 Testing
Director, Clinical Virology Laboratory
Stanford Health Care and Stanford Children's Health

I, Leslie ("Les") Roberts, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Bocaranga, Central African Republic.

_____
LESLIE ROBERTS, MPH, PhD
Professor of Population and Family Health
Columbia University Mailman School of Public Health
Former Epidemic Intelligence Service Officer and Senior Assistant Scientist, Centers for Disease Control and Prevention

I, Goleen Samari, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
GOLEEN SAMARI, PhD, MPH, MA
Assistant Professor
Program on Forced Migration and Health
Columbia Mailman School of Public Health

I, John Santelli, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
JOHN SANTELLI, MD, MPH
Professor, Population and Family Health and Pediatrics
Mailman School of Public Health
Vagelos College of Physicians and Surgeons
Columbia University

I, Anandi Sheth, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Atlanta, Georgia.

_____
ANANDI SHETH, MD, MSc
Associate Professor
Emory University School of Medicine


I, Sharmila Shetty, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Massapequa Park, New York.

_____
SHARMILA SHETTY, MD
Vaccines Medical Advisor,
Médecins Sans Frontières – Access Campaign
Former Epidemiology Lead, Global Rapid Response Team, Centers for Disease Control and Prevention


I, Paul B. Spiegel, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Baltimore, Maryland.

_____
PAUL B. SPIEGEL, MD, MPH
Professor of Practice and Director
Johns Hopkins Bloomberg School of Public Health, Center for Humanitarian Health
Former Medical Epidemiologist, International Emergency and Refugee Health Branch, Centers for Disease Control and Prevention

I, Ronald Waldman, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Washington, DC.

RONALD WALDMAN, MD, MPH
Professor Emeritus of Public Health
Milken Institute School of Public Health
The George Washington University
Former Director, Technical Support Division, International Health Program Office, Centers for Disease Control and Prevention


I, Bradley A. Woodruff, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Victoria, British Columbia, Canada.

BRADLEY A. WOODRUFF, MD, MPH
Consultant, UNICEF, WHO, WFP
Former Senior Medical Epidemiologist and Acting Chief of International Emergency and Refugee Health Branch, Centers for Disease Control and Prevention


I, Monette Zard, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

MONETTE ZARD, MA
Allan Rosenfield Associate Professor of Forced Migration and Health
Director of the Forced Migration and Health Program
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

I, Amy Zeidan, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Atlanta, Georgia.

_____
AMY ZEIDAN, MD
Assistant Professor of Emergency Medicine
Co-Director, Georgia Human Rights Clinic
Emory University School of Medicine

I, Jon Zelner, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Ann Arbor, Michigan.

_____
JON ZELNER, PhD
Assistant Professor
Dept. of Epidemiology
Center for Social Epidemiology and Population Health (CSEPH)
University of Michigan School of Public Health

# DECLARATION OF LINDA RIVAS

I, Linda Rivas, pursuant to 28 U.S.C. § 1746, declare as follows:

**Summary**

1. Through my work as an immigration attorney and Executive Director of a non-profit I have seen the grave harm caused to families and individuals expelled under Title 42. Families experience extortion, kidnapping, rape, and other violence after being expelled. Despite those harms, the government has failed to utilize the El Paso shelter system, complete with COVID-19 protocols, and instead continues to expel families directly into harms way. Asylum seekers should be processed into the United States, and we have the capacity to receive them, consistent with public health protocols.

**Qualifications**

2. I am the Executive Director of the Las Americas Immigrant Advocacy Center ("Las Americas") in El Paso, Texas.

3. Las Americas is a 501(c)(3) nonprofit organization based in El Paso, Texas providing free and low-cost legal services to immigrants and refugees in West Texas and New Mexico. We have served over 40,000 people from over 77 countries since 1987. We provide legal representation through attorneys and Department of Justice accredited representatives.

4. This year alone, Las Americas has assisted over 1,000 people, including families, seeking asylum that have been impacted by Title 42 processing.

5. I make this declaration based on my personal experience at Las Americas working with noncitizen children and families subject to the Title 42 process since the process began in March 2020.

6. I have been the Executive Director of Las Americas since 2016. I began working at Las Americas as a managing attorney in 2014. I continue, as Executive Director, to directly represent many of our clients. Prior to joining Las Americas, I was the West Texas Violence Against Women's Act supervisor at the Texas Civil Rights Project for almost two years. I graduated law school 2011 from Loyola College of Law and have been a member of the Texas bar since 2013.

**Harm from Title 42**

7. When the Title 42 process first began in March 2020, we started receiving desperate phone calls from families and individual impacted by the expulsions. At the time, given the complete denial of access to the asylum system, we did not have any viable option to assist those families or individuals given the absolute denial of access to asylum under the Title 42 process. Despite no meaningful avenue to advocate for those impacted, we

continued to put together robust humanitarian parole packets for people forced to remain in Mexico in an attempt to get particularly vulnerable families and individuals processed into the United States. Only one was granted after the New York Times reported on the case. The rest were denied.

8.  Beginning in February 2021, the Las Americas staff and I started going into Ciudad Juarez to interview people expelled under the Title 42 process. What I heard and saw was shocking. I have witnessed many expulsions occur on the international bridges. I have seen families with very small children, people in wheelchairs, and people on crutches being expelled across the bridges back into Mexico. For many, their vulnerabilities are visible even at a distance.

9.  Also, around February 2021, shelters in Ciudad Juarez, Mexico began asking us to come to provide guidance to desperate families and individual stuck in Mexico. We were asked to visit and explain to those asylum seekers why they were not allowed to access the asylum system in the U.S., despite the change in administration.

10. Through these interviews and presentations, I was horrified to hear stories of people expelled without being told by CBP that they were being expelled. Families flown laterally by DHS from one part of the border region to another before being expelled were falsely told by Border Patrol agents that they were being taken to see a judge. Others were told by Border Patrol that they were heading to shelters in the U.S. where they would be able to talk to a lawyer. But these families were misled, and ultimately expelled under Title 42, not knowing they were being forced to Mexico.

11. One case I recall vividly was that of a former police officer from El Salvador, who traveled with his wife and three children. Several of my clients that were former police officers from El Salvador have been granted asylum. I believed this man presented a strong case for asylum. When he crossed the border, he had expressed fear of return to El Salvador and pleaded with the Border Patrol agents that apprehended him to listen to his story. One agent initially said he would listen, but other agents told him to shut up. He was not allowed to express his fear and was expelled to Ciudad Juarez with his family.

12. On Monday, March 29, 2021, at 4:00 PM, I joined a meeting that included CBP Commissioner Miller, where the group in attendance was informed by local CBP leadership that, as part of the Title 42 process, officers were supposed to screen for claims under the Convention against Torture ("CAT"). Under the Title 42 process, CAT screenings, which carry a higher standard than regular asylum assessments, are supposed to occur but rarely do in practice.

13. After that, I made sure to ask expelled families and individuals in Ciudad Juarez if they had any chance to raise their fear claims. Dozens of families and individuals consistently reported to me that they were not allowed to speak while in Border Patrol custody and that there was no opportunity to raise their fear claims.

14. In February 2021, I also conducted interviews and presented to groups of Haitians expelled back to Mexico under the Title 42 process. CBP dumped whole families on the street in Mexico, with children expelled without their shoes. All of the families I spoke with claimed political persecution based on the situation in Haiti. They were all shocked that there was no ability to access asylum in the United States.

15. Asylum seekers subjected to the lateral flights prior to expulsion also reported having to urinate on themselves during the long process. They reported asking to use the restroom, for basic food and milk for children, and those requests being denied by Border Patrol agents and other officials. One man reported only receiving one small carton of milk during the long processes and flight, despite his pleas for more food for his small child. Families reported the process taking some 16 hours.

16. In one case received by our organization, a mother and her 5-year-old daughter were expelled to Mexico from the United States after fleeing sexual assault and domestic violence in Guatemala. After being expelled to Ciudad Juarez this mother was raped. The family also faced ongoing extortion and death threats from smugglers in Mexico following their expulsion.

**Processing at El Paso, Texas**

17. In April 2021, Las Americas started referring clients for exemption to Title 42, first under the *Huisha* referrals process, and later as a primary referrer to the NGO consortium exemption process. We have provided over 900 referrals to the NGO consortium process. For those families and individuals, we conduct an initial consultation with fill out the required questions for submission to Customs and Border Protection.

18. The El Paso community has always stepped up and put together extensive capacity to provide shelter in the El Paso and southern New Mexico area. Shelter capacity in the region has never been fully taken advantage of by the government.

19. The El Paso shelter system is currently receiving only around 50 people a day through the NGO consortium exemption process and around another 10 per week processed out from the Migrant Protection Protocols.  Meanwhile, the local shelter system has hundreds of beds available each day. There are ample, under-utilized local resources and willingness from the local community to receive released asylum seekers in line with public health measures.

20. Despite our readiness and willingness, which we clearly communicate to the government, the government had continuously failed to fully utilize those resources.

21. The government is capable of managing its own processing at ports of entry and the there is ample capacity in the El Paso and southern New Mexico region to receive asylum seekers.

22. In my opinion, the Title 42 process should be ended immediately. Asylum seekers should be processed into the United States and we have the capacity to receive them, consistent with public health protocols.

I declare under penalty of perjury under the laws of the United States and Texas that the foregoing is true and correct.

Executed on: August 10, 2021, in El Paso, Texas, United States.

Signature:

Linda Rivas

## DECLARATION OF MARISA LIMÓN GARZA

I, Marisa Limón Garza, pursuant to 28 U.S.C. § 1746, declare as follows:

**Summary**

1.  This declaration describes the efforts that my organization and our partners have undertaken to build infrastructure and capacity to receive migrants, including migrant families, into the United States.  We have worked in conjunction with state and local public health authorities to ensure that our systems include COVID-19 testing and quarantine protocols.  Despite our efforts, which we undertook at the encouragement of the federal government, much of our capacity remains unused, while the government expels families back to Mexico.  Our efforts could also be scaled up even further if the federal government would devote serious funding and support to our efforts.

**Qualifications**

2.  I am the Deputy Director of the Hope Border Institute, a faith-based independent Catholic social justice organization focused on borderland-based research, policy and advocacy, and humanitarian response measures. I have served as Deputy Director for the past three years.

3.  As Deputy Director, I oversee day to day operations of the organization and play a central role in a variety of work on immigration policy and strategy, as well as play a central role in humanitarian response efforts on both the U.S. and Mexico sides of the border in the El Paso / Ciudad Juárez area.  In addition to overseeing our organization's direct work, I collaborate closely with other shelter providers, nonprofits, state and local institutions, and others in the region who work on building capacity to receive migrants who have come to the United States. I make this declaration based on my personal and professional experience at the Hope Border Institute working with noncitizen children and families subject to the Title 42 Process since it began in March 2020.

**In partnership with local authorities, COVID-19 protocols are in place ensure against spread in our local shelter systems and community.**

4.  In July 2019, the Hope Border Institute, in partnership along with the Diocese of El Paso established a border refugee assistance philanthropic fund focused on the needs of asylum seekers to establish capacity to welcome asylum seekers into the United States. When Title 42 went into effect in March 2020, we expanded this capacity development work to include migrants allowed into the country under exemptions to Title 42. We also developed infrastructure to ensure that asylum seekers could be welcomed in a way that reduces risk of COVID-19 spread.

1

Supp. Add. 96

5. Monies raised through this fund have supported healthcare programs, psycho-social support efforts, shelter infrastructure, a medical burse, COVID testing, vaccinations for childhood illnesses, food and accompaniment.

6. After engagement with the Biden administration transition team, and due to their focus on the need to partner with U.S. organizations to better manage border processing, we ramped up efforts to increase capacity on the U.S. side of the border. Working with El Paso County, the Frontera Welcome Coalition, and other humanitarian groups, we developed plans in support of and in coordination with the Annunciation House shelter – El Paso's largest shelter provider.

7. In collaboration with the city and county Office of Emergency Management (our liaison to the public health department) and health care professionals, we developed a plan for safely and efficiently processing and housing released migrants into local shelters and onward to their home destinations.

8. Local health authorities and partners visited and consulted with Annunciation House shelters and other prospective shelter space to ensure compliance with all COVID-19 regulations and protections. The shelters thus developed clear protocols for testing and quarantining procedures for positive cases.

9. The City of El Paso and El Paso County made available hotels for COVID-19 quarantine for any migrants or anyone else who did not have the resources to follow quarantine protocols after testing positive. Any person in the community, including migrants released by CBP or ICE, that did not have a place to quarantine could do so safely in one of the provided hotels. Therefore, our system is designed to ensure everyone is medically cleared prior to onward travel or admittance to a shelter.

10. We also invested in personal protective equipment, cleaning supplies and other necessities for keeping our shelter system protected against COVID-19 spread.

11. As Title 42 remained in effect we also expanded our efforts to work with shelters in Ciudad Juárez, Mexico, so that the same protective measures were in place at shelters on the Mexican side of the border for those subjected to expulsions. As part of this pilot project in Ciudad Juárez we worked with one shelter with a capacity to house approximately 40 families and individuals. Our efforts did not expand in Ciudad Juárez given other organizations' commitment to duplicating the same efforts at other shelters in Mexico.

12. These efforts, principally focused on the U.S. side of the border, began in December 2020 and continue to date. By late February 2021 or early March 2021, we were fully prepared to receive migrants in our shelter system with these measures in place, well before vaccines were widely available. Since COVID vaccines are now widely available in the U.S., all shelter operators and volunteers are fully vaccinated. Each shelter is also equipped to provide its own rapid testing and vaccines are offered to arriving migrants.

Supp. Add. 97

Document Ref: WBNQT-67DMG-YRFO8-KROYN

**The administration has not fully utilized the capacity available in our COVID-19 safe local shelter systems**

13. I estimate that the combined El Paso-New Mexico region has over 2,000 shelter beds in safe, welcoming, and non-detention settings where families have access to meals, medical care, and support with travel arrangements. That number could be greatly increased by using hotels, should the need arise. Yet, as of July 2021, less than 10 percent of that capacity was currently in use.

14. The combined capacity of Annunciation House's facilities and a satellite network of smaller shelters and parishes in El Paso is approximately 800 to 1,000 beds, with rapid turnaround of guests and the ability to expand and contract as needed. Las Cruces, New Mexico, which is less than an hour drive from El Paso, has nightly capacity for approximately 700 people coordinated through the New Mexico Hospitality Coalition. The shelter network in Albuquerque, New Mexico can host 300 people per day.

15. Migrants currently being processed through the ports of entry must test negative before they cross. Those released to local shelters directly from ICE detention centers are regularly tested prior to release so that their COVID status is known. CBP does occasionally release migrants through Border Patrol directly to Annunciation House with a "COVID unknown" status that have entered without inspection in-between a port of entry, but those migrants are COVID tested at Annunciation House once they arrive. If any migrant coming through these various avenues of release tests positive at any point, they are quarantined and subject to protocols. After quarantine and a negative COVID-19 test, those migrants are welcomed back into local shelters for assistance with onward travel to their final destination. All local reception efforts were designed in partnership with the Office of Emergency Management, our liaison to the public health department.

16. To date, there have not been any COVID-19 outbreaks in local shelters.

17. In addition to our shelter capacity, Endeavors, a private non-profit contracted by ICE, opened two hotel facilities that provide several hundred additional beds available for local release. Those facilities also include COVID-19 testing and required quarantine when necessary.

18. Unfortunately, the capacity and COVID-19 safe systems we set up have never been fully utilized by the administration. We have had regular meetings with Department of Homeland Security and White House officials where, at every meeting, we stress that we are prepared to and have resources and safe systems in place to welcome families and individuals.

19. Despite our capacity and COVID-19 protocols, the administration is only admitting a total of approximately 50-70 people per day at the ports of entry. We also receive a relatively small number of releases from ICE and Border Patrol, who in most cases people who crossed between ports of entry.

3

Supp. Add. 98

20. In total, our shelter system is capable of housing over 1,000 persons each night, but is only receiving less than 300 per week – a minuscule flow compared to capacity available to receive them.

**We have ample capacity to transport migrants released to local shelters**

21. Hope Border Institute partners with El Paso County to work with Project Amistad, a local non-profit, to provide transportation shuttles from 7:00am to 4:00pm every day between shelters, the airport, the bus station, and ports of entry. We also have a private shuttle company to coordinate transportation for anyone released after 4:00pm, provided directly through Annunciation House. All migrants over the age of six, drivers, and any volunteers are fully masked. All migrants being transported are COVID negative.

22. Hope Border Institute, along with partners, are able to leverage resources from local transportations networks to provide needed transportation for released migrants. Resources are available to add additional transportation if needed and, with additional support, any required transportation could be readily available through partnership with the local and county authorities.

**"Lateral flights" have impeded COVID protocols in Ciudad Juárez and severely traumatized families.**

23. During 2021, the U.S. government has sometimes transported migrants apprehended in other border regions, mainly the Rio Grande Valley, and flown them to El Paso for expulsion under Title 42 to Ciudad Juárez, Mexico.  My understanding is that as many as 100 hundred noncitizens can be put on a single flight. My understanding also is that none of these noncitizens are tested before being put on a flight, or after they are designated for expulsion. We have worked diligently with our Mexican partners to receive families expelled to Ciudad Juárez. Because these families are "COVID-19 status unknown," they need to be tested and potentially quarantined.

24. Local Mexican authorities, in collaboration with the International Organization for Migration (IOM), established a hotel for quarantining migrants in Ciudad Juárez with either COVID-19 symptoms or who tested positive. Anyone testing positive at either a local shelter or upon expulsion from the United States can quarantine for 14 days and later be placed in a shelter with capacity. This system is designed to try and keep shelters in Ciudad Juárez COVID-19 free.

25. At several points in recent months, the expulsion of additional families via "lateral flights" have overwhelmed systems in place in Ciudad Juárez, leaving many families on the street, without proper shelter or in the hands of smugglers.

26. For example, I am currently seeking quarantine space for 5 people who tested positive, out of 100, after being expelled following a "lateral flight" last week. The IOM hotel in Ciudad Juárez is currently at capacity. Had these families been released in the United

4

Supp. Add. 99

States, they would have immediately been taken to hotel quarantine and afterwards provided shelter and assistance in onward travel to their final destination. Instead, they find themselves on the streets of Ciudad Juárez.

27. "Lateral flights" also exacerbate trauma, as U.S. authorities frequently lie to families about where they are heading, telling them they are going to shelters in the United States and not being kicked back into Mexico.

28. Families subjected to "lateral flights" also report a lack of food, children with dirty diapers, and mistreatment by CBP agents.

29. Based on our experience, "lateral flights" only exacerbate the situation by facilitating COVID-19 transmission. They subject families to ongoing suffering, lack appropriate COVID-19 protocols, and needlessly expel noncitizens to Mexico when U.S.-based shelter networks stand ready to receive them here.

**The administration has failed to take its own steps to establish COVID-19 safe protocols for releasing migrants in the United States.**

30. The administration, through meetings with local stakeholders, pushed organizations like ours and our partners to increase capacity for shelters on the United States side of the border. And we did exactly that, in partnership with local city and county agencies, and in ways that our consistent with maximizing public health. And yet, as stated above, we have shelter beds standing unused while the U.S. government expels noncitizens to Mexico.

31. I also firmly believe that the systems we have developed are scalable, if the U.S. government were to invest additional serious resources and funding. Yet, the administration has never shared with us their actual capacity or any plans for increasing their ability to process more people to our systems.

I declare under penalty of perjury under the laws of the United States and Texas that the foregoing is true and correct.

Executed on: August 9, 2021, in El Paso, Texas, United States.

Signature: *Marisa Limón Garza*
_____

Marisa Limón Garza

5

Supp. Add. 100

# Signature Certificate

Document Ref.: WBNQT-67DMG-YRFO8-KROYN

Document signed by:



## Marisa Limón Garza

E-mail:
info@hopeborder.org
Signed via link

IP: 99.47.136.14          Date: 09 Aug 2021 22:35:41 UTC

*Marisa Limón Garza*

Document completed by all parties on:
09 Aug 2021 22:35:41 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is a document workflow and certified eSignature
solution trusted by 25,000+ companies worldwide.



## DECLARATION OF ASTRID DOMINGUEZ

I, Marie Astrid Dominguez, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal experience working with noncitizen children and families subject to the Title 42 Process. This declaration addresses processing capacity at the Brownsville and Hidalgo Ports of Entry.  In my opinion, both ports have the capacity to process more migrants and asylum seekers than they are currently using.  In addition, nongovernmental organizations on the U.S. side of the border in the Brownsville and Hidalgo areas have built up capacity to test migrants for COVID-19 and quarantine them.

2. The migrants I work with have also been subjected to great harm due to their expulsions. For example, I am aware of one case involving a father with a 9-year-old daughter with a spine injury; the father carried his visibly disabled daughter across the border but were nevertheless expelled.  Numerous women have reported they were violated and assaulted after U.S. border agents expelled them back to Mexico.

3. From late 2020, I have been working closely with the Rio Grande Valley (RGV) Welcoming Committee/Comité de Bienvenida and now facilitate their meetings as a consultant.  We are several dozen lawyers and advocates dedicated to welcoming migrants with dignity and assisting government entities with reopening the U.S.–Mexico border to regular asylum and other processing of noncitizens seeking protection, safety, and family reunification.

4. I have been a border advocate since 2012, when I began work with the ACLU of Texas that lasted until May 2021.  I have personally been involved in submitting Title 42 exemption requests for more than one hundred individuals and families.  I interview migrants and assemble the required information to be submitted to the U.S. government.  I have also participated in frequent meetings with a variety of U.S. government officials responsible for both border operations and border policy, including at the Brownsville and Hidalgo ports of entry.

**Processing Capacity at the Brownsville and Hidalgo Ports of Entry**

5. My work focuses primarily on noncitizens coming through two ports of entry, which are respectively located in Brownsville and Hidalgo, Texas, opposite the Mexican cities of Matamoros and Reynosa, Tamaulipas. I am very familiar with operations and capacity in those ports via my work in helping asylum seekers obtain exemptions under Title 42, as well as working with local NGOs and advocates.

6. Until recently, there were two main processes for obtaining Title 42 exemptions. The first process is managed by a consortium of nongovernmental organizations. The second process involved cases submitted directly by lawyers and advocates to the ACLU, which then submitted them to the U.S. government.

7. Noncitizens seeking to come through the Brownsville port of entry as Title 42 exemptions are tested for COVID-19 at the Resource Center Matamoros, a nonprofit

1

Supp. Add. 102

collaborative providing various support services.  This testing typically occurs 72 hours in advance of when the noncitizen is scheduled to cross.  The U.S. government requires the noncitizen to test negative in order cross via the port.  If the test is positive, they are not permitted to cross until a negative result.

8.  Migrants crossing through the Hidalgo, TX port of entry as Title 42 exemptions are tested for COVID-19 at Senda de Vida, a nongovernmental overnight shelter.  Again, the testing occurs 72 hours in advance of when the noncitizen is expected to present at the port, and the U.S. government does not permit them to cross unless they show a negative result.

9.  In my opinion, neither the Brownsville nor the Hidalgo port is operating at capacity. This conclusion is partly because the ports are designed to process large numbers of people coming to the United States for other reasons, e.g. tourism or leisure, but such noncitizens cannot currently enter the United States because of so-called "essential travel" bans.

10.  The federal government could also explore ways to minimize time spent at ports by people who have not provided advance information before coming to the port.  For example, not all immigration-processing functions may need to take place at a port of entry. After verifying the noncitizen's identity and checking that the person presents no criminal, safety, or security concerns, the noncitizen could quickly be sent to a secondary processing center where, for example, they could be issued any necessary paperwork related to their immigration cases.

**Processing Capacity on the U.S. Side**

11.  Noncitizens who cross between ports of entry near Brownsville and Hidalgo and encounter Border Patrol agents are processed by CBP and, if they are permitted to remain instead of being expelled or detained, are released to local nongovernmental organizations that provide universal testing for COVID-19 and social services.

12.  For example, noncitizens who enter near the Hidalgo area are typically sent to McAllen, Texas, where Catholic Charities of the Rio Grande Valley runs the Humanitarian Respite Center (HRC).  The HRC receives them and conducts universal COVID-19 testing with DHS support. In Brownsville, CBP transports noncitizens to a receiving area at the Brownsville bus station, where the City of Brownsville provides support and DHS has been involved in ensuring testing for COVID-19.

13.  Nonprofits, in conjunction with local governments, have developed infrastructure to receive, test, and quarantine migrants. For example, the City of McAllen has raised an emergency shelter that can house approximately 650 noncitizens who have tested positive for COVID-19. Other organizations, including Catholic religious organizations, have contracted with 10 hotels "in a 40-mile radius from the South Texas towns of Weslaco to La Joya and Edinburg and Mission" for quarantine rooms that can accommodate at least 1,000 people. In Brownsville, the City offers noncitizens who test positive an accommodation for a person's quarantine period with financial support available.  There is also quarantine capacity at a local overnight shelter called the Ozanam Center.

14. I am aware that Catholic Charities of the Rio Grande Valley has reported near-universal compliance with quarantine requirements by migrants who test positive at the HRC. Positive tests at the Brownsville bus station have also been followed by quarantine. My understanding is that noncitizens released in both Brownsville and Hidalgo are offered COVID-19 vaccines.

**Noncitizens Subjected to Title 42 Face Grave Danger**

15. My work with the Title 42 exemption process has exposed me to the trauma of hundreds of migrants denied an opportunity to present asylum claims to protection in the United States. The migrants I work with report that they have been expelled to unsafe conditions in Mexico that include homelessness, violence from organized crime, and medical jeopardy. Many have detailed stories and documentary evidence of harm in their home countries. Others are so traumatized that eliciting their hardship is challenging and psychologically delicate.

16. I am aware of many cases where women in advanced pregnancy have been expelled, as well as noncitizens with significant mental and physical disabilities, such as children with special needs and noncitizens with visual disabilities. Our Welcoming Committee was involved in the case of D., a 9-year-old girl whose spine injury whose father carried her to the U.S –Mexico border from Honduras. Yet they were expelled by Border Patrol despite pleading for consideration of D.'s medical condition.

17. Expulsions are taking place to Reynosa and other Mexican cities that are known, and reported by the State Department, to be centers of violent crime against migrants. In particular, sexual violence against female migrants is widespread, even when they are kidnapped with their children. U.S. government expulsions are sending women and children into the hands of rapists. I have talked with many women who were violated repeatedly and brutally by kidnappers after U.S. government officers refused to assess their protection claims. Sometimes these kidnappings happen within hours of expulsion.

18. Despite rampant kidnapping, which often includes deprivation of food and torture, families with young children continue to be expelled to Reynosa. There are no state-provided services for them and the population living unhoused in city plazas now exceeds 4,000 people who are often targeted by organized crime. Family separations also occur when parts of a family are allowed to stay in the U.S. but others are expelled. I have come across parental separations where one parent and a very young child were allowed to stay by Border Patrol while the second parent with an older child was expelled.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on: August 11, 2021, in Toronto, Ontario, Canada.

Signature: _____
Marie Astrid Dominguez

3

DECLARATION OF CHELSEA SACHAU

I, Chelsea Jordan Sachau, declare under penalty of perjury, that the following is true and correct to the best of my knowledge:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

## Summary

2. Based on my experience with Title 42 along the Arizona-Mexico border, the number of migrants who test positive on the Mexican side before entering is exceedingly low, as outlined below.

3. Title 42 has resulted in grave harm to our clients. They face kidnapping, rape, extortion, and other violence on a regular basis.

## Expertise

4. My name is Chelsea Sachau and I am an Equal Justice Works Fellow at the Florence Immigrant and Refugee Rights Project in Arizona ("Florence Project") where I have been employed for 11 months. Founded in 1989, the Florence Project is a 501(c)(3) nonprofit legal service organization providing free legal and social services to adults and unaccompanied children facing removal proceedings in Arizona.

5. At the Florence Project, I work on the Border Action Team. Since 2017, the Florence Project has worked in partnership with the Kino Border Initiative (KBI) by creating the Border Action Team to provide legal services to migrants at KBI's Aid Center for Migrants located in Nogales, Sonora, Mexico. The Border Action Team also works in close collaboration with other local legal services, humanitarian, and community organizations to support migrants in Sonora, Mexico or detained in the state of Arizona. In this capacity, I have provided Know Your Rights orientations, intakes, referrals, asylum application assistance, support with humanitarian parole, and direct representation, among other services, to individuals and families subject to various border policies, including the "Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists" issued by the Centers for Disease Control and Prevention (CDC), commonly referred to as "Title 42."[1]

## Background

6. The Title 42 expulsion policy has closed the US border to nearly all asylum seekers since March 20, 2021, with the exception of unaccompanied minors. Recently, while Title 42 has been in effect, two possible exception systems emerged: the

---

[1] https://www.cdc.gov/coronavirus/downloads/10.13.2020-CDC-Order-Prohibiting-Introduction-of-Persons-FINAL-ALL-CLEAR-encrypted.pdf

exemption process in this litigation ("the exemption process") and the Consortium process. While there are some distinctions between the two processes, they both largely functioned by having legal service providers and other non-profit organizations refer particularly vulnerable families and/or individuals to the government to be considered as an exception to Title 42. Once approved, the families and individuals were scheduled for dates and times to present at designated ports of entry along the border, and were processed into the U.S. by immigration authorities and placed in Title 8 removal proceedings. Depending on the details of the particular case, many were paroled directly from the port of entry, but others were referred to Immigration and Customs Enforcement (ICE), which then determined whether to place the individual in detention or in an alternatives to detention program, such as the use of GPS monitoring devices.

7. The Florence Project made at least 719 referrals for families and individuals to be excepted from Title 42 through both processes. In total, FIRRP referred at least 2,107 persons through these processes. As of August 9, 2021, 127 referrals (about 374 persons) remain pending – meaning these individuals await a call from the local Consortium partner, COVID testing, and a scheduled date to enter into the U.S.

**COVID-19 positivity rates for migrant families crossing into Arizona are extremely low**

8. Initially, particularly vulnerable families and individuals referred through the exemption process in this litigation were not required to receive COVID-19 testing in Mexico prior to presenting at the Nogales POE. However, all persons who were referred through the exemption process and presented at the Nogales POE prior to June 7, 2021 were released from the port and then transported to shelters in Tucson, AZ, where they were tested promptly upon arrival.  There was quarantine space available for those who tested positive.

9. In early June 2021 the U.S. government abruptly changed the COVID policy for the exemption process: all individuals ages six years or older who were referred through the exemption process were required to be COVID tested in Mexico prior to presenting at the designated ports of entry, and should anyone test positive, the entire family would be required to quarantine in Mexico.

**10. Of the 137 persons referred through the exemption process who were required to undergo testing for COVID-19 in Nogales, Sonora, Mexico, only one individual tested positive for COVID-19. This is a 0.72% COVID-19 positivity rate amongst the exemption clients for whom we were forced to coordinate testing and received access to their COVID test results.**

11. The Nogales U.S. Port of Entry does not provide COVID-19 testing, vaccines, or quarantine space to any non-citizens who are referred for exceptions to Title 42. The local humanitarian partners in Mexico, with support from partners in Arizona, were forced to assume those costs and responsibilities through the exemption and Consortium processes.

**CBP has additional processing capacity in the Tucson Sector**

12. The Tucson Sector of Customs and Border Patrol (CBP) covers most of the state of Arizona, from the New Mexico State line to the Yuma County line, an area covering a total of 262 border miles.[2] There are nine (9) ports of entry – organized into eight (8) CBP stations – in the Tucson region. The ports of entry are (from west to east): San Luis, Yuma, Lukeville, Sasabe, Nogales (there are three within Nogales – Mariposa, DeConcini, and Morely Gate), Naco, and Douglas.  However, CBP only processes asylum seekers excepted from Title 42 at the DeConcini POE.

13. From the end of March 2021 until the last day of May 2021, the Nogales POE refused to process any more than ten (10) persons per day. The stated reason was that the Nogales POE did not have the staff capacity to process any more persons per day. This is despite reports that the government had instructed ports to increase capacity to process 50 persons per day if necessary. Moreover, the alleged lack of staff capacity was also contrary to what the Florence Project staff witnessed on a regular basis in April and May 2021. The Florence Project staff crossed the border at least once per day for months during Title 42, and we frequently saw one or more CBP officers sitting idly at desks at either the DeConcini Port of Entry or the Mariposa Land Port of Entry in Nogales.

14. From May 31, 2021 through early July 2021, the Nogales POE was processing 30 persons per day in total, Monday through Friday, with a few exceptionally urgent cases being processed on Saturdays. Beginning July 12, 2021, Nogales POE again increased its capacity and began to allow for 40 persons per day to present for processing. Beginning in early August, the Nogales POE agreed to expand processing capacity even further to 50 persons per day.

15. The Florence Project and other legal and humanitarian service providers have repeatedly requested that the other ports of entry process asylum seekers through the exemption or Consortium processes, as there are hundreds of displaced persons in more remote parts of the border, in particular Lukeville and San Luis ports of entry, as hundreds of our remote clients are displaced in Sonoyta, Sonora and San Luis Rio Colorado, Sonora. Repeatedly, CBP has refused to do so.

16. The government's refusal to process particularly vulnerable families at remote ports of entry has dire consequences for displaced migrants. In late July 2021, cartel violence began to escalate even more in Sonora. Many of the highways that migrants displaced in other parts of Sonora would need to take in order to travel to Nogales, Sonora for processing would place the families we represent directly in the path of the cartel fighting.

**Dangers for expelled families**

17. Migrant families expelled under Title 42 to Sonora face extreme danger and live in precarity. Few have access to safe housing, medical care, or work to support themselves. They face kidnapping, rape, extortion, and other violence on a regular basis.

---

[2] https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/tucson-sector-arizona

18. For example, in the spring of 2021, the Florence Project represented a young woman who was kidnapped in Mexico, held hostage for weeks, repeatedly raped, and then abandoned in the United States near Phoenix. Though Border Patrol did take her to the hospital on account of her obvious injuries and trauma, she nonetheless was expelled to Mexico under Title 42, where she was at risk of being re-trafficked.

19. In mid-February 2021, the Florence Project provided a remote consultation to a single-mother in Sasabe, Sonora, Mexico. On or about March 31, 2021, the mother attempted suicide in Sasabe, Mexico due to the extreme stress and desperate circumstances without access to security. Fortunately, the Florence Project was able to work with local volunteers in Sasabe to get to the mother before she died, and the local volunteers stayed with her for her own protection and that of her daughter. However, she and her daughter continued to suffer, given that the single mother could not access any mental health treatment in Mexico, and did not have any of her medications. The mother's mental health began to deteriorate even further when the organized crime groups that control Sasabe discovered the mother and her daughter had reentered the city without paying the bribes or extortion fee that many displaced migrants are subjected to. Someone told the mother that the organized crime boss "was coming back soon, and would be by to see her," indicating a threat to the mother and her daughter's physical safety.

20. The Title 42 expulsion process also pushes asylum seekers, including those facing imminent danger, to attempt risky border crossings, resulting in deaths and serious injuries, and makes expelled people more vulnerable to attack.

21. I represented a gay man from El Salvador who U.S. immigration officials separated from his partner under Title 42. This young man fled El Salvador in late January 2020 due to persecution by gangs on the basis of his sexual orientation and family ties. My client met his partner, who was fleeing persecution in Cuba, in Tapachula in February 2020. My client and his partner were regularly taunted for being gay.  Around August or September 2020, neighbors broke into the home my client and his partner shared and robbed them. After moving to Nogales in October 2020, my client and his partner were constantly taunted for being gay by a group of men who regularly hung out outside a convenience store located near their home. In February 2021, the same group of men donned ski masks and chased after my client, who narrowly escaped into a nearby taxi. The taxi driver told my client that those men were involved with a cartel and very dangerous. On or about February 14, 2021, in desperation after all they had endured, my client and his partner crossed the U.S.-Mexico border in order to present themselves to Border Patrol agents and request asylum. To their horror, my client and his partner were separated when they tried to present their asylum claim at the border. They were told by CBP that only my client's partner, a Cuban migrant, would be processed into the U.S. and detained, and that my client, a Salvadoran man, would be expelled back across the border under Title 42. After being separated from his partner, my client lived alone in Nogales and took steps to protect himself by minimizing in every way how much time he spent in public view.  My client's neighbor, a retired woman, helped run his errands so that he need not be out in public more than necessary, and she also accompanied him if he needed to attend a meeting or tend to an errand in person.

22. Florence Project staff also represented a young woman in her third trimester of pregnancy who fled Guatemala primarily as a result of gender-based violence. Her partner would beat her, and during her pregnancy it worsened. In one instance, he attempted to abort her pregnancy by beating her. He told her he would hurt her if she went to the police and she was afraid he would follow her and threaten her wherever she might hide. She fled Guatemala to seek asylum in the United States. Unfortunately, she was also persecuted in Mexico. On around April 15, 2021 she was kidnapped and held captive by a group of armed traffickers. She was held for ten days, and during her captivity she did not receive adequate food and was threatened, even though she was pregnant. On around April 25, 2021 she escaped with other kidnapped migrants. The traffickers chased them in vans, but they were able to escape into the United States. When she was located in the desert, Border Patrol took her to the Banner Hospital in Tucson, AZ. She was 38 weeks pregnant and was put on an IV. At the time, she had a contraction, but the doctors told her it was due to the stress. She was put on an IV and her vitals stabilized. She was also told she had a urinary and a vaginal infection. However, she was returned to Mexico under Title 42, despite her late-term pregnancy and medical issues, and attempted intervention by Florence Project legal advocates who had already filed G-28s in her case to inform Border Patrol and other DHS officials that they represented the young woman. She was forced to attend a fear-based screening alone, even though she had counsel. She failed the USCIS screening despite detailing her kidnapping at the border and despite providing the names of some of her kidnappers that she had overheard while restrained. Without informing counsel, CBP expelled the young woman to Nogales, Sonora via the DeConcini Port of Entry in Nogales, Arizona on April 28, 2021, with no resources and no place to stay. She indicated that Border Patrol confiscated her medical release documents before removing her to Mexico. Pregnant, medically vulnerable, and alone, this young woman was only able to reconnect with the Florence Project after a random benefactor took pity and took her in for the night. She was then driven to the KBI Migrant Aid Center, where she received humanitarian services and had a legal intake with the Border Action Team. The young woman gave birth days after being expelled. On May 8, 2021, she and her infant were processed into the U.S., however the infant immediately had to seek medical attention within days of entering the U.S. and nearly died, due to the circumstances of his birth.

23. The U.S. government's failure to timely process migrants, to process migrants at all ports of entry, or to timely end Title 42 continues to expose thousands of migrants to extreme danger at the hands of cartels or other persecutors in Mexico.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 10, 2021 at Tucson, Arizona.

_____
Chelsea Sachau

**DECLARATION OF SUSANA VILLÉN IGLESIAS**

**MEDICAL COORDINATOR FOR MÉDECINS SAN FRONTIÈRES /
DOCTORS WITHOUT BORDERS IN MEXICO**

August 11, 2021

I, Susana Villén Iglesias, declare pursuant to 28 U.S.C. § 1746 that the following is true and
correct:

1. Based on Médecins Sans Frontières/Doctors Without Borders' expertise and experience
   working with migrants in Mexico, I am submitting this declaration to explain why there
   is no adequate public health rationale to continue expelling immigrant families at the
   southern border. The U.S. government can safely process immigrant families, especially
   given the widespread availability of COVID-19 vaccines and other mitigation protocols
   like rapid testing, outdoor processing, masking and social distancing. These measures are
   not only effective against COVID-19 transmission, but they are also well within the U.S.
   government's capacity and resources, especially in light of the extreme hardship,
   violence, and trauma that Title 42 has inflicted on migrants.

**Background and Experience**

2. I am a medical doctor with a post-doctoral degree in tropical medicine and a master's
   degree in Public Health. I have been working with different non-governmental
   organizations in medical-humanitarian projects since 1998 in different counties in Africa,
   Asia, and Latin America. Currently, I am the medical coordinator in Mexico of Médecins
   Sans Frontières (MSF)/Doctors Without Borders. As medical coordinator, I am
   responsible for planning and coordinating all medical activities and medical resources for
   the mission. In Mexico, we are working with local communities as well as people on the
   move. We are providing basic health care in areas with poor access to services as well as
   care to survivors of violence and torture.

3. Médecins Sans Frontières (MSF)/Doctors Without Borders is an independent
   international medical humanitarian organization that delivers neutral and impartial
   emergency aid to people affected by armed conflict, epidemics, natural and man-made
   disasters, and exclusion from health care in more than 70 countries. We were awarded the
   Nobel Peace Prize in 1999. The decision to offer assistance in any country or crisis is
   based solely on our independent assessment of populations' needs. We work to ensure
   that we have the power to freely evaluate medical needs, to access populations without
   restriction, and to directly control the aid we provide. Our financial independence allows
   us to provide aid free from any governmental influence that could be used to
   further political or military goals. MSF currently operates in the world's largest
   humanitarian crises, including Syria, Ethiopia, Yemen, and South Sudan.

4.  I have reviewed the latest Title 42 order issued by the Centers for Disease Control and Prevention (CDC).[1] In this declaration, I explain how immigrant families can be processed into the United States in a manner consistent with public health best practices, taking into account concerns about the Delta variant and other recent COVID-19 developments. To help explain, I will first describe MSF's work in Mexico, our observations on COVID-19 protocols related to the processing of asylum seekers out of the so-called Migrant Protection Protocols ("MPP"), the harm that Title 42 is causing, and then discuss how Title 42 can be phased out for immigrant families in a manner consistent with public health guidance.

**MSF's Work in Mexico**

5.  MSF has been working in Mexico since 1985. Since 2012, MSF has been actively addressing the health needs of people on the move – including immigrant families – across the country through the provision of comprehensive primary healthcare, mental health, social services, and health promotion activities.

6.  During the COVID-19 pandemic, MSF adapted and expanded its activities to include infection prevention and control in health facilities, shelters, and other spaces this population frequents along the migration route in Mexico. MSF set up diverse specialized services such as tailored mental health care, which includes psychological first aid, individual follow-up, and group sessions. MSF assisted in the identification and referral of suspected COVID-19 cases to the Ministry of Health (MoH), which would send teams directly to the camp and test them. MSF would in the meantime provide hygiene isolation kits to suspect cases, which included PPE, paracetamol, rehydration solution, and a guide for best practices during isolation. MSF worked to minimize the risk of COVID-19 transmission among asylum seekers through the distribution of hygiene kits that included personal protective equipment (PPE) and alcohol gel.  MSF has supported health facilities, including community centers and hospitals, to strengthen access to adequate services, particularly with screening, mental health support, health promotion to reduce stigma, and referral to the MoH. In migrant shelters, MSF also helped in identifying the best locations and practices for isolation of suspected cases.

7.  MSF has also offered tailored support to shelters housing migrants, focusing on: 1) providing education on COVID-19 protocols and countering misinformation, 2) setting up infection prevention and control measures such as triage, isolation, washing & disinfection procedures, social distancing, and proper use of PPE; and 3) setting up referral systems for severe COVID-19 cases.

---

[1] *See* CDC, *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* (Aug. 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.

8. In the north of Mexico, MSF has concentrated its activities in Matamoros, Reynosa, Nuevo Laredo, Piedras Negras, Ciudad Acuña, Monterrey and Ciudad Juárez. In the northern border locations, spanning from Texas to California, MSF has been witnessing for several years the detrimental effects of U.S. migration policies on asylum seekers' physical and mental health, including policies that forced them to live in dangerous conditions. For instance, from 2019 through 2021, MSF witnessed and provided care to asylum seekers forced to wait in Mexico under the MPP program. Since 2020, MSF has witnessed similar, if not worse, harm to asylum seekers who are expelled from the United States under Title 42.

**MSF's Experience with COVID-19 Protocols around MPP**

9. One of the critical services that MSF has recently provided in Mexico has been providing physical and mental health services to asylum seekers returned to Mexico under the former U.S. government program, MPP. Through its presence and work with this population of asylum seekers, MSF has direct experience with the safety precautions taken around COVID-19 in Mexico.

10. The Matamoros camp was the direct consequence of the U.S. Government's implementation of MPP. While individuals were sent back to Matamoros and forced to wait for their asylum proceedings, a border camp arose that housed up to 2500 migrants. In response to critical medical needs, MSF has offered health services in the camp from the moment it was first established until the last day the camp was standing in March 2021. When COVID-19 appeared in Mexico, MSF adapted its premises and protocols to include a triage of suspected cases, led the health promotion / COVID-19 prevention activities at the camp, and stepped up mental health assistance. These protocols were maintained until March 2021.

11. When the decision to begin unwinding MPP was taken, the United Nations High Commissioner for Refugees (UNHCR) coordinated with all actors present in the camp in Matamoros and with other key actors such as the International Organization for Migration (IOM), United Nations International Children's Emergency Fund (UNICEF), International Committee of the Red Cross (ICRC), and Hebrew Immigrant Aid Society (HIAS) to facilitate the phase out. Among its responsibilities, MSF worked with shelters to apply sound infection prevention and control measures and ensure that people waiting to be processed and arriving from other Mexican cities faced a lower risk of transmission.

12. MSF relied on a mixture of health education, preventive measures, and clear, simple and efficient control measures based on symptomology which permit isolation of suspected and confirmed cases of COVID-19. One of the more important aspects of the model is consistent implementation of preventive measures (social distancing, masking, hand washing) at all times, and encouraging the self-declaration of symptoms as soon as they

appear. This approach includes a system of symptomatic screening, testing, and medically supervised isolation for those who test positive for COVID-19.

13. Given the nature of COVID-19 transmission and close quarters of the camp, MSF was especially vigilant about any potential outbreaks. During the period when MSF ran the mild COVID-19 stabilization center at the Autonomous University of Tamaulipas, suspected cases were taken there for isolation and medical supervision.

14. As the camp's population was processed into the U.S., MSF wound down our medical activities at that specific location. MSF continues to offer health services in key shelters around the city of Matamoros, as well is the cities of Reynosa, Nuevo Laredo, Monterrey, Ciudad Acuña and Piedras Negras, where there are still asylum seekers in need.

**Harm to Immigrant Families Subject to Title 42**

15. For years now, MSF teams have been witnessing firsthand the devastating toll of harsh US migration policies spanning several administrations on the lives and health of people forced to flee violence and extreme poverty in Central America, Mexico, and other countries.

16. MSF has documented the toll expulsion under Title 42 takes on asylum seekers.[2] These individuals and families being rapidly turned around to extremely dangerous cities along the border are exposed to gang violence and are forced to fend for themselves without protection from local authorities. But accessing the most basic needs is always difficult given to the lack of protection, the lack of shelter, and the lack of health care.

17. Some who have been expelled, including Haitian asylum seekers, do not speak Spanish. Others include people who are injured or ill, people traveling with children, teenagers, pregnant women, and lesbian, gay, bisexual, and transgender people. All these people are at increased risk of violence and extortion in Mexico due to their particular vulnerabilities.

18. MSF mental health teams working with migrants in psychological support groups in Reynosa have observed signs of complex trauma and depression in these patients. They report acute reaction to stress, psychosomatic symptoms such as headache and back pain, hypervigilance due to the insecure location, difficulty sleeping, and fear and anxiety related to their expulsion or living in violent and unpredictable conditions.

---

[2] MSF, Title 42 Deportations Cause Dire Humanitarian Consequences on Mexico's Northern Border (Apr. 29, 2021), https://www.doctorswithoutborders.org/what-we-do/news-stories/news/title-42-deportations-cause-dire-humanitarian-consequences-mexicos.

**Unwinding Title 42 and Processing Immigrant Families**

19. I have reviewed Defendants' declaration from David Shahoulian dated August 2, 2021, filed at ECF No. 113-1, as well as the recent August 2, 2021 CDC order regarding Title 42. MSF does not believe that there is adequate public health rationale to justify continuing to ban immigrant families.

20. Based on MSF's decades of experience in infection prevention and control and in responding to public health emergencies across the world, we firmly believe it is well within the U.S. government's ability to restore access to asylum at the border while safeguarding the health of its citizens and those living on its territory. There is no reason to presume that asylum seekers are more of a threat to public health than any other person crossing the border from Mexico.

21. The measures the U.S. government can take to safely open the border, specifically to those in need of protection, include:

   A.   *Border Processing:* Processing asylum seekers on either side of the border should be done as rapidly as possible and in a way that limits people from being held in congregate settings so as to reduce the risk of COVID-19 transmission. Processing should take place in spaces that are well-ventilated and suitable for expansion of reception should the number of arrivals increase. MSF routinely uses low-cost temporary items such as snow/safety barrier fencing and shade netting to facilitate outdoor activities requiring crowd control measures around the world.

   B.   *Testing*: Compared to the general U.S. public, asylum seekers do not pose a heightened public health risk,[3] therefore they should not be subjected to measures that are not applied to other groups of people crossing the border. However, if the U.S. Government insists on additional measures, ramped up COVID-19 testing at the border can be the cornerstone of any system to efficiently process asylum seekers. We found very low numbers of COVID-infections in border shelters where MSF has relied on a system of symptomatic screening, testing, and referral for medically supervised isolation for those who test positive for COVID-19. In the case of those crossing the border, FDA-approved antigen tests are cost-effective, produce rapid results, and are well-suited to identifying individuals who pose an immediate risk of transmission. If testing is implemented, those who test positive can be isolated and treated. Those who test negative should be paroled

---

[3] Data reflects that number of cases per 100,000 residents is far lower in Mexico compared to the United States. *Compare* N.Y. Times, *Coronavirus in the U.S.: Latest Map and Case Count* (updated Aug. 10, 2021), https://www.nytimes.com/interactive/2021/us/covid-cases.html, *with* N.Y. Times, *Tracking Coronavirus in Mexico: Latest Map and Case Count* (updated Aug. 10, 20201), https://www.nytimes.com/interactive/2021/world/mexico-covid-cases.html.

into the U.S. and told to self-quarantine for the officially designated period, which is in line with the current procedure recommended by the CDC for any international travelers to the U.S. Measures can be taken to ensure safety during internal transportation, including through the distribution of face masks and the use of high-capacity, well-ventilated vehicles.

C.    *Isolation/Quarantine*: An isolation/quarantine system that is flexible and sensitive to fluctuations in arrivals can be established. Safety measures including mask use, ventilation, and reduced density of persons should be applied in those spaces.

D.    *Vaccination*: Any eligible unvaccinated person including asylum seekers should be offered a vaccine when they enter the U.S. The U.S. currently has more capacity to vaccinate Americans, both in terms of vaccine doses and mobilized health personnel, than are currently being used by people in the U.S. MSF has been tracking COVID-19 vaccine supply and, to our horror and disappointment, millions of doses have and may continue to go to waste in the U.S.[4] These excess doses can and should be re-routed for use in other countries, including for those who are eligible for vaccines at the border. Implementing routine vaccination of asylum seekers entering from Mexico is well within the scope of current services offered at some international airports in the U.S.[5]

22. The Delta variant is already dominant in the U.S. and epidemiological data shows similar historical rates of COVID-19 infections in the U.S. and Mexico. The CDC places both countries at the same risk level,[6] but, importantly, the number of new cases is disproportionately higher in the U.S. compared to Mexico.[7] The CDC is currently recommending the same preventive and protective protocols for Delta as were recommended previously.[8] In addition to vaccination, masking, ventilation, physical

---

[4] Dan Levin, *The U.S. Is Wasting Vaccine Doses, Even as Cases Rise and Other Countries Suffer Shortages*, N.Y. Times (Aug. 1, 2021), https://www.nytimes.com/2021/08/01/us/covid-us-vaccine-wasted.html.
[5] *See, e.g.*, San Francisco International Airport, Vaccinations at SFO (last accessed Aug. 10, 2021), https://www.flysfo.com/travel-well/vaccination-site-sfo; NBC News, *Miami Airport Offering Free Covid Vaccines to Travelers* (May 27, 2021), https://www.nbcnews.com/now/video/miami-airport-offering-free-covid-vaccines-to-travelers-113663045707.
[6] CDC, Travel Health Notices (updated Aug. 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html.
[7] *See supra* n.1 (showing that daily average of cases has increased nearly 120% in last 14 days in United States compared to 30% in Mexico, and that case rate per 100,000 people in the United States is nearly triple the rate in Mexico).
[8] CDC, Interim Public Health Recommendations for Fully Vaccinated People (updated July 28, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html

distancing, and hand hygiene are still recommended and can be implemented when processing asylum seekers.[9]

23. Should the necessary resources be allocated, many of the elements that proved effective in unwinding MPP can be scaled to apply to a phase out of Title 42 and a return to a normal asylum processing system at the U.S. southern border. These are resources that are readily available, including medical and public health human resources. FDA-approved antigen tests and COVID-19 vaccines for those who are eligible.

**Conclusion**

24. While the technical solutions highlighted above should be implemented in coordination with Mexican authorities and organizations responding to the needs of asylum seekers in northern Mexico, the U.S. should uphold its obligations to admit people seeking asylum, which includes accepting responsibility for carrying out basic infection prevention and control measures. Regardless of the capacity of the Mexican government to help on this front, the fact remains that northern Mexico is not safe for asylum seekers forced to remain there by virtue of U.S. policy. The U.S. government has the capacity, infrastructure, and knowledge required to safely process those seeking protection at the southern border and must immediately take the necessary steps to do so.

Executed on the 11th of August, 2021 in Ciudad de Mexico, Mexico.

Susana Villén Iglesias
Medical Coordinator in Mexico
Médecins Sans Frontières/Doctors Without Borders

---

[9] CDC, Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage, Morbidity and Mortality Weekly Report (July 30, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7030e2.htm.

## DECLARATION OF TERESA CAVENDISH

I, Teresa Cavendish, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am Director of Operations at Catholic Community Services of Southern Arizona. I oversee operations for Casa Alitas in Tucson, Arizona. Casa Alitas is a program that serves migrant families and adults who are released from Customs and Border Protection ("CBP") custody so that they can seek immigration relief in the United States. I make this declaration based on my personal experience at Casa Alitas working with noncitizen children and families subject to the Title 42 Process since the process came into effect in March 2020.

2. This declaration describes the efforts of Casa Alitas and other shelter providers along the Arizona-Mexico border to develop infrastructure for processing migrants safely after they come to the United States. Our organization and our partners have invested significant time and resources in building systems designed to receive migrants, test them for COVID-19 and quarantine them when necessary, and help them move on to their next destination. In my opinion, if these programs received more grant funding and resources, they could be scaled up to receive even more migrants than they already do.

3. I have been with Casa Alitas for 7 years, since I helped establish the program. In addition, I have held different roles in the nonprofit and social services sector, including Director of Operations for Catholic Community Services of Southern Arizona (CCS); Casa Alitas is a program of CCS. I have been with CCS for 35 years. At Casa Alitas, I supervise 13 staff and coordinate over 100 volunteers.

4. Casa Alitas receives migrants directly from immigration custody. They often come directly from Customs and Border Protection ("CBP") after being swiftly processed near the border immediately after the migrants' entry. Others come from the custody of Immigration and Customs Enforcement ("ICE"), after being held in immigration detention for days or weeks. We have longstanding relationships with both CBP and ICE, who know that we are available as a resource for migrants leaving immigration custody. The migrants we serve are a mix of families with young children and single adults.

5. Casa Alitas runs a variety of different programs for migrants who have recently come to the United States. We run a hospitality center in Tucson, which serves as an initial reception point for migrants who have just been released from detention. Volunteers at the hospitality center greet the migrants and help them contact family members or friends in the United States. If the migrant is able to join their family members immediately, our volunteers help them arrange travel via bus or plane, and provide them basic services (e.g. food, clothing, hygiene items) before they travel. Such migrants typically spend only 24 hours or so at our reception centers.

1

6. Those migrants who cannot travel right away typically spend one to three days in one of our shelters, which are similarly run by volunteers and Catholic Community Services staff members. There, the migrants receive food, shelter, and social services assistance until they can depart for their ultimate destination.

7. The numbers of migrants we receive varies greatly from day to day. These numbers depend on seasonal migration patterns, as well as the availability of other shelter space for migrants being released from DHS custody. On a typical day during June, July, and August of this year, Casa Alitas has received from 30 to 200 individuals per day.

8. Casa Alitas, and other shelter providers operating along the Arizona-Mexico border, have spent the last year or more developing infrastructure and systems to maximize the health and safety of migrants and our staff members/volunteers during the COVID-19 pandemic. Thanks to both private funding and partnerships with public health agencies, Casa Alitas tests every migrant we receive at our reception centers from DHS for COVID-19. We use a rapid test, which typically returns a result in a few minutes. If the migrant tests negative and is able to leave our reception center immediately to travel to relatives or friends, we then make travel arrangements to get him or her to their next destination.

9. If the migrant tests positive, we sent them to quarantine. We have bed space at a local hotel where the migrant can quarantine for 10 days, consistent with CDC guidelines. These hotel beds can currently house approximately 24 migrants/families in quarantine. We are currently working on obtaining additional quarantine space up to 114 rooms. Some migrants can travel quickly from our reception centers or shelters to family or friends in the Tucson area, and those migrants typically choose to quarantine with those local family or friends rather than quarantining in our hotel spaces.

10. While the migrant is in quarantine in one of our hotel beds, and toward the end of the 10-day period, we conduct a second test. If the test comes back negative, we then help arrange travel so that the migrant can go to their next destination.

11. In conjunction with public health agencies, we also offer Phizer, Moderna, and Johnson & Johnson single-shot vaccines to all migrants at our reception centers and shelters. For migrants receiving Pfizer or Moderna vaccines, we provide second dose information available in their destination regions.

12. Since early summer 2021, the number of families we receive from CBP or ICE has reduced substantially. My understanding is that DHS has entered into a multi-million dollar contract with a national agency known as Endeavors. Endeavors operates a network of contracted hotels along the U.S.-Mexico border that serves as both shelter

2

Supp. Add. 118

and quarantine space for migrants. Endeavors operates extensively in Arizona, and since that contract began, DHS has largely referred migrant families to Endeavors, rather than our reception centers and shelters. My understanding is that Endeavors has substantial capacity to house families in the Arizona area.

13. In my opinion, the federal government has not exhausted the capacity of local nonprofits to receive additional migrants in Arizona. As described above, Casa Alitas and other shelter providers along the Arizona-Mexico border have developed a range of systems to ensure that migrants can be processed both safely and efficiently as they move on to their next destination in the United States. These programs could also be scaled up to receive even more grants if the federal government were to devote additional resources to nonprofits like ours.

I declare under penalty of perjury under the laws of the United States and Arizona that the foregoing is true and correct.

Executed on: August 9, 2021, in Tucson, Arizona, United States.

Signature: _Teresa Cavendish_

Teresa Cavendish

3

## DECLARATION OF KATE CLARK, ESQ.

I, Kate Clark, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal experience at JFS working with noncitizen children and families subject to the Title 42 Process since the process came into effect in March 2020. JFS and other nonprofits and advocacy organizations, in conjunction with San Diego County and State of California health authorities, have worked hard to develop effective systems to receive migrant asylum seekers.

2. We have now built infrastructure to test, quarantine, and provide other necessary services to migrants shortly after they enter the United States. **In my opinion, these operations are scalable if the federal government were to invest serious resources, similar to what the government did to build capacity to house increased numbers of unaccompanied children during 2021.**

## QUALIFICATIONS

3. I am Senior Director of Immigration Services and Lead Immigration Attorney at Jewish Family Service of San Diego ("JFS"). Among my responsibilities is coordinating our organization's services for migrant refugees who are released from Customs and Border Protection ("CBP") custody so that they can seek immigration relief in the United States.

4. I have been with Jewish Family Service for 11 years. Previously, I have held different roles in the nonprofit and social services sector, including Director of Immigration Services, Senior Attorney, and Immigration Attorney within the Immigration Services division at JFS.   At Jewish Family Service, I supervise a staff of approximately 100 staff between the legal services and humanitarian shelter operations.

5. JFS receives migrants directly from immigration custody. They often come directly from Customs and Border Protection ("CBP") after being swiftly processed for release into the United States near the border, immediately after the migrants' entry. The migrants we serve are a mix of families with young children and single adults.

6. JFS operates one of two major "hubs" in the San Diego area that receive migrants. Our hub receives migrants who are coming through the San Ysidro port of entry, which is located near San Diego, California. The migrants coming through the port of entry fall into a number of categories, including noncitizens processed via exemptions from Title 42, noncitizens who were formerly forced to wait in Mexico for their removal proceedings under the Migration Protection Protocols, and other noncitizens

1

who DHS has paroled into the United States for various reasons. We also receive some migrants who have sought to cross unlawfully through the port.

7. Catholic Charities operates the other major receiving hub. Their hub focuses on noncitizens who cross the California-Mexico border between ports of entry, and are apprehended by U.S. Border Patrol. Between our two hubs, I estimate that we have the capacity to receive approximately 250-300 migrants per day and currently receive that amount per day.

8. JFS's hub is located in a hotel. We have chartered a set of buses that moves back and forth all day from the San Ysidro port, which transport migrants from the port to our hotel hub. One set of buses is for those migrants who have not been tested prior to coming to the port; the other bus runs are for those who have already tested negative before coming to the United States. Once a migrant arrives at the hub, and if they have not already been tested before crossing, we test them for COVID-19. We also test those noncitizens who have been tested, but are currently showing symptoms for COVID-19. We use a PCR test, which typically returns a result within twelve hours.

9. If the migrant tests negative, or has already been tested and is not showing symptoms, they stay in a room at our hub while we help them travel to their ultimate destination in the United States. While they are staying at our hub, we provide food, shelter, hygiene, medical, case management, and legal services. We also help make travel arrangements. Such migrants typically stay at our hub for about two to three days, before they leave for their next destination.

10. If the migrant tests positive for COVID-19, the County of San Diego requires those noncitizens to quarantine for approximately 10 days. The County provides special hotel spaces for quarantine. I estimate that the County has reserved several hundred hotel beds for migrants to quarantine, and is working on developing more capacity.

11. After the migrant leaves quarantine, they return to our hub, where we provide them the services described above, and help them move onto their next U.S. destination.

12. We also offer the vaccine to all migrants who come through our hub. We offer both the Johnson & Johnson one-shot vaccine, as well as the Pfizer two-shot vaccine.

13. Both JFS's hub and Catholic Charities' hub also receive migrants who are transferred to the San Diego area via so-called "lateral flights." These flights are comprised of migrants who are apprehended in other locations along the U.S.-Mexico border, typically in the Rio Grande Valley region of Texas. Based on my observations, and reports from the migrants themselves, CBP packs migrants onto these flights without any testing or safety regimens. Some number of migrants on each flight are then expelled back to Mexico via the San Ysidro port, and the remainder are allowed into the United States and then eventually reach our hubs.  Thus, by packing untested

2

migrants into flights and later into short-term BP detention facilities in the United States, CBP puts them at risk.

14. As described above, JFS and other organizations in the San Diego area have developed a range of systems to ensure that migrants can be processed both safely and efficiently as they move on to their next destination in the United States. We have developed these systems in conjunction with the State and County's public health authorities, and ensure that our systems are consistent with public health guidance. We have built up these systems via a mix of FEMA Emergency Food and Shelter Program funding, private funding, and public-private partnerships with local agencies. For example, we receive tests and vaccines from the State of California.

15. Unfortunately, we have developed these systems without the meaningful assistance of the federal government, aside from the emergency relief funding which has been provided through FEMA. The federal government could do much more to plan or develop major infrastructure by investing in community-based support services along the entire border to provide respite or transitional shelter to individuals and families upon arrival to the U.S. and facilitate and fund transportation to their destinations within the U.S., all in a manner that complies with federal, state, and local public health guidelines and prioritizes the humane and dignified reception of newly arrived individuals.

16. In my opinion, the federal government could scale up operations like ours by channeling money and resources to local agencies with proven track records, or even building up their own physical and other infrastructure to receive migrants. We have recently seen the federal government conduct such operations to help unaccompanied migrant children who are now exempt from Title 42. In response to increased numbers, the federal government moved swiftly to stand up additional shelters and facilities in California, and instituted testing and quarantine regimes for all unaccompanied children in federal custody. This example shows that the government can conduct such operations when it is willing to devote the resources to doing so.

I declare under penalty of perjury under the laws of the United States and California that the foregoing is true and correct.

Executed on: August 10, 2021, in San Diego, California, United States.

Signature: _____

Kate Clark

3

## DECLARATION OF AARON REICHLIN-MELNICK

I, Aaron Reichlin-Melnick, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

### Summary

1.     I submit this declaration to make two principal points in response to the government's argument that an injunction of Title 42 expulsions for family unit members would strain CBP's ability to safely process asylum seeking families at the border. First, while the government points to a high number of overall "encounters" with undocumented noncitizens at the border, that figure is misleading. Title 42 has perversely led to a high level of "recidivism"—individuals attempting to cross the border (and seek safety in the United States) more than once, and often many times. Thus Title 42, far from reducing border "encounters," has in fact increased the number of border encounters, and thus the number of times CBP officials must interact with families and other noncitizens.

2.     Second, it is important to place the number of individuals potentially impacted by an injunction in this case in context. The number of people entering the United States lawfully at land ports of entry, such as U.S. citizens and permanent residents traveling for pleasure, truck drivers, students, and people attending business meetings, is vastly larger than the number of family unit members apprehended and currently subject to Title 42. Indeed, family unit members who are subjected to Title 42 in June 2021 represented roughly 0.1% of the number of individuals who entered the United States from Mexico through a land port of entry. Yet while that vastly larger set of individuals is subject to no testing or other COVID screening, the

1

government claims the relatively tiny set of families must be expelled in the name of public health.

**Qualifications**

3.    I am a Policy Counsel at the American Immigration Council ("Immigration Council"), a nonprofit and non-partisan organization whose mission includes the use of facts to educate the public on the important and enduring contributions that immigrants make to America. At the Immigration Council, I track and analyze immigration-related statistics produced by the Department of Homeland Security ("DHS"), data on border crossings produced by the Department of Transportation ("DOT"), and any other available data on border processing produced by reputable sources.

4.    I have previously submitted declarations analyzing government-produced immigration statistics in *East Bay Sanctuary Covenant v. Barr*, 4:19-cv-04073-JST (N.D. Cal. filed July 16, 2019), *Innovation Law Lab v. McAleenan*, 3:19-cv-00807-RS (N.D. Cal. filed Feb. 14, 2019), and *Padilla v. ICE*, No. 2:18-cv-00928-MJP (W.D. Wash. filed June 25, 2018).

5.    In my role as policy counsel, I have extensively studied the impact of the novel coronavirus SARS-CoV-2 ("COVID-19") on the United States' immigration system. I have also extensively studied the current humanitarian processing challenges occurring at the U.S.-Mexico border.

6.    On April 27, 2021, I testified as an expert on border trends in front of the House Homeland Security Subcommittee on Border Security, Facilitation, and Operations at a hearing entitled Unaccompanied Children at the Border: Stakeholder Perspectives on the Way Forward.

7.    In preparation for this declaration I reviewed Defendants' declarations, the Centers for Disease Control and Prevention ("CDC") Title 42 Orders, public statistics on entries into the United States that are published by U.S. Customs and Border Protection ("CBP") and DOT, as

well as public information from the CDC on COVID-19 screening and quarantine protocols for individuals who enter the United States through a port of entry or who enter irregularly between ports of entry. I have also reviewed all available data on Title 42 and its effect on individuals entering between ports of entry, as well as extensive public news reporting on the current status of testing and quarantine protocols in use by nongovernmental organizations which are assisting families released by CBP.

## Title 42 Artificially Inflates The Total Number Of Border "Encounters"

8.    In opposing an injunction in this case, DHS repeatedly points to the number of "border encounters." Decl. of David Shahoulian ¶ 19. DHS argues that because of these high encounter rates, the Court should not enjoin Title 42 as applied to families.

9.    The statistics on which DHS is relying—rates of "encounters"—are misleading, however, because Title 42 itself has artificially inflated the number of "encounters" as compared to the actual number of *people* seeking to cross the border and find protection in the United States. That is because when a person attempts to cross multiple times—sometimes 3, 5, 10, or more—each time they are apprehended is counted as a new "encounter." And Title 42 has dramatically increased how often people try to cross the border multiple times—as CBP officials have themselves admitted.

10.  For over a decade, CBP has tracked the "recidivism rate" of individuals encountered at the southwest border, meaning the percent of those individuals apprehended at the border who have previously been apprehended. The agency calculates this rate by dividing the number of "unique individuals" who have been apprehended more than once at the border during a 12-month period by the total number of "unique individuals" apprehended over that same period. *See* Carla N. Argueta, *Border Security Metrics Between Ports of Entry*, Congressional Research Service, Feb.

16, 2016, at 7. The statistics refer to "unique individuals" because a single "unique individual"

may be encountered multiple times. For example, if 100 unique individuals were encountered,

and two of them had been encountered more than once in the past 12 months, the recidivism rate

would be 2 percent.

11.  From 2007 through 2019, recidivism rates fell steadily. But under Title 42, the recidivism

rate rose from 6.7 percent in Fiscal Year 2019[1] to 24.9% in Fiscal Year 2020. *See* Customs and

Border Protection, *U.S. Customs and Border Protection Budget Overview: Fiscal Year 2022*

*Congressional Justification* (2021), at CBP – 2. The recidivism rate has risen even further since,

increasing to 40% for Fiscal Year 2021 through May 2021 (see Figure 1).

**Figure 1: Border Recidivism Rate, Fiscal Year 2005 to FY 2021 (through May)[2]**



12.  That increase makes sense: After Title 42 went into effect, the overwhelming majority of

undocumented Guatemalans, Hondurans, Salvadorans, and Mexicans who crossed the border

were expelled under Title 42 were sent back to Mexico without a deportation order or an

---

[1] The federal government's fiscal year runs from October 1 through September 30, so Fiscal
Year 2021 began on October 1, 2020.
[2] *See* U.S. Customs and Border Protection, Congressional Budget Justifications, FY 2008-2022;
data for Fiscal Year 2021 through May on file with author.

opportunity to access to the asylum process. As a result, the rate at which people crossed the border multiple times began to increase, as desperate individuals sought to cross repeatedly.

13.   High recidivism rates since Title 42 went into place have led to a significant inflation of the overall count of encounters compared to previous years. For example, during the first nine months of Fiscal Year 2019, CBP recorded 780,479 encounters, of which 721,328 were unique encounters of people who had not been encountered in the previous 12 months. During the first nine months of Fiscal Year 2021, CBP recorded 1,119,204 encounters, of which 690,718 were unique encounters—30,610 *fewer* unique encounters than in Fiscal Year 2019 despite 338,725 *more* overall encounters.

14.   The increased recidivism rate is new for family units, who have in previous years shown very low rates of recidivism. For example, through the first nine months of Fiscal Year 2019 the recidivism rate for members of family units was just 1.5% (6,354 out of 421,428 unique individuals encountered). By comparison, through the first nine months of Fiscal Year 2021, the recidivism rate for family units has grown to 16.8% (35,231 out of 209,862 unique individuals encountered). Reports by advocates along the border indicate that the true rate may be even higher. After a first failed attempt as a family, some families are breaking up to try to reenter as single adults and unaccompanied children, in the hope that the children at least will be exempted from Title 42 and the adults can take a shot at crossing on their own.

15.   CBP has formally acknowledged the link between Title 42 and an increased recidivism rate. *See* Customs and Border Protection, *U.S. Customs and Border Protection Budget Overview: Fiscal Year 2022 Congressional Justification* (2021), at CBP – 2. As the agency explained: "[I]ncluding persons encountered by Border Patrol and expelled under Title 42 authority has substantially increased the number of persons counted by this [recidivism rate] measure." *Id.*

5

16.   DHS's reliance on levels of encounters thus overstates the true level of migration, a fact which CBP has also acknowledged. "The large number of expulsions during the pandemic has contributed to a larger-than-usual number of noncitizens making multiple border crossing attempts, and means total encounters somewhat overstate the number of unique individuals arriving at the border." Customs and Border Protection, *CBP Announces May 2021 Operational Update*, June 9, 2021, https://www.cbp.gov/newsroom/national-media-release/cbp-announces-may-2021-operational-update. In other words, Title 42 has led to an exaggerated measure of the total number of *individuals* coming to the United States by prompting a larger number of *encounters* of the same people attempting to enter over and over.

17.   DHS's declarant suggests that encounters are currently at a "historic" level. Shaoulian Decl. ¶ 20. But as explained, that encounter data is elevated because of Title 42, so the comparison to past years in which that program was not encouraging increased recidivism is comparing apples to oranges.  Furthermore, even apart from the government's failure to properly take into account the high recidivism rate, the declarant himself acknowledges that total encounters have been higher in the past, namely in Fiscal Year 2000.

18.   DHS's declarant also makes comparisons to the very early days of the COVID-19 pandemic, including arguing that family encounters have increased "100-fold" since April 2020. Shaoulian Decl. ¶ 23. But that is misleading as well, as movement around the world cratered during those months and Mexico went into a 70-day lockdown. Thus, using April 2020 as a baseline is fundamentally misleading when other more relevant baselines exist. For example, there were 88,587 encounters of family unit members in May 2019, which is 120 times higher than the April 2020 figure the declarant uses as his baseline—and is notably higher than the July 2021 figures that he cites.

19.  In sum, the evidence indicates that Title 42 has increased the number of encounters at the southern border. And yet DHS is paradoxically using that inflated level of encounters to justify keeping Title 42 in place for families. Indeed, by encouraging repeat crossings, Title 42 may well be exacerbating the public health situation it is supposed to address: Each successive Title 42 "encounter" means an additional time that CBP must interact with a family, rather than just being processed once under ordinary immigration procedures.

**Permitted Entries At Ports Vastly Outnumber Families Subjected To Title 42**

20.  Despite some restrictions DHS has imposed on non-essential travel at land ports of entry between the United States and Mexico, millions of individuals are permitted to enter the United States from Mexico every month. Permitted entries include not only all U.S. citizens and lawful permanent residents (traveling for any purpose including tourism), but also any individual travelling to attend school or work in the United States, all individuals "engaged in lawful cross-border trade" such as truck drivers, and any individual travelling for medical treatment in the United States. *See, e.g.,* U.S. Department of Homeland Security, *Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexic*o, 85 Fed. Reg. 22,353 (April 22, 2020).

21.  Since March 2021, more than 10 million people a month have entered the United States from Mexico through a land port of entry. By June 2021, an average of 361,976 people per day were entering the country through land ports of entry along the southwest border. <u>Notably, these restrictions do not include a requirement to present a negative test for COVID-19 nor do they require CBP officials to screen individuals for symptoms of COVID-19.</u>

22.  By contrast, approximately 2,583 individuals in family units are apprehended along the border every day. Shahoulian Decl. ¶ 19. Of those, according to recent government statistics,

Supp. Add. 129

currently approximately 86% are being processed into the country and not expelled. The

remaining 14% who are expelled represent roughly 362 individuals expelled per day, or the

equivalent of 0.1% of the average 361,976 individuals who entered from Mexico at land ports

every day in June 2021. Thus, families subject to Title 42 make up a very small number of

entries into the United States from Mexico. And unlike those entering the United States through

ports of entry, in nearly all cases, families released by CBP and permitted to travel further into

the United States are not only tested for COVID-19 but also given quarantine space if

necessary—albeit generally by nonprofit organizations or local government agencies rather than

the federal government.


EXECUTED this ____10th____ day of August, 2021.

_____/s/ Aaron Reichlin-Melnick_____
AARON REICHLIN-MELNICK

## DECLARATION OF ALAN E. VALDEZ JUÁREZ

I, Alan E. Valdez Juárez, declare that the following is true and correct:

1. I am the Executive Director of AVS Laboratorios ("AVS"), a medical analysis and testing laboratory service located in Piedras Negras, Coahuila, Mexico.

2. Earlier this year, AVS began conducting COVID-19 testing for asylum seekers in Piedras Negras who had received pre-approval for exemptions from the Title 42 Order and had been scheduled for appointments to present for processing into the United States at the Eagle Pass, Texas Port of Entry. The majority of the asylum seekers tested by AVS have been members of families who are scheduled to present at the Port of Entry as family units. As required by the United States government, all such testing has been performed within 72 hours of the asylum seekers' scheduled appointments at the Port of Entry.

3. As of August 6, 2021, AVS has administered 404 COVID-19 tests for asylum seekers scheduled for appointments to enter the United States as part of this Title 42 exemption process. Of those 404 tests, 8 came back with positive results reflecting that the individuals tested were infected with COVID-19. This constitutes a test positivity rate of 1.98 percent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 6th of August 2021 in Piedras Negras, Coahuila, Mexico.

s/ *Alan E. Valdez Juárez*

Alan E. Valdez Juárez

## DECLARATION OF EDGAR RAMÍREZ LÓPEZ

I, Edgar Ramírez López, declare that the following is true and correct:

1. I am the owner and manager of Laboratorio Noralba ("Lab Noralba"), a medical testing laboratory located in Ciudad Acuña, Coahuila, Mexico.

2. Earlier this year, my lab began conducting COVID-19 testing for asylum seekers in Ciudad Acuña who had received pre-approval for exemptions from the Title 42 Order and been scheduled for appointments to present for processing into the United States at the Port of Entry in Del Rio, Texas.  The majority of the asylum seekers tested by Lab Noralba have been members of families who are scheduled to present at the Port of Entry as family units.  In accordance with requirements of the United States government, all such testing has been performed within 72 hours of the asylum seekers' scheduled appointments at the Port of Entry.

3. As of August 6, 2021, Lab Noralba has administered 186 COVID-19 tests for asylum seekers scheduled for appointments to enter the United States as part of this Title 42 exemption process.  Of those 186 tests to date, none has yet yielded a positive result indicating that the individual tested was infected with COVID-19.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 6th of August, 2021, in Ciudad Acuña, Coahuila, Mexico.

s/ *Edgar Ramírez López*
Edgar Ramírez López

## CERTIFICATE OF TRANSLATION

I, Morgan Russell, hereby certify and swear under penalty of perjury that I am competent to translate between English and Spanish, that I translated the content of the foregoing declaration to Edgar Ramírez López in Spanish on August 6, 2021, and that he confirmed that its content is true and correct.

Executed on this 6th of August 2021 in Oakland, California.

s/ Morgan Russell
Morgan Russell

## DECLARATION OF SAMUEL THOMAS BISHOP

I, Samuel Thomas Bishop, declare as follows:

1. I am the Mexico Country Director for Global Response Management ("GRM"), a veteran-led international medical non-governmental organization that provides emergency medical services to vulnerable populations displaced by conflict, war, or disaster.

2. As part of its operations in Matamoros, Tamaulipas, Mexico, GRM conducts SARS-CoV-2 rapid antigen testing for asylum seekers and others in need of free COVID-19 testing services.  The overwhelming majority of people who have received COVID-19 antigen testing at our clinic in Matamoros are asylum seekers who have received pre-approval for exemptions from the Title 42 Order and been scheduled for appointments to present for processing at the Brownsville Port of Entry.  As required by the United States government, all such testing for exemption appointments is performed within 72 hours of the asylum seekers' scheduled appointments at the Port of Entry.

3. During the month of July 2021, GRM administered 1,111 SARS CoV-2 antigen tests in Matamoros.  Of those tests, 9 came back positive for SARS-CoV-2 antigens.  That constitutes an antigen positivity rate of 0.81%.  It is important to understand that this is not a community prevalence rate.  Rather it is the antigen positivity rate of individuals who were tested in our clinic.  It is also important to note that rapid antigen tests, like all tests, are not 100% accurate.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 10th of August 2021 in Austin, Texas.

X  _Samuel T Bishop_
Samuel Thomas Bishop

## DECLARATION OF LUIS ALBERTO LIZARRAGA TOLENTINO

I, Luis Alberto Lizarraga Tolentino, declare that the following is true and correct:

1. I am an Administrative Assistant at Clinica Medica International ("CMI"), a medical examination and testing company specializing in immigration-related medical exams and testing. CMI has testing facilities in Ciudad Juárez and Tijuana, Mexico.

2. Over the last several months, CMI has conducted COVID-19 testing for asylum seekers in Tijuana who had received pre-approval for exemptions from the Title 42 Order and scheduled for appointments to present for processing into the United States at the San Ysidro Port of Entry in California. The majority of the asylum seekers tested by CMI in Tijuana have been members of families who are scheduled to present at the Port of Entry as family units. In accordance with requirements from the United States government, all such testing has been performed within 72 hours of the asylum seekers' scheduled appointments at the Port of Entry.

3. Through August 7, 2021, CMI administered 2,644 COVID-19 tests for asylum seekers scheduled for appointments to enter the United States at the San Ysidro Port of Entry as part of this Title 42 exemption process. Of those 2,644 tests, only 21 yielded a positive result indicating that the individual tested was infected with COVID-19. This constitutes a test positivity rate of 0.79 percent.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 11th of August 2021 in Tijuana, Baja California, Mexico.

s/ Luis Alberto Lizarraga Tolentino
Luis Alberto Lizarraga Tolentino