**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 21-5200**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NANCY GIMENA HUISHA-HUISHA,
on behalf of herself and others similarly situated,

Plaintiffs-Appellees,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLANTS**

———————————

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

CHANNING PHILLIPS
  *Acting United States Attorney*

SHARON SWINGLE
JOSHUA WALDMAN
ASHLEY A. CHEUNG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-0236*
  *Joshua.waldman@usdoj.gov*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Defendants-Appellants submit the following Certificate as to Parties, Rulings, and Related Cases in the above-captioned matter pursuant to Circuit Rule 28(a)(1).

1. <u>Parties, Amici, and Putative Intervenors</u>.

The named Plaintiffs are Nancy Gimena Huisha-Huisha, and her minor child I.M.C.H.; Valeria Macancela Bermejo, and her minor daughter, B.A.M.M.; Josaine Pereira-De Souza, and her minor children H.N.D.S.; E.R.P.D.S.; M.E.S.D.S.; H.T.D.S.D.S.; Martha Liliana Taday-Acosta, and her minor children D.J.Z.; J.A.Z.; Julien Thomas, Fidette Boute, and their minor children D.J.T.-B.; T.J.T.-B.; and Romilus Valcourt, Bedapheca Alcante, and their minor child, B.V.-A.; on behalf of themselves and others similarly situated.  Minor children are proceeding under pseudonyms pursuant to Federal Rule of Civil Procedure 5.2(a).

The named Defendants in the district court were David Pekoske, in his official capacity as Acting Secretary of Homeland Security; Troy Miller, in his official capacity as the Acting Commissioner Of U.S. Customs and Border Protection; William A. Ferrara, in his official capacity as Executive Assistant Commissioner, CBP Office of Field Operations; Rodney S. Scott, in his official capacity as Chief of U.S. Border Patrol; Tae D. Johnson, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; Norris Cochran, in his official capacity as Acting Secretary

of the Department of Health and Human Services; and Dr. Rochelle P. Walensky, in her official capacity as Director of the Centers for Disease Control and Prevention.

Pursuant to Federal Rule of Appellate Procedure 43(c), Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security should replace David Pekoske; Xavier Becerra, in his official capacity as Secretary of the Department of Health and Human Services should replace Norris Cochran, and Raul Ortiz, in his official capacity as Chief of U.S Border Patrol should replace Rodney S. Scott.

Appearing as amici in the district court were (1) Scholars of Refugee and Immigration Law (including Professors T. Alexander Aleinikoff, Deborah Anker, James C. Hathaway, and Gerald L. Neuman); (2) International Refugee Assistance Project; and (3) Historians (including Alan Kraut, Carl Bon Tempo, Nancy Foner, Maria Cristina Garcia, David A. Gerber, Adam Goodman, Torrie Hester, Hidetaka Hirota, Philip Kasinitz, S. Deborah Kang, Julia Rose Kraut, Erika Lee, Julian Lim, Maddalena Marinari, Howard Markel, Deirdre Moloney, Lucy E. Salyer, and Yael Schacher).

On October 11, 2012, the State of Texas moved to intervene in this appeal. All plaintiffs and defendants opposed that motion. This Court has not yet ruled on the motion to intervene.

2. <u>Rulings Under Review</u>.

The notice of appeal seeks this Court's review of the district court's order, dated September 16, 2021, granting a preliminary injunction and granting class certification.

3. <u>Related Cases</u>.

There are no related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C). *P.J.E.S. v. Mayorkas*, D.C. Cir. No. 20-5357, does not involve the same parties as this case, but involves a challenge to the U.S. Centers for Disease Control and Prevention's Order under 42 U.S.C. § 265 by a provisionally-certified class consisting of all unaccompanied noncitizen children who (1) are or will be detained in U.S. government custody in the United States, and (2) are or will be subjected to expulsion from the United States under the CDC Order Process, pursuant to the CDC Order.

    <u>/s/ Joshua Waldman</u>
Joshua Waldman
Counsel for Defendants-Appellants

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION .......................................................... 3

STATEMENT OF THE ISSUE ................................................................. 3

PERTINENT STATUTES AND REGULATIONS .................................... 4

STATEMENT OF THE CASE .................................................................. 4

I.     Statutory and Regulatory Background ......................................... 4

     A.    The Public Service Health Act ............................................ 4

     B.    CDC Promulgates Rules and Issues Orders To Address
           COVID-19 Pandemic ......................................................... 6

     C.    The District Court's Prior Preliminary Injunction of the CDC
           Order Stayed by this Court ................................................ 11

     D.    CDC Excepts Unaccompanied Noncitizen Children From CDC
           Order ................................................................................ 12

     E.    CDC Issues New Order Finding That Temporary Suspension of
           the Right to Introduce Certain Noncitizens Remains Necessary ........ 13

II.    District Court Proceedings ........................................................... 17

SUMMARY OF ARGUMENT .............................................................. 19

STANDARD OF REVIEW .................................................................... 24

## TABLE OF CONTENTS (CONT'D)

**Page**

ARGUMENT ........................................................... 24

I.    The Government is Likely to Succeed on the Merits .................................. 25

    A.    Prohibiting the "Introduction" of Persons from a Foreign Country with a Serious Danger of Communicable Disease Includes the Authority to Expel Such Persons ................................... 25

    B.    Plaintiffs' Alternative Arguments Are Meritless ............................... 37

        1.    Section 265 is Not Limited to Regulating Transportation Entities ................................................ 38

        2.    Section 265 Does Not Irreconcilably Conflict with Immigration Provisions and in Any Event Section 265 Would Control ................................................ 40

        3.    The Constitutional Avoidance Doctrine is Inapplicable .......... 43

II.    The Remaining Preliminary Injunction Factors Do Not Support An Injunction ..................................................... 45

CONCLUSION .................................................... 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Assn. of Realtors v. HHS,*
    141 S. Ct. 2485 (2021)...................................................................33

*Almendarez–Torres v. United States*,
    523 U.S. 224 (1998)......................................................................33

*Castro v. DHS*,
    835 F.3d 422 (3d Cir. 2016) .........................................................26

*Chevron v. NRDC*,
    467 U.S. 837 (1984).......................................................... 19, 21, 34

*Davis v. Pension Ben. Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009)....................................................24

*DHS v. MacLean*,
    574 U.S. 383 (2015).......................................................................38

*DHS v. Thuraissigiam*,
    140 S. Ct. 1959 (2020)...................................................................26

*Encino Motorcars v. Navarro*,
    136 S. Ct. 2117 (2016)...................................................................35

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018)...................................................................40

*Guedes v. ATF*,
    920 F.3d 1 (D.C. Cir. 2019)................................................... 24, 35

*In re Navy Chaplaincy*,
    697 F.3d 1171 (D.C. Cir. 2012)....................................................24

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

**Cases**

*Maryland v. King,*
    567 U.S. 1301 (2012) ......................................................................53

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020)...................................................................44

*P.J.E.S. v. Mayorkas,*
    No. 20-5357 (D.C. Cir.)............................................................ 12, 48

*P.J.E.S. v. Wolf,*
    502 F. Supp. 3d 492 (D.D.C. 2020)......................................... 12, 48

*RadLAX Gateway Hotel v. Amalgamated Bank,*
    566 U.S. 639 (2012)......................................................................40

*Reno v. Flores,*
    507 U.S. 292 (1993)......................................................................44

*Russello v. United States,*
    464 U.S. 16 (1983)........................................................................32

*Serono Labs. v. Shalala,*
    158 F.3d 1313 (D.C. Cir. 1998)....................................................24

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011)......................................................24

*South Bay United Pentecostal Church v. Newsom,*
    140 S. Ct. 1613 (2021)............................................................ 37, 53

*United States v. Mead Corp.,*
    533 U.S. 218 (2001)......................................................................35

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

**Cases**

*United States v. Steinfels*,
    753 F.2d 373 (5th Cir. 1985) ........................................................26

*Winter v. NRDC*,
    555 U.S. 7 (2008)...........................................................................24

**Statutes**

28 U.S.C. § 1292(a)(1)........................................................................3

28 U.S.C. § 1331 .................................................................................3

42 U.S.C. § 111 (1925).........................................................................5

42 U.S.C. § 111 (1940) ......................................................................43

42 U.S.C. § 264 .................................................................................33

42 U.S.C. § 264(a) ....................................................................... 28, 33

42 U.S.C. § 265........................................1, 2, 4-7, 18-27, 29-34, 37-41, 43, 44, 53

42 U.S.C. § 267 .................................................................................33

42 U.S.C. § 267(b) ............................................................................38

42 U.S.C. § 268(b) ............................................................................11

42 U.S.C. § 269 ................................................................................38

42 U.S.C. § 270 ................................................................................38

42 U.S.C. § 271 .......................................................................... 33, 34

42 U.S.C. § 271(b) ............................................................................38

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

**Statutes**

49 U.S.C. § 114(h)(3)(B) ................................................................28

26 Stat. 31 (1890).........................................................................38

80 Stat. 1610 (1966)......................................................................6

Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449, 452 ................... 5, 32, 43

Public Health Service Act, 42 U.S.C. § 265, 58 Stat. 682, 704 (1944).............. 5, 33

**Regulations**

42 C.F.R. § 71.40 ........................................... 4, 7, 10, 11, 27, 43

42 C.F.R. § 71.40(b)(1) ................................................. 7, 27

42 C.F.R. § 71.40(b)(5)..................................................................7

42 C.F.R. § 71.40(e)....................................................................10

42 C.F.R. § 71.40(f) ..................................................... 7, 10, 43

42 C.F.R. § 71.51(g) ....................................................................28

42 C.F.R. § 71.53(a)....................................................................28

42 C.F.R. § 71.53(e)....................................................................28

42 C.F.R. § 71.63(a)....................................................................28

31 Fed. Reg. 8855 (June 25, 1966) .......................................................6

50 Fed. Reg. 1516 (Jan. 11, 1985) ......................................................28

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

**Regulations**

82 Fed. Reg. 6890 (Jan. 19, 2017) .............................................................28

85 Fed. Reg. 16,559 (Mar. 24, 2020).................................... 6, 7, 27, 29, 35

85 Fed. Reg. 17,060 (Mar. 26, 2020)................................ 8, 9, 10, 11, 35, 36, 46, 53

85 Fed. Reg. 22,424 (Apr. 22, 2020) .......................................................11

85 Fed. Reg. 31,503 (May 26, 2020) ................................................. 11, 36

85 Fed. Reg. 56,424 (Sept. 11, 2020) ................................... 7, 8, 11, 30, 41

85 Fed. Reg. 65,806 (Oct. 16, 2020)................................................. 11, 53

86 Fed. Reg. 38,717 (July 22, 2021).......................................................13

86 Fed. Reg. 42,828 (Aug. 5, 2021).......................................................13

86 Fed. Reg. 8267 (Feb. 2, 2021) ...........................................................12

86 Fed. Reg. 9942 (Feb. 17, 2021) .................................................. 12, 13

**Other Authorities**

24 Cong. Rec. 359 (1893) ................................. 5, 29, 38, 39, 41, 42, 43, 44

H.R. Rep. No 78-1364  (1944).................................................................33

American Heritage Dictionary 934 (3d ed. 1992) ........................... 30, 31

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CBP | U.S. Customs and Border Protection |
| CDC | U.S. Centers for Disease Control and Prevention |
| DHS | Department of Homeland Security |
| HHS | Department of Health and Human Services |

## INTRODUCTION

The district court's preliminary injunction deprives the government of the ability to implement vital public-health measures designed to protect against the uncontrolled spread of COVID-19.  The Director of the U.S. Centers for Disease Control and Prevention (CDC) exercised her long-standing authority under 42 U.S.C. § 265 (Section 265) to temporarily suspend the right to introduce into the United States certain noncitizens traveling from Mexico and Canada who would otherwise be held in congregate settings in Ports of Entry or U.S. Border Patrol stations at or near the U.S. border—facilities that are not designed or equipped to quarantine, isolate, or enable social distancing.  Re-asserting authority that has been invoked by CDC since the beginning of the pandemic, the CDC Director determined that in light of the public-health risks inherent in holding covered noncitizens in these congregate settings, it is imperative to continue to suspend the right to introduce covered noncitizens, including by expelling covered noncitizens who manage to cross the border in contravention of the Order as quickly as possible.

The injunction would prohibit the U.S. Government from exercising the authority to expel noncitizens who come to the U.S. as a family unit.  Instead of being able to expel those noncitizens quickly, as is the case for single adults subject to the Order, the government must hold them in congregate settings at or

near the border—exacerbating the virus-transmission risk—pending immigration processing. The preliminary injunction would preclude the government from exercising its lawful discretion under Section 265 to respond in an appropriate and measured manner to a serious public-health threat from a deadly communicable disease. Preventing expulsion of noncitizen family units will increase the risk of COVID-19 transmission to U.S. Customs and Border Protection (CBP) personnel, plaintiffs themselves, other noncitizens, and the U.S. population at large. 1 Joint Appendix (JA) 169-170 ¶ 3. The likely increase in transmission that would arise from the injunction also has the potential to further burden local healthcare systems and resources already stressed by the ongoing effects of COVID-19. 1 JA 170-171 ¶ 6.

The district court's injunction is based on a cramped understanding of CDC's Section 265 authority that all but eviscerates CDC's ability to contain the risk of transmission of communicable diseases at the border. The court ruled that CDC's authority to "prohibit * * * the introduction of persons" from a foreign country does not include the authority to expel such persons if they manage to set foot on U.S. soil. 1 JA 108, 110. Under that ruling, any noncitizen who crosses into the United States over the nearly 6,000 miles of land border with Canada and Mexico is outside the government's power under Section 265, even if the noncitizen is stopped just one step over the border and, most importantly,

2

regardless of the risk of transmission the noncitizen poses. That interpretation finds no support in the statute's text, context, or history, and defies common sense.

In addition to being legally erroneous, the district court's order would threaten irreparable harm to the government and the public at large, particularly given the highly transmissible Delta variant and the historic surge of Southwest Border encounters. 1 JA 173, 175 ¶¶ 13, 18. Congress charged CDC with making public-health judgments about how best to protect the country during a pandemic. The government respectfully suggests that the balancing of equities weighs against the preliminary injunction entered below, and this Court should therefore vacate the injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. 1 JA 47. The district court entered a preliminary injunction on September 16, 2021. 1 JA 67-68. The Government filed a timely notice of appeal on September 17, 2021. 1 JA 128. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in granting a preliminary injunction prohibiting Defendants from expelling the members of the certified class from the United States pursuant to an Order issued by the Director of the Centers for Disease Control and Prevention.

3

## PERTINENT STATUTES AND REGULATIONS

42 U.S.C. § 265 provides as follows:

"Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose."

The provisions of 42 C.F.R. § 71.40 are set forth in the Addendum to this brief.

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background

#### A.    The Public Service Health Act

The federal government has long had the authority to take actions to prevent the spread of communicable diseases.  In 1893, Congress authorized the Executive Branch to enact rules and regulations to prevent the introduction of contagious or

4

infectious diseases from foreign countries into the United States.  Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449, 452 (1893 Act).  The 1893 Act—which was the predecessor statute to the federal government's current authority under 42 U.S.C. § 265—was enacted in response to the cholera epidemic.  24 Cong. Rec. 359 (1893).  Congress recognized the threat of cholera from Europe, Mexico, and Canada, and sought to prevent cholera "from either entering the country or spreading after it has made its entry."  24 Cong. Rec. at 359; *see also id.* at 363, 364.  Accordingly, the 1893 Act authorized the President to "prohibit * * * the introduction of persons" into the United States, "whenever" the President is satisfied that "by reason of the existence of cholera or other infectious or contagious diseases in a foreign country there is a serious danger of the introduction of the same into the United States * * * notwithstanding the quarantine defense," such that "a suspension of the right to introduce" is "demanded in the interest of the public health[.]"  27 Stat. at 452.

The 1893 Act was subsequently codified, as amended, at 42 U.S.C. § 111 (1925), where it remained until its recodification as Section 362 of the Public Health Service Act, 42 U.S.C. § 265, 58 Stat. 682, 704 (1944).  Section 265 authorizes the Secretary of HHS, when "any communicable disease [exists] in a foreign country," to "prohibit * * * the introduction of persons * * from such countries or places" into the United States to "avert" the "serious danger of the

5

introduction of [a communicable] disease into the United States" "[w]henever the [Secretary] determines that" "a suspension of the right to introduce such persons" is "required in the interest of the public health."  42 U.S.C. § 265.[1]

### B.    CDC Promulgates Rules and Issues Orders To Address COVID-19 Pandemic

In March 2020, in light of the unprecedented COVID-19 pandemic, HHS and CDC issued an interim final rule under Section 265 to provide a procedure for the CDC Director to temporarily prohibit the introduction of certain persons into the United States.  85 Fed. Reg. 16,559 (Mar. 24, 2020).  The rule's preamble explained that international travel increases the risk of communicable disease transmission into and through the United States, particularly "when travelers are in congregate settings."  *Id*. at 16,560.  The rule defined "introduction into the United States of persons" to mean "the movement of a person from a foreign country" into the United States "so as to bring the person into contact with persons in the United States * * * in a manner that the Director determines to present a risk of transmission of a communicable disease to persons or property, even if the communicable disease has already been introduced, transmitted, or is spreading within the United States."  *Id.* at 16,566; *see also* 85 Fed. Reg. 56,424, 56,427

---

[1] The statute assigns this authority to the Surgeon General, but the authority was later transferred to the Secretary of HHS.  31 Fed. Reg. 8855 (June 25, 1966); 80 Stat. 1610 (1966).

(Sept. 11, 2020); 42 C.F.R. § 71.40(b)(1).  CDC explained that this definition was
intended to "clarify that 'introduction' can encompass those who have physically
crossed a border of the United States and are in the process of moving into the
interior in a manner the Director determines to present a risk of transmission of a
communicable disease."  85 Fed. Reg. at 16,563; *see also* 85 Fed. Reg. at 56,425
(explaining that "introduction" does not "conclude the instant that a person first
steps onto U.S. soil").  The rule does not apply to U.S. citizens and lawful
permanent residents.  85 Fed. Reg. at 16,567; *see* 42 C.F.R. § 71.40(f).

CDC subsequently explained that "Congress's use of the terms 'suspension'
and 'right to introduce' [in Section 265]—rather than just 'introduce'—means that
[Section 265] grants the Director the authority to temporarily suspend the effect of
any law, rule, decree, or order by which a person would otherwise have the right to
be introduced or seek introduction into the U.S."  85 Fed. Reg. at 56,426; *see* 42
C.F.R. § 71.40(b)(5).  CDC further explained that the "legislative history indicates
that Congress, in enacting [Section 265's] predecessor, sought to give the
Executive Branch the authority to suspend immigration when required in the
interest of public health" and that "[t]his authority is available only in rare
circumstances when 'required in the interest of the public health.'"  85 Fed. Reg. at
56,426 (quoting 42 U.S.C. § 265); *see also id.* at 56,441-42, 56,447, 56,450.

7

CDC also subsequently explained that the "speed and far reach of global travel have been factors in prior outbreaks that expanded to numerous continents." 85 Fed. Reg. at 56,427.  For example, during the 2009-2010 H1N1 influenza pandemic, "the initial cases of 2009 H1N1 influenza occurred in Mexico," and H1N1 cases were later discovered in several border states, "which suggested cross-border transmission of the disease."  *Id.* at 56,428.  CDC explained that "[i]t is possible that had HHS/CDC suspended the introduction of persons from Mexico into the United States early in the pandemic, fewer individuals might have fallen ill or died from H1N1 influenza."  *Id.*

In March 2020, the CDC Director issued an Order, pursuant to the interim final rule, temporarily suspending the introduction of certain noncitizens traveling from Canada and Mexico into the United States.  85 Fed. Reg. 17,060 (Mar. 26, 2020) (March 2020 Order).  The March 2020 Order applied to "covered aliens," defined as persons "traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting" at or near the border, "typically aliens who lack valid travel documents."  *Id.* at 17,061.  The March 2020 Order explained that, under typical procedures, covered noncitizens may spend hours or days in congregate settings while undergoing immigration processing, and that Ports of Entry and U.S. Border Patrol stations are "not designed for, and are not equipped to, quarantine, isolate, or enable social

distancing by persons who are or may be infected with COVID-19." *Id.* at 17,061, 17,066. The Order also explained that holding covered noncitizens in congregate settings risks the spread of COVID-19 to CBP personnel and further transmission of COVID-19 to the U.S. population, with a concomitant increased strain on the U.S. healthcare system and supply chain. *Id.* at 17,061. The Order noted that the alternative of conditional release for mandatory self-isolation and monitoring at home "is not a viable solution" because many covered noncitizens "may lack homes or other places in the United States where they can self-isolate," and CDC "lacks the resources and personnel necessary to effectively monitor such a large number of persons." *Id.* at 17,067. Accordingly, "[r]eliance on conditional release * * * would "jeopardize, not protect, the public health." *Id.*

CDC explained that on March 12-13, 2020, a United States Public Health Service Scientist officer visited the Paso del Norte Port of Entry in El Paso to observe infection control procedures. 85 Fed. Reg. at 17,066. The officer observed that "covered aliens would present infection control challenges during processing and screening in congregate areas." *Id.* This Port of Entry has "several small waiting rooms" that are used to hold individuals "suspected of exposure to or infection with a contagious disease," *id.*, but these are not isolation rooms "because the HVAC system is shared with the rest of the facility" and the rooms do "not have adequate capabilities to contain COVID-19," *id.* at 17,068. Additionally,

9

"[e]scorting a contagious individual to and from this room, as well as holding them there, poses a significant risk of exposing nearby CBP personnel." *Id.* at 17,068. The officer also observed that if an individual infected with COVID-19 were subject to the screening processes, the individual "would be maneuvered throughout various sections of the [Port of Entry], creating a significant risk of COVID-19 exposure to other aliens and CBP officers." *Id.* CDC explained that this Port of Entry was selected because it is "one of CBP's largest and best-equipped Ports of Entry * * * on the Southwest Border" and that other Ports of Entry have even fewer infection-control capabilities. *Id.* However, the Paso del Norte Port of Entry in El Paso "is representative of other [Ports of Entry] in that it is heavily reliant on local and regional hospitals and [emergency medical technician] services to care for aliens." *Id.* at 17,066.

The Order included several exceptions. In particular, it did not apply to U.S. citizens, lawful permanent residents, and other persons whom the government determines "should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." 85 Fed. Reg. at 17,061; *see also* 42 C.F.R. § 71.40(e), (f). CDC requested the assistance of the Department of Homeland Security (DHS) in implementing the Order because CDC lacks the

10

capability and resources to do so.  85 Fed. Reg. at 17,067; *see also* 42 U.S.C. § 268(b).[2]

In September 2020, HHS and CDC published a final rule permitting the CDC Director to "prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries" "for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease."  85 Fed. Reg. at 56,425 (codified at 42 C.F.R. § 71.40).  The CDC Director then issued a new Order that prohibits the introduction of all covered noncitizens into the United States, subject to certain exceptions, until the CDC Director determines that "the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health," based on recurring 30-day reviews by CDC.  85 Fed. Reg. 65,806, 65,807-08 (Oct. 16, 2020).

## C.    The District Court's Prior Preliminary Injunction of the CDC Order Stayed by this Court

In August 2020, a fifteen-year-old from Guatemala who was apprehended in after illegally crossing the U.S.-Mexico border brought suit on behalf of a putative class of all unaccompanied noncitizen children subject to expulsion under the CDC

---

[2] The March 2020 CDC Order was extended and/or amended by subsequent orders because of the continued serious public-health risks posed by COVID-19. *See, e.g.,* 85 Fed. Reg. 22,424 (Apr. 22, 2020); 85 Fed. Reg. 31,503 (May 26, 2020).

Order.  The same district court that issued the preliminary injunction in the present case issued a classwide preliminary injunction in that litigation as well.  *See P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020).  The district court held that plaintiffs demonstrated a likelihood of success on the merits because, in the court's view, Section 265 does not authorize CDC to expel covered noncitizens once they cross the border, *id.* at 511-16, and the district court found that the remaining preliminary injunction factors weighed in plaintiffs' favor, *id.* at 516-20.

The government filed a notice of appeal and a motion for a stay of the injunction pending appeal, which this Court granted on January 29, 2021.  *See P.J.E.S. v. Mayorkas*, No. 20-5357 (D.C. Cir.).  After CDC issued a notice of its decision to temporarily except unaccompanied noncitizen children encountered in the United States from its Order, *see infra* at 12-13, this Court, on March 2, 2021, granted the parties' joint motion to hold the appeal in abeyance, and that appeal remains in abeyance as of the filing of this brief.

### D.    CDC Excepts Unaccompanied Noncitizen Children From CDC Order

On February 11, 2021, CDC issued a notice of its decision, which had gone into effect on or about January 30, 2021, to temporarily except from expulsion unaccompanied noncitizen children encountered in the United States, pending CDC's forthcoming public-health reassessment of the Order.  86 Fed. Reg. 9942 (Feb. 17, 2021); *see also* 86 Fed. Reg. 8267, 8269 (Feb. 2, 2021) (directing "[t]he

Secretary of HHS and the Director of CDC, in consultation with the Secretary of
Homeland Security, [to] promptly review and determine whether termination,
rescission, or modification of the [the CDC Order and Final Rule] is necessary and
appropriate").  CDC explained that the COVID-19 pandemic continued to be a
highly dynamic public-health emergency, and that it was in the process of
reassessing the overall public-health risk at the United States' borders and the
Order based on the most current information regarding the COVID-19 pandemic
and the situation at the Nation's borders.  86 Fed. Reg. 9942.

On July 22, 2021, CDC announced an Order that excepted unaccompanied
noncitizen children from the October 2020 Order, superseding the February 11,
2021 temporary exception for unaccompanied noncitizen children.  *See* 86 Fed.
Reg. 38,717 (July 22, 2021).  The July 2021 Order was based on the availability of
appropriate infrastructure to adequately address the COVID-19-related public-
health concerns associated with introduction of these children, who are typically
placed into HHS Office of Refugee Resettlement custody.  *See id.*

### E. CDC Issues New Order Finding That Temporary Suspension of the Right to Introduce Certain Noncitizens Remains Necessary

In August 2021, CDC issued a new Order, which replaced and superseded
the previous Orders.  1 JA 129-152; 86 Fed. Reg. 42,828 (Aug. 5, 2021) (CDC
Order).  The CDC Order explains that, "[u]pon reassessment of the current

13

situation with respect to the pandemic and the situation at the U.S. borders, CDC finds that an Order" temporarily suspending the right to introduce certain noncitizens traveling from Canada and Mexico, regardless of their country of origin, into the United States "remains necessary" for single adults and family units, subject to recurring 60-day reviews.  1 JA 131.[3]  CDC made this determination after an updated public-health assessment that evaluated numerous considerations, including the particular risks of COVID-19 transmission in congregate settings at U.S. Department of Homeland Security (DHS) facilities, 1 JA 136, the limited ability to maintain physical distancing and cohorting given capacity constraints, 1 JA 140-141, the significant increase in CBP encounters that has caused DHS facilities to exceed capacity, 1 JA 141, the highly transmissible Delta variant, 1 JA 135, and the increase in community transmission and hospitalizations along the U.S.-Mexico border, 1 JA 132, 139-140.

As CDC explained, "variants of concern, particularly the more transmissible Delta variant, have driven a stark increase in COVID-19 cases, hospitalizations, and deaths," with an increase in COVID-19 cases of approximately 400% between June 19 and July 28, 2021.  1 JA 132.  "Of critical significance" was that "the Delta variant has demonstrated increased levels of transmissibility among

---

[3] On October 2, 2021, CDC announced that after its periodic review, the CDC Order continues to be necessary.  https://go.usa.gov/xMtJ8.

unvaccinated persons and might increase the risk of vaccine breakthrough infections in the absence of other mitigation strategies." 1 JA 135. CDC also noted that the United States was experiencing a "migratory surge of noncitizens attempting to enter the country at and between [Ports of Entry] at the southern border," and that "DHS has already recorded more encounters this fiscal year to date than the approximate 977,000 encounters in the whole of FY 2019." 1 JA 140-141. "[T]he current surge has caused CBP to exceed COVID-constrained capacity and routinely exceed its non-COVID capacity." 1 JA 141. "This extreme population density and the resulting increased time spent in custody by noncitizens presents a serious risk of increased COVID-19 transmission in CBP facilities." 1 JA 141.

CDC noted that, where possible, single adults and family units eligible for expulsion under the March and October Orders "have been processed pursuant to the Title 42 authority, unless a case-by-case exception was made by DHS." 1 JA 142. Even under those Orders, however, "a significant percentage of [family units] were unable to be expelled * * * given a range of factors, including, most notably, restrictions imposed by foreign governments." 1 JA 142. "In those cases where Title 42 processing is not possible, [single adults] and [family units] are instead processed pursuant to Title 8." 1 JA 142. Processing noncitizens under Title 8 "takes approximately an hour and a half to two hours per person," whereas

"processing an individual for expulsion under the CDC order takes roughly 15 minutes and generally happens outdoors."  1 JA 143.

The Tile 8 processing time does not include the pre-processing time spent in custody because of the backlog resulting from the recent surge in noncitizen encounters.  1 JA 142-143.  Furthermore, "as the number of noncitizens attempting to enter the United States has surged and as individuals cannot be expelled pursuant to Title 42 given the restrictions in place [imposed by foreign governments], the time in custody at CBP facilities has increased for" single adults and family units.  1 JA 142; *see also* 1 JA 143.  CDC observed that "[a]s of July 29, 2021, the current average time in custody at CBP facilities for" individuals in family units who are not expelled under the CDC Order "is 62 hours."  1 JA 143.  And CDC found that, if the Order were not in place, time in custody for single adults and family units "would likely increase significantly."  1 JA 143.  CDC concluded that the Orders, "[b]y reducing congestion" in DHS facilities, "have helped lessen the introduction, transmission, and spread of COVID-19 among border facilities and into the United States while also decreasing the risk of exposure to COVID-19 for DHS personnel and others in [those] facilities," and that the reduction in the number of single adults and family units "held in these congregate settings continues to be a necessary mitigation measure."  1 JA 143-144.

16

CDC accordingly concluded that single adults and family units "should continue to be subject to the Order at this time pending further improvements in the public health situation." 1 JA 145. The Order also reaffirmed that the exception of unaccompanied noncitizen children was justified given, among other things, the unique care for children by the Office of Refugee Resettlement and the greater ability of the government to implement appropriate COVID-19 measures for this population.[4] 1 JA 145.

## II.    District Court Proceedings

Plaintiffs brought suit in January 2021 on behalf of a putative class of noncitizen family units who are or will be subjected to the CDC Order. 1 JA 59. As relevant here, plaintiffs asserted that the Order exceeds CDC's Section 265 authority. 1 JA 61. Plaintiffs moved for class certification and a classwide preliminary injunction. Dkt. 57-1.

---

[4] CDC explained that, after intake processing, unaccompanied noncitizen children are referred to the Office of Refugee Resettlement, 1 JA 140 n.68, which has "established a robust network of care facilities that provide testing and medical care and institute COVID-19 mitigation protocols, including vaccination for personnel and eligible [unaccompanied noncitizen children]," 1 JA 145. In addition, "[unaccompanied noncitizen children] released to a vetted sponsor or placed in a[n] * * * [Office of Refugee Resettlement] shelter do not pose a significant level of risk for COVID-19 spread into the community," because they are "released only after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction." 1 JA 145.

The case was held in abeyance for several months as the parties engaged in settlement discussions. *See, e.g.*, Dkts. 87, 111; Minute Orders dated Feb. 23, 2021, July 19, 2021. When discussions reached an impasse, the parties resumed litigation. Dkt. 112.

On September 16, 2021, the district court granted class certification and a classwide preliminary injunction. 1 JA 67-69. The district court concluded that Section 265 likely does not authorize the government to expel noncitizens once they have crossed the border into the United States, reasoning that "[e]ven accepting * * * that the phrase, 'prohibit * * * the introduction of,' means 'to intercept or prevent,' the 'process' of introduction * * * this phrase also does not encompass expulsion from the United States" and "'[e]xpelling persons * * * is entirely different from interrupting, intercepting, or halting the process of introduction." 1 JA 110. The court found it significant that Section 265 does not expressly confer the authority to "expel" or "remove" or use a similar word, as statutes in the immigration context do. 1 JA 103-105. The district court further reasoned that Section 265's neighboring statutory provisions reference "quarantine" and similar measures but do not explicitly authorize expulsion, "suggesting that the CDC's powers were limited to quarantine and containment." 1 JA 106. The district court held that CDC's interpretation of "introduction"—to include the movement of a person from a foreign country, even after crossing the

18

border, that brings the person into contact with persons or property in the United States in a manner that presents a risk of transmission of a quarantinable communicable disease—is not entitled to *Chevron* deference, either because the statutory text is unambiguous, or because the agency's interpretation does not implicate its scientific and technical expertise.  1 JA 111-112.

Finally, the district court concluded that the remaining preliminary injunction factors weigh in favor of plaintiffs.  1 JA 112-126.  The court enjoined the government from expelling class members from the United States under the CDC Orders.  1 JA 68, 127.

On September 30, 2021, this Court stayed the preliminary injunction pending appeal.  Doc. 1916334.[5]

## SUMMARY OF ARGUMENT

1.    The district court held that Section 265's authority to prohibit the "introduction" of a person does not permit CDC to expel a person, reasoning that once a person has crossed the border, that person's "introduction" is complete and CDC lacks the authority to prohibit an introduction that is already completed. Even accepting the district court's premise – that the CDC lacks authority to prohibit a person's already-completed introduction – its conclusion is still wrong.

---

[5] On October 11, 2021, the State of Texas moved in this Court to intervene in this litigation.  Plaintiffs and Defendants both opposed intervention.

19

A person's "introduction" into the United States is not complete the moment he or she steps over the border, and thus expelling a person who happens to cross the border nonetheless occurs before that person's "introduction" into the United States is actually accomplished.

More fundamentally, however, the district court adopted an erroneous and narrow interpretation of the word "introduction" that excludes the authority to expel. The statutory authority to prohibit a person's "introduction," however, is most naturally read to include the related authority to expel that person if he or she crosses the border notwithstanding the prohibition. The district court's contrary conclusion defies the statutory context and common sense by rendering CDC powerless to act under Section 265, even in the face of a serious threat of communicable disease, so long as a person evades the statute's lawful restrictions. The district court also overlooked Congress's use of the phrase "introduction" of a communicable disease "into" the United States, which demonstrates Congress's concern not only with stopping the communicable disease, and the persons and property carrying it, before they cross the border, but also with preventing further introduction of the disease, or the person or property that may carry the disease, into the interior of the country. And that view is confirmed by Congress's use of the word "introduction" to refer to both the introduction of persons and also to the introduction of communicable disease into the United States.

20

If there were any remaining doubt, CDC's interpretation is entitled to
*Chevron* deference.  CDC unquestionably administers Section 265, part of the
Public Health Service Act.  The statute authorizes the agency to issue orders to
protect public health that have the force and effect of law when issued "in
accordance with regulations approved by the President."  42 U.S.C. § 265.  The
CDC Order at issue in this case indisputably was authorized pursuant to a final rule
adopted after notice and comment.  In doing so, CDC is exercising its expert
public-health judgment with respect to whether the introduction of persons from
certain foreign countries or places may spread a communicable disease; whether
permitting certain persons to remain in congregate settings at Ports of Entry or U.S.
Border Patrol stations will exacerbate the serious threat of introducing such disease
into the United States; and whether alternative mitigation measures are available or
adequate to address that threat.  CDC's interpretation of Section 265 to permit the
agency to address the scope of the communicable disease threat it perceives is
entitled to *Chevron* deference.

2.      Plaintiffs raised several alternative arguments below: that Section 265
regulates only transportation by common carriers, that CDC's interpretation
impermissibly overrides certain immigration statutes, and that CDC's
interpretation would raise constitutional concerns if applied to U.S. citizens.  The
district court did not reach or rule upon any of those arguments, and this Court

21

should likewise decline to affirm the district court's injunction on these alternative grounds. Regardless, the arguments are without merit. Plaintiffs' contention that Section 265 authorizes nothing more than the regulation of common carriers has no basis in the text of Section 265. It illogically transforms a broad grant of statutory authority to address the serious threat of communicable disease into the mere regulation of transportation entities, leaving the agency without any authority to prohibit the spread of disease by those traveling over a land border without the assistance of a transportation company. That view also disregards the contrast between Section 265, which refers to the "introduction of persons and property," and the surrounding statutory provisions, which expressly regulate "vessels." It likewise overlooks Congress's specific rejection of a narrow statute prohibiting only "passenger travel."

Nor does Section 265 irreconcilably conflict with provisions of immigration laws. Section 265 applies only under narrow and specific circumstances of a public-health emergency, where CDC determines "that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States." 42 U.S.C. § 265. In contrast, the generally applicable immigration provisions plaintiffs cite as being in conflict with the CDC Order apply under normal circumstances and in ordinary times. Even if there were an irreconcilable conflict, moreover, Section 265 would prevail.

22

Congress expressly provided that the authority under Section 265 should operate as a "suspension of the right to introduce such persons and property," 42 U.S.C. § 265, and the statute's drafting history makes unmistakably clear that the authorization "to prohibit * * * the introduction of person" included, but was not limited to, the suspension of immigration.

3.  The district court also erred in concluding that the remaining preliminary injunction factors weigh in favor of plaintiffs.  The preliminary injunction threatens irreparable harm to the government and the public at large.  The COVID-19 pandemic continues to be a highly dynamic public-health emergency, especially in light of the highly transmissible Delta variant.  CDC's discretion concerning whether to prohibit the introduction of persons from particular countries and in what circumstances, as well as its discretion to except certain classes of people from that prohibition, is critical to avoiding irreparable harm.  Congress charged CDC—not federal courts—with making public-health judgments about how best to protect the country during a pandemic; vacating the preliminary injunction is necessary so that the government can implement its expert judgment to respond with flexibility to a rapidly evolving public-health crisis.  The government respectfully suggests that the balancing of equities weighs against a preliminary injunction.

## STANDARD OF REVIEW

This Court reviews a grant of a preliminary injunction for an abuse of discretion, reviewing the district court's legal conclusions *de novo* and its findings of fact for clear error.  *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012); *Serono Labs. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).[6]  The district court abused its discretion in granting a preliminary injunction.  The district court's interpretation of Section 265—which this Court reviews *de novo*—was incorrect as a matter of law, and thus the government is likely to succeed on the merits.  In addition, the balance of equities and public interest weigh against an injunction.

---

[6] The plaintiffs "must meet [the] four independent requirements" for a preliminary injunction by independently demonstrating "*both* a likelihood of success *and* a likelihood of irreparable harm, among other things," rather than relying on "the old sliding-scale approach to preliminary injunctions."  *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring); *see Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011); *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019).

24

## I.    The Government is Likely to Succeed on the Merits

The district court's injunction is premised on the erroneous legal conclusion that the CDC Order exceeds the agency's authority under 42 U.S.C. § 265.

### A.    Prohibiting the "Introduction" of Persons from a Foreign Country with a Serious Danger of Communicable Disease Includes the Authority to Expel Such Persons

Section 265 authorizes CDC "to prohibit, in whole or in part, the introduction of persons and property" from a foreign country "[w]henever" the agency "determines" that, "by reason of the existence of any communicable disease in a foreign country," the "introduction of persons or property from such country" presents a "serious danger of the introduction of such disease into the United States," and the prohibition "is required in the interest of the public health." 42 U.S.C. § 265.  The district court incorrectly concluded that this statutory authority does not provide CDC with any authority to expel persons from the United States once they cross the border.

The district court reasoned that the words "prohibit * * * the introduction" authorize CDC to "stop[] something before it begins," but not to "remedy[] it afterwards."  1 JA 110.  In its view, if covered noncitizens illegally enter the country or present at a Port of Entry, the government is powerless to expel those persons from the United States.  That interpretation should be rejected for multiple reasons.

25

Even assuming the district court's interpretation was correct—that "prohibit[ing] * * * the introduction" is limited to "stopping something before it begins, rather than remedying it afterwards," 1 JA 110—the court still erred in holding that the CDC Order exceeds the agency's authority under Section 265. The district court's reasoning incorrectly assumes that noncitizens who have "crossed the border" have already completed their introduction into the United States. 1 JA 108, 110. But an "introduction" into the United States is a continuing process that does not stop at the border. *See United States v. Steinfels*, 753 F.2d 373, 377 (5th Cir. 1985) ("[I]ntroduction into commerce commences upon the arrival of imported goods upon United States soil, but introduction does not necessarily end there."); *cf. DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) (a noncitizen taken into custody "25 yards into U.S. territory" "is not considered to have entered the country" but instead is "'treated' for due process purposes 'as if stopped at the border'"); *Castro v. DHS*, 835 F.3d 422, 445 (3d Cir. 2016) (noncitizens who are "apprehended within hours of surreptitiously entering the United States" are still treated as "'alien[s] seeking initial admission to the United States'"). Nor does the fact that the government must take steps to expel a noncitizen following his or her apprehension mean that the noncitizen's "introduction" to the United States has concluded.

26

As CDC's March 2020 rule noted, the "introduction" of a person into the United States is not completed merely because that person crosses the border.  *See* 85 Fed. Reg. at 16,563; 42 C.F.R. § 71.40(b)(1).  Understood in context, the term "introduction" in Section 265 covers the process of coming into contact with others in the interior of the United States to whom a disease can be spread.  *See* 85 Fed. Reg. at 16,566 (defining "introduction into the United States of persons" to mean "the movement of a person from a foreign country" into the United States "so as to bring the person into contact with persons in the United States * * * in a manner that the Director determines to present a risk of transmission of a communicable disease").  Accordingly, expulsion pursuant to the CDC Order is authorized by Section 265 because it applies to noncitizens who have not yet completed their "introduction" in the United States.

More fundamentally, the district court erred in concluding that Section 265's authority "to prohibit" the "introduction" of persons "to avert [the] danger" of the spread of communicable disease, 42 U.S.C. § 265, does not include the authority to expel those persons if they are encountered after crossing the border.  1 JA 110.  As a matter of ordinary language, the power to prohibit something naturally encompasses the power to stop the prohibited action after it has begun or to remedy a violation that evades the statutory prohibition.  A statute prohibiting persons from entering certain protected areas is most naturally read to include both

the power to prevent persons from entering in the first instance and the power to expel them if they mistakenly or surreptitiously enter in contravention of that prohibition. For example, the authority to "prevent [a dangerous] individual from boarding an aircraft," 49 U.S.C. § 114(h)(3)(B), is most naturally understood to authorize the removal of an individual who somehow manages to enter the jetway or the plane. Similarly, CDC's authority pursuant to 42 C.F.R. § 71.63(a) to "suspend the entry" of certain animals or property for public health reasons, promulgated under Section 265, includes the authority to "re-export[]" such property, 82 Fed. Reg. 6890, 6929 (Jan. 19, 2017), and CDC has had similar longstanding authority since 1985, *see* 42 C.F.R. § 71.51(g) (authorizing the "export[]" of dogs and cats with communicable diseases) (enacted by 50 Fed. Reg. 1516, 1523 (Jan. 11, 1985)); 42 C.F.R. § 71.53(a), (e) ("export" of nonhuman primates) (enacted by 50 Fed. Reg. at 1524).[7] In the same way, "prohibit[ing]" the "introduction" of a person who may carry a communicable disease into the United States and to the population at large encompasses turning noncitizens around and sending them back across the border if they mistakenly or surreptitiously enter in contravention of that prohibition, in order "to avert [the] danger" of "the introduction of [communicable] disease into the United States." Under the district

---

[7] To the extent these regulations rely on the authority in 42 U.S.C. § 264(a) to take "other measures" with respect to property, those regulations must still be "necessary to prevent the introduction" of communicable disease, *id.*

court's erroneous view, an agency authorized to promulgate rules prohibiting any conduct would be without authority to halt a continuing violation; an agency would be required to stand by and allow the conduct whenever it was unable to prevent the violation from commencing in the first place.

The district court's rigid reading also disregards statutory context. Section 265 grants CDC the authority "to avert" the "serious danger of the introduction * * * into the United States" of "any communicable disease in a foreign country" "in the interest of the public health" if that "danger is so increased by the introduction of persons * * * from such country." 42 U.S.C. § 265. The need to prevent the spread of a communicable disease is in no way diminished by the fact that a noncitizen has arrived at a Port of Entry, or crossed the border unlawfully. Indeed, in enacting Section 265's predecessor statute in 1893, Congress was aware of the danger presented by infected persons arriving from abroad and surreptitiously crossing the border. *See* 24 Cong. Rec. at 373 ("[I]t is an open and notorious fact that for want of patrol people were escaping from the ships and getting to shore more or less during that whole quarantine * * * ."). CDC addressed precisely this danger in issuing its Order. *See* 85 Fed. Reg. at 16,560, 16,563 (because the "further introduction of COVID-19 into the United States" can occur if "infected persons walk[] across the land border," CDC defines "introduction" to "encompass those who have physically crossed a border of the

29

United States and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease"); *see also* 85 Fed. Reg. at 56,445 ("[W]hen a person on U.S. soil moves further into the United States," he or she may "come[] into contact with new persons or property in ways that increase the risk of spreading the quarantinable communicable disease" and thus "'[i]ntroduction' does not necessarily conclude the instant that the person first steps onto U.S. soil."). The district court—concluding that the statute's public-health focus "is beside the point," 1 JA 111—offered no reason why Congress would have intended for CDC to be rendered powerless in those circumstances.

CDC's authority to expel individuals under Section 265 is confirmed by Congress's use of the word "into" when addressing the "serious danger of the introduction of such disease *into* the United States" that is "increased by the introduction of persons * * * from such country." 42 U.S.C. § 265 (emphasis added). The word "into" means "[t]o the inside or interior of," American Heritage Dictionary 934 (3d ed. 1992), indicating that Congress was concerned not only with stopping the communicable disease, and the persons and property carrying it, before they cross the border, but also with preventing further introduction of the disease, or the person or property, into the interior of the country. The phrase "introduction * * * into" is also commonly used to describe the placement of a

30

disease or a species of plant or animal into an existing population, where it then

would have a continuing presence.  *Id*. at 946 (defining "introduce" as "[t]o bring

in and establish in a new place or environment:  exotic plants that had been

introduced from the jungle").  Expulsion is thus one method of prohibiting the

"introduction" of persons or preventing the introduction of disease "into" the

United States.

Notably, Section 265 uses the word "introduction" in two senses:  "the

introduction of persons" who would increase the danger of "the introduction of

such [communicable] disease into the United States."  That dual usage underscores

the connection between a person's presence in the United States and the risk of that

person's serving as a vector for transmitting disease into this country.  In holding

that Section 265 contains no authority to expel a person who sets foot over the

border, the district court mistakenly decoupled the statutory connection between a

person's presence and their propensity for transmitting disease.

The district court also reasoned that "Section 265 simply contains no

mention of the word 'expel'—or any synonyms thereof—within its text," which it

found "significant," "particularly when read in conjunction with * * * statutes

governing immigration."  1 JA 103, 105.  But Section 265 is a public-health

provision, and hence the absence of the terminology prevalent in immigration law

is not significant even if its absence might be meaningful in the immigration

31

context. *Russello v. United States*, 464 U.S. 16, 25 (1983) ("Language in one statute usually sheds little light upon the meaning of different language in another statute.").  Nor would such words have been necessary, because the authority to "prohibit * * * the introduction of persons" to prevent the introduction of disease "into" the United States is most naturally read to include both the power to prevent persons from entering in the first instance and the power to expel them if they mistakenly or surreptitiously enter and continue to move into the country and among its population. *See supra* at 27-29.

The district court similarly reasoned that the express enumeration of certain authorities in Section 265's neighboring provisions—such as quarantine, apprehension, and detention, 1 JA 105-107—implicitly forecloses CDC from taking other actions not expressly mentioned.  1 JA 106, 109.  But that again ignores that Section 265 expressly authorizes CDC to prohibit the introduction of persons into the country, which logically encompasses the power to restore the status quo ante if those persons temporarily evade the prohibition.  It also ignores the statute's drafting history, which demonstrates that Congress enacted Section 265 to expand the government's authority *beyond* the power to quarantine.  In 1893, Congress conferred the authority to prohibit the introduction of persons "notwithstanding the quarantine defense," 27 Stat. at 452, making it clear that the authority to prohibit the introduction of persons was different from, and in addition

32

to, the authority to quarantine.[8]  And Section 265 is entitled "*Suspension of Entries and Imports from Designated Places*," 58 Stat. at 704 (emphasis added), making clear that the provision included authority to suspend the entry of persons into the United States altogether.  *See Almendarez–Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.").[9]

In any event, Section 265 was meant to address extraordinary and unprecedented public-health emergencies.  The statute sensibly grants CDC's scientific and public-health experts the flexibility they need to avert the introduction of communicable diseases.  Section 265 permits CDC to prohibit the introduction of any "persons and property," either "in whole or in part," and "from such countries or places" that CDC designates and "for such a period of time" as it

---

[8] Congress removed the "notwithstanding the quarantine defense" language when it recodified the statute in 1944, 58 Stat. at 704, but in doing so Congress specified that its recodification was "merely a restatement of the laws" then existing.  H.R. Rep. No 78-1364 at 1-3, 25 (1944).

[9] Unlike Section 264(a), in which the scope of CDC's authority to "prevent the introduction" of communicable disease is informed by the expressly enumerated powers listed in the very next sentence of the same subsection, the enumerated mitigation measures relied upon by the district court (quarantine, apprehension, detention, and penalties) appear in different statutory sections (42 U.S.C. §§ 264, 267, 271) and not in Section 265 itself.  *Compare Alabama Assn. of Realtors v. HHS*, 141 S. Ct. 2485, 2488 (2021) (per curiam).  In addition, Congress made clear that Section 265 was intended to expand CDC's authority beyond the express measure of quarantine listed elsewhere in the Public Health Service Act.

"may deem necessary for such purpose" "[w]henever" CDC "determines" that doing so "is required in the interest of the public health."  42 U.S.C. § 265.  That approach appropriately recognizes that a legislative body cannot predict, and thus should not be forced to spell out in advance, what the most effective public-health mitigation measures in response to unanticipated public-health emergencies might be.  The district court's approach, by contrast, would unrealistically require Congress to anticipate and expressly enumerate the precise manner in which CDC should respond to a pandemic.

Similarly, the district court's reliance (1 JA 105-106) on certain penalties—such as imprisonment or fines—that may be imposed for various types of violations under a range of different public-health provisions, *see* 42 U.S.C. § 271, says nothing about whether CDC may use expulsion to implement the basic authority to prevent introduction of individuals and disease among the population. While punishments like arrest, imprisonment, or fines might deter unlawful border crossings in the first instance, they do not further the statutory purpose of averting the spread of disease caused by the continued presence of those who evidently were not sufficiently deterred.

At a minimum, Section 265 is ambiguous and CDC's reasonable interpretation is entitled to deference under *Chevron v. NRDC*, 467 U.S. 837 (1984).  CDC indisputably administers Section 265, and the challenged Order

34

carries the force of law and was issued under the authority of a Final Rule

promulgated in accordance with the APA's notice-and-comment procedures—

which is sufficient to warrant *Chevron* deference.  *Encino Motorcars v. Navarro*,

136 S. Ct. 2117, 2125 (2016); *United States v. Mead Corp.*, 533 U.S. 218, 229-30

(2001); *Guedes v. ATF*, 920 F.3d 1, 17-18 (D.C. Cir. 2019).

The district court incorrectly suggested that deference is unwarranted

because CDC's statutory interpretation does not implicate the agency's "scientific

and technical expertise."  1 JA 112.  To the contrary, CDC explained that its

interpretation of "introduction" was rooted in its scientific judgment that "those

who have physically crossed a border of the United States and are in the process of

moving into the interior * * * present a risk of transmission of a communicable

disease," and may potentially spread "communicable disease into the United

States."  85 Fed. Reg. at 16,563, 16,567.

CDC explained that Ports of Entry and U.S. Border Patrol stations, where

covered noncitizens might ordinarily be held in congregate settings, were "not

designed for, and are not equipped to, quarantine, isolate, or enable social

distancing," presenting a risk of COVID-19 transmission to noncitizens and CBP

personnel, as well as to the public at large.  85 Fed. Reg. at 17,061, 17,066.  CDC

further explained that the "infection control procedures" employed at Ports of

Entry and U.S. Border Patrol stations "are not easily scalable for large numbers of

aliens." *Id.* at 17,065. In addition, CDC found that "a public health tool called conditional release * * * is not a viable solution," *id.* at 17,067, because "there is significant uncertainty that covered aliens would be able to effectively self-quarantine, self-isolate, or otherwise comply with existing social distancing guidelines, if they were conditionally released," 85 Fed. Reg. at 31,508.

CDC also analyzed the risk of COVID-19 spreading from Canada and Mexico, explaining that some "confirmed cases of COVID-19" in Canada are believed to be "travel-related" or related to "close contact[] [with] travelers," 85 Fed. Reg. at 17,063, and that Mexico "has been slower to implement public health measures" and thus "[t]he existence of COVID-19 in Mexico presents a serious danger of the introduction of COVID-19 into the United States," *id.* at 17,064-65. And most recently, CDC analyzed the risk of COVID-19 spreading from Canada and Mexico, explaining that "[a]s the Delta variant continues to spread, both the United States and Mexico are experiencing high or substantial incidence rates," with "a 91.0% increase in new cases over the past week" in the United States, a 30.2% increase in Mexico, and a 14.8% increase in Canada. 1 JA 132. CDC also concluded that the Orders, "[b]y reducing congestion" in DHS facilities, "have helped lessen the introduction, transmission, and spread of COVID-19 among border facilities and into the United States while also decreasing the risk of exposure to COVID-19 for DHS personnel and others in [those] facilities," and

that the reduction in the number of single adults and family units "held in these congregate settings continues to be a necessary mitigation measure." 1 JA 143-144.

Because CDC's interpretation of "introduction" rested on these kinds of scientific and public-health judgments implicating CDC's expertise, judicial deference is particularly warranted. *Cf. South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 716 (2021) (Roberts, C.J., concurring in the partial grant of application for injunctive relief) ("[F]ederal courts owe significant deference to politically accountable officials with the background, competence, and expertise to assess public health.") (citation and internal quotation marks omitted).

## B.    Plaintiffs' Alternative Arguments Are Meritless

In the district court and in their opposition to the government's motion for a stay pending appeal, plaintiffs raised several alternative arguments that the district court did not reach—that Section 265 regulates only transportation by common carriers; that CDC's interpretation impermissibly overrides immigration statutes; and that CDC's interpretation would raise constitutional concerns if applied to U.S. citizens. The district court did not reach any of these questions, 1 JA 112 n.6, and this Court should decline to affirm the district court's exercise of discretion in granting a preliminary injunction based on rationales that court did consider, much less adopt. Regardless, plaintiffs' arguments are without merit.

37

### 1.    Section 265 is Not Limited to Regulating Transportation Entities.

Section 265 is not limited to introduction by common carriers.  Unlike neighboring provisions that explicitly regulate "vessels" or "aircraft," 42 U.S.C. §§ 267(b), 269, 270, 271(b), Section 265 refers to "the introduction of persons" without any textual reference to their means of transportation.  "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another."  *DHS v. MacLean*, 574 U.S. 383, 391 (2015).  When Congress wanted to control the spread of communicable disease by regulating common carriers, it did so expressly, as it had done in 1890 – three years before enacting the statute now codified as Section 265.  *See* 26 Stat. 31, 32 (1890) (providing penalties for "any common carrier" that "willfully violate[s] any of the quarantine laws of the United States").

In fact, Congress specifically rejected a proposal that would have confined the statute to the regulation of common carriers.  Specifically, in enacting Section 265's predecessor in 1893, Congress considered an amendment to bar "passenger travel" or "all passenger travel," 24 Cong. Rec. at 470, but it was immediately objected "that something more would be necessary in order to protect the public interest than the mere restriction upon passenger travel," *id.*, and the proposal was defeated, *id.* at 471.  Instead, Congress adopted the language prohibiting "the

introduction of persons," *id.*, which was plainly intended to be broader than a mere restraint on passenger travel.

Nor was the 1893 Congress exclusively focused on passenger ships. The legislators were well aware that communicable diseases could be spread by persons arriving over land borders. 24 Cong. Rec. at 370 (noting the "terrible ravages [that] cholera was going to bring to this country" could "come from Mexico"); *id.* at 359 (noting immigration "coming through Alaska and Mexico"); *id.* at 364 (noting possibility of "cholera-breeding immigration which will come into this country by land" though Canada); *id.* at 371 (noting "how many people are annually pouring across the line from the north into our States, by whom we might expect cholera to be brought, [from] Canada"). Accordingly, by authorizing CDC to prohibit the "introduction of persons," 42 U.S.C. § 265, Congress indicated that it meant to address not just common carriers, but the introduction of persons whether they arrive by boat or over land.

Plaintiffs' argument also defies common sense. On their understanding, a common carrier could transport passengers just up to the border, after which infected individuals could disembark and travel by foot into the United States— and the government would lack any authority under Section 265 to stop them. Plaintiffs' argument does not address why Congress would have addressed the "serious danger" of transmission of "communicable disease" in such a

39

circumscribed fashion that would be inapplicable for those crossing thousands of miles of land borders without the aid of a transportation entity.

> **2.    Section 265 Does Not Irreconcilably Conflict with Immigration Provisions and in Any Event Section 265 Would Control.**

Plaintiffs argued below, and in response to the government's stay motion, that CDC's interpretation of Section 265 must be rejected because it would irreconcilably conflict with various provisions of immigration law without the requisite clear congressional intent to do so.

While "repeals by implication are 'disfavored'" and courts should avoid "too easily finding irreconcilable conflicts" between statutes, those principles are not implicated where the court can easily "'give effect to both'" and the "two statutes can[] be harmonized." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018). That is the case here.

The immigration provisions on which plaintiffs rely apply generally in normally prevailing conditions and in the absence of an extraordinary and rare public-health emergency. Section 265, by contrast, is an emergency public-health provision that applies only in specific, limited circumstances. There is no irreconcilable conflict in such circumstances, where the specific provision is a limited and rarely invoked exception applicable only under emergency conditions. *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("To

40

eliminate the contradiction, the specific provision is construed as an exception to the general one.").

If there were an irreconcilable conflict, moreover, Section 265 would prevail. Congress expressed its clear intent that Section 265 permits the temporary displacement of immigration laws by providing for a "*suspension* of the right to introduce such persons." 42 U.S.C. § 265 (emphasis added); *see* 85 Fed. Reg. at 56,426 ("Congress's use of the terms 'suspension' and 'right to introduce'—rather than just 'introduce'—means that that [Section 265] grants the Director the authority to temporarily suspend the effect of any law, rule, decree, or order by which a person would otherwise have the right to be introduced or seek introduction into the U.S.").

The drafting history of Section 265 confirms this understanding. As originally proposed, the 1893 statutory predecessor to Section 265 expressly provided for the suspension of immigration:

> That whenever it shall be shown to the satisfaction of the President that by reason of the existence of cholera or yellow fever in a foreign country there is serious danger of the introduction of the same into the United States, and that notwithstanding the quarantine defense this danger is so increased *by immigration* that *a suspension of the same* is demanded in the interest of the public health, the President shall have power *to suspend immigration* from such countries or places and for such period of time as he may deem necessary.

24 Cong. Rec. at 358 (emphases added).

41

Members of Congress, however, repeatedly objected that this provision was too narrow because the serious danger of introducing cholera or yellow fever into the United States was not limited to immigrants, but extended as well to tourists and other temporary foreign visitors. *See* 24 Cong. Rec. at 361 (noting "passengers coming as tourists, or for pleasure, or temporarily"); *id.* at 363 ("[T]here would be just as much danger of bringing contagion into this country by permitting aliens to come in who do not come here to reside or to settle on lands, but simply come here as temporary visitors, as there would be from the other class."); *id.* at 374 ("Cholera is no respecter of persons. * * * It may be brought as well by the subject of a foreign country who comes to this country to visit the country. It may be brought as well by vessels and those who come for a temporary sojourn in the United States as by those who come here to make their home in this country and become permanent residents. So I have not a particle of faith, I repeat, in being able to protect this country against the coming of cholera by simply suspending immigration.").

In response to that concern of under-inclusiveness, Congress amended the proposed bill, in relevant part, by changing the references from the danger resulting from "immigration" and the power to "suspend immigration" to a danger resulting from "the introduction of persons or property" and the "suspension of the right to introduce the same." 24 Cong. Rec. at 470-71. At the same time,

42

Congress made it clear that the purpose of this amendment was "to provide that [the President] may, if the exigency demands, exclude all other passenger travel *as well as immigration*." *Id*. at 471 (emphasis added). Congress could not have been clearer that the language it adopted subsumed and included the power to suspend immigration, though prohibiting "the introduction of persons" was not limited to that end alone. In keeping with the understanding that the statutory authority included the power to suspend immigration, Section 7 of the 1893 Act—what eventually became Section 265—was entitled "Suspension of immigration during existence of contagious diseases," *see* 27 Stat. at 452, a title that remained until the law was re-codified as Section 265 in 1944, *see* 42 U.S.C. § 111 (1940) (entitled "Suspension of immigration").

### 3. The Constitutional Avoidance Doctrine is Inapplicable.

Plaintiffs previously argued that Section 265 cannot include the power to expel because that authority would raise grave constitutional questions if applied to U.S. citizens. Neither the final rule nor the CDC Order, however, applies to U.S. citizens. 42 C.F.R. § 71.40(f); 1 JA 148. Indeed, one reason why Congress conferred on CDC the authority to prohibit the introduction of persons "in whole or in part" was to confer flexibility to exempt certain persons, including U.S. citizens. *See* 24 Cong. Rec. at 471 (amending Section 265's predecessor statute to add the words "in whole or in part" to permit "a partial as well as a total prohibition"); *id.*

43

at 470 ("I do believe that we can discriminate wisely between those who come on that account [for immigration purposes] and those who already have a vested interest in citizenship and home in this country, to whom this country already belongs.").

Moreover, even adopting the district court's construction of Section 265 would not avoid the constitutional concerns that plaintiffs raise. The district court's understanding of Section 265 permits CDC to stop persons before they cross the border, and thus (if applied to U.S. citizens), would permit the agency to indefinitely prevent U.S. citizens from reentering the country from abroad.

If CDC were ever to invoke Section 265 to expel U.S. citizens (or indefinitely bar their re-entry), a court could then address whether such an order would be unconstitutional *as applied* to U.S. citizens, *cf. Reno v. Flores*, 507 U.S. 292, 305-06 (1993), or whether constitutional concerns call for an implicit exception for U.S. citizens, *cf. Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). A court should not, however, preemptively adopt a narrowing construction of the statute that does not eliminate the very constitutional concerns that are the purported basis for that construction.

## II.    The Remaining Preliminary Injunction Factors Do Not Support An Injunction

The district court also erred in concluding that the remaining preliminary injunction factors weigh in favor of plaintiffs.  The preliminary injunction threatens irreparable harm to the government and the public at large.

The COVID-19 pandemic, especially with the highly transmissible Delta variant, continues to be a highly dynamic public-health emergency.  There can be little doubt that the district court's preliminary injunction would increase the risk of the transmission of COVID-19 among noncitizens, CBP personnel, and the public at large.  The injunction would require the government to hold covered family units in congregate settings for hours or days while they undergo immigration processing, in facilities that are not equipped for physical distancing, quarantine, or isolation at the best of times, and that are now substantially over their COVID-restricted capacity.  1 JA 176 ¶ 21.  CDC's discretion to respond to the public-health emergency—including both its decision about whether to prohibit the introduction of persons from particular countries and in what circumstances, and its authority to except certain classes of people from expulsion under its Order—is critical to avoiding irreparable harm to the public at large.

From the beginning of the pandemic, CDC explained that covered noncitizens may spend hours or days in congregate settings while undergoing immigration processing, and that Ports of Entry and U.S. Border Patrol stations are

45

"not designed for, and are not equipped to, quarantine, isolate, or enable social distancing by persons who are or may be infected with COVID-19." 85 Fed. Reg. at 17,061, 17,066. CDC also explained that holding covered noncitizens in congregate settings risks the spread of COVID-19 to CBP personnel and further transmission of COVID-19 to the U.S. population, with a concomitant increased strain on the U.S. healthcare system and supply chain. *Id.* at 17,061. CDC further observed that the alternative of using conditional release would "jeopardize * * * the public health" because many covered noncitizens "may lack homes or other places in the United States where they can self-isolate," and CDC "lacks the resources and personnel necessary to effectively monitor such a large number of persons." *Id.* at 17,067.

Most recently, CDC's August 2021 Order included the results of a "comprehensive reassessment" of its prior orders, and concluded that temporarily suspending the introduction of certain noncitizens traveling from Canada and Mexico, including members of family units and single adults, "remains necessary in light of the current circumstances." 1 JA 133. CDC noted that the current spread of the Delta variant, which "is more than two times as transmissible as the original strains," had led to a 91% increase in new U.S. cases in the week prior to issuing its Order, as well as a 30% increase in new cases in Mexico and a nearly 15% increase in Canada. 1 JA 132, 139. In addition, many people covered by the

46

Order originate from countries with "markedly lower vaccination rates."  1 JA 138; *see also* 1 JA 170 ¶ 3 (DHS "is also experiencing significantly increased rates of noncitizens testing positive for COVID-19").  The Delta variant also increases the risk of breakthrough infections even among the vaccinated.  1 JA 135, 138.  These risks are "acutely present in congregate settings" such as border immigration facilities and the local communities in which they are located.  1 JA 136.

In addition, the United States "is currently encountering record numbers of noncitizens, including families, at the border." 1 JA 169 ¶ 3.  These rates "have strained DHS operations and caused border facilities to be filled beyond their normal operating capacity."  1 JA 169 ¶ 3.  There is "an historic surge in southwest border encounters in recent months."  1 JA 174 ¶ 17.  The "capacity challenges are particularly acute with respect to families."  1 JA 170 ¶ 5.  Under the CDC Order, the government expelled more than 8,000 individuals in family units per month in May and June 2021, and over 10,000 and 16,000 in July and August 2021, respectively.  1 JA 175 ¶¶ 18-19; CBP, DHS, *Southwest Land Border Encounters* (last modified Sept. 15, 2021) https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (interactive dashboard).  The number of individuals in family units encountered monthly has nearly doubled from May to August 2021 (from 44,000 to 86,000).  *Id.*

47

Moreover, the alarming increase in family-unit encounters along the Southwest Border does not account for the *even greater* increase that would be expected were the injunction to be affirmed and take effect.  Similar court orders in the past have served as an incentive to noncitizens to attempt to enter the country, and the injunction here likewise "may become a pull factor leading to additional numbers of family units apprehended by CBP."  1 JA 156 ¶ 7; *see also* 1 JA 161 ¶ 14; 1 JA 177 ¶ 23.  After the same district court enjoined application of a prior version of the CDC Order to unaccompanied noncitizen children in November 2020, *see P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020), preliminary injunction stayed, *P.J.E.S. v. Mayorkas*, No. 20-5357 (D.C. Cir. Jan. 29, 2021), CBP saw an immediate 16.4% increase in encounters of unaccompanied noncitizen children.  1 JA 156-157 ¶ 7.  *Southwest Land Border Encounters* (interactive dashboard), *supra* at 47, indicates that encounters of unaccompanied noncitizen children along the Southwest Border increased from 4,591 in November 2020 to 5,820 in January 2021.  The injunction in this case would likely result in a similar spike.

The district court's injunction would also require DHS to process family units under the immigration procedures of Title 8 rather than under the CDC Order – resulting in processing that takes hours rather than minutes, is generally conducted indoors rather than outdoors, and requires additional staff and space.  1

JA 143, 177 ¶ 24.  And even before immigration processing, individuals in family units who are not expelled under the CDC Order, but who would be processed under Title 8 because of the district court injunction, would spend an average of 62 hours in custody.  1 JA 143.  Under the injunction, DHS after processing the noncitizens "would effectively need to release a growing number of families into border communities, which risks overwhelming the local testing, isolation, and quarantine infrastructure DHS has worked to create and will thus burden local healthcare systems and strain healthcare resources."  1 JA 170-171 ¶ 6.[10]

Meanwhile, border facilities are expected to operate at only 25-50% capacity as a result of COVID-19 restrictions, and as a result many CBP facilities are already over-capacity.  1 JA 175 ¶ 18.  As of August 1, 2021, the U.S. Border Patrol was at 389% of its overall COVID-19-adjusted capacity along the Southwest Border.  1 JA 176 ¶ 21.  Furthermore, two U.S. Border Patrol sectors on the Southwest Border have seen a disproportionate share of the encounters, resulting in "extremely worrisome" statistics, with one sector at 783% over COVID-adjusted

---

[10] Even with the CDC Order in place, DHS can process families with a particular humanitarian need under Title 8, as the CDC Order allows for case-by-case exceptions.  1 JA 150-151; *see also* 1 JA 172 ¶ 11.  As of the beginning of August, more than 16,000 individuals have been processed into the United States under that exception.  1 JA 172 ¶ 11.  Maintaining the Order still allows for the exercise of discretion to address humanitarian needs, whereas requiring DHS to process all families under Title 8 will unduly strain already severely overburdened facilities, irrespective of the public-health conditions on the ground.

capacity as of August 2021.  1 JA 176 ¶¶ 21-22.  And when an additional temporary processing facility was opened in that sector, it "exceeded its normal non-COVID-19 operating capacity" – to say nothing of its COVID-adjusted capacity – within just nine days of opening.  1 JA 176 ¶ 21.  While DHS has been working since January 2021 to build greater capacity, it still "lacks sufficient capacity" to process all individuals seeking to enter the United States, and the problem is "particularly acute with respect to families."  1 JA 170 ¶¶ 4-5.

Contrary to the district court's unfounded suggestion, 1 JA 125, vaccines and testing do not sufficiently mitigate the problem.  CDC acknowledged that mitigation measures "can help," but they do not fully eliminate the existing risks and can be difficult to implement at CBP facilities.  1 JA 137.   For example, CBP must process covered noncitizens in CBP facilities, but "testing for noncitizens at CBP holding facilities is very limited" and the majority of testing would require transportation to an off-site facility in the interior, 1 JA 144, thus increasing the risk of spreading COVID-19.  Similarly, physical distancing, quarantine, and isolation are not effective due to space constraints, as well as CBP's "unique challenges" stemming from requirements to separate noncitizens in its holding facilities according to certain cohorts (*e.g.*, criminal cases held separately from administrative cases, separation by gender identity, family units and unaccompanied children separate from single adults).  1 JA 141-142 & n.76; *see*

50

1 JA 144.  And even if the government could vaccinate all willing and eligible
members of family units encountered, that would not eliminate the potential harm
given the period of time before vaccination would be effective (even putting aside
that many children are currently ineligible for vaccination).

Contrary to the district court's view, 1 App. 122, the public-health necessity
of the CDC Order is not lessened because DHS, in June 2021, was unable to apply
the Order to approximately 86% of individuals in family units, due in large part to
foreign government restrictions that preclude the expulsion of additional family
units.  1 JA 143 & n.80.  DHS is encountering record numbers of noncitizens at the
border, including in family units, and even with the limitations on expelling
individuals in family units the government has expelled 10,000 and 16,000
individuals in family units in July and August 2021, respectively, *see Southwest
Land Border Encounters* (interactive dashboard), *supra* at 47, while also expelling
over 80% of single adults for an average of more than 3,000 *per day*, 1 JA 143 &
n.81.  Were the district court's injunction to take effect, the government would
have to find space for those additional individuals in family units.  And given the
already-dire overcrowding at CBP facilities, an additional 16,000 – and growing –
number of individuals in family units each month could stretch those facilities
beyond their breaking points and would irreparably compound the public-health
risks of COVID-19 transmission in those congregate settings.

To be sure, the latest CDC Order excepts from expulsion unaccompanied children. *See supra* at 12-13.  But that does not lessen the danger to public health posed by the injunction in this case.  CDC explained that unaccompanied children "are differently situated" than single adults and individuals in family units.  1 JA 145.  "The Government has greater ability to care for [unaccompanied children] while implementing appropriate COVID-19 mitigation measures."  1 JA 145.  After intake processing, unaccompanied children are referred to the Office of Refugee Resettlement for care, 1 JA 140 n.68, which has "established a robust network of care facilities that provide testing and medical care and institute COVID-19 mitigation protocols, including vaccination for personnel and eligible [unaccompanied children]," 1 JA 145.  In addition, unaccompanied children "released to a vetted sponsor or placed in a temporary or licensed [Office of Refugee Resettlement] shelter do not pose a significant level of risk for COVID-19 spread into the community," because they are "released only after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction."  1 JA 145.  Because there is an "appropriate infrastructure in place" for unaccompanied children that does not exist for single adults and individuals in family units, and because "[t]he number of [unaccompanied children] entering the United States is smaller than both the number of [single adults] and of [members of

52

family units]," the CDC determined that unaccompanied children can be excepted from the Order without posing a significant public-health risk, while the same is not true of single adults or individuals in family units.  1 JA 145.

Congress authorized the CDC Director to make these kinds of determinations concerning public health, 42 U.S.C. § 265, and the CDC Director determined that the introduction of certain noncitizens into the United States during the pandemic is dangerous to the public health, 85 Fed. Reg. at 17,060; 85 Fed. Reg. at 65,806, and that those dangers remain even today, 1 JA 129.  "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  And that is especially true where the decisions of public officials entrusted with "the safety and the health of the people" in "areas fraught with medical and scientific uncertainties" are "second-guess[ed] by an unelected federal judiciary," *South Bay United Pentecostal Church*, 140 S. Ct. at 1613-14 (2021) (mem.) (Roberts, C.J., concurring) (alteration and quotation marks omitted), particularly where, as here, the district court's opinion did not rest on constitutional grounds.

On the other side of the balance, plaintiffs will not suffer irreparable harm from the reversal of the preliminary injunction, which will simply preserve the pre-litigation status quo ante.  Plaintiffs do not suggest that they are legally entitled to

enter or remain in the United States; instead, their claimed harm is that they wish to apply for humanitarian relief (such as asylum) on the grounds that their home countries "are among the most dangerous in the world due to gang, gender, family membership, and other identity-based violence."  1 JA 113.  But the CDC Order itself provides for case-by-case exceptions for humanitarian needs.  1 JA 151 (explaining that the CDC Order "does not apply to  * * *  [p]ersons whom customs officers determine  * * *  should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests").  As of early August 2021, more than 16,000 individuals had been processed into the United States under that exception.  1 JA 172 ¶ 11.  Reversing the district court's preliminary injunction and allowing the government to enforce the CDC Order during the pendency of this litigation thus would still allow for the exercise of discretion to address humanitarian needs, potentially including those articulated by plaintiffs.

54

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

reversed and the preliminary injunction vacated.

Respectfully submitted,

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

CHANNING PHILLIPS
  *Acting United States Attorney*

SHARON SWINGLE
JOSHUA WALDMAN
ASHLEY A. CHEUNG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-0236*
  *Joshua.waldman@usdoj.gov*

October 2021

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,840 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Joshua Waldman*
Joshua Waldman

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2021, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the

District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Joshua Waldman*

Joshua Waldman

**ADDENDUM**

42 C.F.R. § 71.40

(a) The Director may prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease, by issuing an order in which the Director determines that:

(1) By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and

(2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.

(b) For purposes of this section:

(1) Introduction into the United States means the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons or property in the United States, in a manner

Add.1

that the Director determines to present a risk of transmission of a quarantinable communicable disease to persons, or a risk of contamination of property with a quarantinable communicable disease, even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States;

(2) Prohibit, in whole or in part, the introduction into the United States of persons means to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting movement into the United States, or physically expelling from the United States some or all of the persons;

(3) Serious danger of the introduction of such quarantinable communicable disease into the United States means the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease;

(4) The term Place includes any location specified by the Director, including any carrier, as that term is defined in 42 CFR 71.1, whatever the carrier's flag, registry, or country of origin; and

(5) Suspension of the right to introduce means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person

Add.2

might otherwise have the right to be introduced or seek introduction into the United States.

(c) Any order issued by the Director under this section shall include a statement of the following:

(1) The foreign countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons shall be prohibited;

(2) The period of time or circumstances under which the introduction of any persons or class of persons into the United States shall be prohibited;

(3) The conditions under which that prohibition on introduction shall be effective in whole or in part, including any relevant exceptions that the Director determines are appropriate;

(4) The means by which the prohibition shall be implemented; and

(5) The serious danger posed by the introduction of the quarantinable communicable disease in the foreign country or countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited.

(d) When issuing any order under this section, the Director shall, as practicable under the circumstances, consult with all Federal departments or agencies whose interests would be impacted by the order. The Director shall, as practicable under the circumstances, provide the Federal departments or agencies

with a copy of the order before issuing it. In circumstances when it is impracticable to engage in such consultation before taking action to protect the public health, the Director shall consult with the Federal departments or agencies as soon as practicable after issuing his or her order, and may then modify the order as he or she determines appropriate. In addition, the Director may, as practicable under the circumstances, consult with any State or local authorities that he or she deems appropriate in his or her discretion.

(1) If the order will be implemented in whole or in part by State and local authorities who have agreed to do so under 42 U.S.C. 243(a), then the Director shall explain in the order the procedures and standards by which those authorities are expected to aid in the enforcement of the order.

(2) If the order will be implemented in whole or in part by designated customs officers (including any individual designated by the Department of Homeland Security to perform the duties of a customs officer) or Coast Guard officers under 42 U.S.C. 268(b), or another Federal department or agency, then the Director shall, in coordination with the Secretary of Homeland Security or other applicable Federal department or agency head, explain in the order the procedures and standards by which any authorities or officers or agents are expected to aid in the enforcement of the order, to the extent that they are permitted to do so under their existing legal authorities.

Add.4

(e) This section does not apply to:

(1) Members of the armed forces of the United States and associated personnel if the Secretary of Defense provides assurance to the Director that the Secretary of Defense has taken or will take measures such as quarantine or isolation, or other measures maintaining control over such individuals, to prevent the risk of transmission of the quarantinable communicable disease into the United States; or

(2) Other United States government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, if the Director receives assurances from the relevant head of agency and determines that the head of the agency or department has taken or will take, measures such as quarantine or isolation, to prevent the risk of transmission of a quarantinable communicable disease into the United States.

(f) This section shall not apply to U.S. citizens, U.S. nationals, and lawful permanent residents.

(g) Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder

Add.5

thereof or the application of the provision to persons not similarly situated or to

dissimilar circumstances.