**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 21-5200**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NANCY GIMENA HUISHA-HUISHA,
on behalf of herself and others similarly situated,

Plaintiffs-Appellees,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia

---

**JOINT APPENDIX
VOLUME 1**

---

STEPHEN B. KANG
American Civil Liberties Union
Foundation, Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

LEE GELERNT
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

*Counsel for Plaintiffs-Appellees*
*(additional counsel on next page)*

BRIAN M. BOYNTON
    *Acting Assistant Attorney General*

CHANNING PHILLIPS
    *Acting United States Attorney*

SHARON SWINGLE
JOSHUA WALDMAN
ASHLEY A. CHEUNG
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7232*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-0236*
    *Joshua.waldman@usdoj.gov*

*Counsel for Defendants-Appellants*

*Additional Counsel for Plaintiffs-Appellants*

CODY WOFSY
MORGAN RUSSELL
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

KARLA M. VARGAS
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
(956) 787-8171

JAMIE CROOK
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

DANIEL A. GALINDO
OMAR JADWAT
MING CHEUNG
CELSO PEREZ
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

SCOTT MICHELMAN
ARTHUR B. SPITZER
American Civil Liberties Union
Foundation of the District of
Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

TAMARA GOODLETTE
Refugee and Immigrant Center for
Education & Legal Services
802 Kentucky Avenue
San Antonio, TX 78201
(210) 960-3206

# TABLE OF CONTENTS

**Page**

District Court Docket Entries.............................................................................App. 1

Amended Complaint
    D. Ct. Dkt. 22 (Jan. 28, 2021)...............................................................App. 43

District Court Order Granting Class Certification and Granting
    Preliminary Injunction
    D. Ct. Dkt. 122 (Sept. 16, 2021)............................................................App. 67

District Court Memorandum Opinion
    D. Ct. Dkt. 123 (Sept. 16, 2021)............................................................App. 70

Notice of Appeal
    D. Ct. Dkt. 124 (Sept. 17, 2021)..........................................................App. 128

U.S. Department of Health and Human Services,
    Centers for Disease Control and Prevention,
    Order Under Sections 362 & 265 of the Public Health Service Act
    (42 U.S.C. §§ 265, 268) and 42 CFR 71.40,
    Public Health Reassessment and Order Suspending the Right to
    Introduce Certain Persons from Countries Where a Quarantinable
    Communicable Disease Exists
    D. Ct. Dkt. 114 (Aug. 2, 2021)............................................................App. 129

Declaration of Troy A. Miller
    D. Ct. Dkt. 76-2 (Feb. 17, 2021)..........................................................App. 153

Declaration of David Shahoulian
    D. Ct. Dkt. 113-1 (Aug. 2, 2021).........................................................App. 169

i

APPEAL,STAYED,TYPE–D

## U.S. District Court
### District of Columbia (Washington, DC)
### CIVIL DOCKET FOR CASE #: 1:21–cv–00100–EGS

HUISHA–HUISHA et al v. GAYNOR et al
Assigned to: Judge Emmet G. Sullivan
 Case:  1:20–cv–02245–EGS–GMH
 Case in other court:  21–05200
Cause: 05:0701 Judicial Review of Agency Decision

Date Filed: 01/12/2021
Jury Demand: None
Nature of Suit: 360 P.I.: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**NANCY GIMENA HUISHA–HUISHA**
*and her minor child*

represented by **Tamara Goodlette**
REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION & LEGAL
SERVICES
802 Kentucky Avenue
San Antonio, TX 78201
210–960–3206
Email: tami.goodlette@raicestexas.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
915 15th Street NW
Ste 2nd Floor
Washington, DC 20005
202–601–4266
Fax: 202–457–0805
Email: artspitzer@gmail.com
*ATTORNEY TO BE NOTICED*

**Celso Perez**
ACLU IMMIGRANTS' RIGHTS
PROJECT
125 Broad Street
18th Floor
New York, NY 10004
646–905–8953
Email: cperez@aclu.org
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
415–343–0785
Email: cwofsy@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
New York
125 Broad Street
Suite 18th Floor
New York
New York, NY 10004

646–905–8907
Email: dgalindo@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
CENTER FOR GENDER AND
REFUGEE STUDIES
200 McAllister Street
San Francisco, CA 94102
(415) 565–4877
Fax: (415) 581–8824
Email: crookjamie@uchastings.edu
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
TEXAS CIVIL RIGHTS PROJECT
1017 W. Hackberry Avenue
Alamo, TX 78516
512–731–2576
Email: kvargas@texascivilrightsproject.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
AMERICAN CIVIL LIBERTIES UNION
125 Broad St.
18th Floor
New York, NY 10004
212–549–2616
Fax: 212–549–2654
Email: lgelernt@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
646–610–9943
Fax: 212–549–2654
Email: MCheung@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
415–343–0776
Email: irp_mr@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Immigrants' Rights Project
125 Broad Street
18th Floor
New York, NY 10004
(212) 549–2620

Fax: (212) 549–2654
Email: ojadwat@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
915 15th Street, NW
2nd Floor
Washington, DC 20005
(202) 457–0800
Fax: (202) 457–0805
Email: smichelman@acludc.org
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, CA 94111
415–343–0783
Fax: 415–395–0950
Email: skang@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**I.M.C.H.**                    represented by

**Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**VALERIA MACANCELA BERMEJO**          represented by  **Tamara Goodlette**
*and her minor daughter*                                (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**B.A.M.M.**                    represented by  **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOSAINE PEREIRA–DE SOUZA**        represented by   **Tamara Goodlette**
*and her minor children*                             (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**H.N.D.S.**                    represented by   **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**E.R.P.D.S.**                    represented by **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**M.E.S.D.S.**                    represented by **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**H.T.D.S.D.S.**
*on behalf of themselves and others*
*similarly situated*

represented by **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ALL PLAINTIFFS**                    represented by    **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MARTHA LILIANA TADAY–ACOSTA**
*and her minor children*

represented by  **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**D.J.Z.**                          represented by

App. 12

**Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**J.A.Z.**                              represented by **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**

App. 13

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JULIEN THOMAS**                represented by   **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**

App. 14

(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FIDETTE BOUTE**                    represented by    **Tamara Goodlette**
*and their minor children*                             (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Celso Perez**
                                                       (See above for address)
                                                       *TERMINATED: 04/05/2021*

                                                       **Cody H. Wofsy**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Daniel Antonio Galindo**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jamie L. Crook**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Karla Vargas**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Lee Gelernt**
                                                       (See above for address)

App. 15

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**D.J.T.–B.**                    represented by    **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)

App. 16

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**T.J.T.–B.**                     represented by **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROMILUS VALCOURT**                          represented by  **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BEDAPHECA ALCANTE**                          represented by  **Tamara Goodlette**
*and their minor child*                                        (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celso Perez**

(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**B.V.–A.**                    represented by **Tamara Goodlette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celso Perez**
(See above for address)
*TERMINATED: 04/05/2021*

**Cody H. Wofsy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie L. Crook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karla Vargas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ming Cheung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Bonggyun Kang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**PETER T. GAYNOR**                     represented by   **Sean Michael Tepe**
*ACTING SECRETARY OF HOMELAND*                    U.S. DEPARTMENT OF JUSTICE
*SECURITY, in his official capacity*                555 Fourth Street, NW
*TERMINATED: 01/28/2021*                          Washington, DC 20530
                                                 (202) 252–2533
                                                 Fax: (202) 252–2599
                                                 Email: sean.tepe@usdoj.gov
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**MARK A. MORGAN**                      represented by   **Sean Michael Tepe**
*SENIOR OFFICIAL PERFORMING THE*                  (See above for address)
*DUTIES OF THE COMMISSIONER OF*                   *LEAD ATTORNEY*
*U.S. CUSTOMS AND BORDER*                         *ATTORNEY TO BE NOTICED*
*PROTECTION (CBP), in his official*
*capacity*
*TERMINATED: 01/28/2021*

**Defendant**

**WILLIAM A. FERRARA**                  represented by   **Sean Michael Tepe**
*EXECUTIVE ASSISTANT*                             (See above for address)

*COMMISSIONER, CBP OFFICE OF*
*FIELD OPERATIONS, in his official*
*capacity*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**RODNEY S. SCOTT**
*CHIEF OF U.S. BORDER PATROL, in*
*his official capacity*

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JONATHAN FAHEY**
*SENIOR OFFICIAL PERFORMING THE*
*DUTIES OF THE DIRECTOR OF U.S.*
*IMMIGRATION AND CUSTOMS*
*ENFORCEMENT, in his official capacity*
*TERMINATED: 01/28/2021*

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ALEX M. AZAR, II**
*SECRETARY OF HEALTH AND*
*HUMAN SERVICES, in his official*
*capacity*
*TERMINATED: 01/28/2021*

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT R. REDFIELD**
*DR.,DIRECTOR OF THE CENTERS*
*FOR DISEASE CONTROL AND*
*PREVENTION, in his official capacity*
*TERMINATED: 01/28/2021*

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DAVID PEKOSKE**
*ACTING SECRETARY OF HOMELAND*
*SECURITY, in his official capacity*
*TERMINATED: 02/10/2021*

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TROY MILLER**
*SENIOR OFFICIAL PERFORMING THE*
*DUTIES OF THE COMMISSIONER OF*
*U.S. CUSTOMS AND BORDER*
*PROTECTION (CBP), in his official*
*capacity*

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TAE D. JOHNSON**
*Senior Official Performing the Duties of*
*the Director of U.S. Immigration and*
*Customs Enforcement, in his official*
*capacity*

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**NORRIS COCHRAN**
*Acting Secretary of Health and Human*
*Services, in his official capacity*

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROCHELLE P. WALENSKY**
*Dr., Director of the Centers for Disease
Control and Prevention, in her official
capacity*

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Defendant

**ALEJANDRO J. MAYORKAS**
*SECRETARY OF HOMELAND
SECURITY, in his official capacity*

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Defendant

**XAVIER BECERRA**

represented by **Sean Michael Tepe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**T. ALEXANDER ALEINIKOFF**

represented by **Noah A. Levine**
WILMER CUTLER PICKERING HALE
& DORR LLP
7 World Trade Center
250 Greenwhich Street
New York, NY 10007
(212) 230–8800
Fax: (212) 230–8888
Email: noah.levine@wilmerhale.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel S. Volchok**
WILMER CUTLER PICKERING HALE
& DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663–6103
Fax: (202) 663–6363
Email: daniel.volchok@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Paul R.Q. Wolfson**
WILMER CUTLER PICKERING HALE
& DORR LLP
1875 Pennsylvania Ave., NW
Suite 400E
Washington, DC 20006
(202) 663–6000
Fax: (202) 663–6363
Email: paul.wolfson@wilmerhale.com
*TERMINATED: 08/16/2021*

Amicus

**DEBORAH ANKER**

represented by **Noah A. Levine**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel S. Volchok**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul R.Q. Wolfson**
(See above for address)
*TERMINATED: 08/16/2021*

<u>Amicus</u>

**JAMES C. HATHTAWAY**                  represented by  **Noah A. Levine**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel S. Volchok**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul R.Q. Wolfson**
(See above for address)
*TERMINATED: 08/16/2021*

<u>Amicus</u>

**GERALD L. NEUMAN**                  represented by  **Noah A. Levine**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel S. Volchok**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul R.Q. Wolfson**
(See above for address)
*TERMINATED: 08/16/2021*

<u>Amicus</u>

**INTERNATIONAL REFUGEE**          represented by  **Kathryn S. Austin**
**ASSISTANCE PROJECT**                             INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza
4th Floor
New York, NY 10004
516–296–0688
Email: kaustin@refugeerights.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Geroline A Castillo**
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza
4th Floor
New York, NY 10004
516–824–4256
Email: gcastillo@refugeerights.org
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**HISTORIANS**                  represented by  **Raymond P. Tolentino**
KAPLAN HECKER & FINK LLP
350 Fifth Avenue
Suite 7110

New York, NY 10118
212–763–0883
Fax: 212–564–0883
Email: rtolentino@kaplanhecker.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2021 | 1 | COMPLAINT against ALEX M. AZAR, II, JONATHAN FAHEY, WILLIAM A. FERRARA, PETER T. GAYNOR, MARK A. MORGAN, ROBERT R. REDFIELD, RODNEY S. SCOTT ( Filing fee $ 402 receipt number ADCDC–8066168) filed by B.A.M.M., H.N.D.S., H.T.D.S.D.S., I.M.C.H., JOSAINE PEREIRA–DE SOUZA, E.R.P.D.S., M.E.S.D.S., NANCY GIMENA HUISHA–HUISHA, VALERIA MACANCELA BERMEJO. (Attachments: # 1 Civil Cover Sheet, # 2 Notice of Related Cases, # 3 Summons for all Defendants)(Perez, Celso) (Entered: 01/12/2021) |
| 01/12/2021 | 2 | NOTICE OF RELATED CASE by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. Case related to Case No. 20cv2245. (adh, ) (Entered: 01/12/2021) |
| 01/12/2021 | | Case Assigned to Judge Emmet G. Sullivan. (adh, ) (Entered: 01/12/2021) |
| 01/12/2021 | 3 | SUMMONS (9) Issued Electronically as to ALEX M. AZAR, II, JONATHAN FAHEY, WILLIAM A. FERRARA, PETER T. GAYNOR, MARK A. MORGAN, ROBERT R. REDFIELD, RODNEY S. SCOTT, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(adh, ) (Entered: 01/12/2021) |
| 01/12/2021 | 4 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration of Huisha–Huisha, # 2 Declaration of Pereira–De Souza, # 3 Declaration of Macancela Bermejo, # 4 Text of Proposed Order)(Perez, Celso) (Entered: 01/12/2021) |
| 01/12/2021 | 5 | Emergency MOTION to Stay *Removal* by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA (Attachments: # 1 Memorandum in Support of Emergency Motion for Stay of Removal, # 2 Declaration of Andrea Meza, # 3 Text of Proposed Order)(Perez, Celso) (Entered: 01/12/2021) |
| 01/12/2021 | | MINUTE ORDER. The Court, sua sponte, schedules a Status Conference for January 12, 2021 at 6:00 PM via Teleconference. The parties shall contact Mr. Mark Coates, the Courtroom Deputy Clerk, for the dial–in information. In view of Plaintiffs' 5 Emergency MOTION to Stay Removal, plaintiffs are HEREBY DIRECTED to contact forthwith the United States Attorneys Office for the District of Columbia and/or the Department of Justice as appropriate to identify government counsel. Signed by Judge Emmet G. Sullivan on 1/12/2021. (lcegs2) (Entered: 01/12/2021) |
| 01/12/2021 | | Set/Reset Hearings: Status Conference set for 1/12/2021 at 6:00 PM in Telephonic/VTC before Judge Emmet G. Sullivan. (mac) (Entered: 01/12/2021) |
| 01/12/2021 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan: Status Conference held via VTC on 1/12/2021. The Court Will Grant Motion Over Objection. Plaintiffs Not Involuntarily Moved Pending Further Order Of The Court. The Court Will Issue An Order. Parties Will Confer In Regard To Briefing Schedule. (Court Reporter LISA BANKINS.) (mac) (Entered: 01/12/2021) |
| 01/12/2021 | | MINUTE ORDER granting, over objection, Plaintiffs' 5 Emergency MOTION to Stay Removal. In view of the arguments presented by Plaintiffs in their motion, the representations made by the Government, and for the reasons stated on the record at the January 12, 2021 Status Conference, Plaintiffs shall not be involuntarily removed from the United States pending further order of the Court. Parties shall file a Joint |

| | | |
|---|---|---|
| | | Proposed Scheduling Order by no later than January 15, 2021. In the forthcoming briefing, in addition to other arguments, parties shall address whether this case is related to Civil Action Number 20–2245, P.J.E.S. v. Wolf Signed by Judge Emmet G. Sullivan on 1/12/2021. (lcegs2) (Entered: 01/12/2021) |
| 01/12/2021 | 6 | NOTICE of Appearance by Sean Michael Tepe on behalf of All Defendants (Tepe, Sean) (Entered: 01/12/2021) |
| 01/12/2021 | 7 | NOTICE of Appearance by Scott Michelman on behalf of All Plaintiffs (Michelman, Scott) (Entered: 01/12/2021) |
| 01/12/2021 | 8 | NOTICE of Appearance by Arthur B. Spitzer on behalf of All Plaintiffs (Spitzer, Arthur) (Entered: 01/12/2021) |
| 01/13/2021 | | Set/Reset Deadlines: Joint Status Report due by 1/15/2021 (mac) (Entered: 01/13/2021) |
| 01/13/2021 | | SEALED MINUTE ORDER granting 4 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL. Signed by Judge Emmet G. Sullivan on 1/13/21. (mac) (Entered: 01/13/2021) |
| 01/13/2021 | 9 | SEALED Declarations filed by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 01/13/2021) |
| 01/14/2021 | 10 | NOTICE of Appearance by Jamie L. Crook on behalf of All Plaintiffs (Crook, Jamie) (Main Document 10 replaced on 1/14/2021) (zjf). (Entered: 01/14/2021) |
| 01/15/2021 | 11 | PROPOSED BRIEFING SCHEDULE *Joint Proposed Briefing Schedule* by ALEX M. AZAR, II, JONATHAN FAHEY, WILLIAM A. FERRARA, PETER T. GAYNOR, MARK A. MORGAN, ROBERT R. REDFIELD, RODNEY S. SCOTT. (Tepe, Sean) (Entered: 01/15/2021) |
| 01/15/2021 | | MINUTE ORDER. In view of Parties' 11 PROPOSED BRIEFING SCHEDULE concerning the specific issue of whether this case is related to Civil Action Number 20–2245, P.J.E.S. v. Wolf, the parties SHALL adhere to the following briefing schedule: Defendants shall file a brief with supporting points and authorities of no more than 10 pages in length by no later than January 19, 2021, and Plaintiffs shall file a brief with supporting points and authorities of no more than 10 pages in length by no later than January 21, 2021. Signed by Judge Emmet G. Sullivan on 1/15/2021. (lcegs2) (Entered: 01/15/2021) |
| 01/19/2021 | | Set/Reset Deadlines: Defendants Brief due 1/19/2021. Plaintiffs Brief due 1/21/2021. (mac) (Entered: 01/19/2021) |
| 01/19/2021 | 12 | Emergency MOTION to Stay *Removal* by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (Attachments: # 1 Text of Proposed Order)(Perez, Celso) (Entered: 01/19/2021) |
| 01/19/2021 | 13 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Taday–Acosta, # 3 Declaration of Thomas)(Perez, Celso) (Entered: 01/19/2021) |
| 01/19/2021 | | MINUTE ORDER treating as opposed and granting over objection 12 emergency order to stay removal. In view of the arguments presented by Plaintiffs in their motion and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removal of Martha Liliana Taday–Acosta (SID 369–635–597) and her minor children D.J.Z. (SID 369–635–599) and J.A.Z. (SID 369–635–605); and of Julien Thomas (SID 369–648–244), Fidette Boute (SID 369–648–252), and their minor children D.J.T.–B. (SID 369– 648–250) and T.J.T.–B. (SID 369–648–247), is STAYED pending further order of the Court. It is FURTHER ORDERED that the parties shall file a joint status report with a recommendation for further proceedings by no later than January 21, 2021 at 12:00 PM. This Order is |

| | | |
|---|---|---|
| | | subject to reconsideration for good cause shown by no later than January 19, 2021 at 8:00 PM. Signed by Judge Emmet G. Sullivan on 1/19/2021. (lcegs3) (Entered: 01/19/2021) |
| 01/19/2021 | | MINUTE ORDER granting 13 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL. Signed by Judge Emmet G. Sullivan on 1/19/2021. (lcegs3) (Entered: 01/19/2021) |
| 01/19/2021 | 14 | RESPONSE re 2 Notice of Related Case filed by ALEX M. AZAR, II, JONATHAN FAHEY, WILLIAM A. FERRARA, PETER T. GAYNOR, MARK A. MORGAN, ROBERT R. REDFIELD, RODNEY S. SCOTT. (Tepe, Sean) (Entered: 01/19/2021) |
| 01/19/2021 | 17 | SEALED DECLARATIONS filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 01/21/2021) |
| 01/20/2021 | 15 | REPLY re 2 Notice of Related Cases filed by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (Perez, Celso) Modified on 1/20/2021 to correct docket link (zjf). (Entered: 01/20/2021) |
| 01/21/2021 | | Set/Reset Deadlines: Joint Status Report due no later than 12:00PM on 1/21/2021 (mac) (Entered: 01/21/2021) |
| 01/21/2021 | 16 | Joint STATUS REPORT by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (Perez, Celso) (Entered: 01/21/2021) |
| 01/21/2021 | | MINUTE ORDER. In view of 16 joint status report, Plaintiffs shall file their amended complaint by no later than January 28, 2021. Signed by Judge Emmet G. Sullivan on 1/21/2021. (lcegs3) (Entered: 01/21/2021) |
| 01/22/2021 | | Set/Reset Deadlines: Plaintiff Amended Complaint due by 1/28/2021. (mac) (Entered: 01/22/2021) |
| 01/25/2021 | 18 | STANDING ORDER: The parties are directed to read the attached Standing Order Governing Civil Cases Before Judge Emmet G. Sullivan in its entirety upon receipt. The parties are hereby ORDERED to comply with the directives in the attached Standing Order. Signed by Judge Emmet G. Sullivan on 1/25/21. (Attachment: # 1 Exhibit 1) (mac) (Entered: 01/25/2021) |
| 01/26/2021 | 19 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Karla M. Vargas, Filing fee $ 100, receipt number ADCDC–8127067. Fee Status: Fee Paid. by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (Perez, Celso) (Entered: 01/26/2021) |
| 01/26/2021 | 20 | Emergency MOTION to Stay *Removal* by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (Attachments: # 1 Text of Proposed Order)(Perez, Celso) (Entered: 01/26/2021) |
| 01/26/2021 | 21 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Valcourt)(Perez, Celso) (Entered: 01/26/2021) |
| 01/27/2021 | | MINUTE ORDER treating as opposed and granting over objection 20 emergency motion to stay removal. In view of the arguments presented by Plaintiffs in their motion and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removal of Romilus Valcourt (SID 369–705–271), Bedapheca Alcante, (SID 369–705–293), and their minor child B.V.–A. (SID 369–705–304), is STAYED pending further order of the Court. This Order is subject to reconsideration for good cause shown by no later than January 27, 2021 at 5:00 PM. Signed by Judge Emmet G. Sullivan on 1/27/2021. (lcegs3) (Entered: 01/27/2021) |

| 01/27/2021 | | MINUTE ORDER granting 21 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL. Signed by Judge Emmet G. Sullivan on 1/27/2021. (lcegs3) (Entered: 01/27/2021) |
|---|---|---|
| 01/27/2021 | | Set/Reset Deadlines: Minute Order Reconsideration For Good Cause Shown due no later than 5:00PM on 1/27/2021. (mac) (Entered: 01/27/2021) |
| 01/27/2021 | | MINUTE ORDER granting 19 motion for leave to appear pro hac vice. Karla M. Vargas is hereby admitted pro hac vice in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Emmet G. Sullivan on 1/27/2021. (lcegs3) (Entered: 01/27/2021) |
| 01/27/2021 | 24 | SEALED DOCUMENT (Declaration) filed by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (This document is SEALED and only available to authorized persons.)(znmw) (Entered: 01/29/2021) |
| 01/28/2021 | 22 | AMENDED COMPLAINT against All Defendants filed by B.A.M.M., H.N.D.S., H.T.D.S.D.S., I.M.C.H., JOSAINE PEREIRA–DE SOUZA, E.R.P.D.S., M.E.S.D.S., NANCY GIMENA HUISHA–HUISHA, VALERIA MACANCELA BERMEJO. (Attachments: # 1 Exhibit A. Redline Amended Complaint)(Perez, Celso) (Entered: 01/28/2021) |
| 01/28/2021 | 23 | MOTION to Certify Class by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (Attachments: # 1 Memorandum in Support of Motion to Certify Class, # 2 Declaration of Stephen B. Kang with Exhibits A and B, # 3 Text of Proposed Order)(Perez, Celso) (Entered: 01/28/2021) |
| 01/29/2021 | 25 | Emergency MOTION to Stay *Removal* by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (Attachments: # 1 Text of Proposed Order)(Perez, Celso) (Entered: 01/29/2021) |
| 01/29/2021 | 26 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Casy, # 3 Declaration of De Oliveira, # 4 Declaration of Zami, # 5 Declaration of Lataro)(Perez, Celso) (Entered: 01/29/2021) |
| 01/29/2021 | | MINUTE ORDER treating as opposed and granting over objection 25 emergency motion to stay removal. In view of the arguments presented by Plaintiffs in their motion and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removal of Kaio Joseph Lataro (SID 369–651–122), Carine Nathielle Pereira Brocanelli (SID 369–651–127, and their minor child M.L.B.L. (SID 369–651– 134); Jude Mary Zami (SID 369–696–796), Santhianie Aris (SID 369–696–835), and their minor child C.E.J.Z.A. (SID 369–696–868); Gracia Junior Casy (SID 369–706–088), Farah Casy Bescien (SID 369–706–084), and their minor child T.C. (SID 369–706–096); and Jessica Fernandes de Oliveira (SID 369–676–509) and her minor child J.F.L. (SID 369–676–502) is STAYED pending further order of the Court. This Order is subject to reconsideration for good cause shown by no later than January 29, 2021 at 6:00 PM. Signed by Judge Emmet G. Sullivan on 1/29/2021. (lcegs3) (Entered: 01/29/2021) |
| 01/29/2021 | | MINUTE ORDER granting 26 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL. Signed by Judge Emmet G. Sullivan on 1/29/2021. (lcegs3) (Entered: 01/29/2021) |
| 01/29/2021 | | Set/Reset Deadlines: Motion For Reconsideration due no later than 6:00PM on 1/29/2021. (mac) (Entered: 01/29/2021) |
| 01/29/2021 | 27 | SEALED Declarations of Casy, De Oliveira, Zami and Lataro filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized |

| | | |
|---|---|---|
| | | persons.)(zjf) (Main Document 27 replaced on 1/31/2021) (zjf). (Entered: 01/31/2021) |
| 01/31/2021 | 28 | Emergency MOTION to Stay *Removal* by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (Attachments: # 1 Text of Proposed Order)(Perez, Celso) (Entered: 01/31/2021) |
| 01/31/2021 | 29 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Fils Aime, # 3 Declaration of Ladouceur, # 4 Declaration of Louis, # 5 Declaration of Myrtil, # 6 Declaration of Sabino, # 7 Declaration of Santos De Paula)(Perez, Celso) (Entered: 01/31/2021) |
| 01/31/2021 | | MINUTE ORDER. In view of 28 Emergency Motion to Stay Removal, the government is directed to file a response by no later than February 1, 2021 at 8:00 AM. Plaintiffs shall file a reply by no later than February 1, 2021 at 12:00 PM. Signed by Judge Emmet G. Sullivan on 1/31/2021. (lcegs3) (Entered: 01/31/2021) |
| 02/01/2021 | 30 | RESPONSE TO ORDER OF THE COURT re Order, *Response to January 31, 2021 Minute Order* filed by ALEX M. AZAR, II, JONATHAN FAHEY, WILLIAM A. FERRARA, PETER T. GAYNOR, TROY MILLER, MARK A. MORGAN, DAVID PEKOSKE, ROBERT R. REDFIELD, RODNEY S. SCOTT. (Tepe, Sean) (Entered: 02/01/2021) |
| 02/01/2021 | | Set/Reset Deadlines: Government Response due no later than 8:00AM on 2/1/2021. Plaintiffs Reply due no later than 12:00PM on 2/1/2021. (mac) (Entered: 02/01/2021) |
| 02/01/2021 | 31 | REPLY to opposition to motion re 28 Emergency MOTION to Stay *Removal* filed by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (Perez, Celso) (Entered: 02/01/2021) |
| 02/01/2021 | | MINUTE ORDER granting, over objection, 28 Emergency MOTION to Stay Removal. Although the government notes in its 30 Response that, on January 31, 2021, the U.S. Court of Appeals for the District of Columbia ("D.C. Circuit") stayed the class–wide preliminary injunction in P.J.E.S. v. Wolf, No. 20–cv–2245 (D.D.C.), see Order, P.J.E.S. v. Pekoske, No. 20–5357 (D.C. Cir. Jan. 29, 2021), the government does not, and cannot, argue that the D.C. Circuit's order requires denial of 28 Emergency Motion to Stay Removal because the D.C. Circuit's order is not published and was issued without opinion or reasoning. Accordingly, in view of the arguments presented by Plaintiffs, and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removals of the following six families are STAYED pending further order of this Court: Evens Fils Aime (SID 369–703–977), Shnaidere Altenord (SID 369–703–992), and their minor child A.F.A.A. (SID 369–704–002); Rijkaard Ladouceur (SID 369–690–928), Miralia Fleurima (SID 369–690–930), and their minor children N.F. (SID 369–690–940) and B.R.L.F. (SID 369–690–944); Frenzy Joseph Louis (SID 369–627–368), Rose Maria Bien–Aime (SID 369–627–371), and their minor child H.G.L. (SID 369–627–374); Djimytoo Myrtil (SID 369–705–242), Lunda Odilus (SID 369–705–228), and their minor child M.Y.M.O. (SID 369–705–252); Eric Lenes Sabino (SID 369–694–161), Elisandra de Lima Borges (SID 369–694–170), and their minor children K.C.S.B. (SID 369–694–176) and K.V.S.B. (SID 369–694–183); Josimar Santos de Paula (SID 369–695–923), and his minor child K.V.S.D.P. (SID 369– 695–934). Signed by Judge Emmet G. Sullivan on 2/1/2021. (lcegs3) (Entered: 02/01/2021) |
| 02/01/2021 | | MINUTE ORDER granting 29 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL. Signed by Judge Emmet G. Sullivan on 2/1/2021. (lcegs3) (Entered: 02/01/2021) |
| 02/01/2021 | 32 | SEALED Declarations of Fils Aime, Ladouceur, Louis, Myrtil, Sabino & Santos De Paula filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 02/01/2021) |

| 02/01/2021 | 33 | RESPONSE TO ORDER OF THE COURT re Order on Motion to Stay,,,,,, filed by ALEX M. AZAR, II, JONATHAN FAHEY, WILLIAM A. FERRARA, PETER T. GAYNOR, TROY MILLER, MARK A. MORGAN, DAVID PEKOSKE, ROBERT R. REDFIELD, RODNEY S. SCOTT. (Tepe, Sean) (Entered: 02/01/2021) |
| 02/02/2021 | 34 | Joint MOTION for Scheduling Order by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA−HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA−DE SOUZA. (Attachments: # 1 Text of Proposed Order)(Perez, Celso) (Entered: 02/02/2021) |
| 02/02/2021 | 35 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Stephen B. Kang, Filing fee $ 100, receipt number ADCDC−8155498. Fee Status: Fee Paid. by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA−HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA−DE SOUZA. (Perez, Celso) (Entered: 02/02/2021) |
| 02/02/2021 | 36 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Ming Cheung, Filing fee $ 100, receipt number ADCDC−8155543. Fee Status: Fee Paid. by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA−HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA−DE SOUZA. (Perez, Celso) (Entered: 02/02/2021) |
| 02/02/2021 | 37 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Cody Wofsy, Filing fee $ 100, receipt number ADCDC−8155680. Fee Status: Fee Paid. by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA−HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA−DE SOUZA. (Perez, Celso) (Entered: 02/02/2021) |
| 02/02/2021 | 38 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Lee Gelernt, Filing fee $ 100, receipt number ADCDC−8155714. Fee Status: Fee Paid. by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA−HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA−DE SOUZA. (Perez, Celso) (Entered: 02/02/2021) |
| 02/02/2021 | 39 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Morgan Russell, Filing fee $ 100, receipt number ADCDC−8155725. Fee Status: Fee Paid. by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA−HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA−DE SOUZA. (Perez, Celso) (Entered: 02/02/2021) |
| 02/02/2021 | 40 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Daniel Galindo, Filing fee $ 100, receipt number ADCDC−8155744. Fee Status: Fee Paid. by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA−HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA−DE SOUZA. (Perez, Celso) (Entered: 02/02/2021) |
| 02/02/2021 | 41 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Omar Jadwat, Filing fee $ 100, receipt number ADCDC−8156091. Fee Status: Fee Paid. by B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA−HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA−DE SOUZA. (Perez, Celso) (Entered: 02/02/2021) |
| 02/03/2021 | | MINUTE ORDER granting 34 joint motion for scheduling order. The parties shall abide by the following briefing schedule: Plaintiffs shall file their motion for classwide preliminary injunction by no later than February 5, 2021; Defendants shall file their combined opposition to Plaintiffs' motion for class certification and motion for classwide preliminary injunction by no later than February 17, 2021; and Plaintiffs shall file their combined reply in support of both motions by no later than February 23, 2021. Signed by Judge Emmet G. Sullivan on 2/3/2021. (lcegs3) (Entered: 02/03/2021) |
| 02/03/2021 | | MINUTE ORDER granting 35 motion for leave to appear pro hac vice. Stephen B. Kang is hereby admitted pro hac vice in this action. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Emmet G. Sullivan on 2/3/2021. (lcegs3) (Entered: 02/03/2021) |

| 02/03/2021 | | MINUTE ORDER granting <u>36</u> motion for leave to appear pro hac vice. Ming Cheung is hereby admitted pro hac vice in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). <u>Click for instructions</u>**. Signed by Judge Emmet G. Sullivan on 2/3/2021. (lcegs3) (Entered: 02/03/2021) |
|---|---|---|
| 02/03/2021 | | MINUTE ORDER granting <u>37</u> motion for leave to appear pro hac vice. Cody Wofsy is hereby admitted pro hac vice in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). <u>Click for instructions</u>**. Signed by Judge Emmet G. Sullivan on 2/3/2021. (lcegs3) (Entered: 02/03/2021) |
| 02/03/2021 | | MINUTE ORDER granting <u>38</u> motion for leave to appear pro hac vice. Lee Gelernt is hereby admitted pro hac vice in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). <u>Click for instructions</u>**. Signed by Judge Emmet G. Sullivan on 2/3/2021. (lcegs3) (Entered: 02/03/2021) |
| 02/03/2021 | | MINUTE ORDER granting <u>39</u> motion for leave to appear pro hac vice. Morgan Russell is hereby admitted pro hac vice in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). <u>Click for instructions</u>**. Signed by Judge Emmet G. Sullivan on 2/3/2021. (lcegs3) (Entered: 02/03/2021) |
| 02/03/2021 | | MINUTE ORDER granting <u>40</u> motion for leave to appear pro hac vice. Daniel Galindo is hereby admitted pro hac vice in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). <u>Click for instructions</u>**. Signed by Judge Emmet G. Sullivan on 2/3/2021. (lcegs3) (Entered: 02/03/2021) |
| 02/03/2021 | | MINUTE ORDER granting <u>41</u> motion for leave to appear pro hac vice. Omar Jadwat is hereby admitted pro hac vice in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). <u>Click for instructions</u>**. Signed by Judge Emmet G. Sullivan on 2/3/2021. (lcegs3) (Entered: 02/03/2021) |
| 02/04/2021 | <u>42</u> | Emergency MOTION to Stay Removal by ALL PLAINTIFFS, B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA. (Attachments: # <u>1</u> Text of Proposed Order)(Crook, Jamie) (Entered: 02/04/2021) |
| 02/04/2021 | <u>43</u> | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by ALL PLAINTIFFS, B.A.M.M., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA (This document is SEALED and only available to authorized persons.) (Attachments: # <u>1</u> Text of Proposed Order, # <u>2</u> Declaration of Jonny Dieudonne)(Crook, Jamie) (Entered: 02/04/2021) |
| 02/04/2021 | | Set/Reset Deadlines: Plaintiffs Motion For Classwide Preliminary Injunction due by 2/5/2021. Defendants Combined Opposition To Plaintiffs' Motion For Class Certification And Motion For Classwide Preliminary Injunction due by 2/17/2021. Plaintiffs Combined Reply In Support Of Both Motions due by 2/23/2021.(mac) (Entered: 02/04/2021) |
| 02/04/2021 | | MINUTE ORDER treating as opposed and granting over objection <u>42</u> Emergency Motion to Stay Removal. In view of the arguments presented by Plaintiffs in their motion, the Court's February 1, 2021 Minute Order, and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removals of Jonny Dieudonne (SID 369–745–541), Nathalie Decilian (SID 369–745–608), and their minor child N.J.D.D. (SID 369–745–546) are STAYED pending further order of this Court. This Order is subject to reconsideration for good cause shown by no later than February 4, 2021 at 12:00 PM. Signed by Judge Emmet G. Sullivan on 2/4/2021. (lcegs3) (Entered: 02/04/2021) |
| 02/04/2021 | | MINUTE ORDER granting <u>43</u> SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL. Signed by Judge Emmet G. Sullivan on 2/4/2021. (lcegs3) (Entered: 02/04/2021) |

| | | |
|---|---|---|
| 02/04/2021 | | Set/Reset Deadlines: Reconsideration, If Any, due no later than 12:00PM on 2/4/2021. (mac) (Entered: 02/04/2021) |
| 02/04/2021 | 44 | Emergency MOTION to Stay Removal by BEDAPHECA ALCANTE, ALL PLAINTIFFS, B.A.M.M., B.V.–A., FIDETTE BOUTE, D.J.T.–B., D.J.Z., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., J.A.Z., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA, T.J.T.–B., MARTHA LILIANA TADAY–ACOSTA, JULIEN THOMAS, ROMILUS VALCOURT. (Attachments: # 1 Text of Proposed Order)(Crook, Jamie) (Entered: 02/04/2021) |
| 02/04/2021 | 45 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by BEDAPHECA ALCANTE, ALL PLAINTIFFS, B.A.M.M., B.V.–A., FIDETTE BOUTE, D.J.T.–B., D.J.Z., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., J.A.Z., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA, T.J.T.–B., MARTHA LILIANA TADAY–ACOSTA, JULIEN THOMAS, ROMILUS VALCOURT (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Diana Quilli–Marca)(Crook, Jamie) (Entered: 02/04/2021) |
| 02/04/2021 | 46 | Emergency MOTION to Stay Removal by BEDAPHECA ALCANTE, ALL PLAINTIFFS, B.A.M.M., B.V.–A., FIDETTE BOUTE, D.J.T.–B., D.J.Z., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., J.A.Z., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA, T.J.T.–B., MARTHA LILIANA TADAY–ACOSTA, JULIEN THOMAS, ROMILUS VALCOURT. (Attachments: # 1 Text of Proposed Order)(Crook, Jamie) (Entered: 02/04/2021) |
| 02/04/2021 | 47 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by BEDAPHECA ALCANTE, ALL PLAINTIFFS, B.A.M.M., B.V.–A., FIDETTE BOUTE, D.J.T.–B., D.J.Z., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., J.A.Z., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA, T.J.T.–B., MARTHA LILIANA TADAY–ACOSTA, JULIEN THOMAS, ROMILUS VALCOURT (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Jean Louissaint Fleury, # 3 Declaration of Thechelet Dieudonne, # 4 Declaration of Pouchon Bien–Aime, # 5 Declaration of Elyse Louima)(Crook, Jamie) (Entered: 02/04/2021) |
| 02/04/2021 | | MINUTE ORDER treating as opposed and granting over objection 44 Emergency Motion to Stay Removal. In view of the arguments presented by Plaintiffs in their motion, the Court's February 1, 2021 Minute Order, and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removals of Diana Quilli–Marca (SID 369–752–319) and her minor child N.S.Q. (SID 369–752–531) are STAYED pending further order of this Court. This Order is subject to reconsideration for good cause shown by no later than February 4, 2021 at 10:00 PM. Signed by Judge Emmet G. Sullivan on 2/4/2021. (lcegs3) (Entered: 02/04/2021) |
| 02/04/2021 | | MINUTE ORDER granting 45 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL. Signed by Judge Emmet G. Sullivan on 2/4/2021. (lcegs3) (Entered: 02/04/2021) |
| 02/04/2021 | | MINUTE ORDER treating as opposed and granting over objection 46 Emergency Motion to Stay Removal. In view of the arguments presented by Plaintiffs in their motion, the Court's February 1, 2021 Minute Order, and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removals of the following families are STAYED pending further order of this Court: Thechelet Dieudonne (SID 369–745–511), Juna Delphin (SID 369–745–516), and their minor child T.D. (SID 369–745–519); Pouchon Bien–Aime, (SID 369–780–070), Annediana Desir, (SID 369–780–063), and their minor child P.R.B.A.D. (SID 369–780–078); Jean Louissaint Fleury, (SID 369–780–176), Barbara Fleury Previl, (SID 369–780–197), and their minor children D.L.F. (SID 369–780–189) and M.L. (SID 369–780–181); Elyse Louima (SID 369–739–119), Filande Adolphe (SID 369–739–126), and their minor child E.L.A. (SID 369–739–133). This Order is subject to reconsideration for good cause shown by no later than February 4, 2021 at 10:00 PM. Signed by Judge Emmet G. Sullivan on |

| | | |
|---|---|---|
| | | 2/4/2021. (lcegs3) (Entered: 02/04/2021) |
| 02/04/2021 | | MINUTE ORDER granting 47 Sealed Motion for Leave to File Document Under Seal. Signed by Judge Emmet G. Sullivan on 2/4/2021. (lcegs3) (Entered: 02/04/2021) |
| 02/04/2021 | 48 | Emergency MOTION to Stay Removal by BEDAPHECA ALCANTE, ALL PLAINTIFFS, B.A.M.M., B.V.–A., FIDETTE BOUTE, D.J.T.–B., D.J.Z., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., J.A.Z., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA, T.J.T.–B., MARTHA LILIANA TADAY–ACOSTA, JULIEN THOMAS, ROMILUS VALCOURT. (Attachments: # 1 Text of Proposed Order)(Crook, Jamie) (Entered: 02/04/2021) |
| 02/04/2021 | 49 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by BEDAPHECA ALCANTE, ALL PLAINTIFFS, B.A.M.M., B.V.–A., FIDETTE BOUTE, D.J.T.–B., D.J.Z., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., J.A.Z., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA, T.J.T.–B., MARTHA LILIANA TADAY–ACOSTA, JULIEN THOMAS, ROMILUS VALCOURT (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Fabiana Ferreira Da Costa)(Crook, Jamie) (Entered: 02/04/2021) |
| 02/04/2021 | 64 | SEALED Declaration of DIANA QUILLI–MARCA filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 02/09/2021) |
| 02/04/2021 | 65 | SEALED Declaration of JONNY DIEUDONNE filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 02/09/2021) |
| 02/04/2021 | 66 | SEALED Declarations of Jean Louissaint Fleury, Thechelet Dieudonne, Pouchon Bien–Aime and Elyse Louima filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 02/09/2021) |
| 02/05/2021 | | Set/Reset Deadlines: Motion For Reconsideration due no later than 10:00PM on 2/4/2021. (mac) (Entered: 02/05/2021) |
| 02/05/2021 | | MINUTE ORDER treating as opposed and granting over objection 48 Emergency Motion to Stay Removal. In view of the arguments presented by Plaintiffs in their motion, the Court's February 1, 2021 Minute Order, and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removals of the following families are STAYED pending further order of this Court: Fabiana Ferreira Da Costa (SID 369–729–448), and her minor children M.A.L.F.C. (SID 369–729–454), K.R.F.D.C. (SID 369–729–457), and A.D.M.F.D.C. (SID 369–729–466). This Order is subject to reconsideration for good cause shown by no later than February 5, 2021 at 12:00 PM. Signed by Judge Emmet G. Sullivan on 2/5/2021. (lcegs3) (Entered: 02/05/2021) |
| 02/05/2021 | | MINUTE ORDER granting 49 Sealed Motion for Leave to File Document Under Seal. Signed by Judge Emmet G. Sullivan on 2/5/2021. (lcegs3) (Entered: 02/05/2021) |
| 02/05/2021 | | Set/Reset Deadlines: Motion For Reconsideration due no later than 12:00PM on 2/5/2021. (mac) (Entered: 02/05/2021) |
| 02/05/2021 | 50 | NOTICE of Appearance by Paul R.Q. Wolfson on behalf of T. Alexander Aleinikoff, Deborah Anker, James C. Hathaway, Gerald L. Neuman (Wolfson, Paul) (Entered: 02/05/2021) |
| 02/05/2021 | 51 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Noah A. Levine, Filing fee $ 100, receipt number ADCDC–8169810. Fee Status: Fee Paid. by T. Alexander Aleinikoff, Deborah Anker, James C. Hathaway, Gerald L. Neuman. (Attachments: # 1 Declaration of Noah A. Levine, # 2 Text of Proposed Order)(Wolfson, Paul) (Entered: 02/05/2021) |
| 02/05/2021 | 52 | Unopposed MOTION for Leave to File *a Brief for Scholars of Refugee and Immigration Law as Amici Curiae in Support of Plaintiffs' Motion for Classwide Preliminary Injunction* by T. Alexander Aleinikoff, Deborah Anker, James C. |

| | | |
|---|---|---|
| | | Hathaway, Gerald L. Neuman. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(Wolfson, Paul) (Entered: 02/05/2021) |
| 02/05/2021 | 53 | NOTICE of Appearance by Lee Gelernt on behalf of All Plaintiffs (Gelernt, Lee) (Entered: 02/05/2021) |
| 02/05/2021 | 54 | MOTION for Leave to File *Amicus Curiae Brief* by INTERNATIONAL REFUGEE ASSISTANCE PROJECT. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Austin, Kathryn) (Entered: 02/05/2021) |
| 02/05/2021 | 55 | NOTICE of Appearance by Raymond P. Tolentino on behalf of Historians (Tolentino, Raymond) (Entered: 02/05/2021) |
| 02/05/2021 | 56 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by Historians. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Tolentino, Raymond) (Entered: 02/05/2021) |
| 02/05/2021 | 57 | MOTION for Preliminary Injunction by BEDAPHECA ALCANTE, ALL PLAINTIFFS, B.A.M.M., B.V.–A., FIDETTE BOUTE, D.J.T.–B., D.J.Z., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., J.A.Z., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA, T.J.T.–B., MARTHA LILIANA TADAY–ACOSTA, JULIEN THOMAS, ROMILUS VALCOURT. (Attachments: # 1 Memorandum in Support of Preliminary Injunction, # 2 Text of Proposed Order, # 3 Index of Exhibits, # 4 Declaration of Ming Cheung, # 5 Exhibit A–I, # 6 Declaration of Public Health Experts, # 7 Exhibit A–D, # 8 Declaration of Javier Hidalgo, # 9 Declaration of Allison Herre, # 10 Declaration of Linda Corchado, # 11 Declaration of Lisa Frydman, # 12 Declaration of Taylor Levy)(Gelernt, Lee) (Entered: 02/05/2021) |
| 02/05/2021 | 58 | Emergency MOTION to Stay Removal *of Apollon Family* by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Crook, Jamie) (Entered: 02/05/2021) |
| 02/05/2021 | 59 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by ALL PLAINTIFFS (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Gesnel Apollon)(Crook, Jamie) (Entered: 02/05/2021) |
| 02/05/2021 | 67 | SEALED Declaration of Fabiana Ferreira Da Costa filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 02/09/2021) |
| 02/06/2021 | | MINUTE ORDER treating as opposed and granting over objection 58 Emergency Motion to Stay Removal. In view of the arguments presented by Plaintiffs in their motion, the Court's February 1, 2021 Minute Order, and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removal of the following family is STAYED pending further order of this Court: Gesnel Apollon (SID 369–778–765), Elourdes Bergel (SID#369–778–770), and their minor child, J.A., SID#369–778–776. This Order is subject to reconsideration for good cause shown by no later than February 6, 2021 at 8:00 PM. Signed by Judge Emmet G. Sullivan on 2/6/2021. (lcegs3) (Entered: 02/06/2021) |
| 02/06/2021 | | MINUTE ORDER granting 59 Sealed Motion for Leave to File Document Under Seal. Signed by Judge Emmet G. Sullivan on 2/6/2021. (lcegs3) (Entered: 02/06/2021) |
| 02/06/2021 | 63 | SEALED Declaration of Gesnel Apollon re 58 Emergency MOTION to Stay Removal *of Apollon Family* filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 02/09/2021) |
| 02/08/2021 | | Set/Reset Deadlines: Motion For Reconsideration due no later than 8:00PM on 2/6/2021. (mac) (Entered: 02/08/2021) |
| 02/08/2021 | 60 | Emergency MOTION to Stay Removal *of Desenclos/Emile, Jean, Lalune, and Thomas Families* by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Crook, Jamie) (Entered: 02/08/2021) |
| 02/08/2021 | 61 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by ALL PLAINTIFFS (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Clema |

| | | |
|---|---|---|
| | | Thomas, # 3 Declaration of David Jean, # 4 Declaration of Danie Lalune, # 5 Declaration of Ketlene Emile)(Crook, Jamie) (Entered: 02/08/2021) |
| 02/09/2021 | | MINUTE ORDER treating as opposed and granting over objection 60 Emergency Motion to Stay Removal. In view of the arguments presented by Plaintiffs in their motion, the Court's February 1, 2021 Minute Order, and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removal of the following families are STAYED pending further order of this Court: Ketlene Emile (SID#369–736–280), Michel Riverson Cliff Salis Desenclos (SID#369– 736–194), and their minor child A.D.E. (SID#369–736–308); David Jean (SID# 369–789–160), Edwidge Civil (SID#369–789–185), and their minor child A.J. (SID#369–789–192); Danie Lalune (SID# 369–782–922), Wesley Lalune (SID# 369–782–907), and their two minor children D.L. (SID# 369–782–935) and C.M.L. (SID# 369–782–949); Clema Thomas (SID#369–781–406), Lyesse Sylen (SID#369–783–314), and their minor children A.G.T.S. (SID#369–781–423) and A.G.D. (SID#369–783–326). This Order is subject to reconsideration for good cause shown by no later than February 9, 2021 at 12:00 PM. Signed by Judge Emmet G. Sullivan on 2/9/2021. (lcegs3) (Entered: 02/09/2021) |
| 02/09/2021 | | MINUTE ORDER granting 61 Sealed Motion for Leave to File Document Under Seal. Signed by Judge Emmet G. Sullivan on 2/9/2021. (lcegs3) (Entered: 02/09/2021) |
| 02/09/2021 | 62 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Tamara F. Goodlette, Filing fee $ 100, receipt number ADCDC–8180349. Fee Status: Fee Paid. by BEDAPHECA ALCANTE, B.A.M.M., B.V.–A., FIDETTE BOUTE, D.J.T.–B., D.J.Z., E.R.P.D.S., H.N.D.S., H.T.D.S.D.S., NANCY GIMENA HUISHA–HUISHA, I.M.C.H., J.A.Z., M.E.S.D.S., VALERIA MACANCELA BERMEJO, JOSAINE PEREIRA–DE SOUZA, T.J.T.–B., MARTHA LILIANA TADAY–ACOSTA, JULIEN THOMAS, ROMILUS VALCOURT. (Perez, Celso) (Entered: 02/09/2021) |
| 02/09/2021 | 70 | SEALED Declaration of Clema Thomas,David Jean, Danie Lalune, Ketlene Emile filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 02/10/2021) |
| 02/10/2021 | | Set/Reset Deadlines: Motion For Reconsideration due no later than 12:00PM on 2/9/2021. (mac) (Entered: 02/10/2021) |
| 02/10/2021 | 68 | NOTICE of Appearance by Stephen Bonggyun Kang on behalf of All Plaintiffs (Kang, Stephen) (Entered: 02/10/2021) |
| 02/10/2021 | 69 | NOTICE of Appearance by Cody H. Wofsy on behalf of All Plaintiffs (Wofsy, Cody) (Entered: 02/10/2021) |
| 02/10/2021 | 71 | NOTICE of Appearance by Daniel Antonio Galindo on behalf of All Plaintiffs (Galindo, Daniel) (Entered: 02/10/2021) |
| 02/10/2021 | 72 | NOTICE of Appearance by Ming Cheung on behalf of All Plaintiffs (Cheung, Ming) (Entered: 02/10/2021) |
| 02/10/2021 | 73 | NOTICE of Appearance by Morgan Russell on behalf of All Plaintiffs (Russell, Morgan) (Entered: 02/10/2021) |
| 02/10/2021 | 74 | NOTICE of Appearance by Omar C. Jadwat on behalf of All Plaintiffs (Jadwat, Omar) (Entered: 02/10/2021) |
| 02/11/2021 | | MINUTE ORDER granting 51 motion for leave to appear pro hac vice. Noah A. Levine is hereby admitted pro hac vice in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Emmet G. Sullivan on 2/11/2021. (lcegs3) (Entered: 02/11/2021) |
| 02/11/2021 | | MINUTE ORDER granting 62 motion for leave to appear pro hac vice. Tamara F. Goodlette is hereby admitted pro hac vice in this action. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Emmet G. Sullivan on 2/11/2021. (lcegs3) (Entered: 02/11/2021) |

| 02/11/2021 | | MINUTE ORDER granting 52 Unopposed MOTION for Leave to File a Brief for Scholars of Refugee and Immigration Law as Amici Curiae in Support of Plaintiffs' Motion for Class–wide Preliminary Injunction. The [52–1] amicus brief shall be deemed filed as of February 11, 2021. Signed by Judge Emmet G. Sullivan on 2/11/2021. (lcegs3) (Entered: 02/11/2021) |
| 02/11/2021 | | MINUTE ORDER granting 54 MOTION for Leave to File Amicus Curiae Brief by INTERNATIONAL REFUGEE ASSISTANCE PROJECT. The [54–1] amicus brief shall be deemed filed as of February 11, 2021. Signed by Judge Emmet G. Sullivan on 2/11/2021. (lcegs3) (Entered: 02/11/2021) |
| 02/11/2021 | | MINUTE ORDER granting 56 Unopposed MOTION for Leave to File Amicus Curiae Brief by Historians. The [56–1] amicus brief shall be deemed filed as of February 11, 2021. Signed by Judge Emmet G. Sullivan on 2/11/2021. (lcegs3) (Entered: 02/11/2021) |
| 02/11/2021 | 75 | NOTICE of Appearance by Noah A. Levine on behalf of T. ALEXANDER ALEINIKOFF, DEBORAH ANKER, JAMES C. HATHTAWAY, GERALD L. NEUMAN (Levine, Noah) (Entered: 02/11/2021) |
| 02/11/2021 | 77 | AMICUS BRIEF by T. ALEXANDER ALEINIKOFF, DEBORAH ANKER, JAMES C. HATHTAWAY, GERALD L. NEUMAN. (znmw) (Entered: 02/18/2021) |
| 02/11/2021 | 78 | AMICUS BRIEF by INTERNATIONAL REFUGEE ASSISTANCE PROJECT. (znmw) (Entered: 02/18/2021) |
| 02/11/2021 | 79 | AMICUS BRIEF by HISTORIANS. (znmw) (Entered: 02/18/2021) |
| 02/17/2021 | 76 | Memorandum in opposition to re 23 MOTION to Certify Class , 57 MOTION for Preliminary Injunction filed by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Attachments: # 1 Exhibits A–E, # 2 Declaration of Troy Miller, # 3 Declaration of Russell Hott)(Tepe, Sean) (Entered: 02/17/2021) |
| 02/18/2021 | 80 | Emergency MOTION to Stay *Removal* by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) (Entered: 02/18/2021) |
| 02/18/2021 | 81 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by ALL PLAINTIFFS (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Torres–Rojas)(Gelernt, Lee) (Entered: 02/18/2021) |
| 02/18/2021 | | MINUTE ORDER treating as opposed and granting over objection 80 Emergency Motion to Stay Removal. In view of the arguments presented by Plaintiffs in their motion, the Court's February 1, 2021 Minute Order, and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removal of the following family is STAYED pending further order of this Court: Paola Trinidad Torres–Rojas (SID 369–842–359) and her minor child M.J.Z.T. (SID 369–842–362). This Order is subject to reconsideration for good cause shown by no later than February 18, 2021 at 7:00 PM. Signed by Judge Emmet G. Sullivan on 2/18/2021. (lcegs3) (Entered: 02/18/2021) |
| 02/18/2021 | | MINUTE ORDER granting 81 sealed motion for leave to file document under seal. Signed by Judge Emmet G. Sullivan on 2/18/2021. (lcegs3) (Entered: 02/18/2021) |
| 02/18/2021 | 88 | SEALED Declaration of Bebeto Pierrot filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 02/24/2021) |
| 02/18/2021 | 89 | SEALED Declaration of Torres–Rojas filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 02/24/2021) |
| 02/19/2021 | | Set/Reset Deadlines: Motion For Reconsideration due no later than 7:00PM on 2/18/2021. (mac) (Entered: 02/19/2021) |
| 02/19/2021 | 82 | Emergency MOTION to Stay *Removal* by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) (Entered: 02/19/2021) |

App. 35

| 02/19/2021 | 83 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by ALL PLAINTIFFS (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Francois)(Gelernt, Lee) (Entered: 02/19/2021) |
|---|---|---|
| 02/19/2021 | | MINUTE ORDER treating as opposed and granting over objection 82 Emergency Motion to Stay Removal. In view of the arguments presented by Plaintiffs in their motion, the Court's February 1, 2021 Minute Order, and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removal of the following family is STAYED pending further order of this Court: Fredenel Francois (SID 369–772–515), Guyvlena Malvoisin, (SID 369–772–487), and their minor child, P.A.S.G.M. (SID 369–772–547). This Order is subject to reconsideration for good cause shown by no later than February 19, 2021 at 3:00 PM. Signed by Judge Emmet G. Sullivan on 2/19/2021. (lcegs3) (Entered: 02/19/2021) |
| 02/19/2021 | | MINUTE ORDER granting 83 sealed motion for leave to file document under seal. Signed by Judge Emmet G. Sullivan on 2/19/2021. (lcegs3) (Entered: 02/19/2021) |
| 02/19/2021 | | Set/Reset Deadlines: Motion For Reconsideration due no later than 3:00PM on 2/19/2021. (mac) (Entered: 02/19/2021) |
| 02/19/2021 | 84 | SEALED Declaration of Francois filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) (Entered: 02/19/2021) |
| 02/19/2021 | 85 | Emergency MOTION to Stay *Removal of the Pierrot Family* by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Russell, Morgan) (Entered: 02/19/2021) |
| 02/19/2021 | 86 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by ALL PLAINTIFFS (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Bebeto Pierrot)(Russell, Morgan) (Entered: 02/19/2021) |
| 02/22/2021 | | MINUTE ORDER treating as opposed and granting over objection 85 Emergency Motion to Stay Removal. In view of the arguments presented by Plaintiffs in their motion, the Court's February 1, 2021 Minute Order, and for the reasons stated on the record at the January 12, 2021 Status Conference, it is hereby ORDERED that the removal of the following family is STAYED pending further order of this Court: Bebeto Pierrot, SID 369–772–300, Nadine Remilus, SID 369–772–363, and their minor child M.A.P., SID 369–868–214. This Order is subject to reconsideration for good cause shown by no later than February 22, 2021 at 3:00 PM. Signed by Judge Emmet G. Sullivan on 2/22/2021. (lcegs3) (Entered: 02/22/2021) |
| 02/22/2021 | | MINUTE ORDER granting 86 Sealed Motion for Leave to File Document Under Seal. Signed by Judge Emmet G. Sullivan on 2/22/2021. (lcegs3) (Entered: 02/22/2021) |
| 02/22/2021 | | Set/Reset Deadlines: Motion For Reconsideration due no later than 3:00PM on 2/22/2021. (mac) (Entered: 02/22/2021) |
| 02/22/2021 | 90 | SEALED DOCUMENT (Declaration of Bebeto Pierrot) filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(znmw) (Entered: 02/26/2021) |
| 02/23/2021 | 87 | Joint MOTION to Stay *Joint Motion to Hold in Abeyance Plaintiffs' Class Certification and Preliminary Injunction Motions* by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO N. MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) (Entered: 02/23/2021) |
| 02/23/2021 | | MINUTE ORDER granting 87 joint motion to hold in abeyance Plaintiffs' motions for class certification and classwide preliminary injunction. It is FURTHER ORDERED that either party may request termination of the abeyance by filing a motion seeking such relief. It is FURTHER ORDERED that Plaintiffs shall file their reply in support of their motions for class certification and preliminary injunction by no later than March 23, 2021. Signed by Judge Emmet G. Sullivan on 2/23/2021. (lcegs3) (Entered: 02/23/2021) |
| 02/24/2021 | | Set/Reset Deadlines: Plaintiffs Reply In Support Of Their Motions For Class Certification And Preliminary Injunction due by 3/23/2021. (mac) (Entered: |

| | | 02/24/2021) |
|---|---|---|
| 02/25/2021 | 91 | ENTERED IN ERROR AS A DUPLICATE DE# 90 ..SEALED Declaration of Bebeto Pierrot filed by ALL PLAINTIFFS. (This document is SEALED and only available to authorized persons.)(zjf) Modified on 2/26/2021 (zjf). (Entered: 02/26/2021) |
| 02/26/2021 | 92 | NOTICE of Appearance by Geroline A Castillo on behalf of INTERNATIONAL REFUGEE ASSISTANCE PROJECT (Castillo, Geroline) (Entered: 02/26/2021) |
| 03/15/2021 | 93 | NOTICE of Appearance by Karla Vargas on behalf of All Plaintiffs (Vargas, Karla) (Entered: 03/15/2021) |
| 03/15/2021 | 94 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ALEX M. AZAR, II served on 1/25/2021; JONATHAN FAHEY served on 1/19/2021; WILLIAM A. FERRARA served on 1/19/2021; PETER T. GAYNOR served on 1/19/2021; MARK A. MORGAN served on 1/19/2021; ROBERT R. REDFIELD served on 1/19/2021; RODNEY S. SCOTT served on 1/19/2021 (Cheung, Ming) (Entered: 03/15/2021) |
| 03/15/2021 | 95 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 01/19/2021. (Cheung, Ming) (Entered: 03/15/2021) |
| 03/15/2021 | 96 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 1/21/2021. Answer due for ALL FEDERAL DEFENDANTS by 3/22/2021. (Cheung, Ming) (Entered: 03/15/2021) |
| 03/16/2021 | 97 | Joint MOTION for Protective Order by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Attachments: # 1 Proposed Stipulated Protective Order)(Tepe, Sean) (Entered: 03/16/2021) |
| 03/16/2021 | 98 | Consent MOTION to Vacate *Answer Deadline and Set Joint Status Report Deadline* by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) (Entered: 03/16/2021) |
| 03/22/2021 | 99 | Joint MOTION to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) Modified on 3/22/2021 to correct docket event/text(zjf). (Entered: 03/22/2021) |
| 03/22/2021 | | MINUTE ORDER granting 97 joint motion for entry of a stipulated protective order. The terms presented in [97–1] Stipulated Protective Order are hereby incorporated by reference into this Order. Signed by Judge Emmet G. Sullivan on 3/22/2021. (lcegs3) (Entered: 03/22/2021) |
| 03/22/2021 | | MINUTE ORDER granting 98 consent motion to vacate answer deadline and set joint status report deadline. It is hereby ORDERED that the March 22, 2021 deadline for Defendants to answer or otherwise respond to the Amended Complaint is VACATED. It is FURTHER ORDERED that the parties shall file a joint status report within fourteen days from the date of the Court's decisions on Plaintiffs' Motions for Class Certification and Classwide Preliminary Injunction. Signed by Judge Emmet G. Sullivan on 3/22/2021. (lcegs3) (Entered: 03/22/2021) |
| 03/22/2021 | | MINUTE ORDER granting 99 joint motion to continue to hold in abeyance Plaintiffs' Motions for Class Certification and Classwide Permanent Injunction until April 2, 2021. Plaintiffs shall file their reply in support of their motions by no later than April 2, 2021. Signed by Judge Emmet G. Sullivan on 3/22/2021. (lcegs3) (Entered: 03/22/2021) |
| 03/23/2021 | | Set/Reset Deadlines: Plaintiff Reply due by 4/2/2021. (mac) (Entered: 03/23/2021) |
| 04/01/2021 | 100 | Joint MOTION To Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, |

| | | |
|---|---|---|
| | | RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) Modified on 4/2/2021 (zjf). (Entered: 04/01/2021) |
| 04/02/2021 | | MINUTE ORDER granting 100 joint motion to continue holding in abeyance Plaintiffs' motions for class certification and classwide preliminary injunction. It is FURTHER ORDERED that Plaintiffs shall file their reply in support of their motions for class certification and preliminary injunction by no later than April 12, 2021. Signed by Judge Emmet G. Sullivan on 4/2/2021. (lcegs3) (Entered: 04/02/2021) |
| 04/03/2021 | | Set/Reset Deadlines: Plaintiffs Reply In Support Of Their Motions For Class Certification And Preliminary Injunction due by 4/12/2021. (mac) (Entered: 04/03/2021) |
| 04/05/2021 | 101 | NOTICE OF WITHDRAWAL OF APPEARANCE as to ALL PLAINTIFFS. Attorney Celso Perez terminated. (Gelernt, Lee) (Entered: 04/05/2021) |
| 04/11/2021 | 102 | Joint MOTION to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) (Entered: 04/11/2021) |
| 04/12/2021 | | MINUTE ORDER granting 102 joint motion to continue to hold in abeyance Plaintiffs' Motions for Class Certification and Classwide Permanent Injunction until April 22, 2021. It is FURTHER ORDERED that Plaintiffs shall file their reply in support of their motions for class certification and preliminary injunction by no later than April 22, 2021. Signed by Judge Emmet G. Sullivan on 4/12/2021. (lcegs3) (Entered: 04/12/2021) |
| 04/13/2021 | | Set/Reset Deadlines: Plaintiffs Reply In Support of Their Motions For Class Certification And Preliminary Injunction due by 4/22/2021. (mac) (Entered: 04/13/2021) |
| 04/22/2021 | 103 | Joint MOTION to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) Modified on 4/23/2021 to correct event/text (zjf). (Entered: 04/22/2021) |
| 04/22/2021 | 104 | NOTICE of Appearance by Tamara Goodlette on behalf of All Plaintiffs (Goodlette, Tamara) (Entered: 04/22/2021) |
| 04/26/2021 | | MINUTE ORDER granting 103 joint motion to continue to hold in abeyance Plaintiffs' Motions for Class Certification and Classwide Permanent Injunction until May 3, 2021. Plaintiffs shall file their reply in support of their motions for class certification and preliminary injunction on May 3, 2021. Signed by Judge Emmet G. Sullivan on 4/26/2021. (lcegs3) (Entered: 04/26/2021) |
| 04/26/2021 | | Set/Reset Deadlines: Plaintiffs Reply In Support Of Their Motions For Class Certification And Preliminary Injunction due by 5/3/2021. (mac) (Entered: 04/26/2021) |
| 05/03/2021 | 105 | Joint MOTION to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) (Entered: 05/03/2021) |
| 05/04/2021 | | MINUTE ORDER granting 105 joint motion to continue to hold in abeyance Plaintiffs' Motions for Class Certification and Classwide Permanent Injunction. Plaintiffs shall file their reply in support of their motions for class certification and preliminary injunction by no later than May 13, 2021. Signed by Judge Emmet G. Sullivan on 5/4/2021. (lcegs3) (Entered: 05/04/2021) |
| 05/05/2021 | | Set/Reset Deadlines: Plaintiffs Reply In Support Of Their Motions For Class Certification And Preliminary Injunction due by 5/13/2021. (mac) (Entered: 05/05/2021) |

| 05/13/2021 | 106 | Joint MOTION to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) Modified on 5/14/2021 to correct docket event/text (zjf). (Entered: 05/13/2021) |
|---|---|---|
| 05/17/2021 | | MINUTE ORDER granting 106 joint motion to continue to hold in abeyance Plaintiffs' Motions for Class Certification and Classwide Permanent Injunction. Plaintiffs shall file their reply in support of their motions for class certification and preliminary injunction by no later than May 25, 2021. Signed by Judge Emmet G. Sullivan on 5/17/2021. (lcegs3) (Entered: 05/17/2021) |
| 05/18/2021 | | ENTERED IN ERROR....Set/Reset Deadlines: Plaintiffs Reply In Support Of Their Motions For Class Certification And Preliminary Injunction due by 5/2/2021. (mac) (Entered: 05/18/2021) |
| 05/18/2021 | | Set/Reset Deadlines: Plaintiffs Reply In Support Of Their Motions For Class Certification And Preliminary Injunction due by 5/2/2021 (mac) (Entered: 05/18/2021) |
| 05/25/2021 | 107 | Joint MOTION to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) Modified on 5/26/2021 to correct docket event/text (zjf). (Entered: 05/25/2021) |
| 05/27/2021 | | MINUTE ORDER granting 107 joint motion to continue to hold in abeyance Plaintiffs' Motions for Class Certification and Classwide Permanent Injunction. Plaintiffs shall file their reply in support of their motions for class certification and preliminary injunction by no later than June 8, 2021. Signed by Judge Emmet G. Sullivan on 5/27/2021. (lcegs3) (Entered: 05/27/2021) |
| 05/27/2021 | | Set/Reset Deadlines: Plaintiffs Reply In Support Of Their Motions For Class Certification And Preliminary Injunction due by 6/8/2021. (mac) (Entered: 05/27/2021) |
| 06/08/2021 | 108 | Joint MOTION to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) Modified on 6/9/2021 to correct docket event/text (zjf). (Entered: 06/08/2021) |
| 06/09/2021 | | MINUTE ORDER granting 108 Joint Motion to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction. Plaintiffs shall file their reply brief in support of their motions for class certification and preliminary injunction by no later than June 18, 2021. Signed by Judge Emmet G. Sullivan on 6/9/2021. (lcegs3) (Entered: 06/09/2021) |
| 06/10/2021 | | Set/Reset Deadlines: Plaintiffs Reply Brief In Support Of Their Motions For Class Certification And Preliminary Injunction due by 6/18/2021. (mac) (Entered: 06/10/2021) |
| 06/18/2021 | 109 | Joint MOTION to Continue in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) Modified on 6/21/2021 to correct docket event/text (zjf). (Entered: 06/18/2021) |
| 06/22/2021 | | MINUTE ORDER granting 109 Joint Motion to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction. Plaintiffs shall file their reply brief in support of their motions for class certification and preliminary injunction by no later than July 2, 2021. Signed by Judge Emmet G. Sullivan on 6/22/2021. (lcegs3) (Entered: 06/22/2021) |
| 06/22/2021 | | Set/Reset Deadlines: Plaintiffs Reply Brief In Support Of Motions For Class Certification And Preliminary Injunction due by 7/2/2021. (mac) (Entered: 06/22/2021) |

| 07/02/2021 | 110 | Joint MOTION to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY, XAVIER BECERRA. (Tepe, Sean) Modified on 7/6/2021 to correct docket event/text (zjf). (Entered: 07/02/2021) |
|---|---|---|
| 07/09/2021 | | MINUTE ORDER granting 110 Joint Motion to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction. Plaintiffs shall file their reply brief in support of their motions for class certification and preliminary injunction by no later than July 16, 2021. Signed by Judge Emmet G. Sullivan on 7/9/2021. (lcegs3) (Entered: 07/09/2021) |
| 07/09/2021 | | Set/Reset Deadlines: Plaintiffs Reply Brief In Support Of Their Motions For Class Certification And Preliminary Injunction due by 7/16/2021. (mac) (Entered: 07/09/2021) |
| 07/16/2021 | 111 | Joint MOTION to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction by XAVIER BECERRA, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) Modified on 7/19/2021 to correct docket event/text (zjf). (Entered: 07/16/2021) |
| 07/19/2021 | | MINUTE ORDER granting 111 Joint Motion to Continue Holding in Abeyance Plaintiffs' Motions for Class Certification and Preliminary Injunction. Plaintiffs shall file their reply brief in support of their motions for class certification and preliminary injunction by no later than August 2, 2021. Signed by Judge Emmet G. Sullivan on 7/19/2021. (lcegs1) (Entered: 07/19/2021) |
| 07/19/2021 | | Set/Reset Deadlines: Plaintiffs Reply Brief In Support Of Their Motions For Class Certification And Preliminary Injunction due by 8/2/2021. (mac) (Entered: 07/19/2021) |
| 08/02/2021 | 112 | Joint MOTION for Briefing Schedule *on Plaintiffs' Motions for Class Certification and Classwide Preliminary Injunction* by ALL PLAINTIFFS. (Gelernt, Lee) (Entered: 08/02/2021) |
| 08/02/2021 | | MINUTE ORDER. In view of 112 joint motion to reset briefing schedule, in which the parties indicated that efforts "to resolve or narrow the dispute in this case have reached an impasse," the parties are DIRECTED to file a joint status report by no later than August 4, 2021 informing the Court whether this case would benefit from referral to a magistrate judge, mediation, or any other form of alternative dispute resolution that can be tailored to the needs of their case. Signed by Judge Emmet G. Sullivan on 8/2/2021. (lcegs3) (Entered: 08/02/2021) |
| 08/02/2021 | 113 | MOTION for Leave to File *Supplemental Declaration* by XAVIER BECERRA, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Attachments: # 1 Declaration of David Shahoulian)(Tepe, Sean) (Entered: 08/02/2021) |
| 08/02/2021 | 114 | NOTICE *NOTICE OF CDC PUBLIC HEALTH ORDER* by XAVIER BECERRA, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY (Tepe, Sean) (Entered: 08/02/2021) |
| 08/03/2021 | | Set/Reset Deadlines: Joint Status Report due by 8/4/2021 (mac) (Entered: 08/03/2021) |
| 08/04/2021 | 115 | RESPONSE TO ORDER OF THE COURT re Order,, *Joint Response to Court's August 2, 2021 Order Concerning Further Mediation or Alternative Dispute Resolution* filed by XAVIER BECERRA, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (Tepe, Sean) (Entered: 08/04/2021) |
| 08/05/2021 | | MINUTE ORDER granting nunc pro tunc 112 joint motion to reset briefing schedule on Plaintiffs' motions for class certification and classwide preliminary injunction. It is HEREBY ORDERED that Defendants shall file their supplemental declaration in support of their combined opposition to Plaintiffs' motions for class certification and classwide preliminary injunction by no later than August 2, 2021; and that Plaintiffs shall file their combined reply in support of those motions by no later than August 11, |

| | | 2021. Signed by Judge Emmet G. Sullivan on 8/5/2021. (lcegs3) (Entered: 08/05/2021) |
|---|---|---|
| 08/05/2021 | | MINUTE ORDER granting 113 motion for leave to file supplemental declaration. The Clerk of Court is directed to file the supplemental declaration, ECF No. 113–1, as a separate docket entry. Signed by Judge Emmet G. Sullivan on 8/5/2021. (lcegs3) (Entered: 08/05/2021) |
| 08/06/2021 | | Set/Reset Deadlines: Defendants Supplemental Declaration In Support Of Their Combined Opposition To Plaintiffs' Motions For Class Certification And Classwide Preliminary Injunction due by 08/02/2021. Plaintiffs Reply In Support Of Those Motions due by 08/11/2021. (mac) (Entered: 08/06/2021) |
| 08/06/2021 | 116 | DECLARATION of David Shahoulian re Combined Opposition (ECF No. 76 ) to Plaintiffs Motion for Class Certification (ECF No. 23 ) and Motion for Classwide Preliminary Injunction (ECF No. 57 ). by XAVIER BECERRA, NORRIS COCHRAN, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY. (zjf) (Entered: 08/06/2021) |
| 08/11/2021 | 117 | MOTION for Oral Argument by XAVIER BECERRA, WILLIAM A. FERRARA, TAE D. JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, RODNEY S. SCOTT, ROCHELLE P. WALENSKY re 57 MOTION for Preliminary Injunction (Tepe, Sean) Modified on 8/12/2021 to correct docket event/text (zjf). (Entered: 08/11/2021) |
| 08/11/2021 | 118 | REPLY to opposition to motion re 23 MOTION to Certify Class , 57 MOTION for Preliminary Injunction filed by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Index of Exhibits, # 3 Declaration of Taylor Levy, # 4 Declaration of Julia Neusner, # 5 Declaration of Jennifer K. Harbury, # 6 Declaration of Erika Pinheiro, # 7 Declaration of Savitri Arvey, # 8 Declaration (Supplemental) of Former CDC Officials, # 9 Declaration of 32 Medical and Public Health Experts, # 10 Declaration (Second) of Ming Cheung, # 11 Declaration of Linda Rivas, # 12 Declaration of Marisa Limn Garza, # 13 Declaration of Astrid Dominguez, # 14 Declaration of Chelsea Sachau, # 15 Declaration of Mdecins Sans Frontieres Medical Coordinator in Mexico, # 16 Declaration of Teresa Cavendish, # 17 Declaration of Kate Clark, # 18 Declaration of Aaron Reichlin–Melnick, # 19 Declaration of Alan E. Valdez Jurez, # 20 Declaration of Edgar Ramrez Lpez, # 21 Declaration of Samuel Thomas Bishop, # 22 Declaration of Luis Alberto Lizarraga Tolentino, # 23 Declaration of Cecilia Menjvar, Ph.D.)(Gelernt, Lee) (Entered: 08/11/2021) |
| 08/11/2021 | 119 | MOTION for Leave to File Reply Declarations by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) (Entered: 08/11/2021) |
| 08/16/2021 | 120 | NOTICE of Appearance by Daniel S. Volchok on behalf of T. ALEXANDER ALEINIKOFF, DEBORAH ANKER, JAMES C. HATHTAWAY, GERALD L. NEUMAN (Volchok, Daniel) (Entered: 08/16/2021) |
| 08/16/2021 | 121 | NOTICE OF WITHDRAWAL OF APPEARANCE as to T. ALEXANDER ALEINIKOFF, DEBORAH ANKER, JAMES C. HATHTAWAY, GERALD L. NEUMAN. Attorney Paul R.Q. Wolfson terminated. (Wolfson, Paul) (Entered: 08/16/2021) |
| 09/13/2021 | | MINUTE ORDER granting 119 unopposed motion for leave to file reply declarations. Signed by Judge Emmet G. Sullivan on 9/13/2021. (lcegs3) (Entered: 09/13/2021) |
| 09/16/2021 | 122 | ORDER granting 23 Motion to Certify Class; granting 57 Motion for Preliminary Injunction; denying 117 Motion for Hearing. Signed by Judge Emmet G. Sullivan on 9/16/2021. (lcegs3) (Entered: 09/16/2021) |
| 09/16/2021 | 123 | MEMORANDUM OPINION. Signed by Judge Emmet G. Sullivan on 9/16/2021. (lcegs3) (Entered: 09/16/2021) |
| 09/17/2021 | 124 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 122 Order on Motion to Certify Class, Order on Motion for Preliminary Injunction, Order on Motion for Hearing, 123 Memorandum & Opinion by TAE D. JOHNSON, TROY MILLER, ROCHELLE P. WALENSKY, ALEJANDRO J. MAYORKAS, XAVIER BECERRA, WILLIAM A. FERRARA, RODNEY S. SCOTT. Fee Status: No Fee Paid. Parties |

| | | |
|---|---|---|
| | | have been notified. (Attachments: # 1 Exhibit District Court Order, # 2 Exhibit District Court Memorandum Opinion)(Tepe, Sean) (Entered: 09/17/2021) |
| 09/17/2021 | 125 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 124 Notice of Appeal to DC Circuit Court. (zjf) (Entered: 09/17/2021) |
| 09/17/2021 | | USCA Case Number 21–5200 for 124 Notice of Appeal to DC Circuit Court, filed by XAVIER BECERRA, ALEJANDRO J. MAYORKAS, RODNEY S. SCOTT, WILLIAM A. FERRARA, ROCHELLE P. WALENSKY, TAE D. JOHNSON, TROY MILLER. (zjf) (Entered: 09/21/2021) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NANCY GIMENA HUISHA-HUISHA, and her minor child I.M.C.H.*; VALERIA MACANCELA BERMEJO, and her minor daughter, B.A.M.M.*; JOSAINE PEREIRA-DE SOUZA, and her minor children H.N.D.S.*; E.R.P.D.S.*; M.E.S.D.S.*; H.T.D.S.D.S.*;  MARTHA LILIANA TADAY-ACOSTA, and her minor children D.J.Z.*; J.A.Z.*; JULIEN THOMAS, FIDETTE BOUTE, and their minor children D.J.T.-B.*; T.J.T.-B.*; and ROMILUS VALCOURT, BEDAPHECA ALCANTE, and their minor child, B.V.-A.*; on behalf of themselves and others similarly situated, c/o American Civil Liberties Union 125 Broad Street, 18th Floor New York, NY 10004; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 21-cv-100-EGS |
| | ) ) | |
| *Plaintiffs*, | ) ) | |
| | ) | |
| v. | ) ) | |
| | ) | |
| DAVID PEKOSKE,** ACTING SECRETARY OF HOMELAND SECURITY, in his official capacity, Department of Homeland Security 245 Murray Lane SW Washington, DC 20528; | ) ) ) ) ) ) | |
| | ) | |
| TROY MILLER,** SENIOR OFFICIAL PERFORMING THE DUTIES OF THE COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION ("CBP"), in his official capacity, U.S. Customs and Border Protection 1300 Pennsylvania Ave. NW Washington, DC 20229; | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| WILLIAM A. FERRARA, EXECUTIVE ASSISTANT COMMISSIONER, CBP OFFICE OF FIELD OPERATIONS, in his official capacity, CBP Office of Field Operations 1300 Pennsylvania Ave. NW Washington, DC 20229; | ) ) ) ) ) ) ) | |
| | ) | |
| RODNEY S. SCOTT, CHIEF OF U.S. BORDER PATROL, in his official capacity, U.S. Border Patrol 1300 Pennsylvania Ave. NW Washington, DC 20229; | ) ) ) ) ) ) ) | |

TAE D. JOHNSON,** SENIOR OFFICIAL                )
PERFORMING THE DUTIES OF THE DIRECTOR            )
OF U.S. IMMIGRATION AND CUSTOMS                  )
ENFORCEMENT, in his official capacity,           )
U.S. Immigration and Customs Enforcement,        )
500 12th Street SW                               )
Washington, DC 20536;                            )
                                                 )
NORRIS COCHRAN,** ACTING SECRETARY               )
OF HEALTH AND HUMAN SERVICES, in his             )
official capacity,                               )
U.S. Department of Health and Human Services     )
Hubert H. Humphrey Building                      )
200 Independence Ave. SW                         )
Washington, DC 20201;                            )
                                                 )
DR. ROCHELLE P. WALENSKY,** DIRECTOR             )
OF THE CENTERS FOR DISEASE CONTROL               )
AND PREVENTION, in her official capacity,        )
Centers for Disease Control and Prevention       )
1600 Clifton Road                                )
Atlanta, GA 30329;                               )
                                                 )
_Defendants._                                    )

## FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Violations of Public Health Service Act, Refugee Act, Foreign Affairs Reform and Restructuring Act of 1998, Immigration and Nationality Act, and Administrative Procedure Act)

*Proceeding under pseudonyms pursuant to Federal Rule of Civil Procedure 5.2(a).
** Automatically substituted pursuant to Federal Rule of Civil Procedure 25(d).

## INTRODUCTION

1.      In 2020, the federal government established an unlawful system for restricting immigration along the Canadian and Mexican borders under the purported authority of 42 U.S.C. § 265, a public health provision.  This system is established in a set of agency documents—a new regulation, several orders, and an implementation memo—which Plaintiffs collectively refer to as the "Title 42 Process" or "Title 42 Policy."  The stated purpose of the Policy is to protect against COVID-19.

2.      A certified class of unaccompanied children previously challenged this Title 42 Process, as unauthorized by any law and contrary to the statutes Congress has enacted.  The Process has been enjoined as to unaccompanied children, with all three Judges to have examined the issue agreeing that it's likely unlawful.  *See P.J.E.S. by & through Escobar Francisco v. Wolf*, __ F. Supp. 3d. ___, No. 20-CV-2245-EGS, 2020 WL 6770508 (D.D.C. Nov. 18, 2020) (Sullivan, J., adopting report and recommendation of Harvey, J.); *J.B.B.C. v. Wolf*, No. 20-CV-1509-CJN, 2020 WL 6041870 (D.D.C. June 26, 2020) (Nichols, J.).

3.      Among other things, the Title 42 Process authorizes the summary expulsion of noncitizens, including vulnerable families seeking asylum in this country, without any of the procedural protections guaranteed by Congress—even if the families show no signs of having COVID-19.

4.      Plaintiffs are six families that fled their countries and are seeking safety in the United States.  Prior to the Title 42 Process, and pursuant to longstanding immigration statutes protecting asylum seekers, Plaintiffs were entitled to assert claims for asylum and related forms of humanitarian protection, and to procedures Congress established to ensure the fair determination of their right to remain in the United States.

5.      Through the Title 42 Process, the Trump Administration sought to usurp Congress's role

and bypass the entire immigration statutory scheme.  Specifically, the Trump Administration contended that public health provisions in Title 42 of the U.S. Code—provisions that have rarely been used and never in this way—allow it to set aside the immigration laws.

6.      Title 42 authorizes various powers, such as testing and quarantines, but has never been interpreted to authorize the broad powers the government is claiming here.

7.      Not only does the Title 42 Process violate the immigration statutes, it is also patently arbitrary and capricious from a public health standpoint.

8.      The principal stated justifications for the Title 42 Process are that it is necessary to protect border officers and that the introduction of persons into congregate settings poses a danger to public health.  Specifically, the government asserts that when a person arrives at the border seeking protection and lacks a visa, border agents from the Department of Homeland Security ("DHS") will be forced to spend additional time screening the individual under the immigration laws, thereby exposing the officers to great danger.  But as public health experts have uniformly explained, numerous safety measures are available, including social distancing, face masks, and gloves.

9.      Indeed, the entire Title 42 Process was established as a pretext.  Numerous press reports show that expert scientists at the Centers for Disease Control and Prevention rejected the use of public health powers to expel noncitizens as unnecessary, but the Process was nevertheless imposed on the CDC by former White House officials seeking to limit immigration, and not as a bona fide measure to protect public health.  *See*, *e.g.*, *Pence Ordered Borders Closed After CDC Experts Refused*, AP News (Oct. 3, 2020), https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae; *CDC Officials Objected to Order Turning Away Migrants at Border*, The Wall Street Journal (Oct. 3, 2020),

https://www.wsj.com/articles/cdc-officials-objected-to-order-turning-away-migrants-at-border-11601733601.

10.     Whatever the Trump Administration's motivation for establishing the Title 42 Process and applying it to vulnerable families, the Process is unlawful.  Plaintiffs would face grave danger in their home countries and must be given the opportunity to remain in the United States to pursue the statutory humanitarian protections Congress has provided.

## JURISDICTION AND VENUE

11.     This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); and the Public Health Service Act of 1944, 42 U.S.C § 201, *et seq.*

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  *See also* 5 U.S.C. § 702 (waiver of sovereign immunity).

13.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers of the United States acting in their official capacity, Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

**Plaintiffs**

14.     Nancy Gimena Huisha-Huisha and her one-year-old child I.M.C.H. are detained in DHS

custody and subject to expulsion under the Title 42 Process.

15.     Josiane Pereira-De Souza and her children H.N.D.S., E.R.P.D.S., M.E.S.D., and H.T.D.S.D.S. are detained in DHS custody and subject to expulsion under the Title 42 Process. Ms. Pereira-De Souza's children are respectively sixteen, fourteen, eleven, and seven years old.

16.     Valeria Macancela Bermejo and her four-year-old child B.A.M.M. are detained in DHS custody and subject to expulsion under the Title 42 Process.

17.     Martha Liliana Taday-Acosta, and her children D.J.Z. and J.A.Z. are detained in DHS custody and subject to expulsion under the Title 42 Process.  Ms. Taday-Acosta's children are respectively three and eight years old.

18.     Julien Thomas, Fidette Boute, and their children D.J.T.-B. and T.J.T.-B. are detained in DHS custody and subject to expulsion under the Title 42 Process.  The two children are 23-month-old twins.

19.     Romilus Valcourt, Bedapheca Alcante, and their three-year-old child B.V.-A. are detained in DHS custody and subject to expulsion under the Title 42 Process.

**Defendants**

20.     Defendant David Pekoske is the Acting Secretary of Homeland Security, which is a cabinet-level department of the U.S. government.  He is sued in his official capacity.  In that capacity, Defendant Pekoske is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.  DHS's components include U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE").[1]

21.     Defendant Troy Miller is the Senior Official Performing the Duties of the Commissioner of CBP.  He is sued in his official capacity.  In that capacity, he directed the issuance of the CBP's

---

[1] By naming defendants, Plaintiffs do not concede that any Defendant's appointment was valid.

memorandum implementing expulsions under the Title 42 Process, and is a supervisory official responsible for implementing the Title 42 Process. CBP is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended at or between U.S. ports of entry. CBP is responsible for implementing the Title 42 Process and conducts expulsions pursuant to its terms.

22.     Defendant William A. Ferrara is the Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"). He is sued in his official capacity. OFO is the largest component of CBP and is responsible for border security, including immigration and travel through U.S. ports of entry. Defendant Ferrara is a supervisory official responsible for implementing the Title 42 Process at ports of entry.

23.     Defendant Rodney S. Scott is the Chief of U.S. Border Patrol. He is sued in his official capacity. Border Patrol is responsible for border security between ports of entry. Defendant Scott is a supervisory official responsible for implementing the Title 42 Process between ports of entry.

24.     Defendant Tae D. Johnson is the Senior Official Performing the Duties of the Director of ICE. ICE is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention. Defendant Johnson is sued in his official capacity.

25.     Defendant Norris Cochran is the Secretary of Health and Human Services ("HHS"), which is a cabinet-level department of the U.S. government. He is sued in his official capacity. In that capacity, Defendant Cochran is responsible for the oversight of the Centers for Disease Control and Prevention ("CDC"), which is a component of HHS.

26.     Defendant Dr. Rochelle P. Walensky, M.D., M.P.H., is the Director of the CDC. She is sued in her official capacity. In that capacity, her predecessor, Dr. Robert R. Redfield, M.D., authorized the Title 42 Process at issue in this case.

## FACTS

**Statutory Protections For Asylum Seekers**

27.     Vulnerable families have long fled persecution and danger in their home countries and journey to the United States seeking safety.  Many of them come from countries such as El Salvador, Honduras, Guatemala, Haiti, and Mexico, which have been plagued with escalating rates of violence and weakened state institutions.  Others come from countries such as Ecuador and Brazil, where they have faced persecution based on their indigenous identities or political affiliations.  Many families from these countries are also fleeing gender-based, family-based, and other types of violence.

28.     These families, like other noncitizens, have statutory rights to seek relief in the United States from persecution and torture.  Three forms of relief are possible: asylum, withholding of removal, and protection from torture.

29.     First, the Immigration and Nationality Act ("INA") provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status," may apply for asylum.  8 U.S.C. § 1158(a)(1).  To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of a protected ground.  8 U.S.C. § 1101(a)(42)(A).

30.     Second, implementing this country's obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees, Congress has barred the removal of an individual to a country where it is more likely than not that he would face persecution on a protected ground.  8 U.S.C. § 1231(b)(3).  This form of relief, known as "withholding of removal," requires the applicant to meet a higher burden with respect to the likelihood of harm but is mandatory if the standard is met.

31.     Third, the Convention Against Torture ("CAT"), implemented by FARRA, prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.  *See* 8 U.S.C. § 1231 note.

32.     Certain noncitizens who seek to enter the country without valid documents may be placed in a summary "expedited removal" system (in lieu of full removal proceedings under 8 U.S.C. § 1229a).  *See* 8 U.S.C. § 1225(b)(1).  But even in those expedited proceedings, Congress took pains to guarantee procedural protections for asylum seekers.  Specifically, if noncitizens express a fear of removal, they are entitled to a hearing with an asylum officer, subject to review by an Immigration Judge, to determine whether they have a "credible fear" of return.  *Id.* §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B).  Once the noncitizen shows a credible fear—a "low screening standard," 42 Cong. Rec. 25,347 (1996)—they are entitled to a full removal hearing with the attendant procedural protections, including the right to appeal, *see Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (explaining that one of the "important" goals of the statute was "ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution").

**The Trump Administration's Efforts to Bar Immigrants and the New Title 42 Process**

33.     The Trump Administration, which established the Title 42 Process, has repeatedly and publicly stated that restricting access to asylum is among its key immigration objectives.  The President, his close advisors, and a succession of agency officers have assailed access to asylum and related forms of humanitarian protection.

34.     The Trump Administration sought to use numerous regulatory and policy mechanisms to prevent noncitizens from seeking protection in this country, but the Title 42 Process at issue here goes further than any of those efforts because where it applies it leaves almost no avenue open to

seek protection.

35.     Before COVID-19, Trump Administration officials discussed using public health powers to restrict immigration and circumvent the protections in the immigration laws.  Trump White House advisors repeatedly proposed invoking the government's public health powers to impose immigration restrictions, and justifying those restrictions by pointing to diseases like influenza and mumps.

36.     Notwithstanding the clear statutory framework that requires the United States to allow people arriving at the border (with or without valid travel documents) to apply for asylum, withholding of removal, and CAT relief, then-President Trump announced on March 20, 2020, that the CDC would issue an order pursuant to the public health provisions of Title 42 of the U.S. Code "to suspend the introduction of all individuals seeking to enter the U.S. without proper travel documentation" across the northern and southern borders.  The former President stated that the order would be executed by "immediately returning" such individuals "without delay."

37.     Section 265 was the specific provision of Title 42 invoked to justify the unprecedented expulsion policy.  That provision dates to 1893 and was later reenacted in substantially the same language in the Public Health Service Act of 1944.  Section 265 provides in relevant part: the Surgeon General may "prohibit . . . the introduction of persons or property" from designated places where "by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States."[2]

38.     Deportation has never been an available mechanism under § 265, and in fact, § 265 applies to both noncitizens and citizens.  Rather, the Public Health Service Act prescribes certain civil and

---

[2] In 1966, the Surgeon General's § 265 authority was transferred to what is now HHS.  In 2001, HHS delegated this authority to the CDC.  The President's functions under § 265 were assigned to the Secretary of HHS in a 2003 executive order.

criminal penalties for violations of § 265, including "a fine of not more than $1,000 or . . . imprisonment for not more than one year, or both."  42 U.S.C. § 271(a).

39.     Although § 265 and its predecessors have existed since 1893, no regulation implementing that statute has ever authorized the broad immigration powers Defendants are claiming here.

40.     To exercise this new immigration power, the CDC thus issued a new regulation, without advance notice and comment, on the same day as the President's announcement.  *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16559-01 (Mar. 24, 2020) (effective date Mar. 20, 2020).

41.     Specifically, the regulation added a new provision, 42 C.F.R. § 71.40, which provides that the CDC may prohibit the "introduction into the United States of persons" from foreign countries. 85 Fed. Reg. at 16,563; *see* 42 C.F.R. § 71.40(a).  The public notice of the regulation describes the "introduction of persons" in 42 U.S.C. § 265 to "encompass those who have physically crossed a border of the United States and are in the process of moving into the interior in a manner the [CDC] Director determines to present a risk of transmission of a communicable disease."  85 Fed. Reg. at 16,563; *see* 42 C.F.R. § 71.40(b)(1).  And it describes "serious danger of the introduction of [a particular communicable] disease into the United States" in § 265 as meaning "the potential for introduction of vectors of the communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the [same] communicable disease."  85 Fed. Reg. at 16,563; *see* 42 C.F.R. § 71.40(b)(2).

42.     The regulation exempted U.S. citizens, lawful permanent residents ("LPRs"), and members of the armed forces, stating that the "CDC believes that, at present, quarantine, isolation, and conditional release, in combination with other authorities, while not perfect solutions, can

mitigate" the spread of COVID-19 by such individuals.  85 Fed. Reg. at 16,564; *see* 42 C.F.R. § 71.40(e), (f).

43.     The regulation also provided that, if an order suspending the introduction of persons "will be implemented in whole or in part" by CBP, "then the [CDC] Director shall, in coordination with the Secretary of Homeland Security or other applicable Federal department or agency head, explain in the order the procedures and standards by which any authorities or officers or agents are expected to aid in the enforcement of the order."  85 Fed. Reg. at 16,564; *see* 42 C.F.R. § 71.40(d)(2).

44.     Pursuant to its new regulatory authority, the CDC issued a 30-day "Order Under Sections 362 and 365 of the Public Health Service Act [42 U.S.C. §§ 265, 268] Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists."  85 Fed. Reg. 17,060-17088 (Mar. 26, 2020) (effective date Mar. 20, 2020).  The Order directed the "immediate suspension of the introduction" of certain persons, referred to as "covered aliens."  85 Fed. Reg. at 17,067.  "Covered aliens" are those seeking to enter the United States through Canada or Mexico who "seek[] to enter . . . at POEs [ports of entry] who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended near the border seeking to unlawfully enter the United States between POEs."  85 Fed. Reg. at 17,061.  Section 365 of the Act, codified at 42 U.S.C. § 268, provides that "[i]t shall be the duty of the customs officers and of Coast Guard officers to aid in the enforcement of quarantine rules and regulations."  42 U.S.C. § 268(b).

45.     A principal justification for these restrictions was that "[t]he introduction into congregate settings in land POEs and Border Patrol stations" of such individuals risks "transmission and spread of COVID-19 to CBP personnel" and others.  85 Fed. Reg. at 17,061.

46.    The Order contemplates the forcible return of individuals back to the country from which they entered (Canada or Mexico), their home country, or another location.  85 Fed. Reg. at 17,067.

47.    In addition to repeating the regulatory exceptions for U.S. citizens and LPRs, the Order exempts from the ban the spouses and children of citizens and LPRs (whether or not they have valid documents); persons from foreign countries with valid travel documents; and persons from countries in the visa waiver program who present at ports of entry.  85 Fed. Reg. at 17,061.  The visa waiver program applies to nationals of 39 countries.

48.    The Order states that DHS customs officers could, in their discretion, determine that a noncitizen "should be excepted [from the Order] based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."  85 Fed. Reg. at 17,061.  Other than stating that a supervisor must approve such exceptions, the Order contains no standards or further procedures for exercising that discretion.  *See id.*

49.    The Order and regulation are silent on their application to individuals seeking asylum, withholding of removal, or CAT protection.

50.    The March 20 Order was extended for an additional 30 days on April 20, 2020.  *See* Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective date Apr. 20, 2020).

51.    On May 20, 2020, the CDC extended the Order indefinitely, and amended it to cover both land and coastal ports of entry and Border Patrol stations.  *See* Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020) (effective date May 21, 2020).

52.    As with the prior two 30-day Orders, a principal justification articulated for the indefinite

Order was the danger to border agents who would have to inspect persons who come without documents.

53.    The CDC acknowledged that there were alternatives to expulsion but concluded that it was not worth the resources for those who lacked documents.  The CDC also presumed, without evidence, that those without documents covered by the Order would lack a means of self-quarantining.

54.    CDC suggested in the May 20 Order that there has been a reduced rate of transmission and that this is due to reduced number of "covered aliens" at ports of entry and border patrol stations. CDC offered no evidence for this claim.

55.    Defendants issued a subsequent, substantially similar Final Rule, and reissued the CDC order pursuant to that Rule.  Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56,424 (Sept. 11, 2020) (effective date Oct. 13, 2020); Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806, 65,807-08 (Oct. 16, 2020) (effective date Oct. 13, 2020).

**DHS's Implementation of the Title 42 Process**

56.    Although the March CDC Order was issued by the CDC, and the regulation provides that the CDC and DHS must coordinate in developing corresponding procedures and standards, 42 C.F.R. § 71.40(d)(2), the Order states that it was CBP that "developed an operational plan for implementing the order."  85 Fed. Reg. at 17,067.

57.    On April 2, 2020, CBP issued a memorandum ("CBP Memo") describing the agency's implementation of the Title 42 Process, an effort it calls "Operation Capio."  CBP Memo 2.

58.     To determine whether a noncitizen is "subject to the CDC Order," the CBP Memo instructs officers to use "experience" and "physical observation" to determine whether they "believe[] that it is more likely than not" that the person whom they encounter in "[e]nforcement efforts on the SWB [southwestern border] and NB [northern border]," anywhere "within the area of operation of a Border Patrol station or POE operated by CBP," is "seeking to enter" without proper travel documents at or between POEs.  CBP Memo 1.

59.     Covered noncitizens "will be transported to the nearest POE and immediately returned to Mexico or Canada, depending on their point of transit."  CBP Memo 3.  Those who are "not amenable to immediate expulsion to Mexico or Canada, will be transported to a dedicated facility for limited holding prior to expulsion" to their home country.  *Id*.  Such facilities can be "a tent, soft-sided facility or predesignated CBP/USBP facility with dedicated space."  *Id*.

60.     The CBP Memo provides no instructions on medical screenings or other procedures for determining whether a covered noncitizen may have COVID-19.

61.     Families who arrive in this country together, like Plaintiffs, are subject to the Title 42 Process.  Indeed, Defendants subjected over 21,500 members of such families to the Title 42 Process between March and December, 2020.

62.     The Plaintiff families in this case came to the United States fleeing great danger in their home countries.  All of them seek to apply for asylum, withholding, and protection for torture, but all of them have been denied access to these procedural protections.

63.     The Title 42 Process is not justified by public health concerns.  A principal justification is that border agents will have greater exposure if they are required to process individuals who lack documents and that it is therefore necessary to deport such individuals to reduce the risk to agents.  But, as Plaintiffs' facts illustrate, arranging for air transport to deport individuals will often take

longer than the time in which DHS could process, quarantine, and/or release families.  Ms. Pereira-De Souza and her children, for example, have been detained in DHS custody for over a month while they await expulsion.  In addition, where the individual shows no signs of COVID-19, as is likely true for many of the families at issue here, the risk is even less.

**The Title 42 Process Is An Extreme Outlier**

64.     The Title 42 Process at issue here follows other invocations of COVID-19 by the Trump Administration to ban immigration, but it is far more extreme in seeking to eliminate statutory protections for vulnerable noncitizens.  And it is not only a ban on entry, but provides for summary expulsion for those who entered the country.

65.     For example, in February and March of 2020, President Trump issued a series of Proclamations under 8 U.S.C. § 1182(f) to prohibit the entry of certain persons traveling from China, Iran, and certain European countries where COVID-19 was prevalent.  However, unlike the Title 42 Process, those Proclamations expressly stated that they did not restrict "any individual's eligibility for asylum, withholding of removal, or protection under the regulations issued pursuant to the legislation implementing the Convention Against Torture."

66.     At the same time, the government continues to permit large numbers of people to enter the United States.  In addition to the Title 42 Process at issue here, DHS issued two other orders on March 20, 2020, which temporarily suspended "non-essential" travel from Canada and Mexico.  Under these orders, which have been extended every 30 days since, permitted "essential travel" broadly includes citizens, returning LPRs, individuals traveling for medical purposes, individuals traveling to attend education institutions, individuals traveling to work in the United States (e.g., agricultural workers), truck drivers moving cargo between the United States and Canada, emergency responders, and those engaged in military travel and operations.

67.     On May 22, 2020, former Acting Secretary of Homeland Security Chad Wolf issued an "exemption" from the President's Proclamations under 8 U.S.C. § 1182(f), which additionally permitted certain professional athletes, their staff, and their dependents to enter the country.  Mr. Wolf determined that it served "the national interest" to permit noncitizens who compete in, inter alia, the National Basketball Association, the Professional Golfers' Association Tour, and the National Hockey League, to enter the country and participate in sporting events.

68.     Hundreds of thousands of individuals continue to move back and forth across the U.S.-Mexico border every day.  Since March 20, 2020, when the Title 42 Process first went into effect, numerous individuals exempted from the ban have come into the United States.

**Class Action Allegations**

69.     Plaintiffs bring this action under Federal Civil Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

70.     Plaintiffs seek to represent the following Proposed Class: All noncitizens who (1) are or will be in the United States; (2) come to the United States as a family unit composed of at least one child under 18 years old and that child's parent or legal guardian; and (3) are or will be subjected to the Title 42 Process.

71.     The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable.  According to Defendants' own publicly available data, over 21,000 members of families that fit the class definition have already been subjected to the Title 42 Process.  The proposed class also includes numerous future families.

72.     The class meets the commonality requirements of Rule 23(a)(2).  The members of the class are subject to a common practice: subjection to the Title 42 Process, despite the statutory protections Congress has enacted.  By definition, all class members are or will be subject to that

practice.  The lawsuit raises numerous questions of law common to members of the proposed class, including: whether § 265 authorizes expulsions; whether the Title 42 Process violates the immigration statutes; and whether the promulgation of the Title 42 Process satisfied the APA's requirements.  Plaintiffs and proposed class members also share a common core of facts: all are families who came (or will come) to the United States and were (or will be) subsequently taken into DHS custody; all have been (or will be) subjected to the Title 42 Process; and none have been afforded the protections provided under the nation's immigration laws.

73.      The proposed class meets the typicality requirements of Rule 23(a)(3), because the claims of the representative Plaintiffs are typical of the claims of the class.  Plaintiffs are six families who came to the border and were subjected to the Title 42 Process and threatened with swift expulsion, without being afforded any of the statutory protections they should have received.

74.      The proposed class meets the adequacy requirements of Rule 23(a)(4).  The representative Plaintiffs seek the same relief as the other members of the class—among other things, an order declaring the Title 42 Process unlawful as applied to families, and an injunction against the application of the Title 42 Process.  In defending their rights, Plaintiffs will defend the rights of all proposed class members fairly and adequately.

75.      The proposed class is represented by counsel from the American Civil Liberties Union Foundation Immigrants' Rights Project and other experienced attorneys.  Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of migrant children, families, and other noncitizens facing deportation.

76.      The proposed class also satisfies Rule 23(b)(2).  Defendants have acted (or will act) on grounds generally applicable to the class by subjecting them to the Title 42 Process rather than affording them the protections of the immigration laws.  Injunctive and declaratory relief is

therefore appropriate with respect to the class as a whole.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## (*ULTRA VIRES*, VIOLATION OF THE PUBLIC HEALTH SERVICE ACT, 42 U.S.C. § 265, AND THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A))

77.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

78.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

79.     Title 42 of the U.S. Code does not authorize the expulsion of noncitizens from the United States.

80.     Title 42 of the U.S. Code also does not authorize the expulsion of noncitizens from the United States without affording them the statutory protections provided under the INA.  As a result, the application of the Title 42 Process to Plaintiffs, which will result in their expulsion from the United States, is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

81.     The Title 42 Process, which was purportedly established pursuant to the authority of 42 U.S.C. § 265, was not authorized by that provision and is *ultra vires*.

82.     The application of the Title 42 Process to Plaintiffs is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

## (ASYLUM: VIOLATION OF 8 U.S.C. § 1158, ASYLUM, AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

83.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

84.     The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival

and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section . . . ."  8 U.S.C. § 1158(a)(1).

85.     Defendants' application of the Title 42 Process to Plaintiffs has prevented them from applying for asylum in accordance with 8 U.S.C. § 1158(a)(1), and was therefore contrary to law. *See* 5 U.S.C. § 706(2)(A).

86.     In addition, the APA provides relief for a failure to act: "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

87.     By refusing to grant Plaintiffs the meaningful opportunity to apply for asylum to which they are entitled, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

### THIRD CLAIM FOR RELIEF

### (VIOLATION OF 8 U.S.C. § 1231(b)(3), WITHHOLDING OF REMOVAL, AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

88.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

89.     The "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of an individual to a country where it is more likely than not that he would face persecution.

90.     Defendants applied the Title 42 Process and regulation to Plaintiffs without this required safeguard.  As a result, Defendants' actions against Plaintiffs are contrary to law.  *See* 5 U.S.C. § 706(2)(A).

91.     In addition, by refusing to grant Plaintiffs the procedural protections to which they are entitled, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5

U.S.C. § 706(1).

## FOURTH CLAIM FOR RELIEF

### (VIOLATION OF THE FOREIGN AFFAIRS REFORM AND RESTRUCTURING ACT OF 1998, CODIFIED AT 8 U.S.C. § 1231 NOTE, AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

92.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

93.     FARRA prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.

94.     Defendants applied the Title 42 Process and regulation to Plaintiffs in violation of FARRA and without adequate safeguards against their return to a country where it is more likely than not that they would face torture.  As a result, Defendants' actions against Plaintiffs are contrary to law. *See* 5 U.S.C. § 706(2)(A).

95.     In addition, by refusing to grant Plaintiffs the procedures to which they are entitled, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

## FIFTH CLAIM FOR RELIEF

### (VIOLATION OF 8 U.S.C. § 1101, ET SEQ., AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

96.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

97.     The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

98.     The INA provides that removal proceedings before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA.  8 U.S.C. § 1229a(a)(3).  One mechanism otherwise specified in the INA is the expedited removal system, including its credible

fear screening process.  8 U.S.C. § 1225(b)(1).

99.      The Title 42 Process creates an alternative removal mechanism.  The Title 42 Process purports to operate outside of the immigration laws set forth by Congress in Title 8.

100.     Because the Title 42 Process provides for the expulsion of Plaintiffs without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

101.     As a result, Defendants' actions against Plaintiffs were contrary to law.  *See* 5 U.S.C. § 706(2)(A).

102.     In addition, by refusing to grant Plaintiffs access to the procedures specified in the INA, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

## SIXTH CLAIM FOR RELIEF

## (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A))

103.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

104.     Trump White House officials imposed the Title 42 Process on the CDC, over the objections of agency experts, as a means to limit immigration and not as a bona fide measure to protect public health.

105.     Defendants' actions are arbitrary, capricious, and contrary to law.  Defendants have not articulated a reasoned explanation for their decision to apply the Title 42 Process to families; failed to consider relevant factors in applying the Title 42 process to them, including their fear of persecution and torture in their home countries; relied on factors Congress did not intend to be considered; failed to consider reasonable alternatives that were less restrictive; and offered no sufficient explanation for their decision to expel them from the country.

106.      Plaintiffs' subjection to the Title 42 Process is arbitrary, capricious, and contrary to law because it also departs from the agency's existing policies prohibiting the return of individuals

who fear persecution or torture, without providing a reasoned explanation for departing from these policies.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray this Court to:

a.      Certify a Class of: All noncitizens who (1) are or will be in the United States; (2) come to the United States as a family unit composed of at least one child under 18 years old and that child's parent or legal guardian; and (3) are or will be subjected to the Title 42 Process.

b.      Appoint the undersigned as Class Counsel;

c.      Declare unlawful the Title 42 Process as applied to Plaintiffs and Class Members;

d.      Enter an order enjoining Defendants from applying the Title 42 Process to Plaintiffs and Class Members;

e.      Enter an order providing relief for Plaintiffs and Class Members by ordering that Defendants stay their expulsion, remove them from the Title 42 Process, and afford them the procedures guaranteed by the INA including access to asylum, withholding of removal, CAT relief, and all other forms of relief to which they are eligible;

f.      Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

g.      Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: January 28, 2021

Stephen B. Kang*
Cody Wofsy*
Morgan Russell*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770

Andre Segura
Kathryn Huddleston
Rochelle Garza
Brantley Shaw Drake
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel: (713) 942-8146

Tamara F. Goodlette*
Refugee and Immigrant Center for
Legal Education and Legal Services
(RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
Tel: (210) 960-3206

Karla M. Vargas**
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
Tel: (956) 787-8171

Respectfully submitted,

/s/ Celso J. Perez
Celso J. Perez (D.C. Bar No. 1034959)
Lee Gelernt*
Daniel A. Galindo*
Omar Jadwat*
Ming Cheung*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600

Robert Silverman*
Irit Tamir*
Oxfam America
Boston, MA 02115, Suite 500
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

Jamie Crook (D.C. Bar No. 1002504)
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

*Attorneys for Plaintiffs*

*Pro hac vice application forthcoming*
**Admitted pro hac vice*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NANCY GIMENA HUISHA-HUISHA, *et al.*,

              Plaintiffs,

v.

ALEJANDRO MAYORKAS, *in his official capacity as Secretary of Homeland Security*, *et al.*,

              Defendants.

Civ. Action No. 21-100(EGS)

---

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Class Certification is **GRANTED**; and it is further

**ORDERED** that the Court certifies a class pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure consisting of all noncitizens who: (1) are or will be in the United States; (2) come to the United States as a family unit composed of at least one child under 18 years old and that child's parent or legal guardian; and (3) are or will be subjected to the Title 42 Process; and it is further

**ORDERED** that Plaintiffs Nancy Gimena Huisha-Huisha and her minor child I.M.C.H.; Valeria Macancela Bermejo and her minor

daughter, B.A.M.M.; Josaine Pereira-De Souza and her minor
children H.N.D.S.; E.R.P.D.S.; M.E.S.D.S.; H.T.D.S.D.S.; Martha
Liliana Taday-Acosta and her minor children D.J.Z.; J.A.Z.;
Julien Thomas, Fidette Boute, and their minor children D.J.T.-
B.; T.J.T.-B.; and Romilus Valcourt, Bedapheca Alcante, and
their minor child, B.V.-A., are appointed as Class
Representatives; and it is further

   **ORDERED** that ACLU Immigrants' Rights Project is appointed
Lead Class Counsel, and the Texas Civil Rights Project, the ACLU
of Texas, the ACLU of the District of Columbia, the Refugee and
Immigrant Center for Legal Education and Legal Services
(RAICES), the Center for Gender & Refugee Studies, and Oxfam
America are appointed as Class Counsel; and it is further

   **ORDERED** that Defendants' Motion for Oral Argument is
**DENIED**; and it is further

   **ORDERED** that Plaintiffs' Motion for Preliminary Injunction
is **GRANTED**; and it is further

   **ORDERED** that, pursuant to this Order, Defendants are **HEREBY
ENJOINED** from applying the Title 42 Process, including the CDC's
August 2021 Order, to the Class Members; and it is further

   **ORDERED** that this Order shall be stayed for 14 days from
the date of its entry; and it is further

**ORDERED** that any request to stay this Order pending appeal will be denied for the reasons stated in the accompanying Memorandum Opinion.

**SO ORDERED.**

Signed:   **Emmet G. Sullivan**
          **United States District Judge**
          **September 16, 2021**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.*, | |
| Plaintiffs, | |
| v. | Civ. Action No. 21-100(EGS) |
| ALEJANDRO MAYORKAS, *in his official capacity as Secretary of Homeland Security*, *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs—a group of asylum-seeking families who fled to the United States—bring this lawsuit against Alejandro Mayorkas,[1] in his official capacity as Secretary of Homeland Security, and various other federal government officials ("Defendants" or the "government") for violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq.; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, et seq.; the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), 8 U.S.C. § 1231 note; and the Public Health Service Act of 1944, 42 U.S.C. § 201, et seq. Pending before the Court are Plaintiffs' Motion for Class Certification and Motion for Classwide Preliminary

---

[1] Alejandro Mayorkas is substituted pursuant to Federal Rule of Civil Procedure 25(d).

Injunction. *See* Pls.' Mot. Class Cert., ECF No. 23-1; Mem. Supp.
Pls.' Mot. Classwide Prelim. Inj. ("Pls.' Mot. Prelim. Inj."),
ECF No. 57-1.[2] Upon careful consideration of the motions, the
responses, and replies thereto, the applicable law, and the
entire record, the Court **GRANTS** Plaintiffs' Motion for Class
Certification and **GRANTS** Plaintiffs' Motion for Classwide
Preliminary Injunction.[3]

**I.   Background**

    **A. Factual Background**

        **1.   The U.S. Asylum Process**

"For almost a century, Congress has recognized that
citizens of foreign states are sometimes forced to flee from
persecution in their home countries, and it has been the policy
of the United States government that this country ought to serve

---

[2]  When citing electronic filings throughout this Memorandum
Opinion, the Court cites to the ECF page number, not the page
number of the filed document.

[3] On August 11, 2021, Defendants filed a motion for oral argument
on Plaintiffs' motion for preliminary injunction. *See* Mot. Oral
Argument, ECF No. 117. Pursuant to Local Civil Rule 65(d), "[o]n
request of the moving party together with a statement of the
facts which make expedition essential, a hearing on an
application for preliminary injunction shall be set by the Court
no later than 21 days after its filing, unless the Court earlier
decides the motion on the papers or makes a finding that a later
hearing date will not prejudice the parties." Here, while
Plaintiffs filed their motion on February 5, 2021, briefing on
the motion was stayed until August 5, 2021. *See* Min. Order (Aug.
5, 2021). Thus, the Court finds that there is no prejudice to
the parties in declining to hold a hearing on Plaintiffs' motion
and shall instead decide the motion on the papers. Defendants'
motion for oral argument is therefore denied.

as a place of refuge for persons who are in such distress."
*Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 11-12 (D.D.C. 2020). In
keeping with this policy, Congress has codified various
procedures governing how the United States evaluates and
processes the admission requests of refugees. As relevant here,
there are three primary protections for asylum seekers in place
under current immigration laws.

First, in 1980, Congress passed the Refugee Act, Pub. L.
No. 96-212, 94 Stat. 102, which amended the INA, Pub. L. No. 82-
414, 66 Stat. 163 (1952) (codified as amended in sections of 8
U.S.C.). The Refugee Act created a statutory procedure for
refugees seeking asylum and established the standards for
granting such requests. The INA currently governs this
procedure, and it provides that "[a]ny alien who is physically
present in the United States or who arrives in the United States
(whether or not at a designated port of arrival . . . ),
irrespective of such alien's status, may apply for asylum." 8
U.S.C. § 1158(a)(1). The Attorney General is granted the
discretion to grant asylum. *Id.* § 1158 (b)(1)(A). However, that
relief can only be granted if the alien is a "refugee," as
defined by federal law. *Id.* Pursuant to the INA, a "refugee" is
"any person who is outside any country of such person's
nationality" and who is "unable or unwilling to return to . . .
that country because of persecution or a well-founded fear of

persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). "Thus, the 'persecution or well-founded fear of persecution' standard governs the Attorney General's determination [of] whether an alien is eligible for asylum." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 (1987). Furthermore, even when a noncitizen is subject to a rapid expulsion process known as "expedited removal" because they fit within an established category of persons who can be summarily removed without full hearings or other process, such noncitizen can only be so removed if she does not have "an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

Second, at the same time the Refugee Act of 1980 established the asylum process, it amended the statutory scheme governing a related form of relief—"withholding of deportation"— to remove the Attorney General's discretion to decide whether to grant that form of relief. *Cardoza-Fonseca*, 480 U.S. at 428-29. As amended by the 1980 Act, the INA "requires the Attorney General to withhold deportation of an alien who demonstrates that his 'life or freedom would be threatened' on account of one of [a list of factors] if he is deported." *Id.* at 423. A grant of withholding is mandatory if the individual meets the

statutory criteria. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999).

Third, Article 3 of the Convention Against Torture ("CAT") provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, p. 20, 1456 U.N.T.S. 114. Congress has implemented Article 3 of CAT as part of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"). *Omar v. McHugh*, 646 F.3d 13, 17 (D.C. Cir. 2011). FARRA further declares it "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." *Id.* (quoting Pub.L. No. 105-277, § 2242, 112 Stat. 2681-761, 822 (1998) (codified at 8 U.S.C. § 1231 note).

### 2.    COVID-19 Pandemic and the CDC Orders

Since 1893, federal law has provided federal officials with the authority to stem the spread of contagious diseases from foreign countries by prohibiting, "in whole or in part, the introduction of persons and property from such countries." Act

of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452 ("1893

Act"). Under current law:

> Whenever the Surgeon General determines that
> by reason of the existence of any communicable
> disease in a foreign country there is serious
> danger of the introduction of such disease
> into the United States, and that this danger
> is so increased by the introduction of persons
> or property from such country that a
> suspension of the right to introduce such
> persons and property is required in the
> interest of the public health, the Surgeon
> General, in accordance with regulations
> approved by the President, shall have the
> power to prohibit, in whole or in part, the
> introduction of persons and property from such
> countries or places as he shall designate in
> order to avert such danger, and for such
> period of time as he may deem necessary for
> such purpose.

42 U.S.C. § 265 ("Section 265"). In 1966, the Surgeon General's

Section 265 authority was transferred to the Department of

Health and Human Services ("HHS"), which in turn delegated this

authority to the Centers for Disease Control and Prevention

("CDC") Director. *See P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 503

(D.D.C. 2020); 31 Fed. Reg. 8855 (June 25, 1966), 80 Stat. 1610

(1966).

On March 20, 2020, as the COVID-19 virus spread globally,

HHS issued an interim final rule pursuant to Section 265 that

aimed to "provide[] a procedure for CDC to suspend the

introduction of persons from designated countries or places, if

required, in the interest of public health." Interim Final Rule,

Control of Communicable Diseases; Foreign Quarantine: Suspension

of Introduction of Persons Into United States From Designated

Foreign Countries or Places for Public Health Purposes, 85 Fed.

Reg. 16559-01, 2020 WL 1330968, (March 24, 2020) ("Interim Final

Rule"). Pursuant to the Interim Final Rule, the CDC Director

could "suspend the introduction of persons into the United

States." *Id.* at 16563. The Interim Final Rule stated, in

relevant part:

> (1) Introduction into the United States of
> persons from a foreign country (or one or more
> political subdivisions or regions thereof) or
> place means the movement of a person from a
> foreign country (or one or more political
> subdivisions or regions thereof) or place, or
> series of foreign countries or places, into
> the United States so as to bring the person
> into contact with persons in the United
> States, or so as to cause the contamination of
> property in the United States, in a manner
> that the Director determines to present a risk
> of transmission of a communicable disease to
> persons or property, even if the communicable
> disease has already been introduced,
> transmitted, or is spreading within the United
> States;
>
> (2) Serious danger of the introduction of such
> communicable disease into the United States
> means the potential for introduction of
> vectors of the communicable disease into the
> United States, even if persons or property in
> the United States are already infected or
> contaminated with the communicable disease;
> and
>
> (3) The term "Place" includes any location
> specified by the Director, including any

> carrier, as that term is defined in 42 CFR
> 71.1, whatever the carrier's nationality.

*Id.* at 16566-67.

The CDC's Interim Rule went into effect immediately. *Id.* at 16565. The CDC explained that, pursuant to 5 U.S.C. 553(b)(3)(B) of the APA, HHS had concluded that there was "good cause" to dispense with prior notice and comment. *Id.* Specifically, the CDC stated that "[g]iven the national emergency caused by COVID-19, it would be impracticable and contrary to the public health—and, by extension, the public interest—to delay these implementing regulations until a full public notice-and-comment process is completed." *Id.*

Pursuant to the Interim Final Rule, the CDC Director issued an order suspending for 30 days the introduction of "covered aliens," which he defined as "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land Port of Entry [("POE")] or Border Patrol station at or near the United States borders with Canada and Mexico." Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060-02, 17061, 2020 WL 1445906 (March 26, 2020) ("March 2020 Order"). The March 2020 Order declared that "[i]t is necessary for the public

health to immediately suspend the introduction of covered
aliens" and "require[d] the movement of all such aliens to the
country from which they entered the United States, or their
country of origin, or another location as practicable, as
rapidly as possible." *Id.* at 17067. The CDC Director then
"requested that [the Department of Homeland Security ("DHS")]
implement th[e] [March 2020 Order] because CDC does not have the
capability, resources, or personnel needed to do so." *Id.* The
CDC Director also noted that U.S. Customs and Border Protection
("CBP"), a federal law enforcement agency of DHS, had already
"developed an operational plan for implementing the order." *Id.*

Soon thereafter, the CBP issued a memorandum on April 2,
2020 establishing its procedures for implementing the March 2020
Order. See Ex. E to Cheung Decl. ("CAPIO Memo"), ECF No. 57-5 at
15; *see also* Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 14-15. The
CAPIO Memo instructed that agents may determine whether
individuals are subject to the CDC's order "[b]ased on training,
experience, physical observation, technology, questioning and
other considerations." CAPIO Memo, ECF No. 57-5 at 15. If an
individual was determined to be subject to the order, they were
to be "transported to the nearest POE and immediately returned
to Mexico or Canada, depending on their point of transit." *Id.*
at 17. Those who are "not amenable to immediate expulsion to
Mexico or Canada, will be transported to a dedicated facility

for limited holding prior to expulsion" to their home country. *Id.* The CAPIO Memo "provide[d] no instructions on medical screenings or other procedures for determining whether a covered noncitizen may have COVID-19." Am. Compl., ECF No. 22 ¶ 60.

On April 22, 2020, the March 2020 Order was extended for an additional 30 days. *See* Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 22424-01, 2020 WL 1923282 (April 22, 2020) ("April 2020 Order"). The order was then extended again on May 20, 2020 until such time that the CDC Director "determine[s] that the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health." Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503-02, 31504, 2020 WL 2619696 (May 26, 2020) ("May 2020 Order").

On September 11, 2020, the CDC published its final rule. *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56424-01, 2020 WL 5439721, (Sept. 11, 2020) (Effective

October 13, 2020) ("Final Rule"). The Final Rule "defin[ed] the phrase to '[p]rohibit, in whole or in part, the introduction into the United States of persons' to mean 'to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting movement into the United States, or physically expelling from the United States some or all of the persons.'" *Id.* at 56445. The CDC Director then replaced the March, April, and May 2020 Orders with a new order on October 13, 2020. Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65806, 65808 (Oct. 16, 2020) ("October 2020 Order").

On August 2, 2021, the CDC issued its most recent order, "Public Health Assessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists," which replaced and superseded the October 2020 Order. *See* Public Health Assessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists (Aug. 2, 2021), Attach. A to Notice CDC Public Health Order ("August 2021 Order"), ECF No. 114. The August 2021 Order states that "CDC has determined that an Order under 42 U.S.C. § 265 remains necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE)

and U.S. Border Patrol stations, and destination communities in
the United States during the COVID-19 public health emergency."
*Id.* at 5. Thus, the August 2021 Order continues to prohibit the
introduction of "covered noncitizens"—which is defined to
include "family units"—into the United States along the U.S.
land and adjacent coastal borders. *Id.* at 7. The Court will
refer to the process developed by the CDC and implemented by the
August 2021 Order as the "CDC Order" or the "Title 42 Process."

### 3. CDC Order's Effect on Asylum Seekers

Plaintiffs and the proposed class member are families from
countries "that are among the most dangerous in the world due to
gang, gender, family membership, and other identity-based
violence." Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 31.
Plaintiffs are currently detained and in the custody of DHS. Am.
Compl., ECF No. 22 ¶¶ 14-19. As such, they are subject to
expulsion from the United States pursuant to the CDC Order.
Plaintiffs assert that prior to the Title 42 Process, and
"pursuant to longstanding immigration statutes protecting asylum
seekers, Plaintiffs were entitled to assert claims for asylum
and related forms of humanitarian protection, and to procedures
Congress established to ensure the fair determination of their
right to remain in the United States." *Id.* ¶ 4. Plaintiffs claim
that if they and others like them are expelled pursuant to the
CDC Order, they "would face grave danger in their home

countries." *Id.* ¶ 10. According to Plaintiffs, "Defendants
subjected approximately 21,500 members of families to the Title
42 Process between March and December 2020." Pls.' Mot. Class
Cert., ECF No. 23-1 at 10.

### B. Procedural History

#### 1.    Related Litigation

On November 18, 2020, this Court adopted Magistrate Judge
Harvey's Report and Recommendation, provisionally granted the
plaintiff's motion to certify class, and issued a preliminary
injunction barring enforcement of the Title 42 Process as to
unaccompanied minors in *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492,
520-22 (D.D.C. 2020). The Court of Appeals for the District of
Columbia Circuit ("D.C. Circuit") later stayed the preliminary
injunction pending appeal. Order, *P.J.E.S. v. Mayorkas*, No. 20-
5357 (D.C. Cir. Jan. 29, 2021).

In February 2021, the CDC issued a notice "temporarily
except[ing] . . . unaccompanied noncitizen children" from
expulsion under the Title 42 Process. CDC, Notice of Temporary
Exception from Expulsion of Unaccompanied Noncitizen Children
Encountered in the United States Pending Forthcoming Public
Health Determination, 86 Fed. Reg. 9942-01, 2021 WL 600683 (Feb.
11, 2021). The notice stated that CDC was "in the process of
reassessing" the Title 42 Order and that the temporary exception
for unaccompanied minors would "remain in effect until CDC has

completed its public health assessment and published any notice or modified Order." *Id.* Magistrate Judge Harvey and the D.C. Circuit granted the parties' motion to hold the case in abeyance on February 24, 2021. *See* Min. Order (Feb. 24, 2021); Order, P.*J.E.S. v. Mayorkas*, No. 20-5357 (D.C. Cir. Mar. 2, 2021).

In July 2021, the CDC issued an order "except[ing] unaccompanied noncitizen children . . . from the [CDC's] October [13, 2020] Order." *See* Order Under Sections 362 & 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40; Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 38717, 38718 (July 22, 2021). The CDC explained that the July 16 Order "supersede[s]" the notice issued on February 11, 2021. *Id.* at 38720. On August 2, 2021 the CDC issued another order that superseded the October 2020 Order. Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42828-02 (Aug. 5, 2021). The July 16 Order was "made a part of [the August 2021 Order] and incorporated by reference as if fully set forth" in the August 2021 Order. *Id.* at 42829 n.5.

## 2. Proceedings in this Case

Plaintiffs filed this action on January 12, 2021. *See* Compl., ECF No. 1. The same day, Plaintiffs filed an emergency motion to stay their removal from the United States, and Defendants orally objected to Plaintiffs' request during the hearing on the motion. *See* Pls.' Emergency Mot. Stay Removal, ECF No. 5. The Court entered a Minute Order granting Plaintiffs' emergency motion over objection "[i]n view of the arguments presented by Plaintiffs in their motion, the representations made by the Government, and for the reasons stated on the record at the January 12, 2021 Status Conference." Min. Order (Jan. 12, 2021). The Court also granted thirteen subsequent emergency motions to stay the removal of other families on January 19, 2021; January 27, 2021; January 29, 2021; February 1, 2021; February 4, 2021; February 5, 2021; February 6, 2021; February 9, 2021; February 18, 2021; February 19, 2021; and February 22, 2021. *See* Min. Orders (Jan. 19, 2021; Jan. 27, 2021; Jan. 29, 2021; Feb. 1, 2021; Feb. 4, 2021; Feb. 5, 2021; Feb. 6, 2021; Feb. 9, 2021; Feb. 18, 2021; Feb. 19, 2021; Feb. 22, 2021).

Plaintiffs filed a motion for class certification on January 28, 2021, *see* Mot. Certify Class, ECF No. 23; and they filed a motion for preliminary injunction on February 5, 2021, *see* Mot. Prelim. Inj., ECF No. 57. Defendants filed a combined opposition to both motions on February 17, 2021. *See* Defs.'

Opp'n, ECF No. 76. On February 23, 2021, the Court granted the
parties' joint motion to hold in abeyance Plaintiffs' motions
for class certification and classwide preliminary injunction.
Min. Order (Feb. 23, 2021). The motions were held in abeyance
until August 5, 2021, when the Court granted the parties' motion
for a briefing schedule on Plaintiffs' motions. Min. Order (Aug.
5, 2021). On August 6, 2021, Defendants filed a supplemental
declaration in support of their combined opposition. *See*
Shahoulian Decl., ECF No. 116. Plaintiffs filed their combined
reply brief on August 11, 2021. *See* Pls.' Reply, ECF No. 118.
The motions are now ripe for the Court's adjudication.

## II.  Legal Standard

"A plaintiff seeking a preliminary injunction must
establish [1] that he is likely to succeed on the merits, [2]
that he is likely to suffer irreparable harm in the absence of
preliminary relief, [3] that the balance of equities tips in his
favor, and [4] that an injunction is in the public interest."
*Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration
in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392
(D.C. Cir. 2011)). Where the federal government is the opposing
party, the balance of equities and public interest factors
merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A
preliminary injunction is an "extraordinary remedy that may only
be awarded upon a clear showing that the plaintiff is entitled

to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555
U.S. 7, 22 (2008) (citation omitted). "The purpose of a
preliminary injunction is merely to preserve the relative
positions of the parties until a trial on the merits can be
held." *Univ. of Tex. V. Camenisch*, 451 U.S. 390, 395 (1981). In
this Circuit, the four factors have typically been evaluated on
a "sliding scale," such that if "the movant makes an unusually
strong showing on one of the factors, then it does not
necessarily have to make as strong a showing on another factor."
*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92
(D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v.
Natural Resources Defense Council*, 555 U.S. 7 (2008), "the D.C.
Circuit has suggested that a positive showing on all four
preliminary injunction factors may be required." *Holmes v. FEC*,
71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley*, 644
F.3d at 393 ("[W]e read *Winter* at least to suggest if not to
hold that a likelihood of success is an independent,
freestanding requirement for a preliminary injunction.")
(citation and quotation marks omitted)). Nonetheless, "the
Circuit has had no occasion to decide this question because it
has not yet encountered a post-*Winter* case where a preliminary
injunction motion survived the less rigorous sliding-scale

analysis." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

## III.  **Analysis**

### A. **Plaintiffs' Motion for Class Certification**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation marks omitted). Rule 23(a) establishes four requirements for class certification: (1) that "the class is so numerous that joinder of all members is impracticable"; (2) that "there are questions of law or fact common to the class"; (3) that "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition to satisfying Rule 23(a), a putative class must also meet one of the Rule 23(b) requirements. Here, Plaintiffs seek certification under Rule 23(b)(2), claiming that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Pls.' Mot. Class Cert., ECF No. 23-1 at 8 (quoting Fed. R. Civ. P. 23(b)(2)).

"The party seeking certification bears the burden of persuasion, and must show that the putative class[] meet[s] the requirements of Rule 23 by a preponderance of the evidence." *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 204 (D.D.C. 2018) (citing *Hoyte v. District of Columbia*, 325 F.R.D. 485, 491 (D.D.C. 2017)). To carry that burden, Plaintiffs must "affirmatively demonstrate . . . compliance with the Rule—that is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The Court must undertake a "rigorous analysis" to confirm that the requirements of Rule 23 have been satisfied. *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982).

Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), Plaintiffs have sought certification of the following class: "All noncitizens who (1) are or will be in the United States; (2) come to the United States as a family unit composed of at least one child under 18 years old and that child's parent or legal guardian; and (3) are or will be subjected to the Title 42 Process." Pls.' Mot. Class Cert., ECF No. 23-1 at 7. For the reasons discussed below, the Court finds that Plaintiffs meet all of Rule 23(a) and Rule 23(b)(2)'s requirements. As Defendants' sole challenge to Plaintiffs' class certification motion is that the term "Title 42 Process" is not adequately

defined, Defs.' Opp'n, ECF No. 76 at 16; the Court shall first
address the sufficiency of the class definition before briefly
analyzing the remaining Rule 23(a) and Rule 23(b)(2)
requirements.

### 1.   Class Definition

"[I]t is far from clear that there exists in this
[D]istrict a requirement that a class . . . must demonstrate
ascertainability to merit certification." *Ramirez v. USCIS*, 338
F. Supp. 3d 1, 48 (D.D.C. 2018); *see also Hoyte v. District of
Columbia*, 325 F.R.D. 485, 489 n.3 (D.D.C. 2017) (noting that
"[t]he ascertainability requirement, while adopted by some
courts in this district, has been recently disavowed by four
federal appellate courts" and explaining that "the D.C. Circuit
has not opined on the requirement"). However, the requirement of
"definiteness" has been imposed by some courts as an "implied
requirement" for class certification, in addition to the express
requirements in Rule 23. *See DL v. District of Columbia*, 302
F.R.D. 1, 17 (D.D.C. 2013). This "common-sense requirement,"
*Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998); is
designed primarily to ensure the proposed class is
administratively manageable, *see Hartman v. Duffey*, 19 F.3d
1459, 1471 (D.C. Cir. 1994). "It is not designed to be a
particularly stringent test, but plaintiffs must at least be
able to establish that 'the general outlines of the membership

of the class are determinable at the outset of the litigation.'" *Pigford*, 182 F.R.D. at 346 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1760 at 118).

"[W]here the plaintiff seeks certification of an injunctive class pursuant to Rule 23(b)(2), 'actual membership of the class need not . . . be precisely delimited' because such cases will not require individualized notice, opt-out rights, or individual damage assessments, and the defendant will be required to comply with the relief ordered no matter who is in the class.'" *Brewer v. Lynch*, No. 08-1747, 2015 WL 13604257, at *6 (D.D.C. Sept. 30, 2015). In those cases, the definiteness requirement is satisfied as long as plaintiffs can establish the "existence of a class" and propose a class definition that "accurately articulates 'the general demarcations' of the class of individuals who are being harmed by the alleged deficiencies." *See, e.g.*, *Kenneth R. v. Hassan*, 293 F.R.D. 254, 264 (D.N.H. 2013); *see also DL*, 302 F.R.D. at 17 ("Because the rationale for precise ascertainability is inapposite in the 23(b)(2) context, . . . it is not required in cases such as this where only injunctive relief is sought and notice is not required.").

Defendants contend that Plaintiffs have failed to establish that the proposed class satisfies the requirements of Rule 23(a) and Rule 23(b)(2) because the phrase "Title 42 Process" is not

defined within the class definition. Defs.' Opp'n, ECF No. 76 at
16.  They argue that, due to the lack of a definition,
"Plaintiffs have not established that the conduct they seek to
enjoin or declare unlawful will be 'as to all of the class
members or as to none of them.'" *Id.* (quoting Fed. R. Civ. P.
23(b)(2)). While Defendants concede that "it is no secret that
Plaintiffs challenge the 'practice of summary expulsion under
the Title 42 Process' and the alleged lack of access to asylum,"
they argue that the Amended Complaint and Class Certification
Motion include statements that suggest that the "class
definition might include practices that Plaintiffs do not
challenge as unlawful." *Id.* at 17. Specifically, Defendants note
that Plaintiffs refer to the "Title 42 Process" as a "system
established in a set of agency documents—a new regulation,
several orders, and an implementation memo," and that the
Amended Complaint states that, "*[a]mong other things*, the Title
42 Process authorizes the summary expulsion of noncitizens,
including vulnerable families seeking asylum in this country,
without any of the procedural protections guaranteed by
Congress." *Id.* (quoting Am. Compl., ECF No. 22 ¶¶ 1, 3) (cleaned
up).

The Court disagrees. As an initial matter, the Court notes
that a "vague and ambiguous class definition" is not
automatically "fatal[]" to a motion for class certification.

Defs.' Opp'n, ECF No. 76 at 15-17. The case law is clear that
the mere existence of a problematic class definition does not
automatically mandate denial of class certification. *See Brewer*,
2015 WL 13604257, at *7. Rather, "[w]hen appropriate, district
courts may redefine classes . . . sua sponte prior to
certification." *Borum v. Brentwood Village, LLC*, 324 F.R.D. 1, 8
(D.D.C. 2018); *see also Wagner v. Taylor*, 836 F.2d 578, 589-90
(D.C. Cir. 1987) (stating that district courts may "exercise . .
. broad discretion to redefine and reshape the proposed class to
the point that it qualifies for certification under Rule 23").

　　　Here, however, the proposed class is not so poorly defined
as to require sua sponte redefinition by the Court. First,
Plaintiffs' amended complaint, motions, and reply brief each set
forth a fairly descriptive definition of the Title 42 Process as
referring to the practice of summarily expelling asylum-seeking
families since late March 2020. *See* Pls.' Mot. Class Cert., ECF
No. 23-1 at 7 ("A class action lawsuit is appropriate to
challenge Defendants' unlawful practice of summarily expelling
vulnerable families with minor children under their shadow
deportation system, referred to here as the 'Title 42 Process'
or 'Title 42 Policy.'"); Pls.' Mot. Prelim. Inj., ECF No. 57-1
at 9 ("Defendants moved to summarily deport [Plaintiffs] based
on an unprecedented and unlawful expulsion process, invoking the
public health powers of the Centers for Disease Control and

Prevention ('CDC'), specifically 42 U.S.C. § 265 (the 'Title 42 Process')."); Pls.' Reply, ECF No. 118 at 29 ("Plaintiffs have identified and challenged 'a uniform policy or practice' of 'expulsion,' and sought relief enjoining application of the challenged CDC orders to the class."); Am. Compl., ECF No. 22 ¶ 3 ("Among other things, the Title 42 Process authorizes the summary expulsion of noncitizens, including vulnerable families seeking asylum in this country, without any of the procedural protections guaranteed by Congress—even if the families show no signs of having COVID-19.").

Second, although Plaintiffs do use the phrase "among other things" in one sentence within their Amended Complaint, Defendants' argument is weakened by their own acknowledgment that the focus of this litigation is the "'practice of summary expulsion under the Title 42 Process' and the alleged lack of access to asylum." Defs.' Opp'n, ECF No. 76 at 16.

And third, Defendants' reliance on the Seventh Circuit case *Rahman v. Chertoff*, 530 F.3d 622 (7th Cir. 2008), is misplaced. In *Rahman*, the plaintiffs sought to certify a class of citizens defined as "[a]ll United States citizens who now are and/or in the future will be subjected to detentions upon reentry to the United States as a result of defendants' contested policies, practices and customs." *Id.* at 625. However, the class definition did not specify what "defendants' contested policies,

App. 93

practices and customs" were. *Id.* The Seventh Circuit therefore denied the plaintiffs' motion to certify, explaining that "[a] class of all persons now or in the future subject to unspecified practices may have nothing to do with the named representatives' injuries, or what caused them." *Id.* at 626. The court also noted that the undefined class was "hard to evaluate" and "incompatible" with the "typicality" requirement. *Id.* at 627.

Here, Defendants argue that Plaintiffs' class definition "suffers from similar infirmities." Defs.' Opp'n, ECF No. 76 at 16. But not only is *Rahman* non-binding on this Court, it is also distinguishable on the facts. Significantly, though Plaintiffs refer to the "Title 42 Process" generally as a "system established in a set of agency documents—a new regulation, several orders, and an implementation memo," *id.* at 17; Plaintiffs' Amended Complaint and motions briefing also separately identify and describe each regulation, order, and memo. *See, e.g.*, Am. Compl., ECF No. 22 ¶¶ 41-66. Thus, unlike in *Rahman*, the Court is able to easily evaluate the application of specific policies and procedures on the proposed class members, and any "administrative feasibility requirement" is satisfied because identifying the class members under this definition would not require much, if any, individual factual inquiry. *See Brewer,* 2015 WL 13604257, at *6.

2.    **Rule 23(a) Requirements**

**a. Numerosity**

Because of the general rule in favor of confining litigation to the named parties only, a class action is appropriate only when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although Plaintiffs need not clear any "specific threshold," as a general benchmark, "courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet this requirement." *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007). Plaintiffs may satisfy the requirement by supplying estimates of putative class members, *see Pigford*, 182 F.R.D. at 347-48; "[s]o long as there is a reasonable basis for the estimate provided," *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999).

Here, Defendants do not dispute that the proposed class satisfies the numerosity requirement. Plaintiffs have provided evidence that, between March 2020 and December 2020, approximately 21,515 members of family units[4] were subject to the CDC Order and its previous iterations, *see* Kang Decl., ECF No. 23-2 ¶ 4; and that, between April 2020 and December 2020,

_____

[4] The CBP defines a "family unit" as "the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member." *See* Kang Decl., ECF No. 23-2 ¶ 3.

"approximately 21,018 members of family units (81%) were
expelled under Title 42," *id.* ¶ 6. Accordingly, the Court finds
that the numerosity requirement is met. *See O.A. v. Trump*, 404
F. Supp. 3d 109, 155 (D.D.C. 2019) (finding numerosity
established by evidence in the administrative record estimating
that the class consisted of "thousands of migrants who have
crossed and will cross the United States' southern border
outside ports of entry").

### b. Commonality

A plaintiff seeking class certification must also establish
that "there are questions of law or fact common to the class."
Fed. R. Civ. P. 23(a)(2). This requires more than the
identification of the purported violation of the same provision
of law. *See DL v. District of Columbia*, 713 F.3d 120, 127–30
(D.C. Cir. 2013) (vacating an order certifying a class composed
of students who were purportedly each denied a free appropriate
public education on the ground that plaintiffs had identified
only sufferers of a violation of the same provision of law and
had not met the commonality requirement). Instead, the claims
must depend on "a common contention [that] is capable of
classwide resolution—which means that determination of its truth
or falsity will resolve an issue that is central to the validity
of each one of the claims in one stroke." *Wal–Mart Stores*, 564

U.S. at 350. "Even a single common question will do." *Id.* at 359
(cleaned up).

As the D.C. Circuit has explained, commonality is satisfied
where there is "a uniform policy or practice that affects all
class members." *DL*, 713 F.3d at 128; *see also O.A.*, 404 F. Supp.
3d at 156 (finding commonality satisfied where "[a]ll members of
the proposed class, and all of the proposed class
representatives, face the same threat of injury" and where
"[a]ll challenge the same Rule on the same grounds, and all seek
the same remedy—invalidation of the Rule"). Here, Plaintiffs are
challenging the lawfulness of the Title 42 Process, which is a
uniform policy that applies to each Plaintiff and all members of
the proposed class. Moreover, "[n]ot only do all class members
present the same challenge to the policy, but there also is no
evident variation among them concerning their ultimate
entitlement to relief: if any person in the class has a
meritorious claim, they all do." *J.D. v. Azar*, 925 F.3d 1291,
1321 (D.C. Cir. 2019). The Court can, therefore, conclude that
"common questions of law and fact" unite the class members'
claims. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 332 (D.D.C. 2018)
(finding that "the allegation that the five ICE Field Officers
are no longer providing the 'individualized determinations' of
parole eligibility and procedural protections required by the
Parole Directive" satisfied the commonality requirement).

### c. Typicality

A class representative satisfies the typicality requirement
if the representative's "claims are based on the same legal
theory as the claims of the other class members" and her
"injuries arise from the same course of conduct that gives rise
to the other class members' claims." *Bynum*, 214 F.R.D. at 35.
Put another way, a representative's claims are typical of those
of the class when "[t]he plaintiffs allege that their injuries
derive from a unitary course of conduct by a single system."
*Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). Here,
Plaintiffs and all members of the proposed class face the same
injury: the threat of expulsion pursuant to the Title 42
Process. All challenge the same policy on the same grounds, and
all seek the same remedy—invalidation of the Title 42 Process.
Thus, the typicality requirement is met.

### d. Adequacy

"The adequacy requirement aims to ensure that absent class
members will not be bound by the outcome of a suit in which they
were not competently and fairly represented." *J.D.*, 925 F.3d at
1312. "Adequacy embraces two components: the class
representative (i) 'must not have antagonistic or conflicting
interests with the unnamed members of the class' and (ii) 'must
appear able to vigorously prosecute the interests of the class

through qualified counsel.'" *Id.* (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)).

Defendants also do not dispute that Plaintiffs have satisfied the adequacy requirement. First, Defendants have not identified—and the Court is unaware of—any interest Plaintiffs have that is antagonistic to or conflicts with the putative class members. Rather, courts have found that where, as here, the plaintiffs "seek identical relief for all class members, . . . there are no conflicting interests that might derail certification on this prong." *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 84 (D.D.C. 2015). Second, the Court concludes that Plaintiffs' current counsel are "willing and have the ability vigorously to litigate this case and to protect the interests of absent class members." *O.A.*, 404 F. Supp. 3d at 157.

### 3.    Rule 23(b)(2) Requirement

Having determined that Plaintiffs meet the requirements of Rule 23(a), the Court must next determine whether they meet the requirements of Rule 23(b)(2). Rule 23(b)(2) applies if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the

injunctive or declaratory remedy warranted—the notion that the
conduct is such that it can be enjoined or declared unlawful
only as to all of the class members or as to none of them." *Wal-
Mart*, 564 U.S. at 360 (internal quotation marks and citations
omitted). Rule 23(b)(2) imposes "two requirements: (1) that
defendant's actions or refusal to act are 'generally applicable
to the class' and (2) that plaintiffs seek final injunctive
relief or corresponding declaratory relief on behalf of the
class." *Bynum*, 214 F.R.D. at 37.

Plaintiffs have satisfied both requirements here. The
relief Plaintiffs seek—among other things, a declaration that
the Title 42 Process is unlawful and an injunction prohibiting
Defendants from applying the Title 42 Process to Plaintiffs and
proposed class members—is "generally applicable to the class"
and is indivisible. *See Damus*, 313 F. Supp. 3d at 334-35
(finding Rule 23(b)(2) satisfied where plaintiffs were not
asking the court "to remedy discrete errors in their parole
determinations," but rather "only . . . address an alleged
systematic harm"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 182
(D.D.C. 2015) (finding Rule 23(b)(2) satisfied where plaintiffs
sought to enjoin ICE from consideration of particular factor in
making detention determination). Plaintiffs also do not seek
individualized relief, and thus this is not a case where "each
individual class member would be entitled to a *different*

injunction or declaratory judgment against the defendant." *Wal-Mart*, 564 U.S. at 360; *see also Ramirez*, 338 F. Supp. 3d at 48 (finding Rule 23(b) satisfied where plaintiffs "d[id] not seek a court order mandating any particular outcome with respect to any particular [individual plaintiff]").

For all these reasons, the Court grants Plaintiffs' motion for class certification.

### B. Plaintiffs' Motion for Preliminary Injunction

#### 1. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs argue that the CDC Orders instituting the Title 42 Process exceed the authority granted by Congress pursuant to Section 265 because "[n]othing in [Section] 265, or Title 42 more generally, purports to authorize any deportations, much less deportations in violation of" statutory procedures and humanitarian protections, including the right to seek asylum. Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 17-18. The Court agrees and finds that Plaintiffs have shown that they are likely to succeed on the merits of their claim.

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), provides the framework for reviewing an agency's interpretation of a statute that the agency is charged with administering. *See* 467 U.S. at 837. The first step in this review process is for the court to determine "whether Congress

has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. In determining whether the statute unambiguously expresses the intent of Congress, the court should use all the "traditional tools of statutory construction," including looking to the text and structure of the statute, as well as its legislative history, if appropriate. *See id.* at 843 n.9; *see also Bell Atlantic Tel. Co. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997). If the court concludes that the statute is either silent or ambiguous with respect to the precise question at issue, the second step of the court's review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The court must defer to agency interpretations that are not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

The Court's analysis begins with the statutory text. *See S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 22-23 (D.C. Cir. 1999). Here, Section 265 states in full:

> Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger

> is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265.

As Plaintiffs point out, Section 265 simply contains no mention of the word "expel"—or any synonyms thereof—within its text. *See* Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 18. The lack of express terms within the statute is significant: even "broad rulemaking power must be exercised within the bounds set by Congress," *Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 92, 94 (D.D.C. 2019), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020) (stating that "agencies are 'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes'"); and the CDC "does not [have the] power to revise clear statutory terms," *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014).

Indeed, particularly where the statute in question regards such a "severe 'penalty'" as deportation, *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (quoting *Fong Yue Ting v. United*

*States*, 149 U.S. 698, 740 (1893)); the Court is loathe to recognize an implied power of forced removal from the country, *see Util. Air Reg. Grp.*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"). Rather, as this Court explained in *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 512 (D.D.C. 2020), "when Congress wants to grant the power to expel individuals out of the United States, it does so plainly." *P.J.E.S.*, 502 F. Supp. 3d at 512; *see, e.g.*, 8 U.S.C. § 1225(b)(2)(A), (C) (allowing an alien who has arrived on land from a contiguous country and who is "not clearly and beyond a doubt entitled to be admitted" to be "return[ed] . . . to that territory pending a proceeding"); *id.* § 1231(a)(1)(A) ("Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days . . . ."); 18 U.S.C. § 3186 (authorizing a fugitive from another country found in the United States to be "take[n] . . . to the territory of such foreign government" by an agent of that government). Moreover, "Congress has made clear when public health concerns merit disallowing a non-citizen to remain in the United States." *P.J.E.S.*, 502 F. Supp. 3d at 539; *see* 8 U.S.C. § 1182(a)(1) (providing that "aliens who are inadmissible" are those determined "to have a communicable disease of public health

significance"); *id.* § 1222 (providing for medical detention and examination as part of immigration processing). As the Supreme Court "ha[s] stated time and again[,] . . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citations omitted); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." (internal quotation marks omitted)). And here, the plain language of Section 265, particularly when read in conjunction with the above statutes governing immigration under Title 8 of the U.S. Code, evinces no intention to grant the Executive the authority to expel or remove persons from the United States.

The Court also finds that the plain text of Section 265 is supported by the statutory context. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 132–33 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))). For example, in Section 271, Congress provided for specific "penalties" for those

persons who or vessels that violated public health regulations prescribed under the relevant sections, including Section 265. 42 U.S.C. § 271. For individuals, Section 271 states that any violation "shall be punished by a fine of not more than $1,000 or by imprisonment for not more than one year, or both." *Id.* § 271(a). Removal from the United States, however, is not included as a penalty. Moreover, Section 271 refers to the regulations prescribed under Section 265 and others as "*quarantine* laws," further suggesting that the CDC's powers were limited to quarantine and containment. *Id.* § 271 (emphasis added).

Neither does neighboring Section 264 contemplate the removal of persons from the United States. Section 264 authorizes the Secretary to use various public health measures to "prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264. Although Defendants rely on Section 264 as evidence of the Secretary's "sweeping authority to protect the country from potentially devastating communicable diseases," Defs.' Opp'n, ECF No. 76 at 23; the provision only mentions regulations that provide for the "apprehension, detention, examination, or conditional release of individuals" if the individual is "coming into a State or possession from a foreign country or possession." 42 U.S.C. § 264(c). Again, the authority to remove is not mentioned. "That is, in a section where one would expect the term to appear—where

Congress has delineated the government's power to prevent the spread of contagious disease from individuals coming into the United States from a foreign country—it does not." *P.J.E.S.*, 502 F. Supp. 3d at 537-38.

Furthermore, even beyond Sections 264 and 271, the statute as a whole does not contain "a word about the power of the [CDC] to expel anyone who has come into the country." *Id.* at 513-14 (citing 42 U.S.C., Chap. 6A, Subchap. II, Part G (entitled "Quarantine and Inspection")); 42 U.S.C. § 267 (entitled "Quarantine stations, grounds, and anchorages"); *id.* § 268 (entitled "Quarantine duties of consular and other officers"); *id.* § 270 (entitled "Quarantine regulations governing civil air navigation and civil aircraft"); *id.* § 271 (entitled "Penalties for violation of quarantine laws"); *id.* § 272 (entitled "Administration of oaths by quarantine officers"). Rather, the statutory scheme reflects Congress's focus on the public's health, authorizing the CDC to create regulations that allow for the "apprehension, detention, examination, or conditional release of individuals" entering from foreign countries to stop the spread of communicable diseases from those countries, *id.* § 264; and then in times of serious danger, to halt the "introduction of persons" from designated foreign countries, *id.* § 265.

Defendants argue, however, that the findings above "ignore[] the purely public health purpose of the statute," because "[t]he absence of the terms 'expel' or 'removal' has no special significance in the public health context even if its absence might be meaningful in the immigration context." Defs.' Opp'n, ECF No. 76 at 19-20. They further contend that Section 265's phrase "prohibit[ing] . . . the introduction" does not demonstrate that Congress intended to limit the Executive's authority at "stopping a person precisely at the Nation's borders." *Id.* at 18. Instead, "the term 'introduction' refers to a continuing process and is most naturally read to extend beyond a person's immediate physical crossing of the border," and "to 'prohibit . . . the introduction' naturally means to intercept or prevent such a process." *Id.* at 18-19. Thus, in Defendants' view, "the Section 265 authority includes intercepting and halting persons who have already crossed the border—but who are in the process of being introduced—into the United States." *Id.* at 19.

Defendants arguments are unpersuasive. First, regardless of whether the words "expel" or "remove" are specific to the immigration context, Defendants do not explain the lack of synonyms of either word within the statute. Moreover, "[i]t is a fundamental principle of statutory interpretation that absent provision[s] cannot be supplied by the courts." *Rotkiske v.*

*Klemm*, 140 S. Ct. 355, 360–61 (2019) (internal citations and quotation marks omitted) (alteration in original). "[W]hen Congress wants to mandate [certain] procedures[,] it knows exactly how to do so." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018). In view of current immigration laws, which speak to deportation by using words such as "remove" and "return," *see* 8 U.S.C. § 1182(d)(3)(A) ("The Attorney General shall prescribe conditions . . . to . . . *return* . . . inadmissible aliens . . . ." (emphasis added)); *id.* § 1182(h)(2) ("No waiver shall be granted . . . for a period of not less than 7 years immediately preceding the date of initiation of proceedings to *remove* the alien from the United States." (emphasis added)); this Court recognizes, as have other courts in this District, that "[t]here's a serious question about whether [Section 265's] power includes the power . . . to remove or exclude persons who are already present in the United States," Hr'g Tr., *J.B.B.C. v. Wolf*, No. 20-cv-1509, ECF No. 39 at 50 (June 26, 2020). Put simply, the "fact that Congress did not use [words such as 'return' or 'remove'] . . . suggests at a minimum that the power to remove is not granted by [S]ection 265." *Id.*[5]

---

[5] Citing to dicta in *Russello v. United States*, 464 U.S. 16, 25 (1983), the government argues that "language in one statute usually sheds little light upon the meaning of different language in another statute." Defs.' Opp'n, ECF No. 76 at 19–20.

Second, even accepting the government's position that the phrase "prohibit . . . the introduction of" means "to intercept or prevent" the "process" of introduction, Defs.' Opp'n, ECF No. 76 at 18-19; this phrase also does not encompass expulsion from the United States, nor do any of the definitions provided by the Government contain the word "expel" or synonyms thereof. Rather, to "prohibit . . . the introduction of" merely means that the process of introduction can be halted. And "[e]xpelling persons, as a matter of ordinary language, is entirely different from interrupting, intercepting, or halting the process of introduction." *P.J.E.S.*, 502 F. Supp. at 512; *see also id.* at 536 (finding that the Merriam-Webster Dictionary definitions of "prohibit," "intercept," and "prevent" each "connote stopping something before it begins, rather than remedying it afterwards"). In other words, "interrupting, intercepting, or halting the process of introduction does [not] inexorably lead to expulsion." *Id.* at 512.


However, the Supreme Court routinely points to other statutes as evidence that Congress knows how to legislate in particular ways. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) ("A textual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision. Congress has enacted statutes that expressly include the language [the petitioner] asks us to read in . . . ."); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018) (explaining that "when Congress wants to mandate [certain] procedures[,] it knows exactly how to do so," and "Congress has spoken often and clearly" to the issue in other statutes).

The Government next contends that, "rather than specifying that the power to prohibit the introduction of persons is limited to the Nation's borders," Congress expressly delegated the power to issue regulations that accomplish Section 265's purpose. Defs.' Opp'n, ECF No. 76 at 20. But the government's argument is beside the point; if Section 265 does not provide the authority to expel persons, then it does not delegate the authority to issue regulations to expel persons. In addition, the Court also notes that the legislative history cited by the government—that Section 265's predecessor statute would have given the President the power to suspend "immigration," *see* Defs.' Opp'n, ECF No. 76 at 22—does not provide support for its position that Section 265 authorizes it to expel persons.

Finally, in view of the above discussion and finding that Section 265 is not ambiguous, the Court need not reach step two of the *Chevron* analysis. However, even if the statute was ambiguous, deference would not be justified. First, "the 'reconciliation' of distinct statutory regimes 'is a matter for the courts,' not agencies," *Epic Sys.*, 138 S. Ct. at 1629 (quoting *Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659, 685-86 (1975)); and here, "[t]he question for this claim is purely legal: does Section 265 authorize expulsions from the United States, or does it not?" *P.J.E.S.*, 502 F. Supp. 3d at 544 n.15. And while the government contends that the interpretation of

"introduction" is within the Secretary's expertise, *see* Defs.'
Opp'n, ECF No. 76 at 33-34; the Court disagrees. "The CDC's
'scientific and technical knowledge' . . . has no bearing on
that question of statutory interpretation." *P.J.E.S.*, 502 F.
Supp. 3d at 544 n.15. Moreover, government has not explained how
its scientific and technical expertise would lead it to
interpret "introduction" to encompass "expulsion." *Cf. Kisor v.
Wilkie*, 139 S. Ct. 2400, 2416 (2019) (noting that "[a] court
must make an independent inquiry into whether the character and
context of the agency interpretation entitled it to controlling
weight"); *see also NRDC v. Daley*, 209 F.3d 747, 755-56 (D.C.
Cir. 2000) ("The Service cannot rely on 'reminders that its
scientific determinations are entitled to deference' in the
absence of reasoned analysis 'to cogently explain' why its
additional recommended measures satisfied the Fishery Act's
requirements."). Accordingly, the CDC is not entitled to
deference with respect to its interpretation.[6]

### 2. Plaintiffs Face Irreparable Injury

"The failure to demonstrate irreparable harm is 'grounds
for refusing to issue a preliminary injunction, even if the

---

[6] Because the Court finds that Title 42 does not authorize
expulsion, the Court need not address Plaintiffs' additional
arguments that Section 265 was designed to regulation
transportation or that, even if Section 265 authorized
expulsions, the Title 42 Process would violate the immigration
statutes. *See* Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 21, 27.

other three factors . . . merit such relief.'" *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (RBW) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted).

Plaintiffs contend that they are likely to suffer irreparable harm if they are expelled without the opportunity to seek humanitarian relief pursuant to the Title 42 Process. Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 31. Plaintiffs have presented as evidence United States Department of State reports and multiple declarations asserting that the home countries of the proposed class members "are among the most dangerous in the world due to gang, gender, family membership, and other identity-based violence." *Id.* at 32. The declarations submitted to the Court specify in detail Plaintiffs' fear of violence, persecution, and other victimization if they are removed, yet

they remain subject to the Title 42 Process and face the threat of removal prior to receiving any of the protections the immigration laws provide. *See, e.g.*, Sealed Decl., ECF No. 9; Sealed Decl., ECF No. 17; Sealed Decl., ECF No. 27; Sealed Decl., ECF No. 32; Sealed Decls., ECF Nos. 63-67; Sealed Decl., ECF No. 70; Sealed Decls., ECF Nos. 84; Sealed Decls., ECF No. 88-89. Plaintiffs further assert that many of the families "are expelled to Mexico, where they are often victimized by criminal cartels and gang members and face numerous barriers to finding safe places to shelter." Pls.' Mot. Prelim. Inj., ECF No. 57-1 at 33. Defendants do not dispute the potential harms that Plaintiffs could face if removed from the United States.

The Court finds that Plaintiffs have sufficiently shown they will likely suffer irreparable harm absent a preliminary injunction. Plaintiffs' alleged injuries would likely be "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. First, pursuant to the Title 42 Process, Plaintiffs and the proposed class members face the prospect of expulsion without any opportunity to apply for asylum or withholding of removal. And once expelled from the United States and outside the jurisdiction of the Court, a judicial remedy may be unavailable. *See Doe v. Mattis*, 928 F.3d 1, 22 (D.C. Cir. 2019) (finding irreparable harm likely to flow from the transfer of a dual citizen detained in Iraq to an unidentified third country

because he would then be in the custody of that third country "without any continuing oversight by—or recourse to—the United States"); *P.J.E.S.*, 502 F. Supp. 3d at 545; *Tefel v. Reno*, 972 F. Supp. 608, 619-20 (S.D. Fla. 1997) ("[T]he Court finds . . . that Plaintiffs and class members would suffer irreparable harm if they are deported to their native countries after having been denied an opportunity to have a hearing on their claims for suspension of deportation."); *Velasquez v. Velasquez*, No. 14-cv-1688, 2014 WL 7272934, at *5 (E.D. Va. Dec. 15, 2014) (finding irreparable harm where children could be removed from jurisdiction because that would "frustrate the effort of th[e] Court in resolving the [dispute]"). Second, members of the proposed class also do not seek monetary compensation for their injuries; instead, they seek injunctive and declaratory relief invalidating the Title 42 Process. Unlike economic harm, the harm resulting from expulsion from the United States pursuant to an unlawful policy likely cannot be remediated after the fact. *Cf. Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (explaining that economic losses are typically not irreparable because compensation can be awarded after a merits determination).

In addition, "[i]t is well-established that acts by [g]overnment agencies in derogation of statutory rights of the public or certain individual members of the public can

constitute irreparable injury." *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 42 n.22 (D.D.C. 2017) (quoting *Gates v. Schlesinger*, 366 F. Supp. 797, 800 (D.D.C. 1973)). Here, the Court has explained that Section 265 likely does not authorize expulsion, thereby denying the proposed class members' the opportunity to seek humanitarian benefits pursuant to the immigration statutes.

Defendants argue, however, that the "inherently individualized nature" of Plaintiffs' potential harms does not demonstrate that the harms are "likely" to occur in the absence of a preliminary injunction. Defs.' Opp'n, ECF No. 76 at 35. But while the decision whether to eventually grant asylum to individuals is undoubtedly fact-intensive, as explained above, Plaintiffs have provided ample unrebutted evidence demonstrating that they are collectively deprived of certain statutory procedures to seek protection under the Title 42 Process, and they face real threats of violence and persecution if they were to be removed from the United States. *See, e.g.*, Neusner Decl., ECF No. 118-4 ¶ 8; Harbury Decl., ECF No. 118-5 ¶¶ 1, 10; Arvey Decl, ECF No. 118-7 ¶ 16; Pinheiro Decl., ECF No. 118-7 ¶ 37; Suppl. Levy Decl., ECF No. 118-3 ¶ 16; Rivas Decl., ECF No. 118-11 ¶ 16. In addition, as Plaintiffs point out, "Defendants offer no evidence that class members face materially disparate dangers once expelled." Pls.' Reply, ECF No. 118 at 20. As other courts

have noted, "similar showings" of "bona fide clams for
humanitarian relief, including fear of persecution on the basis
of protected characteristics," have been found to be "sufficient
to demonstrate irreparable injury." *P.J.E.S.*, 502 F. Supp. 3d at
544 (citing cases); *see also J.B.B.C. v. Wolf*, No. 20-cv-1509,
2020 WL 6041870, at *2 (D.D.C. June 26, 2020) (stating that
sealed "declaration describing the possible harms that would
result from plaintiff's return to Honduras" was sufficient);
*Devitri v. Cronen*, 289 F. Supp. 3d 287, 296-97 (D. Mass. 2018)
(finding unrebutted evidence showing threat of persecution or
torture if deported established likely irreparable harm, despite
"no individualized evidence concerning the specific threats each
Petitioner faces in Indonesia"); *Grace v. Whitaker*, 344 F. Supp.
3d 96, 146 (D.D.C. 2018), *aff'd in part, rev'd in part on other
grounds sub nom.*, *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)
("[P]laintiffs credibly alleged at their credible fear
determinations that they feared rape, pervasive domestic
violence, beatings, shootings, and death in their countries of
origin. Based on plaintiffs' declarations attesting to such
harms, they have demonstrated that they have suffered
irreparable injuries."); *Orantes-Hernandez v. Meese*, 685 F.
Supp. 1488, 1504-05 (C.D. Cal. 1988) (finding that plaintiffs
would suffer irreparable harm if they were summarily removed

without being afforded the opportunity to exercise their right to apply for asylum).

Defendants also contend that "the [g]overnment's implementation of the Order provides a process for determining a covered alien's claim for protection under the Convention Against Torture. Thus, Plaintiffs would not be expelled without some opportunity to seek humanitarian relief." Defs.' Opp'n, ECF No. 76 at 35. However, Defendants do not dispute that Plaintiffs and proposed class members would still be deprived of the protections and procedures provided for under the immigration statutes. *See id.*

Plaintiffs have thus shown a likelihood of suffering irreparable harm.

### 3. The Balance of the Equities and Public Interest Favors an Injunction

The balance-of-equities factor directs the Court to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *ConverDyn*, 68 F. Supp. 3d at 52 (quoting *Winter*, 555 U.S. at 24). "When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief." *Id.; see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). By contrast,

the balance of equities may favor a preliminary injunction that
serves only "to preserve the relative positions of the parties
until a trial on the merits can be held." *Rufer v. FEC*, 64 F.
Supp. 3d 195, 206 (D.D.C. 2014) (quoting *Camenisch*, 451 U.S. at
395). "The purpose of . . . interim relief is not to
conclusively determine the rights of the parties, . . . but to
balance the equities as the litigation moves forward. In
awarding a preliminary injunction a court must also 'conside[r]
. . . the overall public interest'. . . ." *Trump v. Int'l
Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (second
alteration in original) (citations omitted).

Plaintiffs contend that issuing a preliminary injunction
"would not substantially injure the government and would be
consistent with public health" because (1) "families who come to
the border . . . can be processed quickly by Border Patrol
agents and released to sponsors in the interior," where they can
quarantine and be subject to local health restrictions; (2)
"insofar as Defendants choose to detain families upon their
apprehension at the border, Defendants operate family detention
facilities where the family can be housed together," as well as
tested and quarantined; and (3) "Defendants keep many families
in custody for weeks before expulsion," where the families are
tested for COVID-19. Pls.' Mot. Prelim. Inj., ECF No. 57-1 at
34-35. Defendants, in opposition, argue that "an injunction will

increase the risk of COVID-19 transmission, which for some could
have deadly consequences, and undoing the mitigation measures
put in place by the Order is not in the public interest." Defs.'
Opp'n, ECF No. 76 at 36.

Here, the Court ultimately finds that the balance of the
equities and the public interest weigh in favor of an
injunction.

First, "[t]here is generally no public interest in the
perpetuation of unlawful agency action." *League of Women Voters
of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also
Ramirez v. ICE*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018) ("The public
interest surely does not cut in favor of permitting an agency to
fail to comply with a statutory mandate."); *R.I.L-R*, 80 F. Supp.
3d at 191 ("The Government 'cannot suffer harm from an
injunction that merely ends an unlawful practice or reads a
statute as required to avoid constitutional concerns.'"). As
explained above, the Court has determined that Plaintiffs are
likely to succeed on their claim that the Title 42 Process is
unlawful. Accordingly, because "there is an overriding public
interest . . . in the general importance of an agency's faithful
adherence to its statutory mandate," *Jacksonville Port Auth. v.
Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977); the Court finds that
Plaintiffs likelihood of success "is a strong indicator that a
preliminary injunction would serve the public interest," *Newby*,

838 F.3d at 12; *see also A.B.-B. v. Morgan*, No. 20-cv-846, 2020 WL 5107548, at *9 (D.D.C. Aug. 31, 2020) ("[T]he Government and public can have little interest in executing removal orders that are based on statutory violations . . . .").

Second, "the public has an interest in 'ensuring that we do not deliver aliens into the hands of their persecutors,' *Leiva-Perez* [*v. Holder*], 640 F.3d [962,] 971 [(9th Cir. 2011)], and 'preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm,' *Nken*, 556 U.S. at 436." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021). Here, the Title 42 Process deprives Plaintiffs and the proposed class members of an opportunity to seek humanitarian protections under the asylum and withholding of removal statutes. Proceeding to the merits of this litigation without preliminary injunctive relief thus "risks [P]laintiffs being returned to home countries where they face significant risk of physical harm." *A.B.-B.*, 2020 WL 5107548, at *9. Defendants do not question that Plaintiffs face substantial harm if returned to their countries of origin. Accordingly, "[t]hese life-or-death consequences weigh heavily in favor of preliminary injunctive relief." *Id.*; *see also Devitri*, 289 F. Supp. 3d at 297 (D. Mass. 2018) ("The public's interest in providing due process for non-citizens to ensure that they are not removed to a country where they will be

persecuted is an extremely weighty one."); *Chaudhry v. Barr*, No. 19-cv-00682, 2019 WL 2009307, at *4 (E.D. Cal. May 7, 2019) ("[T]here is . . . 'a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" (quoting *Sied v. Nielsen*, No. 17-cv-06785, 2018 WL 1142202, at *27 (N.D. Cal. Mar. 2, 2018))).

Defendants argue, however, that "an injunction will increase the risk of COVID-19 transmission, which for some could have deadly consequences, and undoing the mitigation measures put in place by the Order is not in the public interest." Defs.' Opp'n, ECF No. 76 at 36. According to Defendants, (1) "CBP facilities 'are not structured or equipped for quarantine or isolation for COVID-19'"; (2) "[t]he numbers of aliens and the size and capacity of the congregate holding areas are not at all conducive to effective social distancing"; and (3) "CBP is not equipped to provide on-site care to infected persons." *Id.* (quoting March Order at 14; Final Rule, 85 Fed Reg. at 56,433). Due to these constraints, Defendants fear that U.S. Border Patrol's facilities "may rapidly become overcrowded" if the Title 42 Process is rescinded. *Id.* But despite the government's warnings regarding the capacity of its facilities and staff, the fact remains that "86% of families arriving at the southwest border are *already* allowed into the United States and processed

for regular removal proceedings." Pls.' Reply, ECF No. 118 at
22. Moreover, although Defendants have expressed concerns
regarding its inability to provide for quarantine space or
"effective social distancing" if the Title 42 Process were not
in effect, expulsion pursuant to the CDC Orders still results in
"plac[ing] families on crowded planes and buses from the Rio
Grande Valley," without first testing the individuals and
isolating those who test positive, and transporting them "to
other locations in Texas, or places as far away as Arizona and
San Diego," before expelling them or releasing them into the
United States. Pls.' Reply, ECF No. 118 at 25.

Citing an increased number of "enforcement encounters" from
April 2020 to January 2021, Defendants further contend that an
injunction in this case could "create a 'pull factor' leading to
additional attempts to enter the United States and in turn more
apprehensions." Defs.' Opp'n, ECF No. 76 at 37 (citing Miller
Decl., ECF No. 76-2 ¶ 16). However, as Plaintiffs point out,
Defendants' only evidence in support of their prediction is "a
16% increase in encounters of unaccompanied children in the
weeks after entry of this Court's injunction in *P.J.E.S.* in
November 2020," which was actually "part of a larger upward
trend that predated the injunction by *many months*—and it was
smaller than the percentage increase for each month from April
to October 2020, when Title 42 was being enforced against

unaccompanied children." Pls.' Reply, ECF No. 118 at 26 (citing

Menjívar Decl., ECF No. 118-23 ¶ 15). Moreover, though

Defendants contend that there has been a "historic" level of

enforcement encounters at the border, the statistics Defendants

cite "overstate the number of unique individuals arriving at the

border." Reichlin-Melnick Decl., ECF No. 118-18 ¶¶ 15-16. For

example, Plaintiffs have provided evidence that, after the

implementation of the Title 42 Process, the recidivism rate of

individuals crossing the border increased from less than 7% to

40%. *Id.* ¶ 11. In other words, under the Title 42 regime,

individuals seeking an asylum hearing have attempted to cross

the border multiple times, "sometimes 10 times or more, and each

attempt is counted as a new 'encounter.'" Pls.' Reply, ECF No.

118 at 22. Such evidence casts doubt on Defendants' claims that

an injunction in this matter would create a "pull factor." *See*

*Flores v. Sessions*, No. 85-cv-4544, 2018 WL 4945000, at *2 (C.D.

Cal. July 9, 2018) (finding argument that border crossings would

surge due to court order lacked merit).

Defendants also note that "the pandemic has taken a toll on

the CBP workforce," with many CBP employees contracting COVID-19

and several others dying from the virus. Defs.' Opp'n, ECF No.

76 at 37 (citing Miller Decl., ECF No. 76-2 ¶ 18). Defendants

assert that "[w]ith personnel on sick leave or quarantining, the

ability of CBP to perform its functions is diminished." *Id.*

(citing Miller Decl., ECF No. 76-2 ¶ 14). The loss of life resulting from COVID-19 contraction is undeniably tragic, and the Court agrees that "promoting public health—especially during a pandemic—is in the public interest." *Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Off. of Immigration Review*, 456 F. Supp. 3d 16, 34 (D.D.C. 2020). However, Defendants provide no evidence that the CBP employees who tested positive for COVID-19 contracted the virus from any of the asylum seekers crossing the border into the United States. And, significantly, since Defendants filed its opposition brief in this matter, vaccines protecting against the risk of serious disease and hospitalization have become widely available in the United States. *See* Pls.' Reply, ECF No. 118 at 25. The Court does not doubt that a preliminary injunction issued in this matter would force the government "to make difficult decisions about allocation of resources to mitigate the risks caused by COVID-19." *P.J.E.S.*, 502 F. Supp. 3d at 549. But in view of the wide availability of testing, vaccines, and other minimization measures, the Court is not convinced that the transmission of COVID-19 during border processing cannot be significantly mitigated. Indeed, the government has successfully implemented mitigation measures with regard to processing unaccompanied minors in order to minimize risk of COVID-19 transmission. *See* Pls.' Reply, ECF No. 118 at 21-22.

Finally, Defendants argue that "[a]ny time [the government]
is enjoined by a court from effectuating statutes enacted by
representatives of its people, it suffers a form of irreparable
injury." Defs.' Opp'n, ECF No. 76 at 38 (quoting *Maryland v.
King*, 133 S. Ct. 1, 3 (2012)). But, as explained above, the
Title 42 Process is likely unlawful, and "[t]here is generally
no public interest in the perpetuation of an unlawful agency
action." *Newby*, 838 F.3d at 12.

### 4. The Court Will Not Require Plaintiffs to Post a Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he
court may issue a preliminary injunction . . . only if the
movant gives security in an amount that the court considers
proper to pay the costs and damages sustained by any party found
to have been wrongfully enjoined." Fed. R. Civ. P. 65(c).
"Courts in this Circuit have found the Rule 'vest[s] broad
discretion in the district court to determine the appropriate
amount of an injunction bond,' including the discretion to
require no bond at all." *Simms v. District of Columbia*, 872 F.
Supp. 2d 90, 107 (D.D.C. 2012) (quoting *DSE, Inc. v. United
States*, 169 F.3d 21, 33 (D.C. Cir. 1999)) (internal citation
omitted). Here, Plaintiffs are families allegedly fleeing
persecution in their home country and do not have the ability to
post a bond. Additionally, they are seeking to vindicate

important procedures and protections under the immigration laws. Accordingly, the Court will waive the requirement for an injunction bond. *See id.*

### 5. The Court Shall Stay the Preliminary Injunction

Defendants request that the Court stay its Order enjoining the Title 42 Process for 14 days "to give Defendants sufficient time to explore their appellate options." Defs.' Opp'n, ECF No. 76 at 39. Plaintiffs do not oppose Defendants' request. Pls.' Reply, ECF No. 118 at 30. Accordingly, the Court shall stay its Order for 14 days from the date of its entry. However, the Court declines to stay this decision pending appeal for substantially the same reasons as those articulated in this Opinion.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Class Certification, ECF No. 23, and **GRANTS** Plaintiffs' Motion for Preliminary Injunction, ECF No. 57. The preliminary injunction shall be stayed for 14 days. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan
            United States District Judge
            September 16, 2021**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NANCY GIMENA HUISHA-HUISHA, on
behalf of herself and others similarly situated,

Plaintiffs,

v.

ALEJANDRO MAYORKAS, Secretary of
Homeland Security, et al.,

Defendants.

Civ. A. No. 21-100 (EGS)

**NOTICE OF APPEAL**

NOTICE IS HEREBY GIVEN that all Defendants appeal to the United States Court of

Appeals for the District of Columbia Circuit from this Court's September 16, 2021 Order (ECF

No. 122) and Memorandum Opinion (ECF No. 123) granting a preliminary injunction.

Dated:  September 17, 2021

Respectfully submitted,

CHANNING D. PHILLIPS, D.C. Bar #415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

 /s/ Sean M. Tepe
SEAN M. TEPE, DC Bar #1001323
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2533
Email: sean.tepe@usdoj.gov

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC)**

**ORDER UNDER SECTIONS 362 & 365 OF THE PUBLIC HEALTH SERVICE ACT
(42 U.S.C. §§ 265, 268) and 42 CFR 71.40**

**PUBLIC HEALTH REASSESSMENT
AND
ORDER SUSPENDING THE RIGHT TO INTRODUCE
CERTAIN PERSONS FROM COUNTRIES
WHERE A QUARANTINABLE COMMUNICABLE DISEASE EXISTS**

## Executive Summary

The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), is hereby replacing and superseding the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order). The instant Order continues the suspension of the right to introduce "covered noncitizens," as defined herein,[1] into the United States along the U.S. land and adjacent coastal borders. In recognition of the specific COVID-19 mitigation measures available in facilities providing care for Unaccompanied Noncitizen Children (UC), CDC excepted UC from the October Order on July 16, 2021 (July Exception) and continues that exception herein.[2] Following an assessment of the current status of the COVID-19 public health emergency and the situation in congregate settings where noncitizens seeking to enter the United States are processed and held, CDC has determined that an Order remains appropriate at this time for all other covered noncitizens as described herein. As outlined below, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID-19 mitigation protocols as recommended by CDC.

CDC has determined that an Order under 42 U.S.C. § 265 remains necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States during the COVID-19 public health emergency. This Order reflects the current, highly dynamic conditions regarding COVID-19, including variants of concern and levels of vaccination, as well as evolving circumstances specific to the U.S. borders. As facts change, CDC may further modify the Order. This Order will remain in place until either the expiration of the Secretary of HHS' declaration that COVID-19 constitutes a public health emergency, or the CDC Director determines that the danger of further introduction of COVID-19 into the United States has declined such that continuation of the Order is no longer necessary to protect public health, whichever occurs first. The circumstances necessitating the Order will be reassessed at least every 60 days.

---

[1] *See infra* Section III.A.

[2] Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf (July 16, 2021); *see* 86 Fed. Reg. 38717 (July 22, 2021). The July Exception relating to UC is hereby made a part of this Order and incorporated by reference as if fully set forth herein.

**Outline of Reassessment and Order**

I.   Background

   A.  Current Status of COVID-19 Public Health Emergency

   B.  Public Health Factors Related to COVID-19

      1.  Manner of COVID-19 Transmission

      2.  Emerging Variants of the SARS-CoV-2 Virus

      3.  Risks of COVID-19 Transmission Specific to Congregate Settings

      4.  Availability of Testing, Vaccines, and Other Mitigation Measures

      5.  Impact on U.S. Communities and Healthcare Resources

II. Public Health Reassessment

   A.  Immigration Processing and Public Health Impacts

   B.  Public Health Assessment of Single Adults and Family Units

   C.  Comparison to Unaccompanied Noncitizen Children

   D.  Summary of Findings

III. Legal Basis for the Order

IV. Issuance and Implementation of the Order

   A.  Covered Noncitizens

   B.  Exceptions

   C.  APA, Review, and Termination

**I.      Background**

Coronavirus disease 2019 (COVID-19) is a quarantinable communicable disease[3] caused by the SARS-CoV-2 virus. As part of U.S. government efforts to mitigate the introduction, transmission, and spread of COVID-19, CDC issued an Order on October 13, 2020 (October Order), replacing an Order

---

[3] Quarantinable communicable diseases are any of the communicable diseases listed in Executive Order, as provided under § 361 of the Public Health Service Act (42 U.S.C. § 264). 42 CFR 71.1. The list of quarantinable communicable diseases currently includes cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow fever, viral hemorrhagic fevers (Lassa, Marburg, Ebola, Crimean-Congo, South American, and others not yet isolated or named), severe acute respiratory syndromes (including Middle East respiratory syndrome and COVID-19), and influenza caused by novel or reemergent influenza viruses that are causing, or have the potential to cause, a pandemic. *See* Exec. Order 13295, 68 Fed. Reg. 17255 (Apr. 4, 2003), as amended by Exec. Order 13375, 70 Fed. Reg. 17299 (Apr. 1, 2005) and Exec. Order 13674, 79 Fed. Reg. 45671 (July 31, 2014).

initially issued on March 20, 2020 (March Order),[4] suspending the right to introduce[5] certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increase in risk of the introduction of COVID-19. The October Order applied specifically to covered noncitizens who would otherwise be introduced into a congregate setting in land or coastal POE or U.S. Border Patrol stations at or near the U.S. borders[6] with Canada and Mexico. On February 17, 2021, CDC published a notice announcing the temporary exception of unaccompanied noncitizen children (UC)[7] encountered in the United States from the October Order.[8] The exception of UC from the October Order was confirmed with the publication of the July Exception.[9]

POE and U.S. Border Patrol stations are operated by U.S. Customs and Border Protection (CBP), an agency within DHS. The March and October Orders were intended to reduce the risk of COVID-19 introduction, transmission, and spread in POE and U.S. Border Patrol stations by significantly reducing the number and density of covered noncitizens held in these congregate settings, thereby reducing risks to U.S. citizens and residents, DHS/CBP personnel and noncitizens at the facilities, and the healthcare systems in local communities overall. Because of the congregate nature of these facilities and the sustained community transmission of COVID-19, including the highly transmissible B.1.617.2 (Delta) variant, in both the United States and migrants' countries of origin and transit, at this time, there continues to be a high risk of COVID-19 outbreaks in these facilities following the introduction of an infected person. Upon reassessment of the current situation with respect to the pandemic and the situation at the U.S. borders, CDC finds an Order under 42 U.S.C. § 265 for Single Adults (SA)[10] and Family Units (FMU)[11] remains necessary at this time, as discussed in detail below. CDC also recognizes the availability of testing, vaccines, and other mitigation protocols can minimize risk in this area. As the ability of DHS facilities to employ mitigation measures to address the COVID-19 public health emergency increases, CDC anticipates additional lifting of restrictions.

---

[4] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order), and subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503 (May 26, 2020).

[5] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[6] When U.S. Customs and Border Protection (CBP) or the U.S. Department of Homeland Security (DHS) partner agencies encounter noncitizens off the coast closely adjacent to the land borders, it transfers the noncitizens for processing in POE or U.S. Border Patrol stations closest to the encounter. Absent the October Order, such noncitizens would be held in the same congregate settings and holding facilities as any encounters along the land border, resulting in similar public health concerns related to the introduction, transmission, and spread of COVID-19.

[7] As stated in the July Exception, CDC's understanding is that UC are a class of individuals similar to or the same as those individuals who would be considered "unaccompanied alien children" (see 6 U.S.C. § 279) for purposes of HHS Office of Refugee Resettlement custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code. 86 Fed. Reg. 38717, 38718 at note 4.

[8] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Pending Forthcoming Public Health Determination, 86 Fed. Reg. 9942 (Feb. 17, 2021).

[9] *Supra* note 2.

[10] A single adult (SA) is any noncitizen adult 18 years or older who is not an individual in a "family unit," *see infra* note 11.

[11] An individual in a family unit (FMU) includes any individual in a group of two or more noncitizens consisting of a minor or minors accompanied by their adult parent(s) or legal guardian(s). Any statistics regarding FMU count the number of individuals in a family unit rather than counting the groups.

A.      **Current Status of COVID-19 Public Health Emergency**

Since late 2019, SARS-CoV-2, the virus that causes COVID-19, has spread throughout the world, resulting in a pandemic. As of July 28, 2021, there have been over 195 million confirmed cases of COVID-19 globally, resulting in over 4.1 million deaths.[12] The United States has reported over 34 million cases resulting in over 609,000 deaths due to the disease[13] and is currently averaging around 61,976 new cases of COVID-19 a day as of July 27, 2021 with high community transmission.[14] Although several of the key indicators of transmission and spread of COVID-19 in the United States improved during the first half of 2021, variants of concern, particularly the more transmissible Delta variant, have driven a stark increase in COVID-19 cases, hospitalizations, and deaths. COVID-19 cases increased approximately 400% between June 19 and July 28, 2021.[15]

Many countries have begun widespread vaccine administration; however, 78 countries continue to experience high or substantial incidence rates ($\geq$50 cases per 100,000 people in the last seven days) and 123 countries, including the United States, are experiencing an increasing incidence of reported new cases.[16] It is imperative that individuals and communities stay vigilant and that vaccination and other COVID-19 mitigation efforts are maintained. As the Delta variant continues to spread, both the United States and Mexico are experiencing high or substantial incidence rates with 137.9 and 68.6 daily cases per 100,000 persons over a seven-day average, respectively; in Canada, the incidence rate is 8.0. The United States saw a 91.0% increase in new cases over the past week, Mexico experienced a 30.2% increase in new cases. During the same time period, the incidence rate in Canada increased by 14.8%.[17]

COVID-19 was first declared a public health emergency in January 2020[18] and the U.S. government and CDC have implemented a number of COVID-19 mitigation and response measures since that time. Many of these mitigation measures have involved restrictions on international travel and migration.[19] Other measures have focused on recommending and enforcing COVID-19 mitigation

---

[12] *Coronavirus disease (COVID-19) pandemic*, World Health Organization, https://covid19.who.int/ (last visited July 28, 2021).

[13] *COVID Data Tracker*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited July 28, 2021).

[14] *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#cases_community (last visited July 28, 2021).

[15] Christie A, Brooks JT, Hicks LA, et al. Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage. MMWR Morb Mortal Wkly Rep. ePub: 27 July 2021. DOI: http://dx.doi.org/10.15585/mmwr.mm7030e2.

[16] *See Global Trends, Epidemic Curve trajectory Classification,* WHO, as reported at https://covid.cdc.gov/covid-data-tracker/#global-trends (last visited July 28, 2021).

[17] Low/Moderate incidence describes <50 cases per 100,000 people during the past 7 days. Increasing or Decreasing incidence is based on the percentage change in the number of cases reported in the past 7 days compared to the 7 days prior to that (Increasing: >0% change, Decreasing: <0% change).

[18] *Determination that a Public Health Emergency Exists*, U.S. Department of Health and Human Services (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (last visited July 21, 2021). The public health emergency determination has been subsequently renewed at 90-day intervals, most recently on July 28, 2021. *See* https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-19July2021.aspx (last visited July 28, 2021).

[19] The President issued proclamations suspending entry into the United States of immigrants or nonimmigrants who were physically present within a number of countries during the 14-day period preceding their entry or attempted entry into the U.S. *See* Proclamation 9984 (Jan. 31, 2020); Proclamation 9992 (Feb. 28, 2020); Proclamation 10143 (Jan. 25, 2021); and Proclamation 10199 (Apr. 30, 2021). Since March 2020, Canada and Mexico have joined with the U.S. to restrict non-essential travel along land borders to prevent the introduction and spread of the virus that causes COVID-19; these restrictions are in place until at least August 21, 2021. Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the U.S. and Canada, 86 Fed. Reg. 38556 (July 22, 2021); Notification of

4

efforts, including physical distancing and mask-wearing.[20] Recent concerns regarding the spread of the Delta variant prompted CDC to release updated guidance calling for vaccinated persons to wear a mask indoors in public when in an area of substantial or high transmission.[21] Furthermore, CDC recommends that all individuals, including those fully vaccinated, continue to wear a well-fitted face mask in correctional and detention facilities.[22]

## B.    Public Health Factors Related to COVID-19

As directed by Executive Order,[23] CDC conducted a comprehensive reassessment of the October Order to determine whether the suspension of the right to introduce certain persons into the United States remains necessary in light of the current circumstances, including the evolving understanding of the epidemiology of COVID-19 variants and available mitigation measures including testing and vaccination.[24] In conducting this reassessment, CDC examined a number of public health factors, and evaluated how these factors impact POE and U.S. Border Patrol stations and the personnel and noncitizens in those facilities. CDC also scrutinized whether the potential impacts varied by category of noncitizen: SA, FMU, and UC. In carrying out its reassessment, CDC evaluated the following public health factors: (1) the manner of COVID-19 transmission, including asymptomatic and pre-symptomatic transmission; (2) the emerging variants of the SARS-CoV-2 virus; (3) the risks specific to the type of facility or congregate setting; (4) the availability of testing and vaccines and the applicability of other mitigation efforts; and (5) the impact on U.S. communities and healthcare resources. CDC views this public health reassessment as setting forth a roadmap toward the safe resumption of normal processing of arriving noncitizens, taking into account COVID-19 concerns and immigration facilities' ability to implement mitigation measures.

---

Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the U.S. and Mexico, 86 Fed. Reg. 38554 (July 22, 2021). CDC has also issued orders to mitigate risk of further introducing and spreading SARS CoV-2 and its variants into the United States. *See* Framework for Conditional Sailing and Initial Phase COVID-19 Testing Requirements for Protection of Crew, 85 Fed. Reg. 70153 (Nov. 4, 2020) (outlining the process for the phased resumption of cruise ship passenger operations); Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery from COVID-19 for all Airline or Other Aircraft Passengers Arriving into the U.S. from Any Foreign Country, 86 Fed. Reg. 7387 (Jan. 28, 2021); and *COVID-19 Travel Recommendations by Destination*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html#travel-1 (last updated July 26, 2021) (COVID-19-related travel recommendations, including 62 Level 4 Travel Health Notices for countries with very high COVID-19 rates).

[20] CDC's Order requiring the wearing of face masks by travelers while on a conveyance entering, traveling within, or departing the United States and in U.S. transportation hubs remains in place for all travelers at indoor settings on public transportation conveyances and at transportation hubs, regardless of vaccination. Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs, 86 Fed. Reg. 8025 (Feb. 3, 2021). *See Requirement for Face Masks on Public Transportation Conveyances and at Transportation Hubs*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html (last updated June 10, 2021).

[21] *Supra* note 15 (CDC also recommends fully vaccinated persons consider wearing a mask regardless of transmission level if they or someone in their household is immunocompromised or at increased risk for severe disease, or if someone in their household is unvaccinated (including children currently ineligible for vaccination); *see also infra* page 11, section 5 (discussion of "high" and "substantial transmission").

[22] *Interim Public Health Recommendations for Fully Vaccinated People*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last updated May 28, 2021).

[23] Exec. Order 14010, "Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," 86 Fed. Reg. 8267 (Feb. 2, 2021).

[24] CDC's reassessment of the public health situation with respect to covered noncitizens and border facilities relies upon information and data provided by DHS, CBP, and HHS' Office of Refugee Resettlement, including information regarding those entities' policies and practices.

1.      **Manner of COVID-19 Transmission**

SARS-CoV-2, the virus that causes COVID-19, spreads mainly from person-to-person through respiratory fluids released during exhalation, such as when an infected person coughs, sneezes, or talks. Exposure to these respiratory fluids occurs in three principal ways: (1) inhalation of very fine respiratory droplets and aerosol particles, (2) deposition of respiratory droplets and particles on exposed mucous membranes in the mouth, nose, or eye by direct splashes and sprays, and (3) touching mucous membranes with hands that have been soiled either directly by virus-containing respiratory fluids or indirectly by touching surfaces with virus on them.[25] Spread is more likely when people are in close contact with one another (within about 6 feet), especially in crowded or poorly ventilated indoor settings. Unvaccinated persons with asymptomatic and pre-symptomatic infection are significant contributors to community SARS-CoV-2 transmission and occurrence of COVID-19.[26] Asymptomatic cases are currently believed to represent roughly 30% of all COVID-19 infections and the infectiousness of asymptomatic individuals is believed to be about 75% of the infectiousness of symptomatic individuals. CDC's current best estimate is that 50% of infections are transmitted prior to symptom onset (pre-symptomatic transmission).[27] Although rare, as discussed below, breakthrough infections may occur in vaccinated individuals. Due to the variety of source of spread – transmission by asymptomatic, pre-symptomatic, symptomatic, and vaccinated individuals – testing is critical to identify those infected with COVID-19.

Among those who are not vaccinated, serious COVID-19 illness necessitating treatment occurs with greater frequency in older adults and those with certain pre-existing conditions.[28] Although children can be infected with SARS-CoV-2, get sick from COVID-19, and spread the virus to others, when compared with adults, children and adolescents who have COVID-19 are more commonly asymptomatic or have mild, non-specific symptoms. Children are less likely to develop severe illness or die from COVID-19.[29] They typically present with mild symptoms, if any, and have a good prognosis, recovering within one to two weeks after disease onset.[30]

---

[25] *Scientific Brief: SARS-CoV-2 Transmission*, Centers for Disease Control and Prevention (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html; *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, Centers for Disease Control and Prevention (Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html.

[26] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID-19 outbreaks. *Proc Natl Acad Sci U S A.* 2020;117(30):17513-17515.10.1073/pnas.2008373117, available at https://www.ncbi.nlm.nih.gov/pubmed/32632012; Johansson MA, Quandelacy TM, Kada S, et al. SARS-CoV-2 Transmission From People Without COVID-19 Symptoms. Johansson MA, et al. JAMA Netw Open. 2021 January4;4(1):e2035057. doi: 10.1001/jamanetworkopen.2020.35057.

[27] *COVID-19 Pandemic Planning Scenarios*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited July 28, 2021).

[28] *People at Increased Risk and Other People Who Need to Take Extra Precautions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last updated Apr. 20, 2021).

[29] *Science Brief: Transmission of SARS-CoV-2 in K-12 Schools and Early Care and Education Programs – Updated*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science-briefs/transmission_k_12_schools.html (last updated July 9, 2021).

[30] *See* Leeb RT, Price S, Sliwa S, et al. COVID-19 Trends Among School-Aged Children — United States, March 1–September 19, 2020. MMWR Morb Mortal Wkly Rep 2020;69:1410–1415. DOI: http://dx.doi.org/10.15585/mmwr.mm6939e2; Leidman E, Duca LM, Omura JD, Proia K, Stephens JW, Sauber-Schatz EK. COVID-19 Trends Among Persons Aged 0–24 Years — United States, March 1–December 12, 2020. MMWR Morb Mortal Wkly Rep 2021;70:88–94. DOI: http://dx.doi.org/10.15585/mmwr.mm7003e1; Rankin DA, Talj R, Howard LM, Halasa NB. Epidemiologic trends and characteristics of SARS-CoV-2 infections among children in the United States. Curr Opin Pediatr. 2021 Feb 1;33(1):114-121. doi: 10.1097/MOP.0000000000000971. PMID: 33278112; PMCID: PMC8011299; and Castagnoli R, Votto M, Licari A, et al. Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Infection in

6

**2.** **Emerging Variants of the SARS-CoV-2 Virus**

Like all viruses, SARS-CoV-2 constantly changes through mutation as it circulates, resulting in new virus variants over time.[31] Unchecked transmission of SARS-CoV-2 may result in increased viral mutations and the emergence of new variants. New variants of SARS-CoV-2 have emerged globally,[32] several of which have been identified as variants of concern,[33] including the Alpha, Beta, Gamma, and Delta variants. These variants of concern have evidence of an increase in transmissibility and more severe disease, which may lead to higher incidence, hospitalization, and death rates among exposed persons.[34] Furthermore, findings suggest variants may reduce levels of neutralization by antibodies generated during previous infection or vaccination, resulting in reduced effectiveness of treatments or vaccines, or increased diagnostic detection failures.[35] The ultimate concern is a variant that substantially decreases the effectiveness of available vaccines against severe or deadly disease.

Currently, the Delta variant is the predominant SARS-CoV-2 strain circulating in the United States, accounting for over 82% of cases as of July 17, 2021.[36] Of critical significance for this Order, the Delta variant has demonstrated increased levels of transmissibility among unvaccinated persons and might increase the risk of vaccine breakthrough infections in the absence of other mitigation strategies.[37] For the unvaccinated, Delta remains a formidable threat and rates of infection of the Delta variant are growing more rapidly in U.S. counties with lower vaccination rates.[38] Available evidence suggests all three vaccines currently authorized for emergency use in the United States provide significant protection against variants circulating in the United States.[39] However, a small proportion of people who are fully vaccinated may become infected with the Delta variant (known as breakthrough infection); emerging evidence suggests that fully vaccinated persons who do become infected with the Delta variant are at risk for transmitting it to others.[40]

---

Children and Adolescents: A Systematic Review. JAMA Pediatr. 2020;174(9):882–889. doi:10.1001/jamapediatrics.2020.1467.

[31] *About Variants of the Virus that Causes COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last updated Apr. 2, 2021).

[32] Abdool Karim SS, de Oliveira T. New SARS-CoV-2 Variants - Clinical, Public Health, and Vaccine Implications [published online ahead of print, 2021 Mar 24]. *N Engl J Med*. 2021;10.1056/NEJMc2100362. doi:10.1056/NEJMc2100362

[33] *Id.*

[34] Dougherty K, Mannell M, Naqvi O, Matson D, Stone J. SARS-CoV-2 B.1.617.2 (Delta) Variant COVID-19 Outbreak Associated with a Gymnastics Facility — Oklahoma, April–May 2021. MMWR Morb Mortal Wkly Rep 2021;70:1004–1007. DOI: http://dx.doi.org/10.15585/mmwr.mm7028e2 (describing a B.1.617.2 (Delta) Variant COVID-19 outbreak associated with a gymnastics facility and finding that the Delta variant is highly transmissible in indoor sports settings and households, which might lead to increased incidence rates).

[35] *SARS-CoV-2 Variant Classifications and Definitions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-info.html#Concern (last updated June 29, 2021).

[36] *Variant Proportions*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (citing data for the two-week interval ending July 17, 2021).

[37] *About Variants of the Virus that Causes COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html (last updated June 28, 2021).

[38] COVID Data Tracker Weekly Review, Interpretive Summary for July 23, 2021, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (attributing rising numbers of COVID-19 cases in nearly 90% of U.S. jurisdictions to the rapid spread of the Delta variant).

[39] *Science Brief: COVID-19 Vaccines and Vaccination*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html (last updated May 27, 2021). Other vaccines, particularly the one manufactured by AstraZeneca, show reduced efficacy against infection with certain variants but may still protect against severe disease; at the time of the issuance of this Order, the FDA has not authorized the AstraZeneca COVID-19 vaccine for use in the United States.

[40] *Supra* note 15.

7

App. 135

CDC continues to monitor the situation and may adapt recommendations based on the epidemiology of variants of concern. Given the transmissibility of variant strains and the continued emergence of new variants, ongoing monitoring of vaccine effectiveness is needed to identify mutations that could render vaccines most commonly used in the United States less effective against more transmissible variants.[41]

### 3. Risks of COVID-19 Transmission Specific to Congregate Settings

Given the manner of transmission, including asymptomatic or pre-symptomatic transmission, the risk of spreading COVID-19 is particularly pronounced among those who are unvaccinated, partially vaccinated, or vaccinated with less effective vaccines.[42] This risk is acutely present in congregate settings, where a number of people reside, meet, or gather in close proximity for either a limited or extended period of time.[43] Facilities must often carefully weigh the risks of increased transmission not only in the facilities, but also in the local community, due to secondary transmission. These congregate facilities must also consider individual facility and community characteristics (e.g., ability to maintain physical distancing, compliance with universal mask-use policies, ability to properly ventilate, proportion of staff and occupants vaccinated, numbers of those who are at increased risk for severe illness from COVID-19, the availability of resources for broad-based vaccination, testing, and outbreak response, and level of community transmission).[44]

Congregate settings, particularly detention facilities with limited ability to provide adequate physical distancing and cohorting, have a heightened risk of COVID-19 outbreaks.[45] CDC has long recognized the risks specific to such settings, including homeless shelters, detention centers, schools, and workplaces and has provided a number of guidance documents to address the concerns in such spaces. Specifically, CDC developed interim guidance for law enforcement agencies that have custodial authority for detained populations, including civil and pre-trial detention settings. Among the recommendations are physical distancing strategies, isolation of individuals with confirmed or suspected COVID-19, quarantine of close contacts, cohorting of individuals when space is limited, testing, healthcare evaluations for individuals with suspected COVID-19, clinical care as needed for

---

[41] *See About Variants of the Virus that Causes COVID-19*, *supra* note 37.

[42] Vaccines with effectiveness of less than 50% against wildtype strains of COVID-19 are considered less effective.

[43] Notably, COVID-19 has disproportionately affected persons in congregate settings and high-density workplaces. Studies conducted prior to the availability of vaccines showed that a single introduction of SARS-CoV-2 into a facility can result in a widespread outbreak. Lehnertz NB, Wang X, Garfin J, Taylor J, Zipprich J, VonBank B, et al. Transmission Dynamics of Severe Acute Respiratory Syndrome Coronavirus 2 in High-Density Settings, Minnesota, USA, March–June 2020. Emerg Infect Dis. 2021;27(8):2052-2063. https://doi.org/10.3201/eid2708.204838. Whole genome sequencing of samples taken following an outbreak at a correctional facility demonstrated that 92.2% of the samples taken from patients were genetically related, indicating that a single case had likely led to the infection of 48 individuals. Similarly, phylogenetic analysis established that 29.6% of cases from an outbreak at a second correctional facility were closely related and genetically identical, indicating that the index case had led to the infection of approximately 60 others.

[44] *See Recommendations for Quarantine Duration in Correctional Facilities*, Centers for Disease Control and Prevention,, https://www.cdc.gov/coronavirus/2019-ncov/community/quarantine-duration-correctional-facilities.html (last visited July 28, 2021).

[45] Since March 31, 2020, the U.S. Federal Bureau of Prisons and state departments of corrections have together recorded 416,854 COVID-19 cases among residents and 108,945 cases among staff in correctional and detention facilities, resulting in 2,911 deaths. *Confirmed COVID-19 Cases and Deaths in U.S. Correctional and Detention Facilities by State*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#correctional-facilities (last visited July 28, 2021).

individuals with confirmed or suspected COVID-19, and addressing specific considerations for people who are at increased risk for severe illness.[46]

Vaccine coverage in congregate settings varies and infection risk is greater where there is sustained community transmission.[47] In light of this, CDC strongly recommends vaccination against COVID-19 for everyone who is eligible, including people who are incarcerated or detained and staff at correctional and detention facilities.[48] CDC is discussing additional guidance with DHS, highlighting the key metrics to consider before modifying COVID-19 prevention and mitigation measures in facilities that hold or detain migrants.[49]

### 4.   Availability of Testing, Vaccines, and Other Mitigation Measures

The potential for asymptomatic and pre-symptomatic transmission makes testing an essential part of COVID-19 mitigation protocols. With the additional testing capacity available through antigen tests, rapid testing can be implemented to identify infected persons so they can be isolated until they no longer pose a risk of spreading infections and their close contacts can be identified and quarantined.[50] Testing is especially important in congregate settings where even a single asymptomatic case can trigger an outbreak that may quickly exceed a facility's capacity to isolate and quarantine residents. Furthermore, if personnel are infected or exposed, the number of available staff members may be reduced, further stressing facility operations. Testing facility residents and personnel can help facilitate prompt mitigation actions.

COVID-19 vaccines are now widely available in the United States, and vaccination is recommended for all people 12 years of age and up. Three COVID-19 vaccines are currently authorized by the U.S. Food and Drug Administration (FDA) for emergency use: two mRNA vaccines (produced by Pfizer-BioNTech and Moderna) and one viral vector vaccine (produced by Johnson & Johnson/Janssen), each of which has been determined to be safe and effective against COVID-19. As of July 28, 2021, over 163 million people in the United States (57.6% of the population 12 years or older) have been fully vaccinated and over 189 million people in the United States (66.8% of the population 12 years or older) have received at least one dose.[51] After substantial vaccine uptake in the first months of

---

[46] *See* Guidance for Correctional & Detention Facilities, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated June 9, 2021).

[47] Falk A, Benda A, Falk P, Steffen S, Wallace Z, Høeg TB. *COVID-19 Cases and Transmission in 17 K–12 Schools — Wood County, Wisconsin, August 31–November 29, 2020*. MMWR Morb Mortal Wkly Rep 2021;70:136–140. DOI: http://dx.doi.org/10.15585/mmwr.mm7004e3. *See also* Link-Gelles R, DellaGrotta AL, Molina C, et al. *Limited Secondary Transmission of SARS-CoV-2 in Child Care Programs — Rhode Island, June 1–July 31, 2020*. MMWR Morb Mortal Wkly Rep 2020;69:1170–1172. DOI: http://dx.doi.org/10.15585/mmwr.mm6934e2.

[48] *COVID-19 Vaccine FAQs in Correctional and Detention Centers*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/vaccine-faqs.html (last updated June 1, 2021).

[49] *See* CDC memo to DHS "Considerations for modifying COVID-19 prevention and mitigation measures in Department of Homeland Security migrant holding facilities in response to declining transmission," Centers for Disease Control and Prevention (last updated June 11, 2021).

[50] *See* COVID-19 Testing and Diagnostics Working Group (TDWG). U.S. Department of Health and Human Services, https://www.hhs.gov/coronavirus/testing/testing-diagnostics-working-group/index.html (last visited July 28, 2021) (defining the role of the COVID-19 TDWG, which develops testing-related guidance and provides targeted investments to expand the available testing supply and maximize testing capacity).

[51] *COVID-19 Vaccinations in the United States*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations (last updated July 28, 2021).

2021, however, vaccination uptake has plateaued, particularly in those under the age of 65 years.[52] The combination of reduced vaccine uptake and the extreme transmissibility of the Delta variant has resulted in rising numbers of COVID-19 cases, primarily and disproportionately affecting the unvaccinated population.

The availability of COVID-19 vaccines is rising globally but still dwarfed by the rates of vaccination in the United States and a handful of other countries.[53] Countries of origin for the majority of incoming covered noncitizens have markedly lower vaccination rates.[54] Given this, the increased movement of typically unvaccinated covered noncitizens into the United States presents a heightened risk of morbidity and mortality to this population due to the congregate holding facilities at the border and the practical constraints on implementation of mitigation measures in such facilities. Outbreaks in these settings increase the serious danger of further introduction, transmission, and spread of COVID-19 and variants into the country.

CDC is aware of a rising number of breakthrough SARS-CoV-2 infections[55] in vaccinated individuals; even without variants of concern, more vaccine breakthroughs are to be expected due to the rising number of vaccinated individuals. While the vaccines currently authorized by the FDA are successful in mitigating severe illness from the highly transmissible Delta variant, infection and even mild to moderate illness has been documented in a small percentage of vaccinated persons.[56] The emergence of these more transmissible variants increases the urgency to expand vaccination coverage for everyone and especially those in densely populated congregate settings.[57] Public health agencies and other organizations must collaboratively monitor the status of the pandemic in their communities. As widespread vaccination efforts continue, ongoing use of the full panoply of mitigation measures is nevertheless especially important in congregate settings and remains key to slowing introduction, transmission, and spread of COVID-19.

---

[52] Diesel J, Sterrett N, Dasgupta S, et al. COVID-19 Vaccination Coverage Among Adults — United States, December 14, 2020–May 22, 2021. MMWR Morb Mortal Wkly Rep 2021;70: 922–927. DOI: http://dx.doi.org/10.15585/mmwr.mm7025e1. The study found that the lowest vaccination coverage and the intent to be vaccinated among adults aged 18–24 years, non-Hispanic Black adults, and individuals with less education, no insurance, and lower household incomes. Concerns about vaccine safety and effectiveness were commonly cited barriers to vaccination. *See also supra* note 15 (finding that vaccine uptake has slowed nationally with wide variation in coverage by state (range = 33.9%–67.2%) and by county (range = 8.8%–89.0%)).

[53] *See* "PAHO Director calls for fair and broad access to COVID-19 vaccines for Latin America and the Caribbean," Pan American Health Organization, https://www.paho.org/en/news/7-7-2021-paho-director-calls-fair-and-broad-access-covid-19-vaccines-latin-america-and (July 7, 2021) (noting the discrepancies in vaccine availability coverage among North, Central, and South American countries).

[54] Thus far in 2021, Ecuador, El Salvador, Guatemala, Honduras, and Mexico constitute the top five countries of origin for covered noncitizens. Rates of vaccination for each country are as follows: Ecuador: 11% fully vaccinated, 30% only partly vaccinated; El Salvador: 22% fully vaccinated, 17% only partly vaccinated; Guatemala: 1.6% fully vaccinated, 5.3% only partly vaccinated; Honduras: 1.8% fully vaccinated, 12% only partly vaccinated; Mexico: 18% fully vaccinated, 14% only partly vaccinated, https://ourworldindata.org/covid-vaccinations (last visited July 24, 2021).

[55] A vaccine breakthrough infection is defined as the detection of SARS-CoV-2 RNA or antigen in a respiratory specimen collected from a person ≥14 days after receipt of all recommended doses of an FDA-authorized COVID-19 vaccine. COVID-19 Vaccine Breakthrough Infections Reported to CDC — United States, January 1–April 30, 2021. MMWR Morb Mortal Wkly Rep 2021;70:792–793. DOI: http://dx.doi.org/10.15585/mmwr.mm7021e3.

[56] *COVID-19 Vaccine Breakthrough Case Investigation and Reporting*, Centers for Disease Control and Prevention, https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (last updated July 15, 2021).

[57] *Supra* at note 55.

5.      **Impact on U.S. Communities and Healthcare Resources**

COVID-19 cases are on the rise in nearly 90% of U.S. jurisdictions, and multiple outbreaks are occurring in parts of the country that have low vaccination coverage. A person's risk for SARS-CoV-2 infection is directly related to the risk for exposure to infectious persons, which is largely determined by the extent of SARS-CoV-2 circulation in the surrounding community. Emerging evidence regarding the Delta variant finds that it is more than two times as transmissible as the original strains of SARS-CoV-2 circulating at the start of the pandemic. In light of this, CDC recommends assessing the level of community transmission using, at a minimum, two metrics: new COVID-19 cases per 100,000 persons in the last 7 days and percentage of positive SARS-CoV-2 diagnostic nucleic acid amplification tests in the last 7 days. For each of these metrics, CDC classifies transmission values as low, moderate, substantial, or high. At the time of this Order's issuance, over 70% of the U.S. counties along the U.S.-Mexico border were classified as experiencing high or substantial levels of community transmission.[58] In areas of substantial or high transmission, CDC recommends community leaders encourage vaccination and universal masking in indoor public spaces in addition to other layered prevention strategies to prevent further spread.

Between March and June 2021, rates of hospitalization due to COVID-19 decreased dramatically, easing long endured pressures on the U.S. healthcare system. However, in July 2021, with the rise of the Delta variant, the seven-day average for new hospital admissions in the United States increased 35.8% over the prior seven-day period.[59] Rates of hospitalization are rising most sharply in areas with low vaccination coverage.[60] CDC recommends continuous monitoring of the availability of staffed inpatient and intensive care unit beds, as data on usage of clinical care resources to manage patients with COVID-19 reflect underlying community disease incidence. This information can signal when urgent implementation of layered prevention strategies might be necessary to prevent overloading local and regional health care systems. Strains on critical care capacity can increase COVID-19 mortality while decreasing the availability and use of health care resources for non-COVID-19 related medical care.[61] Increased hospital admissions are forecasted in the coming weeks as the Delta variant continues to predominate.[62]

The rapid spread of the highly transmissible Delta variant is leading to worrisome trends in healthcare and community resources. Signs of stress are already present in the southern regions of the

---

[58] Of the 22 U.S. counties along the U.S.-Mexico border, 13 counties are experiencing high levels of community transmission (San Diego County, CA; Hidalgo County, NM; Presidio County, TX; Brewster County, TX; Terrell County, TX; Val Verde County, TX; Kinney County, TX; Maverick County, TX; Webb County, TX; Zapata County, TX; Starr County, TX; Hidalgo County, TX; and Cameron County, TX) and four counties are experiencing substantial levels of community transmission (Imperial County, CA; Pima County, AZ; Santa Cruz County, AZ; and Luna County, NM;). Five counties are experiencing moderate levels of community transmission (Yuma County, AZ; Cochise County, AZ; Dona Ana County, NM; El Paso County, TX; and Hudspeth County, TX). No counties along the border are experiencing low levels of community transmission. *COVID-19 Integrated County View*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#county-view (last updated July 28, 2021).

[59] COVID Data Tracker Weekly Review, Interpretive Summary for July 16, 2021, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07162021.html (last visited July 28, 2021).

[60] COVID Data Tracker Weekly Review, Interpretive Summary for July 9, 2021, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07092021.html.

[61] *Supra* note 15.

[62] COVID-19 Forecasts: Hospitalizations, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/hospitalizations-forecasts.html (last updated July 21, 2021).

United States.[63] Ultimately, the flow of migration directly impacts not only border communities and regions, but also destination communities and the healthcare resources of both. In light of this, the totality of the U.S. community transmission, health system capacity, and public health capacity, as well as local capacity to implement mitigation protocols, are important considerations when reassessing the need for this Order.[64]

## II. Public Health Reassessment

### A.    Immigration Processing and Public Health Impacts

Noncitizens arriving in the United States who lack proper travel documents, whose entry is otherwise contrary to law, or who are apprehended at or near the border seeking to unlawfully enter the United States between POE are normally subject to initial immigration processing by CBP in POE facilities and U.S. Border Patrol stations. Absent CDC's issuance of an order under 42 U.S.C. § 265 directing otherwise, immigration processing takes place pursuant to Title 8 of the U.S. Code. Although some number of inadmissible noncitizens present at POE, the vast majority are encountered by CBP between POE.[65] Upon such encounters, Border Patrol agents conduct an initial field assessment and transport the individuals to a CBP facility for intake processing.[66]

CBP facilities are designed to provide this short-term intake processing and are thus space-constrained.[67] While undergoing intake processing under Title 8 at CBP facilities, noncitizens are regularly held in close proximity to one another anywhere from several hours to several days. Depending on the outcome of intake processing, a noncitizen is generally referred to the DHS' Immigration and Customs Enforcement (ICE), where they are often subject to longer-term detention[68].[69]

Compared to CBP facilities, ICE facilities have space allocations similar to traditional long-term correctional facilities. Still, during migratory surges, capacity constraints hinder CBP and ICE operations and facilities alike. If downstream ICE operations and facilities reach capacity limits, ICE may be unable to take custody of additional noncitizens in a timely manner. When this movement of noncitizens from CBP to ICE custody is impeded or delayed, noncitizens may remain in CBP's densely populated, short-term holding facilities for much longer periods. Of note, the United States is currently experiencing such a migratory surge of noncitizens attempting to enter the country at and between POE

---

[63] *See* COVID Data Tracker: New Hospital Admissions, https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions (last updated July 22, 2021) (showing HHS Regions 4, 6, and 9, encompassing all southern states, experiencing increased rates of new admissions of COVID-19-confirmed patients).

[64] *See Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/community-mitigation.html (last visited May 6, 2021).

[65] Fiscal year to date, 96% (1,076,242 of 1,119,204) of encounters of noncitizens occurred between POE.

[66] CBP facilities include POE, U.S. Border Patrol stations, and facilities managed by the Office of Field Operations.

[67] CBP facilities were designed for the immediate processing of persons and are statutorily designated as short-term (less than 72 hours) holding facilities. 6 U.S.C. § 211(m).

[68] FMU transferred to ICE custody are generally held at a Family Staging Center (FSC). Following intake processing, UC are referred to the Office of Refugee Resettlement (ORR) within HHS' Administration for Children and Families (ACF) for care.

[69] While CBP policies regarding transfer and release decisions are the same across the Southwest Border, implementation varies based on local CBP capacity, and ICE capacity.

at the southern border.[70] DHS has already recorded more encounters this fiscal year to date than the approximate 977,000 encounters in the whole of FY 2019.[71]

CBP has implemented a variety of mitigation efforts to prevent the spread of COVID-19 in POE and U.S. Border Patrol facilities based on the infection prevention strategy referred to as the hierarchy of controls.[72] CBP has invested in engineering upgrades, such as installing plexiglass dividers in facilities where physical distancing is not possible and enhancing ventilation systems. All CBP facilities adhere to CDC guidance for cleaning and disinfection. Surgical masks are provided to all persons in custody and are changed at least daily and if or when they become wet or soiled. Personal protective equipment (PPE) and guidance are regularly provided to CBP personnel. Recognizing the value of vaccination, CBP is encouraging vaccination among its workforce. All noncitizens brought into CBP custody are subject to health intake interviews, including COVID-19 screening questions and temperature checks. If a noncitizen in custody displays symptoms of COVID-19 or has a known exposure, CBP facilitates referral to the local healthcare system for testing. Finally, in the event CBP decides to release a noncitizen prior to removal proceedings, the agency has coordinated with local governments and non-governmental organizations to arrange COVID-19 testing at release.[73]

In addition to these mitigation measures, enhanced physical distancing and cohorting remain key to preventing transmission and spread of COVID-19, particularly in congregate settings. To address this, as the pandemic emerged, CBP greatly reduced capacity in their holding facilities. While U.S. Border Patrol facilities along the southern border currently have a non-pandemic total holding capacity of 14,553 individuals, implementation of mitigation measures led to a 50-75% reduction in holding capacity depending on the design of a given facility, resulting in COVID-constrained holding capacity of 4,706.[74] However, the current surge has caused CBP to exceed COVID-constrained capacity and routinely exceed its non-COVID capacity.[75] From July 3 to July 24, 2021, CBP encountered an average of 3,573 SA and 2,479 FMU daily, over a 21-day period, even with the CDC Order in place. This extreme population density and the resulting increased time spent in custody by noncitizens presents a serious risk of increased COVID-19 transmission in CBP facilities.

CBP faces unique challenges in implementing certain COVID-19 mitigation measures. All individuals encountered by U.S. Border Patrol must be processed in CBP facilities. Not only does this involve close and often continuing contact between CBP personnel and noncitizens, but CBP is further constrained by requirements separate noncitizens within its holding facilities according to specific

---

[70] According to data from DHS, encounters at the southern border have been rising since April 2020 due to several factors, including ongoing violence, insecurity, and famine in the Northern Triangle countries of Central America (El Salvador, Honduras, Guatemala).

[71] *Southwest Land Border Encounters*, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited July 28, 2021).

[72] *Hierarchy of Controls*, Centers for Disease Control and Prevention, available at https://www.cdc.gov/niosh/topics/hierarchy/default.html (last visited July 6, 2021). The hierarchy of controls is used as a means of determining how to implement feasible and effective control solutions. The hierarchy is outlined as: (1) Elimination (physically remove the hazard); (2) Substitution (replace the hazard); (3) Engineering Controls (isolate people from the hazard); (4) Administrative Controls (change the way people work); and (5) PPE (protect people with Personal Protective Equipment).

[73] This is also true of ICE facilities.

[74] Similarly, the operational holding capacity for SA in ICE facilities was reduced by 30% from a regular total capacity of 56,888 beds to 39,821 beds.

[75] Non-COVID-19 holding capacity was exceeded as recently as July 25, 2021.

permutations.[76] These cohorting requirements significantly complicate CBP's ability to address COVID-19-related risks, as CBP facility capacity to accommodate COVID-19 mitigation protocols may not always align with the makeup of the incoming population of noncitizens and the categorical separations required of DHS.

### Immigration Processing under Title 8 of the U.S. Code

The vast majority of noncitizens attempting to enter the United States without proper travel documents are SA; SA account for 68% of overall CBP encounters this fiscal year as of July 26, 2021. Under normal Title 8 immigration processes, SA are transferred to ICE custody pending removal proceedings. As noted above, absent expulsions directed by an order under 42 U.S.C. § 265, SA presenting at POE or attempting entry between POE would be processed and held in CBP facilities while awaiting transfer to ICE. Generally, CBP only releases SA into U.S. communities as a last resort, due to severe overcrowding and when all possible detention options have been explored.

A smaller percentage, 23%, of noncitizens encountered by CBP are members of an FMU.[77] As with SA, CBP has limited capacity to hold FMU. Under Title 8, due to court-ordered restrictions that largely prohibit the long-term detention of families, FMU are generally released from DHS custody pending removal proceedings. Prior to release, some FMU are transferred from CBP custody to Family Staging Centers (FSC) operated by ICE. Only a limited number of FMU may be held in an FSC, and time in custody for an FMU is generally about 2-3 days before being released. FSC capacity is further limited by COVID-19 mitigation protocols.[78]

Releasing FMU to communities necessitates robust testing, vaccination where possible, and careful attention to consequence management (e.g., facilities for isolation and quarantine). DHS has partnered with state and local agencies and non-governmental organizations to facilitate COVID-19 testing of FMU upon release from CBP custody. Pursuant to these arrangements, CBP generally transports FMU to release locations where partner agencies and organizations are on-site to provide testing and facilitate consequence management. Although the implementing partners and their capacities (including for consequence management such as housing) vary, the objectives are constant. These resources, however, are limited. They are already stretched thin, and certainly not available for all FMU who would be processed under Title 8 in the absence of an order issued under 42 U.S.C. § 265. DHS has committed to supporting and, where possible, expanding these efforts, including exploring the incorporation of vaccination into this model. CDC strongly supports DHS efforts that include broad-based testing and vaccination.

### Immigration Processing with an Order under 42 U.S.C. 265

Following the issuance of the March and October Orders, covered noncitizens apprehended at or near U.S. borders, regardless of their country of origin, generally were expelled to Mexico or Canada, whichever they entered from, via the nearest POE, or to their country of origin. Where possible, SA and

---

[76] For example, criminal cases must be held separately from administrative cases, SA must be separated by gender identity, FMU and UC must be separated from SA, and all vulnerable individuals must be protected from harm.

[77] Thus far this fiscal year, as of July 26, 2021.

[78] The total capacity for these FSCs is 3,230. However, due to COVID-19 mitigation protocols and family composition limitations, current operational capacity for the FSCs is approximately 2,400. In July 2021, due to an influx of single adults at the SWB, ICE ceased intake of family units at one of the FSCs and began to transition the facility to hold single adults. With this transition, the remaining COVID-limited FSC capacity for family units is approximately 1,800. Additionally, ICE has procured 1,200 additional beds at Emergency Family Staging Centers (EFSCs); this bed space is not limited by family composition or COVID-19.

FMU eligible for expulsion based on the March and October Orders have been processed pursuant to the Title 42 authority, unless a case-by-case exception was made by DHS.[79]

Even with the March and October Orders in place, a significant percentage of FMU were unable to be expelled pursuant to the order, given a range of factors, including, most notably, restrictions imposed by foreign governments.[80] For example, the Mexican government has placed certain nationality- and demographic-specific restrictions on the individuals it will accept for return via the Title 42 expulsion process. With limited exceptions, the Mexican government will only accept the return of Mexican and Northern Triangle nationals. Moreover, along sections of the border, Mexican officials refuse to accept the return of any non-Mexican family with children under the age of seven, greatly reducing DHS' ability to expel FMU. In addition, many countries impose travel requirements, including COVID-19 testing, consular interviews, and identity verification that can delay repatriation. These added requirements often make prompt expulsion a practical impossibility. Conversely, DHS continues to be able to process the majority of SA under Title 42.[81] In those cases where Title 42 processing is not possible, SA and FMU are instead processed pursuant to Title 8. Processing noncitizens and issuing a Notice to Appear under Title 8 processes takes approximately an hour and a half to two hours per person. Conversely, processing an individual for expulsion under the CDC order takes roughly 15 minutes and generally happens outdoors.

The March and October Orders permitted noncitizens to be promptly returned to their country of origin, rather than being transferred to ICE custody or released into the United States, resulting in noncitizens spending shorter amounts of time in custody at CBP facilities. However, as the number of noncitizens attempting to enter the United States has surged and as individuals cannot be expelled pursuant to Title 42 given the restrictions in place, the time in custody at CBP facilities has increased for SA and FMU, even with the October Order in place. As of July 29, 2021, the current average time in custody at CBP facilities for SA not subject to expulsion under the October Order is 50 hours. FMU currently spend an average of 62 hours in CBP custody prior to release or transfer to ICE. If the CDC Order were not in place, both SA and FMU time in custody would likely increase significantly.

## B.    Public Health Assessment of Single Adults and Family Units

Implementation of CDC's March and October Orders significantly reduced the length of time covered noncitizen SA and FMU are held in congregate settings at POE and U.S. Border Patrol stations, as well as in the ICE facilities that subsequently hold noncitizens.[82] By reducing congestion in these facilities, the Orders have helped lessen the introduction, transmission, and spread of COVID-19 among border facilities and into the United States while also decreasing the risk of exposure to COVID-19 for

---

[79] Some countries have put in place limitations that make expulsion pursuant to Title 42 inapplicable. The October Order excepted covered noncitizens "who must test negative for COVID-19 before they are expelled to their home country" and several countries refuse to accept the return of SA and FMU and other individuals unless DHS first secures a negative test result for each individual to be returned. These noncitizens are thus not covered by the prior Order and thus cannot be expelled pursuant to Title 42. See 85 Fed. Reg. at 65,807.

[80] Only 33% of FMU encountered fiscal year to date have been expelled under Title 42 and this percentage has fallen over time. In June 2021, only 14% of FMU were expelled under Title 42, an average of approximately 300 per day.

[81] Fiscal year to date, 89% of SA have been expelled under Title 42. This percentage has fallen slightly as the constraints on expelling individuals have increased. In June 2021, 82% of SA were expelled under Title 42, an average of over 3,000 per day.

[82] For example, when processing noncitizens under Title 8, prior to referral to ICE or release into the community, CBP generally issues the noncitizen a "Notice to Appear" (also called an I-862), which is a charging document that initiates removal proceedings against the noncitizen and may include a court date or direct the noncitizen to report to an ICE office to receive a court date.

15

DHS personnel and others in the facilities. Implementation of the Orders has mitigated the potential erosion of DHS operational capacity due to COVID-19 outbreaks. The reduction in the number of SA and FMU held in these congregate settings continues to be a necessary mitigation measure as DHS moves towards the resumption of normal border operations.

The availability of testing, vaccination, and other mitigation measures[83] at migrant holding facilities must also be considered. While downstream ICE facilities may have greater ability to provide these measures, CBP cannot appropriately execute consequence management measures to minimize spread or transmission of COVID-19 within its facilities. Space constraints, for example, preclude implementation of cohorting and consequence management such as quarantine and isolation. Covered noncitizens housed in congregate settings who may be infected with COVID-19 may ultimately increase community transmission rates in the United States, especially among susceptible populations (i.e., non-immune, under-vaccinated, and non-vaccinated persons). Mitigation measures, especially testing and vaccination, must be considered for the noncitizens being held, as well as for facility personnel. On-site COVID-19 testing for noncitizens at CBP holding facilities is very limited and the majority of testing takes place off-site. For example, if a noncitizen is transported to a community healthcare facility for medical care, testing is provided based on local protocols. Once transferred to ICE custody, testing for SA and FMU is more widely available.

Although COVID-19-related healthcare resources have substantially improved since the October Order was issued, emerging variants and the potential for a future vaccine-resistant variant mean the possible impacts on U.S. communities and local healthcare resources in the event of a COVID-19 outbreak at CBP facilities cannot be ignored. The introduction, transmission, and spread of SARS-CoV-2—including its variants—among covered noncitizens during processing and holding at congregate CBP settings remain a significant concern to the noncitizens, CBP personnel, as well as the community at large in light of transmission to unvaccinated individuals and the potential for breakthrough cases. Of particular note, POE and U.S. Border Patrol stations are ill-equipped to manage an outbreak and these facilities are heavily reliant on local healthcare systems for the provision of more extensive medical services to noncitizens.[84] Transfers to local healthcare systems for care could strain local or regional healthcare resources. Reliance on healthcare resources in border and destination communities may increase the pressure on the U.S. healthcare system and supply chain during the current public health emergency.[85] Of note, hospitalization rates are once again soaring nationally as the Delta variant spreads and the vaccination rate of the public lags. Ensuring the continued availability of healthcare resources is a critical component of the federal government's overall public health response to COVID-19.

Given the nature of COVID-19, there is no zero-risk scenario, particularly in congregate settings and with variants as transmissible as that of Delta in high circulation in the country. The ongoing pandemic presents complex and dynamic challenges relating to public health that limit DHS' ability to process noncitizens safely under normal Title 8 procedures. Processing a noncitizen under Title 8 can

---

[83] *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#correctional-facilities (last visited July 28, 2021).
[84] *See* CBP Directive No. 2210-004, U.S. Customs and Border Protection, https://www.cbp.gov/sites/default/files/assets/documents/2019-Dec/CBP_Final_Medical_Directive_123019.pdf (Dec. 30, 2019). Many of the U.S. Border Patrol stations and POE facilities are located in remote areas and do not have ready access to local healthcare systems (which typically serve small, rural populations and have limited resources). 85 Fed. Reg. 56424, 56433. *See also* Abubakar I, Aldridge RW, Devakumar D, et al. The UCL-Lancet Commission on Migration and Health: the health of a world on the move. *Lancet*. 2018;392(10164):2606-2654. doi:10.1016/S0140-6736(18)32114-7.
[85] *See COVID-19 State Profile Report - Combined Set*, HealthData.gov, https://healthdata.gov/Community/COVID-19-State-Profile-Report-Combined-Set/5mth-2h7d (last updated July 28, 2021).

App. 144

take up to eight times as long as processing a noncitizen under Title 42. Importantly, longer processing times result in longer exposure times to a heightened risk of COVID-19 transmission for both noncitizens and CBP personnel. Amid the ongoing migrant surge, both the COVID-19-reduced capacity and higher non-COVID holding capacity limits have been exceeded in CBP facilities. Complete termination of any order under 42 U.S.C. § 265 would increase the number of noncitizens requiring processing under Title 8, resulting in severe overcrowding and a high risk of COVID-19 transmission among those held in the facilities and the CBP workforce, ultimately burdening the local healthcare system.[86]

All of this is of particular concern as the Delta variant continues to drive an increase in COVID-19 cases. While scientists learn more about Delta and other emerging variants, rigorous and increased compliance with public health mitigation strategies is essential to protect public health.[87] Reducing the further introduction, transmission, and spread of these variants and future variants of concern into the United States is key to defeating COVID-19. CDC has concluded that SA and FMU should continue to be subject to the Order at this time pending further improvements in the public health situation.

## C.    Comparison to Unaccompanied Noncitizen Children

As discussed in the July Exception, UC are differently situated than SA and FMU. The Government has greater ability to care for UC while implementing appropriate COVID-19 mitigation measures. ORR has established a robust network of care facilities that provide testing and medical care and institute COVID-19 mitigation protocols, including vaccination for personnel and eligible UC. In light of these considerations, there is very low likelihood that processing UC in accordance with existing Title 8 procedures will result in undue strain on the U.S. healthcare system or healthcare resources. Moreover, UC released to a vetted sponsor or placed in a temporary or licensed ORR shelter do not pose a significant level of risk for COVID-19 spread into the community. UC are released only after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction. CDC thus finds that, at this time,[88] there is appropriate infrastructure in place to protect the children, caregivers, and local and destination communities from elevated risk of COVID-19 transmission. CDC believes the COVID-19-related public health concerns associated with UC introduction can be adequately addressed without UC being subject to this Order. As outlined in the July Exception and incorporated herein, CDC is fully excepting UC from this Order. The number of UC entering the United States is smaller than both the number of SA[89] and of FMU. Whereas UC can be excepted from the Order without posing a significant public health risk, the same is not true of SA and FMU, as described above.

## D.    Summary of Findings

Upon review of the various public health factors outlined above and in consideration of the circumstances at DHS facilities, it is CDC's assessment that suspending the right to introduce covered noncitizen SA and FMU who would otherwise be held at POE and U.S. Border Patrol stations remains

---

[86] Throughout the course of the COVID-19 pandemic, CDC has observed numerous outbreaks in similar congregate settings. *See FAQs for Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html (last visited Apr. 15, 2021).

[87] *About Variants of the Virus that Causes COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last updated Apr. 2, 2021).

[88] This situation could change based on an increased influx of UC, changes in COVID-19 infection dynamics among UC, or unforeseen reductions in housing capacity.

[89] Note, the total number of SA encounters may include repeat encounters with SA who attempt entry again following expulsion.

necessary as the United States continues to combat the COVID-19 public health emergency. In making this determination, CDC has considered various possible alternatives (including but not limited to terminating the application of an order under 42 U.S.C. § 265 for some or all SA and FMU, modifying the availability of exceptions for individual SA and FMU in an order under 42 U.S.C. § 265, and reissuing an order under 42 U.S.C. § 265 for some or all UC); but for the reasons discussed herein, CDC finds that the continued suspension of the right to introduce SA and FMU under the terms set forth herein, combined with the exception for UC, is appropriate at this time. This temporary suspension pending further improvements in the public health situation and greater ability to implement COVID-19 mitigation measures in migrant holding facilities will slow the influx of noncitizens into environments at higher risk for COVID-19 transmission and spread.

DHS has indicated a commitment to restoring border operations in a manner that complies with applicable COVID-19 mitigation protocols while also accounting for other public health and humanitarian concerns. In light of available mitigation measures, and with DHS' pledge to expand capacity in a COVID-safe manner similar to expansions undertaken by HHS and ORR to address UC influx, CDC believes that the gradual resumption of normal border operations under Title 8 is feasible. With careful planning, this may be initiated in a stepwise manner that complies with COVID-19 mitigation protocols. HHS and CDC intend to support DHS in this effort and continues to work with DHS to provide technical guidance on COVID-19 mitigation strategies for their unique facilities and populations.[90] CDC understands that DHS intends to continue exercising case-by-case exceptions for individual SA and FMU based on a totality of the circumstances as CDC transitions away from this Order. CDC is also providing an additional exception to permit DHS to except noncitizens participating in a DHS-approved program that incorporates pre-processing COVID-19 testing in Mexico of the noncitizens, prior to their safe and orderly entry to the U.S. via ports of entry. Based on the incorporation of relevant COVID-19 mitigation measures in such programs, in consultation with CDC, CDC believes such an exception is consistent with its legal authorities and in the public health interest.

## II.    Legal Basis for this Order under Sections 362 and 365 of the Public Health Service Act and 42 C.F.R. § 71.40

CDC is issuing this Order pursuant to sections 362 and 365 of the Public Health Service Act (42 U.S.C. §§ 265, 268) and the implementing regulation at 42 C.F.R. § 71.40. In accordance with these authorities, the CDC Director is permitted to prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease, by issuing an Order in which the Director determines that:

(1) By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and

---

[90] CDC has advised DHS on best practices with regard to testing noncitizens at the point they are released to U.S. communities to await further immigration proceedings. In addition to enforcing physical distancing (as practicable), mask-wearing, and testing for both noncitizens and personnel alike in POE and U.S. Border Patrol stations, CDC advises vaccination of DHS/CBP personnel to further reduce the risk of COVID-19 introduction, transmission, and spread in facilities and communities and protect the federal workforce. Widespread vaccination of federal employees and other personnel in congregate settings at POE and U.S. Border Patrol stations is another layer of the strategy that will lead to the normalization of border operations.

18

App. 146

(2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.[91]

CDC has authority under Section 362 and the implementing regulation to issue this Order to mitigate the further spread of COVID-19 disease, especially as the need to prevent proliferation of COVID-19 disease related to SARS-CoV-2 virus variants is heightened while vaccination efforts continue. Section 362 and the implementing regulation provide the Director with a public health tool to suspend introduction of persons not only to prevent the introduction of a quarantinable communicable disease, but also to aid in continued efforts to mitigate spread of that disease.[92]

The term "introduction into the United States" is defined in 42 C.F.R. § 71.40 as "the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons or property in the United States, in a manner that the Director determines to present a risk of transmission of a quarantinable communicable disease to persons, or a risk of contamination of property with a quarantinable communicable disease, even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States." 42 C.F.R. § 71.40(b)(1). Similarly, the term "serious danger of the introduction of such quarantinable communicable disease into the United States" is defined as, "the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease." 42 C.F.R. § 71.40(b)(3).

In promulgating § 71.40, CDC and HHS noted that "'introduction' does not necessarily conclude the instant that a person first steps onto U.S. soil. The introduction of a person into the United States can occur not only when a person first steps onto U.S. soil, but also when a person on U.S. soil moves further into the United States, and begins to come into contact with persons or property in ways that increase the risk of transmitting the quarantinable communicable disease."[93] This language recognizes that many quarantinable communicable diseases, including COVID-19, may be spread by infected individuals who are asymptomatic and therefore unaware that they are capable of transmitting the disease. Even when a communicable disease is already circulating within the United States, prevention and mitigation of continued transmission of the virus is nevertheless a key public health measure. In this case, although COVID-19 has already been introduced and is spreading within the United States, this Order serves as an important disease-mitigation tool to protect public health. This is particularly true as new variants of the virus continue to emerge. By continuing to suspend the introduction of persons from foreign countries into the United States, this Order will help minimize the spread of variants and their ability to accelerate disease transmission.

Section 71.40(b)(2) defines "[p]rohibit, in whole or in part, the introduction into the United States of persons" in Section 362 as "to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting movement into the United States, or physically expelling from the United States some or all of the persons." *See also* 42 U.S.C. § 265 (authorizing the prohibition when the danger posed by the communicable disease "is so increased by the introduction of persons from such country . . . or place that a suspension of the

---

[91] 42 U.S.C. § 265; 42 CFR 71.40.
[92] 85 Fed. Reg. 56424 at 56425-26.
[93] *Id*. at 56425.

right to introduce such persons into the United States is required in the interest of public health"). Pursuant to that provision, this Order permits expulsion of persons covered by it, as did the prior Orders issued under this authority.[94] CDC recognizes that expulsion is an extraordinary action but, as explained in the Final Rule, the power to expel is critical where neither HHS/CDC, nor other Federal agencies, nor state or local governments have the facilities and personnel necessary to quarantine, isolate, or conditionally release the number of persons who would otherwise increase the serious danger of the introduction of a quarantinable communicable disease into the United States.[95] In those situations, the rapid expulsion of persons from the United States may be the most effective public health measure that HHS/CDC can implement within the finite resources of HHS/CDC and its Federal, State, and local partners.[96]

As stated in the Final Rule for 42 C.F.R. § 71.40, CDC "may, in its discretion, consider a wide array of facts and circumstances when determining what is required in the interest of public health in a particular situation . . . includ[ing]: the overall number of cases of disease; any large increase in the number of cases over a short period of time; the geographic distribution of cases; any sustained (generational) transmission; the method of disease transmission; morbidity and mortality associated with the disease; the effectiveness of contact tracing; the adequacy of state and local healthcare systems; and the effectiveness of state and local public health systems and control measures."[97] Other factors noted in the Final Rule are the potential for disease spread among persons held in congregate settings, specifically during processing and holding at CBP facilities, and the potential for disease spread to the community at large.[98]

As stated in 42 C.F.R. § 71.40, this Order does not apply to U.S. citizens, U.S. nationals, lawful permanent residents, members of the armed forces of the United States and associated personnel if the Secretary of Defense provides assurance to the Director that the Secretary of Defense has taken or will take measures such as quarantine or isolation, or other measures maintaining control over such individuals, to prevent the risk of transmission of the quarantinable communicable disease into the United States, and U.S. government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, if the Director receives assurances from the relevant head of agency and determines that the head of the agency or department has taken or will take measures such as quarantine or isolation, to prevent the risk of transmission of a quarantinable communicable disease into the United States.[99]

In addition, this Order does not apply to those classes of persons excepted by the CDC Director. Including exceptions in the Order is consistent with Section 362 and 42 C.F.R. § 71.40, which permit the prohibition of introduction into the United States to be "in whole or in part." As explained in the Final Rule for section 71.40, this language is intended to allow the Director to narrowly tailor the use of the authority to what is required in the interest of public health.[100] Pursuant to this capability, CDC is therefore excepting specific categories of persons from the Order, as described herein.

---

[94] *See id*. at 56425, 56433.
[95] *Id*. at 56425, 56445-46.
[96] *Id*. at 56425.
[97] *Id*. at 56444.
[98] *Id*. at 56434. Strain on healthcare systems was also cited as a factor in the Final Rule, specifically the additional strain that noncitizen migrant healthcare needs may place on already overburdened systems; the Final Rule described the reduction of this strain as a result of CDC's previously issued orders. *Id*. at 56431.
[99] 42 CFR 71.40(e) and (f).
[100] 85 Fed. Reg. 56424, 56444.

As required by Section 362, this Order will be in effect only for as long as it is needed to avert the serious danger of the introduction, transmission, and spread of COVID-19 into the United States and will be terminated when the continuation of the Order is no longer necessary to protect the public health. Finally, as directed by 42 C.F.R. § 71.40(c), the Order sets out the following:

(1) The foreign countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited;

(2) The period of time or circumstances under which the introduction of any persons or class of persons into the United States is being prohibited;

(3) The conditions under which that prohibition on introduction will be effective, in whole or in part, including any relevant exceptions that the Director determines are appropriate;

(4) The means by which the prohibition will be implemented; and

(5) The serious danger posed by the introduction of the quarantinable communicable disease in the foreign country or countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited.

## III.    Issuance and Implementation of Order

Based on the foregoing public health reassessment, I hereby issue this Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. §§ 265, 268, and their implementing regulations under 42 CFR part 71,[101] which authorize the CDC Director to suspend the right to introduce persons into the United States when the Director determines that the existence of a quarantinable communicable disease in a foreign country or place creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of the right of such introduction is necessary to protect public health. This Order hereby replaces and supersedes the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order)[102] and affirms and incorporates the exception for UC published in the July Exception, such that UC are excepted from this Order.[103]

This Order addresses the current status of the COVID-19 public health emergency and ongoing public health concerns, including virus transmission dynamics, viral variants, mitigation efforts, the public health risks inherent to high migration volumes, low vaccination rates among migrants, and crowding of immigration facilities. In making this determination, I have considered myriad facts, including the congregate nature of border facilities and the high risk for COVID-19 outbreaks – especially now with the predominant, more transmissible Delta variant – presented following the introduction of an infected person, as well as the benefits of reducing such risks. I have also considered epidemiological information, including the viral transmissibility and asymptomatic transmission of COVID-19, the epidemiology and spread of SARS-CoV-2 variants, the morbidity and mortality associated with the disease for individuals in certain risk categories, as well as public health concerns with crowding at border facilities and resultant risk of transmission of additional quarantinable communicable diseases. I am issuing this Order to preserve the health and safety of U.S. citizens, U.S. nationals, and lawful permanent residents, and personnel and noncitizens in POE and U.S. Border Patrol

---

[101] Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56424 (Sept. 11, 2020); 42 CFR 71.40.

[102] *Supra* note 4.

[103] *Supra* note 3.

stations by reducing the introduction, transmission, and spread of the virus that causes COVID-19, including new and existing variants, in congregate settings where covered noncitizens would otherwise be held while undergoing immigration processing, including at POE and U.S. Border Patrol stations at or near the U.S. land and adjacent coastal borders.

Based on an assessment of the current COVID-19 epidemiologic landscape and the U.S. government's ongoing efforts to accommodate UC, CDC does not find public health justification for this Order to apply with respect to UC, as outlined in the July Exception. Although CDC finds that, at this time, this Order should be applicable to FMU, CDC notes that there are fewer FMU than SA unlawfully entering the United States and many FMU are already being processed pursuant to Title 8 versus Title 42 given a variety of practical and other limitations on immediately expelling FMU. DHS has indicated that it plans to continue to partner with state and local agencies and nongovernmental organizations to provide testing, consequence management, and eventually vaccination to FMU who are determined to be eligible for Title 8 processing. CDC considers these efforts to be a critical risk reduction measure and encourages DHS to evaluate the potential expansion of such COVID-19 mitigation programs for FMU such that they may be excepted from this Order in the future. Although vaccination programs are not available at this time, CDC encourages DHS to develop such programs as quickly as practicable. While the migration of SA and FMU into the United States during the COVID-19 public health emergency continues and given the inherent risks that accompany holding these groups in crowded congregate settings with insufficient options for effective mitigation, CDC finds the public health justification for this Order is sustained at this time.

DHS has indicated that it is committed to restoring border operations and facilitating arrivals to the United States in a manner that comports with CDC's recommended COVID-19 mitigation protocols. Given the recent migrant surge, DHS believes that an incremental approach is the best way to recommence normal border operations while ensuring health and safety concerns are addressed. To this end, DHS will work to establish safe, efficient, and orderly processes that are consistent with appropriate health and safety protocols and the epidemiology of the COVID-19 pandemic, in consultation with CDC.

CDC's expectation is that although this Order will continue with respect to SA and FMU, DHS will use case-by-case exceptions based on the totality of the circumstances where appropriate to except individual SA and FMU in a manner that gradually recommences normal migration operations as COVID-19 health and safety protocols and capacity allows. DHS will consult with CDC to ensure that the standards for such exceptions are consistent with current CDC guidance and public health recommendations. Based on this incorporation of relevant COVID-19 mitigation measures, CDC believes it is consistent with the legal authorities and in the public health interest to continue the use of case-by-case exceptions as a step towards the resumption of normal border operations under Title 8. Additionally, DHS is working in coordination with nongovernmental organizations, state and local health departments, and other relevant facilitating organizations and entities as appropriate to develop DHS-approved processes that include pre-entry COVID-19 testing. Additional public health mitigation measures, such as maintaining physical distancing and use of masks, testing, and isolation and quarantine as appropriate, are included in such processes. DHS has documented these processes and shared them with CDC. CDC has consulted with DHS to ensure that the processes appropriately address public health concerns and align with relevant CDC COVID-19 mitigation protocols. Based on these plans and processes, CDC believes it is consistent with legal authorities and in the public health interest to permit an exception for noncitizens in such DHS-approved processes to allow for safe and orderly entry into the United States.

### A.    Covered Noncitizens

This Order applies to persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE. For purposes of this Order, I refer to persons covered by the Order as "covered noncitizens."

### B.    Exceptions

This Order does <u>not</u> apply to the following:

- U.S. citizens, U.S. nationals, and lawful permanent residents;[104]
- Members of the armed forces of the United States and associated personnel, U.S. government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, subject to required assurances;[105]
- Noncitizens who hold valid travel documents and arrive at a POE;
- Noncitizens in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE;
- Unaccompanied Noncitizen Children;[106]
- Noncitizens who would otherwise be subject to this Order, who are permitted to enter the U.S. as part of a DHS-approved process, where the process approved by DHS has been documented and shared with CDC, and includes appropriate COVID-19 mitigation protocols, per CDC guidance; and
- Persons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS will consult with CDC regarding the standards for such exceptions to help ensure consistency with current CDC guidance and public health recommendations.

### C.    APA, Review, and Termination

This Order shall be immediately effective. I consulted with DHS and other federal departments as needed before I issued this Order and requested that DHS continue to aid in the enforcement of this Order because CDC does not have the capability, resources, or personnel needed to do so.[107] As part of the consultation, DHS developed operational plans for implementing this Order. CDC has reviewed these plans and finds them to be consistent with the language of this Order directing that covered noncitizens spend as little time in congregate settings as practicable under the circumstances. In my view, DHS's assistance with implementing the Order is necessary, as CDC's other public health tools

---

[104] 42 CFR 71.40(f).
[105] 42 CFR 71.40(e)(1) and (3).
[106] As excepted pursuant to the Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists. 86 Fed. Reg. 38717 (July 22, 2021).
[107] 42 U.S.C. § 268; 42 CFR 71.40(d).

are not viable mechanisms given CDC resource and personnel constraints, the large numbers of covered noncitizens involved, and the likelihood that covered noncitizens do not have homes in the United States.[108]

This Order is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Even if it were, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Order and a delayed effective date. Given the public health emergency caused by COVID-19, it would be impracticable and contrary to public health practices and the public interest to delay the issuing and effective date of this Order with respect to all covered noncitizens. In addition, this Order concerns ongoing discussions with Canada and Mexico on how best to control COVID-19 transmission over our shared borders and therefore directly "involve[s] . . . a . . . foreign affairs function of the United States;"[109] thus, notice and comment and a delay in effective date are not required.

This Order shall remain effective until either the expiration of the Secretary of HHS' declaration that COVID-19 constitutes a public health emergency, or I determine that the danger of further introduction, transmission, or spread of COVID-19 into the United States has ceased to be a serious danger to the public health, and continuation of this Order is no longer necessary to protect public health, whichever occurs first. At least every 60 days, the CDC shall review the latest information regarding the status of the COVID-19 public health emergency and associated public health risks, including migration patterns, sanitation concerns, and any improvement or deterioration of conditions at the U.S. border, to determine whether the Order remains necessary to protect public health. Upon determining that the further introduction of COVID-19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the Federal Register terminating this Order. I retain the authority to modify or terminate the Order, or its implementation, at any time as needed to protect public health.

In testimony whereof, the Director, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set her hand at Atlanta, Georgia, this 2nd day of August, 2021.

_____
Rochelle P. Walensky, MD, MPH
Director
Centers for Disease Control and Prevention

---

[108] CDC relies on the Department of Defense, other federal agencies, and state and local governments to provide both logistical support and facilities for federal quarantines. CDC lacks the resources, manpower, and facilities to quarantine covered noncitizens.
[109] 5 U.S.C. § 553(a)(1).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NANCY GIMENA HUISHA-HUISHA, *et al.*,
on behalf of herself and others similarly
situated,

　　　　　Plaintiffs,

　　v.

ALEJANDRO MAYORKAS, Secretary of
Department of Homeland Security, *et al.*,

　　　　　Defendants.

Civil Docket No. 1:21-cv-00100-EGS

### DECLARATION OF TROY A. MILLER

I, Troy A. Miller, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge,

and documents and information made known or available to me from official records and

reasonably relied upon in the course of my employment, hereby declare as follows:

*Background*

1.  I am the Senior Official Performing the Duties of the Commissioner of U.S. Customs and

    Border Protection (CBP), and have been in this role since January 20, 2021.  Prior to this

    role, I served as Director, Field Operations of CBP's New York Field Office from

    October 28, 2018 to January 19, 2021, and served as Executive Director, National

    Targeting Center from June 5, 2011 to October 27, 2018.  From June 2013 to January

    2015, I also served as Acting Assistant Commissioner, Office of Intelligence and

    Investigative Liaison, following a 20-year career with CBP and its predecessor, the U.S.

    Customs Service, as a Customs Inspector.

2.  The CBP mission is to protect the American people, safeguard our borders, and enhance the Nation's economic prosperity while maintaining the core values of vigilance, service, and integrity.  In my capacity as the Senior Official Performing the Duties of the Commissioner, I oversee and direct five core missions -- counterterrorism, combating transnational crime, securing the border, facilitating lawful trade and protecting revenue, and facilitating lawful travel.  I am responsible for overseeing over 63,000 employees, managing an annual budget of over $13 billion, and ensuring the effective operations of CBP's mission to protect national security while promoting economic prosperity.  CBP annually facilitates $4 trillion in trade and processes over 410 million travelers through Ports of Entry (POEs).  In addition, in FY2019, U.S. Border Patrol (USBP) apprehended 859,501 aliens not lawfully in the U.S.

3.  I am familiar with the Centers for Disease Control and Prevention (CDC) *Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists* (Mar. 20, 2020) (CDC Order) and subsequent extensions and amendments, as well as CBP's role in assisting with implementing this Order. Specifically, I am aware that CDC has determined that transmission of COVID-19 at CBP facilities could lead to the infection of aliens in CBP custody, infection of CBP officers, agents, and others who are exposed to such aliens in custody, as well as increasing exposure risk to already challenged local health systems and local communities.  I am also aware that because of the continued prevalence of COVID-19 in both Mexico and Canada, the CDC has determined that the entry of aliens crossing the northern and southern borders into the United States (regardless of their country of

2

origin) continues to present a serious danger of introducing COVID-19 into POEs and USBP stations at or near the U.S-Mexico and U.S.-Canada borders.

4. I am familiar with *Huisha-Huisha, et al., v. Mayorkas, et al.*, No. 1:21-cv-00100 (D.D.C.), in which plaintiffs ask the court to certify a class defined as "[a]ll noncitizens who (1) are or will be in the United States; (2) come to the United States as a family unit composed of at least one child under 18 years old and that child's parent or legal guardian; and (3) are or will be subjected to the Title 42 Process." Generally, Plaintiffs are requesting the court issue a class-wide preliminary injunction on behalf of the proposed class, and enjoin defendants from applying what it calls the "Title 42 process" to the members of the proposed class. I submit this declaration in support of CBP's assertion of the harm that CBP anticipates would occur if the district court issues a preliminary injunction enjoining the government from expelling class members from the United States. As set forth further below, it is my judgment that if the district court issues a preliminary injunction enjoining the government from expelling class members from the United States, it could be expected to cause harm to national security and substantial negative impacts on lawful trade and travel throughout the country.

5. From March 1, 2020 to February 8, 2021, CBP encountered 38,029 family units along the southwest border. CBP encountered 738 family units in April 2020; 1,052 in May 2020; 1,679 in June 2020; 2,050 in July 2020; 2,715 in August 2020; 3,894 in September 2020; 4,756 in October 2020; 4,370 in November 2020; 4,650 in December 2020; and 7,490 in January 2021. This represents a 915 percent increase from April 2020 to January 2021 (the last full month for which we have complete data).

App. 155

6. Based on CBP's average encounter data from similar time periods in FY2018 and
   FY2019, CBP anticipates that the number of individuals in family units apprehended by
   CBP will increase from the end of February 2021 (estimated 8,998 family units) to the
   end of May 2021 (estimated 18,365 family units). Therefore, CBP is planning for an
   increase of 104 percent in family units in the next few months. In the event of a
   preliminary injunction enjoining the government from expelling family units from the
   United States under Title 42, and with CDC COVID-19 protocols remaining in effect for
   holding facilities, USBP predicts they will exceed maximum holding capacity across the
   southwest border within one week.

7. Additionally, a preliminary injunction enjoining the government from expelling family
   units from the United States under Title 42 may become a pull factor leading to
   additional numbers of family units apprehended by CBP. This would be consistent with
   my past experience with previous court orders that have similarly had an effect – or
   perceived effect – on CBP's processing or detention of certain individuals, as such orders
   have also served as a pull factor for those individuals entering the United States. For
   example, I am familiar with the U.S. District Court for the District of Columbia's
   November 18, 2020 order (District Court Order) in *P.J.E.S. v. Wolf, et al.,* No. 1:20-cv-
   02245 (D.D.C.), that, among other things, certified a class of unaccompanied noncitizen
   children who would be expelled consistent with the CDC Order, generally discussed
   above, and enjoined their expulsion from the United States. From November 18, 2020,
   through January 29, 2021, CBP encountered 12,430 unaccompanied noncitizen children.
   In the same span of time before the injunction, from September 5, 2020, through
   November 17, 2020, CBP encountered 10,675 unaccompanied noncitizen children. This

4

represents a 16.4 percent increase in such encounters after the District Court Order was issued.

8. USBP stations along the southwest border are already at or near operating capacity.  In fact, in nearly half of the USBP sectors along the southwest border, certain stations and entire sectors have been over capacity at some point during the day as particular stations have to intake large groups of aliens that are encountered.  Therefore, on multiple occasions, it has proved necessary to release covered aliens from custody due to capacity constraints—which is precisely the sort of danger that the CDC Order was meant to mitigate.  *See* 85 Fed. Reg. 17060, 17067 (describing how release increases risks where many aliens lack places in the U.S. where they can self-isolate).  This is due, in large part, to the diminished operating capacity necessitated by COVID-19 social distancing protocols and the significant influx of unaccompanied noncitizen children and family units that have been encountered in the United States since the November 18, 2020 *P.J.E.S.* preliminary injunction.  Accordingly, a preliminary injunction enjoining the government from expelling any group of covered aliens from the United States, contrary to CDC's expert guidance, would likely prove extremely dangerous, and possibly deadly given the nature of COVID-19, to the CBP employees working in these facilities, the individuals in CBP custody, as well as those in local communities.

9. Should the District Court issue a preliminary injunction in *Huisha-Huisha* enjoining the government from expelling class members from the United States, the time it takes to process class members will be significantly prolonged, increasing the risk of exposure to COVID-19 for CBP personnel and other aliens in CBP custody.  Under Title 42, family units who can be expelled directly back to Mexico would generally be processed in the

5

App. 157

field without being brought back to a USBP station. With such an injunction, CBP will have to process class members who would otherwise be subject to the CDC Order under Title 8, which will generally require transporting the family unit to a USBP station/processing center, processing the family unit for a Title 8 removal pathway, and holding the family unit until Immigration and Customs Enforcement (ICE) can take custody, or the family is released. Since the implementation of the CDC Order, approximately 79 percent of family units expelled have been immediately expelled without entering a USBP facility, meaning only approximately 21 percent of family units expelled ever reach a USBP facility while awaiting a delayed expulsion. In relation to family unit expulsions from March 21, 2020 through February 8, 2021, 8,288 were immediately expelled by USBP and approximately 2,200 were delayed expulsions. Of those delayed expulsions, USBP expelled 380 and ICE expelled 1,820. Under Title 8, family units are generally taken back to a USBP facility for a more time intensive processing. Once that is complete, the family unit may be processed for a Title 8 removal pathway, such as being placed in 8 U.S.C. § 1229a proceedings or expedited removal pursuant to 8 U.S.C. § 1225(b)(1). Thus, a preliminary injunction will substantially increase the amount of time it takes to process class members, and the number of class members entering CBP facilities will increase dramatically, likely putting CBP personnel and other aliens in CBP custody at a greater risk of contracting COVID-19.

***Risks in Overflowing Border Facilities***

10. I would emphasize that generally, if a particular USBP station or POE, or even a particular USBP Sector or Office of Field Operations Field Office, is facing a significant influx of individuals apprehended or encountered, agents and officers in those locations

must devote a significant portion of their time to processing those individuals, ensuring that those individuals receive appropriate treatment, and transporting those individuals to and out of CBP facilities.  CBP has a finite number of employees.  Thus, with more agents and officers focused on the individuals already in custody, this leaves fewer agents and officers available to actually patrol and secure the border, particularly in remote areas of the southwest border.  Further, as the number of family units in USBP custody increases, the risk of the spread of COVID-19 in USBP facilities increases.  This is because USBP facilities are congregate facilities that are not well equipped for social distancing, isolation, or quarantine.  CDC Order at 1.  USBP facilities are designed for short-term holding, and have limited capacity.  They are not designed to hold individuals for more than a few days, generally for the purpose of transferring custody to another agency, such as ICE or ORR.  Further, I would emphasize that USBP personnel have experienced difficulties with aliens in CBP custody, especially minors, including those in family units, not utilizing personal protective equipment, such as masks, and adhering to social distancing guidelines.  USBP personnel routinely have to ask aliens in CBP custody, especially minors, to wear their masks and to wear them properly in order to protect themselves and others from possible exposure to COVID-19.  Additionally, USBP personnel have to routinely ask aliens in CBP custody, especially young children, to sit apart from one another or keep their distance in order to comply with COVID-19 social distancing guidelines.

11. I am aware that under normal operating conditions, CBP officers and agents come into regular, sustained contact with aliens seeking to enter the United States at POEs, or between POEs.  I am also aware that CBP must normally hold aliens longer for

7

immigration processing if they arrive without valid travel documents, and that such aliens may be in CBP custody, near CBP personnel and other aliens, for hours or days. In light of the current elevated COVID-19 risk, these circumstances create increased risk for CBP personnel, aliens in CBP custody, local health systems, and local communities.

12. The CDC Order has greatly reduced the number of persons CBP has in its custody, and accordingly reduced the COVID-19 risks described above. In the 75 day period preceding the March 20, 2020 Order (i.e., January 6, 2020, to March 20, 2020), there was a daily average of 3,292 aliens in CBP custody at POEs and USBP stations. From March 21, 2020, through February 10, 2021, the daily average declined to 760 aliens in CBP custody. This represents a 77 percent reduction in daily custody numbers and a 90 percent reduction from the same period in 2019, likely as a result of the issuance of the CDC Order. Despite decreases in daily custody numbers, CBP enforcement encounters continue to increase month over month: CBP encountered 17,106 aliens in April 2020; 22,237 aliens in May 2020; 33,049 aliens in June 2020; 40,929 in July 2020; 50,014 in August 2020; 57,674 in September 2020; 69,237 in October 2020; 72,091 in November 2020; 73,923 in December 2020; and 78,323 in January 2021. This represents an increase of 357 percent from April 2020 to January 2021. In relation to family units specifically, in the 75 day period preceding the March 20, 2020 CDC Order (i.e., January 6, 2020, to March 20, 2020), there was a daily average of 1,218 family units in CBP custody at POEs and USBP stations. From March 21, 2020 through February 10, 2021, the daily average declined to 166 family units in CBP custody. This represents an 86 percent reduction in daily custody numbers, likely as a result of the CDC Order.

8

13. CBP estimates that the agency will face significant challenges due to social distancing and space constraints after accounting for COVID-19 protocols. Prior to the COVID-19 pandemic, USBP's holding capacity for aliens apprehended along the southwest border was approximately 12,428. USBP's efforts to further mitigate the spread of COVID-19 necessitated the reduction of our holding capacity to approximately 25 percent to ensure social distancing protocols are maintained, to the extent possible. Despite these internal procedures, CBP continues to be wholly reliant on partner agencies to quickly assume custody of aliens apprehended by its agents and officers. Should the number of persons in custody increase, or transfer of custody to those agencies be delayed beyond 72 hours, USBP facilities may rapidly become overcrowded and the spread of COVID-19 to the population in CBP facilities, CBP employees, CBP contractors, and the general public is likely.

14. There are numerous scenarios under which CBP's limited holding capacity could more quickly be exceeded. For example, in my experience and as discussed above, should a preliminary injunction be issued, it will likely create a pull factor, leading to an increasing number of family units entering or attempting to enter the U.S. Rising apprehensions along the southwest border would decrease the amount of time it would take to reach CBP's COVID-19 reduced holding capacity. A significant influx, like the 2019 southwest border humanitarian crisis, could likewise lead to a substantially shorter timeframe. An influx of aliens apprehended while CBP is operating at a reduced capacity, which could risk infecting numerous agents and/or officers who may become sick and unable to perform their duties, could severely diminish CBP's ability to perform its functions and duties. Further, an outbreak within a CBP facility could quickly

9

handicap CBP's ability to utilize that facility's maximum capacity, further lowering the overall detention capacity along the southwest border. The need to quarantine subjects and deep clean/sanitize infected holding cells will also quickly deplete CBP's detention capacity. In addition, over-capacity conditions at CBP facilities, resulting from the loss of Title 42 authority would increase other humanitarian challenges and other public health concerns.

15. Separate and apart from CBP's overall detention capacity along the southwest border, a particular location's holding capacity could be overwhelmed almost immediately depending on the specific circumstances. For example, an apprehension of a large number of individuals, a significant number of CBP personnel becoming infected or quarantined, or an outbreak of COVID-19 amongst aliens in custody, etc., might lead to that location being overwhelmed within a number of hours or days. The same would be true if there were a surge in COVID-19 infections or quarantined CBP personnel.

16. Reducing the number of, and time spent by, persons in CBP custody lowers the risk that officers and agents will contract COVID-19 in carrying out their official responsibilities and fulfilling the CBP mission to protect the American people, safeguard our borders, and enhance the Nation's economic prosperity. It also reduces the risk that persons in CBP custody will contract COVID-19. I believe the CDC Order has greatly reduced the risk of CBP employees becoming infected with, or needing to self-quarantine because of their exposure to, COVID-19 in the course of carrying out their official duties.

17. CBP examined a hypothetical case study of what would happen if a COVID-19 positive subject apprehended in 2020 had been apprehended during the 2019 southwest border humanitarian crisis, the peak of which saw around 20,000 aliens in custody throughout

USBP's facilities. The case examined the typical processing lifecycle of an actual subject apprehended in 2020 in a group of 53 people who were brought into custody in El Paso, Texas's Centralized Processing Center. A subject positive with COVID-19 would have come into contact with, and potentially infected, anywhere from nearly 400 to over 1,800 other subjects, both aliens in CBP custody and CBP personnel. At most CBP facilities, without the CDC Order in place for all covered aliens, maintaining adequate social distancing may not be possible. As of February 13, 2021, USBP has encountered 372 aliens who tested positive for COVID-19 while in USBP custody. The first known encounter occurred in April 2020, and encounters increased rapidly through the summer of 2020 and have remained steady since then. On average, USBP encounters at least one verified COVID-19 positive alien per day. To date, each of those individuals have been encountered at the U.S.-Mexico border. To be clear, the number of aliens in CBP custody who were infected with COVID-19 is likely far larger. CBP does not test aliens in its custody for COVID-19; rather, the number of positive tests relate strictly to those aliens who were taken to the hospital, including for care not related to COVID-19 symptoms.

18. I am also aware of strained resource capacities at CBP's facilities caused by the effects of COVID-19. As of February 15, 2021, 7,845 CBP employees have tested positive for COVID-19, including 629 actively positive cases. There has been a steady increase in the number of CBP employee positive cases since September 2020. In September 2020, CBP had 218 positive employee cases; October 2020, had 616 positive cases; November 2020, had 1,199 positive cases; December 2020, had 1,726 positive cases; and January 2021, had 1,641 positive cases. This reflects a 752.7 percent increase in monthly new

positive CBP employee cases from September 2020 to January 2021 (the last full month for which we have complete data). As of February 15, 2021, of the 149 CBP employees positive with COVID-19 in the State of Texas, 54 work in El Paso (29) or Laredo (25) along the southwest border. As of February 15, 2021, CBP had a total of 7,845 COVID-19 cumulative positive employee cases, out of approximately 63,457 employees (reflecting employment data current as of January 30, 2021). Therefore, I estimate that CBP's COVID-19 infection rate is approximately 12.36 percent. As of February 12, 2021, the U.S. had a total of 27,127,858[1] positive COVID-19 cases, and a population of 332,215,274.[2] Therefore, I estimate that the U.S.'s COVID-19 infection rate is approximately 8.16 percent. As such, CBP's infection rate already exceeds the national rate, indicating that CBP employees are disproportionately affected by COVID-19, and it is likely that CBP's overall workforce infection rate will grow even faster if an injunction is issued in this case. Unfortunately, twenty-three CBP employees have died in the line of duty due to COVID-19, fifteen of whom were stationed along the southwest border. An additional two CBP employees and one contractor also died as a result of COVID-19. USBP Agent Enrique Rositas, Jr. died in the line of duty after serving over 23 years with USBP. Agent Rositas was a line officer in the McAllen Station part of the Rio Grande Valley Sector, which is consistently the busiest in the nation in terms of the apprehension of aliens crossing the border. By comparison, there was only one non-COVID-19 line of duty death since March 2020, and from FY2015 through FY2019 there were seven total line of duty deaths of CBP employees with no more than two line of duty deaths in a given year.

---

[1] https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days. (last viewed February 12, 2021).
[2] https://www.worldometers.info/world-population/us-population/. (last viewed February 12, 2021).

App. 164

19. An outbreak of COVID-19 in a CBP facility could lead to further significant reductions in available personnel, which could lead to severe vulnerabilities and gaps in securing the border. CBP officers and agents are not readily replaceable, in part because their missions include complex immigration, customs, and national security functions that require specialized training. For example, gaps in the USBP's ability to patrol the border caused by personnel shortages and facility closures would create severe safety and national security risks for the United States, particularly in fulfillment of the core mission priorities involving counter terrorism, combatting transnational crime, securing the border, and impeding the further introduction of COVID-19 into the United States.

20. CBP also sees an increase in strained resources when more aliens need to be transported to hospitals for diagnosis, treatment, or care. In the 50 day period before implementation of the CDC Order, over 1,600 trips were made by USBP to community hospitals to provide aliens advanced medical care. In the 50 days preceding February 11, 2021, a significantly lower 1,058 trips have been made for aliens in CBP custody to receive medical care from community hospitals. Moreover, many CBP facilities, particularly along the southern land border, are located in remote locations distant from hospitals and other medical care and supplies.

21. CBP has policies and procedures in place to mitigate the threats posed by communicable diseases, but the unprecedented challenges posed by the COVID-19 pandemic cannot reliably be addressed by those policies and procedures. CBP is a law enforcement agency, not a medical/public health agency, and although CBP has basic contract medical support on location at certain CBP facilities to provide limited, focused medical support, even this contracted medical support is not sufficient to address a widespread COVID-19

13

App. 165

outbreak or provide COVID-19 testing, diagnosis, and treatment, which requires local health resources. CDC Order at 12.

22. An outbreak of COVID-19 at a CBP facility could cause significant harm to individuals beyond just those in the facility. CBP is generally just the first entity to encounter a migrant in the United States. Normally, CBP would rapidly process and transfer persons in custody to ICE or the Department of Health and Human Services. If aliens in CBP custody or CBP personnel are exposed to COVID-19, this leads to the further spread of COVID-19, with spillover effects on local communities and throughout the nation. CDC Order at 2. The CDC Order protects CBP personnel and persons in CBP custody first, but it also protects against additional exposure throughout local communities and the nation.

23. An outbreak of COVID-19 in a CBP facility forces CBP to temporarily close that facility, which limits where CBP can hold aliens whom it apprehends. Aliens need to be transferred to another facility, which results in additional agent/officer and migrant exposure over longer transportation times and could further harm capacity issues at that facility. In an incident over the summer, after an alien tested positive while in a USBP facility in California in May 2020, other aliens in custody were transferred to another facility for custody hold pending cleaning and the potentially contaminated areas where the alien had been were closed for three days to allow for proper cleaning, reducing facility detention capacity during that time. On the day of exposure, 56 aliens were in the facility awaiting expulsion to Mexico.

24. Closing a facility would also limit how CBP conducts operations even beyond the scope of enforcing immigration law. For example, if the World Trade Bridge in Laredo, Texas

14

App. 166

were to close due to limited staffing from COVID-19 positive exposures, approximately

$514,478,446 (upwards of 7,000 trucks) of daily commercial goods that cross would be

impacted, causing disruptions to the auto industry and other essential operations. Along

the entire southwest border with Mexico, the daily average of cross border trade (imports

and exports) includes over 18,000 commercial trucks carrying $1.6 billion in goods

essential to the economies of both countries. Further, CBP processes all persons and

cargo entering and departing the United States, and any substantial reduction in CBP

staffing capacity at ports of entry, or need to divert resources to impacted areas, could

have enormous consequences on facilitating lawful trade, protecting revenue, and the

economy.

25. The effectiveness of CBP's mission to protect the American people, safeguard our

borders, and enhance the Nation's economic prosperity is dependent on the ability of our

officers and agents to properly perform their duties at the POEs and between the POEs.

It would seriously compromise CBP's ability to perform its counter terrorism, law

enforcement, and lawful trade and travel facilitation mission priorities if the number of

officers and agents were diminished due to infections with COVID-19.

26. I have determined that should the district court grant the plaintiffs' requested injunctive

relief, its restrictions on the use of the CDC Order as a tool available to CBP to manage

the influx of proposed class members would have grave consequences to public safety

and national security by diminishing the ability of CBP to effectively and efficiently

perform its mission.

15

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.

Executed this 17th day of February, 2021.

Troy A. Miller
Senior Official Performing the
Duties of Commissioner
U.S. Customs and Border Protection

16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.,<br><br>Defendants. | Civ. A. No. 21-100 (EGS) |

**DECLARATION OF DAVID SHAHOULIAN**

I, David Shahoulian, pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, as well as documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.  I am the Assistant Secretary for Border and Immigration Policy at the Department of Homeland Security (DHS or Department) and have been in this role since January 20, 2021.  I previously served as Deputy General Counsel at DHS from June 29, 2014 to January 19, 2017.

2.  I submit this declaration to alert the Court to the adverse consequences of a preliminary injunction prohibiting the Government from applying the Centers for Disease Control and Prevention's (CDC) Order Suspending the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists ["CDC Order"], 85 Fed. Reg. 65806 (Oct. 16, 2020), or any similar order, to the putative class in this case.

3.  As explained in more detail below, the United States is currently encountering record numbers of noncitizens, including families, at the border.  These encounter rates have strained DHS operations and caused border facilities to be filled beyond their normal operating capacity,

impacting the ability to employ social distancing in these congregate settings.  At the same time, DHS is also experiencing significantly increased rates of noncitizens testing positive for COVID-19.  In light of these and other considerations, enjoining the application of the CDC Order to families would exacerbate overcrowding at DHS facilities and create significant public health risks.

4.  Since January 2021, the Department has engaged in extensive efforts to increase its capacity to safely process asylum seekers and other noncitizens.  Among other things, DHS has worked tirelessly to build capacity and to create innovative new approaches to allow asylum seekers and other noncitizens to be processed in a manner that ensures their health and safety, and that of DHS officers and the American public.  Those efforts—which are the product of extensive collaboration with other U.S. Government agencies, foreign governments, and non-governmental organization (NGO) partners—have been successful in significant respects as detailed below.

5.  The Department lacks sufficient capacity to safely hold and process all individuals seeking to enter the United States during the global pandemic if the U.S. Government were restricted in its ability to implement the CDC Order.  These capacity challenges are particularly acute with respect to families.  DHS continues to have severely limited capacity to hold and process families, and the current migrant surge and ongoing pandemic have only compounded these issues.

6.  If the CDC Order is enjoined with respect to families, the increased number of families seeking to enter the United States would each require additional processing related to admissibility, which would in turn require them to be held for longer periods in increasingly crowded conditions.  Moreover, due to such conditions and other capacity constraints, DHS would effectively need to release a growing number of families into border communities, which risks overwhelming the local testing, isolation, and quarantine infrastructure DHS has worked to create and will thus burden

local healthcare systems and strain healthcare resources.  An injunction restricting implementation of the current CDC Order as to families will result in an immediate increased risk of harm from COVID-19 for noncitizens in DHS custody, DHS personnel, and potentially the public.

### I.      The U.S. Government's Efforts to Build Capacity and Improve Processing

7.    Since January 2021, the U.S. Government has engaged in extensive and varied efforts to improve the immigration processing systems at the border, while also dealing with challenges presented by the COVID-19 pandemic and the current influx of noncitizens seeking refuge in the United States.

8.    First, the Government has worked to significantly increase its ability to safely process and house individuals encountered between ports of entry after crossing into the United States.  U.S. Customs and Border Protection (CBP) and the Department of Health and Human Services, for example, have stood up numerous emergency facilities in the United States (and retrofitted existing ones) to increase their ability to safely hold and process individuals—particularly unaccompanied children (UCs) and families—encountered after crossing between ports of entry.  U.S. Immigration and Customs Enforcement (ICE) has transitioned existing facilities for the processing and testing of families, and it has entered into a contract with a non-profit social service organization to add over 1,200 additional beds to ICE's family housing capacity.  And the Department has transferred hundreds of personnel from various component agencies around the country to the southwest border to assist with the processing and care of individuals encountered at the border.

9.    Second, the Department has also taken significant steps to develop systems to facilitate testing, isolation, and quarantine of those individuals who are not immediately returned to their home countries after encounter.  Across most of the southwest border, these systems were developed by DHS in coordination with state and local jurisdictions, non-governmental

organizations, and other private entities. In the Del Rio sector, where there is limited non-governmental organization capacity, the Department set up a system for testing and non-congregate sheltering involving private contractors and ICE family facilities. Due to infrastructure and resource limitations, it is not feasible to replicate this latter system across the border.

10. Third, the U.S. Government also engaged in several lines of effort to improve its capacity to safely process asylum seekers and other individuals through U.S. ports of entry. For example, the U.S. Government—in collaboration with international organizations and domestic non-governmental organizations—rapidly developed an innovative system to register, test, and transport certain individuals previously returned to Mexico pursuant to the Migrant Protection Protocols (MPP) for safe and orderly processing into the United States through various ports of entry at the southwest border. To date, the U.S. Government has processed approximately 13,000 individuals, including many families, pursuant to its Title 8 authorities through this program.

11. The U.S. Government has also engaged with international humanitarian organizations and non-governmental organizations to establish similar streamlined systems for the U.S. processing of other individuals, particularly families, who may qualify for an exception to the CDC Order for humanitarian reasons. Under these systems, non-governmental organizations identify and refer families and other individuals in vulnerable situations in Mexico to DHS for possible exception from expulsion, based on the totality of the circumstances, on a case-by-case basis, as determined by DHS in accordance with the CDC Order. Once they test negative for COVID-19, such individuals may be processed pursuant to Title 8 authorities at designated ports of entry. To date, over 16,000 individuals have been processed into the United States through these CDC-authorized processes.

12. DHS is committed to continuing to use mechanisms like those described above to allow the safe processing of vulnerable families under Title 8 for as long as Title 42 remains applicable to families.

## II.   An Injunction Would Result in Severe Capacity Limitations Endangering Non-Citizens, DHS Employees, and Others

13. Despite the U.S. Government's efforts to build safe processing capacity, DHS's application of the CDC Order remains necessary, while the pandemic continues, to prevent COVID-19 exposure risks to DHS personnel, individuals seeking entry to the United States, and border communities.  This risk has recently increased due to the recent spread of the highly transmissible COVID-19 Delta variant.  The rates at which encountered noncitizens are testing positive for COVID-19 have increased significantly in recent weeks.  And although the rate of infection among CBP officers had been declining, this rate recently began increasing again, even though the percentage of officers and agents who have been fully vaccinated has grown significantly since January.  This has led to increasing numbers of CBP personnel being isolated and hospitalized.

14. Unlike at ports of entry, where DHS can better manage the volume and rate at which individuals are processed, there is substantially less ability to manage or control the volume and rate of encounters that may occur between the ports.  Without the CDC Order, DHS would likely encounter increased numbers of families crossing the border between the ports of entry.  And the Department would be faced with processing all such families under Title 8—which is significantly more extensive and time consuming than Title 42 processing—regardless of the number of individuals encountered on a given day.  DHS must often transport such noncitizens in passenger vehicles, including from remote locations, to U.S. Border Patrol stations or other CBP facilities for additional processing in congregate settings.  Each of these interactions—encounter, custody,

App. 173

transportation, and holding in congregate setting—increases the risks of COVID-19 exposure and transmission.

15. As noted in the CDC Order itself, CBP facilities are designed for short-term holding and initial processing, generally prior to transfer to another agency, such as ICE or the Office of Refugee Resettlement (ORR) within HHS, which houses UCs until they can safely be placed with sponsors.  They are not designed to hold individuals for extended periods of time, particularly during a pandemic when social distancing and isolation are needed to limit the spread of disease. The congregate nature of these facilities restricts the ability to quarantine, isolate, and enable social distancing by persons who are or may be infected with COVID-19.  As these CBP facilities become overcrowded during a surge, bottlenecks in immigration processing develop, along with bottlenecks in ICE transportation, detention capacity for families and single adults, and ORR capacity for UCs.  As a result, noncitizens' length of stay in DHS custody extends significantly.

16. Moreover, CBP's already limited border processing capacity has been greatly reduced through the implementation of public-health protocols designed to mitigate COVID-19 transmission.  Under current protocols, CBP aims to maintain 25 percent capacity at many of its facilities, and up to 50 percent capacity at specialized central processing centers and soft sided facilities.  Loss of the ability to expel families pursuant to the CDC Order will directly contribute to the Department's inability to maintain critical COVID-19 capacity controls.

17. Importantly, the ability to expel certain covered noncitizens under the CDC Order does not result in the expulsion of every individual encountered at the border; DHS must still process noncitizens not covered by the Order, noncitizens excepted from the Order on a case-by-case basis, and noncitizens for whom expulsion is not available for other reasons.  Due to a variety of factors, including an historic surge in southwest border encounters in recent months, CBP has been

encountering a significant and growing number of individuals who must be held for processing in congregate facilities.

18. In May and June 2021, for example, CBP recorded over 180,000 and 188,000 encounters, respectively, at the southwest border.  During this period, CBP encountered over 6,000 individuals per day, including about 500 UCs and 1,650 individuals in family units.  These constitute the highest numbers of monthly encounters recorded by CBP in more than twenty years, including during previous surges when the Department was not constrained by COVID-19 capacity considerations.  As noted above, due to COVID-19-related guidance, border facilities are currently expected to operate at only 25 to 50 percent capacity, depending on individual facility infrastructure and facility type.  Due to this combination of factors, many CBP facilities are already over that capacity—many significantly so, even with the CDC Order in place.

19. Based on preliminary data, the number of border encounters continued to increase in July 2021.  Over the first 29 days of July, CBP encountered an average of 6,779 individuals per day, including 616 unaccompanied children and 2,583 individuals in family units.  Overall, according to preliminary data, CBP is likely to have encountered about 210,000 individuals in July, the highest monthly encounter number since Fiscal Year 2000.  July also likely included a record number of unaccompanied child encounters, exceeding 19,000, and the second-highest number of family unit encounters, at around 80,000.

20. Moreover, these historic encounter levels have not been evenly distributed across the southwest border.  Two Border Patrol sectors—Rio Grande Valley (RGV) and Del Rio—have experienced a disproportionate amount of these encounters.  For example, the RGV sector alone saw over 51,000 and 59,000 encounters in May and June 2021, respectively; and based on preliminary data, there appear to have been about 78,000 RGV encounters in July.  These two

sectors have also experienced a disproportionate amount—about 71 percent—of family encounters.  As a result, facilities in these two sectors have been significantly more over-capacity relative to others.

21. As of August 1, 2021, the U.S. Border Patrol was at 389 percent of its overall COVID-19 adjusted capacity along the southwest border.  On that date, the Border Patrol had 17,778 noncitizens in custody (2,233 of whom were UCs) at its Border Patrol facilities, despite a COVID-19 adjusted capacity of 4,706.  More specifically, the Border Patrol was over capacity in seven of its nine southwest border sectors.  As of August 1, the RGV sector—which has been the epicenter of the current surge—was holding 10,002 noncitizens and was thus 783 percent over its COVID-19 adjusted capacity of 1,278 and 287 percent over its normal, non-adjusted capacity of 3,485.  Within RGV, noncitizen families and UCs are primarily transferred to a temporary processing facility in Donna, Texas in the RGV, which has a normal operating capacity of 1,625 and a COVID-19 adjusted capacity of 813 based on CDC recommended guidelines.  Within nine days of this facility opening on February 9, 2021, it had already exceeded its normal non-COVID-19 operating capacity with more than 1,000 noncitizens in custody.  As of August 1, this facility was operating at 446 percent of its COVID-19 adjusted capacity, and 223 percent of its normal non-COVID-19 operating capacity, with 3,623 noncitizens in custody.

22. These capacity figures are extremely worrisome, particularly because of the continued spread of the highly transmissible Delta variant.  Overcrowding challenges DHS's ability to effectively execute many of its core public health mitigation and countermeasure activities.  Additionally, higher rates of COVID-19 transmission within a DHS facility could quickly impede the Department's ability to utilize that facility's maximum capacity, further lowering the overall processing and holding capacity along the southwest border.  Indeed, the Department's operations

have already been impacted by significantly increased positivity rates among individuals in its facilities, including families.

23. Monthly family encounter rates have generally been increasing since April 2020, rising 100-fold from 738 encounters in April 2020 to over 75,000 in July 2021. Due to the impacts of the current pandemic, and the deteriorating economic conditions and increasing instability in the region from which the migrants originate, such encounters may increase further in the coming months. Based on current trends, the Department expects that total encounters this fiscal year are likely to be the highest ever recorded. The Department also expects that these numbers will climb even higher if the CDC Order is enjoined.

24. If an injunction is issued with respect to families, DHS will be required to process additional families under Title 8, requiring additional staff and space due to increased processing times. Processing a family under Title 42 typically takes 10 to 15 minutes and is largely conducted outdoors, while processing a family for Title 8 can take 1.5 to 3 hours and is generally conducted indoors. Processing all families under Title 8 will thus generally require DHS to hold significantly increased numbers of individuals in a variety of congregate settings, including during transportation to Border Patrol stations or other CBP facilities, and to process them at such facilities. Because many Border Patrol stations and other CBP facilities along the southwest border are already over operating capacity, increasing the number of individuals required to be held at such facilities would further limit the ability to employ social distancing and other COVID-19 related countermeasures.

25. The CDC has determined that the expulsion of certain noncitizens is necessary to protect public health because DHS is simply unable to process all noncitizen families safely under current circumstances, and particularly in the event of a large-scale influx. Enjoining DHS's

implementation of the CDC Order as to families would therefore endanger noncitizens in DHS facilities, DHS personnel, and ultimately the general public.

*          *          *

26. The United States has been built by generations of immigrants in search of refuge.  In line with that tradition, the Department is committed to ensuring that asylum seekers and other noncitizens seeking protection are treated with dignity and compassion. At the same time, the ongoing COVID-19 pandemic presents complex and dynamic challenges relating to public health that limit the Department's ability to process all such individuals safely under normal procedures. These challenges have been greatly exacerbated by the rise in novel COVID-19 variants, including the Delta variant.  The Department continues to work tirelessly to address those challenges as they emerge and implement procedures as needed to promote the health and safety of noncitizens, DHS personnel, border communities, and the American public.  During this period and given the unique public health danger posed by the ongoing pandemic, implementation of the CDC Order is critical to preventing overcrowding and the spread of infection within DHS facilities.

Executed on August 2, 2021.

*David Shahoulian*
_____
David Shahoulian
Assistant Secretary for Border and Immigration Policy
U.S. Department for Homeland Security

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2021, I electronically filed the foregoing

Joint Appendix with the Clerk of the Court for the United States Court of Appeals

for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Joshua Waldman*
Joshua Waldman