**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 21-5200**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NANCY GIMENA HUISHA-HUISHA,
on behalf of herself and others similarly situated,

Plaintiffs-Appellees,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**JOINT APPENDIX
VOLUME 2**

———————————

STEPHEN B. KANG
American Civil Liberties Union
Foundation, Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

LEE GELERNT
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

*Counsel for Plaintiffs-Appellees
(additional counsel on next page)*

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

CHANNING PHILLIPS
  *Acting United States Attorney*

SHARON SWINGLE
JOSHUA WALDMAN
ASHLEY A. CHEUNG
  *Attorneys, Appellate Staff
  Civil Division, Room 7232
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-0236
  Joshua.waldman@usdoj.gov*

*Counsel for Defendants-Appellants*

*Additional Counsel for Plaintiffs-Appellants*

CODY WOFSY
MORGAN RUSSELL
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

KARLA M. VARGAS
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
(956) 787-8171

JAMIE CROOK
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

DANIEL A. GALINDO
OMAR JADWAT
MING CHEUNG
CELSO PEREZ
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

SCOTT MICHELMAN
ARTHUR B. SPITZER
American Civil Liberties Union
Foundation of the District of
Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

TAMARA GOODLETTE
Refugee and Immigrant Center for
Education & Legal Services
802 Kentucky Avenue
San Antonio, TX 78201
(210) 960-3206

# TABLE OF CONTENTS

**Page**

Declaration of Andrea Meza
    D. Ct. Dkt. 5-2 (Jan. 12, 2021) ...........................................................App. 179

Declaration of Stephen Kang,
    D. Ct. Dkt. 23-2 (Jan. 28, 2021) .........................................................App. 182

Declaration of Ming Cheung with Exhibits
    D. Ct. Dkts. 57-4, 57-5 .......................................................................App. 192

Declaration of Public Health Experts in Support of
    Plaintiffs' Motion for Classwide Preliminary Injunction
    with Exhibits
    D. Ct. Dkts. 57-6, 57-7 (Feb. 5, 20201)...............................................App. 248

Declaration of Javier O. Hidalgo
    D. Ct. Dkt. 57-8 (Feb. 5, 2021)...........................................................App. 321

Declaration of Allison Herre
    D. Ct. Dkt. 57-9 (Feb. 5, 2021)...........................................................App. 323

Declaration of Linda Corchado
    D. Ct. Dkt. 57-10 (Feb. 5, 2021).........................................................App. 326

Declaration of Lisa Frydman
    D. Ct. Dkt. 57-11 (Feb. 5, 2021).........................................................App. 328

Declaration of Taylor Levy
    D. Ct. Dkt. 57-12 (Feb. 5, 2021).........................................................App. 339

Supplemental Declaration of Taylor Levy
    D. Ct. Dkt. 118-3 (Aug. 11, 2021).......................................................App. 342

Declaration of Julia Neusner
    D. Ct. Dkt. 118-4 (Aug. 11, 2021).......................................................App. 355

i

## TABLE OF CONTENTS (CONT'D)

**Page**

Affidavit of Jennifer K. Harbury
        D. Ct. Dkt. 118-5 (Aug. 11, 2021)........................................................App. 364

Declaration of Erika Pinheiro
        D. Ct. Dkt. 118-6 (Aug. 11, 2021)........................................................App. 369

Declaration of Savitri Arvey
        D. Ct. Dkt. 118-7 (Aug. 11, 2021)........................................................App. 379

Supplemental Declaration of Former Centers for Disease Control
        and Prevention (CDC) Officials
        D. Ct. Dkt. 118-8 (Aug. 11, 2021)........................................................App. 384

Declaration of 32 Medical and Public Health Experts
        D. Ct. Dkt. 118-9 (Aug. 11, 2021)........................................................App. 396

Second Declaration of Ming Cheung
        D. Ct. Dkt. 118-10 (Aug. 11, 2021)......................................................App. 414

Declaration of Linda Rivas
        D. Ct. Dkt. 118-11 (Aug. 11, 2021)......................................................App. 427

Declaration of Marisa Limón Garza
        D. Ct. Dkt. 118-12 (Aug. 11, 2021)......................................................App. 431

Declaration of Astrid Dominguez
        D. Ct. Dkt. 118-13 (Aug. 11, 2021)......................................................App. 437

Declaration of Chelsea Sachau
        D. Ct. Dkt. 118-14 (Aug. 11, 2021)......................................................App. 440

Declaration of Susana Villén Iglesias
        D. Ct. Dkt. 118-15 (Aug. 11, 2021)......................................................App. 445

Declaration of Teresa Cavendish
        D. Ct. Dkt. 118-16 (Aug. 11, 2021)......................................................App. 452

# TABLE OF CONTENTS (CONT'D)

**Page**

Declaration of Kate Clark
     D. Ct. Dkt. 118-17 (Aug. 11, 2021)......................................................App. 455

Declaration of Aaron Reichlin-Melnick
     D. Ct. Dkt 118-18 (Aug. 11, 2021)......................................................App. 458

Declaration of Alan E. Valdez Juárez
     D. Ct. Dkt. 118-19 (Aug. 11, 2021)......................................................App. 466

Declaration of Edgar Ramírez López
     D. Ct. Dkt. 118-20 (Aug. 11, 2021)......................................................App. 467

Declaration of Samuel Thomas Bishop
     D. Ct. Dkt. 118-21 (Aug. 11, 2021)......................................................App. 468

Declaration of Luis Alberto Lizarraga Tolentino
     D. Ct. Dkt. 118-22 (Aug. 11, 2021)......................................................App. 469

Declaration of Ceclia Menjivar
     D. Ct. Dkt. 118-23 (Aug. 11, 2021)......................................................App. 470

## DECLARATION OF ANDREA MEZA

I, Andrea Meza, swearing under penalties of perjury, that the following is true and correct to the best of my knowledge:

1. My name is Andrea Meza and I am an attorney and the Director of the Family Detention Services Program at the Refugee and Immigrant Center for Education and Legal Services ("RAICES"). I have been the program Director since March 2019. Prior to my position as Director I served as the Associate Director from October 2018-March 2019. From September 2015 to July 2017 I was an Equal Justice Works Fellow and provided direct legal services to families at Karnes. I have been licensed in the state of Texas since November 6, 2015.

2. RAICES, with volunteers and pro bono attorneys, has provided free legal services at Karnes County Family Residential Center in Karnes City, Texas ("Karnes family detention center" or "Karnes") since its opening as a family detention center in August 2014. In 2019, RAICES provided legal services to nearly 5,000 people detained at Karnes, and to 1,671 individuals at Karnes in 2020. RAICES' Family Detention Services program strives to provide free, universal representation through all phases of the immigration process during detention at Karnes.

3. RAICES is the primary non-profit legal services provider at Karnes, the only pro bono legal services organization operating on the ground at Karnes, and the primary source of free legal representation for Karnes detained persons. RAICES estimates that it provides free legal services to between 80-95% of the population at Karnes.

4. RAICES is dependent on referrals or on client outreach to provide legal services at Karnes. Immigration and Customs Enforcement (ICE) does not provide RAICES with a list of newly arrived families at Karnes.

5. As Director, I supervise operations of our team of 27 staff, including 11 attorneys and 9 legal assistants who provide direct representation to detained families. In the course of our representation, our staff create contemporaneous notes regarding client and case information. The following information is based on our case records and my communications with DHS officers.

6.  RAICES first encountered a family in Title 42 proceedings at Karnes on July 7, 2020.
    Between July 7, 2020, and October 22, 2020, RAICES represented 42 families in Title 42
    proceedings detained at Karnes.  During this time RAICES also represented 143 families
    in Title 8 proceedings.

7.  On October 22, 2020, ICE transferred all families at Karnes in Title 8 proceedings to the
    South Texas Family Residential Center (Dilley) in Dilley, Texas and began to use Karnes
    as a centralized processing center for families in Title 42 proceedings.

8.  It is my understanding through communication with other immigration advocates that
    most families at Karnes in Title 42 proceedings are detained in ICE custody because CBP
    was unable to secure travel arrangements for their expulsion.  The families that CBP
    apprehend and quickly remove do not appear at Karnes. Thus, the families in Title 42 at
    Karnes are only those whom ICE detains while awaiting expulsion, and they are a subset
    of all families put into Title 42 proceedings.

9.  RAICES gathers information from each of our clients regarding COVID-19 testing and
    conditions of quarantine at Karnes.  Based on our clients' experience, ICE regularly tests
    families for COVID-19 at Karnes. It only tells families the results of their COVID-19 test
    if they test positive.  Families are often tested for COVID-19 upon arrival at the detention
    center and again prior to removal.

10. While no information is provided to us or to the public on the number of families at
    Karnes, or the number of families in Title 42 at Karnes, we believe there may be as many
    as 85 individuals currently detained at Karnes.  We believe this number has increased
    significantly in the last month.

11. RAICES currently represents eight families detained at Karnes, two of which are in Title
    42 proceedings.

12. Our client Josiane Pereira-De Souza is currently detained at Karnes with her four
    children.  She arrived in the United States on December 11, 2020 and was transferred to
    ICE custody at Karnes around December 17, 2020.  On December 29th, Ms. Pereira-De
    Souza and her children were interviewed through an interpreter for approximately 40

minutes to determine whether they feared torture upon return to Brazil.  The family received a negative determination regarding their claim to protection under the Convention Against Torture.

13. Ms. Pereira-De Souza and her children face imminent deportation and their removal may be as soon as Tuesday, January 12, 2021.  The family was previously tested for COVID-19 while at Karnes and did not receive further information from ICE or its contractors about the result of their COVID-19 tests, which is consistent with having tested negative for COVID.  On January 11, 2021, Ms. Pereira-De Souza and her family were again tested for COVID-19, which is a step ICE takes right before it removes a family.

14. Our client Nancy Gimena Huisha-Huisha, an indigenous Kichwa woman, is currently detained at Karnes with one of her children.  Ms. Huisha-Huisha arrived in the United States on December 28, 2020 and was transferred to ICE custody at Karnes on January 5, 2021.

15. Ms. H.H. and her child face imminent deportation and their removal may be as soon as Tuesday, January 12, 2021.

16. On Jan. 11, 2021, I was contacted by the immigration attorney for Ms. Valeria Macancela Bermejo and her daughter, who are both detained at Karnes in Title 42 proceedings.  In collaboration with her counsel, RAICES staff spoke with Ms. Macancela Bermejo regarding her immigration case.  Ms. Macancela Bermejo entered the United States on December 6, 2020 and arrived in ICE custody at Karnes on December 9, 2020.

17. Ms. Macancela Bermejo and her daughter face imminent deportation and may be removed as soon as Tuesday, January 12, 2021.

I declare under penalty of perjury, under the laws of the United States of America and Texas, that the foregoing is true and correct.


Date: January 12, 2021          /s/ Andrea Meza

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) No. 1:21-CV-00100-EGS |
| | ) |
| DAVID PEKOSKE, Acting Secretary of Homeland | ) |
| Security, in his official capacity, et al., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**DECLARATION OF STEPHEN B. KANG IN SUPPORT OF PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION**

I, Stephen B. Kang, hereby declare:

1. I am an attorney at the American Civil Liberties Union Foundation Immigrants' Rights Project ("ACLU"), and am counsel for Plaintiffs in this case. I make this declaration to provide information concerning families subject to the Title 42 Process and describe my qualifications and those of my colleagues to serve as counsel for the Proposed Class in this case.

**Numbers of Families Subject to the Title 42 Process**

2. U.S. Customs & Border Protection ("CBP") reports data on its public website regarding the total number of noncitizens apprehended as part of a family (which CBP refers to as "Family Unit Aliens (FMUA)") which it apprehends and processes under the Title 42 Policy challenged in this case, and how many it processes through the ordinary immigration procedures codified in Title 8 of the U.S. Code. *See* CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

3. A "Family Unit" as CBP uses that term means "the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member." *See* CBP, *U.S. Border Patrol Southwest Border Apprehensions by Sector*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters/usbp-sw-border-apprehensions.

4. CBP's data demonstrates that from March to December 2020, Defendants subjected approximately 21,515 members of family units to the Title 42 Process.

5. That figure is available by visiting the above Southwest Land Border Encounters website and selecting the following from the drop-down menus: "2020" and "2021 (FYTD)" for

1

"FY"; "All" for "Component"; "FMUA" for "Demographic"; "All" for "Citizenship Grouping"; and "Title 42" for "Title of Authority."  A copy of this search result is attached as Exhibit A.

6.  The same data demonstrates that, since April 2020, Defendants have expelled the vast majority of asylum-seeking families pursuant to the Title 42 Process.  From April to December 2020, approximately 21,018 members of family units (81%) were expelled under Title 42, while 4,831 (19%) were processed under Title 8.

7.  These data regarding Title 8 processing are available by visiting the Southwest Land Border Encounters website and selecting the following from the drop-down menus on the website: "2020" and "2021 (FYTD)" for "FY"; "All" for "Component"; "FMUA" for "Demographic"; "All" for "Citizenship Grouping"; and "Title 8" for "Title of Authority." A copy of this search result is attached as Exhibit B.

**Qualifications of Proposed Lead Class Counsel at ACLU**

8.  The attorneys at the ACLU described herein, including myself, have represented unaccompanied children in four federal court cases challenging expulsion pursuant to the Title 42 Process.  *See J.B.B.C. v. Wolf*, No. 20-CV-01509-CJN (D.D.C. filed June 9, 2020); *G.Y.J.P. v. Wolf*, No. 20-CV-01511-TNM (D.D.C. filed June 9, 2020); *Texas Civil Rights Project v. Wolf*, No. 20-CV-02035-BAH (D.D.C. filed July 24, 2020).  Most recently, we were appointed as class counsel in *P.J.E.S. v. Wolf*, __ F. Supp. 3d. ___, No. 20-CV-02245-EGS, 2020 WL 6770508 (D.D.C. Nov. 18, 2020).

9.  <u>Stephen B. Kang</u>.  I am a Detention Attorney at ACLU, where I have worked since 2013. I graduated from New York University School of Law in 2011 and clerked for the Honorable Kermit V. Lipez of the First Circuit Court of Appeals, and the Honorable Margaret M. Morrow (ret.) of the U.S. District Court for the Central District of California.  I am admitted to practice in California.  I am admitted to the bars of the U.S. Courts of Appeals for the Third, Fifth, Sixth, and Ninth Circuits, and the U.S. District Courts for the Central, Northern, and Southern Districts of California and the District of Colorado.

10.  I specialize in systemic litigation and advocacy involving particularly vulnerable populations in the removal system, such as detained children and asylum-seeking families.  My cases in this area include: *Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019) (enjoining government practice of separating asylum-seeking parents from their children at border); *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) (affirming preliminary injunction against unlawful arrest and detention of noncitizens based on flawed gang allegations); *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) (amicus counsel) (upholding rights of detained immigrant children to custody hearings); *Duchitanga v. Lloyd*, No. 18-CV-10332 (S.D.N.Y. filed Nov. 6, 2018) (challenging widespread and severe delays in release of children in government custody due to fingerprinting backlogs); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) (enjoining government's invocation of deterrence to detain asylum seeking families).

11. I have also served as counsel in a number of other cases concerning the due process rights of noncitizens in the removal process, including: *C.J.L.G. v. Barr*, 880 F.3d 1122 (9th Cir. 2018) (en banc) (reversing removal order of unrepresented child for failure to advise of relief eligibility); *J.E.F.M. v. Lynch*, 837 F.3d 1026 (9th Cir. 2016) (dismissing for lack of jurisdiction class action seeking appointed counsel for children); *Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018) (enjoining government's "no release policy" concerning asylum seekers); *Franco-Gonzalez v. Holder*, No. 10-CV-02211 DMG DTBX, 2014 WL 5475097 (C.D. Cal. Oct. 29, 2014) (detailed injunctive order concerning appointed counsel rights for noncitizens with mental disabilities facing removal).

12. A number of the cases described above are complex class actions against the federal government on immigration issues. I am or was class counsel in *Ms. L. v. ICE*, *Saravia v. Sessions*, *Damus v. Nielsen*, *R.I.L-R v. Johnson*, *J.E.F.M. v. Lynch*, and *Franco-Gonzalez v. Holder*.

13. I have given CLE presentations to lawyers and advocates concerning the rights of detained noncitizens and immigrant children, and provide technical assistance to other practitioners litigating federal cases on these topics. I also speak to nonlegal audiences regarding immigration and asylum policy.

14. <u>Lee Gelernt</u>. Lee Gelernt has been an attorney with the American Civil Liberties Union since 1992. He currently holds the positions of Deputy Director of the ACLU's national Immigrants' Rights Project, and Director of the Project's Program on Access to the Courts. Mr. Gelernt graduated from Columbia Law School in 1988.

15. Mr. Gelernt is a member of the New York bar, and is admitted to practice in the U.S. Supreme Court, the U.S. Courts of Appeals for the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth and Eleventh Circuits, and the U.S. District Courts for the Eastern District of New York and the Eastern District of Michigan. He has argued dozens of notable immigrants' rights cases at all levels of the federal court system, including in the U.S. Supreme Court, the U.S. Courts of Appeals for the First, Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits, and in numerous district courts around the country.

16. Mr. Gelernt has served as lead counsel, or argued in, many class action immigration cases, including recently *Ms. L. v. ICE* (involving the Trump administration's family separation practice), and in a series of cases involving classes of long-term U.S. residents subject to deportation to countries where they feared death, persecution, or other harms. *See Hamama v. Adducci*, 258 F. Supp. 3d 828, (E.D. Mich. 2017), *vacated and remanded by* 912 F.3d 869 (6th Cir. 2018); *Devitri v. Cronen*, 290 F. Supp. 3d 86 (D. Mass. 2017); *Ibrahim v. Acosta*, No. 17-CV-24574, 2018 WL 582520 (S.D. Fla. Jan. 26, 2018); *Nak Kim Chhoeun v. Marin*, No. 17-CV-01898, 2018 WL 571503 (C.D. Cal. Jan. 25, 2018).

17. Mr. Gelernt is also lead counsel in numerous systemic cases challenging the federal government's efforts to restrict noncitizens from accessing asylum. *See, e.g., East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832 (9th Cir. 2020) (affirming injunction of bar on

3

App. 184

asylum for individuals who transit through third country); *Capital Area Immigrants' Rights Coal. v. Trump*, No. 19-CV-2117-TJK, 2020 WL 3542481 (D.D.C. June 30, 2020) (vacating same bar); *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020) (affirming injunction of ban of asylum for noncitizens entering between ports of entry); *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) (denying stay of same injunction), *stay denied*, No. 18A615, 2018 WL 6713079 (U.S. Dec. 21, 2018).

18. Mr. Gelernt has also testified as an expert before both the U.S. Senate and House of Representatives on immigration issues. He served as a law clerk to the Honorable Frank M. Coffin, formerly of the First Circuit Court of Appeals. In addition to his work at the ACLU, Mr. Gelernt is adjunct professor at Columbia Law School, and for many years taught at Yale Law School as an adjunct.

19. <u>Cody Wofsy</u>. Cody Wofsy is a Staff Attorney at the ACLU. He is a member of the California bar, and is admitted to practice in the U.S. Supreme Court, U.S. Courts of Appeals for the First, Second, Third, Fourth, Fifth, Sixth, Ninth, and D.C. Circuits, and the U.S. District Courts for the Northern, Southern, Central, and Eastern Districts of California. Mr. Wofsy graduated from Yale Law School in 2013 and served as a Law Clerk to the Honorable Myron H. Thompson of the U.S. District Court for the Middle District of Alabama and the Honorable Marsha S. Berzon of the Ninth Circuit Court of Appeals.

20. Mr. Wofsy litigates complex immigration-related cases at all levels of the federal and state courts. *See, e.g.*, *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) (affirming in part injunction of policies limiting asylum within the expedited removal system); *East Bay Sanctuary Covenant v. Barr*, *Capital Area Immigrants' Rights Coal. v. Trump*, *East Bay Sanctuary Covenant v. Trump* (all described above); *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (denying stay in part of preliminary injunction of an Executive Order barring nationals of certain countries from entering the United States); *Morales v. Chadbourne*, 235 F. Supp. 3d 388 (D.R.I. 2017) (granting partial summary judgment in case challenging immigration arrest); *Ramon v. Short*, 2020 MT 69, 399 Mont. 254, 460 P.3d 867 (holding state officers lack authority to conduct civil immigration arrests); *People ex rel. Wells v. DeMarco*, 168 A.D.3d 31, 88 N.Y.S.3d 518 (N.Y. App. Div. 2018) (same).

21. Mr. Wofsy also represents amici in a number of cases involving the federal government's administration of the immigration laws. *See, e.g.*, *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062 (2020) (rejecting government's interpretation of jurisdictional provision); *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) (rejecting government assertion of authority to impose immigration related conditions on grant program); *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) (same); *City of Philadelphia v. Attorney Gen. of United States*, 916 F.3d 276 (3d Cir. 2019), *reh'g denied* (June 24, 2019) (same); *United States v. California*, 921 F.3d 865 (9th Cir. 2019) (rejecting government efforts to enjoin California Values Act as preempted by immigration statutes), *cert. denied*, No. 19-532, 2020 WL 3146844 (U.S. June 15, 2020); *San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) (affirming injunction of immigration-enforcement Executive Order); *see also*

4

App. 185

*Simon v. City of New York*, 893 F.3d 83 (2d Cir. 2018) (reversing dismissal of case challenging arrest on material witness warrant).

22. <u>Daniel A. Galindo</u>.  Daniel Galindo is a Staff Attorney at the ACLU, where he has worked since 2018.  He is a member of the bars of California and New York, and is admitted to practice in the U.S. Court of Appeals for the Ninth Circuit, and the U.S. District Courts for the Southern District of California and the Northern District of California.  Mr. Galindo graduated from Stanford Law School in 2012 and clerked for the Honorable David O. Carter of the U.S. District Court for the Central District of California, and the Honorable Kermit V. Lipez of the First Circuit Court of Appeals. Prior to his work at the ACLU, Mr. Galindo was an attorney in the criminal defense practice at the Neighborhood Defender Service of Harlem, where he practiced for four years in state trial courts in Manhattan.

23. Mr. Galindo litigates complex immigration-related cases at all levels of state and federal courts.  He serves as class counsel in *Ms. L. v. ICE*, described above.

24. Mr. Galindo also argued *Ramon v. Short*, both at the trial court and at the Montana Supreme Court.  2020 MT 69, 460 P.3d 867 (described above).  His current litigation focuses on federal challenges to the Administration's asylum and border policies.  *See, e.g.*, *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1077 (9th Cir. 2020) (challenge to administration policy of forcing non-Mexican asylum seekers into Mexico while their cases are pending), *Nora v. Wolf*, No. 20-CV-0993-ABJ, 2020 WL 3469670 (D.D.C. June 25, 2020) (same), *A.I.I.L. v. Sessions*, 19-CV-00481-SHR, (D. Ariz. filed Oct. 3, 2019) (damages class action against government for separating asylum-seeking families).

25. <u>Morgan Russell</u>.  Morgan Russell is a Staff Attorney with the ACLU, where he has worked since 2019.  Mr. Russell graduated from the Cardozo School of Law in 2011 and clerked for the Honorable James L. Dennis of the Fifth Circuit Court of Appeals.  He is a member of the New York and California bars, and is admitted to practice before the U.S. Courts of Appeals for the Fifth, Seventh, and Ninth Circuits, and the U.S. District Courts for the Northern and Central Districts of California.

26. Mr. Russell previously practiced at the Law Offices of Robert B. Jobe, where he litigated scores of immigration actions before U.S. District Courts, the Ninth Circuit, and other Courts of Appeals, and argued more than a dozen immigration cases before the Ninth Circuit.  His notable cases include *Singh v. Whitaker*, 914 F.3d 654 (9th Cir. 2019) (granting petition for review of immigration agency's denial of asylum and withholding relief) and *Agonafer v. Sessions*, 859 F.3d 1198 (9th Cir. 2017) (finding that immigration agency abused its discretion in denying motion to reopen noncitizen fleeing persecution on basis of sexual orientation).  *See also, e.g.*, *Sanghera v. Sessions*, 736 F. App'x 175 (9th Cir. 2018); *Gadidas Gonzalez v. Whitaker*, 744 F. App'x 387 (9th Cir. 2018); *Alcaraz-Enriquez v. Sessions*, 727 F. App'x 260 (9th Cir. 2018); *Tuifagalele v. Lynch*, 633 F. App'x 634 (9th Cir. 2015).

27. Mr. Russell serves as counsel on a number of immigrants' rights lawsuits, including *East Bay Sanctuary Covenant v. Barr*, *I.A. v. Barr*, described above, and *U.T. v. Barr*, No. 20-

App. 186

CV-00116 (D.D.C. filed Jan. 15, 2020) (challenging policies providing for the removal of asylum seekers to countries other than their countries of origin).

28. Mr. Russell also serves as co-lead-counsel in *Yanes v. Martin*, ___F. Supp. 3d ___, 2020 WL 3047515, at *6 (D.R.I. June 2, 2020), a class action seeking habeas and injunctive relief on behalf of immigration detainees that has secured the release of more than two dozen individuals.

29. <u>Ming Cheung</u>.  Ming Cheung is a fellow at the ACLU.  He is a member of the New York bar and is admitted to practice before the U.S. Court of Appeals for the Fourth Circuit. He is a 2017 graduate of Harvard Law School.  After graduation, he clerked for the Honorable Roger L. Gregory of the Fourth Circuit Court of Appeals and the Honorable Valerie Caproni of the U.S. District Court for the Southern District of New York.  Since coming to the ACLU in 2020, he has served as counsel on major cases concerning the rights of noncitizens facing removal.

I declare under the penalty of perjury under the laws of the United States and California that the

foregoing is true and correct.  Executed in Oakland, California.


Dated: January 28, 2021                              /s/ *Stephen B. Kang*
                                                     STEPHEN B. KANG

**App. 187**

# Exhibit A

**U.S. Customs and Border Protection (CBP) Encounters**
US Border Patrol (USBP) Title 8 Apprehensions,
Office of Field Operations (OFO) Title 8 Inadmissible Volumes,
and Title 42 Expulsions by Fiscal Year (FY)

| FY | Component | Demographic |
|---|---|---|
| All | All | FMUA |

| Citizenship Grouping | Title of Authority | |
|---|---|---|
| All | Title 42 | Reset Filters |

FY   ■ 2020   ■ 2021 (FYTD)



### FY Southwest Land Border Encounters by Month

|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 (FYTD) | 4,217 | 3,671 | 3,577 | | | | | | | | | | **11,465** |
| 2020 | | | | | | 497 | 630 | 871 | 1,307 | 1,563 | 2,187 | 2,995 | **10,050** |
| 2019 | | | | | | | | | | | | | |
| 2018 | | | | | | | | | | | | | |



FY Comparison by Demographic

**Source:** USBP and OFO official year end reporting for FY18-FY20; USBP and OFO month end reporting for FY21 to date. Data is current as of 1/5/2021.

# Exhibit B

**U.S. Customs and Border Protection (CBP) Encounters**
US Border Patrol (USBP) Title 8 Apprehensions,
Office of Field Operations (OFO) Title 8 Inadmissible Volumes,
and Title 42 Expulsions by Fiscal Year (FY)

FY
Multiple values

Component
All

Demographic
FMUA

Citizenship Grouping
All

Title of Authority
Title 8

**Reset Filters**

FY   ■ 2020   ■ 2021 (FYTD)



**FY Southwest Land Border Encounters by Month**

|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 (FYTD) | 526 | 661 | 1,069 |  |  |  |  |  |  |  |  |  | **2,256** |
| 2020 | 13,719 | 13,144 | 12,053 | 8,198 | 7,117 | 4,138 | 108 | 181 | 372 | 487 | 528 | 899 | **60,944** |



FY Comparison by Demographic

**Source:** USBP and OFO official year end reporting for FY18-FY20; USBP and OFO month end reporting for FY21 to date. Data is current as of 1/5/2021.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.*; | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) No. 21-cv-00100-EGS |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of | ) |
| Homeland Security, in his official capacity *et al.*; | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**DECLARATION OF MING CHEUNG IN SUPPORT OF PLAINTIFFS' MOTION FOR
CLASSWIDE PRELIMINARY INJUNCTION**

I, Ming Cheung, Esq., declare as follows:

1.      I submit this declaration in support of Plaintiffs' Motion for Classwide Preliminary

Injunction.  I have personal knowledge of the facts set forth herein, and, if called as a witness, I

could and would testify competently as follows:

2.      Attached as Exhibit A is a true and correct copy of the Act of February 15, 1893, which

enacted the predecessor provision to 42 U.S.C. § 265.  *See* Act of Feb. 15, 1893, ch. 114, § 7, 27

Stat. 449, https://www.loc.gov/law/help/statutes-at-large/52nd-congress/session-

2/c52s2ch114.pdf.

3.      Attached as Exhibit B is a true and correct copy of Executive Order No. 5143, Restricting

for the Time Being the Transportation of Passengers From Certain Ports in the Orient to a United

States Port (June 21, 1929), as downloaded from the HeinOnline database.

4.      Attached as Exhibit C is a true and correct copy of the July 11, 1929, regulation that

implemented Executive Order No. 5143, as contained in the *Connecticut Health Bulletin* from

September 1929.  *See* Regulations Governing the Embarkation of Passengers and Crew at Ports

in China and the Philippine Islands and Their Transportation to the United States Ports

Prescribed in Accordance with Executive Order Approved June 21, 1929 (July 11, 1929), included in Conn. Dep't of Health, *Connecticut Health Bulletin*, vol. 43, no. 9, 324-326 (Sept. 1929).

5.      Attached as Exhibit D is a true and correct copy of the Treasury Department's circular from September 1, 1892, as contained in the *Abstract of Sanitary Reports* from September 2, 1892.  *See* U.S. Dep't of Treasury, Quarantine Restrictions Upon Immigration to Aid in the Prevention of the Introduction of Cholera into the United States (Sept. 1, 1892) (circular), included in *Abstract of Sanitary Reports*, vol 7, no. 36, 445 (Sept. 2, 1892), https://play.google.com/books/reader?id=3cQhjR-RhXUC&hl=en&pg=GBS.PA445.

6.      On Wednesday, February 3, 2021, I downloaded from the ProPublica website (linking to the Document Cloud website) a Border Patrol memorandum obtained by ProPublica which contains information about the implementation of the Title 42 process.  *See* Dara Lind, *Leaked Border Patrol Memo Tells Agents to Send Migrants Back Immediately — Ignoring Asylum Law*, ProPublica (Apr. 2, 2020), https://www.propublica.org/article/leaked-border-patrol-memo-tells-agents-to-send-migrants-back-immediately-ignoring-asylum-law (linking to https://www.documentcloud.org/documents/6824221-COVID-19-CAPIO.html).  Attached as Exhibit E is a true and correct copy of this memorandum.

7.      On Wednesday, February 3, 2021, I downloaded a webpage from the site of the U.S. Customs and Border Protection with statistics of expulsions under the Title 42 policy.  *See* U.S. Customs and Border Protection, *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (last updated Jan. 7, 2021).  Attached as Exhibit F is a true and correct copy of this webpage.

8.      Attached as Exhibit G is a true and correct copy of the January 19, 2021 ICE Juvenile

Coordinator Report, filed in *Flores v. Rosen*, No. 85-cv-04544 (C.D. Cal Jan. 19, 2021), ECF

No. 1064-1, as downloaded from the PACER electronic database.

9.      Attached as Exhibit H is a true and correct copy of the January 15, 2021 CBP Juvenile

Coordinator Report, filed in *Flores v. Rosen*, No. 85-cv-04544 (C.D. Cal Jan. 15, 2021), ECF

No. 1060-1, as downloaded from the PACER electronic database.

10.      On Thursday, February 4, 2021, I downloaded a webpage from the Internet Archive (also

known as the Wayback Machine), which is an archived copy of a webpage from the site of the

U.S. Immigration and Customs Enforcement as it existed on January 11, 2021, which reported

ICE Detainee Statistics as of January 10, 2021.  U.S. Immigration and Customs Enforcement,

*COVID-19 ICE Detainee Statistics* (updated Jan. 11, 2021),

https://web.archive.org/web/20210112011244/https://www.ice.gov/coronavirus#tab1.  Attached

as Exhibit I is a true and correct copy of this webpage.


          I, Ming Cheung, declare under penalty of perjury of the laws of the State of New Jersey

and the United States of America that the foregoing is true and correct to the best of my

knowledge and belief.

          Executed on February 4, 2021, in Jersey City, New Jersey.


_____
          MING CHEUNG, ESQ.

# Exhibit A

kinds, for the transit of animals, foot passengers, and all kinds of commerce, travel, or communication, and said corporation may charge and receive reasonable tolls therefor, subject to the approval of the Secretary of War. — **Tolls.**

SEC. 3. That any bridge built under this act and subject to its limitations shall be a lawful structure, and shall be recognized and known as a post route, and it shall enjoy the rights and privileges of other post roads in the United States: *Provided*, That the United States may construct a postal telegraph over said bridge without charge therefor. — **Lawful structure and post route. Proviso. Postal telegraph.**

SEC. 4. That said bridge shall be built and located under and subject to such regulations for the security of navigation of said river as the Secretary of War shall prescribe; and to secure that object, the said corporation shall submit to the Secretary of War, for his examination and approval, a design and drawings of the said bridge and a map of the proposed location, giving, for the space of one mile above and one mile below the proposed location, the topography of the banks of the river and the shore lines at high and low water, the direction and strength of the current at all stages, and the soundings, accurately showing the bed of the stream, the location of any other bridge or bridges, and shall furnish such other information as may be required for a full and satisfactory understanding of the subject, and until the plan and location of said bridge have been approved by the Secretary of War, the bridge shall not be commenced or built. — **Secretary of War to approve plans, etc.**

SEC. 5. That all railroad companies desiring the use of any bridge constructed under this act shall have and be entitled to equal rights and privileges relative to the passage of railway trains or cars over the same and over the approaches thereto, upon payment of reasonable compensation for such use; and in case the owner or owners of said bridge and the several railroad companies, or any of them, desiring such use shall fail to agree upon the sum or sums to be paid, and upon rules and conditions to which each shall conform in using said bridge, all matters at issue between them shall be decided by the Secretary of War upon a hearing of the allegations and proof of the parties. — **Use by railroad companies. Compensation.**

SEC. 6. That said bridge herein authorized to be constructed shall be so kept and managed at all times as to afford proper means and ways for the passage of vessels, barges, or rafts, both by day and by night, and there shall be displayed on said bridge by the owners thereof, from sunset to sunrise, such lights or other signals as the Light-House Board may prescribe; and such changes shall be made from time to time in the structure of said bridge as the Secretary of War may direct, at the expense of said bridge company, in order the more effectually to preserve the free navigation of said river. — **Aids to navigation. Lights, etc. Changes.**

SEC. 7. That the right to alter, amend, or repeal this act is hereby expressly reserved, and the right to require any changes in said structure or its entire removal at the expense of the owners thereof, or the corporation or persons controlling the same, whenever public interest requires it, is also reserved. — **Amendment, etc.**

SEC. 8. That this act shall be null and void if actual construction of the bridge herein authorized be not commenced within one year and completed within three years from the date hereof. — **Commencement and completion.**

Approved, February 14, 1893.

---

**CHAP. 114.**—An act granting additional quarantine powers and imposing additional duties upon the Marine-Hospital Service. —

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That it shall be unlawful for any merchant ship or other vessel from any foreign port or place to enter any port of the United States except in accordance with the provisions of this act and with such rules and regulations of State and — **Quarantine. Entry of vessels violating health rules unlawful.**

municipal health authorities as may be made in pursuance of, or consistent with, this act; and any such vessel which shall enter, or attempt to enter, a port of the United States in violation thereof shall forfeit to the United States a sum, to be awarded in the discretion of the court, not exceeding five thousand dollars, which shall be a lien upon said vessel, to be recovered by proceedings in the proper district court of the United States. In all such proceedings the United States district attorney for such district shall appear on behalf of the United States; and all such proceedings shall be conducted in accordance with the rules and laws governing cases of seizure of vessels for violation of the revenue laws of the United States.

*Penalty.*

*Proceedings*

SEC. 2. That any vessel at any foreign port clearing for any port or place in the United States shall be required to obtain from the consul, vice-consul, or other consular officer of the United States at the port of departure, or from the medical officer where such officer has been detailed by the President for that purpose, a bill of health, in duplicate, in the form prescribed by the Secretary of the Treasury, setting forth the sanitary history and condition of said vessel, and that it has in all respects complied with the rules and regulations in such cases prescribed for securing the best sanitary condition of the said vessel, its cargo, passengers, and crew; and said consular or medical officer is required, before granting such duplicate bill of health, to be satisfied that the matters and things therein stated are true; and for his services in that behalf he shall be entitled to demand and receive such fees as shall by lawful regulation be allowed, to be accounted for as is required in other cases.

*Consular bill of health required.*

*Contents.*

*Fees.*

The President, in his discretion, is authorized to detail any medical officer of the Government to serve in the office of the consul at any foreign port for the purpose of furnishing information and making the inspection and giving the bills of health hereinbefore mentioned. Any vessel clearing and sailing from any such port without such bill of health, and entering any port of the United States, shall forfeit to the United States not more than five thousand dollars, the amount to be determined by the court, which shall be a lien on the same, to be recovered by proceedings in the proper district court of the United States. In all such proceedings the United States district attorney for such district shall appear on behalf of the United States; and all such proceedings shall be conducted in accordance with the rules and laws governing cases of seizure of vessels for violation of the revenue laws of the United States.

*Detail of medical officer at consulate.*

*Penalty for vessel violating.*

*Proceedings.*

SEC. 3. That the Supervising Surgeon-General of the Marine Hospital Service shall, immediately after this act takes effect, examine the quarantine regulations of all State and municipal boards of health, and shall, under the direction of the Secretary of the Treasury, co-operate with and aid State and municipal boards of health in the execution and enforcement of the rules and regulations of such boards and in the execution and enforcement of the rules and regulations made by the Secretary of the Treasury to prevent the introduction of contagious or infectious diseases into the United States from foreign countries, and into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia; and all rules and regulations made by the Secretary of the Treasury shall operate uniformly and in no manner discriminate against any port or place; and at such ports and places within the United States as have no quarantine regulations under State or municipal authority, where such regulations are, in the opinion of the Secretary of the Treasury, necessary to prevent the introduction of contagious or infectious diseases into the United States from foreign countries, or into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia, and at such ports and places within the United States where quarantine regulations exist under the authority of the State or municipality which, in the opinion of the Secretary of the Treasury, are not

*Marine-Hospital Service to assist local health boards to enforce rules, etc.*

*Rules to operate uniformly.*

*Additional rules, etc., by Secretary of the Treasury where local regulations are inadequate.*

sufficient to prevent the introduction of such diseases into the United States, or into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia, the Secretary of the Treasury shall, if in his judgment it is necessary and proper, make such additional rules and regulations as are necessary to prevent the introduction of such diseases into the United States from foreign countries, or into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia, and when said rules and regulations have been made they shall be promulgated by the Secretary of the Treasury and enforced by the sanitary authorities of the States and municipalities, where the State or municipal health authorities will undertake to execute and enforce them; but if the State or municipal authorities shall fail or refuse to enforce said rules and regulations the President shall execute and enforce the same and adopt such measures as in his judgment shall be necessary to prevent the introduction or spread of such diseases, and may detail or appoint officers for that purpose. The Secretary of the Treasury shall make such rules and regulations as are necessary to be observed by vessels at the port of departure and on the voyage, where such vessels sail from any foreign port or place to any port or place in the United States, to secure the best sanitary condition of such vessel, her cargo, passengers, and crew; which shall be published and communicated to and enforced by the consular officers of the United States. None of the penalties herein imposed shall attach to any vessel or owner or officer thereof until a copy of this act, with the rules and regulations made in pursuance thereof, has been posted up in the office of the consul or other consular officer of the United States for ten days, in the port from which said vessel sailed; and the certificate of such consul or consular officer over his official signature shall be competent evidence of such posting in any court of the United States.

Sec. 4. That it shall be the duty of the supervising Surgeon-General of the Marine Hospital Service, under the direction of the Secretary of the Treasury, to perform all the duties in respect to quarantine and quarantine regulations which are provided for by this act, and to obtain information of the sanitary condition of foreign ports and places from which contagious and infectious diseases are or may be imported into the United States, and to this end the consular officer of the United States at such ports and places as shall be designated by the Secretary of the Treasury shall make to the Secretary of the Treasury weekly reports of the sanitary condition of the ports and places at which they are respectively stationed, according to such forms as the Secretary of the Treasury shall prescribe; and the Secretary of the Treasury shall also obtain, through all sources accessible, including State and municipal sanitary authorities throughout the United States, weekly reports of the sanitary condition of ports and places within the United States, and shall prepare, publish, and transmit to collectors of customs and to State and municipal health officers and other sanitarians weekly abstracts of the consular sanitary reports and other pertinent information received by him, and shall also, as far as he may be able, by means of the voluntary co-operation of State and municipal authorities, of public associations, and private persons, procure information relating to the climatic and other conditions affecting the public health, and shall make an annual report of his operations to Congress, with such recommendations as he may deem important to the public interest.

Sec. 5. That the Secretary of the Treasury shall from time to time issue to the consular officers of the United States and to the medical officers serving at any foreign port, and otherwise make publicly known, the rules and regulations made by him, to be used and complied with by vessels in foreign ports, for securing the best sanitary conditions of such vessels, their cargoes, passengers, and crew, before their departure for any port in the United States, and in the course of

*Marginal notes:*
Enforcement.

Rules for vessels from foreign ports.

Rules to be posted in consulate.

Duties of Marine-Hospital Service.

Sanitary reports to be made by consuls.

Weekly domestic sanitary reports.

Publication and distribution.

Annual report.

Rules to secure sanitary conditions of vessels, etc.

Case 1:21-cv-0010 Document 16-5 Filed 02/05/24 Page 83 of 53
Case #21-5200          Document #1919200          Filed: 10/21/2021          Page 26 o

**Inspection, etc., on arrival.** the voyage; and all such other rules and regulations as shall be observed in the inspection of the same on the arrival thereof at any quarantine station at the port of destination, and for the disinfection and isolation of the same, and the treatment of cargo and persons on board, so as to prevent the introduction of cholera, yellow fever, or other contagious or infectious diseases; and it shall not be lawful for any vessel to enter said port to discharge its cargo, or land its passengers, except **Vessels not to enter unless upon health officer's certificate.** upon a certificate of the health officer at such quarantine station certifying that said rules and regulations have in all respects been observed and complied with, as well on his part as on the part of the said vessel and its master, in respect to the same and to its cargo, passengers, and **Delivery of papers to customs officer.** crew; and the master of every such vessel shall produce and deliver to the collector of customs at said port of entry, together with the other papers of the vessel, the said bills of health required to be obtained at the port of departure and the certificate herein required to be obtained from the health officer at the port of entry; and that the bills of health herein prescribed shall be considered as part of the ship's papers, and when duly certified to by the proper consular or other officer of the United States, over his official signature and seal, shall be accepted as evidence of the statements therein contained in any court of the United States.

**Infected vessel to be sent to nearest quarantine station.** SEC. 6. That on the arrival of an infected vessel at any port not provided with proper facilities for treatment of the same, the Secretary of the Treasury may remand said vessel, at its own expense, to the nearest national or other quarantine station, where accommodations and appliances are provided for the necessary disinfection and treatment **Certificate after treatment.** of the vessel, passengers, and cargo; and after treatment of any infected vessel at a national quarantine station, and after certificate shall have been given by the United States quarantine officer at said station that the vessel, cargo, and passengers are each and all free from infectious disease, or danger of conveying the same, said vessel shall be admitted to entry to any port of the United States named within **Local quarantine.** the certificate. But at any ports where sufficient quarantine provision has been made by State or local authorities the Secretary of the Treasury may direct vessels bound for said ports to undergo quarantine at said State or local station.

**Suspension of immigration during existence of contagious diseases.** SEC. 7. That whenever it shall be shown to the satisfaction of the President that by reason of the existence of cholera or other infectious or contagious diseases in a foreign country there is serious danger of the introduction of the same into the United States, and that notwithstanding the quarantine defense this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce the same is demanded in the interest of the public health, the President shall have power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate and for such period of time as he may deem necessary.

**Compensation for use of State buildings, etc.** SEC. 8. That whenever the proper authorities of a State shall surrender to the United States the use of the buildings and disinfecting apparatus at a State quarantine station, the Secretary of the Treasury shall be authorized to receive them and to pay a reasonable compensation to the State for their use, if, in his opinion, they are necessary to the United States.

**National board of health abolished.** SEC. 9. That the act entitled "An act to prevent the introduction of infectious or contagious diseases into the United States, and to estab-
**Vol. 20, p. 484.** lish a national board of health," approved March third, eighteen hundred and seventy-nine, be, and the same is hereby, repealed. And the **Disposition of property.** Secretary of the Treasury is directed to obtain possession of any property, furniture, books, paper, or records belonging to the United States which are not in the possession of an officer of the United States under the Treasury Department which were formerly in the use of the National Board of Health or any officer or employee thereof.

Approved, February 15, 1893.

App. 199

# Exhibit B

EO 5143                    *Executive Orders*

Executive Order 5143.   June 21, 1929

# 𝔈𝔵𝔢𝔠𝔲𝔱𝔦𝔳𝔢 𝔒𝔯𝔡𝔢𝔯

————◄•►————

### Restricting for the time being the transportation of passengers from certain ports in the Orient to a United States port.

————◄•►————

Whereas there have arrived periodically at Pacific Coast ports since November 1928, a total of 17 trans-pacific passenger-carrying vessels with epidemic cerebrospinal meningitis infection existing on board among Oriental steerage passengers;

And Whereas the continued arrival of vessels having epidemic cerebrospinal meningitis infection on board has overtaxed the combined available quarantine facilities of federal and local health authorities and that notwithstanding the quarantine defense, there exists danger of introducing this disease into the United States;

Therefore in order to prevent the further introduction of epidemic cerebrospinal meningitis from foreign ports into the United States, by virtue of the authority vested in me by Section 7 of the Act of Congress approved February 15, 1893, entitled "An Act granting additional quarantine powers and imposing additional duties upon the Marine Hospital Service", it is ordered that no persons may be introduced directly or indirectly by transshipment or otherwise into the United States or any of its possessions or dependencies from any port in China (including Hong Kong) or the Philippine Islands for such period of time as may be deemed necessary, except under such conditions as may be prescribed by the Secretary of the Treasury.

This order shall take effect from and after this date.

**HERBERT HOOVER**

The White House
*June 21, 1929.*

[No. 5143]

368

App. 201

# Exhibit C

## PRESIDENT HOOVER'S ORDER FOR CONTROL OF MENINGITIS

### EXECUTIVE ORDER

**Restricting for the Time Being the Transportation of Passengers From Certain Ports in the Orient to a United States Port.**

Whereas, there have arrived periodically at Pacific Coast ports since November, 1928, a total of 17 trans-Pacific passenger-carrying vessels with epidemic cerebrospinal meningitis infection existing on board among Oriental steerage passengers; and

Whereas, the continued arrival of vessels having epidemic cerebrospinal meningitis infection on board has overtaxed the combined available quarantine facilities of federal and local health authorities, and that notwithstanding the quarantine defense, there exists danger of introducing this disease into the United States;

Therefore, in order to prevent the further introduction of epidemic cerebrospinal meningitis from foreign ports into the United States, by virtue of the authority vested in me by section 7 of the act of congress approved February 15, 1893, entitled "An act granting additional quarantine powers and imposing additional duties upon the Marine Hospital Service", it is ordered that no persons may be introduced directly or indirectly by transshipment or otherwise into the United States or any of its possessions or dependencies from any port in China (including Hongkong) or the Philippine Islands for such period of time as may be deemed necessary, except under such conditions as may be described by the Secretary of the Treasury.

This order shall take effect from and after this date.

HERBERT HOOVER

The White House,
   June 21, 1929.

### No. 5143

REGULATIONS GOVERNING THE EMBARKATION OF PASSENGERS AND CREW AT PORTS IN CHINA AND THE PHILIPPINE ISLANDS AND THEIR TRANSPORTATION TO UNITED STATES PORTS PRESCRIBED IN ACCORDANCE WITH THE PROVISIONS OF EXECUTIVE ORDER APPROVED JUNE 21, 1929.

### A. REGULATIONS GOVERNING EMBARKATION.

1. Persons will be permitted to embark for United States ports only under the supervision of a medical officer of the United States Public Health Service and only from the ports of Shanghai and Hongkong in China, and Manila in the Philippine Islands; provided that approved facilities for preembark-

324

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

ation detention and official observation, as prescribed herein, are available and are satisfactorily used.

2.   Cabin passengers and ships' officers will be permitted to only embark from such ports upon presentation of acceptable evidence that:

(a)   Official medical inspection determines such person to be without rise of temperature and free from communicable or quarantinable disease;

(b)   The person has not lived within two weeks prior to embarkation in premises infected with epidemic cerebrospinal meningitis, nor in a district in which such disease is prevalent.

3.   Steerage passengers and crew will be permitted to embark only in such ports following:

(a)   Presentation of acceptable evidence that competent bacteriological examinations of nose and throat for meningococci has been made with negative results within three days of embarkation.

(b)   Detention in small isolated groups in an approved quarantine camp or compound under conditions satisfactory to a medical officer of the United States Public Health Service for not less than fourteen days prior to embarkation, during which period medical inspections shall have been made twice daily and no case of cerebrospinal meningitis shall have been detected in the quarantined group under observation.

4.   No persons other than the ships' officers and cabin passengers shall be allowed to go ashore in ports in China except for disembarkation, and intercommunication between those on board and persons from shore will not be permitted.

## B.  REGULATIONS GOVERNING TRANSPORTATION.

1.   Cabin passengers may be transported in accordance with the provisions of the Navigation Act of 1882.

2.   Steerage passengers may be transported in numbers not to exceed 25 per cent of the total number allowed under the provisions of the Navigation Act of 1882, provided that:

(a)   Steerage passengers embarked at each port shall be maintaining respectively in noncommunicating groups;

(b)   Separate mess gear shall be used for each group, and shall be sterilized in an approved manner after each use.  The use of common drinking cups and common towels is prohibited.

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

Personal cleanliness of steerage passengers shall be enforced for the entire voyage, and adequate soap and bathing water shall be provided as approved;

(c)   Medical inspection shall be made twice daily en route by the ship's doctor, who shall immediately isolate in the ship's hospital or other suitable quarters any persons suspected of having a communicable disease;

(d)   All measures practicable shall be taken on board to reduce individual contacts to a minimum, and especially attention shall be given to avoiding chilling exposure and to providing ample ventilation.

## C.   REGULATIONS GOVERNING VESSELS ARRIVING AT UNITED STATES PORTS UPON WHICH CASES OF MENINGITIS HAVE OCCURRED EN ROUTE.

1.   All cases of meningitis shall be removed from the vessel and detained in quarantine for a period of not less than three weeks from the beginning of the disease and may be discharged following such period only when bacteriological examination of the nose and throat is negative for meningococci.

2.   The immediate contacts of cases occurring among the cabin passengers, ships' officers and crew shall be removed from the vessel and detained in quarantine for not less than 14 days, and may be discharged following such period only when bacteriological examination of the nose and throat is negative for meningococci.

3.   When any case occurs among the steerage passengers, all the steerage passengers shall be considered contacts and shall be removed from the vessel and held in quarantine detention for a period of not less than 14 days and may be discharged following such period only when bacteriological examination of the nose and throat is negative for meningococci; provided that in the discretion of the quarantine officer only the steerage passengers comprising the group in which the case occurs may be treated as contacts, and the other separate groups of steerage passengers may be released without detention.

Approved: July 11, 1929.

OGDEN L. MILLS,
Acting Secretary of the Treasury.

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

# Exhibit D

Case 1:21-cv-00100-EGS   Document 57-5   Filed 02/05/21   Page 13 of 53
USCA Case #21-5200   Document #1919200   Filed: 10/21/2021   Page 34 of 365

# ABSTRACT OF SANITARY REPORTS.

VOL. VII.     WASHINGTON, D. C., SEPTEMBER 2, 1892.     No. 36.

Published at the Marine-Hospital Bureau in accordance with act of Congress of April 29, 1878.]

## UNITED STATES.

### CIRCULAR.

*Quarantine restrictions upon immigration to aid in the prevention of the introduction of cholera into the United States.*

TREASURY DEPARTMENT,
*Office of the Supervising Surgeon-General,*
*U. S. Marine-Hospital Service,*
*Washington, D. C., September 1, 1892.*

*To Collectors of Customs, Medical Officers of the Marine-Hospital Service, Foreign Steamship Companies, State and local Boards of Health:*

It having been officially declared that cholera is prevailing in various portions of Russia, Germany and France, and at certain ports in Great Britain, as well as in Asia, and it having been made to appear that immigrants in large numbers are coming into the United States from the infected districts aforesaid, and that they and their personal effects are liable to introduce cholera into the United States, and that vessels conveying them are thereby a direct menace to the public health, and it having been further shown that under the laws of the several States quarantine detentions may be imposed upon these vessels a sufficient length of time to insure against the introduction of contagious diseases, it is hereby ordered that no vessel from any foreign port carrying immigrants shall be admitted to enter at any port of the United States until said vessel shall have undergone a quarantine detention of twenty days (unless such detention is forbidden by the laws of the State or the regulations made thereunder) and of such greater number of days as may be fixed in each special case by the State authorities.

This circular to take immediate effect except in cases of vessels afloat at this date, which will be made the subject of special consideration upon due application to the Department.

WALTER WYMAN,
*Supervising Surgeon-General, U. S. Marine-Hospital Service.*

Approved:
CHARLES FOSTER,
*Secretary of the Treasury.*
Approved:
BENJ. HARRISON.

60                              (445)

Digitized by Google

# Exhibit E

## COVID-19 CAPIO

U.S. Customs and Border Protection (CBP) and specifically the United States Border Patrol (USBP) is supporting the U.S. Government's response to the coronavirus disease (abbreviated "COVID-19")

The Director of the Centers for Disease Control and Prevention (CDC) under the Authority of the Public Health Service Act has directed CBP to prohibit the introduction of certain persons into the United States who, due to the existence of COVID-19 in countries or places from which persons are traveling, create a serious danger of the introduction of such disease into the United States.

When implementing the order, USBP is not operating pursuant to its authorities under Titles 8 or 19. However, Border Patrol agents may rely on their training and experience in detecting, apprehending and determining whether persons are subject to the CDC order, including but not limited to the following considerations: physical observation, use of sensors and technology, physical indicators and tracking techniques, information from third-parties, and deductive techniques.

### *Encounter*
- Enforcement efforts on the SWB and NB will be conducted as close to the physical border as practical with the objective to intercept aliens that are potentially infected with COVID-19 before further exposing or contaminating the U.S. public.
- Determine if individual encountered is a U.S. Citizen or an alien.
- U.S. Citizens and Lawful Permanent Residents are not subject to the CDC order and will be processed under existing CBP authorities.

### *Determine whether an alien is subject to the CDC order*
- Based on training, experience, physical observation, technology, questioning and other considerations, if an agent believes that it is more likely than not that a person is an alien seeking to enter the United States, without proper travel documentation or otherwise subject to travel restrictions at or between a POE, coming from or transiting through Canada or Mexico (regardless of their country of origin), and if such a person was encountered within the area of operation of a Border Patrol station or POE operated by CBP, the CBP officer or agent shall apply the CDC order to the person in accordance with the procedures below.
- Domiciled aliens encountered within the US will be processed under existing Title 8 authorities and processes. To the extent practical, USBP will leverage field deployed mobile biometric devices to perform immigration and criminal history checks in real-time for officer safety.

### *Processing*
- To the maximum extent possible all processing will be done in the field. Only in exigent circumstances will aliens be taken into permanent CBP facilities.
- Once USBP determines an alien is subject to the CDC order, in the field and to the extent practical, USBP will capture a subject's biographical information and archive data appropriately.

- Agents are not to place subjects in assigned vehicles
- Property is not to be taken into custody

### *The following recommendation will apply for guidance to the field:*

At any time a subject is determined to no longer be amenable under Title 42 CDC Order agents will process under existing statutory authorities found in Title 8 of the US code. The authority to make this determination resides with the Chief Patrol Agent and cannot be delegated below the Watch Commander position.  Subjects taken into custody under Title 8 must be processed under normal Title 8 guidelines (e.g., ER, NTA, etc…)

- Agents are to consider officer safety and safety to the general public at all times.
- The appropriate PPE will be utilized
- Subjects will only be placed in a designated transport vehicle and/or a designated staging area

Upon initial encounter the agent will determine if subject is amenable to expulsion under Title 42 CDC Order

- Contact TOC/Radio Room or utilize **e3 Mobile device** to create a **TSM Event #** under **'Operation Capio'** and initiate **e3 Event** from **TSM**
- Include the number of subjects encountered and verify that **'Operation Capio'** is associated with designated **e3 Event** and obtain both **TSM/e3 Event #'s**
- Record both **TSM/e3 #'s** on **Field Intake Form** and fill in the necessary information required
- Utilize **e3 Mobile** device to enter biographical information and role fingerprints for **Search Only**
- Based on results, should subject still be amenable to being expelled, subject will be transported to the designated Port of Entry – Should an agent determine a subject is not amenable to expulsion refer to **NON DEPORTABLE/IN CUSTODY**
- **Field Intake Forms** will be required to be brought back to station or designated processing areas for data entry into **TSM/e3** Intake **(Note:  Ensure that ALL required information is entered on the Field Intake Form)**

Data Entry of **Field Intake Form** information

- Designated processing personnel will input information from the **Field Intake Form** into the appropriate **e3 Event #**
- Generate an **I-44** under the appropriate **e3 Event #** in accordance to provided information below (Note:  Efforts to keep Family Units together should be considered at all times)
- For the purpose of Title 42 the following definitions will apply in regard to Family Units and Unaccompanied Juveniles:
    - **Family Units:**  A person or persons accompanied by **ANY** relative
    - **Unaccompanied Juvenile:**  A minor under the age of 18 and **NOT** accompanied by a relative
        - Dispositions for all subjects amenable to immediate expulsion

## NON DEPORTABLE/NOT IN CUSTODY

I-44 Narrative Required Information:

*Subject is **one of total number in group**, encountered in **CITY, STATE**. Subject appeared to have no illness or injuries. Subject was removed through the **POE Name** under "Operation CAPIO", in accordance with Title 42 U.S.C Section 265.*

***Subject is member of a Family Unit:***

***FAMILY MEMBER 1: Subjects Name***
***FAMILY MEMBER 2:***
***FAMILY MEMBER 3***

## NON DEPORTABLE/IN CUSTODY

The following disposition of **NON DEPORTABLE/IN CUSTODY** will apply to all subjects who cannot be expelled in an expeditious manner and are required to be transferred to a facility. This is necessary in order to comply with Transport, Escort, Detention, Search (TEDS) & e3 Detention Module (e3 DM).

- Subjects not amenable to being expelled:  TSDB, CIMT, Aggravated Felon, Injured Alien, Non-Immigration Felony Convictions, etc…. or otherwise determined by the Sector Chief Patrol Agent or designated official
- Subjects expelled via flights as appropriate or sent to designated Quarantine Facility
- Subjects non amenable to being expelled via a POE – agents will request an **ICAD Ticket #** and record on Field Intake Form and subjects will be transferred via local guidelines
- Based on available evidence and only for extenuating circumstances, agents may determine to process under existing statutory authorities found in Title 8 of the US code.  The authority to make this determination resides with the Chief Patrol Agent and cannot be delegated below the Watch Commander position.  Subjects taken into custody under Title 8 must be processed under normal Title 8 guidelines (e.g., ER, NTA, etc…)

### *Transportation*

USBP will have dedicated transportation vehicles with separation between agents and subjects encountered to minimize your exposure.  At no time shall subjects be transported in USBP vehicles not designated as COVID-19 transportation vehicles unless exigent circumstances exist.
- Subjects will be transported to the nearest POE and immediately returned to Mexico or Canada, depending on their point of transit.
- Subjects encountered that are not amenable to immediate expulsion to Mexico or Canada, will be transported to a dedicated facility for limited holding prior to expulsion to the alien's country of citizenship.  This varies by sector but should be a tent, soft-sided facility or predesignated CBP/USBP facility with dedicated space.
- ICE/ERO will take custody of any subject cleared by HHS or appropriate medical personnel and follow established procedures under Title 8 or Title 42 as applicable.

Vehicles utilized to temporarily hold subjects will undergo the appropriate sanitation procedures in place to minimize exposure and possible spread of virus

## Convention Against Torture Claim

Aliens that make an affirmative, spontaneous and reasonably believable claim that they fear being tortured in the country they are being sent back to, will be taken to the designated station and referred to USCIS. **Agents should seek Supervisory Guidance.**

- Notify USCIS
  - USCIS determines positive, converted to Title 8, turn over to ERO and entered into 240 proceedings for an Asylum hearing based on Torture.
    - Interview by Asylum Officer while in our custody
    - Secondary review Supervisory Asylum Officer
  - USCIS determines negative, continue under Title 42, expel to Mexico or Other.

# Exhibit F

USCA Case #21-5200     Document #1919200     Filed: 10/21/2021     Page 41 of 365

🇺🇸 Official website of the Department of Homeland Security

**(https://www.facebook.com/CBPgov/)**    **(https://www.instagram.com/cbpgov/)**

**(https://www.flickr.com/photos/cbpphotos/)**    **(https://twitter.com/cbp)**

**(https://www.linkedin.com/company/2997?trk=tyah)**    **(https://www.youtube.com/user/customsborderprotect)**

U.S. Customs and Border Protection (/)

**(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)**

# Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions

On March 21, 2020 the President, in accordance with Title 42 of the United States Code Section 265, determined that by reason of existence of COVID-19 in Mexico and Canada, there is a serious danger of the further introduction of COVID-19 into the United States; that prohibition on the introduction of persons or property, in whole or in part, from Mexico and Canada is required in the interest of public health. Under this order, CBP is prohibiting the entry of certain persons who potentially pose a health risk, either by virtue of being subject to previously announced travel restrictions or because they unlawfully entered the country to bypass health screening measures. To help prevent the introduction of COVID-19 into border facilities and into the United States, persons subject to the order will not be held in congregate areas for processing and instead will immediately be expelled to their country of last transit. In the event a person cannot be returned to the country of last transit, CBP works with interagency partners to secure expulsion to the person's country of origin and hold the person for the shortest time possible. This order does not apply to persons who should be excepted based on considerations of law enforcement, officer and public safety, humanitarian, or public health interests. Expulsions under Title 42 are not based on immigration status and are tracked separately from immigration enforcement actions, such as apprehension or inadmissibility, that are regularly reported by CBP.

## U.S. Border Patrol Monthly Enforcement Encounters 2021: Title 42 Expulsions and Title 8 Apprehensions

| U.S. Border Patrol (USBP) | Enforcement Actions | OCT | NOV | DEC | YTD 21 TOTAL |
|---|---|---|---|---|---|
| **Southwest Border** | Title 42 Expulsions [2] | 62,788 | 60,636 | 60,010 | 183,434 |
| | Title 8 Apprehensions [1] | 6,038 | 7,876 | 10,620 | 24,534 |
| | **Total** | 68,826 | 68,512 | 70,630 | 207,968 |

App. 214

| U.S. Border Patrol (USBP) | Enforcement Actions | OCT | NOV | DEC | YTD 21 TOTAL |
|---|---|---|---|---|---|
| **Northern Border** | Title 42 Expulsions[2] | 27 | 66 | 25 | 118 |
| | Title 8 Apprehensions[1] | 47 | 26 | 30 | 103 |
| | **Total** | 74 | 92 | 55 | 221 |
| **Land Border Total** | Title 42 Expulsions[2] | 62,815 | 60,702 | 60,035 | 183,552 |
| | Title 8 Apprehensions[1] | 6,085 | 7,902 | 10,650 | 24,637 |
| **USBP - Total Land Border Enforcement Encounters** | | 68,900 | 68,604 | 70,685 | 208,189 |

[1] Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe. Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

[2] Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265.

Back to **CBP Enforcement Statistics (/newsroom/stats/cbp-enforcement-statistics)**

# Office of Field Operations Monthly Enforcement Encounters 2021: Title 42 Expulsions and Title 8 Inadmissible Aliens

| Office of Field Operations (OFO) | Enforcement Actions | OCT | NOV | DEC | YTD 21 TOTAL |
|---|---|---|---|---|---|
| **Southwest Border** | Title 42 Expulsions[2] | 1,900 | 1,942 | 1,744 | 5,586 |
| | Title 8 Inadmissibles[1] | 1,000 | 1,008 | 1,139 | 3,147 |
| | **Total** | 2,900 | 2,950 | 2,883 | 8,733 |
| **Northern Border** | Title 42 Expulsions[2] | 877 | 511 | 750 | 2,138 |
| | Title 8 Inadmissibles[1] | 1,706 | 1,051 | 1,399 | 4,156 |
| | **Total** | 2,583 | 1,562 | 2,149 | 6,294 |
| **Land Border Total** | Title 42 Expulsions[2] | 2,777 | 2,453 | 2,494 | 7,724 |
| | Title 8 Apprehensions[1] | 2,706 | 2,059 | 2,538 | 7,303 |

Nationwide Enforcement Encounters Title 8 Enforcement Actions and Title 42 Expulsions | U.S. Customs and Border Protection

| Office of Field Operations (OFO) | Enforcement Actions | OCT | NOV | DEC | YTD 21 TOTAL |
|---|---|---|---|---|---|
| **OFO - Total Land Border Enforcement Encounters** | | 5,483 | 4,512 | 5,032 | 15,027 |

[1] Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe. Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

[2] Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265.

Back to **CBP Enforcement Statistics (/newsroom/stats/cbp-enforcement-statistics)**

**Last modified:** January 7, 2021

**Tags:**   **Statistics,   Port Security,   U.S. Border Patrol**

 Share This Page.

# Exhibit G

# JANUARY 19, 2021
## ICE JUVENILE
## COORDINATOR REPORT

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, *et. al.*, | ) | Case No.: CV 85-4544-DMG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY A. ROSEN, | ) | |
| Acting Attorney General of the | ) | |
| United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## JANUARY 2021 INTERIM REPORT
## OF JUVENILE COORDINATOR DEANE DOUGHERTY
## SUBMITTED BY IMMIGRATION AND CUSTOMS ENFORCEMENT

As required by the Court in its order issued on December 4, 2020, U.S. Immigration and Customs Enforcement (ICE) Juvenile Coordinator Deane Dougherty is submitting the following interim report to provide an update on the Class Members in the FRCs over 20 days, status of implementation of COVID-19 guidances, a census of positive COVID-19 cases at the family residential centers (FRCs), the status of compliance with respect to minors held in Title 42 custody, and confirmation that ICE continues to comply with requests for information and access to residents made by Ms. Ordin and Dr. Wise.

Due to the constantly evolving nature of the COVID-19 crisis, and the frequency of custody and discharge determinations, the information in this report is current and accurate as of the time of signature, or for the reported data, as of the date or time noted in conjunction with the information provided.

## I. Making and Recording Individualized Custody Determinations and Census of Minors at FRCs

As of January 8, 2021, there were a total of 141 Class Members at ICE FRCs. The figures

below breakdown these Class Members by age and country of origin.





ICE has been making continuous efforts to release Class Members under applicable standards throughout the course of this litigation and, where there are no impediments to removal, those that are subject to final orders of removal are repatriated in accordance with the law.[1]  This includes the expeditious release of minors who received a positive credible fear finding by U.S. Citizenship and Immigration Services (USCIS) pursuant to a request for reconsideration, a process solely committed to and within the discretion of USCIS and with which ICE is not involved.  The graph below portrays the book-outs by the FRCs from November 10, 2020 to January 8, 2021, which includes 260 Class Members released into the interior of the United States, 20 Class Members removed from the United States, and 80 Class Members returned to their country of origin pursuant to Title 42 authorities.



As of January 8, 2021, 37 Class Members have been detained at an FRC 20 days or more. Exhibit A. I have reviewed the data provided in Exhibit A, and it has been shared with the Special Monitor, as required by the December 4, 2020, Order. Because this list must be shared with the Special Monitor in advance of this filing, the information contained therein may have changed

---

[1] On January 11, 2012, the U.S. District Court for the Western District of Texas issued a stay of removal for named Plaintiffs in *S.L.V. v. Rosen*, No. 21-00017 (W.D. Tex. filed Jan 11, 2021).  The stay prevented the imminent removal of at least five families detained at the STFRC.  The stay expires 14 days' from issuance, and a hearing is set in the district court for January 25, 2021.  Additionally, a stay of removal for named Plaintiffs in *Huisha-Huisha v. Gaynor, et al.*, No. 21-100 (D.D.C. filed Jan. 12, 2021), prevents the expulsion of three families at the KCFRC who are subject to Title 42.

App. 221

since the date it was compiled. These individuals, and their accompanying parent(s) or legal
guardian(s), may be subject to the *Flores* waiver process contemplated in this Court's September
18, 2020 Order. This process has two parts that remain in development: (1) the Notice of Rights,
and (2) an updated policy or instruction regarding the process that flows from service of the Notice
of Rights where a Class Member and parent or legal guardian consent to the Class Member's
separate release (Directive). On January 12, 2021, the parties filed the latest court-ordered Joint
Status Report regarding the proposed Notice of Rights and Directive.  Once the Court issues a
finalized Notice of Rights and Directive, ICE will update the specific explanations for continued
detention over 20 days as outlined in paragraph 1, 4(c), and 4(d) of the Court's June 26 Order, in
its interim reporting.

## II. __Status of ICE's Implementation of COVID-19 Guidances__

I have confirmed that the measures described in the declarations and the Juvenile
Coordinator's reports, previously submitted to this Court, pertaining to the operational changes the
FRCs have implemented to mitigate the introduction into, and spread of, COVID-19 are still in
effect. As has been the case since the beginning of the pandemic, ICE FRCs are operating well
below maximum capacity, as demonstrated in the chart below.

| Family Residential Center Occupancy 1/8/2021 | | | | | |
|---|---|---|---|---|---|
| Facility | Total # of Beds | # of Beds Occupied | % of Beds Occupied | # of Beds Not Occupied | % of Beds Not Occupied |
| Berks Family Residential Center | 96 | 11 | 11% | 85 | 89% |
| Karnes County Residential Center | 830 | 79 | 10% | 751 | 90% |
| South Texas Family Residential Center | 2,400 | 194 | 8% | 2,206 | 92% |
| **Total** | **3,326** | **284** | **9%** | **3,042** | **91%** |

I am actively monitoring the Department of Homeland Security and ICE guidance with
respect to distributing the COVID-19 vaccination. Due to the limited initial vaccine doses,
vaccinations have begun for law enforcement officers in prioritized phases and in accordance with
U.S. Centers for Disease Control and Prevention (CDC) recommendations and in partnership with

the Veterans Health Administration.  One of these prioritized locations is the San Antonio Field

Office, in which both the Karnes and South Texas Family Residential Centers are located.  Please

note that the vaccination program is voluntary for ICE personnel.  I will update this Court when

more information about the vaccination rollout becomes available, particularly as it may relate to

residents.

### III.  Report of ICE Facilities Holding Minors and Number of COVID-19 Cases

ICE has been regularly reporting positive COVID-19 cases to the United States District

Court for the District of Columbia, which is overseeing *O.M.G. v. Wolf*, and the notices of

positive results are also submitted to this Court. The following charts describe the number of

positive COVID-19 cases at the ICE FRCs as of January 8, 2021.

| COVID-19 Positive Cases at Family Residential Centers as of 1/8/2021 | | | | |
|---|---|---|---|---|
| Facilities | Minor | Adult | Staff | Total |
| Berks Family Residential Center | - | 1 | 10 | 11 |
| Karnes County Residential Center | 39 | 53 | 78 | 170 |
| South Texas Family Residential Center | 12 | 15 | 103 | 130 |
| Total | 51 | 69 | 191 | 311 |

| COVID-19 Positive Cases of Residents at Family Residential Centers as of 1/8/2021 | | | |
|---|---|---|---|
| Facilities | At Intake | In General Population | Total |
| Berks Family Residential Center | 1 | - | 1 |
| Karnes County Residential Center | 92 | - | 92 |
| South Texas Family Residential Center | 17 | 10 | 27 |
| Total | 110 | 10 | 120 |

| COVID-19 Positive Cases of Residents at Family Residential Centers as of 1/8/2021 | | | | |
|---|---|---|---|---|
| Facilities | Symptomatic | Asymptomatic | Hospitalized | Total |
| Berks Family Residential Center | 1 | - | - | 1 |
| Karnes County Residential Center | 3 | 89 | - | 92 |
| South Texas Family Residential Center | 6 | 21 | - | 27 |
| Total | 10 | 110 | - | 120 |

Pursuant to section 4(b)(iv) of this Court's April 24, 2020 Order, the minors who remain

housed at the ICE FRCs have not been released or transferred to non-congregate settings for two

reasons: (1) because they are either in quarantine or cohorting based on CDC guidance as a result of testing positive for COVID-19 or they are a new intake and must undergo a 14-day observation period; and/or (2) because they are housed with their parent or legal guardian whose release is not appropriate and, as discussed previously, ICE will determine the minor's eligibility for release with the consent of a parent or legal guardian in accordance with any future remedy ordered by the Court.

As of January 8, 2021, Cowlitz County Juvenile Detention Center ("Cowlitz") has had no reported cases of COVID-19 by residents or staff.

**IV. <u>Additional Policies and Practices Aimed at Identifying and Protecting Minors from COVID-19</u>**

Pursuant to section 5 of the Court's December 4, 2020 Order, I can confirm that I facilitated, and participated in a number of telephonic discussions with Ms. Ordin, Dr. Wise,  Ms. Fabian and others to discuss Flores compliance with particular regard to COVID-19 precautions. Of note is one case in which Dr. Wise was particularly interested involving a four year old with a shoulder injury that occurred while enroute from Ecuador and was discovered while housed at the South Texas Family Residential Center (Dilley).  While not directly related to Flores oversight, Dr. Wise acknowledged that the medical care and procedures provided to the child while housed at Dilley were excellent and followed accepted protocols.  Dr. Wise, Ms. Ordin and ICE officials collaborated to ensure an expedited review of the child's Reasonable Fear claims which resulted in release from the facility.  Additionally, the family was released with a detailed recommended medical care plan and referrals for possible future medical care in the local community in which the family planned to reside while continuing through their immigration proceedings.  Ms. Ordin and I also conferred regarding the status of Title 42 families and UAC as well as the submission of this report.  I have also telephonically provided Ms. Ordin with data and reports on the hoteling

of minors and families with regard to Title 42 compliance and families who exceeded 20 days in residence at a FRC.

**V.** **Title 42 Compliance**

Pursuant to section 6 of the Court's September 4, 2020 Order, ordering that the government maintain records and statistical information on minors held in Title 42 custody, to include an update regarding the number of minors held in Title 42 custody, and to monitor compliance with the Agreement with respect to minors held in Title 42 custody, I can confirm that ICE has included minors temporarily housed by ICE pursuant to Title 42 authorities over 72 hours pending expulsion in its monthly Paragraph 28A reporting shared with Plaintiffs' counsel since March 2020, and will continue to do so.  Since the last interim report I filed, advising this Court that KCFRC was exclusively housing Title 42 families, as of November 22, 2020, KCFRC resumed housing both Title 42 and Title 8 families.

On November 18, 2020, the U.S. District Court for the District of Columbia issued an order granting a nationwide preliminary injunction prohibiting the expulsion of unaccompanied alien children under regulations issued by the Department of Health and Human Services, Centers for Disease Control and Prevention (CDC) implementing Title 42, Section 265 of the U.S. Code (Title 42).  *P.J.E.S. v. Wolf*, No. 20-cv-02245, (D.D.C. filed Aug. 14, 2020).  The district court invalidated these regulations as applied to a class defined as:

> all unaccompanied noncitizen children who (1) are or will be detained in U.S. government custody in the United States, and (2) are or will be subjected to expulsion from the United States under the CDC Order Process, whether pursuant to an Order issued by the Director of the Centers for Disease Control and Prevention

App. 225

under the authority granted by the Interim Final Rule, 85 Fed. Reg 16559-01, or the

Final Rule, 85 Fed. Reg. 56,424-01.

*Id.*

Between November 10, 2020, and January 8, 2021, which includes nine days before the

preliminary injunction in *P.J.E.S.* was issued, ICE temporarily housed a total of 86 minors pending

expulsion under Title 42 processes. Of those, ICE temporarily housed 5 minors at an FRC with

an average length of stay of 7 days; the chart below demonstrates the age categories:

| Age Category | # of minors |
|---|---|
| 0 -5 years old | 2 |
| 6 - 13 years old | 2 |
| 14 - 17 years old | 1 |
| **Total** | **5** |

ICE temporarily housed 81 minors in hotels, with an average length of stay of 1.4 days; the charts

below demonstrate the age categories and breakdowns by family composition[2]:

| Family Composition | # of minors |
|---|---|
| Family Unit | 2 |
| Family Group | 2 |
| Single Minor | 77 |
| **Total** | **81** |

---

[2] As a reminder, the reporting period for Title 42 data includes single minors processed under Title 42 authorities
pre-*P.J.E.S.* preliminary injunction.

8

| Age Category | # of minors |
|---|---|
| 0 -5 years old | 1 |
| 6 - 13 years old | 6 |
| 14 - 17 years old | 74 |
| **Total** | **81** |

Of the 86 minors temporarily housed pursuant to Title 42 by ICE, no minors were held in hotels for more than 72 hours pending transfer to a licensed facility, and no minors were held in a hotel for more than 2 days pending an expulsion flight.

Signed on this 19th day of January 2021.

DEANE D DOUGHERTY
Digitally signed by DEANE D DOUGHERTY
Date: 2021.01.19 08:52:09 -05'00'

Deane Dougherty
Juvenile Coordinator

9

App. 227

# ATTACHMENT A
# TO JANUARY 15, 2021 ICE
# JUVENILE COORDINATOR REPORT

| Det Locat on | A-Numbe | Subject D | Last Name | F st Name | Count y of C t zensh p Code | Book-In Date | B th Date | Age | Age G oup | F nal O de Date ( as of 1/6/21) | Case Catego y | Spec f c explanat on fo detent on 20 Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CONGO | 9/30/2020 | [redacted] | 1 | 0 to 5 | 9/7/2020 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 08/0 20. On 08 11 20, the IJ affi med the nega ive decision. The family un t's atto ney f led a RFR on 08/12 20. The RFR was den ed on 08/13/20. The fam ly unit s attorney submit ed a 2nd RFR on 10/02/20. The RFR was den ed on 10/06/20. The minor had a final order of emoval but cou d not be removed because the minor/family unit was subject to an administrative stay of removal issued by the U.S. D strict Court for the Northern Distr ct of Cal fornia on Oc ober 17, 2020, in East Bay Sanctuary Covenant v. Barr, No. 19- 073 (N.D. Cal. Fi ed Jul. 16, 2019) PI appeal docketed, No. 19-16 87 (9th Cir. iled Jul. 29, 2019). This s ay has now been li ted. The minor is subject to a inal order of removal and there are no impediments to removal at th s time. Minor is in the process of being scheduled for removal, which includes working with the consula e o secure travel documents and being tested for COVID-19 as is required by country of or gin. The minor is from The Democra ic Republic of Congo and lights are occur ing frequen ly. The family un t is pending Travel documents and awaiting the next ava lable commerc al fl ght for repatria ion. The projected removal will be [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | BRAZIL | 12/16/2020 | [redacted] | 2 | 0 to 5 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The [redacted] ly ente ed on 12/08/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 22 20. An APSO rendered a pos tive decision on 12 23 20. The case of icer received the NTA on 12 23 20. The amily unit is pending release after the sponsor provides the travel arrangements. The fam ly unit in tially did not have a sponsor and was being prepared for intake at a shelter. Contact was made with Pas o [redacted] with [redacted] who wi l sponsor the fam ly |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CHILE | 3/18/2020 | [redacted] | 2 | 0 to 5 | 3/15 2020 | [8G] Expedited Removal - Credib e Fear Referral | The [redacted] a negative credible fear de ermination by an APSO on 03/26 20. On 0 08 20, the IJ affi med the decision set by the APSO. The amily un t's a torney f led for a RFR on 0 /10/20. The RFR was denied on 0 /15 20. The amily un t was schedu ed for removal on 05/05/20. The removal was cancel ed due to the amily un t's a torney f ling a stay of removal with the Circuit Court of the District of Columbia on 0 /28/20. The DC Circu t Court granted the stay of removal on 0 29 20. On 05 15/20, the administra ive stay was dissolved. The family un t was re-scheduled or removal on 05 26 20. The minor had a final order of removal but could not be emoved because the family un t was subject to multiple admin st ative s ays of removal issued in D.A.M v Barr and East Bay Sanctuary Covenant v. Barr. Whi e the stay was in p ace the family un t's attorney iled a 2nd RFR on 06 0 /20. The RFR was den ed on 07/01/20. A RFR was submitted for a 3rd time by the family un t's attorney on 09 23/20. Add tionally, the administrative stays were dissolved. The 3rd RFR was den ed on 12/17/20. The family unit s attorney submit ed a th RFR on 12/21/20. On 01/08/21, an APSO returned with a positive credib e ear determinat on. The family un t was re eased on 01/11/21 after the sponsor provided the t avel arrangemen s. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CHILE | 3/18/2020 | [redacted] | 3 | 0 to 5 | 3/1 2020 | [8G] Expedited Removal - Credib e Fear Referral | Th s minor may be el gible for indiv dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE will de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly received a negative credible fear determination by an APSO on 03/26 20. On 0 08 20, the IJ affirmed the decision set by the APSO. The amily un t's a torney f led for a RFR on 0 /10/20. The RFR was den ed on 0 /15/20. The fam ly unit s attorney fi ed a stay of removal w th the Circu t Court of the District of Columb a on 0 28 20. The DC Circuit Court granted the stay of removal on 0 /29/20. On 05/15/20, the admin st ative stay was d ssolved. The fam ly unit was scheduled for removal on 05/26 20. The minor had a final order of removal but cou d not be removed because the fam ly unit was subject to mul ip e administra ive stays of removal issued in D.A.M v Barr and East Bay Sanctuary Covenant v. Barr. While the stay was in place the family unit's at orney fi ed a 2nd RFR on 06 22/20. The RFR was denied on 06 25/20. A RFR was subm tted for a 3rd time by the amily unit's a torney on 09/23/20. Addit onally, the administrative stays we e dissolved. The 3rd RFR was den ed on 12/11/20. The family unit s attorney submitted a th RFR on 12 21/20. The RFR dec s on is pending. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 9/1 /2019 | [redacted] | 3 | 0 to 5 | 9/30 2019 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 09/23 19. On 09 30 19, the IJ affi med the decision set by the APSO. The amily un t's a torney f led for a RFR on 10/09/19. The RFR was denied on 10/09 19. The minor had a final order of removal but cou d not be removed because the family un t was subject to multiple admin strative stays of removal issued in M.M.V v Barr, D.A M v Barr and East Bay Sanctuary Covenant v. Barr. Wh le the stay was in place the fam ly un t s attorney iled a 2nd RFR on 09/2 /20. The RFR was denied on 10/20/20. The admin strative stays have been dissolved. The minor is subject to a final order of removal and there are no impediments to emoval at th s ime. Minor is in the process of being scheduled for removal, which includes working with the consulate to secure t avel documents and being tested or COVID 19 as is required by country of o igin. The next p ojec ed date of removal s 01 13/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | VENEZUELA | 12/19/2020 | [redacted] | | 0 to 5 | 10/15/2020 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly unit ordered removed on 10 15 20 by an IJ under MPP. The minor/fam ly unit il egally re-entered on 12/17/20. As per HQ-R O, the family unit removal has been denied. The fam ly unit was re eased on 01/08/21 after the sponsor provided the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 9/1/2019 | [redacted] | 5 | 0 to 5 | 8/30 2019 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 09/0 19. On 09 18 19, the IJ affi med the decision set by the APSO. The minor had a final order of emoval but cou d not be removed because the fam ly unit was subject to multiple admin st ative s ays of removal ssued in M M.V v Barr and D.A M v Barr. The fam ly unit s attorney filed for a RFR on 09/30/20. The RFR was den ed on 10/07/20. The administrative stays have been dissolved. The minor is subject to a final order of removal and there are no impediments to removal at this time. Minor is in the process of being scheduled or removal, which includes working with the consulate to secure t avel documents and being tested or COVID-19 as is required by country of origin. The minor family un t was schedu ed for removal on 11/11/2020. The fl ght was cancelled due to weather and airport damage. The next projec ed date of removal s 01/13/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CUBA | 11/19/2020 | [redacted] | 5 | 0 to 5 | 12/19/2019 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly init a ly il ega ly entered on 09 18 2019, processed as MPP and returned to Mexico. The amily un t was ordered removed o Cuba on 12/19/2019 by an IJ. On 11/18/20, the fam ly unit llegally re-entered. As per the Government of Cuba, the family un t was been approved for removal. The family un t was removed from the emoval fl ght to Cuba schedu ed for 12 29 2020 due to testing pos tive for Cov d-19. The pro ected removal wi l be [redacted] . |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | VENEZUELA | 12/19/2020 | [redacted] | 5 | 0 to 5 | 10/22/2020 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly unit ordered removed on 10 22 20 by an IJ under MPP. The [redacted] il egally re-entered on 12/17/20. As per HQ-R O, the family unit removal has been denied. The fam ly unit was re eased on 01/08/21 after the sponsor provided the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | MEXICO | 12/8/2020 | [redacted] | 6 | 6 to 13 | 12/16/2020 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly unit c aimed fear returning to their country of cit zenship on 12/0 /20. The fam ly unit was scheduled for their asylum interview on 12/1 /20. The minor/fam ly was issued a negative decision by an APSO on 12/16/20. The fam ly unit did no request an IJ review of the nega ive determination. The fam ly unit changed their mind and requested an IJ rev ew of the nega ive decision. IJ hearing schedu ed for 01 06/21. The family un t's atto ney f led a RFR on 01/08 21. An APSO ssued a posi ive decision on 01/11/21. The family unit will be released after the sponsor provides the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | BRAZIL | 12/15/2020 | [redacted] | 6 | 6 to 13 | 3/12 2020 | [16] Reinstated Final Order | h s m nor may be el g ble for ind v dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE will de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly unit claimed fear returning o their country of c tizenship on 12/1 /20. The family un t was schedu ed for their asylum interview on 01/0 /21. The minor/fam ly was issued a nega ive decision by an APSO on 01/05/21. The fam ly unit did not request an IJ review of the negative determinat on. On 01 09/21, the amily unit changed their mind and is now requesting an IJ review of the negative dec s on set by the APSO. The decision s pending. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | BRAZIL | 12/18/2020 | [redacted] | 7 | 6 to 13 | N/A | Other - T tle 2 Return | T 2 return fl ght tentative for 01 1 21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/18/2020 | [redacted] | 7 | 6 to 13 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly i lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 28 20. An APSO ssued a NTA on 12 28/20. The case o ficer eceived the NTA on 01 03/21. The amily un t is pending release after the sponsor provides the travel arrangemen s. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CUBA | 11/26/2020 | [redacted] | 8 | 6 to 13 | 11/19/2019 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly init a ly il ega ly entered on 08 26 2019, processed as MPP and returned to Mexico. The amily un t was ordered removed in absentia to Cuba on 11/19 2019 by an IJ. On 11/2 /20, the amily un t i lega ly re-en ered. As per the Government of Cuba, the fam ly unit has been approved for removal. The family un t was removed from the CE cha ter o Cuba scheduled for 12/29/2020 due to the at orney submit ing an emergency stay. The stay was denied. The projected removal w ll be [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/1 /2020 | [redacted] | 8 | 6 to 13 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | [redacted] ly i lega ly ente ed on 12/11/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 29 20. An APSO ssued a NTA on 12 31/20. The case o ficer eceived the NTA on 12 31/20. The amily un t was released on 01 09/21 a ter the sponsor prov ded the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | GHANA | 12/9/2020 | [redacted] | 9 | 6 to 13 | In Proceedings | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly unit c aimed fear returning to their country of cit zenship on 12/05/20. The fam ly unit was scheduled for their asylum interview on 12/17/20. The minor/fam ly was issued a negative decision by an APSO on 12/22/20. The fam ly unit requested an IJ rev ew of the nega ive determination. The IJ hearing was scheduled or 12/31 20. The IJ vaca ed the dec s on set by the APSO on 12/31/2020. USCIS ssued the NTA on 01/05/2021. The fam ly unit was released on 01/09/21 after the sponsor prov ded the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | EL SALVADOR | 8/27/2019 | [redacted] | 9 | 6 to 13 | 9/18 2019 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 09/02 19. On 09 18 19, the IJ affi med the decision set by the APSO. The minor had a final order of emoval but cou d not be removed because the fam ly unit was subject to multiple admin st ative s ays of removal ssued in M M.V v Barr, D.A.M v Ba r, and M.D C v Wo f. The fam ly unit s attorney fi ed for a RFR on 09/2 /20. The RFR was den ed on 10/15/20. The administrative stays have been dissolved. The minor is subject to a inal order of removal and there are no impediments to removal at th s time. Minor is in the process of being scheduled for removal, which includes working with the consula e o secure travel documents and being tested for COVID-19 as is required by country of or gin. The projected removal date s 1/12/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 9/11/2019 | [redacted] | 10 | 6 to 13 | 10/17/2019 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 08/28 19. On 10 17 19, the IJ affi med the decision set by the APSO. The minor had a final order of emoval but cou d not be removed because the fam ly unit was subject to multiple admin st ative s ays of removal ssued in M M.V v Barr, D.A.M v Ba r, and M.D C v Wo f. The fam ly unit s attorney fi ed for a RFR on 09/22/20. The RFR was den ed on 10/07/20. The administrative stays have been dissolved. The minor s subject to a inal order of removal and there are no impediments to removal at th s time. Minor is in the process of being scheduled for removal, which includes working with the consula e o secure travel documents and being tested for COVID-19 as is required by country of or gin. The projected removal date s 1/13/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CONGO | 12/11/2020 | [redacted] | 11 | 6 to 13 | 12/31/2020 | [8G] Expedited Removal - Credib e Fear Referral | he minor fam ly i lega ly ente ed on 2 09 2020 and claimed fear of returning to their home country. he amily un t was scheduled for an asylum interv ew on 12 17 20. The minor/ amily unit received a negative CF decision from APSO on 12/18/20. IJ affirmed APSO's negative CF decision on 12/31/20. The minor is subject o a final o der of removal and there a e no impediments to removal at th s time. Minor is in the process of being scheduled for removal, which includes working with the consulate to secure travel documents and being tested or COV D 19 as is required by country of or gin. The fam ly unit s pending Travel documents and awai ing next ava lable commerc al fl ght for repatria ion. The next projected removal w ll be [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | BRAZIL | 12/18/2020 | [redacted] | 11 | 6 to 13 | N/A | Other - T tle 2 Return | [redacted] ght tentative for 01 1 21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/19/2020 | [redacted] | 11 | 6 to 13 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly i lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 01 0 21. An APSO rendered a pos tive decision on 01 06 21. The case of icer received the NTA on 01 06 21. The amily unit was released on 01 09/21 af er the sponsor prov ded the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 8/27/2019 | [redacted] | 11 | 6 to 13 | 8/26 2019 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 09/03 19. On 09 18 19, the IJ affi med the decision set by the APSO. The minor had a final order of emoval but cou d not be removed because the fam ly unit was subject to multiple admin st ative s ays of removal ssued in M M.V v Barr, D.A.M v Ba r, East Bay Sanctuary Covenant v. Barr, and M.D C v Wo f. The fam ly unit s attorney fi ed for a RFR on 09/23/20. The RFR was den ed on 10/19/20. The administrative stays have been dissolved. The minor s subject to a inal order of removal and there are no impediments to removal at this time Minor is in the process of being scheduled for removal, which includes working with the consulate to secure travel documents and being ested for COVID-19 as s required by country of origin. The projected removal date is 1/13/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | EL SALVADOR | 12/13/2020 | [redacted] | 12 | 6 to 13 | 9/18 2019 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | Th s minor may be el gible for indiv dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE will de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly init ally il egally en ered on 07/12/2019, processed as MPP and returned o Mexico. The amily unit was o dered removed in absent a on 12 18 2019 by an IJ. On 12 10/20, the amily unit i lega ly re-entered. The minor is subject o a final o der of removal and there a e no impedimen s o removal at th s ime. Minor is in the process of being scheduled for removal, which includes working with the consulate o secure travel documen s and being tes ed for COVID-19 as is required by count y of origin. On 12/31 2020, the fam ly unit en ered a motion o reopen. The decision s pending. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CUBA | 11/26/2020 | [redacted] | 12 | 6 to 13 | 11/19/2019 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly init a ly il ega ly entered on 08 26 2019, processed as MPP and returned to Mexico. The amily un t was ordered removed in absentia to Cuba on 11/19 2019 by an IJ. On 11/2 /20, the amily un t i lega ly re-en ered. As per the Government of Cuba, the fam ly unit has been approved for removal. The family un t was removed from the CE cha ter o Cuba scheduled for 12/29/2020 due to the at orney submit ing an emergency stay. The stay was denied. The projected removal w ll be [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | UZBEKISTAN | 12/19/2020 | [redacted] | 12 | 6 to 13 | In Proceedings | [8G] Expedited Removal - Credib e Fear Referral | [redacted] ay be el gible for indiv dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE will de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly unit claimed fear returning o their country of c tizenship on 12/16/20. The family un t was schedu ed for their asylum interview on 12/29/20. The minor/fam ly was issued a nega ive decision by an APSO on 12/31/20. The fam ly unit requested an IJ rev ew of the negative determina ion. The IJ hearing s schedu ed for 01/08/21. The dec s on is pending. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 12/16/2020 | [redacted] | 13 | 6 to 13 | 9/25 2019 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | Th s minor may be el gible for indiv dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE w ll de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly unit in tially llegally entered on 02/16/2019. The family un t was ssued a NTA and released. On 09/25 2019, the fam ly unit was ordered removed in absentia by an IJ. The family un t fai ed to eport on mu tiple occasions. The amily unit was apprehended in Houston, TX on 12/15/2020. The minor s subject to a inal order of removal and there are no impediments to removal at th s time. Minor is in the process of being scheduled for removal, which includes working with the consula e o secure travel documents and being tested for COVID-19 as is required by country of or gin. On 01/0 /2021, the family un t entered a mo ion to reopen. The decision is pending. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | BRAZIL | 12/18/2020 | [redacted] | 1 | 1 to 17 | N/A | Other - T tle 2 Return | T 2 return fl ght tentative for 01 1 21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | GHANA | 12/9/2020 | [redacted] | 1 | 1 to 17 | In Proceedings | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly unit c aimed fear returning to their country of cit zenship on 12/05/20. The fam ly unit was scheduled for their asylum interview on 12/17/20. The minor/fam ly was issued a negative decision by an APSO on 12/22/20. The fam ly unit requested an IJ rev ew of the nega ive determination. The IJ hearing was scheduled or 12/31 20. The IJ vaca ed the dec s on set by the APSO on 12/31/2020. USCIS ssued the NTA on 01/05/2021. The fam ly unit was released on 01/09/21 after the sponsor prov ded the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | GUATEMALA | 12/3/2020 | [redacted] | 1 | 1 to 17 | 12/31/2020 | [8G] Expedited Removal - Credib e Fear Referral | Th s minor may be el gible for indiv dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE will de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly unit claimed fear returning o their country of c tizenship on 12/01/20. The family un t was schedu ed for their asylum interview on 12/15/20. The minor/fam ly was issued a nega ive decision by an APSO on 12/15/20 and did not request a review from the IJ. On 12 21/20 the fam ly unit changed their mind and requested an IJ review of the negative determinat on. The IJ hearing was scheduled for 12/31/20. The IJ a firmed the nega ive decision on 12/31/20. The fam ly unit s at orney submit ed a request for RFR on 01 06/21. The decision is pending. The minor/fam ly is scheduled for a F G with USCIS on 01 11 21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/18/2020 | [redacted] | 1 | 1 to 17 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly i lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 28 20. An APSO ssued a NTA on 12 28/20. The case o ficer eceived the NTA on 01 03/21. The amily un t is pending release after the sponsor provides the travel arrangemen s. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/18/2020 | [redacted] | 1 | 1 to 17 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly i lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 28 20. An APSO ssued a NTA on 12 28/20. The case o ficer eceived the NTA on 01 03/21. The amily un t is pending release after the sponsor provides the travel arrangemen s. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 11/11/2020 | [redacted] | 15 | 1 to 17 | 2/25 2020 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly unit in tially l egally entered on 10/03/2018. The fam ly unit was issued a NTA and released. On 02/25/2019 the fam ly unit was ordered removed in absentia by an IJ. The fam ly unit was apprehended in Beaumont, TX on 11/10/2020. The minor is subject to a final order of removal and there are no impediments to emoval at th s ime. Minor is in the process of being scheduled for removal, which includes working with the consulate to secure t avel documents and being tested or COVID 19 as is required by country of o igin. The next p ojec ed date of removal s 01 13/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/19/2020 | [redacted] | 15 | 1 to 17 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly i lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 01 0 21. An APSO rendered a pos tive decision on 01 06 21. The case of icer received the NTA on 01 06 21. The amily unit was released on 01 09/21 af er the sponsor prov ded the travel arrangements |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 6/11/2019 | 15 | 1 | to 17 | 10/3 2019 | [8Q] Expedited Removal - Credible Fear Referral | The minor/family received a negative credible fear de termination by an APSO on 09/23 19. On 10 03 19, the IJ affi rmed the decision set by the APSO. The minor had a final order of emoval but cou d not be removed because the fam ly unit was subject to multiple admin is trative holds... The fam ly unit s attorney fi led for a RFR on 10/07/19. The RFR was den ed on 10/17/19. A 2nd RFR was f led by the amily un t's a torney on 09/25/20. The RFR was denied on 10/22 20. Addit onally, the admin strative stays have been dissolved. The minor is subject o a final order of removal and there are no impediments to removal at this time. Minor is in the process of being scheduled or removal, which includes working with the consulate to secure t avel documents and being tested or COVID-19 as is required by country of origin. The pre-exited removal date is 1/12/21. |
| | 12/18/2020 | 16 | 1 | to 17 | N/A | Other - T ke 2 Return | T 2 return fl ght tentative for 01 1 - 21. |
| | 12/9/2020 | 16 | 1 | to 17 | In Proceedings | [8Q] Expedited Removal - Credible Fear Referral | The minor/fam ly unit s aimed fear returning to their country of cit zenship on 12/05/20. The fam ly unit was scheduled for their asylum interview on 12/17/20. The minor/fam ly was issued a negative decision by an APSO on 12/22/20. The fam ly unit requested an IJ rev ew of the nega ive determination. The IJ hearing was scheduled on 12/31 20. The IJ vaca ed the dec s on set by the APSO on 12/31/2020. USCIS issued the NTA on 01/05/2021. The fam ly unit was released on 01/09/21 after the sponsor prov ded the travel arrangements. |
| | 12/18/2020 | 17 | 1 | to 17 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly is egal ar end on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 28 20. An APSO ssued a NTA on 12 28/20. The case s fixer scanned the NTA on 01 03/21. The amily un t is pending release after the sponsor provides the travel arrangements s |

# Exhibit H

# JANUARY 15, 2021
# CBP JUVENILE
# COORDINATOR REPORT

1300 Pennsylvania Avenue NW
Washington, DC 20229



January 15, 2021

MEMORANDUM FOR:    The Honorable Judge Gee
District Judge
U.S. District Court, Central District of California

FROM:    Henry A. Moak, Jr.
Chief Accountability Officer
U.S. Customs and Border Protection

1/15/2021

X _____

Signed by: HENRY A MOAK JR

SUBJECT:    CBP Juvenile Coordinator Interim Report

On December 4, 2020, this Court ordered the U.S. Customs and Border Protection (CBP) Juvenile Coordinator to file an interim report "providing a census of Class Members in CBP custody, describing COVID-19 guidances, and specifically addressing whether the conditions at the Weslaco Border Patrol Station [(WSL)] are safe and sanitary under [Flores Settlement Agreement (FSA)] Paragraph 12." The CBP Juvenile Coordinator submits the following report in response to this Court's December 4, 2020 Order. This report does not reflect all FSA monitoring activities conducted since filing the 2020 CBP Juvenile Coordinator report. A comprehensive account of FSA monitoring across the Southwest Border will be included in the annual CBP Juvenile Coordinator report to be filed on July 1, 2021. Based on my review of COVID-19 guidance issued and my team's observations of its implementation, I believe WSL was substantially compliant with the FSA, specifically the safe and sanitary conditions under FSA Paragraph 12.

Background

CBP continues to assist the Centers for Disease Control and Prevention (CDC) in enforcing its *Order Suspending Introduction Of Persons From A Country Where A Communicable Disease Exists* (March 20, 2020) as amended and extended.[1] On November 18, 2020, the U.S. District Court for the District of Columbia issued a preliminary injunction prohibiting the U.S. Department of Homeland Security (DHS) from expelling any minor in the U.S. pursuant to the CDC Order who would otherwise be an unaccompanied alien child (UAC) under Title 8.[2] As of the filing date of this report, the government may still expel single adults and family units in the United States traveling from Canada or Mexico (regardless of their country of origin) who would

---

[1] *See,* 85 Fed. Reg. 16567 (Mar. 24, 2020).
[2] *See, P.J.E.S. v. Wolf, et al., No. 1:20-cv-02245* (D.D.C. Nov. 18, 2020). *See also,* 6 U.S.C. § 297(g)(2) (defining unaccompanied alien child as a child who: (a) has no legal status in the U.S.; (b) has not attained 18 years of age; and (c) does not have a parent or legal guardian in the U.S. or whose parent or legal guardian is not able to provide care and physical custody).

otherwise be held in ports of entry or U.S. Border Patrol (USBP) stations for immigration
processing.

Since filing my 2020 annual report, the USBP Rio Grande Valley (RGV) Sector has adapted to
new operational tempos related to reduced numbers of individuals in custody and long-scheduled
renovations of certain facilities.  RGV Sector completed demobilizing the soft-sided facility in
Donna, Texas in May 2020, and in September 2020, suspended operations at the Central
Processing Center-Ursula (CPC-Ursula) in McAllen, Texas in order to complete renovations at
the latter facility.  As a result, WSL is currently operating as the primary processing hub for both
UACs and family units apprehended in RGV Sector.

On November 18, 2020, Plaintiffs interviewed three class members in WSL and submitted
declarations that included statements alleging lack of social distancing, crowded hold rooms,
cold temperatures, no soap or hand sanitizer available for handwashing, limited or no facemasks
provided to individuals in custody, and personnel not wearing facemasks inside the holding area.
In response, I directed the Juvenile Coordinator's Office (JCO) to conduct inspections in the
RGV Sector, and advise me of their findings.  The results of the JCO inspection specifically
related to WSL and the station's implementation of COVID-19 guidance are included in this
report.

Census of Class Members in Custody

From October 1, 2020 through December 31, 2020, USBP reported 207,968 encounters along the
Southwest land border, which is considerably higher than the encounters reported in Fiscal Year
(FY) 2020 for the same period.[3]  However, in FY2021 to date, the overwhelming majority of
these encounters were with single adults.[4]  USBP encounters with UACs and family units
accounted for only 13% of all December 2020 enforcement encounters.[5]  By comparison, in May
2019, the height of the 2019 surge, UAC and family units accounted for 72% of USBP
Southwest land border enforcement encounters.[6]  In RGV Sector specifically, there were 5,184
UAC enforcement encounters and 4,275 family unit enforcement encounters from October 1 to
December 31, 2020.[7]  These encounters represent a 55% increase in UAC enforcement
encounters and a 35% decrease in family unit enforcement encounters compared to the same
period in FY2020.[8]

---

[3] *See, Southwest Land Border Encounters,* U.S. Department of Homeland Security, Customs and Border Protection,
https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters, (last visited January 14, 2021).
[4] *Id.*
[5] *Id.*
[6] *Id.  See also, Stats and Summaries,* U.S. Department of Homeland Security, Customs and Border Protection,
https://www.cbp.gov/newsroom/media-resources/stats, (last visited January 15, 2021).
[7] *See, U.S. Border Patrol Southwest Border Apprehensions by Sector,* U.S. Department of Homeland Security,
Customs and Border Protection, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters/usbp-sw-
border-apprehensions, (last visited January 14, 2021).
[8] *Id.*

For all USBP facilities along the Southwest Border, maximum facility capacity is approximately 11,200.[9] Maximum facility capacity assumes a homogenous population and full operating status at all facilities.[10] The actual holding capacity along the Southwest Border, and more specifically by facility, is constantly changing based on the characteristics of the in-custody population.[11] For example, a facility's actual holding capacity may change based on the demographics and genders of individuals in custody to ensure the safety of all individuals in custody.[12] In December 2020, there was an average daily population of 634 individuals in USBP custody along the Southwest Border.[13] The average daily population of individuals in RGV Sector was 120 in December 2020.[14]

To address COVID-19 concerns, to the maximum extent operationally feasible, CBP has a current targeted holding capacity of 25% of a facility's normal operational capacity. This target was developed for CBP planning purposes, taking into account COVID-19 considerations and precautions to minimize exposure risk as well as account for additional space requirements for social distancing and isolation/quarantine requirements. In facilities where class members are held, it is not always operationally feasible to stay below the 25% target, and there have been instances where class members were held in facilities with an in-custody population above this target. In these circumstances, CBP still makes every effort to minimize the risk of exposure, including wearing appropriate Personal Protective Equipment (PPE), distributing surgical facemasks to individuals in custody, and following CDC social distancing recommendations.

COVID-19 Guidance

CBP is committed to protecting the health of individuals in its custody and its workforce. As the pandemic unfolds, CBP continues to monitor on-the-ground conditions and respond accordingly to balance mission requirements and health considerations. CBP has coordinated closely and regularly with the CDC regarding COVID-19 guidance since the onset of the pandemic and continues to update, refine, and enhance guidance as appropriate. As with any dynamic operating environment, flexibility is crucial. CBP has issued agency-wide COVID-19 guidance, which establishes general guidelines. Sector and station leadership implement these guidelines consistent with their unique situational demands.

The CBP COVID Toolkit, developed by the CBP Chief Medical Officer and CBP Office of Human Resource Management/Occupational Safety and Health Division (OSH), in consultation with DHS Headquarters and the CDC, contains extensive guidance regarding COVID-19 practices, including COVID exposure risk assessment (contact tracing), isolation/quarantine guidance, and return-to-work guidance. The CBP Chief Medical Officer also engages regularly and directly with operational and medical leadership along the border regarding optimization of COVID-19 practices.

---

[9] *See, Custody and Transfer Statistics FY2021,* U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, (last visited January 14, 2021).
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*

CBP Juvenile Coordinator Interim Report
Page 4

The CBP Job Hazard Analysis (JHA) is included in the CBP COVID Toolkit. The JHA was developed under the direction of the CBP Chief Medical Officer and OSH, and focuses on CBP-wide job-task specific COVID exposure risk and PPE guidance. The JHA outlines the recommended or required PPE all CBP personnel must wear during specific job-tasks. Depending on the situation, PPE required or recommended by the JHA may include any combination of the following items: nitrile gloves, N-95 respirator, protective outer garments, gowns, shoe coverings, face shields, or non-vented goggles. Per the JHA, USBP agents must wear an N-95 respirator when they are within six feet of anyone, gloves when touching potentially contaminated surfaces, and goggles or a face shield during any increased risk situations. In addition, agents must wear a face covering or surgical facemask if further than six feet but still in contact with individuals in custody or personnel.

In addition to the CBP-wide guidance, USBP issued field guidance reiterating the JHA requirements related to PPE and requiring agents to distribute PPE to individuals in custody as appropriate. Furthermore, the guidance requires agents to use only designated transport units equipped with appropriate PPE and sanitized per sector protocol. Additionally, USBP issued two COVID-19 checklists to facilitate contract tracing after a known exposure. Both have specific steps for supervisors and employees, depending on their responsibilities, to notify any individuals in custody of their potential exposure. Moreover, the medical checks conducted by contracted medical professionals or local health facilities for all juveniles entering USBP custody, described in my last report, now include targeted COVID-19 questions in addition to the standard medical questions. All juveniles receive an initial medical check, which includes a temperature check and COVID-19 questions as well as standard medical questions. Any juveniles needing further diagnosis and treatment are referred to the local health system as needed.

Specific to RGV Sector, Sector leadership issued the "Revised Rio Grande Valley Sector Guidelines for COVID-19 Spread Mitigation in the Workplace" memorandum on September 9, 2020 to re-emphasize existing CBP guidance and update Sector-specific requirements. This memorandum specifically requires agents to wear an N-95 respirator when processing, transporting, arresting, or performing any other duty that may require an agent to be in close and/or prolonged proximity to individuals in custody. It also requires that any individual in custody with known or potential COVID-19 receive a surgical facemask. While this memorandum specifically requires surgical facemasks for individuals in custody who are known or suspected of being positive for COVID-19, the current practice is to assume that any person in custody has potential COVID-19 exposure or infection and provide surgical facemasks. At WSL, JCO observed that surgical facemasks were provided to all individuals entering the facility. The juveniles my team interviewed confirmed that agents provided facemasks following apprehension in the field and that they had received new facemasks throughout their time in custody.

Weslaco Station (WSL)

On December 1, 2020 at 9:00 AM, JCO conducted an announced inspection at WSL. At the time of the inspection, there were 51 juveniles onsite, 49 UACs and two accompanied alien

CBP Juvenile Coordinator Interim Report
Page 5

children (AAC).  WSL was operating below its targeted COVID-19 holding capacity of 25% of
the station's total capacity.

Juveniles were in 11 hold rooms, and JCO inspected each one.  All hold rooms had functioning
toilets with toilet paper and functioning sinks with soap.  One hold room had a malfunctioning
sink; however, there were two other functioning sinks available in that hold room, and a work
order had been submitted for the malfunctioning sink.  The hold rooms and processing area were
clean, and no sanitary issues were observed.  Each hold room had a five-gallon water jug and
cups available for drinking.  All hold rooms measured within the temperature range of 66 to 80
degrees Fahrenheit.  JCO observed a separate designated caregiver area, where the younger
juveniles could play.  Contracted caregivers were onsite, and JCO confirmed they worked seven
days a week.

JCO observed the food and supplies available for agents to provide to juveniles.  An agent
explained that a food services contractor prepared and distributed meals three times a day.  Baby
formula, cookies, crackers, Pedialyte, milk, and juice were available and within the expiration
date.  Diapers, baby wipes, body soap, toothbrushes and toothpaste, shampoo, deodorant, and
feminine hygiene products were also available.  JCO observed various types of clothing available
in multiple sizes for juveniles and adults.

JCO pulled a sample of six juveniles currently onsite and reviewed their custody logs.  All six
custody logs recorded receipt of a new surgical facemask mask.  All six juveniles' custody logs
recorded showers, clean clothes, and dental hygiene products provided.  While five of the
custody logs recorded welfare checks at regular intervals, showing adequate supervision to
protect the juvenile from others, one had a four-hour gap around dinnertime.  Although there was
a gap in recordation, JCO observed agents moving through the processing area and caregivers
onsite engaging with juveniles to provide consistent supervision.  Three of the custody logs did
not record that a mat and Mylar blanket had been provided, although JCO observed that all
juveniles had both.  While no juveniles were receiving medical care while JCO was onsite, all
had the required medical checks recorded in their custody logs.

Throughout the inspection, my team paid special attention to how WSL implemented COVID-19
guidance and the measures taken to prevent the spread of COVID-19.  JCO observed juveniles
arriving to the station through the sally port.  As the juveniles exited the vehicle, JCO observed
that they were wearing surgical masks.  In the sally port, medical contractors stood by to conduct
medical checks and provide a new surgical facemask.  Medical contractors asked specific
questions from a COVID-19 questionnaire and completed the standard medical check, which
included taking the juvenile's temperature.  Medical contractors informed JCO that juveniles
with possible COVID-19 symptoms remained in the sally port until being transported to a local
hospital for further evaluation.  If the hospital determined the juvenile was positive for COVID-
19 or another contagious disease, the juvenile was taken to a different station for isolation.  At
the time of this inspection, Brownsville Station was designated as the medical isolation station.
If the juveniles did not have possible COVID-19 symptoms, they received a more detailed
medical check before entering the facility.

CBP Juvenile Coordinator Interim Report
Page 6

The Acting Watch Commander ((A) WC) informed JCO that agents provided surgical facemasks to juveniles upon apprehension and these surgical facemasks were routinely replaced throughout juveniles' time in custody. When briefing the WSL Acting Patrol Agent in Charge ((A) PAIC) after leaving RGV Sector, the (A) PAIC informed JCO that agents typically provided extra facemasks to families with young children each time facemasks were replaced because agents recognized younger children were more likely to drop the facemask or get it dirty before it was replaced next. Moreover, JCO observed caregivers handing out surgical facemasks at the time that juveniles received a shower, which reflected new COVID-19 protocols. The (A) WC informed JCO that on November 25, 2020, RGV Sector instructed WSL to have only six individuals shower at a single time to decrease the number of individuals queueing for a shower. JCO observed this practice at the time of the inspection. Moreover, JCO observed soap dispensers filled with soap in all hold rooms at WSL. JCO later learned that by the end of December, RGV Sector had installed soap dispensers in all hold rooms Sector-wide. JCO observed that surgical facemasks and gloves were stored on the exterior side of all hold room doors. My team observed agents wearing N-95s respirators at all times in the processing area and when interacting with individuals in custody.

JCO leveraged video conferencing technology to interview juveniles while onsite. The same team members who interviewed all juveniles during the 2020 reporting period continued the same general process of interviewing juveniles who volunteered to speak about their time in CBP custody. One team member onsite facilitated the interview process and solicited volunteers. The second team member, fluent in Spanish, used a video conferencing platform to interview juveniles and translate for the onsite team member. JCO conducted the interviews with the juveniles in a room separate from any agents or other individuals in custody. Both juveniles and the onsite team member wore facemasks and maintained, as best as possible, social distancing throughout the interview.

First, JCO interviewed C.T.S., a 15-year-old UAC female from Guatemala. At the time of the interview, C.T.S. had been in CBP custody for approximately 12 hours. C.T.S. explained that apprehending agents treated her with respect and provided a facemask for her to wear before she was transported to a station. At the first station she arrived at, C.T.S. explained that medical professionals took her temperature in the sally port and gave her a new facemask to wear. After, C.T.S. explained that she was brought inside the station for a medical check and processing. Custodial records noted that a medical check was completed when C.T.S. arrived at Rio Grande City Station. After the medical check, C.T.S. informed JCO she received a blue wristband, which the onsite interviewer observed on her wrist. After initial processing and fingerprinting was complete, C.T.S. told JCO she was placed in a hold room where there were approximately 25 individuals, including adult females with children. C.T.S. informed JCO that all individuals in the hold room were wearing facemasks and that there was space between them. Inside the hold room, C.T.S. confirmed there was a functioning toilet with toilet paper and a functioning sink with soap. She also confirmed that there was a five-gallon water jug with cups. C.T.S. stated the hold room temperature fluctuated, indicating sometimes it felt hot and sometimes it felt cold. C.T.S. estimated she was in this hold room for a half hour before she was transferred to WSL.

CBP Juvenile Coordinator Interim Report
Page 7

When she arrived at WSL, C.T.S. explained medical professionals also took her temperature in the sally port and gave her a new facemask.  C.T.S. then explained the medical professionals conducted another medical check inside the station and gave her another blue wristband after it was complete.  The JCO interviewer onsite observed C.T.S. was wearing two blue wristbands at the time of the interview.  Next, C.T.S. explained that she received water, an apple, juice, and crackers.  C.T.S. also stated she received a Mylar blanket and mat when she was placed in the WSL hold room with approximately 8 or 9 female juveniles who were all wearing facemasks.  C.T.S. confirmed that this hold room also had a functioning toilet with toilet paper, a functioning sink with soap, and a five-gallon water jug with paper cups.  Like at the first station, C.T.S. explained that the temperature in the WSL hold room also fluctuated between "hot" and "cold," but that she was still able to sleep.  C.T.S. told JCO that the lights were not dimmed overnight.  C.T.S. explained that the next morning, the day of the interview, she and the female juveniles in her hold room all woke up by themselves without anyone waking them up.

Next, she explained that she received breakfast, which included a warm egg and bean burrito, an apple, crackers, milk, and bottled water.  C.T.S. told JCO that she ate breakfast, and it did not hurt her stomach.  Custodial records noted that she was provided a hot breakfast and a new mask.  After breakfast, C.T.S. stated she showered and brushed her teeth.  She explained that caregivers facilitated the shower process and gave clear instructions about the hygiene items available and where to put her dirty clothes so that they could be washed and returned to her.  At the time of the interview, C.T.S. was wearing a T-shirt and sweatpants she received before her shower and her own jacket over top of the T-shirt.  C.T.S. told JCO the shower trailer was warm and that she was not rushed during the shower process.  C.T.S. also told JCO that she received a new facemask before she took her shower.  After showering, C.T.S. stated she returned to the hold room.  Custodial records noted that she was provided with a shower, bodily cleansing product, dental hygiene product, feminine hygiene product, and clean clothing.  She stated she moved to a different hold room before the interview because the one she was in was being cleaned.  When she moved to the new hold room, C.T.S. stated she received a new Mylar blanket and mat.  C.T.S. told JCO she and the other female juveniles in her hold room had been watching cartoons.  She also told JCO she had not been hungry and that she had been treated with respect throughout her time in CBP custody.  Before ending the interview, JCO reminded C.T.S. that medical professionals were available onsite if needed, and that she could ask for food, snacks, and hygiene items.  Custodial records noted that she was shown the UAC video.  Custodial records also noted that she received a hot lunch and that, later that afternoon, she was transported to a U.S. Health and Human Services, Office of Refugee and Resettlement (HHS/ORR) facility.

Next, JCO interviewed E.R.A., a 17-year-old UAC male from Guatemala.  At the time of the interview, E.R.A. had also been in CBP custody for approximately 12 hours.  E.R.A. told JCO that the apprehending agent was respectful, offered him water to drink, and gave him a facemask to wear.  Like C.T.S., E.R.A. explained he was then transported to a station where medical professionals took his temperature in the sally port before he entered the station for a medical check.  During the medical check, the medical professional asked E.R.A. if he was hungry and gave him water and crackers.  After the medical check, E.R.A. received a blue wristband, which the onsite JCO interviewer observed him wearing.  This medical check was not recorded in his custody log.  E.R.A. explained that he then completed initial processing, which included fingerprinting, before he was placed in a hold room with one other male juvenile, who was also

wearing a facemask. E.R.A. confirmed there was a functioning toilet, a functioning sink with soap, and a five-gallon water jug with cups. E.R.A. explained he was in the hold room very briefly before being transferred to WSL.

Upon arriving at WSL, E.R.A. explained that medical professionals took his temperature in the sally port and he received a new facemask. Then, medical professionals completed a medical check inside the station. After this medical check, E.R.A. also received a blue wristband. The onsite JCO interviewer observed he was wearing both wristbands at the time of the interview. This medical check was recorded in E.R.A.'s custody log. After the medical check, E.R.A. stated he was assigned a hold room, and received a mat and Mylar blanket. E.R.A. also told JCO he was given an apple, crackers, milk, and water. Custodial records noted that he was provided with snacks, bodily cleansing product, dental hygiene product, a mat, and a Mylar blanket. E.R.A. stated that he shared the hold room with the same juvenile that was in his hold room at the first station. He confirmed this hold room also had a functioning toilet with toilet paper, a functioning sink with soap, and a five-gallon water jug with cups. E.R.A. said the hold room was cold, but "not too bad." E.R.A. told JCO he had been able to sleep, but not well because he was nervous about being in custody. When JCO asked whether there was anything specifically making him nervous, he explained it was the new environment and the fact that he had never been in CBP custody before. E.R.A. stated the lights were on overnight. E.R.A. explained that, the next day, someone opened the hold room door and said, "Wake up," before handing out breakfast, which included a warm burrito, apple, cookies, milk, juice, and bottled water. Custodial records noted that he was provided a hot breakfast and a new mask. After breakfast, E.R.A. told JCO he took a nap on his mat before he showered and brushed his teeth. E.R.A. explained there were two male caregivers giving instructions in Spanish about the shower process, including instructions about clean towels, clean clothes, and soap. E.R.A. stated he received clean clothes to wear while his clothes were laundered. At the time of the interview, E.R.A. was wearing the clothes provided by the station and his own jacket. Custodial records noted that he was provided with a shower, bodily cleansing product, dental hygiene product, and clean clothing. Prior to the interview, E.R.A. also told JCO he received lunch, which included a warm burrito, two single-serving boxes of cereal, an apple, juice, and bottled water. Custodial records noted that he received a hot lunch. E.R.A. stated he received a new facemask before the interview. He informed JCO it was the third facemask he received while in CBP custody. Before ending the interview JCO reminded E.R.A. that medical professionals were available onsite if needed, and that he could ask for food, snacks, and hygiene items. Custodial records noted that he was shown the UAC video. Custodial records also noted that, later that afternoon, he was transported to a HHS/ORR facility.

Based on JCO's inspection, I believe WSL was substantially compliant with the FSA, and more specifically, conditions were safe and sanitary as articulated under Paragraph 12A of the FSA. WSL was operating below the targeted 25% COVID-19 capacity during the inspection. Furthermore, JCO discussed with the (A) WC the safety measures implemented in response to COVID-19. JCO's observations and interviews with juveniles demonstrated WSL followed these enhanced safety measures, including agents wearing N-95 respirators in the processing areas and while interacting with individuals in custody, temperature screenings conducted in the sally port, routine distribution of surgical facemasks for individuals in custody, and soap for handwashing available in all hold rooms.

CBP Juvenile Coordinator Interim Report
Page 9

The current operating environment, amidst the COVID-19 pandemic, places increased demands on CBP and adds additional variables to its comprehensive border security mission. USBP must accept and maintain custody of individuals until they can be transferred to another agency regardless of facility capacity. CBP generally relies on its inter-agency partners to transfer juveniles out of its custody. This coordination and expeditious transfer of juveniles out of CBP custody is even more critical during this period of reduced capacity to facilitate social distancing and prevent the spread of COVID-19. CBP recognizes this unique challenge as well as its responsibilities under the FSA to ensure safe and sanitary conditions for all juveniles in its custody. The Agency will continue to monitor on-the-ground conditions and adjust accordingly to minimize risk of COVID-19 exposure and protect the health of all individuals in custody.

# Exhibit I

https://www.ice.gov/coronavirus    Go

1,682 captures
27 Mar 2020 - 4 Feb 2021

◀ **12** ▶
2020 **2021** 2022
DEC  JAN FEB
About this capture


Official Website of the Department of Homeland Security

# ICE

Report Crimes: Email or Call 1-866-DHS-2-ICE

NOTICE

Click here for the latest ICE guidance on COVID-19

## ICE Guidance on COVID-19

Overview & FAQs    ICE Detainee Statistics    Judicial Releases    Previous Statements

**Page information is recorded from a live database; data may change as the agency receives updated case information.**

DETAINED POPULATION [1]
AS OF 01/08/2021
**15,415**

COVID-19 POSITIVE CASES CURRENTLY IN CUSTODY [2]
UNDER ISOLATION OR MONITORING AS OF 01/10/2021
**523**

DETAINEES TESTED
AS OF 01/08/2021
**82,585**

### COVID-19 ICE Detainee Statistics by Facility
**AS OF 01/10/2021**

| Custody/AOR/Facility | Confirmed cases currently under isolation or monitoring | Detainee deaths [3] | Total confirmed COVID-19 cases [4] |
|---|---|---|---|
| **Atlanta Field Office** | | | |
| Charleston County Detention Center | 0 | 0 | 2 |
| Columbia Regional Care Center | 0 | 0 | 1 |
| Folkston ICE Processing Center (D. Ray James) | 7 | 0 | 91 |
| Irwin County Detention Center | 13 | 0 | 61 |
| Robert A. Deyton Detention Center | 1 | 0 | 5 |
| Sheriff Al Cannon Detention Center | 0 | 0 | 1 |
| Stewart Detention Center | 42 | 3 | 446 |
| **Baltimore Field Office** | | | |
| Howard County Detention Center | 1 | 0 | 2 |
| Worcester County Jail | 0 | 0 | 1 |
| **Boston Field Office** | | | |
| Bristol County Detention Center | 0 | 0 | 1 |
| Cumberland County Jail | 0 | 0 | 1 |
| Franklin County House of Corrections | 1 | 0 | 9 |

App. 243




| | | | |
|---|---|---|---|
| Plymouth County Correctional Facility | 2 | 0 | 2 |
| Strafford County Corrections | 6 | 0 | 16 |
| Wyatt Detention Center | 1 | 0 | 5 |
| **Buffalo Field Office** | | | |
| Buffalo (Batavia) Service Processing Center | 2 | 0 | 52 |
| **Chicago Field Office** | | | |
| Chase County Detention Facility | 0 | 0 | 82 |
| Clay County Justice Center | 1 | 0 | 18 |
| Dodge County Jail | 0 | 0 | 4 |
| Kankakee County Detention Center | 2 | 0 | 2 |
| Lincoln County Detention Center | 0 | 0 | 1 |
| McHenry County Adult Correctional Facility | 0 | 0 | 6 |
| Montgomery County Jail | 0 | 0 | 1 |
| Morgan County Detention Center | 0 | 0 | 1 |
| Pulaski County Detention Center | 2 | 0 | 110 |
| **Dallas Field Office** | | | |
| Bluebonnet Detention Facility | 1 | 0 | 391 |
| Eden Detention Center | 0 | 0 | 62 |
| Johnson County Law Enforcement Center | 0 | 0 | 4 |
| Kay County Detention Center | 0 | 0 | 1 |
| Moore Detention Center | 0 | 0 | 35 |
| Prairieland Detention Facility | 2 | 0 | 133 |
| Rolling Plains Detention Center | 0 | 0 | 59 |
| **Denver Field Office** | | | |
| Aurora Contract Detention Facility | 38 | 0 | 167 |
| **Detroit Field Office** | | | |
| Butler County Jail | 1 | 0 | 1 |
| Calhoun County Correctional Center | 4 | 0 | 55 |
| Geauga County Jail | 0 | 0 | 1 |
| Monroe County Jail | 0 | 0 | 1 |
| Morrow County Correctional Facility | 0 | 0 | 51 |
| Saint Clair County Jail | 3 | 0 | 15 |
| **El Paso Field Office** | | | |
| Cibola County Correctional Center | 0 | 0 | 1 |
| El Paso Service Processing Center | 9 | 0 | 323 |
| Otero County Processing Center | 0 | 0 | 185 |
| Torrance County Detention Center | 0 | 0 | 55 |
| **Houston Field Office** | | | |




| | | | |
|---|---|---|---|
| Coastal Bend Detention Center | 0 | 0 | 12 |
| Houston Contract Detention Facility | 0 | 0 | 159 |
| IAH Polk Adult Detention Facility | 0 | 0 | 31 |
| Joe Corley Detention Center | 0 | 1 | 51 |
| Montgomery Processing Center (Houston) | 12 | 0 | 245 |
| **Los Angeles Field Office** | | | |
| Adelanto ICE Processing Center | 4 | 0 | 270 |
| **Miami Field Office** | | | |
| Baker County Detention Center | 1 | 0 | 13 |
| Broward Transitional Center | 58 | 0 | 218 |
| Glades County Detention Center | 3 | 1 | 182 |
| Krome North Service Processing Center | 4 | 0 | 221 |
| Larkin Behavioral Health Center | 0 | 0 | 2 |
| San Juan Staging Facility | 0 | 0 | 1 |
| Wakulla County Jail | 1 | 0 | 42 |
| **Newark Field Office** | | | |
| Elizabeth Detention Center | 1 | 0 | 38 |
| Essex County Jail | 9 | 0 | 23 |
| **New Orleans Field Office** | | | |
| Adams County Correctional Center | 3 | 0 | 109 |
| Alexandria Staging Facility | 16 | 0 | 220 |
| Allen Parish Detention Center | 0 | 0 | 12 |
| Catahoula Correctional Center | 0 | 0 | 119 |
| Etowah County Jail | 6 | 0 | 30 |
| Hancock County Jail | 0 | 0 | 1 |
| Jackson Parish Correctional | 1 | 0 | 114 |
| LaSalle ICE Processing Center - Jena | 0 | 0 | 83 |
| LaSalle ICE Processing Center - Olla | 1 | 0 | 25 |
| Pine Prairie ICE Processing Center | 8 | 0 | 73 |
| Richwood Correctional Center | 0 | 0 | 127 |
| River Correctional Center | 0 | 0 | 56 |
| South Louisiana Correctional Center | 4 | 0 | 29 |
| Winn Correctional Center | 10 | 1 | 284 |
| **New York City Field Office** | | | |
| Bergen County Jail | 0 | 0 | 7 |
| Hudson County Jail | 0 | 0 | 14 |
| Orange County Jail | 1 | 0 | 1 |
| **Philadelphia Field Office** | | | |
| Berks Family Residential Center | 0 | 0 | 1 |

App. 245

https://www.ice.gov/coronavirus   Go

1,682 captures
27 Mar 2020 - 4 Feb 2021

DEC   JAN   FEB

12

2020   2021   2022

About this capture

| | | | |
|---|---|---|---|
| Cambria County Prison | 0 | 0 | 12 |
| Clinton County Correctional Facility | 6 | 0 | 62 |
| Pike County Correctional Facility | 3 | 0 | 36 |
| South Central Regional Jail | 1 | 0 | 1 |
| York County Prison | 108 | 0 | 235 |
| **Phoenix Field Office** | | | |
| CCA Florence Correctional Center | 12 | 0 | 103 |
| Eloy Federal Contract Facility | 4 | 0 | 280 |
| Florence Detention Center | 6 | 0 | 95 |
| La Palma Correctional Facility | 16 | 0 | 531 |
| **Salt Lake City Field Office** | | | |
| Cache County Jail | 0 | 0 | 15 |
| Henderson Detention Center | 2 | 0 | 28 |
| Nevada Southern Detention Center | 0 | 0 | 13 |
| Nye County Jail | 1 | 0 | 60 |
| Washington County Jail | 0 | 0 | 6 |
| **San Antonio Field Office** | | | |
| El Valle Detention Facility | 11 | 0 | 117 |
| Karnes County Family Residential Center | 5 | 0 | 95 |
| Laredo Processing Center | 0 | 0 | 7 |
| LaSalle County Regional Detention Center | 0 | 0 | 11 |
| Limestone County Detention Center | 3 | 0 | 92 |
| Port Isabel Detention Center | 10 | 0 | 242 |
| Rio Grande Detention Center | 14 | 0 | 183 |
| South Texas Family Residential Center (Dilley) | 2 | 0 | 27 |
| South Texas ICE Processing Center (Pearsall) | 4 | 0 | 284 |
| T. Don Hutto Residental Center | 1 | 0 | 3 |
| Webb County Detention Center (CCA) | 7 | 0 | 101 |
| **San Diego Field Office** | | | |
| Imperial Regional Detention Facility | 9 | 0 | 19 |
| Otay Mesa Detention Center (San Diego CDF) | 0 | 1 | 201 |
| San Luis Regional Detention Center | 0 | 0 | 21 |
| **San Francisco Field Office** | | | |
| Golden State Annex Facility | 2 | 0 | 5 |
| Mesa Verde ICE Processing Center | 0 | 0 | 59 |
| Yuba County Jail | 6 | 0 | 7 |
| **Seattle Field Office** | | | |

App. 246

USCA Case #21-5200　　　Document #1919200　　　Filed: 10/21/2021　　Page 74 of 365

| | | | |
|---|---|---|---|
| Northwest ICE Processing Center (NWIPC) | 1 | 0 | 29 |
| **St. Paul Field Office** | | | |
| Douglas County Corrections | 0 | 0 | 1 |
| Freeborn County Adult Detention Center | 0 | 0 | 5 |
| Hardin County Jail | 0 | 0 | 7 |
| Kandiyoh County Jail | 1 | 0 | 41 |
| Linn County Jail | 0 | 0 | 2 |
| Nobles County Jail | 0 | 0 | 2 |
| Phelps County Jail | 0 | 0 | 2 |
| Polk County Jail | 0 | 0 | 15 |
| Sherburne County Jail | 0 | 0 | 2 |
| **Washington D.C. Field Office** | | | |
| Caroline Detention Facility | 9 | 0 | 65 |
| Immigration Centers of America - Farmville | 0 | 1 | 339 |
| TOTAL | 523 | 8 | 8,735 |

*Updated 01/11/2021 5:00pm*

[1] ICE's FY 2019 Average Daily Population was 50,165.

[2] "Currently under isolation or monitoring" includes detainees who tested positive for COVID-19 and are currently in ICE custody under isolation or monitoring. This number excludes detainees who previously tested positive for COVID-19 and were either returned to the general population after a discontinuation of medical monitoring/isolation or are no longer in ICE custody.

[3] "Detainee deaths" includes detainees who have died after testing positive for COVID-19 while in ICE custody; COVID-19 may not be the official cause of death.

[4] "Total confirmed COVID-19 cases" is the cumulative total of detainees who have tested positive for COVID-19 while in ICE custody since testing began in February 2020. Some detainees may no longer be in ICE custody or may have since tested negative for the virus.

↑ Return to top

Last Reviewed/Updated: 01/11/2021

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.,* | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   No. 21-cv-00100-EGS |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of Homeland | ) |
| Security, in his official capacity, *et al.,* | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**DECLARATION OF PUBLIC HEALTH EXPERTS IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION**

The undersigned hereby declare:

1. We make this declaration based on our own personal knowledge and if called to testify could and would do so competently and truthfully to these matters.

**Sharmila Shetty, MD**

2. I, Sharmila Shetty, am a public health physician with 20 years of experience in global health practice. I completed my pediatric residency training at North Shore University Hospital in Manhasset, N.Y., and then completed my post-doctorate fellowship in applied epidemiology at the Centers for Disease Control and Prevention (the "CDC"), and subsequently worked at the CDC for another 11 years, until November 2020.

3. From 2015 to 2020, I served as a medical epidemiologist and Epidemiology Lead for the Global Rapid Response Team in the CDC's Emergency Response and Recovery Branch, where I responded to multiple global health crises including Ebola, measles, and cholera outbreaks. During the COVID-19 pandemic, I was part of the Emergency Operations Center's domestic response and served as the Clinical team deputy, and also provided clinical guidance on COVID-19 to healthcare providers.

4. From 2009 to 2014, I served as a medical epidemiologist in the CDC's Immigrant, Refugee, and Migrant Health Branch. In that capacity, I, among other responsibilities, developed an H1N1 influenza preparedness plan for U.S.-bound refugees, investigated outbreaks, and recommended strategies for managing epidemics.

5. I've also served as faculty at Johns Hopkins Bloomberg School of Public Health, in the International Health Department, working on the Hib Vaccine Initiative.

6. I am currently a medical epidemiologist at the Fund for Population Health New York City working on COVID-19 in Congregate Settings

7. My curriculum vitae is attached as Exhibit A.

**Stephen Patrick Kachur, MD, MPH**

8. I, S. Patrick Kachur, am a Professor of Population and Family Health at the Columbia University Mailman School of Public Health. I am a public health physician with 30 years of experience in global health practice. I completed clinical and residency training at the Mary Imogene Bassett Hospital and Johns Hopkins University and a community health fellowship at the University of Ilorin in Nigeria.

9. For over 20 years (1995-2018), I was based at the CDC, where I held leadership roles in the Malaria Branch and Center for Global Health, receiving the agency's highest service award. At the CDC, I contributed to the Global Health Security Agenda and responded to global health crises including pandemic H1N1 influenza, Ebola and Zika.

10. My scholarship has focused on experimental and observational epidemiology and health systems studies examining the effectiveness and equity of malaria and child health interventions, with an emphasis on real world research that shapes policies and programs. I joined the faculty of the Columbia University Medical Center in 2018, where I coordinate implementation science partnerships with a focus on expanding access to quality primary health care services. I also serve on the World Health Organization's Malaria Policy Advisory Committee.

11. My curriculum vitae is attached as Exhibit B.

**Les Roberts, MPH, PhD**

12. I, Leslie ("Les") Roberts, am an epidemiologist and a Professor of Population and Family Health at the Columbia University Mailman School of Public Health.

13. I did my post-doctorate fellowship in epidemiology at the CDC. I worked at the CDC for 4 years, where I was the first winner of the CDC's Paul C. Schnitker Award for contributions to global health.

14. In addition, in 1994, I worked as an epidemiologist for the World Health Organization in Rwanda during their civil war. I was also the Director of Health Policy at the International Rescue Committee from 2000 until 2003. I have led over 50 surveys in 17 countries, and my studies have been cited by the U.S. State Department, United Nations, World Health Organization, and other governmental and international institutions. I am also a regular lecturer at John Hopkins University. I hold a bachelor's degree in physics from St. Lawrence University, a master's degree in public health from Tulane University, and a PhD in environmental engineering from John Hopkins University.

15. My curriculum vitae is attached as Exhibit C.

**Bradley A. Woodruff, MD, MPH**

16.  I, Bradley A. Woodruff, am a physician and medical epidemiologist. I currently work as a consultant for UNICEF, WHO, WFP, and other United Nations agencies. I have faculty appointments at the Rollins School of Public Health of Emory University and several other schools of public health worldwide.

17. I studied medicine at Upstate Medical Center in Syracuse, New York and public health at the Johns Hopkins School of Hygiene and Public Health.

18. I worked for the CDC for 20 years, from 1987 to 2007. For most of my career at CDC, I worked in the fields of communicable disease, specifically diarrheal disease, viral hepatitis, and refugee health. During the last 4 years, I worked in the field of nutrition and nutritional status assessment.

19. I have received many awards during my career, including the Charles C. Shepard Award for Outstanding Scientific Contribution to Public Health, the Secretary's Award for Distinguished Service, and several US Public Health Service citations.

20. I have authored or co-authored more than 75 publications in biomedical journals and several major reports and book chapters.

21. My curriculum vitae is attached as Exhibit D.

**The CDC Order's Inconsistency with Public Health Practice**

22. In our opinion, the proposition that the March 20th CDC Order should be used to expel families seeking asylum is not logical or consistent with public health practice or epidemiological evidence.

23. Our understanding is that the vast majority of asylum seekers coming to the Southwest border pass through Mexico.  Mexico is therefore the place of their likeliest exposure to COVID-19 before coming to the United States.

24. At this time, the prevalence of COVID-19 in Mexico is lower than in the United States itself.  At the time of this declaration, the recorded incidence in Mexico has been lower than in the United States for the entire outbreak, and less than one-fourth the rate over the last week and month.[1]  The fact that Mexico has a lower rate of infection than the United States is confirmed by sero-prevalence studies, which use blood tests to measure the

---

[1] *See Mexico*, Johns Hopkins University of Medicine, Coronavirus Resource Center, https://coronavirus.jhu.edu/region/mexico (last visited Feb. 1, 2021); *United States*, Johns Hopkins University of Medicine, Coronavirus Resource Center, https://coronavirus.jhu.edu/region/united-states (last visited Feb. 1, 2021).

percentage of the population that has previously been infected.  Because the proportion of the Mexican population that has been infected with SARS-CoV-2 is lower than that of the United States population, the lower incidence of COVID-19 in Mexico is unlikely to be merely an artifact of lower testing rates.[2]

25. Thus, the idea that these individuals create a risk or threat to the health of U.S. residents or officials ignores the likelihood that, currently, U.S. residents probably face greater risks from *other U.S. residents* than from the average person coming to the U.S.-Mexico border.

26. The CDC Order also irrationally distinguishes between asylum seekers without documentation and numerous categories of other individuals who pose just as much risk of spreading COVID-19.  For examples, thousands of truck drivers and other individuals are allowed across the border each day without testing or quarantine, and they then travel to the interior to communities in the United States.  Families like the class members in this case likely pose no more risk of spreading COVID-19 than these truck drivers, and given the lower incidence in children, perhaps on average pose less risk of being infectious or requiring medical care within the United States.

27. If such families can be processed quickly at the border and released to sponsors in the United States, they would create little or no more risks of inducing infection than the thousands of individuals passing the border each day.

28. It is also our view that, to the extent that families may need to be temporarily detained at congregate facilities, risks of infection can be substantially mitigated if such facilities operate at reduced capacity, such that families are able to socially distance and reside in separate rooms.  Such risks can be further reduced if staff or families are vaccinated.

29. Several technical advances, such as improved COVID-19 tests and an announced Johnson & Johnson single-dose vaccine, all suggest that the burden and risks of accepting asylum seeking families are only likely to decrease over time.

I, Sharmila Shetty, declare under penalty of perjury of the laws of the State of New York and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 4, 2021 in Massapequa Park, New York.

_____

SHARMILA SHETTY

_____

[2] *See* Natalia Martinez-Acuña et al., *Seroprevalence of anti-SARS-COV-2 antibodies in blood donors from Nuevo Leon state, Mexico, during the beginning of the COVID-19 pandemic*, MedRxiv (Nov. 30, 2020), https://www.medrxiv.org/content/10.1101/2020.11.28.20240325v1.

I, Stephen Patrick Kachur, declare under penalty of perjury of the laws of the State of New York and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 3, 2021 in New York, New York.

_____
STEPHEN PATRICK KACHUR


I, Leslie Roberts, declare under penalty of perjury of the laws of the State of New York and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 3, 2021 in Cincinnatus, New York.

_____
LESLIE ROBERTS


I, Bradley A. Woodruff, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.
Executed on December 1, 2020 in Victoria, British Columbia, Canada.

Executed on February 3, 2021 in Victoria, British Columbia, Canada.

_____
BRADLEY A. WOODRUFF

# Exhibit A

**CURRICULUM VITAE**
**SHARMILA SHETTY, M.D.**
70 Harbor Lane, Massapequa Park, NY 11762
Phone: 443-854-3343
Email: sharmshetty@gmail.com

**EDUCATION**

| | |
|---|---|
| Barnard College, Columbia University, New York, NY | Sept 1988 - May 1992 |
| Degree: B.A. Asian Studies (cum laude) | |
| | |
| Mount Sinai School of Medicine, New York, NY | July 1992 - May 1996 |
| Degree: M.D. | |

**PROFESSIONAL TRAINING**

| | |
|---|---|
| North Shore University Hospital, Manhasset, N.Y. | July 1996 - June 1997 |
| Department of Pediatrics, Internship (PGY1) | |
| | |
| North Shore University Hospital, Manhasset, N.Y. | July 1997 - June 1999 |
| Department of Pediatrics, Residency (PGY 2-3) | |
| | |
| Centers for Disease Control and Prevention (CDC), Atlanta, GA | July 2002 - June 2004 |
| Epidemic Intelligence Service Fellowship | |

**PROFESSIONAL EXPERIENCE**

**Medical Epidemiologist**                                           Nov 2020- present
**COVID-19 Congregate Settings Investigation and Response Unit**
**New York City Department of Health and Mental Hygiene**
*New York, NY*

- Lead case investigations for COVID-19 in residential congregate settings
- Develop guidance documents and educational resources related to management of COVID-19 in congregate residential facilities
- Provide relevant infection prevention and control guidance and support based on current scientific knowledge and agency recommendations

**Medical Epidemiologist**                                           May 2015-Nov 2020
**Emergency Response and Recovery Branch, Centers for Disease Control and Prevention (CDC)**
*Atlanta, Georgia, USA*

- Deputy for Clinical Team on domestic COVID-19 Response as part of Emergency Operations Center activation
- Medical epidemiologist on Clinical On-Call Center, providing guidance to health

care providers over the phone with clinical queries on COVID-19
- CDC preparedness team lead in Kisangani, DRC during 2019-2020 Ebola outbreak
- CDC team lead for Cyclone Idai response in Beira, Mozambique
- CDC Ebola preparedness coordinator in Juba, South Sudan
- Polio response coordinator for UNICEF in Papua New Guinea
- Technical Advisor to UNHCR on roll out of Health Information System in Cox's Bazar, Bangladesh as part of the Rohingya refugee crisis
- Co-lead for CDC on the Health Emergencies Preparedness Initiative with UNICEF
- Chief Science Officer for CDC's Incident Management System for Hurricane Matthew Response in Haiti
- Liaison to Pan American Health Organization during Hurricane Matthew Response in Haiti
- Technical Advisor to UNHCR on immunization services evaluation tools
- Technical Advisor for Guinea Country Team Ebola Response
- Epidemiology Team Lead for CDC Ebola response in Sierra Leone
- Team lead for response to flooding in Freetown, Sierra Leone
- Technical advisor to UNHCR on a cholera outbreak in Dadaab refugee camp in Dadaab, Kenya
- Team lead for response to humanitarian crisis in Northeast Nigeria

**Medical Epidemiologist, Medecins sans Frontieres**          March 2014-Sept 2014
*Yangon, Myanmar*

- Supervised team to ensure data quality and data management in a long-running HIV project in Dawei, Myanmar
- Developed proposals and protocols for research projects
- Evaluated current data collection systems and provided recommendations to the project for streamlining
- Assisted in the development of data monitoring and evaluation guidelines for the project

**Medical Epidemiologist**                                September 2009-February 2014
**Immigrant, Refugee and Migrant Health Branch, Centers for Disease Control and Prevention (CDC)**
*Atlanta, Georgia, USA*
- CDC team lead for Horn of Africa crisis in Dadaab refugee camp, Kenya
  - Managed and analyzed data on measles cases and provided weekly reports and recommendations to health partners to help manage the epidemic
  - Monitored surveillance data for cholera and shigella and trained health workers on cholera prevention and preparedness
  - Provided recommendations to improve quality of mortality and diseases of outbreak potential reporting

App. 255

- Co-principal investigator of a multi-state epidemiologic investigation of an outbreak of suicides among U.S.-resettled Bhutanese refugees
  - Led a team of three EIS Officers, staff and multiple students in the design and implementation of a representative cross-sectional survey to identify risk and protective factors for suicide among resettled Bhutanese refugees in seven U.S. cities
  - Acted as CDC liaison between state refugee health programs, state epidemiologists, Office of Refugee Resettlement, and refugee resettlement agencies in all cities of the investigation
- Led an investigation of Vaccine Coverage and Timing among US-Born Somali Children and Vaccine Knowledge, Attitudes, and Perceptions among Somali Parents
- Provided technical assistance on the medical management of unaccompanied Haitian orphans following the 2010 Haiti earthquake to the HHS/Office of Refugee Resettlement/Division of Unaccompanied Children Services, during a one-month emergency detail.
- Created recommendations for the medical screening of Haitian orphans following the 2010 Haiti earthquake
- Conducted a survey of Haitian adoptee parents and medical providers on the health of Haitian adoptees following the 2010 Haiti earthquake
- Assisted in the development of CDC domestic refugee medical screening guidelines
- Participated in Refugee Vaccine Working Group to provide vaccine recommendations  for U.S.-bound refugees
- Led and coordinated efforts between CDC and U.S. adoption specialty clinics to design and implement a surveillance system for international adoptee health
- Coordinated efforts between CDC and the Association of Refugee Health Coordinators to design a surveillance system for domestic refugee health medical screening
- Conducted evaluations of panel physicians who perform the required medical examinations for immigrants and refugees to assess their capacity to implement updated tuberculosis screening requirements in Guatemala, China, Ethiopia, DRC and Congo-Brazzaville.
- Served as project manager for *Enhancing Partnerships in Refugee Health*, a collaboration between the Association of Refugee Health Coordinators and the Association of State and Territorial Health Officials
- Served as project manager for Harvard Opinion Research Poll project, coordinating and managing a team conducting opinion polls on public perception of non-pharmaceutical interventions related to H1N1 influenza
- Developed an H1N1 influenza preparedness plan for US-bound refugees

**Medical Epidemiologist, The Hib Initiative**                    January 2007- July 2009
*Johns Hopkins Bloomberg School of Public Health, Baltimore, MD USA*
The Hib Initiative, a highly successful global vaccine initiative to accelerate adoption of
*Haemophilus influenzae* type b (Hib) vaccine in low income countries

- Lead epidemiologist for the Southeast Asia region
  - Provided technical assistance in preparing country comprehensive multi-year plans and GAVI country applications for new vaccine funding support

  - Conducted monitoring and evaluation of research and surveillance activities related to Hib disease burden by reviewing quarterly technical reports
  - Provided regular assessment and recommendations through site visits in target countries

- India strategy team lead, guiding policy strategy development and implementation of Hib vaccine introduction in India

  - Analyzed and synthesized epidemiologic data, guidelines, and other research to support policy development of Hib vaccine introduction

  - Led coordination activities between Hopkins team and Indian Ministry of Health, WHO, UNICEF and other stakeholders to facilitate issues around preparation of policy development, GAVI application and vaccine introduction

  - Provided technical backstopping for WHO and Indian Ministry of Health regarding technical issues around Hib disease burden and Hib vaccine

  - Assisted in planning and implementation of pneumonia advocacy workshop for Indian academics and policy-makers
- Reviewed all research and surveillance project proposals and advised upon technical content
- Developed a monitoring and evaluation system for all Hib Initiative research and surveillance projects
- Liaised with WHO HQ and regional officers to develop regional workplans for new vaccines
- Assisted in development of Hib Initiative workplan and budgets
- Supplied technical oversight for a wide range of global, regional and country level communication and advocacy materials, including press releases and fact sheets for more than 30 countries
- Represented Hib Initiative at various global and regional meetings and disseminated information on Hib disease and vaccine to various stakeholders
- Provided technical expertise in evaluating immunization system effects post introduction of Hib vaccine

**Senior Health Delegate, American Red Cross**          October 2005- October 2006
*Tsunami Recovery Program, Banda Aceh, Indonesia*
- As part a five-year relief and recovery project following the catastrophic 2004 tsunami, developed and managed a multi-million dollar portfolio of comprehensive health programs
  - Conducted health assessments of internally displaced persons camps to

            determine health needs
- o Designed a community health project, Community Based First Aid, which trained local Red Cross volunteers in Aceh Province in communicable diseases, hygiene practices, disaster management, and first aid skills to be used in the community
- o Developed a comprehensive proposal for an avian influenza public education campaign to be conducted by local Red Cross volunteers
- o Organized and mobilized local Red Cross volunteers to participate in a malaria bed net distribution campaign
- o Designed a proposal to support the health and water sanitation needs of internally displaced persons in Aceh province
- Led American Red Cross activities as part of the Measles Initiative in organizing a nationwide measles vaccination campaign in Indonesia, which ultimately reached 31 million children
  - o Represented American Red Cross in Measles Task Force and Inter Agency Coordination Committee (ICC) meetings
  - o Designed and implemented a social mobilization program for local Red Cross volunteers in support of measles vaccination campaign
  - o Provided on-the-ground technical oversight to monitoring and evaluation of an integrated measles vaccination campaign in Bengkulu province, Sumatra
  - Served as team health advisor and disseminated information to staff regarding relevant health issues

**Consultant, International Rescue Committee**         July 2005
*West Bank and Gaza Strip*
- Conducted an assessment of health services by interviewing government members, UN agencies and local and international health organizations regarding health needs of the Palestinian population
- Led focus groups with vulnerable populations
- Provided comprehensive assessments of  local health centers

**Medical supervisor, Mygoma orphanage**      August 2004 - December 2004
**Medecins sans Frontieres**
*Khartoum, Sudan*
- Supervised team of 3 doctors and 26 nurses to provided inpatient pediatric care in a large urban orphanage of 320 children
- Provided training and mentorship to doctors and nurses in general pediatric and neonatal care
- Supervised the pharmacist regarding drug consumption, and implemented measures to prevent wastage

**Epidemic Intelligence Service Officer**      July 2002 - June 2004
*Mycotic Diseases Branch,*

*Centers for Disease Control and Prevention (CDC),*
*Atlanta, Georgia, USA*
Fellowship in applied epidemiology

- Investigation of an outbreak of *Candida parapsilosis*
  - Led a CDC team investigating an outbreak of bloodstream infections in a Denver community hospital
  - Designed and conducted a case-control and cohort study to determine risk factors for illness
  - Performed data analysis and presented findings at a national meeting
- Investigation of outbreak of Histoplasmosis, Nebraska
  - Led a team to investigate source for illness among workers in a large industrial plant
  - Designed and conducted a case-control and cohort study to identify risk factors for disease
  - Acted as liaison between State Health Dept., CDC and plant officials
- Study of Cryptococcosis Among AIDS Patients in Gauteng, South Africa
  - Performed an evaluation of a surveillance system for cryptococcosis
  - Designed and conducted a follow-up study to determine outcomes and compliance with secondary prophylaxis among AIDS patients with cryptococcosis
  - Supervised local staff in data collection and conducting interviews
  - Performed data collection and data analysis
- Integrated Disease Surveillance Review, Kenya
  - Led a team to assess disease surveillance activities in Kakamega District, Kenya
  - Presented findings and provided recommendations at a national stakeholders meeting
- Nationwide Measles Vaccination Campaign, Liberia
  - Provided technical assistance and guidance to public health officials and non-governmental organizations in micro planning and implementation of vaccination campaign
  - Monitored and evaluated ongoing vaccination campaigns in various counties
  - Participated in weekly meetings with Ministry of Health, WHO, and non-governmental organizations to communicate status of campaign
- Yellow Fever outbreak, Bong County, Liberia
  - Conducted case finding among internally displaced persons camp
  - Participated in meetings with Ministry of Health and other organizations to develop strategy for vaccinations
- Analyzed data from the National Nosocomial Infection Surveillance System and described the epidemiology of Neonatal Candida Bloodstream Infections among High Risk Nurseries in the U.S. for presentation at national meeting
- Performed data analysis of a risk factor study of neonatal candidemia in Baltimore, Maryland, and published findings in peer reviewed journal
- Designed protocol and survey instrument to Assess Current Candida Sepsis

Prevention Programs Among U.S. Neonatal Intensive Care Units

**Medical supervisor of Pediatric ward, Bundibugyo Hospital,**   Dec 2001 - Apr 2002
**Medecins sans Frontieres**
*Bundibugyo, Uganda*
- Provided inpatient pediatric care for internally displaced population in a remote district hospital in a post conflict setting
- Supervised pediatric department and staff of 10 nurses and 2 medical officers
- Managed patient care and running of a therapeutic feeding center

**Adjunct Assistant Clinical Professor of Pediatrics**   July 2000 - Nov 2001
**Department of Pediatrics, Bronx Lebanon Hospital Center**
*New York, USA*
- Provided clinical care in Emergency Department and outpatient clinics in a large, urban private hospital
- Supervised and precepted cadre of pediatric residents

**Pediatrician, Medecins sans Frontieres**   Dec 1999 - Apr 2000
*Hamshari Hospital, Saida, Lebanon*
- Assisted in the establishment of a pediatric department for a large refugee camp hospital for Palestinian refugees
- Provided inpatient pediatric care alongside local doctors and nurses and trained them in pediatric management
- Designed syllabus and taught a semester long training in pediatrics for an ICU Nursing course

**PROFESSIONAL ACTIVITIES**
Member of the Board of Directors   September 2017-present
Vedanta Center of Atlanta

Member of the Board of Directors   June 2007-June 2010
Doctors Without Borders/Medecins sans Frontieres USA

Member of the Board of Directors   June 2012-Jan 2014
Sagal Radio Services, radio station for refugees and new Americans

Volunteer pediatrician at the Dekalb County Board   October 2010-Feb 2014
Of Health Pediatric Refugee Clinic

Volunteer for Medecins sans Frontieres Peer Support Network;   2000- present
Provide support and counseling for returned field volunteers

Volunteer for the Asylum Network of Physicians for Human Rights;   2000-2004
Perform physical exams on victims of torture and wrote medical affidavits

**HONORS AND AWARDS**

<u>Public Health Service Awards:</u>

| | |
|---|---|
| Unit Commendation, Exceptional service in successful control of a measles outbreak among Burmese refugees from Malaysia | 2012 |
| Outstanding Unit Citation, 2010 Haiti Earthquake Response Team | 2011 |
| Commissioned Corps training Ribbon | 2011 |
| Outstanding Unit Citation, CDC H1N1 Task Force | 2010 |
| Crisis Response Service Award, Haiti Earthquake Response Mission | 2010 |
| Outstanding Unit Citation, SARS Response Team | 2005 |

<u>Non- Public Health Service Awards:</u>

| | |
|---|---|
| CDC-ATSDR Honor Award for Excellence in Emergency Response-International | 2012 |
| CDC DGMQ Exceptional Partnerships Award | 2012 |
| CDC NCEZID Award for Haiti earthquake response | 2011 |
| CDC NCEZID Award for outstanding development of a web portal for health information for international adoptions | 2011 |
| CDC NCEZID Award for excellence in partnering to strengthen public health activities and CDC's role regarding TB control among international  adoptees | 2010 |
| CDC NCEZID Award for exemplary service as chairman of the board of MSF-USA | 2010 |
| Graduated cum laude, Barnard College | 1992 |

**PUBLICATIONS**

Bermúdez-Aza EH, **Shetty S**, Ousley J, Kyaw NTT, Soe TT, Soe K, et al. (2018) Long-term clinical, immunological and virological outcomes of patients on antiretroviral therapy in southern Myanmar. PLoS ONE 13(2): e0191695. https://doi.org/10.1371/journal.pone.0191695

Ao T, **Shetty S**, Sivilli T, Blanton C, Ellis H, Geltman P, Cochran J, Taylor E, Lankau E, Lopes Cardozo B. Suicidal Ideation and Mental Health of Bhutanese Refugees in the United States. J Immigrant Minority Health. 2015 Dec; DOI 10.1007/s10903-015-0325-7

Hagaman A, Sivilli T, Ao T, Blanton C, Ellis H, Lopes Cardozo B, **Shetty S**. An Investigation into Suicides among Bhutanese Refugees Resettled in the United States between 2008 and 2011. Journal of Immigrant and Minority Health; 2016 Aug;18(4):819-27.

Taylor E, Painter J, Posey D, Zhou W, **Shetty S.** Latent Tuberculosis Infection Among

Immigrant and Refugee Children Arriving in the United States, 2010. Journal of Immigrant and Minority Health; 2015 Sep 12.

Kyaw NT, Harries AD, Chinnakali P, Antierens A, Soe KP, Woodman M, Das M, **Shetty S**, Zuu MK, Htwe PS, Fernandez M. Low Incidence of Renal Dysfunction among HIV-Infected Patients on a Tenofovir-Based First Line Antiretroviral Treatment Regimen in Myanmar. PLoS One. 2015 Aug 24;10(8):e0135188. doi: 10.1371/journal.pone.0135188. eCollection 2015.

Scott KC, Taylor EM, Mamo B, Herr ND, Cronkright PJ, Yun K, Altshuler M, **Shetty S**. Hepatitis B screening and prevalence among resettled refugees - United States, 2006-2011. Centers for Disease Control and Prevention (CDC). MMWR Morb Mortal Wkly Rep. 2015 Jun 5;64(21):570-3.

Ellis BH, Lankau EW, Ao T, Benson MA, Miller AB, **Shetty S**, Lopes Cardozo B, Geltman PL, Cochran J. Understanding Bhutanese refugee suicide through the interpersonal-psychological theory of suicidal behavior. Am J Orthopsychiatry. 2015 Jan;85(1):43-55.

Cuffe K, Stauffer W, Painter J, **Shetty S**, Montour J, Zhou W. Update: vitamin B12 deficiency among Bhutanese refugees resettling in the United States, 2012. Centers for Disease Control and Prevention (CDC). MMWR Morb Mortal Wkly Rep. 2014 Jul

Shah AY, Suchdev PS, Mitchell T, **Shetty S**, Warner C, Oladele A, Reines S. Nutritional status of refugee children entering DeKalb County, Georgia. J Immigr Minor Health. 2014 Oct;16(5):959-67. doi: 10.1007/s10903-013-9867-8.

Vonnahme L, Lankau E, Ao T, **Shetty S,** Lopes Cardozo B. Factors Associated with Symptoms of Depression Among Bhutanese Refugees in the United States. Journal of Immigrant and Minority Health 2014; (16) 5:773.

Navarro-Colorado C, Mahamud A, Burton A, Haskew C, Maina G, Wagacha J, Ahmed J, **Shetty S**, Cookson S, Goodson J, Schilperoord M, Spiegel P. Measles Outbreak Response Among Adolescent and Adult Somali Refugees Displaced by Famine in Kenya and Ethiopia, 2011. Journal of Infectious Diseases 2014; doi: 10.1093/infdis/jiu395.

Mahamud A, Burton A, Hassan M, Ahmed J,  Wagacha J, Spiegel P, Haskew C, Eidex R, **Shetty S**, Cookson S, Navarro-Colorado C, Goodson J.  Risk Factors for Measles Mortality Among Hospitalized Somali Refugees Displaced by Famine, Kenya, 2011. Clinical Infectious Diseases 2013;57(8):e160 – 6.

Park B, **Shetty S,** Ahlquist A, et al. Long-term Follow-up and Survival of Antiretroviral-Naïve Patients with Cryptococcal Meningitis in the pre-Antiretroviral Therapy Era, Gauteng Province, South Africa. International Journal of STD & AIDS. 2011; 22: (4) 199–203.

Ojo LR, O'Loughlin RE, Cohen AL, Loo JD, Edmond KM, **Shetty SS**, Bear AP, Privor-Dumm L, Griffiths UK, Hajjeh R. Global use of Haemophilus influenzae type b conjugate vaccine. Vaccine. 2010 Oct 8; 28(43):7117-22.

O'Loughlin RE, Edmond K, Mangtani P, Cohen AL, **Shetty S,** Hajjeh R, Mulholland K. Methodology and Measurement of the Effectiveness of Haemophilus influenzae type b. Vaccine: Systematic Review. Vaccine. 2010 Aug 31; 28 (38):6128-36.

**Shetty S,** Cohen AL, Edmond K, Ojo L, Loo J, O'Loughlin R, Hajjeh R.
A systematic review and critical evaluation of invasive Haemophilus influenzae type B disease burden studies in Asia from the last decade: lessons learned for invasive bacterial disease surveillance. Pediatr Infect Dis J. 2010 Jul; 29 (7):653-61.

Ojo LR, O' Loughlin R, Cohen AL, **Shetty S**, et al.  Progress Toward Introduction of *Haemophilis influenzae* type b Vaccine in Low-Income Countries- Worldwide, 2004-2007.  MMWR 2008 Feb 15; 57(6): 148-151.

Fridkin SK, Kaufman D, Edwards JR, **Shetty S**, Horan T. Changing incidence of Candida bloodstream infections among NICU patients in the United States: 1995-2004. Pediatrics. 2006 May;117(5):1680-7.

**Shetty S**, Harrison L, Taylor T, Mirza S, Bustamante A, Thompson L, Schutt K, Hajjeh R, Fridkin S. Evaluating Risk Factors for Candidemia  among Newborn Infants from Population-Based Surveillance-- Baltimore, Maryland, 1998-2000. Pediatric Infectious Disease Journal. 24(7):601-604, July 2005.

An Outbreak of Histoplasmosis Among Industrial Plant Workers-- Nebraska, 2004; MMWR 2004, 53 (43); 1020-1022.

**PRESENTATIONS**

Refugees and Displaced Populations in the 21st Century-    November 2016
a Health Perspective.
Plenary speaker, Midwest Global Health Conference
Lexington, KY

An Investigation of Suicides Among Bhutanese Refugees in the    June 2012
United States, 2009-2012: Preliminary Findings.
Oral presentation, North American Refugee Healthcare Conference
Rochester, NY

CDC's Role in Overseas Refugee Processing.    May 2011
Oral presentation, ASTHO/ARHC Enhancing Partnerships in

Refugee Health Conference, Washington DC

| | |
|---|---|
| The CDC's Role in Inter-country Adoption.<br>Oral presentation, The Joint Council on International Children's<br>Services Annual Conference, New York, NY | April 2011 |

| | |
|---|---|
| Compliance with Fluconazole Secondary Prophylaxis (SP) Among<br>AIDS Patients with Cryptococcosis--Gauteng Province,<br>South Africa, 2003-2004.<br>Poster presentation, 53rd Annual Epidemic Intelligence Service (EIS) Conference,<br>Atlanta, Georgia | April 2004 |

| | |
|---|---|
| The Epidemiology of Neonatal Candida Bloodstream Infections<br>among High Risk Nurseries in the U.S., 1995-2003.<br>Poster presentation, Society for Healthcare Epidemiology of America (SHEA)<br>14th Annual Scientific Meeting, Philadelphia, Pennsylvania | April 2004 |

| | |
|---|---|
| A Nosocomial Outbreak of *Candida parapsilosis* Bloodstream<br>Infections Denver, Colorado, September 2002.<br>Oral presentation, 52nd Annual Epidemic Intelligence Service (EIS) Conference,<br>Atlanta, Georgia | April 2003 |

| | |
|---|---|
| A Nosocomial Outbreak of *Candida parapsilosis* Bloodstream<br>Infections Denver, Colorado, Sept 2002.<br>Poster presentation, Infectious Disease Society of America,<br>San Diego, California | October 2003 |

| | |
|---|---|
| Risk Factors for Candidemia among Infants—<br>Baltimore, MD, 1998-2000.<br>Poster presentation, Infectious Disease Society of America,<br>San Diego, California | October 2003 |

**CITIZENSHIP**          USA

**LANGUAGES**          English, conversational French and Hindi

**REFERENCES**          available upon request

# Exhibit B

**S. Patrick Kachur, MD, MPH, FACPM, FASTMH**
Heilbrunn Department of Population and Family Health
Mailman School of Public Health, Columbia University Irving Medical Center
60 Haven Avenue, Suite B-2
New York, NY 10032
+1-212-304-5234
patrick.kachur@columbia.edu

**Date of Preparation:** 01 June 2020

Academic Appointments/ Work Experience
_____

| | | |
|---|---|---|
| 06/2018—Present | **Heilbrunn Department of Population and Family Health** **Mailman School of Public Health** **Columbia University Irving Medical Center** *Professor* **Advancing Research on Community Health Systems (ARCHES)** *Director* **Program on Forced Migration and Health** *Faculty Member* | New York, NY |
| 05/2011—05/2018 | **Malaria Branch, Center for Global Health** **Centers for Disease Control and Prevention** *Branch Chief* | Atlanta, GA |
| 01/2016—05/2016 | **Center for Global Health** **Centers for Disease Control and Prevention** *Acting/ Interim Principal Deputy Director* | Atlanta, GA |
| 12/2006—05/2011 | **Strategic and Applied Sciences Unit** **Malaria Branch, Center for Global Health** **Centers for Disease Control and Prevention** *Founding Unit Chief/ Team Lead* | Atlanta, GA |
| 09/2002—12/2006 | **CDC/ Ifakara Health Institute Malaria Program in Tanzania** **National Center for Zoonotic and Vector-Borne Diseases** **Centers for Disease Control and Prevention** *Director* | Dar-es-Salaam, TANZANIA |
| 06/1995—09/2002 | **Malaria Branch, National Center for Infectious Diseases** **Centers for Disease Control and Prevention** *Medical Epidemiologist* | Atlanta, GA |

Post Doctoral Training
_____

| | | |
|---|---|---|
| 07/1993—06/1995 | **Division of Violence Prevention,** **National Center for Injury Prevention and Control** **Centers for Disease Control and Prevention** *Epidemic Intelligence Service Officer* | Atlanta, GA |
| 07/1991—06/1993 | **Johns Hopkins University School of Hygiene and Public Health** *General Preventive Medicine Resident* | Baltimore, MD |
| 07/1990—06/1991 | **Mary Imogene Bassett Hospital** **Columbia University College of Physicians and Surgeons** *Transitional and Preliminary Internal Medicine Intern, PGY-1* | Cooperstown, NY |

SP Kachur

| | | |
|---|---|---|
| 07/1988—05/1989* | **Department of Community Medicine, University of Ilorin** **American Medical Student Association Foundation** *International Health Fellow* | Ilorin, NIGERIA |

Education
_____

| | | |
|---|---|---|
| 07/1991—05/1992 | **Johns Hopkins University School of Hygiene and Public Health** **Department of Epidemiology** MPH, May 1992 | Baltimore, MD |
| 06/1985—05/1990* | **Northeastern Ohio Universities College of Medicine** MD, May 1990 | Rootstown, OH |
| 05/1982—05/1990* | **Kent State University, College of Arts and Sciences** BS *cum laude*, May 1990 | Kent, OH |

**\*Explanation of training dates from 05/1982 to 05/1990:**
I completed a combined BS/MD degree program and both degrees were awarded in May of 1990.  In addition, I
participated in a 10 month international health fellowship from July 1988 to May 1989.

Licensure and Board Certification
_____

| | | |
|---|---|---|
| 09/1991—09/2020 | **Maryland Board of Physicians** | Medical License |
| 05/1995--lifetime | **American Board of Preventive Medicine** | Diplomate |

Honors
_____

| | | |
|---|---|---|
| 10/2019 | ***Zisung*** (Honorary Title: Chief of Peace) Bogunaayili Village | Northern Region, GHANA |
| 09/2019 | **Watanakunakorn Lecture** | Northeast Ohio Medical University |
| 09/2018 | **Distinguished Alumni Award** | Northeast Ohio Medical University |
| 06/2018 | **William C Watson Jr Medal of Excellence** *CDC's Highest Service Award* | Centers for Disease Control and Prevention |
| 06/2017 | **Leverhulme Lecture and Medal** | Liverpool School of Tropical Medicine (UK) |
| 12/2016 | **Outstanding Unit Citation**—West Africa Ebola Response | US Public Health Service |
| 11/2014 | **Fellow** | American Society of Tropical Medicine and Hygiene |
| 09/2010 | **Outstanding Unit Citation**—Novel H1N1 Influenza | US Public Health Service |
| 09/2010 | **Outstanding Unit Citation**—President's Malaria Initiative | US Public Health Service |
| 03/2008 | **Meritorious Service Medal**—Malaria Control in Tanzania | US Public Health Service |
| 09/2004 | **Commendation Medal**—Malaria Research in Africa | US Public Health Service |
| 04/2004 | **Fellow** | American College of Preventive Medicine |
| 07/1997 | **Secretary's Award for Distinguished Service**—Global guinea worm eradication | US Department of Health and Human Services |
| 07/1997 | **Secretary's Award for Distinguished Service**—Oklahoma City Bombing Injury Investigation | US Department of Health and Human Services |
| 03/1996 | **Outstanding Unit Citation**—Suicide Prevention in US | US Public Health Service |

2

SP Kachur

| 11/1995 | *Atunluse Tokunbo* (Honorary Title: Benefactor), Gbodi Village | Kwara State, NIGERIA |
| 08/1994 | **Citation Medal**—School-associated Violent Deaths Study | US Public Health Service |
| 05/1990 | **Dixon V Burns Award for Human Values in Medicine**—Charter recipient | Northeastern Ohio Universities College of Medicine |
| 03/1990 | **Alpha Omega Alpha** | Northeastern Ohio Universities College of Medicine |
| 06/1982 | **Distinguished Scholar/ Honors Scholar in Residence** | Kent State University |

## Professional Organizations, Societies and Service

### Memberships/ Positions

| 2020—2022 | **JGHS Commission on the mitigating the impact of COVID-19** | Member |
| 2018—present | **Consortium of Universities for Global Health** Network of Academic Advisors; Public Health Workforce Panel; Scientific Program Advisory Committee | Member, Advisor |
| 2018—present | **Health Systems Global** | Member |
| 2014—2019 | **European Society of Clinical Microbiology and Infectious Diseases** | Program Committee |
| 2011—2018 | **Malaria Elimination Group** | Member |
| 2008—present | **Roll Back Malaria Partnership Case Management Working Group** | Member, Co-Chair |
| 1998—present | **Royal Society for Tropical Medicine and Hygiene** | Member |
| 1996—present | **American Society of Tropical Medicine and Hygiene** and **ASTMH Committee on Global Health** Scientific Program Committee; Travel Award Committee | Member, Fellow |
| 1998—2009 | **American Public Health Association** | Member, Abstract Reviewer |

### Consultative

| 2020 | **Science Team, COVID-19 Epidemic Intelligence Unit, Resolve to Save Lives** | Technical Consultant |
| 2019—2023 | **"What's at stake in the fake? Indian pharamecuticals, African markets and global health" (Wellcome Trust)**:  University of Warwick, University of Witwatersrand and University of Amsterdam | Advisor |
| 2018—2019 | **UNITAID and WHO Call Reference 2018-12:  Better tools for integrated management of childhood fever** | Consultant Technical Expert |
| 2018—present | **Zanzibar Malaria Elimination Programme, Strategic Advisory Group** | Chair, Member |
| 2018 | **US National Institutes of Health Special Emphasis Panel on International Centers of Excellence for Malaria Research** | Member |
| 2018—present | **Board of Directors, Medical Care Development, Inc** International Programs Advisory Committee | Member, Chair |

3

| 2017—present | **World Health Organization Malaria Policy Advisory Committee** | Member |
|---|---|---|
| 2014—present | **US National Institutes of Health Study Section on Infectious Diseases, Reproductive Health, Asthma and Pulmonary Conditions** | Member, Reviewer |
| 2012—2018 | **World Health Organization Collaborating Center for Malaria Prevention and Control** | Technical Director, Investigator |

2009—2018     **Malaria Eradication Research Agenda Technical Panels**     Member
- Insecticide and antimalarial drug resistance
- Combining interventions and modeling
- Diagnosis and diagnostics
- Health systems and operations research

2007—present     **Bioko Island Malaria Elimination Program, Technical Advisory Group**     Member, Evaluation Consultant

2006—present     **World Health Organization Evidence Review Groups**     Member
- Low density malaria infections
- Mass drug administration and chemoprevention
- *Plasmodium vivax*
- Estimating global malaria burden
- Economics, financing and implementation of malaria control
- Antimalarial drug policy and access

1999—2008     **NetMark and NetMark Plus Projects, Technical Advisory Group**     Member

Editorial

| 2019—present | ***BioMed Central Health Services Research*** | Associate Editor |
|---|---|---|
| 2019—present | ***Journal of Global Health Science*** | Editorial Board |
| 2016—2017 | ***American Journal of Tropical Medicine and Hygiene*** | Supplement Editor |
| 2014—2018 | ***Case Studies in Infectious Diseases*** | Editorial Board |
| 2007—2018 | ***Malaria Journal*** | Associate Editor, Editorial Board |

4

SP Kachur

| | | |
|---|---|---|
| *ad hoc* reviewer | **Acta Tropica** | Manuscripts |
| | **American Academy of Pediatrics** *Red Book:  Report of the Committee on infectious Diseases* | |
| | **American Journal of Tropical Medicine and Hygiene** | |
| | **BioMed Central Public Health** | |
| | **Bulletin of the World Health Association** | |
| | **Emerging Infectious Diseases** | |
| | **Health Policy and Planning** | |
| | **JAMA** | |
| | **Lancet; Lancet Global Health; Lancet Infectious Diseases** | |
| | **New England Journal of Medicine** | |
| | **PLoS Medicine; PLoS Neglected Tropical Diseases;  PLoS One** | |
| | **Social Science and Medicine** | |
| | **Transactions of the Royal Society of Tropical Medicine & Hygiene** | |
| | **Tropical Medicine and International Health** | |
| | **American Public Health Association** | Abstracts |
| | **INDEPTH Network Annual Scientific Meeting** | |
| | **International Emerging Infectious Diseases Conference** | |
| | **Multilateral Initiative on Malaria** | |
| | **TEPHINET Global Scientific Conference** | |
| | **Bill and Melinda Gates Foundation** | Proposals |
| | **Fondation Botnar** | |
| | **UNITAID/ WHO** | |
| | **UK Medical Research Council** | |
| | **US Agency for International Development** | |
| | **US National Institutes of Health** | |
| | **Wellcome Trust** | |

Departmental and University Committees

| | | |
|---|---|---|
| 2020 | **Core Curriculum Evaluation Team:** Columbia University Mailman School of Public Health | Member |
| 2019—2020 | **Search Committee:**  Heilbrunn Department of Population and Family Health, Columbia University Mailman School of Public Health | Member |
| 2019—present | **Faculty Liaison Network**: National Academies of Sciences, Engineering and Medicine Action Collaborative on Preventing Sexual Harassment, Columbia University Irving Medical Center | Member |
| 2018—2021 | **Faculty Steering Committee**: Columbia Global Center \| Nairobi, Columbia University | Member |
| 2018—present | **Doctoral Committee:**  Heilbrunn Department of Population and Family Health, Columbia University Mailman School of Public Health | Member |
| 2017—2018 | **Selection Committee:** Director of CDC western Kenya field operations | Member |
| 2016—2017 | **Search and Selection Committee:** Principal Deputy Director, National Center for Immunizations and Respiratory Diseases | Member |
| 2015—2017 | **Annual Meeting Planning Committee**:  Center for Global Health | Member |
| 2008—2012 | **Awards Selection Committee:**  Center for Global Health | Representative |

5

| 2004—2015 | **Steering Committee**: Antimalarial Combination Therapy Consortium | Officer |
| 2003—2012 | **Executive Committee**: INDEPTH Network Effectiveness and Safety Studies Platform | Task Team Lead |
| 2003—2008 | **Steering Committee**: Improving access to malaria treatment in the Kilombero Valley | External Expert |

External Fellowship and Grant Support

| 2020 US$  107,397. | **Clinton Health Access Initiative:** Implementation of a malaria surveillance assessment in Benin | Principal Investigator |
| 2020—2022 US$  275,000. | **Fogarty International Center, US National Institutes of Health:** Effectiveness of the Diabetes Prevention Program in Urban Bamako, Mali: Small Steps, Big Rewards (primary: University of Sciences, Techniques and Technologies of Bamako) | Co-Investigator |
| 2019—2021 US$ 1,000,000. | **World Bank Group:** Specialized consultancy services to conduct analytical research on critical questions regarding forced displacement on the health sector | Co-Principal Investigator |
| 2019—2021 US$ 5,100,000. | **US Agency for International Development:** Developing Acute Care & Emergency Referral Systems: ACERS Project/ Ghana (primary: Catholic Relief Services) | Consultant |
| 2018—2021 US$ 8,100,000. | **Doris Duke Charitable Foundation, Inc:** A National Program for Strengthening the Implementation of the Community-based Health Planning and Services (CHPS) Initiative in Ghana: CHPS+ | Co-Principal Investigator |

Teaching/ Training Experience and Responsibilities

Specific Courses

| 2020—present | **Columbia University Mailman School of Public Health, NY, NY** Pandemic Control and Outbreak Response (pending approval) | Course Director |
| 2020 | **Columbia University Mailman School of Public Health, NY, NY** Confronting COVID: Science in Action at Mailman School | Course Moderator |
| 2020—present | **Columbia University Mailman School of Public Health, NY, NY** Applications of Implementation Science in Low- and Middle-Income Countries (P9620) | Instructor |
| 2019 | **Columbia University Mailman School of Public Health, NY, NY** Self, Social and Global Awareness Workshop | Facilitator |
| 2019 | **University of Minnesota, Twin Cities, Minneapolis, MN** Global Health Course | Lecturer |
| 2019—present | **Columbia University Mailman School of Public Health, NY, NY** Malaria Program Planning (P8654) | Instructor |
| 2019 | **Columbia University Mailman School of Public Health, NY, NY** Epidemiology of Infectious Diseases (P8406) | Lecturer |
| 2019 | **Columbia College, Columbia University, New York, NY** Fundamentals of Global Health (C3100) | Lecturer |
| 2018—present | **Columbia University Mailman School of Public Health, NY, NY** Advanced Methods in Global Health (P9652) | Lecturer |
| 2018 | **Harvard TH Chan School of Public Health, Cambridge USA** Science of Eradication--Malaria | Lecturer/ Resource |

SP Kachur

| | | |
|---|---|---|
| 2012—2018 | **Rollins School of Public Health, Emory University, Atlanta USA**<br>Malaria Prevention, Control and Treatment (GH 574) | Lecturer |
| 2006—2018 | **Centers for Disease Control and Prevention, Atlanta USA**<br>Introduction to Parasitology | Lecturer |
| 2016—2017 | **School of Public Health, Georgia State University, Atlanta USA**<br>Introduction to Global Health (PH 7600) | Lecturer |
| 2016 | **School of Public Health, Georgia State University, Atlanta USA**<br>Introduction to Public Health (PH 2000) | Lecturer |
| 2007—2010 | **Rollins School of Public Health, Emory University, Atlanta USA**<br>Global Perspectives in Parasitic Diseases (GH 516) | Lecturer |
| 1999—2002 | **Centers for Disease Control and Prevention, Atlanta USA**<br>STOP Polio Initiative Pre-Deployment Course | Lecturer |
| 1996—2000 | **Centers for Disease Control and Prevention, Atlanta USA**<br>Introduction to Parasitology | Course Coordinator |
| 1992—1993 | **College of Arts & Sciences, Johns Hopkins Univ., Baltimore USA**<br>Introduction to Public Health (AS 230) | Course Director |

<u>General Teaching Activities</u>

| | | |
|---|---|---|
| 1996—2018 | **Epidemiology Elective for Medical/ Veterinary Students**,<br>Centers for Disease Control and Prevention, Atlanta USA | Supervisor |
| 1995—2018 | **Epidemic Intelligence Service**, Centers for Disease Control and<br>Prevention, Atlanta USA | Supervisor |
| 2002—2003 | **International Health Program**, Rainbow Babies and Children's<br>Hospital, MetroHealth Medical Center and Case Western Reserve<br>University, Cleveland USA | Preceptor |
| 2000—2002 | **Enhanced Capacity Development Program for CDC Malaria**<br>**Collaborators**, Atlanta USA | Coordinator |
| 1998—2001 | **General Preventive Medicine Residency**, Emory University, Atlanta<br>USA | Supervisor |
| 1997—2000 | **Asian Collaborative Training Network for Malaria**, Bangkok,<br>THAILAND | Faculty and Curriculum<br>Committee |
| 1992 | **US Peace Corps**, Igbo-Ora, NIGERIA | Technical Training<br>Coordinator |

<u>PhD and Masters Theses Trainees</u>

| | | |
|---|---|---|
| 2018--2021 | **Heilbrunn Department of Population and Family Health,<br>Columbia University Mailman School of Public Health**—DrPH in<br>Leadership for Global Health and Humanitarian Systems<br>5 DrPH candidates | DrPH academic advisor |
| 2018—2020 | **Heilbrunn Department of Population and Family Health,<br>Columbia University School of Public Health**<br>10 MPH candidates | MPH academic advisor |
| 2011—2014 | **Department of Infectious Disease Epidemiology, Imperial College,<br>London UK**<br>Dr Bhargavi Rao: "Barriers to effectiveness—artemisinin<br>combination therapies and the health system." | PhD field advisor |
| 2006—2009 | **Department of Economics, Yale University, New Haven USA**<br>Dr. Achuyta Adhvaryu: "Essays on the adoption of new malaria<br>therapy in Tanzania." | PhD field advisor |

7

| | | |
|---|---|---|
| 2004—2010 | **Department of Anthropology, New York University, New York USA**<br>Dr René Gerrets: "Globalizing international health—the cultural politics of 'parntership' in Tanzanian malaria control." | PhD field advisor |
| 2003—2009 | **Department of Epidemiology and Public Health, Swiss Tropical and Public Health Institute, Basel SWITZERLAND**<br>Dr Rashid Khatib: "Malaria control dynamics in rural Tanzania—evaluation of the implementation of artemisinin-based combination therapy." | PhD field advisor |
| 2008—2009 | **Department of Global Health, Morehouse School of Medicine, Atlanta USA**<br>Dr Daniel Okenu:  "The impact of antimalarial combination therapy on the prevalence of malaria parasitemia and anemia in rural Tanzania." | MPH preceptor and examiner |
| 2008—2009 | **Department of Epidemiology, Emory University, Atlanta USA**<br>Ms Katia Bruxvoort: "Effect of insecticide-treated nets and indoor spraying on parasitemia and anemia in children under five." | MPH preceptor and examiner |
| 2007—2009 | **Department of Pediatric Infectious Diseases, Emory University, Atlanta USA**<br>Dr Julie Gutman: "Assessing the efficacy of sulfadoxine/ pyrimethamine (SP), the combination of SP + artesunate, and artemether-lumefantrine for uncomplicated malaria." | MSc mentor |
| 2001—2008 | **Department of Zoology, Sokoine Agricultural University, Morogoro TANZANIA**<br>Dr Allan Malisa: "The evolutionary dynamics of genetic determinants of *Plasmodium falciparum* resistance to sulfadoxine/ pyrimethamine in southeastern Tanzania." | PhD field advisor |
| 2005—2006 | **African Studies Program, Swiss Tropical Institute and University of Basel, Basel SWITZERLAND**<br>Ms Daria Czendlik:  "Malaria in pregnancy—risks, insecticide-treated nets and intermittent preventive treatment, a study in Rufiji District, Tanzania | MA mentor and external examiner |
| 2004—2006 | **Australian Centre for Economic Research on Health and Australian National University, Canberra AUSTRALIA**<br>Dr Masha Somi: "Vicious cycles between health and wealth: Evidence from the relationship between socioeconomic status and malaria in rural Tanzania." | PhD field advisor |
| 2004—2005 | **Department of Behavioral Science and Health Education, Emory University, Atlanta USA**<br>Ms Meklit Hailemeskal: "Health communication for optimizing antimalarial combination therapy for malaria treatment in Tanzania." | MPH preceptor and examiner |

8

SP Kachur

| | | |
|---|---|---|
| 2003—2008 | **Department of Public Health and Epidemiology, Karolinska Institute, Stockholm SWEDEN**<br>Dr Achuyt Bhattarai: "Impact of artemisinin combination therapy on the public health burden of malaria in the Zanzibar Archipelago."—INCOMPLETE | PhD field advisor (and proposed external examiner) |
| 1996—2003 | **Department of Health Promotion, Universtty of Maastricht, Maastricht, NETHERLANDS**<br>Dr Jane Alai: "Insecticide-treated bednets for malaria control—relevance for utilization in a western Kenyan community." | PhD field advisor |

PhD Examination- Advisory- and Defense Committees

| | | |
|---|---|---|
| 2019—2021 | **Department of Environmental Health Sciences, Columbia University Mailman School of Public Health, New York, NY**<br>Mr Israel U Ukawuba:  "Forecasting malaria incidence from climate data in Rwanda" | PhD Committee |
| 2019—2021 | **Department of Population and Family Health, Columbia University Mailman School of Public Health, New York, NY**<br>Dr Hana Thomas:  "Acute Care and Emergency Referral Strengthening (ACERS): Improving Emergency Obstetrical and Neonatal Quality of Care in Ghana" | PhD Committee; faculty sponsor |
| 2020 (expected) | **Dept. of Public Health, the Open University, Milton Keynes UK**<br>Beatrice Amboko: "Trends and determinants of the quality of outpatient malaria case-management in Kenya." | External Examiner |
| 2019 | **Department of Environmental Health Sciences, Columbia University Mailman School of Public Health, New York, NY**<br>Dr Alexandra K Heaney: "Forecasting childhood diarrhea and environmental drivers in Botswana" | PhD Committee |
| 2019 | **Department of Epidemiology, Columbia University Mailman School of Public Health, New York, NY**<br>Dr Beth Rubenstein: "Microcredit, temptation spending and health outcomes in Indonesia: a longitudinal evaluation" | PhD Committee |
| 2017 | **Dept. of Public Health, the Open University, Milton Keynes UK**<br>Dr George Okello: "Producing malaria indicators through District Health Information Software 2." | External Examiner |
| 2016 | **Department of Public Health and Caring Sciences, Uppsala University, Uppsala SWEDEN**<br>Dr Emily White Johansson: "Beyond 'test and treat'—malaria diagnostic test use, and adherence into IMCI practice" | External Examiner |
| 2009—2015 | **Department of Epidemiology and Population Health, London School of Hygiene and Tropical Medicine, London UK**<br>Dr Katia Bruxvoort: "Factors associated with adherence to antimalarial combination therapy in Tanzania" | PhD Committee |
| 2010—2013 | **Department of Epidemiology, Swiss Tropical and Public Health Institute, Basel SWITZERLAND**<br>Dr Irene Masanja: "Influence of health systems in malaria case management as part of malaria control in Tanzania." | External Examiner |

9

App. 274

| 2009—2013 | **Department of Health Services Research and Health Policy, Emory University, Atlanta USA** Dr Joseph Njau: "Essays on the economic and socio-economic effectiveness of large-scale malaria control programs in three subSaharan African countries." | PhD Committee |
| 2004—2007 | **Department of Epidemiology, Swiss Tropical Institute, Basel SWITZERLAND** Dr. Manuel Hetzel: "Access to prompt and effective malaria treatment in the Kilombero Valley, Tanzania." | External Examiner |

Other Trainee Advisory Roles

| 2019—present | **Department of Environmental Health Sciences, Columbia University Mailman School of Public Health, New York, NY** Ms Victoria Lynch: "Health effects of extreme weather events and seasonal flooding in the United States" | Advisory Committee Member |
| 2019—present | **Department of Pediatrics, Vagelos College of Physicians and Surgeons, Columbia University, New York, NY** Dr Nadir Ijaz (Critical Care Medicine Fellow): "Bubble CPAP implementation for pediatric respiratory distress in district hospitals in Pakistan" | Scientific Oversight Committee Member |
| 2017—present | **Barcelona Institute for Global Health (ISGlobal), Barcelona SPAIN** Research Assistant Professor Dr Carlos Chaccour:  UNITAID-funded program: "Broad One Health Endectocide-based Malaria Intervention in Africa" | External Faculty Mentor |
| 2009—2011 | **Association of Schools and Programs in Public Health, Allan Rosenfield Fellowship in Global Epidemiology, Washington USA** Ms Eugenie Poirot | Mentor |

Patents and Inventions

None.

Publications

Original, Peer Reviewed Articles

1.  **SP Kachur**, AJ Sonnega, R Cintron, C Farup, K Silbersiepe, K Marconi, M McKinney, M Pounds, DD Celentano, J Kwait (1992).  An analysis of the Greater Baltimore HIV Services Planning Council.  *AIDS and Public Policy Journal* 7(4):238-246.
2.  LB Potter, KE Powell, **SP Kachur** (1995).  Suicide prevention from a public health perspective.  Suicide and Life-Threatening Behavior 25(1):82-91. PMID: 7631377.
3.  **SP Kachur**, LB Potter, KE Powell, ML Rosenberg (1995).  Suicide:  epidemiology, prevention and treatment. Adolescent Medicine State of the Art Reviews 6(2):171-182. PMID: 10358309.
4.  **SP Kachur** (1995).  Premature mortality from firearm-related injuries in the United States:  a comparison of methods.  Technology:  The Journal of the Franklin Institute 332(A):105-110.
5.  AM Dellinger, **SP Kachur**, E Sternberg, J Russell (1996).  Risk of heat-related injury to disaster relief workers in a slow-onset flood disaster.  Journal of Occupational Medicine 38(7):689-692. PMID: 8823659.
6.  **SP Kachur**, GM Stennies, KE Powell, W Modzeleski, R Stephens, R Murphy, M Kresnow, D Sleet, R Lowry (1996).  School-associated violent death in the United States 1992 to 1994.  JAMA:  Journal of the American Medical Association 275(22):1729-1733. PMID: 8637169.

10

7.  **SP Kachur**, E Nicolas, V Jean-Francois, PB Bloland, Y Saint Jean, DL Mount, TK Ruebush, A Benitez, P Nguyen-Dinh (1998). Prevalence of malaria parasitemia and accuracy of microscopic diagnosis in Haiti, October 1995. Revista PanAmericana de Salud Publica/ PanAmerican Journal of Public Health 3(1):35-39. PMID: 9503961.

8.  HA Williams, **SP Kachur**, NC Nalwamba, AW Hightower, C Simoonga, PC Mphande (1999). A community perspective on the efficacy of malaria treatment options for children in Lundazi District, Zambia. Tropical Medicine and International Health 4(10):641-652. PMID: 10583897.

9.  **SP Kachur**, PA Phillips-Howard, AM Odhacha, TK Ruebush, AJ Oloo, BL Nahlen (1999). Maintenance and sustained use of insecticide treated bednets and curtains 3 years after a controlled trial in western Kenya. Tropical Medicine and International Health 4(11): 728-735. PMID: 10588766.

10. C Baume, D Helitzer, **SP Kachur** (2000). Patterns of care for childhood malaria in Zambia. Social Science and Medicine 51(10):1505-1515. PMID: 11077952.

11. RA Jadak, B Pare, **SP Kachur**, JM Zenilman (2000). Self-reported weapon ownership, use, and violence experience among clients accessing an inner-city sexually transmitted diseases clinic. Research in Nursing and Health 6(4):324-335. PMID: 10871536.

12. JR MacArthur, TH Holtz, J Jenkins, JP Newall, JE Koehler, ME Parise, **SP Kachur** (2001). Brief report: Probable mosquito-transmitted malaria in Georgia, 1999. Clinical Infectious Diseases 32e(7):124-128. PMID: 11283820.

13. TH Holtz, LH Marum, C Mkandala, N Chizani, JM Roberts, A Macheso, ME Parise, **SP Kachur** (2002). Insecticide-treated bednet use, anemia, and malaria parasitemia in Blantyre District, Malawi. Tropical Medicine and International Health 7(3):220-230. PMID: 11903984.

14. JA Alaii, HW van den Borne, **SP Kachur**, HA Mwenesi, JM Vulule, WA Hawley, MI Meltzer, BL Nahlen, PA Phillips-Howard (2003). Perceptions of bed nets and malaria prevention before and after a randomized controlled trial of permethrin-treated bed nets in western Kenya. American Journal of Tropical Medicine and Hygiene 68(4 Supplement):142-148. PMID: 12749498.

15. JA Alaai, HW van den Borne, **SP Kachur**, K Shelley, HA Mwenesi, JM Vulule, WA Hawley, BL Nahlen, PA Phillips-Howard (2003). Community reactions to the introduction of permethrin-treated bed nets for malaria control during a randomized controlled trial in western Kenya. American Journal of Tropical Medicine and Hygiene 68(4 Supplement):128-136. PMID: 12749496.

16. J Arudo, JE Gimnig, FO ter Kuile, **SP Kachur**, L Slutsker, MS Kolczak, WA Hawley, ASS Orago, BL Nahlen, PA Phillips-Howard (2003). Comparison of government statistics and demographic surveillance to monitor mortality in children less than 5 years old in rural western Kenya. American Journal of Tropical Medicine and Hygiene 68(4 Supplement):30-37. PMID: 12749483.

17. PA Phillips-Howard, BL Nahlen, MS Kolczak, AW Hightower, FO ter Kuile, JA Alaii, JE Gimnig, J Arudo, JM Vulule, A Odhacha, **SP Kachur**, E Schoute, DH Rosen, JD Sexton, AJ Oloo, WA Hawley (2003). Efficacy of permethrin-treated bed nets in the prevention of mortality in young children in an area of high perennial malaria transmission in western Kenya. American Journal of Tropical Medicine and Hygiene 68(4 Supplement):23-29. PMID: 12749482.

18. PA Phillips-Howard, FO ter Kuile, BL Nahlen, JA Alaii, JE Gimnig, MS Kolczak, DJ Terlouw, SK Kariuki, YP Shi, **SP Kachur**, AW Hightower, JM Vulule, WA Hawley (2003). The efficacy of permethrin-treated bed nets on child mortality and morbidity in western Kenya II. Study design and methods. American Journal of Tropical Medicine and Hygiene 68(4 Supplement):10-15. PMID: 12749480.

19. PA Phillips-Howard, BL Nahlen, JA Alaii, FO ter Kuile, JE Gimnig, DJ Terlouw, **SP Kachur**, AW Hightower, AA Lal, E Schoute, AJ Oloo, WA Hawley (2003). The efficacy of permethrin-treated bed nets on child mortality and morbidity in western Kenya I. Development of infrastructure and description of study site. American Journal of Tropical Medicine and Hygiene 68(4 Supplement):3-9. PMID: 12749479.

11

20. TH Holtz, **SP Kachur**, LH Marum, C Mkandala, N Chizani, JM Roberts, ME Parise, A Macheso (2003).  Care-seeking behavior and home management of febrile illness in children:  a household survey in Blantyre District, Malawi.  Transactions of the Royal Society for Tropical Medicine and Hygiene 97(5): 491-497. PMID: 15307408.

21. PB Bloland, **SP Kachur**, HA Williams (2003).  Trends in antimalarial drug deployment in subSaharan Africa.  Journal of Experimental Biology 206(21):3761-3769. PMID: 14506211.

22. TH Holtz, **SP Kachur**, LH Marum, C Mkandala, N Chizani, JM Roberts, ME Parise, A Macheso (2004).  Use of antenatal care services and intermittent preventive treatment among pregnant women in Blantyre District, Malawi.  Tropical Medicine and International Health 9(1):77-82. PMID: 14728610.

23. C Goodman, **SP Kachur**, S Abdulla, E Mwageni, J Nyoni, J Armstrong Schellenberg, A Mills, PB Bloland (2004).  Retail supply for malaria-related drugs in rural Tanzania:  threats and opportunities for improving malaria treatment.  Tropical Medicine and International Health 9(6):655-663. PMID: 15189455.

24. **SP Kachur**, R Khatib, E Kaizer, S Fox, S Abdulla, PB Bloland (2004).  Adherence to antimalarial combination therapy with sulfadoxine/ pyrimethamine and artesunate in rural Tanzania.   American Journal of Tropical Medicine and Hygiene 71(6): 715-722. PMID: 15642960.

25. R. Pearce, A Malisa, **SP Kachur**, KI Barnes, B Sharp, C Roper (2005).  Reduced variation around drug-resistant dhfr alleles in African Plasmodium falciparum.  Molecular Biology and Evolution 22(9):1834-1844. PMID: 15917494.

26. **SP Kachur**, J Schulden, CA Goodman, H Kassala, BF Elling, RA Khatib, LM Causer, S Mkikima, S Abdulla, PB Bloland (2006).  Prevalence of malaria parasitemia among clients obtaining treatment for fever or malaria at drug stores in rural Tanzania, 2004.  Tropical Medicine and International Health 11(4): 441-451. PMID: 16553927.

27. JD Njau, C Goodman, **SP Kachur**, N Palmer, RA Khatib, S Abdulla, A Mills, PB Bloland (2006).  Fever treatment and household wealth: the challenge posed for rolling out combination therapy for malaria.  Tropical Medicine and International Health 11(3):299-313. PMID: 16553910.

28. **SP Kachur**, C Black, C Goodman, S Abdulla (2006).  Putting the genie back in the bottle? Availability and presentation of oral artemisinin compounds at retail drug stores in urban Dar-es-Salaam.  Malaria Journal 5:25e. PMID: 16569252.

29. MW Hetzel, JJ Msechu, C Goodman, C Lengeler, B Obrist, **SP Kachur**, A Makemba, R Nathan, A Schultze, H Mshinda (2006). Decreased availability of antimalarials in the private sector following the policy change from chloroquine to sulpahdoxine-pyrimethamine in the Kilombero Valley, Tanzania.  Malaria Journal 5:109e. PMID: 17105662.

30. J Skarbinski, JJ Massaga, AK Rowe, **SP Kachur** (2007).  Distribution of free untreated bednets bundled with insecticide via an integrated child health campaign in Lindi Region, Tanzania:  lessons for future campaigns.  American Journal of Tropical Medicine and Hygiene 76(6):1100-1106. PMID: 17556618.

31. CA Goodman, **SP Kachur**, S Abdulla, PB Bloland, A Mills (2007).  Drug shop regulation and malaria treatment in Tanzania—why do shops break the rules and does it matter?   Health Policy and Planning 22(6):393-403. PMID: 17921151.

32. GF Killeen, TA Smith, HM Ferguson, H Mshinda, S Abdulla, C Lengeler, **SP Kachur** (2007).  Preventing childhood malaria in Africa by protecting adults from mosquitoes with insecticide-treated nets.  PLoS Medicine 4(7):229e. PMID: 17608562.

33. MF Somi, JR Butler, F Vahid, JD Njau, **SP Kachur**, S Abdulla (2007).  Economic burden of malaria in rural Tanzania: variations by socioeconomic status and season. Tropical Medicine and International Health 12 (10):1139-1147. PMID: 17956495.

12

34. MF Somi, JR Butler, F Vahid, JD Njau, **SP Kachur**, S Abdulla (2007). Is there evidence for dual causation between malaria and socioeconomic status? Findings from rural Tanzania. American Journal of Tropical Medicine and Hygiene 77 (6):1020-7. PMID: 18165515.

35. A Bhattarai, AS Ali, **SP Kachur**, A Mårtensson, AK Abbas, RA Khatib, AW al-Mafwazy, M Ramsan, G Rotllant, JF Gerstenmaier, F Molteni, S Abdulla, SM Montgomery, A Kaneko, A Björkman (2007). Impact of artemisinin-based combination therapy and insecticide-treated nets on malaria burden in Zanzibar. PLoS Medicine 4 (11):309e. PMID: 17988171.

36. JD Njau, CA Goodman, **SP Kachur**, J Mulligan, JS Munkondya, N Mchomvu, S Abdulla, PB Bloland, A Mills (2008). The costs of introducing artemisinin-based combination therapy: evidence from district-wide implementation in rural Tanzania. Malaria Journal 7:4e. PMID: 18179716.

37. RA Khatib, GF Killeen, SMK Abdulla, E Kahigwa, PD McElroy, RPM Gerrets, PD McElroy, H Mshinda, A Mwita, **SP Kachur** (2008). Markets, voucher subsidies and free nets combine to achieve high bed net coverage in rural Tanzania. Malaria Journal 7 (98)e. PMID: 18518956.

38. J Skarbinski, CA Winston, JJ Massaga, **SP Kachur**, AK Rowe (2008). Assessing the validity of health facility-based data in insecticide-treated bednet possession and use: comparison of data collected via health facility and household surveys—Lindi Region and Rufiji District, Tanzania, 2005. Tropical Medicine and International Health 13(3):396-405. PMID: 18397401.

39. MF Somi, JR Butler, F Vahid, JD Njau, **SP Kachur**, S Abdulla (2008). Use of proxy measures in estimating socioeconomic inequalities in malaria prevalence. Tropical Medicine and International Health 13(3):354-64. PMID: 18397398.

40. AM Kabanywanyi, JR MacArthur, WA Stolk, JDF Habbema, H Mshinda, PB Bloland, S Abdulla, **SP Kachur** (2008). Malaria in pregnant women in an area with sustained high coverage of insecticide-treated bednets. Malaria Journal 7:133e. PMID: 18644118.

41. M McMorrow, I Masanja, S Abdulla, E Kahigwa, **SP Kachur** (2008). Challenges in routine implementation and quality control of rapid diagnostic tests for malaria in Rufiji District, Tanzania. American Journal of Tropical Medicine and Hygiene 79(3):385-390. PMID: 18784230.

42. R Bronzan, M McMorrow, **SP Kachur** (2008). Diagnosis and treatment of malaria: guidelines for endemic and non-endemic regions. Molecular Diagnosis and Therapy 12(5):299-306. PMID: 18803428.

43. H Kaur, CA Goodman, MI Masanja, E Thompson, KA Thompson, **SP Kachur**, S Abdulla (2008). A nationwide survey of the quality of antimalarial drugs at retail outlets in Tanzania. PLoS ONE 3(10): e3403. PMID: 18923672.

44. HA Williams, L Causer, E Metta, A Malila, T O'Reilly, S Abdulla, **SP Kachur**, PB Bloland (2008). Dispensary level pilot implementation of rapid diagnostic tests: an evaluation of RDT acceptance and usage by providers and patients—Tanzania, 2005. Malaria Journal 7:239e. PMID: 19019233.

45. CA Goodman, **SP Kachur**, S Abdulla, PB Bloland, A Mills (2009). Concentration and drug prices in the retail market for malaria treatment in rural Tanzania. Health Economics 18(6):727-742. PMID: 19301420.

46. ND Walter, T Lyimo, J Skarbinski, E Metta, E Kahigwa, B Flannery, SF Dowell, S Abdulla, **SP Kachur** (2009). Why first-level health workers fail to follow guidelines for managing severe disease in children in the Coast Region, United Republic of Tanzania. Bulletin of the World Health Organization 87(2):99-107. PMID: 19274361.

47. R Pearce, H Pota, MB Evehe, B el Hadj, G Mombo-Ngoma, A Malisa, R Ord, W Inojosa, A Matondo, DA Diallo, W Mbacham, IV van den Broek, TD Swarthout, A Assefa, S Dejene, MP Grobusch, F Njie, S Dunyo, M Kweku, S Owusu-Ageyi, D Chandramohan, M Bonnet, JP Guthmann, S Clarke, K Barnes, E Streat, ST Katokele, P Uusiku, CO Agboghoroma, OY Elegba, B Cisse, IE A-Elbasit, HA Giha, **SP Kachur**, C Lynch, J Rwakimari, P Chanda, M Hawela, B Sharp, I Naidoo, C Roper (2009). Dispersal of drug resistant dhps reveals regional migration patterns among African P. falciparum. PLoS Medicine 6(4) e1000055. PMID: 19365539.

13

48. J Hwang, S McClintock, J Williamson, **SP Kachur**, L Slutsker, P Arguin (2009).  Comparison of National Malaria Surveillance System with the National Notifiable Disease Surveillance System in the United States: a capture-recapture approach.  Journal of Public Health Management Practice 15(4):345-351. PMID: 19525779.

49. AK Rowe, **SP Kachur**, S Yoon, M Lynch, L Slutsker, R Steketee (2009).  Caution is required when using health facility data to evaluate the health impact of malaria control in Africa. Malaria Journal 8:209. PMID: 19728880.

50. M McMorrow, MI Masanja, E Kahigwa, S Abdulla, **SP Kachur** (2010).  Quality assurance of rapid diagnostic tests for malaria in routine patient care in rural Tanzania.  American Journal of Tropical Medicine and Hygiene 82(1):151-155. PMID: 20065013.

51. J Hwang, PM Graves, **SP Kachur**, A Getachew, R Reithinger, T Gebre, D Jima and the Ethiopia Malaria Indicators Survey Working Group (2010).  Malaria-related health behaviors associated with women's knowledge of malaria — Malaria Indicator Survey, Ethiopia, 2007.  PLoS ONE 5(7):e11692. PMID: 20657782.

52. A Stergachis, RJK Bartlein, A Dodoo, J Nwokike, **SP Kachur** (2010).  A situational analysis of pharmacovigilance plans in Global Fund malaria and US President's Malaria Initiative proposals.  Malaria Journal 9:148e. PMID: 20509971.

53. AL Malisa, R Pearce, S Abdulla, H Mshinda, **SP Kachur**, PB Bloland, C Roper (2010).  Drug coverage in treatment of malaria and its consequences for resistance evolution—evidence from the use of sulphadoxine/ pyrimethamine.  Malaria Journal 9:190e. PMID: 20602754.

54. MI Masanja, M McMorrow, E Kahigwa, **SP Kachur**, P McElroy (2010).  Health workers' use of malaria rapid diagnostic tests (RDTs) to guide clinical decision making in rural dispensaries, Tanzania.  American Journal of Tropical Medicine and Hygiene 83(6):1238-1241. PMID: 21118927.

55. N Lucchi, A Demas, J Narayanan, D Sumari, AM Kabanywanyi, **SP Kachur**, J Barnwell, V Udhayakumar (2010).  Real-time fluorescence loop mediated isothermal amplification for the diagnosis of malaria. PLOS One 5(10):e13733. PMID: 21060829.

56. The malERA Consultative Group on Health Systems and Operational Research (2011).  A research agenda for malaria eradication: health systems and operational research.  PLOS Medicine 8(1):e 1000397. PMID: 21311588.

57. The malERA Consultative Group on Diagnoses and Diagnostics (2011).  A research agenda for malaria eradication: diagnoses and diagnostics.  PLoS Medicine 8(1):e1000396. PMID: 21311583.

58. JI Thwing, JD Njau, C Goodman, J Munkondya, E Kahigwa, PB Bloland, S Mkikima, A Mills, SMK Abdulla, **SP Kachur** (2011).  Drug dispensing practices during implementation of artemisinin-based combination therapy at health facilities in rural Tanzania, 2002-2005.  Tropical Medicine and International Health 16(3):272-279. PMID: 21226795.

59. A Demas, J Oberstaller, J DeBarry, NW Lucchi, G Srinivasamoorthy, D Sumari, AM Kabanywanyi, L Villegas, AA Escalante, **SP Kachur**, JW Barnwell, DS Peterson, V Udhayakumar, JC Kissinger (2011).  Applied genomics: Data mining reveals species-specific malaria diagnostic targets more sensitive than 18S rRNA.  Journal of Clinical Microbiology 49(7):2411-2418. PMID: 21525225.

60. TL Russell, NJ Govella, S Azizi, CJ Drakeley, **SP Kachur**, GF Killeen (2011).  Increased proportions of outdoor feeding among residual malaria vector populations following increased use of insecticide-treated nets in rural Tanzania.  Malaria Journal 10:80e. PMID: 21477321.

61. AL Malisa, R Pearce, S Abdulla, B Mutayoba, H Mshinda, **SP Kachur**, PB Bloland, C Roper (2011).  Molecular monitoring of resistant dhfr and dhps allelic haplotypes in Morogoro and Mvomeru districts in south eastern Tanzania.  African Health Sciences 11(2):142-150. PMID: 21857842.

62. AL Malisa, R Pearce, B Mutayoba, S Abdulla, H Mshinda, **SP Kachur**, PB Bloland, C Roper (2011). The evolution of pyrimethamine-resistant dhfr in Plasmodium falciparum of southeastern Tanzania:  comparing selection under SP alone vs. SP+artesunate combination.  Malaria Journal 10:317e. PMID: 22029848.

14

63. KE Mace, D Mwandama, J Jafali, M Luka, SJ Filler, J Sande, D Ali, **SP Kachur**, D Mathanga, J Skarbinski (2011). Adherence to treatment with artemether-lumefantrine for uncomplicated malaria in rural Malawi. Clinical Infectious Diseases 53(8):772-779. PMID: 21921220.

64. J Hwang, BH Alemayehu, D Hoos, Z Melaku, SG Tekleyohannes, T Teshi, SG Birhanu, L Demeke, D Hoos, K Gobena, M Kassa, D Jima, R Reithinger, H Nettey, M Green, JL Malone, **SP Kachur**, SJ Filler (2011). In vivo efficacy of artemether-lumefantrine against uncomplicated Plasmodium falciparum malaria in central Ethiopia. Malaria Journal 10:209e. PMID: 21798054.

65. ML McMorrow, M Aidoo, **SP Kachur** (2011). Malaria rapid diagnostic tests in elimination settings—can they find the last parasite? Clinical Microbiology and Infection 17(11):1624-1631. PMID: 21910780.

66. AL Malisa, R Pearce, B Mutayoba, S Abdulla, H Mshinda, **SP Kachur**, P Bloland, C Roper (2011). Media, health workers, and policy makers' relationship and their impact on antimalarial policy adoption: a population genetics perspective. Malaria Research and Treatment 2011:217276. PMID: 22347670.

67. D Townes, A Existe J Boncy, R Magloire, JF Vely, R Amsalu, MD Tavernier, J Muigai, S Hoibak, M Albert, M McMorrow, L Slutsker, **SP Kachur**, M Chang (2012). Malaria Survey in Post-Earthquake Haiti—2010. American Journal of Tropical Medicine and Hygiene 86(1):29-31. PMID: 22232446.

68. JR Gutman, **SP Kachur**, L Slutsker, A Nzila, T Mutabingwa (2012). Combination of probenecid-sulphadoxine-pyrimethamine for intermittent preventive treatment in pregnancy. Malaria Journal 11:39e. PMID: 22321288.

69. RA Khatib, J Skarbinski, JD Njau, C Goodman, BF Elling, E Kahigwa, JM Roberts, JR MacArthur, J Gutman, AM Kabanywanyi, EE Smith, MF Somi, T Lyimo, A Mwita, B Genton, M Tanner, A Mills, H Mshinda, PB Bloland, S Abdulla, **SP Kachur** (2012). Routine delivery of artemisinin-based combination treatment via fixed health facilities reduces malaria burden in rural Tanzania: an observational study. Malaria Journal 11:140e. PMID: 22545573.

70. BJ Huho, GF Killeen, HM Ferguson, A Tami, C Lengeler, JD Charlwood, A Kihonda, J Kihonda, **SP Kachur**, TA Smith, S Abdulla (2012). The introduction of artemisinin-based combination therapy did not lead to measurable reductions in human infectiousness to vectors in a setting of intense malaria transmission. Malaria Journal 11:118e. PMID: 22513162.

71. MI Masanja, M Selemani, B Amuri, D Kajungu, RA Khatib, **SP Kachur**, J Skarbinski (2012). Increased use of malaria rapid diagnostic tests improves targeting of antimalarial treatment in rural Tanzania: implications for nationwide rollout of malaria rapid diagnostic tests. Malaria Journal 11:221e. PMID: 22747655.

72. AC Eziefula, R Gosling, J Hwang, MS Hsiang, T Bousema, L von Seidlein, C Drakeley and the Primaquine in Africa Discussion Group (2012). Rationale for short course primaquine in Africa to interrupt malaria transmission. Malaria Journal 11:360e. PMID: 23130957.

73. MS Hsiang, J Hwang, AR Tao, Y Liu, A Bennett, GD Shanks, J Cao, **SP Kachur**, RG Feachem, RD Gosling, Q Gao (2013). Mass drug administration for the control and elimination of Plasmodium vivax malaria: an ecological study from Jiangsu Province, China. Malaria Journal 12:383e. PMID: 24175930.

74. MI Masanja, M Selemani, RA Khatib, B Amuri, I Kuepfer, D Kajungu, D de Savigny, **SP Kachur**, J Skarbinski (2013). Correct dosing of artemether-lumefantrine for management of uncomplicated malaria in rural Tanzania: do facility and patient characteristics matter? Malaria Journal 12:446e. PMID: 24325267.

75. J Hwang, BH Alemayehu, R Reithinger, SG Tekleyohannes, T Teshi, SG Birhanu, L Demeke, D Hoos, Z Melaku, M Kassa, D Jima, JL Malone, H Nettey, M Green, A Poe, S Akinyi, V Udhayakumar, **SP Kachur**, S Filler (2013). In vivo efficacy of artemether-lumefantrine and chloroquine against Plasmodium vivax: a randomized open label trial in central Ethiopia. PLOS One 8(5):e63433. PMID: 23717423.

76. KA Lindblade, L Steinhardt, A Samuels, **SP Kachur**, L Slutsker (2013). The silent threat: asymptomatic parasitemia and malaria transmission. Expert Reviews of Anti-Infective Therapy 11(6):623-639. PMID: 23750733.

15

77. JD Njau, AM Kabanywanyi, CA Goodman, JR MacArthur, BK Kapella, JE Gimnig, E Kahigwa, PB Bloland, SM Abdulla, **SP Kachur** (2013).  Adverse drug events resulting from use of drugs with sulphonamide-containing anti-malarials and artemisinin-based ingredients:  findings on incidence and household costs from three districts with routine demographic surveillance systems in rural Tanzania.  Malaria Journal 12:236e. PMID: 23844934.

78. JD Njau, R Stephenson, M Menon, **SP Kachur**, DA McFarland (2013).  Exploring the impact of targeted distribution of free bed nets on household bed net ownership, socio-economic disparities and childhood malaria infection rates:  analysis of national malaria survey data from three sub-Saharan African countries. Malaria Journal 12:245e. PMID: 23855893.

79. A Agarwal, M McMorrow, P Onyango, K Otieno, C Odero, J Williamson, S Kariuki, **SP Kachur**, L Slutsker, M Desai (2013).  A randomized trial of artemether-lumefantrine and dihydroartemisinin-piperaquine in the treatment of uncomplicated malaria among children in western Kenya.  Malaria Journal 12:254e. PMID: 23870627.

80. K Bruxvoort, A Kalolella, H Nchimbi, C Festo, M Taylor, R Thomson, M Cairns, J Thwing, I Kleinschmidt, C Goodman, **SP Kachur** (2013). Getting antimalarials on target:  impact of national roll-out of malaria rapid diagnostic tests on health facility treatment in three regions of Tanzania.  Tropical Medicine and International Health 18(10):1269-1282. PMID: 23937722.

81. K Bruxvoort, C Goodman, **SP Kachur**, D Schellenberg (2014).  How patients take malaria treatment: a systematic review of the literature on adherence to antimalarial drugs.  PLoS One 9(1):e84555. PMID: 24465418.

82. R Thomson, C Festo, B Johanes, A Kalolella, K Bruxvoort, H Nchimbi, S Tougher, M Cairns, M Taylor, I Kleinschmidt, Y Ye, A Mann, R Ren, B Willey, F Arnold, K Hanson, **SP Kachur**, C Goodman (2014).  Has Tanzania embraced the green leaf? Results from outlet and household surveys before and after implementation of the Affordable Medicines Facility—malaria. PLOS One 9(5):e95607. PMID: 24816649.

83. MA Briggs, A Kalolella, K Bruxvoort, R Wiegand, G Lopez, C Festo, P Lyaruu, M Kenani, S Abdulla, C Goodman, **SP Kachur** (2014).  Prevalence of malaria parasitemia and purchase of artemisinin-based combination therapies among drug shop clients in two regions with ACT subsidies in Tanzania.  PLOS One 9(4)e94074. PMID: 24732258.

84. JD Njau, R Stephenson, **SP Kachur**, MP Menon, DA McFarland (2014). Investigating the important correlates of maternal education and childhood malaria infections.  American Journal of Tropical Medicine and Hygiene 91(3):509-519. PMID: 25002302.

85. J Hwang, K Cullen, **SP Kachur**, PM Arguin, JK Baird (2014).  Severe morbidity and mortality risk from malaria in the United States, 1985—2011. Open Forum Infectious Diseases 1(1):1-8. PMID: 25734104.

86. K Bruxvoort, C Festo, A Kalolella, M Cairns, P Lyaruu, M Kenani, **SP Kachur**, C Goodman, D Schellenberg (2014). Cluster randomized trial of text message reminders to retail staff in Tanzanian drug shops dispensing artemether-lumefantrine: effect on dispenser knowledge and patient adherence. American Journal of Hygiene and Tropical Medicine 91(4):844-853. PMID: 25002300.

87. MM Plucinski, S Cichuecue, E Macete, J Colborn, S Yoon, **SP Kachur**, P Aide, P Alonso, C Guinovart, J Morgan (2014). Evaluation of a universal coverage bed net distribution campaign in four districts in Sofala Province, Mozambique. Malaria Journal 13:427e. PMID: 25373784.

88. World Health Organization (2014).  Severe malaria.  Tropical Medicine and International Health 19(suppl 1):7-131. PMID: 25214480.

89. A Roca-Feltrer, N Khim, S Kim, Sophy Chy, L Canier, A Kerleguer, P Tor, CM Chuor, S Kheng, S Siv, **SP Kachur**, WRJ Taylor, J Hwang, D Menard (2014). Field trial evaluation of the performances of point-of-care tests for screening G6PD deficiency in Cambodia.  PLoS One 9(12):e116143. PMID: 25541721.

16

90. MI Masanja, ML McMorrow, MB Maganga, D Sumari, V Udhayakumar, PD McElroy, **SP Kachur**, NW Lucchi (2015). Quality assurance of malaria rapid diagnostic tests used for routine patient care in rural Tanzania: microscopy versus real-time polymerase chain reaction. Malaria Journal 14:85e. PMID: 25889613.

91. WWARN Artemether-Lumefantrine Dose Impact Study Group (2015). The effect of dose on the antimalarial efficacy of artemether-lumefantrine: a systematic review and pooled analysis of individual patient data. Lancet Infectious Diseases 15(6):692-702. PMID: 25788162.

92. ACT Consortium Drug Quality Project Team and IMPACT2 Study Team (2015). Quality of artemisinin-containing antimalarials in Tanzania's private sector—results from a nationally representative outlet survey. American Journal of Tropical Medicine and Hygiene 92(6 Suppl):75-86. PMID: 25897065.

93. E Talundzic, S Akiniyi, K Congpuong, MM Plucinski, L Morton, I Goldman, **SP Kachur**, C Wongsrichanalai, W Satimai, JW Barnwell, V Udhayakumar (2015). Selection and spread of artemisinin resistant alleles in Thailand prior to the global artemisinin resistance containment campaign. PLoS Pathogens 11(4):e1004789. PMID: 25836766.

94. K Bruxvoort, A Kalolella, M Cairns, C Festo, **SP Kachur**, D Schellenberg, C Goodman (2015). Are Tanzanian patients attending public facilities or private retailers more likely to adhere to artemisinin-based combination therapy. Malaria Journal 14:87e. PMID: 25889767.

95. M Plucinksi, T Guilavogui, S Sidikiba, N Diakité, S Diakité, M Dioubaté, I Bah, I Hennessee, JK Butts, ES Halsey, PD McElroy, **SP Kachur**, J Aboulab, R James, M Keita (2015). Effect of the Ebola-virus-disease epidemic on malaria case management in Guinea, 2014: a cross-sectional survey of health facilities. Lancet Infectious Diseases 15(9):1017-1023. PMID: 26116183.

96. G Newby, J Hwang, K Koita, I Chen, B Greenwood, L von Seidlein, GD Shanks, LM Slutsker, **SP Kachur**, I Chen, J Wegbreit, M Ippolito, E Poirot, R Gosling (2015). Review of mass drug administration for malaria and its operational challenges. American Journal of Tropical Medicine and Hygiene 93(1):125-34. PMID: 26013371.

97. VL Phillips, JD Njau, S Li, **SP Kachur** (2015). Simulations show diagnostic testing for malaria in young African children can be cost-saving or cost-effective. Health Affairs 34(7):1196-1204. PMID: 26153315.

98. K Bruxvoort, C Festo, M Cairns, A Kalollela, F Mayaya, **SP Kachur**, D Schellenberg, CA Goodman (2015). Measuring patient adherence to malaria treatment: a comparison of results from self report and a customized electronic monitoring device. PLoS One 10(7):e0134275. PMID: 26214848.

99. WWARN Artemisinin-based combination therapy Africa Baseline Study Group (2015). Clinical determinants of early parasitological response to ACTs in African patients with uncomplicated malaria: a pooled analysis of individual patient data. BMC Medicine 13:212e. PMID: 26343145.

100. PS Twomey, BL Smith, C McDermott, A Novitt-Moreno, W McCarthy, **SP Kachur**, PM Arguin (2015). Intravenous artesunate for the treatment of severe and complicated malaria in the United States: Clinical use under an Investigational New Drug Protocol. Annals of Internal Medicine 163(7):498-506. PMID: 26301474.

101. MM Plucinski, S Chichuecue, E Macete, GA Chambe, O Muguande G Matsinhe, J Colborn, SS Yoon, TJ Doyle, **SP Kachur**, P Aide, PL Alonso, C Guinovart, J Morgan (2015). Sleeping arrangements and mass distribution of bednets in six districts in central and northern Mozambique. Tropical Medicine and International Health 20(12):1685-1695. PMID: 26338026.

102. M Bushman, L Morton, N Duah, N Quashie, B Abuaku, KA Koram, PR Dimbu, M Plucinski, J Gutman, P Lyaruu, **SP Kachur**, JC de Roode, V Udhayakumar (2016). Within host competition in the human malaria parasite Plasmodium falciparum. Proceedings of the Royal Society B 283(1826):20153038. PMID: 26984625.

103. WWARN Gametocyte Study Group (2016). Gametocyte carriage in uncomplicated Plasmodium falciparum malaria: a systematic review and pooled analysis of individual patient data. BMC Medicine 14(1):79e. PMID: 27221542.

104.    P Wangroongsarb, J Hwang, J Thwing, S Karuchit, T Kiratihatayakorn, A Rand, C Drakeley, JR MacArthur, **SP Kachur**, W Satimai, S Meek, DM Sintasath (2016).  Using respondent driven sampling to identify malaria risks and occupational networks among migrant workers in Ranong, Thailand.  PLOS Medicine 11(12):e0178371. PMID: 28033322.

105.    LC Steinhardt, Y St Jean, D Impoinvil, K Mace, R Wiegand, CS Huber, JS Fils Alexandre, J Frederick, E Nkuruziza, S Jean, B Wheeler, E Dotson, L Slutsker, **SP Kachur**, J Barnwell, JF Lemoine, MA Chang (2017).  Effectiveness of insecticide-treated bednets in malaria prevention in Haiti: a case-control study.  Lancet Global Health 5(1):e96-103. PMID: 27894851.

106.    H Hopkins, K Bruxvoort, ME Cairns, CIR Chandler, B Leurent, EK Anasah, F Baiden, KA Baltzell, A Björkman, HED Burchett, SE Clarke, DD DiLiberto, K Elfving, C Goodman, KS Hansen, **SP Kachur**, S Lal, DG Lalloo, T Leslie, P Magnussen, L Mangham-Jefferies, A Mårtensson, I Mayan, AK Mbonye, MI Mwinyi, OE Onwujekwe, S Owusu-Agyei, H Reyburn, MW Rowland, D Shakely, LS Vestergaard, J Webster, VL Wiseman, D Schellenberg, SG Staedke, CJM Whitty (2017).  Impact of introduction of rapid diagnostic tests for malaria on antibiotic prescribing: analysis of observational and randomized studies in public and private healthcare settings.  BMJ 356:j1054. PMID: 28356302.

107.    KJ Bruxvoort, B Leurent, CIR Chandler, EK Ansah, F Baiden, A Björkman, HED Burchett, SE Clarke, B Cundill, DD DiLiberto, K Elfving, C Goodman, KS Hansen, **SP Kachur**, S Lal, DG Lalloo, T Leslie, P Magnussen, L Mangham-Jefferies, A Mårtensson, I Mayan, AK Mbonye, MI Msellem, OE Onwujekwe, S Owusu-Agyei, MW Rowland, D Shakely, SG Staedke, LS Vestergaard, J Webster, CJM Whitty, VL Wiseman, S Yeung, D Schellenberg, H Hopkins (2017).  The impact of introducing malaria rapid diagnostic tests on fever case management: a synthesis of ten studies from the ACT Consortium.  American Journal of Tropical Medicine and Hygiene 97(4):1170-1179. PMID: 28820705.

108.    T Abreha, J Hwang, K Thriemer, Y Tadesse, S Girma, Z Melaku, A Assefa, M Kassa, MD Chatfield, KZ Landman, SM Chenet, NW Lucchi, V Udhayakumar, Z Zhou, YP Shi, **SP Kachur**, D Jima, A Kebede, H Solomon, A Mekasha, BH Alemayhu, JL Malone, G Dissanayake, H Teka, S Auburn, L von Seidlein, RN Price (2017).  Comparison of artemether-lumefantrine and chloroquine with and without primaquine for the treatment of Plasmodium vivax in Ethiopia: a randomized controlled trial.  PLoS Medicine 14(5):e1002299. PMID: 28510573.

109.    AM Samuels, N Awino, W Odongo, B A'bongo, J Gimnig, K Otieno, YP Shi, Vincent Were, DR Allen, F Were, T Sang, D Obor, J Williamson, MJ Hamel, **SP Kachur**, L Slutsker, K Lindblade, S Kariuki, M Desai (2017).  Community-based intermittent mass testing and treatment for malaria in an area of high transmission intensity:  study design and methodology for a cluster-randomized controlled trial.  Malaria Journal 16:240e. PMID: 28592250.

110.    JF Lemoine, J Boncy, S Filler, **SP Kachur**, D Fitter, MA Chang (2017).  Haiti's commitment to malaria elimination: progress in the face of challenges, 2010-2016. American Journal of Tropical Medicine and Hygiene 97(Suppl. 4):43-48. PMID: 29064360.

111.    A Bhattarai, **SP Kachur** [eds.] (2017).  Evaluating the impact of malaria control interventions in sub-Saharan Africa. American Journal of Tropical Medicine and Hygiene 97(3 Supplement):1-110.

112.    malERA Refresh Consultative Panel on Combination Interventions and Modeling (2017).  malERA:  an updated research agenda for combination interventions and modeling in malaria elimination and eradication.  PLoS Medicine 14(11):1002453. PMID: 29190295.

113.    malERA Refresh Consultative Panel on Insecticide and Drug Resistance (2017).  malERA: an updated research agenda for insecticide and drug resistance in malaria elimination and eradication.  PLoS Medicine 14(11):e1002450.  PMID: 29190671.

114.    MM Plucinski, D Dimbu, F Fortes, S Abdulla, S Ahmed, J Gutman, **SP Kachur**, A Baadane, D Ndiaye, E Talundzic, N Lucchi, M Aidoo, V Udhayakumar, E Halsey, E Rogier (2018).  Post-treatment HRP2 clearance in

18

patients with uncomplicated Plasmodium falciparum malaria.  Journal of Infectious Diseases 217(5):685-692.  PMID: 29220497.

115.    V Were, AM Buff, M Desai, S Kariuki, A Samuels, FO ter Kuile, PA Phillips-Howard, **SP Kachur**, L Niessen (2018).  Socioeconomic health inequality in malaria indicators in rural western Kenya:  evidence from a household malaria survey on burden and care-seeking behavior.  Malaria Journal 17:166e. PMID: 29661245.

116.    EW Kanmiki, JK Awoonor-Williams, JF Phillips, **SP Kachur**, SF Achana, J Akazili, AA Bawah (2019). Socio-economic and demographic disparities in ownership and use of insecticide-treated bed nets for preventing malaria among rural reproductive-aged women in northern Ghana.  PLoS One 14:e0211365. PMID: 30695044.

117.    NA Odero, AM Samuels, W Odongo, B Abong'o, J Gimnig, K Otieno, C Odero, D Obor, M Ombok, V Were, T Sang, MJ Hamel, **SP Kachur**, L Slutsker, KA Lindblade, S Kariuki, M Desai (2019).  Community-based intermittent mass testing and treatment for malaria in an area of high transmission intensity, western Kenya: development of study site infrastructure and lessons learned.  Malaria Journal 18:255. PMID: 31357997.

118.    RA Ashton, A Bennett, AW al-Mafazy, AK Abass, MI Msellem, P McElroy, **SP Kachur**, AS Ali, J Yukich, TP Eisele, A Bhattarai (2019).  Use of routine health information system data to evaluate impact of malaria control interventions in Zanzibar, Tanzania from 2000-2015.  EClinicalMedicine 12:11-19. PMID: 31388659.

119.    EW Kanmiki, AA Bawah, JF Phillips, JK Awoonor-Williams, **SP Kachur**, PO Asuming, C Agula, J Akazili (2019).  Out-of-pocket payment for primary healthcare in the era of national health insurance: evidence from northern Ghana.  PLoS One 14(8):e0221146.  PMID: 31430302.

120.    V Were, AM Buff, M Desai, S Kariuki, AM Samuels, P Phillips-Howard, FO ter Kuile, **SP Kachur**, LW Niessen (2019).  Trends in malaria prevalence and health-related socioeconomic inequality in rural western Kenya: results from repeated household malaria cross-sectional surveys from 2006 to 2013.  BMJ Open 9(9):e033883. PMID: 31542772.

121.    LC Steinhardt, TL Richie, R Yego, D Akach, MJ Hamel, JR Gutman, RE Wiegand, EL Nzuu, A Dungani,  N Kc, T Murshedkar, LWP Church, BKL Sim, PF Billingsley, ER James, Y Abebe, S Kariuki, AM Samuels, K Otieno, T Sang, **SP Kachur**, D Styers, K Schlessman, TL Richie, G Abarbanell, SL Hoffman, RA Seder, M Oneko (2019). Safety, tolerability and immunogenicity of PfSPZ vaccine administered by direct venous inoculation to infants and young children: findings from an age de-escalation, dose-escalation double-blinded randomized, controlled study in western Kenya.   Clinical Infectious Diseases {electronic release ahead of print publication].  PMID: 31555824.

122.    The Ivermectin Roadmappers (P Billingsley, F Binka, C Chaccour, B Foy, S Gold, M Gonzalez-Silva, J Jacobseon, G Jagoe, C Jones, **SP Kachur**, K Kobylinski, A Last, J Lavery, D Mabey, L Mboera, C Mbogo, NR Rabinovich, S Rees, F Richards, C Rist, J Rockwood, P Ruiz-Castillo, J Sattabongkot, F Saute, H Slater, A Steer, K Xia, R Zulliger) (2020).  A roadmap for the development of ivermectin as a complementary malaria vector control tool.  American Journal of Tropical Medicine and Hygiene 102(2s):3-24. PMID: 31971144.

123.    MC Sheff, AA Bawah, PO Asuming, M Kushitor, K Awoonor-Williams, JF Phillips, **SP Kachur** (2020).  Evaluating health service coverage using a modified Tanahashi model in Ghana's Volta Region.  Global Health Action 13(1):1732664.  PMID: 32174254.

124.    AM Samuels, N Awino, W Odongo, K Otieno, YP Shi, T Sang, J Williamson, R Wiegand, MJ Hamel, **SP Kachur**, L Slutsker, KA Lindblade, S Kariuki, M Desai (2020).  Impact of community-based mass testing and treatment on malaria infection prevalence in a high transmission area of western Kenya: A cluster randomized controlled trial. Clinical Infectious Diseases [electronic release ahead of print publication]. PMID: 32324850.

125.    M Kweku, H Amu, M Adjuik, E Manu, FY Aku, EE Tarkang, J Komesuor, GA Asalu, NN Amuna, LA Boateng, JS Alornyo, R Glover, AA Bawah, T Letsa, JK Awoonor-Williams, **SP Kachur**, JF Phillips, JO Gyapong (2020).

19

Community involvement and perceptions of the Community-based Health Planning and Services (CHPS) strategy for improving health outcomes in Ghana: Quantitative comparative evidence from two Systems Learning Districts of the CHPS+ Project.  Advances in Public Health 2020:2385742.

126.    LD Zambrano, E Jentes, C Phares, M Weinberg, **SP Kachur**, MS Basnet, A Klosovsky, M Mwesigwa, M Naoum, SL Nsobya, O Samson, M Goers, R McDonald, B Morawski, H Njuguna, C Peak, R Laws, Y Bashsh, SA Iverson, C Bezold, H Alikhenfr, R Horth, J Yang, S Miller, M Kacka, A Davids, M Mortimer, W Stauffer, N Marano (2020).  Clinical sequelae associated with unresolved tropical splenomegaly in a cohort of recently resettled Congolese refugees in the United States—multiple states, 2015—2018. American Journal of Tropical Medicine and Hygiene [electronic release ahead of print publication].

Case Reports and Non-peer-reviewed Articles

127.    Centers for Disease Control and Prevention (1994).  Firearm-related years of potential life lost before age 65 years—United States, 1980 to 1992.  MMWR Weekly Reports 43(33):609-611. PMID: 8065292.

128.    **SP Kachur**, LB Potter, KE Powell (1995).  Suicide in the United States, 1980 to 1992.  Violence Surveillance Summary Series No. 1.  Atlanta:  Centers for Disease Control and Prevention.

129.    Centers for Disease Control and Prevention (1995).  Suicide among children, adolescents and young adults—United States, 1980 to 1992.  MMWR 44(15):289-291. PMID: 7708038.

130.    Centers for Disease Control and Prevention (1996).  Mosquito-transmitted Malaria—Michigan, 1995.  MMWR Weekly Reports 45(19):398-400. PMID: 8609882.

131.    **SP Kachur**, ME Reller, AM Barber, LM Barat, EHA Koumans, ME Parise, J Roberts, TK Ruebush II, JR Zucker (1997).  Malaria Surveillance—United States, 1994.  MMWR CDC Surveillance Summaries 46(SS5):1-18. PMID: 9347910.

132.    HA Williams, J Roberts, **SP Kachur**, AM Barber, LM Barat, PB Bloland, TK Ruebush II, EB Wolfe (1999).  Malaria Surveillance—United States, 1995.  MMWR CDC Surveillance Summaries 48(SS1):1-23. PMID: 10074931.

133.    Centers for Disease Control and Prevention (2000).  Probable locally acquired mosquito-transmitted Plasmodium vivax infection—Suffolk County, New York, 1999.  MMWR Weekly Reports 49:495-498. PMID: 10881766.

134.    JR MacArthur, AR Levin, M Mungai, J Roberts, AM Barber, PB Bloland, **SP Kachur**, RD Newman, RW Steketee, ME Parise (2001).  Malaria Surveillance—United States, 1997.  MMWR CDC Surveillance Summaries 50(SS1):25-44.

135.    TH Holtz, **SP Kachur**, JR MacArthur, JM Roberts, AM Barber, RW Steketee, ME Parise (2001).  Malaria Surveillance—United States, 1998.  MMWR CDC Surveillance Summaries 50(SS5):1-20. PMID: 11770906.

136.    KE Mace, MF Lynch, JR MacArthur, **SP Kachur**, L Slutsker, RW Steketee (2011).  Grand Rounds:  the opportunity for and challenges to malaria eradication.  MMWR Weekly Reports 60(15):476-80. PMID: 21508924.

137.    Centers for Disease Control and Prevention, Global Public Health Achievements Team (2011).  Ten Great Public Health Achievements—Worldwide, 2001—2010. MMWR Weekly Reports 60(24):812-818. PMID: 21697806.

138.    S. Mali, **SP Kachur**, PM Arguin (2012).  Malaria Surveillance—United States, 2010. MMWR CDC Surveillance Summaries 61(2):1-18. PMID: 22377962.

139.    LD Zambrano, O Samson, C Phares, E Jentes, M Weinberg, M Goers, **SP Kachur**, R McDonald, B Morawski, H Njuguna, Y Bakhsh, R Laws, C Peak, SA Iverson, C Bezold, H Alkhenfr, R Horth, J Yang, S Miller, M Kacka, A Davids, M Mortimer, N Khan, W Stauffer, N Marano (2018). Unresolved splenomegaly in recently resettled Congolese refugees—multiple states, 2015—2018. MMWR Weekly Reports 67(49):1358-1362. PMID: 30543602.

20

Books and Chapters

140.     Office of Disease Prevention and Health Promotion (1994).  Tuberculosis (Chapter 42).  In *Put Prevention into Practice:  Clinician's Handbook of Preventive Services*.  Washington:  US Public Health Service and Government Printing Office, pp. 227-232.

141.     Office of Disease Prevention and Health Promotion (1994).  Thyroid Function (Chapter 41).  In Put Prevention into Practice:  Clinician's Handbook of Preventive Services.  Washington:  US Public Health Service and Government Printing Office, pp. 223-225.

142.     **SP Kachur**, C DiGuiseppi (1996).  Screening for suicide risk.  In US Preventive Services Task Force.  Guide to Clinical Preventive Services 2nd Edition.  Baltimore:  Williams & Wilkins, pp. 547-554.

143.     **SP Kachur**, PB Bloland (1998).  Malaria.  In RB Wallace [ed.].  Maxcy-Rosenau-Last Textbook of Public Health and Preventive Medicine 14th Edition.  Norwalk:  Appleton & Lange, pp. 313-326.

144.     HO Lobel, **SP Kachur** (2000).  Malaria Epidemiology.  In HL DuPont and R Steffen [eds.].  Textbook of Travel Medicine and Health 2nd Edition.  Hamilton:  BC Decker, pp. 184-189.

145.     TH Holtz, **SP Kachur**, PB Bloland (2000).  Malaria.  In RF Edlich [ed.].  Advances in Medicine.  Arlington:  ABI Professional Publications,  pp. 64-86.

146.     JR MacArthur, **SP Kachur** (2002).  Malaria.  In L Breslow [ed.].  Encyclopedia of Public Health.  Volume 3.  New York:  MacMillan, pp. 705-708.

147.     TH Holtz, **SP Kachur** (2004).  The reglobalization of malaria.  In M Fort, MA Mercer and O Gish [eds.]  Sickness and Wealth:  The Corporate Assault on Global Health.  Cambridge:  South End Press,  pp. 127-141.

148.     **SP Kachur**, A Macedo de Oliveira, PB Bloland (2008).  Chapter 13e:  Malaria.  In RB Wallace [ed.].  Maxcy-Rosenau-Last Textbook of Public Health and Preventive Medicine 15th Edition.  New York, McGraw-Hill Medical, pp. 373-386.

149.     PM Arguin, **SP Kachur** (2008).  Malaria.  In RE Rakel and ET Bope [eds.].  Conn's Current Therapy 2008.  Philadelphia:  Saunders, pp. 105-113.

150.     PM Arguin, **SP Kachur** (2009).  Malaria.  in RE Rakel and ET Bope [eds.].  Conn's Current Therapy 2009.  Philadelphia:  Saunders, pp. 103-112.

151.     **SP Kachur** (2011).  The plausibility design, quasi-experiments and real world research: a case study of artemisinin-based combination therapy in Tanzania.  in PW Geissler and S Molyneux [eds.].  Evidence, Ethos and Ethnography: The Anthropology and History of Medical Research in Africa.  London:  Berghahn,  pp. 197-227.

152.     H Williams, M Schilperoord, DA Townes, **SP Kachur** (2018). Malaria in Humanitarian Emergencies. in DA Townes, M Gerber, M Anderson [eds.]. Health in Humanitarian Emergencies: Principles and Practice for Public Health and Healthcare Practitioners.  Cambridge: Cambridge University Press, pp. 348-361.


Reviews, Correspondence and Editorials

153.     **SP Kachur** (1991).  Uninsured in Akron, Ohio:  the national crisis in local perspective. Part 1.  Summit County Medical Bulletin  Issue 7.

154.     **SP Kachur** (1991).  Uninsured in Akron, Ohio:  the national crisis in local perspective. Part 2.  Summit County Medical Bulletin  Issue 8.

155.     JR Zucker, **SP Kachur** (1996).  Transfusion-associated malaria [letter].  Emerging Infectious Diseases 2(2):152.

156.     **SP Kachur** (1999).  Improving referral.  Child Health Dialogue 17:14-15.

157.     **SP Kachur**, S Abdulla, K Barnes, H Mshinda, D Durrheim, A Kitua, PB Bloland (2001).  Complex and large trials of pragmatic malaria interventions [letter].  Tropical Medicine and International Health 6(4):324-325.  PMID: 11348524.

158.     **SP Kachur**, L Slutsker (2006). Measuring malaria drug efficacy and transmission intensity [editorial].  Lancet 368(9529):10-12. PMID: 16815361.

159. **SP Kachur**, JR MacArthur, L Slutsker (2010). A call to action: addressing the challenge of artemisinin-resistant malaria [editorial]. Expert Review of Anti-Infective Therapy 8(4):365-366. PMID: 20377330.

160. J Gutman, **SP Kachur** (2010). Treating malaria in pregnant women: a pressing problem [comment]. Lancet Infectious Diseases 10(11):739-740. PMID: 21029982.

161. M Lynch, E Korenromp, R Steketee, T Eisele, **SP Kachur**, H Newby, BL Nahlen, JR MacArthur, RD Newman, R Cibulskis, S Yoon, A Bhattarai (2012). New global estimates of malaria deaths [comment]. Lancet 380(9841):559-561. PMID: 22883496.

162. L Slutsker, **SP Kachur** (2013). It is time to rethink tactics in the fight against malaria [comment]. Malaria Journal 12:140e. PMID: 23617700.

163. EA Poirot, J Skarbinski, D Sinclair, **SP Kachur**, L Slutsker, J Hwang (2013). Mass drug administration for malaria. Cochrane Database of Systematic Reviews 2010(11):CD008846. PMID: 24318836.

164. **SP Kachur** (2016). 'Beyond "test and treat"—Malaria diagnosis for improved pediatric fever management in sub-Saharan Africa' by Emily White Johansson [invited commentary]. Global Health Action 9:34416. PMID: 27989276.

165. MM Plucinski, ES Halsey, M Venkatesan, **SP Kachur**, PM Arguin (2017). Interpreting data from passive surveillance of antimalarial treatment failures [letter]. Antimicrobial Agents and Chemotherapy 61(6):e000498-17. PMID: 28539500.

166. LS Lau, G Samari, R Moresky, SE Casey, **SP Kachur**, L Roberts, M Zard (2020). COVID-19 in Humanitarian Settings and Lessons Learned from Past Epidemics [comment]. Nature Medicine (electronic release ahead of print publication). PMID: 32269357.

## Abstracts and Presentations

(limited to lead author presentations)

1. A role for medical treatment in the community based control of guinea worm disease. Oral presentation to the Nigerian Guinea Worm Eradication Program 2nd National Task Force Meeting. (Lagos  NIGERIA: 1988).

2. International collaboration in community-based medical education. Panel presentation with S Gloyd, J Ryan and G Smilkstein. National Council for International Health Annual Meeting (Washington, DC  USA: 1989).

3. Underserved, ignored or forgotten? Lessons from the international health community. Workshop presented with D Hilfiker and CW Keck to the Human Values in Medicine Program, Northeastern Ohio Universities College of Medicine (Rootstown, Ohio  USA: 1990).

4. HIV services in Baltimore and the impact of the Ryan White CARE Act (with AJ Sonnega and the Ryan White Services Project). Poster presentations at VIII International Conference on AIDS and III STD World Congress (Amsterdam  NETHERLANDS: 1992), and at American Public Health Association Annual Meeting (Washington, DC  USA: 1992).

5. Observations on the Greater Baltimore HIV Services Planning Council (with AJ Sonnega and the Ryan White Services Project). Poster presentations at VIII International Conference on AIDS and III STD World Congress (Amsterdam  NETHERLANDS: 1992), and at American Public Health Association Annual Meeting (Washington, DC  USA: 1992).

6. Years of potential life lost to firearm injuries in the United States. Oral presentation at the Epidemic Intelligence Service Conference (Atlanta, Georgia  USA: 1994).

7. Violent deaths associated with schools in the United State—a public health perspective and findings from a nation-wide study. Oral presentation with W. Modzeleski at CDC Epidemiology Grand Rounds (Atlanta, Georgia  USA: 1995).

8. Suicide among older persons in the United States, 1980 to 1992. Oral presentation at the Annual Meeting of the American Association of Suicidology (Phoenix, Arizona  USA: 1995).

9. Violent deaths associated with schools in the United States, 1992 to 1994. Oral presentation at CDC-sponsored National Violence Prevention Conference (Des Moines, Iowa   USA: 1995).

22

SP Kachur

10. Malaria prevention and treatment in the United States.  Oral presentation to Texas Department of Health Continuing Medical Education Conference (Austin, Texas   USA:  1996).

11. Narratives of fatal childhood illness in the Asembo Bednet Project.  Oral presentation to the Society for Literature and Science (Pittsburgh, Pennsylvania   USA:  1997).

12. Bednets, revisited:  sustainability of insecticide-treated materials for malaria control.  Lessons from the efficacy trials.  Oral presentation to 2nd International Congress of Vector Ecology (Orlando, Florida   USA: 1997).

13. Risk factors for child mortality in the Asembo Bednet Project.  Oral presentation at the 46th Annual Meeting of the American Society for Tropical Medicine and Hygiene (Lake Buena Vista, Florida   USA: 1997).

14. Social and behavioral science priorities for emerging infectious diseases.  Invited presentation with PJ Brown at American Psychological  Association-sponsored meeting:  Public Health in the 21st Century, Behavioral and Social Science Contributions (Atlanta, Georgia   USA: 1998).

15. Promoting rational antimalarial drug use by health workers, vendors and consumers.  Invited oral presentations of background papers prepared for CDC-supported workshops:  Confronting the challenge of antimalarial drug resistance in Africa (Nairobi   KENYA  and Harare   ZIMBABWE:  1998).

16. Causes of child mortality in the context of a bednet intervention trial in western Kenya.  Abstract accepted for oral presentation at 47th Annual Meeting of the American Society of Tropical Medicine and Hygiene (San Juan, Puerto Rico   USA:  1998); meeting cancelled.

17. Use of commercial pharmaceuticals in severe and fatal childhood illness in western Kenya.  Invited oral presentation at Makerere Institute of Social Research and Danish Bilharziasis Laboratory-sponsored workshop:  People and Medicines in East Africa (Mbale   UGANDA: 1998).

18. Local perceptions of malaria treatment options:  a cross national comparison.  Invited oral presentation at Makerere Institute of Social Research and Danish Bilharziasis Laboratory-sponsored workshop:  People and Medicines in East Africa (Mbale   UGANDA: 1998).

19. Malaria epidemiology and prevention.  Invited oral presentation to Los Alamos National Laboratory (Los Alamos, NM  USA: 1998).

20. Local illness classifications, treatment preferences and the construct of efficacy:  implications for malaria control programs in Zambia and Malawi.  Oral presentation at the American Anthropology Association Annual Meeting (Philadelphia, Pennsylvania   USA: 1998) and poster presentation at the Multilateral Initiative on Malaria 2nd PanAfrican Malaria Conference (Durban   SOUTH AFRICA: 1999).

21. Anthropological approaches to understanding community drug use:  implications for malaria control.  Oral presentation at the Society for Applied Anthropology Annual Meeting (San Francisco, California   USA: 2000).

22. Antimalarial drugs:  trends in drug resistance and efficacy perceptions among health workers and consumers.  Oral presentation at a Danish Bilharziasis Laboratory-sponsored workshop:  Rolling Back Malaria.  Prospects and Constraints (Usa River   TANZANIA: 2000).

23. Improving community drug use: a trials of improved practices approach to combating antimalarial drug resistance.  Invited presentation at 2nd International Conference on Emerging Infectious Diseases (Atlanta, Georgia   USA: 2001).

24. Home management of childhood febrile illness in the context of emerging antimalarial drug resistance, Blantyre District, Malawi.  Poster presentation at 49th Annual Meeting of the American Society of Tropical Medicine and Hygiene (Houston, Texas   USA:  2001).

25. Overview and baseline findings from the Interdisciplinary Monitoring Project for Antimalarial Combination Therapy in Tanzania.  Invited oral presentation at Harvard University-sponsored workshop:  Developing Methodologies for the Economic Assessment of Malaria Drug Combination Therapies (Cambridge, Massachusetts   USA: 2001).

23

SP Kachur

26. Home and community management in the era of antimalarial drug resistance.  Plenary oral presentation at Danish Bilharziasis Laboratory-sponsored workshop:  People and Malaria Medicines (Mbarara   UGANDA:  2001).

27. Post-modern, post-colonial, post-global:  examining the theoretical crisis in international public health.  Invited oral presentation at American Public Health Association's 129th Annual Meeting (Atlanta, Georgia USA:  2002).

28. A strategic framework for approaching interventions to improve malaria home care.  Invited presentation with V. Marsh at East Africa and Great Lakes subRegional Meeting for Roll Back Malaria (Mombasa   KENYA:  2002).

29. Utilization patterns for malaria treatment and prevention services in Blantyre District, Malawi.  Oral presentation at World Bank-supported meeting:  Ensuring Malaria Control Interventions Reach the Poor (London   UNITED KINGDOM, 2002).

30. Effective malaria treatment:  is access enough?  Panel discussion with P. Olumese, R. Shretta-Chag and A. Mwita at 3rd Multilateral Initiative on Malaria PanAfrican Malaria Conference (Arusha   TANZANIA:  2002).

31. Developing interventions to promote coadministration of sulfadoxine/ pyrimethamine and artesunate in rural Tanzania.  Poster presentation at 3rd Multilateral Initiative on Malaria PanAfrican Malaria Conference (Arusha   TANZANIA:  2002).

32. Prevalence of malaria parasitemia and recent pharmaceutical medicine use in rural Tanzania:  Implications for a multi-year evaluation of artemisinin-containing combination therapy.  Oral presentation at 3rd Multilateral Initiative on Malaria PanAfrican Malaria Conference (Arusha   TANZANIA:  2002).

33. Optimizing access to and utilization of malaria treatment in Africa.  Invited oral presentation of background paper for US Institute of Medicine Task Force on the Economics of Antimalarial Drugs (London   UNITED KINGDOM:  2003).

34. Implementation of artemisinin-containing antimalarial combination therapy in Tanzania.  Oral presentation at 52nd Annual Meeting of the American Society of Tropical Medicine and Hygiene (Philadelphia, Pennsylvania   USA:  2003).

35. Comparing socioeconomic status data across sites in repeated household surveys, methodologic considerations; and Describing quality of care received from retrospective interviews.  Oral presentations at London School of Hygiene and Tropical Medicine-sponsored Workshop on Undertaking Household Surveys in Low and Middle Income Countries  (Ahmedabad   INDIA:  2004).

36. Adherence to antimalarial combination therapy with sulfadoxine/ pyrimethamine plus artesunate in Tanzania:  a practical methodology for programmatic assessment.  Oral presentation at 53rd Annual Meeting of the American Society of Tropical Medicine and Hygiene (Miami, Florida   USA:  2004).

37. Implementation of artemisinin-containing combination therapies in an area of stable malaria transmission:  implications for enhanced diagnostic services.  Invited presentation to a World Health Organization technical consultancy on rapid diagnostic tests for malaria (Geneva   SWITZERLAND:  2004).

38. Prevalence of malaria parasitemia among clients obtaining treatment for fever or malaria at drug stores in rural Tanzania, 2004.  Oral presentation at 4th MIM Pan-African Conference on Malaria (Yaonde CAMEROON;  2005).

39. The plausibility design, quasi-experiments, and real world research:  A critical perspective.  Oral presentation to Conference on Ethnography of Health Research in African Settings (Kilifi KENYA:  2005).

40. Trends in malaria parasitemia, malaria-related anemia and malaria-related child mortality before, during and after the introduction of sulfadoxine/ pyrimethamine monotherapy and artemisinin-based combination therapy.  Oral presentation to 55th annual meeting American Society of Tropical Medicine and Hygiene (Atlanta, GA   USA:  2006).

24

41. Consumer perceptions and care seeking for febrile illness associated with the availability of antimalarial combination therapy in Rufiji District, Tanzania, 2003-2006.  Oral presentation to 56th annual meeting American Society of Tropical Medicine and Hygiene (Philadelphia, PA   USA:  2007).

42. Quality of antimalarial drugs sold at retail outlets in Tanzania, 2005.  Results of a nationally representative survey: Poster presentation to 56th annual meeting American Society of Tropical Medicine and Hygiene (Philadelphia, PA   USA:  2007).

43. Factors impacting the effectiveness of antimalarial combination therapy interventions.  Oral presentation at 5th MIM Pan-African Congress on Malaria (Nairobi   KENYA: 2009).

44. Potential role for transmission blocking vaccines in the context of scaled up malaria control and elimination efforts.  Invited oral presentation at Symposium on Malaria Transmission Blocking Vaccines, sponsored by Malaria Vaccine Initiative, with J Skarbinski and L Slutsker (Bethesda, Maryland   USA: 2010).

45. Investing in Strategic and Applied Science for Malaria at CDC.  Invited presentation at Advancements in US Science and Technology, a Capitol Hill Reception convened by Malaria No More, with R Shah, B Hall, and P Weina (Washington, DC   USA; 2012).

46. Malaria Control and Elimination:  Progress and Promise.  Invited key note lecture at annual meeting of the Malaria Capacity Development Consortium (Atlanta, Georgia   USA; 2012).

47. Malaria elimination redux.  Invited presentation at "Disease Elimination and Eradication in Theory and Practice: Multidisciplinary Perspectives" sponsored by Emory University Institute for Developing Nations and Carter Center Malaria Program  (Atlanta, Georgia   USA; 2013).

48. How is the malaria landscape shifting? Closing remarks from a veteran in the war against malaria.  Keynote presentation at "The Secret Life of Malaria: A Global Journey to Cure and Prevention," organized by University of Georgia Center for Tropical and Emerging Diseases (Athens, Georgia   USA; 2014).

49. Rethinking tactics in the new push for malaria elimination.  Invited presentation at "World Malaria Day, 2014: Fighting Malaria with Faith and Facts," sponsored by Johns Hopkins Malaria Research Institute (Baltimore, Maryland   USA; 2014).

50. Haemoloysis in US patients treated with intravenous artesunate.  Symposium presentation at 24th European Congress on Clinical Microbiology and Infectious Diseases (Barcelona   SPAIN; 2014).

51. The threat of artemisinin and pyrethroid resistance [Chair].  Invited panel presentation with Pascal Ringwald, Christopher Plowe, Fredros Okumu, and Martin Akogbeto, at "A Strategic Approach to Malaria in the Post-2015 Era," sponsored by Center for Strategic International Studies (Washington, DC   USA; 2014).

52. CDC and the global response to the Zika virus public health emergency. Invited presentation to the United Nations Economic and Social Council (New York, NY USA; 2016).

53. Zika virus: clinical considerations and CDC response. Invited panel presentation with C Chinn, J Patz, K Spong, and M Wilson at 8th Annual Global Health Conference, Consortium of Universities for Global Health (San Francisco, CA USA; 2016).

54. Achieving a bold vision for global health: Policy solutions to advance global health research and development. Invited panel presentation with: P Hotez, J Kolkor, D Shoultz and E Will Morton, sponsored by Global Health Technologies Coalition at Russell Senate Office Building (Washington, DC USA; 2016).

55. Combatting infectious disease: the unfolding threat of Zika. Invited panel presentation with: JS Morrison, A Pope, M Espinal and D Dulitsky, at Center for Strategic and International Studies' Annual Global Development Forum (Washington, DC USA; 2016).

56. Priority setting in global health symposium. Invited panel presentation at Harvard TH Chan School of Public Health (Cambridge, MA USA; 2016).

57. Malaria Epidemiology, Control and Treatment.  Invited presentation at Congressional Briefing (Washington, DC   USA; 2017).

25

58. Surveillance as a malaria intervention, pivoting from control to elimination.  Invited panel presentation with B Nahlen, BL Hall, S Hoffman and L Slutsker at inaugural Alan J Magill Malaria Eradication Symposium sponsored by American Society of Tropical Medicine and Hygiene and Council for Strategic International Studies (Washington, DC  USA; 2017).

59. The on-going fight to eliminate malaria.  Invited panel presentation with S Baker, I Priestley and D Zimmerman at Rotary International Convention (Atlanta, GA   USA; 2017).

60. Fulcrum or fetish? The appeal of commodities in the global malaria effort.  Leverhulme Lecture at Liverpool School of Tropical Medicine (Liverpool   UNITED KINGDOM; 2017).

61. CDC and US Government contributions to the global malaria effort.  Presentation to Washington Global Health Alliance (Seattle, WA; 2017).

62. Malaria Control:  A critical investment for saving lives in Africa.  Invited panel presentation with J Kates, B Nahlen, SS Peterson, R Rabinovich, A Glassman, sponsored by Center for Global Development and American Society of Tropical Medicine and Hygiene (Washington, DC; 2017).

63. US Government Priorities for Ending Preventable Child and Maternal Deaths.  Invited panel presentation with B Hughes and BL Nahlen at US State Department's Foreign Service Institute Global Health Diplomacy Course (Washington, DC; 2017).

64. Disease on our borders:  Fighting global health threats in the Americas.  Invited panel presentation with Marcos Espinal, and Greg Noland at UN Foundation Nothing But Nets Malaria Leadership Summit (Washington, DC; 2018).

65. Malaria elimination in high burden countries.  Invited panel presentation with K Sturm-Ramirez at Science of Eradication—Malaria Course, sponsored by Harvard University (Cambridge, MA; 2018).

66. Malaria Control:  Where are we now?  Grand Rounds webinar presentation to ICAP at Columbia University (New York, NY; 2018).

67. Epidemiology, control and prevention of malaria in pregnancy and implications for maternal and newborn survival. Invited presentation to Department of Family Health Services, Ministry of Health (Monrovia LIBERIA; 2019).

68. Malaria:  Progress and promise.  Watanakunakorn Memorial Lecture.  Northeast Ohio Medical University (Rootstown, OH; 2019).

69. Community Health Planning and Services in Ghana:  Implementation Science for Universal Health Coverage.  Invited presentation at Korea International Cooperation Agency's Ghana Community-based Primary Health Care Conference (Seoul, REPUBLIC OF KOREA; 2019).

70. Transforming the epidemiology of malaria through control and elimination efforts.  Infectious Disease Epidemiology Seminar, Department of Epidemiology, Columbia University Mailman School of Public Health (New York, NY; 2019).

71. Tangible and intangible assets for malaria programs across the elimination spectrum.  Invited presentation at the Allan Magill Symposium.  American Society for Tropical Medicine and Hygiene (National Harbor, MD; 2019).  CANCELLED.

# Exhibit C

## LESLIE F. ROBERTS, PHD

| | |
|---|---|
| **Address** | Columbia University Mailman School of Public Health |
| | Heilbrunn Department of Population and Family Health |
| | 60 Haven B-2 |
| | New York, NY 10032 |
| | lfr2102@cumc.columbia.edu |

**Education**

| | |
|---|---|
| Ph.D. | (1992) Johns Hopkins University, Baltimore, MD |
| | Department of Geography and Environmental Engineering |
| M.S.P.H. | (1987) Tulane School of Public Health and Tropical Medicine, LA |
| | Department of Environmental Health |
| B.S. | (1983) St. Lawrence University, Canton, NY |
| | Major: Physics |

**Professional Experience**

| | |
|---|---|
| 9-11/14, 3-4/15 | **Regional Epidemiologist & Foreign Medical team Coordinator,** WHO, Sierra Leone. Worked as an administrator and epidemiologist to address an EVD outbreak. |
| 4/14 – Present | **Professor**, Columbia Univ., Mailman School of Pub. Hlth. |
| 11/17 – 8/18 | **Director, Program on Forced Migration and Health** |
| 3/12 – 3/14 | |
| 9/06 – 3/14 | **Associate Professor of Clinical Public Health** |
| 10/02 – 9/06 | **Adjunct Faculty**, Columbia Univ., Mailman School of Pub. Health, NY, NY. Teaching responsibilities include: courses in applied epidemiology for complex emergencies, water and sanitation, and epidemiological methods for documenting human rights abuses. |
| 3/97 – 11/00 | |
| 5/03 – 9/06 | **Consultant**, Clients included: Univ. of B.C. Human Security Centre; Overseas Development Institute (ODI); City of Westminster, CO.; a recreational water park in Georgia; Centers for Disease Control and Prevention; and the International Rescue Committee. Teaching clients |

1

included:  BPRM of the US State Dept., USAID, University of Hawaii COE, CDC, the National Academy of Pediatrics and ICDDR,B.  In 2005, provided technical oversight and support of a World Bank funded project in Afghanistan.

9/95 – 7/2006    **Lecturer**, Department of Geography and Environmental Engineering, Johns Hopkins Whiting School of Engineering.  Responsibilities include:  teaching a joint engineering – public health course entitled, "Engineering Responses to Public Health Crises" and giving approximately 10 other lectures each year.    In 2003, ran seminar entitled, "Epidemiological Methods for Documenting Human Rights Abuses."

12/00  - 5/03    **Director of Health Policy**, International Rescue Committee, NY, NY.  Responsibilities included:  developing policy for health programs, providing technical support and oversight for 5 programs in the Great Lakes Region of Africa, providing epidemiological support and training.  Conducted mortality surveys in Rwanda, the Democratic Republic of Congo and Sierra Leone.

6/97 – Present    **Adjunct Faculty**, Tulane School of Public Health and Tropical Medicine.  Conduct an intensive summer course entitled, "Field Methods in Complex Emergencies."

5/95 – 2/97    **Sr. Assistant Scientist**, CDC, Nat. Ctr. Environmental Health, EHHE, HSB Activities included:  conducting human health studies regarding domestic water issues; providing technical support to staff epidemiologists and oversight of EIS Fellows; assisted in humanitarian relief efforts related to water and sanitation; and responded to public, congressional, and technical inquiries.  Teaching activities included:  lectures at the Emory Rollins School of Public Health, the Army War College, the University of Maryland, and U.S. Office of Foreign Disaster Assistance workshops in Bangladesh and Hawaii, and an intensive week-long class at Johns Hopkins University.  Represented CDC as the Executive Secretary of the HHS Subcommittee on Drinking Water and Health, a body for coordinating Federal efforts related to human health and drinking water.

10/94 - 4/95    **Consultant**, Activities included:  lecturing in the U.S. Office of Foreign Disaster Assistance Training Course and at the Johns Hopkins School of Public Health, reviewing reports for UNICEF.

6/94 - 9/94    **Epidemiologist**, World Health Organization, Rwanda.  Established disease surveillance systems and assisted with epidemic responses in Northern Rwanda and Goma, Zaire.

7/92 - 5/94    **EIS Officer**, CDC/International Health Pgm. Office/TSD, Atlanta, GA.

2

As a postdoctoral fellow, conducted assessments in Southern Africa and Bosnia; a nationwide household survey in Armenia, and an intervention trial to prevent diarrhea among refugees in Malawi.

12/90 - 5/91     **Study Director**, PRISMA, Lima, Peru.
Conducted a study of the movement of fecal material within shantytown households.

5/90 - 10/90     **Public Health Engineer II**, DOE, Dundalk, MD.  Conducted field studies examining the function of stormwater management facilities.

1/85 - 6/85      **Physics Teacher**, Fayetteville-Manlius High School, Fayetteville, NY.

9/83 - 6/84      **Physics Teacher**, Old Rochester Regional High School, Mattapoiset, MA.

## Selected Publications

Lau LS et al.  COVID-19 in Humanitarian Settings and Lessons Learned from Past Epidemics. Nature Medicine volume 26, pages647–648(2020).

Jarrett P, Zadravecz FJ, O'Keefe J, Nshombo M, Karume A, and Roberts L.  Evaluation of a population mobility, mortality, and birth surveillance system in South Kivu, Democratic Republic of the Congo.  Disasters, 2020, 44(2): 390−407.

Flaherty MG, Roberts L.  Internet searching and potential for promoting humanitarian injustice: short report.  Confl Health. 2019; 13: 4

Briody C, Rubenstien L, Roberts L. Penney E,  Keenan W, Horbar J.   Review of attacks on health care facilities in six conflicts of the past three decades.  Confl Health. 2018; 12: 19.

Roberts LF.  When Violence becomes Endemic.  Int. J. Pub. Hlth. June 2017.

Sara A. Snyder, and Columbia Epidemiology of Human Rights Study Group.  The Eric Garner Case: Statewide survey of NY voters' response to proposed police accountability legislation. J. of Social Service Research.  October 2016.

Bennouna, Cyril; van Boetzelaer, Elburg; Rojas, Lina; Richard, Kinyera; Karume, Gang ; Nshombo, Marius ; Roberts, Les; Boothby, Neil.  Monitoring and Reporting Attacks on Education in Somalia and the Democratic Republic of the Congo. Disasters. Aug. 9, 2017

Bennouna C. Ali I, Nshombo M, Karume G, Roberts L.  Improving surveillance of attacks on children and education in South Kivu: A knowledge collection and sensitivity analysis in the D.R. Congo.   Vulnerable   Children   &   Youth   Studies.   23   Jan,   2016 http://dx.doi.org/10.1080/17450128.2016.1139221

3

Checchi F, Waldman R, Roberts L. et al.  The World Health Organization and emergency health: if not now, when?  *BMJ* 2016; 352 doi: http://dx.doi.org/10.1136/bmj.i469  (Published 28 January 2016)

Parcesepe A, Stark L, Roberts L. Boothby N. Measuring Physical Violence and Rape Against Somali Women Using the Neighborhood Method.  Violence Against Women.  1-17, 2015.

Roberts L, VanRooyen MJ. Ensuring Public Health Neutrality.  New Engl. J. Med.  2013;368: 1073-1075.  March 21.

Carpenter D, Fuller T, Roberts L.  WikiLeaks and Iraq Body Count: the Sum of Parts May Not Add Up to the Whole-A Comparison of Two Tallies of Iraqi Civilian Deaths. Prehospital and Disaster Med. 2013 Feb 6:1-7.

Alfaro S, Myer K, Anonymous,  Ali I, and Roberts L.  Estimating Human Rights Violations in South Kivu Province, Democratic Republic of the Congo: A Population-Based Survey.  Vulnerable Children and Youth Studies.  7;3:201-210. Sept. 2012

Potts A, Myer K, Roberts L. Measuring human rights violations: Results from a nationwide cluster survey in Central African Republic.  Conflict and Health.  2011; 5: 4.

Henderson SW, Olander WE, Roberts LF.  Reporting Iraqi civilian fatalities in a time of war.  Conflict and Health.  Nov. 2009; 3:9.

Stark L, Roberts L, Wheaton W, et al. Measuring Violence against Women amidst War and Displacement in Northern Uganda Using the 'Neighborhood Method.'  JECH Online First, Nov. 24, 2009.  10.1136/jech.2009.093799

Cairns LK, Woodruff BA, Myatt M, Bartlett L, Goldberg H. and Roberts L. Cross-sectional survey methods to assess retrospectively mortality in humanitarian emergencies.  Disasters. Vol. 33(4) :503-21.  Feb. 17, 2009.

Flaherty MG, Roberts L. Rural Outreach Training Efforts to Clinicians and Public Library Staff: NLM Resource Promotion.  J of Consumer Hlth. on the Internet. Vol. 13(1):14-30.  Jan. 2009.

Siegler A, Roberts L, Balch E. et al. Media Coverage of Violent Deaths in Iraq:  An Opportunistic Capture-Recapture Analysis.  Prehosp. and Disaster Med. 2008; 23(4):369-371.

Checchi F, Roberts L. Documenting mortality in crises: what keeps us from doing better?  PLoS Med. 2008 Jul 1;5(7):e146

Roberts L. Advances in monitoring have not translated into improvements in humanitarian health

4

services.  Prehosp. Disaster Med. 2007 Sept-Oct;22(5):384-9.

Burnham G, Doocy S, Roberts L. Making data on Iraqi mortality rates available. Science: Vol 316. No 5830: 1424-5. June 2007.

Burnham G, Roberts L. A Debate Over Iraqi Death Estimates. *Science* **24:** Vol. 314 no. 5803 (1241). Nov 2006.

G Burnham, R Lafta, S Doocy, L Roberts.  Mortality after the 2003 invasion of Iraq: a cross-sectional cluster sample survey.  Lancet Vol. 368; 9545: 1421–1428. Oct. 2006

Salama P, Roberts L.
        Evidence-based interventions in complex emergencies. Lancet. 2005 May 28;365(9474):1848.

Roberts L, Lafta R, Garfield R, et al.
        Mortality before and after the 2003 invasion of Iraq: cluster sample survey.  Lancet. Volume 364;9448:1857-1864. Oct. 29, 2004.

Roberts L, Hoffman C-A.
        Assessing the impact of humanitarian assistance in the health sector.  Emerging Themes in Epidemiology. Vol. 1:3, October 7, 2004

Roberts L.
        Little relief for eastern Democratic Republic of Congo.  Lancet (Dispatch) Vol. 357;9266:1421, May 5, 2001.

Roberts L, Chartier Y, Toole M, et al.
        Keeping Clean Water Clean in a Malawi Refugee Camp: A Randomized Intervention Trial. Bull. W.H.O., Vol. 79(4):280-287, 2001.

Mermin, J, Villar R, Carpenter J, Roberts L, et al.
        A Massive Epidemic of Multidrug-Resistant Typhoid Fever in Tajikistan Associated with Consumption of Municipal Water. *Journal of Infectious Diseases.* 179 (6): 1416-1422. June, 1999.

Roberts L, Despines M.
        Mortality in Katana Health Zone, Eastern DRC.  Lancet (Letter) Vol. 353;9171:2249-50, Jan. 26, 1999.

Peterson AE, Roberts L, Toole MJ, et al.
        The Effect of Soap Distribution on Diarrhea: Nyamithuthu Refugee Camp.  Int. J. of Epi., 1998;27:520-524.

5

Semenza J, Roberts L, Henderson A, et al.
> Water Distribution System and Diarrheal Disease Transmission: A Case Study in Uzbekistan.  Am. J. Trop. Med. Hyg. 59(6), 1998, pp. 941-46.

Roberts L, Toole M.
> Cholera Deaths in Goma (Letter).  Lancet, Vol.346:1431.   Nov. 25, 1995.

Goma Epidemiology Group
> Public Health Impact of Rwandan Refugee Crisis: What Happened in Goma, Zaire, in July, 1994? Lancet.  Vol.345:339-44.  Feb. 11, 1995.

Ventura G, Roberts L, Gilman R.
> Vibrio cholerae non-O1 in sewage lagoons and seasonality in Peru cholera epidemic. Lancet. 339(8798):937-8.  Apr. 11, 1992.

Lindsay G, Roberts L, Page W.
> Inspection and Maintenance of Infiltration Facilities.   Journal of Soil and Water Conservation  Vol. 47(6):481-486.  Nov. 1992.

Esrey SA, Potash JB, Roberts LF, Shiff C.
> Water Supply and Sanitation: Health Effects on Ascariasis, Diarrhoea, Guinea Worm, Hookworm, Schistosomiasis, and Trachoma. Bull. W.H.O. 69 (5):609-621, 1991.

## MMWR Publications

> Elevated Mortality Associated With Armed Conflict --- Democratic Republic of Congo, 2002.  Vol. 52(20); 469-471.

> Spontaneous Abortions Possibly Related to Ingestion of Nitrate-Contaminated Well Water -- LaGrange County, Indiana, 1991-1994.  Vol. 45(26); 569-572.

> Status of Public Health - Bosnia and Herzegovina, August-September 1993.  Vol. 42;50:973-82.

> Mortality among Newly Arrived Mozambican Refugees - Zimbabwe and Malawi, 1992. Vol. 42;24:468-77.

## Other Publications

Roberts L. War: Not Anarchy but Shrinking Circles.  In: Why Peace? Marc Guttman Editor, 2012.

Roberts L. Advancing Humanitarian Aid: Infusing the era of hope with a dash of accountability.  In *Health  G20.*   Carballo M Editor. International Center for Migration. Oct. 2010.

6

http://healthg20.com/info

Roberts LF. A Plea For Cost-Effectiveness, or at Least Avoiding Public Health Malpractice
Am J Public Health, Sep 2009; 99: 1546 - 1548.

Roberts L, Muganda C. War in the Democratic Republic of Congo.  In Levy B & Sidel V (Eds.),
War and Public Health. Oxford: 2008.

Roberts L. Burnham G.  Ignorance of Iraqi death toll no longer an option.  Global Research Sept. 22,
2007.  http://www.globalresearch.ca/index.php?context=va&aid=6848 and in Baltimore Sun and
Oneonta Daily Star.

Roberts L. Iraq's Death Toll is Far Worse than our Leaders Admit.  Independent. Feb. 14, 2007.
http://www.independent.co.uk/opinion/commentators/les-roberts-iraqs-death-toll-is-far-worse-than-
our-leaders-admit-436291.html

Roberts L.
        100,000 deaths in Iraq: A year later.  American Friends Service Committee Oct. 26, 2005
        http://www.afsc.org/iraq/news/2005/10/100000-deaths-in-iraq-year-later.htm        and        in
        Baltimore Times.

Roberts L.
        The Iraq War: Do Civilian Casualties Matter?  Audit of Conventional Wisdom, MIT Center
        for International Studies, July 2005.

Roberts L.
        Civilian Deaths a Murky Issue in the War in Iraq.  Humanitarian Exchange, Humanitarian
        Practice Network, #29, Mar. 2005.

Checci F, Roberts L.
        Interpreting and Using Mortality Data in Humanitarian Emergencies: A Primer for Non-
        Epidemiologists.  Humanitarian Policy Network Paper #52, 2005.

Lafta R, Roberts L, Garfield R and Burnham G.
         Role of Small Arms during the 2003 – 2004 Conflict in Iraq.  Working Paper 1.  Small Arms
        Survey, Geneva, Switzerland 2005.

Roberts L, Ngoy P, Mone C. et al.
        Mortality in the Democratic Republic of the Congo: Results from a nation-wide survey.
        IRC, New York, March 2003. http://www.theirc.org/DRCongo/index.cfm Accessed 1/10/03

Roberts L, Hale C, Belyakdoumi F, et al.
        Mortality in Eastern Democratic Republic of Congo: Results from Eleven Mortality Surveys.
        IRC, New York, 2001.  http://intranet.theirc.org/docs/mortII_report.pdf  Accessed 11/20/02

7

Roberts L.
   Mortality in Eastern DRC: Results from Five Mortality Surveys.  The International Rescue
   Committee, May, 2000.

Roberts L.
   Diminishing standards: How much water do people need?  In *Forum: Water and War*.
   Geneva: ICRC, 1998.

Esrey SA, Shiff C, Roberts LF, Potash JB.
   The Health Benefits following Improvements in Water and Sanitation: Synthesis of Existing
   Knowledge concerning Diarrheal Disease, Ascariasis, Guinea Worm, Hookworm,
   Schistosomiasis, and Trachoma.  W.A.S.H. Technical Report #66.  June, 1990.

Reinke WA, Stanton BF, Roberts L, Newman J.
   Rapid Assessments for Decision Making: Efficient Methods for Data Collection and
   Analysis.  W.A.S.H. Field Report #391.  January, 1993.

Roberts L, Lindsey G.
   Maintenance Needs of Stormwater Facilities in Baltimore, Carroll, Cecil, and Harford
   Counties.  Maryland Department of the Environment, Sediment and Stormwater
   Administration.  Dundalk, Maryland.  September, 1990.

## Awards and Honors

2012          Teaching Excellence Award, Mailman School of Public Health.

2008          Edward Barsky Award at APHA Annual Conference.

2007          APHA Special Award for Conflict Epidemiological Research,.  With Burnham G,
              Doocy, S, Lafta R.

2006          Ambassador, Paul G. Rogers Society for Global Health Research.

1995          The Paul C. Schnitker Award for Outstanding Contribution to International Health,
              Centers for Disease Control and Prevention, Atlanta, GA., March.

1994          Medal of Achievement, USPHS, Spring.

1990 – 1991   The Dick C. Heil Memorial Scholarship.  Chesapeake Chapter of the American
              Water Works Association.

# Exhibit D

**Bradley A. Woodruff, MD, MPH**
November 30, 2020

**Postal address**:
2650 Bowker Avenue
Victoria, BC V8R 2G1
Canada

**Contact information**:
E-mail: bradleyawoodruff@gmail.com
Skype name: BradWoodruff
Telephone: +1 (778) 967-1874

**Residence**:
Victoria, BC CANADA
GMT -7 hours (summer)
GMT -8 hours (winter)

## EDUCATION

E.I.S.   Epidemic Intelligence Service, Centers for Disease Control, stationed in West Virginia Department of Health. June 1989.

M.P.H.   The Johns Hopkins University School of Hygiene and Public Health, Baltimore, MD.  May 1986. Concentration in epidemiology and international health.

M.D.   Upstate Medical Center, Syracuse, N.Y.  May 1980.

B.A.   State University College at Fredonia, N.Y. and State University of New York at Buffalo, in biology. January 1976.

## HONORS AND AWARDS

**Awards from the United States Government**:

Charles C. Shepard Award for Outstanding Scientific Contribution to Public Health, 2003.

Secretary's Award for Distinguished Service; Department of Health and Human Services, 2000.

Achievement Medal; United States Public Health Service, 1993.

PHS Citation; United States Public Health Service, 1989.

NCEH Director's Award (2), 1997 and 2000.

Outstanding Unit Citations (3); United States Public Health Service, 1995, 1997, and 2001.

Meritorious Group Award; U.S. Agency for International Development, 2003.

Unit Commendations (6); United States Public Health Service, 1989 (2), 1992, 1993 (2), 2003.

Group Special Recognition Award; United States Dept of Health and Human Service, 1992.

Group Honor Award, International Health; United States Dept of Health and Human Service, 1997.

Foreign Duty Service Ribbons (11); United States Public Health Service, 1992-2003.

Hazardous Duty Service Ribbon (3); United States Public Health Service, 1993, 1994, 2003.

Isolated Hardship Service Ribbon; United States Public Health Service, 1994.

Crisis Response Service Ribbon; United States Public Health Service, 1994.

Special Assignment Service Ribbon; United States Public Health Service, 1995.

**Other honors and awards**:

Dean's List, Phi Beta Kappa, and Summa Cum Laude; State University of N.Y., 1970-76.

Alpha Omega Alpha Medical Honor Society; Upstate Medical Center, 1979.

Listed in Who's Who in Medicine and Health Care 2009-2010 7th edition and International Who's Who in Medicine, 2nd edition, 1995.

Distinguished Alumnus, Upstate Medical Center, 2010.

## LICENSES AND CERTIFICATES

State medical license in New York, 1981; Pennsylvania, 1983; and Maryland, 1985.  National medical license in Kenya, 1983.

Bradley A. Woodruff, MD MPH                                                                    -2-

**WORK EXPERIENCE**

**Positions in Epidemiology and Public Health:**

*July 2007 – present:*  Consultant in International Health and Nutrition.

Assist non-governmental organizations and United Nations agencies, including the World Food Programme, the World Health Organization, and UNICEF, in carrying out assessments, evaluations, and studies of public health and nutrition programs in less-developed countries.  Provide training and supervision, both in the classroom and in the field, for agency personnel in epidemiologic techniques of assessment and investigation.  Review protocols, reports, and other documents for technical quality and accuracy.  Write technical reports and articles for publication.

*June 2004 – June 2007:*  Senior Medical Epidemiologist, International Micronutrient Malnutrition Prevention and Control Program (IMMPaCt), Maternal Child Nutrition Branch, National Center for Chronic Disease Prevention and Health Promotion, Centers for Disease Control and Prevention (CDC), U.S. Public Health Service; Atlanta, Georgia.

Provide technical supervision to IMMPaCt staff in matters of micronutrient status assessment, program design, and other issues.  Investigate improvements in survey and assessment methodology and make recommendations to IMMPaCt and Branch leadership.

Design training programs for partner organizations, including UNICEF, the World Food Programme, and the Pan-American Health Organization, in methods of assessing micronutrient status, laboratory techniques of measuring micronutrient status, and monitoring and evaluation of micronutrient deficiency prevention and control programs.  Design and teach a course at the Rollins School of Public Health at Emory University on food and nutrition in humanitarian emergencies.

Write and review guidelines for the World Food Programme, UNICEF, USAID, and other organizations on nutrition assessment techniques in both humanitarian emergencies and stable populations.

Supervised Epidemic Intelligence Service officers during 2-year training in epidemiology and public health.

*April 1996 – June 2004:*  Medical Epidemiologist, International Emergency and Refugee Health Branch, National Center for Environmental Health, Centers for Disease Control and Prevention (CDC), U.S. Public Health Service; Atlanta, Georgia.  Job duties included:

Responded to requests for technical assistance from other organizations, including other parts of the U.S. government, U.N. agencies, international organizations, and nongovernmental organizations (NGOs).  Such technical assistance activities encompassed all fields of public health, disease control, and nutrition in humanitarian emergencies.  Specific activities included management and technical direction of the public health portions of multimillion dollar relief programs, quantitative and qualitative assessment of the health and nutrition status of displaced populations, evaluation of specific programs, and implementation of disease control programs.  Assisted other parts of CDC in activities related to refugees and displaced populations.

Trained health personnel from many organizations in public health practice in refugee emergencies, including designing curriculum, presenting lectures, and facilitating exercises and case studies.

Determined research priorities in refugee and emergency response, prepare and supervise preparation of research project proposals and protocols, obtain funding, and implement and supervise research studies.

Developed and implemented International Emergency Capacity Development program, a training program for CDC personnel with a $185,000 annual budget.  Oversaw all aspects of this program, including recruitment and selection of training candidates, development of curriculum,

review of technical content, development and selection of teaching methods, implementation of special seminars, and organization of overseas field experiences.

Wrote guidelines and recommendations for refugee health and nutrition. Provided technical expertise to international groups and committees writing such guidelines and developing consensus regarding best practices in public health in emergency situations. Carried out research on all aspects of refugee health and nutrition and presented results in published scientific articles and presentations.

Supervised Epidemic Intelligence Service officers during 2-year training in epidemiology and public health.

*May 2000 – June 2001*: <u>Acting Chief, International Emergency and Refugee Health Branch</u>, National Center for Environmental Health, Centers for Disease Control and Prevention (CDC), U.S. Public Health Service; Atlanta, Georgia.

Coordinated CDC's overall response to refugee and humanitarian emergencies, including providing liaison with other parts of the U.S. government, U.N. agencies, international organizations, and nongovernmental organizations. Provided supervision for eight staff members and oversaw all activities of the Branch and maintained coordination with other parts of the National Center for Environmental Health and CDC. The total budget of the Branch increased from $US 1.2 million to $US 6.2 million during this time.

*July 1990 - March 1996:* <u>Medical Epidemiologist; Hepatitis Branch, Division of Viral and Rickettsial Diseases</u>, Centers for Disease Control and Prevention (CDC), U.S. Public Health Service; Atlanta, Georgia.

a) In San Francisco (May 1992 - March 1996):

Infant hepatitis B vaccination. Implemented demonstration project funded by a $1.5 million federal grant to carry out universal infant immunization against hepatitis B in the city of San Francisco. Duties included developing policy guidelines for administration of hepatitis B vaccine, coordinating research projects, and supervising 7 full-time project staff members and 6 public health students. Program implementation activities included organizing community advisory committee meetings, developing a vaccine distribution system, and designing a vaccine dose reporting system. Also served as liaison to San Francisco medical providers and conducted educational campaigns, including publishing articles in local medical publications and giving numerous presentations at Pediatric Grand Rounds and other medical meetings on hepatitis B virus infection, hepatitis B control strategies, hepatitis B vaccination, and the San Francisco Demonstration Project.

Supervised staff members, public health students, and preventive medicine residents who carried out research projects, including: 1) a questionnaire survey of hospital nursery staff regarding attitudes toward hepatitis B vaccination of newborns; 2) medical record reviews in birthing hospitals to estimate first dose vaccine coverage of newborns at the time of hospital discharge; 3) medical record reviews in public clinics and private offices to estimate overall vaccine coverage at 9 months of age; 4) a questionnaire survey of parents of infants to estimate vaccine coverage, attitudes toward hepatitis B vaccination, and barriers to vaccination; 5) a survey of nursing administrators of obstetric hospitals in the San Francisco. metropolitan area to assess policies and practices regarding newborn hepatitis B vaccination; 6) a survey of obstetric providers to determine feasibility of providing vaccination education during prenatal visits. Collaborated on questionnaire survey of pediatric providers to determine why and when pediatricians incorporate new preventive technologies into their practice. Assisted staff members and students in preparing presentations for national scientific meetings and articles for publication in peer-reviewed biomedical journals.

School-based hepatitis B vaccination. Served as technical consultant to the San Francisco Unified School District for pilot project in adolescent in-school hepatitis B vaccination. Reviewed for technical accuracy all materials produced during the project, including those for teacher, student,

Bradley A. Woodruff, MD MPH                                                                -4-

and parent education.  Supervised design and conduct of: 1) pre- and post-testing of students to assess knowledge acquired during lessons about hepatitis B; 2) a questionnaire survey of parents to determine attitudes about school-based vaccination and reasons for consenting to or refusing vaccination; 3) collection and analysis of data from refusal form on reason for refusal; and 4) an intervention trial to assess the effect of incentives designed to induce peer pressure.  Supervised planning and conduct of meeting of school-based hepatitis B vaccination projects to summarize nationwide experience and preparation of a comprehensive report.

   Other projects.  1) Served as technical consultant to the Vietnamese Community Health Promotion Project of the University of California, San Francisco for their cancer prevention program; one portion included health education about hepatitis B and hepatitis B vaccination.  2) Designed and conducted a serologic and questionnaire survey of employees of the Oakland Police Department to determine the occupational risk of hepatitis B virus infection.  3) Designed and collaborated in conduct of serologic survey of residents of a residential institution for developmentally disabled persons to determine risk of hepatitis C and hepatitis A virus infections.   4) Designed and collaborated in conduct of immunogenicity trial of hepatitis B vaccination of adolescents according to a 0,2,4 months schedule.  5) Analyzed hospital and outpatient data to determine risk of various adverse reactions to hepatitis B vaccination among newborns.

b) In Atlanta (July 1990 - May 1992):

   Responsible for conduct of epidemiologic research supporting implementation of initiative to eliminate hepatitis B virus transmission in the United States.  Also participated in education of state and local health officials, practicing physicians, and others regarding perinatal hepatitis B screening and infant immunization.

   Other research activities included:  1) Assisted in planning and execution of a serologic survey to evaluate the hepatitis B vaccination program in American Samoa;  2) Planned and collected specimens for a study comparing the detection hepatitis B serologic markers in dried blood spot specimens and serum specimens;  3) Directed collection of data and special studies of adverse reactions to recombinant hepatitis B vaccines;  4) Collected and analyzed available hepatitis B screening data from health programs for refugees entering the United States;  5) Designed a case-control study of the association  of hepatitis C infection and primary hepatocellular carcinoma; 6) Designed and carried out a multicenter serologic and questionnaire survey of public safety workers to investigate their risk of occupational hepatitis B virus infection;  7) Reviewed available research results on intradermal administration of hepatitis B vaccine and presented results in publications; 8) Coordinated testing and analyzed data from serum specimens from migrant workers in San Diego County, California to determine prevalence of past hepatitis E virus infection; and  9) Coordinated testing and analyzed data from serum specimens from slum dwellers in Trujillo, Peru to determine the prevalence of hepatitis E virus infection.

   Supervised and assisted epidemiology trainees during field outbreak investigations and analytic projects, specifically the investigation of an outbreak of hepatitis A in a residential institution for the severely disabled, the investigation of a nosocomial outbreak of hepatitis A in a pediatric hospital, and a serologic survey for hepatitis B and C virus infection in women seeking prenatal care in San Juan, Puerto Rico.

   Answered inquiries regarding viral hepatitis from state and local health officials, private physicians, journalists, and the public.

*July 1989 - June 1990:*  Resident in Preventive Medicine; Enteric Disease Branch, Division of Bacterial Diseases, Centers for Disease Control (CDC), U.S. Public Health Service; Atlanta, Georgia.

   Reviewed current status of immunization against typhoid fever, including all work, published and unpublished, on the Ty21a oral vaccine and presented a summary to the Immunization Practices Advisory Committee (ACIP).

Collected and analyzed 14 years of botulism surveillance and laboratory data to explore clinical and laboratory differences between types A, B, and E botulism.

Carried out survey of state health department policies regarding chronic typhoid carriers and compiled epidemiologic description of currently known carriers in the United States.

Supervised and assisted epidemiology trainees during field investigations of outbreaks, specifically a state-wide outbreak of *Salmonella heidelberg* in Maine and a community outbreak of E. Coli O157:H7 in Missouri.

Answered inquiries regarding bacterial enteric diseases from state and local health officials, private physicians, journalists, and the public.

*July 1987 - June 1989:*  <u>Epidemic Intelligence Service Officer; Assigned to the West Virginia Department of Health</u> from the Division of Field Services, Epidemiology Program Office, Centers for Disease Control (CDC), U.S. Public Health Service; Atlanta, Georgia.

Conducted field investigations of 1) shigellosis in a religious commune, 2) epidemic psychogenic illness in a workplace, 3) viral conjunctivitis in a nursing home and an elementary school, and 4) respiratory disease in a nursing home.  Assisted in investigations of nosocomial legionellosis and community-acquired tuberculosis.

Planned and carried out epidemiologic studies, including:  1) a case-control study of the risk factors for La Crosse encephalitis; 2) a questionnaire survey regarding immunization coverage and reasons children are not fully immunized at age two years; and 3) collection of data regarding incidents in West Virginia and South Carolina of exposure to rabies from domesticated raccoons.

Evaluated surveillance systems for spinal cord injury and Lyme disease and analyzed data contained therein.

Provided technical advice to personnel in the West Virginia Health Department and answered phone and mail inquiries from local health department personnel, legislators, physicians, journalists, and the public.

Gave presentations and workshops to local health officials, physicians, nurses, other health professionals, and the public on various topics, including: 1) The epidemiologic, legal, and economic aspects of AIDS; 2) Lyme disease; 3) La Crosse encephalitis; 4) Methods of tuberculosis contact investigation; 5) Spinal cord injury surveillance; and 6) The use of statistics in hospital infection control.

*February - June 1987:*  <u>Technical Advisor, Operations Research; Stationed in Dakar, Senegal for Center for Population and Family Health</u>, Columbia University; New York, N.Y.

Provided advice on research techniques to local investigators carrying out operations research on family planning programs.

**Academic Appointments in Epidemiology and Public Health:**

*Senior Lecturer*: Columbia University, Mailman School of Public Health, Program on Forced Migration; New York City, New York.  November 2012 – present.

*Adjunct Associate Professor*: Emory University, Rollins School of Public Health, Department of International Health; Atlanta, Georgia.  April 1997 - present.

*Adjunct Assistant Professor*: Tulane University School of Public Health and Tropical Medicine, Department of International Health and Development; New Orleans, Louisiana.  May 2002 – present.

*Lecturer*: University of California Berkeley School of Public Health, Department of Epidemiology; Berkeley, California.  August 1993 - present.

*Clinical Assistant Professor*: Emory University School of Medicine, Department of Community and Preventive Medicine; Atlanta, Georgia.  September 1990 - May 1992.

*Clinical Instructor*: West Virginia University School of Medicine, Department of Community Medicine; Charleston, West Virginia.  February 1988 - June 1989.

*Visiting Professor of Epidemiology*: Co-director of introductory epidemiology course, St. George's University School of Medicine; Grenada, West Indies.  March - April 1986.

**Positions in Clinical Medicine:**

*Emergency Physician*: Allegheny Valley Hospital, Natrona Heights, Pennsylvania.  June 1984 - June 1985.

*General Physician*: Hôpital St. Jean de Dieu in Parakou, Benin, West Africa, February - March 1983; and P.C.E.A. Tumutumu Hospital in Karatina, Kenya, March - October 1983.

*Resident in General Surgery*: Upstate Medical Center, Syracuse, New York.  July 1981 - June 1982.

*Intern in General Surgery*: University of Cincinnati Medical Center, Cincinnati, Ohio.  July 1980 - June 1981.

**SELECTED INTERNATIONAL CONSULTANCIES IN EPIDEMIOLOGY AND PUBLIC HEALTH**

*Jordan*: Assisted with design, planning, and execution of a national nutrition and micronutrient assessment survey; for UNICEF and Ministry of Health. April 2018 ongoing.

*Somalia*: Assisted with design, planning, and execution of a national nutrition and micronutrient assessment survey; for UNICEF and Ministries of Health of Somaliland, Puntland, and the Republic of Somalia. April 2018 ongoing.

*Kenya*: Negotiated evaluation methodology for program integrating agricultural assist, nutrition training, and provision of nutrition-related products. Created a data analysis plan and performed preliminary data analysis  for two double-masked follow-up interventin trials; for One Acre Fund and GroundWork. April 2017.

*Ghana*: Assisted with training of survey workers, including training in anthropometry and laboratory procedures; for University of Ghana Legon and UNICEF. April 2017.

*Guinea*: Carried out analysis of data from 1999, 2005, and 2012 DHS to identify risk factors for wasting and stunting; presented findings to Ministry of Health, UN agencies, and non-govermental agencies in French; for UNICEF Guinea. October 2015 – August 2016.

*Uzbekistan*: Assisted with design and planning of a national nutrition and micronutrient assessment survey; for UNICEF and Ministry of Health. February 2016.

*Zambia*: Assisted with all aspects of design and analyzed data for survey evaluating multi-intervention social development program; for Concern.  May 2015-present.

*Sierra Leone*: Assisted with design of data collection forms, formulation of sampling scheme, writing report and manuscripts, and analyzed final data for nationwide micronutrient assessment survey; for WHO.  May 2014 – present.

*Oman*: Assisted with design and planning of a national nutrition and micronutrient assessment survey; for UNICEF and Ministry of Health. September 2014.

*Telangana State, India*: Designed data collection instruments and analyzed data evaluating coverage and effectiveness of distribution of fortified food; for GAIN. September 2014 – March 2015.

*Ethiopia*: Analyzed data from Demographic and Health Surveys in 2000, 2005, and 2011 to identify factors leading to a substantial decline in the prevalence of stunting in Ethiopia; for UNICEF.  July 2013 – October 2014.

*Senegal*:  Analyzed differences in methods of assessing household food security and nutrition status in young children and recommended ways to combine these methods in integrated population assessments; for Save the Children.  August – September 2013.

*Azerbaijan*:  Assisted with designed, implementation, data analysis, and report writing of national nutrition assessment survey; for UNICEF Azerbaijan. August 2012 to October 2014.

*Uganda*:  Designed a template for integrated survey assessment of household food security and nutritional status and supervised implementation of a pilot survey; for World Food Programme and UNICEF.  March 2011 to April 2013.

*China*: Analyzed data from a series of surveys and wrote report evaluating the distribution of micronutrient powder in earthquake-affected areas of Sichuan Province, China; for UNICEF-China and China Institute for Nutrition and Food Safety. February – October 2011.

*Philippines*:  Assisted Global Alliance for Improved Nutrition, UNICEF, and the University of the Philippines in developing plans for a baseline survey to be carried out in selected areas to measure the effectiveness of a wide-scale nutrition improvement program.  Subsequently, analyzed the data from this survey for publication.  December 2010 - August 2011.

*Bangladesh*: Assisted the Global Alliance for Improved Nutrition, UNICEF, and the International Center for Diarrheal Disease Research – Bangladesh in formulating a plan for a nationwide survey of micronutrient deficiency as a baseline against which to measure the effectiveness of a program for fortification of edible oil.  September 2010.

*United Arab Emirates*:  Assisted the UAE Ministry of Health, the World Health Organization, and additional collaborators in designing UAE's first nation-wide nutrition assessment survey to assess the prevalence and severity of risk factors for selected micronutrient deficiencies, overweight, and nutrition-related chronic diseases; for United Arab Emirates Ministry of Health.  June 2010.

*Mongolia*:  Designed and supervised all aspects of a nationwide nutrition assessment survey, including determining indicators, calculating equipment and supply needs, designing the sampling scheme, creating data collection forms, training survey workers, cleaning and organizing computer datasets, analyzing data, and writing and disseminating the final report; for Mongolia Nutrition Research Center UNICEF.  January 2010 - September 2011.

*Republic of Georgia*:  Designed and supervised all aspects of a nationwide nutrition assessment survey, including determining indicators, calculating equipment and supply needs, designing the sampling scheme, creating data collection forms, training survey workers, cleaning and organizing computer datasets, and writing and disseminating the final report; for Georgian National Center for Disease Control and Public Health and UNICEF.  June 2009 – May 2010.

*Canada*: Reviewed survey documents and prepared report of recommended revisions in methodology for Canadian Red Cross evaluation surveys. December 2008 – January 2009.

*Ethiopia*: Designed and supervised a large prospective controlled trial of supplementary feeding in Ethiopia for the World Food Programme.  November 2007 - March 2009.

*United Kingdom*: Created web-based course in epidemiologic methods in conflict situations for the London School of Hygiene and Tropical Medicine.   January – May 2008.   (see http://conflict.lshtm.ac.uk/page_02.htm )

*Ethiopia*, *India*, *Uganda*, *Egypt*, *Indonesia*, *Zambia*, *Nepal*, *Cambodia*, *Pakistan*:  Designed, supervised, and conducted 6-day training workshops in the assessment of nutritional status and mortality rates using cross-sectional surveys; activities included delivering lectures, coordinating case studies, and supervising field exercises; for the World Food Programme.  Altogether, trained more than 200 staff of WFP, UNICEF, and other organizations.  June 2005 (Ethiopia), November 2005 (India), February 2007 (Uganda), April 2007 (Egypt), July 2007 (Indonesia), November 2007 (Zambia), June 2008 (Zambia), September 2008 (Nepal), November 2009 (Cambodia), and September 2011 (Pakistan).

*Fiji*:  Assisted the UNICEF Pacific Sub-Regional Office in formulating a strategy to collect data on micronutrient deficiencies in Pacific island countries in order to support a regional food fortification policy. October 2006.

*Jordan*: Assisted the Iraq Ministry of Health in designing a baseline nationwide micronutrient assessment survey.  Assisted the Jordan Ministry of Health in designing a follow-up nationwide micronutrient survey to measure the effect of flour fortification. July-August 2006.

*Kenya*:  Supervised the design of a community trial of distribution of micronutrient powder through a social marketing program. June-July 2006.

*Bolivia*:  Worked with the Ministry of Health, Pan-American Health Organization, and Micronutrient Initiative on creating a monitoring and evaluation plan for a nationwide program of micronutrient powder to young children.  May 2006.

*Sri Lanka*:  Set-up and directed a WHO sub-office in Southern Province; assisted Sri Lankan health officials in monitoring health, water, sanitation, and nutritional status of persons affected by the Indian Ocean tsunami of December 2004.  January – February 2005.

App. 309

*Papua New Guinea*:  Supervised CDC's assistance to UNICEF and the Department of Health in the planning, implementation, analysis, and reporting of a national survey assessing nutrition and micronutrient status of young children and adult women.  July 2004 - October 2006.

*Liberia*:  Served on the USAID Office of Foreign Disaster Assistance (OFDA) Disaster Assistance Response Team (DART) by determining health and nutrition priorities in the Monrovia area, evaluating funding proposals submitted to OFDA, and assessing performance of USAID-funded programs.  August – September 2003.

*Kuwait and Iraq*:  Served on the USAID Office of Foreign Disaster Assistance (OFDA) Disaster Assistance Response Team (DART) by assisting in evaluating health and nutrition needs, investigating reported disease outbreaks, and funding programs for relief and reconstruction in southern Iraq during and after the second Iraq War.  March – May 2003.

*Tanzania*:  Carried out follow-up surveys to assess the impact on the prevalence of anemia in young children and women of eating food cooked in iron pots distributed to refugees, in collaboration with UNHCR, WFP, and the London School of Hygiene and Public Health.  August 2002 - January 2003.

*Afghanistan*:  Assisted with training of Afghan professionals in techniques of assessment of micronutrient deficiencies.  Also conducted workshops in Mazar-i-Sharif in survey and sampling methodology and computer analysis of survey data, in collaboration with UNICEF.  November – December 2002.

*Afghanistan*:  Designed and supervised the implementation, analysis, and reporting of a health and nutrition survey of young children and women of child-bearing age assessing the effects of civil conflict and drought in Badghis Province, in collaboration with the provincial health authorities and UNICEF.  March - April 2002.

*Oman*:  Created and presented training module on micronutrient status assessment which included instruction on the design and implementation of surveys, sampling techniques, and data analysis, to public health professionals from seven Gulf countries.  September 2001.

*Mongolia*: Designed and supervised the implementation, analysis, and reporting of a national health and nutrition survey assessing the effects of severe winter weather, in collaboration with the Mongolian Ministry of Health, the World Health Organization, and UNICEF.  March – July 2001.

*Laos*:  Assisted the Laotian Ministry of Health in analyzing and interpreting data from a national nutrition survey, in collaboration with the World Food Programme.  December 2000.

*East Timor*:  Designed a survey to assess health and nutritional status, in collaboration with U.N. organizations, international nongovernmental organizations, and local.  August - September 2000.

*Uganda and Sierra Leone*:  Supervised an exploratory mission to assess the feasibility of measuring the prevalence of HIV infection in displaced populations in these countries in order to plan more comprehensive HIV treatment and prevention services.  January 2000.

*Nepal*:  Designed, supervised, implemented, analyzed, and reported the results of a survey measuring anthropometric indices, assessing the prevalence of anemia, and investigating riboflavin deficiency among adolescents in seven refugee camps; supervised a team of 4 expatriates from CDC and WHO, in collaboration with UNHCR and WFP.  September - October 1999.

*Macedonia*: Designed, supervised, implemented, analyzed, and reported four multi-sector assessment surveys of Kosovar refugees in refugee camps in Macedonia.  Assisted in overall coordination of public health and health services for refugees living in camps and host families, in collaboration with UNHCR.  May - July 1999.

*Kenya*: Designed, supervised, implemented, and analyzed nutrition survey and investigation of the causes of anemia among adolescents in four refugee camps; supervised a team of 3 CDC personnel, in collaboration with UNHCR.  November - December 1998.

*Tanzania*: Supervised and assisted CDC personnel in refugee camps in Kigoma Region in: 1) assessing reproductive health services, including analysis of birthweight data, 2) evaluating public health surveillance, 3) assessing the extent of malaria and anemia, including carrying out a malaria smear survey, and 4) designing a study of interventions for severe anemia in children, for UNHCR and IFRC, August - September 1997.  Supervised implementation and follow-up of intervention trial of treatment of severe anemia in children < 5 years of age.  February - June 1998.

*Afghanistan*: Assessed health status and health programs in Afghanistan, especially in the capital city of Kabul, and made recommendations regarding funding of health and nutrition programs, in collaboration with the Office of Foreign Disaster Assistance (OFDA).  October - November 1997.

*Zaire*: Designed strategy for assessment of health status and health services in rebel-held eastern part of Zaire, in collaboration with UNICEF.  March - April 1997.

*Rwanda*: Coordinated health services during repatriation and assessed capacity of local health services and the impact of the repatriation, in collaboration with UNHCR.  November 1996 - January 1997.

*Kenya*: Presented lectures and exercises on refugee health and emergency health assessment at UNICEF Emergency Management Workshop in Lokichokio, Kenya.  October 1995.

*Zaire*: Assessed, coordinated, and supervised preventive and curative medical care in centers for unaccompanied children in Goma, Zaire, in collaboration with UNICEF.  August - September 1994.

*Moldova*: Conducted assessment of the public health importance and modes of transmission of hepatitis B virus infection, in collaboration with USAID.  June-July 1993.

*Tajikistan*: Conducted overall health assessment after the two-year civil war, in collaboration with USAID.  April 1993.

*Somalia*: Implemented emergency disease surveillance and conducted health and nutrition assessment surveys, in collaboration with UNICEF.  December 1992 – February 1993.

*Middle East*: Assisted in the design, implementation, and analysis of a nutrition survey assessment of Palestinian refugee children and women in Syria, Jordan, Gaza, and the West Bank, in collaboration with UNRWA.  December 1989 - May 1990.

*Saudi Arabia*: Taught computer and epidemiology skills.  February - March 1989

*Sudan*: Implemented emergency disease surveillance after a flood in Khartoum, in collaboration with USAID.  August - September 1988.


**SELECTED MAJOR PRESENTATIONS**

Spinal-cord-injury surveillance, West Virginia. 37th Annual EIS Conference, Centers for Disease Control.  Atlanta, GA; April 1988.

La Crosse encephalitis in West Virginia.  EPO Professional Staff Seminar, Centers for Disease Control.  Atlanta, GA; June 1988.

Disease surveillance and control after the Khartoum flood of 1988.  38th Annual EIS Conference, Centers for Disease Control.  Atlanta, GA; April 1989.

Spinal cord injury surveillance in West Virginia.  117th Annual Meeting of the American Public Health Association.  Chicago, IL; October 1989.

Typhoid immunization and the Ty21a live-attenuated vaccine.  Meeting of the Advisory Committee on Immunization Practices, Centers for Disease Control.  Atlanta, GA; February 1990.

Nutritional status of Palestinian refugee children.  EPO Professional Staff Seminar, Centers for Disease Control.  Atlanta, GA; June 1990.

Clinical and laboratory evaluation of 239 cases of botulism.  30th Interscience Conference on Antimicrobial Agents and Chemotherapy (ICAAC). Atlanta, GA; October 1990.

Viral hepatitis in the USSR and among Soviet immigrants to the United States.  National Conference on Soviet Refugee Health and Mental Health.  Chicago, IL; December 1991.

Risk of occupational hepatitis B virus (HBV) infection among firefighters (poster).  5th National Forum on AIDS, Hepatitis, and Other Blood-Borne Diseases.  Atlanta, GA; March 1992.

The risk of hepatitis B and hepatitis C virus infections among health care workers.  60th Annual Meeting of the American Academy of Orthopedic Surgeons.  San Francisco, CA; February 1993.

Risk of hepatitis B virus infection in firefighters (poster).  The 8th Triennial International Symposium on Viral Hepatitis and Liver Disease.  Tokyo, Japan; May 1993.

Hepatitis B vaccination of infants and adolescents: results of the San Francisco demonstration projects.  27th National Immunization Conference.  Washington, DC; June 1993.

The evolution of U.S. national recommendations for hepatitis B control and the cost-benefit of hepatitis B vaccination in the United States.  Meeting of the National Health Insurance and Physicians Board.  Bonn, Germany; June 1993.

Military involvement in humanitarian assistance, the Somalia experience.  121st Annual Meeting and Exhibition of the American Public Health Association.  San Francisco, CA; October 1993.

Progress in integrating hepatitis B vaccine into infant immunization schedules.  28th National Immunization Conference.  Charlotte, NC; June 1994.

How to immunize hard-to-reach groups.  Canadian National Immunization Conference: Immunizations in the 90s, challenges and solutions.  Quebec, Canada; October 1994.

School-based adolescent hepatitis B vaccination in San Francisco (poster).  Prevention '95, the Twelfth Annual National Preventive Medicine Meeting.  New Orleans, LA; April 1995.  (Selected as one of three best posters)

Adolescent hepatitis B - results of demonstration projects: San Francisco, San Diego, and Baltimore.  29th National Immunization Conference.  Los Angeles, CA; May 1995.  (presenter and moderator of session on school-based hepatitis B vaccination)

Parents' attitudes toward school-based vaccination.  123d Annual Meeting and Exposition of the American Public Health Association.  San Diego, CA; October 1995.  (presenter and moderator of session on school-based hepatitis B vaccination)

Attitudes and practices of hospital newborn care personnel regarding hepatitis B vaccination.  123d Annual Meeting and Exposition of the American Public Health Association.  San Diego, CA; October 1995.

Risk factors for hepatitis C virus infection among STD clinic patients.  IX Triennial International Symposium on Viral Hepatitis and Liver Disease.  Rome, Italy; April 1996.

School-based hepatitis B vaccination in the United States.  IX Triennial International Symposium on Viral Hepatitis and Liver Disease.  Rome, Italy; April 1996.

Coordination of the international relief effort during the mass repatriation to Rwanda, November and December, 1996.  46th Annual EIS Conference, Centers for Disease Control and Prevention.  Atlanta, GA; April 1997.

Organization of health services for displaced populations.  125th Annual Meeting and Exposition of the American Public Health Association.  Indianapolis, IN; November 1997.

Reproductive outcomes and risk factors in a refugee population in western Tanzania (Discussant).  EPO Professional Staff Seminar, Centers for Disease Control.  Atlanta, GA; June 1998.

What are they exposed to?  Diseases affecting refugees. (invited talk) 48th Annual Meeting of the American Society of Tropical Medicine and Hygiene.  Washington, D.C.; December 1999.

HIV/STDs - What do we know and what can we do?  (Moderator and discussant) Conference 2000: Findings on reproductive health of refugees and displaced populations.   Washington, D.C.; December 2000.

Using Cormic index to adjust the body mass index of older adolescents and adults, Bhutanese refugees in Nepal, 1999.  ACC Sub-Committee on Nutrition. Nairobi, Kenya; April 2001.

Moderated discussion and lead working group on assessment of adult malnutrition. 28th session of the U.N. ACC Sub-Committee on Nutrition. Nairobi, Kenya; April 2001.

Statistical considerations in the analysis and presentation of urinary iodine concentration (UIC) in population-based surveys. Micronutrient Forum 2016. Cancun, Mexico; October 2016.


**PUBLICATIONS**

**Refereed national and international journals**

1.  **Woodruff BA**, Baron RC, Heydinger DK.  Mandatory premarital HIV screening in West Virginia. West Virginia Medical Journal 1988;84:22-23.

2.  **Woodruff BA**, Baron RC.  Letter to the editor.  JAMA 1989;262:350.

3.  **Woodruff BA**, Toole MJ, Rodrigue D, et al.  Disease surveillance and control after a flood in Khartoum, Sudan - 1988.  Disasters 1990;14:151-163.

4.  AbuRahma AF, **Woodruff BA**.  Edema following femoropopliteal bypass: lymphatic and venous theories of causation.  Journal of Vascular Surgery 1990;11:461-467.

5.  AbuRahma AF, **Woodruff BA**.  Effects and limitations of pentoxifylline therapy in various stages of peripheral vascular disease of the lower extremity.  American Journal of Surgery 1990;160:266-270.

6.  **Woodruff BA**, Pavia AT, Blake PA.  A new look at typhoid vaccination: information for the practicing physician.  JAMA 1991;265:756-759.

7.  **Woodruff BA**, Chen RT.  Oral typhoid vaccination for travelers (letter).  Archives of Internal Medicine 1991;151:619-620.

8.  AbuRahma AF, **Woodruff BA**, Lucente FC, Stuart SP, Boland JP.  Factors affecting survival of patients with ruptured abdominal aortic aneurysm in a West Virginia community.  Surgery Gynecology and Obstetrics 1991;172:377-382.

9.  **Woodruff BA**, Jones JL, Eng TR.  Human exposures to rabies from pet wild raccoons in South Carolina and West Virginia, 1987-1988.  American Journal of Public Health 1991;81:1328-1330.

10. McCrosky LM, Hatheway CL, **Woodruff BA**, Greenberg JA, Jurgensen P.  Type F botulism due to neurotoxigenic *Clostridium baratii* from an unknown source in an adult.  Journal of Clinical Microbiology 1991;29:2618-2620.

11. Niu MT, Polish LB, Robertson BH, Khanna BK, **Woodruff BA**, et al. Multistate outbreak of hepatitis A associated with frozen strawberries.  Journal of Infectious Diseases 1992;166:518-524.

12. **Woodruff BA**, Baron RC, Tsai TF.  Symptomatic La Crosse virus infections of the central nervous system: a study of risk factors in an endemic area.   American Journal of Epidemiology 1992;136:320-327.

13. **Woodruff BA**, Moyer LA.  Intradermal vaccination for hepatitis B (letter).   Clinical Infectious Diseases 1992;15:1063-1064.

14. **Woodruff BA**, Griffin PM, McCroskey LM, et al.  Clinical and laboratory comparison of botulism from types A, B, and E in the United States, 1975-1988.  Journal of Infectious Diseases 1992;166;1281-1286.

15. Swerdlow DL, **Woodruff BA**, Brady RC, et al.  A waterborne outbreak in Missouri of *Escherichia coli* O157:H7 associated with bloody diarrhea and death.  Annals of Internal Medicine 1992;117:812-9.

16. Mahoney FJ, **Woodruff BA**, Erben JJ, et al.  Effect of a hepatitis B vaccination program on the prevalence of hepatitis B virus infection.  Journal of Infectious Diseases 1993;167:203-207.

17. **Woodruff BA**, Moyer LA, O'Rourke KM, Margolis HS.  Blood exposure and the risk of hepatitis B virus infection in firefighters.  Journal of Occupational Medicine 1993;35:1048-1054.

18. **Woodruff BA**, Popovici F, Beldescu N, Shapiro CN, Hersh BS.  Hepatitis B virus infection among pregnant women in northeastern Romania.  International Journal of Epidemiology 1993;22:923-926.

19. **Woodruff BA**, Baron RC.  A description of non-fatal spinal cord injury using a hospital-based registry.  American Journal of Preventive Medicine 1994;10:10-14.

20. Deseda CC, Sweeney PA, **Woodruff BA**, Lindegren ML, Shapiro CN, Onorato IM.  Prevalence of hepatitis B, hepatitis C, and human immunodeficiency virus infection among women attending prenatal clinics in San Juan, Puerto Rico, 1989-1990.  Obstetrics and Gynecology 1995;85:75-78.

21. Pegues DA, **Woodruff BA**, Lambert SB, Tant M, Woernle CH.  Immune response to revaccination among public safety workers who received primary intradermal vaccination against hepatitis B.  Clinical Infectious Diseases 1995;20:335-341.

22. Burkholder BT, Coronado VG, Brown J, Hutto JH, Shapiro CN, Robertson B, **Woodruff BA**.  Nosocomial transmission of hepatitis A in a pediatric hospital traced to an anti-hepatitis A virus-negative patient with immunodeficiency. Pediatric Infectious Disease Journal 1995;14:261-266.

23. The Goma Epidemiology Group.  Public health impact of Rwandan refugee crisis: what happened in Goma, Zaire, in July, 1994?  Lancet 1995;345:339-344.

24. Dowell SF, Toco A, Sita C, Piarroux R, Duerr A, **Woodruff BA**.  Health and nutrition in centers for unaccompanied refugee children: experience from the Rwandan refugee crisis.  JAMA 1995;273:1802-1806.

25. **Woodruff BA**, Stevenson J, Yusuf H, et al.  Progress toward integrating hepatitis B vaccine into routine infant immunization schedules in the United States, 1991 through 1994.  Pediatrics 1996;97:798-803.

26. **Woodruff BA**, Unti L, Coyle K, Boyer-Chuanroong L.  Parents' attitudes toward school-based hepatitis B vaccination of their children.  Pediatrics 1996;98:410-413.

27. Mahoney FJ, **Woodruff BA**, Auerbach S, McReady J, Williams I, Pretrick E.  Progress on the elimination of hepatitis B virus transmission in Micronesia and American Samoa.  Pacific Health Dialog 1996;3:140-146.

28. Walker LR, Moscicki AB, Wong V, Wibbelsman C, **Woodruff BA**.  Immunization of adolescents for hepatitis B using a 0, 2 and 4-month schedule.  Pediatric Research 1996;39 Supplement 2:36.

29. Zola J, Smith N, Goldman S, **Woodruff BA**.  Attitudes and educational practices of obstetric providers regarding infant hepatitis B vaccination.  Obstetrics and Gynecology 1997;89:61-64.

30. Unti LM, Coyle KK, **Woodruff BA**, Boyer-Chuanroong L.  Incentives and motivators in school-based hepatitis B vaccination programs.  Journal of School Health 1997;67:265-268.

31. Boyer-Chuanroong L,  **Woodruff BA**, Unti LM, Sumida YU.  Immunizations from ground zero: lessons learned in urban middle schools.  Journal of School Health 1997;67:269-272.

32. Hutin YJ, Harpaz R, Drobeniuc J, Melnic A, Ray C, Favorov M, Iarovoi P, Shapiro CN, **Woodruff BA**.  Injections given in healthcare settings as a major source of acute hepatitis B in Moldova.  International Journal of Epidemiology 1999;28:782-786.

33. Drobeniuc J, Hutin YJF, Harpaz R, Favorov M, Melnik AA, Iarovoi R, Shapiro CN, **Woodruff BA**.  Prevalence of  hepatitis B, D, and C virus infections among children and pregnant women in Moldova: additional evidence supporting the need for routine hepatitis B immunization of infants.  Epidemiology and Infection 1999; 123: 463-467.

34. Spiegel PB, Sheik M, **Woodruff BA**, Burnham G.  The accuracy of mortality reporting in displaced persons camps during the post-emergency phase.  Disasters 2001;25:172-180.

35. Tomashek KM, **Woodruff BA**, Gotway CA, Bloland P, Mbaruku G.  Randomized intervention study to determine the most effective method to treat moderate anemia in refugee children in Kigoma Region, Tanzania.  American Journal of Tropical Medicine and Hygiene 2001;64:164-171.

36. Lewis E, Shinefield HR, **Woodruff BA**, et al.  Safety of neonatal hepatitis B vaccine administration.  Pediatric Infectious Disease Journal 2001;20:1049-1054.

37. Averhoff FM, Moyer LA, **Woodruff BA**, Deladisma AM, Nunnery J, Alter MJ, Margolis HS.  Occupational exposures and risk of hepatitis B virus infection among public safety workers.  Journal of Occupational and Environmental Medicine 2002;44:591-596.

38. **Woodruff BA**, Vazquez E. Prevalence of hepatitis virus infections in an institution for persons with developmental disabilities. American Journal of Mental Retardation 2002;107:278-292.

39. Blanck HM, Bowman BA, Serdula MK, Khan LK, Kohn W, **Woodruff BA**.  Angular stomatitis and B vitamin status among adolescent Bhutanese refugees living in southeastern Nepal.  American Journal of Clinical Nutrition 2002;76:430-435.

40. **Woodruff BA**, Duffield A.  Anthropometric assessment of nutritional status in adolescent populations in humanitarian emergencies.  European Journal of Clinical Nutrition 2002;56:1108-1118.

41. Bilukha OO, Brennan M, **Woodruff BA**.  Death and injury from landmines and unexploded ordnance in Afghanistan. Journal of the American Medical Association 2003;290:650-653.

42. **Woodruff BA**, Kaiser R.  Violence and mortality in West Darfur – an invited commentary.  Lancet 2004;364:1290-1291.

43. Hoven CW, Duarte CS, Lucas CP, Wu P, Mandell DJ, Goodwin RD, Cohen M, Balaban V, **Woodruff BA**, et al.  Psychopathology among New York City public school children six months after September 11.  Archives of General Psychiatry 2005;62:545-551.

44. Burkle FM, **Woodruff BA**, Noji EK. Lessons and controversies: planning and executing immediate relief in the aftermath of the war in Iraq.  Third World Quarterly 2005;26:797-814.

45. **Woodruff BA**.  Interpreting mortality data in humanitarian emergencies – an invited commentary.  Lancet 2006;367:9-10.

46. **Woodruff BA**, Blanck HM, Slutsker L, Cookson ST, Larson MK, Duffield A, Bhatia R. Anaemia, iron status, and vitamin A deficiency among adolescent refugees in Kenya and Nepal. Public Health Nutrition 2006;9:26-34.

47. Kaiser R, **Woodruff BA**, Bilukha O, Spiegel P, Salama P. Using design effect from previous cluster surveys to guide sample size calculation in emergency settings. Disasters 2006;30:199–211.

48. Working Group for Mortality Estimation in Emergencies. Wanted: studies on mortality estimation methods for humanitarian emergencies, suggestions for future research. Emerging Themes in Epidemiology 2007;4:9.

49. Mills EJ, Checchi F, Orbinski JJ, Schull MJ, Burkle FM, Beyrer C, Cooper C, Hardy C, Singh S, Garfield R, **Woodruff BA**, Guyatt GH. Users' guides to the medical literature: how to use an article about mortality in a humanitarian emergency. Conflict and Health 2008;2:9.

50. Cairns KL, **Woodruff BA**, Myatt M, Bartlett L, Goldberg H, Roberts L. Cross-sectional survey methods to assess retrospectively mortality in complex humanitarian emergencies. Disasters 2009;33:503-521.

51. Suchdev PS, Jashi M, Sekhniashvili Z, **Woodruff BA**. Progress toward eliminating iodine deficiency in the Republic of Georgia. International Journal of Endocrinology and Metabolism 2009;3:200-207.

52. Talley L, **Woodruff BA**, Seal A, Tripp K, Mselle LS, Abdalla F, Bhatia R, Mirghani Z. Evaluation of the effectiveness of stainless steel cooking pots in reducing iron-deficiency anaemia in food-aid dependent populations. Public Health Nutrition 2010;13:107-115.

53. Tripp K, MacKeith N, **Woodruff BA**, Talley L, Mselle L, Mirghani Z, Abdalla F, Bhatia R, Seal AJ. Acceptability and use of iron and iron-alloy cooking pots: Implications for anaemia control programmes. Public Health Nutrition 2010;13:123-130.

54. Sullivan KM, Hossain SM, **Woodruff BA**. Mortality rate and confidence interval estimation in humanitarian emergencies. Disasters 2010;34:164-175.

55. Suchdev PS, Ruth LJ, **Woodruff BA**, Mbakaya C, Mandava U, Flores-Ayala R, Jefferds MED, Quick R. Selling Sprinkles micronutrient powder reduces anemia, iron deficiency, and vitamin A deficiency in young children in western Kenya: a cluster-randomized controlled trial. American Journal of Clinical Nutrition 2012; 95(5):1223-1230.

56. Otgonjargal D, **Woodruff BA**, Batjargal J, Gereljargal B, Davaalkham D. Nutritional status of under-five children in Mongolia. Journal of Medicine and Medical Sciences 2012;3(5):341-349.

57. Rohner F, **Woodruff BA**, Aaron GJ, Yakes EA, Lebanan MA, Rayco-Solon P, Saniel OP. Infant and young child feeding practices in urban Philippines and their associations with stunting, anemia, and deficiencies of iron and vitamin A. Food Nutr Bull. 2013 Jun;34(2 Suppl):S17-34.

58. Shinoda N, Sullivan KM, Tripp K, Erhardt JG, Haynes BM, Temple VJ, **Woodruff B**. Relationship between markers of inflammation and anaemia in children of Papua New Guinea. Public Health Nutrition 2013;16(2):289-295.

59. Checchi F, Waldman RJ, Roberts LF, Ager A, Asgary R, Benner MT, Blanchet K, Burnham G, d'Harcourt E, Leaning J, Massaquoi MB, Mills EJ, Moresky RT, Patel P, Roberts B, Toole MJ, **Woodruff B**, Zwi AB. World Health Organization and emergency health: if not now, when? BMJ 2016; Jan 28;352:i469. doi: 10.1136/bmj.i469.

60. Rohner F, Wirth JP, **Woodruff BA**, Chiwile F, Yankson H, Sesay F, Koroma AS, Petry N, Pyne-Bailey S, Dominguez E, Kupka R, Hodges M, de Onis M. Iodine status of women of reproductive age in

Sierra Leone and its association with household coverage with adequately iodized salt. Nutrients 2016;8(2),74; doi: 10.3390/nu8020074.

61.  Wirth JP, Rohner R, **Woodruff BA**, Chiwile F, Yankson H, Koroma AS, Russel F, Sesay F, Dominguez E, Petry N, Shahab-Ferdows S, de Onis M, and Hodges M. Anaemia, micronutrient deficiencies and malaria in children and women in Sierra Leone prior to the Ebola outbreak. PLoS One. 2016 May 10;11(5):e0155031

62.  Wirth JP, Leyvraz M, Sharma ND, Aaron GJ, Sodani PR, **Woodruff BA**. Coverage of adequately iodized salt is suboptimal and rice fortification using public distribution channels could reach low-income households: findings from a cross-sectional survey of anganwadi center catchment areas in Telangana, India. PLoS One. 2016 Jul 22;11(7):e0158554.

63.  Leyvraz M, Wirth JP, **Woodruff BA**, Sankar R, Sodani PR, Sharma ND, Aaron GJ.  High coverage and utilization of fortified take-home rations among children 6 - 35 months of age provided through the Integrated Child Development Services Program: Findings from a cross-sectional survey in Telangana, India PLoS One. 2016 Oct 3;11(10):e0160814.

64.  Leyvraz M, Rohner F, Konan AG, Esso LJ **Woodruff BA**, Norte A, Adiko F, Bonfoh B, Aaron GJ.  High awareness but low coverage of a locally produced fortified complementary food in Abidjan, Côte d'Ivoire: Findings from a cross-sectional survey. PLoS One. 2016 Nov 8;11(11):e0166295.

65.  Wirth JP, Rohner F, Petry N, Onyango A, Matji J, Bailes A, de Onis M, **Woodruff BA**.  Assessment of the WHO Stunting Framework using Ethiopia as a case studyMatern Child Nutr. 2017 Apr;13(2). doi: 10.1111/mcn.12310. Epub 2016 Apr 29.

66.  Wirth JP, Matji J, **Woodruff BA**, Chamois S, Getahun Z, White J, Rohner R.  Scale up of nutrition and health programs in Ethiopia and their overlap with reductions in child stunting.  Matern Child Nutr. 2017 Apr;13(2). doi: 10.1111/mcn.12318. Epub 2016 May 1.

67.  **Woodruff BA**, Wirth JP, Bailes A, Matji J, Timmer A, Rohner F.  Determinants of stunting reduction in Ethiopia 2000 – 2011.  Matern Child Nutr. 2017 Apr;13(2). doi: 10.1111/mcn.12307.

68.  Wirth JP, **Woodruff BA**, Engle-Stone R, Namaste SM, Temple VJ, Petry N, Macdonald B, Suchdev PS, Rohner F, Aaron GJ. Predictors of anemia in women of reproductive age: Biomarkers Reflecting Inflammation and Nutritional Determinants of Anemia (BRINDA) project. Am J Clin Nutr. 2017;106(Suppl 1):416S-427S.

69.  Wirth JP, Ansumana R; **Woodruff BA**, Koroma AS, Hodges MH. Association between sickle cell and β-thalassemia genes and hemoglobin concentration and anemia in children and non-pregnant women in Sierra Leone: ancillary analysis of data from Sierra Leone's 2013 National Micronutrient Survey. BMC Res Notes 2018;11:43.

70.  **Woodruff BA**, Wirth JP, Ngnie-Teta I, Beaulière JM, Mamady D, Ayoya MA, Rohner F. Determinants of stunting, wasting, and anemia in Guinean preschool-age children: An Analysis of DHS Data From 1999, 2005, and 2012. Food Nutr Bull 2018;39:39-53.

71.  Wirth JP, Rajabov T, Petry N, **Woodruff BA**, Shafique NB, Mustafa R, Tyler VQ, Rohner F. Micronutrient deficiencies, over- and undernutrition, and their contribution to anemia in Azerbaijani preschool children and non-pregnant women of reproductive age. Nutrients 2018; 10:1483; doi:10.3390/nu10101483.

72.  Wirth JP, **Woodruff BA**, Mamady D, Beauliere JM, Ayoya M, Rohner F and Teta IN. Nutrition trends in the past fifteen years in Guinea: secondary analysis of cross-sectional data on children, adolescent girls and women.  Afr J Food Agric Nutr Dev 2019;19(4):14889-14915

73. Rohner F, Nizamov F, Petry N, Yuldasheva F, Ismailov S, Wegmuller R, Guo S, Wirth JP, **Woodruff BA**. Household coverage with adequately iodized salt and iodine status of non-pregnant and pregnant women in Uzbekistan. Thyroid. 2020;30:898-907.

74. Petry N, Nizamov F, **Woodruff BA**, Ishmakova R, Komilov J, Wegmüller R, Wirth JP, Arifdjanova D, Guo S, Rohner F. Risk factors for anemia and micronutrient deficiencies among women of reproductive age - The impact of the wheat flour fortification program in Uzbekistan. Nutrients 2020 Mar 7;12(3):714.

75. Petry N, Al-Maamary SA, **Woodruff BA**, Alghannami S, Al-Shammakhi SM, Al-Ghammari IK, Tyler V, Rohner F, Wirth JP.  National prevalence of micronutrient deficiencies, anaemia, genetic blood disorders and over- and undernutrition in Omani women of reproductive age and preschool children. Sultan Qaboos University Med J, May 2020, Vol. 20, Iss. 2, pp. e151–164.


**Books or book chapters**

1. **Woodruff BA**, Burkholder BT.  Health and nutrition among refugees and displaced persons. In: Strickland GT, ed.  Hunter's Tropical Medicine, Eighth Edition. Orlando, FL: W.B. Saunders and Company, 1999.

2. Surveillance and Monitoring.  In: Reproductive Health in Refugee Situations: an interagency field manual.  Geneva, Switzerland: UNHCR, 1999.  Pages 95-117.

3. WHO.  Rapid health assessment protocols for emergencies.  World Health Organization, Geneva, Switzerland.  1999.

4. Communicable Disease Control in Emergencies: a Field Manual.  World Health Organization, Geneva, Switzerland.  2005.

5. Measuring Mortality, Nutritional Status and Food Security in Crisis Situations: Smart Methodology, Version 1, June 2005.  UNICEF and USAID, New York and Washington, D.C. 2005.

6. Chapter 3 – Comprehensive Survey Design and Chapter 4 – Measuring Mortality.  In: Measuring and Interpreting Malnutrition and Mortality: A Manual for WFP Staff.  World Food Programme, Rome. 2005


**U.S. government and United Nations publications**

1. Centers for Disease Control.  La Crosse encephalitis in West Virginia.  MMWR 1988;37:79-82.

2. ACIP.  Typhoid immunization: recommendations of the Immunization Practices Advisory Committee (ACIP).  MMWR 1990;39(RR-10):1-5.

3. Centers for Disease Control and Prevention.  Inadequate immune response among public safety workers receiving intradermal vaccination against hepatitis B - United States, 1990-1991. MMWR 1991;40:569-572.

4. Centers for Disease Control and Prevention.  Screening for hepatitis B virus infection among refugees arriving in the United States, 1979-1991.  MMWR 1991;40:784-6.

5. Centers for Disease Control and Prevention.  Guidelines for collecting, processing, storing, and shipping diagnostic specimens in refugee health-care environments.  Annex of: Famine-affected, refugee, and displaced populations: recommendations for public health issues, MMWR 1992;41.

6. Intradermal administration of hepatitis B vaccine: an update;  in, Hepatitis Surveillance Report No. 54.  Atlanta: Centers for Disease Control, 1992, pages 2-5.

7.  Centers for Disease Control and Prevention.  Hepatitis B vaccination of adolescents - California, Louisiana, and Oregon - 1992-1994.  MMWR 1994;43:605-9.

8.  Centers for Disease Control and Prevention.  Nutritional assessment of adolescent refugees — Nepal, 1999.  MMWR 2000;49:864-867.

9.  **Woodruff BA** and Duffield A.  Assessment of nutritional status in emergency-affected populations: adolescents.  RNIS Supplement, July 2000.

10.  Centers for Disease Control and Prevention.  Nutritional assessment of children after severe winter weather --- Mongolia, June 2001.  MMWR 2002;51:5-7.

11.  Centers for Disease Control and Prevention.  Injuries associated with landmines and unexploded ordnance --- Afghanistan, 1997—2002.  MMWR 2002;52:859-862.

12.  Centers for Disease Control and Prevention. Cholera epidemic after increased civil conflict – Monrovia, Liberia, June-September 2003.  MMWR 2003;52:1093-1095.

13.  Mokdad A and **Woodruff BA**, eds. Disaster Response. In: Chronic Diseases and Vulnerable Populations in Times of Natural Disaster: An Action Guide.  Mensah GA and Wilcox L, eds.  Atlanta: Centers for Disease Control and Prevention, 2006.

14.  Centers for Disease Control and Prevention.  Baseline Data from the Nyando Integrated Child Health and Education Project — Kenya, 2007.  MMWR 2007;56:

**Other journals, conference proceedings, and major technical reports**

1.  **Woodruff BA**, Baron RC, Tsai TF.  La Crosse encephalitis in West Virginia, 1987 and 1988.  In: Proceedings of the 23rd Annual Meeting of the Ohio Mosquito Control Association. Columbus: 23rd Annual Meeting of the Ohio Mosquito Control Association, 1989:15-9.

2.  Yip R, Keller W, **Woodruff BA**, Sullivan KM.  Report of the UNRWA nutrition survey of Palestinian refugees in Gaza, Jordan, Lebanon, Syria, and the West Bank, 1990: survey and consultation report for UNRWA and EMRO/WHO.  UN Relief and Works Agency for Palestinian Refugees in the Near East (UNRWA) and US CDC.  Jerusalem, Israel; September 15, 1990.

3.  **Woodruff BA**, Taylor F, Grossman M.  The San Francisco demonstration project - universal infant immunization against hepatitis B.  San Francisco Medicine 1992;65:32-3.

4.  **Woodruff BA**, Grossman M, Abbott MB.  A primer on hepatitis B: frequently asked questions about hepatitis B immunization.  California Pediatrician 1993;9:31-2.

5.  **Woodruff BA**.  Hepatitis B control in the United States (editorial).  Liver Update: Function and Disease 1993;6:1-2.

6.  **Woodruff BA**, Gandelman AA, Boyer-Chu L, Iser J, Stevenson MA, Grossman M, Taylor F.  The San Francisco demonstration project in hepatitis B vaccination: implementation and preliminary results.  In: Centers for Disease Control and Prevention, National Immunization Program.  27th National Immunization Conference Proceedings; 1993 June 14-18; Washington, DC.  Atlanta: CDC, 1993:89-93.

7.  **Woodruff BA**, Harpaz R, Margolis HS.  Hepatitis B virus infection in Moldova: report of a consultancy for USAID, July - August 1993.  Moldova National Center for Scientific and Applied Hygiene and Epidemiology and US CDC.  Atlanta, Georgia; 1993.

8.  **Woodruff BA**.  Recommendations for the control and prevention of hepatitis B virus infection among refugees entering the United States.  US CDC.  Atlanta, Georgia; 1994.

9.  **Woodruff BA**.  Accident scene infection risk (letter).  Hang Gliding 1995;25(3):6.

10. Unti L, Coyle K, **Woodruff BA**, and Demonstration Project Staff.  A review of adolescent school-based hepatitis B vaccination projects. San Francisco Unified School District and US CDC.  San Francisco; 1995.

11. Hailemeskal H, **Woodruff BA**, Yahmed SB.  Rapid health assessment.  World Health: the Magazine of the World Health Organization 1996;49(6):28.

12. Cookson ST, **Woodruff BA**, Slutsker L.  Prevalence of anemia and low body-mass index among adolescents 10-19 years of age in refugee camps in Dadaab District, Kenya.  UN High Commissioner for Refugees (UNHCR). Nairobi, Kenya; 1998.

13. **Woodruff BA**, Slutsker L, Cookson ST.  Prevalence and causes of anemia and prevalence of low body-mass index in adolescents 10-19 years of age in Kakuma camp, Kenya.  UN High Commissioner for Refugees (UNHCR).  Nairobi, Kenya; 1999.

14. **Woodruff BA**, Duffield A, Blanck H, Larson MK, Pahari S, Bhatia R.  Prevalence of low body mass index and specific micronutrient deficiencies in adolescents 10-19 years of age in Bhutanese refugee camps, Nepal, October 1999.  UN High Commissioner for Refugees (UNHCR). Kathmandu, Nepal; 1999.

15. **Woodruff BA**.  Older people, nutrition, and emergencies in Ethiopia - commentary.  Field Exchange 2001;14:28.

16. **Woodruff BA**.  Measuring mortality rates in cross-sectional surveys: a commentary.  Field Exchange 2002;17:16.

17. **Woodruff BA**, Reynolds M, Tchibindat F, Ahimana C.  Nutrition and Health Survey: Badghis Province, Afghanistan.  February – March 2002.  UNICEF. Kabul, Afghanistan; 2002.

18. Skau J, Belachew T, Girma T, **Woodruff BA**.  Outcome evaluation study of the targeted supplementary food (TSF) program in Ethiopia.  World Food Programme and Jimma University. Addis Ababa, Ethiopia.  2009.


**PERSONAL DATA**

| | |
|---|---|
| Date of birth: | May 24, 1953 |
| Marital status: | Married |
| Citizenship: | Canada |
| | United States |
| Languages: | French, able to work in language |
| | German, basic |
| | Swedish, basic |
| | Mandarin, basic |

**DECLARATION OF JAVIER O. HIDALGO**

I, Javier O. Hidalgo, swearing under penalties of perjury, that the following is true and correct to the best of my knowledge:

1. My name is Javier O. Hidalgo and I am the Supervising Attorney of the Family Detention Services Program at the Refugee and Immigrant Center for Education and Legal Services ("RAICES").  I have been the Supervising Attorney since October 2018.  I am licensed to practice law in the states of New York and Texas.

2. My colleague Andrea Meza previously provided a declaration that described RAICES's work providing free legal services at Karnes County Family Residential Center in Karnes City, Texas ("Karnes family detention center" or "Karnes") since its opening as a family detention center in August 2014. *See* ECF No. 5-2.

3. RAICES has now represented dozens of families subjected to Title 42 expulsion while detained at Karnes.  The following information is based on information learned from representing these families, as well as our communications with DHS officers.

4. The intake process for new families arriving at Karnes currently includes testing for COVID-19 and a period or quarantine. Typically, for family units that include both parents, the fathers are quarantined separately from the rest of the family. After a family who has tested negative for COVID-19 finishes their quarantine period, they are allowed to access some common spaces with other detained families.

5. Karnes currently has a total bed capacity of approximately 830 individuals.[1] We believe that it currently houses 78 individuals as of the date of this declaration, which is a relatively small percentage of its total capacity.

6. ICE detains families at Karnes in both Title 42 and Title 8 proceedings, though we believe that currently only Title 42 families are detained at Karnes. In our experience, families in Title 42 proceedings are detained at Karnes for at least two weeks on average. We have seen families in Title 42 proceedings detained at Karnes as long as forty seven

---

[1] *See* https://www.ice.gov/factsheets/karnes-county-residential-center (last accessed February 3, 2021).

(47) days. In comparison, families at the facility in Title 8 proceedings have most recently been detained at Karnes an average of twenty-seven (27) days.

7. When we learn of a detained family subject to Title 42 expulsion, and that family has a fear of return to their home country, we notify DHS that the family needs an assessment for relief under the Convention Against Torture (as DHS's guidance requires).  Thus far, we are not aware of any Title 42 families who have passed DHS's screening for torture claims.

8. The families in Title 8 proceedings receive a credible or reasonable fear interview as a threshold screening for potential asylum protection. If a family receives a negative fear determination, they can ask an immigration judge to review that finding. Upon review of our data from July 2020 through the present, the majority of families in Title 8 proceedings for whom our team provided legal services received a positive fear finding or had a negative fear finding vacated by an immigration judge. In even more cases, DHS releases the family from Karnes before we learn of the results of their fear screening, likely because family passed the screening. Generally, families in Title 8 proceedings are at Karnes for an average of 27 days, after which they are served with Notices to Appear for removal proceedings under section 240 of the INA if they receive a positive credible fear finding.  Families are then are released to a sponsor, usually a family member here in the United States, or to a shelter.

9. In the Fall of 2020, due to our advocacy DHS decided to reprocess a number of families detained at Karnes from Title 42 to Title 8. The majority of those families reprocessed into Tile 8 proceedings received positive credible fear findings and were released to their sponsors in the United States.

I declare under penalty of perjury, under the laws of the United States of America and Texas, that the foregoing is true and correct.

Date: February 4, 2021                              /s/ Javier O. Hidalgo
                                                   Javier O. Hidalgo

**DECLARATION OF ALLISON HERRE**

I, Allison Herre, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney licensed to practice law in Ohio.  Since July 2019, I have been the Managing Attorney for Proyecto Dilley (formerly the CARA Pro Bono Project and Dilley Pro Bono Project).  Proyecto Dilley has provided pro bono legal services to asylum-seeking immigrant parents and their children who are detained by U.S. Immigration and Customs Enforcement ("ICE") at the South Texas Family Residential Center ("Dilley") in Dilley, Texas since the facility opened at the end of 2014. Our project provides direct representation in immigration proceedings through project staff as well as volunteers from all over the country.

2. I have been practicing law since 2012 during which time I have focused my practice on immigration law at both private and non-profit organizations.  Immediately prior to joining Proyecto Dilley, I served as the director of Immigration Legal Services, for Catholic Charities of Southwestern Ohio in Cincinnati, Ohio.

3. This declaration is based on my personal experience working with noncitizen children and families detained at Dilley.  I am also familiar with the facility after having visited Dilley almost daily prior to the outbreak of the COVID-19 pandemic and by regularly interacting with facility staff and ICE officers both before and during the COVID-19 pandemic.

4. Proyecto Dilley's volunteer-based model has allowed our project to represent the overwhelming majority of families who have been detained at Dilley. In 2015 we represented 10,804 families, in 2016, we represented 12,850 families; in 2017, we represented 13,291 families, in 2018, we represented 16,734, and in 2019, we represented 10,086 families.

5. Subsequent to the government's implementation of the Title 42 expulsion process, ICE's use of Dilley to detain asylum-seeking families dropped dramatically. In fact, since the start of the COVID-19 pandemic in March 2020, our office has only represented fewer than 500 families.

6. In a report filed by ICE Juvenile Coordinator Deane D. Dougherty with the District Court for the Central District of California on January 19, 2021, 194 beds of the 2,400 beds available at Dilley were occupied, an 8% total occupancy of the facility's total capacity.  This capacity reflects what we have seen for many months in Dilley.

7. Our clients typically come to the United States fleeing great danger in their home countries, including El Salvador, Guatemala, Honduras, Brazil, Ecuador, Haiti, Mexico, Cuba, Venezuela, the Democratic Republic of the Congo, Romania, Angola, Uzbekistan, and many others.

8. The families we represent seek safety in the United States after experiencing unimaginable harm. For example, Ms. K is a young mother, who was kidnapped by her child's father and held hostage for two years during which time he beat her, raped her daily, and locked her and her child in the house for days without any food. The abuser held guns to her head and threatened to kill her many times. On one occasion, he beat her so severely that she went into premature labor and her child was born with weak lungs, which have made him susceptible to severe respiratory infections. When Ms. K and her one-year-old child arrived at the border, Ms. K had a fractured collar bone from the final beating she received before escaping her abuser. Her child became very ill and required hospitalization while detained by border patrol.

9. Another client, Ms. C, is from an ethnic minority in her home country. As a member of the minority ethnic group, Ms. C was beaten by her teachers in school, had rocks thrown at her, was denied medical care, and was prohibited from entering any public buildings, such as the police station and government benefits office. Ms. C's son was murdered by a man who is a member of the majority ethnic group because Ms. C's son tried to defend himself from the man's son who punched Ms. C's child. When Ms. C tried to report her son's murder, the police refused to permit her into the building and called her "dirty" and other slurs for the ethnic minority. The man later broke into Ms. C's home with a group of men and raped Ms. C, beat her son, and raped her daughter-in-law. The man has also beaten Ms. C's son on numerous occasions.

10. We recently represented the "L" Family that openly opposed their government's anti-capitalist policies by importing goods from the United States to sell in the family's store. As punishment for the family's defiance, the government sent police to Mr. and Ms. L's store where they ransacked and looted the store on at least two occasions, arrested Mr. and Ms. L, and tortured Mr. L while he was detained. The police repeatedly beat Mr. L in the groin so many times that he required hospitalization and surgery after police finally released him.

11. As of November 2020, it is my understanding that all of the families detained at Dilley are being processed under Title 8, rather than being subjected to immediate expulsion under Title 42. Prior to November 2020, the overwhelming majority of families that we represented and worked with were also placed in proceedings under Title 8.

12. Dilley has instituted policies to house, quarantine, isolate, process, and release immigrant families from the facility. Each family at the facility is put in the facility and quarantined for about fourteen days. All family members are tested for COVID-19 and either remain in quarantine, or if they test positive, are put in medical isolation for at least fourteen days after the positive test. If the family includes both a father

and mother, the fathers are held in a different wing of the facility apart from the mothers with their children.

13. Families who are detained in Dilley are housed in rather large solid-sided trailers, where they have access to beds, sinks, telephones, showers, bathrooms, and a sitting area. While most trailers in Dilley have capacity to hold up to six families at a time, until recently, each family was put in a trailer alone.  Recently, DHS has sometimes put two or three families (mothers and children) together in a trailer, and sometimes put multiple fathers in a trailer together.

14. Many of our clients have recently reported that they were asked by facility staff if they would like to receive a COVID-19 vaccine. Clients who declined to receive a vaccine were provided with contact information for a health center close to their final destination and informed they could access the vaccine upon release from detention.

15. Typically, families who come to Dilley in Title 8 proceedings participate in interviews with the U.S. Citizenship and Immigration Services. During the interview, an asylum officer quickly determines whether the family has bona fide claim for protection from persecution or torture.  If families receive a positive determination subsequent to their interview, they are processed into removal proceedings before an immigration judge and are eligible for release.  They are then released, typically to the care of a sponsor in the United States who assumes responsibility for their care and housing.

16. Over the last five years, with the exception of a period of time between July 2019 and March 2020, more than 99% of the families represented by Proyecto Dilley received positive decision in their case and were released from detention.

17. Families in Title 8 proceedings can be screened, processed, and released from Dilley within 20 days, which is more than enough time for each family to complete 14 days of quarantine for COVID-19.  In my experience, the vast majority of immigrant families we serve are well-suited for immediate release, because they have genuine claims for relief from persecution, pose no danger to society, and are not flight risks.

I declare under penalty of perjury under the laws of the United States of America and Texas that the foregoing is true and correct.

Executed on: February 5, 2021, in San Antonio, Texas, United States.


Signature: _____

Allison Herre

## DECLARATION OF LINDA CORCHADO

I, Linda Corchado, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney licensed to practice law in New York.  Since May 2019, I have been the Legal Director at Las Americas Immigrant Advocacy Center ("Las Americas").  I engage in direct representation of noncitizen clients and also supervise attorneys and other staff at Las Americas who represent individuals detained during immigration proceedings.

2. I have been practicing law since 2014.  Prior to joining Las Americas, I worked as a private immigration attorney for four years.

3. I make this declaration based on my personal experience working with noncitizen families and children subject to the Title 42 Process since the process came into effect in March 2020.

4. Our office regularly provides legal services and other assistance to low-income refugees and asylum seekers in CBP and ICE custody.  Our clients typically come to the United States fleeing great danger in their home countries, including Brazil, Ecuador, El Salvador, Guatemala, Haiti, Honduras, Mexico, and others.  Because they are often escaping death threats and other forms of extreme persecution, summary expulsion of our clients endangers their lives.

5. Since the CDC order went into effect in March 2020, it has been extremely difficult to find our clients before they are deported under Title 42.  Some children and families are summarily deported after only a few days in government custody, and sometimes after just a few hours.  We often hear of clients subject to Title 42 expulsion because we get an urgent call from a family member of the detained person, saying that the person is subject to imminent expulsion and needs help.

6. Despite these impediments, our office has now represented a number of children and family members who were subject to the Title 42 Process.  In my experience, these individuals all have significant protection needs, fear return to their home countries or expulsion to Mexico, and would be potentially eligible for various forms of humanitarian relief if they were put into regular removal proceedings.

7. Under the Title 42 Process, families—including families with young children—are being expelled without any meaningful opportunity to prove their claims of persecution or torture.  Generally, noncitizens are apprehended and quickly processed and sent back across the border to Mexico or sent to detention centers awaiting expulsion to another country.

1

8.   I now know of clients and clients' family members who have been kidnapped, threatened, or otherwise harmed after being expelled to Mexico or to their origin countries under the Title 42 Process. In August 2020, I represented an 8-year-old client who had originally fled Honduras with his father.  Under the Title 42 Process, both the child and his father were summarily expelled to Mexico, where his father was soon kidnapped.  My client then entered the United States a second time, by himself, to reunite with his grandmother and escape persecution.

I declare under penalty of perjury under the laws of the United States of America and Texas that the foregoing is true and correct.

Executed on: February 5, 2021, in El Paso, Texas, United States.

Signature: _____

Linda Corchado

2

App. 327

**DECLARATION OF LISA FRYDMAN**

I, Lisa Frydman, pursuant to 28 U.S.C. § 1746, declare as follows:

**Information about KIND and the Declarant**

1.      I am Vice President of International Programs at Kids in Need of Defense ("KIND"), a nonprofit advocacy and legal services organization based in the United States. I am an attorney and have been, since March 2020, Vice President of International Programs at KIND. From 2017-2020 I was Vice President for Regional Policy and Initiatives ("Regional Team") at KIND. From 2015-2017 I served as KIND's Director for Regional Policy and Initiatives. In my work at KIND, I supervise KIND's International Team with programming in Central America, Mexico, and Europe, and regularly visit the northern countries of Central America and Mexico (referred to collectively herein as "the Region") to carry out the organization's work described here.

2.      KIND's International Team offers direct programming with children and adolescents in the northern countries of Central America. The International Team, through civil society partner organizations, provides reintegration support services for children repatriating to Guatemala and Honduras, as well as sexual and gender-based violence prevention programming for children in certain high migration communities in Guatemala and Honduras. Through its Reintegration Program and other Regional programming and visits, KIND's International Team communicated with approximately 550 Central American children in 2019. From 2015-2017, the Regional Team provided support services to children in Honduras and El Salvador with pending cases for refugee resettlement in the United States under an in-country refugee processing and parole effort known as the Central American Minors ("CAM") Program. In 2018 the Regional Team, through civil society partners, conducted a project in the Region to empower adolescent

refugees and migrants, as well as internally displaced adolescents from El Salvador, Guatemala, and Honduras, to tell their stories related to immigration and internal displacement. In 2020, KIND launched a broader set of programming in Mexico, with staff located along the U.S.-Mexico border and in Mexico City.

3.    While KIND's focus is on unaccompanied children, our work along the border regularly intersects with families that include children. Our U.S. offices have served dozens of children who reached the borders with their families; were placed in the Trump Administration's "Migrant Protection Protocols" (MPP) program that involved returning the families to northern Mexico to await their immigration court hearings; and who subsequently entered the United States as unaccompanied children, often because their parent or guardian was kidnapped or killed while the family waited in Mexico. The experiences of families in the MPP program are relevant here because many families expelled under Title 42—particularly those who are from Guatemala, Honduras, and El Salvador—are sent to Mexico and forced to live there, instead of being returned to their countries of origin.

4.    Children and families expelled to Guatemala, Honduras, and El Salvador under Title 42 are returning to three of the most dangerous countries in the world. Guatemala, Honduras, and El Salvador all rank among the top ten most dangerous countries by homicide rates globally.[1] Accordingly, these countries send significant numbers of asylum seekers with *bona fide* claims to the United States each year. In 2018, the United States granted asylum to 7,350 individuals from these countries.[2]

---

[1] According to the United Nations Office on Drugs and Crime (UNODC), in 2017, El Salvador ranked first in the world by homicide rate, followed by Honduras (third) and Guatemala (ninth). UNODC, *Global Study on Homicide* (2019).
[2] Dep't of Homeland Security, Office of Immigration Statistics, *Annual Flow Report, Refugees and Asylees: 2018* (Oct. 2019), at 8, *available at*

5.      Violence, in combination with impunity and a failure of protection, causes children and families to flee their homes in the northern countries of Central America and seek safety in the United States. Migrants from these countries seek to escape violence inflicted by criminal gangs or other organized crime, for example by drug cartels; sexual and gender-based violence, including violence and extreme discrimination based on sexual orientation and/or gender identity; and domestic abuse. Women and girls, and lesbian, gay, bisexual, transgender, and intersex ("LGBTI") individuals, face very high levels of sexual and gender-based violence. Children are also frequently trafficked from rural to urban areas and across borders or to border areas, where they are often sexually exploited or subject to exploitative labor. Femicide, or the gender-motivated killing of women and girls, is also pervasive in these countries.[3]

6.      Gangs now dominate much of the urban areas of the Northern Triangle countries, and their control has increasingly spread to rural areas as well, where international drug cartels also, increasingly, operate. The most recent U.S. State Department Travel Advisory for Guatemala illustrates this point, issuing a level 3 travel advisory for the departments of Guatemala, Escuintla, Chiquimula, Quetzaltenango, Izabal, and Petén.[4] The departments of San Marcos and Huehuetenango have also experienced significant growth of organized crime in recent years. Where these criminal groups dominate, women and girls are in constant danger of

---

https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2018/refugees_asylees_2018.pdf.
[3] *See* UNODC, *Global Study on Homicide* (2019), *supra* note 4 (reporting that in 2017, El Salvador and Honduras ranked first and third in the world for female homicide rates); Mimi Yagoub, *Why Does Latin America Have the World's Highest Female Murder Rates*, InSight Crime (Feb. 11, 2016), *available at* https://www.insightcrime.org/news/analysis/why-does-latin-america-have-the-world-s-highest-female-murder-rates/ (reporting Guatemala ranked third in the world by female murder rate).
[4] U.S. Dep't of State, *Guatemala Travel Advisory*, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/guatemala-travel-advisory.html (last visited Feb. 5, 2021).

being targeted for sexual violence, as they use rape and the threat of rape as a tactic of control in the areas where they operate. Women and girls are also frequently targeted for forced sexual relationships with organized crime members, and those who resist these advances face violence or even death. When family members seek to protect women and girls from forced relationships they face violence repercussions.

7.      Gangs also forcibly recruit boys and girls and, once invited to join, those who resist (or are related to those who resist) face threats, torture, and ultimately death. These same consequences also face individuals who fail to comply with violent extortion demands from these groups, which have become very common in recent years. When victims attempt to escape by relocating within their countries, gangs often track them down and ruthlessly punish them.

8.      Gang-based violence is pervasive in Guatemala, Honduras, or El Salvador. Over 90% of homicide cases in the northern countries of Central America end in impunity, and in cases involving sexual and gender-based violence the impunity rate is even higher—at 95%. Law enforcement officers sometimes target LGBTI individuals precisely when they come in to report violence. Violence against women and children has increased during the pandemic, at the same time that severe restrictions on movement and reduced staff at government agencies in Guatemala, El Salvador, and Honduras, have made reporting it even more difficult.

9.      COVID-19 has exacerbated gender-based violence, gang violence, and other longstanding concerns in Northern Central America, making the situation even more dire for expelled families. The increase in violence against women and children has been evident in the spike in calls to emergency hotlines during the pandemic. The Organization of Salvadoran Women for Peace (ORMUSA) reported a 70 percent increase in complaints of violence against

women in El Salvador between mid-March and late May of 2020.[5]  In Honduras, since the pandemic started, every hour a woman experiences some form of GBV[6], and the number of reported cases of domestic and intra-family violence increased by 4.1 percent per week during the first months of lockdown (March through May), reaching 10,000 reports made to the National Emergency System in April alone.[7]

      10.    In El Salvador, Honduras, and Guatemala, street gangs have used COVID-related confinement to strengthen their control over communities.[8] This includes "stepping up of extortion, and sexual and GBV, and using forced disappearances, murders, and death threats against those who do not comply"[9] with curfews and other restrictions. In Honduras, for example, gangs have used such tactics against citizens who did not comply with stay-at-home orders.[10]  In El Salvador, gangs, like the MS-13, enforced the implementation of COVID-19 lockdown restrictions in several cities, including Santa Ana and San Salvador, through threats and violence.[11] Gangs killed 74 people during the first week of lockdown, far surpassing the previous average of approximately three deaths per day due to gang violence.[12]

---

[5] https://ormusa.org/organizaciones-lanzan-campana-de-sensibilizacion-de-la-violencia-contra-las-mujeres-en-el-marco-de-la-emergencia-por-covid-19/ and
https://www.elsalvador.com/eldiariodehoy/violencia-domestica-coronavirus-cuarentena/702488/2020/
[6] https://honduras.unfpa.org/es/news/es-prioridad-asegurar-la-continuidad-de-los-servicios-de-atenci%C3%B3n-victimas-de-violencia-durante
[7] https://www.rescue.org/press-release/irc-data-shows-increase-reports-gender-based-violence-across-latin-america   and https://presencia.unah.edu.hn/noticias/observatorio-de-la-violencia-reporta-45-muertes-violentas-de-mujeres-en-el-periodo-de-confinamiento/
[8] UNHCR staff. 2020. "Central America's displacement crisis aggravated by COVID-19." UNHCR
[9] Ibd.
[10] UN News. 2020. "Coronavirus Lockdowns in Central America, Exploited by Criminal Gangs | COVID-19 | UN News." United Nations.
[11] Linthicum, Kate. O'Toole, M. Renderos, A. 2020."In El Salvador, gangs are enforcing the coronavirus lockdown with baseball bats." Los Angeles Times.
[12] Edgardo Ayala.2020. "Pandillas, virus más letal que el COVID-19 en El Salvador." La

11.     Expelled families are returning to grave food insecurity, a longstanding problem in Guatemala, El Salvador, and Honduras, where over 35 percent of the population experiences extreme, chronic undernourishment, but made much worse by the economic impacts of the pandemic.[13]  Increased economic and social insecurity combined with heightened control exerted by gangs during the pandemic, has left children and their families more vulnerable to violence, displacement and forced recruitment by gangs.  This has had an even greater impact on children and families who had already being displaced within their own country in previous years due to escalating violence and insecurity.[14]

12.     Closely related to impunity are the well-documented problems of corruption and repression in all three of these countries. In one notable example, the former Guatemalan president, Jimmy Morales, recently expelled the International Commission against Impunity in Guatemala ("CICIG"), an entity created by agreement with the United Nations to prosecute corruption. In its final report, CICIG described the Guatemalan government as a "mafia coalition," noting that corruption in that country could not be solved without "a profound restricting of the state."[15] In October 2019, the brother of Honduran president Juan Orlando Hernández was convicted on charges of drug trafficking, in a trial in which multiple witnesses testified that President Hernández himself was aware of the activity, but accepted bribes and

Jornada. And Martinez, C. Martinez, O. Lemus, E. 2020 "Pandillas amenazan a quien incumpla la cuarentena." El Faro
[13] Food and Agriculture Organization. 2020. "SDG Indicator 2.1.1 – Prevalence of Undernourishment." United Nations.
[14] https://www.unhcr.org/news/briefing/2020/5/5ebe47394/central-americas-displacement-crisis-aggravated-covid-19.html
[15] *Guatemala in grip of 'mafia coalition', says UN body in scathing corruption report*, The Guardian (Aug. 8, 2019), *available at* https://www.theguardian.com/world/2019/aug/28/guatemala-corruption-mafia-coalition-jimmy-morales.

political support in exchange for turning a blind eye.[16] In January 2020 President Hernández shut down the mandate for the Mission to Support the Fight Against Corruption and Impunity in Honduras (MACCIH), the anti-graft body backed by the Organization for American States.

13.     I am aware of numerous cases involving domestic violence or sexual violence perpetrated by a male involved in organized crime in which the perpetrator was able to "buy off" law enforcement, as well as examples of police officers and judges being bought off. I have spoken with numerous women, including some adolescent girls, who fled abusive domestic partners in the northern countries of Central America whose partners had either money or family connections that protected them from prosecution.

14.     In addition to these forms of violence, children and families expelled to Guatemala, El Salvador, and Honduras face discrimination from those fearful that they will introduce COVID-19 to the community. Expelled migrants have faced threats of lynching or burning in some cases.[17] Asylum-seekers expelled to the country of origin have also continued to face threats from their persecutors. KIND referred a number of expelled children and their families to protective housing arrangements in order to provide some limited, short-term safety, but asylum-seekers returned to dangerous conditions lack long-term protection. Migrants, like the 19 shot and charred dead Guatemalans recently found in a truck in Tamaulipas, are often the victims, with perpetrators ranging from police or other security forces to drug cartels and other organized criminal groups.[18]  These cases include a Guatemalan family who had fled persecution

---

[16] *Honduran President's Brother is Found Guilty of Drug Trafficking*, N.Y. Times (Oct. 18, 2019), *available at* https://www.nytimes.com/2019/10/18/world/americas/honduras-president-brother-drug-trafficking.html.
[17] *U.S. returns migrant children despite risks worsened by Coronairus: UNICEF*, Reuters (May 21, 2020), *available at:* https://www.reuters.com/article/us-health-coronavirus-usa-mexico/us-returns-migrant-children-despite-risks-worsened-by-coronavirus-unicef-idUSKBN22X1RP.
[18] https://www.washingtonpost.com/world/the_americas/mexico-tamaulipas-police-migrant-

in their country of origin, after they had unsuccessfully attempted to relocate in Guatemala and

their persecutors found them.  The family—which included a parent and two children—came to

the United States and were placed in MPP and forced to live in Mexico while awaiting their

removal proceedings.  Conditions in Mexico became so unsafe that the children crossed the

border without their mother to seek safety in the United States, but were then expelled to

Guatemala.  The parent, who remained in Mexico when the children went on to the United

States,   returned to Guatemala after learning of the children's expulsion, although the parent felt

terrified to return.

15.    Mexican children and families risk return to the same dangers they fled, typically

violence at the hands of drug cartels. Central American families expelled to Mexico face the

additional risk of being targeted because of their status as migrants.[19] In one family's case, the

family was returning to one of the encampments along the U.S.-Mexico border where migrants

are living while awaiting removal proceedings in the United States.  The mother was targeted by

kidnappers and escaped, but her child was injured in the process.   Another family faced threats

by criminal gangs who were attempting to steal children in an encampment in Matamoros,

Mexico.[20] We are also aware of three families whose children suffered sexual abuse while living

killing/2021/02/03/32c22274-65c7-11eb-8468-21bc48f07fe5_story.html.

[19] According to Human Rights First, as of May 13, 2020 there were over 1,114 reported cases of
"murder, rape, torture, kidnapping, and other violence assaults against asylum seekers and
migrants" at the U.S. Mexico border, *available at:*
https://www.humanrightsfirst.org/campaign/remain-mexico; *More People Kidnapped, Abused on
Migration Route in Southern Mexico*, Doctors Without Borders (Oct. 30, 2019), *available at*
https://www.msf.org/increase-kidnappings-and-violence-against-migrants-southern-border-
mexico.

[20] Brief of Young Center for Immigratn Children's Rights, Kids in Need of Defense, et al., *Wolf
v. Innovation Law Lab*, No. 19-1212 (Jan. 22, 2021) at 19-20, 31-21,
http://www.supremecourt.gov/DocketPDF/19/19-1212/167044/20210122180800456_19-
1212%20Amici%20Curiae.pdf.

in a migrant shelter in Ciudad Juarez, Mexico.

16.    Mexico ranks in the top 20 countries with the highest global homicide rates, and border towns in Mexico—where many children and families are expelled to—have some of the highest rates of homicide, kidnapping, and femicide in the country. In 2016 the average homicide rate per capita in 35 Mexican border municipalities was over four times the rate in the corresponding U.S. border counties.[21]

17.    In addition, the U.S. government currently expels many families from Guatemala, Honduras, and El Salvador to Mexico. Such families often face grave threats at the U.S.-Mexico border. In the Mexican border state of Tamaulipas, children face high rates of kidnappings and murder. From 2006 to 2014 at least 2,000 children were murdered or mutilated, and in the first five months of 2020, 265 children were reported missing.[22] Children in Mexico's border regions are particularly vulnerable to human trafficking, sexual exploitation, and forced labor, in many cases at the hands of organized criminal groups. Over the past five years, rates of femicide, or gender-motivated killing of women and girls have increased 137 percent and in many cases these murders are accompanied by torture, mutilation, and sexual violence. The border states of Sonora, Nuevo León, and Chihuahua had the highest femicide rates in the country, almost twice the rate of Mexico City. Femicide rates in the border city of Ciudad Juarez have been on the rise since 2019, and historical data show that young women are disproportionately targeted, with half

---

[21] *Here's What Violence Along the U.S.-Mexico Border Really Looks Like*, Igarape Institute (Jul 3, 2017), *available at:* https://igarape.org.br/en/heres-what-violence-along-the-u-s-mexico-border-really-looks-like/.

[22] *Relatoría sobre los Derechos de la Niñez culmina su visita a México* (Rapporteur on children's rights completes visit to Mexico), Organization of American States (Oct. 20, 2014), *available at:* http://www.oas.org/es/cidh/prensa/comunicados/2014/125.asp; https://www.hrw.org/news/2020/06/02/dhs-oig-formal-complaint-regarding-remain-mexico.

of victims under the age of 19.[23]

18.    Ninety-nine percent of crimes committed against migrants in Mexico end in impunity.[24] The vast majority of gender-based crimes in Mexico also go unpunished due to widespread underreporting, corruption, and the failure of government institutions to effectively investigate and prosecute crimes. As many as 99 percent of femicides result in impunity.[25] Migrant women and children who are victims of gender-based violence in Mexico face even greater barriers to accessing protection and justice, including fear of discrimination or deportation if they report violence.

19.    KIND has also worked with families subjected to Title 42 expulsion, including a family that repeatedly expressed a strong fear of return to their Central American country of origin while caring for a child recovering from a serious medical condition. After being apprehended by CBP in July 2020, the family was held for several days in hotels near the border, under guard and allowed only brief, non-private telephone calls with their U.S. citizen family member; the child's medication was taken and not replaced, and a promised visit from a doctor

---

[23] Femicide in Juárez is Not a Myth, Texas Observer (Sept. 28, 2015), *available at:* https://www.texasobserver.org/femicide-in-juarez-is-not-a-myth/. In July 2020 there were 161 homicides in Juarez, which was only the third-highest month this year; 15 of the victims were female, including a two-year-old child. Luz del Carmen Sosa, Cobra julio 161 víctimas de homicidio (In July, 161 victims of homicide), *El Diario* (Aug. 1, 2020), *at* https://diario.mx/juarez/cobra-julio-161-victimas-de-homicidio-20200801-1691599.html.
[24] *Access to Justice for Migrants in Mexico: a Right that Exists Only on the Books*, Washington Office on Latin America, Fundar, Fundacion Para la Justicia, Hermandos del Camino, Red Migrantes Sonora, La 72, Casa del Migrante Saltillo (Jul. 2017), *available at:* https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwi2ot-onNPuAhU9CjQIHQwBD-MQFjABegQIBBAC&url=https%3A%2F%2Fwww.wola.org%2Fwp-content%2Fuploads%2F2017%2F07%2FAccess-to-Justice-for-Migrants_July-2017.pdf&usg=AOvVaw1xJPmgWElEm8dNetnhVxxY.
[25] *Despite the Coronavirus Mexican Women are Fighting Femicide*, Foreign Policy (May 20, 2020), *available at: https://foreignpolicy.com/2020/05/20/coronavirus-mexico-women-fighting-femicide/.*

never materialized. They were then expelled on a flight to their country of origin.

I declare under penalty of perjury under the laws of the United States of America and California that the foregoing is true and correct.  Executed on: February 5, 2021, in Berkeley, California, United States.


Signature:    /s/ Lisa Frydman

_____

Lisa Frydman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al. | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALEJANDRO MAYORKAS, Secretary of | ) | No. 20-cv-00100-EGS |
| Homeland Security, in his official capacity, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF TAYLOR LEVY IN SUPPORT OF PLAINTIFF'S MOTION FOR
CLASSWIDE PRELIMINARY INJUNCTION**

I, Taylor Levy, hereby declare:

1. I am an attorney admitted to practice in Texas. I became licensed in 2019. I am in good
standing with the State Bar of Texas (State Bar No. 24113588). I specialize in
immigration law, and run a private law firm called Taylor Levy Law through which I
provide primarily pro bono legal services to individuals along the U.S.-Mexico border.

2. Since 2009, I have worked as an attorney and advocate in various capacities for
noncitizens at or near the border. Among other roles, I have worked as Legal Coordinator
for Annunciation House in El Paso, Texas, where I coordinated volunteers who represent
and advocate for immigrants in the El Paso area. Before I became licensed as an attorney,
I worked for five years as a Department of Justice Accredited Representative representing
individuals in immigration court in the El Paso, Texas area.

3. Beginning in March 2020 I began going to the Mexican side of the Paso del Norte Port of
Entry in Ciudad Juarez, Mexico to provide free legal advice to migrants presenting for
their (cancelled) Migrant Protection Protocols ("MPP") hearings.  From March 2020
through August 2020, I went to the Paso del Norte Port of Entry almost every weekday
from approximately 4 am to 10 am and provided free legal advice and free consultations.
From March 2020 through November 2020, I also frequently visited migrant shelters to
give free legal advice and consultations to families who had been expelled under Title 42.
In addition to my work in Juarez, I serve as a free mentor to immigration attorneys from
across the country. Since March 2020, I have consulted on numerous cases involving
asylum-seeking families expelled across the southern border.

4. Since the Title 42 Process went into effect in March, I have worked with dozens of
families subjected to expulsion under Title 42.   Many of these families include very

App. 339

young children, some of whom are infants or toddlers.  Most of the families I have worked with come from El Salvador, Guatemala, Honduras, and Venezuela.

5.  Between March and August 2020, I personally observed hundreds of Title 42 expulsions, which included a number of families with parents and their children.  The children who I observed being expelled ranged from infants held in their mothers' arms who were too young to walk, to four-year-old toddlers, to teenagers.  Many of the children I saw being expelled were in wet and muddy clothes.  They told me that they were hungry and thirsty.

6.  When I observed people who I thought had been expelled, I would approach them and try to explain that I was an immigration lawyer and there to help if they needed help. They were often too scared to speak with me, as they did not know who I was or if I was going to hurt them or trick them.  However, during this period I spoke with dozens of people who were expelled, including many families with minor children, both at the bridge and in migrant shelters.

7.  The families I have worked with were frequently fleeing grave persecution and threats in their countries of origin.  I would ask families if they had asked US border agents for asylum prior to their expulsions.  Many said they had asked for asylum but that US immigration agents had told them that asylum had been cancelled and that it was impossible to ask for asylum.  Many would break down crying, sobbing, shaking, saying they had nowhere to go in Mexico, they did not know where they were, and that they could not return to their home countries.  They would often tell me that they had told immigration agents details about the violence and persecution they were fleeing in their home countries and were ignored. The most common refrain from people was, "what am I supposed to do, where am I supposed to go."

8.  People were scared of being in Juarez because they did not know how to navigate the area or where they could go to stay safe, and they were scared they would be kidnapped. They were too scared and uninformed to know who was there to help them and who was there to hurt them, so there was no way for them to learn about the (few) resources that exist in Juarez for migrants, like migrant shelters.  Some expelled migrants told me that they attempted to turn themselves in to Mexican immigration officials, but the officials told the migrants that they could not help because of the pandemic.  Some even asked Mexican officials to deport them back to their home countries because they felt safer hiding there than trying to survive on the streets of Juarez, but that Mexican officials declined because there were no deportations happening due to the pandemic.

9.  On one occasion I spoke with a family from Central America.  The family consisted of a mom and her school-aged son who were originally too scared to talk to me.  After they had been at the bridge for several hours, observing me speak with other migrants, they finally trusted me enough to talk to me.  They told me that they had been expelled after being apprehended at a Border Patrol checkpoint, trying to leave El Paso.  The mother was despondent and told me she told the agents she wanted to seek asylum.  She said they told her that no asylum was available.  She did not know what she was going to do and did not know where to go in Juarez and was scared they would be harmed in Juarez.  This

family was emblematic of many other families I observed and spoke with, who similarly were fleeing persecution and were told by U.S. officials that asylum was no longer available.

10. On another occasion I saw a mom with a little boy who was 4 or 5 years old.  I saw them at 4 am, right when I got to the bridge.  I knew she was a migrant because of the hour and because she had a small child with her.  She was an asylum seeker from Honduras who was too traumatized to tell me why she was fleeing, she just kept saying "asylum, asylum," when I asked.  The mom was very upset because when she was picked up, Border Patrol had taken her passport and her son's birth certificate.  When she was expelled, Border Patrol had not returned these documents to her.  Like other people who were expelled under Title 42, she had been taken to the middle of the bridge by Border Patrol and told to walk south.  She told me that once she understood she was being expelled, she asked the officers repeatedly to return her documents to her.  Now that she was in Juarez without these documents, she was terrified that someone would take her child from her since, without her son's birth certificate, she could not prove that her son was her son.  I immediately took her back to the middle of the bridge and asked the officers for her documents.  The officers I spoke with initially denied that Border Patrol agents had taken her documents, saying Border Patrol did not do that.  I then called Border Patrol Station 1 and begged them to listen to me.  After several phone calls and being bounced around to different officers, I was finally told that Border Patrol agents did have her documents and would return them.  Approximately one hour later, a Border Patrol officer came to the middle of the bridge where we were waiting and returned her passport and her son's birth certificate to her.  I feel confident that she would not have been able to recover her documents without my advocacy.

11. I have also consulted on numerous cases involving kidnapped Central American asylum-seeking families. In many of these cases, the families were kidnapped immediately upon being expelled from the United States. Because the families are not Mexican, and lack connections and resources in that country, they are frequently preyed upon and victimized by gang members, the cartels, or others seeking to take advantage of their vulnerable circumstances.  The families are easily-recognizable in Mexico because of the locations where they are returned, their clothing, and their accents.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed in Hallandale Beach, Florida.

Dated: February 5, 2021                          /s/ Taylor Levy
                                                 TAYLOR LEVY

SUPPLEMENTAL DECLARATION OF TAYLOR LEVY

I, Taylor Levy, hereby declare, pursuant to 28 U.S.C. § 1746:

**SUMMARY**

1. Having worked with border communities for over ten years, including having represented over 1,200 migrants impacted by the Title 42 policy, I am deeply familiar with the humanitarian crisis fueled by the policy and the policy's disconnect from COVID-19 concerns.

2. CBP expulsions of migrants occur in predictable locations at predictable times in areas where kidnappers and organized crime are rampant. As a result, many migrants are kidnapped immediately upon CBP releasing them into Mexico from a U.S. port of entry.

3. The risks to migrants are particularly acute when CBP engages in so-called lateral expulsions, in which migrants are apprehended at one part of the border (often the Rio Grande Valley in Texas), detained for as long as seven days, transported by plane or bus to another part of the U.S. border (as far away as San Diego, California), and then expelled into a completely different part of Mexico. Such expulsions make asylum-seekers even bigger targets for organized crime because the migrants (1) are easily identifiable outside the ports of entry, (2) are unfamiliar with their new surroundings, (3) have no shelter or other resources in the area, and (4) they likely have no more money to pay extortion ("protection fees") to another local gang or cartel (after already being extorted at their previous location).

4. My clients in Mexico suffer abuse from every possible source. For instance, one El Salvadoran woman had been expelled by the United States, then kidnapped, raped, and dumped in the desert, before the Mexican police told her that "migrants like to be raped" when she tried to report it; she then discovered that she was pregnant from the rape and suffered a forced abortion while seeking prenatal care at a public hospital. Overall, approximately 40% of the clients I worked with in Nuevo Laredo, Mexico report either an actual or attempted kidnapping (or both).

5. The horrific conditions that migrants endure in Mexico, combined with the federal government's decision to exempt children but not their parents from Title 42, have also forced parents to make gut-wrenching decisions to send their children across the border alone, unsure whether they will ever reunite.

6. Many of my clients were also actively harmed by CBP during their expulsions. Mothers who recently gave birth were expelled—while still bleeding profusely—with their U.S.-citizen newborns. Others had their critical medications seized and disposed of.

7. Through my work, I have become familiar with border processing, as well as shelter operations on both sides of the border. In my experience, Customs and Border Protection (CBP) has demonstrated that it can process families quickly, and shelter operators have taken extensive measures to prevent COVID-19 transmission among migrants, including testing and quarantine.

8. I have helped facilitate COVID-19 testing for 858 clients, and only 22 people (2.56%) tested positive.

**QUALIFICATIONS**

9. I am an attorney admitted to practice in Texas. I became licensed in 2019. I am in good standing with the State Bar of Texas (State Bar No. 24113588). I specialize in immigration law, and run a private law firm called Taylor Levy Law through which I provide primarily pro bono legal services to individuals along the U.S.-Mexico border.

10. Since 2009, I have worked as an attorney and advocate in various capacities for noncitizens at or near the southern border. Among other roles, I have worked as Legal Coordinator for Annunciation House in El Paso, Texas. Prior to my attorney licensure, I worked for five years as an accredited representative for the U.S. Department of Justice representing individuals in immigration court in the El Paso, Texas area.

11. Beginning in March 2020 I began going to the Mexican side of the Paso del Norte Port of Entry in Ciudad Juarez, Mexico to provide free legal advice to migrants presenting for their (canceled) Migrant Protection Protocols ("MPP") hearings. From March 2020 through August 2020, I went to the Paso del Norte Port of Entry almost every weekday from approximately 4 am to 10 am and provided free legal advice and free consultations. From March 2020 through November 2020, I also frequently visited migrant shelters to give free legal advice and consultations to families who had been expelled under Title 42. In addition to my work in Juarez, I served as a free mentor to immigration attorneys from across the country. Since March 2020, I have consulted on numerous cases involving asylum-seeking families expelled across the southern border.

12. Since May 2021, I shifted my focus from my work in the Ciudad Juarez region to Nuevo Laredo (in partnership with the nonprofit organization VECINA) due to the alarming rates of expulsions under Title 42, which has subjected individuals seeking asylum to dangerous conditions in Nuevo Laredo, Mexico. I also work with some clients subjected

to Title 42 in Reynosa and Piedras Negras. I also communicate extensively with other immigration attorneys and humanitarian aid organizations providing services across the Mexican border.

13. I have also represented and helped many people seek exemptions from the CDC's Title 42 policy and be successfully processed at various ports of entry since April 2021. I have also helped arrange COVID-19 tests for hundreds of migrants prior to their entry into the United States since June 2021.

**Migrant Families Are Trapped in Horrific Conditions in Mexico As They Await the End of Title 42.**

14. Migrant families are extremely vulnerable in Mexico because, among other things, they are routinely (1) targeted for kidnapping, rape, trafficking, and extortion; (2) denied medical care even for serious illnesses; (3) displaced, homeless, and often forced to sleep on the street or in a plaza; (4) discriminated, harassed, and attacked based on race, gender, and sexual orientation; (5) assaulted by a combination of police and private actors; and (6) prevented from accessing basic services and legal protection due to language barriers.

15. Since May 2021, I have represented 398 families, and 22% of them had been kidnapped in Mexico. Twenty-one percent managed to escape from an attempted kidnapping. Overall, 41% experienced an actual or attempted kidnapping or both.

16. One of my female clients from El Salvador, who had been expelled three times under Title 42, was kidnapped by two men who put a wet rag over her mouth, causing her to lose consciousness. When she awoke, she was alone, mostly naked, dumped in the desert, and had been raped. She walked until she found a woman who gave her pants and some money for a bus ride. My client went to the municipal police to report the rape, and the police officers told her that they were not going to accept her complaint because she was a migrant and "migrants liked to be raped." She later realized that she was pregnant as a result of the rape and went to the public hospital for prenatal care. At the hospital, a doctor, without informing my client or obtaining her consent, forcibly induced an abortion. As a Christian, my client does not believe in abortion and wanted to keep her baby, who was innocent, despite being the product of rape.

17. That client's trauma was severe but not unique. I also represented a Black Honduran mother and her 7-year-old son—they were kidnapped in Reynosa, and the mother was severely beaten and raped in front of her son. When she sought help, Mexican police officers refused to help her and instead taunted her, asking her how much she would

charge to give them a turn. Since this trauma, the 7-year-old became extremely depressed and has frequently told his mother that he wants to die.

18. Another client told me that she was "lucky," because even though the kidnappers gang-raped her repeatedly, they always did it in a separate room so that her 8-year-old daughter and 6-year-old son did not have to watch.

19. Kidnappers target migrants in hopes of extracting ransom from family and friends in the U.S. Migrants, particularly Black migrants and other racial minorities, are readily identified based on their appearance and their proximity to the border.

20. Many of the families I work with have serious medical conditions and they are unable to access appropriate medical care in Mexico. They report going to the public hospitals to seek emergency treatment (as officially required under Mexican law) only to be denied care because of their status as migrants. My clients' untreated medical conditions have included cerebral palsy, seizures resulting from brain injuries suffered during beatings, brain tumor, vaginal infection, skin rashes, hernias, fainting, heart problems, diabetes, high blood pressure, asthma, anxiety, depression, suicidality, diarrhea, serious weight-loss, bed-wetting, gallstones, kidney stones, pediatric liver disease, anemia, ovarian cysts, spina bifada, hyperthyroidism, blood disease, autism, epilepsy, and scoliosis.

21. I represented a Honduran family whose one-year-old baby was denied emergency medical attention when he stopped breathing.  The baby has Down's Syndrome and a heart murmur. The family sought help at a public Mexican hospital and was told explicitly that they were denied care because they were foreigners. This family has been expelled to Mexico twice after trying to seek asylum in the United States.

22. I also represented a young Venezuelan man with spina bifada who was in a wheelchair, whose immobility made him particularly vulnerable to kidnapping. He was unable to receive necessary check-ups for his condition, and he ended up with an infection that moved to his kidneys as a result.

23. Another client had experienced vaginal bleeding for 3 months and was told by a doctor at the public hospital that she had over 20 uterine fibroids and was in severe need of surgery. However, the hospital refused to perform the operation because she was a migrant.

24. One of my clients was an 8-year-old girl with an enlarged heart that results in her turning purple and struggling to breathe. When the family sought out medical treatment for her,

doctors at public hospitals refused to serve them on numerous occasions, saying that Mexicans were more deserving of their help.

25. Families also frequently report a severe fear of leaving the shelters to seek out medical treatment because they are worried about being kidnapped, especially those families who have already survived one kidnapping and worry that their families will be unable to gather another ransom if requested.

26. My clients frequently report being harmed by Mexican law enforcement.  Many families report being robbed, bribed, kidnapped, beaten, and sexually assaulted by Mexican police.  Other migrants report Mexican immigration officials demanding $500 bribes in exchange for their release; some expelled migrants report being handed over directly to kidnappers by Mexican immigration officials immediately upon expulsion.

27. I represented a Black Honduran asylum-seeker who was six-months-pregnant and suffered a miscarriage due to extreme distress caused by frequent police raids at her apartment.

**Title 42 Has Exacerbated the Dangers that Migrant Families Face in Mexico.**

28. In addition to prolonging the time that people spend under dangerous conditions, Title 42 elevates the risks that migrants face in Mexico and inflicts additional trauma on asylum-seekers.

29. CBP expulsions of migrants occur in predictable locations at predictable times in areas where kidnappers and organized crime are rampant. As a result, many migrants are kidnapped immediately upon CBP releasing them into Mexico from a U.S. port of entry.

30. The risks to migrants are particularly acute when CBP engages in so-called lateral expulsions, in which migrants are apprehended at one part of the border (often the Rio Grande Valley in Texas), detained for as long as seven days, transported by plane or bus to another part of the U.S. border (as far away as San Diego, California), and then expelled into a completely different part of Mexico.

31. Such expulsions make asylum-seekers even bigger targets for organized crime because the migrants (1) are easily identifiable outside the ports of entry, (2) are unfamiliar with their new surroundings,  (3) have no shelter or other resources in the area, and (4) they likely have no more money to pay extortion ("protection fees") to another local gang or cartel (after already being extorted at their previous location).

32. At multiple ports of entry in Texas (Laredo, El Paso, Eagle Pass, and Hidalgo), CBP has routinely expelled my clients, including newborns, into the waiting arms of kidnappers biding their time next to the port. Migrants become immediate targets as soon as they are marched over the boundary line into Mexico. Several of my clients have reported kidnappings and attempted kidnappings by armed men in trucks and vans waiting near the spots where Title 42 expulsions occur.

33. During those incidents, children are sometimes ripped from the arms of their mothers and fathers and pulled into the kidnappers' vehicles. Oftentimes migrant families run from these kidnappers trying to escape, resulting in family separation where some members escape while others are not so lucky. In some cases, the family members who survived the attempted kidnapping never again hear from their missing family members.

34. Others have reported being kidnapped by supposed taxi drivers who park near the ports and either kidnap the migrants directly or who refuse to take them to their destination and instead hand them over to kidnappers.

35. I represented a father and his six-year-old son, who were kidnapped and almost kidnapped a second time, each time immediately after being expelled from a U.S. port of entry. The first time, they were immediately kidnapped after CBP expelled them into Reynosa; the father was trafficked for labor. After they were released, the family tried to seek asylum again—this time, CBP transported the family and expelled them into Nuevo Laredo, where they narrowly escaped another kidnapping attempt.

36. Another client family, consisting of a mother and her seven-year-old son from El Salvador, were expelled into Mexico on several occasions trying to seek asylum in the United States. On their final attempt, they were kidnapped immediately upon expulsion to Nuevo Laredo and held for eight days while their family gathered the money to pay their ransom. The mother reported that her son did not eat anything during the entire kidnapping and was deeply traumatized.

37. I also represented a Honduran mother, father, and their children, ages eight and one. The mother was kidnapped and held for a month before finally being released after her family in the United States paid a ransom. Later, the father was approached by the cartel in Nuevo Laredo who demanded that he work for them. He refused, and they beat him so badly that they broke his hip and told him that he was going to have to start working for him once he healed. The family was so terrified that they hid in the migrant shelter rather than try to seek medical care; as a result, the father can no longer walk unassisted.

38. Another client was immediately kidnapped after being expelled from El Paso and was repeatedly sexually assaulted by her captors.

39. I also worked with a young mother of three who attempted to cross at Reynosa, Mexico but the family was apprehended and expelled more than a thousand of miles away into Tijuana, Mexico. On their second attempt, they were deported to Nuevo Laredo, where the family was kidnapped for five days and threatened with dismemberment for a ransom of $20,000. The family is now traumatized from the event.

40. In another case, a mother and her two sons—including one who has severe autism and is nonverbal—were kidnapped for three weeks after being expelled into Mexico. The family had fled their home country after the children's father was murdered.

41. Another mother and her 8-year old son seeking asylum were expelled and then kidnapped for several days until her son fell ill and they were released "so her son would die elsewhere."

42. I also worked with a family of four that included a nine-month-pregnant mother, a father, and two children ages four and nine. The family originally sought asylum in the Reynosa area, only to be expelled. During their second attempt to seek safety, the family was accosted by cartel members. The young children made it across the river (thereby becoming unintentional unaccompanied minors), but the mother and father were kidnapped, separated, and brutalized. Eventually, the mother was released when she went into labor, and her baby was born with severe complications.

43. Title 42 has also resulted in more dangerous crossings. Prior to Title 42, I had rarely witnessed or learned of families attempting to climb over the border wall, but now, this has become a more common occurrence for desperate families subject Title 42 expulsions. I worked with a family who attempted to jump over the border wall and the two children fell off; one broke their leg and the other was seriously injured.

44. I have also represented clients who suffered direct harm at the hands of the Border Patrol during the expulsion process. For instance, expelled families frequently report having their medications seized by the Border Patrol. For example, I recently represented a Honduran mother with a chronic heart condition whose medication was taken away by Border Patrol upon apprehension and never returned; this resulted in her having extremely high blood pressure and swelling in her feet. I also represented a mother and her two-year-old son, whose asthma medicine was seized.

45. Since March 2021, I have represented five Central American mothers who were expelled into the streets of Piedras Negras, Mexico, within 48-72 hours after giving birth to a U.S. citizen baby in Eagle Pass, Texas. All of the mothers reported being expelled with limited baby formula, diapers, and clothing. The mothers—including one who had a cesarean section—all told me that they were in significant pain from given birth and unable to access medical care in Mexico. One mother told me that the Border Patrol took away all her belongings prior to expulsion—including her cell phone, money, clothing, and sanitary napkins—such that she had bled through her only pair of underwear and pants. All five mothers were expelled prior to obtaining birth certificates for their infants. Once in Mexico, they were unable to obtain appropriate medical attention for their babies because of their undocumented status.

**Title 42 Has Caused Innumerable Families to Become Separated From Their Children.**

46. Given the dangerous conditions in Mexico, the continued application of Title 42 to migrant families has forced parents to make heart-wrenching decisions to send their children to the United States alone, not knowing when (or if) they would ever see each other again.

47. I have witnessed the desperation that has forced parents to send their children unaccompanied to the border, because the Biden administration will accept only unaccompanied minors and not families under Title 42. Parents believe that is their only option. I have heard parents say, "no me queda de otra" ("I have no other option").

48. For example, I worked with an indigenous mother with limited Spanish fluency who tried to seek asylum with her eight-year-old daughter. Immediately upon expulsion, the family was pursued by masked men with guns. The mother told her daughter to run, and the child was able to narrowly escape while the mother was abducted. The daughter ended up in the custody of the Office of Refugee Resettlement ("ORR")—deeply traumatized— and thinking for over a month that her mother had been killed.

49. Another one of my clients was the mother of a nine-year-old boy fleeing forced gang recruitment in Honduras. After an attempted kidnapping in Mexico, the child's mother sent him alone to the U.S, where he was languishing in ORR custody with no viable sponsor and about to be placed in long-term foster care.

50. I also represented a family that crossed the border twice in April 2021 seeking asylum. After being expelled both times, the family decided to send their son across alone. The remaining adult family members narrowly escaped an attempted kidnapping in Ciudad Juarez. They were also accosted and robbed by Mexican police officers.  The father also

had uncontrolled diabetes and was unable to access proper medical care in Mexico. An attorney for the child, who was in ORR custody, contacted me for assistance applying for a humanitarian exemption from Title 42 for the adult family members, because the child—who had been identified as a victim of human trafficking—was suffering severe psychological trauma worrying about his family's safety.

51. It is my professional opinion that the unaccompanied minor increase at the border is directly linked to the Title 42 expulsions and the decision to only exempt children (but not their parents and adult relatives) from expulsion.

52. Almost all of the parents I have worked with who sent their kids ahead alone as unaccompanied minors did so only after first being expelled as a family unit.

53. I have worked with dozens of such families, including many who sent across young children. Some families decided to only send their older children across the border alone, keeping their younger children with them. After sending their kids across the border unaccompanied, the parents then continue to try and enter the country, as single adults.

54. I have worked with clients who have attempted to cross into the United States as many as nine times out of desperation, being expelled each time without an asylum hearing that could have been provided the first time they sought entry, thereby avoiding multiple contacts with CBP.

55. Instead of deterring families from coming into the United States, Title 42 forces families to enter again and again, because there is no other way to seek protection or to reunite with their children.

56. In many of these cases, unless the parent is allowed to enter the United States, the child would be stuck in government foster care indefinitely, potentially for years. I frequently field phone calls and emails from attorneys representing unaccompanied minors in ORR custody who have been designated "Category 4"—meaning that there is no parent or other sponsor able to take custody of the child in the United States.

**DHS's Selective Application of Title 42 Discriminates on the Basis of Nationality.**

57. Although the Title 42 policy on its face applies to undocumented persons regardless of country of origin, in reality, DHS engages in selective application of Title 42 that discriminates on the basis of nationality.

58. As the federal government has acknowledged, DHS generally does not expel nationalities that the Mexican government refuses to accept. *See* Centers for Disease Control and Prevention, *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* (Aug. 2, 2021) (hereinafter "CDC Order") at 15, https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf. Mexico in turn "will only accept the return of Mexican and Northern Triangle nationals," with "limited exceptions." *Id.*

59. By adopting Mexico's nationality preferences, DHS is distinguishing between migrants under Title 42 for geopolitical reasons, rather than on the basis of public health.

60. As a result of DHS's selective enforcement, Mexican, Guatemalan, Honduran, and Salvadoran migrants are much more likely to be expelled into Mexico compared to other nationalities, even though they may present the exact same COVID-19 risk. *See* CBP, *Southwest Land Border Encounters* (last visited Aug. 10, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

**CBP Can Process More Families at Ports of Entry, Including at El Paso.**

61. Rather than force families to cross dangerous terrain to seek asylum, CBP can and should make orderly presentment at ports of entry a possibility for asylum-seeking families.  I have worked with many families who approached ports of entry for an opportunity to prove their asylum claims before they were prevented from entering the port.

62. Although the government claims that every individual takes hours to process, based on my experience, CBP is capable of processing people more quickly than that.

63. I am also familiar with families and individuals being processed for humanitarian exemptions from the Title 42 policy via the so-called consortium process, which enables certain NGOs to identify and refer vulnerable individuals to the federal government to receive exemptions.  Those individuals are able to be quickly processed without being detained for hours in congregate settings.

64. Over the past several months, I have maintained a waiting list of hundreds of families who were waiting for a humanitarian exemption from Title 42.  Many of these families have been waiting in Mexico for a chance to pursue their asylum claims in the United States since before the onset of Title 42, due to various other Trump administration policies undermining access to asylum.  Some of those families have waited their turn for 1-2 years under dangerous conditions, hoping to follow the law and do everything the "correct" way. Now that NGOs responsible for referring exemption requests to DHS are

no longer accepting new cases because of a backlog, those families whose desperation has reached a tipping point after years of suffering are now left with no options.

65. In the past, families were able to be processed much more quickly than the amount of time that the government is currently contending. Prior to 2018, I seldom witnessed noncitizens being immediately issued Notices to Appear (NTA), which formally commence removal proceedings and create a process for asserting asylum claims. Now, DHS has opted to issue NTAs immediately and asserts that the complexities of issuing an NTA requires significant processing time (and the detention of the noncitizen while the paperwork is being prepared). However, as past practice would indicate, DHS is not required to issue NTAs immediately, particularly when doing so unnecessarily prolongs detention and strains processing capacity. DHS and CBP could easily address their capacity issue by merely returning to historical practices. In the past, noncitizens could be quickly issued release documents and informed to check in with ICE at their ultimate destination to receive their NTA.

66. Another practice that should be adopted to speed up the processing times and reduce time in congregate settings is to utilize available space around the ports of entry. For example, due to my extensive work in the El Paso area, I am extremely familiar with the port of entry and its ability to utilize outdoor spaces for processing. I have witnessed the use of mobile fingerprinting stations, trailers, and tents for the quick processing of migrants. The El Paso port of entry and nearby Border Patrol facilities have ample outdoor spaces and empty parking lots where mobile processing stations could be set up for faster and COVID-safe processing. Notably, CBP has developed innovative ways to process noncitizens, but unfortunately is employing these methods to undertake Title 42 expulsions, and not for regular asylum processing.

**Testing, Quarantine, and Shelter Capacity**

67. Through my extensive work at the border, I have personal experience with the non-governmental organizations (NGOs) that assist noncitizen families in Juarez and El Paso as well as Nuevo Laredo and Laredo.

68. My work with Annunciation House for a decade provided me with intimate knowledge in the ways that these shelters and organizations can and are more than willing to accommodate larger numbers of people entering the country.

69. The work of these organizations was happening prior to the pandemic, it continued through the pandemic, and currently they are waiting to be able to take in more people. I

have personally been responsible for setting up pop-up shelters in churches, community centers, and hotels when expansions were needed.

70. Shelters and other NGOs on both sides of the border have worked to provide COVID-19 testing and implement steps designed to reduce the risk of COVID-19 transmission in migrant shelters.  For example, from March 2020 through November 2020, I observed first-hand the various mitigation measures undertaken in the migrant shelter system in Ciudad Juarez, Mexico. There were various "filter" shelters erected to house, quarantine, and treat migrants who were COVID-19 positive and those who had not yet been tested. The rest of the shelters severely restricted in-and-out privileges to reduce the risk of contagion, and masks are generally required indoors. Hand sanitizer, bleach, and soap were plentiful. Visitation was limited to those providing essential services (such as legal aid) and occurred outdoors, masked, and with sufficient social distancing.

71. Similarly, I work closely with a network of migrant shelters in Nuevo Laredo and Monterrey, Mexico. While I have not visited them in person, I have heard about their COVID-19 protocols from both the pastor managing the shelters and the migrants themselves. Migrants are instructed not to leave the shelters except for doctor's appointments or work; regardless, most rarely leave upon arrival because of the danger faced by migrants in Nuevo Laredo. There are plentiful masks, hand sanitizer, and cleaning supplies. The shelters are cleaned twice per day by the migrants. People who test positive for COVID-19 or who have high temperatures are transferred to a special quarantine shelter and isolated from the general population. A local lab comes to the shelters to administer COVID-19 tests as needed.

72. In both Juarez and Nuevo Laredo, families who receive a humanitarian exemption from Title 42 are able to access free or affordable COVID-19 tests before their appointments at the ports of entry, to ensure that they are not carrying the virus into the United States.

73. As part of my representation of clients seeking humanitarian exemptions, I have tracked their COVID-19 test results because those who test positive for COVID-19 were rejected by CBP.

74. Overall, 2.56% of my clients (22 out of 858) tested positive for COVID-19 in Mexico when they received a test prior to their appointments at the Laredo Port of Entry.

75. On the U.S.-side, shelters like Annunciation House that receive families released by CBP have developed procedures for COVID-19 testing, quarantine, and isolation as well. They provide rapid tests on-site and move positive families to quarantine locations.

76. Vaccinations are also available in Texas on demand without an appointment.

77. Prior to, during, and after the pandemic, I have been and will be working with families to ensure safe and humane processing into the United States while they await an asylum decision.  Based on years of direct experience, I know there are ways to process people quickly and in a manner that is safe for both my clients, border communities, and government personnel.

I declare under the penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. Executed in El Cerrito, California.

Dated: August 10, 2021                              /s/ Taylor Levy
                                                    TAYLOR LEVY

# DECLARATION OF JULIA NEUSNER

I, Julia Neusner, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a Legal Fellow in the Refugee Protection Program at Human Rights First. I make this declaration based on my personal knowledge and my interviews with refugees and migrants who have entered or attempted to enter the United States along the U.S.-Mexico border.

2. This declaration addresses three overarching issues.  First, under Title 42 asylum seekers are being expelled to Mexico where they are targeted by criminal organizations for kidnappings, extortion, or other attacks.  By expelling them, often at night, the U.S. government is putting vulnerable people directly in harm's way.  Second, DHS is conducting expulsions in a manner that increases the likelihood that they will get sick, specifically by flying them from one part of the border to another for expulsion without testing or basic COVID protocols (so-called "lateral flights").  Third, asylum seekers blocked from seeking safety in the United States are living in encampments in unsafe conditions, where they lack access to adequate health care and become even more obvious targets for gangs and criminal elements.

## My Research and Expertise

3. I have worked for Human Rights First since September 2020. Human Rights First is a national non-profit, non-partisan organization that provides pro bono legal services to asylum seekers and advocates for the United States government to uphold its human rights obligations abroad and at home, including its duties to refugees and asylum seekers under U.S. law and international treaties. I received a Juris Doctor from Stanford Law School and a master's degree in international policy from Stanford University in June 2020.

4. During the past year I have led Human Rights First's research on the effects of the Title 42 expulsion policy, interviewing hundreds of asylum seekers returned to Mexico or turned away at ports of entry. I conducted field research in migrant shelters and tent encampments in Tijuana for three weeks in March and April 2021 and in Ciudad Juárez for one week in June 2021. I also remotely interviewed hundreds of asylum seekers located in Mexican cities including Piedras Negras, Monterrey, Reynosa, Matamoros, Nuevo Laredo, and others.  I have also interviewed numerous individuals working with asylum seekers, including Mexican immigration officials, migrant shelter staff, pastors and members of religious orders assisting asylum seekers, non-profit legal and social service providers, and private immigration attorneys.  Based on these investigations, I co-authored four human rights reports.[1]

---

[1] Human Rights First, "Humanitarian Disgrace: U.S. Continues to Illegally Block, Expel Refugees to Danger," (December 2020) *available at*
https://www.humanrightsfirst.org/resource/humanitarian-disgrace-us-continues-illegally-block-

**Asylum Seekers Expelled to Mexico Face a Perilous Security Situation**

5. Asylum seekers sent by DHS to Mexico under Title 42 are exposed to violent attacks and exploitation. During the time asylum seekers are forced to wait in Mexico for the opportunity to request U.S. protection, they have been and are targeted based on characteristics that mark them as foreign nationals in Mexico, including their accent and/or primary language and physical appearance, as well as on account of race, gender identity, and sexual orientation, among other characteristics.

6. Many asylum seekers and service providers told me that criminal organizations specifically target migrants returned to Mexico by DHS for kidnappings, extortion, and other attacks—often with the participation or complicity of Mexican police and/or other Mexican security forces. DHS sometimes expels families in the middle of the night without their shoelaces, a practice which clearly marks the families as expelled migrants and makes them even more vulnerable to kidnapping by cartels.[2] More than ten asylum seekers told me they were kidnapped after DHS expelled them to unfamiliar cities far from where they'd entered the U.S. Some were kidnapped within minutes of being expelled.

7. My colleagues at Human Rights First and I track publicly reported cases of violent attacks against asylum seekers blocked or expelled to Mexico under Title 42. This tally is based on direct interviews my colleagues and I conduct with asylum seekers and/or their attorneys, incidents reported by other human rights groups and service providers (including Al Otro Lado, Human Rights Watch, Amnesty International, and Doctors Without Borders), as well as published media accounts.

8. As of June 17, 2021, Human Rights First has tracked 3,250 kidnappings and other attacks, including rape, human trafficking, and violent armed assaults, against asylum seekers and migrants expelled to Mexico or blocked from crossing the U.S.-Mexico

---

expel; Human Rights First, Al Otro Lado, and Haitian Bridge Alliance, "Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger," (April 2021) *available at* https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum; Human Rights First: "Update: Grave Dangers Continue for Asylum Seekers Blocked In, Expelled to Mexico by Biden Administration," (June 2021) *available at* https://www.humanrightsfirst.org/resource/update-grave-dangers-continue-asylum-seekers-blocked-expelled-mexico-biden-administration. Human Rights First and Hope Border Institute, "Disorderly and Inhumane: Biden Administration Continues to Expel Asylum Seekers to Danger While U.S. Border Communities Stand Ready to Welcome." (July 2021) *available at* https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf.
[2] "Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger," p. 28.

2

border since January 2021.[3] This tally includes incidents published in media, interviews of asylum seekers by Human Rights First, information from attorneys and humanitarian services providers at the border, as well as more than 2,700 reported incidents of violent attacks against migrants and asylum seekers stranded in Mexico that were received through an ongoing electronic survey conducted by the organization Al Otro Lado and reviewed by Human Rights First.

9. For example, a Honduran woman I interviewed in a Juárez shelter told me that she and her seven-year-old daughter were kidnapped immediately after DHS expelled them to Juárez via a lateral expulsion flight from the Rio Grande Valley in April 2021. Mexican migration officials at the State Population Council (COESPO) of Chihuahua had told the woman that shelters were full and that the family had to find housing on their own. Immediately after mother and child left the COESPO office, armed men kidnapped them and held them captive for two months in a house where they were forced to sleep on the floor with dozens of other kidnapping victims and deprived of sufficient food and clean drinking water, with nothing but potatoes and eggs to eat. They managed to escape while being transported to another location. As of June 2021, the family remained in danger in a Juárez migrant shelter, experiencing nightmares and difficulty sleeping due to the trauma they suffered.[4]

10. I interviewed at least 20 asylum seekers who had requested U.S. protection after having been kidnapped in Mexico who reported that DHS expelled them without asking if they feared returning to Mexico. DHS expelled a Salvadoran woman and her two children in June 2021 immediately after the family had escaped from kidnappers who had forcibly held them for 10 days, extorted the woman's sister for thousands of dollars, and fired shots at the family as they ran away. The woman told me that U.S. immigration officers mocked her as she begged them not to return the family to Ciudad Juárez just hours after they crossed the border to ask for protection in the United States. On their return, Mexican immigration officers took her cell phone. As of June 2021, the woman's sister was still receiving threatening messages from the kidnappers and the family was terrified to leave the Juárez shelter where we spoke.[5]

11. Another Guatemalan family with two young children reported having been kidnapped immediately after DHS expelled them to Nogales by armed men who demanded a $15,000 ransom for their release. Border Patrol agents had transferred the family 17 hours by bus from where they had entered Texas to request asylum. When their

---

[3] Human Rights First, "Human Rights First Tracker of Reported Attacks During the Biden Administration Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico" (last updated 6/17/2021) *available at* https://www.humanrightsfirst.org/sites/default/files/AttacksonAsylumSeekersStrandedinMexico DuringBidenAdministration.6.17.21.pdf

[4] Disorderly and Inhumane: Biden Administration Continues to Expel Asylum Seekers to Danger While U.S. Border Communities Stand Ready to Welcome,*" supra* note 1 at 3.

[5] *Id.* at 4.

3

captors released them, they put them on a bus to Tijuana, where the traumatized family was still waiting in fear when I interviewed them in April 2021.[6]

12. I interviewed many asylum seekers who were kidnapped or attacked in Mexico while waiting for U.S. asylum processing to resume. A Honduran woman fleeing death threats by a gang that murdered her partner was kidnapped in Mexico and trafficked for sexual exploitation for three months before she managed to escape in April 2021 and reunite with her 12-year-old daughter, who had been staying with another family member in Mexico. I spoke with the woman by phone while she was hiding in a Tijuana shelter, traumatized, depressed, and terrified that her traffickers would find her again. Though she has contacted multiple legal services organizations for help, she and her daughter have been unable to access the Title 42 exemption process and remain in danger in Mexico as of August 2021.

13. Several asylum seekers told me that Mexican police refused to investigate kidnappings and attacks against them or were complicit in their perpetration. A Honduran mother with three young boys recalled being kidnapped by Mexican police in Reynosa at the end of March 2021. Police ordered her and other families onto a bus, then sold the busload of people to a cartel, who held them captive until her family paid ransom. Badly shaken, she and her children crossed the U.S. border to seek asylum. DHS expelled them back to Mexico.[7] Another Salvadoran mother told me that Mexican police kidnapped, tortured, and robbed her 16-year-old son in Piedras Negras in April 2021 while the family was waiting to request U.S. asylum.

14. Asylum seekers fleeing gender-based violence risk being discovered by their persecutors in Mexico. I interviewed several women escaping abusive ex-partners who had located them in Tijuana. In April 2021, I spoke with a Guatemalan Indigenous woman who was raped in the street in Tijuana after DHS expelled her there with her three young children in February 2021. The family had crossed the border at Mexicali to seek asylum after fleeing abuse and threats by the woman's ex-partner.  I also interviewed a Salvadoran mother and children who had entered the United States seeking protection in March 2021 after the woman's ex-partner had tried to kill her. DHS expelled them to Tijuana, where the woman received threatening WhatsApp messages from her abusive ex-partner, who knew which shelter she was staying at and told her he had eyes on her in Tijuana.[8]

---

[6] Julia Neusner, "Kidnapped, Raped, and Robbed: Dangerous Title 42 Expulsions to Mexico Continue," (May 2021) *available at* https://www.humanrightsfirst.org/blog/kidnapped-raped-and-robbed-dangerous-title-42-expulsions-mexico-continue.

[7] "Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger," *supra* note 1.

[8] "Kidnapped, Raped, and Robbed: Dangerous Title 42 Expulsions to Mexico Continue," *supra* note 6.

15. Mexican asylum seekers are particularly vulnerable, trapped in the very country they are trying to flee. Multiple Mexican asylum seekers have reported that they were fleeing the country after brutal murders of their family members. A Mexican grandmother fled to the border with her nine young grandchildren and their mothers after gang members had murdered the woman's two sons on the doorstep of the family home and threatened the rest of the family. They had also shot her two-year-old granddaughter, who had been standing outside with her father. The bullet passed through the child's body and out her arm. Another Mexican grandmother told me a cartel had killed her husband, daughter, and son. They took over her house, forcing her to flee with her two grandchildren before they had time to gather anything for the trip. When I met the families in a Tijuana shelter in April 2021, they had been waiting for more than a month for asylum processing to resume, terrified their persecutors would find them there.[9] In a shelter in Ciudad Juárez, I interviewed a grandmother from Michoacán fleeing with her surviving family members who had hid in her home helpless as masked men abducted her husband and adult son, who were found the next day shot to death. Several family members fleeing with her reported that they continue to receive death threats, but as of late June 2021, the family could not seek asylum in the United States due to Title 42.[10]

**DHS Endangers Migrants By Moving Them from One Border Location to Another for Expulsion**

16. At various points in 2021, DHS has transferred migrants via plane from one sector of the border to another, and then expelled them at the second location, in a program known as "lateral transfers."  In April 2021, I interviewed more than 50 families with young children in a shelter who had been expelled to Tijuana via lateral transfer flights after having entered the United States in the Rio Grande Valley or other parts of the border.[11] The families recalled nearly identical experiences in DHS custody. They recalled being detained with their children for days in extremely cold, crowded holding cells after border patrol agents seized all but one layer of their clothing. Many had to sleep on the floor. All reported that DHS did not separate sick detainees from the group, provided minimal or no medical care, and failed to test anyone for COVID-19. The families were transferred in packed vans to the airport, then flown 1,500 miles to San Diego, where they were again packed into vans and expelled to Tijuana. Some told me that other families they'd met in the holding cells were released into the United States.

---

[9] "Kidnapped, Raped, and Robbed: Dangerous Title 42 Expulsions to Mexico Continue."
[10] Disorderly and Inhumane: Biden Administration Continues to Expel Asylum Seekers to Danger While U.S. Border Communities Stand Ready to Welcome," *supra* note 1 at 4.
[11] *See* Kate Morrisey, "Biden expelling asylum-seeking families with young children to Tijuana after flights from Texas" San Diego Tribune (April 2021) *available at* https://www.sandiegouniontribune.com/news/immigration/story/2021-04-09/biden-expelling-families-tijuana

17. All families transferred from the Rio Grande Valley reported that DHS seized all their belongings, including clothing, medication, and food for their children, and did not return their belongings when they were expelled. Most reported receiving little or no food in DHS custody. I watched Mexican government vans deliver a group of about forty migrants to the shelter who had been transferred by flight from the Rio Grande Valley earlier that day. They exited the van with no belongings except a clear plastic bag containing their cell phones and documents. Their shoelaces had all been removed. The pastor running the shelter told me that the Mexican government had been delivering 50 to 100 asylum seekers expelled this way each day for weeks, and that many were arriving at the shelter weak and without having eaten for several days.[12]

18. A Honduran woman told me DHS expelled her while she was visibly limping due to an injured ankle along with her seven-year-old daughter to Ciudad Juárez via a lateral expulsion flight in April 2021, refusing to provide even ice to address the swelling.[13] I also spoke to a Honduran grandmother with blindness who told me that in July 2021, DHS expelled her alone to Reynosa after separating her from her daughter and grandchildren, with whom she had entered the U.S. to ask for asylum protection after the family fled death threats by gangs in Honduras and was kidnapped for 15 days in Mexico. A pastor had to find another asylum seeker to take care of the grandmother, who requires 24-hour assistance due to her blindness.

**Asylum Seekers Expelled to Mexico Are Living In Places Without Access to Adequate Health Care, and Where Criminal Elements Can Easily Prey on Them**

19. Asylum seekers blocked from the U.S. border or expelled to Mexican border cities lack access to secure housing. In August 2021 I have spoken with asylum seekers and service providers who reported that shelter capacity is lacking in the Mexican cities of Tijuana, Ciudad Juárez, Piedras Negras, and Reynosa; and that many are forced to sleep in the streets or in other precarious conditions. Large tent encampments have emerged in Tijuana and Reynosa. I spoke with many asylum seekers with medical issues who endure challenging living conditions and lack access to the medical care they need. Without money, resources, or employment opportunities, many asylum seekers who have been expelled to Mexico do not have enough to eat.

---

[12] "'They Lied to Us': Biden Administration Continues to Expel, Mistreat Families Seeking Asylum." Human Rights First (May 2021) *available at* https://www.humanrightsfirst.org/blog/they-lied-us-biden-administration-continues-expel-mistreat-families-seeking-asylum

[13] Disorderly and Inhumane: Biden Administration Continues to Expel Asylum Seekers to Danger While U.S. Border Communities Stand Ready to Welcome," *supra* note 1.

20. In Tijuana, more than 2,000[14] asylum seekers blocked from crossing the border or returned to Mexico by DHS under Title 42, including large numbers of children, are sheltering in a makeshift tent encampment immediately adjacent to the San Ysidro port of entry, which renders them an obvious and easy target for rape, kidnapping, human trafficking, robbery, assault, and extortion. The Mexican government does not provide regular police or private security to guard the camp. When I visited the camp in April 2021, there were no police officers in sight. A Honduran asylum seeker who was staying in the camp told me that in April 2021, Mexican men he believed to be gang members had approached him in the camp and asked him to transport drugs and threatened him with death if he refused.

21. Multiple asylum seekers staying in the camp told me that people they believed to be gang members had forcibly removed at least eight Central American men from their tents and forced them into cars. As of May 2021, the men who were taken had not returned to the camp.[15] Some Mexican asylum seekers refused to leave their tents, frightened at the prospect that they might be seen by gang members patrolling the area. One father had been beaten nearly to death by gang members that were trying to recruit his sons in Michoacán. He told me, "the same gang that was after us back home operates here." He and his sons were so afraid to go outside that they went to the bathroom in buckets inside their tent. A trans woman from Chiapas, Mexico crossed the border to seek U.S. asylum after she suffered abuse for her gender identity. U.S. immigration officers expelled her to Tijuana, and as of April 2021 she remained in the tent encampment, constantly afraid for her safety.[16]

22. More recently, I interviewed a Mexican woman by phone who, after being threatened with death in Michaocán, asked for U.S. asylum with her family at the San Ysidro port of entry in July 2021. After DHS turned the family away, they tried to sleep in the tent encampment near the port of entry. A man in the encampment charged her money to stay there, then a group of men assaulted the woman's teenage daughter.

23. Another family from Michoacán had a similar experience in June 2021. After gang members tried to kill them, they asked for asylum at the San Ysidro port of entry and were turned away. A man in the tent encampment who had offered to help the family assaulted the mother. I also spoke to a Salvadoran man who was robbed of all his belongings in the Tijuana tent encampment in July 2021 after he had attempted to ask for asylum at the San Ysidro port of entry and DHS officers turned him away. Though both families from Michoacán and the Salvadoran man have contacted advocacy organizations for help, they have been unable to access exemption processes and all remain in danger in Mexico as of August 2021.

---

[14] "Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger" *supra* note 1.
[15] *Id.*
[16] "Kidnapped, Raped, and Robbed: Dangerous Title 42 Expulsions to Mexico Continue," *supra* note 6.

24. In Reynosa, approximately 3000 migrants and asylum seekers are staying in a tent encampment in Plaza las Américas, the city's center plaza, where they endure horrendous living conditions and are vulnerable to violent crime.[17] I interviewed more than 15 asylum seekers by phone in July and August 2021 who are currently staying in the Reynosa encampment, sleeping on the ground in tents or out in the open. All reported horrible living conditions in the encampment, including dirty, fly-infested toilets, excruciating heat, and destructive storms. An Afro-Honduran woman told me she developed a fungus on her feet after walking barefoot in the toilet area. Many reported that their children became sick with nausea and flu symptoms in the encampment. Several asylum seekers told me they or their children lost significant amounts of weight because they did not have enough to eat.

25. Asylum seekers living with health conditions in the Reynosa encampment are unable to obtain the care they need. I spoke to a Honduran woman who, after fleeing death threats by gang members who killed her brother, is now staying with her 12-year-old daughter in the Reynosa tent encampment. The mother, who has kidney disease, is experiencing severe abdominal pain, headaches, and back pain from sleeping on the ground. Her daughter is so depressed that she's stopped speaking and her hair is falling out. They have been unable to obtain healthcare. Though they have contacted advocates for help, as of August 2021 they remain in danger in Reynosa.

26. Another Honduran woman and her 9-year-old daughter were robbed of all their money and valuables in Reynosa immediately after the U.S. government expelled them there in July 2021. After sleeping on the ground in a tent for weeks, cysts in the woman's breasts became inflamed and painful. Her daughter became ill with stomach pain so severe she could not sit up.

27. I interviewed another Honduran woman who was kidnapped with her 9-year-old son and held captive in horrendous conditions for 10 days before the woman's sister managed to pay ransom. Unable to ask for U.S. protection at the port of entry due to Title 42, the traumatized family went to the Reynosa tent encampment, where they slept on the ground for months. The child became weak, tired, and malnourished. The mother, who had been diagnosed with an ovarian cyst, was in severe pain, but as of July 2021, neither could access medical care in Reynosa.

28. I interviewed many asylum seekers facing threats to their personal security in the tent encampment. At least one asylum seeker has been kidnapped directly from the encampment.[18] In July 2021 a Honduran woman told me she was terrified to leave her

---

[17] Sandra Sanchez, "Mexican officials order migrant shelter in Reynosa to evacuate or face bulldozing," Border Report (July 2021) *available at* https://www.borderreport.com/hot-topics/immigration/mexican-officials-order-migrant-shelter-in-reynosa-to-evacuate-or-face-bulldozing/

8

tent because of a man in the camp who was harassing her and had repeatedly threatened to assault her. Another Honduran woman told me that in July 2021, a group of men had repeatedly recorded photos and videos of her teenage daughters, who were terrified to leave their tents for fear of being kidnapped. Another Honduran woman fleeing domestic abuse with her 8-year-old son told me she was robbed of all her belongings in Mexico before asking for U.S. protection. DHS expelled her to Reynosa where, desperate to avoid the tent encampment, she accepted an offer to work and live with a local family. Her employer repeatedly abused her in August 2021, forcing her to stay in the encampment, where she and her son remain in danger.

I declare under penalty of perjury under the laws of the United States and New York that the foregoing is true and correct.

Executed on: August 10, 2021, in Brooklyn, New York, United States.

Signature: _____

Julia Neusner

## AFFIDAVIT OF JENNIFER K. HARBURY

## RE: IMPACT OF TITLE 42 ON ASYLUM SEEKERS IN REYNOSA, MEXICO

### AUGUST 9, 2021

I, Jennifer K. Harbury, declare under penalty of perjury pursuant to 28 U.S.C. §1746, that the following is true and correct to the best of my knowledge:

1. I am submitting this declaration to provide information about the severe harm that Title 42 is inflicting on the migrant families currently being expelled to Reynosa, Mexico. This is a city in Tamaulipas, the most dangerous Mexican state along our southern border, where powerful gangs and cartels target and brutalize migrants on a daily basis. These criminal networks operate with impunity because local police and officials are unable and often unwilling to protect migrants. I have met with and interviewed hundreds of migrant families who, because of Title 42, have suffered one or even multiple acts of kidnapping, extortion, rape, and/or assault. There have been many deaths as well.

2. I graduated from the Harvard School of Law in June, 1978 and received my Texas law license shortly thereafter. I practiced law there until 2018, when I went into inactive status. Most of my practice focused on civil rights issues here in the Texas-Mexico border area of the lower Rio Grande Valley. I have also spent substantial time periods monitoring and assisting human rights in Guatemala and am very familiar with the realities on the ground in Central America.

3. I am a founding member of the Angry Tias and Abuelas, ("Angry Tias"), an organization based here at the border, and dedicated to the preservation and promotion of human rights and human dignity for migrants on both sides of the Rio Grande. Our organization is made up of volunteers who provide humanitarian assistance to migrants, including basic necessities, transportation, shelter and other support. We assist thousands of migrants every year. In addition to meeting their physical needs, the Angry Tias collaborate with local NGOs, provide funds for legal counsel, and highlight the plight that asylum seekers face in media and policy circles.

4. In 2017 I began to do extensive volunteer work in Reynosa, Mexico with the asylum seeker community there. In late 2018 I retired from my public interest legal career and began to do full time volunteer work there, as well as on the Texas side of the border. This work has included interviews of thousands of migrant families over the years. Although the United States government began sending migrant families back to Reynosa under Title 42 in spring 2020, this practice greatly expanded earlier this year. That is when I began to interview as many families as possible. I would estimate that I have personally interviewed several hundred families this year alone.

5. This declaration is based on my direct experience and work with migrant families since the United States government began sending them back to Reynosa under Title 42. I have provided support to well over 300 families subject to Title 42 this year alone. This has

included assisting them in obtaining needed exemptions to lawfully cross the border on humanitarian grounds.

**Dangers for Expelled Migrant Families**

6. Reynosa, Mexico is one of the most dangerous areas anywhere in the world. Reynosa is in Tamaulipas state, which is categorized as a Category Four "Do Not Travel" security risk by the U.S. Department of State due to danger stemming from crime and kidnapping.[1] This is equal to the ranking of areas like Afghanistan and Iraq. U.S. officers are warned not to enter this region. This extraordinary danger results from the total control of the area by violent gangs and cartels. As the State Department notes: "Heavily armed members of criminal groups often patrol areas of the state and operate with impunity particularly along the border region from Reynosa to Nuevo Laredo. In these areas, local law enforcement has limited capacity to respond to incidents of crime."[2]

7. Migrant families are a favorite target for kidnapping and trafficking throughout Tamaulipas, and especially in Reynosa. This is because it is well known that there will be no consequences for such crimes. Local officials and police are unable and often unwilling to protect the migrants. It is also widely understood that, although the migrants themselves are penniless, they have relatives in the north who will do anything to save them. Even impoverished friends and family members will take on heavy debts to rescue their loved ones. Thus, gang and cartel members have great incentive to kidnap migrants, and hold them for ransoms of $5,000 or per person, or even larger amounts. This has become a booming business.

8. To make matters worse, most of the Mexican government officials in the region are fully entwined with, or have already joined, the gangs/cartels. For example, in February 2019, Telemundo aired footage showing that a number of families were being secretly held in the basement of the Mexican immigration building for $3000 ransom.[3] The monies were traced back to the Reynosa Director of the National Institute of Immigration ("INM") himself. This is but one example. I have spoken to many families who have been robbed and/or kidnapped by local officials.

9. Currently, when migrants are expelled from the United States back to Reynosa under Title 42, they must walk back across the international bridge to the Mexican INM building. There they are processed back into the country. The majority of the migrants tell me that they were taken to side rooms and thoroughly searched, sometimes strip-searched, and that the Mexican official confiscated all of their money and any valuables, including their phones. Some reported that they had to call a relative to send hundreds of dollars to pay an officer before they could be released at all. The families are given no

---

[1] U.S. State Department, Mexico Travel Advisory (July 12, 2021),
https:/travel.state.gov/content/travel/en/traveladvisories/mexico-travel-advisory.html.
[2] *Id.*
[3] Noticias Telemundo, "Revelan que policías mexicanos extorsionan a migrantes" (Feb. 14, 2020), https://www.telemundo.com/noticias/edicion-noticias-telemundo/video/revelan-que-policias-mexicanos-extorsionan-migrantes-tmvo8890349.

information and have no idea where to go. Those who take taxis are often kidnapped by the drivers.

10. Most of the families initially find their way to the small park diagonally across from the international bridge. Over two thousand migrants are there now, including elderly persons, pregnant women, injured persons and numerous small children. Human rights networks have provided portable toilets and tents, and local pastors provide food and water as often as possible, but the conditions are terrible. Not surprisingly, the gangs raid this small encampment every night, kidnapping many and dragging them away to waiting vehicles. A local police car is parked there regularly, but the officers either look the other way or drive off when the kidnappers arrive.

11. Two church-run shelters exist in Reynosa. But one, Casa de Migrantes, gives only three days of lodging. The other, Senda de Vida, is suddenly under threat of demolition by local officials despite their fifteen years of close collaboration.

12. I think that the accounts of the migrants themselves best indicate the horrific effects that Title 42 has upon the migrant families. Set forth below are a few of the in-person accounts I have received.[4]

   A. A mother ("A") tried to save her young daughter when the gangs arrived to rape her. The gangs beat A and kidnapped the girl, who did not return for nearly a year. When the mother received still more threats, she fled north with her mentally disabled 15-year-old son.  The son had the functional development of a 5-year-old. The trip was terrifying. The family tried twice to cross the river, but U.S. officials sent them back both times under Title 42. In Reynosa, the mother realized she could not keep her son safe from the endless kidnappings and assaults going on around her.  If she tried to cross with her son again, they would both be sent back. If he crossed alone, he would be sent to her family in the United States because Title 42 did not apply to unaccompanied minors. Like so many other desperate parents, she finally sent him across again, this time on his own. He was found dead shortly thereafter. Initial reports suggest torture and mutilation. Based on my experience, I suspect the gangs approached the boat in which he was a passenger and asked for "claves," or passwords each traveler gets once they have paid the proper crossing "fees" to the gangs. If anyone attempts to cross without such payment, they are killed. Had the gangs asked this young man for his password, he would have been unable to answer and therefore killed.

   B. A young mother ("B"), seven months pregnant, was in her car with her husband and two small children when gang members ambushed them and opened fire with automatic weapons. B's husband was killed, and she took seven bullets. At the hospital, doctors were unable to remove the bullet lodged near her cervix. Worse yet, the killers found out that B was still alive, and that she had recognized them. She took

---

[4] For safety reasons I am not giving names or identifying information. Moreover, I am reporting only the cases of persons we have assisted to lawfully cross on humanitarian grounds.

her young children and fled north. She tried twice to cross the Rio Grande with her
children, but both times U.S. officials sent the surviving members of the family back
to Mexico under Title 42 despite her serious medical condition and pregnancy.

C.  An older woman ("C") survived a gang massacre which left seven in her family shot
to death, including her 17-year-old son. C and several others were wounded but
survived. The survivors took their blind 94-year-old grandmother (C's mother), and
fled north. They crossed the river, but U.S. officials sent them straight back under
Title 42, despite the grandmother's frailty. The grandmother fell gravely ill back in
Reynosa, but the family, like so many other migrants, had a very hard time getting her
admitted to a hospital given the local anti-migrant sentiments. She died shortly
thereafter. C suffered a kidnapping attempt while she was with her mother at the
hospital.

D.  A teenaged boy was being aggressively recruited by local gangs, but he turned them
down. To keep him alive, his mother ("D") sent the boy with his father to a highly
remote area where communications are nearly impossible. She then fled with her
daughter, a minor who is mentally disabled. They made it to the Reynosa area, where
they were kidnapped and D was raped. They tried to cross the Rio Grande but were
sent back under Title 42. In Reynosa they were dumped back into the unprotected
Plaza near the international bridge. As described above, the gangs arrive every night
to rob and kidnap people, with the consistent acquiescence of the police officers
posted nearby.

E.  A young woman ("E")'s family testified against gang members responsible for the
kidnapping and mutilation of a relative. The gang then came after the family. E was
dragged into a car but escaped by leaping from the moving vehicle. Her shoulder was
badly smashed, requiring multiple surgeries. Her uncle was later killed, as was a
young man who grew up in their family home. She fled north and tried to cross to
Texas but was immediately sent back under Title 42 by U.S. officials.  Mexican
immigration officials stole $500 from her as she returned. She then tried to take a taxi
at the foot of the bridge, but the driver kidnapped her. When she ran, he dragged her
back by her hair, but she was later able to escape and make it to a shelter. Her
shoulder then became badly infected, putting her life at risk.

F.  A young Trans woman ("F") went through hellish persecution in her homeland. The
gangs beat her so severely that she fled in early 2019. She made it to Reynosa, but
U.S. officials sent her back under the MPP program. F tried to go back to the border
for her immigration court appointment in Laredo, but the local gangs pulled over the
bus and dragged everyone off. Eventually she got away, but she had missed her
hearing. A few months ago, she tried again to cross the Rio Grande but was sent back
to Mexico. This time the gangs beat her and raped her. Worse yet, she now has HIV
from her assailants.

13. Please note that there are thousands of migrants in Reynosa, with similarly horrifying
stories and traumatic experiences, who have not yet even been interviewed.

I, Jennifer K. Harbury, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August ___9___ 2021 at ___MANASSAS___ , ___VIRGINIA___ , United States.

Jennifer K. Harbury

DECLARATION OF ERIKA PINHEIRO

I, Erika Pinheiro, declare under penalty of perjury, that the following is true and correct to the best of my knowledge:

**Summary**

1. In my expertise as an attorney with 18 years of experience in the immigration legal field who regularly works across the U.S.-Mexico border (principally in Southern California and corresponding areas of Mexico) and who has advised the Biden Administration on immigration policy, I have witnessed the failures and extraordinary harm of the Title 42 policy.

2. Although widespread testing and vaccination access is available in both Baja California, Mexico and San Diego to safely process migrant families seeking asylum, CBP has chosen to implement a policy that only exacerbates COVID-19 in the region. CBP is not taking basic mitigation measures to limit the spread of COVID-19 among migrants and in fact actively introduces COVID-19 into the region by flying migrants in crowded flights from other parts of the southwest border to San Diego and expelling them.

3. Title 42 expels families into extreme danger in Tijuana, where few have access to safe housing, or medical care, and face kidnapping, rape, extortion, and other violence on a regular basis. Since March 2021, three of AOL's clients have died after being denied the ability to seek medical care in the U.S.

**Experience and Expertise**

4. I am the Litigation and Policy Director at Al Otro Lado ("AOL"), a nonprofit advocacy and legal services organization based in Los Angeles, California, with offices in San Diego, California and Tijuana, Mexico. I have been the Litigation and Policy Director since April 2017. I am currently based primarily in Tijuana, Mexico, and oversee various programs and operations in all AOL locations.

5. I am an immigration attorney and have been working in the immigration legal field since 2003. I hold a JD from Georgetown University Law Center, a Masters of Public Policy from the Georgetown Public Policy Institute, and a Certificate in Refugee and Humanitarian Emergencies from Georgetown University Institute for the Study of International Migration. Throughout my legal career, I have specialized in high-volume legal representation and education for immigrants detained in immigration or criminal custody, as well as those seeking asylum at the US-Mexico border. In each position I have held, I have created, maintained, and analyzed extensive databases to identify the effects of policies governing the admission, detention, transfer, and release of immigrant adults and children at the border and in criminal and/or immigration custody. Prior to joining AOL, I administered federally funded legal access programs for immigrant adults in ICE custody and unaccompanied children in Office of Refugee Resettlement custody, serving thousands of individuals per year. Since 2010, I have personally observed and

App. 369

tracked migration and detention trends, especially with respect to adults, unaccompanied children, and family units seeking asylum at the US-Mexico border.

6. AOL provides legal and humanitarian support to indigent refugees, deportees, and other migrants, including providing free direct legal services on both sides of the US-Mexico border and beyond.

7. As the Litigation and Policy Director, I supervise attorneys and other staff who work directly with migrants on both sides of the US-Mexican border. I also travel frequently across the US-Mexican border. I also engage with elected officials on immigration matters, educate policymakers about border issues, and provide technical assistance to Congressional committees and government agencies. From November 2020 through January 2021, I engaged with the Biden transition team and Secretary Mayorkas in numerous meetings concerning US border policy; since President Biden's inauguration, I meet frequently with officials at the White House, DHS, DOS, and other federal agencies to participate in immigration and border security policy discussions. I am also one of the leads of the California Welcoming Task Force, a coalition of around 100 nonprofit organizations working with the White House, federal agencies, California state government, local city and county governments, and Mexican government officials to plan and execute policies related to asylum processing at the US-Mexico border.

8. I help supervise AOL's work representing families, individuals, and children seeking a humanitarian exemption from the Title 42 expulsion process. Since April 2021, AOL has represented approximately 5,900 individuals, including 2,450 children in obtaining humanitarian exemptions.

9. This declaration is based on my personal experience working with noncitizens at the US-Mexico border as well as my experience supervising attorneys who provide legal services to them. I am also familiar with the Tijuana – San Diego border region as I work regularly on both sides of the border.

**Vaccination and testing is widely available in Baja California**

10. I have resided in Baja California since 2017, and have been on the ground providing humanitarian and legal support to refugees and other migrants residing in Tijuana and throughout Baja California since the start of the COVID pandemic. Generally, vaccines and testing are widely available in Baja California, and migrants have had relatively low COVID positivity rates as compared to the broader population due to intensive mitigation efforts, although those efforts have been frustrated by the expulsion of individuals DHS has brought to the region on lateral flights from other parts of the U.S., as explained below.

11. The Mexican government has been making a concerted effort to maximize COVID-19 vaccination in the northern border region as part of its push to more fully reopen the land border with the United States.  As of August 5, 2021, more than half of adults in the five

Mexican states along the U.S. border had received at least one dose of a COVID vaccine.[1]  The adult vaccination rate is 80% in Baja California, 60% in Sonora, 75% in Chihuahua, 56% in Coahuila, and 64% in Tamaulipas.[2]  In the Mexican municipalities (the equivalent of U.S. counties) closest to the border, rates are even higher: as of July 27, 2021 at least 75% of those in border municipalities had received at least one vaccine dose in Baja California, Sonora, Chihuahua, Coahuila, and Nuevo Leon.[3] As of August 1, 2021, more than 97% of adults between 18 and 39 had received at least one dose in Tamaulipas.[4]

12. Baja California is the first state in Mexico to have "fully" vaccinated its adult population (18+); approximately 80% of the adult population has been vaccinated with at least one shot. Vaccines continue to be regularly distributed at large-scale vaccination sites located in all of the state's municipalities and are available to anyone over the age of 18, regardless of immigration status. Municipal and state departments of health also conduct specialized outreach campaigns to vulnerable and hard-to-reach populations, such as Indigenous communities residing in remote locations. In July and August 2021, local health authorities held a vaccination drive at the migrant camp located outside the Ped West Port of Entry and at seven migrant shelters, and other shelter providers have organized transportation to bring migrants to mass vaccination sites.[5] The local departments of health continue to develop outreach strategies to vaccinate vulnerable populations, including migrants.

13. Although there has been a recent slight increase in positive COVID cases due to the spread of the Delta variant, numbers remain extremely low in Baja California. For example, on August 8, 2021, there were 69 new positive cases in Tijuana, a city of around 2 million residents. The seven-day average is 107 new positive COVID cases/day. The rate of new COVID cases in Tijuana is exponentially lower than in San Diego County, California, which saw 2,754 new positive cases on August 8, 2021, with a seven day average of 1,417 new positive cases per day for a population of around 3.3 million.[6] This discrepancy is likely due to the relatively high vaccination rate in Baja California (80% adults vaccinated in Baja California vs. 73.2% in San Diego County), as well as the consistent use of masks in most indoor spaces in Mexico. Unlike the United States, Baja California never lifted its mask mandate, even for vaccinated individuals. I have observed

---

[1] Gobierno de Mexico, Secretaria de Salud, *COVID-19 Mexico Comunicado Tecnico Diario*, at 9 (Aug. 5, 2021), https://tinyurl.com/w2enjmh3.

[2] *Id.*

[3] *Id.*

[4] Miguel Dominguez, *Afirman Vacunar Casi al 100% de Jóvenes en Tamaulipas*, Reforma (Aug. 1, 2021), https://tinyurl.com/y8d476kb.

[5] Alexandra Mendoza, *Migrants in Tijuana vaccinated at camp, shelters* (Aug. 4, 2021), https://tinyurl.com/dmf2d9m.

[6] *COVID-19 Data Repository*, Center for Systems Science and Engineering (CSSE) at Johns Hopkins University, https://github.com/CSSEGISandData/COVID-19.

almost all individuals in Baja California consistently using masks in most public indoor spaces and crowded outdoor spaces, whereas in San Diego, I rarely, if ever, see individuals using masks outside, and have observed a rising percentage of individuals who do not use masks in public indoor spaces.

14. COVID-19 testing is readily available at pharmacies and health providers across Tijuana. Pricing for tests varies among providers, but generally starts around $10-12 USD for an antigen test. Local and state Departments of Health also have free mobile testing programs, and have offered free COVID testing at the Chaparral migrant encampment and at various shelters. Several local medical nonprofits also offer free testing to migrants, and universities on both sides of the border have conducted numerous COVID-related studies through which they have administered free tests to thousands of individuals.[7]

15. Many asylum seekers have already been vaccinated before presenting at the port of entry. Dozens of our clients have sent photos of their vaccination records. Many of our clients have told our staff and volunteers that they are eager and willing to be vaccinated to protect themselves and others against COVID-19.

16. Beginning in March 2021, AOL began representing vulnerable families, children, and adults to seek humanitarian exemptions from the Title 42 expulsion process. Individuals approved for an exemption are tested for COVID-19 before presenting at a port of entry. A U.S.-based foundation has covered the cost of COVID testing for all of AOL's clients, as well as others being processed through the exemption process. CBP has required all children seven years or older to submit a negative COVID-19 test taken within 72 hours of presenting at a port of entry. Those who test positive are denied entry if they attempt to present.

17. Before the widespread availability of vaccines in Baja California, AOL worked with a network of nonprofits, international intergovernmental organizations (i.e. IOM and UNHCR), as well as with local, state, and federal government agencies to develop effective strategies that reduced the spread of COVID among migrant populations. AOL helped install hand washing stations and clean water access points at shelters and medical clinics, distributed masks and other PPE, conducted public health education, and provided funding to build capacity at local medical nonprofits serving the migrant population. IOM and the local government also established a COVID "filter" hotel, at which migrants would stay for 10-14 days before moving on to shelters. AOL also provided grocery cards, medication, PPE, quarantine housing, and other direct

---

[7] *See, e.g.*, City News Service, *COVID-19 Survey Finds Baja California Faring Better than Other Mexican States*, KPBS (June 16, 2021), https://www.kpbs.org/news/2021/jun/16/covid-19-survey-finds-baja-california-faring-bette/.

humanitarian support to help migrants residing outside of the shelter system to remain in quarantine during periods of high community spread.

**CBP's policy of lateral flights has a negative effect on COVID-19 rates in the region**

18. The mitigation efforts described above were extremely successful, and we saw very little COVID spread among migrants until March of 2021, when the US government began flying migrants who crossed in Texas on lateral flights to San Diego and expelling them there. Despite our regular engagement with the White House and DHS on border policy matters, we were given no notice, and nonprofits and government agencies working in Tijuana were ill-prepared to receive the 100 migrants being expelled each day from lateral flights, in addition to hundreds of others already being expelled or removed to Tijuana each day. Because migrants were placed in close proximity to one another on lateral flights and expelled to Tijuana, we saw a much higher COVID positivity rate among lateral flight migrants than among the local migrant population in general. Shelters receiving lateral flight expulsions began to see more COVID positive cases, but local health authorities and non-profits lacked the capacity and resources to quickly create a comprehensive public health strategy to address the problems posed by lateral flights.

19. DHS ceased the practice of lateral flight expulsions to Tijuana around June 21, 2021, which has enabled those of us working in Baja California to reassert control over the spread of COVID among the migrant population, especially in shelters, using the mitigation measures described above and by promoting vaccines. However, DHS resumed lateral flights to San Diego in the last week of July 2021, and resumed expulsions to Tijuana on Friday, August 6, 2021, when we received 135 migrants expelled from a flight that originated in Texas. Our shelter partners in San Diego, who work with San Diego County and the State of California to administer COVID tests to all migrants arriving in the region, have confirmed that the COVID positivity rate is highest among migrants who arrive via lateral flights (as compared to migrants processed at the Port of Entry or those who enter without inspection locally). Undoubtedly, the practice of lateral flight expulsions has a negative effect on COVID rates in the region and undermines the ability of government agencies and service providers on both sides of the border to control COVID spread among the migrant population.

**CBP has additional capacity to process asylum seeking families at ports of entry in the San Diego region**

20. CBP has consistently used "capacity" limitations as a pretext for reducing the number of asylum seekers processed at Ports of Entry, both before and during the pandemic. Al Otro Lado is the organizational plaintiff in *Al Otro Lado v. Mayorkas,* 3:17-cv-02366-BAS-KSC (S.D. Cal.), filed in July 2017, a class action lawsuit challenging CBP's practice of unlawfully turning away asylum seekers who seek to present at Ports of Entry, as well as "metering" policies that force asylum seekers to wait in Mexico on informal lists.

Evidence obtained through discovery in that case, including depositions of DHS officials, confirm that CBP has consistently understated its capacity to process asylum seekers at Ports of Entry in an effort to reduce access to the US asylum system.  An October 2020 Office of Inspector General Report, citing in part evidence obtained from a CBP whistleblower, confirmed that CBP lied about capacity to reduce asylum seeker processing,[8] and recently, the court in *AOL v. Mayorkas* sanctioned the government for destroying evidence protected by a court order. CBP officials also admitted in a deposition that the processing of asylum seekers is given low priority among other types of processing at ports in terms of officer and resource allocation, going so far to admit that livestock would be given processing priority over asylum seekers. Nothing in the recent past indicates that these policies and priorities have changed significantly.

21. In June 2021, CBP processed approximately 412,000 pedestrians at the San Ysidro Port of Entry. Notably, CBP is processing about 500,000 *less* pedestrians per month at the San Ysidro POE than they were before Title 42 was put into place; for example, in June 2019, CBP processed over 917,000 pedestrians at the San Ysidro Port of Entry. This discrepancy should give CBP plenty of capacity to safely process asylum seekers, even allowing for the fact that processing refugee families takes longer than processing most travelers.

22. Under Title 42, US citizens, Lawful Permanent Residents, and Mexicans with certain types of visas are able to cross the border freely. Throughout the pandemic, I have personally observed large numbers of U.S. citizens crossing the border into Tijuana, Rosarito, and Ensenada for tourism and other "non-essential" purposes. I have also crossed the border, on average, about once per week since June of 2020 to the present. Based on my personal experience, CBP does not employ any COVID screening protocol for travelers not subject to Title 42 restrictions. I have personally observed numerous CBP officers working without masks, or with their masks pulled down around their chins. CBP officers have never asked me any COVID or other health-related questions when entering the United States.

**CBP is not taking adequate steps to limit the spread of COVID-19 among migrants who cross between ports of entry.**

23. When CBP encounters asylum-seeking families who cross the border between ports of entry, it does not take meaningful steps to prevent the spread of COVID-19, aside from providing masks. Migrants are flown on full planes and ride together in busses to the border to be expelled. CBP does not provide COVID-19 testing and only coordinates with third parties to test migrants when they are released from CBP custody. Those who

---

[8] *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry*, Office of Inspector General (Oct. 27, 2020), https://tinyurl.com/266bbcfm.

exhibit COVID-19 symptoms are not separated from others in CBP/Border Patrol custody.

24. The state of California has provided funding for COVID testing of all migrants who come to the California border, whether through a Port of Entry, between ports of entry, or on lateral flights. California has established a testing, quarantine, treatment, and vaccination protocol for all migrants, and set up several hubs in the border region to create additional capacity. The federal government does not currently cover the costs of these regional hubs, nor do they currently cover the costs of shelter and transportation. California state and numerous counties have stepped in to create a robust migrant reception system that treats migrants with dignity while protecting public health.

25. Families that are exempt from Title 42 in Tijuana are released to a network of shelters in the San Diego area. There are two main shelter hubs in the San Diego area. Jewish Family Service provides testing, quarantine, and case management to any migrant being processed through the Port of Entry, including those who come on lateral flights. Catholic Charities serves those who cross between ports. The state, counties, and cities all work together to create local capacity for migrants as needed. For example, Long Beach, San Diego, and other cities provided convention centers and other facilities to meet the needs of unaccompanied children during a recent increase. The California Welcoming Task Force, a coalition of around 100 nonprofit organizations formed in February of 2021 working with governments on both sides of the border, coordinates to ensure that all migrants in the region receive legal, humanitarian, and other vital services upon arrival in California.

26. The biggest challenge over the past six months has not been the capacity to serve the number of migrants in the region, but rather the lack of processing at the ports of entry, and an overall lack of communication from DHS regarding its implementation of Title 42 expulsions, such as through lateral flights.

**Title 42 places asylum-seeking families in extreme danger**

27. Migrant families expelled under Title 42 to Tijuana face extreme danger and live in precarity. Few have access to safe housing, medical care, or work to support themselves. They face kidnapping, rape, extortion, and other violence on a regular basis. Clients frequently report to us that they are unable to afford food, medicine, and other basic necessities. Families travelling with minor children frequently report kidnapping attempts on their children. Families with children who identify as female frequently report sexual harassment and other sexual violence. Three of our clients have died since March 2021 because they were denied the ability to seek medical care in the U.S.

28. Thousands of migrants live in a makeshift tent encampment in El Chaparral next to the port of entry. They sleep under plastic tarps, without bathrooms, and are subject to extreme weather conditions. There is no running water or sanitation. Organized criminal

groups control the camp and AOL has received reports of kidnappings, assaults, and sexual abuse against migrants. Smugglers pressure migrants into hiring them through fraud and force. AOL has received multiple reports of migrants who were held for ransom by smugglers. Others have been kidnapped by traffickers and forced into prostitutions or other types of labor. The situation at the El Chaparral camp is so dangerous that AOL does not provide services there. Aid workers have received numerous threats from those controlling the camp. Few groups are willing to provide in-person services, so there is a lack of food and supplies for those living in the camp.

29. Families with family members who identify as LGBTQ are frequently subjected to violence and discrimination. One family that we represented in this process was forced to leave from three different housing situations after the owners of each property discovered that the mother was in a same-sex relationship. Another LGBTQ couple that we represented were both kidnapped and raped in Mexico and both subsequently contracted HIV. While in Tijuana, they were forced to leave a shelter because they were constantly receiving threats. Another client, a Haitian LGBTQ man who was unable to seek asylum due to Title 42, was living in a rented room in Tijuana when armed men broke into his dwelling, raped him, and stole all of his belongings and documents. He had to go into hiding because these same people continued to threaten him.

30. Migrants who are not from Mexico frequently struggle to access medical care. When they are able to be admitted to a hospital, they frequently report discrimination at the hands of medical staff. Multiple Haitian clients have reported to us that they refer to the hospitals in Tijuana as "where Haitians go to die."

31. AOL staff members transported a Honduran man with an epidural hematoma between hospitals because the initial hospital refused to touch him without an upfront payment in full for the emergency neurosurgery he required. At this point, he was lying on a bed with a nosebleed and struggling to breathe. When staff members tried to call for an ambulance because of the delicate nature of his condition, the hospital said that they were unable to communicate with the receiving hospital and thus it would not be possible to send an ambulance. Staff members were left with no alternative but to transport him themselves or risk his death.

32. A Haitian woman who wanted to seek asylum along with her husband and young daughter suffered third degree burns while living in Tijuana. Her injuries were so severe that an external fixator had to be applied to hold the bone in her arm together. While she was able to access emergency treatment, she was unable to access any follow-up care or cleaning for her burn wounds. The family was living in the tent camp where she had no access to running water or sanitation.

33. Because of Title 42, at least 13 mothers who gave birth while in CBP custody have been expelled to Mexico along with their U.S. citizen babies. These infants were rendered

essentially stateless in Mexico because they were expelled without any kind of legal identity documents.

34. Title 42 has separated countless vulnerable families. A 19-year-old asylum seeker was turned away under Title 42 in Tijuana even though he was permanently disabled after falling off a train. He had lost both his right arm and leg and was thus forced to live at the mercy of strangers in a shelter. He had been trying to join his mother and siblings but Title 42 kept them separated for nearly a year.

35. Four siblings, two under 18, from Nicaragua were separated from their father due to Title 42. Their father was in the U.S. and had been granted immigration relief. When the siblings' mom was disappeared in Nicaragua, they fled to seek asylum and join their father. However, Title 42 left them living in a tent camp.

36. A Honduran woman with multiple gunshot injuries and diabetes was pursuing her asylum case in the United States in 2019. She returned to Mexico when she learned that her teenage daughter had been raped and kidnapped. She left her two younger children in the care of a friend in the U.S. Once she reunited with the daughter who had been raped and kidnapped in Mexico, she was not permitted to rejoin her two minor children in the U.S. and to continue her asylum case. Around the same time, her brother was kidnapped and almost certainly killed by cartel members as he attempted to cross the border with a smuggler because Title 42 closed all legal options to request asylum.

37. AOL's clients in other cities across the southwest border face similarly dangerous situations after being expelled through Title 42. In Reynosa, one of our clients who had previously tried to seek asylum at the border but who was expelled under Title 42 was kidnapped shortly thereafter with her young son. The mother and child were held for days without food until they finally escaped.

38. Another client in Reynosa, traveling with his wife and children, was kidnapped by a criminal group. He was tortured and left for dead, covered in blood with burn and stab wounds all over his body. He survived and the family fled to Tijuana, unable to seek asylum in the U.S. due to Title 42. They were then forced to live in the tent camp at Chaparral, where the client's wounds became infected due to lack of medical treatment and sanitation.

39. In Nuevo Laredo, a client was waiting to be able to cross with her U.S. citizen daughter when they were kidnapped by armed men while walking down the street. The men took them to a house, shaved their heads, and beat them severely. The U.S. citizen daughter's face was slashed with a knife on both sides. She lost so much blood from her injuries that she had to be hospitalized.

40. CBP expelled one asylum-seeking client in Nuevo Laredo in the middle of the night and he was immediately kidnapped by gang members. His family paid the ransom and he was

released. He was then immediately kidnapped by a cartel. His family has heard nothing
from him since.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 11, 2021, in Mexico City, Mexico.

Signature:

Erika Pinheiro

DECLARATION OF SAVITRI ARVEY

I, Savitri Arvey, pursuant to 28 U.S.C. § 1746, hereby declare:

**Summary**

1.  As a migration policy advisor who has worked with hundreds of migrants being subjected to the Title 42 policy, I am deeply familiar with the harms that the policy has inflicted on migrant families.  The Title 42 policy has forced asylum-seeking families, including pregnant mothers and individuals with U.S. citizen children, to live in squalid and dangerous conditions in Mexico, often sleeping under bridges or on the street. More than 1 out of 5 of the asylum seekers I have worked with reported being kidnapped in Mexico, and many of the women were raped during their capture. The government's process for exempting certain families from Title 42 is an inadequate substitute for regular port processing of asylum seekers, all of whom have a right to be heard on their claims.

**Qualifications**

2.  I am currently a Policy Advisor, within the Migrant Rights and Justice program at the Women's Refugee Commission ("WRC"), a non-profit organization that aims to improve the lives and protect the rights of women, children, and youth displaced by crisis and conflict. In this role, I advocate on regional protection issues for women, children, and families in Mexico and Central America. Before assuming this role, I worked as a consultant for WRC from March to June 2021 where I focused on issues related to access to protection at the U.S.-Mexico border and asylum processing at ports of entry. I hold a bachelor's in International Relations from Connecticut College and a master's in public policy from the University of California ("UC"), San Diego.

3.  From October 2018 to July 2021, I collaborated on an initiative as the Central America & Mexico Policy Initiative Fellow at the Strauss Center for International Security and Law at the University of Texas at Austin and as a Graduate Student Researcher and Border and Migration Fellow at UC San Diego Center for U.S.-Mexican Studies to document U.S. Customs and Border Protection's ("CBP's") metering practices and the conditions faced by people seeking protection waiting in Mexican border cities to be inspected and processed by CBP officials. In these roles, I made regular visits to the U.S.-Mexico border and conducted phone and in-person  interviews with people seeking protection,

migrant shelter staff, representatives of international and nongovernmental organizations, and Mexican federal and local government officials in eleven Mexican border cities.[1]

4. I have also helped 251 people seek humanitarian exemptions from an order issued by the Centers for Disease Control and Prevention ("CDC's") under Title 42 of U.S. Code, obtain COVID-19 tests, and be successfully processed at four ports of entry[2] since April 1, 2021.

5. For these reasons, I am deeply familiar with conditions at the U.S.-Mexico border and CBP's ability to safely process people seeking asylum at ports of entry.

### The Devastating Toll of Title 42

6. Title 42 endangers the lives and safety of individuals seeking asylum, by leaving them waiting in squalid conditions in the Mexican border cities for many months.

7. In Piedras Negras, for example, the municipal government has prevented migrant shelters from reopening at even a limited capacity due to COVID-19. As a result, many have been forced to sleep in abandoned houses, in the bus terminal, under bridges or on the street, leaving them more vulnerable to the extreme elements and abuse from exploitative actors. In these conditions, families with young children have struggled to access the most basic necessities, such as food and water, and suffered from inadequate sanitary conditions.

8. In addition, there are hundreds of families living in tent camps in Tijuana and Reynosa, where they vulnerable to criminal elements and lack access to services.

9. The inability to request asylum at a port of entry forces migrants, including women, to wait in conditions where they are vulnerable to harm and unable to access basic medical care. Several women I interviewed have recounted being sexually assaulted or otherwise harmed while sleeping on the street in Mexican border cities.

10. I have supported thirteen pregnant women in seeking exemptions from Title 42, most of whom struggled to access basic medical or prenatal care in Mexico and the limited humanitarian assistance in Mexican border cities such as Piedras Negras and Ciudad Acuña. One woman experienced bleeding and became worried that her pregnancy was

---

[1] Those cities are: Matamoros, Tamaulipas; Reynosa, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Ciudad Juárez, Chihuahua; Agua Prieta, Sonora; Nogales, Sonora; San Luis Rio Colorado, Sonora; Mexicali, Baja California; Tijuana, Baja California. I have also conducted interviews in Monterrey, Nuevo León.
[2] Those four ports of entry are: San Ysidro, Eagle Pass, Del Rio, and Hidalgo.

high risk, while another who was able to visit a health clinic was told that she was at risk of a miscarriage. Others expressed deep concern that the insecurity and extremely unstable living conditions would negatively affect the health of their babies.

11. Title 42 expulsions have also endangered asylum seekers with medical conditions, including families with U.S. citizen children. I sought an exemption for a lesbian couple from El Salvador who were expelled to Piedras Negras days after one of the mothers gave birth to a U.S. citizen baby, while she was still recovering from a cesarean delivery. The U.S. citizen baby was severely sick for several weeks, and the couple struggled to access affordable medical care in Mexico. The couple approached the port of entry and showed the documentation for their U.S. citizen newborn, but they were prevented from entering the bridge by Mexican authorities who told them they needed a visa.

12. While waiting in Mexican border cities, numerous people seeking asylum who I have spoken to in the last few months have reported being extorted, robbed, physically assaulted, and threatened by authorities and other individuals, leaving them fearful for their lives.

13. Individuals seeking protection in Mexican border cities face a high risk of being kidnapped, and this risk is particularly heightened in the state of Tamaulipas, due to the presence of the Gulf Cartel and Cartel del Noreste. Kidnappings of migrants in Mexico that have occurred since February 2021 have been documented through public testimonies, interviews, and an electronic survey by Human Rights First.[3] Approximately one out of every five individuals I interviewed through the exemption process affirmatively reported that they had been kidnapped (32 people), suffered a kidnapping attempt (20 people), or received threats of kidnapping (2 people) in Mexico. This figure is likely a significant undercount because I did not directly solicit information about kidnapping from individuals and many people may have been afraid to report such experiences.

14. Kidnappings of migrants often occur at bus stations, outside migrant shelters, or outside an international bridge or near the port of entry.

15. Title 42 expulsions, especially expulsions to Nuevo Laredo and Reynosa, Tamaulipas, force individuals seeking protection into a situation where they can be easily targeted. After migrants and individuals seeking protection are identified on the street, they are

---

[3] Human Rights First, *Tracker of Reported Attacks During the Biden Administration Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico* (June 2021), https://www.humanrightsfirst.org/sites/default/files/AttacksonAsylumSeekersStrandedinMexicoDuringBidenAdministration.6.17.21.pdf.

generally forced into vans by armed men and driven to a safe house where they are asked for contacts of people will pay ransom, or their phones are searched for U.S. numbers. Those contacts, who are usually family members in the U.S., receive a call demanding thousands of dollars and threatening to harm those in captivity. While being held in the safe house, women are often raped by their captors.

16. One Honduran woman I spoke with in April 2021 was expelled with her young daughter by CBP officials at night through the Hidalgo Port of Entry. After she exited the international bridge into Reynosa, several armed men grabbed her and covered her face with a black hat and forced her in a car. While being held, she was raped multiple times and she begged her captors not to harm her daughter. Her daughter was released by herself and crossed the border unaccompanied. After a month, the woman was able to escape with other women who were being held. She did not know where her daughter was until she was finally contacted by a U.S. shelter.

**Restoring Access to Asylum at Ports of Entry**

17. Instead of forcing families to cross dangerous terrain in between ports of entry to seek protection, CBP should restore access to asylum at ports of entry.

18. Throughout the exemption process, I have worked with many families who approached ports of entry for an opportunity to present their asylum claims but they were blocked from entering the port. For example, two weeks ago, a single mother with a U.S. citizen child who has special needs approached the Eagle Pass Port of Entry but was prevented from entering.

19. Although Defendants assert that thousands of people have been processed via ports of entry for exemptions from Title 42 (over a period of several months), Shahoulian Decl. (ECF No. 113-1) ¶ 11, those exemption processes cannot meet the needs of the majority of individuals seeking protection at the border and shift burdens onto nongovernmental organizations ("NGOs") to gather information from vulnerable asylum seekers, including under dangerous conditions in Mexico.

20. Many asylum seekers do not have access to NGOs, and, due to the very limited number of exemptions granted each day, the majority of asylum seekers will not be able to obtain an exemption from Title 42, no matter how vulnerable they are.

I declare under the penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct. Executed in New York, New York.

Dated: August 10, 2021

_____
Savitri Arvey

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al., )<br><br>*Plaintiffs*, )<br><br>v. )<br><br>ALEJANDRO MAYORKAS, Secretary of Homeland )<br>Security, in his official capacity, et al., )<br><br>*Defendants*. ) | No. 1:21-CV-00100-EGS |

**SUPPLEMENTAL DECLARATION OF FORMER CENTERS FOR DISEASE
CONTROL AND PREVENTION (CDC) OFFICIALS**

The undersigned hereby declare:

1.  We make this declaration based on our own personal knowledge and if called to testify could and would do so competently and truthfully to these matters.

2.  We submit this supplemental declaration as former CDC officials to address inaccuracies and logic shortfalls raised in Defendants' opposition to Plaintiffs' motion for a classwide preliminary injunction, Opp. (ECF No. 76), and in Defendants' supplemental declaration, Shahoulian Decl. (ECF No. 113-1).

3.  We have also carefully reviewed the CDC order issued on August 2, 2021[1] (hereinafter "CDC Order").

4.  We reaffirm the view expressed in our original declaration from February 5, 2021, ECF No. 57-6, that risks of infection can be successfully mitigated by reasonable public health measures and that any potential risks from allowing asylum-seeking families to enter the United States are no greater than many of the activities sanctioned by the CDC (such as indoor sporting events and concerts, indoor schooling, travel, and other regular activities that have resumed).

5.  Moreover, compared to February 2021 and earlier points in the pandemic, the United States is now even better equipped to safely process immigrant families, given the availability of high effective vaccines and other interventions. Notwithstanding recent

---

[1]    CDC, *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* (Aug. 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.

variants of the COVID-19 virus, there remains no valid public health basis for expelling immigrant families.

**Highly Effective, Widely Available Vaccines Protect Against All Known Variants of the COVID-19 Virus and Reduce the Risk of Transmission in the United States.**

6.  In the United States, COVID-19 vaccines are now widely available and accessible to all individuals over the age of 12, at no cost to the recipient.  Vaccines are available on demand in convenient locations, including local pharmacies.

7.  As of August 10, 2021, 71% of adults in the United States have received at least one COVID-19 vaccination shot, exceeding President Biden's national goal.[2]  Vaccination rates are higher among older, more vulnerable demographics, with more than 90% of adults 65 or older having received at least one dose; over 80% of adults 65 or older are fully vaccinated.[3]

8.  Overall, as of August 10, 2021, more than 195,000,000 people in the United States (more than 58% of total population) have received at least one dose of the COVID-19 vaccine, and more than 166,000,000 are fully vaccinated (more than 50% of total population).[4] With respect to those individuals who are vaccine-eligible (people ages 12 and up), 68.9% of that population has received at least one dose and 58.8% is fully vaccinated.

9.  Although the CDC Order claims that "vaccination uptake has plateaued," CDC Order at 10, the CDC's own data show that the daily administration of first doses has more than doubled over the last month (seven-day moving average increased from 218,696 daily doses to 438,461 daily doses between July 7 and August 7, 2021).[5]

10. The widespread availability of vaccines has no doubt changed the course of the COVID-19 pandemic. As shown below, the number of new daily cases, hospitalizations, and deaths from COVID-19 have fallen drastically in the United States as vaccination numbers have increased.  Even as restrictions have been lifted, cases, hospitalizations, and deaths are now a fraction of their peak.

---

[2]      CDC, *COVID-19 Vaccinations in the United States* (last updated Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#vaccinations.
[3]      *Id.*
[4]      *Id.*
[5]      CDC, *Trends in Number of COVID-19 Vaccinations in the US* (last updated Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#vaccination-trends_vacctrends-onedose-daily.



*Figure 1* - Source: CDC, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.



*Figure 2* - Source: CDC, *Prevalent Hospitalizations of Patients with Confirmed COVID-19, United States, August 01, 2020 – August 08, 2021* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#hospitalizations.

**Daily Trends in Number of COVID-19 Deaths in the United States Reported to CDC and Cumulative Count of Total Doses Administered.**



*Figure 3 - Daily Number of COVID-19 Deaths vs. Total Vaccine Doses Administered. Source: CDC, Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.*

11. Since vaccines became widely available in February and March 2021, the number of individuals who die from or are hospitalized due to COVID has dropped significantly. Figure 3, above, shows the inverse relationship between COVID-19 deaths and administered vaccine doses.

12. According to the CDC, studies show that all vaccines authorized for use in the United States—Pfizer-BioNTech, Moderna, and Johnson & Johnson—are effective against all known variants, including the Delta variant. CDC, *About Variants of the Virus that Causes COVID-19* (Aug. 6, 2021), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html.

13. Individuals who are vaccinated against COVID-19 are far less likely to become infected, to require hospitalization, and to transmit the virus to others. Individuals receive significant protection even after one dose of a two-dose vaccine. Vaccination produces better protection from infection and illness than surviving a naturally occurring case of

COVID-19 illness. If fully vaccinated people become infected with COVID-19 (though still rare), they are less likely to have symptoms or to transmit the virus to others.

14. The vaccines commonly used in North America are very effective at preventing illness, hospitalization and death from all known forms of the virus, including the Delta variant that has become the dominant form.

15. While so-called "breakthrough" infections are possible in vaccinated individuals, vaccinated individuals remain unlikely to develop a symptomatic illness and only very rarely will they become seriously ill or require hospitalization even if infected.

16. According to CDC data, less than 0.001% of vaccinated individuals have died from COVID-19. [6] Unvaccinated individuals account for more than 99% of recent COVID-19 deaths.[7]

17. According to a survey of 50 hospitals around the country, unvaccinated individuals make up the overwhelming majority (nearly 95%) of COVID-19 hospitalizations and deaths.[8]

18. There is some evidence that individuals with breakthrough infections from the Delta variant can carry the virus and potentially transmit infection to others, but according to the CDC, mitigation methods such as masking, social distancing, and proper building ventilation are effective ways of preventing transmission. *See, e.g.*, CDC Order at 7, 9, 13.

19. Apart from vaccinations, an additional 10 to 15% of the U.S. population has likely recovered from a prior COVID-19 infection.[9] Although prior infection confers less protection than a vaccination, studies show that individuals who have recovered from COVID-19 are unlikely to become infected again, and such individuals tend to develop milder symptoms even if re-infected.[10]

---

[6]    CDC, *COVID-19 Vaccine Breakthrough Case Investigation and Reporting* (last updated Aug. 5, 2021), https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html.

[7]    NPR, *U.S. COVID Deaths Are Rising Again. Experts Call It A 'Pandemic Of The Unvaccinated'* (July 16, 2021), https://www.npr.org/2021/07/16/1017002907/u-s-covid-deaths-are-rising-again-experts-call-it-a-pandemic-of-the-unvaccinated.

[8]    ABC News, *Vast majority of ICU patients with COVID-19 are unvaccinated, ABC News survey finds* (July 29, 2021), https://abcnews.go.com/US/vast-majority-icu-patients-covid-19-unvaccinated-abc/story?id=79128401.

[9]    Frederick J. Angulo, *Estimation of US SARS-CoV-2 Infections, Symptomatic Infections, Hospitalizations, and Deaths Using Seroprevalence Surveys,* JAMA Network Open (Jan. 4, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7786245/.

[10]    *See, e.g.*,  Adnan Qureshi et al., *Reinfection With Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) in Patients Undergoing Serial Laboratory Testing*, Clinical Infectious Diseases (Apr. 25, 2021), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciab345/6251701

20. Even in the face of a more transmissible variant form of the virus, current cases detected in the U.S. remain far below what they were at the peak of the epidemic, even while many restrictions and regulations have been relaxed. COVID-19 vaccines have almost certainly contributed to suppressing transmission and are the best form of protection against illness, hospitalization and death.

21. Given that asylum-seeking families make up a tiny percentage of daily inbound individuals, expelling asylum seekers at the southern border would do almost nothing to reduce the number of cases or the rate of transmission in the U.S. Instead, layered protection including masking, physical distancing, and improved ventilation, along with vaccination and testing, should be expected to prevent additional cases among this group and the Customs & Border Protection (CBP) personnel they interact with.

**Defendants' Expulsion Practices Are Inconsistent with Public Health.**

22. A basic public health concept is that most public health actions produce a combination positive and negative effects, which must be weighed against one another. Notably, the CDC Order appears to be nearly devoid of any consideration of the adverse consequences of the Title 42 policy, both to the asylum seekers and to the health of the U.S. public.

23. The CDC Declaration acknowledges that, notwithstanding COVID-19 variants, numerous safety measures remain effective in preventing the transmission of COVID-19, including in congregate settings. *See, e.g.*, CDC Order at 7, 9, 13. Those measures including rapid testing, quarantining, providing vaccines, masking, distancing, improving ventilation, and others.

24. According to reports by advocates and the media,[11] Defendants are carrying out "lateral" expulsions, which involve flying or bussing untested migrants already in the United States from one part of the border to another region before expelling them into Mexico.

25. We also understand from attorneys representing immigrants subject to Title 42 that some of their clients are detained in congregate facilities for days or weeks, before they are

---

[11]    *See, e.g.*, NBC News, *Biden admin again flying migrants who cross border in one place to another place before expelling them* (June 18, 2021), https://www.nbcnews.com/politics/immigration/biden-admin-again-flying-migrants-who-cross-border-one-place-n1271211; Washington Post, *Fewer migrant families being expelled at border under Title 42, but critics still push for its end* (June 13, 2021), https://www.washingtonpost.com/immigration/fewer-migrant-families-being-expelled-at-border-under-title-42-but-critics-still-push-for-its-end/2021/06/13/422c702c-c7cc-11eb-81b1-34796c7393af_story.html; San Diego Union-Tribune, *Biden expelling asylum-seeking families with young children to Tijuana after flights from Texas* (Apr. 9, 2021), https://www.sandiegouniontribune.com/news/immigration/story/2021-04-09/biden-expelling-families-tijuana.

expelled from the United States, sometimes after testing negative for COVID-19 or after completing quarantine or isolation. *See, e.g.*, Hidalgo Decl. (ECF No. 57-8) ¶ 6; Levy Decl. ¶ 30.

26. Such practices, if undertaken by the Department of Homeland Security, increase the risk of transmission on both sides of the border, compared to actual public health strategies such as testing and quarantining or offering vaccines to migrants and releasing migrants from congregate settings.

27. Migrants in Mexico have also begun receiving COVID-19 vaccines since at least May 2021, according to multiple media reports.[12] Like other vaccinated individuals, migrants who have received a vaccine are extremely unlikely to transmit COVID-19, compared to unvaccinated travelers who are permitted to cross the Southwest border daily.

28. There is no public health basis for expelling immigrant families, particularly those who have been vaccinated against, tested negative for, or previously recovered from COVID-19, while allowing hundreds of thousands of other travelers to enter the United States daily via the Southwest border with no restrictions.

**Immigrant Families Subject to Title 42 Are Not a Significant Source of COVID-19 in the United States.**

29. The CDC premised its Title 42 order on the need to prevent the "introduction" of COVID-19 into the United States. CDC Order at 1.

30. In public health and epidemiology, "introduction" generally refers to first contact with a disease in an area where it was previously unknown or undocumented.[13]

31. Since the first confirmed case of COVID-19 in January 2020, there have been nearly 36,000,000 confirmed cases of COVID-19 in the United States as of August 10, 2021.[14] The actual number of infections is likely much higher.

---

[12]     Reuters, *Mexico to vaccinate migrants in Baja California under new border initiative* (June 18, 2021), https://www.reuters.com/world/americas/mexico-vaccinate-migrants-baja-california-under-new-border-initiative-2021-06-19/; Reuters, *U.S. bound-migrants vaccinated for COVID-19 in Mexican border city* (May 6, 2021), https://www.reuters.com/world/americas/us-bound-migrants-vaccinated-covid-19-mexican-border-city-2021-05-06/.

[13]     KE Nelson and CM Wilson [eds] (2007), *Infectious Disease Epidemiology Theory and Practice*, 2nd Edition.  Sudbury, MA: Jones and Bartlett.

[14]     CDC, *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction* (last updated Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#cases.

32. According to the CDC, there were over 91,000 new confirmed COVID-19 cases reported on July 31, 2021, more than 80% of which were caused by the Delta variant.[15]  There is no evidence that the Delta variant originated in a migrant crossing the Southwest border, and, at this point, asylum-seeking families cannot meaningfully introduce the variant into the United States, where it is already the dominant strain.

33. According to public data from CBP, the agency has expelled an average of 8,600 family unit noncitizens per month in the last two months, or approximately 285 people per day.[16]

34. Even if 100% of those approximately 285 people per day were to test positive for COVID-19 (which they will not), they would still represent only a negligible addition to the more than 70,000 new cases that have been reported each day in the United States on average over the most recent week.[17]

35. Given that noncitizen families represent a very small fraction of the hundreds of thousands of inbound people allowed to cross the Southwest border each day (without COVID-19 testing or vaccination requirements),[18] even with entry to congregate conditions, asylum seekers cannot plausibly constitute a meaningful additional COVID-19 risk to the U.S. public. That minimal risk is further diminished by a majority of Americans and a large majority of vulnerable age groups receiving COVID-19 vaccinations.

36. The minimal risk that those few asylum-seekers could infect others could be further mitigated by a testing and quarantine process or via widely available vaccinations. According to Defendants, DHS has already developed, in coordination with state, local, and NGO partners, capacity to test, quarantine, or isolate noncitizen families. Shahoulian Decl. ¶¶ 8–9. Apart from that capacity, noncitizen families can be directed to self-quarantine with the help of their family, friends, or other sponsors in the United States. A recent study found that "91.9% [of asylum seekers] have family or close friends who live in the U.S."[19]

---

[15]      CDC, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.  CDC, *Variant Proportions* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#variant-proportions.

[16]      CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[17]      CDC*, Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.

[18]      Department of Transportation, *Border Crossing Entry Data* (last visited Aug. 9, 2021), https://explore.dot.gov/views/BorderCrossingData/Annual?:isGuestRedirectFromVizportal=y&:embed=y.

[19]      U.S. Immigration Policy Center at UC San Diego, *Seeking Asylum: Part 2* 13(Oct. 29, 2019), https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-final.pdf?fbclid=IwAR07M_jP1Wy8KIn85d0jnw0Kobiz-MR7XeAIT77c9afuRInkd7sHL21FE1Q.

37. Additional quarantine or isolation capacity can be acquired by expanding the use of hotel or by utilizing temporary, mobile housing units that can be rapidly deployed by HHS and CDC in coordination with local partners.

**Defendants Make Misleading Claims About the Infection Risks That Agency Personnel Face.**

38. Defendants' suggestion that CBP employees are at elevated risk for COVID-19 due to contact with immigrants is unfounded.

39. If vaccinated with one of the widely available vaccines, CBP employees would be highly unlikely to contract COVID-19 and develop symptomatic or serious illness.

40. Defendants assert that the rate of infection has been increasing among CBP officers, despite significant numbers of fully vaccinated employees since January 2021. *See* ECF No.113-1, ¶ 13. However, Defendants do not indicate whether any of the recently infected CBP officers had been vaccinated, or whether any breakthrough infections had led to serious disease. Moreover, Defendants' infection figures appear to include all CBP employees, including those who are not located at the Southwest border (or even in the United States).[20]

41. Defendants also do not disclose how many CBP employees have actually been vaccinated. We understand that the federal government has only recently required all federal employees and contractors to either attest to vaccination, or otherwise comply with testing and masking requirements.[21]  As more CBP employees get vaccinated or begin to follow more rigorous testing and masking protocols, infection and hospitalization rates should correspondingly decrease.

42. Because CBP employees are far more likely and able to be tested than the average American citizen, the fact that 12.36% of CBP employees may have tested positive for COVID-19 (as of February 15, 2021) compared to 8.16% nationally is not probative. *See* ECF No. 76-2, ¶ 18. Indeed, a nationwide sero-prevalence survey conducted prior to the availability of vaccines, suggested that 14.3% of the United States population had been infected as of mid-November 2020, more than twice the number of confirmed cases.[22]

---

[20]     CBP, *Agency COVID-19 Information* (last updated Aug. 6, 2021), https://www.cbp.gov/newsroom/coronavirus.

[21]     Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Agency Model Safety Principles* (July 29, 2021), https://www.saferfederalworkforce.gov/downloads/revised%20COVID19_Safe%20Federal%20Workplace_Agency%20Model%20Safety%20Principles_20210728.pdf

[22]     Frederick J. Angulo, *Estimation of US SARS-CoV-2 Infections, Symptomatic Infections, Hospitalizations, and Deaths Using Seroprevalence Surveys,* JAMA Network Open (Jan. 4, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7786245/.

43. In fact, based on CBP's latest public data, CBP employees have likely had a lower incidence of confirmed COVID-19 cases compared to the overall adult population in the United States. Between February 15 and August 6, 2021, 1,905 CBP officers tested positive for COVID-19, out of 63,457 employees.[23] Accordingly, approximately 3.00% of CBP personnel contracted COVID-19 during that time. During that same period, 3.01% of adults in the United States tested positive for COVID-19.[24]  Because CBP officers are tested more frequently than the average adult in the United States, the fact that they have almost identical rates of confirmed cases suggests that CBP officers are less likely to be infected with COVID-19 than the rest of the adult population in the country.

44. The fact that CBP officers likely have a lower rate of infection compared to the American public as a whole suggests that CBP is able to process immigrants safely, given vaccinations and other mitigation measures, despite having to work in congregate settings at times.

45. Notably, the CDC Order cites no evidence for its contention that the Title 42 policy has "helped lessen the introduction, transmission, and spread of COVID-19 among border facilities and into the United States while also decreasing the risk of exposure to COVID-19 for DHS personnel and others in the facilities." CDC Order at 15-16. Given the likely lower incidence in CBP personnel, including during the asserted period of increased facility crowding in 2021, this statement is likely incorrect.

**Defendants Make Misleading Claims About the Risk of Infection Posed by Travelers from Mexico.**

46. Defendants note that Mexico has "had the third highest total number of deaths from COVID-19 in the world," Opp. at 4, which is no longer the case. Moreover, the statement omits noting that the United States has reported the *most* COVID-19 deaths in the world cumulatively and that the COVID-19 death rate on a per capita basis is nearly identical in the US and Mexico.[25]

47. In any event, Defendants' reliance on total deaths as a measure of infection risk is misguided: National death counts vary depending on factors such as the quality of

---

[23]    *See* Miller Decl. (ECF No. 76-2) ¶ 18; CBP, *Agency COVID-19 Information* (last updated Aug. 6, 2021), https://www.cbp.gov/newsroom/coronavirus.

[24]    CDC, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory* (last visited Aug. 10, 2021), https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.

[25]    World Health Organization, WHO Coronavirus Disease (COVID-19) Dashboard (last updated Aug. 10, 2021), https://covid19.who.int/table; Johns Hopkins University of Medicine Coronavirus Resource Center, Mortality Analysis (last updated Aug. 10, 2021), https://coronavirus.jhu.edu/data/mortality.

medical care once infected and differences in population and demographics, none of which reveals the likelihood that a traveler from Mexico is carrying the virus that causes COVID-19. Not only is quality healthcare less accessible in Mexico, the Mexican population also suffers from high rates of obesity and other chronic conditions that place them at particular risk for severe illness and death from COVID-19.[26]

48. In the latest CDC Order, the only data that the agency cited regarding COVID-19 prevalence in Mexico show that the United States is experiencing more than twice as many cases per capita compared to Mexico. CDC Order at 4. The Order also cites data indicating that the recent rate of increase of confirmed COVID-19 cases in the United States is three times higher than Mexico's. *Id.*

49. While Defendants have previously asserted that Mexico is underreporting its COVID-19 cases and deaths, sero-prevalence studies, as explained in our initial declaration, confirm that Mexico's lower counts cannot be fully explained by differences in reporting. *See* ECF No. 57-6, ¶ 24.

50. In short, the CDC has not provided any evidence or reason to believe that migrants arriving from Mexico are more likely to have COVID-19 than the average person in the United States.

---

[26] Diego Rolando Hernández-Galdamez, et al., *Increased Risk of Hospitalization and Death in Patients with COVID-19 and Pre-existing Noncommunicable Diseases and Modifiable Risk Factors in Mexico*, Archives of Medical Research (July 22, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7375298/.

I, Sharmila Shetty, declare under penalty of perjury of the laws of the State of New York and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Massapequa Park, New York.

_____
SHARMILA SHETTY

I, Stephen Patrick Kachur, declare under penalty of perjury of the laws of the State of New York and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
STEPHEN PATRICK KACHUR

I, Leslie Roberts, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Bocaranga, Central African Republic.

_____
LESLIE ROBERTS

I, Bradley A. Woodruff, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Victoria, British Columbia, Canada.

_____
BRADLEY A. WOODRUFF

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al., | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) No. 1:21-CV-00100-EGS |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity, et al., | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**DECLARATION OF 32 MEDICAL AND PUBLIC HEALTH EXPERTS**

The undersigned hereby declare:

1. We make this declaration based on our own personal knowledge and if called to testify could and would do so competently and truthfully to these matters.

2. We have carefully reviewed the latest Title 42 order issued by the Centers for Disease Control & Prevention (CDC) and conclude that it still does not provide adequate public health justifications for expelling asylum-seeking families at the border. *See* CDC, *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* (Aug. 2, 2021) (hereinafter "CDC Order"), https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.

3. Based on our professional opinion as epidemiologists, medical doctors, public health experts, and former officials from the CDC, we believe that:

   ■ Families seeking asylum at the southwest border can be admitted, processed, and transported in a manner that safeguards public health, notwithstanding the COVID-19 pandemic and the currently circulating variants of the COVID-19 virus;
   ■ Migrants are not responsible for increases in COVID-19 infections, nor did they introduce the current variants into the United States;
   ■ Processing of asylum seekers, with mitigation strategies, presents no greater risk than that posed by countless activities currently allowed by the CDC (such as indoor sporting events, dining, and concerts); and
   ■ The CDC Order does *not* conclude that the processing of asylum seekers cannot be done safely. Rather, the CDC has concluded that the Department of Homeland Security (DHS) has not taken all of the recommended mitigation steps, despite having had more than a year to do so.

4.  In short, the CDC Order is an indictment of the DHS's yearlong failure to adopt reasonable mitigation steps in order to safely process asylum-seeking families, and not a conclusion by CDC that migrants present an unacceptable public health risk.  The CDC Order also makes clear that where the federal government has wanted to allocate resources toward mitigation protocols for migrants entering the United States, it can do so, as it did when it exempted unaccompanied minors from Title 42.

5.  In its order, the CDC "recognizes [that] the availability of testing, vaccines, and other mitigation protocols can minimize risk" of COVID-19 transmission during border processing.  CDC Order at 3.  Thus, according to the CDC, the primary reason that asylum-seeking families are still being subjected to Title 42 is because of DHS's failure to expand available mitigation measures:

> CDC considers these efforts [to expand testing, consequence management, and vaccination programs] to be a critical risk reduction measure and encourages DHS to evaluate the potential expansion of such COVID-19 mitigation programs for [family units] such that they may be excepted from this Order in the future.

Id. at 22.  The CDC also stated that it "encourages DHS to develop such programs as quickly as practicable."  Id.

6.  The CDC further recognized that the federal government has successfully implemented those mitigation steps in order to process unaccompanied children without posing "a significant level of risk for COVID-19 spread into the community"—DHS simply has not done the same for families.  See id. at 17.

7.  To date, Title 42 has not been lifted for any subset of asylum-seeking families, even though the CDC has concluded that "[i]n light of available mitigation measures," "the gradual resumption of normal border operations under Title 8 is feasible" with "careful planning."  Id. at 18.

8.  Effective mitigation measures have enabled this country to re-open, return to in-person schooling, travel, religious practice, indoor sporting events and other regular activities.  The risks from allowing migrants fleeing persecution and danger into the United States are minimal considering the number of mitigation tools available, and certainly not greater than risks associated with many activities that the CDC currently sanctions.

9.  By utilizing highly effective vaccines and following the other practical mitigation recommendations (set forth below), Defendants can ensure the health of government

employees, noncitizens, and communities in the United States.  These mitigation concepts are not novel in the context of border processing.[1]

**SARS-CoV-2 and Its Variants Do Not Provide a Public Health Basis to Exclude Asylum-Seeking Families From the United States.**

10. The CDC has recognized that mitigation strategies continue to be effective against all known variants of the COVID-19 virus, including the Delta variant, the dominant strain currently circulating in the United States.  *See, e.g.*, CDC Order at 7.

11. Title 42 expulsions at the southwest border cannot prevent the introduction of the Delta variant into the country, because the variant is already widespread in the United States.[2]

12. There is no evidence that any of the four variants of concern to the CDC originated in a person crossing the southwest border.[3]

**Minimizing Transmission Risk During Border Processing.**

13. A package of risk mitigation strategies is effective even if no individual strategy completely blocks transmission on its own.  By combining multiple strategies, including vaccinations, testing, masking, ventilation, and sanitizing, Customs and Border Protection (CBP) can safely process asylum-seeking families while minimizing transmission of COVID-19.

14. On July 29, 2021, President Biden announced a requirement that millions of federal employees and contractors be vaccinated or be subjected to rigorous safety protocols.[4]

15. Ensuring that only fully-vaccinated government agents are placed in migrant-facing roles would largely eliminate the risks of serious illness, hospitalization, and death among government personnel from COVID-19; it would also significantly reduce transmission of SARS-CoV-2 between government personnel and migrants.

16. Offering COVID-19 vaccinations to migrants would further dampen cycles of transmission.  All migrants should be offered a vaccine when they come into CBP

---

[1]    Columbia Mailman School of Public Health, *Public Health Recommendations for Processing Families, Children and Adults Seeking Asylum or Other Protection at the Border* (Dec. 12, 2020), https://www.publichealth.columbia.edu/research/program-forced-migration-and-health/public-health-recommendations-processing-families-children-and-adults-seeking-asylum-or-other.

[2]    *See* CDC, *Variant Proportions* (last updated Aug. 3, 2021), https://covid.cdc.gov/covid-data-tracker/#variant-proportions.

[3]    *See* CDC, *SARS-CoV-2 Variant Classifications and Definitions* (last updated Aug. 3, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-info.html.

[4]    The White House, *Fact Sheet: President Biden to Announce New Actions to Get More Americans Vaccinated and Slow the Spread of the Delta Variant* (July 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-president-biden-to-announce-new-actions-to-get-more-americans-vaccinated-and-slow-the-spread-of-the-delta-variant/.

custody, or shortly after leaving CBP custody, regardless of whether or not they are ultimately allowed to remain in the country.

17. The U.S. government has adequate vaccine supplies to take this step.[5]  DHS should also offer vaccine information in multiple languages to increase vaccine uptake.

18. Vaccination programs for migrants arriving at the southwest border are reportedly being considered by DHS and CBP and should be implemented immediately, as recommended by the CDC.[6]  In the past, CBP has reportedly resisted the CDC's recommendation to vaccinate migrants, acting contrary to public health.[7]

19. In addition to vaccinations, transmission could be further reduced by maximizing outdoor processing, such as by repurposing parking lots and other well-ventilated spaces.  The CDC Order noted that processing for Title 42 expulsions generally takes place outdoors. CDC Order at 15.  However, if CBP were to similarly shift processing for those allowed to enter the country to outdoor settings or semi-outdoor spaces with open-sided structures, transmission risk would be substantially reduced.

20. Even if congregate processing indoors were necessary, there are numerous safeguards that minimize the risk of transmission in such settings.

21. For instance, as one layer of protection, indoor facilities can utilize air filtration or other means of improving ventilation, such as reducing recirculation of air and opening windows.

22. When families are indoors, transmission can be mitigated through masking, social distancing, and hand-sanitizing, all of which remain effective against all known variants of the COVID-19 virus.  All building occupants could be instructed to wear masks in the correct manner and to use surgical masks or respirators with better filtration instead of cloth masks.  *See* CDC, *Improve the Fit and Filtration of Your Mask to Reduce the Spread of COVID-19* (last updated Apr. 6, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/mask-fit-and-filtration.html.

23. Mobile testing units deploying rapid antigen tests could be used to test individuals for COVID-19 before they enter an indoor, congregate setting.  According to the CDC, in congregate settings, "rapid testing can be implemented to identify infected persons so

---

[5]      *See, e.g.*, The White House, *Fact Sheet: President Biden Announces Major Milestone in Administration's Global Vaccination Efforts: More Than 100 Million U.S. COVID-19 Vaccine Doses Donated and Shipped Abroad* (Aug. 3, 2021) (stating that United States government will deliver "hundreds of millions of more doses" to other countries "in the coming weeks"), https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/03/fact-sheet-president-biden-announces-major-milestone-in-administrations-global-vaccination-efforts-more-than-100-million-u-s-covid-19-vaccine-doses-donated-and-shipped-abroad.
[6]      *See* The Washington Post, *Biden administration preparing to offer vaccines to migrants along Mexico border* (Aug. 3, 2021), https://www.washingtonpost.com/national/biden-vaccines-migrants-border/2021/08/03/afaff516-f471-11eb-83e7-06a8a299c310_story.html.
[7]      CNN, *CDC urged US Customs and Border Protection to vaccinate migrants, but they rejected the idea* (Nov. 26, 2019), https://www.cnn.com/2019/11/26/health/cdc-vaccinations-migrants-border-patrol/index.html.

they can be isolated until they no longer pose a risk of spreading infections."  CDC Order at 9.  The rapid testing could be part of the COVID-19 medical screenings and temperature checks already conducted by CBP prior to taking noncitizens into custody. *Id.* at 13.

24. Any individual who tests positive for COVID-19 from the antigen test should be immediately referred for medical care and isolation while they await a PCR test to confirm the COVID-19 diagnosis. CBP can work with local health authorities, shelters, and humanitarian assistance organizations to find additional facilities, like unused dormitory and hotel facilities, to allow such individuals to isolate and undergo additional testing.

25. According to the CDC, CBP already has testing, quarantine, and isolation systems set up for most family units, who are not typically detained.  *See id.* at 14.

26. According to the CDC, CBP has already been implementing several other mitigation strategies at its facilities.  *Id.* at 13 ("CBP has implemented a variety of mitigation efforts to prevent the spread of COVID-19 in [CBP] facilities.  CBP has invested in engineering upgrades, such as installing plexiglass dividers in facilities where physical distancing is not possible and enhancing ventilation systems.  All CBP facilities adhere to CDC guidance for cleaning and disinfection.  Surgical masks are provided to all persons in custody and are changed at least daily and if or when they become wet or soiled. Personal protective equipment (PPE) and guidance are regularly provided to CBP personnel.  Recognizing the value of vaccination, CBP is encouraging vaccination among its workforce.").

27. We are not aware of any reason that DHS could not take additional mitigation steps beyond those it has already taken, if it were willing to allocate sufficient resources.  Nor does the CDC Order explain why DHS could not take such additional mitigation steps.

28. The above precautionary measures, combined with testing (including rapid testing), quarantine, isolation, and vaccinations, provide multiple layers of protection against transmission, minimize disease transmission, and enable asylum-seeking families to be processed without posing a significant public health risk.

**Minimizing Transmission Risk During Transport.**

29. Mitigation strategies are effective in preventing transmission of COVID-19 when asylum-seeking families have to be transported by CBP prior to release.

30. Ensuring that all migrant-facing CBP personnel are vaccinated and masked, and that all noncitizens are tested prior to boarding, cohorted by COVID-19 status and known exposure, and masked will significantly reduce transmission risk.  These steps for minimizing transmission during air and ground transportation are already outlined in CDC guidance.  *See* CDC, *Interim Guidance for Transporting or Arranging Transportation by Air into, from, or within the United States of People with COVID-19 or*

*COVID-19 Exposure* (Jan. 19, 2021), https://www.cdc.gov/quarantine/interim-guidance-transporting.html.

31. Transmission risk can be further mitigated by using larger capacity vehicles, improving ventilation by opening windows, minimizing recirculation of air by the heating/cooling system, seating individuals in a socially distanced manner, and sanitizing vehicles between uses.

32. In the event that a longer trip is necessary, vehicle occupancy can be reduced to mitigate transmission risk.

**Public Health Alternatives to Expulsion.**

33. Expulsions magnify the risks of COVID-19 transmission to CBP personnel and border communities.

34. Title 42 expulsions encourage repeat interactions between noncitizens and CBP. According to CBP, "[t]he large number of expulsions during the pandemic has contributed to a larger-than-usual number of noncitizens making multiple border crossing attempts." CBP, *CBP Announces May 2021 Operational Update* (June 9, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-announces-may-2021-operational-update. Noncitizens subject to expulsion are generally expelled across the border into Mexico via the nearest port of entry. *See* CDC Order at 14.

35. According to CBP statistics, approximately 35-40% of noncitizens encountered at the southwest border are repeat encounters. *See* CBP, *CBP Announces June 2021 Operational Update* (July 16, 2019), https://www.cbp.gov/newsroom/national-media-release/cbp-announces-june-2021-operational-update. CBP, *CBP Announces May 2021 Operational Update* (June 9, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-announces-may-2021-operational-update.

36. Rather than increasing transmission opportunities by multiplying the number of direct interactions, DHS and CBP should implement proven public health strategies, such as testing and quarantine and vaccination programs for migrants.

37. According to the CDC, a protocol for testing, quarantine, and vaccination (when age-appropriate) has enabled unaccompanied children to be placed in congregate shelters or released to sponsors (who can assist with compliance with medical guidance) "without posing a significant public health risk." CDC Order at 17.

38. The same can be done for asylum-seeking families, the overwhelming number of whom have sponsors, family, or friends in the United States who can assist with compliance

with medical and public health direction.  A recent study found that "91.9% [of asylum seekers] have family or close friends who live in the U.S."[8]

39.   According to the CDC, CBP has already developed partnerships "with state and local agencies and non-governmental organizations to facilitate COVID-19 testing of [families] upon release from CBP custody."  CDC Order at 14.  Highly effective vaccines are already available upon demand in the United States, free of charge, to all individuals 12 or older, in local pharmacies and other accessible locations.

40.   To the extent that such resources for testing and quarantine are limited, DHS and HHS should procure additional testing and quarantine capacity or provide funding to local and state groups.  The use of quarantine hotels or motels could be quickly scaled up or down as needed.

41.   Asylum-seeking families in the United States can also be directed to shelter in place at their ultimate destinations.

42.   Additionally, HHS and CDC should assist with expanding quarantine and isolation capacity through the use of temporary or mobile housing units, in coordination with local health authorities.

---

[8]      U.S. Immigration Policy Center at UC San Diego, *Seeking Asylum: Part 2* 13(Oct. 29, 2019), https://usipc.ucsd.edu/publications/usipc-seeking-asylum-part-2-final.pdf?fbclid=IwAR07M_jP1Wy8KIn85d0jnw0Kobiz-MR7XeAIT77c9afuRInkd7sHL21FE1Q.

I, Joseph J. Amon, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Princeton, New Jersey.

JOSEPH J. AMON, PhD, MSPH
Director of Global Health
Clinical Professor, Community Health and Prevention
Dornsife School of Public Health, Drexel University
Former Epidemiologist, Epidemic Intelligence Service, Centers for Disease Control and
Prevention

I, Stefano M. Bertozzi, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 8, 2021 in Berkeley, California.

STEFANO M. BERTOZZI, MD, PhD
Dean Emeritus and Professor, Health Policy & Management
UC Berkeley School of Public Health

I, Jacqueline Bhabha, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Cambridge, Massachusetts.

JACQUELINE BHABHA
Professor of the Practice of Health and Human Rights, Harvard T.H. Chan School of Public
Health
Director of Research, François-Xavier Bagnoud Center for Health and Human Rights
Harvard University

I, Ietza Bojorquez, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 8, 2021 in Tijuana, Mexico.

_____
IETZA BOJORQUEZ, MD, PhD
Department of Population Studies, El Colegio de la Frontera Norte
Tijuana, BC, Mexico

I, Joanne Csete, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
JOANNE CSETE, PhD, MPH
Associate Professor
Columbia University Mailman School of Public Health

I, Charles Nicholas Cuneo, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Baltimore, Maryland.

_____
CHARLES NICHOLAS CUNEO, MD, MPH
Assistant Professor of Medicine and Pediatrics
Johns Hopkins University School of Medicine (Division of Hospital Medicine, Pediatric Hospital Medicine Division)
Johns Hopkins Bloomberg School of Public Health (Center for Public Health and Human Rights – Migrant Health & Human Rights Program, Center for Humanitarian Health)

I, Ayman El-Mohandes, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
AYMAN EL-MOHANDES, MBBCh, MD, MPH
Dean
CUNY Graduate School of Public Health & Health Policy

I, Eric Friedman, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 8, 2021 in Washington, DC.

_____
ERIC A. FRIEDMAN
Global Health Justice Scholar
O'Neill Institute for National and Global Health Law
Georgetown University Law Center

I, Gregg Gonsalves, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New Haven, Connecticut.

_____
GREGG GONSALVES, PhD
Associate Professor of Epidemiology
Yale School of Public Health

I, Lawrence Gostin, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Washington, DC.

_____
LAWURENCE GOSTIN
Linda D. & Timothy J. O'Neill Professor of Global Health Law
Faculty Director, O'Neill Institute for National & Global Health Law
Professor of Medicine, Georgetown University
Member of the National Academy of Medicine

I, M. Claire Greene, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in New York, New York.

_____
M. CLAIRE GREENE
Postdoctoral Research Scientist
Columbia University Mailman School of Public Health

I, Michele Heisler, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Ann Arbor, Michigan.

_____
MICHELE HEISLER, MD, MPA
Professor of Internal Medicine and Public Health
Co-Director, Michigan Center for Diabetes Translational Research (MCDTR—NIDDK P30DK092926)
University of Michigan, Ann Arbor, MI

I, Monik C. Jiménez, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Brimfield, Massachusetts.

_____
MONIK C. JIMÉNEZ, ScD, SM, FAHA
Assistant Professor
Brigham and Women's Hospital/Harvard Medical School

I, Stephen Patrick Kachur, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
STEPHEN PATRICK KACHUR, MD, MPH
Professor of Population and Family Health
Columbia University Mailman School of Public Health
Former Branch Chief, Malaria Branch, Centers for Disease Control and Prevention

I, Ameeta Kalokhe, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Atlanta, Georgia.

_____
AMEETA KALOKHE, MD MSc
Associate Professor
Emory University School of Medicine, Division of Infectious Diseases
Emory Rollins School of Public Health, Department of Global Health

I, Michel Khoury, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Atlanta, Georgia.

_____
MICHEL KHOURY, MD
Assistant Professor, Department of Neurology, Emory University
Co-Director, Georgia Human Rights Clinic


I, William D. Lopez, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Ann Arbor, Michigan.

_____
WILLIAM D. LOPEZ, PhD, MPH
Clinical Assistant Professor
University of Michigan School of Public Health


I, Terry McGovern, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____
TERRY MCGOVERN, JD
Professor and Chair
Heilbrunn Department of Population and Family Health, Mailman School of Public Health, Columbia University

I, Rachel T. Moresky, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.



RACHEL T. MORESKY, MD, MPH
Director, Columbia University sidHARTe - Strengthening Emergency Systems Program & Global Emergency Medicine Fellowship
Associate Professor, Population and Family Health & Emergency Medicine Departments, Columbia University Irving Medical Center

I, Katherine R. Peeler, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Boston, Massachusetts.

KATHERINE R. PEELER, MD, MA
Medical Expert, Physicians for Human Rights
Instructor of Pediatrics, Global Health and Social Medicine, and Bioethics, Harvard Medical School
Medical Director, Harvard Students Human Rights Collaborative Asylum Clinic

I, Benjamin Pinsky, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in San Francisco, California.

BENJAMIN PINSKY, MD, PhD
Associate Director of Clinical Pathology for COVID-19 Testing
Director, Clinical Virology Laboratory
Stanford Health Care and Stanford Children's Health

App. 409

I, Leslie ("Les") Roberts, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Bocaranga, Central African Republic.

_____

LESLIE ROBERTS, MPH, PhD
Professor of Population and Family Health
Columbia University Mailman School of Public Health
Former Epidemic Intelligence Service Officer and Senior Assistant Scientist, Centers for Disease Control and Prevention

I, Goleen Samari, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____

GOLEEN SAMARI, PhD, MPH, MA
Assistant Professor
Program on Forced Migration and Health
Columbia Mailman School of Public Health

I, John Santelli, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

_____

JOHN SANTELLI, MD, MPH
Professor, Population and Family Health and Pediatrics
Mailman School of Public Health
Vagelos College of Physicians and Surgeons
Columbia University

I, Anandi Sheth, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Atlanta, Georgia.

_____
ANANDI SHETH, MD, MSc
Associate Professor
Emory University School of Medicine

I, Sharmila Shetty, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Massapequa Park, New York.

_____
SHARMILA SHETTY, MD
Vaccines Medical Advisor,
Médecins Sans Frontières – Access Campaign
Former Epidemiology Lead, Global Rapid Response Team, Centers for Disease Control and Prevention

I, Paul B. Spiegel, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Baltimore, Maryland.

_____
PAUL B. SPIEGEL, MD, MPH
Professor of Practice and Director
Johns Hopkins Bloomberg School of Public Health, Center for Humanitarian Health
Former Medical Epidemiologist, International Emergency and Refugee Health Branch, Centers for Disease Control and Prevention

I, Ronald Waldman, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Washington, DC.

RONALD WALDMAN, MD, MPH
Professor Emeritus of Public Health
Milken Institute School of Public Health
The George Washington University
Former Director, Technical Support Division, International Health Program Office, Centers for Disease Control and Prevention

I, Bradley A. Woodruff, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2021 in Victoria, British Columbia, Canada.

BRADLEY A. WOODRUFF, MD, MPH
Consultant, UNICEF, WHO, WFP
Former Senior Medical Epidemiologist and Acting Chief of International Emergency and Refugee Health Branch, Centers for Disease Control and Prevention

I, Monette Zard, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in New York, New York.

MONETTE ZARD, MA
Allan Rosenfield Associate Professor of Forced Migration and Health
Director of the Forced Migration and Health Program
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

I, Amy Zeidan, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2021 in Atlanta, Georgia.

_____
AMY ZEIDAN, MD
Assistant Professor of Emergency Medicine
Co-Director, Georgia Human Rights Clinic
Emory University School of Medicine

I, Jon Zelner, declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2021 in Ann Arbor, Michigan.

_____
JON ZELNER, PhD
Assistant Professor
Dept. of Epidemiology
Center for Social Epidemiology and Population Health (CSEPH)
University of Michigan School of Public Health

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.,* | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | No. 21-cv-00100-EGS |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity, *et al.,* | ) ) ) | |
| *Defendants*. | ) ) ) | |

**SECOND DECLARATION OF MING CHEUNG**

I, Ming Cheung, hereby declare:

1.      I am an attorney at the American Civil Liberties Union Foundation Immigrants' Rights Project, and am counsel for Plaintiffs in this case.

2.      Attached as Exhibit A is a copy of an excerpt of the 1835 Statutes at Large of South Carolina (No. 2653, An Act More Effectually to Prevent Free Negros and Other Persons of Color From Entering Into This State; And For Other Purposes), available at Thomas Cooper, Editor; McCord, David, Editor, Statutes at Large of South Carolina (1836-1873), at 470-74, as downloaded from the HeinOnline database.

3.      Attached as Exhibit B is a copy of an excerpt of the 1842 Code of Mississippi (Art. 17, An Act to Amend the Several Acts of this State in Relation to Free Negroes and Mulattoes (Feb. 26, 1842)), available at A. Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848 (1798-1848), at 537-40, as downloaded from the HeinOnline database.

I, Ming Cheung, declare under penalty of perjury of the laws of the State of New Jersey and the

United States of America that the foregoing is true and correct to the best of my knowledge and

belief.

      Executed on August 10, 2021, in Jersey City, New Jersey.


_____
      MING CHEUNG, ESQ.

# Exhibit A

470                          STATUTES AT LARGE

*Acts relating to Slaves.*

abetting, where any game of chance is played, as aforesaid, such person, upon conviction thereof, by indictment, shall be whipped, not exceeding thirty-nine lashes, snd fined and imprisoned at the discretion of the court trying such person.

VII. This Act shall take effect from the first day of April next.

In the Senate House, the seventeenth day of December, in the year of our Lord one thousand eight hundred and thirty-four, and in the fifty-ninth year of the Independence of the United States of America.

H. DEAS, *President of the Senate.*
PATRICK NOBLE, *Speaker of the House of Representatives.*

————

No. 2653.   AN ACT more effectually to prevent Free Negroes and other Persons of Color from entering into this State; and for other purposes.

I. *Be it enacted* by the Senate and House of Representatives, now met and sitting in General Assembly, and by the authority of the same, That

*Prohibiting their entrance into this State.*

from and after the passing of this Act, it shall not be lawful for any free negro or person of color to migrate into this State, or be brought or introduced into its limits, under any pretext whatever, by land or by water. And in case any free negro or person of color, (not being a seaman on board any vessel arriving in this State,) shall migrate into, or be introduced into, this State, contrary to this Act, it shall and may be lawful for any white person to seize and convey him or her before any magistrate of the

*Duty of officers upon information.*

district or parish where he or she may be taken; and it shall be the duty of the sheriff or any constable in the parish or district in which said entry shall be made, and of the city marshalls in the city of Charleston, should the entry be made in Charleston, upon information of the migration or introduction of any such free negro or person of color, to arrest and bring before some magistrate of the district or parish where the said free negro or person of color shall be taken; which magistrate is by this Act empowered to commit to prison, or, at his discretion, to hold to bail, such free negro or person of color, and to summon three freeholders and form a court, as the law directs for the trial of persons of color, and examine such free negro or person of color, within six days after his or her arrest, and, on conviction, to order him or her to leave the State, and to commit such free negro or person of color so convicted, to close prison, until such time as he or she can leave the State; or to release him or her on sufficient bail, for any time not exceed-

*Penalty for not leaving the State.*

ing fifteen days, at the discretion of the magistrate. And every free negro or person of color so bailed, and ordered to leave the State, as aforesaid, who shall not have left the State within the time for which he or she shall have been released on bail, or who, having left the State after conviction as aforesaid, shall return into the same, shall be arrested and committed to close prison as aforesaid; and upon proof before a court, to be constituted as this Act directs, of his or her having failed to leave the State as aforesaid, or of his or her having returned into the State after having left the same as aforesaid, he or she shall be subjected to such corporal punishment as

App. 417

**OF SOUTH CAROLINA.**          471

*Acts relating to Slaves.*          A. D. 1835.

the said court in their discretion shall think fit to order.   And if, after said sentence or punishment, such free negro or person of color shall still remain in the State longer than the time allowed, or having left the State, shall thereafter return to the same, upon proof and conviction thereof, before a court to be constituted as hereinbefore directed, he or she shall be sold at public sale as a slave; and the proceeds of such sale shall be appropriated and applied, one half thereof to the use of the State, and the other half to the use of the informer.

II. *And be it further enacted* by the authority aforesaid, That it shall **Sheriff's duty.** not be lawful for any free negro or person of color to come into this State on board any vessel, as a cook, steward or mariner, or in any other employment on board such vessel; and in case any vessel shall arrive in any port or harbour of this State, from any other State or foreign port, having on board any free negro or person of color, employed on board such vessel, as a cook, steward or mariner, or in any other employment, it shall be the duty of the sheriff of the district in which such port or harbour is situated, immediately on the arrival of such vessel, to apprehend such free negro or person of color, so arriving contrary to this Act, and to confine him or her closely in jail, until such vessel shall be hauled off from the wharf, and ready to proceed to sea.   And that when said vessel is ready to sail, the captain of the said vessel shall be bound to carry away the said free negro or person of color, and to pay the expenses of his or her detention.   And in every such case, it shall be the duty of the sheriff aforesaid, immediately on the apprehension of any free negro or person of color, to cause said captain to enter into a recognizance, with good and sufficient security, in the sum of one thousand dollars for each free negro or slave so brought or introduced into this State, that he will comply with the requisitions of this Act; and that on his neglect, refusal or inability to do the same, he shall be compelled by the sheriff aforesaid, to haul said vessel into the stream, one hundred yards distance from the shore, and remain until said vessel shall proceed to sea.   And if said vessel shall not be hauled off from the shore **Penalty on** as aforesaid, on the order of the sheriff aforesaid, within twenty-four hours **masters of ves-** after the said order, the captain or commanding officer of said vessel shall **sels.** be indicted therefor, and, on conviction, forfeit and pay one thousand dollars, and suffer imprisonment not exceeding six months.

III. *And be it further enacted* by the authority aforesaid, That whenever any free negro or person of color shall be apprehended and committed to **Sheriff's duty.** jail, as having arrived in any vessel in the capacity of cook, steward, mariner, or otherwise, contrary to this Act, it shall be the duty of the sheriff, during the confinement in jail of such free negro or person of color, to call upon some justice of the peace or quorum, to warn such free negro or person of color, never to enter the said State, after he or she shall have departed therefrom; and such justice of the peace or quorum, shall, at the time of warning such free negro or person of color, insert his or her name in a book to be provided for that purpose by the sheriff, and shall therein specify his or her age, occupation, height, and distinguishing marks; which book shall be good and sufficient evidence of such warning.   And said book shall be a public record, and be subject and open to the examination of all persons who may make application to the clerk of the court of general sessions, in whose office it shall be deposited.   And such justice shall receive the sum **Justice's fees.** of two dollars, payable by the captain of the vessel in which said free negro or person of color shall be introduced into this State, for the services rendered in making said entry.   And every free negro or person of

472   STATUTES AT LARGE

A. D. 1835.

*Acts relating to Slaves.*

color, who shall not depart the State, in case of the captain refusing or neglecting to carry him or her away, or having departed, shall ever again enter into the limits of this State, by land or by water, after having been warned as aforesaid, shall be dealt with as the first section of this Act directs in regard to persons of color who shall migrate or be brought into this State.

IV. *And be it further enacted* by the authority aforesaid, That it shall not be lawful for any master or captain of any vessel, or for any other **Penalty for introducing free negroes and persons of color into this State.** person, to introduce or bring into the limits of this State any free negro or person of color, as a passenger, or as a cook, mariner, steward, or in any other capacity, on board of such vessel, whose entrance into this State is prohibited by this Act.   And if any master or captain of any such vessel, as aforesaid, shall bring in or introduce into this State any such free negro or person of color, whose entrance is prohibited as aforesaid, or if any other person shall introduce by land, as a servant, any free negro or person of color, every such person shall, for the first offence, be indicted therefor, and on conviction, be fined in a sum not exceeding one hundred dollars; and for the second offence, be liable to forfeit and pay, for each free negro or person of color so brought into this State, the sum of one thousand dollars; and shall, moreover, be liable to be imprisoned for any term of time not exceeding six months.   And such free negro or person of color, so introduced, whose entrance into this State is prohibited as aforesaid, shall be dealt with as is prescribed in the first section of this Act.

V. *And be it further enacted* by the authority aforesaid, That it shall not be lawful for any free negro or person of color, who has left the State **Penalty for returning, after leaving the State.** at any time previous to the passing of this Act, or for those who may hereafter leave the State, ever to return again into the same, without being subject to the penalties of the first section of this Act, as fully as if they had never resided therein.

VI. *And be it further enacted* by the authority aforesaid, That it shall not be lawful for any citizen of this State, or other person, to bring into this **Not lawful to bring slaves from foreign parts.** State, under any pretext whatever, any slave or slaves from any port or place in the West Indies, or Mexico, or any part of South America, or from Europe, or from any sister State situated to the North of the Potomac river, or the city of Washington.   Neither shall it be lawful for any person to bring in-**Slaves taken out of the State cannot be brought back again.** to this State, as a servant, any slave who has been carried out of the same, if, at any time during the absence of such slave from this State, he or she hath been in ports or places situated in Europe, in the West Indies, or Mexico, or any part of South America, or in any State north of the Potomac, or city of Washington; and any person who shall bring into this State any slave, contrary to the meaning of this Act, shall forfeit and pay the sum of one thousand dollars for each such slave, to be recovered in an action of debt, in any court having jurisdiction; and each and every such slave shall be forfeited as is hereinafter provided by this Act : *Provided*, that nothing herein contained shall prevent any owner from bringing into the State any runaway slave who may have been re-taken.

VII. *And be it further enacted* by the authority aforesaid, That it shall and may be lawful for any white person, on the arrival of any slave into this State from any other State or foreign port, to arrest and carry him or her before some magistrate of the district or parish where he or she may be taken; and it shall be the duty of the sheriff or any constable of the district or parish into which such slave shall be brought, as aforesaid, on information given, to arrest any slave arriving, brought or introduced into

App. 419

*Acts relating to Slaves.*                           A. D. 1835.

this State from any other State or foreign port, and carry him or her before **The power to**
some magistrate, as aforesaid, who shall forthwith commit such slave or **arrest.**
slaves to prison, and there keep him or her until the owner or person intro-
ducing such slave or slaves into this State shall make oath, that at no time
during the absence of such slave or slaves from this State, he, she or they
have been in any port or place prohibited by this Act. And should such
owner or person introducing such slave or slaves, neglect or refuse to make
such oath, for the space of ten days after he or she shall have received no-
tice of the arrest of such slave or slaves, and of the cause thereof, it shall
be the duty of the magistrate aforesaid, to form a court of two magistrates **Method of**
and five freeholders, and on proof, to the satisfaction of such court, that **forming court.**
such slave or slaves have been beyond the limits of this State, and that such
owner or person who shall have introduced them into this State, as afore-
said, after having been duly served with the notice of such slave or slaves
having been arrested, as aforesaid, and of the cause of such arrest, has ne-
glected or refused to make oath, as aforesaid, it shall then be lawful
for said court to order the said slave or slaves to be sold at public sale, and
the proceeds of such sale shall go and be appropriated, one half to the
State, and the other half to the use of the informer.

VIII. *And be it further enacted* by the authority aforesaid, That all **Cases of ex-**
free negroes and persons of color, and all other persons, shall be exempted **ception.**
from the operation of this Act, where such free negroes or persons of co-
lor, and slaves, have arrived within the limits of this State by shipwreck,
stress of weather, or other unavoidable accident. But such free negroes or
persons of color, and slaves, shall be, nevertheless, liable to arrest and im-
prisonment, as is provided by the second section of this Act for all free
negroes or person of color migrating or introduced into this State contrary
to law; and each free negro or person of color, and slaves, and all other
persons, shall be subject to all the other penalties of this Act, if the requi-
sitions of the same be not complied with within thirty days after such ship-
wreck, stress of weather, or other unavoidable accident.

IX. *And be it further enacted* by the authority aforesaid, That this **Cases of ex-**
Act shall not extend to free negroes or persons of color who shall arrive **ception.**
in any port or harbor of this State, as cooks, stewards, mariners, or as
otherwise employed in any vessel of war of the United States navy, or on
board of any national vessel of the navies of any of the European or other
powers in amity with the United States, unless said free negroes or persons
of color shall be found on shore after being warned by the sheriff or his
deputy to keep on board their vessels. Nor shall this Act extend to free
American Indians, free Moors or Lascars, or other colored subjects of
countries bepond the cape of Good Hope, who may arrive in this State in
any merchant vessel.

X. *And be it further enacted* by the authority aforesaid, That in case
any master or mate of any vessel, on his arrival, shall make any false re- **Penalty for**
turn to the sheriff, or his deputy, of the number of persons he may have on **false returns.**
board, whose entrance may be prohibited by this Act, he shall forfeit and
pay the sum of one thousand dollars, to be recovered by an action of debt,
in any court having jurisdiction. And any master of a vessel, or other
person, opposing the sheriff or his deputy, or any constable or marshal, in
the execution of his duty under this Act, and all persons aiding and abet-
ting him therein, shall be liable to be indicted, and, on conviction, fined
not exceeding one thousand dollars, and be imprisoned not exceeding six
months.

**VOL. VII.—60.**

STATUTES AT LARGE

A. D. 1835.

*Acts relating to Slaves.*

Penalty on
masters of ves-
sels for false
returns.

XI. *And be it further enacted* by the authority aforesaid, That any sheriff, constable or marshal, who shall wilfully neglect or refuse to perform the duties required by this Act, shall forfeit and pay five hundred dollars, one half to the informer, and the other half to the use of the State, to be recovered by action of debt, in any court having jurisdiction.

XII. *And be it further enacted* by the authority aforesaid, That all prosecutions under this Act may be maintained without limitation of time. *Provided, however,* that no prosecution shall be permitted against the masters of vessels, or any other white persons from any part of the United States, in less than three months, or against captains of vessels from foreign ports in less than six months, after the passing of this Act.

Repeal of re-
pugnant Acts.

XIII. *And be it further enacted* by the authority aforesaid, That so much of an Act passed on the twentieth day of December, one thousand eight hundred and twenty, entitled "An Act to restrain the emancipation of slaves, and to prevent free persons of color from entering into this State ; and for other purposes ;" and also so much of another Act, passed on the twenty-first day of December, one thousand eight hundred and twenty-two, entitled "An Act for the better regulation and government of free negroes and persons of color, and for other purposes," as are repugnant to this Act, and so much thereof as makes it the duty of the harbor-master to report to the sheriff the arrival of all free negroes in the harbor of Charleston ; and also an Act passed on the twentieth day of December, one thousand eight hundred and twenty-three, entitled "An Act the more effectually to prohibit free negroes and persons of color from entering into this State, and for other purposes," be, and the same are hereby, repealed.

Not permitted
to carry fi.e-
arms.

XIV. *And be it further enacted* by the authority aforesaid, That no free negro or other free person of color shall carry any fire-arms, or other military or dangerous weapons abroad, except with a written ticket from his or their guardian, under pain of forfeiting the same, and being fined or whipped, at the discretion of any magistrate and three freeholders before whom he or they may be convicted thereof. Nor shall any free person of color be hereafter employed as a pioneer, though he may be subjected to military fatigue duty when called on.

In the Senate House, the nineteenth day of December, in the year of our Lord one thousand eight hundred and thirty-five, and in the sixtieth year of the Sovereignty and Independence of the United States of America.

H. DEAS, *President of the Senate.*
PATRICK NOBLE, *Speaker of the House of Representatives.*

# Exhibit B

Ch. 37. *Master and Servant, Slaves, &c.*          537

ART. 15. *Amendment of Article Two—Feb.* 16, 1839.

§ 1, 2, 3. *Penalties for Harboring Slave.*  Any free white person who shall be convicted of secretly harboring a slave or slaves without the consent of his, her, or their owner, employer or overseer, shall be fined, for each such slave or slaves so harbored, in a sum not more than five hundred dollars, nor less than two hundred dollars, to be recovered before any court having competent jurisdiction ; one moiety of which shall be paid into the county treasury of such county in which said offence shall have been committed, and the other moiety to the owner or employer of such slave or slaves for the time being ; and further, be imprisoned not less than one nor more than six months, at the discretion of the court.

Any Indian, free negro, or mulatto, who shall be guilty of so secretly harboring any slave or ·slaves as aforesaid, upon conviction thereof before any court having competent jurisdiction, shall, for each and every such offence, forfeit and pay to the owner or employer of such slave or slaves for the time being, the sum of fifty dollars, together with all costs ; and, further, be imprisoned not less than three nor more than six months, at the discretion of the court.

Any slave or slaves who shall be convicted of a like offence, before any justice of the peace, he, she, or they shall receive such corporeal chastisement, not exceeding thirty-nine lashes, as shall be directed by the justice of the peace of before whom such slave may be brought.

ART. 16. *An Act defining the Duties of Sheriffs in Relation to Runaway Slaves—Feb.* 16, 1839.

It shall hereafter be the duty of the sheriffs of the different counties of this state, that, when any slave or slaves shall be taken up as runaways and committed to jail, within ten days thereafter to forward to the public printer of this state an advertisement, giving a particular description of such slave or slaves ; and it shall be the duty of the public printer to give to said advertisement two insertions in the said paper ; and it is hereby made the duty of the sheriff, when said slave or slaves be proven or sold, as the case may be, to retain the amount of the said printer's fees, subject to his order.  See a. 22.

ART. 17. *An Act to amend the several Acts of this State in Relation to free Negroes and Mulattoes—Feb.* 26, 1842.

§ 1. *Proceedings against those unlawfully here.*  It shall be the duty of any justice of the peace, and he is hereby authorized, at the request of any freeholder of his county, to cause any free negro or mulatto, unlawfully within this state, to be brought before him, and give good and sufficient security in the sum of one hundred dollars, that he or she will be of good behavior while in this state, and if any such free negro or mulatto shall refuse or fail for the space of two days to give such security, it shall be the duty of such justice to commit such free negro or mulatto to jail, and the sheriff of such county shall advertise and sell the same in the manner provided by law.

2. *Of emancipated Negroes.*  In all cases when any person hath sent or taken any slave from this state, and hath emancipated such slave, or caused such slave to be emancipated without this state, or shall hereafter do so, and such slave shall, after such emancipation, be found within this state, such person shall forfeit, and are hereby declared to have forfeited, all right or title to protect such emancipated slave from incurring all the penalties of this Act, or

from being proceeded against as a free negro or mulatto unlawfully within this state : *Provided,* Such emancipation takes place after the passage of this Act.

3. *Free Negroes may not emigrate to this State.*   From and after the passage of this Act, it shall not be lawful for any free negro or mulatto to emigrate into this state or be brought or introduced into its limits under any pretence whatsoever, by land or by water ; and in case any free negro or mulatto shall emigrate into, or be introduced into this state contrary to this Act, it shall and may be lawful for any white citizen of this state to seize and convey him or her before some justice of the peace in the county in which such free negro or mulatto may be found ; and it shall be the duty of the sheriff or any constable of such county, upon information of the emigration or introduction of any such free negro or mulatto, to arrest him or her, and bring him or her before some justice of the peace of their county, which justice of the peace is hereby authorized and empowered, on the conviction of such free negro or mulatto of having so emigrated into this state, to order such free negro or mulatto to receive any number of lashes not exceeding thirty-nine, and to leave this state within twenty days ; and it shall be the duty of the sheriff of such county or any constable to whom an order may be delivered by such justice, to inflict such corporeal punishment on such free negro or mulatto ; and if such free negro or mulatto shall not remove from this state within the time aforesaid, or having so removed, shall again return to this state, such free negro or mulatto shall be taken and commited to jail, and sold in the same manner as is directed by law.

4. *Penalty against Captains, &c., of Water Craft for introducing them.* It shall not be lawful for any captain, master, or owner of any vessel, steamboat, flatboat, or other water craft, or for any other person, to introduce or bring into the limits of this state, any free negro or mulatto, as a passenger, or as a cook, mariner, steward, or in any other capacity ; and if any captain, master, or owner of such vessel, steamboat, flat or other water craft, or any other person, shall bring or introduce into this state any free negro or mulatto, every such person shall, for the first offence, be indicted therefor, and on conviction, be fined in a sum not exceeding five hundred dollars, and for the second offence, shall be fined in the sum of one thousand dollars, and be imprisoned for any term of time not exceeding six months.

5. *Duty of Sheriffs, &c., in such case.*   It shall be the duty of any sheriff or constable within this state, who may be informed, or believes that any negro or mulatto, landing or coming into his county, is a free negro or mulatto, unlawfully within this state, to seize such negro or mulatto and carry the same before some justice of the peace of his county, to be dealt with according to the provisions of this Act, or the several laws now in force against free negroes and mulattoes ; unless the owner or master of such negro or mulatto, or the person having the custody, care, or control of such negro or mulatto shall make oath before some justice of the peace, or before such sheriff or constable, which oath such sheriff or constable is hereby authorized, and upon the request of such master, owner, or other person, required to administer, that such negro or mulatto is a slave ; and if any person making such oath shall swear falsely, he shall be deemed and held guilty of perjury, and, upon conviction thereof, shall be imprisoned in the penitentiary of this state for a term of not less than five nor more than ten years.

6. *Allowance to Sheriff, &c., under this Act—Penalty for his Neglect.* Sheriffs, jailors, and constables, and other officers, shall receive for the services required of them by this Act, to be paid out of the county treasury, upon the order of the board of police of their county, such fees as the said police may

order or allow; and any sheriff, jailor, or constable, or other officer, who shall fail or refuse to discharge any of the duties required of him by this Act, shall, for every such failure and refusal, forfeit and pay to the state the sum of one hundred dollars, to be recovered by action of debt in the name of the state, or by motion for the use of the state, in any court having cognizance thereof. See a. 19.

7. *Not over Six to be quartered beyond a Mile from Owner's Residence.* From and after the first day of May next, it shall not be lawful for any person, being the owner or employer of any such slaves, to keep or suffer any such slaves, exceeding six in number, to be quartered or to reside at any distance greater than one mile from the residence of such person, unless such person shall keep and employ with such slaves, as an overseer, a white male person capable of performing patrol duty.

8. *How quartered in a Town.*  It shall not be lawful for any person, being the owner or employer, or having the care or control of any slave or slaves, after the first day of May next, to permit or suffer any such slave or slaves to reside or be quartered in any lot or in any house in any incorporated town or city in this state, unless such lot is immediately connected with the lot upon which is the usual dwelling house and residence of such person, or unless the house upon which such slaves reside, or are quartered, is upon such lot.

9. *Penalty for Violation of 7th and 8th Sections.*  Any person who shall offend against either of the two last preceding sections of this Act, shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined in a sum not less than five hundred dollars, nor exceeding one thousand dollars.

10. *Act given in charge to Grand Jury.*  The judges of the Circuit Courts shall give the three last preceding sections of this Act in charge to the grand jury at each term of the Circuit Courts by them holden.

11. *Not Lawful to Emancipate by last Will—In Cases heretofore with Provisos.*  Hereafter it shall not be lawful for any person, by last will or testament, to make any devise or bequest of any slave or slaves for the purpose of emancipation, or to direct that any slave or slaves shall be removed from this state for the purpose of emancipation elsewhere; and in all cases of will heretofore made and admitted to Probate within this state, whereby any slaves have been directed to be removed from this state for the purposes of emancipation elsewhere, or whereby any slave or slaves have been devised or bequeathed in secret trust for such purpose, unless such slaves shall be removed from this state within one year after the passage of this Act, it shall not be lawful for the executor or executors of such last will or testament, or the person or persons having possession of such slave or slaves, under the provisions of such will, so to remove such slave or slaves; but the same shall descend to, and be distributed amongst, the heirs at law of the testator, or be otherwise disposed of according to law, in the same manner as if such testator had died intestate: *Provided, however,* That if such executor or other person having such possession, shall be prevented or restrained within the said time of one year from such removal by injunction or other legal process, or otherwise, the time during which such restraint shall continue or exist, shall not be taken or computed as any part of the said time of one year: *And provided, further,* That it shall be competent for any person or persons, being the owner of any slave or slaves, by last will and testament, to direct his, her, or their executor or executors, to emancipate any such slave or slaves, for meritorious services rendered to his, her, or their owner or owners, upon such conditions as shall be prescribed by the legislature of the state, to which such last

540        Ch. 37. *Master and Servant, Slaves, &c.*

will and testament shall be referred for approval before any such devise, be-
quest, or direction shall be carried into effect.

<div align="center">Art. 18. <em>Act of July</em> 25, 1843 .. 109.</div>

The first and second sections gave to the Board of Police of Warren
and Adams, the power to license certain free persons of color to reside in
Vicksburgh and Natchez on proof of good character, and that a majority
of the citizens desired it—reserving to the Board the power of expulsion—
then followed,

§ 3. *Like Power to Boards generally.*  The Board of Police of any of the
counties in this state shall have the same powers and privileges in relation to
free persons of color residing within their respective counties, as are con-
ferred by this Act on the police courts of the counties of Warren and Adams:
*Provided,* That said Boards of Police shall not have the power to grant
license to any free negroes or mulattoes that are not residents of the state at
this time.

Art. 19. *An Act to Amend the Sixth Section of an Act entitled an Act to
Amend the several Acts of the State Relating to Free Negroes and Mulat-
toes—Feb.* 23, 1844.

*Allowances to Sheriff, Jailor, or Constable.*  The sixth section of an Act
entitled an Act to amend the several Acts of this state in relation to free
negroes and mulattoes, approved February the 28th, 1842, be so enlarged and
construed as to authorize the Boards of Police of the several counties in this
state to make the same allowance to sheriffs, jailors, and constables, of fees for
services rendered under the several Acts to which said Act is an amendment,
as they are authorized to allow for services rendered by such officers under
said amended Act by said sixth section.

Art. 20. *An Act to Secure to the Owners of Slaves executed by Sentence of
Law, Compensation for the same—Feb.* 18, 1846.

§ 1. *Half Value of Condemned Slave paid to Owner by State.*  One half of
the value of any slave or slaves hereafter condemned to die, by the sentence of
any court of competent jurisdiction within this state, and who shall suffer
death accordingly, shall be paid to the owner out of the State Treasury.

Repealed, as to non-resident owners, by a. 24.

2. *Value of such Slave, how found.*  Before any judge of this state shall pass
sentence of death upon any slave found guilty of capital crime, by the verdict
of a jury, such judge shall cause the sheriff of the county in which such slave
was found guilty, to summons five slave-holders to appear in court at the time
specified in said summons, which said slave-holders, or any three of them, shall
then and there find the value of such slave, so condemned and to be sentenced,
and shall certify the same under their hands and seals to said court.

3. *Copy of Valuation, &c., to be presented to Auditor.*  A copy of the certifi-
cate of the value so fixed by said slave-holders, as aforesaid, certified by the
clerk of the court to which it was returned, together with an endorsement
thereon of the sheriff of the county, that the slave mentioned therein has been
duly executed according to the judgment and sentence of the court, on pre-
sentation to the Auditor of Public Accounts, shall authorize him to issue his
warrant on the Treasurer in favor of the person or persons entitled to the same,
for one half the value so found of said slave, to be paid out of any money in
the Treasury, not otherwise appropriated.

<div align="center">App. 426</div>

## DECLARATION OF LINDA RIVAS

I, Linda Rivas, pursuant to 28 U.S.C. § 1746, declare as follows:

**Summary**

1. Through my work as an immigration attorney and Executive Director of a non-profit I have seen the grave harm caused to families and individuals expelled under Title 42. Families experience extortion, kidnapping, rape, and other violence after being expelled. Despite those harms, the government has failed to utilize the El Paso shelter system, complete with COVID-19 protocols, and instead continues to expel families directly into harms way. Asylum seekers should be processed into the United States, and we have the capacity to receive them, consistent with public health protocols.

**Qualifications**

2. I am the Executive Director of the Las Americas Immigrant Advocacy Center ("Las Americas") in El Paso, Texas.

3. Las Americas is a 501(c)(3) nonprofit organization based in El Paso, Texas providing free and low-cost legal services to immigrants and refugees in West Texas and New Mexico. We have served over 40,000 people from over 77 countries since 1987. We provide legal representation through attorneys and Department of Justice accredited representatives.

4. This year alone, Las Americas has assisted over 1,000 people, including families, seeking asylum that have been impacted by Title 42 processing.

5. I make this declaration based on my personal experience at Las Americas working with noncitizen children and families subject to the Title 42 process since the process began in March 2020.

6. I have been the Executive Director of Las Americas since 2016. I began working at Las Americas as a managing attorney in 2014. I continue, as Executive Director, to directly represent many of our clients. Prior to joining Las Americas, I was the West Texas Violence Against Women's Act supervisor at the Texas Civil Rights Project for almost two years. I graduated law school 2011 from Loyola College of Law and have been a member of the Texas bar since 2013.

**Harm from Title 42**

7. When the Title 42 process first began in March 2020, we started receiving desperate phone calls from families and individual impacted by the expulsions. At the time, given the complete denial of access to the asylum system, we did not have any viable option to assist those families or individuals given the absolute denial of access to asylum under the Title 42 process. Despite no meaningful avenue to advocate for those impacted, we

continued to put together robust humanitarian parole packets for people forced to remain in Mexico in an attempt to get particularly vulnerable families and individuals processed into the United States. Only one was granted after the New York Times reported on the case. The rest were denied.

8.  Beginning in February 2021, the Las Americas staff and I started going into Ciudad Juarez to interview people expelled under the Title 42 process. What I heard and saw was shocking. I have witnessed many expulsions occur on the international bridges. I have seen families with very small children, people in wheelchairs, and people on crutches being expelled across the bridges back into Mexico. For many, their vulnerabilities are visible even at a distance.

9.  Also, around February 2021, shelters in Ciudad Juarez, Mexico began asking us to come to provide guidance to desperate families and individual stuck in Mexico. We were asked to visit and explain to those asylum seekers why they were not allowed to access the asylum system in the U.S., despite the change in administration.

10. Through these interviews and presentations, I was horrified to hear stories of people expelled without being told by CBP that they were being expelled. Families flown laterally by DHS from one part of the border region to another before being expelled were falsely told by Border Patrol agents that they were being taken to see a judge. Others were told by Border Patrol that they were heading to shelters in the U.S. where they would be able to talk to a lawyer. But these families were misled, and ultimately expelled under Title 42, not knowing they were being forced to Mexico.

11. One case I recall vividly was that of a former police officer from El Salvador, who traveled with his wife and three children. Several of my clients that were former police officers from El Salvador have been granted asylum. I believed this man presented a strong case for asylum. When he crossed the border, he had expressed fear of return to El Salvador and pleaded with the Border Patrol agents that apprehended him to listen to his story. One agent initially said he would listen, but other agents told him to shut up. He was not allowed to express his fear and was expelled to Ciudad Juarez with his family.

12. On Monday, March 29, 2021, at 4:00 PM, I joined a meeting that included CBP Commissioner Miller, where the group in attendance was informed by local CBP leadership that, as part of the Title 42 process, officers were supposed to screen for claims under the Convention against Torture ("CAT"). Under the Title 42 process, CAT screenings, which carry a higher standard than regular asylum assessments, are supposed to occur but rarely do in practice.

13. After that, I made sure to ask expelled families and individuals in Ciudad Juarez if they had any chance to raise their fear claims. Dozens of families and individuals consistently reported to me that they were not allowed to speak while in Border Patrol custody and that there was no opportunity to raise their fear claims.

14. In February 2021, I also conducted interviews and presented to groups of Haitians expelled back to Mexico under the Title 42 process. CBP dumped whole families on the street in Mexico, with children expelled without their shoes. All of the families I spoke with claimed political persecution based on the situation in Haiti. They were all shocked that there was no ability to access asylum in the United States.

15. Asylum seekers subjected to the lateral flights prior to expulsion also reported having to urinate on themselves during the long process. They reported asking to use the restroom, for basic food and milk for children, and those requests being denied by Border Patrol agents and other officials. One man reported only receiving one small carton of milk during the long processes and flight, despite his pleas for more food for his small child. Families reported the process taking some 16 hours.

16. In one case received by our organization, a mother and her 5-year-old daughter were expelled to Mexico from the United States after fleeing sexual assault and domestic violence in Guatemala. After being expelled to Ciudad Juarez this mother was raped. The family also faced ongoing extortion and death threats from smugglers in Mexico following their expulsion.

**Processing at El Paso, Texas**

17. In April 2021, Las Americas started referring clients for exemption to Title 42, first under the *Huisha* referrals process, and later as a primary referrer to the NGO consortium exemption process. We have provided over 900 referrals to the NGO consortium process. For those families and individuals, we conduct an initial consultation with fill out the required questions for submission to Customs and Border Protection.

18. The El Paso community has always stepped up and put together extensive capacity to provide shelter in the El Paso and southern New Mexico area. Shelter capacity in the region has never been fully taken advantage of by the government.

19. The El Paso shelter system is currently receiving only around 50 people a day through the NGO consortium exemption process and around another 10 per week processed out from the Migrant Protection Protocols. Meanwhile, the local shelter system has hundreds of beds available each day. There are ample, under-utilized local resources and willingness from the local community to receive released asylum seekers in line with public health measures.

20. Despite our readiness and willingness, which we clearly communicate to the government, the government had continuously failed to fully utilize those resources.

21. The government is capable of managing its own processing at ports of entry and the there is ample capacity in the El Paso and southern New Mexico region to receive asylum seekers.

22. In my opinion, the Title 42 process should be ended immediately. Asylum seekers should be processed into the United States and we have the capacity to receive them, consistent with public health protocols.

I declare under penalty of perjury under the laws of the United States and Texas that the foregoing is true and correct.

Executed on: August 10, 2021, in El Paso, Texas, United States.

Signature:  _____

Linda Rivas

## DECLARATION OF MARISA LIMÓN GARZA

I, Marisa Limón Garza, pursuant to 28 U.S.C. § 1746, declare as follows:

**Summary**

1. This declaration describes the efforts that my organization and our partners have undertaken to build infrastructure and capacity to receive migrants, including migrant families, into the United States.  We have worked in conjunction with state and local public health authorities to ensure that our systems include COVID-19 testing and quarantine protocols.  Despite our efforts, which we undertook at the encouragement of the federal government, much of our capacity remains unused, while the government expels families back to Mexico.  Our efforts could also be scaled up even further if the federal government would devote serious funding and support to our efforts.

**Qualifications**

2. I am the Deputy Director of the Hope Border Institute, a faith-based independent Catholic social justice organization focused on borderland-based research, policy and advocacy, and humanitarian response measures. I have served as Deputy Director for the past three years.

3. As Deputy Director, I oversee day to day operations of the organization and play a central role in a variety of work on immigration policy and strategy, as well as play a central role in humanitarian response efforts on both the U.S. and Mexico sides of the border in the El Paso / Ciudad Juárez area.  In addition to overseeing our organization's direct work, I collaborate closely with other shelter providers, nonprofits, state and local institutions, and others in the region who work on building capacity to receive migrants who have come to the United States. I make this declaration based on my personal and professional experience at the Hope Border Institute working with noncitizen children and families subject to the Title 42 Process since it began in March 2020.

**In partnership with local authorities, COVID-19 protocols are in place ensure against spread in our local shelter systems and community.**

4. In July 2019, the Hope Border Institute, in partnership along with the Diocese of El Paso established a border refugee assistance philanthropic fund focused on the needs of asylum seekers to establish capacity to welcome asylum seekers into the United States. When Title 42 went into effect in March 2020, we expanded this capacity development work to include migrants allowed into the country under exemptions to Title 42. We also developed infrastructure to ensure that asylum seekers could be welcomed in a way that reduces risk of COVID-19 spread.

1

App. 431

5.  Monies raised through this fund have supported healthcare programs, psycho-social support efforts, shelter infrastructure, a medical burse, COVID testing, vaccinations for childhood illnesses, food and accompaniment.

6.  After engagement with the Biden administration transition team, and due to their focus on the need to partner with U.S. organizations to better manage border processing, we ramped up efforts to increase capacity on the U.S. side of the border. Working with El Paso County, the Frontera Welcome Coalition, and other humanitarian groups, we developed plans in support of and in coordination with the Annunciation House shelter – El Paso's largest shelter provider.

7.  In collaboration with the city and county Office of Emergency Management (our liaison to the public health department) and health care professionals, we developed a plan for safely and efficiently processing and housing released migrants into local shelters and onward to their home destinations.

8.  Local health authorities and partners visited and consulted with Annunciation House shelters and other prospective shelter space to ensure compliance with all COVID-19 regulations and protections. The shelters thus developed clear protocols for testing and quarantining procedures for positive cases.

9.  The City of El Paso and El Paso County made available hotels for COVID-19 quarantine for any migrants or anyone else who did not have the resources to follow quarantine protocols after testing positive. Any person in the community, including migrants released by CBP or ICE, that did not have a place to quarantine could do so safely in one of the provided hotels. Therefore, our system is designed to ensure everyone is medically cleared prior to onward travel or admittance to a shelter.

10. We also invested in personal protective equipment, cleaning supplies and other necessities for keeping our shelter system protected against COVID-19 spread.

11. As Title 42 remained in effect we also expanded our efforts to work with shelters in Ciudad Juárez, Mexico, so that the same protective measures were in place at shelters on the Mexican side of the border for those subjected to expulsions. As part of this pilot project in Ciudad Juárez we worked with one shelter with a capacity to house approximately 40 families and individuals. Our efforts did not expand in Ciudad Juárez given other organizations' commitment to duplicating the same efforts at other shelters in Mexico.

12. These efforts, principally focused on the U.S. side of the border, began in December 2020 and continue to date. By late February 2021 or early March 2021, we were fully prepared to receive migrants in our shelter system with these measures in place, well before vaccines were widely available. Since COVID vaccines are now widely available in the U.S., all shelter operators and volunteers are fully vaccinated. Each shelter is also equipped to provide its own rapid testing and vaccines are offered to arriving migrants.

2

App. 432

**The administration has not fully utilized the capacity available in our COVID-19 safe local shelter systems**

13. I estimate that the combined El Paso-New Mexico region has over 2,000 shelter beds in safe, welcoming, and non-detention settings where families have access to meals, medical care, and support with travel arrangements. That number could be greatly increased by using hotels, should the need arise. Yet, as of July 2021, less than 10 percent of that capacity was currently in use.

14. The combined capacity of Annunciation House's facilities and a satellite network of smaller shelters and parishes in El Paso is approximately 800 to 1,000 beds, with rapid turnaround of guests and the ability to expand and contract as needed. Las Cruces, New Mexico, which is less than an hour drive from El Paso, has nightly capacity for approximately 700 people coordinated through the New Mexico Hospitality Coalition. The shelter network in Albuquerque, New Mexico can host 300 people per day.

15. Migrants currently being processed through the ports of entry must test negative before they cross. Those released to local shelters directly from ICE detention centers are regularly tested prior to release so that their COVID status is known. CBP does occasionally release migrants through Border Patrol directly to Annunciation House with a "COVID unknown" status that have entered without inspection in-between a port of entry, but those migrants are COVID tested at Annunciation House once they arrive. If any migrant coming through these various avenues of release tests positive at any point, they are quarantined and subject to protocols.  After quarantine and a negative COVID-19 test, those migrants are welcomed back into local shelters for assistance with onward travel to their final destination. All local reception efforts were designed in partnership with the Office of Emergency Management, our liaison to the public health department.

16. To date, there have not been any COVID-19 outbreaks in local shelters.

17. In addition to our shelter capacity, Endeavors, a private non-profit contracted by ICE, opened two hotel facilities that provide several hundred additional beds available for local release. Those facilities also include COVID-19 testing and required quarantine when necessary.

18. Unfortunately, the capacity and COVID-19 safe systems we set up have never been fully utilized by the administration. We have had regular meetings with Department of Homeland Security and White House officials where, at every meeting, we stress that we are prepared to and have resources and safe systems in place to welcome families and individuals.

19. Despite our capacity and COVID-19 protocols, the administration is only admitting a total of approximately 50-70 people per day at the ports of entry. We also receive a relatively small number of releases from ICE and Border Patrol, who in most cases people who crossed between ports of entry.

3

App. 433

20. In total, our shelter system is capable of housing over 1,000 persons each night, but is only receiving less than 300 per week – a minuscule flow compared to capacity available to receive them.

**We have ample capacity to transport migrants released to local shelters**

21. Hope Border Institute partners with El Paso County to work with Project Amistad, a local non-profit, to provide transportation shuttles from 7:00am to 4:00pm every day between shelters, the airport, the bus station, and ports of entry. We also have a private shuttle company to coordinate transportation for anyone released after 4:00pm, provided directly through Annunciation House. All migrants over the age of six, drivers, and any volunteers are fully masked. All migrants being transported are COVID negative.

22. Hope Border Institute, along with partners, are able to leverage resources from local transportations networks to provide needed transportation for released migrants. Resources are available to add additional transportation if needed and, with additional support, any required transportation could be readily available through partnership with the local and county authorities.

**"Lateral flights" have impeded COVID protocols in Ciudad Juárez and severely traumatized families.**

23. During 2021, the U.S. government has sometimes transported migrants apprehended in other border regions, mainly the Rio Grande Valley, and flown them to El Paso for expulsion under Title 42 to Ciudad Juárez, Mexico.  My understanding is that as many as 100 hundred noncitizens can be put on a single flight. My understanding also is that none of these noncitizens are tested before being put on a flight, or after they are designated for expulsion. We have worked diligently with our Mexican partners to receive families expelled to Ciudad Juárez. Because these families are "COVID-19 status unknown," they need to be tested and potentially quarantined.

24. Local Mexican authorities, in collaboration with the International Organization for Migration (IOM), established a hotel for quarantining migrants in Ciudad Juárez with either COVID-19 symptoms or who tested positive. Anyone testing positive at either a local shelter or upon expulsion from the United States can quarantine for 14 days and later be placed in a shelter with capacity. This system is designed to try and keep shelters in Ciudad Juárez COVID-19 free.

25. At several points in recent months, the expulsion of additional families via "lateral flights" have overwhelmed systems in place in Ciudad Juárez, leaving many families on the street, without proper shelter or in the hands of smugglers.

26. For example, I am currently seeking quarantine space for 5 people who tested positive, out of 100, after being expelled following a "lateral flight" last week. The IOM hotel in Ciudad Juárez is currently at capacity. Had these families been released in the United

4

App. 434

States, they would have immediately been taken to hotel quarantine and afterwards provided shelter and assistance in onward travel to their final destination. Instead, they find themselves on the streets of Ciudad Juárez.

27. "Lateral flights" also exacerbate trauma, as U.S. authorities frequently lie to families about where they are heading, telling them they are going to shelters in the United States and not being kicked back into Mexico.

28. Families subjected to "lateral flights" also report a lack of food, children with dirty diapers, and mistreatment by CBP agents.

29. Based on our experience, "lateral flights" only exacerbate the situation by facilitating COVID-19 transmission. They subject families to ongoing suffering, lack appropriate COVID-19 protocols, and needlessly expel noncitizens to Mexico when U.S.-based shelter networks stand ready to receive them here.

**The administration has failed to take its own steps to establish COVID-19 safe protocols for releasing migrants in the United States.**

30. The administration, through meetings with local stakeholders, pushed organizations like ours and our partners to increase capacity for shelters on the United States side of the border. And we did exactly that, in partnership with local city and county agencies, and in ways that our consistent with maximizing public health. And yet, as stated above, we have shelter beds standing unused while the U.S. government expels noncitizens to Mexico.

31. I also firmly believe that the systems we have developed are scalable, if the U.S. government were to invest additional serious resources and funding. Yet, the administration has never shared with us their actual capacity or any plans for increasing their ability to process more people to our systems.

I declare under penalty of perjury under the laws of the United States and Texas that the foregoing is true and correct.

Executed on: August 9, 2021, in El Paso, Texas, United States.

Signature: *Marisa Limón Garza*

_____

Marisa Limón Garza

5

App. 435

# Signature Certificate

Document Ref.: WBNQT-67DMG-YRFO8-KROYN

Document signed by:



## Marisa Limón Garza

E-mail:
info@hopeborder.org
Signed via link

IP: 99.47.136.14    Date: 09 Aug 2021 22:35:41 UTC

*Marisa Limón Garza*

Document completed by all parties on:
09 Aug 2021 22:35:41 UTC
Page 1 of 1



Signed with **PandaDoc.com**

PandaDoc is a document workflow and certified eSignature
solution trusted by 25,000+ companies worldwide.



## DECLARATION OF ASTRID DOMINGUEZ

I, Marie Astrid Dominguez, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal experience working with noncitizen children and families subject to the Title 42 Process. This declaration addresses processing capacity at the Brownsville and Hidalgo Ports of Entry.  In my opinion, both ports have the capacity to process more migrants and asylum seekers than they are currently using.  In addition, nongovernmental organizations on the U.S. side of the border in the Brownsville and Hidalgo areas have built up capacity to test migrants for COVID-19 and quarantine them.

2. The migrants I work with have also been subjected to great harm due to their expulsions. For example, I am aware of one case involving a father with a 9-year-old daughter with a spine injury; the father carried his visibly disabled daughter across the border but were nevertheless expelled.  Numerous women have reported they were violated and assaulted after U.S. border agents expelled them back to Mexico.

3. From late 2020, I have been working closely with the Rio Grande Valley (RGV) Welcoming Committee/Comité de Bienvenida and now facilitate their meetings as a consultant.  We are several dozen lawyers and advocates dedicated to welcoming migrants with dignity and assisting government entities with reopening the U.S.–Mexico border to regular asylum and other processing of noncitizens seeking protection, safety, and family reunification.

4. I have been a border advocate since 2012, when I began work with the ACLU of Texas that lasted until May 2021.  I have personally been involved in submitting Title 42 exemption requests for more than one hundred individuals and families.  I interview migrants and assemble the required information to be submitted to the U.S. government.  I have also participated in frequent meetings with a variety of U.S. government officials responsible for both border operations and border policy, including at the Brownsville and Hidalgo ports of entry.

**Processing Capacity at the Brownsville and Hidalgo Ports of Entry**

5. My work focuses primarily on noncitizens coming through two ports of entry, which are respectively located in Brownsville and Hidalgo, Texas, opposite the Mexican cities of Matamoros and Reynosa, Tamaulipas. I am very familiar with operations and capacity in those ports via my work in helping asylum seekers obtain exemptions under Title 42, as well as working with local NGOs and advocates.

6. Until recently, there were two main processes for obtaining Title 42 exemptions. The first process is managed by a consortium of nongovernmental organizations. The second process involved cases submitted directly by lawyers and advocates to the ACLU, which then submitted them to the U.S. government.

7. Noncitizens seeking to come through the Brownsville port of entry as Title 42 exemptions are tested for COVID-19 at the Resource Center Matamoros, a nonprofit

collaborative providing various support services.  This testing typically occurs 72 hours in advance of when the noncitizen is scheduled to cross.  The U.S. government requires the noncitizen to test negative in order cross via the port.  If the test is positive, they are not permitted to cross until a negative result.

8. Migrants crossing through the Hidalgo, TX port of entry as Title 42 exemptions are tested for COVID-19 at Senda de Vida, a nongovernmental overnight shelter.  Again, the testing occurs 72 hours in advance of when the noncitizen is expected to present at the port, and the U.S. government does not permit them to cross unless they show a negative result.

9. In my opinion, neither the Brownsville nor the Hidalgo port is operating at capacity. This conclusion is partly because the ports are designed to process large numbers of people coming to the United States for other reasons, e.g. tourism or leisure, but such noncitizens cannot currently enter the United States because of so-called "essential travel" bans.

10. The federal government could also explore ways to minimize time spent at ports by people who have not provided advance information before coming to the port.  For example, not all immigration-processing functions may need to take place at a port of entry. After verifying the noncitizen's identity and checking that the person presents no criminal, safety, or security concerns, the noncitizen could quickly be sent to a secondary processing center where, for example, they could be issued any necessary paperwork related to their immigration cases.

**Processing Capacity on the U.S. Side**

11. Noncitizens who cross between ports of entry near Brownsville and Hidalgo and encounter Border Patrol agents are processed by CBP and, if they are permitted to remain instead of being expelled or detained, are released to local nongovernmental organizations that provide universal testing for COVID-19 and social services.

12. For example, noncitizens who enter near the Hidalgo area are typically sent to McAllen, Texas, where Catholic Charities of the Rio Grande Valley runs the Humanitarian Respite Center (HRC).  The HRC receives them and conducts universal COVID-19 testing with DHS support. In Brownsville, CBP transports noncitizens to a receiving area at the Brownsville bus station, where the City of Brownsville provides support and DHS has been involved in ensuring testing for COVID-19.

13. Nonprofits, in conjunction with local governments, have developed infrastructure to receive, test, and quarantine migrants. For example, the City of McAllen has raised an emergency shelter that can house approximately 650 noncitizens who have tested positive for COVID-19. Other organizations, including Catholic religious organizations, have contracted with 10 hotels "in a 40-mile radius from the South Texas towns of Weslaco to La Joya and Edinburg and Mission" for quarantine rooms that can accommodate at least 1,000 people. In Brownsville, the City offers noncitizens who test positive an accommodation for a person's quarantine period with financial support available.  There is also quarantine capacity at a local overnight shelter called the Ozanam Center.

14. I am aware that Catholic Charities of the Rio Grande Valley has reported near-universal compliance with quarantine requirements by migrants who test positive at the HRC.  Positive tests at the Brownsville bus station have also been followed by quarantine.  My understanding is that noncitizens released in both Brownsville and Hidalgo are offered COVID-19 vaccines.

**Noncitizens Subjected to Title 42 Face Grave Danger**

15. My work with the Title 42 exemption process has exposed me to the trauma of hundreds of migrants denied an opportunity to present asylum claims to protection in the United States.  The migrants I work with report that they have been expelled to unsafe conditions in Mexico that include homelessness, violence from organized crime, and medical jeopardy.  Many have detailed stories and documentary evidence of harm in their home countries.  Others are so traumatized that eliciting their hardship is challenging and psychologically delicate.

16. I am aware of many cases where women in advanced pregnancy have been expelled, as well as noncitizens with significant mental and physical disabilities, such as children with special needs and noncitizens with visual disabilities.  Our Welcoming Committee was involved in the case of D., a 9-year-old girl with a spine injury whose father carried her to the U.S –Mexico border from Honduras.  Yet they were expelled by Border Patrol despite pleading for consideration of D.'s medical condition.

17. Expulsions are taking place to Reynosa and other Mexican cities that are known, and reported by the State Department, to be centers of violent crime against migrants.  In particular, sexual violence against female migrants is widespread, even when they are kidnapped with their children.  U.S. government expulsions are sending women and children into the hands of rapists.  I have talked with many women who were violated repeatedly and brutally by kidnappers after U.S. government officers refused to assess their protection claims.  Sometimes these kidnappings happen within hours of expulsion.

18. Despite rampant kidnapping, which often includes deprivation of food and torture, families with young children continue to be expelled to Reynosa.  There are no state-provided services for them and the population living unhoused in city plazas now exceeds 4,000 people who are often targeted by organized crime.  Family separations also occur when parts of a family are allowed to stay in the U.S. but others are expelled.  I have come across parental separations where one parent and a very young child were allowed to stay by Border Patrol while the second parent with an older child was expelled.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on: August 11, 2021, in Toronto, Ontario, Canada.

Signature: _____

Marie Astrid Dominguez

DECLARATION OF CHELSEA SACHAU

I, Chelsea Jordan Sachau, declare under penalty of perjury, that the following is true and correct to the best of my knowledge:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

**Summary**

2. Based on my experience with Title 42 along the Arizona-Mexico border, the number of migrants who test positive on the Mexican side before entering is exceedingly low, as outlined below.

3. Title 42 has resulted in grave harm to our clients. They face kidnapping, rape, extortion, and other violence on a regular basis.

**Expertise**

4. My name is Chelsea Sachau and I am an Equal Justice Works Fellow at the Florence Immigrant and Refugee Rights Project in Arizona ("Florence Project") where I have been employed for 11 months. Founded in 1989, the Florence Project is a 501(c)(3) nonprofit legal service organization providing free legal and social services to adults and unaccompanied children facing removal proceedings in Arizona.

5. At the Florence Project, I work on the Border Action Team. Since 2017, the Florence Project has worked in partnership with the Kino Border Initiative (KBI) by creating the Border Action Team to provide legal services to migrants at KBI's Aid Center for Migrants located in Nogales, Sonora, Mexico. The Border Action Team also works in close collaboration with other local legal services, humanitarian, and community organizations to support migrants in Sonora, Mexico or detained in the state of Arizona. In this capacity, I have provided Know Your Rights orientations, intakes, referrals, asylum application assistance, support with humanitarian parole, and direct representation, among other services, to individuals and families subject to various border policies, including the "Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists" issued by the Centers for Disease Control and Prevention (CDC), commonly referred to as "Title 42."[1]

**Background**

6. The Title 42 expulsion policy has closed the US border to nearly all asylum seekers since March 20, 2021, with the exception of unaccompanied minors. Recently, while Title 42 has been in effect, two possible exception systems emerged: the

---

[1] https://www.cdc.gov/coronavirus/downloads/10.13.2020-CDC-Order-Prohibiting-Introduction-of-Persons-FINAL-ALL-CLEAR-encrypted.pdf

exemption process in this litigation ("the exemption process") and the Consortium process. While there are some distinctions between the two processes, they both largely functioned by having legal service providers and other non-profit organizations refer particularly vulnerable families and/or individuals to the government to be considered as an exception to Title 42. Once approved, the families and individuals were scheduled for dates and times to present at designated ports of entry along the border, and were processed into the U.S. by immigration authorities and placed in Title 8 removal proceedings. Depending on the details of the particular case, many were paroled directly from the port of entry, but others were referred to Immigration and Customs Enforcement (ICE), which then determined whether to place the individual in detention or in an alternatives to detention program, such as the use of GPS monitoring devices.

7. The Florence Project made at least 719 referrals for families and individuals to be excepted from Title 42 through both processes. In total, FIRRP referred at least 2,107 persons through these processes. As of August 9, 2021, 127 referrals (about 374 persons) remain pending – meaning these individuals await a call from the local Consortium partner, COVID testing, and a scheduled date to enter into the U.S.

**COVID-19 positivity rates for migrant families crossing into Arizona are extremely low**

8. Initially, particularly vulnerable families and individuals referred through the exemption process in this litigation were not required to receive COVID-19 testing in Mexico prior to presenting at the Nogales POE. However, all persons who were referred through the exemption process and presented at the Nogales POE prior to June 7, 2021 were released from the port and then transported to shelters in Tucson, AZ, where they were tested promptly upon arrival.  There was quarantine space available for those who tested positive.

9. In early June 2021 the U.S. government abruptly changed the COVID policy for the exemption process: all individuals ages six years or older who were referred through the exemption process were required to be COVID tested in Mexico prior to presenting at the designated ports of entry, and should anyone test positive, the entire family would be required to quarantine in Mexico.

10. **Of the 137 persons referred through the exemption process who were required to undergo testing for COVID-19 in Nogales, Sonora, Mexico, only one individual tested positive for COVID-19. This is a 0.72% COVID-19 positivity rate amongst the exemption clients for whom we were forced to coordinate testing and received access to their COVID test results.**

11. The Nogales U.S. Port of Entry does not provide COVID-19 testing, vaccines, or quarantine space to any non-citizens who are referred for exceptions to Title 42. The local humanitarian partners in Mexico, with support from partners in Arizona, were forced to assume those costs and responsibilities through the exemption and Consortium processes.

**CBP has additional processing capacity in the Tucson Sector**

12. The Tucson Sector of Customs and Border Patrol (CBP) covers most of the state of Arizona, from the New Mexico State line to the Yuma County line, an area covering a total of 262 border miles.[2] There are nine (9) ports of entry – organized into eight (8) CBP stations – in the Tucson region. The ports of entry are (from west to east): San Luis, Yuma, Lukeville, Sasabe, Nogales (there are three within Nogales – Mariposa, DeConcini, and Morely Gate), Naco, and Douglas.  However, CBP only processes asylum seekers excepted from Title 42 at the DeConcini POE.

13. From the end of March 2021 until the last day of May 2021, the Nogales POE refused to process any more than ten (10) persons per day. The stated reason was that the Nogales POE did not have the staff capacity to process any more persons per day. This is despite reports that the government had instructed ports to increase capacity to process 50 persons per day if necessary. Moreover, the alleged lack of staff capacity was also contrary to what the Florence Project staff witnessed on a regular basis in April and May 2021. The Florence Project staff crossed the border at least once per day for months during Title 42, and we frequently saw one or more CBP officers sitting idly at desks at either the DeConcini Port of Entry or the Mariposa Land Port of Entry in Nogales.

14. From May 31, 2021 through early July 2021, the Nogales POE was processing 30 persons per day in total, Monday through Friday, with a few exceptionally urgent cases being processed on Saturdays. Beginning July 12, 2021, Nogales POE again increased its capacity and began to allow for 40 persons per day to present for processing. Beginning in early August, the Nogales POE agreed to expand processing capacity even further to 50 persons per day.

15. The Florence Project and other legal and humanitarian service providers have repeatedly requested that the other ports of entry process asylum seekers through the exemption or Consortium processes, as there are hundreds of displaced persons in more remote parts of the border, in particular Lukeville and San Luis ports of entry, as hundreds of our remote clients are displaced in Sonoyta, Sonora and San Luis Rio Colorado, Sonora. Repeatedly, CBP has refused to do so.

16. The government's refusal to process particularly vulnerable families at remote ports of entry has dire consequences for displaced migrants. In late July 2021, cartel violence began to escalate even more in Sonora. Many of the highways that migrants displaced in other parts of Sonora would need to take in order to travel to Nogales, Sonora for processing would place the families we represent directly in the path of the cartel fighting.

**Dangers for expelled families**

17. Migrant families expelled under Title 42 to Sonora face extreme danger and live in precarity. Few have access to safe housing, medical care, or work to support themselves. They face kidnapping, rape, extortion, and other violence on a regular basis.

---

[2] https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/tucson-sector-arizona

18. For example, in the spring of 2021, the Florence Project represented a young woman who was kidnapped in Mexico, held hostage for weeks, repeatedly raped, and then abandoned in the United States near Phoenix. Though Border Patrol did take her to the hospital on account of her obvious injuries and trauma, she nonetheless was expelled to Mexico under Title 42, where she was at risk of being re-trafficked.

19. In mid-February 2021, the Florence Project provided a remote consultation to a single-mother in Sasabe, Sonora, Mexico. On or about March 31, 2021, the mother attempted suicide in Sasabe, Mexico due to the extreme stress and desperate circumstances without access to security. Fortunately, the Florence Project was able to work with local volunteers in Sasabe to get to the mother before she died, and the local volunteers stayed with her for her own protection and that of her daughter. However, she and her daughter continued to suffer, given that the single mother could not access any mental health treatment in Mexico, and did not have any of her medications. The mother's mental health began to deteriorate even further when the organized crime groups that control Sasabe discovered the mother and her daughter had reentered the city without paying the bribes or extortion fee that many displaced migrants are subjected to. Someone told the mother that the organized crime boss "was coming back soon, and would be by to see her," indicating a threat to the mother and her daughter's physical safety.

20. The Title 42 expulsion process also pushes asylum seekers, including those facing imminent danger, to attempt risky border crossings, resulting in deaths and serious injuries, and makes expelled people more vulnerable to attack.

21. I represented a gay man from El Salvador who U.S. immigration officials separated from his partner under Title 42. This young man fled El Salvador in late January 2020 due to persecution by gangs on the basis of his sexual orientation and family ties. My client met his partner, who was fleeing persecution in Cuba, in Tapachula in February 2020. My client and his partner were regularly taunted for being gay.  Around August or September 2020, neighbors broke into the home my client and his partner shared and robbed them. After moving to Nogales in October 2020, my client and his partner were constantly taunted for being gay by a group of men who regularly hung out outside a convenience store located near their home. In February 2021, the same group of men donned ski masks and chased after my client, who narrowly escaped into a nearby taxi. The taxi driver told my client that those men were involved with a cartel and very dangerous. On or about February 14, 2021, in desperation after all they had endured, my client and his partner crossed the U.S.-Mexico border in order to present themselves to Border Patrol agents and request asylum. To their horror, my client and his partner were separated when they tried to present their asylum claim at the border. They were told by CBP that only my client's partner, a Cuban migrant, would be processed into the U.S. and detained, and that my client, a Salvadoran man, would be expelled back across the border under Title 42. After being separated from his partner, my client lived alone in Nogales and took steps to protect himself by minimizing in every way how much time he spent in public view.  My client's neighbor, a retired woman, helped run his errands so that he need not be out in public more than necessary, and she also accompanied him if he needed to attend a meeting or tend to an errand in person.

22. Florence Project staff also represented a young woman in her third trimester of pregnancy who fled Guatemala primarily as a result of gender-based violence. Her partner would beat her, and during her pregnancy it worsened. In one instance, he attempted to abort her pregnancy by beating her. He told her he would hurt her if she went to the police and she was afraid he would follow her and threaten her wherever she might hide. She fled Guatemala to seek asylum in the United States. Unfortunately, she was also persecuted in Mexico. On around April 15, 2021 she was kidnapped and held captive by a group of armed traffickers. She was held for ten days, and during her captivity she did not receive adequate food and was threatened, even though she was pregnant. On around April 25, 2021 she escaped with other kidnapped migrants. The traffickers chased them in vans, but they were able to escape into the United States. When she was located in the desert, Border Patrol took her to the Banner Hospital in Tucson, AZ. She was 38 weeks pregnant and was put on an IV. At the time, she had a contraction, but the doctors told her it was due to the stress. She was put on an IV and her vitals stabilized. She was also told she had a urinary and a vaginal infection. However, she was returned to Mexico under Title 42, despite her late-term pregnancy and medical issues, and attempted intervention by Florence Project legal advocates who had already filed G-28s in her case to inform Border Patrol and other DHS officials that they represented the young woman. She was forced to attend a fear-based screening alone, even though she had counsel. She failed the USCIS screening despite detailing her kidnapping at the border and despite providing the names of some of her kidnappers that she had overheard while restrained. Without informing counsel, CBP expelled the young woman to Nogales, Sonora via the DeConcini Port of Entry in Nogales, Arizona on April 28, 2021, with no resources and no place to stay. She indicated that Border Patrol confiscated her medical release documents before removing her to Mexico. Pregnant, medically vulnerable, and alone, this young woman was only able to reconnect with the Florence Project after a random benefactor took pity and took her in for the night. She was then driven to the KBI Migrant Aid Center, where she received humanitarian services and had a legal intake with the Border Action Team. The young woman gave birth days after being expelled. On May 8, 2021, she and her infant were processed into the U.S., however the infant immediately had to seek medical attention within days of entering the U.S. and nearly died, due to the circumstances of his birth.

23. The U.S. government's failure to timely process migrants, to process migrants at all ports of entry, or to timely end Title 42 continues to expose thousands of migrants to extreme danger at the hands of cartels or other persecutors in Mexico.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 10, 2021 at Tucson, Arizona.

Chelsea Sachau

**DECLARATION OF SUSANA VILLÉN IGLESIAS**

**MEDICAL COORDINATOR FOR MÉDECINS SAN FRONTIÈRES /
DOCTORS WITHOUT BORDERS IN MEXICO**

August 11, 2021

I, Susana Villén Iglesias, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. Based on Médecins Sans Frontières/Doctors Without Borders' expertise and experience working with migrants in Mexico, I am submitting this declaration to explain why there is no adequate public health rationale to continue expelling immigrant families at the southern border. The U.S. government can safely process immigrant families, especially given the widespread availability of COVID-19 vaccines and other mitigation protocols like rapid testing, outdoor processing, masking and social distancing. These measures are not only effective against COVID-19 transmission, but they are also well within the U.S. government's capacity and resources, especially in light of the extreme hardship, violence, and trauma that Title 42 has inflicted on migrants.

**Background and Experience**

2. I am a medical doctor with a post-doctoral degree in tropical medicine and a master's degree in Public Health. I have been working with different non-governmental organizations in medical-humanitarian projects since 1998 in different counties in Africa, Asia, and Latin America. Currently, I am the medical coordinator in Mexico of Médecins Sans Frontières (MSF)/Doctors Without Borders. As medical coordinator, I am responsible for planning and coordinating all medical activities and medical resources for the mission. In Mexico, we are working with local communities as well as people on the move. We are providing basic health care in areas with poor access to services as well as care to survivors of violence and torture.

3. Médecins Sans Frontières (MSF)/Doctors Without Borders is an independent international medical humanitarian organization that delivers neutral and impartial emergency aid to people affected by armed conflict, epidemics, natural and man-made disasters, and exclusion from health care in more than 70 countries. We were awarded the Nobel Peace Prize in 1999. The decision to offer assistance in any country or crisis is based solely on our independent assessment of populations' needs. We work to ensure that we have the power to freely evaluate medical needs, to access populations without restriction, and to directly control the aid we provide. Our financial independence allows us to provide aid free from any governmental influence that could be used to further political or military goals. MSF currently operates in the world's largest humanitarian crises, including Syria, Ethiopia, Yemen, and South Sudan.

4.   I have reviewed the latest Title 42 order issued by the Centers for Disease Control and Prevention (CDC).[1] In this declaration, I explain how immigrant families can be processed into the United States in a manner consistent with public health best practices, taking into account concerns about the Delta variant and other recent COVID-19 developments. To help explain, I will first describe MSF's work in Mexico, our observations on COVID-19 protocols related to the processing of asylum seekers out of the so-called Migrant Protection Protocols ("MPP"), the harm that Title 42 is causing, and then discuss how Title 42 can be phased out for immigrant families in a manner consistent with public health guidance.

**MSF's Work in Mexico**

5.   MSF has been working in Mexico since 1985. Since 2012, MSF has been actively addressing the health needs of people on the move – including immigrant families – across the country through the provision of comprehensive primary healthcare, mental health, social services, and health promotion activities.

6.   During the COVID-19 pandemic, MSF adapted and expanded its activities to include infection prevention and control in health facilities, shelters, and other spaces this population frequents along the migration route in Mexico. MSF set up diverse specialized services such as tailored mental health care, which includes psychological first aid, individual follow-up, and group sessions. MSF assisted in the identification and referral of suspected COVID-19 cases to the Ministry of Health (MoH), which would send teams directly to the camp and test them. MSF would in the meantime provide hygiene isolation kits to suspect cases, which included PPE, paracetamol, rehydration solution, and a guide for best practices during isolation. MSF worked to minimize the risk of COVID-19 transmission among asylum seekers through the distribution of hygiene kits that included personal protective equipment (PPE) and alcohol gel.  MSF has supported health facilities, including community centers and hospitals, to strengthen access to adequate services, particularly with screening, mental health support, health promotion to reduce stigma, and referral to the MoH. In migrant shelters, MSF also helped in identifying the best locations and practices for isolation of suspected cases.

7.   MSF has also offered tailored support to shelters housing migrants, focusing on: 1) providing education on COVID-19 protocols and countering misinformation, 2) setting up infection prevention and control measures such as triage, isolation, washing & disinfection procedures, social distancing, and proper use of PPE; and 3) setting up referral systems for severe COVID-19 cases.

---

[1] *See* CDC, *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* (Aug. 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.

8.  In the north of Mexico, MSF has concentrated its activities in Matamoros, Reynosa, Nuevo Laredo, Piedras Negras, Ciudad Acuña, Monterrey and Ciudad Juárez. In the northern border locations, spanning from Texas to California, MSF has been witnessing for several years the detrimental effects of U.S. migration policies on asylum seekers' physical and mental health, including policies that forced them to live in dangerous conditions. For instance, from 2019 through 2021, MSF witnessed and provided care to asylum seekers forced to wait in Mexico under the MPP program. Since 2020, MSF has witnessed similar, if not worse, harm to asylum seekers who are expelled from the United States under Title 42.

**MSF's Experience with COVID-19 Protocols around MPP**

9.  One of the critical services that MSF has recently provided in Mexico has been providing physical and mental health services to asylum seekers returned to Mexico under the former U.S. government program, MPP. Through its presence and work with this population of asylum seekers, MSF has direct experience with the safety precautions taken around COVID-19 in Mexico.

10. The Matamoros camp was the direct consequence of the U.S. Government's implementation of MPP. While individuals were sent back to Matamoros and forced to wait for their asylum proceedings, a border camp arose that housed up to 2500 migrants. In response to critical medical needs, MSF has offered health services in the camp from the moment it was first established until the last day the camp was standing in March 2021. When COVID-19 appeared in Mexico, MSF adapted its premises and protocols to include a triage of suspected cases, led the health promotion / COVID-19 prevention activities at the camp, and stepped up mental health assistance. These protocols were maintained until March 2021.

11. When the decision to begin unwinding MPP was taken, the United Nations High Commissioner for Refugees (UNHCR) coordinated with all actors present in the camp in Matamoros and with other key actors such as the International Organization for Migration (IOM), United Nations International Children's Emergency Fund (UNICEF), International Committee of the Red Cross (ICRC), and Hebrew Immigrant Aid Society (HIAS) to facilitate the phase out. Among its responsibilities, MSF worked with shelters to apply sound infection prevention and control measures and ensure that people waiting to be processed and arriving from other Mexican cities faced a lower risk of transmission.

12. MSF relied on a mixture of health education, preventive measures, and clear, simple and efficient control measures based on symptomology which permit isolation of suspected and confirmed cases of COVID-19. One of the more important aspects of the model is consistent implementation of preventive measures (social distancing, masking, hand washing) at all times, and encouraging the self-declaration of symptoms as soon as they

appear. This approach includes a system of symptomatic screening, testing, and medically supervised isolation for those who test positive for COVID-19.

13. Given the nature of COVID-19 transmission and close quarters of the camp, MSF was especially vigilant about any potential outbreaks. During the period when MSF ran the mild COVID-19 stabilization center at the Autonomous University of Tamaulipas, suspected cases were taken there for isolation and medical supervision.

14. As the camp's population was processed into the U.S., MSF wound down our medical activities at that specific location. MSF continues to offer health services in key shelters around the city of Matamoros, as well is the cities of Reynosa, Nuevo Laredo, Monterrey, Ciudad Acuña and Piedras Negras, where there are still asylum seekers in need.

**Harm to Immigrant Families Subject to Title 42**

15. For years now, MSF teams have been witnessing firsthand the devastating toll of harsh US migration policies spanning several administrations on the lives and health of people forced to flee violence and extreme poverty in Central America, Mexico, and other countries.

16. MSF has documented the toll expulsion under Title 42 takes on asylum seekers.[2] These individuals and families being rapidly turned around to extremely dangerous cities along the border are exposed to gang violence and are forced to fend for themselves without protection from local authorities. But accessing the most basic needs is always difficult given to the lack of protection, the lack of shelter, and the lack of health care.

17. Some who have been expelled, including Haitian asylum seekers, do not speak Spanish. Others include people who are injured or ill, people traveling with children, teenagers, pregnant women, and lesbian, gay, bisexual, and transgender people. All these people are at increased risk of violence and extortion in Mexico due to their particular vulnerabilities.

18. MSF mental health teams working with migrants in psychological support groups in Reynosa have observed signs of complex trauma and depression in these patients. They report acute reaction to stress, psychosomatic symptoms such as headache and back pain, hypervigilance due to the insecure location, difficulty sleeping, and fear and anxiety related to their expulsion or living in violent and unpredictable conditions.

---

[2] MSF, Title 42 Deportations Cause Dire Humanitarian Consequences on Mexico's Northern Border (Apr. 29, 2021), https://www.doctorswithoutborders.org/what-we-do/news-stories/news/title-42-deportations-cause-dire-humanitarian-consequences-mexicos.

**Unwinding Title 42 and Processing Immigrant Families**

19. I have reviewed Defendants' declaration from David Shahoulian dated August 2, 2021, filed at ECF No. 113-1, as well as the recent August 2, 2021 CDC order regarding Title 42. MSF does not believe that there is adequate public health rationale to justify continuing to ban immigrant families.

20. Based on MSF's decades of experience in infection prevention and control and in responding to public health emergencies across the world, we firmly believe it is well within the U.S. government's ability to restore access to asylum at the border while safeguarding the health of its citizens and those living on its territory. There is no reason to presume that asylum seekers are more of a threat to public health than any other person crossing the border from Mexico.

21. The measures the U.S. government can take to safely open the border, specifically to those in need of protection, include:

   A.   *Border Processing:* Processing asylum seekers on either side of the border should be done as rapidly as possible and in a way that limits people from being held in congregate settings so as to reduce the risk of COVID-19 transmission. Processing should take place in spaces that are well-ventilated and suitable for expansion of reception should the number of arrivals increase. MSF routinely uses low-cost temporary items such as snow/safety barrier fencing and shade netting to facilitate outdoor activities requiring crowd control measures around the world.

   B.   *Testing*: Compared to the general U.S. public, asylum seekers do not pose a heightened public health risk,[3] therefore they should not be subjected to measures that are not applied to other groups of people crossing the border. However, if the U.S. Government insists on additional measures, ramped up COVID-19 testing at the border can be the cornerstone of any system to efficiently process asylum seekers. We found very low numbers of COVID-infections in border shelters where MSF has relied on a system of symptomatic screening, testing, and referral for medically supervised isolation for those who test positive for COVID-19. In the case of those crossing the border, FDA-approved antigen tests are cost-effective, produce rapid results, and are well-suited to identifying individuals who pose an immediate risk of transmission. If testing is implemented, those who test positive can be isolated and treated. Those who test negative should be paroled

---

[3] Data reflects that number of cases per 100,000 residents is far lower in Mexico compared to the United States. *Compare* N.Y. Times, *Coronavirus in the U.S.: Latest Map and Case Count* (updated Aug. 10, 2021), https://www.nytimes.com/interactive/2021/us/covid-cases.html, *with* N.Y. Times, *Tracking Coronavirus in Mexico: Latest Map and Case Count* (updated Aug. 10, 20201), https://www.nytimes.com/interactive/2021/world/mexico-covid-cases.html.

into the U.S. and told to self-quarantine for the officially designated period, which is in line with the current procedure recommended by the CDC for any international travelers to the U.S. Measures can be taken to ensure safety during internal transportation, including through the distribution of face masks and the use of high-capacity, well-ventilated vehicles.

    C.    *Isolation/Quarantine*: An isolation/quarantine system that is flexible and sensitive to fluctuations in arrivals can be established. Safety measures including mask use, ventilation, and reduced density of persons should be applied in those spaces.

    D.    *Vaccination*: Any eligible unvaccinated person including asylum seekers should be offered a vaccine when they enter the U.S. The U.S. currently has more capacity to vaccinate Americans, both in terms of vaccine doses and mobilized health personnel, than are currently being used by people in the U.S. MSF has been tracking COVID-19 vaccine supply and, to our horror and disappointment, millions of doses have and may continue to go to waste in the U.S.[4] These excess doses can and should be re-routed for use in other countries, including for those who are eligible for vaccines at the border. Implementing routine vaccination of asylum seekers entering from Mexico is well within the scope of current services offered at some international airports in the U.S.[5]

22. The Delta variant is already dominant in the U.S. and epidemiological data shows similar historical rates of COVID-19 infections in the U.S. and Mexico. The CDC places both countries at the same risk level,[6] but, importantly, the number of new cases is disproportionately higher in the U.S. compared to Mexico.[7] The CDC is currently recommending the same preventive and protective protocols for Delta as were recommended previously.[8] In addition to vaccination, masking, ventilation, physical

---

[4] Dan Levin, *The U.S. Is Wasting Vaccine Doses, Even as Cases Rise and Other Countries Suffer Shortages*, N.Y. Times (Aug. 1, 2021), https://www.nytimes.com/2021/08/01/us/covid-us-vaccine-wasted.html.

[5] *See, e.g.*, San Francisco International Airport, Vaccinations at SFO (last accessed Aug. 10, 2021), https://www.flysfo.com/travel-well/vaccination-site-sfo; NBC News, *Miami Airport Offering Free Covid Vaccines to Travelers* (May 27, 2021), https://www.nbcnews.com/now/video/miami-airport-offering-free-covid-vaccines-to-travelers-113663045707.

[6] CDC, Travel Health Notices (updated Aug. 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html.

[7] *See supra* n.1 (showing that daily average of cases has increased nearly 120% in last 14 days in United States compared to 30% in Mexico, and that case rate per 100,000 people in the United States is nearly triple the rate in Mexico).

[8] CDC, Interim Public Health Recommendations for Fully Vaccinated People (updated July 28, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html

distancing, and hand hygiene are still recommended and can be implemented when processing asylum seekers.[9]

23. Should the necessary resources be allocated, many of the elements that proved effective in unwinding MPP can be scaled to apply to a phase out of Title 42 and a return to a normal asylum processing system at the U.S. southern border. These are resources that are readily available, including medical and public health human resources. FDA-approved antigen tests and COVID-19 vaccines for those who are eligible.

**Conclusion**

24. While the technical solutions highlighted above should be implemented in coordination with Mexican authorities and organizations responding to the needs of asylum seekers in northern Mexico, the U.S. should uphold its obligations to admit people seeking asylum, which includes accepting responsibility for carrying out basic infection prevention and control measures. Regardless of the capacity of the Mexican government to help on this front, the fact remains that northern Mexico is not safe for asylum seekers forced to remain there by virtue of U.S. policy. The U.S. government has the capacity, infrastructure, and knowledge required to safely process those seeking protection at the southern border and must immediately take the necessary steps to do so.

Executed on the 11th of August, 2021 in Ciudad de Mexico, Mexico.

Susana Villén Iglesias
Medical Coordinator in Mexico
Médecins Sans Frontières/Doctors Without Borders

---

[9] CDC, Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage, Morbidity and Mortality Weekly Report (July 30, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7030e2.htm.

## DECLARATION OF TERESA CAVENDISH

I, Teresa Cavendish, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am Director of Operations at Catholic Community Services of Southern Arizona. I oversee operations for Casa Alitas in Tucson, Arizona. Casa Alitas is a program that serves migrant families and adults who are released from Customs and Border Protection ("CBP") custody so that they can seek immigration relief in the United States. I make this declaration based on my personal experience at Casa Alitas working with noncitizen children and families subject to the Title 42 Process since the process came into effect in March 2020.

2. This declaration describes the efforts of Casa Alitas and other shelter providers along the Arizona-Mexico border to develop infrastructure for processing migrants safely after they come to the United States. Our organization and our partners have invested significant time and resources in building systems designed to receive migrants, test them for COVID-19 and quarantine them when necessary, and help them move on to their next destination. In my opinion, if these programs received more grant funding and resources, they could be scaled up to receive even more migrants than they already do.

3. I have been with Casa Alitas for 7 years, since I helped establish the program. In addition, I have held different roles in the nonprofit and social services sector, including Director of Operations for Catholic Community Services of Southern Arizona (CCS); Casa Alitas is a program of CCS. I have been with CCS for 35 years. At Casa Alitas, I supervise 13 staff and coordinate over 100 volunteers.

4. Casa Alitas receives migrants directly from immigration custody. They often come directly from Customs and Border Protection ("CBP") after being swiftly processed near the border immediately after the migrants' entry. Others come from the custody of Immigration and Customs Enforcement ("ICE"), after being held in immigration detention for days or weeks. We have longstanding relationships with both CBP and ICE, who know that we are available as a resource for migrants leaving immigration custody. The migrants we serve are a mix of families with young children and single adults.

5. Casa Alitas runs a variety of different programs for migrants who have recently come to the United States. We run a hospitality center in Tucson, which serves as an initial reception point for migrants who have just been released from detention. Volunteers at the hospitality center greet the migrants and help them contact family members or friends in the United States. If the migrant is able to join their family members immediately, our volunteers help them arrange travel via bus or plane, and provide them basic services (e.g. food, clothing, hygiene items) before they travel. Such migrants typically spend only 24 hours or so at our reception centers.

1

6. Those migrants who cannot travel right away typically spend one to three days in one of our shelters, which are similarly run by volunteers and Catholic Community Services staff members. There, the migrants receive food, shelter, and social services assistance until they can depart for their ultimate destination.

7. The numbers of migrants we receive varies greatly from day to day. These numbers depend on seasonal migration patterns, as well as the availability of other shelter space for migrants being released from DHS custody. On a typical day during June, July, and August of this year, Casa Alitas has received from 30 to 200 individuals per day.

8. Casa Alitas, and other shelter providers operating along the Arizona-Mexico border, have spent the last year or more developing infrastructure and systems to maximize the health and safety of migrants and our staff members/volunteers during the COVID-19 pandemic. Thanks to both private funding and partnerships with public health agencies, Casa Alitas tests every migrant we receive at our reception centers from DHS for COVID-19. We use a rapid test, which typically returns a result in a few minutes. If the migrant tests negative and is able to leave our reception center immediately to travel to relatives or friends, we then make travel arrangements to get him or her to their next destination.

9. If the migrant tests positive, we sent them to quarantine. We have bed space at a local hotel where the migrant can quarantine for 10 days, consistent with CDC guidelines. These hotel beds can currently house approximately 24 migrants/families in quarantine. We are currently working on obtaining additional quarantine space up to 114 rooms. Some migrants can travel quickly from our reception centers or shelters to family or friends in the Tucson area, and those migrants typically choose to quarantine with those local family or friends rather than quarantining in our hotel spaces.

10. While the migrant is in quarantine in one of our hotel beds, and toward the end of the 10-day period, we conduct a second test. If the test comes back negative, we then help arrange travel so that the migrant can go to their next destination.

11. In conjunction with public health agencies, we also offer Phizer, Moderna, and Johnson & Johnson single-shot vaccines to all migrants at our reception centers and shelters. For migrants receiving Pfizer or Moderna vaccines, we provide second dose information available in their destination regions.

12. Since early summer 2021, the number of families we receive from CBP or ICE has reduced substantially. My understanding is that DHS has entered into a multi-million dollar contract with a national agency known as Endeavors. Endeavors operates a network of contracted hotels along the U.S.-Mexico border that serves as both shelter

2

App. 453

and quarantine space for migrants. Endeavors operates extensively in Arizona, and since that contract began, DHS has largely referred migrant families to Endeavors, rather than our reception centers and shelters. My understanding is that Endeavors has substantial capacity to house families in the Arizona area.

13. In my opinion, the federal government has not exhausted the capacity of local nonprofits to receive additional migrants in Arizona. As described above, Casa Alitas and other shelter providers along the Arizona-Mexico border have developed a range of systems to ensure that migrants can be processed both safely and efficiently as they move on to their next destination in the United States. These programs could also be scaled up to receive even more grants if the federal government were to devote additional resources to nonprofits like ours.

I declare under penalty of perjury under the laws of the United States and Arizona that the foregoing is true and correct.

Executed on: August 9, 2021, in Tucson, Arizona, United States.

Signature: _Teresa Cavendish_

Teresa Cavendish

3

**DECLARATION OF KATE CLARK, ESQ.**

I, Kate Clark, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal experience at JFS working with noncitizen children and families subject to the Title 42 Process since the process came into effect in March 2020. JFS and other nonprofits and advocacy organizations, in conjunction with San Diego County and State of California health authorities, have worked hard to develop effective systems to receive migrant asylum seekers.

2. We have now built infrastructure to test, quarantine, and provide other necessary services to migrants shortly after they enter the United States. **In my opinion, these operations are scalable if the federal government were to invest serious resources, similar to what the government did to build capacity to house increased numbers of unaccompanied children during 2021.**

**QUALIFICATIONS**

3. I am Senior Director of Immigration Services and Lead Immigration Attorney at Jewish Family Service of San Diego ("JFS"). Among my responsibilities is coordinating our organization's services for migrant refugees who are released from Customs and Border Protection ("CBP") custody so that they can seek immigration relief in the United States.

4. I have been with Jewish Family Service for 11 years. Previously, I have held different roles in the nonprofit and social services sector, including Director of Immigration Services, Senior Attorney, and Immigration Attorney within the Immigration Services division at JFS.   At Jewish Family Service, I supervise a staff of approximately 100 staff between the legal services and humanitarian shelter operations.

5. JFS receives migrants directly from immigration custody. They often come directly from Customs and Border Protection ("CBP") after being swiftly processed for release into the United States near the border, immediately after the migrants' entry. The migrants we serve are a mix of families with young children and single adults.

6. JFS operates one of two major "hubs" in the San Diego area that receive migrants. Our hub receives migrants who are coming through the San Ysidro port of entry, which is located near San Diego, California. The migrants coming through the port of entry fall into a number of categories, including noncitizens processed via exemptions from Title 42, noncitizens who were formerly forced to wait in Mexico for their removal proceedings under the Migration Protection Protocols, and other noncitizens

who DHS has paroled into the United States for various reasons. We also receive some migrants who have sought to cross unlawfully through the port.

7. Catholic Charities operates the other major receiving hub. Their hub focuses on noncitizens who cross the California-Mexico border between ports of entry, and are apprehended by U.S. Border Patrol. Between our two hubs, I estimate that we have the capacity to receive approximately 250-300 migrants per day and currently receive that amount per day.

8. JFS's hub is located in a hotel. We have chartered a set of buses that moves back and forth all day from the San Ysidro port, which transport migrants from the port to our hotel hub. One set of buses is for those migrants who have not been tested prior to coming to the port; the other bus runs are for those who have already tested negative before coming to the United States. Once a migrant arrives at the hub, and if they have not already been tested before crossing, we test them for COVID-19. We also test those noncitizens who have been tested, but are currently showing symptoms for COVID-19. We use a PCR test, which typically returns a result within twelve hours.

9. If the migrant tests negative, or has already been tested and is not showing symptoms, they stay in a room at our hub while we help them travel to their ultimate destination in the United States. While they are staying at our hub, we provide food, shelter, hygiene, medical, case management, and legal services. We also help make travel arrangements. Such migrants typically stay at our hub for about two to three days, before they leave for their next destination.

10. If the migrant tests positive for COVID-19, the County of San Diego requires those noncitizens to quarantine for approximately 10 days. The County provides special hotel spaces for quarantine. I estimate that the County has reserved several hundred hotel beds for migrants to quarantine, and is working on developing more capacity.

11. After the migrant leaves quarantine, they return to our hub, where we provide them the services described above, and help them move onto their next U.S. destination.

12. We also offer the vaccine to all migrants who come through our hub. We offer both the Johnson & Johnson one-shot vaccine, as well as the Pfizer two-shot vaccine.

13. Both JFS's hub and Catholic Charities' hub also receive migrants who are transferred to the San Diego area via so-called "lateral flights." These flights are comprised of migrants who are apprehended in other locations along the U.S.-Mexico border, typically in the Rio Grande Valley region of Texas. Based on my observations, and reports from the migrants themselves, CBP packs migrants onto these flights without any testing or safety regimens. Some number of migrants on each flight are then expelled back to Mexico via the San Ysidro port, and the remainder are allowed into the United States and then eventually reach our hubs.  Thus, by packing untested

migrants into flights and later into short-term BP detention facilities in the United States, CBP puts them at risk.

14. As described above, JFS and other organizations in the San Diego area have developed a range of systems to ensure that migrants can be processed both safely and efficiently as they move on to their next destination in the United States. We have developed these systems in conjunction with the State and County's public health authorities, and ensure that our systems are consistent with public health guidance. We have built up these systems via a mix of FEMA Emergency Food and Shelter Program funding, private funding, and public-private partnerships with local agencies. For example, we receive tests and vaccines from the State of California.

15. Unfortunately, we have developed these systems without the meaningful assistance of the federal government, aside from the emergency relief funding which has been provided through FEMA.  The federal government could do much more to plan or develop major infrastructure by investing in community-based support services along the entire border to provide respite or transitional shelter to individuals and families upon arrival to the U.S. and facilitate and fund transportation to their destinations within the U.S., all in a manner that complies with federal, state, and local public health guidelines and prioritizes the humane and dignified reception of newly arrived individuals.

16. In my opinion, the federal government could scale up operations like ours by channeling money and resources to local agencies with proven track records, or even building up their own physical and other infrastructure to receive migrants. We have recently seen the federal government conduct such operations to help unaccompanied migrant children who are now exempt from Title 42. In response to increased numbers, the federal government moved swiftly to stand up additional shelters and facilities in California, and instituted testing and quarantine regimes for all unaccompanied children in federal custody. This example shows that the government can conduct such operations when it is willing to devote the resources to doing so.

I declare under penalty of perjury under the laws of the United States and California that the foregoing is true and correct.

Executed on: August 10, 2021, in San Diego, California, United States.


Signature:   _____

                    Kate Clark

## DECLARATION OF AARON REICHLIN-MELNICK

I, Aaron Reichlin-Melnick, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

### Summary

1.    I submit this declaration to make two principal points in response to the government's argument that an injunction of Title 42 expulsions for family unit members would strain CBP's ability to safely process asylum seeking families at the border. First, while the government points to a high number of overall "encounters" with undocumented noncitizens at the border, that figure is misleading. Title 42 has perversely led to a high level of "recidivism"—individuals attempting to cross the border (and seek safety in the United States) more than once, and often many times. Thus Title 42, far from reducing border "encounters," has in fact increased the number of border encounters, and thus the number of times CBP officials must interact with families and other noncitizens.

2.    Second, it is important to place the number of individuals potentially impacted by an injunction in this case in context. The number of people entering the United States lawfully at land ports of entry, such as U.S. citizens and permanent residents traveling for pleasure, truck drivers, students, and people attending business meetings, is vastly larger than the number of family unit members apprehended and currently subject to Title 42. Indeed, family unit members who are subjected to Title 42 in June 2021 represented roughly 0.1% of the number of individuals who entered the United States from Mexico through a land port of entry. Yet while that vastly larger set of individuals is subject to no testing or other COVID screening, the

App. 458

government claims the relatively tiny set of families must be expelled in the name of public health.

<div align="center"><u>**Qualifications**</u></div>

3.    I am a Policy Counsel at the American Immigration Council ("Immigration Council"), a nonprofit and non-partisan organization whose mission includes the use of facts to educate the public on the important and enduring contributions that immigrants make to America. At the Immigration Council, I track and analyze immigration-related statistics produced by the Department of Homeland Security ("DHS"), data on border crossings produced by the Department of Transportation ("DOT"), and any other available data on border processing produced by reputable sources.

4.    I have previously submitted declarations analyzing government-produced immigration statistics in *East Bay Sanctuary Covenant v. Barr*, 4:19-cv-04073-JST (N.D. Cal. filed July 16, 2019), *Innovation Law Lab v. McAleenan*, 3:19-cv-00807-RS (N.D. Cal. filed Feb. 14, 2019), and *Padilla v. ICE*, No. 2:18-cv-00928-MJP (W.D. Wash. filed June 25, 2018).

5.    In my role as policy counsel, I have extensively studied the impact of the novel coronavirus SARS-CoV-2 ("COVID-19") on the United States' immigration system. I have also extensively studied the current humanitarian processing challenges occurring at the U.S.-Mexico border.

6.    On April 27, 2021, I testified as an expert on border trends in front of the House Homeland Security Subcommittee on Border Security, Facilitation, and Operations at a hearing entitled Unaccompanied Children at the Border: Stakeholder Perspectives on the Way Forward.

7.    In preparation for this declaration I reviewed Defendants' declarations, the Centers for Disease Control and Prevention ("CDC") Title 42 Orders, public statistics on entries into the United States that are published by U.S. Customs and Border Protection ("CBP") and DOT, as

well as public information from the CDC on COVID-19 screening and quarantine protocols for individuals who enter the United States through a port of entry or who enter irregularly between ports of entry. I have also reviewed all available data on Title 42 and its effect on individuals entering between ports of entry, as well as extensive public news reporting on the current status of testing and quarantine protocols in use by nongovernmental organizations which are assisting families released by CBP.

### Title 42 Artificially Inflates The Total Number Of Border "Encounters"

8.    In opposing an injunction in this case, DHS repeatedly points to the number of "border encounters." Decl. of David Shahoulian ¶ 19. DHS argues that because of these high encounter rates, the Court should not enjoin Title 42 as applied to families.

9.    The statistics on which DHS is relying—rates of "encounters"—are misleading, however, because Title 42 itself has artificially inflated the number of "encounters" as compared to the actual number of *people* seeking to cross the border and find protection in the United States. That is because when a person attempts to cross multiple times—sometimes 3, 5, 10, or more—each time they are apprehended is counted as a new "encounter." And Title 42 has dramatically increased how often people try to cross the border multiple times—as CBP officials have themselves admitted.

10.  For over a decade, CBP has tracked the "recidivism rate" of individuals encountered at the southwest border, meaning the percent of those individuals apprehended at the border who have previously been apprehended. The agency calculates this rate by dividing the number of "unique individuals" who have been apprehended more than once at the border during a 12-month period by the total number of "unique individuals" apprehended over that same period. *See* Carla N. Argueta, *Border Security Metrics Between Ports of Entry*, Congressional Research Service, Feb.

16, 2016, at 7. The statistics refer to "unique individuals" because a single "unique individual" may be encountered multiple times. For example, if 100 unique individuals were encountered, and two of them had been encountered more than once in the past 12 months, the recidivism rate would be 2 percent.

11.   From 2007 through 2019, recidivism rates fell steadily. But under Title 42, the recidivism rate rose from 6.7 percent in Fiscal Year 2019[1] to 24.9% in Fiscal Year 2020. *See* Customs and Border Protection, *U.S. Customs and Border Protection Budget Overview: Fiscal Year 2022 Congressional Justification* (2021), at CBP – 2. The recidivism rate has risen even further since, increasing to 40% for Fiscal Year 2021 through May 2021 (see Figure 1).

**Figure 1: Border Recidivism Rate, Fiscal Year 2005 to FY 2021 (through May)[2]**



12.   That increase makes sense: After Title 42 went into effect, the overwhelming majority of undocumented Guatemalans, Hondurans, Salvadorans, and Mexicans who crossed the border were expelled under Title 42 were sent back to Mexico without a deportation order or an

---

[1] The federal government's fiscal year runs from October 1 through September 30, so Fiscal Year 2021 began on October 1, 2020.
[2] *See* U.S. Customs and Border Protection, Congressional Budget Justifications, FY 2008-2022; data for Fiscal Year 2021 through May on file with author.

opportunity to access to the asylum process. As a result, the rate at which people crossed the

border multiple times began to increase, as desperate individuals sought to cross repeatedly.

13.   High recidivism rates since Title 42 went into place have led to a significant inflation of the

overall count of encounters compared to previous years. For example, during the first nine

months of Fiscal Year 2019, CBP recorded 780,479 encounters, of which 721,328 were unique

encounters of people who had not been encountered in the previous 12 months. During the first

nine months of Fiscal Year 2021, CBP recorded 1,119,204 encounters, of which 690,718 were

unique encounters—30,610 *fewer* unique encounters than in Fiscal Year 2019 despite 338,725

*more* overall encounters.

14.   The increased recidivism rate is new for family units, who have in previous years shown

very low rates of recidivism. For example, through the first nine months of Fiscal Year 2019 the

recidivism rate for members of family units was just 1.5% (6,354 out of 421,428 unique

individuals encountered). By comparison, through the first nine months of Fiscal Year 2021, the

recidivism rate for family units has grown to 16.8% (35,231 out of 209,862 unique individuals

encountered). Reports by advocates along the border indicate that the true rate may be even

higher. After a first failed attempt as a family, some families are breaking up to try to reenter as

single adults and unaccompanied children, in the hope that the children at least will be exempted

from Title 42 and the adults can take a shot at crossing on their own.

15.   CBP has formally acknowledged the link between Title 42 and an increased recidivism rate.

*See* Customs and Border Protection, *U.S. Customs and Border Protection Budget Overview:*

*Fiscal Year 2022 Congressional Justification* (2021), at CBP – 2. As the agency explained:

"[I]ncluding persons encountered by Border Patrol and expelled under Title 42 authority has

substantially increased the number of persons counted by this [recidivism rate] measure." *Id.*

16.   DHS's reliance on levels of encounters thus overstates the true level of migration, a fact which CBP has also acknowledged. "The large number of expulsions during the pandemic has contributed to a larger-than-usual number of noncitizens making multiple border crossing attempts, and means total encounters somewhat overstate the number of unique individuals arriving at the border." Customs and Border Protection, *CBP Announces May 2021 Operational Update*, June 9, 2021, https://www.cbp.gov/newsroom/national-media-release/cbp-announces-may-2021-operational-update. In other words, Title 42 has led to an exaggerated measure of the total number of *individuals* coming to the United States by prompting a larger number of *encounters* of the same people attempting to enter over and over.

17.   DHS's declarant suggests that encounters are currently at a "historic" level. Shahoulian Decl. ¶ 20. But as explained, that encounter data is elevated because of Title 42, so the comparison to past years in which that program was not encouraging increased recidivism is comparing apples to oranges.  Furthermore, even apart from the government's failure to properly take into account the high recidivism rate, the declarant himself acknowledges that total encounters have been higher in the past, namely in Fiscal Year 2000.

18.   DHS's declarant also makes comparisons to the very early days of the COVID-19 pandemic, including arguing that family encounters have increased "100-fold" since April 2020. Shahoulian Decl. ¶ 23. But that is misleading as well, as movement around the world cratered during those months and Mexico went into a 70-day lockdown. Thus, using April 2020 as a baseline is fundamentally misleading when other more relevant baselines exist. For example, there were 88,587 encounters of family unit members in May 2019, which is 120 times higher than the April 2020 figure the declarant uses as his baseline—and is notably higher than the July 2021 figures that he cites.

19.   In sum, the evidence indicates that Title 42 has increased the number of encounters at the southern border. And yet DHS is paradoxically using that inflated level of encounters to justify keeping Title 42 in place for families. Indeed, by encouraging repeat crossings, Title 42 may well be exacerbating the public health situation it is supposed to address: Each successive Title 42 "encounter" means an additional time that CBP must interact with a family, rather than just being processed once under ordinary immigration procedures.

### **Permitted Entries At Ports Vastly Outnumber Families Subjected To Title 42**

20.   Despite some restrictions DHS has imposed on non-essential travel at land ports of entry between the United States and Mexico, millions of individuals are permitted to enter the United States from Mexico every month. Permitted entries include not only all U.S. citizens and lawful permanent residents (traveling for any purpose including tourism), but also any individual travelling to attend school or work in the United States, all individuals "engaged in lawful cross-border trade" such as truck drivers, and any individual travelling for medical treatment in the United States. *See, e.g.,* U.S. Department of Homeland Security, *Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexic*o, 85 Fed. Reg. 22,353 (April 22, 2020).

21.   Since March 2021, more than 10 million people a month have entered the United States from Mexico through a land port of entry. By June 2021, an average of 361,976 people per day were entering the country through land ports of entry along the southwest border. Notably, these restrictions do not include a requirement to present a negative test for COVID-19 nor do they require CBP officials to screen individuals for symptoms of COVID-19.

22.   By contrast, approximately 2,583 individuals in family units are apprehended along the border every day. Shahoulian Decl. ¶ 19. Of those, according to recent government statistics,

currently approximately 86% are being processed into the country and not expelled. The

remaining 14% who are expelled represent roughly 362 individuals expelled per day, or the

equivalent of 0.1% of the average 361,976 individuals who entered from Mexico at land ports

every day in June 2021. Thus, families subject to Title 42 make up a very small number of

entries into the United States from Mexico. And unlike those entering the United States through

ports of entry, in nearly all cases, families released by CBP and permitted to travel further into

the United States are not only tested for COVID-19 but also given quarantine space if

necessary—albeit generally by nonprofit organizations or local government agencies rather than

the federal government.

EXECUTED this _____10th_____ day of August, 2021.

_____/s/ Aaron Reichlin-Melnick_____
AARON REICHLIN-MELNICK

## DECLARATION OF ALAN E. VALDEZ JUÁREZ

I, Alan E. Valdez Juárez, declare that the following is true and correct:

1.  I am the Executive Director of AVS Laboratorios ("AVS"), a medical analysis and testing laboratory service located in Piedras Negras, Coahuila, Mexico.

2.  Earlier this year, AVS began conducting COVID-19 testing for asylum seekers in Piedras Negras who had received pre-approval for exemptions from the Title 42 Order and had been scheduled for appointments to present for processing into the United States at the Eagle Pass, Texas Port of Entry.  The majority of the asylum seekers tested by AVS have been members of families who are scheduled to present at the Port of Entry as family units.  As required by the United States government, all such testing has been performed within 72 hours of the asylum seekers' scheduled appointments at the Port of Entry.

3.  As of August 6, 2021, AVS has administered 404 COVID-19 tests for asylum seekers scheduled for appointments to enter the United States as part of this Title 42 exemption process.  Of those 404 tests, 8 came back with positive results reflecting that the individuals tested were infected with COVID-19.  This constitutes a test positivity rate of 1.98 percent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 6th of August 2021 in Piedras Negras, Coahuila, Mexico.

s/ *Alan E. Valdez Juárez*

Alan E. Valdez Juárez

## DECLARATION OF EDGAR RAMÍREZ LÓPEZ

I, Edgar Ramírez López, declare that the following is true and correct:

1.  I am the owner and manager of Laboratorio Noralba ("Lab Noralba"), a medical testing laboratory located in Ciudad Acuña, Coahuila, Mexico.

2.  Earlier this year, my lab began conducting COVID-19 testing for asylum seekers in Ciudad Acuña who had received pre-approval for exemptions from the Title 42 Order and been scheduled for appointments to present for processing into the United States at the Port of Entry in Del Rio, Texas.  The majority of the asylum seekers tested by Lab Noralba have been members of families who are scheduled to present at the Port of Entry as family units.  In accordance with requirements of the United States government, all such testing has been performed within 72 hours of the asylum seekers' scheduled appointments at the Port of Entry.

3.  As of August 6, 2021, Lab Noralba has administered 186 COVID-19 tests for asylum seekers scheduled for appointments to enter the United States as part of this Title 42 exemption process.  Of those 186 tests to date, none has yet yielded a positive result indicating that the individual tested was infected with COVID-19.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 6th of August, 2021, in Ciudad Acuña, Coahuila, Mexico.

s/ *Edgar Ramírez López*

Edgar Ramírez López

## CERTIFICATE OF TRANSLATION

I, Morgan Russell, hereby certify and swear under penalty of perjury that I am competent to translate between English and Spanish, that I translated the content of the foregoing declaration to Edgar Ramírez López in Spanish on August 6, 2021, and that he confirmed that its content is true and correct.

Executed on this 6th of August 2021 in Oakland, California.

s/ Morgan Russell

Morgan Russell

## DECLARATION OF SAMUEL THOMAS BISHOP

I, Samuel Thomas Bishop, declare as follows:

1. I am the Mexico Country Director for Global Response Management ("GRM"), a veteran-led international medical non-governmental organization that provides emergency medical services to vulnerable populations displaced by conflict, war, or disaster.

2. As part of its operations in Matamoros, Tamaulipas, Mexico, GRM conducts SARS-CoV-2 rapid antigen testing for asylum seekers and others in need of free COVID-19 testing services. The overwhelming majority of people who have received COVID-19 antigen testing at our clinic in Matamoros are asylum seekers who have received pre-approval for exemptions from the Title 42 Order and been scheduled for appointments to present for processing at the Brownsville Port of Entry. As required by the United States government, all such testing for exemption appointments is performed within 72 hours of the asylum seekers' scheduled appointments at the Port of Entry.

3. During the month of July 2021, GRM administered 1,111 SARS CoV-2 antigen tests in Matamoros. Of those tests, 9 came back positive for SARS-CoV-2 antigens. That constitutes an antigen positivity rate of 0.81%. It is important to understand that this is not a community prevalence rate. Rather it is the antigen positivity rate of individuals who were tested in our clinic. It is also important to note that rapid antigen tests, like all tests, are not 100% accurate.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 10th of August 2021 in Austin, Texas.

X _Samuel T Bishop_

Samuel Thomas Bishop

## DECLARATION OF LUIS ALBERTO LIZARRAGA TOLENTINO

I, Luis Alberto Lizarraga Tolentino, declare that the following is true and correct:

1. I am an Administrative Assistant at Clinica Medica International ("CMI"), a medical examination and testing company specializing in immigration-related medical exams and testing. CMI has testing facilities in Ciudad Juárez and Tijuana, Mexico.

2. Over the last several months, CMI has conducted COVID-19 testing for asylum seekers in Tijuana who had received pre-approval for exemptions from the Title 42 Order and scheduled for appointments to present for processing into the United States at the San Ysidro Port of Entry in California. The majority of the asylum seekers tested by CMI in Tijuana have been members of families who are scheduled to present at the Port of Entry as family units. In accordance with requirements from the United States government, all such testing has been performed within 72 hours of the asylum seekers' scheduled appointments at the Port of Entry.

3. Through August 7, 2021, CMI administered 2,644 COVID-19 tests for asylum seekers scheduled for appointments to enter the United States at the San Ysidro Port of Entry as part of this Title 42 exemption process. Of those 2,644 tests, only 21 yielded a positive result indicating that the individual tested was infected with COVID-19. This constitutes a test positivity rate of 0.79 percent.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 11th of August 2021 in Tijuana, Baja California, Mexico.

s/ Luis Alberto Lizarraga Tolentino
Luis Alberto Lizarraga Tolentino

## DECLARATION OF CECILIA MENJIVAR, Ph.D.

I, Cecilia Menjivar, declare as follows:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows.

## I.      Summary

1.      The government's assertion that an injunction in this case would be a "pull factor" triggering an increase in the arrival of asylum-seeking families requesting entry to the United States is unfounded.  I have studied the causes of migration for decades and they are not a function of U.S. court decisions or changes in policy, but conditions in migrants' countries of origin.  For refugees, threats to life or freedom in their countries of origin are a strong push factor that will likely overcome any disincentive created by harsher enforcement policies at the southern border.

## II.     Qualifications

2.      I received my Ph.D. in Sociology from the University of California, Davis in 1992. My doctoral dissertation was titled "Salvadoran Migration to the U.S.: The Dynamics of Social Networks in International Migration."

3.      Currently, I am a professor of Sociology at University of California, Los Angeles, where I hold the Dorothy L. Meier Chair in Social Equities. Previously, I was Foundation Distinguished Professor of Sociology at the University of Kansas. And prior to my position at KU, I was on the faculty at Arizona State University for 19 years, where I was Cowden Distinguished Professor with my appointment as full professor.

4.      At UCLA, I am affiliated faculty in the Latin American Institute and the Center for the Study of International Migration, and Faculty Fellow of the California Center for

Population Research. At KU, I served on the executive board of the Center for Latin American Studies and co-founded and co-directed the Center for Migration Research. I was a Senior Fellow at the American Immigration Council's Immigration Policy Center in 2012-2013. There, I wrote a report on immigrant women as they go through the legalization process. I was one of 18 members of the National Academy of Sciences panel on immigrant integration and wrote a report summarizing the state-of-the-art research on immigrant integration. I assisted the United Nations High Commissioner for Refugees (UNHCR) in its 2015 report, *Women on the Run*, which documented the factors that drive female asylum seekers to flee Guatemala, El Salvador, and Honduras in search of protection in the United States. In addition, I am in charge of summarizing the sociological research about and from Central America for the Library of Congress' Handbook on Latin American Studies, published biannually. For the past 25 years I have taught courses on research methods, immigration, refugees, and gender violence.

5.      I am the author or editor of six books addressing violence, gender, and immigration, primarily focusing on the context of Central American states. My first published book, *Fragmented Ties: Salvadoran Immigrant Networks in America*, was named one of the twelve most influential books on the family since 2000 in a review published in the journal Contemporary Sociology. My second book, *Enduring Violence: Ladina Women's Lives in Guatemala*, was published by the University of California Press in 2011 and received several awards; the Spanish translation was published in Guatemala in 2014. My third book, *Immigrant Families*, was published in 2016. In addition, I have edited fourteen volumes of essays and articles related to immigration and the lives of Central American and immigrant women and children. I am co-editor *The Oxford Handbook of Migration Crises*, published by the Oxford

2

App. 471

University Press in 2019, and of the volume *Undocumented and Unaccompanied: Children of Migration in the European Union and the United States*, to be published by Routledge in 2021.

6.        Since 1993, I have published more than 150 peer-reviewed scholarly articles, book chapters, and contributions to encyclopedias, many of which present the results of original quantitative and qualitative research about migration to the United States from Central America. A complete list of my publications is included in my C.V. A true and correct copy of my C.V. is attached as Exhibit A. I currently sit on the Editorial Board of eleven journals dedicated to the fields of sociology, migration, and Latin American and Latino Studies.

7.        In August 2020, I was awarded the Distinguished Career Award by the American Sociological Association's Section on International Migration. I currently serve as President of the American Sociological Association.

8.        I have previously provided affidavits or testimony as an expert witness in more than four dozen cases in federal court, in immigration court, or in asylum proceedings.

9.        My opinions derive from the three decades of study that I have carried out specific to the topic of migration; my hundreds of interviews with migrants and potential migrants from Central America and their families; review of the relevant research on the topic in my field of general migration, and more specifically of migration and violence in Central America; and my understanding of prevailing norms of social science research methods as developed through my training, scholarship, and teaching.

3

### III.     Findings and Opinions

10.     I write to address the assertions made by government declarants in this case that an injunction prohibiting application of the Title 42 exemption process may result in an increase in the number of asylum-seeking families arriving at the southwest border.[1]

11.     These claims that an injunction prohibiting the government from enforcing the Title 42 order against asylum-seeking families would serve as a migration "pull factor" are unfounded.

12.     As background, it is helpful to understand that immigration across the southwest border has fluctuated in recent years but has declined significantly overall in the past two decades.[2] The number of migrants apprehended by U.S. Border Patrol officials at the U.S.-Mexico border in fiscal year ("FY") 2018 was 396,579.[3] In FY 2019, notwithstanding the Trump administration's introduction of controversial policies such as the Migration Protection Protocols (MPP)[4]—which forced asylum seekers to remain in dangerous conditions in northern Mexico while awaiting U.S. immigration court hearings—the number of apprehensions rose to 851,508.[5] The number of apprehensions in FY 2020 returned to 400,651, slightly higher than the FY 2018

---

[1] *See* Declaration of Troy A. Miller ¶ 7, ECF No. 82-2 (Feb. 17, 2021); Declaration of Russell Hott ¶ 31, ECF No. 76-3 (Feb. 17, 2021).

[2] National Public Radio, *3 Charts That Show What's Actually Happening Along The Southern Border* (June 22, 2018), https://www.npr.org/2018/06/22/622246815/unauthorized-immigrationin-three-graphs; Stuart Anderson, *There Is No Crisis At The Border—And DHS Stats Prove It*, Forbes, June 25, 2018, https://www.forbes.com/sites/stuartanderson/2018/06/25/there-is-nocrisis-at-the-border-and-dhs-stats-prove-it/#2ef5fded112a ("Donald Trump talked about 'the illegal immigration crisis on the southern border.' But data coming from his own administration show there is no such crisis.")

[3] U.S. Customs and Border Protection, Southwest Border Migration FY2018, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2018.

[4] Migration Protection Protocols, Department of Homeland Security (Jan. 24, 2019).

[5] U.S. Customs and Border Protection, Southwest Border Migration FY2019, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.

4

figure.[6] In comparison, southwest border apprehensions were much higher in previous years. For

example, FY 2000 saw a record high of 1,643,679 apprehensions.[7] Each of the previous three

decades saw multiple years in a row where border apprehensions exceeded one million, e.g., FY

1983 through 1987, FY 1990 through 1994, FY 1995 through 2001, and FY 2004 through 2006.[8]

13.    Turning to the Title 42 expulsion process at issue in this case, the evidence does

not indicate that enforcement of the CDC Title 42 Orders has served as a deterrent to decrease

migration at the southwest border. The government's declarant, Mr. Miller, acknowledges in his

declaration that both the number of total so-called CBP "encounters" along the southwest border

*increased* every month from April 2020 to January 2021—and that the number of "encounters"

involving families increased in all but one of those months—notwithstanding enforcement of the

Title 42 process against single adult asylum seekers, families, and unaccompanied children

throughout that period.[9]

14.    The evidence therefore does not indicate that enforcement of the Title 42 process

to summarily expel asylum seekers and unaccompanied children since late March 2020

suppressed or deterred the migration of those groups to the southwest border. This lack of

deterrent effect of the Title 42 process was predictable, as it is well recognized that such harsh

immigration enforcement policies are ineffective at deterring migrants fleeing violence, as is the

case for most asylum-seeking families who arrive at the southern border. Because large-scale

---

[6] U.S. Customs and Border Protection, Southwest Border Migration FY2020,
https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2020.
[7] U.S. Border Patrol, Southwest Border Sectors, Total Illegal Alien Apprehensions By Fiscal
Year, https://www.cbp.gov/sites/default/files/assets/documents/2019-Mar/bp-southwest-border
sector-
apps-fy1960-fy2018.pdf. This document is attached as Exhibit B to this declaration.
[8] *Id.*
[9] Declaration of Troy A. Miller ¶¶ 5, 12, ECF No. 82-2 (Feb. 17 2021).

application of the Title 42 process did not reduce the number of such asylum seekers arriving at the border, there is no evidence or any reason to believe that a preliminary injunction enjoining application of the Title 42 process to asylum-seeking families will increase the number of such families arriving at the border.

15.    Mr. Miller's sole example of a previous court order that purportedly "served as a pull factor" for asylum seekers fleeing to the United States is unpersuasive. Mr. Miller reports that in the ten-week period from the Court's entry of its preliminary injunction in *P.J.E.S. v. Wolf* on November 18, 2020 and the end of January 2021, CBP encounters of unaccompanied children increased by 16.4 percent compared to the ten-week period preceding entry of the injunction.[10] However, between April and November 2020, the number of reported "encounters" of unaccompanied children had already been steadily increasing each month compared to the month before: by 36 percent in May 2020; by 68 in June 2020; by 48 percent in July 2020; by 24 percent in August 2020; by 25 percent in September 2020; and again by 24 percent in October 2020.[11] Therefore, while it is true that "encounters" of unaccompanied children increased by 9 percent in December 2020 as compared to November 2020, and by 17 percent in January 2021 as compared to December 2020, these post-injunction monthly percentage increases were actually smaller than the corresponding increases that preceded the injunction, during months when unaccompanied children were being expelled pursuant to Title 42.[12] Similarly, such encounters of unaccompanied children decreased by 21 percent from April to May 2021—well after

---

[10] Declaration of Troy A. Miller ¶ 7, ECF No. 76-2 (Feb. 17, 2021).

[11] U.S. Customs & Border Protection, Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Aug. 5, 2021).

[12] *Id.*

unaccompanied children had been exempted from Title 42—before increasing again modestly in

June 2021.[13] When placed in the appropriate context of these larger fluctuations, including the

months-long upward trend in unaccompanied child encounters that preceded the date of the

*P.J.E.S.* injunction, there is no basis for Mr. Miller's assumptions that a 16 percent increase in

encounters of unaccompanied children in the weeks following the entry of the injunction is either

significant or remotely attributable to the injunction itself.

16.     Additionally, it is critical to keep in mind that CBP's southwest border

enforcement "encounter" numbers are inflated. This is because the immediate expulsion of

families and others across the border into Mexico under Title 42 leads to repeat encounters

involving the same previously-expelled individuals as they attempt to cross again and again. In

an Operational Update published on July 16, 2021, CBP acknowledged: "The large number of

expulsions during the pandemic has contributed to a larger-than-usual number of migrants

making multiple border crossing attempts, which means that total encounters somewhat overstate

the number of unique individuals arriving at the border."[14] Thus, "between March 20, 2020

[when the first CDC Title 42 Order was issued] and February 4, 2021, 38 percent of all

[southwest border] encounters involved recidivism, or individuals who have been apprehended

---

[13] *Id.*

[14] U.S. Customs & Border Protection, *CBP Announces June 2021 Operational Update*, July 16, 2021, https://www.cbp.gov/newsroom/national-media-release/cbp-announces-june-2021-operational-update.

more than once."[15] In June 2021, the repeat-encounter rate was 34 percent.[16] By comparison, the equivalent "re-encounter rate" averaged just 14 percent from FY 2014 through FY 2019.[17] Thus, while CBP reported that it had "encountered 188,829 persons attempting entry along the Southwest Border" in June 2021, "[t]he number of unique new encounters in June 2021 was 123,838."[18] More broadly, "[t]he number of unique individuals encountered" during FY 2021 through June 2021 was "454,944 compared to 489,760 during the same time period in 2019."[19]

17.      The current numbers of apprehensions at the southwest border are partly due to the presence of a large population of asylum seekers stranded in Mexico who have not been able to seek protection in the United States. Several factors explain the presence of this population of vulnerable people in Mexico who repeatedly seek to cross into the United States. First, as explained in greater detail below, the high rates of violence in northern Central America continued and increased in some respects during the COVID-19 pandemic. Second, "historic lockdowns" and "strict restrictions on movement" in northern Central America and in Mexico during the first months of the pandemic delayed the ability of many asylum seekers to migrate in

---

[15] U.S. Customs & Border Protection, *CBP Announces January 2021 Operation Update*, Feb. 10, 2021, https://www.cbp.gov/newsroom/national-media-release/cbp-announces-january-2021-operational-update; *see also, e.g.*, Julián Aguilar, *Border Apprehensions Down Sharply in 2020 but Spiked in September*, Texas Tribune (Oct. 14, 2020) (reporting that the Title 42 policy "has led to an increase in repeat attempts by individual crossers and quoting U.S. Border Patrol Chief Rodney Scott as acknowledging that "recidivism has gone up dramatically," and is "in excess of 50%" in some areas of the border).

[16] *Id.*

[17] U.S. Customs & Border Protection, *CBP Announces June 2021 Operational Update*, July 16, 2021, https://www.cbp.gov/newsroom/national-media-release/cbp-announces-june-2021-operational-update.

[18] *Id.*

[19] *Id.*

App. 477

search of safety.[20] The Trump administration's suspension of the normal processing of asylum seekers into the United States (including the MPP program and ultimately Title 42) could not and did not dissuade or prevent migrants from fleeing the violence they fear in their countries of origin. However, those measures—and the continued use of Title 42 by the current administration—have prevented asylum seekers from being processed into the United States. This has created a large backlog of refugees stranded in especially dangerous areas of northern Mexico—a country which is in general one of the most dangerous migrant corridors in the world, and has become increasingly so. These families and individuals understandably try repeatedly to cross into the United States to seek safety from kidnapping, rape, and other dangers.[21]

18.    Even considering the inflated nature of the "encounter" figures that CBP has used since the imposition of the Title 42 process in March 2020, it is clear that keeping Title 42 in place through the remainder of last year did not deter outward migration by asylum seekers.  As Mr. Miller acknowledged in his declaration, the increase in total southwest border encounters from 17,106 in April 2020 to 78,323 in January 2021 "represent[ed] an increase of 357

---

[20] *See, e.g.*, Laura Gottesdiener, Lizbeth Diaz & Sarah Kinosian, *Central Americans Edge North as Pandemic Spurs Economic Collapse*, Reuters (Oct. 15, 2020) (reporting that in the early months of the pandemic, "U.S.-bound migration plummeted as Central American . . . countries imposed strict restrictions on movement in response to the growing coronavirus pandemic"; and that these "controls on movement across the region, shrinking resources available to many potential migrants, and lingering fears of the pandemic still raging in Mexico and the United States" largely "kept a lid on migration" into Fall 2020), https://www.reuters.com/article/us-usa-immigration-centralamerica/central-americans-edge-north-as-pandemic-spurs-economic-collapse-idUSKBN2701GL; Sofia Menchu & Nelson Renteria, *El Salvador, Guatemala Ramp Up Coronavirus Fight, Impose Curfews*, Reuters (Mar. 21, 2020), https://www.reuters.com/article/us-health-coronavirus-el-salvador/el-salvador-guatemala-ramp-up-coronavirus-fight-impose-curfews-idUSKBN21904R.
[21] *See, e.g.*, Al Jazeera News, *"I Don't Feel Safe": Migrants Face Attacks, Threats in Mexico—New Report Finds 492 Attacks Against Migrants stuck at US-Mexico Border or Expelled from US to Mexico Since January 21* (Apr. 21, 2021), https://www.aljazeera.com/news/2021/4/21/i-dont-feel-safe-migrants-face-attacks-threats-mexico.

percent";[22] and the increase in family unit encounters from 738 in April 2020 to 7,490 in January 2021 "represent[ed] a 915 percent increase."[23] Accordingly, it is clear that aggressive enforcement of the Title 42 process by the Trump administration between April 2020 and January 2021 did not deter migration to the southwest border either overall or with respect to families specifically.

19.     The Title 42 program's lack of deterrent effect on migration is not at all surprising, even for such an extreme departure from the United States' obligations to receive asylum seekers. Studies of the effects of immigration enforcement policies have shown that the imposition of harsher measures on asylum seekers has no deterrent effect on migration. The International Detention Coalition has explained that "asylum seekers' destinations are determined largely by historical, economic, and reputational factors that cannot be influenced by immigration policy makers."[24] DHS's own Advisory Committee on Family Residential Centers concluded that "[d]espite efforts to deter immigration from [Central American] countries, unaccompanied children and families (mainly mothers and children) continue to brave the treacherous journey to a safer location" " rather than face violence in their home countries.[25] This point has been thoroughly documented, including in UNHCR's 2015 *Women on the Run* report and in my own work. In interviews I personally conducted with women in Guatemala and with my research team with deportees in Honduras, interview subjects repeatedly stated that they

---

[22] Declaration of Troy A. Miller ¶ 12 (Feb. 17, 2021).
[23] *Id.* ¶ 5.
[24] Int'l Detention Coalition, *Does Detention Deter?* at 4 (Apr. 2015), *available at* https://idcoalition.org/wp-content/uploads/2015/04/Briefing-Paper_Does-Detention-Deter_April-2015-A4_web.pdf (comparing migration policies in twenty industrialized countries against the number of asylum seekers over a fourteen-year period).
[25] DHS Advisory Committee, *Report on Family Residential Centers* at 109 (Sept. 30, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

knew the journey to the United States would be perilous but that the dangers they faced in

Guatemala and Honduras left them no alternative but to leave. The Honduran deportees had

previously endured harrowing journeys through Mexico but were already planning to leave again

because living in Honduras was impossible.

20.    Moreover, in a memorandum prepared in early 2019, former Acting Secretary of

Homeland Security Chad Wolf acknowledged that the then-"recent[ly] implement[ed]" MPP

program "w[ould] not ultimately affect the flow of migrants heading north" from Mexico and

Central America.[26] Mr. Wolf reached this conclusion based in part on the lack of other safe

destinations for asylum seekers in the region.[27] Indeed, as noted above, despite DHS's large-

scale implementation of MPP and other similarly unprecedented and extreme measures to

prevent asylum seekers from gaining protection in the United States throughout 2019, southwest

border apprehensions increased significantly in FY 2019 from FY 2018.

21.    These same conclusions regarding the failure of prior harsh enforcement efforts to

deter asylum seekers apply equally to the Title 42 process. The nature of the migrant flows of

asylum-seeking families undercuts any theorized deterrent effect of harsher immigration policies.

While the overall number of migrants has decreased dramatically in recent years compared to

two decades ago, the number of migrants from the smaller countries in northern Central America

has continued to grow in recent years,[28] and includes a higher percentage of women, children,

---

[26] Chad F. Wolf, Senior Official Performing the Duties of the Under Secretary, DHS Office of
Strategy, Policy, and Plans, Department of Homeland Security, Memorandum for the Secretary
re: Migrant Protection Protocols as only One Piece of a Comprehensive Approach to Regional
Migration Management at 1, *available at* http://www.dmrs-ep.org/wp-
content/uploads/2020/11/2019-ICLI-00062.pdf.
[27] *Id.* at 1-2.
[28] D'vera Cohn et al., *Rise in U.S. Immigrants From El Salvador, Guatemala and Honduras
Outpaces Growth From Elsewhere*, Pew Research Ctr.: Hispanic Trends (Dec. 7, 2017)

and families because they are being driven from their homes due to horrific violence in those countries.[29] "By the end of 2019, nearly 800,000 people from El Salvador, Guatemala and Honduras had sought protection either within their countries or had crossed international borders to escape escalating levels of gang violence and persecution, among other push factors. In this context, children and adolescents are particularly vulnerable."[30] "Defying the gangs is extremely dangerous, particularly as retaliation not only affects the youth who refuse to join them, but also their family members who become targets of attacks. . . . This targeted violence and a lack of overall safety within their communities and countries has driven many families to leave their homes."[31]

22.     In northern Central America, law enforcement organizations, including especially the police, are frequently bribed by gangs or otherwise complicit with gangs' activities. Even law enforcement officers who are not on gangs' payrolls quite commonly acquiesce in gang activities and demands due to their own fears of violent retaliation from the gang if they fail to cooperate. Officers know, for example, that if they fail to notify a gang that someone has filed a complaint about the gang, the officers and their families may be targeted next. Therefore, meaningful law enforcement protection is practically non-existent and people—especially women—often give up on reporting threats and other crimes to authorities.

---

[hereinafter Pew Research, Outpaces Growth], http://www.pewhispanic.org/2017/12/07/rise-inu-s-immigrants-from-el-salvador-guatemala-and-honduras-outpaces-growth-from-elsewhere/

[29] *See* Rocio C. Labrador & Danielle Renwick, *Central America's Violent Northern Triangle*, Council on Foreign Relations (Jan. 19, 2016), http://www.cfr.org/transnational-crime/centralamericas-violentnortherntriangle/p37286; Dennis Stinchcomb & Eric Hershberg, Ctr. for Latin Am. & Latino Studies, *Unaccompanied Migrant Children from Central* America 13 (Nov. 2014), http://ssrn.com/abstract=2524001.

[30] UNHCR & UNICEF, *Families on the Run: Why Families Flee from Northern Central America* (Dec. 2020), *available at* https://familiesontherun.org/#.

[31] *Id.*

23.     Because families coming to the United States from Mexico and the northern part of Central America are driven primarily by violence, a policy of summary removal is unlikely to deter them from taking the journey to the United States' southern border. For a refugee, threats to life or freedom in his or her country of origin are a strong push factor that will likely overcome any disincentive created by harsher enforcement policies at the southern border.[32]

24.     The overwhelming majority of families crossing the United States' southern border in recent years have been fleeing violence both inside and outside the home in Mexico and northern Central America—"one of the most dangerous places on earth."[33] According to the most recent U.N. Office on Drugs and Crime Global Study on Homicide, which includes data through 2018, the intentional homicide rate in El Salvador that year was 52 per 100,000 people, the rate in Honduras was 38.9 per 100,000, and that in Guatemala was 22.5 per 100,000.[34] By comparison, the homicide rate in the United States was 5 per 100,000, and the global average was 5.8 per 100,000.[35]

25.     Women and children are particularly vulnerable to violence in northern Central America. In recent years, women in the region have been subject to "rampant violence—murders, disappearances, femicide, and acts of torture."[36] The current violence in northern

---

[32] *See, e.g.*, UNHCR, *Back to Basics* at iii (Apr. 2011); *see also* Jeremy Slack et al., *In Harm's Way: Family Separation, Immigration Enforcement Programs and Security on the US-Mexico Border*, 3 J. on Migration & Human Security, No. 2, 2015, at 114-16 ("[D]eterrence by arrest, incarceration and removal is largely ineffective. The majority of respondents expressed that they intend to return to the United States sometime in the future.").

[33] Muzaffar Chishti & Faye Hipsman, *The Child and Family Migration Surge of Summer 2014: A Short Lived Crisis with a Lasting Impact*, 68 J. Int'l Aff. 95, 95-96 (2015).

[34] U.N. Office on Drugs & Crime, *Victims of Intentional Homicide, 1990-2018*, https://dataunodc.un.org/content/data/homicide/homicide-rate.

[35] *Id.*

[36] Carolina Campos & Andrew Stefan, *The Salvadoran Dream Is Now Survival—Even If It Means Illegal Migration to the U.S.*, Reader Supported News, Jan. 10, 2016, *available at*

Central America flows from "a decades-old crisis that has reached unimaginable and intolerable levels."[37] UNHCR has found that women in particular "have been forced to flee their homelands" in northern Central America due to a "surging tide of violence," including rape, assault, extortion, disappearances, exposure to gun fights, and death threats by armed criminal groups.[38] Such violence and victimization have for years been the most consistent factors cited by Central American women and children for their migration to the United States.[39]

26.    A December 2020 joint report from UNHCR and UNICEF confirms that "the many forms of violence and persecution that have driven forced displacement in [northern Central America] for years on end[] have continued and, in some instances, worsened during" the COVID-19 pandemic, including "an increase in reports of domestic violence since the beginning of the pandemic, while child protection services have been cut back"; and a rise in "sexual and gender-based violence."[40] The U.N. report indicates that gang and gender violence and similar "push factors" remain dominant forces driving migrants—and particularly families—to flee northern Central America. "Forty-four percent of the[] families [surveyed in 2020 in El Salvador, Guatemala, and Honduras] reported not feeling safe in their places of residence and living under threats of violence during the six months prior to the study," and "23 percent

---

https://readersupportednews.org/opinion2/277-75/34535-focus-the-salvadoran-dream-is-nowsurvival-even-if-it-means-illegal-migration-to-the-us.

[37] *Id.*

[38] UNHCR, *Women on the Run: Run: First-hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico*, at i, 2, 4 (Oct. 2015), *available at* https://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html.

[39] *Id.* at 4; UNHCR, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection*, at 31 (Mar. 2014), *available at* https://www.unhcr.org/56fc266f4.html.

[40] UNHCR & UNICEF, *Families on the Run: Why Families Flee from Northern Central America* (Dec. 2020), https://familiesontherun.org/#.

14

indicated they had suffered violence and intimidation by gangs."[41] Similarly, among Central

American asylum seekers in surveyed by the U.N. study in Mexico, 49 percent "identified

violence as their main motivation to flee from northern Central America," with 30 percent

reporting that they had fled in response to death threats.[42]

27.    Reported "disappearances"—especially of women—have increased considerably

in northern Central America. Such "disappearances" are not registered in official homicide

statistics, which therefore likely significantly undercount the number of people—and particularly

the number of women—being murdered in these countries. This past month, the leader of a

women's rights organization in El Salvador recently informed me that her group has estimated

that for every woman officially recorded as murdered in El Salvador, three women are reported

"disappeared."  The ratio for men is roughly one to one.

28.    It was this ongoing and increasing societal violence—and not any potential policy

change in the United States—that formed the basis for the U.N.'s prediction in December 2020

that the numbers of asylum seekers migrating in the region would increase. The U.N. report

explained "that as [regional pandemic-related] movement restrictions ease, more people will

flee—internally or across international borders—to escape extortion and violence by criminal

groups, domestic violence, as well as other human rights abuses, amongst other push factors."[43]

The head of UNICEF reiterated in an April 2021 briefing that Guatemala, El Salvador, and

Honduras have "[a]mong the highest homicide and femicide rates in the world" and that asylum

seekers from the region "are fleeing a tangle of dangers" including "[v]iolence and death threats"

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

15

and "[w]eak or non-existence safety nets and infrastructure," exacerbated in part by "relentless natural disasters like last November's back-to-back hurricanes."[44]

29.     Notably, the August 2, 2021 CDC Title 42 Order itself notes that, "[a]ccording to data from DHS, encounters at the southern border have been rising since April 2020 due to several factors, including ongoing violence, insecurity, and famine in the Northern Triangle countries of Central America (El Salvador, Honduras, Guatemala)."[45] The government's most recent declaration likewise acknowledges that potential further increases in numbers of encounters at the southwest border will be "[d]ue to the impacts of the current pandemic, and the deteriorating economic conditions and increasing instability in the region from which the migrants originate."[46]

30.     This is because, for families fleeing crime and violence in the northern countries of Central America in particular, "no amount of danger or chance of deportation [will be] sufficient to dissuade [them] from leaving."[47] A 2014 Vanderbilt University survey of prospective migrants still living in the northern region of Central America, for example, indicated that U.S. immigration policy had no significant impact on such individuals' decisions

---

[44] UNICEF, *Remarks of UNICEF Executive Director Henrietta Fore*, Apr. 20, 2016, *available at* https://www.unicef.org/press-releases/unicef-executive-director-henrietta-fores-remarks-virtual%E2%80%AFbriefing-humanitarian.

[45] Centers for Disease Control & Prevention, Public Health Reassessment & Order Suspending the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists, ECF No. 114, Ex. A, at 13 n.70 (Aug. 2, 2021).

[46] Declaration of David Shahoulian ¶ 23, ECF No. 113-1 (Aug. 2, 2021). However, as explained above, there is no basis for Mr. Shahoulian's unexplained further assertion that "these numbers will climb even higher if the CDC Order is enjoined." *See id.*

[47] Jonathan T. Hiskey et al., *Understanding the Central American Refugee Crisis: Why They Are Fleeing and How U.S. Policies Are Failing to Deter Them*, Am. Immigr. Council (Feb. 1, 2016), https://www.americanimmigrationcouncil.org/research/understanding-central-american-refugee-crisis.

to leave the region: "[K]nowledge of the risks of migration—deportation, border conditions, and treatment in the United States—played no significant role in who had plans to migrate and who did not have such plans."[48] Indeed, "all else being equal, individuals who thought deportations had increased in 2014 were just as likely to report intentions to migrate as those individuals who thought deportations had decreased since 2013."[49] These findings are consistent with my own research in Guatemala and Honduras, as well as the research of other experts in the field.

31.     Another study used survey data from El Salvador, Guatemala, and Honduras to assess whether enhanced deterrence efforts by the United States mitigate Central American immigration caused by crime and violence in the country of origin.[50] The study revealed that "individuals in El Salvador and Honduras who have experienced crime first hand multiple times are particularly likely to express intentions to migrate" and "persist in their migration plans even if they are fully aware of the dangers they are likely to encounter along the way and the high probability of deportation if they make it to the United States."[51] There is, in fact, an "utter lack of statistical significance" when it comes to U.S. immigration policy on migration from northern Central America, which "raise[s] questions about the effectiveness of current US efforts to deter future emigration from countries with high levels of crime and violence."[52] This means that "views of the dangers of migration to the United States, or the likelihood of deportation, do not seem to influence emigration plans in any meaningful way."[53]

---

[48] *Id.*

[49] *Id.*

[50] Jonathan T. Hiskey et al., *Leaving the Devil You Know: Crime Victimization, US Deterrence Policy, and the Emigration Decision in Central America*, 53 Latin Am. Res. Rev. 429, 430 (2018).

[51] *Id.*

[52] *Id.* at 442.

[53] *Id.* at 441.

32.     Again, all of this evidence is entirely consistent with the admission in Mr. Miller's declaration that even with the enforcement of the Title 42 process effecting a nearly complete abandonment of U.S. obligations to accept asylum seekers between April 2020 and January 2021, migration was not deterred and CBP border encounters instead increased each month both overall and (in each month but one) specifically as to families.[54]

## IV. Conclusion

33.     Title 42 process itself predictably did not deter migration by asylum-seeking families, and there is no reason to expect that a preliminary injunction enjoining the application of the Title 42 process against such families will serve as a "pull factor" prompting additional migration by families beyond what would otherwise occur. Rather, in the coming months—as in recent months and in previous years, and in line with UNHCR and UNICEF's prediction in December 2020[55]—we should expect the number of families arriving at the southern border to be driven by the violence and harm such families are fleeing in their countries of origin.

I declare under penalty of perjury that the foregoing is true and correct. Executed August 9, 2021 in Los Angeles, California.

_____
DR. CECILIA MENJIVAR

---

[54] Declaration of Troy A. Miller ¶ 7, ECF No. 76-2 (Feb. 17, 2021).
[55] UNHCR & UNICEF, *Families on the Run: Why Families Flee from Northern Central America* (Dec. 2020), *available at* https://familiesontherun.org/#.

18

# Exhibit A

**Cecilia Menjívar**
Professor and Dorothy L. Meier Social Equities Chair
(August 2021)

Department of Sociology                              Phone: 310-267-4928
University of California, Los Angeles               Skype: cecimenjivar
375 Portola Plaza, 264 Haines Hall Los Angeles, CA 90095-1551     Email: menjivar@soc.ucla.edu

**Positions Held**
2018-present Professor and Dorothy L. Meier Social Equities Chair, Department of Sociology, UCLA
2015-2018 Co-Director, Center for Migration Research, University of Kansas
2015-2018 Foundation Distinguished Professor, Department of Sociology, University of Kansas
2012- 2015 Associate Director, Sanford School of Social and Family Dynamics, Arizona State University
2008- 2015 Cowden Distinguished Professor, School of Social and Family Dynamics
2005-2007 Associate Professor, Program in Sociology, School of Social and Family Dynamics, ASU.
2001-2005 Associate Professor, School of Justice and Social Inquiry, Arizona State University.
1996-2001 Assistant Professor, School of Justice and Social Inquiry, Arizona State University.
9/94-12/95 Post-doctoral Fellow, RAND Corporation.
8/92-8/94 Chancellor's Postdoctoral Fellow, University of California, Berkeley.

**Affiliations, Appointments, and Visiting Positions**
2021-    Faculty Fellow (Affiliate since 2018), California Center for Population Research, UCLA
2019    Department of Sociology/HOMing Project, University of Trento, Italy (Summer)
2019-    Founding member, National Science Foundation College of Reviewers (GCR, NSF-wide program)
2019-    Immigrant Youth Task Force, UCLA
2014-2015 Member, National Academy of Sciences, Engineering and Medicine Committee on the
             Integration of Immigrants into American Society (see Waters & Pineau, 2015 volume below).
2014    Visiting Scholar (one week), Center for Gender & Leadership, Yerevan State University, Armenia
2012-2013 Immigration Policy Center, Washington DC, Senior Fellow (area: Immigrant Women)
2006-2008 Research Affiliate, Center on Race, Religion, and Urban Life (CORRUL), Rice University
2006    Fellow (not in residence), Mexican American and U.S. Latino Research Center, Texas A & M
2006-2012 Member, Working Group on Childhood and Migration (Drexel University)
2005    Visiting Professor, Yerevan State University, Yerevan, Armenia (Fall)
2003    Visiting Scholar, Maison des Sciences de l'Homme, Paris, France (Spring)
2000-    External Research Associate, Center for Comparative Immigration Studies, UC San Diego

**Education**
1992    Ph.D., Sociology. University of California, Davis.
1986    Master of Arts, Sociology. University of California, Davis.
1983    Master of Science, International Education. University of Southern California. Areas: Policy,
           Planning, and International Development.
1981    Bachelor of Arts, Psychology and Sociology, University of Southern California.

**Workshops and Additional Training**
1996    Southwest Institute for Research on Women Summer Institute, University of Arizona.
1989    University of Texas, Austin. IUPLR (training in qualitative methods). Summer.
1986, 1988 University of Michigan, Ann Arbor, Summer ICPSR (training in quantitative methods).
1985-86 Graduate Group in Demography, UC Berkeley. Demographic Theory and methods.
1984    University of Texas, El Paso (LULAC). Training in counseling immigrant teenagers.
1983    University of California, Los Angeles. Non-formal Education and Development Seminars.
1982    Université de Genève, Faculté de Lettres, Langue et Civilisation. Intermediate-advance French language.

**Awards and Honors**

2020-2023 President-elect, President, Past-President, American Sociological Association
2013-2016 Vice-President elect, Vice-President, Past Vice-President, American Sociological Association

*Research and Scholarship*
2020    Distinguished Career Award, International Migration Section, American Sociological Association
2018    2017 *Feminist Criminology* Best Article Award for ""Humane" Immigration Enforcement"
2017    Elected member, Sociological Research Association
2017    Andrew Carnegie Fellow
2017    Honorable Mention, Louis Wirth Best Article Award International Migration Section, American Sociological
        Association, 2017, for "Transformative Effects of Immigration Law."
2014    John Simon Guggenheim Fellow
2014    The Victoria Foundation Eugene Garcia Research Award
2014    Best Article Award, Latino/a Section, American Sociological Association, for *Legal Violence*
2013    *Fragmented Ties* among 12 most influential books on family since 2000, *Contemporary Sociology*
2013    Best Article Award, Latino Studies Section, Latin American Studies Association, for *Legal Violence*
2012    Distinguished Scholarship Award, Pacific Sociological Association, for *Enduring Violence*.
2012    Mirra Komarovsky Book Award, Eastern Sociological Society, for *Enduring Violence*.
2011    Hubert Herring Best Book Award, Pacific Coast Council on Latin American Studies, *Enduring Violence*.
2010    Julian Samora Distinguished Career Award, Latinos/as Section, American Sociological Association.
2009    Alpha Kappa Delta Distinguished Lecture, ASA meetings
2007    Distinguished Contribution to Research Award, Latinos/as Section, American Sociological Association.
2007    Alumni Association Faculty Achievement Award in Research, Arizona State University.
2002    Choice Outstanding Academic Titles in Social and Behavioral Sciences for *Fragmented Ties*.
2001    William J. Goode Outstanding Book Award, American Sociological Association Family Section,
        for *Fragmented Ties*
2001    Honorable mention, Thomas and Znaniecki Book Award, American Sociological Association
        International Migration Section for *Fragmented Ties*.
2001    Faculty Achievement Award, School of Justice Studies, Arizona State University.
1990-91 University of California Regents Dissertation Fellowship.
1989-90 American Sociological Association Minority Fellowship (1 year MFP Fellow).
1990    American Sociological Association Pre-doctoral Research Fellowship.

*Teaching and Mentoring*
2011 Outstanding Doctoral Mentor Award, Arizona State University (university-wide award)
2002    Outstanding Mentor Award, Graduate Women's Association, Arizona State University.
2002    Nominee, Outstanding Doctoral Mentor Award, Graduate College, Arizona State University.
2001    Student Affairs Honors (for enhancing the quality of life for ASU students), Student Affairs, ASU

*Other*
2015    Public Sociology Award, International Migration Section, American Sociological Association
2007    School of Justice & Social Inquiry, Affiliated Faculty Recognition Award.
2006    College Marshall (College of Liberal Arts & Sciences), Fall 2006 Commencement, ASU.
2002    Outstanding Achievement and Contribution Toward Advancing The Status of Women,
        Commission on the Status of Women, Arizona State University.
1983    Cum Laude, School of Education, University of Southern California.
1979-81 Member of Honor Societies in Psychology, Sociology, and Foreign Languages.

**Publications**

<u>Books</u>

2016    Cecilia Menjívar, Leisy Abrego and Leah Schmalzbauer. *Immigrant Families*. Cambridge, UK: Polity.

2014    Cecilia Menjívar. *Eterna Violencia: Vidas de las mujeres ladinas en Guatemala*. Guatemala: Ediciones del Pensativo & FLACSO-Guatemala. (Adapted & translated from *Enduring Violence*: *Ladina Women's Lives in Guatemala*.)
- Author meets critics & book presentation, FLACSO-Guatemala, Guatemala City, Nov. 18th 2014

2011    Cecilia Menjívar. *Enduring Violence: Ladina Women's Lives in Guatemala*. Berkeley, CA: University of California Press.
- Distinguished Scholarship Award, Pacific Sociological Association, 2012
- Mirra Komarovsky Book Award, Eastern Sociological Society, 2012
- Hubert Herring Best Book Award, Pacific Coast Council on Latin American Studies, 2011
- Chapter 2, "A Framework for Examining Violence," reprinted in Pp. 130-144 in *Gender through the Prism of Difference*, 5th Ed., by Maxine Baca Zinn, Pierrette Hondagneu-Sotelo, Michael A. Messner, & Amy M. Denissen. Oxford University Press, 2015.

2000    Cecilia Menjívar. *Fragmented Ties: Salvadoran Immigrant Networks in America*. Berkeley, CA: University of California Press.
- Among 20 books in "Influential Women of and for Anthropology*" Anthropology News*, American Anthropological Association, March 8th, 2017
- Among the 12 most influential books on the family since 2000, *Contemporary Sociology* 42 (3)
- William J. Goode Outstanding Book Award, American Sociological Association Family Section, 2001
- Honorable mention, Thomas & Znaniecki Book Award, American Sociological Association International Migration Section, 2001
- Choice Outstanding Academic Title in Social and Behavioral Sciences, 2002
- Review essay in *Contemporary Sociology*, 33 (4): 399-401 (2004)

<u>Edited volumes (including journal special issues)</u>

Forth    Cecilia Menjívar and Krista Perreira. (Eds.) *Undocumented and Unaccompanied: Children of Migration in the European Union and the United States*. London: Routledge (based on *Journal of Ethnic and Migration Studies* special issue)

2019    Cecilia Menjívar, Marie Ruiz and Immanuel Ness. (Eds.) *The Oxford Handbook of Migration Crises*. Oxford University Press.
- Listed in "Election 2020 Resources from Oxford University Press."

2019    Cecilia Menjívar and Krista Perreira (Guest Editors) "Undocumented and Unaccompanied: Children of Migration in the European Union and the United States." *Journal of Ethnic and Migration Studies,* 45 (2), January.

2017    Bryan Roberts, Cecilia Menjívar and Nestor Rodriguez (Eds.) *Deportation and Return in a Border Restricted World: Experiences in Mexico, El Salvador, Guatemala, and Honduras*. Springer International Publishing.

2015    Waters, M., & Pineau, M.G. (2015). (Eds.) (Contributing author.) *The Integration of Immigrants into American Society*. Committee on Immigrant Integration, National Academy of Sciences, Engineering, Medicine. Washington, DC: National Academy Press. (Peer reviewed)

2014    Cecilia Menjívar and Daniel Kanstroom. (Eds.) *Constructing Immigrant "Illegality": Critiques, Experiences, and Responses.* New York, NY: Cambridge University Press

2014    Elizabeth Aranda, Cecilia Menjívar, and Katharine M. Donato (Guest editors). "Spillover Effects of Immigration Enforcement in Local Contexts." *American Behavioral Scientist*, 58 (13) November.

2013    Cecilia Menjívar (Co-Editor with Saer Maty Ba, Michael Borgolte, Donna Gabaccia, Dirk Hoerder, Alex Julca, Marlou Shrover and Greggory Woolf). *Encyclopedia of Global Human Migration* Vols. 1-5 (Editor-in-Chief: Immanuel Ness). Chichester Willey-Blackwell.

2012    Jørgen Carling, Cecilia Menjívar, and Leah Schmalzbauer (Guest editors). "Transnational Parenthood." *Journal of Ethnic and Migration Studies*, 38 (2) February.

2008    Havidán Rodríguez, Rogelio Sáenz and Cecilia Menjívar. (Eds.) *Latinos/as in the United States: Changing the Face of América.* New York: Springer

2008    Adrian Pantoja, Cecilia Menjívar, and Lisa Magaña (Guest editors). The Spring Marches of 2006: Latinos, Immigration, and Political Mobilization in the 21st Century. *American Behavioral Scientist*, 52 (4) December.

2006    Cecilia Menjívar (Guest editor). Public Religion and Immigration across National Contexts. *American Behavioral Scientist*, 49 (11) July.

2005    Cecilia Menjívar and Nestor P. Rodríguez. (Eds.) *When States Kill: Latin America, the US, and Technologies of Terror*. Austin, TX: University of Texas Press.

2003    Cecilia Menjívar (Ed.) *Through the Eyes of Women: Gender, Social Networks, Family and Structural Change in Latin America and the Caribbean.*" Ontario, Canada: de Sitter Publications. *Based on special issue of *Journal of Developing Societies* (see below)

2002    Cecilia Menjívar (Guest editor, double issue*). Structural Changes and Gender Relations in Latin America and the Caribbean. Double issue of the *Journal of Developing Societies,* 18 (2-3).

Peer-Reviewed Articles (*denotes student or post-doc at the time of submission)

Forth   *Daniel Alvord and Cecilia Menjívar. "The Language of Immigration Coverage: The Arizona Republic and Media's Role in the Production of Social Illegality." *Sociological Perspectives*

2021    Carlos Santos, *German Cardenas, Cecilia Menjívar, and *Jesus Cisneros. "The development and evaluation of the Stigma of Illegality and Marginalization of Latinxs (SIML) scale: Links to psychological distress." *Du Bois Review: Social Science Research on Race,* 18 https://doi.org/10.1017/S1742058X21000199

2021    Irene Bloemraad and Cecilia Menjívar. "Precarious Times, Professional Tensions: The Ethics of Migration Research and the Drive for Scientific Accountability." *International Migration Review* https://doi.org/10.1177/01979183211014455

2021    Victor Agadjanian, *Byeongdon Oh, and Cecilia Menjívar. "(Il)legality and Subjective Well-Being: Central Asian Migrant Women in Russia." *Journal of Ethnic and Migration Studies* https://doi.org/10.1080/1369183X.2021.1872373

2021    *Adrian Bacong and Cecilia Menjívar. "Recasting the Immigrant Health Paradox through Intersections of Legal Status and Race." *Journal of Immigrant and Minority Health* https://doi.org/10.1007/s10903-021-01162-2

2021    Cecilia Menjívar. "The Racialization of Illegality." *Daedalus: Journal of the American Academy of Arts & Sciences*, 150 (2): 91-105

2021    Cecilia Menjívar. "Policing and Violence: The Less Visible Harms of Policing Practices." *The Brown Journal of World Affairs,* 27 (2): 1-12 (Main/lead essay)

2021    William P. Simmons, Cecilia Menjívar, and *Elizabeth Salerno Valdez. "The Gendered Effects of Local Immigration Enforcement: Latinas' Social Isolation in Chicago, Houston, Los Angeles, and Phoenix." *International Migration Review*, 55 (1): 108-134

2021    Walter J. Nicholls, Cecilia Menjívar, and *Daniel Alvord. ""No Tyson in Tongie!": The Battle to Protect a Rural Way of Life in Kansas." *Sociological Forum*, 36 (1): 29-50

2020    Cecilia Menjívar, Victor Agadjanian, and *Byeongdon Oh. "The Contradictions of Liminal Legality: Economic Attainment and Civic Engagement of Central American Immigrants on Temporary Protected Status." *Social Problems* doi.org/10.1093/socpro/spaa052

2020    *Andrea Gómez Cervantes and Cecilia Menjívar. "Legal Violence, Health, and Access to Care: Latina Immigrants in Rural and Urban Kansas" *Journal of Health and Social Behavior,* 61(3): 307-323

2020    *Erin Adamson, Cecilia Menjívar, and Shannon Drysdale Walsh. "The Impact of Adjacent Laws on Implementing Violence Against Women Laws: Legal Violence in the Lives of Costa Rican Women." *Law & Social Inquiry*, 45 (2): 432-489

2020    *Andrea Vest Ettekal, Sandra D. Simpkins, Cecilia Menjívar, and *Melissa Y. Delgado. "The Complexities of Culturally Responsive Organized Activities: Latino Parents' and Adolescents' Perspectives." *Journal of Adolescent Research*, 35 (3): 395-426

2019    Cecilia Menjívar and Krista Perreira. "Undocumented and Unaccompanied: Children of Migration in the European Union and the United States." (Introduction to special issue.) *Journal of Ethnic and Migration Studies*, 45 (2): 197-217

2018    Cecilia Menjívar, William P. Simmons, *Daniel Alvord, and *Elizabeth Salerno Valdez. "Immigration Enforcement, the Racialization of Legal Status, and Perceptions of the Police: Latinos in Chicago, Los Angeles, Houston, and Phoenix in Comparative Perspective." *Du Bois Review: Social Science Research on Race*, 15 (1): 107-128

2018    *Daniel Alvord, Cecilia Menjívar, and *Andrea Gómez Cervantes. "The Legal Violence in the 2017 Executive Orders: The Expansion of Immigrant Criminalization in Kansas." *Social Currents,* 5 (5): 411-42 (Lead article)

2018    Cecilia Menjívar, *Andrea Gómez Cervantes and *Daniel Alvord. ""The Expansion of "Crimmigration, Mass Detention, and Deportation." *Sociology Compass* 12 (4): e12573

2018    *Gómez Cervantes, Andrea, *Daniel Alvord, and Cecilia Menjívar. "'Bad Hombres:' The Effects of Criminalizing Latino Immigrants through Law and Media in the Rural Midwest." *Migration Letters,* 15 (2): 182-196

2018   Cecilia Menjívar and Sarah M. Lakhani. "Combining Qualitative Data in Research Among U.S. Immigrant Populations." *SAGE Research Methods Cases* doi.org/10.4135/9781526444356

2018   Cecilia Menjívar, Juliana Morris, and Nestor Rodriguez. "The Ripple Effects of Deportations to Honduras." *Migration Studies,* 6 (1): 120-139

2018   Olga Kornienko, Victor Agadjanian, Cecilia Menjívar, and *Natalia Zotova. "Financial and Emotional Support in Close Personal Ties among Central Asian Migrant Women in Russia." *Social Networks,* 53: 125-135

2018   Carlos E. Santos, Cecilia Menjívar, *Rachel A. VanDaalen, Olga Kornienko, Kimberly A. Updegraff and *Samantha N. Cruz. "Awareness of Arizona's Immigration Law SB 1070 Predicts Classroom Behavioural Problems among Latino Youth during Early Adolescence." *Ethnic and Racial Studies*, 41 (9): 1672-1690

2017   *Alex Lin, *Erin Gaskin, Sandra Simpkins and Cecilia Menjívar. "Cultural Values and Other Perceived Benefits of Organized Activities: A Qualitative Analysis of Mexican-Origin Parents' Perspectives in Arizona." *Applied Developmental Science*, 22 (2): 89-109 (Lead article)

2017   Leisy Abrego, Mat Coleman, Daniel E. Martinez, Cecilia Menjívar, and Jeremy Slack. "Making Immigrants into Criminals: Legal Processes of Criminalization in the Post-IIRIRA Era." *Journal on Migration and Human Security*, 5 (3): 694-715

2017   *Andrea Gomez Cervantes, Cecilia Menjívar, and William S. Staples. ""Humane" Immigration Enforcement and Latina Immigrants in the Detention Complex." *Feminist Criminology*, 12 (3): 269-292

   - 2017 *Feminist Criminology* Best Article Award (given in 2018)

2017   Cecilia Menjívar and Shannon Drysdale Walsh. "The Architecture of Feminicide: The State, Inequalities, and Everyday Gender Violence in Honduras." *Latin American Research Review,* 52(2): 221-240

2017   Victor Agadjanian, Cecilia Menjívar, and *Natalia Zotova. "Legality, Racialization, and Immigrants' Experiences of Ethnoracial Harassment in Russia." *Social Problems*, 64 (4): 558-576

   - Included in Immigrants' Incorporation virtual issue, *Social Problems*
     https://academic.oup.com/socpro/pages/immigration_vi

2017   *Chara Price, Sandra Simpkins and Cecilia Menjívar. "Sibling Behaviors and Mexican-Origin Adolescents' After-School Activities." *Journal of Adolescent Research,* 32 (2): 127-154 (lead article)

2016   Shannon Drysdale Walsh and Cecilia Menjívar. "What Guarantees Do We Have?" Legal Tolls and Persistent Impunity for Feminicide in Guatemala." *Latin American Politics and Society*, 58 (4): 31-55

2016   Cecilia Menjívar and Sarah M. Lakhani. "Transformative Effects of Immigration Law: Migrants' Personal and Social Metamorphoses through Regularization." *American Journal of Sociology*, 121 (6): 1818-1855

   - Louis Wirth Best Article Award Honorable Mention, International Migration Section, American Sociological Association, 2017.

2016   Shannon Drysdale Walsh and Cecilia Menjívar. "Impunity and Multisided Violence in the Lives of Latin American Women: El Salvador in Comparative Perspective." *Current Sociology,* 64 (4): 586-602.

2016    Menjívar, Cecilia and Shannon Drysdale Walsh. "Subverting Justice: Socio-Legal Determinants of Impunity for Violence against Women in Guatemala." *Laws* 5 (3): 1-20.

2016    *Alex R. Lin, Cecilia Menjívar, *Andrea Vest Ettekal, Sandra D. Simpkins, *Erin Gaskin and *Annelise Pesch. ""They Will Post a Law About Playing Soccer" and other Ethnic/Racial Microaggressions in Organized Activities Experienced by Mexican-Origin Families." *Journal of Adolescent Research,* 31 (5): 557-581

2016    Cecilia Menjívar. "Immigrant Criminalization in Law and the Media: Effects on Latino Immigrant Workers' Identities in Arizona." *American Behavioral Scientist*, 60 (5-6): 597-616

2015    *Dulce Medina and Cecilia Menjívar. "The Context of Return Migration: Challenges of Mixed-status Families in Mexico's Schools." *Ethnic and Racial Studies*, 38 (12): 2123-2139

2015    *Haruna Fukui and Cecilia Menjívar. "Bound by Inequality: The Social Capital of Older Asian and Latinos in Phoenix, Arizona." *Ethnography,* 16 (4): 416-437

2015    María E. Enchautegui and Cecilia Menjívar. "Paradoxes of Family Reunification Law: Family Separation and Reorganization under the Current Immigration Regime." *Law & Policy,* 37(1-2): 32-60.
        • Immigration Article of the Day" April 1, 2015, ImmigrationProf Blog

2015    William Simmons, Cecilia Menjívar and Michelle Téllez. "Violence and Vulnerability of Female Migrants in Drop Houses in Arizona: The Predictable Outcome of a Chain Reaction of Violence." *Violence Against Women,* 21 (5): 551-570

2014    Cecilia Menjívar. "Immigration Law Beyond Borders: Externalizing and Internalizing Border Controls in an Era of Securitization." *Annual Review of Law and Social Science,* 10: 353-369

2014    *Jennifer Arney and Cecilia Menjívar. "Medicalization of Emotionality in DTCA: Techniques Used to Expand the Antidepressant Market." *Sociological Inquiry*, 84 (4): 519-544

2014    Victor Agadjanian, *Evgenia Gorina, and Cecilia Menjívar. "Economic Incorporation, Civil Inclusion, and Social Ties: Plans to Return Home among Central Asian Migrant Women in Moscow, Russia." *International Migration Review*, 48 (3): 577-603. (Lead article)

2014    Elizabeth Aranda, Cecilia Menjívar and Katharine M. Donato. "The Spillover Consequences of an Enforcement-First U.S. Immigration Regime." (Introduction to special issue.) *American Behavioral Scientist*, 58 (13): 1687-1695.

2014    Cecilia Menjívar. The "Poli-Migra": Multi-layered legislation, enforcement practices, and What We Can Learn About and From Today's Approaches." *American Behavioral Scientist*, 58 (13): 1805-1819.

2014    *Silvia Dominguez and Cecilia Menjívar. "Beyond Individual and Visible Acts of Violence: A Framework to Examine the Lives of Women in Low-Income Neighborhoods." *Women's Studies International Forum* 44 (1): 184-195

2013    Carlos Santos and Cecilia Menjívar. "Youth's Perspective on Senate Bill 1070 in Arizona: The Socioeconomic Effects of Immigration Policy." *Association of Mexican-American Educators (AMAE) Journal*, Special invited issue, 7 (2): 7-17. (Lead article)

2013    Cecilia Menjívar. "Central American Immigrant Workers and Legal Violence in Phoenix, Arizona." *Latino Studies*, 11 (2): 228-252

2013    *Zeynep Kiliç and Cecilia Menjívar. "Fluid Adaptation of Contested Identities: Second Generation Turks in Germany and the United States." *Social Identities*, 19 (2): 204-220.

2012    Tanya Golash-Boza and Cecilia Menjívar. "Causes and Consequences of International Migration: Sociological Evidence for the Right to Mobility." *The International Journal of Human Rights*, 16 (8): 1213-1227.

- Reprinted in pp. 91-105, *New Directions in the Sociology of Human Rights*, edited by Patricia Hynes, Michele Lamb, Damien Short and Matthew Waites. London: Routledge, 2014

2012    *Olivia Salcido and Cecilia Menjívar. "Gendered Paths to Legal Citizenship: The Case of Latin American Immigrants in Phoenix." *Law & Society Review* 46 (2): 335-368.

- Reprinted in *Immigration, Refugee & Citizenship Law eJournal*, Vol. 14, No. 67. (Lead article)

2012    Cecilia Menjívar and *Leisy J. Abrego "Legal Violence: Immigration Law and the Lives of Central American Immigrants." *American Journal of Sociology*, 117 (5): 1380-1421.

- Best Article Award, Latino/a Section, American Sociological Association, 2014
- Best Article Award, Latino Studies Section, Latin American Studies Association 2013
- Spanish translation: "Violencia Legal: La ley de inmigración y las vidas de los inmigrantes centroamericanos." Pp. 173-246 in *Visiones de acá y de allá: Implicaciones de la política antimigrante en las comunidades de origen mexicano en Estados Unidos y México*, Carlos G. Vélez-Ibáñez, Roberto Sánchez Benítez and Mariángela Rodríguez Nicholls, eds. México D.F.: UNAM, 2015

2012    *Aysem R. Şenyürekli and Cecilia Menjívar. "Turkish Immigrants' Hopes and Fears Around Return Migration." *International Migration*, 50 (1): 3-19 (Lead article)

2012    Cecilia Menjívar. "Transnational Parenting and Immigration Law: The Case of Central Americans in the United States." *Journal of Ethnic and Migration Studies*, 38 (2): 301-322.

2012    *Nels Paulson and Cecilia Menjívar. "Religion, the State, and Disaster Relief in the United States and India." *International Journal of Sociology and Social Policy*, 32 (3-4): 179-196.

2012    Jørgen Carling, Cecilia Menjívar, and Leah Schmalzbauer. "Central Themes in the Study of Transnational Parenthood." (Introduction to special issue.) *Journal of Ethnic and Migration Studies*, 38 (2): 191-217.

2011    Cecilia Menjívar. "The Power of the Law: Central Americans' Legality and Everyday Life in Phoenix, Arizona." *Latino Studies*, 9 (4): 377-395. (Lead article)

2011    Victor Agadjanian and Cecilia Menjívar. "Fighting Down the Scourge, Building up the Church: Organizational Constraints in Religious Involvement with HIV/AIDS in Mozambique." *Global Public Health*, 6 (2): S148-S162.

2011    *Leisy J. Abrego and Cecilia Menjívar. "Immigrant Latina Mothers as Targets of Legal Violence." *International Journal of Sociology of the Family*, 37 (1): 9-26. (Lead article of special issue)

2011    *Sean McKenzie and Cecilia Menjívar. "The Meanings of Migration, Remittances, and Gifts: The views of Honduran Women Who Stay." *Global Networks: a Journal of Transnational Affairs*, 11 (1): 63-81.

2010    *Lilian Chavez and Cecilia Menjívar. "Children without Borders: A Mapping of the Literature on Unaccompanied Migrant Children to the United States." *Migraciones Internacionales*, 5 (3): 71-111.

2010    Cecilia Menjívar. "Immigrants, Immigration, and Sociology: Reflecting on the State of the Discipline." Inaugural Sociological Inquiry Distinguished Essay, *Sociological Inquiry*, 80, (1): 3-26. (Lead article)

2008    Adrian Pantoja, Cecilia Menjívar and Lisa Magaña. "The Spring Marches of 2006: Latinos, Immigration, and Political Mobilization in the 21st Century." (Introduction to special issue.) *American Behavioral Scientist* 52 (4): 499-506.

2008    Cecilia Menjívar. "Corporeal Dimensions of Gender Violence: Women's Self and Body in Eastern Guatemala." *Studies in Social Justice*, 2(1): 12-26

2008    Cecilia Menjívar. "Educational Hopes, Documented Dreams: Guatemalan and Salvadoran Immigrants' Legality and Educational Prospects." *The ANNALS of the American Academy of Political and Social Science*, 620 (1): 177-193.

2008    Cecilia Menjívar. "Violence and Women's Lives in Eastern Guatemala: A Conceptual Framework." *Latin American Research Review* 43 (3): 109-136.

  •    Earlier version published as "Violence and Women's Lives in Eastern Guatemala: A Conceptual Framework." 2008. WID (*Women & International Development) Working Paper Series*, #290 (peer reviewed & refereed), Michigan State University: Center for Gender in Global Context.

2008    Victor Agadjanian and Cecilia Menjívar. "Talking through the "Epidemic of the Millennium": Congregation-based informal communication about HIV/AIDS in Mozambique." *Social Problems* 55 (3): 301-321 (Lead article)

2007    Cecilia Menjívar and Victor Agadjanian. "Men's Migration and Women's Lives: Views from Rural Armenia and Guatemala." *Social Science Quarterly* 88 (5): 1243-1262.

  •    Reprinted in *Web Anthology on Migration and Remittances* (Topic 15), Richard H. Adams, Jr., Hein de Haas, Richard Jones, and Una O. Osili, eds. NY: Social Science Research Council, 2012

2006    Cecilia Menjívar. "Public Religion and Immigration across National Borders." (Introduction to special issue.) *American Behavioral Scientist*, 49 (11): 1447-1454

2006    Cecilia Menjívar. "Global Processes and Local Lives: Guatemalan Women's Work at Home and Abroad." *International Labor and Working Class History* 70 (1): 86-105.

2006    Cecilia Menjívar. "Family Reorganization in a Context of Legal Uncertainty: Guatemalan and Salvadoran Immigrants in the United States." *International Journal of Sociology of the Family*, 32 (2): 223-245.

  •    Reprinted in pp. 90-114, *Globalization and the Family*, edited by Nazli Kibria and Sunil Kukreja. New Delhi & Kuala Lumpur: Ashwin-Anoka Press, 2007.

2006    Cecilia Menjívar. "Liminal Legality: Salvadoran and Guatemalan Immigrants' Lives in the United States." *American Journal of Sociology*, 111 (4): 999-1037.

  •    Featured in Discoveries: New and Noteworthy Social Research, as "Between 'documented' and 'undocumented.'" *Contexts: Understanding People in their Social Worlds*, 5 (4): 8-9 (2006)

• Winner, Best Article Award, 2007, Latino/a Section, American Sociological Association

2005  *Michelle Moran-Taylor and Cecilia Menjívar. "Unpacking Notions of Return: Guatemalan and Salvadoran Migrants in Phoenix." *International Migration*, 43 (4): 91-131.

2004  Cecilia Menjívar and *Cynthia Bejarano. "Latino Immigrants' Perceptions of Crime and of Police Authorities: A Case Study from the Phoenix Metropolitan Area." *Ethnic and Racial Studies,* 27 (1): 120-148.

2003  Cecilia Menjívar. "Reflections from One Latino Field: Notes from Research Among Central Americans in the United States." *Cahiers des Amériques Latines*, 42 (1): 69-80.

2003  Cecilia Menjívar. "Religion and Immigration in Comparative Perspective: Salvadorans in Catholic and Evangelical Communities in San Francisco, Phoenix, and Washington D.C." *Sociology of Religion*, 64 (1): 21-45.

• Featured in Discoveries: New and Noteworthy Social Research, as "Different Paths to Americanism," *Contexts: Understanding People in their Social Worlds*, 3 (2): 9 (2004)

• Reprinted in pp. 246-263, *Perspectives in Social Research Methods and Analysis: A Reader for Sociology*, Howard Lune, Enrique S. Pumar and Ross Koppel, eds.  Sage, 2010

2002  Cecilia Menjívar and *Sang Kil. "For Their Own Good: Benevolent Rhetoric and Exclusionary Language in Public Officials' Discourse on Immigrant-related Issues" *Social Justice,* 29(1-2): 160-176.

2002  Cecilia Menjívar and *Olivia Salcido. "Immigrant Women and Domestic Violence: Common Experiences in Different Countries." *Gender & Society*, 16 (6): 898-920.

• Reprinted in pp. 123-136, *Gender Through the Prism of Difference*, Maxine Baca Zinn, Pierrette Hondagneu-Sotelo and Michael A. Messner, eds. Oxford University Press, 2005 (3rd ed).

2002  Cecilia Menjívar. "The Ties that Heal: Guatemalan Immigrant Women's Networks and Medical Treatment." *International Migration Review*, 36 (2): 437-466.

2002  Cecilia Menjívar. "Living in two worlds? Guatemalan-origin children in the United States and emerging transnationalism." *Journal of Ethnic and Migration Studies*, 28 (3): 531-552.

2002  Cecilia Menjívar. "Structural Changes and Gender Relations in Latin America and the Caribbean." (Introduction to special issue.) *Journal of Developing Societies*, 18 (2-3): 1-10.

2001  Cecilia Menjívar. "Latino Immigrants and Their Perceptions of Religious Institutions: Cubans, Salvadorans, and Guatemalans in Phoenix, AZ." *Migraciones Internacionales* 1 (1): 65-88. (Invited, peer-reviewed article for inaugural issue.)

2001  *Emily Skop and Cecilia Menjívar. "Phoenix: The Newest Latino Immigrant Gateway?" *Association of Pacific Coast Geographers Yearbook*, 63: 63-76.

1999  Cecilia Menjívar. "Religious Institutions and Transnationalism: A Case Study of Catholic and Evangelical Salvadoran Immigrants." *International Journal of Politics, Culture and Society*, 12 (4): 589-612.

- Spanish translation: Instituciones religiosas y transnacionalismo: El caso de inmigrantes salvadoreños católicos y evangélicos, en *Istmo: Revista Virtual de Estudios Literarios y Culturales Centroamericanos*, Vol. 8, 2004.

1999   Cecilia Menjívar. "The Intersection of Work and Gender: Central American Immigrant Women and Employment in California." *American Behavioral Scientist*, 42(4): 595-621.

- Reprinted in pp. 101-126, *Gender and U.S. Immigration: Contemporary Trends*, edited by Pierrette Hondagneu-Sotelo. Berkeley: University of California Press, 2003.

1998   Cecilia Menjívar, Julie DaVanzo, Lisa Greenwell, and R. Burciaga Valdez. "Remittance Behavior of Filipino and Salvadoran Immigrants in Los Angeles." *International Migration Review*, 32 (1): 99-128.

1997   Cecilia Menjívar. "Immigrant Kinship Networks and the Impact of the Receiving Context: Salvadorans in San Francisco in the early 1990s." *Social Problems*, 44 (1): 104-123.

1997   Cecilia Menjívar. "Immigrant Kinship Networks: The Case of Vietnamese, Salvadorans, and Mexicans in Comparative Perspective" *Journal of Comparative Family Studies*, 28 (1): 1-24. (Lead article).

1996   Cecilia Menjívar. "Continuidad, transformación o ruptura?: las experiencias de refugiadas salvadoreñas en Estados Unidos" *Revista Mundial de Sociología* (*World Review of Sociology*) 2: 51-84.

1995   Cecilia Menjívar. "Kinship Networks Among Recent Immigrants: Lessons from a Qualitative Comparative Approach" *International Journal of Comparative Sociology*, 36 (3-4): 97-109.

1995   Cecilia Menjívar. "Immigrant Social Networks: Implications and Lessons for Policy." *Harvard Journal of Hispanic Policy* 8: 35-59.

1994   Cecilia Menjívar. "Salvadorean Migration to the United States in the 1980s: What Can We Learn *About* it and *From* it?" *International Migration* 32 (3): 371-401. (Lead article).

1993   Cecilia Menjívar. "History, Economy, and Politics: Macro and Micro-level Factors in Recent Salvadorean Migration to the United States." *Journal of Refugee Studies* 6 (4): 350-371.

Chapters in Edited Volumes (editor, board, or peer reviewed):

Forth   Cecilia Menjívar and Leydy Diossa-Jiménez. "State Accountability and Feminicide." In *The Routledge Handbook of Femicide/Feminicide*, edited by Myrna Dawson and Saide Mobayed

Forth   Cecilia Menjívar. "The Catholic Church and Central American Immigrants in the United States." In *The Oxford Handbook of Latino/a Christianities in America*, edited by Kristy Nabhan-Warren. Oxford University Press

Forth   Cecilia Menjívar. "Sociology: Central America." in the *Handbook of Latin American Studies*, Hispanic Division of the Library of Congress, edited by Tracy North and Katherine D. McCann. Austin, TX: University of Texas Press.

Forth   Leisy Abrego and Cecilia Menjívar. "Central American Migration to the United States: Historical Roots and Current Conditions." In *The Handbook of Latin American Migration*, edited by Andreas Feldmann, Jorge Durand, Stephanie Schütze and Xóchitl Bada. Routledge

2021   Cecilia Menjívar, *Andrea Gómez Cervantes, and William Staples. "Masking Punitive Practices:

Latina Immigrants' Experiences in the U.S. Detention Complex." In *Latinas in the Justice System Victims, Targets, and Offenders*, edited by Vera Lopez and Lisa Pasko. New York: New York University Press

2021    Cecilia Menjívar. "Guatemalan Origin Children's Transnational Ties." Pp. 121-133 in *Critical Diálogos in Latinx Studies Anthology*, edited by Ana Y Ramos-Zayas and Mérida Rúa. New York University Press.

2020    Cecilia Menjívar and *Andrea Gómez Cervantes. "Bureaucracies of Displacement: From Immigrants' Social and Physical Exclusion to their Judicial Removal." Pp. 475-491 in *The Handbook of Displacement*, edited by Peter Adey, Janet Bowstead, Katherine Brickell, Vandana Desai, Mike Dolton, Alasdair Pinkerton, and Ayesha Siddiqi. Palgrave McMillan

2020    Cecilia Menjívar. "Document Overseers, Enhanced Enforcement, and Racialized Local Contexts: Experiences of Latino Immigrants in Phoenix, AZ." Pp. 153-178 in *Paper-Trails: Migrants, Documents, and Insecurity in the Global North,* edited by Sarah Horton and Josiah Heyman. Duke University Press

2019    Cecilia Menjívar. "Undocumented (or Unauthorized) Immigration." Pp. 369-381in *The Routledge International Handbook of Migration Studies, 2nd Edition*, edited by Steven J. Gold and Stephanie J. Nawyn. Routledge

2019    Cecilia Menjívar. "Sociology: Central America." Pp. 502-514 in the *Handbook of Latin American Studies*, Hispanic Division of the Library of Congress, edited by Tracy North and Katherine D. McCann. Austin, TX: University of Texas Press.

2019    Nina Rabin and Cecilia Menjívar. "On Their Own: Immigrant Youth Navigating Legal Systems." Pp. 89-101 in *Illegal Encounters: The Effect of Detention and Deportation on Young People*, edited by Deborah A. Boehm and Susan J. Terrio. New York University Press.

2019    Cecilia Menjívar and Shannon Drysdale Walsh. "Gender, Violence, and Migration." Pp. 45-57 in *The Handbook on Critical Geographies of Migration*, edited by Katharyne Mitchell, Reece Jones, and Jennifer Fluri. UK: Edward Elgar Publishing

2018    *Andrea Gómez Cervantes and Cecilia Menjívar. "Mass Deportation: Forced Removal, Immigrant Threat, and a Disposable Labor Force in a Global Context." Pp. 527-546 in *The Handbook of Race, Ethnicity, Crime, and Justice*, edited by Ramiro Martinez Jr., Meghan E. Hollis, and Jacob I. Stowell. Wiley Blackwell.

2018    Cecilia Menjívar and *Andrea Gómez Cervantes. "Immigration" Pp. 319-338 in *The Cambridge Handbook of Social Problems*, Vol. 1, edited by Javier A. Treviño. New York: Cambridge University Press.

2018    Cecilia Menjívar, *Andrea Gómez Cervantes and *Daniel Alvord. "Two Decades of Constructing Immigrants as Criminals." Pp. 193-204 in *The Routledge Handbook of Immigration and Crime,* edited by Holly Ventura Miller and Anthony Peguero. Routledge

2017    Cecilia Menjívar. "Illegality." Pp. 93-96 in *Keywords for Latino Studies*, edited by Deborah R. Vargas, Nancy Raquel Mirabal, and Lawrence La Fountain Stokes. New York: New York University Press.

- This volume was named a 2018 Choice Outstanding Academic Title

2017    Bryan Roberts, Cecilia Menjívar and Nestor Rodriguez. "Voluntary and Involuntary Return
        Migration." (Introduction) Pp. 3-26 in *Deportation and Return in a Border-Restricted World:
        Experiences in Mexico, El Salvador, Guatemala, and Honduras*. Springer.

2017    Cecilia Menjívar. "Spaces of Legal Ambiguity: Central American Immigrants, 'Street-level
        Workers,' and Belonging." Pp. 36-52 in *Within and Beyond Citizenship: Borders, Membership, and
        Belonging*, edited by Roberto G. Gonzalez and Nando Sigona. London & New York: Routledge.

2017    Angélica Reina Paez and Cecilia Menjívar. "Understanding Intersectional Factors Surrounding Providers'
        Views and Latina Immigrant Victims' Access to Anti-Domestic Violence Services in the Midwest." Pp.
        171-188 in *Routledge Handbook on Victims' Issues in Criminal Justice*, edited by Cliff Roberson. New
        York & London: Routledge

2016    Cecilia Menjívar. "Sociology: Central America." Pp. 519-528 in the *Handbook of Latin American
        Studies*, Hispanic Division of the Library of Congress, edited by Tracy North and Katherine D.
        McCann. Austin, TX: University of Texas Press.

2016    Cecilia Menjívar and *Andrea Gómez Cervantes. "The Effects of Parental Undocumented Status
        on Families and Children." *Children, Youth, and Families News* (Kalina Brabeck, editor),
        American Psychological Association.
        http://www.apa.org/pi/families/resources/newsletter/2016/11/undocumented-status.aspx

2016    Cecilia Menjívar. "Normalizing Suffering, Robadas, and Marital Unions among Ladinas in
        Eastern Guatemala." Pp. 75-85 in *Marital Rape: Consent, Marriage and Social Change in Global
        Context*, edited by Kersti Yllö and M. Gabriela Torres. Oxford University Press.

2015    Victor Agadjanian, Cecilia Menjívar, and *Arusyak Sevoyan. "The Impact of Male Labour Migration
        on Women and Households in Rural Armenia." Pp. 203-217 in *Armenians around the World: Migration
        and Transnationality*, edited by Artur Mkrtichyan. Frankfurt am Main: Peter Lang.

2015    Cecilia Menjívar and María Enchautegui. "Confluence of the Economic Recession and Immigration
        Laws in the Lives of Latino Immigrant Workers in the United States." Pp. 105-126 in *Immigrant
        Vulnerability and Resilience: Comparative Perspectives on Latin American Immigrants During the
        Great Recession*, edited by María Aysa-Lastra and Lorenzo Cachón. Springer

2015    Cecilia Menjívar. "Central American Immigrant Workers: How Legal Status Shapes the Labor
        Market Experience." Pp. 3-28 in *Immigration and Work (Research in the Sociology of Work),*
        Vol. 27, edited by Jody Agius Vallejo. Emerald Group Publishing Ltd.

2014    Cecilia Menjívar. "Implementing a Multilayered Immigration System: The Case of Arizona." Pp.
        179-204 in *Hidden Lives and Human Rights in the United States: Understanding the
        Controversies and Tragedies of Undocumented Immigration*, edited by Lois A. Lorentzen. Santa
        Barbara, CA: Praeger.

2014    Cecilia Menjívar. "Sociology: Central America." Pp. 47-59 in the *Handbook of Latin American
        Studies*, Vol., 69, Hispanic Division of the Library of Congress, edited by Tracy North and
        Katherine D. McCann. Austin, TX: University of Texas Press.

2014    *Bruce Rogers and Cecilia Menjívar. "Simulating the Social Networks and Interactions of Poor
        Immigrants." Pp. 336-355 in *Mixed Methods Social Networks Research: Design and Applications*,
        edited by Silvia Dominguez and Betina Hollstein. New York: Cambridge University Press

2014    Cecilia Menjívar and Susan Coutin. "Challenges of Recognition, Participation and Representation for the

Legally Liminal." Pp. 325-330 in In *Migration, Gender and Social Justice*, edited by Tanh-Dam Truong, Des Gasper, Jeff Handmaker and Sylvia I. Berg. Heidelberg & New York: Springer (online 9/2013)

2014    Cecilia Menjívar and Daniel Kanstroom. "Immigrant Illegality:  Constructions, Critiques, and Responses." (Introduction.) Pp. 1-33 in *Constructing Immigrant "Illegality": Critiques, Experiences, and Responses*, edited by Cecilia Menjívar and Daniel Kanstroom. New York: Cambridge University Press.

2013    Victor Agadjanian, Cecilia Menjívar and *Boaventura Cau. "Economic Uncertainties, Social Strains, and HIV Risks: Effects of Male Labor Migration on Rural Women in Mozambique." Pp. 234-251 in *How Immigrants Impact their Homelands*, edited by Susan E. Eckstein and Adil Najam. Durham, NC: Duke University Press.

2013    Carlos Santos, Cecilia Menjívar, and Erin Godfrey. "Effects of SB 1070 on Children." Pp. 79-92 in *Latino Politics and Arizona's Immigration Law SB 1070*, edited by Lisa Magaña and Erik Lee. New York: Springer.

2013    Cecilia Menjívar. "Undocumented (or Unauthorized) Immigration." Pp. 355-365 in *Routledge International Handbook of Migration Studies*, edited by Steven J. Gold and Stephanie J. Nawyn. New York, NY: Routledge Press.

2012    Cecilia Menjívar. "Violencia en la vida de las mujeres en Guatemala." Pp. 211-234 in *Diálogos Interdisciplinarios sobre Violencia Sexual*, edited by Patricia Ravelo Blancas and Héctor Domínguez Ruvalcaba. Mexico, DF: FONCA, Ediciones EON & LLILAS.

2012    Cecilia Menjívar. "Sociology: Central America." Pp. 501-509 in the *Handbook of Latin American Studies*, Vol., 67, Hispanic Division of the Library of Congress, edited by Tracy North and Katherine D. McCann. Austin, TX: University of Texas Press.

2012    Cecilia Menjívar. "U.S. Immigration Law, Immigrant Illegality, and Immigration Reform." Pp. 63-71 in *Agenda for Social Justice: Solutions 2012*, edited by Glenn W. Muschert, Kathleen Ferraro, Brian V. Klocke, Robert Perrruci and Jon Shefner. Nnoxville, TN: Society for the Study of Social Problems.

2011    Cecilia Menjívar. "Mujeres migrantes en el contexto de la globalización: el caso de centroamericanas/os en Estados Unidos." Pp. 173-188 in *Mujeres Escribas: Tejedoras de pensamiento. II Encuentro Mesoamericano de Estudios de Género y Feminismos, Avances y retos de una década: 2001-2011*. Guatemala: FLACSO

2011    Rogelio Sáenz, Cecilia Menjívar, and *San Juanita Edilia Garcia. "Arizona's SB 1070: Setting Conditions for Violations of Human Rights Here and Beyond." Pp. 155-178 in *Sociology and Human Rights: A Bill of Rights for the Twenty-first Century*, edited by Judith Blau and Mark Frezzo. Los Angeles, CA: Sage/Pine Forge Press.

    •    Reprinted in titled *Governing Immigration Through Crime: A Reader*, edited by Julie Dowling and Jonathan Inda. Stanford, CA: Stanford University Press, 2013

2010    Cecilia Menjívar. "Immigrant Art as Liminal Expression: The Case of Central Americans." Pp 176-196 in *Art in the Lives of Immigrant Communities in the United States*, edited by Paul DiMaggio and Patricia Fernández-Kelly. New Brunswick, NJ: Rutgers University Press.

2010    Cecilia Menjívar. "Latino immigrants, gender and poverty in the United States." Pp. 266-271 in *The International Handbook on Gender and Poverty: Concepts, Research, Policy*, edited Sylvia Chant. Cheltenham, UK: Edward Elgar.

2009   *Sang Kil, Cecilia Menjívar, and Roxanne Doty. "Securing Borders: Patriotism, Vigilantism and the Brutalization of the US American Public." Pp. 297-312 in Immigration, *Crime, and Justice*, edited by William F. McDonald. Bingley, UK: Emerald/JAI Press.

2009   Cecilia Menjívar and *Leisy J. Abrego. "Parents and Children across Borders: Legal Instability and Intergenerational Relations in Guatemalan and Salvadoran Families." Pp. 160-189 in *Across Generations: Immigrant Families in America*, edited by Nancy Foner. New York: New York University Press.

   •   Italian translation: "Genitori e figli confine: instabilità legale e rapporti intergenerazionali nelle famiglie guatemalteche e salvadoregne." *Famiglie Migranti*, ed Maurizio Ambrosini, in *Mondi Migranti: Rivista di studi e ricerche sulle migrazione internazionali*, 1: 7-34, 2009 (lead article).

2009   Nestor P. Rodríguez and Cecilia Menjívar. "Central American Immigrants and Racialization in a PostCivil Rights Era." Pp. 183-199 in *How the United States Racializes Latinos: White Hegemony and its Consequences*, edited by José A. Cobas, Jorge Duany, and Joe R. Feagin. Boulder & London: Paradigm Publishers.

   •   Reprinted in the 2nd edition of the volume, published by Routledge, New York, 2016

2008   Cecilia Menjívar and Rubén G. Rumbaut. "Rights of Migrants." Pp. 60-74 in *The Leading Rogue State: The United States and Human Rights*, edited by Judith Blau, David L. Brunsma, Alberto Moncada, and Catherine Zimmer. Boulder, CO & London: Paradigm Publishers.

2007   Cecilia Menjívar. "Salvadorans." Pp. 412-420 in *The New Americans: A Guide to Immigration Since 1965*," edited by Mary Waters C. and Reed Ueda. Cambridge, Mass.: Harvard University Press.

2006   Cecilia Menjívar. "Serving Christ in the Borderlands: Faith Workers Respond to Border Violence." Pp. 104-121 in *Religion and Social Justice for Immigrants*, edited by Pierrette Hondagneu-Sotelo. Rutgers University Press.

2006   *Sang Hea Kil and Cecilia Menjívar. "The "War on the Border:" The Criminalization of Immigrants and the Militarization of the U.S.-Mexico Border." Pp. 164-188 in *Immigration and Crime: Ethnicity, Race and Violence*, edited by Ramiro Martinez, Jr. and Abel Valenzuela, Jr. New York University Press.

2005   Cecilia Menjívar and Néstor Rodríguez. "State Terror in the U.S.-Latin American Interstate Regime. (Introduction.) Pp. 3-27 in *When States Kill: Terror in the U.S.-Latin American Interstate Regime*, edited by Cecilia Menjívar and Néstor Rodríguez. Austin: University of Texas Press.

2005   Cecilia Menjívar and Néstor Rodríguez. "New Responses to State Terror." (Conclusion.) Pp. 335-346 in *When States Kill: Terror in the U.S.-Latin American Interstate Regime*, edited by Cecilia Menjívar and Néstor Rodríguez. Austin: University of Texas Press.

2005   Cecilia Menjívar. "Immigrants and Refugees." Pp. 307-318 in *Companion to Gender Studies*, edited by Philomena Essed, David Theo Goldberg, and Audrey Kobayashi. London: Blackwell Publishers.

2004   Cecilia Menjívar. "El Salvador." Pp. 155-171 in *Teen Life in Latin America and the Caribbean*, edited by Cynthia Margarita Tompkins and Kristen Sternberg. Westford, Conn: Greenwood Press.

2004   Flavio Francisco Marsiglia and Cecilia Menjívar. "Nicaraguan and Salvadoran Children and Families," Pp. 253-273 in *Culturally Competent Practice with Immigrant and Refugee Children and Families*, edited by Rowena Fong. New York: Guilford Publications.

2002    Cecilia Menjívar and Lisa Magaña. "Immigration to Arizona: Diversity and Change." Pp. 53-71 in *Arizona Hispanics: The Evolution of Influence*, 81st Arizona Town Hall, edited by Louis Olivas. Tempe: Arizona State University.

- Reprinted in Arizona as a Border State—Competing in the Global Economy, 86th Arizona Town Hall, 2005.

2002    Geeta Chowdhry and Cecilia Menjívar. "(En)Gendering Development, Race(ing) Women's Studies: Core Issues in Teaching Gender and Development." Pp. 133-152 in *Encompassing Gender: Integrating International Studies and Women's Studies*, edited by Mary L.Lay, Janice Monk, and Deborah S. Rosenfelt. New York: The Feminist Press.

1999    Cecilia Menjívar. "Salvadorans and Nicaraguans: Refugees Become Workers." Pp. 232-253 in *Illegal Immigration in America: A Reference Handbook*, edited by David Haines and Karen E. Rosenblum. Westport, Conn.: Greenwood Press.

1992    Anita Leal and Cecilia Menjívar. "Xenophobia or Xenophilia?: Hispanic Women in Higher Education,". Pp. 93-103 in *Perspectives on Minority Women in Higher Education*, edited by L.B. Welch. New York, Westport & London: Praeger.

Encyclopedia Contributions (board of editors reviewed)

Forth    Cecilia Menjívar. "Central American Asylum Seekers' "Caravans" as a Political Act." *The Wiley-Blackwell Encyclopedia of Social & Political Movements*, edited by David A. Snow, Donatella della Porta, Douglas J. McAdam, and Bert Klandermans.  Wiley

Forth    *Haruna Fukui and Cecilia Menjívar. "Gender and Social Networks of Migrants." *Encyclopedia of Migration*, edited by Susan K. Brown and Frank D. Bean, Springer Reference

2016    Leisy Abrego and Cecilia Menjívar. "Immigration in the United States." *Encyclopedia of Family Studies*, edited by Constance L. Shehan, Willey-Blackwell
DOI: 10.1002/9781119085621.wbefs006

2016    Cecilia Menjívar. "Salvadorans Immigrants to the United States." *The Blackwell Encyclopedia of Race, Ethnicity and Nationalism*. doi: 10.1002/9781118663202.wberen084

2016    Cecilia Menjívar. "Guatemalan Immigrants to the United States" *The Blackwell Encyclopedia of Race, Ethnicity and Nationalism*. doi: 10.1002/9781118663202.wberen083

2015    Cecilia Menjívar. "Migrant Children: and the U.S. Crisis of Policy" (Special Report: World Affairs). Pp 370-371in Book of the Year, Events of 2014, edited by Karen Sparks. *Encyclopedia Britannica*.

2013    Cecilia Menjívar. "Immigrant Workers." *Sociology of Work: An Encyclopedia*, Vol. 1: 415-420, edited by Vicki Smith. Los Angeles, CA: Sage.

2013    Cecilia Menjívar "Salvadorans" *ABC-Clio Encyclopedia of American Immigration*, edited by Elliott R. Barkan.

2013    Cecilia Menjívar. "Central America: Gender and Migration." Pp. 897-901 in *Encyclopedia of Global Human Migration*, Vol. 2, edited by Immanuel Ness et al. Malden, MA: Wiley Blackwell.

2013    Cecilia Menjívar. "Domestic Violence, Abuse, and Migration." Pp. 1251-1256 in *Encyclopedia of Global Human Migration*, Vol. 3, edited by Immanuel Ness et al. Malden, MA: Wiley Blackwell.

2009   Cecilia Menjívar. "Children and Immigration: Historical and Cultural Perspectives." Pp. 481-484 in *The Child: An Encyclopedic Companion*, edited by Richard A. Shweder, with Thomas R. Bidell, Anne C. Dailey, Suzanne D. Dixon, Peggy J. Miller, and John Modell. Chicago: The University of Chicago Press

2008   Cecilia Menjívar. "Central Americans." Pp. 278-282 in *Encyclopedia of Race and Racism, 3 vols.* ed. by John Hartwell Moore. Detroit: Macmillan Reference USA

2006   Cecilia Menjívar. "Social Networks." Pp. 313-316 in *Immigration in America Today: An Encyclopedia*, edited by James Loucky, Jeanne Armstrong, and Larry J. Estrada. Westport CT: Greenwood.

2006   Cecilia Menjívar. "Central Americans." Pp. 134-137 in *Latinas in the United States: A Historical Encyclopedia*, Volume 1, edited by Vicki L. Ruiz and Virginia Sánchez-Korrol. Indiana University Press.

2005   Cecilia Menjívar. "Central Americans." Pp. 294-303 in *The Oxford Encyclopedia of Latinos and Latinas in the United States* (Vol.1), edited by Suzanne Oboler and Deena J. González. Oxford, England: Oxford University Press.

   - Reprinted in pp. 129-134, *Encyclopedia of Latino/as in Politics, Law, and Social Movements*, edited by Suzanne Oboler and Deena J. González, Oxford University Press, 2016.

2001   Cecilia Menjívar. "Central America." Pp. 1099-1108 in *Encyclopedia of American Immigration*, edited by James Ciment. Armonk, New York: M.E. Sharpe.

2000   Menjívar, Cecilia. "Immigration." Pp. 1123-1126 in *Routledge International Encyclopedia of Women: Global Women's Issues and Knowledge*, Volume 3, edited by Cheris Kramarae and Dale Spender. New York: Routledge.

<u>Book Reviews</u>

2021   Hiding in Plain Sight: Immigrant Women and Domestic Violence. Halifax: Fernwood Publishing, 2020. *Gender & Society* doi: 10.1177/08912432211024604

2021   Undocumented Migration, by Roberto G. Gonzales, Nando Sigona, Martha C. Franco, and Anna Papoutsi. Cambridge, UK: Polity, 2019. *American Journal of Sociology,* 126 (3): 728-730

2020   Kids at Work: Latinx Families Selling Food on the Streets of Los Angeles, by Emir Estrada. New York: New York University Press, 2019. *Contemporary Sociology*, 49 (6): 505-506

2016   In Harm's Way: The Dynamics of Urban Violence, by Javier Auyero and María Fernanda Berti. Princeton and Oxford: Princeton University Press, 2015. *American Journal of Sociology,* 122 (1): 292-294

2016   Skills of the 'Unskilled': Work and Mobility among Mexican Migrants, by Jacqueline Maria Hagan, Rubén Hernández-León, and Jean-Luc Demonsant, Oakland, CA, University of California Press, 2015. *Ethnic and Racial Studies,* 39 (13): 2456-2458

2015   Adiós Niño: The Gangs of Guatemala City and the Politics of Death, by Deborah T. Levenson. Durham, NC: Duke University Press, 2013. *Contemporary Sociology*, 44 (3): 375-377

2015   Violence against Latina Immigrants: Citizenship, Inequality, and Community, by Roberta Villalón. New York: New York University Press, 2010. *Social Forces*, 93(4): e106-107

2014    Intimate Migrations: Gender, Family, and Illegality Among Transnational Mexicans, by Deborah A. Boehm. New York and London: New York University Press, 2012.  *Journal of Latin American Anthropology*, 46 (1): 213-214

2014    The Militarization of Childhood: Thinking beyond the Global South, edited by Marshall Beier. New York: Palgrave Macmillan, 2011. *Contemporary Sociology,* 43 (2): 192-194

2009    Migration Miracle: Faith, Hope, and Meaning of the Undocumented Journey, by Jacqueline Maria Hagan. Cambridge, MA: Harvard University Press, 2008. *Contemporary Sociology*, 38 (6): 529-531.

2009    God's Heart Has No Borders: How Religious Activists are Working for Immigrant Rights, by Pierrette Hondagneu-Sotelo. Berkeley: University of California Press, 2008. *Journal of Church and State*, 51 (1): 159-160.

2009    God Needs No Passport: Immigrants and the Changing American Religious Landscape, by Peggy Levitt. New York & London: The New Press. *American Journal of Sociology*, 114 (5): 1578-1580.

2008    Deflecting Immigration: Networks, Markets, and Regulation in Los Angeles, by Ivan Light. Russell Sage Foundation, 2006. *Social Forces* 87 (2): 1158-1161

2008    Sacred Assemblies and Civic Engagement: How Religion Matters for America's Newest Immigrants. By Fred Kniss and Paul D. Numrich. 2007. New Brunswick, NJ: Rutgers University Press, 2007. *Journal for the Scientific Study of Religion*: 47 (3): 522-523.

2006    Landscapes of Struggle: Politics, Society, and Community in El Salvador, edited by Aldo Lauria Santiago and Leigh Binford. Pittsburg: University of Pittsburg Press, 2004. *Journal of Latin American & Caribbean Anthropology* 11 (2): 471-473.

2006    Immigrants at the Margins: Law, Race, and Exclusion in Southern Europe, by Kitty Calavita. Cambridge: Cambridge University Press, 2005. *Law & Society Review* 40 (4): 965-967.

2005    Paradise in Ashes: A Guatemalan Journey of Courage, Terror and Hope, by Beatriz Manz. Berkeley: University of California Press, 2004. *Contemporary Sociology* 34 (6): 653-655.

2005    Migration, Mujercitas, and Medicine Men: Living in Urban Mexico, by Valentina Napolitano. Berkeley: University of California Press, 2002. *Gender & Society* 19 (5): 706

2005    A Courtship after Marriage: Sexuality and Love in Mexican Transnational Families, by Jennifer S. Hirsch. Berkeley: University of California Press, 2003. *Gender & Society 19* (1): 126-128.

2005    Salvadoran Migration to Southern California: Redefining El Hermano Lejano, by Beth Baker-Cristales. Gainesville: University Press of Florida, 2004. *Journal of Latin American & Caribbean Anthropology* 10 (1): 251-252.

2004    Gender in Latin America, by Sylvia Chant, with Nikki Craske. New Brunswick, New Jersey: Rutgers University Press, 2003. *Gender & Society* 18 (1): 146-147.

2004    Salvadorans in Costa Rica: Displaced Lives, by Bridget A. Hayden. Tucson, Ariz.: The University of Arizona Press, 2003. *Contemporary Sociology* 33 (3): 331-332.

2003    Doméstica: Immigrant Workers Cleaning and Caring in the Shadows of Affluence, by Pierrette Hondagneu-Sotelo. Berkeley: University of California Press, 2001. *Journal of Ethnic and Migration Studies* 29 (1): 174-175.

2002    Gender and International Migration in Europe: Employment, Welfare and Politics, by Eleonore Kofman, Annie Phizacklea, Parvati Raghuram, and Rosemary Sales. London: Routledge, 2000. *Journal of Ethnic and Migration Studies* 28 (3): 571.

2002    Free Markets, Open Societies, Closed Borders?: Trends in International Migration and Immigration Policy in the Americas, by Max J. Castro, editor. Miami, Florida: North-South Center Press at the University of Miami, 1999. *Journal of Latin American Studies* 34: 472-473.

2002    Seeking Community in a Global City: Guatemalans and Salvadorans in Los Angeles, by Nora Hamilton and Norma Stoltz Chinchilla. Philadelphia: Temple University Press, 2001. *Contemporary Sociology* 31 (2): 174-175.

2001    The Mercy Factory: Refugees and the American Asylum System, by Christopher J. Einolf. Chicago, Il: Ivan R. Dee Publisher, 2001. *Journal of Refugee Studies* 14 (4): 449-450.

2001    Legalizing Moves: Salvadoran Immigrants' Struggle for U.S. Residency, by Susan Bibler Coutin. Ann Arbor: University of Michigan Press, 2000. *International Migration Review* 35 (3) 936-937.

2000    Growing Up American: How Vietnamese Children Adapt to Life in the United States, by Min Zhou and Carl L. Bankston III. New York: Russell Sage Foundation, 1998. *Asian and Pacific Migration Journal* 9 (1): 131-133.

1998    No More Kin: Exploring Race, Class, and Gender in Family Networks, by Anne R. Roschelle. Beverly Hills: Sage Publications, 1997. *Journal of Marriage and the Family* 60 (3): 797-798.

1998    International Migration, Refugee Flows and Human Rights in North America: The Impact of Trade and Restructuring, by Alan B. Simmons, editor. New York: Center for Migration Studies, 1996. *Journal of Refugee Studies* 11 (2): 251-253.

1998    The Other Argentina: The Interior and National Development, by Larry Sawyers. Boulder: Westview Press, 1996. *Economic Development and Cultural Change* 46 (3): 663-669.

1997    The Other Side of the Asian American Story, by Wendy Walker-Moffat. San Francisco: Jossey-Bass Publishers, 1995. *Journal of Refugee Studies* 10 (1): 101-103.

1996    From Vietnam, Laos, and Cambodia: A Refugee Experience in the United States, by Jeremy Hein. New York: Twayne Publishers, 1995. *Journal of Refugee Studies* 9 (2): 217-219.

Preface, Essays & Commentary

Forth    Cecilia Menjívar. Prólogo. *Senderos Feministas: De la enseñanza y la investigación al incesto en perspectiva*, by Gloria González-López. Universidad Autónoma de Aguascalientes, Mexico

2021    Cecilia Menjívar. "Immigration Policy, Legal Status & Enforcement Through Three Decades of Research Among Central Americans in the United. States." *The Sociologist*,

2020    Cecilia Menjívar. "Will the Outcome of the 2020 Election Reshape U.S. Immigration Policies?" Commentary. *International Migration*, 58 (5): 277-280

2020    Cecilia Menjívar. "An Architecture of Repulsion." Review essay of Refuge Beyond Reach: How Rich Democracies Repel Asylum Seekers, by David FitzGerald. *Contemporary Sociology*, 49 (4): 318-22 (lead)

2019   Cecilia Menjívar. "Learning *about* and *from* the Great Escape of African Americans to Appalachia." Commentary, *Gone Home: Race and Roots through Appalachia*, by Karida Brown. *Ethnic and Racial Studies*, 42 (13): 2311-2317

2019   Cecilia Menjívar. Foreword. "Gendered Violence in Cultural Texts of the Global South," Special Section, Representations of Gendered Violence in Cultural Texts of the Global South. *Australian Humanities Review*, 64 (May): 82-86

2017   Cecilia Menjívar "Studying Central Americans in Latino Studies." *Latino Studies*, 15 (1): 91-94

2017   Cecilia Menjívar. Preface. Pp. xi-xv in *Violence and Crime in Latin America: Representations and Politics*, edited by Gema Santamaria and David Carey Jr. Oklahoma University Press.

   - Translated as Prefacio. Pp. 19-24 in *Violencia y Crimen en América Latina*, 2020, Gema Kloppe-Santamaria, David Carey, eds. Centro de Investigación y Docencia Económicas, CDMX, Mexico

2016   Cecilia Menjívar. Review essay, *Everyday Illegal,* based on *Everyday Illegal: When Policies Undermine Immigrant Families*, by Joanna Dreby. *Sociological Forum*, 31 (3): 724-728

2016   (with Peter Rolhoff and others) "Fertility Awareness Methods Are Not Modern Contraceptives: Defining Contraception to Reflect Our Priorities." *Global Health Science & Practice, 4 (2): 342-345*

2013   Cecilia Menjívar. "When Immigration Policies Affect Immigrants' Lives: Commentary." Response to "How do Tougher Immigration Measures Impact Unauthorized Immigrants?" by Catalina Amuedo Dorantes, Thitima Puttitanun, and Ana P. Martinez-Donate. *Demography*, 50 (3): 1097-1099.

2012   Cecilia Menjívar. Comment to "Awakening to a Nightmare," by Roberto G. Gonzales and Leo R. Chavez.  *Current Anthropology* 53 (3): 272.

2011   Cecilia Menjívar. "Long-term Family Separations and Unaccompanied Children's Lives." Response to "Voice, Agency, and Vulnerability: the Immigration of Children through Systems of Protection and Enforcement" by Aryah Somers. *International Migration* 49 (5): 17-19.

2009   Cecilia Menjívar. "Who Belongs and Why." Response to article, "Which American Dream Do You Mean?" by David Stoll. *Society*, 46 (5): 416-418

2008   Havidán Rodríguez, Rogelio Sáenz, and Cecilia Menjívar. (Preface.) Pp. xv-xxiii in *Latinos/as in the United States: Changing the Face of América.* New York*:* Springer

2004   Cecilia Menjívar. "Response to Levitt: Limits of Transnationalism." *Contexts*, 3 (3): 5

Working Papers, Policy Reports and Conference Proceedings

2021   Cecilia Menjívar and Andrea Gómez Cervantes. Latina Immigrants' Health and Access to Healthcare in the Heartland, before and during the Pandemic. https://immigrationinitiative.harvard.edu/latina-immigrant-women%E2%80%99s-health-and-access-healthcare-heartland-and-during-pandemic

       Spanish version: La salud y atención médica de las mujeres inmigrantes latinas en la región Central de Estados Unidos, antes y durante la pandemia: https://immigrationinitiative.harvard.edu/files/hii/files/brief_12_sp_final_0.pdf?m=1624621172

2020   Cecilia Menjívar. Temporary Protected Status for Central American Immigrants. Latino Policy & Politics Initiative, UCLA https://latino.ucla.edu/research/temporary-protected-status/

*Spanish version:* https://latino.ucla.edu/research/estatus-de-proteccion-temporal-tps-para-inmigrantes-centroamericanos/

2018    Cecilia Menjívar and Andrea Gómez Cervantes. El Salvador: Civil War, Natural Disasters, and Gang Violence Drive Migration. Washington, DC: Migration Policy Institute https://www.migrationpolicy.org/article/el-salvador-civil-war-natural-disasters-and-gang-violence-drive-migration

2017    Cecilia Menjívar. Temporary Protected Status in the United States: The Experiences of Hondurans and Salvadorans http://ipsr.ku.edu/migration/pdf/TPS_Report.pdf

2015    Cecilia Menjívar. "Country Conditions: Mexico, Guatemala, Honduras and El Salvador." Prepared for Women on the Run report. Washington DC: UNHCR

2013    Cecilia Menjívar and William P. Simmons. "Insecure Communities in Maricopa County: Latino Perceptions of Police Involvement in Immigration Enforcement." Report prepared for the National Day Labor Organizing Network/Puente, presented at the Insecure Communities and Community Mistrust forum, Phoenix, AZ, December 11th.

2013    Cecilia Menjívar and Olivia Salcido. "Gendered Paths to Legal Status: The Case of Latin American Immigrants in Phoenix, Arizona." (Special Report) Washington, DC: Immigration Policy Center, American Immigration Council. http://www.immigrationpolicy.org/special-reports/gendered-paths-legalstatus-case-latin-american-immigrants-phoenix-arizona

2012    Cecilia Menjívar and Leisy Abrego. "Legal Violence in the Lives of Immigrants: How Immigration Enforcement Affects Families, Schools, and Workplaces." Washington, DC: Center for American Progress. http://www.americanprogress.org/issues/immigration/report/2012/12/11/47533/legal-violencein-the-lives-of-immigrants/

2008    Cecilia Menjívar. "Unaccompanied Migrant Children: A First Step at Mapping What We Know." Report prepared for FUNDEMEX, ASU's Office of the President, and the Office of the First Lady of Mexico. April 27th. (CePoD Working Paper #2008-108)

2005    Cecilia Menjívar. "Migraciones y Transformaciones en la Familia." (Chapter 7). Informe sobre Desarrollo Humano (Human Development Report), United Nations Development Program, San Salvador, El Salvador. http://www.desarrollohumano.org.sv/migraciones

2000    Cecilia Menjívar. "Networks and Religious Communities Among Salvadoran Immigrants in San Francisco, Washington D.C., and Phoenix." Center for Comparative Immigration Studies, University of California, San Diego, Working Paper No. 25.

1999    Cecilia Menjívar et al. "Contemporary Latino Migration to the Phoenix Metropolitan Area." Report presented to the Center for Urban Inquiry, Arizona State University.

1995    Cecilia Menjívar. "Social Networks Among Salvadorans in California." Pp. 47-51 in *Central Americans in California: Transnational Communities, Economies and Cultures*, edited by Nora Hamilton and Norma Chinchilla. The Center for Multiethnic and Transnational Studies, University of Southern California, Occasional Papers Series, Monograph No.1.

1994    Cecilia Menjívar. "Social Networks Dynamics: Implications for Salvadoreans in San Francisco." *University of California, Berkeley Chicano/Latino Policy Project* Working Paper, Vol 2, No.1.

<u>Non-peer Reviewed Professional Publications & Public Engagement</u>

2021    Interview with Cecilia Menjívar, "About Legal Liminality and Different Forms of Violence." IMISCOE, conducted by Milena Belloni, August 5th https://www.imiscoe.org/news-and-blog/podcast/1354-about-legal-liminality-and-different-forms-of-violence

2021    Cecilia Menjívar and William P. Simmons. "Latina Immigrants' Social Isolation." *Public Health Post* https://www.publichealthpost.org/research/latina-immigrants/

2021    Cecilia Menjívar. "The Real Crisis at the US Border." Oxford University Press's Academic Insights for the Thinking World https://blog.oup.com/2021/05/the-real-crisis-at-the-us-border/

2021    Cecilia Menjívar. "What We Should Talk About When We Talk About Root Causes of Migration." Interview with *Mother Jones* April 9th https://www.motherjones.com/politics/2021/04/what-we-should-talk-about-when-we-talk-about-root-causes-of-migration/

2020    Interview with ASA President-elect, Cecilia Menjívar, conducted by Dr. Joanna Perez. ASA Latina/o Sociology Section, *NOTAS* Fall issue, 3-4. (Long version: https://www.youtube.com/watch?v=UMmUqj8-f88)

2020    Interview with Cecilia Menjívar, "Trump, Covid-19 and the fragility of migrant lives." Institute for Research into Superdiversity (IRIS), University of Birmingham, conducted by Nando Sigona, September 29th https://superdiversity.net/2020/09/29/1778/

2020    Cecilia Menjívar. "TPS Recipients Are Helping to Save the US Economy: It's Time to Protect Them." Opinion, *Latino Rebels*, https://www.latinorebels.com/2020/10/06/tpsrecipients/

2020    Cecilia Menjívar and Leisy Abrego. "La Brutalidad del sistema migratorio se ensaña contra las mujeres." Opinión, El Faro https://elfaro.net/es/202009/columnas/24832/La-brutalidad-del-sistema-migratorio-se-ensa%C3%B1a-contra-las-mujeres.htm

2020    Cecilia Menjívar, Jacob G. Foster, and Jennie E. Brand. "Don't Call it Social Distancing." CNN Opinion https://www.cnn.com/2020/03/21/opinions/physical-distancing-menjivar-foster-brand/index.html

- A version appears in the Symposium "Inequalities in Challenging Times," in the newsletter of the Inequality, Poverty, and Mobility Section, ASA, May 2020 issue.

2020    Content consultant for, *Your Passport to El Salvador* by Sarah Corts (Capstone Publishing), book for 3rd grade readers

2020    Cecilia Menjívar. "Reflection on the Trump Administration." ASA Section on Human Rights, Winter 2020 newsletter, pp. 3-4. https://asahumanrights.files.wordpress.com/2020/01/hr-newsletter-winter-2020.pdf

2019    Interview with Cecilia Menjívar, conducted by Milena Belloni and Ilka Vari-Lavoisier, HOMing Project, University of Trento, Trento, Italy, September https://homing.soc.unitn.it/2019/12/03/homing-interview-34-cecilia-menjivar/

2019    Cecilia Menjívar and M. Gabriela Torres. "Trump may wish Guatemala were a safe place for asylum applicants to wait, but it's not." *Los Angeles Times*, July 25th https://www.latimes.com/opinion/story/2019-07-24/trump-guatemala-asylum-safety

2019    Content consultant for, *Central American Immigrants: In Their Shoes* (Momentum Publishers/ The Child's World, 2019), book for 3rd to 6th grade readers.

2018    Cecilia Menjívar. "The Central American "Caravan" as a Political Act." *Mobilizing Ideas*, The Center for the Study of Social Movements, University of Notre Dame https://mobilizingideas.wordpress.com/2018/12/03/the-central-american-caravan-as-a-political-act/

2018    Cecilia Menjívar and Shannon Drysdale Walsh. "Gender Violence: One Driver of the Central American "Caravan." The Gender Policy Report, University of Minnesota https://genderpolicyreport.umn.edu/gender-violence-one-driver-of-the-central-american-caravan/

- Reprinted in WUNRN (Women's UN Report Network): https://wunrn.com/2018/11/gender-violence-a-major-driver-of-the-central-american-caravan/

2018    Cecilia Menjívar and Shannon Drysdale Walsh. "Gender-based Violence in Central America and Women Asylum Seekers in the U.S." *Translational Criminology*, 16x: 12-14.

- Reprinted in the ASA Sex & Gender Section newsletter, November 2019 (pp. 4-5). https://asasexandgender.files.wordpress.com/2019/11/sexandgender_newsletter_nov2019.pdf

2018    Rogelio Sáenz and Cecilia Menjívar. "U.S. should own up to its role in the plight of Salvadorans." *The Houston Chronicle*, January 13th http://www.houstonchronicle.com/opinion/outlook/article/Saenz-U-S-should-own-up-to-its-role-in-the-12496957.php?utm_campaign=email-premium&utm_source=CMS%20Sharing%20Button&utm_medium=social

- Reprinted in *La Voz de Esperanza*, San Antonio, TX, Vol. 3 (1): 10-11 (February)

2017    Cecilia Menjívar. "Immigrant Rights Under Siege." Featured article, ASA Section on Human Rights Newsletter, Fall issue, pp. 4-6

2017    Cecilia Menjívar and Shannon Drysdale Walsh. "The Architecture of Feminicide." http://www.panoramas.pitt.edu/larr/architecture-feminicide-state-inequalities-and-everyday-gender-violence-honduras *Latin American Research Review* blog

2014    Cecilia Menjívar. "Reflecting on Enduring Violence." *Society,* 51 (4): 401-403.

2014    "Enduring Violence." *Gender & Society* blog: http://gendersociety.wordpress.com/2014/03/26/enduringviolence/

2010    "Letter from Immigrant Mothers in Phoenix." MomsRising.org, May 29, https://www.momsrising.org/blog/letter-from-immigrant-mothers-in-phoenix

2009    "Immigration Reform: A Country Divided, Or a Richer Society?" *Religion Dispatches*, November 20. http://www.religiondispatches.org/

- Reprinted in *Faith in Public Life*: http://faithinpubliclife.org/content/news/2009/11/immigration_reform_a_country_d.html

2008    Cecilia Menjívar. "Los inmigrantes salvadoreños en "limbo legal" en Estados Unidos." El Faro Académico, El Faro (El Salvador's on line newspaper) November 26th. http://www.elfaro.net/secciones/academico/20081124/academico1.asp

2001    Cecilia Menjívar. "'Papers' offer opportunity, justice for undocumented." *The Arizona Republic,* Sunday, August 5, 2001, V3.

  • Reprinted in Crime and Juvenile Delinquency Division Newsletter, SSSP, Fall 2001.

2001    Cecilia Menjívar. "Latino Immigrants and Views of Crime and Police Authorities in the Phoenix Metropolitan Area." *World on the Move*, Newsletter of the International Migration Section, American Sociological Association, Volume 7, Number 2. (Spring)

**Funded Research**
External

2020-2021 NSF Dissertation Improvement Grant to Leydy Diossa-Jimenez, Sociology, UCLA "Emigrant Political Rights in Latin America, Dual citizenship, Voting and Representation: the cases of Argentina and Colombia (1970-2018)" ($25,087)
2019-2021 Social Science and Humanities Council of Canada. Role: Co-recipient (Alison Mountz, PD). "Negotiating Asylum and Protection Along the Canada-US Border." ($191,657)
2019-2020 NSF Dissertation Improvement Grant to Chiara Galli, Sociology, UCLA, for "The Effects of the Law on Central American Unaccompanied Minors' Lives in the United States." ($15,800),
2017-2018 NSF Dissertation Improvement Grant to Andrea Gómez Cervantes, Sociology, University of Kansas for "Mixed-Status Families: Power, Identity, and Community." ($12,000)
2015-2020 NIH/NICHD Program Grant # P01HD080659. Role: Co-Investigator, with others (Program Director: Jennifer Glick). "Family Migration Context and Early Life Outcomes." ($4,867,581)
2014 American Sociological Association/National Science Foundation Travel Grant to ISA, ($1,500)
2014-2016 NICHD 1R21HD078201-01 Role: Co-Investigator (Victor Agadjanian, PI) "Behavioral and Institutional Barriers to HIV Prevention Among Migrant Women." ($423,800)
2013-2016 W.T. Grant Foundation. Role: Co-PI (Sandra Simpkins, PI) "Distal Factors and Proximal Settings as Predictors of Latino Adolescents' Activities: Insights from Mixed Methods." ($386,352)
2010-2015 NIMH 1K01MH086687-01A1 Role: Qualitative Methods Consultant/Expert (Armando Piña, PI) "School-based Prevention for Childhood Anxiety." ($894,495)
2008-2013 NIH/NICHD R01 HD058365. Role: Co-PI (Victor Agadjanian, PI) "Childbearing Dynamics in a Setting of High HIV Prevalence and Massive ART Rollout." ($1,672,931)
2008-09 NSF Dissertation Improvement Grant to Jennifer Arney, Sociology, ASU for "Direct to Consumer Advertising of Psychotropic Medications: Effects for Consumers, Physicians and Society at Large." ($4,625)
2007– 2012 NIH/National Center on Minority Health and Health Disparities, P20 MD002316-01 Role: Co-investigator, with others (Flavio Marsiglia, director) "Health Disparities Research at SIRC: Cultural Processes in Risk and Resiliency. ($7,178,038)
2006-2010 NIH/NICHD, R01HD05175. Role: Co-PI (Victor Agadjanian, PI) "Religious Institutions and HIV/AIDS Prevention and Care" ($1,043,493)
2006-2008 NIH/NICHD 1R21HD048257-01A1 Role: Co-PI (Victor Agadjanian, PI) "Men's Migration and Women's HIV/AIDS Risks." ($305,128)
2004-2005 NIH/NICHD Supplement to Grant R03 HD043675 Role: Co-PI (Victor Agadjanian, PI) "Organized Religion and HIV/AIDS in Mozambique." ($114,138)
1995-1997 NIH/NICHD Minority Investigator Research Supplement to Grant R01 HD27361-06S1 (P.I. of parent project: Anne R. Pebley) "Health Care Choices During Pregnancy and Illness." ($48,798)
1990-1991 American Sociological Association Dissertation Research Grant ($5,000)

Internal

2020    "Pro Bono Expert Witness Database Project" (Leisy Abrego and Cecilia Menjívar). Luskin Institute on Inequality and Democracy, UCLA ($9,393)
2013    Institute for Humanities Research, ASU. "Austere Borderlands: Recession, Migration, and Contested Means of Belonging in the E.U." Role: PI (Co-PIs: Megan Carney and Laia Soto-Bermant). ($12,000)
2013    Comparative Border Studies Initiative, ASU ($4,500)

2012    College of Liberal Arts and Sciences, ASU. Co-PI with Cynthia Tompkins et al. "Mapping Affect to Understand and Impede the Reproduction of Violence in Latin America." ($20,000)

2005-2007 Mexican American and U.S. Latino Research Center, Texas A&M (Immigration from El Salvador), CoPI (Nadia Flores, PI) ($19,500)

2006    Elizabeth Guillot Award, Sociology Program, ASU ($3,000).

2003-2004 Vice President for Research Office, ASU. Co-PI with Laura Peck, Elizabeth Segal and Myla Vicente Carpio "Examining Poverty in the U.S. Southwest." ($45,859)

2002    Women's Studies Summer Research Grant, ASU. "The Social Worlds of Women: Class, Context, and Culture in Rural Guatemala." ($2,000)

2000-2001 ASU (university-wide) cluster grant for the study of immigration, coordinated by Brian Gratton. "People in Motion Seminar." ($2500)

2000    Dean's Incentive Grant, College of Public Programs, ASU. "The Phoenix Metropolitan Area: A New Latino Immigration Gateway." ($4,800)

1999    Center for Latin American Studies, ASU. "Class, Context and Culture and in Rural Guatemalan Women's Networks." ($1,100) (Summer)

1999    Dean's Incentive Grant, College of Public Programs, ASU. "New Settlement Patterns of Latino Immigrants in the Phoenix Metropolitan Area." ($5,000)

1999-2000 Center for Urban Inquiry, ASU. Graduate Scholars Special Grant to Cindy Bejarano, Eugene Arene and Emily Skop. Role: Faculty Sponsor/Advisor/Coordinator. "Latino Immigration to the Phoenix Metropolitan Area." ($6,993)

1998-1999 Center for Urban Inquiry, ASU, Special Grants. "Contemporary Latino Migration to the Phoenix Metropolitan Area." Role: PI ($9,003).

1998-1999 Dean's Incentive Grant. College of Public Programs, ASU. "Family and Gender in New Settlement Patterns of Latino Immigrants to the Phoenix Metropolitan Area." ($5,000).

1997-1998 Faculty Grant in Aid (university-wide), ASU. "Guatemalan Immigrant Women' Networks." ($5,350).

1997    Dean's Incentive Grant, College of Public Programs, ASU. "Economic and Political Justice: Refugee Migrations in the late 20th Century." ($5,000).

1996    Dean's Incentive Grant, College of Public Programs, ASU. "Class, Context, and Culture: Guatemalan Women's Networks." ($4,952).

1996    Women's Studies Summer Research Grant, ASU. "Salvadoran Women's Networks." ($2,300).

1989-1990 University of California Regents, Graduate Student Research Grant. ($5000).

1989-1990 California Policy Seminar, Technical Research Grant. ($2,500)

**Keynote and Distinguished Lectures & Panel Presentations (2006 to present)**

2021    "Centroamérica a la Luz del Bicentenario y la Pandemia." Conferencia inaugural, XVII Congreso Centroamericano de Sociología, San Salvador, El Salvador, June 14th; Panel de cierre del Congreso, June 18th

2021    "Gender, Race, and the Criminalization of Asylum Seekers in the United States." Charles Moskos Lecture, Department of Sociology, Northwestern University, May 20th

2020    "Latino Immigrants in the Rural Midwest: Integration, Accommodation, or Exclusion?" Allen D. and Polly S. Grimshaw Lecture, Department of Sociology, Indiana University, November 13th

2020    "Los desafíos institucionales de la sociología y las ciencias sociales en el mundo de hoy." Conversatorio ALAS con el mundo. Presidential panel, Asociación Latinoamericana de Sociología, Lima, Perú, September 7th (virtual).

2020    "Immigrant Families, Law, and Enforcement: Central American Parents and Children Living in Legal Limbo." Council on Contemporary Families 20th Biennial Conference, Austin TX, February 7th.

2019    "Crimmigration: Reflections, Critiques, and Future Steps." Presidential Panel, American Society of Criminology meetings, San Francisco, November 12-14.

2019    "The Health Consequences of Immigration Policies: Experiences of Central American Women Migrants, Plenary Session, Interdisciplinary Association for Population Health, Seattle, WA October 1-4,

2019    "A Continuum of Structural and Institutional Violence in the Lives of Central American Immigrant Women." Keynote Address, 17th Annual Workshop, Racial Democracy, Crime, and Justice Network, Center for Law and Justice, Rutgers University, Newark, July 12th

2019    "Immigrant Families and Youth: Justice and Democracy." Presidential Panel, Latin American Studies Association, Boston May 24-27

2019    "Relations Between Latino Immigrants and Non-Immigrant Residents in the Heartland." Robin Williams Lecture, Department of Sociology and Jack W. Peltason Center for the Study of Democracy, UC Irvine, April 26th

2018    "Migrant Illegality Across Uneven Spaces: Advancing the Sociology of Immigration." Keynote lecture, Migrant Illegality Across Uneven Spaces Conference, Brown University, October 28th

2018    "Law, the Media and the Criminalization of Immigrants: Constructions and Consequences." Henry M. Jackson Endowed Lecture in International Relations, Whitman College, February 28th

2017    "Gender-based Violence across the Global South: Learning *about* it and *from* it." "Gendered Violence in the Global South" Conference, University of South Wales, Sidney, Australia, December 6th

2017    "Immigration Law, Hostile Contexts, and the Membership of Latino Immigrants." Keynote lecture, Latin American and Latino Studies, University of Arkansas, April 4th

2017    "Immigration Law in the Lives of Immigrants: Membership, Citizenship, and Exclusion?" Keynote lecture, Center for Latina/o Studies in the Americas, University of San Francisco, February 27th.

2016    "Country Conditions for the Migration of Central American Women," Plenary Session, CLINIC (Catholic Legal Immigration Network, Inc.) Convening, Sheraton Hotel, Kansas City, MO. May 24th.

2015    "Central American Immigrants Navigate the US Ethnoracial Landscape." Keynote lecture, Rethinking Race: USC's Centennial Celebration Conference, University of Southern California, October 28-19

2015    "U.S. Immigration Law and the Reconfiguration of Immigrant Families." The 2015 Albert Morris Lecture, Department of Sociology, Boston University, April 29th

2014    "The Reconfiguration of Immigrant Latino Families." Bold Aspirations Lecture, Office of the Provost, University of Kansas, October 21st.

2014    "The Reconfiguration of Immigrant Latino Families in Light of the Current Immigration Regime." Latin American & Latino Studies Distinguished Lecture, University of California, Santa Cruz, May 14th

2013    "Multi-layered Legislation, Enforcement Practices, and Piecemeal Immigration Policies: What Can We Learn From and About Today's Approaches?" Keynote Address, Latino Communities in Old and New Destinations: Multi-disciplinary Perspectives to Assessing the Impact of Legal Reforms Conference, University of South Florida, November 8th

2013    "Immigrants' Lives, Immigration Laws and Reflections for Reform." The Bastian Foundation Diversity Lecture Series, Westminster College, Salt Lake City, September 27th

2013    "A Reflection on Immigration, Violence and Vulnerability." The Cole Lecture, 31st Annual Sociology and Anthropology Symposium, Wheaton College, Norton, MA January 30-31

2012    "Immigration and Religious Communities: Challenges to Public Life." Plenary Session, Society for the Scientific Study of Religion and Religious Research Association, Phoenix, AZ, November 9-11

2012    "Borders, Migration, Community: Arizona and Beyond" Preconference Lecture, International Communication Association, Phoenix, Arizona, May 24th

2012    "The Power of the Law: Central Americans' Legality in Everyday Life." Featured speaker, Central Americans and the Latino/a Landscape: New Configurations of Latina/o America Conference, LLILAS/CMAS, University of Texas, Austin, February 24th.

2011    "Everyday Violence in the Lives of Ladina Guatemalans." ADVANCE Distinguished Lecture, Kansas State University, Oct 21st

2011    "Migración Femenina Centroamericana en Estados Unidos." Conferencia magistral, II Encuentro Mesoamericano de Estudios de Género y Feminismos, Avances y retos de una década: 2001-2011. FLACSO, Guatemala City, Guatemala, May 6th

2011    "Latino Immigrant Lives: Reflections for Reform." The 20th Anniversary Daniel S. Sanders Peace and Social Justice Lecture, University of Illinois, Urbana-Champaign, May 2nd

2010    "Living in Legal Limbo: Latino Immigration in Arizona." Keynote Address, Changing Face of America Conference: Immigration and Social Policy, San Jose State University, Oct 23rd.

2010    "Citizenship, Exclusion, and the Contemporary Immigration Regime. Opening Keynote Lecture, 10th conference on Globalization and Social Responsibility, St Olaf College, February 26th, and "Gender and Families Left Behind in the Context of Migration," February 27th.

2009    "Immigration, Citizenship, and Exclusion: Latin-American Immigrants and the Contemporary Immigration Regime." Alpha Kappa Delta Distinguished Lecture, American Sociological Association Meetings, San Francisco, August 8th.

2008    "Violence Against Immigrants: The Border and Beyond." Keynote speaker, Lives on the Edge: Immigration and Politics Along the U.S.-Mexico Border Workshop, University of Arizona May 2nd.

2008    "Domestic Violence and Immigrant Families." Plenary panel: "The Role of Families in Integration." Tenth Metropolis Conference, Halifax, NS, Canada, April 3-6

2007    "Immigration Policy and Family Reorganization: Experiences of Salvadoran and Guatemalan Immigrants." Keynote speaker for the year's colloquium series, Department of Sociology, University of North Carolina, Greensboro, March 23rd

2006    Closing Remarks, Latina/o Migration: Local and National Challenges, University of Illinois, Urbana Champaign, October 11th.

**Public & Policy Engagement Presentations**

2021    "Immigration Reform for the 21st Century: Exploring Pathways to Safer and More Prosperous Communities." Latino Policy & Politics Initiative, UCLA, May 4th

2020    "Central American Women and Contexts of Violence." Panel on Feminist Approaches to Justice: Addressing Partner Violence Against Colonized Women, American Society of Criminology, DWC, CSW63 Committee, NGO Forum, United Nations, New York (cancelled day before)

2019    "The Making of Immigrants into Criminals: Law, Enforcement, and the Media." Spotlight Sociology, Public Lecture, Social Science Division, UCLA, January 24th.

2018    "Asylum Protection for Immigrant Women Fleeing Violence." Congressional Briefing, Rayburn House of Representatives, October 11th (Division of Women & Crime, American Society of Criminology).

2017    "Temporary Protected Status in the United States: The Experiences of Hondurans and Salvadorans."
      --Legislative briefing, Cannon Building 122 (House), Washington DC, June 23rd
      --Presentation to the National TPS Alliance, All Souls Church, Washington DC, June 24th

2015-2016 The Integration of Immigrants into American Society Report, National Academy of Sciences, Engineering, and Medicine. Panelist/Contributing author.
      --Congressional Briefing, Rayburn House of Representatives, DC, March 11th, 2016
      -- National Immigrant Integration Conference, December 14th, 2015
      --National Academy of Sciences, Engineering, and Medicine, Washington DC September 28th, 2015

2015    "Central America: Migration Trends" brief. Bureau of Western Hemisphere Affairs, Department of State, Washington DC, January 7th

2012    "Legal Violence in the Lives of Immigrants: How Immigration Enforcement Affects Families, Schools, and Workplaces." (with Leisy Abrego). Capstone event, Documenting the Undocumented Series, Center for American Progress, Washington, DC, December 11th.

2011    "Family Separation and Immigrant Women." "Organizations Working with Latina Immigrants: Resources and Strategies for Change," Institute for Women's Policy Research/Woodrow Wilson International Center, Washington DC, March 25th

**Invited Presentations/Lectures (2006 to present)**

2021    "Central American Women in the Asylum System and Beyond." Migration Working Group, University of North Carolina, Chapel Hill, March 10th.

2021    "Central Americans Latinos/as." (Sociology of Latinx Identity and Mobilization, Cristina Lacomba) Harvard University, February 24th.

2021    "Gender-based Violence in Central America." Humanizing Asylum for All Symposium, University of Pennsylvania Carey Law School, February 19th

2021    "Immigration in a Changing Policy Context." District of Columbia Sociological Society ASA President-elect Address, February 18th

2021    "Interviewing Immigrants in Different Contexts." California Center for Population Research, UCLA, January 13th.

2020    "Seeking Refuge in the Carceral State: Central American Women in the U.S. Asylum System." Department of Sociology, University of Wisconsin-Madison, December 16th

2020    "Desafíos actuales y futuros de las migraciones Latinoamericanas." Sección Migraciones Internacionales-Latin American Studies Association, December 9th

2020    "Observaciones sobre la Nueva Narrativa de Centroamérica." FLACSO-El Salvador/Naciones Unidas-El Salvador, December 4th

2020    "Reflexiones sobre migración y esperanza." Primer conversatorio, Semana por la Esperanza, Centro de Investigaciones y Estudios Sociológicos/Centre of Latin American Studies, University of Cambridge, UK, December 1st

2020    "A Conversation on Asylum, Violence and Latin American Immigrants in an Age of Enforcement." Latin American Studies (LAS 250, Dana Leibsohn), Smith College, November 5

2020    "A Continuum of Punishment: Post-Detention Lives of Central American Women Asylum Seekers." The Tri-Campus Colloquium Speaker Series, Department of Sociology, University of Toronto, October 8th

2020    "Gender and Multisided Violence in Central America and Beyond." Danish Institute for International Studies, Copenhagen, June 4th

2020    "Comments" to AKD (Sociology International Honor Society) Inductees, Department of Sociology, Loyola University Maryland, April 28th

2019    "Criminalization of Immigrants through Law and the Media in the U.S." Public lecture (HOMinG Seminar), University of Trento, Italy, September 11th

2019    "Latino Immigrants and Non-Immigrants in the U.S. Heartland: Ethnographic Lessons." International Summer School in Ethnography, University of Trento, September 10th.

2019    "Reflections on Conducting Research in Immigrant Communities Today." American Voices Project (Peter Cookson, Kathryn Edin, David Grusky, PIs), Johns Hopkins University, June 25th

2019    "Contradictions of Temporary Protected Status: Earnings, Education, Civic Engagement." University of Massachusetts, Lowell, March 27th

2019    "Transparency in Ethnographic Research: Ethics and Professional Responsibility." (Graduate Student Workshop) Urban Ethnography Lab, University of Texas, February 28th

2019    "Relations between Central American Immigrants and Non-Immigrants in Rural Kansas." Department of Sociology, University of Texas, Austin, February 28th

2019    "Relations between Latino Immigrants and Non-Immigrants in the Heartland." Migration and Immigrant Incorporation Workshop, Department of Sociology, Harvard University, February 19th

2018    "Transformative Effects of Immigration Law and Its Enforcement on Perceptions of the Self." Center for the Study of Law & Society, UC Berkeley, November 19th

2018    "Ethics & human subjects today: legal rights & limits for researchers," "Collecting data on Undocumented: Fieldwork Techniques." Summer Institute in Migration Research Methods, BIMI, UC Berkeley, June 18th

2018    "The Legal Violence of the 2017 Executive Orders: Effects on Latino Immigrants and White Residents in Rural America." LALACS, Dartmouth College, May 23th

2017    "Temporary Legal Statuses and Transformations of the Immigrant Self." Center for Comparative Migration Studies, UC San Diego, May 25th

2015    "Immigration Law and Immigrant Families." Department of Sociology, Yerevan State University, Yerevan, Armenia, May 13th

2015    "The Reconfiguration of Immigrant Families through Law." The Kercher Symposium Series, Department of Sociology, Western Michigan University, April 8th

2014    "Immigration Laws and Immigrant Families." OLLAS Lecture Series, Office of Latino/Latin American Studies, University of Nebraska, Omaha, November 11th.

2014    "The Transformative Effects of Immigration Law." CLASS Workshop, Gould School of Law, University of Southern California, September 29th.

2014    "Transformative Effects of Immigration Law on Families." Department of Sociology, UCLA, April 6th

2013    "Enduring Violence: Ladina Women's Lives in Guatemala." Department of Sociology, University of Pennsylvania, November 20th.

2013    "Transformative Effects of Immigration Law." Center for Migration and Development, Princeton University, May 9th.

2013    "Legal Violence: Short- and Long-Term Effects on Immigrants." Population Studies & Training Center, Brown University, May 2nd.

2012    "Criminalization of Immigrants: Effects on the ground." Krost Symposium, Texas Lutheran University, October 4th.

2012    "Enduring Violence in Guatemala's Women's Lives." Department of Sociology, Northern Arizona University, September 25th.

2012    "Hyper Awareness of the Law in Central American Immigrants' Everyday Life." Center for Race, Ethnicity and Politics, UCLA, April 18th.

2012    "Enduring Violence: Ladina Women's Lives in Guatemala." UCLA "Untold Histories: Transnational Voices of Central Americans" series, and California State University, Los Angeles Chicano Studies and Latin American Studies, February 2nd.

2011    "Living in Legal Limbo: Latino Immigrants in Arizona's Immigration Regime." University of California, Merced, March 14th

2010    "A Framework of Vulnerability and Violence." What Katrina Can Tell Us About Race, Class, and Gender in These United States Meeting, Social Science Research Council, New York, November 12th-13[th].

2010    "Central Americans' Legality and Everyday Life in Phoenix, Arizona." Center for Multicultural Studies, University of California, Santa Barbara, May 3rd

2010    "El impacto de las leyes migratorias en la vida de centroamericanos en Estados Unidos: el caso de Phoenix, Arizona." Seminario Permanente de Migración, Colegio de La Frontera Norte, Tijuana, BC, Mexico, April 9th.

2010    "Family, Border Justice, and Policy." 7th Border Justice Series Conference, Social Justice and Human Rights Program, Arizona State University West, March 25th

2009    "Legal Violence: Contemporary U.S. Immigration Law and Central American Lives." Marcos & Conceptos: A Critical Latin/a American Studies Symposium." American Studies and Ethnicity Program, University of Southern California, April 17th.

2009    "Immigration and Legality." Global Initiative Speaker Series, Northern Arizona University, March 4th.

2008    "Legal Violence?: Immigration Law in the Lives of Central Americans in the United States." Department of Sociology, Department of Chicano/Latino Studies, and Center for Research on Latinos in a Global Society, University of California, Irvine, May 9th.

2008    "Men's Migration and the Women who Stay." Department of Sociology's Workshop on Economic Sociology and Center for Migration Studies, Princeton University, April 28th.

2008    "International Perspectives on Migration and the Family: Research from the United States." Family Migration Pre-Conference Day, St. Mary's University, Halifax, NS, Canada April 3rd.

2008    "Central American Immigrant Families and Contemporary Immigration Law: Redefinition, Reorganization or Breakdown?" Latino and Hispanic Caribbean Studies, Rutgers University Latin American Studies, and Center for Latino Arts & Culture, Rutgers University March 26th.

2007    "Legal Violence and the Family Lives of Central American Immigrants." Institute for the Study of Social Change, University of California, Berkeley, November 8th.

2007    "Immigration Policy and Family Reorganization: Experiences of Salvadoran and Guatemalan Immigrants." Mason Migration Project/Department Sociology, George Mason University, March 22nd.

2006    Primer encuentro de latinidades: Una mirada crítica a los movimientos y realidades de los emigrantes hispanoamericanos en los Estados Unidos, especialista participante. Convenio Andrés Bello, Bogotá, Colombia, Dec 15-16.

2006    "Law Against the Family: Salvadoran and Guatemalan Immigrant Families and Immigration Law." Department of Sociology, UCLA December 7th.

2006    "Religion and the Contexts of Exit and Reception in Immigrants' Lives: Observations from Phoenix." CORRUL/Department of Sociology, Rice University, November 10th

2006    "Las nuevas familias centroamericanas en tiempos de migración." Taller Centroamericano de la Red Internacional de Migración y Desarrollo (RIMD), Programa de Naciones Unidas para El

Desarrollo (PNUD) El Salvador, y Universidad Centroamericana José Simeón Cañas, (UCA) San Salvador, El Salvador, June 28th & 29th.

**Conference/paper Presentations** (*denotes invited) (**2006 to present**)

2020   "Legal Conditions for Law In/Effectiveness: The Anti-Abortion and Violence Against Women (VAW) Laws in El Salvador." Law & Society Association meetings, May 28-31, Denver, (online)

2020   "The Central American Exodus: Its Roots, Present Course, and Prospects." (Panelist & organizer.) Invited Thematic Panel, Eastern Sociological Society, Philadelphia, February 27-March 1*

2020   "Central American Women in the Immigration System: From Asylum Seeking to Detention." American Association for the Advancement of Science, Seattle, February 13-16* (Panel selected for press briefing.)

2019   "The State and Bureaucracies of Displacement." Special Session on "State Policies: Evasion, Implementation and Impact on the Livelihood and Welfare of Refugees and Recent Migrants." American Sociological Association, New York, August 9-13*

2019   "State Response to Violence Against Women: Transforming Police Practice." Roundtable discussion, Shannon Drysdale Walsh organizer/discussant. Latin American Studies Association meetings, Boston, MA, May 24-27*

2019   "Illegal Encounters: The Effect of Detention and Deportation on Young People." Chapter presentation.  Latin American Studies Association meetings, Boston, MA, May 24-27*

2019   "Género en la migración centroamericana contemporánea a Estados Unidos." Advanced Research Institute on International Migration, El Colegio de México, Mexico City, May 16th*

2019   "Transformative Effects of Immigration Law in Hostile Contexts." Law, Inequality and the Politics of Moral Worth Conference, Weatherhead Research Cluster on Comparative Inequality and Inclusion, Harvard University, May 3rd *

2019   "Media Frames and Effects on Immigrants and Non-Immigrants in Arizona and Kansas." Immigration: The Politics of Inclusion and the Politics of Threat Workshop, Social Science Research Council, New York, March 29th*

2018   "The Media's Role in Anti-Immigrant Policies: The Arizona Republic and SB 1070" (with Daniel Alvord). Social Science History Association meetings, Phoenix AZ Nov 8-11*

2018   "Las Contradicciones del TPS: Educación, Ingresos y Participación Cívica." 2nd Annual Metropolis North America Migration Policy Forum, Mexican Secretariat of Foreign Affairs, Mexico City, September 27-28*

2018   "Legal Structures, Institutions, Racialization Practices and the Immigrant Self." Invited Session, "Theorizing Emotions and the Self in Migration Research American Sociological Association Meetings, Philadelphia, August 11-14*

2017   "The Contradictions of Liminal Legality: Economic Attainment and Civic Engagement of Immigrants on TPS." (with Byeongdon Oh, Daniel Alvord, and Victor Agadjanian) American Sociological Association, Montreal, Canada, August 12-16

2017   "Document Overseers, Enhanced Enforcement, Racialized Local Contexts, and Liminally Legal Latino Immigrants." Paper-Trails: Migrants and Documents in an Era of Legal Insecurity, University of Colorado, Denver, August 7-9.*

2017   "Country Conditions, Gender-based Violence, and the Migration of Central American Women to the U.S." Reconsidering Gender-based Violence in the Context of Displacement and Migration, Göttingen Center for Gender Studies Summer Symposium, Göttingen, Germany July 6-7*

2017   "The Temporariness of Legality: Waiting, Uncertainty, and Transformations of the Self." Citizenship in Unsettling Times Workshop, University of Leicester, Leicester, UK, June 8-9.*

2017   "Gender-based Violence." Country Conditions in Central America and Asylum Decision-Making, Center for Latin American & Latino Studies, American University, January 12-13, Washington, DC*

2016   "Legal Experiences and Attitudes of Immigrants." Law & Society Association, June 2-5, New Orleans*

2016   The Transformative Effects of Multi-layered Precarity: Experiences of Liminally Legal Central American Immigrant Workers, Latin American Studies Association, May 27-30, New York.*

2016    "Geopolitics, Securitization, and the Definitional Question in Asylum Admissions: The Case of Central Americans Then and Now." Shifting Landscapes of Asylum in North America, Canada Program, Weatherhead Center for International Affairs, Harvard University, May 2-3.*

2016    "Theoretical, Methodological, and Ethical Issues in Conducting Research with Undocumented, Unaccompanied, and Citizen Children," Undocumented, Unaccompanied, and Citizen: Charting Research Directions for Children of Immigration, School of Social Work, UT Austin, Feb 25-26.*

2016    "Is There a Role for Academics in the Support of Central American Refugees?" Plenary opening panel, Derechos en Crisis: Refugees, Migrant Detention, and Authoritarian Neoliberalism, LLILAS, UT, Austin, February 24-26.*

2015    Panel "The Politics of Citizenship," Transforming Migrations: Beyond the 1965 Act Conference, University of California, Irvine, October 8-9.*

2015    Panel "Intersections of Violence in Latin America and Human Rights Across Time and Space." Intersections of Violence in Latin America Symposium, Latin American, Caribbean and Latino Studies Program, University of Kentucky, September 30th

2015    "Exploring Strategies from Scholarly Research to Expert Testimony." Central American Refugees in Detention: Rethinking U.S. Immigration Conference, Chicano Research Center, UCLA, September 17th

2015    "Everyday Aggression: Inequality and Feminicide in Honduras and Latin America." Featured Session— Enduring and/or New Forms of Inequality in a Globalizing Word, Panel 1. Latin American Studies Association meetings, San Juan Puerto Rico, May 27-30.*

2015    "Legal Status as an Identity among Immigrants." Migration and Identity: Perspectives from Asia, Europe and North America, Chinese University of Hong Kong, Hong Kong, March 6-7.*

2015    "Contributions to Policy: Legal Status." Frontiers of Immigration Research and Policy Conference, Temporary Migration Cluster, University of California, Davis, January 22-23.*

2014    "Social Networks Among Older Asian and Latino Immigrants in Phoenix." (Cecilia Menjívar and Haruna Fukui) Thematic Session on Networks of Need in the Age of Economic and Social Precarity, American Sociological Association, San Francisco, CA, August 16-19.*

2014    "Multisided Violence and the State in the Lives of Guatemalan and Salvadoran Women." XVIII ISA World Congress of Sociology, Yokohama, Japan, July 13-19.

2013    "Broken by Law?: How Immigration Policies Split Families." (Maria Enchautegui and Cecilia Menjívar), Association for Public Policy Analysis and Management, Washington DC, November 7-9.

2013    "Contexts of Exit and Women's Emigration." Law, Asylum, and Sending Countries panel, Crossing Borders: Immigration and Gender in the Americas, Radcliffe Institute, Harvard University, April 25-26.*

2013    "Violence Against Immigrants: A Focus on Structures." Undocunation Symposium, Center for Race & Gender, University of California, Berkeley, February 15.

2012    "The Plurality of the Legal Context of Reception: The Case of Central Asian Immigrant Women in Russia." (Cecilia Menjívar, Natalia Zotova, and Victor Agadjanian), American Sociological Association meetings, Denver, CO, August

2012    "Twenty Years of Continued Migration," El Salvador: Twenty Years of Peace panel, Latin American Studies Association meetings, San Francisco, CA, May 23-26.*

2012    "Legality without Borders: US Immigration Law and Transnational Links." [Im]Migration and Movement: People, Ideas, and Social Worlds: A Fellows Symposium, Institute for Humanities Research, Arizona State University, April 23rd.*

2012    "The Socio-emotional Effects of SB 1070 on Youth in Arizona." (Carlos Santos and Cecilia Menjívar) Equity and Opportunity Research Symposium: Immigration Policy Shifts affecting Latino Children/Families, Arizona State University, February 23-24.*

2011    "Everyday Violence in the Lives of Ladina Guatemalans." Thematic Session on Conflict, Citizenship, and Development in Latin America, American Sociological Association meetings, Las Vegas, NV, August 20-23.*

2011    "War and Peace: Enduring Social Effects of Protracted Conflicts in Southern Africa and Central America." (Cecilia Menjívar and Victor Agadjanian) Thematic Session on Learning from Intractable Social Conflict, American Sociological Association meetings, Las Vegas, NV, August 20-23.*

2011    "Immigrant Latina Mothers as Targets of Legal Violence." (Leisy Abrego and Cecilia Menjívar) Invited section on Treacherous Geographies of Borders, Gender, and Immigrant Communities in the Americas, American Sociological Association meetings, Las Vegas, NV, August 20-23.*

2011    Presentation/Discussion of *Enduring Violence: Ladina Women's Lives in Guatemala*. Encuentro Mesoamericano de Estudios de Género y Feminismos, Avances y retos de una década: 2001-2011. FLACSO, Guatemala City, Guatemala, May 5th *

2011    "Labor Force Participation Among Aging Immigrants in the United States." (Haruna Fukui and Cecilia Menjívar) Poster, Population Association of America meetings, Washington, DC, April 1st

2010    "Central Americans' Lives in the United States: What Can We Learn *About* Them and *From* Them." Surveying Social Marginality Conference, University of Washington, Seattle, October 8th.*

2010    "Liminal Legality and the Experiences of Transnational Children and their Families." Thematic Session on Children's Citizenship Status and Experiences in a Globalizing World, American Sociological Association meetings, Atlanta, GA, August 14-17.*

2010    "Enduring Violence: Ladina Women's Lives in The Guatemalan Oriente." Republics of Fear: Understanding Endemic Violence in Latin America Today Conference, Lozano Long Center, University of Texas, Austin, March 4-5.*

2009    "Controlling Immigration or Legal Violence?: An Assessment from Phoenix, AZ." Migration during an Era of Restriction Conference, University of Texas, Austin, November 4-6.*

2009    "Economic Uncertainties, Social Strains, and HIV Risks: Exploring the Effects of Male Labor Migration on Rural Women in Mozambique." (Victor Agadjanian, Cecilia Menjívar and Boaventura Cau) How Immigrants Impact their Homelands Conference, Boston University, September 25th.*

2009    "Living on the Edge of the Law: The 1.5 Undocumented Mexican Generation and the Transformation of Citizenship." (Belinda Herrera and Cecilia Menjívar) Social Science Research on Immigration: The Role of Transnational Migration, Communities and Policy, Arizona State University, September 10-11th*

2009    "Defending Borders and the Brutalization of the US American Public." (Sang Kil, Cecilia Menjívar, and Roxanne Doty) American Sociological Association, San Francisco, CA, August 8-11.

2009    "Securing Borders: Patriotism, Vigilantism, and the Brutalization of the U.S. American Public." (Sang Kil, Cecilia Menjívar, and Roxanne Doty) Pacific Sociological Association, San Diego, CA, April 8-11*

2009    "Combining Computer Simulation and Ethnography in Studying Network Dynamics, Network Formation, and Disintegration of Salvadoran Immigrants' Networks." (Bruce Rogers and Cecilia Menjívar) Mixing Methods in Social Network Research International Conference, European Academy, Berlin, Germany, January 30-31*

2008    "Family Separation and Immigration Law: Central American cases in Phoenix, Arizona." Transnational Parenthood and Children-Left-Behind Conference, International Peace Research Institute (PRIO), Oslo, Norway, November 20-21.

2008    "Parents and Children across Borders: Legal Instability and Intergenerational Relations in Guatemalan and Salvadoran Families." (Cecilia Menjívar and Leisy Abrego) American Sociological Association Meetings, Boston, August 1-4*

2008    "In Solidarity: Assistance to Central American Transmigrants during their Journeys North. (Lilian Chavez and Cecilia Menjívar) International Migration Section Roundtables, American Sociological Association Meetings, Boston, August 1-4.

2008    "Residents' Views toward Immigration and Social Transformation in the U.S. Southwest." (Haruna Fukui and Cecilia Menjívar) International Migration Section Roundtables, American Sociological Association Meetings, Boston, August 1-4.

2008    "Educational Aspirations and Documented Dreams: Guatemalan and Salvadoran Immigrants and their Prospects in the U.S. Educational System." The Americas Plural: Regional and Comparative Perspectives Conference, Institute for the Study of the Americas, University of London, June 19-20*

2007    "Rights of Racial and Ethnic Minorities and Migrants: Between Rhetoric and Reality" (Cecilia Menjívar and Rubén Rumbaut). To be presented at the "Migration and Human Rights in the North American Corridor" conference, Human Rights Program, University of Chicago, Oct 12-13*

2007    "Women's Lives and Violence in Eastern Guatemala." Latin American Studies Association Meetings, Montreal, Canada, September*

2007    "Reshaping the Post-Soviet Periphery: The Impact of Men's Labor Migration on Women's Lives and Aspirations in Rural Armenia" (Victor Agadjanian, Arousyak Sevoyan, and Cecilia Menjivar). Population Association of America, New York, March.

2007    "Escaping Stereotypes: Older Women's Perceptions of Old Age and Aging." Leah Rohlfsen and Cecilia Menjívar. Pacific Sociological Association Meetings, Oakland, CA, March.

2006    "Enduring Violence: Women's Lives in Eastern Guatemala." American Anthropological
        Association Meetings, San Jose, CA, November*
2006    "Fighting to Exist in Non-Existence: The Citizenship Process of Central American and Mexican
        Women" (Olivia Salcido and Cecilia Menjívar). International Migration Section Roundtables,
        American Sociological Association Meetings, Montreal, Canada, August.
2006    "Guatemalan women's work and gender relations in Guatemala." Research Committee 06,
        Family Research, Session 10: Families in developing countries. ISA World Congress of
        Sociology, Durban, South Africa, July.
2006    "Guatemalan and Salvadoran Immigrant Families and US Immigration Policy." Research
        Committee 06, Family Research, Session 06: Various family forms. ISA World Congress of
        Sociology, Durban, South Africa, July.
2006    "New Family Formations and US Immigration Law." Latin American Studies Section, Western
        Social Science Association, Phoenix, AZ, April.

**Conference/invited panel discussant (2006 to present)**
2021    30th Anniversary of the Latina/o Section of the American Sociological Association, Panel on
        Future Directions of Latina/Latino Sociology, July 21st
2019    Migration Panel II. Critical Perspectives on Race and Human Rights: Transnational Reimaginings
        Conference, The Promise Institute for Human Rights, UCLA School of Law, March 8th
2017    Thematic Session: The Cultural Terrain of Migrant Inclusion and Exclusion: Perspectives from
        Africa and Asia (presider & discussant), American Sociological Association, Montreal, Aug. 12-16
2015    "Immigration and Politics." Regular session, American Sociological Association meetings, Aug
        22-25, Chicago, IL. (Discussant)
2015     "Migrations, Precarities and Illegalizations in the Americas" (Panel I). Latin American Studies
        Association, San Juan Puerto Rico, May 27-30 (Panel Discussant)
2015    "Gender Issues in Contemporary Armenia: From Research to Policy." Yerevan State University
        Center for Gender and Leadership Studies, Armenia, May 11-12 (Conference Rapporteur)
2015     "Fleeing Violence, Finding Prison: The Treatment of Migrant Women in Flight from Domestic Violence
        in the U.S. Immigration System." Haury Program in Environmental and Social Justice, James E.
        Rogers College of Law, University of Arizona, Tucson, AZ, April 23-24
2014    "Somos Familia: The Transnational Politics of Representation about Latino Families." Latina/o
        Studies International Conference, Chicago, IL, July 17-19
2014     "The Disappeared, Displaced and Technologies of Memory: Long-term Consequences of Armed
        Conflicts in Central America." Latin American Studies Association meetings, Chicago, May 21-24
2014    Central American Immigration: Honoring Pioneers & Charting New Paths, Center for the Study
        of Immigrant Integration, University of Southern California, February 26.
2013     Trabajadoras migrantes en la frontera sur: seminario/taller. El Colegio de México, June 21-22.
2012    Thematic session, Gender and Immigration, Pacific Sociological Association Meetings, San
        Diego, CA, 22-25 March
2010    Thematic session, Spiritual and Religious Challenges to State Citizenship in the Age of
        Migration, American Sociological Association meetings, Atlanta, GA, August 14-17.
2010    Taller "Familias y Movilidades: Enfoques teóricos y perspectivas metodológicas", Colegio de
        México, DF, México, June 11th
2009    Unaccompanied Migrant Children Workshop/Discussion, Radcliffe Institute, Harvard University,
        June 17-20.
2008    "Religion at the Edge: Expanding the Boundaries of the Sociology of Religion." Center for the
        Study of Religion, Princeton University, October 3-4.
2007    Panel "The Border is Everywhere: "New" Spaces and Actors in Transnational Migration between
        Latin America and the United States - Part 1, Latin American Studies Association, Montreal.
2007     "A Conversation with Alejandro Portes." Eastern Sociological Society, Philadelphia, March.
2006    Session "Beyond Low Wage Labor Migration: Entrepreneurs, Professionals, & Managers."
        American Sociological Association Meetings, Montreal, Canada, August
2006     Qualitative methods session and session on ethics of research. "Taller Centroamericano de la Red

Internacional de Migración y Desarrollo (RIMD), Programa de Naciones Unidas para El Desarrollo (PNUD) El Salvador, y La Universidad Centroamericana José Simeón Cañas, (UCA) San Salvador, El Salvador, June 28th & 29th.

2006    Panel "Transnational Families." Fourth Annual Summer Institute on International Migration, Center for Comparative Immigration Studies, University of California, San Diego, June 19-23.

2006    Migration and the Arts in the United States Workshop, Princeton University, June 1-2.

2006    Panel "Voces Inocentes: Discusión sobre el largometraje." Latin American Studies Association Meetings, San Juan, Puerto Rico, March.

## Critic on Book Panels

2021    Panel for "In Someone Else's Country: Anti-Haitian Racism and Citizenship in the Dominican Republic," by Trenita Brookshire Childers. Society for the Study of Social Problems, August 5th.

2020    "Toward Social Justice: New Books by Latinx Scholars." School of Social Ecology, UC Irvine, October 15th

2019    Panel for "Kids at Work: Latinx Families Selling Food on the Streets of Los Angeles," by Emir Estrada. School of Human Evolution and Social Change, ASU, November 7, 2019.

2018    Panel for "Gone Home: Race and Roots through Appalachia," by Karida Brown. UCLA Center for the Study of International Migration, October 5th.

2015    Panel for "Crime, Punishment and Migration," by Dario Melossi. American Society of Criminology, November 18-21, Washington, DC.

2009    Panel for "Survival of the Knitted: Immigrant Social Networks in a Stratified World," by Vilna Bashi. American Sociological Association, San Francisco, CA, August 9th.

2009    Panel for "God's Heart has no Borders," by Pierrette Hondagneu-Sotelo, Pacific Sociological Association, San Diego, CA, April 10th.

2006    Panel for "La Virgen of el Barrio: Marian Apparitions, Catholic Evangelizing, and Mexican American Activism, by Kristy Nabhan-Warren. Association for the Sociology of Religion, Montreal, Canada, August 9-12.

## Presentations At UCLA

2021    "Effects of Immigration Law on Physical and Mental Health of Immigrants." Neuropsychology Brown Bag (Instructor Mirella Diaz Santos), Department of Psychiatry and Biobehavioral Sciences, Simmel Institute, February 11th

2021    "Law In(effectiveness) in Women's Lives: Family-first Ideologies vs. Abortion and Violence Against Women Laws in El Salvador." (with Leydy Diossa-Jimenez), Gender and Sexuality Working Group, Department of Sociology, February 10th

## Presentations at the University of Kansas

2015    "Central American Women: Immigrants or Refugees?" XXIV Waggoner Research Colloquium, Center for Latin American Studies, University of Kansas, November 13th

## Presentations at Arizona State University

2012    "Immigration and Arizona" Faculty Cross-talks, Office of Diversity, November 14.

2012    "Enduring Violence: Ladina Women's Lives in Guatemala" Latin American Studies cluster, Institute for Humanities Resarch, September 21st.

2010    "Living in Legal Limbo in Phoenix, AZ." School of Geographical Sciences and Urban Planning, ASU, September 24th.

2009    "Methodological Issues in Qualitative Research: Lessons from Research on Central American Immigrants in the United States," Southwest Interdisciplinary Research Center (SIRC), March 25th.

2007    "The Impact of Immigration Law on Immigrant Families: Reconfiguration or Breakdown?" Sociological Sciences Speaker Series, School of Social and Family Dynamics, ASU, March 1st.

2006    "Legal Status and the Lives of Central American Immigrants." Voces Convergentes: Literatura, linguística y cultura. 11th Spanish Graduate Student Symposium, Arizona State University, April 13th—15th.

2006    "Social Networks, Migration, and Immigrant Incorporation." Mathematics and Cognition Seminar, Arizona State University, March 7th.

1999    "Central American Immigrants in the United States." First Conference on Central American Literatures and Culture, Arizona State University, April 8-10.

1999    "The Social Networks of Salvadoran Women and Men in San Francisco." Women Studies Program colloquium, Arizona State University, January 29th.

**Courses Taught**

UCLA:
>   Sociology 236B Immigrant Incorporation/Assimilation (graduate)
>   Sociology 152 Immigrant Incorporation/Assimilation (undergraduate)
>   Sociology 191V Immigration and Media (undergraduate seminar)

University of Kansas:
>   Sociology of Immigration (undergraduate and graduate)

Arizona State University:
>   Sociology/School of Social and Family Dynamics:
>   Graduate: Seminar in qualitative methods; immigration
>   Undergraduate: research methods; immigration.
>   Graduate/undergraduate course: Gender Violence

>   School of Justice and Social Inquiry:
>   Graduate: Research Methods; Immigration and Justice; Migration, Immigration and Justice; Refugee Migrations and Justice.
>   Undergraduate: Research Methods; Gender and International Development; Immigration and Justice.

Department of Sociology, University of California, Davis: 1989-1990 Instructor; 1/87-6/89 Teaching Assistant.  Department of Sociology, University of Southern California: 9/81-5/82 Teaching Assistant.

**Mentoring and Student Committees**

*Book workshops*

2021    Blair Sackett and Annette Lareau, University of Pennsylvania, June 2021
2021    Asad Asad, Humanities Center, Stanford University, May 2021
2020    katrina quisumbing king, Provost's Postdoctoral Scholar, USC, January 2020
2019    Paige Sweet, Inequality in America Initiative, Harvard University, October 25th
2019    Leisy Abrego, Center for the Study of Women, UCLA, May 17th
2018    Ming Chen, University of Colorado, Boulder Law School, December 6
2017    Angela Garcia, School of Social Service Administration, University of Chicago, Sept 28-29
2017    Maria Rendón, UC Irvine (held at UC Berkeley), June 21
2016    Jennifer Jones, Institute for Latino Studies, University of Notre Dame, Sept. 7-8.
2013    Leisy Abrego, Penn Kanner Next Generation Fellowship, Center for the Study of Women, UCLA, April 5

*Post-doctoral*

Amada Armenta, Department of Sociology, University of Pennsylvania. Post-doctoral Fellowship, Ford Foundation Diversity Fellowship (declined); The Woodrow Wilson National Fellowship, 2016-2017 (Mentor)

Leisy J. Abrego, Chicano Studies Department, UCLA. Ford Foundation Diversity Post-doctoral Fellowship, 2012-2013 (Mentor)

Silvia Dominguez, Sociology, Northeastern University. Ford Foundation Diversity Post-doctoral Fellowship, 2009-2010 (Mentor)

Carolina Valdivia Ordorica, School of Education, Harvard University, UC President's Post-doctoral Fellowship, 2020-2021 (Mentor)

Sandra D. Simpkins, School of Social and Family Dynamics, Arizona State University. W.T. Grant Foundation Fellowship, 2007-2012 (Mentor/qualitative methods advisor)

*PhDs in Progress (Committee Chair/Co-Chair)*
Estefanía Castañeda Pérez, (Co-Chair) Department of Political Science, UCLA
Catherine Crooke, Department of Sociology, UCLA

*PhDs in Progress (Committee Member)*
Adrian Bacong, Fielding School of Public Health, UCLA
Caitlyn Carr, Department of Anthropology, University of South Florida
Oscar Rubén Cornejo Casares, Department of Sociology, Northwestern University
Rose Ann Gutierrez, School of Education, UCLA
Leydy Diossa-Jimenez, Department of Sociology, UCLA
Harleen Kaur, Department of Sociology, UCLA
Lucia León, Department of Chicana/o Studies, UCLA
Claire Niehaus, Clinical Psychology Doctoral Program, George Mason University
Karime Parodi Ambel, Department of Anthropology, UCLA
Anthony James Williams, Department of Sociology, UCLA
Yue Yang, Department of Sociology, UCLA

*PhDs Completed (Chair)*
Jennifer Arney          Sociology, School of Social and Family Dynamics (Spring 2010), ASU
Dissertation: "Prescription Drug Advertising and the Biomedical Construction of Affective Disorder: Effects for Consumers, Physicians, and Society."
*Associate Professor, University of Houston, Clear Lake

Lilian Chavez          Sociology, School of Social and Family Dynamics (Spring 2016), ASU
Dissertation: "The Migration Process for Unaccompanied Immigrant Minors: Children and Adolescents Migrating from Mexico and Central America to the United States."
*Assistant Professor, Mesa Community College

Luis Fernandez          School of Justice and Social Inquiry (Spring 2005), ASU
Dissertation: "Policing Protest Spaces: Social Control in the Anti-Globalization Movement."
*Professor, Northern Arizona University (formerly, Grinnell College)

Haruna Fukui          Sociology, School of Social and Family Dynamics (Fall 2014), ASU
"Social Networks of Older Immigrants in Phoenix, Arizona."
*Assistant Professor, Okayama University, Japan

Andrea Gómez Cervantes Sociology, University of Kansas (Spring 2019)
"Inflexible Illegality: Immigration and Integration Processes of Indigenous and Non-Indigenous Latina/o Immigrants in the Midwest."
*UC President's Post-doctoral fellow &Assistant Professor, Department of Sociology, Wake Forest University

Belinda Herrera          School of Justice and Social Inquiry (Spring 2009) (co-chair), ASU

Dissertation: "Living on the Edge of the Law: Undocumented 1.5 Mexican Immigrants and their Expressions of Citizenship."

Sang Kil                    School of Justice and Social Inquiry (Fall 2006), ASU
Dissertation: "Covering the Border: How the News Media Create Race, Crime Nation, & the USA-Mexico Divide."
*Associate Professor, San Jose State University

Zeynep Kilic             Sociology, School of Social and Family Dynamics (Fall 2006), ASU
Dissertation: "Reluctant Citizens: Belonging and Immigrant Identification in the Era of Transnationalism."
*Associate Professor, University of Alaska

Carole McKenna           School of Justice and Social Inquiry (Fall 2008), ASU
Dissertation: "Militarism: Micro-Macro Power Arrangements between Wives, Soldiers, and the Military-Industrial-Service-Complex."
*Instructor, Ferris State University

Dulce Medina             School of Social Transformation, Program in Justice Studies (Spring 2016) ASU
Dissertation: "Immigrant Incorporation in the U.S. and Mexico: Well-being, Community Reception, and National Identity in Contexts of Reception and Return."
*Research Analyst, California Pension System

Carlos Posadas           School of Justice and Social Inquiry (Spring 2007), ASU
Dissertation: "Women's Translocal Networks and How they Organize Resettlement by Looking at Specific Spheres of their Lives."
*Associate Professor (and former Chair), New Mexico State University

Olivia Salcido           School of Justice and Social Inquiry (Spring 2011), ASU
Dissertation: "Wolves" or "Blessing": Victims'/Survivors' Perspectives on the Criminal Justice System.
*Tempe Preparatory Academy faculty

Tyler Wall               School of Justice and Social Inquiry (Spring 2009) (co-chair), ASU
Dissertation: "War-Nation: Military and Moral Geographies of the Hoosier Homefront."
*Associate Professor, University of Tennessee (formerly, Eastern Kentucky University)

*PhDs Completed (Committee Member)*
Melinda Alexander        School of Geographical Sciences, (Fall 2014), ASU
Dissertation: "Belonging With the Lost Boys: The Mobilization of Audiences and Volunteers at a Refugee Community Center in Phoenix, Arizona."

Randall Amster           School of Justice Studies (Spring 2002), ASU
Dissertation: "Patterns of Exclusion, Forces of Resistance: Urban Sidewalks, National Forests, and the Contested Realms of Public Space."

Cynthia Bejarano         School of Justice Studies (Summer 2001), ASU
Dissertation: "A Mosaic of Latino Cultures: Young Lives at the Crossroads of Sameness and Difference."

Naomi Bellot             School of Justice and Social Inquiry (Spring 2009), ASU
Dissertation: "Gender Vulnerabilities in the Caribbean: A Focus upon Indigenous Kalinago (Carib) Women in Bataka, Dominica."

Diya Bose                Department of Sociology (Summer 2020), UCLA
(3 articles dissertation)

Neslihan Cevik          Sociology, School of Social and Family Dynamics (Summer 2010), ASU
Dissertation: "Religious Revival in Modern Turkey: Muslim, New Muslim Entrepreneurs, and Sites of Hybridity."

Chantal Figueroa          Organizational Leadership, Policy, & Development (Summer 2014) U. of Minnesota
"State of Terror, States of Mind: Gender, Mental Health and Systems of Care in Guatemala City."

Chiara Galli          Department of Sociology (Spring 2020), UCLA
"Refugee Children or Immigrant Teenagers?: The Precarious Rights and Belonging of Central American Unaccompanied Minors in the United States."

Everardo Garduño          Dept. of Anthropology (Fall 2005), ASU
"From Invented to Imagined and Invisible Communities: Mobility, Social Networks and Ethnicity among the Yumans of Baja California."

Gail Gibbons          School of Social Work (Fall 2006), ASU
Dissertation: "Twenty-five Years Later: A Comparative Study of the Socioeconomic Integration of Vietnamese Refugees in Arizona."

Anneliese M Harper          School of Human Communication (Spring 1996), ASU
Dissertation: "The Impact of Immigration on Rural Guatemalan Women Ways of Speaking (Gossip)"

Khaleel Husssaini          Sociology, School of Social and Family Dynamics (Spring 2008), ASU
"Immigrant Adaptation Among Mexican Students in the Southwest: Understanding Differences Among Fifth Graders' Consumption Norms of Alcohol, Cigarettes, and Marijuana."

Atsuko Kawakami          Sociology, School of Social and Family Dynamics (Spring 2012), ASU
"Aging and Identity Among Japanese Immigrant Women."

Heather Kuhn          School of Public Health (Spring 2005) (External Reader) Harvard University
Dissertation: "Health Profile of Farm workers and Interface of Workers with Healthcare in Imperial County, California:  A Qualitative Analysis."

Mirian Martinez-Aranda, Department of Sociology (Summer 2021), UCLA
(3 paper dissertation)

Brenda Ohta          Sociology, School of Social and Family Dynamics (Spring 2008), ASU
Dissertation: "Determinants of Care for Medicare Recipients at the End of Life: Utilization and Decision Making in the Acute Care Hospital."

John Rosinbum          Department of History, ASU (Spring 2014), ASU
"A Crisis Transformed: Refugees, Activists and Government Officials in the United States and Canada during the Central American Refugee Crisis."

Florencia Rojo, Department of Sociology and Behavioral Sciences, UCSF (Spring 2019)
""You wanted norte:" Central American Families and the Ongoing Trauma of Migration, Separation, and Deportation."

Aundrea Janaé Snitker Women & Gender Studies (Spring 2016) ASU
Dissertation: "Constructing Masculinities and the Role of Stay-at-Home Fathers: Discussions of Isolation, Resistance and the Division of Household Labor."

Emily Skop          Department of Geography (Spring 2002), ASU
Dissertation: "The Saffron Suburbs: Asian Indian Immigrants Community Formation in Metropolitan Phoenix."

Meredith Van Natta, Department of Sociology & Behavioral Sciences, UCSF (Spring, 2019)
"Balancing Risks: Health, Citizenship, and Biopolitical Exclusion in the U.S."

Andrea Vest           Family and Human Development, Sanford School (Fall 2014), ASU
Dissertation: "Latino Adolescents' Organized Activities: Understanding the Role of Ethnicity and Culture
in Shaping Participation."

Paloma Elizabeth Villegas Dept. of Sociology and Equity Studies (Summer 2012) University of Toronto
Dissertation: "Assembling and (re)marking migrant illegalization: Mexican migrants with precarious
status in Canada."

Arely Zimmerman           Department of Political Science, (Spring 2010) UCLA
Dissertation: "Contesting Citizenship: Identity, Rights, and Participation across Borders, Central
Americans in Los Angeles."

_Doctoral Qualifying Examinations/Defenses only_ (All at ASU, unless otherwise indicated)
Eugenio Arene            Educational Policy Analysis, School of Education
Jennifer Chappell Eckert, School of Social Welfare, University of Kansas (qualifying exam committee)
Neel Bhattacharjee     Dept. of Geography
Terna Gbasha             School of Justice and Social Inquiry
Estye Fenton             Department of Sociology and Anthropology (Northeastern University)
Mei Lei                  School of Public Affairs
Chara Price              Family and Human Development, Sanford School, ASU
Elizabeth (Lisa) Reber School of Social Transformation, ASU

_M.A. Theses in Progress:_

_M.A. Theses & Capstone Papers Completed (Chair)_
Cameron Brandt           Latin American Studies Program, UCLA (Spring 2020)
Capstone: "Media Framing and SB1070: Racialization, Illegalization and Impact on Health Outcomes"

Nathan Cheong            Latin American Studies Program, UCLA (Spring 2020)
Capstone: "Blood, Sweat and Tears: The U-Visa Application Process and Acquisition and its Effects on Immigrant
Wellbeing and Citizenship in the United States."

Catherine Crooke         Department of Sociology, UCLA (Spring 2021) (Co-chair)
"U.S. Asylum Lawyering and Temporal Violence."

Aurelia de La Rosa Aceves       Sociology, School of Social and Family Dynamics (Spring 2011), ASU
"Phoenix's Place for the Homeless: Stories from the Maricopa County Human Services Campus."

Cherie Espinoza          School of Justice Studies ASU (Fall 2000)
Thesis: "Education for Extinction: Protecting Our Roots from Arizona English-Only Initiative."

Luiza Kinzerska-Martinez Latin American Studies Program, UCLA (Spring 2020)
Thesis: "#Ni Una Menos: Central American Policy Approaches to Gender-Based Violence in the Twenty-
First Century."

Paola Lopez              Latin American Studies Program, UCLA (Spring 2020)
Capstone: "U.S. Asylum Procedure: Asylum Seekers Trapped in Violence Generated by the State."

Dulce Medina            Sociology, School of Social and Family Dynamics ASU (Summer 2011)
Thesis: "Return Migration: Modes of Incorporation for Mixed Nativity Households in Mexico"

Rigoberto Quintana       Latin American Studies Program, UCLA (Spring 2020)
Thesis "Points of Contact: Agents of Aid and Social Reproduction at a Migrant Shelter in Tijuana."

Emily Sawyer            Sociology, School of Social and Family Dynamics, ASU (Spring 2009)
Thesis: "The Adoption of Biomedicine into *Quechua* Cosmology of Health and Illness: Treatment-
Seeking Behavior in an Indigenous Ecuadorian Community."  (Co-Chair)

Cecilia Martinez-Vasquez  School of Justice Studies ASU (Summer 2005)
Thesis: "Identity Formation Among Salvadoran Youth of the 1.5 and Second Generation."

*M.A. Theses/Papers & Capstone Competed (Committee Member)*

John Abiel Benítez       Department of Geography (Summer 2002), ASU
Thesis: "The Hispanic Protestant Landscape in Mesa, AZ."

Melissa Carpenter        Dept. of English/ Comparative Literature (Spring 2001), ASU
Thesis: "También somos madres: Militancy and Maternity in Latin American Testimonios."

Mario Escobar            Department of Spanish (Fall 2011), ASU
"Globalización, violencia y solidaridad: prácticas discursivas eurocentroamericanas y chicanas."

Miriam Hilin             Department of Sociology (Spring 2005), ASU
"Immigration Law and the Family Stability of Mexican Undocumented Immigrants."

Summer Lopez Colorado         Department of Sociology, UCLA (Fall 2020)
"Spinning the Revolving Door: Advancing a Legal Violence Framework to Investigate Predatory Policing
Practices in the Sex Trade."

Juan Esteban Mejía Aguilar Estudios de Población, Colegio de la Frontera Norte, México (Summer 2014)
"Migrantes Desaparecidos: Una Búsqueda Interminable."

Robert Miller            School of Architecture (Spring1998), ASU
Final Project: "Redesigning the INS Building to Accommodate the Social and Cultural Diversity of Immigrants."

Paul Ara Nersessian      Department of Religious Studies (Summer 2002), ASU
Thesis: "Borderlands Scholarship."

Reena Patel              Global Technology and Development (ASU East) (Summer 2003), ASU
Thesis: "The Re-Enforcement of Traditional Gender Roles in the Technology Sector: A Case Study of
Female Engineers in India."

Chara Price              Family and Human Development, Social and Family Dynamics (Fall 2012), ASU
"Sibling Behaviors and Mexican Origin Adolescents' After-School Activity Participation."

Emily Skop              Dept. of Geography (Summer 1997), ASU
Thesis: "Segmented Paths: The Geographic and Social Mobility of Mariel Cuban Exiles."

Kathleen Tonnies         Curriculum & Instruction, School of Education, (Fall 2016) University of Kansas
 "From Passion to Practice: Developing a Culturally Relevant Training Program for Volunteers of Adult Refugee
English Language Learners."

*Honors Theses in Progress (Chair*)
Federico Trudu, Department of Sociology/Minor in Migration Studies, (Spring 2021) UCLA

*Honors Theses Completed (Chair*)
Michelle Brady             School of Justice Studies (Fall 2000), ASU
Thesis: "The Stalker: A Creative Project."

Chrisanne Gultz          School of Politics and Global Studies (Spring 2014), ASU
"The Media Construction of Undocumented Immigration as a National Crisis"

Sean McKenzie           Departments of Political Science & Spanish (Spring 2008), ASU
"Formation of Perceptions of Migration Among Wives and Mothers Left Behind in Rural Honduras."

Daniella Rodriguez, Migration Studies minor, (Winter 2020), UCLA
"Social Imaginaries of Migration: How Images of Life Course Inform Adult Undocumented Latino
Immigrants' Desires to Stay or Return."

Edna Sandoval Avila     Latin American Studies, UCLA (McNair Scholar) (Spring 2020)
"Guatemala Mujeres en Resistencia: Racialized Struggle in the Aftermath of War."

Magdalena Valenzuela  School of Justice Studies (Spring 2000), ASU
"A System Flawed: The Death Penalty in the United States."

*Honors Theses Completed (Committee Member)*
Anna Fairbanks Bethancourt      Department of English (Spring 2011), ASU
"Consolidating Migrant Identity in Arizona: Newcomers and a State's Need for Social Empathy."

Loredana Cuatro Nochez  School of Languages and Linguistics, *Griffith University, Australia (Summer 2007)
Thesis: "Salvadorian migrant: A case study to investigate their schooling experience, cultural identity and
their language maintenance in (Queensland) Australia."

Falynn Glickstein         School of Justice Studies (Spring 2004), ASU
Honor's thesis: "Killings of the Women in Juarez."

Brenna Gromley          Department of History (Spring 2008), ASU
"Battling Neighbors: The United States Response to Honduran-El Salvador "Soccer War.""

Lauren Kerchenko        Department of History (Fall 2000), ASU
Thesis: "From the Ukraine to the US: Immigrant Women and Assimilation."

Haley McInnis             Sociology (Spring 2013), ASU
"The Role of Religious Organizations in Progressive Social Movements: Local Churches and Their
Response to Senate Bill 1070."

Michelle Speck           Dept. of Anthropology (Spring 2001), ASU
Thesis: "Mexican Immigrant Women."

*Other Undergraduate Mentoring*

*At UCLA*
Dalesy Casasola          Pre-Doctoral Scholars Summer Program, California State University, Los Angeles, 2019
Isabel García            Department of Sociology, UCLA

*At the University of Kansas*
Giselle Almodovar        Emerging Scholars Faculty Mentor, Center for Undergraduate Research, 2016-2018
Faculty Mentor Program, College of Liberals Arts and Science, Fall 2016

*At Arizona State University*

| Lea Fordyce | B.A. | Obama Scholar Mentorship Program, 2013-2014 |
| William McDonald | B.S. | Research Apprenticeship, School of Politics & Global Studies, 2013 |
| Mauro Whiteman | B.S. | Research Fellow, Center for the Study of Religion and Conflict, Fall 2012 |
| Christy Garcia | B.S. | Research Apprenticeship, School of Social and Family Dynamics, Fall 2007 |
| Vanessa Tucker | B.S. | Research Apprenticeship, School of Social and Family Dynamics, Fall 2007 |
| Joshua Whistler | B.S. | Research Fellow, Center for the Study of Religion and Conflict, 2004-05 |
| Olivia Reyes | B.S. | Research Fellow, Center for the Study of Religion and Conflict, 2004-05 |
| Sonia Anaya | B.S. | Research Apprenticeship, School of Justice Studies, Fall 2003 |
| Malea Chavez | B.S. | Research Apprenticeship, School of Justice Studies, Fall 1998 |

**Panels, Boards, Consulting, and Related**

--Advisory Board Member, Consortium on Gender-Based Violence, University of Arizona, 2018-
--Advisory Board, Migrant Children & Youth Project, Deborah Boehm and Susan Terrio (leads), 2017
--Advisory planning board, "Developing a 21st Century US Immigration Agenda," CMS, New York, 2016
--Advisory council member, Immigrant Integration: Assessing and Improving the Collective Response of the Catholic Church in the United States Panel, Center for Migration Studies, New York, 2014-
--Institute for Women's Policy Research, Washington, D.C. "Women Immigrants in the New Destinations: Religion's Role in Facilitating Incorporation and Improving Well-Being," 1/2009-2011.
--United Nations Development Program (UNDP). San Salvador, El Salvador. Contributor to Report, 12/04-04/05.
--Annie E. Casey Foundation. Participant, Consultative Session on Transnational Families, September 23rd, 2002
--Center for the Common Good, Vesper Society, Oakland, CA. Research Consultant, Immigration Project, 4/932/94
--University Eduardo Mondlane, Maputo, Mozambique, Facultade de Letras, Advisor/Consultant, 1993 (Summer)
--Joint Committee on International Migration, Refugee Resettlement, and International Cooperative Development, Sacramento, CA. Research Coordinator, 9/89-1/91
--Evaluation, Training and Management Co., Sacramento, CA. Consultant, Project: Rehabilitation programs in low-income communities, 1/90-12/90.
--Casa de la Cultura, Ministry of Culture, Managua, Nicaragua Assistant Coordinator, 5/85-9/85.
--LULAC, Los Angeles, Program Development Assistant, 9/83-9/84.

**Professional Service** (*denotes elected)

American Sociological Association
2020-2021 President-elect;* 2021-2022 President; 2022-2023 Past-President
2017-2018 Chair Elect,* 2018-2019 Chair, 2019-2020 Past Chair, International Migration Section
2016-2017; 2018-2020 Member, Committee on the Status of Women
2016-2017 Member, Committee on Nominations, Family Section
2016-2017 Chair, Founders' Award Committee, Latino/a Section
2015-2016 Chair, Public Sociology Award Committee, International Migration Section
2014-2015 Member, William J. Goode Book Award Committee, Family Section
2013-2014 Member, Lewis A. Coser Award Committee, Theory Section
2013-2014 Founders Award Selection Committee, Latino/a Section
2013-2014 Vice-President elect*; 2014-2015Vice-President; 2015-2016Past Vice-President;
       Program Committee 2015 Meetings
2012-2013 Chair, Article Award Committee, International Migration Section
2010-2013 Member-at-large,* ASA Council.
       Fund for the Advancement of the Discipline sub-committee
       Minority Fellowship Program Advisory Board (Council Liaison)
2010-2011 Chair, Awards Committees and Chair, Career Award Committee, Latino/a Section
2010 Member, NSF/ASA Postdoctoral Fellowship Review Committee (also in 2012)
2009-2010 Member, Committee on Nominations, Family Section

2007-2008 Member, Awards Committee, Latino/a Section
2007-2009 Member,* ASA Committee on Nominations
2006-2008 Member, Program committee for the Annual Meetings (& author-meets-critics books selection).
2004-2005 Chair-elect; * 2005-2006 Chair; 2006-2007 past Chair, Latina/o Section.
2003-2004, 2004-2005 Member, Thomas and Znaniecki Award Committee, International Migration Section.
2003-2006 Council Member,* International Migration Section.
2002-2004  Member, Program committee for the Annual Meetings.

<u>Latin American Studies Association</u>
2017     International Migration Section Article Award Committee member
2009-2010 Diskin Distinguished Lecture and Diskin Dissertation Award Selection Committee member.
2009-2010 Co-chair, Migration and Latin American Diasporas Track, for 2010 meetings, Toronto, Canada
2007-2009 Co-chair, Cross-border Studies and Migration Track, for 2009 meetings, Rio de Janeiro, Brazil.
2004-2006 Council member,* Section on Gender.
2002-2003 Co-chair,* Central American Section.
2000-2002 Council member,* Central American Section.

<u>Pacific Sociological Association</u>
2012-2013 Member, Distinguished Scholarship Award committee
2004-2007 Member,* Committee on Committees, Southern Region.

<u>Society for the Study of Social Problems</u>
2004-2005 Chair, Committee on Committees (one year replacement).
2004     Member, Program Committee for the Annual Meeting.
2002-2005 Member,* Committee on Committees.
2001-2002 Chair, Minority Fellowship Selection Committee.
2001     Site visit for Social Problems Editorial Office, Summer.
2000-2001 Chair-elect and Member. Minority Fellowship Selection Committee.
1998-1999 Member, Lee Founders Award Committee.

<u>Sociologists for Women in Society</u>
Member, Mainstream Team (media contact) 2009-

<u>Editorial/Advisory Boards</u> (Journals)
*American Behavioral Scientist*, 9/2009-
*American Journal of Sociology,* Consulting editor, 9/2011-8/2013
*American Sociological Review,* 1/2009-12/2011; 1/2003-12/2005
*Contexts,* 1/2017-12/2019
*Aztlán: A Journal of Chicano Studies,* 1/2018-12/2020
*Gender & Society,* 1/2013-1/2015; 1/2003-1/2005
*International Migration Review,* 2021-2023; 2018-2021
*Journal of Developing Societies*, Associate editor, 2002- 2005
*Journal of Developing Societies*, Book Review Editor, 1995-2000
*Journal of Latin American Studies*, International advisory board member, 1/2014-
*Journal of Marriage and Family, 2021*
*Latino Studies*, 1/2001-
*Law & Social Inquiry,* 2021-2023
*Migraciones Internacionales*, 2001-2010
*Perspectives on Global Development and Technology*, 2001-2003
*Population Research and Policy Review*, 9/2015-
*RSF: The Russell Sage Foundation Journal of the Social Sciences, 3/2019-2/2022*
*Sociological Science* (Consulting editor), 6/2017-
*The Sociological Quarterly,* 2008-2014
*Sociology of Race and Ethnicity,* 1/2017-12/2019

*Studies in Social Justice,* 1/2006-
*TRACE* (Travaux et Recherches dans les Amériques du Centre), CEMCA 9/2012-

Editorial Boards (Encyclopedias, Series, and Volumes)
Women on the Move: Past and Present Perspectives Series, *Manchester University Press*, 2021-
Social Mechanisms Series, *Oxford University Press*, 2021-
Global Migration and Social Change Series, *Policy Press* (University of Bristol), 2016-
Latina/o Sociology Series, *New York University Press*, 2013-
Latinos in the United States: Studies in Diversity and Change Series, *Lynne Rienner Publishers*, 2004-
School of Advanced Research Press (Santa Fe, NM), 2007-2010
*Immigration and Crime: Ethnicity, Race, and Violence,* edited by Ramiro Martinez, Jr., and Abel
    Valenzuela. New York University Press (2005).
*Latinas in the United States: An Historical Encyclopedia.* Vicki L. Ruiz and Virginia Sánchez-Korrol,
    editors. Indiana University Press (2005).

Other professional service (selected)
2017    Organizing committee member, "Country Conditions in Central America and Asylum Decision-
        Making" Workshop, College of Law & Center for Latin American & Latino Studies, American
        University, Washington DC January 12
2006-2012 Expert/member, Working Group on Global Childhood and Migration
2006    Faculty participant, Fourth Annual Summer Institute on International Migration, Center for
        Comparative Immigration Studies, University of California, San Diego, June 19-23.
2002    "Hispanic Gendering of the Americas: Beyond Cultural and Geographical Boundaries." National
        Endowment for the Arts Summer Institute for College and University Teachers, Arizona State
        University, June 17-July 19. (Institute faculty member.)
1998    Co-Chair. Immigration and Human Rights Working Group, Inter-University Program for Latino
        Research. (IUPLR, based at the University of Texas, Austin.)
1997    Mentor. Southwest Institute for Research on Women. Summer Institute on Global Processes, Local
        Lives: Comparative Approaches to Women's and Area Studies. University of Arizona. 6/8-15.

*Grant Reviews*: Center for Engaged Scholarship (2017), European Research Council (2020), NSF Law
and Society Program (2005, 2007, 2008, 2013); NSF Social and Behavioral Sciences Program (1996,
2005, 2006, 2007, 2018); NSF Sociology Program (2012, 2013, 2016, 2017, 2018, 2 in 2019), Social
Sciences and Humanities Research Council of Canada (2002, 2004, 2007, 2016); Foundation for Child
Development, New York (1997); Louisiana Board of Regents' Research Competitiveness Subprogram
(2006); Israel Science Foundation (2007, 2010, 2016); Austrian Science Fund (2010, 2012), National
Humanities Center (2011), Russell Sage Foundation (2013, 2016, 2019), Sam Houston State University
Office of Sponsored Projects (2013).

*Manuscript referee for book publishers*: The University of Arizona Press, The University of California
Press, Cambridge University Press, Columbia University Press, The University Press of Florida, The
Johns Hopkins University Press, School of American Research Press, New York University Press,
University of North Carolina Press, University of Notre Dame Latino Studies Institute, Oxford University
Press, University of Pittsburg Press, Polity Press, Routledge, Rutgers University Press, Springer, Stanford
University Press, Temple University Press, University of Texas Press, Wadsworth Publishing

*Tenure and promotion reviews*: University of Alaska, Arizona State University, University of Arkansas, SUNY
Albany, SUNY Stony Brook, Amherst College, University of British Columbia, University of Birmingham,
Brigham Young University, Brown University, Columbia University, Bucknell University, UC Berkeley, UC
Irvine, UCLA, UC Santa Cruz, UC Davis, UC San Diego, Clemson University, Columbia University, Cornell
University, CUNY, Dartmouth College, Drexel University, Florida International University, Fordham University,
Grinnell College, Harvard University, University of Illinois Urbana-Champaign, University of Illinois-Chicago,
Indiana University, Iowa State University, Kansas State University, University of Massachusetts at Lowell,
University, University of Massachusetts-Boston, University of Massachusetts-Lowell, Michigan State University,

North Carolina State University, Northeastern University, University of Oregon, Oregon State University, University of Pennsylvania, Pitzer College, Pomona College, Princeton University, Providence College, Rice University, St. Mary's University (MD), Texas A&M, University of Texas at Austin, University of Toronto, Tufts, University of San Francisco, University of South Florida, University of Southern California, University of Utah, Wheaton College (MA), Virginia Tech, Whitman College, Wellesley College.

*Program review*: Global and Sociocultural Studies, Florida International University (Graduate Program), (Spring 2013); Department of Sociology, Brown University (Spring 2018)

**Service at UCLA**
2021-2022, 2020-21, 2019-2020, Elected member, Executive Committee, Department of Sociology
2020- Chair, Advisory Board, Center for the Study of International Migration
2020 Search Committee for Director Center for the Study of Women
2020 Fellowship Reviewer, Graduate Division
2019-2021 Faculty Advisory Board Member, Chicano Studies Research Center
2019-2020 Faculty Advisory Board Member, Latin American Institute
2019- Faculty co-coordinator, Gender and Sexuality Working Group, Department of Sociology
2018-2019 Member, Undergraduate Committee, Department of Sociology

**Service at the University of Kansas**
2016-2017 Member, Personnel Committee, Department of Sociology
2016- Member, Search Committee for CLAS Associate Dean for Diversity, Equity & Inclusion
2016-Member, Advisory Board, Women, Gender, and Sexuality Studies
2015- Member, Executive Committee, Center for Latin American & Caribbean Studies

**Service at Arizona State University**
University
2014 Southwest Borderlands Initiative Selection Committee (member)
2013-2016 Member, University Graduate Council
2012-2014 Co-convener, working group on Immigration Theory, Institute for Humanities Research
2012-2014 Co-organizer, Working group on Latin American Studies, Institute for Humanities Research
2012-2014 Member, Executive Board, Faculty Women's Association
2012-2014 Outstanding Doctoral Mentor Committee, Graduate College
2012-2013 Member, Executive Board, Comparative Border Studies Center, School of Transborder Studies
2011-2012 President, Chicano and Latino Faculty and Staff Association
2009      Member, Personnel Committee, Dept. of Transborder, Chicano/a, & Latino/a Studies (Fall)
2007-2010 Member, Campus Environment Team
2006-2008 Faculty Liaison, Chicano & Latino Faculty and Staff Association/Faculty Women's Association.
2006      Member, Advisory Board, Center for Latin American Research (Fall)
2006      Faculty panel participant, Social Science Graduate Student Association, April 21st.
2006      Panel judge, Graduate Students in Life, Earth, and Social Sciences Association, Feb 17th.
2006      Member, Personnel Committee, Asian Pacific American Studies Program.
2003-2004 Mentor, Faculty Development Program
2004-2005 Member, Search Committee (for director) Center for Latin American Studies,
2003-2004 Member, Steering Committee, School of Global Studies
2003      Keynote speaker, Sociology Club kickoff celebration. Department of Sociology, Nov. 18th.
2003      Sabbatical Review, Social and Behavioral Sciences, Arizona State University West.
2003-2004 Member, Personnel Committee, Asian Pacific American Studies Program.
2001-2002 Member, Committee on the Status of Women.
2000-   Member. Race and Ethnic Relations Doctoral Examination Committee, Department of Sociology.
1998-2001 Member, Executive Board, Committee on Law and the Social Sciences.
2000-2001 Member, Child and Family Services Advisory Board.
2000-2001 Member, Recruitment Committee. Asian Pacific American Studies Program. 2000, 2001, and 2002
Graduate College Representative in Dissertation Defenses: May 2002, September 2001, July 2000.

1999      Participant (and fund raising), First Conference on Central American Literature and Culture, April.
1999      Participant, "A Campus Climate for Diversity Summit." (Part of "Preparing for the University of the Next Century.") March 27th
1998-1999 Member, Search Committee, Department of Chicana/Chicano Studies.
1998-1999 Member, Search Committee, Department of Religious Studies.
1997-1999 Coordinator. Women in Latin America Working Group. Center for Latin American Studies.
1996-1997 Advisory Council, Center for Latin American Studies.

College of Letters, Arts and Sciences
2013-2014 Member, Committee on Committees (elected)
2012 (Spring semester) Search Committee member (for Social Science Dean)
2010-2011 Member, Dean's Advisory Council

College of Public Programs
2001-2002 College of Public Programs Internal Grants Committee.

School of Social and Family Dynamics (2005-present)
2012- Associate Director
2007-2009; 2010-2012 Director, Graduate Studies (Sociology)
2006-2007 Graduate Committee (member).

School of Justice Studies (1996-2005)
Chair: Personnel Committee; Computer and Colloquium Committee
Member (multiple years): Policy Work Group, Graduate Committee, Personnel Committee, John P. Frank Lecture Committee, Graduate Committee, Computer Committee, Recruitment Committee

**Community Engagement and Public Presentations**
2014      "Conversación sobre migración." Centro Laboral, South Omaha, November 10th.
2014      Panel "Global Violence and Social Justice: A Conversation", Tucson Festival of Books, March 15th.
2012      "The Effects of Migration on Those Who Stay in the Countries of Origin." Foundation for Inter-Cultural Dialogue, Tempe, AZ, December 5.
2008, 2009 Committee member, II Feria de la Pupusa, Unidos en Arizona/Comité Salvadoreño, Nov.
2007      Presentation to Wilson Elementary School students, Faculty Ambassadors Program, Nov 16th.
2006      Academic participant, Religious Convening, Interfaith Worker Justice, Phoenix Dioceses, 3/26-3/27.
2002      Presentation, ASU Escribe, ASU Public History Program, Arizona Book Festival, April 6th.
2001      Lecture on immigration. Phoenix Civitan Club, Phoenix Arizona. June 7th.
2000      Organizer and Chair. Feria Informativa de Servicios Sociales (Social Services Informational Fair for Latino immigrants in the area), ASU Downtown Center. July 15th.
2000      Immigrants and Laborers. Presentation to the City of Mesa, Arizona Neighborhood Committee. May 25th.
8/90-12/93 Northern California Legal Services, Sacramento, CA. Legal Assistance and Refugee Project, Assistant/Translator (Volunteer)
5/91- 8/92 Dixon Family Planning Services, Dixon, CA (Research Consultant)
  --Country conditions expert witness (all pro bono) in asylum cases of Central American immigrant immigrants throughout the country, with a focus on detention cases in Artesia, Dilly, and Karnes, Texas.
  --Multiple local, regional, national and international media interviews (in English and Spanish).

**Memberships**
American Sociological Association
Latin American Studies Association
Sociologists for Women in Society
Eastern Sociological Society
Pacific Sociological Association
Citizenship and Immigration Network, Law and Society Association
Red Internacional de Migración y Desarrollo

Association for the Sociology of Religion

**Languages**
Fluent in Spanish and Portuguese.
Fair knowledge of French and Italian.

# Exhibit B

# United States Border Patrol

## Southwest Border Sectors

**Total Illegal Alien Apprehensions By Fiscal Year** (Oct. 1st through Sept. 30th)

| Fiscal Year | Big Bend (formerly Marfa) | Del Rio | El Centro | El Paso | Laredo | Rio Grande Valley (formerly McAllen) | San Diego | Tucson | Yuma | Southwest Border Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 8,045 | 15,833 | 29,230 | 31,561 | 32,641 | 162,262 | 38,591 | 52,172 | 26,244 | 396,579 |
| 2017 | 6,002 | 13,476 | 18,633 | 25,193 | 25,460 | 137,562 | 26,086 | 38,657 | 12,847 | 303,916 |
| 2016 | 6,366 | 23,078 | 19,448 | 25,634 | 36,562 | 186,830 | 31,891 | 64,891 | 14,170 | 408,870 |
| 2015 | 5,031 | 19,013 | 12,820 | 14,495 | 35,888 | 147,257 | 26,290 | 63,397 | 7,142 | 331,333 |
| 2014 | 4,096 | 24,255 | 14,511 | 12,339 | 44,049 | 256,393 | 29,911 | 87,915 | 5,902 | 479,371 |
| 2013 | 3,684 | 23,510 | 16,306 | 11,154 | 50,749 | 154,453 | 27,496 | 120,939 | 6,106 | 414,397 |
| 2012 | 3,964 | 21,720 | 23,916 | 9,678 | 44,872 | 97,762 | 28,461 | 120,000 | 6,500 | 356,873 |
| 2011 | 4,036 | 16,144 | 30,191 | 10,345 | 36,053 | 59,243 | 42,447 | 123,285 | 5,833 | 327,577 |
| 2010 | 5,288 | 14,694 | 32,562 | 12,251 | 35,287 | 59,766 | 68,565 | 212,202 | 7,116 | 447,731 |
| 2009 | 6,360 | 17,082 | 33,521 | 14,999 | 40,569 | 60,989 | 118,721 | 241,673 | 6,951 | 540,865 |
| 2008 | 5,391 | 20,761 | 40,961 | 30,312 | 43,658 | 75,473 | 162,390 | 317,696 | 8,363 | 705,005 |
| 2007 | 5,536 | 22,920 | 55,883 | 75,464 | 56,714 | 73,430 | 152,460 | 378,239 | 37,992 | 858,638 |
| 2006 | 7,520 | 42,636 | 61,465 | 122,256 | 74,840 | 110,528 | 142,104 | 392,074 | 118,549 | 1,071,972 |
| 2005 | 10,536 | 68,506 | 55,722 | 122,679 | 75,346 | 134,186 | 126,904 | 439,079 | 138,438 | 1,171,396 |
| 2004 | 10,530 | 53,794 | 74,467 | 104,399 | 74,706 | 92,947 | 138,608 | 491,771 | 98,060 | 1,139,282 |
| 2003 | 10,319 | 50,145 | 92,099 | 88,816 | 70,521 | 77,749 | 111,515 | 347,263 | 56,638 | 905,065 |
| 2002 | 11,392 | 66,985 | 108,273 | 94,154 | 82,095 | 89,927 | 100,681 | 333,648 | 42,654 | 929,809 |
| 2001 | 12,087 | 104,875 | 172,852 | 112,857 | 87,068 | 107,844 | 110,075 | 449,675 | 78,385 | 1,235,718 |
| 2000 | 13,689 | 157,178 | 238,126 | 115,696 | 108,973 | 133,243 | 151,681 | 616,346 | 108,747 | 1,643,679 |
| 1999 | 14,952 | 156,653 | 225,279 | 110,857 | 114,004 | 169,151 | 182,267 | 470,449 | 93,388 | 1,537,000 |
| 1998 | 14,509 | 131,058 | 226,695 | 125,035 | 103,433 | 204,257 | 248,092 | 387,406 | 76,195 | 1,516,680 |
| 1997 | 12,692 | 113,280 | 146,210 | 124,376 | 141,893 | 243,793 | 283,889 | 272,397 | 30,177 | 1,368,707 |
| 1996 | 13,214 | 121,137 | 66,873 | 145,929 | 131,841 | 210,553 | 483,815 | 305,348 | 28,310 | 1,507,020 |
| 1995 | 11,552 | 76,490 | 37,317 | 110,971 | 93,305 | 169,101 | 524,231 | 227,529 | 20,894 | 1,271,390 |
| 1994 | 13,494 | 50,036 | 27,654 | 79,688 | 73,142 | 124,251 | 450,152 | 139,473 | 21,211 | 979,101 |
| 1993 | 15,486 | 42,289 | 30,058 | 285,781 | 82,348 | 109,048 | 531,689 | 92,639 | 23,548 | 1,212,886 |
| 1992 | 13,819 | 33,414 | 29,852 | 248,642 | 72,449 | 85,889 | 565,581 | 71,036 | 24,892 | 1,145,574 |
| 1991 | 8,764 | 38,554 | 30,450 | 211,775 | 72,293 | 87,319 | 540,347 | 59,728 | 28,646 | 1,077,876 |
| 1990 | 7,180 | 41,373 | 28,708 | 223,219 | 89,089 | 97,018 | 473,323 | 53,061 | 36,387 | 1,049,321 |
| 1989 | 5,560 | 46,786 | 27,524 | 168,105 | 75,292 | 79,650 | 366,757 | 51,445 | 31,387 | 852,506 |
| 1988 | 6,209 | 59,403 | 41,179 | 182,566 | 69,912 | 60,294 | 431,592 | 48,683 | 42,723 | 942,561 |
| 1987 | 9,586 | 64,934 | 55,291 | 231,994 | 74,139 | 71,038 | 500,327 | 47,481 | 67,277 | 1,122,067 |
| 1986 | 23,796 | 123,952 | 95,186 | 312,892 | 143,685 | 121,783 | 629,656 | 71,675 | 93,219 | 1,615,844 |
| 1985 | 23,667 | 99,280 | 71,519 | 240,350 | 114,931 | 82,826 | 427,772 | 55,269 | 67,737 | 1,183,351 |
| 1984 | 22,196 | 87,058 | 68,563 | 212,652 | 87,059 | 66,860 | 407,828 | 46,283 | 59,777 | 1,058,276 |
| 1983 | 20,829 | 83,733 | 71,897 | 205,944 | 65,279 | 55,706 | 429,121 | 35,870 | 63,595 | 1,033,974 |
| 1982 | 20,268 | 48,753 | 55,440 | 152,882 | 40,385 | 32,533 | 314,979 | 32,344 | 48,236 | 745,820 |
| 1981 | 17,584 | 50,455 | 59,774 | 146,872 | 36,910 | 32,809 | 326,836 | 33,085 | 45,483 | 749,808 |
| 1980 | 15,602 | 50,762 | 57,009 | 127,488 | 39,167 | 35,012 | 285,984 | 33,668 | 45,862 | 690,554 |
| 1979 | 20,116 | 50,262 | 55,532 | 149,722 | 50,666 | 41,915 | 337,930 | 37,075 | 52,580 | 795,798 |
| 1978 | 23,501 | 54,098 | 42,118 | 174,010 | 36,627 | 45,201 | 325,557 | 34,991 | 53,338 | 789,441 |
| 1977 | 22,239 | 42,322 | 38,421 | 145,059 | 27,289 | 38,704 | 337,195 | 33,295 | 48,669 | 733,193 |
| 1976 | 19,846 | 32,988 | 32,327 | 114,886 | 24,665 | 38,839 | 266,709 | 34,641 | 42,598 | 607,499 |
| 1975 | 20,472 | 32,008 | 27,217 | 99,000 | 26,199 | 31,300 | 185,499 | 39,941 | 50,628 | 512,264 |
| 1974 | 23,291 | 44,098 | 26,143 | 112,432 | 30,061 | 38,668 | 196,981 | 50,108 | 49,824 | 571,606 |
| 1973 | 22,378 | 42,232 | 23,125 | 82,386 | 23,854 | 37,092 | 128,889 | 44,824 | 36,286 | 441,066 |
| 1972 | 20,269 | 31,110 | 15,327 | 78,168 | 21,781 | 29,338 | 73,115 | 32,272 | 19,946 | 321,326 |
| 1971 | 22,026 | 25,780 | 14,292 | 57,796 | 17,665 | 28,281 | 59,375 | 23,548 | 15,228 | 263,991 |
| 1970 | 16,770 | 18,711 | 12,028 | 43,640 | 11,569 | 20,708 | 50,663 | 14,222 | 13,469 | 201,780 |
| 1969 | 11,973 | 12,991 | 9,195 | 31,159 | 8,129 | 14,076 | 33,311 | 8,301 | 8,833 | 137,968 |
| 1968 | 8,834 | 9,576 | 8,358 | 19,408 | 5,715 | 10,093 | 24,116 | 4,537 | 6,004 | 96,641 |
| 1967 | 7,049 | 7,906 | 6,974 | 13,656 | 4,178 | 9,029 | 17,844 | 3,068 | 4,269 | 73,973 |
| 1966 | 6,592 | 6,845 | 6,916 | 10,119 | 3,658 | 8,706 | 13,362 | 2,392 | 4,050 | 62,640 |
| 1965 | 3,973 | 4,292 | 5,344 | 6,355 | 2,310 | 8,057 | 6,558 | 1,480 | 1,651 | 40,020 |
| 1964 | 3,146 | 4,489 | 2,640 | 4,486 | 2,168 | 9,173 | 4,521 | 1,200 | 696 | 32,519 |
| 1963 | 2,026 | 4,417 | 1,690 | 3,813 | 1,753 | 9,992 | 3,768 | 1,466 | 719 | 29,644 |
| 1962 | 1,431 | 3,250 | 1,426 | 3,304 | 1,525 | 5,569 | 3,091 | 1,247 | 511 | 21,103 |
| 1961 | 954 | 3,458 | 1,878 | 3,540 | 1,172 | 6,713 | 2,279 | 1,178 | 573 | 21,745 |
| 1960 | 732 | 3,023 | 1,839 | 3,630 | 1,024 | 5,515 | 3,371 | 1,255 | 633 | 21,022 |

App. 537

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2021, I electronically filed the foregoing

Joint Appendix with the Clerk of the Court for the United States Court of Appeals

for the District of Columbia Circuit by using the appellate CM/ECF system.


*/s/ Joshua Waldman*
Joshua Waldman