No. 21-5200

# IN THE UNITED STATES COURT OF APPEALS FOR THE D.C. CIRCUIT

————

NANCY GIMENA HUISHA-HUISHA, ET AL.,

*Plaintiffs-Appellees*,

*v.*

ALEJANDRO MAYORKAS, ET AL.,

*Defendants-Appellants*,

————

On Appeal from the United States District Court
for the District of Columbia
Case No. 1:21-cv-00100-EGS

————

## CORRECTED BRIEF FOR *AMICUS CURIAE* THE STATE OF TEXAS IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

————

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General

RYAN S. BAASCH
Assistant Solicitor General
Ryan.baasch@oag.texas.gov

LEIF A. OLSON
Special Counsel

Counsel for Proposed Intervenor-Defendant the State of Texas

# Table of Contents

Page

Table of Authorities..................................................................... iii

Interest of Amicus Curiae the State of Texas .......................................vii

Introduction...............................................................................1

Background ................................................................................3

    A.    Federal Regulation of the Entry of Aliens.................................3

    B.    Regulation of Contagious Diseases at the Borders...................... 6

    C.    The CDC Promulgates the Regulation and Orders Under Review .......... 8

    D.    Procedural History.................................................... 9

Argument..................................................................................10

  I.  Defendants Are Likely to Succeed on the Merits ........................ 11

    A.    The Executive Has Statutory and Constitutional Authority to Expel Aliens Who Violate the CDC's Orders........................................ 11

        1.    The Executive Had Statutory Expulsion Authority When Section 265 Was Enacted, and Retains That Authority Now. .......................... 11

        2.    The Executive Has Constitutional Authority to Expel Aliens Who Violate the CDC's Order.............................................. 13

    B.    Defendants Suspended the Right of Aliens to Enter and So Those Aliens No Longer Possess Any Defense to Immediate Removal................................ 15

  II.    The Other Preliminary Injunction Factors Demonstrably Disfavor Plaintiffs. ........................................... 20

    A.    Plaintiffs Have Failed to Show Irreparable Harm. .................. 20

    B.    The Balance of Equities Disfavors Plaintiffs........................... 22

Conclusion............................................................................... 24

Certificate of Compliance ........................................................25

Certificate of Service................................................................25

# Table of Authorities

Page(s)

**Cases:**

*Babb v. Wilkie*,
   140 S. Ct. 1168 (2020) ................................................................. 10

*Castro v. U.S. Dep't of Homeland Sec.*,
   835 F.3d 422 (3d Cir. 2016) ............................................................ 5

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004) ......................................................... 21

*Cuomo v. NRC*,
   772 F.2d 972 (D.C. Cir. 1985) (per curiam) ................................. 20

*Davis v. Mich. Dep't of Treasury*,
   489 U.S. 803 (1989) ....................................................................... 10

*Demore v. Kim*,
   538 U.S. 510 (2003) .......................................................................... 4

*Dep't of Homeland Sec. v. Thuraissigiam*,
   140 S. Ct. 1959 (2020) ............................................... 3, 6, 12, 14, 21

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ...................................................... 20

*Ekiu v. United States*,
   142 U.S. 651 (1892) ............................................................. 3, 14, 17

*Fong v. United States*,
   149 U.S. 698 (1893) ............................................................. 1, 3, 13

*Kendall v. United States ex rel. Stokes*,
   37 U.S. 524 (1838) ........................................................................ 14

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ......................................................................... 4

*United States ex rel. Knauff v. McGrath*,
   181 F.2d 839 (2d Cir. 1950) ......................................................... 12

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ................................................................ 13, 14

*Landon v. Plasencia*,
   459 U.S. 21 (1982) .......................................................................... 1

iii

*Lew Moy v. United States*,
    237 F. 50 (8th Cir. 1916) ................................................................ 17

*Mayor of New York v. Miln*,
    36 U.S. (11 Pet.) 102 (1837) ............................................................ 3

*New Prime Inc. v. Oliveira*,
    139 S. Ct. 532 (2019) .............................................................10, 19

*Oceanic Steam Nav. Co. v. Stranahan*,
    214 U.S. 320 (1909) ..................................................................... 17

*Rotkiske v. Klemm*,
    140 S. Ct. 355 (2019) ................................................................... 19

*Serono Labs., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) .............................................. 22, 24

*Sotorios Targakis v. United States*,
    12 F.2d 498 (5th Cir. 1926) .......................................................... 17

*Texas v. Biden*,
    2:21-cv-67 (N.D. Tex.) .................................................................. vii

*Texas v. Biden*,
    4:21-cv-00579-P (N.D. Tex.) ........................................................ vii

*Texas v. United States*,
    1:18-cv-68 (S.D. Tex.) .................................................................. vii

*Texas v. United States*,
    6:21-cv-3 (S.D. Tex.) .................................................................... vii

*Texas v. United States*,
    6:21-cv-16 (S.D. Tex.) .................................................................. vii

*United States v. Texas*,
    3:21-cv-173 (W.D. Tex.) ............................................................... vii

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
    259 F.2d 921 (D.C. Cir. 1958) ...................................................... 22

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) (per curiam) .................................. 21

*Yamataya v. Fisher*,
    189 U.S. 86 (1903) ....................................................................... 11

**Constitutional Provisions, Statutes and Rules:**

U.S. Const. Art. II ................................................................ 2, 13, 15

8 U.S.C.:

    §§ 1101 et seq. ..................................................................... 5

    § 1152(c)-(e) ...................................................................... 5

    § 1157 ................................................................................ 5

    § 1158 ................................................................................ 5

    § 1158(a)(1) ...................................................................... 19

    § 1225(b)(2)(A) ................................................................. 12

    § 1225(b)(2)(C) ................................................................. 12

    § 1227(a) .......................................................................... 12

    § 1229a ............................................................................. 12

    § 1231 ............................................................................... 19

    § 1231(b)(3) ...................................................................... 19

    § 1252 ............................................................................... 12

42 U.S.C.:

    § 243(a) ....................................................................... 8, 23

    § 265 ...................................................... 1, 2, 7, 15, 16

42 C.F.R. § 71.40(b)(1) ....................................................... 8

85 Fed. Reg. 17,060-02 (Mar. 26, 2020) .............................. 8

**Other Authorities:**

Act of March 3, 1891, ch. 551, § 1, 26 Stat. 1084 ................ 4, 5

Act of February 5, 1917, ch. 29, § 19, 39 Stat. 874 .............. 4, 12

Act of February 15, 1893, ch. 114, § 7, 27 Stat. 449 ............. 6, 7

Congressional Research Service, *Refugee Admissions and Resettlement Policy* (Dec. 18, 2018) .......................................................... 5

Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559 (Mar. 24, 2020) ................................................. 8

Foreign Affairs Reform and Restructuring Act of 1998 ........ 19

Funk and Wagnall's New Standard Dictionary of the English Language  (1946) .......................................................... 16, 18

H.R. Rep. No. 78-1364 (1944) ........................................... 7

Hidalgo County Judge Richard F. Cortez, *Declaring a Local State of Disaster* (Aug. 2, 2021)..........................................................22

Immigration and Nationality Act, Pub. L. No. 82-414, § 101, 66 Stat. 163 (1952) ............................................................................5

Will Maslow, *Recasting Our Deportation Law: Proposals for Reform*, 56 Colum. L. Rev. 309, 317 (1956) ............................................5

Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833 (1993) ..................................3, 4

Public Health Service Act, Pub. L. No. 78-410, 58 Stat. 682 (1944) ........................7

Congressional Research Service, *Refugee Admissions and Resettlement Policy*(Dec. 18, 2018) ............................................................5

1 William Blackstone, Commentaries on the Laws of England 252 (1765) ...................................................................................... 13

2 Universal English Dictionary (John Craig ed. 1869) ........................................... 16

Mayor Bruno J. Lozano, *City of Del Rio Emergency Local Disaster Declaration* (Sept. 17, 2021)...................................................... 23

Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 16, 2020) ....................................................9

Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828-02 (Aug. 5, 2021).............................................................................................9

Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs*, 111 Yale L.J. 231 (2001) ............................................. 13

Universal English Dictionary 1067 (John Craig ed. 1861) ..................................... 18

Webb County Judge Tano E. Tijerina, *Corrected Declaration of Local State of Disaster and Order* (July 21, 2021) .......................................... 23

# Interest of Amicus Curiae the State of Texas

Texas has a unique interest in border enforcement and in the outcome of this case. Multiple Texas border communities have declared states of disaster because of the surge of aliens who have crossed the border and who are infected with COVID-19. Texas' local and regional healthcare resources are also burdened by the costs of providing care for these aliens. And Texas is currently litigating a host of related immigration and other challenges against the federal government. *See, e.g., Texas v. Biden*, 4:21-cv-00579-P (N.D. Tex.) (whether federal government adequately using its public health authority to expel aliens); *Texas v. United States*, 1:18-cv-68 (S.D. Tex.) (DACA); *Texas v. Biden*, 2:21-cv-67 (N.D. Tex.) (Migrant Protection Protocols); *Texas v. United States*, 6:21-cv-3 (S.D. Tex.) (pause on removals); *Texas v. United States*, 6:21-cv-16 (S.D. Tex.) (prioritization of removal); *United States v. Texas*, 3:21-cv-173 (W.D. Tex.) (Texas authority to restrict transport of aliens).

Texas, on her own behalf and on behalf of her citizens, files this brief as a friend of the Court to support Defendants' authority to exclude from the United States aliens traveling from countries experiencing a communicable disease outbreak.

vii

# INTRODUCTION

"[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). And so, as a default, "[t]he right of a nation to expel or deport foreigners who have not been naturalized, or taken any steps towards becoming citizens of the country . . . [is] **absolute and unqualified**." *Fong v. United States*, 149 U.S. 698, 707 (1893) (emphasis added). The United States has given aliens the opportunity to apply for many *statutory* privileges (*i.e.*, visas or asylum). But as statutory—not constitutional—privileges, they may be eliminated or suspended.

That truism describes—and decides—this entire case. Plaintiffs are a group of aliens who unlawfully entered this country, have no legal status, and are now resisting expulsion. They claim that multiple statutory protections may give them a right to remain. But Congress has the power to turn off those protections. And here Congress unequivocally and explicitly granted Defendant the Center for Disease Control and Prevention("CDC") the power to do just that when necessary to protect Americans from a communicable disease. 42 U.S.C. § 265 ("Section 265"). There is no dispute that COVID-19 is a communicable disease. And there is no dispute that the CDC took the action at issue in this case under Section 265 to protect Americans from aliens who may be carrying COVID-19. That means that Plaintiffs' statutory protections from removal are suspended and Plaintiffs have no plausible basis remaining to defend against immediate expulsion.

The district court erred, however, because it addressed only whether *Section 265* "evinces [an] intention to grant the Executive the authority to expel or remove

persons from the United States." JA105. That answer to that question is irrelevant because the Executive[1] *already has authority* to expel or remove[2] aliens. Congress has granted that authority under a host of other statutes. And the Executive also has expulsion power under Article II of the Constitution. The relevant question is instead whether Section 265 granted the Executive authority to suspend the statutory defenses that Plaintiffs may use to *resist* expulsion. Section 265 plainly does, *see* 42 U.S.C. § 265 (conferring authority to determine "that a suspension of the right to introduce [aliens] is required in the interest of the public health"), and the Executive has plainly exercised that power.

The district court also erred in its grant of a preliminary injunction because the equities do not favor Plaintiffs. They entered illegally, and took the chance that they would be returned in accordance with our nation's laws. The fact that their gamble might fail was a risk all along, and it does not constitute irreparable injury. In addition, aliens with COVID-19 impose extraordinary harms and costs on Texas (and other border states), draining the resources of local communities and exposing Americans to heightened risk of COVID-19. Protection of the health and well-being of border communities and the resources of local and regional healthcare systems easily outweighs any harm from expelling aliens here unlawfully.

---

[1] For simplicity, Texas' brief uses the term "the Executive" to refer to the President as well as his subordinate administrative officers in charge of federal public health and immigration law. Nothing in this case turns on the identity of one department or its head versus another.

[2] Unless context indicates otherwise, Texas' brief uses the terms "expel" and "remove" interchangeably.

This Court should vacate the injunction.

## BACKGROUND

### A.  Federal Regulation of the Entry of Aliens

Every sovereign has inherent, unqualified authority to exclude aliens or to admit them on the conditions it deems appropriate. *See Ekiu v. United States*, 142 U.S. 651, 659 (1892). ("[E]very sovereign nation has the power . . . to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit."). Every sovereign likewise has the inherent, unqualified authority to expel new entrant aliens who lack legal status. *See Fong v. United States*, 149 U.S. 698, 707 (1893) ("The right of a nation to expel or deport foreigners who have not been naturalized, or taken any steps towards becoming citizens of the country . . . [is] absolute and unqualified."). To enter *or* remain, an alien must rely on a statutory privilege (like asylum or a visa) that Congress has granted as a matter of grace. *See Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1981-82 (2020).

For approximately 100 years, the federal government did not meaningfully regulate alien entry. Instead, that role was filled by our federal system's co-sovereigns: the States. *See* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833 (1993); *Mayor of New York v. Miln,* 36 U.S. (11 Pet.) 102 (1837). Among other things, States regulated the entry of aliens "suspected of carrying contagious diseases," including through "expulsion of travelers from" places where contagious diseases were prevalent. Neuman, *supra*, at 1859, 1861. And although the States usually reserved punishment for those who

*brought* aliens illegally (and not the aliens themselves), "direct punishment *was* more frequently threatened against travelers evading quarantine restrictions." *Id.* at 1883 (emphasis added).

In 1875 Congress began to comprehensively regulate entry of aliens. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972). From very early on, it flatly barred entrance of aliens suffering from a "dangerous contagious disease." *See* Act of March 3, 1891, ch. 551, § 1, 26 Stat. 1084 ("1891 Immigration Act"). And for decades Congress also invested the Executive with significant, nearly unreviewable discretion to rapidly expel aliens present illegally. *See, e.g.*, Act of February 5, 1917, ch. 29, § 19, 39 Stat. 874, 890 ("1917 Immigration Act") ("[A]t any time within three years after entry, any alien who shall have entered the United States . . . at any place other than one designated as a port of entry for aliens . . . shall, upon the warrant of the Secretary of Labor, be taken into custody and deported. . . . [T]he decision of the Secretary of Labor shall be final.");1891 Immigration Act § 8 ("All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury."); *Demore v. Kim,* 538 U.S. 510, 538 (2003) (O'Connor, J., concurring) ("until 1952 [Congress] made no express provision for judicial review" of "deportation or exclusion decisions"). But from the beginning Congress also granted rights to certain classes of aliens. *See, e.g.*, 1891 Immigration Act § 1 (restricting many classes of aliens, but leaving door open to "persons convicted of a political offense . . . by the laws of the land whence he came"). It did not, however,

grant rights to aliens who evaded border officials to enter illegally. Instead, those persons were "immediately sent back on the vessel by which they were brought in." *Id.* § 10.

Gradually, federal immigration regulation became more permissive. In 1952 Congress passed the Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, § 101, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. §§ 1101 et seq.). Under the INA, as amended, the United States awards hundreds of thousands of visas annually. *See* 8 U.S.C. § 1152(c)-(e). The United States also admits tens of thousands of refugees per year through a consultative process between the President and Congress. *See* 8 U.S.C. § 1157; Congressional Research Service, *Refugee Admissions and Resettlement Policy* at 2 (Dec. 18, 2018).[3] And the United States allows an uncapped number of aliens to affirmatively apply for asylum or to defensively seek it in a removal hearing. 8 U.S.C. § 1158. (Asylum seekers definitionally differ from refugees by virtue of their existing presence in the United States.)

In addition, whereas initially the Executive had nearly unreviewable authority to rapidly expel aliens without any significant procedural protections, *see Castro v. U.S. Dep't of Homeland Sec.*, 835 F.3d 422, 436 (3d Cir. 2016) (describing period up until 1952 where "immigration law rendered final . . . the Executive's decisions to admit, exclude, or deport aliens"), in the second half of the 20th century Congress began to confer significant adjudicative rights on aliens. *See* Will Maslow, *Recasting Our Deportation Law: Proposals for Reform*, 56 Colum. L. Rev. 309, 317 (1956) (explaining

---

[3] https://sgp.fas.org/crs/misc/RL31269.pdf.

how the INA "for the first time prescribed a hearing before a[n] [administrative officer] to make determinations, including orders of deportation") (quotation marks omitted). Now, by statute, "[t]he usual removal process involves an evidentiary hearing before an immigration judge, and at that hearing an alien may attempt to show that he or she should not be removed," such as by showing he is eligible for asylum. *Thuraissigiam*, 140 S. Ct. at 1964. Aliens who lose in front of the immigration judge also have significant appeal rights, first to the Board of Immigration Appeals and then a federal court of appeals. *Id.* Aliens subject to removal are generally detained "at considerable expense." *Id.*

### B.  Regulation of Contagious Diseases at the Borders

In 1893 Congress enacted the predecessor version of Section 265. Substantively, it closely resembled the current version of the law. As noted *supra* at 4, federal immigration law already barred entry of aliens with contagious diseases. But the 1893 Act went further and gave the Executive broad discretion to determine that *all* aliens (and property) from a specific country should be barred. Act of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452 ("1893 Public Health Act"). Specifically, if the Executive concluded that health exigencies warranted, he was granted authority to find "that a suspension of the right to introduce" aliens from certain countries was required and to "prohibit, in whole or in part, the introduction" of aliens from such countries. *Id*. In other words, in addition to barring entry of those that Congress had already declared inadmissible (*i.e.*, those specific individuals with a contagious disease), this Act gave the Executive further power to bar entry of even those that

6

*could* claim some source of statutory right to enter if he concluded that the country they were migrating from was suffering from a contagious disease.

The Act also recognized that States had primary jurisdiction over entry of aliens who might be carrying a contagious disease. *Id.* § 3. Congress accordingly directed federal health officials to "co-operate with and aid State and municipal boards of health in the execution and enforcement of the[ir] rules and regulations . . . to prevent the introduction of contagious or infectious diseases into the United States from foreign countries." *Id.* But Congress also intended that State laws would provide a floor only. If federal officials deemed them "not sufficient," then the Secretary of Treasury was directed to promulgate stricter rules to prevent introduction of contagious diseases. *Id.* The Act did not contain provisions regarding expulsion, but, as noted, federal immigration law already vested the Executive with essentially unreviewable authority to expel inadmissible aliens. And the States likewise exercised expulsion authority during this era. *See supra* at 3-4.

In 1944, Congress enacted the current version of Section 265 as part of the Public Health Service Act, Pub. L. No. 78-410, 58 Stat. 682 (1944). Substantively, very little changed—Congress designed the current law to be "merely a restatement of the laws" that already existed. H.R. Rep. No. 78-1364 at 1-3, 25 (1944). Thus, the current version of Section 265 likewise gives the Executive authority to conclude that the public health requires a "suspension of the right to introduce" aliens from certain countries, and to "prohibit, in whole or in part, the introduction" of aliens from such countries. 42 U.S.C. § 265. The Executive also retains a similar relationship with the States: he is "authorized to accept from State and local authorities any assistance"

7

they may provide, he is directed to "assist States and their political subdivisions in the prevention and suppression of communicable diseases," and he "shall cooperate with and aid State and local authorities in the enforcement of their quarantine and other health regulations." 42 U.S.C. § 243(a).

## C.  The CDC Promulgates the Regulation and Orders Under Review

In March 2020, in light of the COVID-19 pandemic, the CDC and Department of Health and Human Services ("HHS") issued an interim final rule to establish a procedure for implementing the Section 265 authority and issuing orders suspending the right of "introduction" of aliens from foreign countries. Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559 (Mar. 24, 2020). Among other things, that interim rule clarified that the "introduction" bar applies not just to those seeking to physically enter the United States, but also those who have already "physically crossed a border of the United States and are in the process of moving into the interior." *Id.* at 16,563. In other words, aliens could not circumvent the "introduction" suspension merely by setting foot on U.S. soil before a government agent intercepted them; those who evaded border security were subject to immediate expulsion. Two days later, the CDC issued an order under the rule temporarily suspending the introduction of certain aliens traveling into the United States from Canada and Mexico. 85 Fed. Reg. 17,060-02 (Mar. 26, 2020).

On September 11, 2020, the CDC and HHS issued a final version of the interim rule. *See* 42 C.F.R. § 71.40(b)(1). Since then, the CDC has issued multiple orders

under the rule continuing the suspension of the right to introduce certain aliens from Mexico and Canada and directing that aliens who enter in violation of the orders must be expelled. *See* Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806, 65,812 (Oct. 16, 2020) ("The continued suspension of the right to introduce covered aliens requires the movement of all such aliens to the country from which they entered the United States, their country of origin, or another practicable location outside the United States, as rapidly as possible."); Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828-02, 42,829 (Aug. 5, 2021) ("The instant Order continues the suspension of the right to introduce 'covered noncitizens.'").

### D.  Procedural History

Plaintiffs brought suit in January 2021 on behalf of a putative class of aliens who entered unlawfully and who are subject to immediate expulsion under Defendants' Section 265 Orders. Plaintiffs' core theory is that they "must be given the opportunity to remain in the United States to pursue the statutory humanitarian protections Congress has provided." JA47 ¶ 10. They claim that Defendants' Orders under Section 265 violated statutes providing these rights, and specifically that "Title 42 of the U.S. Code does not authorize the expulsion of noncitizens from the United States." JA61 ¶ 79. Plaintiffs moved for certification of a class of alien family units (defined as a family unit composed of at least one child and that child's parent or legal guardian). JA65.

On September 16, 2021, the district court certified the class and granted a preliminary injunction. The court held that Section 265 likely does not "evince[] [an] intention to grant the Executive the authority to expel or remove persons from the United States." JA105. And it preliminarily enjoined Defendants from subjecting the class to "expulsion without any opportunity to apply for asylum or withholding of removal." JA114, 127. On September 30, 2021, this Court stayed the preliminary injunction pending appeal. ECF No. 1916334. On October 26, 2021, this Court denied Texas' motion to intervene on appeal, but instructed that it may participate as an amicus. ECF No. 1919599.

## ARGUMENT

When interpreting a statute, courts start with the text. *See Babb v. Wilkie*, 140 S. Ct. 1168, 1172 (2020) ("Which [statutory] interpretation is correct? To decide, we start with the text of the statute."). The text is interpreted according to the plain meaning of the words at the time of enactment. *See also*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). And it is also "a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). These interpretive tools demonstrate that the Executive has ample sources of removal authority and that when he exercises his Section 265 authority to "suspend" the "right" to "introduce aliens," aliens subject to that order have no remaining defense to immediate expulsion.

## I.   Defendants Are Likely to Succeed on the Merits

### A.   The Executive Has Statutory and Constitutional Authority to Expel Aliens Who Violate the CDC's Orders.

The district court's core error was to enjoin Defendants from expelling Plaintiffs under the view that *Section 265* does not "authorize[] [the Executive] to expel persons." JA111. That conclusion is irrelevant. The Executive has ample other sources of expulsion authority, including statutory and constitutional sources.

#### 1.   The Executive Had Statutory Expulsion Authority When Section 265 Was Enacted, and Retains That Authority Now.

Soon after Congress began regulating immigration, it granted the Executive substantial statutory expulsion authority. For example, in 1888 Congress provided that whenever the Secretary of the Treasury was "satisfied" that an alien entered the country in violation of the federal prohibition on alien entry to perform contract labor, and it was "within the period of one year after landing or entry," the Secretary could take the alien into custody and "return[] [him] to the country from whence he came." *Yamataya v. Fisher*, 189 U.S. 86, 94 (1903) (describing the state of the law). In 1891 Congress broadened the categories of aliens not allowed to enter, and provided that any alien who entered in violation "may be returned . . . at any time within one year thereafter." 1891 Immigration Act § 11. That was the state of the law when Congress enacted the 1893 Public Health Act, so, if the Executive sought to expel someone at that time, he had ample statutory authority without any need to resort to the Section 265 predecessor.

The state of play was similar in 1944, when the current version of Section 265 was enacted. The 1917 Immigration Act provided that "all aliens brought to this

country in violation of law shall be immediately sent back . . . to the country whence they respectively came . . . unless in the opinion of the Secretary of Labor immediate deportation is not practicable or proper." 1917 Immigration Act § 18. And it provided that illegally present aliens, including "any alien who shall have entered the United States . . . at any place other than one designated as a port of entry for aliens . . . shall, upon the warrant of the Secretary of Labor, be taken into custody and deported." *Id.* § 19. The Secretary's decision was deemed "final" by law. *Id.* Materially the same framework for expulsion was on the books when Congress enacted current Section 265. *See, e.g.*, *United States ex rel. Knauff v. McGrath*, 181 F.2d 839, 841 (2d Cir. 1950). So the Executive likewise at that point did not need to rely on Section 265 if he sought to expel someone.

Today too, the Executive has ample sources of statutory expulsion authority and does not need to rely on Section 265 to expel aliens. For example, current law provides that an alien "shall, upon the order of the Attorney General, be removed if the alien" fits into one of a number of categories, including if the alien is "present in the United States in violation of [the immigration code] or any other law of the United States." 8 U.S.C. § 1227(a). The Executive can also "return" an alien who has arrived on land and who is "not clearly and beyond a doubt entitled to be admitted" during the pendency of removal proceedings. *Id.* § 1225(b)(2)(A), (C). Of course, Congress has also granted aliens significant rights to resist expulsion, including a right to seek asylum as a defense to removal, *Thuraissigiam*, 140 S. Ct. at 1964, a hearing before an immigration judge, *see* 8 U.S.C. § 1229a, and a right to

12

judicial review, *id.* § 1252. But, as explained *infra* at 15-20, an order under Section 265 *suspends* those rights.

### 2. The Executive Has Constitutional Authority to Expel Aliens Who Violate the CDC's Order.

In addition, the Executive possesses independent Constitutional authority to expel aliens.

The Constitution vests the President with all "Executive Power." U.S. Const. Art. II. At the Founding "Executive Power" was understood to include a host of foreign affairs prerogatives exercised by the King. *See, e.g.*, Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs*, 111 YALE L.J. 231 (2001). Among those powers was the right to send home aliens "whenever the king sees occasion." 1 William Blackstone, Commentaries on the Laws of England 252 (1765). And English judges recognized that the "executive authority of a colony" likewise had power to expel aliens. *See Fong*, 149 U.S. at 709.

The Supreme Court has recognized this inherent, Executive power in unequivocal terms. In *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), the Supreme Court addressed whether the Executive could exclude the German wife of a citizen who served in World War II (including without a hearing) upon the raw conclusion that her admission would be prejudicial to American interests. The immigration code already provided multiple bases for excluding aliens, but Congress further gave the Executive authority to add new ones "upon [a] finding that the interests of the United States required it." *Id.* at 540. The Executive used this power to promulgate a regulation making aliens excludable without a hearing. *Id.* at 541.

13

The German wife was detained at Ellis Island under this regulation, and the Attorney General accepted the recommendation of an immigration official that she be permanently excluded because her admission would have prejudiced American interests. *Id.* at 539-40.

The wife challenged the exclusion on the basis that the regulation was promulgated under an unconstitutional delegation of legislative power. *Id.* at 542.[4] But the Court concluded "there is no question of inappropriate delegation of legislative power involved here" because the right to exclude aliens "is inherent in the executive power to control the foreign affairs of the nation." *Id.* Thus, Congress can "prescribe[] a procedure concerning the admissibility of aliens," *id.*, and it can direct the Executive to exclude certain aliens, but even if it *does nothing* the Executive can still lawfully take action to exclude or remove aliens. *Id.* at 542-43.[5]

---

[4] The wife obtained judicial review through "habeas corpus proceedings." *Knauff*, 338 U.S. at 540. Specifically, "[t]he habeas statute in effect during this time was broad in scope" and "authorized the federal courts to review whether a person was being held in custody in violation of any federal law, including immigration laws." *Thuraissigiam*, 140 S. Ct. at 1976. That was the only way aliens could obtain judicial review during this era, when Congress did not expressly provide that removal decisions were reviewable. *See supra* at 4. But even when aliens were able to enter court under the habeas statute during the finality era, the court's review was very narrow. *See Ekiu*, 142 U.S. at 663 ("The words of [the immigration law] are clear . . . and were manifestly intended to prevent the question of an alien immigrant's right to land, when once decided adversely by an inspector, acting within the jurisdiction conferred upon him, from being impeached or reviewed, in the courts or otherwise."). The current habeas statute contains "restrictions on the issuance of writs in immigration matters." *Thuraissigiam*, 140 S. Ct. at 1976.

[5] The Executive does not, however, have the authority to *ignore* Congress's laws requiring exclusion or expulsion of aliens. *See Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838) ("To contend that the obligation imposed on the President to see

* * *

At every relevant point, the Executive has had ample sources of authority to expel aliens. Congress has granted him multiple expulsion authorities by statute, and he has always possessed expulsion authority under Article II. The Executive does not need to rely on Section 265 in order to expel aliens.

## B. Defendants Suspended the Right of Aliens to Enter and So Those Aliens No Longer Possess Any Defense to Immediate Removal.

With the expulsion power properly framed, the merits question is easy. Aliens ordinarily have substantive and procedural statutory defenses to removal. But Section 265 authorizes the Executive to turn off ("suspend") the application of those statutes. When the Executive does this, aliens become subject to his removal authority unqualified by any Congressional act that ordinarily would provide them a defense. That is clear under the plain statutory text as it was understood at the time of enactment. And the broader statutory structure of our immigration and public health laws confirms it.

Section 265 provides as follows:

> Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a **suspension of the right to introduce such persons** and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have **the power to prohibit, in whole**

---

the laws faithfully executed, implies a power to forbid their execution, is . . . entirely inadmissible.").

**or in part, the introduction of persons** and property from such
countries or places as he shall designate in order to avert such danger,
and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265 (emphasis added).

The statute gives the Executive power to "suspend" the "right" to
"introduce" aliens, and to "prohibit" the "introduction" of aliens. When the
Executive "suspends" a "right," to do something, he renders inoperative any right
that previously existed to do that thing. That is how the concept of "suspension"
has always been understood. *See* 2 Universal English Dictionary 815 (John Craig ed.
1869) (to "suspend" something means to "to cause to cease for a time from
operation or effect."); Funk and Wagnall's New Standard Dictionary of the English
Language 2432 (1946) (defining "suspend" as "to cause to cease for a time; hold
back temporarily from operation"). So when the Executive uses his Section 265
authority, he is turning off statutory rights. And Section 265 tells us *which* rights: the
right to "introduce" foreign persons (aliens) or property. That much does not
appear to be in dispute.

The operative question in this case is whether an "introduction" is complete
the second an alien crosses the border, or instead whether an "introduction"
continues until some later time, *i.e.*, when the alien obtains legal status. If it is the
former, then an alien who circumvents border security achieves "introduction" and
so Executive suspension of the "introduction" right may ostensibly not affect
separate rights, such as to resist expulsion post-"introduction." But if it is the
latter—if an alien is still in the process of introduction *after* he crosses the border—

then the Executive's suspension still applies to the alien's defenses to expulsion during that phase.

Every interpretive principle demonstrates that it is the latter, and that an "introduction" within the meaning of Section 265 is not complete when an alien crosses the border, but continues until he has obtained some form of legal status.

*First*, "introduction," as regards aliens, was a term of art when Section 265's predecessor was enacted. *See, e.g.*, *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 342 (1909) (referring to Congress's power to "forb[i]d[] the introduction of aliens"). And the concept was understood broadly to include acts that extended far beyond the mere crossing of borders. For example, in *Lew Moy v. United States*, 237 F. 50 (8th Cir. 1916), individuals were prosecuted for a conspiracy to bring unauthorized aliens into the country. On appeal the defendants contended that the trial court erroneously admitted evidence of what transpired *after* the aliens had crossed the border, because in defendants' view "the conspiracy was at an end" once the aliens "were brought across the international boundary." *Id.* at 52. But the Eighth Circuit rejected this argument and held that "introduction" is not "consummate[d]" when aliens come "across the" border—instead, introduction includes the act of being "transport[ed]" deeper "into the interior." *Id.* And that makes perfect sense, because at that time it was well-understood that an alien who *had* entered was in no different legal position than an alien *seeking* to enter, unless and until he received some form of officially recognized legal status. *See Sotorios Targakis v. United States*, 12 F.2d 498, 498 (5th Cir. 1926) (even an alien with a right to enter "is not lawfully admitted until after proper inspection"); *Ekiu*, 142 U.S. at

661 (alien taken off of steamship and placed in domestic "mission-house" pending determination of her right to remain was "in the same position, so far as regarded her right to land in the United States, as if she never had been removed from the steam-ship").

*Second*, dictionary definitions of the word "introduction" confirm that the word is broad and sweeps in acts beyond the mere crossing of a border. For example, at the time the 1893 Public Health Law was enacted the word "introduction" was defined to include "the act of bringing ***into*** a country," Universal English Dictionary 1067 (John Craig ed. 1861) (emphasis added), not merely the act of crossing a specific boundary. Dictionary definitions at the time that Section 265's current version was enacted were likewise broad and extended far beyond the simple act of physical entrance. *See* Funk and Wagnall′s New Standard Dictionary of the English Language (1946) (defining "introduce" as to "bring, lead, or put in; conduct inward; usher in; insert" and "introduction" as the "act of introducing, in any sense").

*Third*, other portions of the immigration statutes on the books when Section 265's predecessor was enacted confirm that Congress knew how to use more restrictive language to refer to the mere physical act of entrance instead of the broader concept of "introduction." For example, the Immigration Act of 1891 provided a penalty for "any person who shall **bring into or land** in the United States . . . any alien not lawfully entitled to enter." 1891 Immigration Act § 6 (emphasis added). Congress could have used this language when it enacted Section 265's predecessor in 1893. For example, it could have given the Executive power to "suspend the right to **bring into or land**" aliens, or the power to "prohibit, in whole

or in part, the **bringing into or landing**" of aliens. Its decision not to use that language and to use the broader "introduction" term is telling. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) (rejecting party's statutory interpretation where "Congress has enacted statutes that expressly include the language [the party] asks us to read in").

*Fourth*, the broader legal context at the time Section 265 and its predecessor were enacted demonstrates that it would have been nonsensical for Congress to authorize the Executive to suspend only a right to cross the border while leaving in place alien "rights" to resist expulsion after an unlawful entry. That is because an alien who entered illegally *did not have any* rights to resist expulsion; the Executive had plenary, essentially unreviewable authority to expel ***any*** alien that physically crossed the border without a right. *See supra* at 4, 11-12. All of the laws that Plaintiffs claim protect them from expulsion, *see* JA50-51 ¶¶ 29-31 (listing the right to defensively claim asylum, 8 U.S.C. § 1158(a)(1), the right to "withholding of removal," *id.* § 1231(b)(3), and rights under the Foreign Affairs Reform and Restructuring Act of 1998, *see* 8 U.S.C. § 1231 note), were enacted *after* Section 265. Plaintiffs' arguments would not have even been conceivable when Section 265 was enacted because Plaintiffs would have had no colorable right to resist expulsion, regardless of what the word "introduction" means. *See Oliveira*, 139 S. Ct. at 539 (statute must be interpreted as understood at enactment).

In sum, when the Executive suspends the right to introduce aliens he suspends not only the rights they may claim to physically enter the country, he also suspends defenses they may have to resist expulsion after illegal entry. Plaintiffs did enter

illegally, Defendants' Section 265 Orders suspended the defenses they may have had against expulsion, and Plaintiffs are now subject to immediate removal.

## II. The Other Preliminary Injunction Factors Demonstrably Disfavor Plaintiffs.

Appellants' opening brief (at 45-54) correctly described why a preliminary injunction is unwarranted in light of the harm it would thrust on the government and the public at large. Texas adds the following, however, to explain why the Plaintiffs have not made an adequate showing of irreparable harm, and to show how the balance of equities demonstrably disfavors a preliminary injunction here where Texans would suffer substantially more concrete harm from an injunction than Plaintiffs might in its absence.

### A. Plaintiffs Have Failed to Show Irreparable Harm.

Plaintiffs' theory of irreparable harm has fatal legal and factual flaws.

Legally, it is well established that a party does not suffer irreparable harm if it takes a gamble that does not pan out; in equity, litigants cannot put their money on red and then claim irreparable harm from being forced to pay up when the wheel hits black. *See Cuomo v. NRC*, 772 F.2d 972, 977 (D.C. Cir. 1985) (per curiam) (company made expenditures "in the anticipation that a [certain] license would eventually be granted. In making these [expenditures], [the company] took a risk that [the] license might not be granted or might be delayed. Such self-imposed costs are not" irreparable harm); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (no irreparable harm to oyster farm company who was not granted renewal permit for its operations because company "purchased the oyster farm with full

disclosure, knowing that the [permit] was set to expire in 2012" and was "repeatedly warned" that a new permit may not issue). But that is exactly what Plaintiffs are doing—they entered the country unlawfully, gambling that they might succeed in a later immigration proceeding and be permitted to stay. *See* JA45 ¶ 4 (Plaintiffs conceding that they were planning to resist removal on the basis of statutory privileges that are dispensed at immigration officials' discretion). But it is well known that aliens frequently fail to achieve that result. *See, e.g.*, *Thuraissigiam*, 140 S. Ct. at 1963 ("Most asylum claims . . . ultimately fail, and some are fraudulent."). It is not "irreparable harm" for Plaintiffs to incur the consequences of their failed gamble.

Factually, even if Plaintiffs' theories of harm from removal were cognizable, they are nevertheless insufficient because they are speculative. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (to warrant preliminary injunction irreparable harm "must be both certain and great; it must be actual and not theoretical"). Plaintiffs claimed below that they may encounter violence if removed because their home countries "are among the most dangerous in the world due to gang, gender, family membership, and other identity-based violence." JA113. Plaintiffs submitted evidence showing they have a "***fear***" of violence in their home countries. JA113-14 (emphasis added). But "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). If that were not true, then it might literally be the case that almost ***every*** alien resisting removal satisfies the "irreparable harm"

inquiry. That cannot be right, and Plaintiffs cannot rely on the bare assertion that their home countries are more dangerous than the United States to satisfy their burden.

### B.  The Balance of Equities Disfavors Plaintiffs.

The balance of equities also does not favor Plaintiffs. Even assuming that Plaintiffs have adequately demonstrated irreparable harm, the substantial harms that Texas will suffer under an injunction more than offsets the harms that Plaintiffs fear.

"Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as [an] equitable judgment." *See Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958); *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("ignoring injury" to two parties when "balancing the harms" and viewing them as "offsetting"). Here an injunction will subject Texas to substantial harm. As Defendants have recognized, "[t]he public health risks of inaction include transmission and spread of COVID-19" along the border, and "further transmission and spread of COVID-19 in the interior." 85 Fed. Reg. at 65,807. And COVID-19 outbreaks in immigration facilities "would lead to transfers of such persons to local or regional health care providers, which would exhaust the local or regional healthcare resources, or at least reduce the availability of such resources to the domestic population, and further expose local or regional healthcare workers to COVID-19." *Id.* at 65,809. There is no legitimate dispute that this is happening in Texas and inflicting substantial harm on local Texas communities. *See* Hidalgo County Judge Richard F. Cortez, *Declaring a Local State of Disaster* at 1 (Aug. 2,

2021) (declaring disaster because "local Non-Governmental Organizations, and the City of McAllen are overwhelmed with the unanticipated influx of individuals and can no longer adequately feed, house, provide medical attention or otherwise accommodate the individuals being released into the County");[6] Webb County Judge Tano E. Tijerina, *Corrected Declaration of Local State of Disaster and Order* at 1 (July 21, 2021) (declaring disaster because "the unanticipated influx of [aliens with high COVID-19 positivity rates] has overwhelmed local resources and services to the extent that they can no longer adequately feed, house, provide medical attention or otherwise accommodate these individuals");[7] Mayor Bruno J. Lozano, *City of Del Rio Emergency Local Disaster Declaration* at 1 (Sept. 17, 2021) (declaring state of disaster where "limited resources of the City cannot adequately furnish the necessary procedures and facilities set forth by the [CDC] for the testing and quarantining of thousands of immigrants who may be infected with unknown variants of COVID-19").[8]

Finally, to the extent the equities are even close, Congress broke any tie by expressly instructing that the public interest favors *Texas*, not illegal entrants. Defendants have a statutory obligation to "assist States and their political subdivisions in the prevention and suppression of communicable diseases." 42 U.S.C. § 243(a). An injunction barring immediate expulsion of aliens who violate the

---

[6] *See* https://www.hidalgocounty.us/DocumentCenter/View/47015/08022021-Declaring-A-Local-State-of-Disaster.

[7] https://www.webbcountytx.gov/DisasterDeclarationRIMSJuly202021.pdf.

[8] https://www.cityofdelrio.com/home/showpublisheddocument/6590/637674846959119902.

Section 265 Orders would undermine that instruction and would harm the public interest. *See Serono Labs*, 158 F.3d at 1326 (equating Congress's purpose in passing amendments to statute with the public interest).

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed and its preliminary injunction vacated.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1896
Fax: (512) 370-9191

JUDD E. STONE II
Solicitor General

/s/ Ryan S. Baasch
RYAN S. BAASCH
Assistant Solicitor General
Ryan.baasch@oag.texas.gov

LEIF A. OLSON
Special Counsel

Counsel for Amicus Curiae the State of Texas

24

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with Federal Rules of Appellate Procedure 32(a)(5) and (6) because it is written in 14-point Equity typeface. It complies with Federal Rules of Appellate Procedure 29(a)(5) because it contains 6,447 words, excluding exempted portions, according to Microsoft Word.

/s/ Ryan S. Baasch
RYAN S. BAASCH

## CERTIFICATE OF SERVICE

On October 28, 2021, the foregoing brief and certificate as to parties and amici were served via CM/ECF on all registered counsel.

/s/ Ryan S. Baasch
RYAN S. BAASCH