ORAL ARGUMENT NOT YET SCHEDULED

No. 21-5200

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

NANCY GIMENA HUISHA-HUISHA, on behalf of
herself and others similarly situated, et al.,

*Plaintiffs-Appellees*,

v.

ALEJANDRO MAYORKAS, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia
No. 1:21-cv-100
Hon. Emmet G. Sullivan

## BRIEF FOR APPELLEES

Stephen B. Kang
Cody Wofsy
Morgan Russell
My Khanh Ngo
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

Lee Gelernt
Omar Jadwat
Daniel A. Galindo
Ming Cheung
David Chen
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

*Attorneys for Plaintiffs-Appellees*      (*Additional Counsel on Next Page*)

Andre Segura
Kathryn Huddleston
Brantley Shaw Drake
American Civil Liberties Union
Foundation of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
(713) 942-8146

Karla M. Vargas
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
(956) 787-8171

Blaine Bookey
Neela Chakravartula
Jamie Crook
Karen Musalo
Center for Gender &
Refugee Studies
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Robert Silverman
Irit Tamir
Oxfam America
Suite 500
Boston, MA 02115
(617) 482-1211

Scott Michelman
Arthur B. Spitzer
American Civil Liberties Union
Foundation of the District of
Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

Tamara F. Goodlette
Refugee and Immigrant Center for
Legal Education and Legal
Services (RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
(210) 960-3206

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Plaintiffs-Appellees certify as follows:

## A. Parties and Amici

Except for the following amici, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants: (1) Immigration Law Reform Institute; (2) State of Texas. The Court denied the State of Texas's motion to intervene in this appeal.

## B. Rulings under Review

Reference to the ruling under review appears in the Brief for Appellants.

## C. Related Cases

This case has not previously been before this or any other court. *P.J.E.S. v. Mayorkas*, D.C. Cir. No. 20-5357, does not involve the same parties as this case, but involves a challenge to the U.S. Centers for Disease Control and Prevention's Order under 42 U.S.C. § 265 by a provisionally-certified class consisting of all unaccompanied noncitizen children who (1) are or will be detained in U.S. government custody in the United States, and (2) are or will be subjected to the CDC Order.

*/s/Lee Gelernt*
Lee Gelernt

i

## TABLE OF CONTENTS

GLOSSARY.................................................................................................. xi

INTRODUCTION ..........................................................................................1

STATUTES AND REGULATIONS...............................................................3

STATEMENT OF THE CASE.......................................................................3

    I. LEGAL BACKGROUND .........................................................................3

        A. The Comprehensive Immigration System Governing Removals and
           Humanitarian Protections......................................................................3

        B. The Title 42 Process ..............................................................................5

        C. Title 42 in Operation ...........................................................................10

    II. DISTRICT COURT PROCEEDINGS.........................................................12

SUMMARY OF ARGUMENT ....................................................................13

ARGUMENT ...............................................................................................15

    I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS...............15

        A. Section 265 Does Not Authorize Expulsions........................................16

        B. Section 265 Was Designed To Regulate *Only* Transportation
           Providers................................................................................................25

        C. Adhering To The Statutory Text Does Not Render Defendants
           Powerless To Respond To A Public Health Crisis. .............................31

D. Even Assuming The Statute Permits Expulsions In Some Cases, It Cannot Override Congress's Specific Humanitarian Protections........34

E. *Chevron* Deference Is Unwarranted. .....................................................40

II. FAMILIES WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION. ...............................................................42

III. THE REMAINING EQUITABLE FACTORS WEIGH STRONGLY IN FAVOR OF A PRELIMINARY INJUNCTION......................................45

A. Migrant Families Are Not A Significant Source Of COVID-19. .........46

B. CDC Itself Agrees That Mitigation Measures Can Safely Reduce The Risk Of COVID-19 Transmission.........................................................49

C. The Injunction Does Not Impose A Substantial Burden On DHS........54

CONCLUSION ........................................................................................58

# TABLE OF AUTHORITIES

## Cases

*Alabama Realtors Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    141 S. Ct. 2485 (2021) .................................................. 3, 15, 23, 24, 34

*Barron v. Burnside*,
    121 U.S. 186 (1887) ........................................................38

*Brown v. GSA*,
    425 U.S. 820 (1976) ........................................................39

*Chamber of Commerce of U.S. v. FEC*,
    69 F.3d 600 (D.C. Cir. 1995).............................................42

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*
    467 U.S. 837 (1984) ...................................... 12, 40, 41, 42

*Clark v. Martinez*,
    543 U.S. 371 (2005) ........................................................24

*Dessouki v. Att'y Gen. of U.S.*,
    915 F.3d 964 (3d Cir. 2019) .............................................24

*District of Columbia v. Dep't of Labor*,
    819 F.3d 444 (D.C. Cir. 2016)...........................................41

*Doe v. Mattis*,
    928 F.3d 1 (D.C. Cir. 2019)..............................................24

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) ............................... 36, 37, 38, 39, 40

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S 120 (2000) ........................................................ 39, 41

*Flores v. Sessions*,
    No. 85-CV-4544, 2018 WL 4945000 (C.D. Cal. July 9, 2018) ..........................56

*Grace v. Barr*,
    965 F.3d 883 (D.C. Cir. 2020).......................................................... 5, 35

*Hazeltine v. Miss. Valley Fire Ins. Co.*,
    55 F. 743 (C.C.W.D. Tenn. 1893) .......................................................38

*Indep. Ins. Agents of Am., Inc. v. Hawke*,
    211 F.3d 638 (D.C. Cir. 2000).......................................................39

*INS v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) ...................................................................4

*J.B.B.C v. Wolf.*,
    No. 20-cv-01509-CJ, 2020 WL 6041870 (D.D.C. June 26, 2020) ............... 16, 40

*Lockheed Martin Corp. v. United States*,
    833 F.3d 225 (D.C. Cir. 2016)..........................................................57

*Loving v. IRS*,
    742 F.3d 1013 (D.C. Cir. 2014).................................................... 40, 41

*Merck & Co. v. U.S. Dep't of Health & Human Servs.*,
    962 F.3d 531 (D.C. Cir. 2020)................................................ 21, 23, 41

*Mexichem Fluor, Inc. v. EPA*,
    866 F.3d 451 (D.C. Cir. 2017)..........................................................33

*NRDC v. Daley*,
　209 F.3d 747 (D.C. Cir. 2000)..............................................................42

*P.J.E.S. v. Wolf*,
　502 F. Supp. 3d 492 (D.D.C. 2020) ................................. 8, 23, 24, 37, 38, 40, 56

*Padilla v. Kentucky*,
　559 U.S. 356 (2010) ...........................................................................16

*R.I.L-R v. Johnson*,
　80 F. Supp. 3d 164 (D.D.C. 2015)........................................................56

*Rotkiske v. Klemm*,
　140 S. Ct. 355 (2019). .........................................................................16

*Russello v. United States*,
　464 U.S. 16 (1983) .............................................................................18

*SAS Inst., Inc. v. Iancu*,
　138 S. Ct. 1348 (2018) ........................................................................41

*United States v. Juvenile Male*,
　670 F.3d 999 (9th Cir. 2012)...............................................................40

*United States v. Texas*,
　--- F.Supp.3d ----, No. 21-CV-173, 2021 WL 4848743 (W.D. Tex. Aug. 26,
　2021) ................................................................................................48

*Util. Air Regul. Grp. v. EPA*,
　573 U.S. 302 (2014) ..................................................................... 15, 41

*Valentine v. United States ex rel. Neidecker*,
　299 U.S. 5 (1936) ...............................................................................18

*Walsh v. Preston*,
   109 U.S. 297 (1883) ...................................................................................26

## Statutes and Treaties

8 U.S.C. § 1158(a)(1).................................................................................4

8 U.S.C. § 1158(b)(2).................................................................................5

8 U.S.C. § 1182(a) ...................................................................................19

8 U.S.C. § 1182(a)(1)........................................................................... 18, 33

8 U.S.C. § 1182(a)(1)(A)(i) .........................................................................5

8 U.S.C. § 1222 ........................................................................................33

8 U.S.C. § 1225(b)(1)................................................................................35

8 U.S.C. § 1225(b)(1)(A)(i) ........................................................................4

8 U.S.C. § 1225(b)(2)(C) ..........................................................................17

8 U.S.C. § 1229a(b)(4) ...............................................................................4

8 U.S.C. § 1229a(c)(4) ...............................................................................4

8 U.S.C. § 1231 ........................................................................................16

8 U.S.C. § 1231(b)(3).................................................................................4

8 U.S.C. § 1231(b)(3)(B) ............................................................................5

18 U.S.C. § 3185.......................................................................................17

18 U.S.C. § 3186 ...................................................................................... 17

18 U.S.C. § 3196 ...................................................................................... 17

42 U.S.C. § 264(a) ................................................................................... 20

42 U.S.C. § 264(b) ................................................................................... 20

42 U.S.C. § 264(c) ........................................................................... 6, 20, 33

42 U.S.C. § 264(d) ................................................................................. 20

42 U.S.C. § 265 .... 5, 6, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 42

42 U.S.C. § 271 ................................................................................. 6, 20

42 U.S.C. § 271(a) ............................................................................. 6, 20

49 U.S.C. § 114(h)(3)(B) ......................................................................... 19

Act of Aug. 5, 1892, Pub. L. No. 52-380, 27 Stat. 34 ............................... 37

Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 ..................................... 25, 26

Act of May 6, 1882, ch. 126, 22 Stat. 58 ............................................. 17

Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084 .............................. 17, 18, 19

U.N. Convention Against Torture, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988) .................................................................................. 5

Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 ........................... 5

## Regulations

8 C.F.R. § 1208.16 ..................................................................5

8 C.F.R. § 1208.17 ..................................................................5

8 C.F.R. § 1208.18 ..................................................................5

42 C.F.R. § 71.51(g) ..............................................................20

82 Fed. Reg. 6,890 (Jan. 19, 2017) ......................................20

85 Fed. Reg. 16,559 (March 20, 2020) ..................................6

85 Fed. Reg. 17,060 (March 26, 2020) ..................................6

85 Fed. Reg. 56,424 (Sept. 11, 2020) ....................................7

86 Fed. Reg. 9,942 (Feb. 17, 2021) ......................................8

86 Fed. Reg. 38,717 (July 22, 2021) ................................ 8, 50

86 Fed. Reg. 41,863 (Aug. 3, 2021) ....................................11

86 Fed. Reg. 42,828 (Aug. 5, 2021) ......................................6

86 Fed. Reg. 50,989 (Sept. 9, 2021) ....................................52

86 Fed. Reg. 58,216 (Oct. 21, 2021) ....................................10

86 Fed. Reg. 59,603 (Oct. 25, 2021) ....................................10

86 Fed. Reg. 61,224 (Nov. 5, 2021)...................................................... 48, 54

86 Fed. Reg. 61,246 (Nov. 5, 2021)..........................................................54

86 Fed. Reg. 61,252 (Nov. 5, 2021)..........................................................47

## Other Authorities

24 Cong. Rec. 290 *et seq.* (1892-93) ........................................ 17, 25, 27, 29, 30, 31

*Introduce*, *Universal English Dictionary* (John Craig ed. 1861) ...........................25

*Introduce*, *Webster's Collegiate Dictionary* (1st ed. 1898)....................................25

Treasury Department, *United States Quarantine Laws and Regulations*
  (Feb. 24, 1893)..........................................................................................27

# GLOSSARY

App.                Joint Appendix

Br.                 Opening brief for Defendants-Appellants

CAT                 United Nations Convention Against Torture

CBP                 United States Customs and Border Protection

CDC                 Centers for Disease Control and Prevention

DHS                 United States Department of Homeland Security

**INTRODUCTION**

The Title 42 Process is based on an 1893 statute that has never been understood to authorize expulsions.  The statute contains no mention of expulsion, and, indeed, applies only to transportation providers, not individual travelers.  The lack of explicit expulsion authority is determinative.  Congress has never authorized, and the Supreme Court has never permitted, physical removal in any context without explicit authority.

Defendants argue that "introduction" is a continuing process and continues after one crosses the border.  But the district court did not hold otherwise.  Assuming the statute regulates individual travelers at all, it provides only specified enforcement mechanisms.  One who crosses in violation of a public health order can be arrested, jailed, and subject to civil fines.  And other parts of the public health laws authorize quarantines.  They do not, however, authorize expulsion.

This is not a situation, moreover, where Congress overlooked the issue.  Since 1891, the immigration laws have expressly allowed removal for a communicable disease.  Critically, however, Congress has mandated that even those with communicable diseases be allowed to seek asylum (though they can be quarantined).  In fact, over the past four decades, Congress has repeatedly amended the asylum laws to disqualify certain groups from seeking protection, but has never done so for those with communicable diseases.  Moreover, in 1996 Congress

1

addressed the *same* migrants covered by the Title 42 Process, and specifically forbade the government from rapidly deporting them without an asylum screening—yet Defendants now do just that. Thus, even assuming the statute authorizes some expulsions, Defendant's invocation of it impermissibly casts aside Congress's careful balancing.

Defendants do not seriously contest that Plaintiffs are suffering grave harm. Not only are families with young children being flown to some of the most dangerous countries in the world, but every day Defendants push families directly into the hands of waiting cartels in Mexico who are routinely kidnapping and brutalizing them, as Defendants are fully aware. App. 346.

Defendants nonetheless claim that a preliminary injunction is not warranted and seek refuge in the expertise of the Centers for Disease Control and Prevention ("CDC"). But CDC's analysis actually supports the injunction. As numerous public health experts, including former CDC officials, explained below, CDC's most recent Order did *not* conclude that asylum seekers cannot be safely processed given the mitigation tools now readily available to the Department of Homeland Security ("DHS")—the Order was instead an "indictment" of DHS and its refusal to adequately expand CDC's recommended mitigation programs more than one-and-a-half years into the pandemic. App. 396-97 (public health experts). Moreover, because Defendants were already safely processing *86% of families* at

the time the district court ruled, an injunction would not mean a dramatic change for Defendants.  App. 122-23.

Dr. Anthony Fauci said it clearly: Immigrants are "absolutely not" a "major reason why COVID-19 is spreading in the US," and "expelling [immigrants] is not the solution."  CNN, *Fauci: Expelling immigrants 'not the solution' to stopping Covid-19 spread* (Oct. 3, 2021), https://tinyurl.com/5ua5m4bm (2:13 to 4:05 of video) ("*Fauci interview*").  Indeed, expelled families comprise less than 0.1% of persons daily entering the United States from Mexico.  App. 458.

Ultimately, Defendants' argument is that the public health statute *should* provide them with an expulsion power.  But as the Supreme Court recently held in another Title 42 case, that argument is for Congress.  *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021) ("*Alabama Realtors*").

## STATUTES AND REGULATIONS

Applicable provisions are contained in Appellants' Brief.

## STATEMENT OF THE CASE

## I.    LEGAL BACKGROUND

### A. The Comprehensive Immigration System Governing Removals and Humanitarian Protections

In the immigration laws, Congress has devised an intricate system to balance the need to remove ineligible noncitizens arriving at our borders with procedural

3

safeguards and the right to seek protection for those fleeing danger.  Generally, individuals suspected of being inadmissible (or "removable") have the right to hearings before immigration judges, in which they are entitled, among other things, to be represented by counsel, examine and present evidence, and testify.  8 U.S.C. §§ 1229a(b)(4), (c)(4).  But for those who arrive without proper travel documents, Congress in 1996 provided DHS with authority to employ an expedited removal process, in which border agents can rapidly order and effectuate removal.  *Id.* § 1225(b)(1)(A)(i).

Regardless of the type of proceeding, Congress has expressly required that noncitizens be able to seek specific humanitarian protections to fulfill our obligations under international treaties and our solemn commitments after World War II.  Whether noncitizens are processed under regular or expedited removal, they are entitled to seek three principal forms of protection.  First, any noncitizen "physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such [noncitizen's] status, may apply for asylum."  8 U.S.C. § 1158(a)(1).  Second, withholding of removal prohibits removal "to a country where [that person's] life or freedom would be threatened" on a protected ground.  *Id.* § 1231(b)(3).  Enacted to conform to the 1951 Refugee Convention, Congress made withholding of removal *non-discretionary*.  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999).

4

Finally, Congress has implemented Article 3 of the U.N. Convention Against Torture ("CAT"), which provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." CAT art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988); *see* Pub. L. No. 105-207, Div. G. Title XXI, § 2242(a), 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-18.  Indeed, even the expedited removal process was specifically "design[ed]" to ensure that noncitizens fleeing harm "are not returned" without at least a screening for humanitarian protection.  *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020).

Congress has created narrow exceptions to these statutory protections.  *See* 8 U.S.C. §§ 1158(b)(2), 1231(b)(3)(B).  But none applies here.  Under the immigration laws, Congress has also expressly provided that "a communicable disease of public health significance" can be the basis for deportation or denying admission.  8 U.S.C. § 1182(a)(1)(A)(i).  Yet even as Congress has repeatedly amended the protection statutes to add additional exceptions, it has never made communicable disease a basis for denying noncitizens the right to seek protection.

## B. The Title 42 Process

The Title 42 Process is, in effect, a new parallel deportation system targeting asylum seekers.  Section 265 of Title 42, on which the CDC Order at issue here is

5

based, was first enacted in 1893 and later reenacted without material change in the Public Health Service Act of 1944.  Section 265 currently provides that the Surgeon General may "prohibit" the "introduction of persons and property" where a communicable disease presents a serious danger to public health.  Section 265 does not, however, prescribe the enforcement mechanisms.  Rather, § 271 of Title 42 sets out the penalties for individuals violating a § 265 order.  Those penalties do not involve expulsion, but rather civil and criminal sanctions, including "imprisonment for not more than one year."  § 271(a).  Detention and quarantine are likewise authorized.  42 U.S.C. § 264(c).

Nevertheless, CDC issued a rule and order in March 2020 providing for summary expulsion as the means to "prohibit the introduction into the United States of persons from designated foreign countries."  85 Fed. Reg. 16,559, 16,563 (March 20, 2020); *see* 85 Fed. Reg. 17,060, 17,061 (March 26, 2020).  CDC reissued its order several times, including most recently in August 2021.  App. 129-52; 86 Fed. Reg. 42,828 (Aug. 5, 2021) ("CDC Order" or "Order").

The CDC Order does not provide for *any* screening for asylum or withholding of removal.  The Order provides only that noncitizens may be screened for protection from torture.  But under the policy, agents provide that screening only if noncitizens make an "affirmative, spontaneous and reasonably believable claim that they fear torture."  App. 212.  Even then, such CAT

6

screenings are not uniformly conducted, and when they are, they lack even the most rudimentary procedural safeguards.  App. 322, 428-29.  Under this scheme, few individuals have received a CAT screening (0.27% of all expulsions) and, without the assistance of counsel, only a miniscule number of those given a screening have passed (272 *total*).[1]

The CDC Order does not apply to the vast majority of people crossing the U.S.–Mexico border, such as truck drivers, students, and businesspeople.  App. 458; *see* App. 464-65 (families subjected to Title 42 represent 0.1% of the average 361,976 people who enter at land ports from Mexico daily).  Rather, "covered noncitizens" subject to expulsion are primarily limited to asylum seekers fleeing persecution.  *See e.g.*, App. 351-52, 355-56, 379; 85 Fed. Reg. 56,424, 56,452 (Sept. 11, 2020).

Multiple news reports indicated that Trump Administration officials forced CDC to adopt the Title 42 Process in March 2020 over the objections of the agency's experts.  App. 46-47 (citing Wall Street Journal and others); James Bandler, *Inside the Fall of the CDC*, ProPublica (Oct. 15, 2020), https://tinyurl.com/4h48ubea.  That initial March 2020 Order stated that asylum seekers, including unaccompanied children, could not be safely allowed into the

---

[1] Camilo Montoya-Galvez, *Few migrants processed under Title 42 border policy are screened for U.S. protection*, CBS News (Oct. 15, 2021), https://tinyurl.com/y9h7dek5.

7

country, and sought to justify that conclusion based on the state of affairs at that early date, including the lack of testing and a vaccine. 85 Fed. Reg. at 17,062 ("there is no vaccine"), *id*. at 17,066 (same for "rapid testing").

In February 2021, with the change in administrations, CDC categorically exempted unaccompanied minors from the Title 42 Process. 86 Fed. Reg. 9,942, 9,942 (Feb. 17, 2021); 86 Fed. Reg. 38,717, 38,718 (July 22, 2021).[2] But CDC has retained the Title 42 Process for families (and single adults, who are not at issue in this case). App. 129. The most recent CDC Order, issued in August 2021, did *not* conclude, however, that families could not safely be processed into the country. App. 396. Rather, CDC explained that there were now a variety of "mitigation protocols" that "can minimize risk" and cited, among other things, the processing of asylum seekers in "outdoor" facilities, "the availability of testing [and] vaccines," and the ability to "partner with state and local agencies and nongovernmental organizations" to provide mitigation measures. App. 131, 150.

The CDC Order further observed that the efficacy of these protocols had already been demonstrated. CDC explained that the exemption of unaccompanied minors was working because the Office of Refugee and Resettlement, the agency

---

[2] In *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020), the district court issued a nationwide preliminary injunction enjoining the Title 42 Process as to unaccompanied minors. The government's appeal of that injunction (No. 20-5357) is being held in abeyance in this Court in light of CDC's decision to exempt unaccompanied minors.

responsible for receiving unaccompanied children after processing, had "established a robust network of care facilities that provide testing and medical care and institute COVID-19 mitigation protocols, including vaccination" to minimize risk after those children are released by United States Customs & Border Protection ("CBP").  App. 145.  "Thus, according to the CDC, the primary reason that asylum-seeking families are still being subjected to Title 42 is because of DHS's failure to expand available mitigation measures."  App. 397 (public health experts).

In light of CDC's explanation for the continued application of Title 42 to families, numerous health experts, including former CDC officials, submitted affidavits below stating that the CDC Order was properly understood as an "indictment of DHS" for refusing to institute the recommended protocols and "to allocate resources toward mitigation protocols."  App. 397 ("The CDC Order also makes clear that where the federal government has wanted to allocate resources toward mitigation protocols for migrants entering the United States, it can do so, as it did when it exempted unaccompanied minors from Title 42.").  These experts concluded that "by combining multiple strategies, including vaccinations, testing, masking, ventilation, and sanitizing [CBP] can safely process asylum-seeking families while minimizing transmission of COVID-19."  App. 398.  Additionally,

they observed that migrants at the border are not a substantial source of COVID-19 infections, *id.*, a point recently echoed by Dr. Fauci.  *See also* App. 391.

Notably, even fully vaccinated migrants are denied the right to apply for asylum under the Title 42 Process.  Kristina Cooke et al., *U.S. borders reopen, but not for asylum seekers stuck in Mexico*, Reuters (Nov. 9, 2021) (documenting use of Title 42 against vaccinated asylum seekers), https://tinyurl.com/y6ywyxj5.  That stands in stark contrast to CDC's recent decision to allow day shoppers and other "non-essential" travel, including over the U.S.-Mexico border, if those individuals have been vaccinated.  *See* 86 Fed. Reg. 58,216, 58,217-18 (Oct. 21, 2021) ("Notwithstanding [increased COVID-19 cases], vaccines are effective against Delta and other known variants[.]"); 86 Fed. Reg. 59,603, 59,604 (Oct. 25, 2021) (air travel).

### C. Title 42 in Operation

Three points are notable.  First, as Defendants acknowledge, Br. 15, not all families can be expelled because Mexico and other countries refuse to receive certain families.  At the time of the injunction, the government was already safely processing 86% of families into the United States, and expelling only 14%.  App. 465.

Second, overwhelming evidence shows that asylum-seeking families are expelled into grave danger, and Defendants submitted no contrary evidence.

Because Defendants expel families at predictable times in predictable locations, cartels often wait just across the border to abduct them, physically and sexually assault them, and demand ransom from their relatives. *See, e.g.*, App. 116, 346-47, 357-58, 366. For example, after one mother was expelled, "several armed men grabbed her" and she was subsequently "raped multiple times" while "she begged her captors not to harm her daughter." App. 382. Another mother and her seven-year-old daughter were kidnapped immediately after being expelled to Mexico and held for two months without adequate food or water. App. 357. One organization has documented 3,250 kidnappings and other attacks within just a six-month period. App. 356-57. Even if families are able to avoid kidnapping, they must often live in horrendous tent encampments where food and water are scarce, and which are so dangerous that service providers are unable to visit; others live in abandoned buildings, under bridges, or on the streets. *See, e.g.*, App. 362, 375-76, 380.

Defendants fly other families to countries where political institutions have collapsed and where brutal abuses and persecution are rampant. *See, e.g.*, App. 337-38; *see also* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863, 41,864 (Aug. 3, 2021) (citing "a deteriorating political crisis, violence, and a staggering increase in human rights abuses."); App. 482 (citing U.N. report documenting high homicide rates in Guatemala, Honduras, and El Salvador).

11

Third, the limited humanitarian exemption process facilitated by non-governmental organizations on which Defendants rely is no longer in existence. Br. 54; Mica Rosenberg, *Disappearing asylum protections for migrant families at border test Biden*, Reuters (Aug. 11, 2021), https://tinyurl.com/zr8j2mhc.

## II.    DISTRICT COURT PROCEEDINGS

The district court granted a classwide preliminary injunction prohibiting the application of the Title 42 Process to families. App. 101-27. The court observed that § 265 "contains no mention of the word 'expel'—or any synonyms thereof—within its text," App. 103, and contrasted that absence with statutes governing immigration, which specifically provide procedures to remove noncitizens with communicable diseases. App. 104-05. The court further noted that Title 42 provides specific means of enforcement, namely civil and criminal penalties, but does not include expulsion. App. 105-11. The court also held *Chevron* deference was not warranted. App. 111-12.

On the harms, the court noted that that this case did not involve single adults and that 86% of families were already being safely processed, so an injunction would not require a dramatic change in border operations. App. 122-23. The court additionally observed that numerous mitigation measures are now available. App. 125. It concluded that DHS could not refuse to provide asylum access, even if

doing so would require "allocation of resources," especially where there was indisputable evidence that expelled families were being brutalized. *Id*.

This Court expedited the appeal but stayed the preliminary injunction in a summary order without opinion.

## SUMMARY OF ARGUMENT

I.   Section 265 does not authorize expulsions, as demonstrated by the statute's text, context, and history.  But even if the statute authorized some expulsions, it does not override statutory rights to seek humanitarian protection.

When Congress wants to provide the extraordinary authority to forcibly remove someone from the country, it does so *expressly*—as the Supreme Court has specifically required.  Yet § 265 does not mention an expulsion power.  Indeed, § 265's penalty provision specifically authorizes civil and criminal sanctions, but not expulsions.  Moreover, if Defendants' interpretation of § 265 were correct, it would mean that Congress silently authorized summary expulsions not only of noncitizens, but also of *citizens*.  That is extremely doubtful and would raise serious constitutional concerns.  Congress's choice to omit expulsion power is unsurprising: The statute was aimed at ships bringing cholera from Europe and regulates only the "introduction" of persons by *transportation providers*, and does not even apply to individual travelers themselves.

13

Even if § 265 were not limited to the regulation of transportation providers, and authorized expulsions of some individuals, it could not authorize the summary expulsions of individuals seeking protection. Congress has repeatedly created exemptions to the humanitarian protection statutes, but not for communicable disease. Although migrants can be subject to medical examinations and quarantines, Congress has forbidden them to be summarily sent back to danger without access to mandatory humanitarian procedures and protections. And in 1996 Congress specifically rejected rapid deportations without an asylum screening for noncitizens arriving without immigration documents—the same people that Defendants are now expelling with no such screening. Title 42 expulsions thus override Congress's specific humanitarian protections, even though those protections were enacted long after the more general 1893 public health statute. Defendants cannot carry the heavy burden of showing Congress manifestly intended that result.

II. The Title 42 Process is inflicting unspeakable harms on families, including those with babies and toddlers. Families are pushed across bridges into the waiting arms of the cartels, a fact of which Defendants are well aware. They are also flown to exceptionally dangerous countries. Not surprisingly, therefore, Defendants do not seriously dispute that Title 42 inflicts grave harm on families.

14

III.  Defendants argue that a preliminary injunction is nonetheless unwarranted because of the risk of COVID-19 transmission, seeking refuge in the CDC Order.  But CDC did not conclude that asylum processing is unsafe, only that DHS must expand existing mitigation protocols.  A preliminary injunction is necessary to force DHS to take these readily available mitigation steps.

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Section 265 of Title 42 was enacted in 1893.  Its only prior use to suspend the introduction of persons was in 1929, to stop *vessels* from transporting people to our shores during a meningitis outbreak.  Defendants claim to have now discovered in this statute a never-before-asserted authority to execute summary expulsions without regard for Congress's carefully crafted judgments in the immigration laws. But when an agency claims to discover "an unheralded power" in such "a long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see Alabama Realtors*, 141 S. Ct. at 2487, 2489 (rejecting "unprecedented" CDC eviction moratorium

promulgated under neighboring Title 42 provision).  That skepticism is well-warranted here.

**A. Section 265 Does Not Authorize Expulsions.**

For the first time in the statute's long history, the government asserts that Congress provided the authority to establish an entire system of summary "expulsions," in parallel to the longstanding *immigration* deportation system but without the immigration laws' careful procedural protections.  Yet § 265 says nothing about expulsions.

1.  Section 265's text contains nothing about the power to physically remove people from the country.  "A textual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."  *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019).  When Congress wants to authorize physical removal, it does so "plainly."   App. 104; *see also J.B.B.C v. Wolf.*, No. 20-cv-01509-CJ, 2020 WL 6041870, at *2 (D.D.C. June 26, 2020) (Nichols, J.) (similar).  Indeed, Plaintiffs are not aware of a single time in which Congress has ever silently authorized expulsions, which makes sense for "such a 'severe penalty.'"  App. 103-04 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010)) (cleaned up).

The immigration statutes explicitly provide the authority to physically expel people, whether as a permanent "removal," 8 U.S.C. § 1231, or temporary

16

"return," 8 U.S.C. § 1225(b)(2)(C).  And Congress has been *expressly* granting

such authority since the earliest immigration regulations, even before the 1893 law

at issue here.  *See* Act of May 6, 1882, ch. 126, §§ 2, 12, 22 Stat. 58, 59, 61

(providing for unauthorized immigrants "to be removed"); Act of Mar. 3, 1891, ch.

551, 26 Stat. 1084, 1086 (providing for unauthorized immigrants to "be

immediately sent back").

Notably, Congress considered but declined to enact another bill alongside

the 1893 Act at issue here, which would have provided that anyone "entering the

United States contrary to" its terms "be sent back to the country from which he

came."  24 Cong. Rec. 290; *see id.* at 305.  Section 265 has never contained similar

language.

Contrary to Defendants' suggestion (at 31-32), Congress's long history of

*expressly* granting authority to physically remove is not limited to immigration.

Extradition statutes, for example, likewise explicitly empower the government to

physically expel people from the United States.  *See, e.g.*, 18 U.S.C. §§ 3185

(authorizing "return[] and surrender[]" of fugitives), 3186 (authorizing fugitive "to

be delivered to" foreign government).

And the Supreme Court has specifically invalidated an extradition on the

ground that the treaty's text lacked the clear statement necessary to confer the

extraordinary power to physically remove a person, emphasizing that such a power

17

"must be *affirmatively* granted" by Congress.  *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 12 (1936) (emphasis added).  In doing so, *Valentine* specifically rejected the government's argument that the power to extradite could be divined by implication.  *Id*. at 11-12.

Defendants invoke dicta in *Russello v. United States*, 464 U.S. 16, 25 (1983), to argue none of these non-public health statutes are relevant, Br. 32, but "the Supreme Court routinely points to other statutes as evidence that Congress knows how to legislate in particular ways," App. 109-10 n.5 (citing cases).

Nor did Congress simply fail to address communicable diseases.  Congress has long supplied immigration officials with express authority to remove noncitizens specifically for public health reasons, even before 1893.  *See* 26 Stat. at 1084 (1891).  That authority likewise exists today.  *See* 8 U.S.C. § 1182(a)(1) ("[h]ealth-related grounds" of removal, including communicable diseases); *id*. § 1222 (medical detention and examination as part of immigration processing).  Thus, Congress plainly knows how to authorize expulsion in the name of public health, yet did not do so in § 265.  Critically, moreover, Congress has amended the humanitarian protection provisions multiple times over the past four decades to add various exception to the right to seek protection but has *never* created an exception for communicable diseases.  *See infra* Part I.D.

18

Defendants nonetheless argue that a "statute prohibiting persons from entering certain protected areas is most naturally read to include . . . the power to expel." Br. 27-28. If that were true, then for the past century Congress could simply have prohibited entry in the immigration laws with no need to explicitly provide corresponding authority for deportation. Yet Congress has always *expressly* provided both for prohibitions on entry into the country *and* for deportation. *See, e.g.*, 26 Stat. at 1084, 1086 (describing categories that "shall be excluded from admission," and directing that they be "sent back" and "returned"); 8 U.S.C. § 1182(a) (categories that are "ineligible to be admitted" under current law); *id.* § 1231 ("removal" of such people). Defendants cannot so easily avoid the clear statement rule.

Defendants' purported examples offer no support. They claim, for example, that the "authority to 'prevent [a dangerous] individual from boarding an aircraft,'" must also "authorize [their] removal." Br. 28 (quoting 49 U.S.C. § 114(h)(3)(B)). But that subsection speaks not only of preventing boarding, but also "tak[ing] other appropriate action with respect to that individual." Whatever that language might authorize an airline to do, it bears no resemblance to § 265, which includes no similar catch-all language.

Defendants likewise cite regulatory actions asserting the power to "export" animals, arguing such power is granted by § 265. Br. 28. But each of those

19

actions, whatever their validity, relied on authority *in addition to* § 265, including

42 U.S.C. § 264(a), which provides express authority for "destruction" and "other

measures" to deal with dangerous "animals or articles." *See* 82 Fed. Reg. 6,890,

6,929 (Jan. 19, 2017) ("re-exportation, or destruction"); 42 C.F.R. § 71.51(g)

(animals "shall be exported or destroyed"). It is unsurprising that, having

expressly authorized the *destruction* of animals, "other measures" under § 264(a)

might then be read to permit exportation. But CDC's powers over human beings

are (properly) much more curtailed. *See* 42 U.S.C. § 264(b)-(d).

Congress's omission of expulsion power should be the end of Defendants'

case given that such an extraordinary power has always been granted only by an

express statement.

2. That § 265 provides no expulsion power is strongly reinforced by a

neighboring provision, 42 U.S.C. § 271(a), which lays out the "[p]enalties" for

violation of "any regulation prescribed" under § 265 and makes no mention of any

expulsion authority. Instead, § 271 provides only for fines and imprisonment (to

accompany a quarantine power granted by other provisions). Had Congress

intended expulsion to be an available enforcement mechanism, it would have said

so.

Defendants do not deny that the § 271 penalties apply to § 265 violations,

but argue that § 271 is not relevant because its penalties also apply to provisions

other than § 265.  Br. 34.  But that is illogical.  Indeed, the fact that Congress chose to adopt penalties for § 265 as part of an overall penalties scheme further undermines Defendants' theory: While Congress understood the agency would be permitted to issue a specific kind of prohibition order under § 265, it saw no need to provide *enforcement* authority distinct from the other public health provisions. By contrast, under Defendants' view that § 265 silently authorizes whatever enforcement mechanisms the agency deems necessary to back its prohibitions, there would have been no reason for Congress to have specified *any* penalties for violating § 265 orders.

If Congress had intended to authorize whatever "public-health mitigation measures" Defendants might deem "the most effective" to enforce § 265, Br. 34, it could have said so.  Ultimately, Defendants' argument reduces to a claim that because § 265 was enacted to protect public health, it *must* provide for expulsions. But "agencies are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 962 F.3d 531, 536 (D.C. Cir. 2020) (internal quotation marks omitted).

3.  Defendants claim that the district court erred in assuming that "once a person has crossed the border, that person's 'introduction' is complete" and Defendants are powerless to address it.  Br. 19.  They argue that the term

21

"introduction" should be understood as "a continuing process" that does not end after the individual crosses the border. *Id*. at 26.

But the district court *accepted* for purposes of argument Defendants' view that introduction is "a continuing process" and that § 265's authority to "prohibit" such introduction allows Defendants to enforce that prohibition after one passes the border, whether they are one foot into the country or further. App. 108, 110 (quoting Defendants' brief). The district court's point, and Plaintiffs' argument here, is not that § 265 turns on whether one has crossed the border, but on the enforcement *mechanisms* available under the statute. Even assuming § 265 applies to individual travelers at all, and not just transportation providers, *but see infra* Part I.B, civil and criminal penalties are the statutorily authorized mechanism for enforcing § 265 orders, thus allowing even imprisonment as a means of stopping the violation after one crosses the border (in addition to quarantines and the explicit power to remove under the immigration laws). *See* App. 110.

Defendants argue, however, that the statute would make little sense if it allowed the government to physically stop one from entering U.S. soil but not expel after entry. Br. 26-29. But the district court did not decide whether the public health laws permit the government to physically block entrance or, instead, authorize enforcement through quarantine, the imposition of fines, and imprisonment after one crosses the border in violation of a public health order.

22

There is good reason to doubt that any such power to physically block entrance exists, given that the statute says nothing about it.  Indeed, to the extent such a power exists, it would likely rest on authorities outside the public health laws and not at issue here.  In any event, even if the statute permitted the government to physically block entrance while denying the power to expel, Defendants overstate any resulting illogic: The power to expel is more extreme than the power to block entrance—especially where U.S. citizens are subject to the statute, as they are here, *see infra*.

4.  The implications of Defendants' interpretation cannot be ignored. Section 265 applies to "persons," and Defendants have conceded that, on their view, the statute provides authority "to expel even U.S. citizens."  *P.J.E.S.*, 502 F. Supp. 3d at 539-40 (noting concessions).  This asserted authority is "breathtaking." *Alabama Realtors*, 141 S. Ct. at 2489.  It makes no difference to the interpretation of the *statute* that the current Title 42 *policy* exempts citizens.  *See* Br. 43.  "[T]he breadth of the [government's] asserted authority is measured not only by the specific application at issue, but also by the implications of the authority claimed." *Merck*, 962 F.3d at 541.  Defendants' interpretation necessarily implies that Congress silently empowered health officials to summarily, indefinitely, and physically *expel* U.S. citizens from their own country.  That is hardly likely, and is

a compelling additional reason to reject that interpretation. *See Alabama Realtors*, 141 S. Ct. at 2489.

The implications of Defendants' position are magnified here because the claimed power to summarily expel citizens raises grave constitutional questions. *See P.J.E.S.*, 502 F. Supp. 3d at 540; *Doe v. Mattis*, 928 F.3d 1, 8 (D.C. Cir. 2019) ("A fundamental attribute of United States citizenship is a right to remain in this country.") (cleaned up); *Dessouki v. Att'y Gen. of U.S.*, 915 F.3d 964, 967 (3d Cir. 2019) (applying constitutional avoidance because the "Executive cannot deport a citizen").

Defendants suggest that the grave constitutional issues presented by their statutory theory should be decided only when CDC actually expels citizens. Br. 44. But the Court should not now embrace an interpretation that would require such future constitutional adjudication. Avoidance is "a tool for choosing between competing" statutory interpretations, allowing "courts to *avoid* the decision of constitutional questions," "whether or not [the] constitutional problems pertain to the particular litigant before the Court." *Clark v. Martinez*, 543 U.S. 371, 381 (2005).[3]

---

[3] Defendants suggest that the same constitutional questions are presented by the "district court's understanding of Section 265 [as permitting] CDC to stop persons before they cross the border." Br. 44. But, as noted above, the district court did not decide whether § 265 provides the power to block entrance.

24

**B. Section 265 Was Designed To Regulate *Only* Transportation Providers.**

That § 265 does not authorize expulsions is unsurprising given that the statute does not even apply to individual travelers, but rather regulates only the "introduction" of "persons or property" *by someone else*, namely transportation providers. Although the district court did not reach this argument, it is an independently sufficient basis to find the Title 42 Process unauthorized.

1. When the statute was passed in 1893, Congress's overriding concern was cholera coming by ship from Europe, and it sought to remedy the problem by prohibiting *transportation* companies from *introducing* individuals into the country. *See, e.g.*, 24 Cong. Rec. 360 ("It is well known to Senators that 90 or 95 per cent of the immigration into the United States comes into the city of New York, and that the most danger of cholera is to be apprehended from vessels arriving at that port.").

Section 7 of the 1893 Act, which the parties agree became § 265 in 1944 without material change, granted the "power to prohibit, in whole or in part, the *introduction* of persons and property" into the country. Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449, 452 (emphasis added). That term—"introduction"—meant then, as now, "'the act of bringing into a country.'" *Introduce*, *Universal English Dictionary* 1067 (John Craig ed. 1861); *see also Introduce*, *Webster's Collegiate Dictionary* 453 (1st ed. 1898) ("[t]o lead, bring, or usher in"); Br. 31 (same). As a

25

matter of ordinary language and usage, introducing a person into a country or place is an action taken by a *third party*—in 1893, the transportation companies which brought the *overwhelming* majority of immigrants to the United States.

Thus, for example, the Supreme Court held in 1883 that a "colonization" contract requiring a party to "introduce" immigrant families into Texas was unsatisfied, where there was no evidence that new residents "were brought to Texas by [the party];" rather, "they came and settled of their own accord." *Walsh v. Preston*, 109 U.S. 297, 298, 314, 315 (1883). Likewise, nineteenth-century state statutes made it unlawful "for any free . . . person of color to migrate into this State, *or* be brought or *introduced* into its limits." App. 417 (emphases added); *see id.* at 424 (similar). "[T]o migrate" is an action an individual takes, moving themselves into a new state, and accordingly is used in the first clause as an intransitive, active verb. By contrast, the second clause uses a passive and transitive construction because a person is "brought" or "introduced" into a state *by someone else* (like a transportation company).

The ordinary meaning of "introduction" as referring to the actions of a third party is reinforced by the statutory context. The Act's other provisions were directed at ships, *see* §§ 1–6, 27 Stat. 449-51, and imposed penalties *only* against them, *see id*. §§ 1–3 (fines for "vessel" violating Act). And, tellingly, the regulations promulgated pursuant to the Act immediately after its enactment were

26

exclusively (and exhaustively) focused on the regulation of ships to protect the public health. *See* Treasury Department, *United States Quarantine Laws and Regulations* (Feb. 24, 1893), https://tinyurl.com/y82rtn5u.

The history of the statute also strongly reinforces that it regulates only transportation providers. In 1892, just prior to this provision's enactment, the Executive Branch took unprecedented steps to protect against cholera by *regulating transportation*. As the Surgeon General explained, "*vessels* conveying" certain immigrants were a "direct menace to the public health." App. 207 (emphasis added). He therefore issued orders, *see id*., effectively halting all *transportation* of immigrants in the interest of public health, *Twenty Days Quarantine*, N.Y. Times (Sept. 2, 1892), https://tinyurl.com/wrcaz5z8. Importantly, this action triggered a significant debate about whether the Executive had authority to take such action under existing law. *Id*. The 1893 statute, enacted just months later, was a direct response, *expressly* authorizing prohibitions on transportation providers introducing people into the country. *See* 24 Cong. Rec. 360 (sponsor of 1893 Act inquiring to Assistant Treasury Secretary "what is the present statutory authority under which" the 1892 order was issued, and what "additional law, if any, is desired confirming or conferring" authority).

Notably, moreover, prior to 2020 the *only* time the statute was ever used to prohibit the introduction of persons was to regulate transportation providers, not

27

individual travelers.  President Hoover, invoking the statute in 1929, issued an

Executive Order entitled: "Restricting for the time being the *transportation of*

*passengers* from certain ports in the Orient to a United States port."  App. 203

(emphasis added).  The Treasury Department issued associated regulations

"governing the embarkation of passengers and crew" and "their transportation to

United States ports."  *Id.*

        2.  Defendants do not dispute that Congress's central focus in enacting the

statute was on ships bringing cholera from Europe.  They suggest, however, that if

§ 265 applied only to third-party transportation (and not to individual travelers as

well), Congress would have limited its terms to "common carriers."  Br. 38.  But to

address all the entities and persons who would be transporting "persons" *or*

"*property*" under § 265, "common carriers" would not fit the bill.  Congress could

have included a long list: common carriers, *other* carriers, shippers, captains,

owners, agents, etc.  Instead, it chose to use the general term "introduction of

persons and property" to encompass the various means of transporting passengers

and cargo, as well as the persons responsible for doing so, such as ship

captains.  That concise choice does not undermine the overall limitation to third-

party transportation.

        Defendants note that Congress rejected an amendment to what became § 265

that would have prohibited "all passenger travel, but not immigration alone."  24

28

Cong. Rec. 470; *see* Br. 38 (selectively quoting amendment). They argue that this amendment was rejected because of a concern that "something more would be necessary" than a "restriction upon passenger travel," and suggest that the "something more" must have been to extend the statute to individual travelers as well as passenger travel. Br. 38. That conclusion is flatly wrong.

The final language of the bill *does* cover "something more" than regulation of "passenger travel," namely transportation not only of *persons* (passengers), but also *property*. Moreover, the "passenger travel" amendment was actually rejected for an entirely different reason: disagreement over how broad passenger transportation restrictions should be. The amendment they cite would have prohibited "all passenger travel, *but not immigration alone*." 24 Cong. Rec. 470 (emphasis added). The proponent of that amendment, Senator Vilas, explained that the point of this language was to prohibit "discrimination" against immigrant passengers, such that if public health required a prohibition at all, it would have to apply to everyone (including citizens) evenhandedly. *Id*.[4] Other Senators rejected this anti-discrimination principle, arguing that the government should be able to "discriminate wisely" and bar only transportation of immigrants if it chose to do so

---

[4] The Senators used the term immigration in this context as shorthand for passenger travel of immigrants. Thus, Senator Vilas observed that a bill simply prohibiting "all passenger travel" would include the "less[er]" power to prohibit "immigration." 24 Cong. Rec. 470.

29

in particular circumstances. *Id*. For that reason, the proposal was rejected, and the eventual bill was amended to allow prohibitions to be "in whole or part." *Id*. at 470-71.

Thus, the rejection of the amendment does not support Defendants' argument that § 265 regulates individuals arriving by foot; to the contrary, the entire debate was focused on regulation of passenger transportation (as well as cargo). Indeed, Senator Chandler (a primary supporter of the bill) equated the final "introduction" language with the "passenger travel" language, explaining the prohibition power would apply to "all *other passenger travel* as well as immigration." *Id*. at 471 (emphasis added). In other words, the statute would allow prohibition of passenger travel by immigrants, as well as all *other* passenger travel (including citizens). Not one Senator suggested that any of these formulations would apply to individual travelers arriving by foot.

Defendants cite snippets of legislative history mentioning disease from Mexico and Canada to suggest Congress was not "exclusively" concerned with the threat of cholera by ship. Br. 39. But Defendants do not deny that that was Congress's overriding focus. Senator Chandler noted that "90 or 95 per cent" of immigration arrived "into the city of New York" and "most" of the "danger of Cholera" came from "vessels arriving at" just that single port. 24 Cong. Rec. 360. Thus, he further explained (in a statement Defendants selectively quote) that he

30

was "*not* afraid" of cholera coming "by land."  24 Cong. Rec. 364 (emphasis added).  And other Senators that Defendants quote, far from suggesting the bill was aimed at individuals crossing the land border, actually criticized the bill for *not* addressing disease from Mexico and Canada. Br. 39 (citing 24 Cong. Rec. 359, 370, 371).  In any event, even assuming Congress was concerned with possible disease from Mexico and Canada, that does not mean the statute must have regulated *individual travelers* crossing by foot.  Section 265's terms were broad enough to encompass land *transportation*, for example by train.

Finally, Defendants assert that limiting § 265 to transportation providers would also be illogical because ships might drop passengers just before the border, allowing them to walk into the country.  Br. 39.  But the deportation laws remained in force.  Moreover, Defendants never explain what commercial entity would possibly engage in that subterfuge or why the statute would not allow penalties if transportation companies actually attempted to circumvent the law in that fashion.[5]

## C. Adhering To The Statutory Text Does Not Render Defendants Powerless To Respond To A Public Health Crisis.

Defendants contend Congress must have intended to grant an expulsion power notwithstanding the statute's silence because otherwise CDC would be

---

[5] Defendants argue that because the 1893 Act included the phrase "notwithstanding the quarantine defense," it "expand[ed] the government's authority *beyond* the power to quarantine."  Br. 32.  It did so by allowing prohibition of transportation.

31

"rendered powerless" to address COVID-19.  Br. 30.  That is wrong.  It is undisputed that § 265 provides the power to regulate transportation providers, and it was used in just that way in 1929.  *Supra* Part I.B.  That is an extraordinary authority, as has been clear since the unilateral Executive action in 1892.  *Id*.  And it remains an extraordinary power: In early 2020, for example, the federal government could have invoked it based on the "existence" of COVID-19 in designated "foreign countr[ies]" to "prohibit. . . the introduction of persons . . . from such countries" by halting *all* transportation by air, sea, and land.  That statutory power is immense.

Moreover, assuming, as the district court did, that § 265 permits some regulation of individual travelers, such regulation is far from toothless without expulsion power.  Congress explicitly backed § 265 orders with criminal and civil penalties.  Contrary to Defendants' suggestion that they would "be required to stand by and allow" violations of § 265 orders, Br. 29, a person violating such an order could face arrest and possible prison time (and quarantine)—an effective deterrent for almost all travelers.  *See* Br. 34 (acknowledging deterrent effect).

In light of this vast sweep of the statute, Defendants' real objection is clear. The Title 42 Process they have developed singles out noncitizens without travel documents.  Defendants' real policy argument is thus that, without an expulsion power, they do not believe the statute provides a sufficient solution to addressing

32

that *specific* group.  Even assuming that is true, statutes are not required to address every possible problem, and courts cannot rewrite them to include provisions the government desires 128 years later.  That § 265 may not address the specific challenges Defendants now raise does not permit them "to jam a square peg" (the expulsion authority they claim to need) "into a round hole" (the actual statute, which provides no such power).  *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 460 (D.C. Cir. 2017) (rejecting similar argument that existing environmental authority should be read expansively to address pressing climate change concerns).

Nor, of course, is § 265 the only authority Defendants can draw on to address their asserted concerns.  Individuals entering from a foreign country can be detained, examined, and quarantined under the public health laws.  42 U.S.C. § 264(c).  Modern immigration laws (like their nineteenth-century predecessors) provide the authority to remove noncitizens from the country, and include inadmissibility provisions specifically addressing "communicable disease," with accompanying procedural safeguards to balance the competing goals of fairness and public safety.  8 U.S.C. §§ 1182(a)(1), 1222.  Alongside the various other immigration tools, recent arrivals without documentation can also be subjected to "expedited removal" proceedings, a rapid procedure (which nevertheless requires access to humanitarian protections).  *See id*. § 1225(b)(1).

In short, in § 265 Congress was addressing a specific problem through tailored means.  The resulting statute is limited to regulating transportation providers.  But even if this Court accepts that the statute also applies to individual land travelers, the text, structure and history of the law make clear that Congress did not authorize expulsion as a means of enforcement.  As the Supreme Court has recently underscored, concerns about COVID-19 are not a blank check to the Executive Branch to rewrite statutes.  *Alabama Realtors*, 141 S. Ct. at 2490 (public "interest in combating the spread of the COVID-19 Delta variant" cannot "overcome a lack of congressional authorization," as "our system does not permit agencies to act unlawfully even in pursuit of desirable ends").

## D. Even Assuming The Statute Permits Expulsions In Some Cases, It Cannot Override Congress's Specific Humanitarian Protections.

Defendants' invocation of § 265 suffers from an additional, independently fatal flaw.  Congress has expressly provided the right to seek protection from persecution, including specifically for noncitizens arriving at the border without documents.  Yet the Title 42 Process denies precisely those later-enacted statutory protections, which have never contained an exception for communicable diseases. Defendants lack the authority to override the protection statutes.

Over the last 40 years Congress has repeatedly and carefully enshrined access to asylum, withholding of removal, and CAT protection.  *Supra*, Statement. The Title 42 Process eliminates access to these congressionally-guaranteed

34

protections.[6]  Indeed, the primary effect of Defendants' policy is to eliminate

access to asylum screenings.  Their expulsion regime effectively applies *only* to

individuals coming to this country without documents, *see* App. 151 (defining

"covered noncitizens"), but Congress already authorized immigration officers to

rapidly remove such people from the country, 8 U.S.C. § 1225(b)(1).  Critically,

however, Congress prohibited summary removal for noncitizens who fear return,

instead requiring screenings to ensure that "individuals with valid asylum claims

are not returned to countries where they could face persecution."  *Grace*, 965 F.3d

at 902.  And Congress has repeatedly chosen not to make the protection statutes

unavailable on grounds of communicable diseases.  The core practical effect of the

Title 42 Process is thus that asylum seekers without documents, for whom

Congress in 1996 mandated special asylum procedures, are instead summarily

expelled without being given those protections.  Whatever § 265 may permit in

general, it cannot deny statutory protection procedures to the exact group of people

Congress later specifically concluded should *have* those procedures, even if they

have a communicable disease.

---

[6] The only humanitarian protection provided under the Title 42 Process is
limited to a CAT screening, which indisputably is not a legal substitute under the
immigration laws for asylum and withholding of removal protection (and in
practice is illusory even as to CAT).  *Supra*, Statement.

Defendants argue that these humanitarian protections apply only in "normally prevailing conditions and in the absence of an extraordinary and rare public-health emergency." Br. 40. But under Defendants' reading of the statutory schemes, there is no bar to *indefinitely* overriding the asylum statutes, or to invoking various other contagious diseases (such as the flu) to deny asylum access, as the prior administration contemplated even before the emergence of COVID-19.[7] The asylum system Congress crafted does not permit the Executive to eliminate humanitarian protections whenever it deems it expedient.

Because Defendants' Title 42 Process "tramples the work done" by the immigration laws, Defendants "bear[] the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624, 1627 (2018) (cleaned up). Defendants can show no such "clear and manifest" intention. *Id*. at 1624.

Defendants point to the requirement that a § 265 order be predicated upon a finding that "a *suspension of the right* to introduce . . . persons and property [from the designated country] is required in the interest of the public health." 42 U.S.C. § 265 (emphasis added). Defendants suggest that "suspension" refers to the

---

[7] Caitlin Dickerson & Michael D. Shear, *Before Covid-19, Trump Aide Sought to Use Disease to Close Borders*, N.Y. Times (May 3, 2020), https://tinyurl.com/aa432k.

suspension of *laws*, and so "permits the temporary displacement of immigration laws." Br. 41. But § 265 is clear about the substantive power it grants: "the power to prohibit, in whole or in part, the introduction of persons and property from [designated] countries." 42 U.S.C. § 265. Defendants do not suggest that this grant of authority itself explicitly allows the Executive to override the immigration laws, and instead point to a subordinate clause describing a *finding* the agency must make before exercising that substantive power.

It defies common sense that Congress would delegate authority to override all other federal statutes in a dependent clause describing a background finding the agency must make. *See Epic Sys.*, 138 S. Ct. at 1626-27 (Congress does not "hide elephants in mouseholes," particularly "an elephant that tramples the work done by these other laws") (internal quotation marks omitted). To the contrary, Congress knows—and knew in 1893—how to indicate that a statute was meant to override all other provisions of law. *See P.J.E.S.*, 502 F. Supp. 3d at 541 (discussing "notwithstanding" clauses); Act of Aug. 5, 1892, Pub. L. No. 52-380, 27 Stat. 349, 366 (appropriations bill addressing immigration, quarantine, and epidemic prevention and separately providing for certain taxes, "any other law to the contrary notwithstanding"). At a minimum, Defendants have failed to carry their "heavy burden of showing a clearly expressed congressional intention" that all

contrary laws would be swept aside.  *Epic Sys.*, 138 S. Ct. at 1624 (internal

quotation marks omitted).[8]

Nothing in the legislative history indicates an intention to override all other

laws, much less a clear and manifest intention.  *See P.J.E.S.*, 502 F. Supp. 3d at

515.  Defendants emphasize statements and a statutory title referring to suspending

"immigration."  Br. 42-43.  But, as explained above, the Senators plainly

understood "immigration" in this context to refer to the *transportation* of people

intending to immigrate—just as the 1892 regulation of transportation effectively

suspended immigration.  *Supra* Part I.B.  Defendants point to no statements

actually referring to overriding immigration laws.[9]

Thus, Title 42 and the humanitarian statutes should be read together, and

Congress's asylum protections narrow whatever expulsion power § 265 might

otherwise be construed to authorize.  *See Indep. Ins. Agents of Am., Inc. v. Hawke*,

---

[8] In fact, the "suspension of the right" language reinforces Plaintiffs' argument, *supra* Part I.B, that § 265 authorizes regulation of transportation providers, not expulsions of individuals.  That phrase most naturally refers to suspension of *licenses* conferring "the right" to ply certain routes as a way of introducing passengers into the country.  *See, e.g.*, *Barron v. Burnside*, 121 U.S. 186, 200 (1887) (discussing state license granting corporation the "right to carry on commerce"); *Hazeltine v. Miss. Valley Fire Ins. Co.*, 55 F. 743, 746 (C.C.W.D. Tenn. 1893) (statute authorized agency to "suspend the right of a licensed foreign insurance company 'to do business in the state'").

[9] Defendants note that the title was later changed to "[s]uspension of entries," Br. 33, but that later title has no bearing on the meaning of § 265, which (Defendants agree) was materially unchanged in the 1944 recodification, *see id*. at 33 n.8.

211 F.3d 638, 643 (D.C. Cir. 2000) ("A broad statute when passed 'may have a range of plausible meanings,' but subsequent acts can narrow those meanings . . . .") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000)).

To the extent there is any conflict between the statutes, the specific provisions addressing humanitarian protection procedures control over the general public health authority under Title 42. The INA's humanitarian protections are "precisely drawn, detailed statute[s]," *Brown v. GSA*, 425 U.S. 820, 834 (1976), that "speak[] directly" to "the question before [the Court]," *Epic Sys.*, 138 S. Ct. at 1631, namely what the government must do before it seeks to remove an asylum seeker. And, as noted, Congress spoke directly to the protections required for this particular group of noncitizens, prohibiting their rapid removal without a screening. Critically, moreover, Congress has spoken directly to the relationship between these protections and serious communicable diseases, as explained above. Throughout 40 years of legislating humanitarian protections and exceptions, Congress has never created an exception based on disease.

By contrast, § 265 "doesn't mention [expulsion or asylum procedures] at all." *Id*. at 1632. And this specific-over-general interpretive principle has particular force where the more specific statute is the later-enacted one; that is the case here, as § 265 was originally enacted in 1893 and last amended in 1944. *See*

39

*United States v. Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012) (explaining that "[w]here two statutes conflict, the later-enacted, more specific provision generally governs").  Recent Congresses have spoken clearly and explicitly regarding the required treatment of asylum seekers; the Executive is not at liberty to ignore those commands.

### E. *Chevron* Deference Is Unwarranted.

Deference is not warranted here.  App. 111-12; *P.J.E.S.*, 502 F. Supp. 3d at 516 (Sullivan, J.); *J.B.B.C.*, 2020 WL 6041870, at *2 (Nichols, J.).

First, CDC "hasn't just sought to interpret [§ 265] in isolation," but rather "to interpret [it] in a way that limits the work of a second statute." *Epic Sys.*, 138 S. Ct. at 1629.  Such "reconciliation of distinct statutory regimes is a matter for the courts, not agencies."  App. 111 (cleaned up).  Indeed, Defendants do not even claim deference for their argument that § 265 displaces the entire immigration statute and overrides specific humanitarian protections.

Second, Defendants fail at *Chevron*'s first step because their asserted new expulsion power is at odds with "the traditional tools of statutory interpretation— including the statute's text, history, structure, and context." *Loving v. IRS*, 742 F.3d 1013, 1021-22 (D.C. Cir. 2014).  Nor can Defendants claim that the statute's *silence* itself creates ambiguity, where all the textual, contextual, and historical evidence underscores that the statute leaves no space for an assertion of expulsion

power.  *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (rejecting

agency's argument that silence as to asserted authority created ambiguity).

Third, for similar reasons, Defendants' interpretation would warrant no

deference at *Chevron*'s second step "because it is unreasonable in light of the

statute's text, history, structure, and context."  *Loving*, 742 F.3d at 1022; *see also*

*District of Columbia v. Dep't of Labor*, 819 F.3d 444, 454 (D.C. Cir. 2016)

(rejecting "novel reading" that would "significantly enlarge" longstanding statute's

effect).  Among other things, courts "expect Congress to speak clearly if it wishes

to assign to an agency decisions of vast 'economic and political significance.'"

*Util. Air Regul. Grp*., 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at

160).  That is particularly so where, as here, an agency asserts "an unheralded

power" under "a long-extant statute."  *Id*.

The implications of Defendants' interpretation—and in particular that U.S.

citizens and those fleeing danger could be summarily expelled from the country—

are of the greatest significance.  *See Merck*, 962 F.3d at 540 (relying on this

principle to hold that "the sweeping 'nature and scope of the authority being

claimed by the' Department underscores the unreasonableness of the

Department's" interpretation) (quoting *Loving*, 742 F.3d at 1021); *see also*

*Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600, 605 (D.C. Cir. 1995)

(constitutional avoidance warrants rejection of *Chevron* deference).

Defendants contend that deference is warranted because their "interpretation

of 'introduction' was rooted in [CDC's] scientific judgment," Br. 35, but notably

point only to various ways in which that judgment might impact what power it

thinks is *needed*.  But the legal question is whether § 265 provides the *authority* to

expel in direct contravention of humanitarian protections, not whether CDC *wants*

that authority or thinks it would be helpful.  *See NRDC v. Daley*, 209 F.3d 747,

755-56 (D.C. Cir. 2000); *but see infra* Part III.B (noting that CDC itself does not

actually claim the need to bar asylum seekers as long as DHS takes available

mitigation steps).

## II.    FAMILIES WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION.

The district court cited overwhelming, unrebutted evidence that Defendants'

expulsion practices deliver vulnerable parents and children directly into danger.

App. 116; App. 347 ("CBP has routinely expelled my clients, including newborns,

into the waiting arms of kidnappers[.]"), 357 (mother and seven-year-old daughter

"kidnapped immediately after DHS expelled them"), 358 (mother "was raped in

the street in Tijuana after DHS expelled her there with her three young children"),

366 (body of 15-year-old son found mutilated after expulsion).  Additionally, the

district court correctly held that migrants suffer irreparable harm when expelled

without a chance to seek asylum and other immigration protections.  App. 116-18 (collecting cases).

As one declarant describes, "[m]igrant families are a favorite target" of kidnappers because "police are unable and often unwilling to protect the migrants," and "although the migrants themselves are penniless, they have relatives in the north who will do anything to save them."  App. 365.  One organization documented more than 3,200 kidnappings and other attacks against migrants subjected to the Title 42 Process within a six-month period, while other advocates testified that 20-40% of their clients reported being victims of kidnappings or attempted kidnappings.  App. 344, 356-57, 381.

Defendants make these families even more vulnerable targets by expelling them at "predictable locations at predictable times in areas where kidnappers and organized crime are rampant."  App. 346.  Cartels wait at the end of the bridges where CBP pushes families into their waiting arms, as the U.S. government is well aware.  *See id.* ("As a result, many migrants are kidnapped immediately upon CBP releasing them into Mexico from a U.S. port of entry.").

Title 42 expulsions have also forced asylum-seeking families to remain in "horrendous living conditions" in Mexico.  App. 362.  Migrants are "sleeping on the ground in tents or out in the open," and lack food even for children who are malnourished.  App. 362, 375.  They are also routinely denied critical healthcare.

43

App. 369 (three clients who died due to lack of medical care), 345 (baby with Down Syndrome and heart murmur denied medical care); *see also* App. 344 (woman forcibly subjected to an abortion against her religious beliefs).

In addition to expulsions to Mexico, many families are flown directly to the countries from which they fled, which "are among the most dangerous in the world," a fact that Defendants do not dispute. App. 81 (citing State Department country reports), 323-24, 329-37, 340. Indeed, DHS recently invoked Title 42 to expel thousands of parents and children to Haiti—even though the agency recently deemed Haiti too dangerous to remove people to, even those without asylum claims. *See* Camilo Montoya-Galvez, *U.S. expels nearly 4,000 Haitians in 9 days as part of deportation blitz*, CBS News (Sept. 27, 2021), https://tinyurl.com/5f28f4wp; 86 Fed. Reg. at 41,864-65.

Defendants do not directly dispute this mountain of evidence, but make the perplexing statement that "plaintiffs will not suffer irreparable harm" because the denial of a preliminary injunction would simply "preserve the status quo." Br. 53. But that is obviously not the test.

Defendants also suggest a theoretical possibility that some families with "humanitarian need[s]" could obtain "case-by-case exceptions" from Title 42. Br. 54. Yet CBP routinely expels children and parents who should obviously satisfy any reasonable definition of "humanitarian need" if a meaningful process actually

44

existed.  App. 437 (expulsion of father who "carried his visibly disabled daughter [with spinal injuries] across the border but were nevertheless expelled"), 377 (expulsion of 19-year-old who "had lost both his right arm and leg"), 444 (expulsion of pregnant woman experiencing contractions despite her "detailing her kidnapping at the border" to CBP), 349 (expulsion of five new mothers who were bleeding and in pain from having given birth in U.S. within prior 48-72 hours), 429 (expulsion of children without their shoes; denial of food and milk to children).

And although non-governmental organizations previously assisted DHS with identifying some vulnerable families, at great personal danger to their staff, that process ended in August 2021 (although Defendants continue to rely on it rhetorically).  *Supra*, Statement.  In any event, that process was never an adequate substitute for a government-run asylum system available for all seeking protection, and not just those whom nonprofit organizations with limited resources happen to locate.  *E.g.*, App. 382 (explaining shortcomings of exemptions process).

In short, as the district court properly found based on the undisputed record evidence, families, including those with toddlers and babies, are being brutalized every day that the Title 42 Process remains in effect.

## III.    THE REMAINING EQUITABLE FACTORS WEIGH STRONGLY IN FAVOR OF A PRELIMINARY INJUNCTION.

The Supreme Court recently stressed that "combating the spread of the COVID-19 Delta variant" is no basis for denying injunctive relief where CDC's

*ultra vires* actions cause plaintiffs irreparable harm. *Alabama Realtors*, 141 S. Ct. at 2490 (finding economic harm to landlords sufficient).

Here, migrant families are not a meaningful source of COVID-19, and critically, CDC itself has *not* concluded that families cannot be safely processed. Rather, CDC has explained that families may be allowed to enter if *DHS* were to expand testing and other basic mitigation measures—which the government has previously done safely for 86% of families and 100% of unaccompanied children. *See* App. 150 (CDC recommending "expansion of [DHS's] COVID-19 mitigation programs for [families] such that they may be excepted from this Order"), 122-23 (finding that 86% of families are already processed under Title 8), 171-72 (DHS describing mitigation measures).

Expelled families also comprise less than 0.1% of persons entering the United States from Mexico. App. 458. The burden on DHS to marginally expand existing mitigation measures—more than one-and-a-half years into the pandemic—cannot outweigh the grave risk of kidnapping, rape, and death facing class members.

### A. Migrant Families Are Not A Significant Source Of COVID-19.

As Dr. Anthony Fauci recently explained, immigrants are "absolutely not" a "major reason why COVID-19 is spreading in the US" and that "focusing on immigrants, expelling them or what have you, is not the solution to [the]

46

outbreak." *Fauci Interview* at 2:37, 4:01; *see also* 86 Fed. Reg. 61,252, 61,256 (Nov. 5, 2021) (CDC attributing recent increase in COVID-19 cases to the "proportion of the [U.S.] population that remains not fully vaccinated").

Dr. Fauci's views are consistent with the conclusion of over 1,300 medical professionals that the Title 42 Process has "no basis" in public health.  Physicians for Human Rights, *1,300+ Medical Professionals from 49 U.S. States and Territories Call on CDC to End "Junk Science" Border Expulsion Policy* (Oct. 28, 2021), https://tinyurl.com/ud7fhktk.  Indeed, multiple reports indicate that career CDC scientists objected to the original Title 42 Order, which they thought was driven by immigration politics and xenophobia rather than public health.  *See supra* Statement.

Former CDC scientists submitted affidavits below stating that "[e]ven if 100% of [the families expelled by CBP] were to test positive for COVID-19 (which they will not), they would still represent only a negligible addition to the [tens of thousands of] new cases that have been reported each day in the United States on average[.]"  App. 391; *Fauci Interview* at 2:54 ("[W]hen you have . . . millions and millions and millions of Americans getting infected . . . [t]he problem is within our own country . . . . Let's face reality here.").

Despite Defendants' purported concern about lower vaccination rates in migrants' home countries, Br. 46-47, the CDC Order contains no exception for

fully vaccinated migrants. Yet shoppers may walk across the border if they show proof of vaccination. *Supra*, Statement. Moreover, CBP has been permitting a daily average of over 361,000 people (including truck drivers, students, and business travelers) to enter at land ports along the Mexico border, without even inquiring into their vaccination or COVID-19 status. App. 464. Migrant families expelled under Title 42 represent a tiny fraction (1/1000) of that cross-border traffic, *id.*, and, as discussed *infra*, Part III.B, migrant families are tested either prior to or upon their release from CBP custody. App. 141 (CDC Order), 171-72 (DHS declarant). Defendants are likewise now permitting unvaccinated air travelers from countries with extraordinarily low vaccination rates to enter the United States. 86 Fed. Reg. 61,224, 61,227 (Nov. 5, 2021).

In fact, migrant families are *less* likely to be infected with COVID-19 than people already in the United States. Unrebutted evidence shows that only 1.14% of asylum seekers who were in Mexico requesting exceptions from Title 42 under the now-discontinued exceptions process tested positive for COVID-19—a positivity rate far lower than that in border states like Texas. *See* App. 343, 441, 466-69; *see also United States v. Texas*, --- F.Supp.3d ----, No. 21-CV-173, 2021 WL 4848743, at *7 (W.D. Tex. Aug. 26, 2021) ("[M]igrants generally test positive at similar or lower rates than Americans living in the counties where they are tested.") (citation omitted); App. 132 (CDC reporting lower COVID-19 rate in

Mexico), 250-51 (public health experts explaining that U.S. residents are more likely to be infected with COVID-19 than travelers from Mexico). There is simply no evidence or finding that migrant families are increasing COVID-19 infection rates in the United States.

### B. CDC Itself Agrees That Mitigation Measures Can Safely Reduce The Risk Of COVID-19 Transmission.

DHS attempts to use CDC to shield its unlawful expulsions, but CDC's latest Order does *not* conclude that migrant families cannot be safely processed. App. 396-97. Rather, as dozens of public health experts have explained, the CDC Order "is an indictment of the DHS's yearlong failure to adopt reasonable mitigation steps in order to safely process asylum-seeking families." *Id.* Indeed, the CDC Order pointedly notes that "'the availability of testing, vaccines, and other mitigation protocols can minimize risk' of COVID-19 transmission during border processing." App. 397 (public health experts quoting CDC Order at App. 131). The CDC Order thus concludes that migrant families "may be excepted from this Order" upon DHS's "expansion of such COVID-19 mitigation programs." App. 150.

CDC and Plaintiffs' public health experts therefore agree that the government "can safely process asylum-seeking families while minimizing transmission of COVID-19." App. 398. To the extent that COVID-19 remains an issue, it is because *DHS has chosen* not to allocate resources to expand the

49

available mitigation measures CDC has recommended.  *See* App. 397.  DHS has simply failed to act despite CDC urging it to do so, App. 150, and an injunction is thus plainly needed.

Critically, CDC's exemption of unaccompanied children demonstrates that COVID-19 risk can be safely mitigated notwithstanding the conditions at CBP's processing facilities and the emergence of the Delta variant.  *See* App. 129, 135. Both unaccompanied children and family units are typically processed in the *same* congregate facilities, App. 141 (CDC Order), and remain there for comparable amounts of time.  *Compare* 86 Fed. Reg. 38,717, 38,719 (July 22, 2021) (CDC explaining that unaccompanied children "generally are transferred to [shelters] within 72 hours of intake at" CBP facility, with some being detained even longer), *with* App. 177 (DHS explaining that "processing a family for Title 8 can take 1.5 to 3 hours") *and* App. 143 (families "currently spend an average of 62 hours in CBP custody prior to release or transfer").  CDC has rightly concluded that employing testing and other measures after such children's release by CBP adequately mitigated COVID-19 risk.  86 Fed. Reg. at 38,719 (citing testing, availability of vaccines for children over 12, "masks, physical distancing, frequent hand washing, cleaning and disinfection, improved ventilation, staff vaccination, and cohorting" at various shelters).  The same can be done for families.  And just as CDC notes that many unaccompanied children are eventually placed with sponsors who can

assist with public health precautions, App. 145, nearly all families have similar

support in the United States, App. 401-02. In short, the CDC Order treats the

exemption of unaccompanied children as a roadmap for safely processing families.

App. 150.

Indeed, DHS has already created a testing and quarantine system for migrant

families (analogous to shelters for unaccompanied children) that minimizes

community transmission following their release from CBP facilities. Because

Mexican authorities have refused to accept the expulsion of certain families, App.

143, DHS has coordinated with local and nonprofit entities in the United States to

provide testing, vaccinations, and other mitigation for as many as 86% of the

families encountered at the border. App. 171-72 (DHS declarant); 452 (nonprofit

describing investment of resources in systems for receiving, testing, and

quarantining migrants in Tucson), 455-57 (San Diego), 431-33 (El Paso and New

Mexico), 438 (Brownsville and Hidalgo). CDC has endorsed that system and

encourages its expansion "such that [families] may be [fully] excepted from this

Order." App. 150 (CDC Order). The pieces CDC has identified as critical for safe

processing are thus already known to DHS and in place in significant part—

because DHS was compelled to act in response to Mexican policy—and all that is

needed is for DHS to expand those CDC-recommended programs to encompass the

remaining families.

Moreover, events occurring since this Court's ruling on Defendants' stay motion mean that processing families now likely poses *less* risk compared to when CDC first exempted unaccompanied children in February 2021. The entire federal workforce (subject to narrow exceptions) is now required to be fully vaccinated no later than November 22, 2021. 86 Fed. Reg. 50,989, 50,989 (Sept. 9, 2021); Safer Federal Workforce, *Vaccinations* (last visited Nov. 9, 2021), https://tinyurl.com/4smkwcnd. That vaccine mandate "largely eliminate[s] the risks of serious illness, hospitalization, and death among government personnel," App. 398 (public health experts), removing one of Defendants' main purported rationales for the Title 42 Process, *see* Br. 46, and also "significantly reduce[s] transmission" to migrants prior to their release from CBP, App. 398. *See also* App. 146 n.90 (CDC explaining significance of vaccinating CBP personnel).

Furthermore, vaccines are now available for children starting at age five, and over 80% of adults have received at least one dose, as have over 98% of those 65 or older (and vaccines are widely available to the remainder). CDC, *COVID-19 Vaccinations in the United States* (last visited Nov. 8, 2021), https://tinyurl.com/yceajwkz.

Even apart from testing and vaccinations, public health experts have explained that Defendants can use numerous other tools to further minimize risk at the border, such as outdoor processing, air filtration, sanitizing, and masking. App.

397-401; *see also* App. 352, 438, 449-51.  But rather than utilizing these proven public health strategies to manage COVID-19, DHS's expulsions likely *spread* COVID-19, App. 389-90 (public health experts), putting "'families on crowded planes and buses from the Rio Grande Valley,' without first testing the individuals and isolating those who test positive, and transporting them 'to other locations in Texas, or places as far away as Arizona and San Diego'" prior to expulsion.  App. 123 (district court).

Defendants claim that vaccines and other mitigation "do not *fully* eliminate" risk, Br. 50 (emphasis added), but CDC has never applied a zero-risk standard towards COVID-19, whether in permitting hundreds of thousands of other daily cross-border travelers, exempting unaccompanied children, or sanctioning "in-person schooling, travel, religious practice, indoor sporting events and other regular activities."  App. 396-97 (public health experts); *see, e.g.*, App. 145 (CDC exempting unaccompanied children because they "do not pose a *significant* level of risk for COVID-19 spread") (emphasis added).

Defendants' insistence on complete risk elimination is particularly indefensible now that DHS is allowing virtually all vaccinated foreign travelers— *except asylum seekers*—to enter via air and land ports of entry.  *See supra*, Statement; Part III.A.  Those international travelers likely spend hours in packed terminals or on buses and airplanes prior to arrival, possibly contracting and

53

spreading COVID-19.  *See* 86 Fed. Reg. 61,246, 61,246 (Nov. 5, 2021) (CDC explaining that "[a]ir travel may potentially continue the spread of [COVID-19] . . . rapidly around the globe").

The zero-risk standard is thus being applied *only* to desperate people fleeing harm.  DHS is now singling out asylum seekers for the most strenuous border restrictions—and not even exempting those who are tested and vaccinated.

### C. The Injunction Does Not Impose A Substantial Burden On DHS.

Defendants' complaints of hardship rely on inflated statistics and false choices.  As the district court found, admitting the remaining 14% of families subjected to expulsion (which represents 0.1% of border traffic) would not impose a significant additional burden.  App. 175, 122-23, 464-65.  Critically, shelters have unused capacity to test and quarantine additional families if released by CBP instead of expelled—facts that Defendants have not rebutted.  App. 431 (provider stating existing programs "could also be scaled up" with more support), 433 (estimating that "less than 10 percent of [El Paso's] capacity was currently in use"), 457 (explaining that some organizations have "developed these systems without the meaningful assistance of the federal government").

Defendants argue generally that "record numbers of noncitizens" "have strained DHS operations."  Br. 47.  But they do not dispute the district court's finding that the Title 42 Process itself is artificially inflating their numbers,

54

because desperate asylum seekers try to cross again to finally get a protection screening that they should have been provided the first time, with each crossing counted as a new "encounter."  App. 124 (district court concluding that "after the implementation of the Title 42 Process, the recidivism rate of individuals crossing the border increased from less than 7% to 40%."), App. 460-62 ("Title 42 authority has substantially increased the [recidivism] measure.") (quoting CBP).  In any case, the remaining families who are subject to Title 42 represent only a small percentage of migrant encounters.  App. 175, 465.

The Title 42 Process is also counterproductive because it forces CBP agents to process the same migrants over and over again.  By causing desperate families "to cross the border multiple times," as CBP acknowledges, App. 460, 462, expulsions increase transmission opportunities far more than simply admitting each family once for asylum screenings while following mitigation protocols.  App. 401.

DHS claims that the injunction could increase migration, but the district court correctly rejected DHS's unfounded speculation.  As DHS has acknowledged in other litigation, "[t]he reality is that migration patterns are affected by a range of factors and difficult to predict," and attempts to forecast "complex decisions made by noncitizens [who] risk[] life and limb" is "only speculation."  Brief for Appellants at 14, *Biden v. Texas*, No. 21-10806 (5th Cir.) (quoting *Arpaio v.*

*Obama*, 797 F.3d 11, 20-21 (D.C. Cir. 2015)).  Indeed, courts have repeatedly rejected DHS's unfounded "pull-factor" arguments.  *See, e.g.*, *Flores v. Sessions*, No. 85-CV-4544, 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 190 (D.D.C. 2015).  And as the district court rightly observed, there is even greater reason to doubt the deterrence value of Title 42, which has led to *more* border encounters overall.  App. 124.

Defendants point to a 16% increase in encounters of unaccompanied children after the *P.J.E.S.* injunction in November 2020, Br. 48, but that increase was part of a larger upward trend that *predated* the injunction by *many months*— and was smaller than the percentage increases observed prior to the injunction. App. 123 (district court); App. 475-76.  There is thus "no basis" to suggest that the injunction caused increased migration.  App. 476.  But regardless of what caused an increase in unaccompanied children, the government has been able safely to accommodate that increase, and there is no reason to believe that it could not do the same for families.

DHS also cites purported obstacles that are within its control.  The agency asserts that processing an asylum-seeking family "can take 1.5 to 3 hours" and "is generally conducted indoors," App. 177, but CBP can expedite processing and conduct it outdoors, and has previously done so.  App. 352, 399-400, 438, 449. DHS also claims that, apart from actual processing time, families could spend even

longer time in custody due to a "backlog," but it fails to explain why CBP cannot allow migrants to wait outdoors or reduce wait times, such as by offering an appointment option at ports of entry. *See* Br. 8, 16. Moreover, unaccompanied children experience comparable wait times. *Supra*, Part III.B. Because local providers have unused capacity to transport and receive families from CBP, App. 429, 433-34, 453-54, any bottleneck is of the agency's own making.

DHS also claims to have "very limited" "testing for noncitizens" at CBP facilities. Br. 50. "But here, again, only the government's own choice[s] appear[] to constrain its path forward." *Lockheed Martin Corp. v. United States*, 833 F.3d 225, 239 (D.C. Cir. 2016). The CDC Order itself acknowledges that rapid testing is useful, available, and "can be implemented," App. 137, yet Defendants fail to explain why DHS has not expanded testing, Br. 50. And, as noted, families have access to effective post-release testing and quarantine. *Supra* Part III.B.

DHS, and CBP specifically, are among the most well-resourced government agencies in the world: DHS has a $81 billion budget, of which $18 billion is just for CBP. *See* Department of Homeland Security, *FY 2021 Budget in Brief*, https://tinyurl.com/28byu8tx. There is no reason why they cannot implement mitigation steps and safely process asylum seekers, as CDC recommends and as other developed nations have. *See, e.g.*, European Commission, *Exemptions to*

*coronavirus travel restrictions into the EU* (last visited Nov. 8, 2021) (exempting "[p]ersons claiming asylum"), https://tinyurl.com/xmfvnbev.

*     *     *

Public health experts and CDC itself have left no doubt that asylum seekers can be safely processed if DHS would take proper mitigation steps.  Whatever is motivating DHS's intransigence, it cannot therefore be public health.

## CONCLUSION

The Court should affirm.

Dated:  November 12, 2021

Stephen B. Kang
Cody Wofsy
Morgan Russell
My Khanh Ngo
American Civil Liberties
Union Foundation, Immigrants'
Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770

Andre Segura
Kathryn Huddleston
Brantley Shaw Drake
American Civil Liberties
Union Foundation of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
(713) 942-8146

Karla M. Vargas
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
(956) 787-8171

Blaine Bookey
Neela Chakravartula
Jamie Crook
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877

Respectfully submitted,

/s/ Lee Gelernt
_____

Lee Gelernt
Omar Jadwat
Daniel A. Galindo
Ming Cheung
David Chen
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

Robert Silverman
Irit Tamir
Oxfam America
Suite 500
Boston, MA 02115
(617) 482-1211

Scott Michelman
Arthur B. Spitzer
American Civil Liberties Union
Foundation of the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

Tamara F. Goodlette
Refugee and Immigrant Center for
Legal Education and Legal Services
(RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
(210) 960-3206

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This response brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,915 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Professional Plus 2019 in 14-point Times New Roman font.

*/s/Lee Gelernt*
Lee Gelernt

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2021, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the DC Circuit by using the CM/ECF system. A true and correct copy of the foregoing has been served via the Court's CM/ECF system on all counsel of record.

*/s/Lee Gelernt*
Lee Gelernt