Case No. 21-5200

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

---

NANCY GIMENA HUISHA-HUISHA, AND HER MINOR
CHILD, ET AL.,

*Appellees,*

*v.*

ALEJANDRO N. MAYORKAS, SECRETARY OF
HOMELAND SECURITY, IN HIS OFFICIAL CAPACITY,
ET AL.,

*Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia, 21-CV-100-EGS
(Hon. Emmet G. Sullivan)

---

## BRIEF *AMICUS CURIAE* OF THE CATO INSTITUTE
## IN SUPPORT OF APPELLEES

Ilya Shapiro
CATO INSTITUTE
1000 Mass. Ave. NW
Washington, DC 20001
(202) 842-0200
ishapiro@cato.org


November 19, 2021

Ilya Somin
   *Counsel of Record*
SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
703-993-8069
isomin@gmu.edu

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel certifies:

<u>Parties and *Amici*</u>: a. Appellants. b. The Cato Institute is a not-for-profit corporation, exempt from income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3); it has no parent corporation; and no publicly held company has a 10% or greater ownership interest in the Cato Institute.

<u>Rulings Under Review</u>: *Huisha-Huisha v. Mayorkas*, 2021 WL 4206688 (D.D.C. Sept. 16, 2021).

<u>Related Cases</u>: Counsel is not aware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

## CERTIFICATION REGARDING SEPARATE BRIEFING

Pursuant to Circuit Rule 29 and Federal Rule of Appellate Procedure 29, counsel certifies that a separate brief is necessary to outline the important nondelegation and "major questions" issues raised by the case.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* the Cato Institute is a nonprofit corporation. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public. Pursuant to D.C. Circuit Rule 26.1(b), the Cato Institute states that it is a 501(c)(3) nonprofit organization dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for

Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CERTIFICATION REGARDING SEPARATE BRIEFING....................................i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT......................................i

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES .................................................................iv

STATEMENT OF INTEREST OF *AMICUS CURIAE*.............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT ..........................................................................................6

I.      APPELLANTS' INTERPRETATION OF THE CDC'S AUTHORITY
        WOULD CREATE AN UNCONSTITUTIONAL DELEGATION...............6

II.     APPELLANTS' INTERPRETATION OF SECTION 265 VIOLATES
        THE "MAJOR QUESTIONS" DOCTRINE..................................................14

III.    ADOPTION OF A NARROWER INTERPRETATION OF
        SECTION 265 IS REQUIRED BY THE CANON AGAINST
        STATUTORY INTERPRETATIONS THAT RAISE
        CONSTITUTIONAL PROBLEMS .............................................................20

CONCLUSION .....................................................................................22

CERTIFICATE OF COMPLIANCE...................................................................23

CERTIFICATE OF SERVICE .........................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021) .................................. 4, 9, 10

*Ala. Ass'n of Realtors v. HHS*, 2021 WL 2221646 (D.C. Cir. June 2, 2021).........10

*Am. Lung Ass'n v. EPA*, 985 F.3d 914 (D.C. Cir. 2021) ..........................................4

*Banks v. Booth*, 3 F.4th 445 (D.C. Cir. 2021).........................................................5

*Bostock v. Clayton Cty.,* 140 S. Ct. 1731 (2020) ...................................................15

*Crowell v. Benson,* 285 U.S. 22 (1932) ....................................................... 5, 20, 21

*DHS v. Thuraissigiam,* 140 S. Ct. 1959 (2020) ....................................................13

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988).........................................................................................21

*FDA v. Brown & Williamson*, 520 U.S. 120 (2000) .................................................3

*Gundy v. United States*, 139 S. Ct. 2116 (2019)............................................. 1, 2, 8

*Head v. N.M. Bd. of Exam'rs in Optometry,* 374 U.S. 424 (1963).........................14

*Hooper v. California,* 155 U.S. 648 (1895) ...........................................................20

*Huisha-Huisha v. Mayorkas*,
    2021 WL 4206688 (D.D.C. Sept. 16, 2021) ....................................... 2, 15, 19, 22

*Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d 549 (N.D. Cal. 2020),
    *app. dismissed*, 2021 WL 1652546 (9th Cir. Apr. 8, 2021) ........................ 11, 14

*NFIB v. Sebelius*, 567 U.S. 519 (2012).......................................................... 5, 20, 21

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979) ..................................21

*P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020)..........................................2, 12

*Skyworks, Ltd. v. CDC*, 524 F. Supp. 3d 745 (N.D. Ohio 2021).........................9, 10

*Terkel v. CDC*, 521 F. Supp. 3d 662 (E.D. Tex. 2021) ........................................1, 9

*Tiger Lily, LLC v. HUD*, 5 F.4th 666 (6th Cir. 2021)..............................................9

*Tiger Lily, LLC v. HUD*, 525 F. Supp. 3d 850 (W.D. Tenn. 2021).........................9

*Tiger Lily, LLC v. HUD*, 992 F.3d 518 (6th Cir. 2021).............................................9

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950)........................13

*Util. Air Reg. Group v. EPA*, 573 U.S. 302 (2014) ...........................................3, 14

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825) .................................................2

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ...........................................5

## Statutes

42 U.S.C. § 264 ...................................................................................................5

42 U.S.C. § 265 ......................................................................................... 3, 5, 7, 15

Alien Friends Act, 1 Stat. 570, 571 (1798) ...........................................................12

## Other Authorities

"1,300+ Medical Professionals from 49 U.S. States and Territories Call on
    CDC to End "Junk Science" Border Expulsion Policy," *Physicians for Human
    Rights*, Oct. 28, 2021...........................................................................................17

Alison Durkee, "Fauci Says Immigrants Are 'Absolutely Not' Driving Covid-19
    Surge: 'Let's Face Reality Here,'" *Forbes*, Oct. 3, 2021 .....................................18

Am. Immigration Council, *A Guide to Title 42 Expulsions at the Border*
    (Oct. 15, 2021) ....................................................................................................10

B.E. Smith & Dwight W. Whitney, *The Century Dictionary: An Encyclopedic
    Lexicon of the English Language* (1895)..............................................................16

Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490 (2021)............12

James Madison, "The Report of 1800," *in* 17 T*he Papers of James Madison* 303
    (David B. Mattern et al. eds., 1991).....................................................................12

James Morton Smith, *The Enforcement of the Alien Friends Act of 1798*,
    41 Miss. Valley Hist. Rev. 85 (1954) ..................................................................13

Letter to CDC Director Walensky, "HHS Secretary Becerra, and DHS Secretary
    Mayorkas on the August 2021 Title 42 Order," Sept. 1, 2021 .............................17

Leyla Best, "Why Viruses Mutate, Explained by an Infectious Disease Expert,"
    *UnityPoint Health*, July 12, 2021 .......................................................................20

Matthew J. Lindsey, *Immigration, Sovereignty, and the Constitution of Foreignness*, 45 Conn. L. Rev. 743 (2013) ...........................................................13

Rachel Siegel & Jonathan O'Connell, "The Feared Eviction 'Tsunami' Has Not Yet Happened. Experts are Conflicted on Why," *Wash. Post*, Sept. 28, 2021 ....11

Rebecca Beitsch, "Trump CDC Official: No 'Public Health Reason' for Border Closure, Title 42," *The Hill*, Nov. 12, 2021 ................................................. 17, 18

*The Modern Webster Dictionary for Home and School* (1941) .............................16

*Webster's Dictionary* (1893) .......................................................................................16

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute, established in 1977, is a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books, studies, and the annual *Cato Supreme Court Review*, and conducts conferences and forums.

This case interests Cato because the Institute has long advocated strong enforcement of constitutional constraints on separation of powers, including the nondelegation principle. It filed an *amicus* brief to that effect in *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). Cato also filed a brief supporting the plaintiffs in *Terkel v. CDC*, 521 F. Supp. 3d 662 (E.D. Tex. 2021), one of the cases challenging the Centers for Disease Control's efforts to impose a nationwide eviction moratorium, a case that raised nondelegation issues strikingly similar to this one.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Since March 2020, the Centers for Disease Control (CDC), has used its supposed powers under Section 265 of the Public Health Service Act of 1944 to

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in whole or in part. No person or entity other than *amicus* made a monetary contribution to its preparation or submission. All parties have been timely notified and consented to the filing of this brief.

expel hundreds of thousands of migrants and asylum seekers crossing the southern border. *Huisha-Huisha v. Mayorkas*, 2021 WL 4206688 at *2–5 (D.D.C. Sept. 16, 2021). A district court injunction forbids the CDC from expelling unaccompanied minors. *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020).[2] But the agency has continued to deport families and unaccompanied adults. Appellees' Br. at 7–10.

Appellants' interpretation of the CDC's powers under Section 265 would render the statute unconstitutional by violating the nondelegation doctrine. That principle of separation of powers holds that "Congress . . . may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy*, 139 S. Ct. at 2123 (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). While Congress can give executive branch officials a wide range of discretion, it cannot delegate "unguided and unchecked" discretion over a major area of public policy, such as immigration and entry into the United States. *Id.* at 2123 (citation omitted). The latter is exactly what the CDC would enjoy if the Appellants prevail here: It would have the power to exclude or deport virtually any entrants into the United States at any time, thereby usurping legislative power over immigration and regulation of entry into the country.

---

[2] The injunction is currently in abeyance, because the agency has agreed to stop such deportations. Appellees' Br. at 7–8.

42 U.S.C. § 265 gives the CDC "the power to prohibit… the introduction of persons and property from such countries or places as he shall designate" whenever the agency "determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States." 42 U.S.C. § 265. If this language is interpreted as giving the CDC virtually unlimited power to bar or deport migrants from such countries as it designates, it would violate constitutional constraints on delegation.

By contrast, there would be no such nondelegation issue if the term "introduction" were limited to situations where the entry of persons from the country in question could result in the spread of a disease not already prevalent in the United States. *See* Part II, *infra*. The problem could also be averted if this court adopts the Appellees' interpretation of Section 265 as being limited to regulation of transportation, excluding the power to deport migrants, and subject to limitation by later statutes granting rights to asylum seekers. Appellees' Br. at 16–30, 34–40.

For similar reasons, Appellants' position also violates the longstanding principle that courts must not assume that Congress has delegated to the executive the power to decide a "major" question of public policy, unless Congress has clearly indicated its intent to do so. *See, e.g.*, *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'") (citation omitted); *FDA v.*

3

*Brown & Williamson*, 520 U.S. 120, 159–60 (2000) (Congress cannot be assumed to have implicitly delegated the power to regulate "a significant portion of the American economy" because "we are confident that Congress could not have intended to delegate a decision of such economic and political significance" without explicitly saying so.); *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 959 (D.C. Cir. 2021) ("[S]ometimes an agency's exercise of regulatory authority can be of such 'extraordinary' significance that a court should hesitate before concluding that Congress intended to house such sweeping authority in an ambiguous statutory provision.").

The Supreme Court recently reaffirmed this vital rule in a decision involving the CDC, the same agency involved in the present litigation. In *Alabama Ass'n of Realtors v. HHS*, the Court rejected the CDC's claims that another provision of the Public Health Service Act gave it the authority to enact a nationwide eviction moratorium in order to combat the Covid-19 pandemic. The Court ruled that, "[e]ven if the text were ambiguous, the sheer scope of the CDC's claimed authority under Section 361(a) would counsel against the Government's interpretation." 141 S. Ct. 2485, 2489 (2021). Such an assertion of power was rejected by the Court because "[w]e expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Id.* (quoting *Util. Air Reg. Group*, 573 U.S. at 324).

4

The same agency has made the same mistake here. Rather than heed the admonition that Congress "does not . . . hide elephants in mouseholes," the CDC has indeed tried to squeeze yet another pachyderm into a narrow provision of the Public Health Service Act. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *cf. Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021) ("Congress does not hide elephants in mouseholes."). Having vastly overclaimed its authority under Section 361 of the Act in the eviction moratorium litigation, the agency has done the same thing with Section 362 here.[3] There are few bigger elephants than near-total control over entry into the United States.

Like the nondelegation problem, the major questions issue can be solved by limiting the scope of Section 265 to cover only the spread of diseases not already present within the United States or by adopting the Appellees' more limited interpretation of Section 265 as being confined to regulation of transportation, excluding the power to deport migrants, and constrained by later statutes pertaining to asylum rights. Appellees' Br. at 16–30, 34–40.

Finally, to the extent that the text of the Public Health Service Act is ambiguous, this court should rule against Appellants because doing so is required by the rule that courts must interpret federal statutes to avoid constitutional problems,

---

[3] Sections 361 and 362 of the Act were codified as 42 U.S.C. § 264 and 42 U.S.C. § 265, respectively.

so long as it is "fairly possible" to do so. *NFIB v. Sebelius*, 567 U.S. 519, 563 (2012) (quoting *Crowell v. Benson,* 285 U.S. 22, 62 (1932)). "'[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Id.* (quoting *Hooper v. California,* 155 U.S. 648, 657 (1895)).

The government's position here at the very least raises serious constitutional problems with respect to nondelegation.  And there obviously are "fairly possible" alternative readings that would give the CDC's authority a more limited construction—one that would avoid running afoul of nondelegation principles.

## ARGUMENT

## I.   APPELLANTS' INTERPRETATION OF THE CDC'S AUTHORITY WOULD CREATE AN UNCONSTITUTIONAL DELEGATION

If accepted by this court, Appellants' position would give the CDC virtually unlimited discretion to bar or expel any entrant into the United States from anywhere in the world, at any time. A delegation of such vast power  runs afoul of nondelegation principles and must be rejected.

42 U.S.C. § 265 gives the CDC director "the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose" whenever the agency  "determines  that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger

6

is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health." 42 U.S.C. § 265.

Appellants contend this language gives the CDC the power to both prevent entry and expel migrants for an unlimited period of time, whenever it decides that such a measure might be necessary. Appellants' Br. at 25–36. They even admit that their interpretation of the statute could well allow the CDC to bar or expel U.S. citizens. *Id*. at 43–45.

It is important to recognize that the statute does not require the CDC to provide evidence that the "serious danger" can be averted by the measures it adopts. Rather, the agency need only "determine" that this is so and then "deem necessary" the measures in question. On Appellants' interpretation of the statute, those measures include barring all entry into the United States, and expulsion of anyone who manages to enter nonetheless.

In addition, nothing in the text of the statute restricts these vast powers only to cases where the disease at issue is a deadly pandemic, such as Covid-19. Rather, the text covers "*any* communicable disease" (emphasis added), which includes even such relatively minor dangers as the flu or the common cold. On this view, the CDC could order the expulsion of entrants into the United States from any country where

the flu is prevalent during flu season, even though that disease is already present in the United States.

At any given time, communicable diseases of one type or another exist in every inhabited area of the world. There is, therefore, always a danger that entrants from anywhere in the world might "introduce" a disease into the United States, as Appellants' approach defines that term. Thus, under Appellants' interpretation of the statute, the CDC has virtually unlimited power to prohibit entry into the United States from anywhere in the world, to deport entrants from anywhere, and to continue these measures for as long as the agency might "deem necessary." In effect, this amounts to a claim of near-total control over both immigration policy and entry into the United States more generally.

The Appellants do suggest, at one point, that "Section 265 was meant to address extraordinary and unprecedented public-health emergencies." Appellants' Br. at 33. But nothing in the logic of their argument requires any such limitation on the CDC's power under Section 265.

The agency's breathtakingly expansive view of its authority runs afoul of the nondelegation doctrine. While Congress has considerable leeway to delegate policy decisions to agencies, it cannot delegate "unguided and unchecked" discretion over a major area of public policy, such as immigration and entry into the United States. *Gundy,* 139 S. Ct. at 2123 (quotation omitted). If the CDC is given virtually

8

unlimited power to bar any entrants from anywhere, at any time, that surely amounts to "unguided and unchecked" discretion, if anything does.

The Supreme Court and several lower courts recently rejected a comparably broad claim of authority by the CDC in the context of the agency's attempt to impose a nationwide eviction moratorium as a measure to combat the Covid-19 pandemic. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489; *Tiger Lily, LLC v. HUD*, 5 F.4th 666 (6th Cir. 2021); *Tiger Lily, LLC v. HUD*, 992 F.3d 518 (6th Cir. 2021); *Tiger Lily, LLC v. HUD*, 525 F. Supp. 3d 850 (W.D. Tenn. 2021); *Skyworks, Ltd. v. CDC*, 524 F. Supp. 3d 745 (N.D. Ohio 2021); *Terkel v. CDC*, 521 F. Supp. 3d 662.

 In its ruling against the CDC eviction moratorium, the Supreme Court emphasized that the "breathtaking amount of authority" claimed by the agency was a crucial factor in its decision. *Ala. Ass'n of Realtors,* 141 S. Ct. at 2489. The Sixth Circuit, in its ruling against the eviction moratorium, highlighted nondelegation concerns even more directly, emphasizing that "the government's interpretation of § 264(a) could raise a nondelegation problem . . . . Under that interpretation, the CDC can do anything it can conceive of to prevent the spread of disease." *Tiger Lily*, 5 F.4th at 672; *cf. id.* at 673–74 (Thapar, J., concurring) (emphasizing that application of the nondelegation doctrine in this case was necessary to preserve the

"separation of powers" and ensure that "one branch" cannot "impermissibly delegate . . . its powers to another").[4]

As in the eviction moratorium litigation, the CDC has claimed "a breathtaking amount of authority" over a major area of public policy, giving itself nearly unlimited discretion to bar entry into the United States. *Ala. Association of Realtors,* 141 S. Ct. at 2489. And, as with the eviction moratorium, the agency has sought to "exercise powers of "vast economic and political significance." *Id.* (citation omitted). Expelling some 1.2 million entrants, as the CDC has done under the order challenged today, unquestionably has enormous economic and social effects. *See* Am. Immigration Council, *A Guide to Title 42 Expulsions at the Border* (Oct. 15, 2021), https://bit.ly/3FkrZCw. Expelled migrants often suffer enormous harm, including rape, murder, assault, and kidnapping, as well as "horrendous living conditions." Appellees' Br. at 42–45.

---

[4] Other lower-court rulings against the eviction moratorium also emphasized nondelegation. *See, e.g.*, *Tiger Lily*, 525 F. Supp. 3d at 862 ( "The Court construes 42 U.S.C. § 264 narrowly in order to uphold the Separation of Powers and avoid violation of the non-delegation doctrine"); *Skyworks*, 524 F. Supp. 3d at 757 (broad reading of CDC authority "would likely raise a serious question whether Congress violated the Constitution by granting such a broad delegation of power unbounded by clear limitations or principles"). This court rejected the plaintiffs' nondelegation arguments in the eviction moratorium case. *Ala. Ass'n of Realtors v. HHS*, 2021 WL 2221646 at *3 (D.C. Cir. June 2, 2021). But its construction of the statute was repudiated by the Supreme Court's later ruling striking down the slightly more limited revised version of the moratorium. *Ala. Ass'n of Realtors,* 141 S. Ct. at 2489.

Indeed, the impact of the Title 42 expulsions is likely even greater than that of the eviction moratorium, which may have altered only a small number of landlord-tenant relationships, given that there were relatively few planned evictions affected by it. *Cf.* Rachel Siegel & Jonathan O'Connell, "The Feared Eviction 'Tsunami' has not Yet Happened. Experts are Conflicted on Why," *Wash. Post*, Sept. 28, 2021 (noting that there has been no spike in evictions since the moratorium ended, which suggests that it may have prevented or delayed very few such actions).

Last year, a federal district court ruled against the executive branch's attempt to use the Covid-19 crisis as justification for suspending a wide range of employment visas, because "Congress' delegation of authority in the immigration context . . . does not afford the President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners." *Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d 549, 563 (N.D. Cal. 2020), *app. dismissed*, 2021 WL 1652546 (9th Cir. Apr. 8, 2021). The court emphasized that "there must be some measure of constraint on Presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power in the immigration context, an area within clear legislative prerogative . . . . Such unrestrained delegation in the context of immigration would plainly contradict the structural foundation undergirding the Constitutional separation of powers." *Id.*

11

The present case involves a similar claim of "unrestrained delegation" giving an executive agency "entirely monarchical power in the immigration context." It would give the CDC virtually unlimited authority to bar the entry of migrants and visitors from abroad, and even U.S. citizens. *See P.J.E.S.*, 502 F. Supp. 3d at 539–40 (noting that the "[t]he government . . . admitted . . . that the section authorizes the government to expel even U.S. citizens who arrive from a foreign country during a pandemic").

The delegation of power over important subjects to the executive was precisely the sort of measure that the founding generation understood to be a grave breach of separation of powers, and therefore unconstitutional. *See* Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490 (2021). There are few more important subjects than the power to exclude or deport virtually any entrant into the country.

James Madison, the "father of the Constitution," was among those who argued that a similarly broad delegation of expulsion authority to the executive in the Alien Friends Act of 1798, was unconstitutional. *Id.* at 1512–14.[5] As Madison warned in his constitutional critique of that act, if the executive were granted the power to expel

---

[5] The Alien Friends Act authorized the president to order the departure of "all such aliens as he shall judge dangerous to the peace and safety of the United States," as well as any suspected of "treasonable or secret machinations against the government." Alien Friends Act, 1 Stat. 570, 571, § 1 (1798).

foreigners at will, "it would follow, that the whole power of legislation might be *transferred* by the legislature from itself, and proclamations might become substitutes for laws." James Madison, "The Report of 1800," *in* 17 T*he Papers of James Madison* 303, 324 (David B. Mattern et al. eds., 1991). The Alien Friends Act was widely condemned as unconstitutional, and eventually allowed to expire by President Thomas Jefferson, without ever actually being used to deport a migrant. Matthew J. Lindsey, *Immigration, Sovereignty, and the Constitution of Foreignness*, 45 Conn. L. Rev. 743, 758–59 (2013); James Morton Smith, *The Enforcement of the Alien Friends Act of 1798*, 41 Miss. Valley Hist. Rev. 85 (1954).

The CDC's actions here are precisely the sort of usurpation of legislative power that Madison warned against. If it is permitted to stand, the agency's "proclamations" will indeed "become substitutes for laws." *Id.*

In *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), the Supreme Court concluded that nondelegation principles generally do not constrain executive power over "the exclusion of aliens." *Id.* at 542. But the Court also differentiated this from rules "concerning deportation of persons who have gained entry into the United States." *Id.* The present case concerns deportation of persons already in the country.[6] In addition, the government's sweeping interpretation of

---

[6]In *DHS v. Thuraissigiam,* 140 S. Ct. 1959 (2020), the Supreme Court ruled that aliens detained soon after "unlawful entry" into the United States may be treated as

Section 265 would allow the exclusion of US citizens, as well as aliens. Appellants' Br. at 43–45.

Furthermore, nondelegation can still apply to exclusion of immigrants to the extent that the latter is not based on foreign policy or national security considerations, but on considerations of domestic policy. *Nat'l Ass'n of Mfrs.*, 491 F. Supp. 3d at 563–64. The CDC order at issue in the present case is based on the domestic policy objective of protecting public health, which is a part of government's internal police power. *See, e.g.*, *Head v. N.M. Bd. of Exam'rs in Optometry,* 374 U.S. 424, 428 (1963) ("protection of the public health . . . falls within the most traditional concept of what is compendiously known as the police power").

## II.    APPELLANTS' INTERPRETATION OF SECTION 265 VIOLATES THE "MAJOR QUESTIONS" DOCTRINE

For much the same reasons as it runs afoul of the nondelegation doctrine, Appellants' interpretation of Section 265 also violates the "major questions" doctrine, which holds that courts must not assume that Congress has delegated to the executive the power to decide a "major" question of public policy, unless Congress has clearly indicated its intent to do so. Congress must "speak clearly if it wishes to

---

applicants for admission, with respect to the Due Process Clause of the Fifth Amendment and the Suspension Clause. *Id.* at 1982-83. However, this ruling not efface the distinction between entry and deportation for nondelegation purposes. Moreover, the present case concerns the status of asylum seekers whose entry would be legal, but for the CDC order whose own legality is at issue in this very case. *See* Appellees' Br. at 34–40.

assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Reg. Group*, 573 U.S. at 324 (quotation omitted).

In this case, there is no such clear statement, because Section 265 can readily be construed more narrowly. It does not give the CDC the power to restrict all entry by people who may be carriers of a contagious disease. Instead, it merely allows it to forbid entry by those who might create a "serious danger of the *introduction* of such disease into the United States." 42 U.S.C. § 265 (emphasis added).

The term "introduction" could perhaps be interpreted to cover any and all instances where a carrier of a contagious disease might enter the United States. But it is more plausible to interpret it to refer to the transmission of a disease that is not already present in this country, or at least not yet widely prevalent.

The Supreme Court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cty.,* 140 S. Ct. 1731, 1738 (2020). Thus, it is essential to consider the ordinary meaning of "introduction" at the time Section 265 was enacted.

The origins of Section 265 are traceable to an 1893 law, which was later incorporated without significant change into the 1944 Public Health Service Act. *Huisha-Huisha*, 2021 WL 4206688 at *2. During both periods, standard definitions of "introduction" focused on the insertion of that which was not present previously.

On this view, one cannot "introduce" into the United States that which is already here.

The first listed definition of "introduction" in the 1895 *Century Dictionary* is "The act of introducing, or leading or ushering in; the act of bring in: as, the *introduction* of manufacturers into a country." B.E. Smith & Dwight W. Whitney, *The Century Dictionary: An Encyclopedic Lexicon of the English Language* 3164 (1895). It makes little sense to refer to the "ushering in" of a phenomenon into an area where it already exists. Likewise, "introduction of manufacturers into a country" clearly refers to their establishment in a country where they are not already present.

In the same vein, the first and most relevant listed definition of "introduction" in the 1893 *Webster's Dictionary* is "[t]he Act of introducing, or bringing to notice." *Webster's Dictionary* 393 (1893). "The Act of introducing" is not something that can be done with respect to an entity that is already present. Similarly, "[b]ringing to notice" is usually accomplished by the act of initially introducing a new phenomenon. Something which is already present cannot be "brought to notice" because it has likely been noticed already. Standard definitions of the relevant term around the time of the reenactment of the statute 1944 were similar to those of 1893.[7]

---

[7] *See, e.g.*, *The Modern Webster Dictionary for Home and School* 201 (1941), (defining "introduce" as "To bring into use, notice or acquaintance" and

Perhaps "introduction" in this sense can still occur in an area where the phenomenon in question is present, but still very rare, thereby potentially escaping notice and not–yet–been truly "ushered in." But that does not apply to the present situation, where—tragically—Covid-19 is anything but rare in this country.

This comparatively narrower definition of "introduction" is consistent with the idea that purpose of Section 265 is to prevent diseases from spreading to the United States. That purpose that cannot be achieved by blocking entry from abroad in a situation where the disease in question is already widely prevalent in this country, as is currently true of Covid-19. Whatever may have been true when the CDC order was first adopted in March 2020,[8] it is now impossible to prevent the "introduction" of Covid-19 into the United States for the simple reason that it is already here, and already widespread. As numerous public health experts have testified, Title 42 expulsions cannot and do not meaningfully restrict spread of Covid-19 to this country. *See, e.g.*, Supplemental Declaration of Former Centers For Disease Control And Prevention (CDC) Officials, Joint Appx. 384; "1,300+ Medical Professionals from 49 U.S. States and Territories Call on CDC to End "Junk

---

"introduction as "act of introducing," thereby linking the definition of the latter word to the former).

[8] The Covid-19 virus was likely already widespread in the United States even then, and therefore its spread could not have been prevented through the use Title 42 authority. CDC experts held this view at the time and were overridden by the White House. *See* Rebecca Beitsch, "Trump CDC Official: No 'Public Health Reason' for Border Closure, Title 42," *The Hill*, Nov. 12, 2021, https://bit.ly/3ceJtnl.

Science" Border Expulsion Policy," *Physicians for Human Rights*, Oct. 28, 2021, https://tinyurl.com/ud7fhktk; Letter to CDC Director Walensky, "HHS Secretary Becerra, and DHS Secretary Mayorkas on the August 2021 Title 42 Order," Sept. 1, 2021 (letter signed by numerous experts), https://bit.ly/3DiYFMk. Even when the Title 42 order was first enacted in March 2020, CDC public health experts recognized, as one recently stated, that "[t]he bulk of the evidence at that time did not support this policy proposal," in part because "a]t that time, there was a lot more disease in the U.S. than south of the border." Beitsch, *supra*.

Dr. Anthony Fauci, the administration's top adviser on Covid-19 policy, recently stated that the spread of the disease "is not driven by immigrants" because it is already "present in our country." Alison Durkee, "Fauci Says Immigrants Are 'Absolutely Not' Driving Covid-19 Surge: 'Let's Face Reality Here," *Forbes*, Oct. 3, 2021, https://bit.ly/3HAYheL. Therefore, he concluded in a direct reference to the Title 42 expulsions, "focusing on immigrants, expelling them . . . is not the solution to an outbreak." *Id.* Dr. Fauci recognizes that migrants subject to expulsion under the CDC policy are not introducing the disease into the United States, for the simple reason that it is already here.

Adopting the narrower and more plausible interpretation of "introduction" avoids giving the CDC vast power to decide major questions of social and economic policy without clear authorization by Congress. Under this approach, the CDC might

still be able to restrict entry by persons who are likely to be carriers of a deadly contagious disease that is not already widely prevalent in the United States. But the agency would not have the vastly greater power to bar the entry of virtually anyone at any time, for as long as it wants.

The requirements of the major questions doctrine would also be at least partially satisfied if this court adopts the district court's ruling that Section 265 does not authorize the CDC to expel migrants already within the United States, and the Appellees' additional arguments that its reach is limited to regulating transportation providers, and that the agency's powers are limited by other federal statutes protecting the rights of asylum seekers. *Huisha-Huisha,* 2021 WL 4206688 at *12– 14; Appellees' Br. at 16–30, 34–40. The adoption of these restrictions would also deny the CDC vast power to exclude or deport virtually any entrants into the United States, at any time.

This Court's approach to the major questions doctrine in the eviction moratorium litigation was recently implicitly rejected by the Supreme Court.[9] The Court should heed the Supreme Court, and rigorously apply the doctrine in the present case.

---

[9] *Compare Alabama Ass'n of Realtors*, 2021 WL 2221646 at *3 (rejecting "major questions" challenge to the eviction moratorium) *with Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (ruling against a later, slightly less expansive, version of the moratorium because it violated the major questions doctrine).

It could be argued that the narrower definition of "introduction" might still authorize the CDC to enact its large-scale exclusion and deportation policy on the grounds that the policy keeps out potential new variants of Covid-19, which—if allowed to enter—would qualify as bringing in a new disease not already prevalent in the United States. But virtually all viruses mutate over time and can potentially develop variants. *See, e.g.*, Leyla Best, "Why Viruses Mutate, Explained by an Infectious Disease Expert," *UnityPoint Health*, July 12, 2021, https://bit.ly/3cd0tdI. If the mere possibility of blocking a new variant of an existing disease were enough to trigger the CDC's Section 265 authority, it would again become a virtually unlimited power over immigration policy, thus violating both nondelegation principles and the major questions doctrine.

At the very least, the risk of new variants cannot qualify as "introduction" under Section 265 unless there is strong evidence that the new variant is fundamentally different from the old, and that it is prevalent in the country at issue.

## III.   ADOPTION OF A NARROWER INTERPRETATION OF SECTION 265 IS REQUIRED BY THE CANON AGAINST STATUTORY INTERPRETATIONS THAT RAISE CONSTITUTIONAL PROBLEMS

Courts must interpret federal statutes to avoid constitutional problems, so long as it is "fairly possible" to do so. *NFIB*, 567 U.S. at 563 (quoting *Crowell,* 285 U.S. 62). "'[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Id.* (quoting *Hooper v. California,* 155 U.S. 648, 657

20

(1895)).  The Supreme Court has emphasized that a reading of the statute that avoids constitutional problems must be adopted in preference to one that raises them even if the latter interpretation would otherwise be sounder. "The question is not whether [the reading that avoids unconstitutionality] is the most natural interpretation [of the statute] . . . , but only whether it is a 'fairly possible' one." *Id.* (quoting *Crowell*, 285 U.S. at 62).

This rule applies not just when a state would otherwise be rendered plainly unconstitutional, but also in cases where the alternative approach would raise "serious constitutional problems." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 574 (1988). *See also NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 504 (1979) (requiring a "clear expression of an affirmative intention of Congress" before a statutory interpretation that raises serious constitutional questions can be upheld).

There is no doubt Appellants' interpretation of Section 265 here at the very least raises serious constitutional nondelegation issues. *See* Part I, *infra*. As a result, the avoidance canon applies. And, just as obviously, there are "fairly possible" alternative readings of the statute that avoids the problem by interpreting the term "introduction" more narrowly than the extraordinarily broad approach urged by the CDC. *See* Part II, *supra*.

21

The constitutional problem can also be avoided, or at least greatly mitigated, by adopting the district court's reading of the statute as denying the CDC the power to expel migrants already present within the United States, and Appellees' additional arguments that the agency's powers are confined to regulation of transportation providers, and limited by other statutes protecting asylum rights. *Huisha-Huisha*, 2021 WL 4206688 at *12–14; Appellees' Br. at 16–30, 34–40.

## CONCLUSION

For these reasons, this court should affirm the decision of the district court.

Respectfully submitted,

/s/ *Ilya Somin*

Ilya Shapiro
CATO INSTITUTE
1000 Mass. Ave. NW
Washington, DC 20001
(202) 842-0200
ishapiro@cato.org

November 19, 2021

Ilya Somin
   *Counsel of Record*
SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
703-993-8069
isomin@gmu.edu

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,287 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman.

/s/ *Ilya Somin*
Ilya Somin

## CERTIFICATE OF SERVICE

I certify that on November 19, 2021, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

<u>/s/ <em>Ilya Somin</em></u><br>Ilya Somin