ORAL ARGUMENT SCHEDULED ON JANUARY 19, 2022

## No. 21-5200

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

NANCY GIMENA HUISHA-HUISHA, ON BEHALF OF HERSELF AND OTHERS SIMILARLY
SITUATED,

*Plaintiffs-Appellees*,

v.

ALEJANDRO MAYORKAS, SECRETARY OF HOMELAND SECURITY, IN HIS OFFICIAL
CAPACITY, ET AL.

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia
No. 21-cv-00100-EGS

## BRIEF OF HISTORIANS AS *AMICI CURIAE*
## IN SUPPORT OF PLAINTIFFS-APPELLEES

Raymond P. Tolentino
  *Counsel of Record*
Mahrah M. Taufique
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
rtolentino@kaplanhecker.com

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A. Parties and *Amici Curiae*

Except for the *amici* joining this brief and any other *amici* who had not yet entered an appearance in this case as of the filing of the Brief for Defendants-Appellants, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Defendants-Appellants.

### B. Rulings under Review

References to the ruling under review appear in the Brief for Defendants-Appellants.

### C. Related Cases

*Amici* agree with the statement in the Brief for Defendants-Appellants that there are no related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Dated: November 19, 2021

*/s/ Raymond P. Tolentino*

Raymond P. Tolentino
*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## D.C. CIRCUIT RULE 29(d) STATEMENT

The *amici* who join this brief are filing a separate brief because, as professional historians, they have a unique perspective on the legal issues presented on appeal. Specifically, *amici* seek to provide this Court with valuable historical context in assessing whether the government has authority under 42 U.S.C. § 265 to summarily expel noncitizen families from the country.

Dated: November 19, 2021

*/s/ Raymond P. Tolentino*

Raymond P. Tolentino
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

PAGE

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... vi

CORPORATE DISCLOSURE STATEMENT ....................................... vi

D.C. CIRCUIT RULE 29(d) STATEMENT ....................................... viv

TABLE OF AUTHORITIES ..................................................... vi

GLOSSARY ..................................................................... viii

IDENTITY AND INTEREST OF *AMICI CURIAE* .................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT .....................................................................3

     I.    Congress Feared That Infectious Diseases Like Cholera Would Spread to the United States via Ship in the Late Nineteenth Century .................................................................3

     II.   Congress Enacted Section 7 of the 1893 Act To Regulate Steamships and Transportation Companies .............................6

     III.  Past Practice Confirms That the 1893 Act Was Meant To Regulate Transportation .........................................................12

     IV.  The 1944 Recodification of the 1893 Act Did Not Materially Alter the Statute ......................................................14

CONCLUSION ..................................................................15

APPENDIX A

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Compagnie Francaise de Navigation a Vapeur v. Louisiana*, 186 U.S. 380 (1902) ........................................................................................................7

*Larsen v. Ins. Co. of N. Am.*, 252 F. Supp. 458 (W.D. Wash. 1965)......................13

*Minneapolis, St. P. & S.S.M. Ry. Co. v. Milner*, 57 F. 276 (C.C.W.D. Mich. 1893).4

*Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302 (2014) .................................................8

**Statutes**

42 U.S.C. § 265 ...................................................................................... 1, 2, 13, 14

Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893)....................................... 2, 6, 7, 8

Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084 (1891) .....................................................4

**Rules**

Control of Communicable Diseases, 82 Fed. Reg. 6890 (Jan. 19, 2017)...............13

**Other Authorities**

24 Cong. Rec. 359-471 (1893)................................................ 3, 4, 6, 8, 9, 10, 11, 12

Exec. Order No. 5143 (June 21, 1929) .....................................................................13

*Hearing on H.R. 3379 Before the Subcomm. of the H. Comm. on Interstate & Foreign Commerce*, 78th Cong. 28 (1944) ..........................................................14

Howard Markel, *"Knocking out the Cholera": Cholera, Class, and Quarantines in New York City, 1892*, 69 Bull. Hist. Med. 420 (1995) .................3

Niall Johnson & Juergen Mueller, *Updating the Accounts: Global Mortality of the 1918-1920 "Spanish" Influenza Pandemic*, 76 Bull. Hist. Med. 105 (2002) .... 12

*Twenty Days Quarantine*, N.Y Times (Sept. 2, 1892), https://tinyurl.com/wrcaz5z8...................................................................................5

U.S. Dep't of Treas., *Quarantine restrictions upon immigration to aid in the prevention of the introduction of cholera into the United States* (Sept. 1, 1892)......................................................................................................................5

## GLOSSARY

App.                        Joint Appendix

Br. for Appellees           Brief for Plaintiffs-Appellees

Br. for Appellants          Brief for Defendants-Appellants

CDC                         Centers for Disease Control and Prevention

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici* are distinguished scholars with expertise in the history of immigration, medicine, and public health in the United States. They have substantial academic, pedagogical, and professional experience bearing on the legal questions presented for this Court's review. In particular, *amici* submit this brief to offer an accurate historical understanding of 42 U.S.C. § 265, which forms the basis of the government's unprecedented policy of barring and expelling families at the border under the guise of protecting public health. Based on their expertise and knowledge of the relevant history, *amici* urge the Court to affirm the district court's order.

A full list of *amici* is attached as Appendix A.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in part; no party's counsel contributed money that was intended to fund the preparation or submission of the brief; and no person—other than *amici* and their counsel—contributed money that was intended to fund the preparation or submission of the brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In the nineteenth and twentieth centuries, Congress enacted landmark public health laws aimed at preventing the spread of infectious diseases from foreign countries to the United States. To achieve that end, Congress chose a very specific and targeted approach. Instead of granting public health officials sweeping immigration powers to summarily deport all individuals deemed a public health risk, Congress chose to regulate the primary method by which those individuals were transported (or, in statutory terms, "introduce[d]") into the country—which, at the time, was steamships. *See* Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893), App. 196-99 (the "1893 Act").

As *amici* explain in this brief, the historical record is replete with evidence showing that section 7 of the 1893 Act—which was later reenacted as 42 U.S.C. § 265 without material change—was intended to give the President authority to regulate *transportation* of individuals rather than to deport or expel the individuals themselves. Because the government's deportation policy rests on an atextual and ahistorical understanding of the relevant public health statutes, this Court should affirm the district court's order.[2]

---

[2] Because the district court found that, even assuming Title 42 authorizes regulation of individuals seeking to come into the country, it "does not authorize expulsion," the district court did not address the alternative argument (presented by *amici* in this brief) that the statute regulates only transportation and, for that

2

**ARGUMENT**

## I.    Congress Feared That Infectious Diseases Like Cholera Would Spread to the United States via Ship in the Late Nineteenth Century

Before turning to the 1893 Act itself, it is critical to understand the historical context in which Congress was legislating. During the late nineteenth century, two interrelated historical developments were unfolding in the United States and Europe. First, the United States was experiencing a great wave of immigration that brought a steady stream of newcomers to the United States from across the Atlantic. *See* Howard Markel, *"Knocking out the Cholera": Cholera, Class, and Quarantines in New York City, 1892*, 69 Bull. Hist. Med. 420, 423 (1995). And second, many of those immigrants were coming from countries (mainly in Europe) that were experiencing deadly outbreaks of infectious diseases—including cholera in the 1880s.

Federal officials and members of Congress quickly realized that this heavy volume of maritime transportation heightened the risk of an epidemic in the United States. *See, e.g.*, 24 Cong. Rec. 360 (statement of Senator Chandler noting that "90 or 95 per cent of the immigration into the United States comes into" New York City, and that "the most danger of cholera is to be apprehended from vessels arriving at

---

additional reason, does not authorize the government's draconian expulsion policy. App. 112 n.6.

that port"); *see also id.* at 359 (letter from physician stating that "the extent of th[e] danger" of a cholera outbreak from Europe was "very considerable").

Recognizing the specific threat of communicable diseases brought to the United States by sea, Congress thus began to take an increasingly active role in regulating public health and developing quarantine laws targeted at diseases borne on seafaring vessels. It was not especially concerned about the transmission of disease across the country's land borders. *See* 24 Cong. Rec. 364 (statement of Senator Chandler stating he was "not afraid . . . that there will be any cholera-breeding immigration which will come into this country by land"). That made sense: the primary source of cholera was overseas, and at the time, individual States enforced their own health and quarantine laws to prevent the transmission of disease across land borders. *See, e.g.*, *Minneapolis, St. P. & S.S.M. Ry. Co. v. Milner*, 57 F. 276, 277 (C.C.W.D. Mich. 1893) (finding that the Michigan State Board of Health was permitted to quarantine railway passengers entering Michigan from Canada).

By 1891, Congress had already implemented immigration legislation empowering the federal government to inspect noncitizens before admission and deport them based on public health concerns. *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1084-86 (1891). But, with cholera at the nation's doorstep, President Benjamin Harrison took an extraordinary step in September 1892: rather than invoke his statutory authority under the Immigration Act of 1891 to expel individual

immigrants from infected countries, he cut off their primary mode of transportation into the United States. He therefore instructed Surgeon General Walter Wyman to issue a "circular" order to "[f]oreign [s]teamship [c]ompanies." U.S. Dep't of Treas., Quarantine restrictions upon immigration to aid in the prevention of the introduction of cholera into the United States (Sept. 1, 1892), App. 207. The circular order recognized that "immigrants in large numbers" were "coming into the United States" from "infected districts" in "Russia, Germany and France, and at certain ports in Great Britain, as well as in Asia." *Id.* Notably, however, it did not ban those immigrants from entry or otherwise impose restrictions on them. *Id.* Instead, it mandated that "no *vessel* from any foreign port carrying immigrants shall be admitted to enter at any port of the United States until said vessel shall have undergone a quarantine detention of twenty days." *Id.* (emphasis added). This quarantine requirement imposed severe (and often prohibitive) costs on steamship companies; as the New York Times predicted at the time, the circular order would "practically put a stop to immigration, for no steamship company will continue to transport people to this country" given the high costs of quarantine. *Twenty Days Quarantine*, N.Y. Times (Sept. 2, 1892), https://tinyurl.com/wrcaz5z8. According to press reports, several Harrison administration officials initially questioned whether they had the statutory authority to impose such drastic quarantine procedures. *See id.*

## II. Congress Enacted Section 7 of the 1893 Act To Regulate Steamships and Transportation Companies

A few months later, in February 1893, Congress enacted the 1893 Act. Much of the legislative debate over that statute concerned whether Congress should override existing State public health laws or merely supplement them. 24 Cong. Rec. 362, 371-73. While Congress was hesitant to usurp individual States' traditional jurisdiction over quarantine powers, it recognized that national control might be necessary to effectively control the influx of disease threatening to arrive by seaborne vessels. *See, e.g.*, 24 Cong. Rec. 362 (debating legislation for the establishment of an exclusive national quarantine, which was not adopted). The final language of the 1893 legislation reflected respect for the continuing role of States in enforcing public health rules while arming the federal government with additional powers to protect the nation's public health from the looming threat of contagion. *See* Act of Feb. 15, 1893, ch. 114, §§ 3, 4, & 6, 27 Stat. 450. One of the arrows in that new quiver was section 7, which gave the President clear statutory authority to issue orders like the one issued by President Harrison in 1892.

In particular, section 7 granted the President the "power to prohibit, in whole or in part, the introduction of persons and property" from foreign countries experiencing outbreaks of "cholera or other infectious or contagious diseases." *See* 1893 Act § 7. Congress's deliberate use of the word "introduction" shows that section 7 was designed to regulate the steamships or other third parties that were

6

transporting or "bringing in" infected immigrants or goods to the country. *See* Br. for Appellees at 25-26 (collecting contemporaneous sources defining the term "introduce" to mean to "bring" in).[3]

The statutory context of the 1893 Act elucidates section 7's focus on regulating transportation, as opposed to authorizing deportation policies. Neighboring provisions in the statute show that Congress's concern in the 1893 Act was the regulation of steamships that were transporting individuals into the country. *See, e.g.*, 1893 Act § 1 (prohibiting "any merchant ship or other vessel from any foreign port" from entry into U.S. ports except in accordance with public health regulations); *id.* § 2 (requiring "any vessel" traveling to the United States to first obtain a bill of health at "port of departure"); *id.* § 3 (authorizing Secretary of the Treasury to regulate "vessels sail[ing] from any foreign port or place"); *id.* § 4 (charging the Surgeon General of the Marine Hospital Service with, among other

---

[3] Before the district court, the government argued (in a passing footnote) that the Supreme Court in *Compagnie Francaise de Navigation a Vapeur v. Louisiana*, 186 U.S. 380 (1902), held that a statute prohibiting "introduction" can authorize the exclusion of individuals. Def.'s Opp'n to Pls.' Mot. for Class Cert. at 21 n.12, *Huisha-Huisha v. Mayorkas*, No. 21-cv-100(EGS) (D.D.C. Sept. 16, 2021). But that argument is mistaken. *Compagnie Francaise* involved a constitutional challenge to the State's regulation of a steamship, and the Court's analysis of the Louisiana statute therefore focused on the State's regulation of *transportation*. 186 U.S. 380 at 381-82, 391-92. In any event, the Louisiana statute in *Compagnie Francaise*—which authorized "rules and regulations, terms and conditions on which intercourse with said infected locality shall be permitted," *id.* at 384—was broader than section 7.

things, "obtain[ing] information of the sanitary condition of foreign ports"); *id.* § 5 (directing Treasury Secretary to issue "rules and regulations" governing "vessels in foreign ports"); *id.* § 6 (providing for "an infected vessel" to be "remand[ed]" to "the nearest . . . quarantine station"). Moreover, the 1893 Act imposed penalties only on *transportation* that violated the public health requirements established under the statute; no such penalties were imposed on individual immigrants. *See, e.g.*, *id.* § 1 (imposing a penalty of up to $5,000 on any "vessel" that violated the Act).

Thus, read in context, section 7 (like its neighboring provisions) is properly understood as a provision that gives the federal government authority to regulate transportation. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 320-21 (2014) (noting the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," and stating that any "reasonable statutory interpretation must account for both the specific context in which . . . language is used and the broader context of the statute as a whole" (ellipsis in original) (internal quotation marks omitted)).

The legislative history confirms what the statutory text and context already make clear: that section 7 was never meant to bestow upon the President wide-ranging deportation powers. For instance, Senator Chandler, a proponent of the 1893 Act, expressed the view that restricting travel by *ship* would protect the country from a cholera epidemic. *See* 24 Cong. Rec. at 360-63. Senator Harris, one of the Act's

8

sponsors, explained that section 7 was directed at "vessels" that were "sailing to this country" with "passengers, crews, and cargo," *id.* at 392, because the federal government already had the authority to quarantine and inspect individuals crossing land borders under a different statute, *id.* at 370 (referencing a preexisting "power to protect the Mexican and Canadian borders"). Congress's focus on the regulation of steamships in the 1893 Act was no surprise. As explained above, *see supra* Part I, Congress enacted the 1893 Act during a moment in history when it was widely understood that immigrants, especially those from Europe and Asia, overwhelmingly arrived by ship (rather than by land), and that transoceanic immigration by steamship from Europe posed a perilous threat to the nation's health.

The government argues that Congress could not have been focused on passenger ships, because legislators were aware that communicable diseases could spread across land borders. Br. for Appellants at 39. As evidence, the government selectively cites comments by legislators about cholera spreading to the United States from Canada and Mexico. *Id*. But a review of the legislative record demonstrates that these comments were made by critics of the bill, in the context of their argument that the bill was unduly focused on vessels from Europe to the detriment of commerce, while not being broad enough to address migration by foot from Canada or Mexico. 24 Cong. Rec. at 370 (noting that the bill "invests certain officers with power to prohibit the entry of vessels bearing this enormous commerce

9

into our ports" while cholera could "come from Mexico"). In fact, it was *because* these critics understood the 1893 Act to be limited to regulating transportation that these objections were raised.

Examining various proposals for the language of section 7 further supports the view that Congress always understood section 7 of the 1893 Act to address passenger travel. For example, Congress initially considered an amendment to section 7 that would give the President the power to "suspend immigration." 24 Cong. Rec. at 470. Senator Vilas proposed striking "immigration" and inserting "all passenger travel, but not immigration alone." *Id*. The government argues that the consideration and rejection of this language must mean that section 7 "was plainly intended to be broader than a mere restraint on passenger travel." Br. for Appellants at 38-39. But this argument misapprehends the debate at the time. Senator Vilas understood that "immigration" was only one type of passenger travel. 24 Cong. Rec. at 470 (explaining that the power to prohibit all passenger travel "would be the greater power . . . which would include the less[er]" power to prohibit immigration). He reasoned that if it were necessary "to take so violent a remedy as to prohibit the access to our shores of people from foreign lands" to protect against disease, that power "ought not to be an authority which *discriminates* in the manner in which the

10

word 'immigration' operates a discrimination." *Id*.[4] (emphasis added). He was thus not willing to grant the power to prohibit transportation of certain travelers "unless it shall also be provided that the exigency which shall forbid them shall be sufficient to forbid all." *Id*. That proposal was rejected because others did not agree that discrimination was a problem. Senator Gray explained, for example, that he saw "no great injustice in the discrimination," such that if "we can avert a threatened danger or deal with it successfully by a discriminating embargo," the statute should grant the power to prohibit "any passenger class." *Id*. Ultimately, Congress adopted the

---

[4] Senator Vilas also proposed a second edit to the text of section 7, replacing the term "immigration" used in another part of the language with "passenger travel." This was merely a conforming edit, as the operative text granted the power to suspend "all passenger travel, but not immigration alone." The full text of his proposal read:

> That whenever it shall be shown to the satisfaction of the President that by reason of the existence of cholera or other infections or contagious diseases in a foreign country there is serious danger of the introduction of the same into the United States, and that notwithstanding the quarantine defense this danger is so increased by *passenger travel* that a suspension of the same is demanded in the interest of the public health, the President shall have power to suspend *all passenger travel, but not immigration alone*, from such countries or places as he shall designate and for such period of time as he may deem necessary.

24 Cong. Rec. at 470 (emphases added). In this context, suspending "immigration" meant suspending passenger travel of immigrants as one type of traveler, as opposed to other types of travelers, such as tourists. Properly understood, the whole debate was about the transportation of passengers and property, not the regulation of individuals coming on foot. Therefore, these proposals provide no support for reading section 265 (and section 7 before it) as overriding immigration laws, as the government suggests. Br. for Appellants at 41-43.

language prohibiting the "introduction of persons and property," "in whole or in part" because it was understood that the new language would include transportation of both "all . . . classes of travel" and property such as cargo, or of just some such transportation. 24 Cong. Rec. at 471. Throughout these discussions, the debate revolved around the various kinds of passenger travel that the bill could prohibit, not whether it created the power to regulate individual travelers directly, much less deport or expel individuals.

## III.  Past Practice Confirms That the 1893 Act Was Meant To Regulate Transportation

Past practice provides further historical evidence that section 7 of the 1893 Act does not supply the Executive with broad authority to expel or deport immigrants based on public health concerns. Section 7 has been invoked rarely throughout history as a basis to prohibit the introduction of persons.[5] And in the rare circumstance when it has, the federal government has used its section 7 authority to regulate the *transportation* of those persons to the United States. In response to the meningitis outbreak of 1929, President Herbert Hoover, invoking his authority under section 7, issued an executive order restricting the "*transportation* of passengers

---

[5] The federal government did not invoke its authority under the 1893 Act during the devastating influenza pandemic of 1918, which was responsible for the deaths of approximately 675,000 people in the United States, or about 0.65% of the population at the time. *See* Niall Johnson & Juergen Mueller, *Updating the Accounts: Global Mortality of the 1918-1920 "Spanish" Influenza Pandemic*, 76 Bulletin of the History of Medicine 105, 111 (2002).

from" China and the Philippines to the United States. Exec. Order No. 5143 (June 21, 1929), App. 201 (emphasis added).[6]

Accordingly, the language of the 1929 executive order made abundantly clear that the President was invoking his section 7 authority to regulate the transportation of infected passengers from infected countries. In *amici*'s view, the limited usage of section 7 in the historical record strongly reinforces that the provision was intended to give the President regulatory authority over steamships and transportation companies to protect public health—not to endow him with expansive deportation powers that have never been exercised in the history of the country.[7]

---

[6] The order prohibited introduction "by transshipment or otherwise." Transshipment refers to transferring something between ships. *See Larsen v. Ins. Co. of N. Am.*, 252 F. Supp. 458, 473 (W.D. Wash. 1965). The order thus covered all types of transportation: direct, indirect with stops, and via a single or multiple ships. There is no basis in the order's text to suggest, as the government previously has, that this order would apply to a person swimming or walking ashore to the United States. Def.'s Opp'n to Pls.' Mot. for Class Cert. at 23, *Huisha-Huisha v. Mayorkas*, No. 21-cv-100(EGS) (D.D.C. Sept. 16, 2021).

[7] Subsequent invocations of 42 U.S.C. § 265, the successor provision of section 7, follow the same pattern. For example, in 2017, the CDC promulgated regulations pursuant to 42 U.S.C. §§ 264 and 265 (among other provisions) in response to the largest outbreak of Ebola on record, an outbreak of Middle East Respiratory Syndrome, and repeated outbreaks of measles. *See* Control of Communicable Diseases, 82 Fed. Reg. 6890 (Jan. 19, 2017). The regulations enhanced and clarified the CDC's broad responsibilities with respect to preventing the introduction, transmission, and spread of communicable diseases into the United States and between States. But the regulations do not purport to authorize deportations.

13

## IV.    The 1944 Recodification of the 1893 Act Did Not Materially Alter the Statute

In 1944, Congress passed the Public Health Service Act, which recodified section 7 of the 1893 Act as 42 U.S.C. § 265 without material change. Thus, like its statutory forebear, section 265 was not intended to supply the federal government with statutory authority to expel noncitizens from the United States. As evidenced by the continued use of the term "introduction," the focus of section 265 remained the same: regulating transportation to protect against the spread of infectious diseases from other countries. *See* 42 U.S.C. § 265. To be sure, in 1944, Congress believed that the public health quarantine laws needed to be updated to account for modern air travel. *See Hearing on H.R. 3379 Before the Subcomm. of the H. Comm. on Interstate & Foreign Commerce*, 78th Cong. 28, 45 (1944) ("[T]he revolution in travel brought about by the airplane has necessitated the revolution of our methods of control and our defense against disease."). But, if anything, this congressional focus on modes of transportation further supports the conclusion that section 265 (and section 7 before it) was designed to give the President the power to regulate transportation, not to create new deportation policies out of whole cloth.

\* \* \*

The history and application of the legislation in 1893 and 1944 is clear: neither section 7 of 1893 nor its successor provision (section 265) was intended to provide the President with the power to deport or expel individuals deemed to be a public

14

health risk. Based on their expertise and knowledge, *amici* respectfully submit that the government's policy is flatly inconsistent with the statute and the historical record and must therefore be enjoined.

## CONCLUSION

For these reasons, the Court should affirm.


Dated: November 19, 2021

Respectfully Submitted,

*/s/ Raymond P. Tolentino*

Raymond P. Tolentino
  *Counsel of Record*
Mahrah M. Taufique
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
rtolentino@kaplanhecker.com

*Counsel for Amici Curiae*

# APPENDIX A

The *amici* listed below join this brief as individuals; institutional affiliation is noted for informational purposes only and does not indicate endorsement by institutional employers of the positions advocated in this brief.

**Alan Kraut, PhD**
Distinguished Professor of History
College of Arts & Sciences
American University
Washington, District of Columbia

**Carl Bon Tempo, PhD**
Associate Professor
Department of History
University at Albany, State University of New York
Albany, New York

**Nancy Foner, PhD**
Distinguished Professor of Sociology
Graduate Center and Hunter College
City University of New York
New York, New York

**Maria Cristina Garcia, PhD**
Howard A. Newman Professor of American Studies
College of Arts and Sciences
Cornell University
Ithaca, New York

**David A. Gerber, PhD**
Distinguished Professor of History Emeritus
Senior Fellow in History and in Disability Studies
University at Buffalo, State University of New York
Buffalo, New York

**Adam Goodman, PhD**
Assistant Professor of History and Latin American and Latino Studies
University of Illinois at Chicago
Chicago, Illinois

**Torrie Hester, PhD**
Associate Professor of History
College of Arts and Sciences
Saint Louis University
St. Louis, Missouri

**Hidetaka Hirota, PhD**
Associate Professor
Department of English Studies
Sophia University
Tokyo, Japan

**Philip Kasinitz, PhD**
Presidential Professor of Sociology
Graduate Center
City University of New York
New York, New York

**S. Deborah Kang, PhD**
Associate Professor
University of Virginia
Charlottesville, Virginia

**Julia Rose Kraut, JD, PhD**
Legal Historian
Author, THREAT OF DISSENT: A HISTORY OF IDEOLOGICAL EXCLUSION AND
DEPORTATION IN THE UNITED STATES (2020)
New York, New York

**Erika Lee, PhD**
Regents Professor of History and Asian American Studies
Director, Immigration History Research Center
University of Minnesota
Minneapolis, Minnesota

**Julian Lim, JD, PhD**
Associate Professor of History
School of Historical, Philosophical and Religious Studies
Arizona State University
Tempe, Arizona

**Maddalena Marinari, PhD**
Associate Professor of History
Gustavus Adolphus College
St. Peter, Minnesota

**Howard Markel, MD, PhD**
George E. Wantz Distinguished Professor of the History of Medicine
Director, Center for the History of Medicine
Professor of Pediatrics and Communicable Diseases
Professor of Health Management and Policy (Public Health)
Professor of History
University of Michigan
Ann Arbor, Michigan

**Deirdre Moloney, PhD**
Historian
Author, NATIONAL INSECURITIES: IMMIGRANTS AND U.S. DEPORTATION POLICY SINCE 1882 (2012)
Lawrenceville, New Jersey

**Lucy E. Salyer, PhD**
Professor of History
University of New Hampshire
Durham, New Hampshire

**Yael Schacher, PhD**
Senior U.S. Advocate
Refugees International
Washington, District of Columbia

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 3,630 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced type face using Microsoft Word 2010 in Times New Roman 14-point font.

Dated: November 19, 2021

*/s/ Raymond P. Tolentino*

Raymond P. Tolentino
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2021, I electronically filed the foregoing *amicus* brief with the Clerk for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

Dated: November 19, 2021

*/s/ Raymond P. Tolentino*

Raymond P. Tolentino
*Counsel for Amici Curiae*