ORAL ARGUMENT SCHEDULED FOR JANUARY 19, 2022

**No. 21-5200**
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated, *et al.*,

*Plaintiffs-Appellees*,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity, *et al.*,

*Defendants-Appellants*.
_____

On Appeal from the United States District Court
for the District of Columbia
No. 1:21-cv-00100-EGS
_____

**BRIEF OF *AMICUS CURIAE*
THE INTERNATIONAL REFUGEE ASSISTANCE PROJECT, INC.
IN SUPPORT OF APPELLEES**

Kathryn Austin
Geroline A. Castillo
Mariko Hirose
Deepa Alagesan
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 4th Floor
New York, N.Y. 10004

kaustin@refugeerights.org
gcastillo@refugeerights.org
mhirose@refugeerights.org
dalagesan@refugeerights.org
Tel: (516) 296-0688

*Counsel for Amicus Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A.    Parties and *Amici*

Except for the State of Texas, the Immigration Reform Law Institute, and any other *amici* who had not yet entered an appearance in this case as of the filing of the Brief for Appellants, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Appellants.

### B.    Rulings Under Review

Reference to the ruling at issue appears in the Brief for Appellants.

### C.    Related Cases

*Amicus* is aware of no related cases within the meaning of Circuit Rule 28(a)(1)(C).  The case on review has never previously been before this Court or any other court, nor has any other case involving both substantially the same parties and the same or similar issues.

Dated: November 19, 2021                    */s/ Kathryn Austin*
                                                            Kathryn Austin
                                                            *Counsel for Amicus Curiae*

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rules 26.1 and 29(b) and Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amicus curiae* submits the following corporate disclosure statement:

The International Refugee Assistance Project, Inc. is a private, non-profit organization dedicated to advancing and defending the rights of refugees and other displaced people through systemic litigation, direct representation, and policy and media advocacy. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## CIRCUIT RULE 29(d) STATEMENT

*Amicus curiae* the International Refugee Assistance Project, Inc. is filing a separate brief because, as an organization dedicated to advancing and defending the rights of refugees, asylum seekers, and other displaced people, and that has represented asylum seekers who have been affected by Defendants' expulsion policy, it has a distinct perspective from other *amici*. *Amicus* seeks to provide this Court with information about the well-established rights of asylum seekers like our clients under U.S. immigration laws and to show how the expulsion policy contravenes the text and purpose of these laws. In its order dated September 30, 2021, the Court granted *amicus* leave to file a brief at this merits stage.

Dated: November 19, 2021

                                        */s/ Kathryn Austin*

                                        Kathryn Austin
                                        *Counsel for Amicus Curiae*

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

CIRCUIT RULE 29(d) STATEMENT.................................................... iii

INTEREST OF AMICUS CURIAE ....................................................1

INTRODUCTION .........................................................................2

ARGUMENT .............................................................................3

    I.   THE EXECUTIVE MUST FOLLOW SPECIFIC PROCEDURES TO
        IDENTIFY AND EVALUATE HUMANITARIAN PROTECTION
        CLAIMS ...........................................................................3

    II.  THE EXECUTIVE MAY NOT BLOCK ACCESS TO THE
        HUMANITARIAN PROTECTION SYSTEM ON HEALTH-RELATED
        GROUNDS .......................................................................14

CONCLUSION ...........................................................................18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Grace v. Barr*,
 965 F.3d 883 (D.C. Cir. 2020)...……………………………………….....10

*INS v. Cardoza-Fonseca*,
 480 U.S. 421 (1987)...………..…..……………………………………......8

*Matter of Cross*,
 26 I. & N. Dec. 485 (B.I.A. 2015)….…………………………………......5

*Vartelas v. Holder*,
 566 U.S. 257 (2012)…………..……...………………………………......4

**Statutes**

8 U.S.C. § 1101 ...............................................................................................4

8 U.S.C. § 1158 .................................................................................. 3, 6, 15-16

8 U.S.C. § 1159 ...............................................................................................6

8 U.S.C. § 1182 .............................................................................. 6, 16-17

8 U.S.C. § 1222 .............................................................................................17

8 U.S.C. § 1225 .......................................................................... 6-7, 13

8 U.S.C. § 1227 .............................................................................................14

8 U.S.C. § 1227 (1994) ..................................................................................4

8 U.S.C. § 1229 .............................................................................................4

8 U.S.C. § 1229a .................................................................................... 4-6

8 U.S.C. § 1231 ...................................................................... 3-5, 14-15

8 U.S.C. § 1252 ..................................................................................6, 13

8 U.S.C. § 1252 (1994) ..................................................................................4

8 U.S.C. § 1427 .............................................................................................6

Foreign Affairs Reform and Restructuring Act of 1998,
Pub. L. No. 105-277, § 1242, 112 Stat. 2681 ........................................... 10, 13-14

Refugee Act of 1980, § 101, Pub. L. No. 96-212, 94 Stat. 102 ...........................9, 12

## Regulations

8 C.F.R. § 108.1 (1979) ........................................................................11

8 C.F.R. § 208.30 .................................................................................7

8 C.F.R. § 1208.16 .............................................................................3, 6

8 C.F.R. § 1208.17 ........................................................................... 3, 6, 14

8 C.F.R. § 1240.1 ...............................................................................5-6

42 C.F.R. § 34.3 ...............................................................................17

42 C.F.R. § 34.5 ...............................................................................17

## Rules

Federal Rule of Appellate Procedure 29 .................................................................1

## Agency Materials

Public Health Reassessment and Order Suspending the Right to Introduce Certain
Persons from Countries Where a Quarantinable Communicable Disease Exists
(Aug. 2, 2021) ........................................................................14

Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb.
19, 1999) ............................................................................10

USCIS Policy Manual Vol. 7, Part M, Ch. 3 (2021) ...............................................16

USCIS Policy Manual Vol. 8, Part B, Ch. 3 (2021) ...............................................16

U.S. Dep't of Justice, Executive Office for Immigration Review, Immigration
Court Practices During the Declared National Emergency Concerning the
COVID-19 Outbreak, PM 20-10 (Mar. 18, 2020) ................................................16

**Legislative History**

114 Cong. Rec. 27,758 (1968) ...................................................................15

114 Cong. Rec. 29,391 (1968) .....................................................................7

114 Cong. Rec. 29,607 (1968) .....................................................................7

125 Cong. Rec. 11,973 (1979) .....................................................................9

126 Cong. Rec. 4507 (1980) .......................................................................13

142 Cong. Rec. 11,491 (1996) ............................................................. 10, 13

H.R. Rep. No. 96-608 (1979) ................................................... 7, 9, 11-13

H.R. Rep. No. 104-469 (1996) ..................................................................10

S. Rep. No. 96-256 (1979) .........................................................................12

*Admission of Refugees into the United States, Hearings before the Subcomm. on Immigr., Citizenship, and Int'l Law, H. Comm. on the Judiciary*, 95th Cong. 126 (1977) ......................................................................................................11

*The Refugee Act of 1979, S. 643: Hearing Before the S. Comm. on the Judiciary*, 96th Cong. 36 (1979) ..............................................................................9

**Other Authorities**

Affidavit of Louis Henkin, Resp'ts' Br., *McNary v. Haitian Ctrs. Council, Inc.*, 1992 WL 541267 (U.S. Dec. 21, 1992) ....................................................8

Exec. Comm. of the High Commissioner's Programme, Note on International Protection, U.N. Doc. A/AC.96/815 (Aug. 31, 1993) ...........................8

The Refugee Convention, 1951: The Travaux Preparatoires Analysed with a Commentary by Dr Paul Weis ..................................................................8, 15

ESCOR, Report of the Working Group on a Draft Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Doc. E/CN.4/L.1470 (Mar. 12, 1979) ................................................10

**Glossary**

| | |
|---|---|
| **App.** | Joint Appendix |
| **IRAP** | International Refugee Assistance Project, Inc. |

## INTEREST OF AMICUS CURIAE

*Amicus curiae* the International Refugee Assistance Project, Inc. ("IRAP") is a nonprofit organization dedicated to advancing and defending the rights of refugees and other displaced people through systemic litigation, direct representation, and policy and media advocacy. As counsel to hundreds of refugees and asylum seekers before administrative agencies and in the federal courts since its founding in 2008, IRAP has direct insight into the worldwide refugee crisis and a strong interest in ensuring that the Refugee Act and related laws are enforced in a manner that is consistent with Congress's humanitarian objectives. Through a dedicated project undertaken in collaboration with an organization working at the U.S.-Mexico border, IRAP has knowledge of the dangerous conditions Defendants' expulsion policy is creating, and the harm and suffering it is causing.

No counsel for a party authored this brief in whole or in part; no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amicus curiae*, its members, or its counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E). In an order dated September 30, 2021, the Court granted IRAP permission to file a brief as *amicus curiae* at this merits stage. *See* Doc. 1916334.

# INTRODUCTION

Since March 2020, officers of U.S. Customs and Border Protection have been expelling people from the United States on asserted public health grounds without regard for the system Congress created to ensure protection for those fleeing persecution and torture. Congress's system requires the executive branch to follow specific procedures to identify and evaluate humanitarian protection claims whenever it seeks to expel, turn away, or otherwise remove someone from the United States. And it bars the executive branch from discounting the rights of people at or within U.S. borders who seek humanitarian protection (hereinafter "asylum seekers"), including when addressing public health concerns.

Defendants purport to have authority under the Public Health Service Act to expel asylum seekers like Plaintiffs and class members without these safeguards. Defendants are wrong because, among other things, the U.S. humanitarian protection system that Defendants ignore is comprehensive, and its procedures are mandatory. IRAP agrees with Plaintiffs that the Court should affirm the district court's order and submits this brief to further detail how the expulsion policy is contrary to the laws Congress enacted to protect asylum seekers. IRAP urges the Court affirm the order of the district court.

**ARGUMENT**

Under U.S. law, the federal government is prohibited from returning people to places where they will be persecuted or tortured and is required to give people who reach U.S. borders an opportunity to seek asylum. *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16, 1208.17; 8 U.S.C. § 1158(a)(1). To ensure that the Executive does not run afoul of these mandates, Congress requires it to follow specific procedures to identify and adjudicate humanitarian protection claims whenever it seeks to remove a person from the United States. This system is comprehensive, and there is no legal basis for the Executive to circumvent it on public health grounds. Indeed, while Congress provides generally for removal based on certain communicable diseases, it has been careful never to make such health considerations a barrier to applying for or being granted humanitarian protection.

## I.  THE EXECUTIVE MUST FOLLOW SPECIFIC PROCEDURES TO IDENTIFY AND EVALUATE HUMANITARIAN PROTECTION CLAIMS

Congress requires the Executive to follow specific procedures to protect the rights of asylum seekers at or within U.S. borders; understanding the United States' humanitarian responsibilities to be urgent moral obligations, Congress has acted deliberately to prevent these obligations from being circumvented by the executive branch.

Typically, when the Executive seeks to remove a person from the United States, it must grant that person an administrative hearing with an immigration judge that includes procedural safeguards to ensure that the person is not removed wrongfully. *See* 8 U.S.C. § 1229a. For example, the Executive must provide written notice of, among other things, the legal grounds on which it believes the person may be removed—including the specific "inadmissibility" or "deportability" grounds—and the conduct that it alleges warrants removal. *See* 8 U.S.C. §§ 1229(a)(1)(C)-(D), 1229a(a)(1)-(2).[1] It must afford the person the opportunity to secure counsel. *See* 8 U.S.C. §§ 1229(a)(1)(E), (b), 1229a(b)(4)(A). And it must give the person the chance to present evidence and cross-examine government witnesses. *See* 8 U.S.C. § 1229a(b)(4)(B).

---

[1] Whether the "inadmissibility" grounds or "deportability" grounds apply in any given "removal" proceeding depends on whether the person was formally "admitted" following "inspection and authorization by an immigration officer" before the proceeding began. 8 U.S.C. § 1101(a)(13)(A); *see also* 8 U.S.C. § 1229a(c). This framework has governed since 1997. Before 1997, Congress provided for two separate types of proceedings—exclusion hearings or deportation proceedings—to effectuate removals from the United States. *See, e.g.*, *Vartelas v. Holder*, 566 U.S. 257, 261 (2012). Considerations of excludability and deportability under the prior regime map roughly to considerations of inadmissibility and deportability in current-day consolidated removal proceedings. *See id.* at 261-63 & n.3. Whether in the current or former framework, Congress has consistently used express terms when it has granted the Executive authority to remove individuals deemed removable. *Compare, e.g.*, 8 U.S.C. §§ 1229a(c)(5), 1231(a) (removal after removal proceedings), *with, e.g.*, 8 U.S.C. § 1227 (1994) (removal after exclusion proceedings), *and* 8 U.S.C. § 1252 (1994) (removal after deportation proceedings).

No person may be removed unless the judge determines that there are, in fact, grounds in the law to remove them. *See* 8 U.S.C. § 1229a(a), (c)(1)(A). The removal hearing provides a forum in which the person may contest the grounds for their removal. The person may argue, for example, that they are exempt from the grounds as a U.S. citizen, *see, e.g.*, *Matter of Cross*, 26 I. & N. Dec. 485 (B.I.A. 2015), or that the grounds do not apply for some other legal or factual reason. *See generally* 8 U.S.C. § 1229a(c)(2)-(3); 8 C.F.R. § 1240.1(a)(1)(i).

If a person is removable as a threshold matter, the removal hearing then affords the person an opportunity to apply for relief from removal, including several forms of humanitarian protection. *See* 8 U.S.C. § 1229a(c)(4); 8 C.F.R. § 1240.1(a)(1)(ii)-(iii). Requiring the government to consider and adjudicate humanitarian protection claims ensures that the United States adheres to its humanitarian protection obligations not to return people to countries where they may be persecuted or tortured—even if those people are otherwise removable. To claim protection from persecution, a person may apply for withholding of removal under 8 U.S.C. § 1231(b)(3), which, with limited exceptions inapplicable here, bars the United States from removing someone to a place where their "life or freedom would be threatened . . . because of [their] race, religion, nationality, membership in a particular social group, or political opinion." *See also* 8 U.S.C. § 1229a(c)(4); 8 C.F.R. § 1240.1(a)(1)(iii). To claim protection from torture, the person may apply

for deferral or withholding of removal under the law implementing the United Nations Convention Against Torture, which bars the United States from removing anyone to any place where it is "more likely than not" that they would be tortured. 8 C.F.R. §§ 1208.16(c), 1208.17(a); *see also* 8 U.S.C. § 1229a(c)(4); 8 C.F.R. § 1240.1(a)(1)(iii).  In removal proceedings, a person may also apply for asylum status, *see* 8 U.S.C. §§ 1158(a)(1), 1229a(c)(4); 8 C.F.R. § 1240.1(a)(1)(ii), which confers additional rights beyond protection from removal, including a pathway to U.S. citizenship, *see* 8 U.S.C. §§ 1159(b), 1427(a).

Should the immigration judge determine both that there are grounds to remove a person and that relief from removal is not warranted, the judge may order the person removed from the United States.  *See* 8 U.S.C. § 1229a(c)(1)(A), (c)(5).  A person ordered removed may appeal the immigration judge's decision, *see* 8 U.S.C. § 1229a(c)(5), and, ultimately, seek federal judicial review, *see* 8 U.S.C. § 1252(b).

Since its enactment of the Illegal Immigration Reform and Immigrant Responsibility Act in 1996, Congress has also permitted the Executive to avail itself of an expedited removal process, through which an immigration officer may order certain people removed "without further hearing or review"—including individuals without valid entry documents.  *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(7).  Yet when it created this expedited removal process, Congress took care to ensure that any person who might be eligible for asylum or entitled to withholding or deferral

of removal would not be removed in violation of the United States' humanitarian protection laws:  In the expedited removal system, a person who expresses a fear of persecution or torture *must* be referred for a "credible fear" screening.  *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (b)(1)(B).  The screening process affords them the opportunity to consult with a person of their choosing, *see* 8 U.S.C. § 1225(b)(1)(B)(iv), and to be interviewed by an asylum officer with specialized training and under proper supervision, *see* 8 U.S.C. § 1225(b)(1)(B)(i), (E); 8 C.F.R. § 208.30(d).  So long as their fear is deemed credible, they are placed in removal proceedings.  *See* 8 C.F.R. § 208.30(f).

The modern asylum system—including laws that require the government to screen for protection claims in expedited removal proceedings and to give people the opportunity to present those claims as a defense to removal in full removal proceedings—reflects Congress's recognition of the grave moral implications of returning people to their abusers.  U.S. humanitarian protection laws originated in the *non-refoulement* provision of the 1951 U.N. Convention Relating to the Status of Refugees, which had urgent moral underpinnings.[2]  As Louis Henkin, an

---

[2] Though the United States did not ultimately ratify the Refugee Convention, the Refugee Convention's provisions were carried through in relevant part to the U.N. Protocol Relating to the Status of Refugees, which the United States did ratify.  114 Cong. Rec. 29,391 (1968); 114 Cong. Rec. 29,607-08 (1968); *see also* H.R. Rep. No. 96-608, at 17 (1979) (noting that the enactment of asylum and *non-refoulement* provisions "conforms United States statutory law to our [Protocol] obligations").

American framer of the treaty, explained: In the aftermath of the Second World War, reports emerged "that police of some countries had pushed refugees back into the hands of the pursuing Nazis." "[G]overnments," therefore, "were asked to commit themselves not to prevent a person from escaping oppression and not to become an accomplice to their oppression." Henkin Aff. ¶¶ 4, 6, Resp'ts' Br., *McNary v. Haitian Ctrs. Council, Inc.*, 1992 WL 541267 (U.S. Dec. 21, 1992). Universal recognition of the *non-refoulement* principle was considered essential to an effective refugee protection system. *See* The Refugee Convention, 1951: The Travaux Preparatoires Analysed with a Commentary by Dr Paul Weis 235, *available at* https://www.unhcr.org/en-us/protection/travaux/4ca34be29/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul.html    [hereinafter "Travaux"] ("The Chairman felt that if the work of the Committee resulted in the ratification of [the *non-refoulement* provision] alone, it would have been worth while."); *see also* Exec. Comm. of the High Commissioner's Programme, Note on International Protection ¶ 10, U.N. Doc. A/AC.96/815 (Aug. 31, 1993), *available at* https://www.refworld.org/docid/3ae68d5d10.html ("It would be patently impossible to provide international protection to refugees if States failed to respect this paramount principle of refugee law and human solidarity."). *See generally INS v. Cardoza-Fonseca*, 480 U.S. 421, 436-39 (1987) (treating negotiating history and UNHCR material as persuasive authority).

When codifying the protections of the Refugee Convention and the subsequent Protocol in the 1980 Refugee Act, Congress remained all too aware of the harms asylum seekers would face were the United States to turn its back on them, and thus sought to conform statutory protections to the *non-refoulement* mandate. *See, e.g.*, H.R. Rep. No. 96-608, at 17 (1979) (noting that the asylum and *non-refoulement* provisions are designed to "conform[] United States statutory law to our obligations under [the Convention and Protocol]"); Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102, 102 ("declar[ing] that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands"). Senator Kennedy pointed to the "tragic results" of the country's lack, at the time, of a consistent asylum policy, including "instances where people came up to our embassies[,] were rejected, and were later shot." *The Refugee Act of 1979, S. 643: Hearing Before the S. Comm. on the Judiciary*, 96th Cong. 36 (1979). In the House debates, Representative Chisholm held up the "tragic plight" of thousands of Haitians who had sought asylum in Florida, citing evidence of "the arrest and indeed execution of Haitians deported by the Immigration and Naturalization Service." 125 Cong. Rec. 11,973 (1979).

When Congress enacted an expedited removal process in 1996, it remained attentive to the risks of removal. Even as it recognized some utility in permitting the Executive to remove certain people more quickly, Congress deliberately made the

9

central, credible fear standard for avoiding expedited removal "a low screening standard for admission into the usual full asylum process," 142 Cong. Rec. 11,491 (1996) (statement of Sen. Hatch), to avoid the "danger that an alien with a genuine asylum claim w[ould] be returned to persecution," H.R. Rep. No. 104-469, at 158 (1996). *See also Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (Congress's purpose to ensure that "individuals with valid asylum claims are not returned to countries where they could face persecution" is evident in the asylum system's design and legislative history).

In implementing the *non-refoulement* provision from the Convention Against Torture soon thereafter, Congress again recognized the potentially grave consequences of removal, announcing that it would be the policy of the United States "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 1242(a), 112 Stat. 2681, 2681-822. At the direction of Congress, the Department of Justice promulgated regulations making protection mandatory, with no exceptions. *See* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8481 (Feb. 19, 1999). This was in keeping with the aim of the framers of the Convention Against Torture, who desired "to afford the greatest possible protection against torture." *See* ESCOR, Report of the Working

Group on a Draft Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ¶ 44, U.N. Doc. E/CN.4/L.1470 (Mar. 12, 1979), *available at* https://digitallibrary.un.org/record/6761?ln=en.

Given the interests at stake, it was critical to Congress that recognition of humanitarian protection needs not be left to the Executive's discretion.  Before Congress enacted the Refugee Act in 1980, recognition of claims for asylum domestically was discretionary and no specific procedure was required for adjudication of those claims.  *See, e.g.*, 8 C.F.R. § 108.1 (1979).  Congress considered the system to be unfair, inadequate, and too susceptible to the winds of political climate and world events.  *See, e.g.*, H.R. Rep. No. 96-608, at 1, 17-18 (1979) (seeking "to eliminate current discrimination on the basis of outmoded geographical and ideological considerations" and deeming a domestic asylum provision "necessary and desirable" for a "fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law").  Representative Holtzman, a House sponsor of the Refugee Act, explained the problem: "One of the matters that has concerned me greatly about the admission of . . . persons who seek asylum is the fact that there really are no specific procedures that would assure that due process is granted when such persons are questioned in order [to] determine[] whether or not they meet the present statutory standards." *Admission of Refugees into the United*

11

*States, Hearings before the Subcomm. on Immigr., Citizenship, and Int'l Law, H. Comm. on the Judiciary*, 95th Cong. 126 (1977). "[W]hen Congress creates a statutory scheme and does not really specify how that scheme is to be implemented," she continued, "it can be thwarted by the executive branch." *Id.* at 127; *see also id.* (statement of John E. McCarthy, Chairman, Comm. on Migration and Refugee Affs., Am. Council of Voluntary Agencies for Foreign Serv.) ("You're treading on very dangerous ground when you're examining these people because if you're wrong and the person is forced to return you have got a terrible problem. . . . We don't have the standards here which are so necessary."); *id.* (pointing to politicized denials of protection to Chilean refugees).

With the 1980 Refugee Act, which was designed to be comprehensive, Congress sought to remedy the problem. *See, e.g.*, H.R. Rep. No. 96-608, at 1 (1979) ("The purpose of the bill is to establish a coherent and comprehensive U.S. refugee policy. This objective is accomplished by creating a systematic and flexible procedure for the admission and resettlement of refugees."); S. Rep. No. 96-256, at 1 (1979) (proposed bill would "establish[] for the first time a comprehensive United States refugee resettlement and assistance policy"); Refugee Act of 1980, Pub. L. No. 96-212, § 101(b), 94 Stat. 102, 102 (setting out to provide "a permanent and systematic procedure" and "comprehensive and uniform provisions"). It created a new, "specific statutory basis for United States asylum policy," and directed the

Attorney General to establish uniform procedures that would bind the executive branch. H.R. Rep. No. 96-608, at 17-18 (1979); *see also* 126 Cong. Rec. 4507 (1980) (statement of Rep. Holtzman) (the bill "mandates a procedure for the consideration of asylum claims by people who are here on our shores"). And it amended the terms of the then-existing statutory withholding of removal provision to use mandatory language, to avoid any suggestion that whether to grant withholding might be within the Executive's discretion. *See* H.R. Rep. No. 96-608, at 18, 30 (1979).

When Congress created the expedited removal process in 1996, it again set limits on the Executive not only by mandating screenings for humanitarian protection claims but also by, among other things, taking care to specify the training, supervision, and review that immigration officers conducting the screenings would be required to undergo. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III), (b)(1)(E); 8 U.S.C. § 1252(e)(3); *see also* 142 Cong. Rec. 11,491 (1996) (statement of Sen. Hatch) ("I feel very strongly that the appropriate, fully trained asylum officers conduct the screening in the summary exclusion process"). Congress similarly cabined the Executive's discretion in implementing the Convention Against Torture, making clear that its prohibitions applied notwithstanding any other government policy. *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 1242(a), 112 Stat. 2681, 2681-822.

## II.    THE EXECUTIVE MAY NOT BLOCK ACCESS TO THE HUMANITARIAN PROTECTION SYSTEM ON HEALTH-RELATED GROUNDS

Defendants suggest that guarding the public health requires them to deny the rights of asylum seekers.  *See, e.g.*, Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists (Aug. 2, 2021), App. 149-51.  But in several different ways, Congress was clear that potential health concerns are not grounds for preventing asylum seekers from accessing humanitarian protection.

First, Congress drafted the humanitarian protection laws such that a person's health would be irrelevant to whether they could be granted asylum status, withholding of removal, or protection under the Convention Against Torture.  Under the Convention Against Torture, the United States is prohibited without exception from returning a person to their torturers.  *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 1242(a)-(c), 112 Stat. 2681, 2681-822; 8 C.F.R. § 1208.17(a).  With respect to withholding of removal under 8 U.S.C. § 1231(b)(3), a person facing persecution is ineligible for protection only if they have persecuted others; have participated in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing; have committed or been convicted of certain crimes; or pose a serious threat to the security of the United States.  *See* 8 U.S.C. §§ 1231(b)(3)(B), 1227(a)(4)(B).  This is consistent with the

14

goals of the framers of the Refugee Convention and Protocol, from which the withholding provision originated, who rejected the possibility of limiting protection on health-related grounds. *See* Travaux 222, 225, *available at* https://www.unhcr.org/en-us/protection/travaux/4ca34be29/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul.html ("[R]efugees should not be expelled . . . because they had been sick or indigent"; treaty "would not . . . permit the deportation of [refugees] on 'social grounds,' such as . . . illness"); 114 Cong. Rec. 27,758-59 (1968) (statement of Sec. of State Rusk) (Since "refugees by definition are without a homeland, deportation of a refugee is a particularly serious measure, and it would not be humanitarian to deport a refugee for reasons of health . . . ."). A person is barred from asylum only for the narrow set of reasons set out in 8 U.S.C. § 1158(a)(2) and (b)(2), which overlap in part with the exceptions for withholding of removal under 8 U.S.C. § 1231(b)(3), and similarly have nothing to do with health.

Second, even though Congress created a mechanism in the immigration laws for the United States to remove a person from the country on health-related grounds, it specifically declined to make such health-related grounds barriers to applying for and being granted humanitarian protection from removal. Ordinarily, a person who seeks authorization to remain in the United States or to adjust their immigration status must be "admissible"—*i.e.*, they must not fall within any of the grounds of

15

ineligibility specified in 8 U.S.C. § 1182(a), such as lacking valid entry documents, 8 U.S.C. § 1182(a)(7)(A)(i), having crossed the border without inspection, 8 U.S.C. § 1182(a)(6)(A)(i), or having been convicted of certain crimes, 8 U.S.C. § 1182(a)(2)(A), (B). *See also supra* p. 4 and note 1 (citing immigration judge review of alleged grounds of inadmissibility). A person may also be inadmissible on "health-related grounds," including being "determined . . . to have a communicable disease of public health significance," 8 U.S.C. § 1182(a)(1)(A)(i); according to the government, COVID-19 is one such disease.[3]

Yet Congress was clear that a person may apply for and be granted humanitarian relief regardless of whether there might be grounds, including a health-related inadmissibility ground, to remove them: As to asylum, a person may apply for and be granted this relief "irrespective" of whether they are admissible. 8 U.S.C. § 1158(a)(1). As the government itself has acknowledged, an individual seeking asylum is simply "not subject to inadmissibility grounds at the time of [an] asylum grant." USCIS Policy Manual Vol. 7, Part M, Ch. 3 (2021), *available at* https://www.uscis.gov/policy-manual/volume-7-part-m-chapter-3; *see also* USCIS Policy Manual Vol. 8, Part B, Ch. 3 (2021), *available at*

---

[3] U.S. Dep't of Justice, Executive Office for Immigration Review, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak, PM 20-10, at 1 n.1 (Mar. 18, 2020), *available at* https://web.archive.org/web/20200320020033/https://www.justice.gov/eoir/file/1259226/download.

https://www.uscis.gov/policy-manual/volume-8-part-b-chapter-3       (no     specific
medical examination or vaccination required for granting asylum).  Withholding and
deferral of "removal," for their part, by definition are available when a person could
otherwise be removed.

Third, though it rejected the notion that asylum seekers might be barred from
humanitarian protection on health-related grounds, Congress accounted for the
public health by permitting the Executive to screen asylum seekers on arrival.
Asylum seekers, like others being inspected for admission to the United States, may
be screened for inadmissibility grounds, including "communicable disease[s] of
public health significance," according to procedures specified by Congress and the
Department of Health and Human Services.  *See* 8 U.S.C. § 1182(a)(1)(A)(i).  These
procedures permit the government to conduct medical exams and to detain for
medical screening certain individuals arriving at ports of entry or from places "where
any [relevant] diseases are prevalent or epidemic."  *See, e.g.*, 8 U.S.C. § 1222; 42
C.F.R. § 34.3.  And they specify that when a medical examiner cannot make a
diagnosis, the government must postpone the medical examination until a diagnosis
can be made and, in the meantime, refer the noncitizen for any necessary medical
care.  *See* 42 C.F.R. § 34.5.  The medical screening and its result may lead the
government to charge an asylum seeker with a health-related inadmissibility ground
in removal proceedings—but they may be removed only if they are not granted

17

asylum or withholding or deferral of removal upon consideration of a corresponding application for relief from removal.  Whatever the result of the screening, what the government may not do is bypass credible fear interviews or removal proceedings, deprive asylum seekers of the opportunity to apply for humanitarian protection from removal, or prevent asylum seekers from being granted such protection on health grounds.

Through its expulsion policy, the Executive has upended Congress's carefully delineated system for identifying and adjudicating humanitarian protection claims. Congress accounted for the public health and at the same time took care to ensure that health considerations would not prevent a person from applying for or being granted protection.

## CONCLUSION

For all these reasons, IRAP urges the Court to affirm the district court's order.

Dated:  November 19, 2021

New York, N.Y.

Respectfully submitted,


*/s/ Kathryn Austin*
Kathryn Austin
Geroline A. Castillo
Mariko Hirose
Deepa Alagesan
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 4th Floor
New York, N.Y. 10004
Tel: (516) 296-0688
kaustin@refugeerights.org
gcastillo@refugeerights.org
mhirose@refugeerights.org
dalagesan@refugeerights.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. 32(f), it contains 4,123 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font.

Dated:  November 19, 2021

*/s/ Kathryn Austin*

Kathryn Austin
*Counsel for Amicus Curiae*