**No. 21-5200**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated, et al.,

*Plaintiffs-Appellees*

v.

ALEJANDRO MAYORKAS, et al.,

*Defendants-Appellants*

————————

On Appeal from the United States District Court for the District of Columbia
Case No. 1:21-cv-100
Hon. Emmet G. Sullivan

————————

**BRIEF OF AMICI CURIAE HIAS, ASYLUM ACCESS,
THE CATHOLIC LEGAL IMMIGRATION NETWORK, INC.,
THE INSTITUTE FOR WOMEN IN MIGRATION, AND PROJECT
CORAZON – LAWYERS FOR GOOD GOVERNMENT
IN SUPPORT OF PLAINTIFFS-APPELLEES**

————————

Kathleen R. Hartnett
Julie Veroff
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: +1 415 693 2000
khartnett@cooley.com

*Attorneys for Amici Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to District of Columbia Circuit Rule 29(b), undersigned counsel for *amici curiae* represent that counsel for all parties have been sent notice of the filing of this brief and have consented to the filing.[1]

Pursuant to District of Columbia Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that this separate brief is necessary. HIAS is one of two non-governmental organizations that oversaw the main process by which migrants were referred to the Department of Homeland Security for humanitarian exemptions from Title 42, the policy at issue in this appeal. Asylum Access, The Catholic Legal Immigration Network, Inc., The Institute for Women in Migration, A.C., and Project Corazon – Lawyers for Good Government, referred vulnerable asylum seekers for humanitarian exemptions. *Amici* are therefore directly familiar with the process of obtaining an exemption from Title 42 and uniquely positioned to explain to the Court why that process is no longer available and was highly flawed and unsustainable while in operation, and thus does not alleviate Plaintiffs' injuries.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4), *amici curiae* state that no counsel for a party authored this brief in whole or in part, and no person other than *amici curiae* or its counsel made a monetary contribution to its preparation or submission.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and District of Columbia Circuit Rule 26.1, *amici curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I.     PARTIES AND *AMICI*

Except for HIAS, Asylum Access, The Catholic Legal Immigration Network, Inc., The Institute for Women in Migration, A.C., and Project Corazon – Lawyers for Good Government, and any other *amici* who had not yet entered an appearance in this case as of the filing of the Brief for Appellees, all parties, intervenors, and *amici* appearing before the district court and this Court are listed in the Brief for Appellants and Brief for Appellees.

### II.     RULINGS UNDER REVIEW

Reference to the rulings at issue appears in the Brief for Appellants.

### III.     RELATED CASES

Reference to any related cases pending before this Court appears in the Brief for Appellants and Brief for Appellees.

Dated: November 19, 2021                    By: /s/ Kathleen Hartnett
                                                         *Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

GLOSSARY ................................................................................... viii

INTEREST OF AMICI CURIAE ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................... 4

ARGUMENT .................................................................................. 7

I.     THE TITLE 42 EXEMPTION PROCESS NO LONGER
EXISTS. ............................................................................... 7

     A.     The NGO-Led Consortium Protocol Provided a
Temporary Title 42 Exemption Pathway that No Longer
Exists. .................................................................. 8

     B.     The ACLU Exemption Protocol Provided a Temporary
Title 42 Exemption Pathway that No Longer Exists. .............. 10

     C.     There Is No Title 42 Exemption Process to Defeat
Plaintiffs' Showing of Irreparable Injury ................................ 11

II.    THE NGO-FACILITATED EXEMPTION PROCESS WAS
DEEPLY FLAWED AND UNSUSTAINABLE. .............................. 13

     A.     The Exemption Process Created Serious Security
Concerns for Migrants and NGO Staff. .................................. 14

     B.     The Exemption Process Was Abused to Defraud
Vulnerable Migrants. ........................................................... 18

     C.     The Exemption Process Imposed Extraordinary Strain on
NGOs and Their Staff. .......................................................... 18

     D.     DHS Strictly Limited the Size and Scope of the
Exemption Process, Leaving Many Vulnerable Migrants
Without Access to Protection ................................................. 20

CONCLUSION ............................................................................. 22

CERTIFICATE OF COMPLIANCE .............................................. 23

CERTIFICATE OF SERVICE ....................................................... 23

## TABLE OF AUTHORITIES

**Page**

**Statutes**

8 U.S.C. § 212(d)(5)..................................................................12

42 U.S.C. § 265 ........................................................................4

**Other Authorities**

Adolfo Flores, *Biden's Border Policy Is Trapping LGBTQ Asylum-Seekers in Dangerous Conditions in Mexico*, Buzzfeed News, Sept. 16, 2021, 7:49 PM ET, https://tinyurl.com/a9vnvw46 ........................11

Camilo Montoya-Galvez, *Top CDC Official Told Congress Migrant Expulsion Policy Was Not Needed to Contain COVID*, CBS News, Nov. 12, 2021, 5:31 PM, https://tinyurl.com/c5pjyp5n.......................4

Dan Friedman, *Title 42: Over a Million Expulsions and No End in Sight*, HIAS Blog, Sept. 23, 2021, https://tinyurl.com/3rx2sxns ..................8, 10

Elliot Spagat & Julie Watson, *Advocates End Work with US to Pick Asylum-Seekers in Mexico*, AP News, July 30, 2021, https://tinyurl.com/398pnmes ................................................8

Hamed Aleaziz, *Biden Officials Are Considering a Process to Allow Some "Vulnerable" Immigrants to Avoid Trump-Era Border Restrictions*, BuzzFeed News, Apr. 29, 2021, 5:56 PM ET, https://tinyurl.com/rym8xzd7 ................................................9

Human Rights First, *Human Rights Travesty: Biden Administration Embrace of Trump Asylum Expulsion Policy Endangers Lives, Wreaks Havoc*, Aug. 2021, https://tinyurl.com/3mw4frfx .......................*passim*

Human Rights First, *"Illegal and Inhumane": Biden Administration Continues Embrace of Trump Title 42 Policy as Attacks on People Seeking Refuge Mount* 17, Oct. 2021, https://tinyurl.com/ae3kkybz ..........13, 21

Int'l Rescue Committee, *The IRC Completes Participation in DHS' Exceptions Process; Renews Call to End Use of Title 42 to Expel Vulnerable People*, July 30, 2021, https://tinyurl.com/5xnh6t6n......................20

# TABLE OF AUTHORITIES
(continued)

**Page**

James Bandler et al., *Inside the Fall of the CDC*, ProPublica, Oct. 15, 2020, 1:12 PM EDT, https://tinyurl.com/5vafu2s9 ...............................................5

Jason Dearen & Garance Burke, *Pence Ordered Borders Closed After CDC Experts Refused*, Associated Press, Oct. 3, 2020, https://tinyurl.com/rawpkejw...................................................................5

Jihan Abdalla, *Rights Groups Decry 'Flawed' US Asylum Exemptions Process*, Aljazeera, June 17, 2021, https://tinyurl.com/cfrdarwb..................9, 10

Joel Rose & Scott Neuman, *The Biden Administration Is Fighting in Court to Keep a Trump-Era Immigration Policy*, NPR, Sept. 20, 2021, 3:31 PM ET, https://tinyurl.com/ns938aew...............................12

Kate Morrissey, *Attorney Groups Call for Investigation into Delays Processing Humanitarian Requests to Enter U.S.*, San Diego Union-Tribune, Nov. 10, 2021, 5:07 PM PT, https://tinyurl.com/ysrjw3nt.................................................................13

Kate Morrissey, *Border Officials Cancel Entry Appointments for Vulnerable Asylum Seekers in Tijuana*, L.A. Times, July 24, 2021, 2:36 PM PT, https://tinyurl.com/wenkrvtn.........................................17

Letter to Joseph V. Cuffari Re: U.S. Customs and Border Protection's Failure to Adjudicate Urgent Humanitarian Parole Applications, Nov. 10, 2021, https://tinyurl.com/5s4yz272 ....................................13

René Kladzyk, *Vulnerable Migrants Will No Longer Be Exempt from Rapid Expulsion at the Border*, El Paso Matters, Sept. 7, 2021, https://tinyurl.com/frt2chyu ..................................................................15

Stef W. Kight, *ACLU to Ask Court to End Biden Administration's Use of Title 42*, Axios, Aug. 2, 2021, https://tinyurl.com/e5n79rrb ........................11

U.S. Customs and Border Protection, *Southwest Land Border Encounters*, https://tinyurl.com/nsfff9cm.......................................5, 20

U.S. Dep't of Homeland Sec., *DHS Improves Process for Humanitarian Exceptions to Title 42*, May 12, 2021, https://tinyurl.com/7ubp85yy..................................................................8

**TABLE OF AUTHORITIES**
(continued)

**Page**

UNHCR, *Statement Attributable to UN High Commissioner for Refugees Filippo Grandi on the Need to End US COVID-19 Asylum Restrictions*, May 20, 2021, https://tinyurl.com/dn9k4mr2...................14

Women's Refugee Commission, *Doubling Down on Deterrence: Access to Asylum Under Biden*, Sept. 2021, https://tinyurl.com/kberejwm.......................................................................11, 14

# GLOSSARY

| | |
|---|---|
| ACLU | American Civil Liberties Union |
| CBP | United States Customs and Border Protection |
| CDC | Centers for Disease Control and Prevention |
| CLINIC | The Catholic Legal Immigration Network, Inc. |
| DHS | United States Department of Homeland Security |
| IMUMI | The Institute for Women in Migration, A.C. |
| IRC | International Rescue Committee |
| JA | Joint Appendix |
| NGO | Non-Governmental Organization |
| OB | Opening Brief for Defendants-Appellants |

## INTEREST OF AMICI CURIAE

*Amici* are non-governmental organizations that aided migrants and asylum seekers for several months in 2021 in obtaining humanitarian exemptions to the federal government's summary expulsion policy at the southern border, otherwise known as Title 42. *Amici*—along with all other organizations involved—ended their participation in the Title 42 exemption process by August 2021. *Amici* submit this brief to help the Court understand that the exemption process is now, and for several months has been, defunct, and that it was deeply flawed even when it was operational. That process therefore did not and does not provide migrants and asylum seekers a meaningful avenue of relief from the Title 42 policy or prevent their irreparable harm, much less provide a legally proper substitute for a government-operated asylum process available to all who are fleeing danger.

**HIAS** is a non-profit organization that provides a variety of services to refugees and other foreign nationals seeking to resettle in the United States. Founded as the Hebrew Immigrant Aid Society, HIAS exists to rescue people whose lives are in danger and help them resettle in the United States. HIAS is the global refugee organization of the American Jewish community. Its clients include refugees and their families, both in the United States and abroad. For several months in 2021, HIAS worked with the Department of Homeland Security ("DHS") to implement a process by which migrants could obtain humanitarian exemptions to Title 42.

1

**Asylum Access** is a family of non-profit organizations, headquartered in Oakland, California, with national offices in Mexico, Thailand, and Malaysia. Asylum Access' mission is to make human rights a reality for refugees, by supporting forcibly displaced individuals and communities as they reclaim their rights, agency, and power. Asylum Access Mexico participated in the Title 42 exemption process before withdrawing in June 2021 due to the issues detailed herein.

**The Catholic Legal Immigration Network, Inc. ("CLINIC")** is the nation's largest network of non-profit immigration legal services providers, with over 400 affiliates in 49 states. CLINIC's mission, which derives from its broader purpose of embracing the Gospel value of welcoming the stranger, is to promote the dignity and protect the rights of immigrants in partnership with its network of affiliates. Since 2019, CLINIC has operated the *Estamos Unidos* project in Ciudad Juarez, Mexico, providing information and assistance to U.S. asylum seekers in Mexico. For several months in 2021, CLINIC referred vulnerable asylum seekers to a process administered by Plaintiffs' counsel for humanitarian exemptions to Title 42.

**The Institute for Women in Migration, A.C. ("IMUMI")** is a civil society organization based in Mexico City that promotes the rights of women and their families in migration. In addition to providing legal support for migrants, IMUMI collaborates with civil society organizations, academic institutions, and government

bodies to ensure issues relevant to women are included in government initiatives focusing on migration policy. Through its legal and policy work, IMUMI highlights the increasing participation of women in migration to foster better governmental responses to their particular needs. IMUMI seeks to encourage the creation of policies and programs that take into account the situation of migrant women in a broad sense, focusing on three major areas: the right to be free from violence, the right to an identity, and the right to family unity. For several months in 2021, IMUMI participated in the Title 42 exemption process.

**Project Corazon – Lawyers for Good Government** was created to defend the rights of migrants in the face of inhumane immigration policies. Project Corazon is run by Lawyers for Good Government, a community of over 125,000 lawyers, law students, and activists, and centers on providing legal assistance to vulnerable asylum seekers at the Brownsville/Matamoros border crossing. In 2021, Project Corazon – Lawyers for Good Government referred vulnerable asylum seekers to a process administered by Plaintiffs' counsel for humanitarian exemptions under Title 42.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For close to two years, the federal government has been summarily expelling arriving migrants without any meaningful legal process, even if they are fleeing danger and seeking asylum in the United States.  As claimed authority for this summary expulsion policy, referred to here as "Title 42," the Centers for Disease Control and Prevention ("CDC") has relied on an old and rarely used public health provision, 42 U.S.C. § 265, to issue several orders establishing the policy.  *See* 1 JA 74-81, 129-52.

The government claims that Title 42 is necessary to combat the COVID-19 pandemic, but that public health rationale has been roundly criticized by scientists, who note that even before the widespread availability of testing and vaccines there was no medical justification for the policy.  The second-highest ranking CDC official at the time the policy was issued recently testified to Congress that "the bulk of the evidence at that time did not support this policy proposal," and that the director of the CDC's office overseeing border-related public health measures did not support Title 42 because he thought that "the facts on the ground didn't call for this from a public health reason, and that the decision wasn't being made based on criteria for quarantine" but "for other purposes."  Camilo Montoya-Galvez, *Top CDC Official Told Congress Migrant Expulsion Policy Was Not Needed to Contain COVID*, CBS News, Nov. 12, 2021, 5:31 PM, https://tinyurl.com/c5pjyp5n ("Top

CDC Official").  That testimony corroborates earlier reporting that high-level CDC scientists objected to Title 42, which was pushed by White House officials focused on barring migration.  *See, e.g.*, James Bandler et al., *Inside the Fall of the CDC*, ProPublica, Oct. 15, 2020, 1:12 PM EDT, https://tinyurl.com/5vafu2s9; Jason Dearen & Garance Burke, *Pence Ordered Borders Closed After CDC Experts Refused*, Associated Press, Oct. 3, 2020, https://tinyurl.com/rawpkejw.

*Amici* strongly agree with Plaintiffs and the District Court that Title 42 is unlawful.  *See* 1 JA 101.  This brief, however, focuses not on the merits of Plaintiffs' legal claim but rather on why the Court should not credit the government's argument that Plaintiffs cannot show irreparable injury.

The government offers only one reason why Plaintiffs allegedly will not suffer irreparable injury absent a preliminary injunction: that "their claimed harm is that they wish to apply for humanitarian relief (such as asylum)" and the operative CDC Order governing Title 42 "provides for case-by-case exceptions for humanitarian needs." OB-54 (citing 1 JA 151); *see also* OB-49 n.10.  As support for this assertion, the government notes that over 16,000 individuals (compared to more than 1.3 million expelled) have been processed into the United States pursuant to that exception authority as of early August 2021.  OB-49 n.10 (citing 1 JA 172 (Decl. of David Shahoulian) ¶ 11); *see* U.S. Customs and Border Protection, *Southwest Land Border Encounters*, https://tinyurl.com/nsfff9cm (last accessed Nov. 18, 2021)

("Southwest Land Border Encounters"). But the government fails to acknowledge a critical fact: that the processes that allowed the exception authority to function ceased in practice at the end of August 2021 and there is no prospect of their restarting. The primary exemption process, launched by the government in spring 2021, depended on non-governmental organizations ("NGOs") like HIAS to help identify migrants for exemptions. That process has been defunct since the end of August 2021 when the government refused to end Title 42 and reinstate a legal asylum process. At that point, HIAS and the other NGOs who had been participating in the exemption process were unable to continue doing so, given the ongoing unlawful use of Title 42 and the security risks and strains on their staff created by the policy. The government has not announced any plans for restarting the exemption process or creating an alternative process. Nor is the discrete and limited exemption process facilitated by an agreement between Plaintiffs' counsel and the government any longer in operation.

Moreover, even when the exemption processes were operational, they were deeply flawed and unsustainable. The process generated serious safety risks for NGOs and migrants, subjected asylum seekers to fraud by criminal actors pretending to offer access to exemptions, and strained already overextended NGOs. And because of the government's strict numerical and geographic limits on exemptions, only a small subset of migrants in need of protection received it. Thus, the

6

government's flawed Title 42 exemption system was (and is) no substitute for the asylum processing required by law that Plaintiffs wish to access.

In short, no Title 42 exemption process exists to alleviate Plaintiffs' injuries and provide them a path to humanitarian relief in the United States. As a result, individuals who should qualify even under the most restrictive possible definition of humanitarian need are expelled. The District Court thus properly concluded that Plaintiffs would suffer irreparable harm absent an injunction, and its decision granting Plaintiffs' motion for preliminary injunction should be affirmed.

## ARGUMENT

## I.     THE TITLE 42 EXEMPTION PROCESS NO LONGER EXISTS.

Prior to August 2021, two pathways to obtaining a humanitarian exemption from expulsion under Title 42 were temporarily available to particularly vulnerable individuals. The first was a protocol run by a consortium of NGOs, including HIAS, that worked with DHS to identify migrants suitable for an exemption. The second was a protocol run by Plaintiffs' counsel in this case, the American Civil Liberties Union ("ACLU"), while the instant litigation was stayed as the parties explored avenues for resolution. These pathways no longer exist. There is thus no present or prospective exemption process.

A.     **The NGO-Led Consortium Protocol Provided a Temporary Title 42 Exemption Pathway that No Longer Exists.**

In spring 2021, the government began working with a consortium of six NGOs, led by HIAS and the International Rescue Committee ("IRC"), to oversee an exemption protocol through which the NGOs would identify and refer particularly vulnerable individuals to DHS for consideration for humanitarian exemptions to Title 42 and admission to the United States.  *See* Dan Friedman, *Title 42: Over a Million Expulsions and No End in Sight*, HIAS Blog, Sept. 23, 2021, https://tinyurl.com/3rx2sxns ("No End in Sight").[2]  From the outset, the expectation was that the consortium protocol would be in place only for a temporary, three-month period lasting until July 31, 2021, when it was widely understood and expected that the Biden Administration would rescind Title 42.  *See* Elliot Spagat & Julie Watson, *Advocates End Work with US to Pick Asylum-Seekers in Mexico*, AP News, July 30, 2021, https://tinyurl.com/398pnmes.

The consortium protocol operated at six ports of entry along the U.S.-Mexico border: San Ysidro in California, Nogales in Arizona, and El Paso, Laredo, Hidalgo, and Brownsville in Texas.  IRC led the referral process at Nogales, and HIAS led

---

[2] As DHS explained in a contemporaneous press release, the humanitarian exemption process entailed "close coordination with international and non-governmental organizations in Mexico and COVID-19 testing before those identified through this process are allowed to enter the country."  U.S. Dep't of Homeland Sec., *DHS Improves Process for Humanitarian Exceptions to Title 42*, May 12, 2021, https://tinyurl.com/7ubp85yy.

the referral process at the other five ports.  The other organizations in the consortium referred migrants to HIAS and IRC.  *Id.*  The government allowed up to 250 migrants per day to enter the United States through the consortium protocol.  *See* Jihan Abdalla, *Rights Groups Decry 'Flawed' US Asylum Exemptions Process*, Aljazeera, June 17, 2021, https://tinyurl.com/cfrdarwb ("Rights Groups").  Each port of entry had different daily caps.

Operation of the consortium protocol required coordination across various organizations, government agencies, and borders. To begin, staff at HIAS's offices in Mexico identified individuals potentially suitable for a humanitarian exemption from Title 42 due to their vulnerability, either directly or via referrals from the other consortium and non-consortium organizations operating on the ground in Mexico. HIAS then assessed vulnerability and decided which migrants to propose to U.S. Customs and Border Protection ("CBP") as suitable for exemption. HIAS submitted the biographical and biometric data of the individuals it recommended to CBP and scheduled them for an appointment to present at a designated port of entry.  *See* Hamed Aleaziz, *Biden Officials Are Considering a Process to Allow Some "Vulnerable" Immigrants to Avoid Trump-Era Border Restrictions*, BuzzFeed News, Apr. 29, 2021, 5:56 PM ET, https://tinyurl.com/rym8xzd7.  In addition, because the government required all noncitizens seeking exemptions to obtain a

negative COVID-19 test before presenting at a port of entry, HIAS arranged for exemption-seekers to get COVID tested.  *Id.*

When the Biden Administration did not end Title 42 at the end of July 2021, HIAS and IRC announced that they could no longer be part of implementing the consortium protocol.  HIAS formally withdrew from its agreement with the government at the end of August, having used the remaining weeks to clear the backlog of applicants it had already accepted.  *See No End in Sight*.  HIAS and the consortium organizations were compelled to end their involvement in the exemption process because they could not indefinitely participate in enabling Title 42, a fundamentally illegal policy, and could not continue to subject their staff to the security risks and strain detailed in Part II, *infra*.

**B.    The ACLU Exemption Protocol Provided a Temporary Title 42 Exemption Pathway that No Longer Exists.**

In early 2021, Plaintiffs, represented by the ACLU and others, filed this litigation to challenge the continued use of Title 42 against families with at least one minor child.  *See* 1 JA 43-66.  From late February through August 2021, the case was held in abeyance while the parties engaged in settlement discussions.  *See* 1 JA 85; *No End in Sight*.  As part of those negotiations, the government agreed to permit the ACLU to oversee a protocol whereby up to 35 families per day could be admitted to the United States under exemptions from Title 42.  *See Rights Groups*.

Under this exemption protocol, Plaintiffs' counsel collected applications from various non-profits that worked directly with asylum seekers before submitting them to CBP for consideration. While this exemption process occurred, Plaintiffs made clear to the government that it was not an adequate substitute for a legal asylum process and that the goal of this litigation was to end the policy altogether. *See* Stef W. Kight, *ACLU to Ask Court to End Biden Administration's Use of Title 42*, Axios, Aug. 2, 2021, https://tinyurl.com/e5n79rrb.

The agreement between Plaintiffs and the government lasted until early August. At that time, the government halted this exemption protocol after settlement discussions ended. *See* Adolfo Flores, *Biden's Border Policy Is Trapping LGBTQ Asylum-Seekers in Dangerous Conditions in Mexico*, Buzzfeed News, Sept. 16, 2021, 7:49 PM ET, https://tinyurl.com/a9vnvw46.

## C. There Is No Title 42 Exemption Process to Defeat Plaintiffs' Showing of Irreparable Injury.

Both the consortium and Plaintiffs' exemption protocols were intended as temporary exemption processes under Title 42 and were not intended as permanent replacements to a legal asylum system. In light of the government's refusal to abandon Title 42, no Title 42 humanitarian exemption process is now available for people summarily expelled under that authority. *See, e.g.*, *id.*; Women's Refugee Commission, *Doubling Down on Deterrence: Access to Asylum Under Biden* 5,

Sept. 2021, https://tinyurl.com/kberejwm ("Doubling Down") ("There is currently no exemption process available for people impacted by Title 42.").

Because there is no longer an NGO-based exemption process (or one facilitated by Plaintiffs' counsel), any Title 42 exemption process must be implemented solely by the government.  The government, however, has failed to do so.  *See* Joel Rose & Scott Neuman, *The Biden Administration Is Fighting in Court to Keep a Trump-Era Immigration Policy*, NPR, Sept. 20, 2021, 3:31 PM ET, https://tinyurl.com/ns938aew.  As a result of the government's decision not to implement and oversee an exemption process itself in the over two months since the other exemption processes terminated, migrants currently have neither a meaningful pathway to exemption under Title 42 nor access to a legal asylum process.

Accordingly, the government is wrong that a Title 42 exemption process undermines Plaintiffs' showing of irreparable injury absent a preliminary injunction. There is currently no existing or planned Title 42 exemption process.  Rather, in reality, Title 42 prevents Plaintiffs from reliably accessing any humanitarian relief. To the extent that the government claims there is still case-by-case relief available to individuals seeking humanitarian parole at ports of entry, that process provides no meaningful relief.[3]

---

[3] Although DHS has statutory authority to consider requests for humanitarian parole, *see* 8 U.S.C. § 212(d)(5), the parole process (the existence of which pre-dates Title 42) is extremely limited and highly dysfunctional, and is no substitute for a

## II.   THE NGO-FACILITATED EXEMPTION PROCESS WAS DEEPLY FLAWED AND UNSUSTAINABLE.

Even when the Title 42 exemption protocols were operational, they were deeply problematic because of the limitations and parameters the government placed on them.  The NGO-facilitated process created security risks for NGOs and migrants, exposed migrants to fraud by criminal actors pretending to offer access to exemptions, placed an extraordinary burden on NGO staff, and failed to offer sufficient protection to highly vulnerable migrants because of government-imposed

---

functioning asylum system.  In particular, since August 2021, when the NGO exemption process ended, parole requests "have been ignored or denied in the vast majority of cases without explanation."  Human Rights First, *"Illegal and Inhumane": Biden Administration Continues Embrace of Trump Title 42 Policy as Attacks on People Seeking Refuge Mount* 17, Oct. 2021, https://tinyurl.com/ae3kkybz ("Illegal and Inhumane"). For example, CBP denied parole requests submitted on behalf of "a Honduran woman who was raped by Mexican police, sex trafficked, and forced to work in a massage parlor," *id.*, and a 21-year old woman who fled persecution in her home country and was then kidnapped, held hostage at gunpoint for five days, starved, and sexually assaulted by traffickers in Mexico, and escaped only by throwing herself out a window, *see* Kate Morrissey, *Attorney Groups Call for Investigation into Delays Processing Humanitarian Requests to Enter U.S.*, San Diego Union-Tribune, Nov. 10, 2021, 5:07 PM PT, https://tinyurl.com/ysrjw3nt.  Parole applications on behalf of young children with epilepsy and other urgent medical needs have been left pending for months. *Id.*  The parole process is so flawed that five experienced legal services organizations recently submitted an administrative complaint to the DHS Office of Inspector General regarding CBP's systematic "failure to adjudicate applications for humanitarian parole," calling the parole process "nebulous," "increasingly opaque," and "unduly arduous to navigate."  Letter to Joseph V. Cuffari Re: U.S. Customs and Border Protection's Failure to Adjudicate Urgent Humanitarian Parole Applications, Nov. 10, 2021, https://tinyurl.com/5s4yz272.

numerical caps and processing delays.  *See, e.g.*, *Doubling Down* at 5 (noting that the exemption process was "inaccessible to the vast majority of individuals seeking protection, and endangered both asylum seekers and the legal and humanitarian groups assisting them").  As the United Nations High Commissioner for Refugees observed in appealing to the U.S. government to end Title 42, a limited exemption process run by NGOs simply is not an adequate substitute for the longstanding system of asylum processing at the border.  *See* UNHCR, *Statement Attributable to UN High Commissioner for Refugees Filippo Grandi on the Need to End US COVID-19 Asylum Restrictions*, May 20, 2021, https://tinyurl.com/dn9k4mr2 ("A system which allows a small number of asylum seekers to be admitted daily, however, carries with it a number of risks, and is not an adequate response.").

### A.     The Exemption Process Created Serious Security Concerns for Migrants and NGO Staff.

By its very structure, the exemption process in multiple ways "created serious security issues for asylum seekers as well as the [NGOs]" involved.  Human Rights First, *Human Rights Travesty: Biden Administration Embrace of Trump Asylum Expulsion Policy Endangers Lives, Wreaks Havoc* 25, Aug. 2021, https://tinyurl.com/3mw4frfx ("Human Rights Travesty").

To start, because the exemption process represented a limited opportunity to enter the United States when the border was otherwise closed, migrants and NGO staff became easy targets for criminal organizations and human traffickers.  For

example, criminal organizations cloned attorneys' telephone numbers or otherwise falsely claimed to be involved in the exemption process to kidnap and ransom asylum seekers. *Id.* (recounting examples of asylum seekers kidnapped by people pretending to be affiliated with an NGO helping with the exemption process). NGO staff, in turn, were harassed, surrounded by crowds at their offices, followed home, and approached by members of criminal organizations. To keep its staff safe, HIAS had to adopt a number of security risk mitigation measures, including refusing to discuss publicly its participation in the exemption process while it was happening. As explained by an attorney at Las Americas, an NGO that referred vulnerable migrants to HIAS, the exemption process "put[] nonprofits in danger" because they "became seen as a ticket into the United States." René Kladzyk, *Vulnerable Migrants Will No Longer Be Exempt from Rapid Expulsion at the Border*, El Paso Matters, Sept. 7, 2021, https://tinyurl.com/frt2chyu.

Further, the government only processed humanitarian exemptions at six ports of entry along the southern border, which are located "in dangerous border cities[.]" *Human Rights Travesty* at 25. Migrants "desperate to seek protection in the United States" thus had no choice but to stay in areas where they "were vulnerable to kidnapping, exploitation—including by some shelter operators—extortion, and violent attacks as they attempted to request exemptions and while waiting for appointments at U.S. ports of entry." *Id.* Because the government also required all

15

migrants seeking exemptions to show a negative COVID-19 test within 72 hours before presenting at a port of entry, migrants then had "to travel through dangerous areas" to obtain a COVID-19 test, "placing them at additional risk of kidnapping or other harm." *Id.*

The exemption process was also plagued by long wait times between when an NGO referred a migrant's case to CBP for consideration and when the migrant was finally processed for an exemption. *Id.*; *see also* 2 JA 351 (Supp. Decl. of Taylor Levy) ¶ 64 (legal services attorney describing "waiting list of hundreds of families who were waiting for a humanitarian exemption"). These delays exacerbated the risks migrants faced by having to stay in dangerous areas in Mexico. *Human Rights Travesty* at 26. For instance, "a 49-year-old Mexican asylum seeker fleeing persecution in Mexico . . . died of a heart attack while waiting for an exemption appointment" at the San Ysidro port of entry. *Id.* He had been "experiencing unrelenting terror because persecutors from Michoacán had tracked him, his wife and child to a house where they were hiding" pending the appointment. *Id.* Another asylum seeker, a 29-year-old from Haiti, "died of respiratory failure after he was unable to access adequate medical care for his condition in Tijuana while waiting to request an exemption to Title 42." *Id.* And "a 49-year-old Mexican asylum seeker with high blood pressure died while waiting for her scheduled appointment to

approach" the San Ysidro port for an exemption, leaving behind a six-year-old son.
*Id.*

In addition, multiple asylum seekers were deported by Mexican immigration officials to their home countries, where they face persecution, while they were waiting to present at a port of entry after having been referred by an NGO for an exemption. *See Human Rights Travesty* at 22-23.  As just one example, a Honduran man and his family had been referred for an exemption after having been kidnapped, assaulted, and robbed in Mexico, but the man was detained by Mexican authorities while en route to meet his family for their exemption appointment at the port of entry and then deported. *Id.* at 23.

Towards the end of the exemption process, CBP further amplified the danger and instability that migrants faced by cancelling their appointments at the San Ysidro port of entry at the last minute. *Id.* at 25.  These abrupt cancellations left migrants who had given up their housing and jobs in Mexico in anticipation of presenting at the port homeless, without means of support, and vulnerable to kidnapping and other violence.  *See* Kate Morrissey, *Border Officials Cancel Entry Appointments for Vulnerable Asylum Seekers in Tijuana*, L.A. Times, July 24, 2021, 2:36 PM PT, https://tinyurl.com/wenkrvtn.  For example, the same night a Haitian man was turned back from the port of entry because of CBP's cancellations, a large group with guns and machetes broke down his door, forced him to leave, and stole all his possessions,

leaving him with just $20 and his passport.  *Id.*  CBP gave him a new appointment that was not until a full month after his original one, leaving him with nowhere to stay in the interim.  *Id.*

**B.    The Exemption Process Was Abused to Defraud Vulnerable Migrants.**

Criminal groups and human traffickers further abused the exemption process by fraudulently manipulating vulnerable migrants seeking refuge in the United States into believing that they had to pay for the ability to seek an exemption.  For instance, some unscrupulous shelter operators falsely told asylum seekers they had to pay for the opportunity to speak with NGOs facilitating the exemption process. *Human Rights Travesty* at 25.  One such shelter operator in Tijuana charged a family $8,000 after claiming that was the fee charged by a legal services organization.  *Id.* Migrants also were defrauded by individuals falsely claiming to be NGO staff and advising that they could pay a fee to have their exemption requests expedited.  *Id.* Other migrants were scammed out of $1,000 after being told that money was required for transportation to an NGO's office and the ability to seek an exemption. *Id.*

**C.    The Exemption Process Imposed Extraordinary Strain on NGOs and Their Staff.**

The exemption process was extremely resource intensive for participating NGOs.  Identifying, screening, and referring migrants to CBP for consideration for

an exemption involved interviewing tens of thousands of individuals about their vulnerability; collecting and processing highly sensitive biographical and biometric details; arranging for COVID-19 tests at the right time (within 72 hours of presenting at a port of entry); matching recommended individuals with dates and times to present at specific ports of entry; coordinating with those individuals to ensure they had all the relevant information and actually got to the port; and sometimes actually accompanying them to present at the port, a process that could include interfacing with armed Mexican soldiers hostile to asylum seekers.

Further, asking NGOs to decide who was worthy of the government's consideration for an exemption—while knowing full well that all the asylum seekers not referred for consideration would suffer in Mexico or their home countries—put them in an unsustainable position. *Amici* and other organizations were not simply determining whether someone met a vulnerability threshold. Rather, because of the strict limits on the number of people CBP would process for an exemption, NGOs were making a comparative assessment—among many vulnerable people, who was the *most* vulnerable and so in greatest need of an exemption to Title 42, and thus the opportunity to seek asylum in the United States. Being asked by the government to exercise that moral authority was incredibly stressful for *amici*'s staff and resulted in significant mental health strain and burnout. *See Human Rights Travesty* at 24 ("In effect, DHS forced already overstretched[] attorneys and organizations to

19

gatekeep these limited exemptions while the Biden administration violated its legal obligation to provide people fleeing persecution and torture access to the U.S. asylum system.").  Moreover, beyond the stress and danger to staff, asking NGOs to identify which of their clients should be permitted to exercise their lawful right to seek asylum created untenable ethical dilemmas.  It cannot be the role of human rights organizations to weigh the vulnerabilities of one client versus another and then judge which applications are more worthy of submission to the government.

### D.    DHS Strictly Limited the Size and Scope of the Exemption Process, Leaving Many Vulnerable Migrants Without Access to Protection.

As noted in Part I *supra*, DHS allowed only limited numbers of migrants to be processed for humanitarian exemptions each day—far fewer than the total number of vulnerable migrants and asylum seekers.  *See, e.g.*, Int'l Rescue Committee, *The IRC Completes Participation in DHS' Exceptions Process; Renews Call to End Use of Title 42 to Expel Vulnerable People*, July 30, 2021, https://tinyurl.com/5xnh6t6n; 2 JA 382 (Decl. of Savitri Arvey) ¶ 20 ("[D]ue to the very limited number of exemptions granted each day, the majority of asylum seekers will not be able to obtain an exemption from Title 42, no matter how vulnerable they are.").  In total, over 1.3 million people have been expelled under Title 42 since the policy first began, and just 16,000 were granted humanitarian exemptions.  *See Southwest Land Border Encounters*; 1 JA 172 (Decl. of David Shahoulian) ¶ 11. The many vulnerable people unable to access protection via an exemption or the

asylum system were left in extremely dangerous conditions in Mexico. Human Rights First has tracked 7,647 kidnappings, rapes, armed assaults, and other violent attacks against people subjected to Title 42 between January and October 2021. *See Illegal and Inhumane* at 11.

The government also limited the exemption process to only six ports of entry along the southern border, meaning that migrants could only receive a humanitarian intervention if they presented at one of those designated ports. That geographic limitation made it very difficult for migrants in more remote areas to access an exemption, forcing them to either forego the opportunity to seek an exemption or travel through extremely dangerous areas of Mexico to reach a designated port. An attorney at a legal services provider in Arizona, for example, explained that legal and humanitarian service providers repeatedly asked DHS to permit asylum seekers to present for exemptions at other ports of entry in Arizona besides Nogales, as hundreds of their clients were displaced in more remote areas of the border. 2 JA 442 (Declaration of Chelsea Sachau) ¶ 15. The government refused to do so, effectively forcing those asylum seekers to travel "directly in the path of the cartel fighting." *Id.* ¶ 16.

Finally, by conditioning access to the exemption process on the ability to get connected with the right NGO, the government effectively shut out the many migrants who were unable to do so. *See* 2 JA 382 (Decl. of Savitri Arvey) ¶ 20

21

(noting that "[m]any asylum seekers do not have access to NGOs"); *Human Rights Travesty* at 24 ("Only those families and individuals in contact with attorneys and organizations involved in the exemptions were able to request exemptions.").

## CONCLUSION

The Court should reject the government's effort to downplay the devastating, ongoing harms caused by Title 42 through its invocation of a highly flawed—and now defunct—exemption process. No meaningful humanitarian exemption process under Title 42 currently exists and the government does not identify any concrete plans to implement such a process. In any event, the exemption process was highly flawed and unsustainable, and cannot be considered an adequate substitute for the asylum process that Title 42 circumvents. The Court should affirm the District Court's decision granting a preliminary injunction.

Dated: November 19, 2021                    Respectfully submitted,

                                            */s/ Kathleen Hartnett*
                                            Kathleen R. Hartnett (483250)
                                            Julie Veroff
                                            Zoë Helstrom
                                            COOLEY LLP
                                            3 Embarcadero Center, 20th Floor
                                            San Francisco, CA 94111-4004
                                            Telephone:  +1 415 693 2000
                                            khartnett@cooley.com

                                            *Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 5,080 words, excluding the parts of the brief exempted by Federal Rules of Appellate Procedure 32(f) and Circuit Rule 32(e)(1). This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Professional Plus 2019 in 14-point Times New Roman font.

*/s/ Kathleen Hartnett*
Kathleen Hartnett

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2021, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. A true and correct copy of the foregoing has been served via the Court's CM/ECF system on all counsel of record.

*/s/ Kathleen Hartnett*
Kathleen Hartnett