ORAL ARGUMENT SCHEDULED: JANUARY 19, 2022, 9:30 A.M.

## No. 21-5200

————————

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

*Nancy Gimena Huisha-Huisha, and her minor child, et al.*

Plaintiffs-Appellees,

*v.*

*Alejandro N. Mayorkas, Secretary of Homeland Security, in his official capacity, et al.*,

Defendants-Appellants.

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
THE HONORABLE EMMET G. SULLIVAN, JUDGE
CASE NO. 21-cv-00100-EGS

————————

**BRIEF OF *AMICI CURIAE* 14 LEGAL SERVICE AND ADVOCACY
ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLEES**

————————

DANIEL J. TULLY
JUSTICE ACTION CENTER
P.O. BOX 27280
TELEPHONE: 323.450.7275

DIMITRI D. PORTNOI
O'MELVENY & MYERS LLP
400 SOUTH HOPE STREET, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90071
TELEPHONE:    213.430.6000
FACSIMILE:  213.430.6407

Counsel for *Amici Curiae*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), counsel certifies the following:

**(A) Parties and *Amici*:** Except for *amici* joining this brief, all parties, intervenors, and *amici* appearing before the District Court and in this Court are listed in the Brief of Defendants-Appellants and Brief of Plaintiffs-Appellees.

**(B) Rulings Under Review:** References to the ruling under review appears in the Brief of Defendants-Appellants.

**(C) Related Cases:** References to the related cases appear in the Brief of Plaintiffs-Appellees.

Dated:  November 19, 2021

> DIMITRI D. PORTNOI
> O'MELVENY & MYERS LLP
>
>
> By:     /s/ Dimitri D. Portnoi
>                    Dimitri D. Portnoi
>
> Counsel for *Amici Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* are non-profit corporations. *Amici* have no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public. Pursuant to D.C. Circuit Rule 26.1(b), *amici* state that they are non-profit legal service and advocacy organizations who serve immigrant communities throughout the country. *Amici* share a common mission of advancing and protecting the constitutional and statutory rights of individuals seeking asylum and legal status in the United States.

Dated: November 19, 2021

DIMITRI D. PORTNOI
O'MELVENY & MYERS LLP

By:  /s/ Dimitri D. Portnoi
          Dimitri D. Portnoi

Counsel for *Amici Curiae*

## <u>CIRCUIT RULE 29(D) STATEMENT</u>

Pursuant to D.C. Circuit Rule 29(d), counsel certifies that it is necessary to separately file the following Brief of *Amici Curiae* 14 Legal Service and Advocacy Organizations in Support of Plaintiffs-Appellees.  *Amici* are legal service and advocacy organizations who serve immigrant communities throughout the country. As legal service providers and advocates for immigrants, including asylum seekers and asylees, *amici* will provide this Court with their insight and offer a unique perspective on the impact that this proceeding will have on the individuals and communities served by *amici*.

Dated:  November 19, 2021

DIMITRI D. PORTNOI
O'MELVENY & MYERS LLP


By:    /s/ Dimitri D. Portnoi
                Dimitri D. Portnoi

Counsel for *Amici Curiae*

## <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

CORPORATE DISCLOSURE STATEMENT ...................................... ii

CIRCUIT RULE 29(d) STATEMENT................................................ iii

TABLE OF CONTENTS.........................................................................iv

TABLE OF AUTHORITIES ................................................................v

GLOSSARY OF ABBREVIATIONS .................................................. vii

STATUTES AND REGULATIONS ................................................... vii

INTEREST OF AMICI CURIAE ..........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................3

ARGUMENT .........................................................................................5

     I.    THE PUBLIC INTEREST SUPPORTS AN INJUNCTION
           PREVENTING FAMILIES FROM BEING RETURNED TO
           COUNTRIES WHERE THEY WILL FACE CERTAIN AND
           SUBSTANTIAL HARM.....................................................5

     II.   CBP AND ICE AGENTS DIRECTLY INFLICT
           IRREPARABLE HARM ON FAMILIES BEING
           PROCESSED UNDER THE TITLE 42 POLICY ...........................15

CONCLUSION .....................................................................................19

LIST OF AMICI CURIAE ....................................................................21

CERTIFICATE OF COMPLIANCE......................................................22

CERTIFICATE OF SERVICE ..............................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................5, 14

**Regulations**

*Order Suspending the Right to Introduce Certain Persons From Countries
  Where a Quarantinable Communicable Disease Exists*, 85 Fed. Reg.
  65806 (Oct. 16, 2020) ............................................................................2

*Public Health Reassessment and Order Suspending the Right to Introduce
  Certain Persons From Countries Where a Quarantinable Communicable
  Disease Exists*, 86 Fed. Reg. 42828-02 (Aug. 5, 2021) ........................2

**Statutes**

8 U.S.C. § 1158(a)(1)................................................................................14

8 U.S.C. § 1231(b)(3)................................................................................14

Note to 8 U.S.C. § 1231 ............................................................................14

**Other Authorities**

Barrett Limoges, *'I'm trapped here': Haitian asylum seekers languish in
  Mexico*, Aljazeera (Apr. 24, 2021),
  https://www.aljazeera.com/news/2021/4/24/im-trapped-here-haitian-
  asylum-seekers-languish-in-mexico....................................................10

Camilo Montoya-Galvez, *Top CDC official told Congress migrant expulsion
  policy was not needed to contain COVID*, CBS News (Nov. 12, 2021),
  https://www.cbsnews.com/news/cdc-official-told-congress-migrant-
  expulsion-policy-not-needed-to-contain-covid/....................................3

Camilo Montoya-Galvez, *U.S. expels nearly 4,000 Haitians in 9 days as part
  of deportation blitz*, CBS News (Sep. 27, 2021),
  https://www.cbsnews.com/news/haiti-migrants-us-expels-nearly-4000-in-
  nine-days/ ..............................................................................................4

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Extending Title 42 Will Endanger Refugees, Not Stop Covid-19*, Amnesty International (Aug. 3, 2021), https://www.amnestyusa.org/press-releases/extending-title-42-will-endanger-refugees-not-stop-covid-19/...............9

Harold Hongju Koh, Re: *Ending Title 42 return flights to countries of origin, particularly Haiti* (Oct. 2, 2021), https://www.politico.com/f/?id=0000017c-4c4a-dddc-a77e-4ddbf3ae0000.....4, 7

Human Rights Watch, *Mexico: Abuses Against Asylum Seekers at US Border* (Mar. 5, 2021), https://www.hrw.org/news/2021/03/05/mexico-abuses-against-asylum-seekers-us-border...........................................................11

Jasmine Aguilera, *Caught Between U.S. Policies and Instability at Home, Haitian Migrants in Tijuana Are in a State of Limbo*, Time (July 22, 2021), https://time.com/6080579/haitian-migrants-tijuana-us-policy/................10

Katy Murdza and Walter Ewing, Ph.D., *The Legacy of Racism within the U.S. Border Patrol*, American Immigration Council (Feb. 10, 2021), https://www.americanimmigrationcouncil.org/research/legacy-racism-within-us-border-patrol ..........................................................9

Nicole Phillips and Tom Ricker, *The Invisible Wall: Title 42 and Its Impact on Haitian Migrants*, Haitian Bridge Alliance, The UndocuBlack Network and The Quixote Center (2021), https://www.quixote.org/wp-content/uploads/2021/03/The-Invisible-Wall.pdf ...................................... 8, 9, 10

Paloma Delgado, *Title 42 is Not About Public Health. It's About Exclusion*, Human Rights First (Oct. 21, 2021), https://www.humanrightsfirst.org/blog/title-42-not-about-public-health-it-s-about-exclusion...................................................................9

*Read: Resignation letter from U.S. special envoy for Haiti, Daniel Foote*, Washington Post (Sep. 23, 2021), https://www.washingtonpost.com/context/read-resignation-letter-from-u-s-special-envoy-for-haiti-daniel-foote/3136ae0e-96e5-448e-9d12-0e0cabfb3c0b/ ...........................................................6

Returns of Migrants and Reception Assistance in Haiti, International Organization for Migration, United Nations (Nov. 8, 2021) ................................4

## **GLOSSARY OF ABBREVIATIONS**

CBP:  U.S. Customs and Border Protection

ICE:  U.S. Immigration and Customs Enforcement

## **STATUTES AND REGULATIONS**

All pertinent statutes and regulations are contained in the Statutory

Addendum to the Brief of Defendants-Appellants.

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are 14 legal service and advocacy organizations who serve and advocate alongside migrant families arriving at the southern border who are subjected to field processing and expulsion under Title 42. *Amici* include national advocacy organizations as well as local legal service practitioners and advocates working with migrant families arriving in Texas, New Mexico, Arizona, and California. *Amici* fight for the rights of migrant women, children, and other vulnerable populations, and are driven by a commitment to immigrant and racial justice. *Amici* have a strong interest in this proceeding because Title 42 causes irreparable harm to the clients and communities served by *amici*, who are subjected to egregious conditions, denied due process under the law, and summarily expelled to countries where they face persecution, violence, and death.

Collectively, *amici* provide direct legal services to thousands of immigrants annually. Relevant here, many of *amici*'s clients seek relief at the U.S.-Mexico border and have been subject to Defendants' policy of summarily expelling immigrants pursuant to a purported health order under 42 U.S.C. § 265 (the "Title

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the undersigned counsel certifies that this brief was authored in full by *amici* and their counsel, no party or counsel for a party authored or contributed monetarily to this brief in any respect, and no other person or entity—other than *amici* and their counsel—contributed monetarily to this brief's preparation or submission.

42 Policy").[2] *Amici* are invested in ensuring that all people, including immigrants, are treated with dignity and share a common mission of advancing and protecting the constitutional and statutory rights of individuals seeking asylum and legal status in the United States.  Through both direct services and federal impact litigation, *amici* have worked for decades to improve immigrants' access to legal services and representation, to ensure immigrants arriving in the United States can pursue all relief they are entitled to seek under the law, and to ensure immigrants' constitutional due process and other rights are upheld.

 *Amici* respectfully submit this brief to assist the Court in evaluating the merits of the District Court's preliminary injunction.  In light of their expertise and experience working with families who have been harmed by the Title 42 Policy, *amici* believe they will offer the Court a unique perspective as to the public interest and why it overwhelmingly favors upholding the District Court's preliminary injunction of the Title 42 Policy as it applies to family units.  Absent affirmance of the District Court's preliminary injunction, *amici*'s clients and constituents will

---

[2] *See Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 85 Fed. Reg. 65806 (Oct. 16, 2020); *Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42828-02 (Aug. 5, 2021).

continue to face egregious conditions under Title 42's field processing as well as due process deprivations of their right to seek asylum and other immigration relief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In March 2020, former President Trump issued the Title 42 Policy, ostensibly on public health grounds, to effectively prevent any immigrant arriving at the southern border from accessing the legal process afforded to them under U.S. law. An ever-growing chorus of objections from health experts, including many employed by the federal government, confirms that the policy has never had a sound public health justification. In fact, "the bulk of the evidence [in March 2020] did not support [the Title 42 Policy] proposal."[3]

Nevertheless, for more than a year and a half, Defendants have relied on this policy to categorically shut the door on hundreds of thousands of people seeking safety. Indeed, during a fourteen-day stay of the District Court's preliminary injunction, Defendants moved swiftly to use the Title 42 Policy to expel thousands of Black and Haitian migrants from an encampment in Del Rio, Texas, to Haiti, a country that administration officials have characterized as "undeniably a

---

[3] Camilo Montoya-Galvez, *Top CDC official told Congress migrant expulsion policy was not needed to contain COVID*, CBS News (Nov. 12, 2021), https://www.cbsnews.com/news/cdc-official-told-congress-migrant-expulsion-policy-not-needed-to-contain-covid/.

humanitarian disaster area."[4]  This unprecedented mass expulsion led to widely

disseminated images that evoke the era of slavery, with white men on horseback

rushing Black migrants and wielding long ropes like whips.  It also resulted in the

unlawful expulsion of thousands of Haitian parents and children.[5]

Each family who has been subject to Defendants' unlawful Title 42 Policy

has their own story of the resolve, resourcefulness, and courage that compelled

them to take the perilous journey to seek protection and the promise of a better life

in the United States.  Because of the Title 42 Policy, however, most of these stories

share a common thread: the federal government expels vulnerable individuals,

including many pregnant people and families with babies and very young children,

to countries where they face kidnapping, extortion, physical and sexual assault, and

death without permitting them to access the legal process expressly afforded to

them under U.S. law to seek protection and legal status in this country.

---

[4] Harold Hongju Koh, Re: *Ending Title 42 return flights to countries of origin, particularly Haiti* (Oct. 2, 2021), https://www.politico.com/f/?id=0000017c-4c4a-dddc-a77e-4ddbf3ae0000.

[5] Camilo Montoya-Galvez, *U.S. expels nearly 4,000 Haitians in 9 days as part of deportation blitz*, CBS News (Sep. 27, 2021), https://www.cbsnews.com/news/haiti-migrants-us-expels-nearly-4000-in-nine-days/ (at least 2,300 Haitian parents and children expelled in nine-day period); *see also* Returns of Migrants and Reception Assistance in Haiti, International Organization for Migration, United Nations (Nov. 8, 2021) (approximately 8,500 Haitians expelled from United States since September 19, 2021, of which approximately 3,740 were women and children).

The stories of families who have been subjected to the Title 42 Policy illustrate that the policy offends the law in two important and related respects. *First*, it directly undermines this nation's strong public interest in preventing individuals from being wrongfully removed to countries where they are likely to face substantial harm.  *Second*, it enables and empowers federal immigration officials to inflict irreparable and gratuitous harm on the most vulnerable among us.  For these reasons the District Court's injunction of the Title 42 Policy should be affirmed.

## ARGUMENT

## I.    THE PUBLIC INTEREST SUPPORTS AN INJUNCTION PREVENTING FAMILIES FROM BEING RETURNED TO COUNTRIES WHERE THEY WILL FACE CERTAIN AND SUBSTANTIAL HARM

The Supreme Court has recognized "a public interest in preventing [individuals] from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Nken v. Holder*, 556 U.S. 418, 436 (2009). This public interest applies with particular force to families with minor children, tens of thousands of whom the federal government has summarily returned to countries rife with danger.  Because Defendants use the Title 42 Policy to remove families without any process or protections to countries where they will indisputably face grave harm, the public interest supports the District Court's injunction.

5

Defendants' mass expulsion of Haitian and other Black migrants from Del Rio, Texas, just two months ago is a case in point.  In the midst of Defendants' efforts to operate multiple expulsion flights to Haiti each day, Daniel Foote, the United States Special Envoy to Haiti, resigned in protest, refusing to "be associated with the United States['] inhumane, counterproductive decision to deport thousands of Haitian refugees and [ ] immigrants to Haiti, a country where American officials are confined to secure compounds because of the danger posed by armed gangs in control of daily life."[6]  In his resignation letter, Ambassador Foote noted that Haiti is a "collapsed state," "unable to provide security or basic services," and that the people of Haiti are "mired in poverty, hostage to the terror, kidnappings, robberies and massacres of armed gangs and suffering under a corrupt government with gang alliances."  Under such circumstances, the "forced infusion of thousands of returned migrants lacking food, shelter, and money" can only "fuel further desperation and crime."

Apart from returning thousands of families to a "humanitarian nightmare," Defendants undertook the mass expulsion of migrants from Del Rio to Haiti—as with all other Title 42 expulsions—without any process to protect against the

---

[6] *Read: Resignation letter from U.S. special envoy for Haiti, Daniel Foote*, Washington Post (Sep. 23, 2021), https://www.washingtonpost.com/context/read-resignation-letter-from-u-s-special-envoy-for-haiti-daniel-foote/3136ae0e-96e5-448e-9d12-0e0cabfb3c0b/.

erroneous and unlawful return of individuals to countries where their life or freedom would be threatened.  As Harold Koh, a former senior advisor to the Biden Administration, has pointed out, Defendants apply the Title 42 Policy to "individuals who are already in the United States *and to whom our legal obligations under the Refugee treaties and parallel statutes have undeniably attached.*"[7]  But when processing migrants for expulsion under the policy, Defendants provide no affirmative screening for an individual's fear of persecution upon return.  This lack of screening "inevitably create[s] an unacceptably high risk that a great many people deserving of asylum will instead likely be returned to countries where they fear persecution, death, or torture."[8]  The Title 42 Policy thus "violate[s] our legal obligation not to expel or return ('refouler') individuals"— "especially migrants fleeing from Haiti."[9]

Expulsions of migrant families to Haiti under the Title 42 Policy are not limited to the recent Del Rio incident.  **Daniel**[10] and his family were expelled to Haiti in 2020, after first fleeing the country in 2015 when armed gangs demanded money from his family and shot at his house when they could not pay.  His parents

---

[7] *See* Harold Hongju Koh, *supra* note 4 (emphasis added).

[8] *Id*.

[9] *Id*.

[10] *Amici* have used first-name pseudonyms for certain individuals whose stories are shared in this brief.  Supporting documentation for each pseudonymous individual's story is held by the individual's attorney of record.

begged him and his family to leave the country for their own safety.  When Daniel and his wife and child were able to make their way to the U.S. border, they were immediately apprehended and separated from each other.  Daniel's family, like many Haitian individuals expelled under the Title 42 Policy, was never given a chance to raise with an immigration officer their fear of being returned to Haiti.[11] They were detained for two weeks with only tortillas and cookies to eat, and before they were put on an expulsion flight, U.S. Immigration and Customs Enforcement ("ICE") forced the family to eat ice chips to ensure that they would pass a temperature test meant to prevent people with COVID-19 from being placed on expulsion flights.

Upon their expulsion to Haiti, Daniel and his family were forced to stay with his wife's sister in Port-au-Prince because they knew that if he returned to his old family home, the same gangs would very likely attempt to kill him.  He and his family were devastated to find Haiti even more dangerous than when they had left five years prior, with kidnappings happening daily and people in constant fear for their lives.  As soon as they were able to gather enough money, they fled Haiti again and went back to Mexico, where they are barely surviving on what Daniel is

---

[11] Nicole Phillips and Tom Ricker, *The Invisible Wall: Title 42 and Its Impact on Haitian Migrants*, Haitian Bridge Alliance, The UndocuBlack Network and The Quixote Center (2021), https://www.quixote.org/wp-content/uploads/2021/03/The-Invisible-Wall.pdf.

able to earn working several days a week.  Due to deep-seated anti-Black racism

within U.S. Customs and Border Protection ("CBP"), Haitians and other Black

migrants like Daniel are disproportionately harmed by application of the Title 42

Policy.[12]

Defendants' expulsion of individuals to other countries besides Haiti,

including Mexico, presents equally grave concerns that the United States is

wrongfully returning individuals to countries where they are likely to face

substantial harm.  Unfortunately, the abuse of expelled immigrants at the hands of

organized crime in Mexico is all too common.  Individuals expelled from the

United States are easily identifiable as foreign, in many cases do not have basic

access to shelter in the places where they are expelled, and lack sufficient

resources to protect themselves.  Black migrants are especially at risk, due to

rampant anti-Black racism in Mexico and in countries from which they fled,

---

[12] *See, e.g.,* Katy Murdza and Walter Ewing, Ph.D., *The Legacy of Racism within the U.S. Border Patrol*, American Immigration Council (Feb. 10, 2021), https://www.americanimmigrationcouncil.org/research/legacy-racism-within-us-border-patrol; Nicole Phillips, *supra* note 11; *Extending Title 42 Will Endanger Refugees, Not Stop Covid-19*, Amnesty International (Aug. 3, 2021), https://www.amnestyusa.org/press-releases/extending-title-42-will-endanger-refugees-not-stop-covid-19/; Paloma Delgado, *Title 42 is Not About Public Health. It's About Exclusion*, Human Rights First (Oct. 21, 2021), https://www.humanrightsfirst.org/blog/title-42-not-about-public-health-it-s-about-exclusion.

including Chile, Brazil, and elsewhere.[13]  Denied the opportunity to seek refuge under U.S. law, they are faced with the Hobson's choice of remaining in Mexico, vulnerable to exploitation, violence, and death, or returning to their home countries, which often presents an even graver threat to their safety.

**Gabriel**, for example, fled his home country of Honduras with his wife and three young children after gangs killed three of his wife's siblings, tried to kill his brother, broke into Gabriel's home and robbed him, severely beat him after he reported the robbery to the police, and threatened to kill him and his family. Although Gabriel received asylum for himself and his family in Mexico, he was forced to flee yet again when the gangs from Honduras tracked him to Mexico to take revenge against Gabriel and his wife for reporting them to the police.  U.S. immigration officials expelled Gabriel, his wife and children, and his brother to Mexico under the Title 42 Policy in February 2021.

Because they feared for their lives in Honduras, Gabriel's family remained in Mexico, hoping that it would be less dangerous, even though they often went hungry and repeatedly were threatened by gangs operating along the border.  In

---

[13] *See, e.g.*, Nicole Phillips, *supra* note 11; Barrett Limoges, *'I'm trapped here': Haitian asylum seekers languish in Mexico*, Aljazeera (Apr. 24, 2021), https://www.aljazeera.com/news/2021/4/24/im-trapped-here-haitian-asylum-seekers-languish-in-mexico; Jasmine Aguilera, *Caught Between U.S. Policies and Instability at Home, Haitian Migrants in Tijuana Are in a State of Limbo*, Time (July 22, 2021), https://time.com/6080579/haitian-migrants-tijuana-us-policy/.

July 2021, gang members in Mexico kidnapped Gabriel and his brother and held

them for ransom, subjecting both men to physical abuse.  Although Gabriel and his

brother were able to escape, Gabriel was forced to hide from the gangs in a

garbage dump.  When it was finally safe for him to emerge from hiding, he found

that his wife and children had disappeared, and Gabriel was on the verge of suicide

after searching for them for several days before finally learning of their

whereabouts.

The story of Gabriel's family is unfortunately typical of many families who

have sought protection from persecution in the United States, only to be expelled

to hardship and trauma in Mexico.  The abuse they experience harms the entire

family, with lasting repercussions.  **Sebastian**, for instance, is a seven-year-old

Black Honduran boy who witnessed the violent rape of his mother by a gang after

they were expelled to Mexico under the Title 42 Policy.  When they finally

escaped, Sebastian's mother turned to the Mexican police.  But as advocates have

documented, Mexican authorities are known to discriminate against migrants,

especially Black migrants.[14]  Rather than helping, the police taunted Sebastian's

mother, asking how much she would charge to give them a turn.  Since then, he has

---

[14] *See, e.g.*, Human Rights Watch, *Mexico: Abuses Against Asylum Seekers at US Border* (Mar. 5, 2021), https://www.hrw.org/news/2021/03/05/mexico-abuses-against-asylum-seekers-us-border ("Nearly half of those interviewed said Mexican police, immigration agents, or criminal groups targeted them for extortion.").

repeatedly told his mother that he wants to die.  In another instance, **Graciela**, a Honduran mother also expelled under the Title 42 Policy with her eight-year-old daughter and six-year-old son, considers herself "lucky" because although she and her children were kidnapped in Mexico after their expulsion, the kidnappers gang-raped her in a separate room so that her children did not have to watch.

**Luz**, a sixteen-year-old girl from Honduras, and her mother experienced similar trauma from the Title 42 Policy.  Luz and her mother fled to the United States because the head of a local gang was trying to force Luz to have a sexual relationship with him.  After nearly two months of perilous travel to seek safety in the United States, U.S. border authorities expelled Luz and her mother to Mexico under the Title 42 Policy in July 2021.  Because they feared what would happen to them if they returned to Honduras, the family remained in Mexico, surviving on little to eat and finding places to sleep on the street and in abandoned homes. While in Mexico, they were assaulted and robbed by Mexican officials attempting to prevent immigrants from approaching the river.  A group of men also attacked them, raping Luz and attempting to rape her mother.  The Mexican police refused to provide any assistance.  Luz still suffers emotionally and psychologically from being raped, and both she and her mother need counseling services to cope with the trauma they experienced in Mexico.

Families subjected to the Title 42 Policy are also kidnapped and split apart due to gang and cartel violence upon expulsion by CBP.  **Isabel**, for example, was captured along with her husband by the Zetas cartel and separated from her two young daughters, ages four and nine, mere hours after she and her family were expelled from the United States under the Title 42 Policy.  Immediately following their expulsion, Isabel's family walked along the riverbank for four hours in search of a safe place to cross.  While her husband was carrying their girls across the river, men attempted to kidnap Isabel.  When Isabel's husband tried to come to her aid, the gang attacked and subdued him, capturing them both.  They were held for ransom in Mexico for over two weeks, while Isabel was nine months pregnant— and with no idea what had happened to their daughters.

The Title 42 Policy also causes families to self-separate because conditions in Mexico are so dangerous that many families make the desperate and impossible decision to send their children across the border alone because only unaccompanied children are exempt from the policy.  **Javier**, for example, is a sixteen-year-old boy who was forced into labor by a gang in Honduras and attempted to flee to the United States with his parents and older brother.  In April 2021, Javier's family attempted twice to enter the United States to seek asylum through the statutorily prescribed procedures, but they were expelled both times under the Title 42 Policy.  While in Mexico, the Mexican police harassed and

extorted the family.  They also narrowly escaped an attempted kidnapping by the cartel in Ciudad Juárez.  The conditions in Mexico were so dangerous that, out of desperation to protect their child, Javier's parents sent him across the border as an unaccompanied child to keep him safe.

As former government officials have stressed, and as the stories of Daniel, Gabriel, Sebastian, Graciela, Luz, Isabel, Javier, and their families illustrate, the Title 42 Policy causes grave harm to migrants, which is compounded for many Black migrants, by sending families to countries where they will face substantial harm while depriving them of the specific protections that Congress has extended to vulnerable individuals seeking protection from persecution.[15]  Defendants seek to continue enforcing the Title 42 Policy to expel families to certain harm and suffering.  The public interest weighs decidedly in favor of affirming the District Court's injunction.  *See Nken*, 556 U.S. at 436.

---

[15] *E.g.*, 8 U.S.C. § 1158(a)(1) (allowing any noncitizen physically present in the United States to apply for asylum); 8 U.S.C. § 1231(b)(3) (forbidding the Attorney General from removing a noncitizen if the Attorney General decides that the noncitizen's life or freedom would be threatened in her home country because of her race, religion, nationality, membership in a particular social group, or political opinion); Note to 8 U.S.C. § 1231 (declaring a U.S. policy not to remove a person to a country where there are substantial grounds for believing the person would be in danger of being subjected to torture).

## II.   CBP AND ICE AGENTS DIRECTLY INFLICT IRREPARABLE HARM ON FAMILIES BEING PROCESSED UNDER THE TITLE 42 POLICY

It is beyond dispute that migrant families subject to the Title 42 Policy suffer inhumane treatment at the hands of CBP and ICE agents.  There have been numerous, documented reports of migrants being assaulted, shackled, denied food and medical care, or forcibly separated from their families.  The substantial harms occurring to migrants while being processed under the Title 42 Policy supports the District Court's injunction.

Defendants' recent mass expulsion of migrants from Del Rio, Texas, exemplifies the inhumane treatment that migrants receive as a result of the Title 42 Policy and the many flaws inherent in a policy that requires CBP to process migrants for expulsion "in the field" whenever possible.  Migrants present at the Del Rio encampment reported feeling "treated like animals" when they were simply trying to obtain food and water for their families and were unexpectedly charged by CBP officers on horseback, who were attempting to drive migrants back into Mexico.  Migrant families, who were lawfully invoking their right to seek asylum, were shackled onboard their ICE flights to Haiti.  For instance, **Macdalla**, a mother of a newborn, had her hands and feet cuffed and connected to a chain around her waist, making it difficult to hold her baby during the flight.  She had never been shackled before in her life.

Many migrants also report being denied access to medical care and basic sanitation while in CBP or ICE custody pending expulsion. **Roseline**, for example, is a Haitian woman who fled Haiti in 2016 because she had been kidnapped, beaten, and raped by a cartel because of her political affiliations. Before being expelled to Haiti under the Title 42 Policy in February 2021, she was detained by U.S. officials for eleven days. While in detention, Roseline was not given a single opportunity to shower or brush her teeth, had no way to clean her baby's soiled clothes, and had no access to medical care for her baby's respiratory infection.

CBP also routinely withholds information and lies to migrants about their expulsions, exacerbating the inherent due process deprivations under the Title 42 Policy. **Mirlande** and her family, for example, presented themselves at the U.S. border after fleeing violence in Haiti. They were detained and told they would quarantine in a cell for fourteen days, but just a few days into their quarantine they were abruptly moved in the middle of the night, and told they were being brought to another detention center. They instead were brought to an airport for expulsion to Haiti. Even as they were being forced onto the plane, no one would tell them where they were going or whether they were being deported. Mirlande was so distressed that she fainted while getting onto the plane, falling and suffering severe injuries. CBP's practice of withholding information and lying to families about their expulsion results not only in gratuitous cruelty but serves to further deprive

16

families of any opportunity to share information that might result in a humanitarian exception to Title 42.

In operation, the Title 42 Policy has also served as another engine of government-sanctioned family separation, as CBP officials have deliberately separated husbands and wives, and children and parents under the policy. **José** and his family, for example, attempted to cross the border and seek asylum in August 2021 when CBP agents forcibly separated the family. To José's dismay, while CBP permitted José's wife and six-year-old stepson to come into the country, CBP separated José and his two-year-old daughter and expelled them to Mexico under the Title 42 Policy. CBP provided no explanation for why they divided the family in this way, and now José and his daughter are staying in a crowded migrant shelter in a dangerous neighborhood in Tijuana while his wife and stepson have connected with extended family members in Virginia. The separation from her mother has been severely traumatic for José's two-year-old daughter, who has lost five pounds in one month, suffers from diarrhea and vomiting, has contracted conjunctivitis, and displays extreme emotional swings from disconnect or withdrawal to tantrums where she cries hysterically, begging for her mother. José is beside himself from seeing his daughter suffering so much and feeling powerless to alleviate her trauma—which could have been avoided if Defendants had not divided the family in this way.

17

**Marisa** was similarly separated from her children, despite being in possession of their birth certificates and documented proof that she is their mother. Marisa initially fled El Salvador with her eleven- and fifteen-year-old sons to protect them after her husband was assassinated. They went directly to the border, but were quickly expelled under the Title 42 Policy. After facing unbearable conditions in Mexico, they attempted to enter the United States a second time. On this second attempt, Marisa and her children spent seven hours wading through the river, then another hour walking, as Marisa bled from a wound on her stomach from a recent surgery that had not yet healed. Along this harrowing journey, they were stopped by local sheriffs, who handed the family over to CBP officials. When Marisa presented her sons' birth certificates to CBP, however, she was accused of being a coyote and trafficking her own children. She was expelled under the Title 42 Policy while her children were separated from her and taken into Office of Refugee Resettlement custody. After she was expelled, Marisa was promptly taken into custody by the Mexican federal police and handed over to the cartels, who subjected her to extensive sexual, physical, and psychological abuse. The cartels tied her up and left her for dead with several other women, and she survived only because she found her way to safety after walking through the desert for multiple days with no water or food.

18

CBP officers have also separated young children from their siblings under the Title 42 Policy.  **Esperanza**, a thirteen-year-old girl, was separated from her older sister, who had turned eighteen just one day before they attempted to enter the United States.  After a hurricane destroyed their home in Honduras and gangs started pursuing Esperanza's sister, the girls' mother sent them to the United States with their family's entire savings.  At the border, however, CBP officers took Esperanza into custody as an unaccompanied child and expelled her sister, her only caregiver, to Mexico under the Title 42 Policy.  Esperanza now has only limited contact with her sister, who remains in Mexico in danger.  Esperanza, distraught over the separation and terrified for her sister, cannot stop crying.

Defendants' enforcement of the Title 42 Policy has inflicted, amplified, and multiplied the harm of family separation and subjected families to gratuitous cruelty for simply seeking an opportunity to comply with this country's immigration laws, seek immigration relief through the procedure Congress has established, and hopefully pursue safety and a better life for themselves and their children.  The Court should not accept Defendants' invitation to subject more vulnerable families to irreparable trauma and harm.

## <u>CONCLUSION</u>

In defending the Title 42 Policy, Defendants do not seek to advance the public health—a false pretense the Administration's own officials have laid bare.

Instead, Defendants seek license to deny vulnerable families the ability to access Congressionally created protections and summarily remove them to countries where they are likely to be persecuted and subjected to extreme suffering and trauma.  The Court should not sanction such conduct, which disserves the public interest and inflicts irreparable harm on thousands of families.  The District Court's injunction should be affirmed.

Dated:  November 19, 2021         DIMITRI D. PORTNOI
                                  O'MELVENY & MYERS LLP


                                  By:    /s/ Dimitri D. Portnoi
                                            Dimitri D. Portnoi

                                  Counsel for *Amici Curiae*
                                  O'MELVENY & MYERS LLP
                                  400 SOUTH HOPE STREET, 18TH FLOOR
                                  LOS ANGELES, CALIFORNIA  90071-2899
                                  TELEPHONE:   213.430.6000
                                  FACSIMILE:    213.430.6407

20

## LIST OF *AMICI CURIAE*

First Focus on Children

Haitian Bridge Alliance

Innovation Law Lab

Justice Action Center

Justice for Our Neighbors El Paso

Kino Border Initiative

La Raza Centro Legal

National Immigration Law Center

National Immigration Project (NIPNLG)

National Network for Immigrant and Refugee Rights

Pangea Legal Services

Student Clinic for Immigrant Justice

Tahirih Justice Center

Women's Refugee Commission

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this document complies with the type-volume limitation set forth in Federal Rules of Appellate Procedure 29(a)(5) & 32(a)(7)(B) because it contains 4560 words, exclusive of the portions of the brief that are exempted by Federal Rule of Appellate Procedure 32(f).  I certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

Dated:  November 19, 2021

DIMITRI D. PORTNOI
O'MELVENY & MYERS LLP


By:     /s/ Dimitri D. Portnoi
                Dimitri D. Portnoi

Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that, on November 19, 2021, a true and correct copy of the

foregoing was filed with the Clerk of the United States Court of Appeals for the

District of Columbia Circuit via the Court's CM/ECF system, which will send

notice of such filing to all registered CM/ECF users.


Dated:  November 19, 2021

DIMITRI D. PORTNOI
O'MELVENY & MYERS LLP


By:    /s/ Dimitri D. Portnoi
            Dimitri D. Portnoi

Counsel for *Amici Curiae*