ORAL ARGUMENT SCHEDULED ON JANUARY 19, 2022
No. 21-5200

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NANCY GIMENA HUISHA-HUISHA, ET AL.,

*Plaintiffs-Appellees*,

*v.*

ALEJANDRO MAYORKAS, ET AL.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (CIV. NO. 1:21-CV-00100)
(HON. EMMET G. SULLIVAN, J.)

## BRIEF OF AMICUS CURIAE UNITED NATIONS
## HIGH COMMISSIONER FOR REFUGEES IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

ALICE FARMER
KAREN BAKER
UNITED NATIONS HIGH
COMMISSIONER FOR REFUGEES

1800 Massachusetts Avenue, N.W.
Washington, DC 20036
  (202) 296-5191
  (202) 296-5660 (fax)

VINCENT LEVY
  *Counsel of Record*
DENISHA S. BACCHUS
HOLWELL SHUSTER & GOLDBERG LLP

425 Lexington Avenue
New York, NY 10017
(646) 837-5151
(646) 837-5150 (fax)
vlevy@hsgllp.com
dbacchus@hsgllp.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A. Parties and Amici

Except for amicus curiae and any other amici who had not yet entered an appearance in this case as of the filing of the Brief for Defendants-Appellants, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Defendants-Appellants.

### B. Rulings under Review

References to the ruling under review appear in the Brief for Defendants-Appellants.

### C. Related Cases

Amicus curiae agrees with the statement in the Brief for Defendants-Appellants that there are no related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

/s/ Vincent Levy
VINCENT LEVY

DATED: NOVEMBER 19, 2021

## TABLE OF CONTENTS

I.   UNHCR PROVIDES AUTHORITATIVE REFUGEE LAW
     GUIDANCE. ....................................................................... 5

II.  INTERNATIONAL LAW REQUIRES PARTICULARIZED
     ASSESSMENT OF THE RISK OF PERSECUTION PRIOR TO
     EXPULSION REGARDLESS OF PUBLIC-HEALTH CONCERNS.
     ........................................................................................ 9

     A. THE REFUGEE CONVENTION AND PROTOCOL REQUIRE
        ADHERENCE TO THE FOUNDATIONAL PRINCIPLE OF
        NON-REFOULEMENT FOR REFUGEES ................................ 9

     B. PUBLISHED AUTHORITATIVE GUIDANCE REFLECTS
        STATES' REQUIREMENTS TO IDENTIFY REFUGEES AND
        PREVENT REFOULEMENT ................................................... 16

     C. THE U.S.'S SUMMARY EXPULSION POLICY VIOLATES
        THE INTERNATIONAL LAW PRINCIPLE OF NON-
        REFOULEMENT ...................................................................... 21

III. THE U.S. CAN BOTH PROTECT PUBLIC HEALTH DURING
     COVID-19 AND COMPLY WITH INTERNATIONAL LAW. ....... 24

# TABLE OF AUTHORITIES [1]

## CASES

*Barapind v. Reno*,
225 F.3d 1100 (9th Cir. 2000) ................................................................9

*Castaneda-Castillo v. Holder*,
638 F.3d 354 (1st Cir. 2011) ..............................................................9

*Garcia v. Sessions*,
856 F.3d 27 (1st Cir. 2017) ..................................................................7

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) ................................................................2, 6, 7, 10

*Mohammed v. Gonzales*,
400 F.3d 785 (9th Cir. 2005) ..............................................................7

*Murray v. The Charming Betsey*,
6 U.S. 64 (1804) ..................................................................................10

*N-A-M- v. Holder*,
587 F.3d 1052 (10th Cir. 2009) ..........................................................2

*Negusie v. Holder*,
555 U.S. 511 (2009) ..........................................................................2, 6

*Sale v. Haitian Ctrs. Council*,
509 U.S. 155 (1993) ..........................................................................2, 6

*Usoyan v. Republic of Turkey*,
6 F.4th 31 (D.C. Cir. 2021) ................................................................10

---

[1] Pursuant to Circuit Rule 28(a)(2), "[a]uthorities upon which [UNHCR] chiefly rel[ies] are marked with asterisks."

## STATUTES

8 U.S.C. § 1231(b)(3)...............................................................10

## RULES

D.C. Circuit Rule 32(e)(1).......................................................31

Fed. R. App. P. 29(a)(5) ..........................................................31

Fed. R. App. P. 32(a)(5)(A) ......................................................31

Fed. R. App. P. 32(a)(6) ...........................................................31

Fed. R. App. P. 32(a)(7) ...........................................................31

Fed. R. App. P. 32(f)................................................................31

## OTHER AUTHORITIES

ANDREAS ZIMMERMAN & CLAUDIA MAHLER, THE 1951 CONVENTION
RELATING TO THE STATUS OF REFUGEES & ITS 1967 PROTOCOL: A
COMMENTARY (2011) ..............................................................5

Ctrs. for Disease Control & Prevention, Public Health Assessment and
Order Suspending the Right to Introduce Certain Persons from Coun-
tries Where a Quarantinable Communicable Disease Exists (Aug. 2,
2021), https://www.federalregister.gov/documents/2021/08/05/2021-
16856/public-health-reassessment-and-order-suspending-the-right-to-
introduce-certain-persons-from.............................................23

Conseil d'État [Council of State], 7ème chambre, No. 440756, Jul. 8,
2020 (Fr.),
https://www.legifrance.gouv.fr/ceta/id/CETATEXT000042100831/ ....28

United Nations Convention Against Torture and Other Forms of Cruel,
Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23
I.L.M. 1027, 1465 U.N.T.S. 85...............................................12

iv

**\***Convention Relating to the Status of Refugees, 19 U.S.T. 6259, 189 U.N.T.S. 150 (1951).........................................1, 2, 6, 11, 12, 14, 16

CORNELIS W. WOUTERS, INTERNATIONAL LEGAL STANDARDS FOR THE PROTECTION FROM REFOULEMENT, Intersentia (2009) ..........................13

Eur. Asylum Support Office, EASO Case Law Database: Applicant (Central African Republic), Case No. 440756, https://caselaw.easo.europa.eu/pages/viewcaselaw.aspx?CaseLawID=1148 ...........................28

Eur. Comm'n, *Exemptions to coronavirus travel restrictions into the EU,* https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/travel-during-coronavirus-pandemic/exemptions-coronavirus-travel-restrictions-eu_en.......................................................................25

Eur. Comm'n, *Guidance on the implementation of the temporary restriction on non-essential travel to the EU, on the facilitation of transit arrangements for the repatriation of EU citizens, and on the effects on visa policy* (Mar. 30, 2020), https://ec.europa.eu/home-affairs/system/files/2020-03/20200330_c-2020-2050-report_en.pdf........26

Executive Comm. of the High Commissioner's Programme, Gen. Conclusion on Int'l Protection, Rep. of Exec. Comm. on Its Fortieth Session, U.N. Doc. A/44/12/Add.1 (Oct. 13, 1989), https://www.unhcr.org/en-us/excom/exconc/3ae68c43c/generalconclusion-international-protection.html ...............................................................................................8

H.R. Rep. No. 96-781 (1980) (Conf. Rep.), *as reprinted in* 1980 U.S.C.C.A.N. 160.....................................................................................9

JAMES C. HATHAWAY, THE RIGHTS OF REFUGEES UNDER INTERNATIONAL LAW, Cambridge Univ. Press (2005).......................................................13

Memorandum from Harold Hongju Koh, Former U.S. Dep't of State Legal Adviser, "Re: Ending Title 42 return flights to countries of origin, particularly Haiti" (Oct. 2, 2021)...................................................22, 24

Norwegian Gov't Sec. & Serv. Organization, The coronavirus situation: Questions and answers about entry to Norway (Aug. 10, 2021), https://www.regjeringen.no/en/topics/koronavirus-covid-19/Questions-and-answers-coronavirus-situation-in-Norway/the-coronavirus-situation-questions-and-answers-aboutentering-norway/id2703365/?expand=factbox2830667 ........................................................................27

Rikspolisstyrelsen [Swedish National Police Board, or "Polisen"], Travel to Sweden during the corona pandemic (updated Nov. 15, 2021), https://polisen.se/en/the-swedish-police/the-coronavirus-and-the-swedish-police/travel-to-and-from-sweden/ ................................................27

Sir Elihu Lauterpacht & Daniel Bethlehem, The Scope and Content of the Principle of Non-Refoulement: Opinion, in REFUGEE PROTECTION IN INTERNATIONAL LAW: UNHCR'S GLOBAL CONSULTATIONS ON INTERNATIONAL PROTECTION (Erika Feller et al. eds., 2003) ...............13

Statute of the Office of the UNHCR, G.A. Res. 428(V), U.N. Doc. A/RES/428(V) (Dec 14, 1950) ............................................................1, 6

U.N. Ad Hoc Comm. on Refugees and Stateless Persons, Ad Hoc Committee on Refugees and Stateless Persons, Second Session: Summary Record of the Thirty-Fourth Meeting Held at the Palais des Nations, Geneva, on Monday, 14 August 1950, at 3 p.m., E/AC.32/SR.34 (Sept. 22 1950), https://www.refworld.org/docid/3ae68c1d34.html ...............15

UNHCR, Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol (Jan. 26, 2007), http://www.unhcr.org/refworld/docid/45f17a1a4.html ...................11, 17

UNHCR, Background on the Executive Committee (July 1, 2001), https://www.unhcr.org/en-us/excom/announce/3b4f09faa/background-executive-committee.html .......................................................................8

UNHCR, Conclusion of the Executive Committee No. 8 on Determination of Refugee Status - 1977 (Oct. 12, 1977), https://www.refworld.org/docid/3ae68c6e4.html ............................................................18

vi

**\***UNHCR, *Conclusions of the Executive Committee on International Protection and Durable Solutions in the Context of a Public Health Emergency* (Oct. 2021), https://www.refworld.org/docid/617a510e6.html ...................................................................8, 24, 29

UNHCR, COVID-19 Protection Issues Global Monitoring: Borders and Admission of Asylum Seekers (Database) (updated Nov. 18, 2021) (on file with author) ...................................................................27

UNHCR, *Executive Committee's membership by year of admission of members*, https://www.unhcr.org/afr/excom/announce/40112e984/ex.html ..........8

**\***UNHCR, *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, U.N. Doc HCR/1P/4/ENG/REV.3 (2011) ....................................6, 7, 16, 17, 19, 20

**\***UNHCR, *Key Legal Considerations on Access to Territory for Persons in need of International Protection in the Context of the Covid-19 Response* (Mar. 16, 2020), https://www.refworld.org/docid/5e7132834.html ...3, 7, 8, 10, 18, 19, 21, 22, 24, 29

UNHCR, Mɪᴅ-Yᴇᴀʀ Tʀᴇɴᴅs 2021 (Nov. 11, 2021) ....................................1

UNHCR, *Note of the Principle of Non -Refoulement* (Nov. 1997) https://www.refworld.org/docid/438c6d972.html....................................11

UNHCR, *Practical Recommendations and Good Practice to Address Protection Concerns in the Context of the COVID-19 Pandemic*, https://www.refworld.org/docid/5ede06a94.html.............................26, 28

UNHCR, *Submission by the Office of the United Nations High Commissioner for Refugees in the case of Hirsi and Others v. Italy* (Mar. 2010), https://www.unhcr.org/refworld/docid/4b97778d2.html (last visited Nov. 11, 2021) ...............................................................................11

UNHCR, *UNHCR concerned over U.S. expulsion flights under COVID-19 asylum restrictions* (Aug. 11, 2021), https://www.un-hcr.org/news/press/2021/8/6113dfc14/unhcr-concerned-expulsion-flights-under-covid-19-asylum-restrictions.html...................................13

UNHCR, *UNCHR Legal Considerations with regards to the EU Commission's Guidelines for border management measures to protect health and ensure the availability of goods and essential services* (Mar. 18, 2020),
https://www.refworld.org/docid/5E7882484.html....................................4

UNHCR, *UNHCR Note on the Principle of Non-Refoulement* (Nov. 1997), https://www.refworld.org/docid/438c6d972.html.................11, 26

UNHCR, *Where We Work* (2021),
https://www.unhcr.org/en-us/where-we-work.html...............................1

UNHCR & Inter-Parliamentary Union, *A Guide to International Refugee Protection and Building State Asylum Systems: Handbook for Parliamentarians N° 27* (Dec. 31, 2017), https://www.un-hcr.org/3d4aba564.pdf ..............................................................13, 19, 22

UNHCR et al., *Agencias de la ONU expresan preocupación frente al deterioro de las condiciones humanitarias de las personas migrantes y solicitantes de asilo en las fronteras norte y sur de México* (Aug. 11, 2021), https://www.acnur.org/es-mx/noti-cias/ul/2021/8/61143e084/agencias-de-la-onu-expresan-preocupacion-frente-al-deterioro-de-las-condiciones.html ...................................22, 23

**\***1967 Protocol Relating to the Status of Refugees, 606 U.N.T.S. 267, 19 U.S.T. 6223......................................................................1, 2, 6, 9, 11

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **CDC** | Centers for Disease Control and Prevention |
| **UNHCR** | United Nations High Commissioner for Refugees |
| **UNGA** | United Nations General Assembly |
| **Joint App.** | Joint Appendix |
| **Refugee Convention** | Convention Relating to the Status of Refugees |
| **Protocol** | 1967 Protocol Relating to the Status of Refugees |

## <u>RULE 29 STATEMENT</u>

All parties to this appeal have consented to the filing of this brief.

No person or entity other than *amicus curiae* United Nations High Commissioner for Refugees and its counsel authored this brief or contributed money intended to fund its preparation or submission.

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

The Office of the United Nations High Commissioner for Refugees ("UNHCR"), pursuant to authority delegated to it by the United Nations General Assembly ("UNGA"), is responsible for the promotion and supervision of compliance with international refugee law. G.A. Res. 428(V), U.N. Doc. A/RES/428(V), ¶¶ 1, 8(a) (Dec. 14, 1950) ("UNHCR Statute"). Today, more than 70 years after its founding, UNHCR works in 132 countries and territories helping to respond to the needs of more than 82 million forcibly displaced people worldwide. UNHCR, *Where We Work* (2021), https://www.unhcr.org/en-us/where-we-work.html; UNHCR, MID-YEAR TRENDS 2021 (Nov. 11, 2021).

Two treaties binding upon the United States—namely, (i) the 1951 Convention Relating to the Status of Refugees, 19 U.S.T. 6259, 189 U.N.T.S. 150 (July 28, 1951) ("Refugee Convention") and (ii) the Refugee Convention's 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, 606 U.N.T.S. 267 (Jan. 31, 1967) (the "Protocol")—reiterate UNHCR's authority regarding international refugee law. Those treaties require the United States and other States party to "co-operate with" UNHCR "in the exercise of its functions," and to "facilitate [UNHCR's]

duty of supervising the application" of refugee law.  Refugee Convention art. 35; Protocol art. II.

In line with UNHCR's mandate and the United States' treaty obligations, the "Supreme Court has consistently turned" to UNHCR and its published guidance "for assistance in interpreting [U.S.] obligations under the Refugee Convention." *N-A-M- v. Holder*, 587 F.3d 1052, 1061-62 (10th Cir. 2009) (Henry, J., concurring) (per curiam) (collecting cases); *see, e.g.*, *Negusie v. Holder*, 555 U.S. 511, 536-37 (2009); *Sale v. Haitian Ctrs. Council*, 509 U.S. 155 (1993); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 (1987).  Although UNHCR takes no position directly on the merits of Plaintiffs-Appellees' claims, UNHCR respectfully submits that this Court should follow UNHCR's interpretation of international refugee law (summarized below), including as reflected in its published guidance.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Briefs for Defendants-Appellants and Plaintiffs-Appellees, respectively.

## SUMMARY OF ARGUMENT

The August 2, 2021 Order of the Centers for Disease Control and Prevention ("the CDC Order") suspends entry to the United States

through its contiguous borders and enables the expulsion of certain categories of non-nationals without an assessment of refugee status. This policy violates fundamental tenets of the Refugee Convention and its Protocol—and conflicts with UNHCR's consistent and authoritative interpretations of refugee law—because the policy breaches international legal obligations prohibiting States from returning refugees to countries in which they reasonably fear persecution based upon race, religion, nationality, membership of a particular social group, or political opinion.

That does not mean the United States may not protect its nationals from public-health risks associated with COVID-19. Time and again, UNHCR has reiterated the "sovereign power" of States "[u]nder international law . . . to regulate the entry of non-nationals." UNHCR, *Key Legal Considerations on Access to Territory for Persons in Need of International Protection in the Context of the COVID-19 Response* ¶ 1 (Mar. 16, 2020).[1] That border-management authority includes the right to institute "measures to ascertain and manage risks to public health in the con-

---

[1] https://www.refworld.org/docid/5e7132834.html (last visited Nov. 19, 2021).

3

text of the current COVID-19 outbreak"—but it does not permit categorical refoulement policies. UNHCR, *UNHCR Legal Considerations with regard to the EU Commission's Guidelines for border management measures to protect health and ensure the availability of goods and essential services* (Mar. 18, 2020).[2]

Other countries have taken public-health measures while abiding by their international law obligations to allow asylum-seekers access to the asylum procedures. Italy, for example, quarantines *all* non-nationals at the border for 10 days. Norway, Austria, and Sweden employ a different strategy, explicitly exempting those who fit the legal definition of refugee from entry restrictions. What a State cannot do, however, is implement a policy of blanket expulsion for potential refugees or asylum-seekers—or of those of a particular nationality or nationalities—without evidence that a *particular* individual presents a particular security risk, and while taking no steps to avoid refoulement. That is not justified under international refugee law since, insofar as a policy of blanket expulsions results in the forcible return of refugees, it would be a clear violation of

---

[2] https://www.refworld.org/docid/5E7882484.html (last visited Nov. 10, 2021).

the United States' obligations under the Refugee Convention and its Protocol.

## ARGUMENT

### I.   UNHCR PROVIDES AUTHORITATIVE REFUGEE LAW GUIDANCE.

A.  In 1950, delegates from the United States and other members of the United Nations convened to draft an agreement to ensure that refugees "are not turned back to countries where they would be exposed to the risk of persecution."  ANDREAS ZIMMERMAN & CLAUDIA MAHLER, THE 1951 CONVENTION RELATING TO THE STATUS OF REFUGEES & ITS 1967 PROTOCOL: A COMMENTARY 281, 337 (2011).  The result was the Refugee Convention, which delineates the basic rights of refugees and asylum-seekers under international law, and which, for more than seven decades since its 1951 enactment, has served as the "cornerstone of the international system for" refugee protection.  G.A. Res. 49/169 (Dec. 23, 1994).

As discussed *supra*, UNHCR is formally responsible for the protection of refugees under international law.  Its mandate—laid out by UNGA statute and reiterated by multiple international treaties including the Refugee Convention—requires UNHCR to (i) "[p]romot[e]" the Refugee

Convention and its Protocol, and (ii) "supervis[e] their application." UNHCR Statute ¶¶ 1, 8(a); Refugee Convention art. 35; Protocol art. II.

The Refugee Convention and its Protocol also require Contracting States to cooperate with UNHCR in the fulfillment of its mandate. And, in line with international law, the U.S. Supreme Court and federal courts addressing U.S. law and obligations follow UNHCR's written guidance interpreting refugee law. *See, e.g.*, *Negusie*, 555 U.S. at 536-37; *Sale*, 509 U.S. at 155; *Cardoza-Fonseca*, 480 U.S. at 439.

B.  UNHCR exercises its supervisory responsibility in part by issuing guidance, based on its seven decades of experience, on the interpretation of the Refugee Convention, the Protocol, other relevant international law instruments, and customary international law.  Among UNHCR's most-authoritative and most-cited guidance—including by U.S. courts—is the Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status, prepared at the behest of the United States and other Contracting States.  UNHCR, Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refu-

gees, U.N. Doc HCR/1P/4/ENG/REV.3 (2011)), at Foreword ¶ IV [herein-after "UNHCR Handbook"].[3]  Indeed, as the U.S. Supreme Court has explained, the UNHCR Handbook provides "significant guidance" on interpreting U.S. obligations under refugee law.  *Cardoza-Fonseca*, 480 U.S. at 439 n.22.

UNHCR periodically supplements the guidance set forth in the UNHCR Handbook by publishing "Guidelines", "Guidance Notes", "Advisory Opinions," and other practical, contemporary legal analyses.  *Garcia v. Sessions*, 856 F.3d 27, 55 n.31 (1st Cir. 2017) (citing guidance); *Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005) (same).

Two recent publications—a March 2020 analysis titled "Key Legal Considerations on Access to Territory for Persons in Need of International Protection in the Context of the COVID-19 Response" ("Key Legal Considerations"), and the October 2021 "Conclusion of the Executive Committee on International Protection and Durable Solutions in the

---

[3] https://www.refworld.org/docid/4f33c8d92.html (last visited Nov. 11, 2021) (noting that the Executive Committee asked UNHCR to issue, "for the guidance of Governments[,] a handbook relating to procedures and criteria for determining refugee status"); *see also infra* n.5 (discussing significance of Executive Committee conclusions).

Context of a Public Health Emergency" ("Executive Committee COVID-19 Conclusion")—are particularly relevant here.[4]

The analyses in both documents reflect a reasoned interpretation of long-standing and unquestionable foundational principles of international law, including international refugee and human-rights law, in the context of COVID-19. Executive Committee conclusions, in particular, are highly probative, as they are adopted by consensus among the 107 State members of UNHCR's Executive Committee,[5] including the United States.

---

[4] UNHCR, *Key Legal Considerations on Access to Territory for Persons in Need of International Protection in the Context of the COVID-19 Response* (Mar. 16, 2020), https://www.refworld.org/docid/5e7132834.html (last visited Nov. 11, 2021); UNHCR, *Conclusions of the Executive Committee on International Protection and Durable Solutions in the Context of a Public Health Emergency* (Oct. 2021), https://www.refworld.org/docid/617a510e6.html (last visited Nov. 11, 2021).

[5] Executive Committee conclusions reflect important "international guidelines" that UNHCR and States draw upon "when developing or orienting their policies on refugee issues." Gen. Conclusion on Int'l Protection, Rep. of Exec. Comm. on Its Fortieth Session, ¶ p, U.N. Doc. A/44/12/Add.1 (Oct. 13, 1989), https://www.unhcr.org/en-us/excom/ex-conc/3ae68c43c/generalconclusion-international-protection.html (last visited Nov. 11, 2021); *see also* UNHCR, *Background on the Executive Committee* (July 1, 2001), https://www.unhcr.org/en-us/excom/an-nounce/3b4f09faa/background-executive-committee.html (last visited

## II.   INTERNATIONAL LAW REQUIRES PARTICULARIZED ASSESSMENT OF THE RISK OF PERSECUTION PRIOR TO EXPULSION REGARDLESS OF PUBLIC-HEALTH CONCERNS.

### A.   The Refugee Convention and Protocol Require Adherence to the Foundational Principle of Non-Refoulement for Refugees

The United States became a party to the Protocol—and, by extension, the Refugee Convention—in 1968.[6]  H.R. Rep. No. 96-781, at 19 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 160, 160; S. Exec. Rep. No. 14, 90th Cong., 2d Sess. 4 (1968).  In 1980, Congress passed the Refugee Act, by which "Congress sought to bring United States refugee law into conformity with the 1967 United Nations Protocol Relating to the Status of Refugees[.]"  *Castaneda-Castillo v. Holder*, 638 F.3d 354, 361 (1st Cir. 2011) (quoting *Barapind v. Reno*, 225 F.3d 1100, 1106 (9th Cir. 2000)).  In light of that objective, the Supreme Court has instructed, the Refugee

---

Nov. 11, 2021) ("The Committee's Conclusions on international protection represent an important body of opinion on detailed aspects.").

The United States has been a member of the Executive Committee continuously since the Executive Committee was founded in 1958. UNHCR, *Executive Committee's membership by year of admission of members*, https://www.unhcr.org/afr/excom/announce/40112e984/excom-membership-date-admission-members.html (last visited Nov. 19, 2021).

[6] Pursuant to Article 1 of the Protocol, States party "to the Protocol [agree] to apply articles 2 to 34 inclusive of the Convention to refugees as hereinafter defined."  Protocol art. 1.

Act's provisions must "be interpreted in conformance with the [Protocol's]" provisions—and thus, by extension, the Refugee Convention's. *See supra* n.6; *Cardoza-Fonseca*, 480 U.S. at 437. *See also Murray v. The Charming Betsey*, 6 U.S. 64, 118 (1804) (noting that an Act of Congress should not be construed to violate the law of nations "if any other possible construction" exists); 8 U.S.C. § 1231(b)(3) ("Restriction on removal to a country where alien's life or freedom would be threatened").

Two key aspects of the United States' obligations are particularly relevant in considering the question presented on this appeal because, taken together, they require the United States to take steps to (i) identify and (ii) protect "refugees" from "refoulement"—that is, from direct or indirect return to a country in which they face serious threats to their lives or freedoms.[7]

1. First, international refugee law protects those who fear persecution in their country of origin (or for those who have no nationality, their

---

[7] "The principle of non-refoulement" is not just required by treaty but also "ha[s] been recognized as a norm of customary international law." Key Legal Considerations at 3 (citing materials); *see Usoyan v. Republic of Turkey*, 6 F.4th 31, 41 n.4 (D.C. Cir. 2021) ("[C]ustomary international law has essentially the same binding force under international law as treaty law.") (citation omitted).

country of habitual residence).  Under the Refugee Convention, a "refugee" is any person who "is outside the country of his [or her] nationality and is unable or . . . unwilling" to return to such country "owing to" a "well-founded fear of being persecuted" based upon race, religion, nationality, membership of a particular social group, or political opinion.  Refugee Convention art. 1(A)(2).[8]

2.  The principle of non-refoulement is key to protecting refugees under international law, and the Refugee Convention and its Protocol both reflect this "cornerstone of asylum [and] international refugee law."[9]

The non-refoulement principle prohibits States from allowing the "exp[ulsion] or return ('refouler') [of] a refugee *in any manner whatsoever*

---

[8] The Protocol removed prior geographic and timing limitations on the definition of "refugee."  Protocol art. 1(2)-(3).

[9] UNHCR, UNHCR Note on the Principle of Non-Refoulement (Nov. 1997), https://www.refworld.org/docid/438c6d972.html (last visited Nov. 19, 2021) [hereinafter "1997 Note"]; *see also* UNHCR, Submission by the Office of the United Nations High Commissioner for Refugees in the case of *Hirsi and Others v. Italy* ¶¶ 4.1.1-4.2.3 (Mar. 2010), https://www.unhcr.org/refworld/docid/4b97778d2.html (last visited Nov. 11, 2021); UNHCR, Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol (Jan. 26, 2007), http://www.unhcr.org/refworld/docid/45f17a1a4.html (last visited Nov. 19, 2021).

to the frontiers of territories where his life or freedom would be threat-ened on account of his race, religion, nationality, membership of a partic-ular social group or political opinion." Refugee Convention art. 33(1) (em-phasis added). A State may therefore not send a refugee back to the ref-ugee's country of origin, or another country where she or he fears perse-cution or serious harm, without violating international law.[10]

By prohibiting the return of a refugee to his or her country of origin or another country where s/he fears persecution or serious harm "[i]n any manner whatsoever," the Convention also encompasses expulsion that *indirectly* leads to a refugee's return. Refugee Convention art. 33(1). Ref-ugee law indeed prohibits not just direct refoulement, but also indirect or chain refoulement— i.e., "the removal of a refugee or asylum seeker to a third State in circumstances in which there is a risk that he or she might be sent from there to a territory where he or she would be at risk." Sir

---

[10] The Convention Against Torture and Other Cruel, Inhuman or De-grading Treatment or Punishment, to which the United States is *also* a party, similarly provides that "[n]o State Party shall expel, return ('re-fouler') or extradite a person to another State where there are substan-tial grounds for believing that he would be in danger of being subjected to torture." United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85.

Elihu Lauterpacht & Daniel Bethlehem, The Scope and Content of the Principle of Non-Refoulement: Opinion, *in* REFUGEE PROTECTION IN INTERNATIONAL LAW: UNHCR'S GLOBAL CONSULTATIONS ON INTERNATIONAL PROTECTION (Erika Feller et al. eds., 2003).[11]  If, for example, a non-Mexican refugee passes through Mexico to claim asylum at the U.S. border, and the United States expels him or her to Mexico, then the United States is jointly responsible under international refugee law if Mexico returns him or her to his or her country of origin.[12]

    3.  Combined with the definition of a refugee, the non-refoulement provision is key to the protection of persons fleeing persecution.  Moreover, the principle recognizes only limited exceptions: the Convention

---

[11] *See also* UNHCR & Inter-Parliamentary Union, *A Guide to International Refugee Protection and Building State Asylum Systems: Handbook for Parliamentarians N° 27s* (Dec. 31, 2017), https://www.unhcr.org/3d4aba564.pdf (last visited Nov. 11, 2021) [hereinafter "Guide on Building State Systems"] (discussing article 33(1) and reaching the same conclusion).

[12] Press Release, UNHCR, UNHCR concerned over U.S. expulsion flights under COVID-19 asylum restrictions (Aug. 11, 2021), *reprinted at* https://www.unhcr.org/news/press/2021/8/6113dfc14/unhcr-concerned-expulsion-flights-under-covid-19-asylum-restrictions.html (last visited Nov. 19, 2021).

makes *no* exception for public health, and also has no provision for any sort of *blanket* exceptions based on nationality, legal or other status.

Take Article 33(2) of the Convention. It provides that a person who qualifies as a "refugee"—and thus, who would otherwise be protected from expulsion or return "to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion"—*may* be returned where "there are reasonable grounds for regarding [him] as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country." Refugee Convention art. 33(2). Likewise, a more general provision in Article 9 provides for suspension of some rights of *particular* individuals for reasons of national security, again focusing upon the "particular person."[13]

_____

[13] "Nothing in this Convention shall prevent a Contracting State, in time of war or other grave and exceptional circumstances, from taking provisionally measures which it considers to be essential to the national security in the case of *a particular person*, pending a determination by the Contracting State that that person is in fact a refugee and that the continuance of such measures is necessary in his case in the interests of national security." Refugee Convention art. 9 (emphasis added).

Notably, neither of these articles and no other part of the Refugee Convention contains any exceptions or carve-out for public health.  Nor do the national-security exceptions discuss or encompass public-health emergencies, or otherwise permit non-individualized derogation.

To the contrary, the Convention's drafters "considered, but rejected, an all-embracing power of derogation in time of national crisis," with the American delegate insisting that "any exception to the duties owed refugees be limited to 'very special cases.'"[14]  Where the Convention included carve-outs, it specified that they must be exercised only with an *individualized* assessment. Refugee Convention arts. 9, 33(2).  *No* blanket exception—for public health or otherwise—authorizes expulsion without individualized assessment.

---

[14] JAMES C. HATHAWAY, THE RIGHTS OF REFUGEES UNDER INTERNATIONAL LAW 261-62, Cambridge Univ. Press (2005) (*quoting* UNHCR, Statement of Louis Henkin, UN Doc.E/AC.32/SR. 34-35 (Aug. 14-15, 1950)); *see also* U.N. Ad Hoc Comm. on Refugees and Stateless Persons, *Ad Hoc Committee on Refugees and Stateless Persons, Second Session: Summary Record of the Thirty-Fourth Meeting Held at the Palais des Nations, Geneva, on Monday, 14 August 1950, at 3 p.m.* (Sept. 22 1950), E/AC.32/SR.34, *reprinted at* https://www.refworld.org/docid/3ae68c1d34.html (last visited Nov. 19, 2021).

**B.    Published Authoritative Guidance Reflects States' Requirements to Identify Refugees and Prevent Refoulement**

Non-refoulement requires that, upon a non-national's appearance at a State's borders, the State must (i) identify whether the non-national has a well-founded fear of persecution based on protected traits (i.e., is or may be a "refugee"), and, if so, (ii) protect that non-national from (direct or indirect) return to his country of origin.  The only exception is if, based on a particularized assessment, that particular non-national poses a specific security risk to the State.

1.  The first of these steps—identification of "refugee[s]"—is critical to a State's ability to comply with its non-refoulement obligations.  Refugee Convention art. 1(A)(2) (defining refugee); *id.* art. 33 (prohibiting refoulement of defined refugees).  Refugee status is declaratory (that is, objective): a person is a refugee as soon as the criteria contained in the Convention's definition are fulfilled, which necessarily occurs prior to the time at which refugee status is formally determined.  UNHCR Handbook ¶ 28.  So absent credible identification procedures, a State might breach its non-refoulement obligations by expelling a non-national without knowing the individual was a refugee.  *See* UNHCR, Note on Determination of Refugee Status under International Instruments, ¶ 5 (Aug. 24,

1977) ("[A]ny person is a refugee within the framework of a given instrument if he meets the criteria of the refugee definition in that instrument, whether he is formally recognized as a refugee or not.")[15]; *cf.* UNHCR, Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol, ¶¶ 9, 20 (Jan. 26, 2007) (States must "ensur[e] protection from refoulement . . . *as soon as a person presents him- or herself at the border*") (emphasis added).[16]

In order to give effect to their obligations under the 1951 Convention, Contracting States must put in place fair and efficient procedures to identify refugees.  UNHCR Handbook ¶ 189.  While the 1951 Convention leaves it to Contracting States to establish procedures that correspond with their domestic systems, those procedures must satisfy a number of basic requirements aimed at allowing an individual assessment of

---

[15] https://www.unhcr.org/excom/scip/3ae68cc04/note-determination-refugee-status-under-international-instruments.html (last visited Nov. 11, 2021).

[16] www.unhcr.org/refworld/docid/45f17a1a4.html (last visited Nov. 11, 2021).

an asylum application by a competent authority, and the State is required to consider, in good faith and with due diligence, the individual circumstances of the person concerned. *Id.* ¶¶ 189-94; *see also* UNHCR, Conclusion of the Executive Committee No. 8 on Determination of Refugee Status - 1977 (Oct. 12, 1977).[17]

Through decades of published guidance, UNHCR has provided technical assistance to States in establishing fair and efficient asylum procedures. Starting from the person's arrival, States have an affirmative obligation to elicit information that might reveal potential refugee status. *See, e.g.*, Key Legal Considerations ¶ 3 ("States have a duty vis-à-vis persons who have arrived at their borders[] to make independent inquiries as to the persons' need for international protection and to ensure they are not at risk of *refoulement*") (italics in original). Thus, if there is *any* reason to *suspect* that a non-national may fear return to his or her country of origin, or other country where he or she fears persecu-

---

[17] https://www.refworld.org/docid/3ae68c6e4.html (last visited Nov. 19, 2021); *see also supra* n.5 (discussing significance of Executive Committee conclusions).

tion or serious harm—regardless of any clearly articulated need for pro-
tection—the State has a "duty" to make "independent inquiries as to the
person['s] need for international protection." *Id.*

If, during the course of such assessment, a State confirms that a
person has such a need—meaning he or she qualifies as a refugee—then
the State *must* protect him or her from refoulement, both directly (from
its borders to his or her country of origin or other country where he or she
faces persecution or serious harm) or indirectly (by way of expulsion to a
country that might return the individual to his or her country of origin
or other country where she or he faces persecution or serious harm). *See*
Guide on Building State Systems at 20; *see also* CORNELIS W. WOUTERS,
INTERNATIONAL LEGAL STANDARDS FOR THE PROTECTION FROM
REFOULEMENT 133, Intersentia (2009).

2.  Given these parameters, the UNHCR Handbook instructs States
on the design of refugee-identification procedures consistent with the in-
ternational treaties—all of which make clear that the CDC Order runs
afoul of international refugee law by instituting a blanket policy.

The UNHCR Handbook encourages States to prioritize practicality
and be mindful that, as "an applicant for refugee status is normally in a

19

particularly vulnerable situation," the applicant "may experience serious difficulties, technical and psychological, in submitting his case to the authorities of a foreign country, often in a language not his own."  UNHCR Handbook ¶ 190.  Thus, States should staff their refugee-identification operations with "qualified personnel having the necessary knowledge and experience, and an understanding of an applicant's particular difficulties and needs."  *Id.*

The UNHCR Handbook further recommends (*id.* at ¶ 192) that States ensure the following with respect to every non-national:

- The non-national is addressed by a "competent official (e.g., immigration officer or border police officer) . . . at the border or in the [State party] . . . [who] ha[s] clear instructions for dealing with cases which might come within the purview of the relevant international instruments. He should be required to act in accordance with the principle of non-refoulement and to refer such cases to a higher authority."

- The non-national receives "necessary guidance" about the State's refugee-identification procedure—including, if needed, guidance from a "competent interpreter."  Among other things, that guidance should indicate for the non-national the "clearly identified authority . . . with responsibility for examining [any] request for refugee status."

- Any non-national who indicates an interest in refugee status is "given the opportunity . . . to contact a representative of UNHCR."

- Any non-national who applies for refugee status is "permitted to remain in the country pending a decision" on his request, in compliance with the principle of non-refoulement.

The specifics of this longstanding guidance are less important here than the simple point they reflect:  international law requires States to conduct an individualized assessment, *before* a person is expelled, to evaluate whether the individual is a qualifying "refugee."  That is the key foundational principle that the CDC Order contravenes.

## C.   The U.S.'s Summary Expulsion Policy Violates the International Law Principle of Non-Refoulement.

Applying this longstanding law and guidance, UNHCR has concluded in published guidance that a summary-expulsion policy, such as the one codified in the CDC Order, cannot be reconciled with the Refugee Convention and its Protocol.  There is no reasonable contrary conclusion.

To repeat, the "cardinal protection principle" of non-refoulement prohibits State conduct that *could* "lead[] to" a refugee's "'return in *any* manner whatsoever' to an unsafe foreign territory."  Key Legal Considerations ¶ 2 (citing Refugee Convention art. 33) (emphasis added).  That certainly proscribes enactment and implementation of a blanket policy—like the CDC Order's summary-expulsion policy—of "rejection at the [border] or non-admission to the territory," because blanket rejection or non-

21

admission clearly may subject a refugee to direct and/or indirect re-
foulement.  Key Legal Considerations ¶ 2 (citing Refugee Convention art.
33) (emphasis added).  That is clear regardless of what Title 42 does or
does not allow under domestic law.

Nor can the United States justify the policy on the ground that it
may not be the country that *directly* subjects the refugee to harm or re-
turn: for again, the United States violates international law if it turns
away a refugee to a third country that *itself* returns the refugee to his or
her country of origin.  *See* Guide on Building State Systems at 68 (dis-
cussing the obligation to prevent chain refoulement).[18]

---

[18] Critics of the CDC Order have highlighted the risk that it impermissi-
bly enables direct refoulement to countries like Haiti.  *See, e.g.*, Memo-
randum from Harold Hongju Koh, Former U.S. Dep't of State Legal Ad-
viser, "Re: Ending Title 42 return flights to countries of origin, particu-
larly Haiti" (Oct. 2, 2021), *reprinted at* https://www.polit-
ico.com/f/?id=0000017c-4c4a-dddc-a77e-4ddbf3ae0000 (last visited Nov.
11, 2021) [hereinafter "Koh Memo"].  However, the risk of chain re-
foulement is *also* concerning to the extent that the United States expels
non-nationals to Mexico.  A recent joint statement by UNHCR, the
United Nations Children's Fund, the United Nations High Commis-
sioner for Human Rights, the United Nations Entity for Gender Equal-
ity and the Empowerment of Women, and the International Organiza-
tion for Migration, warns that Mexican institutions—overwhelmed by
the pandemic—have recently been unable to guarantee refugees' non-
refoulement (and other) rights.  *See* UNHCR et al., *Agencias de la ONU*

In short, the CDC Order's "suspension of" entry by (i) single adults and family units (ii) traveling from Canada or Mexico (regardless of their country of origin) (iii) "who would otherwise be held at [point of entry] and U.S. Border Patrol Stations" upon entry violates international law because it does not include a *personalized* assessment of *refugee status* and does not adequately protect against direct and indirect refoulement. CDC, Public Health Assessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists (Aug. 2, 2021), at 42829-30, 42838, 42841.[19]

It is not sufficient that the CDC Order authorizes DHS to make case-by-case exceptions "based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." *Id.* at 42841. Nor does the CDC Order's special screening of the subset of non-nationals

---

*expresan preocupación frente al deterioro de las condiciones humanitarias de las personas migrantes y solicitantes de asilo en las fronteras norte y sur de México* (Aug. 11, 2021), https://www.acnur.org/es-mx/noticias/ul/2021/8/61143e084/agencias-de-la-onu-expresan-preocupacion-frente-al-deterioro-de-las-condiciones.html (last visited Nov. 11, 2021).

[19] https://www.federalregister.gov/documents/2021/08/05/2021-16856/public-health-reassessment-and-order-suspending-the-right-to-introduce-certain-persons-from (last visited Nov. 11, 2021).

that take on the burden of making an "affirmative, spontaneous[,] and reasonably believable claim that they fear being tortured in the country they are being sent back to" remedy those errors.[20]  Doc. No. 1919200 (Joint App.), at 212.  The Order nowhere instructs DHS to individually assess non-nationals to determine refugee status and, if a non-national *is* a refugee, to guarantee his or her safety from refoulement.  *That* is what international law plainly requires.

## III.   THE U.S. CAN BOTH PROTECT PUBLIC HEALTH DURING COVID-19 AND COMPLY WITH INTERNATIONAL LAW.

UNHCR has long acknowledged that States may take measures to ascertain and manage risks to public health (such as testing and quarantine), including at the border. Key Legal Considerations ¶ 5; *see* Executive Committee COVID-19 Conclusion ("[a]cknowledging that States have the right to take measures to protect public health[,] while recalling that such measures need to be implemented in a manner consistent with States' obligations under international law, including international refugee" law).

---

[20] As one former government official explains, under this provision, "[m]igrants who arrive at the border are not screened for fears of persecution upon return unless they affirmatively raise their fear, in what is informally known as the 'shout test.'"  Koh Memo 2.

In line with that principle, it is entirely possible—and now common—to adopt public-health measures to stem the transmission of COVID-19 without violating the Refugee Convention and its Protocol. To date, UNHCR's ongoing review has identified 75 countries with pandemic-era restrictions that, as written, include carve-outs to take account of refugee status (including, where applicable under domestic law, asylum-seekers) and abide by non-refoulement obligations.

Take, for example, the European Commission's standards on travel restrictions to the European Union during the pandemic, which provide:

> To slow down the spread of coronavirus and protect the health and well-being of all Europeans, some travel restrictions have been implemented for travel into the EU from third countries . . . [But] the temporary travel restrictions should not . . . apply to travel by people with an essential need, *including . . . persons in need of international protection or for other humanitarian reasons.*

European Commission, *Exemptions to coronavirus travel restrictions into the EU.*[21]

The European standards' explicit exception for "persons in need of international protection"—including refugees—transforms what would otherwise be an impermissible blanket policy into a policy that complies

---

[21] https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/travel-during-coronavirus-pandemic/exemptions-coronavirus-travel-restrictions-eu_en (last visited Nov. 11, 2021).

with the cardinal principle of non-refoulement.  *See* 1997 Note; *see also* European Commission, Guidance on the implementation of the temporary restriction on non-essential travel to the EU, on the facilitation of transit arrangements for the repatriation of EU citizens, and on the effects on visa policy, 5 (Mar. 30, 2020) (excepting from restrictions "[p]ersons in need of international protection or for other humanitarian reasons respecting the principle of non[-]refoulement.").[22]

Indeed, as EU Member States have sought to abide by EU law, some of them adopted "[t]argeted measures . . . for newly arrived asylum seekers, such as self-isolation, quarantine, placement in emergency structures and health screening."  Eur. Comm'n, The impact of COVID-19 in the migration area in EU and OECD countries, 23 (Apr. 2021).[23]

---

[22] https://ec.europa.eu/home-affairs/system/files/2020-03/20200330_c-2020-2050-report_en.pdf (last visited Nov. 11, 2021); *see also* UNHCR, Practical Recommendations and Good Practice to Address Protection Concerns in the Context of the COVID-19 Pandemic, https://www.refworld.org/docid/5ede06a94.html (last visited Nov. 19, 2021) [hereinafter "UNHCR Practical Recommendations"] (discussing practices in Europe as of April 2020).

[23] https://www.oecd.org/migration/mig/00-eu-emn-covid19-umbrella-inform-en.pdf (last visited Nov. 11, 2021).

Such measures, as written and when properly implemented, would also comply with non-refoulement obligations.[24]

UNHCR has collected additional data from States party to the Refugee Convention and its Protocol.  Austria, for example, enacted a national decree restricting travel during the pandemic—but stipulated that entry could not be refused where doing so would violate applicable law. UNHCR, COVID-19 Protection Issues Global Monitoring: Borders and Admission of Asylum Seekers (Database) (updated Nov. 18, 2021) (on file with author).  Norway and Sweden's policies are similar. *Id.*[25]

---

[24] Human rights advocates have disputed that EU members always comply with the *written policy* (and international law) *in practice*. *See, e.g.*, Human Rights Watch, WORLD REPORT 2021: EVENTS OF 2020, 242 (2021) ("Nongovernmental and international organizations reported cases of pushbacks, often accompanied by violence, or denials of access to asylum at many EU land external borders, including in Greece, Croatia, Slovenia, Bulgaria, Hungary, and Poland").  For purposes of this brief, UNHCR takes no position on that issue.

[25] *See* Norwegian Gov't Sec. & Serv. Organization, *The coronavirus situation: Questions and answers about entry to Norway* (Aug. 10, 2021), https://www.regjeringen.no/en/topics/koronavirus-covid-19/Questions-and-answers-coronavirus-situation-in-Norway/the-coronavirus-situation-questions-and-answers-aboutentering-norway/id2703365/?expand=factbox2830667 (last visited Nov. 18, 2021) (Norwegian exception for "asylum seekers and resettlement refugees); Rikspolisstyrelsen [Swedish National Police Board, or "Polisen"], *Travel to Sweden during the corona pandemic* (updated Nov. 15, 2021), https://polisen.se/en/the-

France, by contrast, faced litigation before its highest administrative court last year about the overbreadth of its travel restrictions. In one case, the French Council of State denounced the French authorities' wrongful expulsion of a non-national who attempted to seek asylum at the French border.[26] In light of the circumstances, "[t]he Council of State concluded that by refusing [her] entry to the territory[,] the authorities had manifestly infringed the right to asylum." *Id.* France resumed regular processing for asylum applications—while adding hygiene measures designed to combat COVID-19 transmission.

Altogether, these examples illustrate that States can both protect public health and comply with international law. That practice accords

---

swedish-police/the-coronavirus-and-the-swedish-police/travel-to-and-from-sweden/ (last visited Nov. 18, 2021) (Swedish exception for "[i]ndividuals in need of international protection (e.g. asylum) or have other humanitarian needs."); *see generally* UNHCR Practical Recommendations.

[26] Conseil d'État [Council of State], 7ème chambre, No. 440756, Jul. 8, 2020 (Fr.), https://www.legifrance.gouv.fr/ceta/id/CETATEXT000042100831/ (last visited Nov. 18, 2021); *see* Eur. Asylum Support Office, *EASO Case Law Database: Applicant (Central African Republic), Case No.* 440756, https://caselaw.easo.europa.eu/pages/view-caselaw.aspx?CaseLawID=1148 (last visited Nov. 18, 2021) (English summary).

with UNHCR guidance on the proper exercise of States' "sovereign power to regulate the entry of non-nationals" while respecting international refugee law's core precepts.  Key Legal Considerations ¶ 1; *see also id.* ¶ 5 ("Denial of access to territory without safeguards to protect against refoulement cannot be justified on the grounds of any health risk."); Executive Committee COVID-19 Conclusion ¶ k (noting that the Executive Committee—including its member, the United States—"[w]elcomes steps taken by States to ensure that measures taken to limit entry at borders in connection with public health emergencies are . . . applied in a manner which safeguards public health, while respecting the right to seek and enjoy asylum and the principle of non-refoulement, and complying with applicable obligations under international law, including international refugee law").

## CONCLUSION

In UNHCR's view, the CDC Order's summary-expulsion policy cannot be reconciled with the inviolable prohibition against refoulement under international law.

NOVEMBER 19, 2021                    Respectfully submitted,

                                     /s/ Vincent Levy
                                     VINCENT LEVY
                                        *Counsel of Record*
                                     DENISHA S. BACCHUS
                                     HOLWELL SHUSTER & GOLDBERG LLP
                                        *425 LEXINGTON AVENUE*
                                        *NEW YORK, NY 10017*
                                        (646) 837-5151
                                        (646) 837-5150 (FAX)

                                     ALICE FARMER
                                     KAREN BAKER
                                     UNITED NATIONS HIGH
                                     COMMISSIONER FOR REFUGEES
                                        *1800 Massachusetts Ave., N.W.*
                                        *Washington, DC 20036*
                                        *(202) 296-5191*
                                        *(202) 296-5660 (fax)*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)(A) and Fed. R. App. P. 32(a)(7)(B) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 14-point font.

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and D.C. Circuit Rule 32(f) because it contains 5,658 words excluding the parts exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(f).

/s/ Vincent Levy
VINCENT LEVY

DATED: NOVEMBER 19, 2021

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on November 19, 2021. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Vincent Levy
VINCENT LEVY

DATED: NOVEMBER 19, 2021