**[ORAL ARGUMENT SCHEDULED FOR JANUARY 19, 2022]**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NANCY GIMENA HUISHA-HUISHA,
on behalf of herself and others similarly situated,

Plaintiffs-Appellees,

v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**REPLY BRIEF**

———————————

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

MATTHEW M. GRAVES
  *United States Attorney*

SHARON SWINGLE
JOSHUA WALDMAN
ASHLEY A. CHEUNG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7261*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9018*
  *ashley.cheung@usdoj.gov*

# TABLE OF CONTENTS

**Page**

GLOSSARY

SUMMARY OF ARGUMENT ........................................................................1

ARGUMENT.................................................................................................3

I.    The Government is Likely to Succeed on the Merits................................3

    A.    Prohibiting the "Introduction" of Persons from a Foreign Country with a Serious Danger of Communicable Disease Includes the Authority to Expel Such Persons.................................3

    B.    Plaintiffs' Alternative Arguments Are Meritless...........................12

        1.    Section 265 is Not Limited to Regulating Transportation Providers. ........................................................................12

        2.    Section 265 Does Not Irreconcilably Conflict with Immigration Provisions, but in Any Event, Section 265 Would Control..................................................................17

        3.    The Constitutional Avoidance Doctrine is Inapplicable. ........20

II.    The Remaining Preliminary Injunction Factors Do Not Support An Injunction ..........................................................................................21

CONCLUSION............................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Alabama Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021)..........................................................................11, 12

*DHS. v. MacLean*,
  574 U.S. 383 (2015)....................................................................................13

*Encino Motorcars, LLC v. Navarro*,
  139 S. Ct. 2117 (2016).................................................................................12

*Gundy v. United States*,
  139 S. Ct. 2116 (2019).................................................................................11

*Latif v. Obama*,
  677 F.3d 1175 (D.C. Cir. 2011) ..................................................................20

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020).................................................................................22

*Reno v. Flores*,
  507 U.S. 292 (1993).....................................................................................22

*Valentine v. United States ex rel. Neidecker*,
  299 U.S. 5 (1936) ..........................................................................................7

**Statutes:**

26 Stat. 1084 (1891).................................................................................. 8, 14

27 Stat. 449 (1893)........................................................................................13

8 U.S.C. § 1182(a)(1)......................................................................................8

8 U.S.C. § 1222...............................................................................................8

8 U.S.C. § 1222(a)...........................................................................................9

18 U.S.C. § 1325(a) ...................................................................................10

18 U.S.C. § 3185 .........................................................................................6

42 U.S.C. § 265 .............................................. 3, 4, 5, 6, 10, 11, 19, 20

42 U.S.C. § 267(b) .....................................................................................13

42 U.S.C. § 269 ..........................................................................................13

42 U.S.C. § 270 ..........................................................................................13

42 U.S.C. § 271(a) .......................................................................................9

42 U.S.C. § 271(b) .....................................................................................13

**Regulation:**

42 C.F.R. § 71.40(f) ............................................................................ 7, 21

**Legislative Material:**

24 Cong. Rec. (1893) ...................................... 7, 8, 14, 15, 16, 18, 19

**Other Authorities:**

Black's Law Dictionary, Westlaw (11th ed. 2019):
   *Carrier* ..................................................................................14
   *Extradite* .............................................................................7

85 Fed. Reg. 16,559 (Mar. 24, 2020) ........................................................12

85 Fed. Reg. 56,424 (Sept. 11, 2020) ........................................................20

86 Fed. Reg. 42,828 (Aug. 5, 2021) ...........................................................9

U.S. Customs and Border Prot., DHS, *Southwest Land Border Encounters*,
   https://go.usa.gov/xeQ8Y (last modified Nov. 15, 2021) ................................27

## GLOSSARY

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| CDC | U.S. Centers for Disease Control and Prevention |
| DHS | Department of Homeland Security |

## SUMMARY OF ARGUMENT

The district court enjoined the application of a critical public-health measure—the authority granted in Section 265 to prevent the introduction of a communicable disease into the United States. The challenged U.S. Centers for Disease Control and Prevention (CDC) Order protects against the risk of transmission of COVID-19 resulting from holding noncitizens in congregate settings—facilities that are not designed or equipped to quarantine, isolate, or enable social distancing—pending immigration processing. If permitted to go into effect, the district court's injunction would prohibit the U.S. Government from exercising the authority to expel noncitizens who come to the United States as a family unit. The government would instead be required to hold those noncitizens in congregate settings at or near the border, thereby exacerbating the virus-transmission risk. The preliminary injunction would preclude the government from exercising its lawful discretion under Section 265 to respond in an appropriate and measured manner to a serious public-health threat from a deadly communicable disease. The highly transmissible Delta variant and the historic surge of noncitizens crossing the Southwest Border have only increased the need for the Order.

Plaintiffs' opposition fails to undermine the government's demonstration that the district court abused its discretion. On the merits, the statutory text and

context strongly support CDC's conclusion that Section 265 authorizes enforcement of the prohibition on introduction of noncitizens by expelling those noncitizens if they manage to cross the border before being encountered. Plaintiffs fall back on alternative merits arguments that Section 265 regulates only transportation providers; that CDC's interpretation impermissibly overrides certain immigration statutes; and that CDC's interpretation would raise constitutional concerns if applied to U.S. citizens. But the district court did not reach or rule upon any of those arguments, and this Court should likewise decline to affirm the district court's injunction on these grounds. In any event, the arguments are meritless.

First, plaintiffs' contention that Section 265 authorizes only the regulation of transportation providers impermissibly transforms a broad grant of statutory authority to address the serious threat of communicable disease into a limited authority that would leave the agency powerless to prohibit the spread of disease by those crossing a land border without the assistance of a transportation company. Second, Section 265 does not irreconcilably conflict with the immigration provisions that plaintiffs invoke. Those generally applicable immigration provisions apply in normally prevailing conditions in the absence of a rare public-health emergency, whereas Section 265 applies only in narrow and specific circumstances of a public-health emergency. And even if there were a conflict,

2

Section 265 would control.  Third, this Court does not need to address plaintiffs'

argument that CDC's interpretation would raise constitutional concerns if applied

to U.S. citizens, as neither the final rule nor the CDC Order applies to U.S.

citizens.  At a minimum, CDC's reasonable interpretation is entitled to *Chevron*

deference.

Plaintiffs have also failed to demonstrate that the remaining preliminary

injunction factors support an injunction.  The COVID-19 pandemic continues to be

a highly dynamic public-health emergency.  CDC's discretion concerning whether

to prohibit the introduction of persons from particular countries and in what

circumstances is critical to avoiding irreparable harm.  Plaintiffs ask this Court to

overrule CDC's expert public-health judgment regarding the increased risk of a

serious danger of transmission of COVID-19.  But Congress charged CDC—not

the federal courts—with making public-health judgments about how best to protect

the country during a pandemic.

## ARGUMENT

## I.    The Government is Likely to Succeed on the Merits

### A.    Prohibiting the "Introduction" of Persons from a Foreign Country with a Serious Danger of Communicable Disease Includes the Authority to Expel Such Persons

Section 265 authorizes CDC "to prohibit, in whole or in part, the

introduction of persons and property" from a foreign country "[w]henever" the

3

agency "determines" that, "by reason of the existence of any communicable disease in a foreign country," the "introduction of persons or property from such country" presents a "serious danger of the introduction of such disease into the United States," and the prohibition "is required in the interest of the public health." 42 U.S.C. § 265.  Plaintiffs and the district court are incorrect in concluding that this statutory authority does not provide CDC with any authority to expel persons from the United States once they cross the border.

As a matter of ordinary language, the power to prohibit something naturally encompasses the power to stop the prohibited action after it has begun or to remedy a violation that evades the statutory prohibition.  A statute prohibiting persons from entering certain areas is most naturally read to include both the power to prevent persons from entering in the first instance and the power to expel them if they mistakenly or surreptitiously enter in contravention of that prohibition.  *See* Gov't Br. 27-32.  Thus, "prohibit[ing]" the "introduction" of a person who may carry a communicable disease into the United States and to the population at large encompasses turning noncitizens around and sending them back across the border if they mistakenly or surreptitiously enter in contravention of that prohibition, in order "to avert [the] danger" of "the introduction of [communicable] disease into the United States."  42 U.S.C. § 265.

Statutory context also squarely supports CDC's interpretation. Section 265 seeks "to avert" the "serious danger of the introduction * * * into the United States" of "any communicable disease in a foreign country" if that "danger is so increased by the introduction of persons * * * from such country." The need to prevent the spread of disease is in no way diminished by the fact that a noncitizen has arrived at a Port of Entry or managed to cross the border unlawfully, and neither plaintiffs nor the district court offer any plausible reason why the statute should be read to render CDC powerless in those circumstances.

Plaintiffs argue that the statute could confer expulsion authority only if Congress *explicitly authorized* physical removal with an "express statement" or included catch-all language such as take "other appropriate action" or "other measures." Br. 16-20. What matters is not whether Congress used magic words, but what the words that Congress did use mean. Here, the most common-sense reading of Section 265 includes the power both to prevent persons from entering and to prevent people who manage to evade restrictions on entering from moving further into the country by expelling them.

Plaintiffs rely on extradition statutes in arguing that Congress has a "long history" of expressly granting expulsion authority. Br. 17. But it is not surprising that extradition statutes use terms such as "return[] and surrender[]," 18 U.S.C. § 3185, as the definition of "extradite" is "[t]o surrender or deliver (a fugitive) to

5

another jurisdiction" or "to send (an accused person) back to the state or country where a crime may have happened," *Extradite*, Black's Law Dictionary, Westlaw (11th ed. 2019). Plaintiffs rely on *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936), but that case addressed whether a treaty authorized the extradition of *U.S. citizens* where the treaty stated that "[n]either of the contracting Parties shall be bound to deliver up its own citizens." *Id.* at 6-7. The Court held that "a grant * * * of discretionary power to surrender citizens of the United States" may not "be implied" from this language. *Id.* at 11-12. *Valentine* thus has no bearing on the meaning of Section 265, particularly where the final rule and the CDC Order do not apply to U.S. citizens. 42 C.F.R. § 71.40(f); 1 Joint Appendix (JA) 148.

Plaintiffs also find it significant (Br. 17) that in 1893, Congress simultaneously considered two competing bills to address the cholera epidemic—the bill that would become Section 265, and a competing bill (that Congress did not enact) that would have suspended all immigration for one year and that specified that an immigrant entering to the contrary shall "be sent back to the country from which he came." 24 Cong. Rec. 290 (1892). But in debating the merits of these competing bills, no member of Congress attributed any significance to the absence of similar language in Section 265. Rather, Senators discussed the merits of requiring a presidential proclamation to trigger a prohibition (as Section

6

265 required, but the competing bill did not), *see* 24 Cong. Rec. 364-65 (1893), and the merits of applying a prohibition to immigration only (as the competing bill did, *see* 24 Cong. Rec. 290) or also to tourists and other temporary visitors (as did Section 265, as amended), *see* 24 Cong. Rec. 361, 363, 374. And Senator Chandler, who introduced and was the chief proponent of the competing bill, ultimately proclaimed himself "heartily in favor" of Section 265, 24 Cong. Rec. 393, voted for Section 265 as amended, *id.* at 471, and let his competing bill "lapse," *id.* at 473. To the extent the legislative history of this unenacted bill is relevant, it demonstrates that no member of Congress viewed the absence of "sent back" language in Section 265 to be a notable difference, consistent with the view that Section 265's language is most naturally read to include the authority to prohibit entry as well as to expel.

Plaintiffs note that under certain immigration provisions, the government can detain and remove noncitizens on "health-related grounds." Br. 18 (citing 8 U.S.C. §§ 1182(a)(1), 1222). That Congress separately addressed health-related grounds of inadmissibility in an immigration statute says nothing about the meaning of Section 265, a public-health statute. If anything, the fact that Congress enacted Section 265 to address the cholera epidemic just two years after enacting a statute to exclude noncitizens from admission because of a "dangerous contagious disease," 26 Stat. 1084, 1084 (1891); *see* Br. 18, underscores that Congress

7

considered the existing immigration laws insufficient to address adequately the relevant dangers, and that Congress intended for Section 265 to confer a *greater* authority to prohibit the entry of, and to expel, persons who presented a risk of introducing a contagious disease into the United States. Likewise, exercising the authority to detain noncitizens for examination "[f]or the purpose of determining whether [noncitizens] arriving at ports of the United States" are inadmissible "by reason of being afflicted with [certain] diseases," 8 U.S.C. § 1222(a), would not address the same harms as Section 265, as CDC has repeatedly explained that holding noncitizens in congregate settings increases the risk of COVID-19 transmission. 86 Fed. Reg. 42,828, 42,830 (Aug. 5, 2021).

Plaintiffs also note that the government can arrest and imprison or fine noncitizens who cross the border. Br. 20-22 (citing 42 U.S.C. § 271(a)). But Congress's provision of these penalties in Section 271 in no way limits CDC's authority under Section 265 to use expulsion to implement the basic authority to prevent introduction of individuals and disease among the population. Although those punishments might deter some unlawful border crossings in the first instance, they do not further Section 265's purpose of averting the spread of disease caused by the continued presence of those who were not sufficiently deterred. Indeed, imprisonment in congregate settings risks exacerbating the risk of transmission that the CDC Order seeks to avoid and would be contrary to the statutory purpose of

keeping contagious persons out of the country.  It is hard to imagine that Congress enacted Section 265 with the expectation that individuals with a deadly and highly contagious disease (like COVID-19 or, for example, Ebola) would have to be permitted to remain in the United States—thus ensuring the "introduction" of the disease at issue.  Under plaintiffs' view, the United States would be powerless to prevent the introduction of a novel disease, no matter how detrimental.  In light of the purpose of Section 265, the plaintiffs' interpretation is implausible in context.

Plaintiffs further suggest that Section 265 does not authorize the government to stop noncitizens from crossing the border.  Br. 22-23.  Notably, the district court did not endorse this extreme view.  1 JA 110.  Nor do plaintiffs provide any support for this interpretation, which would render Section 265 a virtual nullity. Indeed, plaintiffs' view would render even their own interpretation of the statute essentially meaningless, as it would presumably preclude the government from stopping transportation providers from crossing the border.  If all Section 265 permitted were after-the-fact punishment of noncitizens who unlawfully cross the border, it would do nothing more than the existing criminal penalty for illegal entry.  *See* 18 U.S.C. § 1325(a).

Amicus The Cato Institute argues (at 12) that Section 265 is an impermissible delegation that "would give the CDC virtually unlimited authority to bar the entry of migrants and visitors from abroad."  But Section 265 only applies

where CDC determines that the "introduction of persons or property" presents a "serious danger of the introduction of [] disease into the United States" and the prohibition "is required in the interest of the public health." 42 U.S.C. §265. That standard is at least as intelligible as others upheld by the Supreme Court. *See Gundy v. United States*, 139 S. Ct. 2116 (2019) (plurality op.) (explaining that the Court has "upheld even very broad delegations," including delegations to regulate in the "public interest"; to set "'fair and equitable' prices and 'just and reasonable' rates"; and to issue air quality standards as "'requisite to protect the public health'").

The Cato Institute also relies on *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2485 (2021), but the Court did not address the nondelegation doctrine there. Moreover, in *Alabama Association of Realtors*, the scope of CDC's authority under Section 264(a) to "prevent the introduction" of communicable disease was informed by the expressly enumerated powers listed in the very next sentence of the same subsection. *Id.* at 2488. Here, in contrast, the enumerated mitigation measures relied upon by the district court and plaintiffs (quarantine, apprehension, detention, and penalties) appear in different statutory provisions, not Section 265 itself. Congress made clear that Section 265 was intended to expand CDC's authority beyond the express measure of quarantine listed elsewhere in the Public Health Service Act. Nor, finally, do Section 265 or the CDC Order

10

"exercise powers of vast economic and political significance" or "intrude[] into an area that is the particular domain of state law." *Id.* at 2489. Section 265 and the CDC Order do not regulate economic activity; do not directly regulate any domestic persons or entities; and operate in an area of uniquely federal concern.

At a minimum, Section 265 is ambiguous, and CDC's reasonable interpretation is entitled to *Chevron* deference. Gov't Br. 34-37. Plaintiffs do not dispute that CDC administers Section 265 and that the challenged Order carries the force of law and was issued under the authority of a final rule promulgated in accordance with the Administrative Procedure Act. That is sufficient to warrant *Chevron* deference. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Plaintiffs argue that CDC is entitled to no deference because its interpretation of Section 265 would override another statute it does not administer. Br. 40. But that argument is plainly incorrect with respect to the primary issue presented: whether Section 265 by its own terms permits expulsion to avoid the spread of disease. Moreover, contrary to plaintiffs' assertion, Br. 42, CDC's interpretation is rooted in its expert public-health determination that "those who have physically crossed a border of the United States and are in the process of moving into the interior * * * present a risk of transmission of a communicable disease" into the United States. 85 Fed. Reg. 16,559, 16,563, 16,567 (Mar. 24, 2020).

11

### B.    Plaintiffs' Alternative Arguments Are Meritless

Plaintiffs also raise alternative merits arguments—not reached or ruled on by the district court—in support of their assertion that they are likely to prevail on the merits.  Br. 25-40.  Putting aside the anomaly of asserting that the district court did not abuse its discretion based on issues it never reached, *see* 1 JA 112 n.6, plaintiffs' arguments are meritless.

### 1.    Section 265 is Not Limited to Regulating Transportation Providers.

Contrary to plaintiffs' argument, Br. 25-31, Section 265 is not limited to regulating transportation providers.  Unlike neighboring provisions explicitly regulating "vessels" or "aircraft," 42 U.S.C. §§ 267(b), 269, 270, 271(b), Section 265 refers to "the power to prohibit * * * the introduction of persons" without any reference to their means of transportation.  "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *DHS v. MacLean*, 574 U.S. 383, 391 (2015).

Plaintiffs argue that Congress used the "general term 'introduction of persons and property'" to "encompass the various means of transporting passengers and cargo."  Br. 28.  But elsewhere in the same statute, Congress expressly referred to "any merchant ship or other vessel," as well as "its cargo, passenger, and crew," 27 Stat. 449, 449-50 (1893), and its use of different words in Section 265 must be taken to have meaning.  Congress could also have used a

phrase such as "steamship or transportation company or owners of vessels * * * or * * * [its] agents" as it had done two years earlier, 26 Stat. at 1084, or "common carrier," which (despite plaintiffs' claim, Br. 28) encompasses "transport[ing] *freight* or passengers," *Carrier,* Black's Law Dictionary, Westlaw (11th ed. 2019) (emphasis added).  Congress could even have used the phrase "third-party transportation" or "transportation providers," as plaintiffs suggest was its intent.  But Congress did none of that.  As one Senator emphasized in discussing what became Section 265, it regulated people, not their method of transportation.  *See* 24 Cong. Rec. 393 ("[W]e are now legislating in regard to persons; we are now legislating in regard to immigration.  To say that an empty vessel may come in with nobody upon it is, I submit, simply begging the whole question.").

Indeed, when considering Section 265's predecessor, the Senate rejected an amendment to bar "passenger travel" or "all passenger travel," 24 Cong. Rec. 470.  As Senator Palmer explained, "something more would be necessary in order to protect the public interest than the mere restriction upon passenger travel," for example "some stronger word, such [as a] term to prohibit intercourse," *id.*, and after the "passenger travel" amendment was rejected, Senator Palmer proposed instead the language authorizing the "power to prohibit * * * the introduction of persons," *id*. at 471, which the Senate adopted, *id.* at 471-72.  Plaintiffs implausibly contend that the Senate meant to "equate[]" that language with the

13

rejected "passenger travel" proposal, Br. 30; in fact, the Senate did the opposite, adopting the language in the statute because it was not limited to passenger travel.[1]

Plaintiffs suggest that the "something more" the Senate thought necessary when it rejected the "passenger travel" proposal was the authority to prohibit the introduction of property. Br. 29. But as Senator Chandler explained, "[i]t is not what the passenger brings with him * * * that is itself important to us, but it is important that the people who come here shall be cleanly," 24 Cong. Rec. 366, and in any event he suggested that the President already possessed the power "to keep out infectious property; but there is no harm in adopting the amendment in this form," *id.* at 471. Nor did the Senate reject the "passenger travel" proposal "for [the] entirely different reason" that the statute lacked flexibility to apply "in whole or in part." Br. 29-30. The Senate rejected the "passenger travel" proposal entirely, instead adding the flexibility conferred by "in whole or in part" to

_____

[1] Plaintiffs (Br. 28-29) and Historians (at 10-11 & n.4) place weight on the fact that the rejected amendment would have prohibited "all passenger travel, *but not immigration alone*." 24 Cong. Rec. 470 (emphasis added). Under either wording, the proposal would have covered all types of passenger travel, but the Senate rejected that proposed amendment and instead adopted different and broader language prohibiting "the introduction of persons," which contained no textual limitation to means of travel.

different statutory language, namely, the "power to prohibit, in whole or in part, the introduction of persons and property."[2]

Contrary to plaintiffs' claim, Br. 26-31, Congress was not exclusively focused on passenger ships, and its Members were well aware that communicable diseases could be spread by persons arriving over land borders. 24 Cong. Rec. 370 (noting the "terrible ravages [that] cholera was going to bring to this country" could "come from Mexico"); *id.* at 359 (noting immigration "coming through Alaska and Mexico"); *id.* at 364 (noting possibility of "cholera-breeding immigration which will come into this country by land" though Canada); *id.* at 371. Plaintiffs accuse the government of "selectively quot[ing]" Senator Chandler, Br. 30, claiming that he was "not afraid" of cholera coming "by land," Br. 31. In fact, Senator Chandler stated he was "not afraid, *if the bill passes for the suspension of immigration for one year* [discussed *supra* p. 7-8], that * * * cholera-breeding immigration [would] come into this country by land," 24 Cong. Rec. 365

---

[2] Amicus Historians (at 11) attribute the rejection of the "passenger travel" proposal to a debate between Senators Vilas and Gray over the degree to which the bill should "discriminate" among different persons. But aside from the fact that these Senators were addressing different issues (Senator Vilas addressed whether immigrants should be treated the same as temporary visitors, while Senator Gray addressed the distinction between citizens and non-citizens, *see* 24 Cong. Rec. 470), the Senate resolved the problem by adding the authority to prohibit "in whole or in part"—but to the prohibition on "the introduction of persons" rather than the rejected amendment prohibiting "passenger travel."

(emphasis added).  And as noted above, *supra* p. 8, rather than pursuing his bill for a one-year suspension of immigration, Senator Chandler voted for the competing bill that became Section 265, which granted the power to prohibit the introduction of persons, without any limitation on whether they come by land or by overseas vessel.[3]

Plaintiffs contend (Br. 27-28) that the only time Section 265 was invoked prior to 2020 to prohibit the introduction of persons was by regulating transportation providers.  But the relevant executive order in fact addressed how persons "may be introduced directly or indirectly by transshipment *or otherwise* into the United States."  2 JA 203 (emphasis added).  Regardless, it is not surprising that an executive order applying only to persons coming overseas from China or the Philippine Islands would focus on transportation vessels, which would have been the only practical means of coming to the United States from those locations in 1929.  This example says nothing about the authority under Section 265 to address the threat of contagious disease from noncitizens arriving at Canadian and Mexican land borders, where the introduction of a person does not require a transportation provider.

---

[3] Plaintiffs also object that other Senators criticized Section 265 for *failing* to address persons arriving by land, Br. 31, but those statements were made *before* the bill was amended to authorize the "power to prohibit * * * the introduction of persons."

In the end, plaintiffs do not dispute that their interpretation would lead to the illogical conclusion that passengers could simply disembark offshore, or just before the border, and then enter the country without violating the statute; they merely question whether that scenario is likely. *See* Br. 31. But one Senator noted this exact problem, observing that "it is an open and notorious fact that for want of patrol people were escaping from the ships and getting to shore more or less during that whole quarantine" the previous year. 24 Cong. Rec. 373. Plaintiffs also question why a commercial entity would risk penalties by engaging in that behavior. But the relevant question for interpreting the statute is why Congress would have left such an obvious and gaping loophole in Section 265, not why the supposed subject of regulation would risk violating the statute.

### 2.     Section 265 Does Not Irreconcilably Conflict with Immigration Provisions, but in Any Event, Section 265 Would Control.

Plaintiffs argue that CDC's interpretation of Section 265 unlawfully conflicts with provisions of the immigration laws providing humanitarian protections without the requisite clear congressional intent to do so. Br. 34-40. But as we have explained, Gov't Br. 40-41, the statutes are readily harmonized: the immigration provisions that plaintiffs invoke apply in normally prevailing conditions in the absence of a rare public-health emergency, whereas Section 265

is an emergency public-health provision that applies only in specific, limited circumstances.

Nor do plaintiffs seriously contest the drafting history of Section 265, which demonstrates that Congress amended the statute to change the authority for a "suspension" of "immigration" to an authority for a "suspension of the right to introduce * * * persons," making clear that Section 265 authorized *both* the prohibition on immigration *and* the prohibition on tourists and other temporary visitors.  Gov't Br. 41-43.  And contrary to plaintiffs' claim, Br. 38, "a very strong argument" put forward in floor debate in favor of Section 265 was that it made "quite clear that * * * the purpose of the law" includes "the power to suspend immigration altogether," 24 Cong. Rec. 393, and that it grants "very extraordinary powers" including "a total embargo upon immigration," *id.* at 470.  Plaintiffs then argue, implausibly, that Section 265's authorization for the suspension of immigration does not include the suspension of immigration "laws."  Br. 37.

Plaintiffs also object that under the government's construction of Section 265, "there is no bar to *indefinitely* overriding the asylum statutes."  Br. 36.  By its plain terms, however, Section 265 applies only where CDC determines that the "introduction of persons or property from such country" presents a "serious danger of the introduction of such disease into the United States," and the prohibition "is required in the interest of the public health."  42 U.S.C. § 265.  Section 265 is thus

18

a limited exception that is applicable only under emergency conditions—and which has only rarely been invoked. *See* 85 Fed. Reg. 56,424, 56,426 (Sept. 11, 2020) ("This authority is available only in rare circumstances when 'required in the interest of the public health.'" (quoting 42 U.S.C. § 265)). Moreover, the CDC Order is subject to recurring 60-day reviews. 1 JA 131. Nor should the Court give any weight to plaintiffs' unsupported suggestion that the government will abuse its authority under Section 265 to "eliminate humanitarian protections whenever it deems it expedient." Br. 36; *cf. Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2011) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (quotation marks and citation omitted)). Further, plaintiffs do not dispute that the government's implementation of the CDC Order provides a process for determining a covered noncitizen's claim for protection under the Convention Against Torture (CAT). *See* Dkt. 76, at 29 n.15 (explaining that the Department of Homeland Security (DHS) will refer a noncitizen to U.S. Citizenship and Immigration Services for a CAT screening if the noncitizen claims a fear of torture); Br. 35 n.6. Thus, noncitizens would not be expelled without some opportunity to seek humanitarian relief.

Plaintiffs acknowledge that Section 265 provides for a "*suspension* of the right to introduce such persons" (emphasis added), but they argue that this

language cannot provide for the temporary suspension of immigration laws because it is found in a "dependent clause." Br. 37. Section 265's grammatical structure, however, does not undermine Congress's clear intent that it permits the temporary displacement or suspension of immigration laws that otherwise provide certain rights to noncitizens. Indeed, if plaintiffs were correct that a "dependent clause" cannot authorize the suspension of other laws, it would undermine their own theory that Congress authorized the suspension of transportation provider licenses, *see* Br. 38 n.8.

### 3. The Constitutional Avoidance Doctrine is Inapplicable.

Plaintiffs argue that Section 265 cannot include the power to expel because that authority would raise grave constitutional questions if applied to U.S. citizens. Br. 36-37. But plaintiffs do not dispute that neither the final rule nor the CDC Order applies to U.S. citizens. 42 C.F.R. § 71.40(f); 1 JA 148. Nor do plaintiffs dispute that interpreting Section 265 to permit CDC to stop persons (including U.S. citizens) from crossing the border would raise the same constitutional concerns. *See* Gov't Br. 44. Plaintiffs' only answer is to question whether Section 265 authorizes even that limited step as a statutory matter, Br. 24 n.3, which avoids the constitutional issue by construing the statute to be a virtual nullity, *see supra* p. 10.

If CDC were ever to invoke Section 265 to expel U.S. citizens (or indefinitely bar their re-entry), a court could at that point address whether such an

20

order would be unconstitutional *as applied* to U.S. citizens, *cf. Reno v. Flores*, 507

U.S. 292, 305-06 (1993), or whether constitutional concerns call for an implicit

exception for U.S. citizens, *cf. Our Lady of Guadalupe Sch. v. Morrissey-Berru*,

140 S. Ct. 2049, 2060 (2020).  This Court should not preemptively adopt a

narrowing construction of the statute that does not eliminate the very constitutional

concerns that are the purported basis for that construction.

## II.    The Remaining Preliminary Injunction Factors Do Not Support An Injunction

The district court also erred in concluding that the remaining preliminary

injunction factors weigh in favor of plaintiffs.  The preliminary injunction

threatens irreparable harm to the government and the public at large.

There can be little doubt that the district court's preliminary injunction

would increase the risk of the transmission of COVID-19 among noncitizens, U.S.

Customs and Border Protection (CBP) personnel, and the public at large.  The

injunction would require the government to hold covered family units in

congregate settings for hours or days while they undergo immigration processing,

in facilities that are not equipped for physical distancing, quarantine, or isolation at

the best of times, and that are now substantially over their COVID-restricted

capacity.  1 JA 176 ¶ 21.  CDC's discretion to respond to the public-health

emergency—including both its decision about whether to prohibit the introduction

of persons from particular countries and in what circumstances, and its authority to

21

except certain classes of people from its Order—is critical to avoiding irreparable harm to the public. CDC is scheduled to complete its next periodic review on November 30, 2021. *See* Gov't Br. at 14 (discussing CDC's recurring 60-day reviews).

Plaintiffs argue that noncitizen family units are not a "meaningful source of COVID-19." Br. 46-49. In support of this argument, plaintiffs rely on high positivity rates within the United States and border states. Br. 47-48. Plaintiffs' argument only underscores CDC's conclusion that temporarily suspending the introduction of certain noncitizens traveling from Canada and Mexico, including members of family units and single adults, "remains necessary in light of the current circumstances" and rising positivity rates. 1 JA 132, 133, 135. Rising positivity rates exacerbate the exact strain on the healthcare system that the CDC Order is meant to avoid, and CDC's expert public-health judgment is entitled to deference. Moreover, plaintiffs' observation that noncitizen members of family units are a "tiny fraction" of "cross-border traffic," Br. 48, is a meaningless comparison. The vast majority of those travelers do not require extended Title 8 processing in congregate settings—the source of the risk that CDC seeks to address—and the ones that do (*e.g.*, single adults lacking valid travel documents) are also subject to the Order. Moreover, even small numbers of contagious individuals can lead to substantial spread in crowded CBP facilities. The

injunction inhibits CDC's authority to respond effectively to changes in the public-health environment and the status of the pandemic.

Plaintiffs also fault the government for not expanding testing, vaccines, and other mitigation protocols. Br. 49-54. But plaintiffs' unfounded assertion that "DHS has simply failed to act" is undermined by the record in this case. Br. 50. DHS is moving expeditiously to implement and expand the use of robust COVID-19 mitigation measures and has been working since January 2021 to build greater capacity. *See, e.g.*, 1 JA 170 ¶ 4 (government declarant explaining that "DHS has worked tirelessly to build capacity and to create innovative new approaches to allow asylum seekers and other noncitizens to be processed in a manner that ensures * * * health and safety"); 1 JA 171-173 ¶¶ 7-12. Despite these efforts, DHS still "lacks sufficient capacity" to process all individuals seeking to enter the United States, and the problem is "particularly acute with respect to families." 1 JA 170 ¶ 5. CDC has concluded in its expert public-health judgment that the "extreme population density and the resulting increased time spent in custody by noncitizens" in CBP facilities currently pose significant risk. 1 JA 141. In addition, risk-mitigation efforts are constrained by requirements to hold various population cohorts separately, as well as resource and physical constraints that make isolation and separation of those who test positive for COVID-19 infeasible. 1 JA 141-42. The fact that certain local organizations might have available

23

capacity to receive and transport families *after* they have been processed by CBP, Br. 51, does not address the risk that the Order is meant to address, *i.e.*, the risk of spread of COVID-19 if CBP must hold family units in overcrowded CBP facilities pending immigration processing.

Plaintiffs argue that "CDC's exemption of unaccompanied children demonstrates that COVID-19 risk can be safety mitigated" for family units. Br. 50. But CDC explained that unaccompanied children "are differently situated" than single adults and individuals in family units for several reasons, including that "[t]he number of [unaccompanied children] entering the United States is smaller than both the number of [single adults] and of [members of family units]." 1 JA 145; *see also* Gov't Br. 52-53. As the government has explained, the United States "is currently encountering record numbers of noncitizens, including families, at the border," 1 JA 169 ¶ 3, and an *even greater* increase could be expected if the injunction were to be affirmed and take effect, 1 JA 156 ¶ 7; 1 JA 161 ¶ 14; 1 JA 177 ¶ 2; Gov't Br. 48. There is "an historic surge in southwest border encounters in recent months" and the "capacity challenges are particularly acute with respect to families." 1 JA 170 ¶ 5; 1 JA 174 ¶ 17; Gov't Br. 47.

Plaintiffs also contend that the vaccine mandate for federal workers and the availability of vaccines for children starting at the age of five can help mitigate the COVID-19 risks associated with processing additional family units. Br. 52. But

24

many people covered by the CDC Order originate from countries with "markedly lower vaccination rates." 1 JA 138; *see also* 1 JA 170 ¶ 3 (DHS "is also experiencing significantly increased rates of noncitizens testing positive for COVID-19"). And even if the government could vaccinate all willing and eligible members of family units encountered, that would not eliminate the potential harm given the period of time before vaccination would be effective. Nor do plaintiffs dispute that the Delta variant also increases the risk of breakthrough infections even among the vaccinated. 1 JA 135, 138.

Plaintiffs note that DHS is permitting vaccinated foreign travelers to enter the United States. Br. 53. But those travelers will not spend hours or days in congregate settings while undergoing immigration processing, unlike the noncitizens covered by the CDC Order. *See* 1 JA 143 (explaining that individuals in family units who are not expelled under the CDC Order, but who would be processed under Title 8 because of the district court injunction, would spend an average of 62 hours in custody at CBP facilities, and that "[i]f the CDC Order were not in place * * * time in custody would likely increase significantly").

Plaintiffs assert that, because in June 2021 the government was unable to apply the CDC Order to approximately 86% of individuals in family units, primarily as a result of foreign government restrictions, 1 JA 143 & n.80, enjoining application of the CDC Order to the remaining family units would not "impose a

25

substantial burden on DHS." Br. 54-58. But under the Order, the government

expelled more than 8,000 individuals in family units per month in May and June

2021, and over 10,000 and 16,000 in July and August 2021, respectively. 1 JA

174-75 ¶¶ 17-18; CBP, *Southwest Land Border Encounters*,

https://go.usa.gov/xeQ8Y (last modified Nov. 15, 2021) (interactive dashboard).

The number of individuals in family units encountered monthly has nearly doubled

from May to August 2021 (from 44,000 to 86,000), *id.*, and is expected to escalate

sharply if the preliminary injunction were to take effect, as the application of the

CDC Order has been a significant deterrent to the entry of family units who qualify

for processing under the CDC Order, 1 JA 177 ¶ 23; 1 JA 156, 161.[4] Furthermore,

two Border Patrol sectors on the Southwest Border have seen a disproportionate

share of the encounters, resulting in "extremely worrisome" statistics, with one

section at 783% over COVID-adjusted capacity as of August 2021. 1 JA 175-76.[5]

Plaintiffs also assert that the balancing of harms weighs in favor of a

preliminary injunction because noncitizens who hope to come to the United States

---

[4] Despite plaintiffs' claim of inflated statistics due to repeat crossings, Br. 54-55, their own statistics show only a 16.8% recidivism rate for family units in the first nine months of fiscal year 2021, 2 JA 462, which is dwarfed by the surge in the number of family unit encounters, 1 JA 175-76.

[5] Overcapacity or other factors might necessitate the transfer of noncitizens to other regions for processing under the CDC Order, Br. 53, but those risks from overcapacity and transfer would be substantially exacerbated if the government were required to process all noncitizen members of family units under Title 8.

but are barred from doing so, or who have been encountered in the United States and expelled under the CDC Order, have been victimized by criminal gangs in those foreign countries.  Br. 42-45.  This is a deplorable situation, and the U.S. government has been taking action to provide additional protections for vulnerable individuals subject to the CDC Order.  Of note, the United States has excepted from the Order particularly vulnerable families, in partnership with nongovernmental organizations—an effort that has resulted in the exception of over 16,000 individuals from the CDC Order.  1 JA 172 ¶ 11.  As noted by plaintiffs and certain amici, participating nongovernmental organizations have recently decided to cease assisting the U.S. government in implementing this process, which has hampered such efforts.  But the government nonetheless continues to grant case-by-case exceptions based on the totality of the circumstances, including humanitarian considerations, and will continue to do so.

The issue before the court is whether the federal government is disabled from taking quick action, based on the reasoned decision of the nation's public-health authorities, to protect the public health in circumstances that pose a risk of spread of COVID-19 not just for covered noncitizens but for CBP personnel and the U.S. public.  With all respect, the government submits that it is not.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and the preliminary injunction vacated.

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

MATTHEW M. GRAVES
*United States Attorney*

SHARON SWINGLE

/s/ Ashley A. Cheung
ASHLEY A. CHEUNG
JOSHUA WALDMAN
*Attorneys, Appellate Staff*
*Civil Division, Room 7261*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-9018*
*ashley.cheung@usdoj.gov*

November 2021

28

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,500 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Ashley A. Cheung*
Ashley A. Cheung

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2021, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of Appeals

for the District of Columbia Circuit by using the appellate CM/ECF system.

Participants in the case are registered CM/ECF users, and service will be

accomplished by the appellate CM/ECF system.

*/s/ Ashley A. Cheung*
Ashley A. Cheung